UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

<table>
<tr><td>

<u>EDEN ROGERS</u> and

BRANDY WELCH,

                                    Plaintiffs,

            -against-

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

ALEX AZAR, in his official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES;

LYNN JOHNSON, in her official capacity as
Assistant Secretary of the ADMINISTRATION
FOR CHILDREN AND FAMILIES;

STEVEN WAGNER, in his official capacity as
Principal Deputy Assistant Secretary of the
ADMINISTRATION FOR CHILDREN AND
FAMILIES;

HENRY MCMASTER, in his official capacity as
Governor of the STATE OF SOUTH CAROLINA;
and

MICHAEL LEACH, in his official capacity as State
Director of the SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,

                                Defendants.

</td><td>

Civil Action No.: _____

**COMPLAINT**

</td></tr>
</table>

       Plaintiffs Eden Rogers and Brandy Welch (collectively, "Plaintiffs"), by and

through their undersigned attorneys, for their Complaint against defendants United States

Department of Health and Human Services ("HHS"); Alex Azar in his official capacity as

Secretary of HHS; Administration for Children and Families ("ACF"); Lynn Johnson in

her official capacity as Assistant Secretary of ACF; Steven Wagner in his official

capacity as Principal Deputy Assistant Secretary of ACF; Henry McMaster in his official

capacity as Governor of the State of South Carolina; and Michael Leach in his official

capacity as State Director of the South Carolina Department of Social Services ("DSS")

(collectively, "Defendants"),[1] allege as follows:

<u>Nature of the Action</u>

1.     Plaintiffs bring this action seeking declaratory and injunctive relief

against Defendants in their official capacities for unlawfully authorizing state-contracted,

government-funded foster care agencies to use religious eligibility criteria to exclude

qualified families from fostering children in the public child welfare system.  This

practice harms vulnerable children by denying them access to the loving families they

desperately need and limits opportunities for would-be foster parents to participate in the

public child welfare system on the bases of religion and sexual orientation.  It also

violates the Establishment, Equal Protection and Due Process Clauses of the United

States Constitution.

2.     In 2018, the South Carolina Department of Social Services

determined that Miracle Hill Ministries ("Miracle Hill"), the largest state-contracted,

government-funded foster care agency in South Carolina, violated state and federal law

by restricting eligibility to prospective foster parents who are evangelical Protestant

Christians.  Miracle Hill's religious eligibility criteria for prospective foster families also

disqualify families headed by same-sex couples regardless of their faith.  Miracle Hill has

---

[1] This Complaint refers to HHS, ACF, Alex Azar, Lynn Johnson and Steven Wagner as the "Federal Defendants", Henry McMaster and Michael Leach as the "State Defendants", and all defendants collectively as "Defendants".

turned away families seeking to open their hearts and homes to children in need because they were Jewish, Catholic, same-sex couples, or otherwise failed to meet the agency's religious test.

3.     Rather than enforce state and federal laws and policies prohibiting such discrimination in the public child welfare system, the Governor of South Carolina took steps to allow the continued use of religious eligibility criteria by Miracle Hill and other agencies providing public child welfare services. As a critical, essential step, the Governor requested a waiver from the federal government to allow South Carolina to continue to receive federal funding for its public child welfare system despite violating a federal regulation barring discrimination based on non-merit factors, including religion. The United States Department of Health and Human Services granted South Carolina a waiver in January 2019. Once this hurdle was cleared, DSS issued Miracle Hill a new standard license to continue its public foster care work while allowing it to exclude countless prospective foster families that do not satisfy the agency's religious criteria.

4.     Defendants' actions have created a public child welfare system in South Carolina, funded by taxpayer dollars, in which the suitability of prospective foster parents is assessed based on religious requirements. Prospective foster parents who adhere to evangelical Protestant Christian beliefs and are heterosexual have the option of working with any state-contracted agency that serves their area. These families can choose the agency that best suits their circumstances, including Miracle Hill, which is the State's largest foster care agency. Miracle Hill receives substantial government funding and is thus able to provide comprehensive support services to foster families. Prospective foster parents who adhere to any other faiths or to no faith, or who are same-sex couples

of any faith, are offered a limited set of options from which to choose. For prospective foster parents who live in South Carolina's upstate region and do not meet Miracle Hill's religious requirements, the primary foster care agency serving the region is not available to them.

5.      By authorizing and enabling state-contracted foster care agencies to discriminate against families based on religious criteria, Defendants deny prospective foster parents like Plaintiffs, who do not share Miracle Hill's religious beliefs and are a same-sex couple, the same opportunities that are afforded to families that meet Miracle Hill's religious test. Such denial creates a practical barrier to fostering, as not all foster care agencies are equivalent or offer the same services, and also stigmatizes these families, branding them as inferior and less worthy of serving as foster parents.

6.      Moreover, this discriminatory treatment of prospective foster parents denies children access to families they need. South Carolina has a severe shortage of foster families to meet the needs of the thousands of children in State custody. Authorizing discrimination against prospective foster parents because of their faith or sexual orientation only exacerbates this shortage by making it more difficult for those families to pursue this calling. It also limits the diversity of family placement options for children, such that children may not be able to be placed with a family that shares their faith or with a same-sex couple where such a placement is desired or otherwise would be beneficial. Defendants' actions elevate the interests of the agencies above the best interests of the children whose welfare Defendants are charged with protecting.

7.      By authorizing and enabling state-contracted, government-funded foster care agencies to use religious criteria to exclude families based on their faith and

sexual orientation, Defendants' actions violate the Establishment, Equal Protection and Due Process Clauses of the United States Constitution.

<u>Parties</u>

8.     Plaintiffs Eden Rogers and Brandy Welch are prospective foster parents who were turned away by Miracle Hill because they fail to meet the agency's religious requirements.  Eden and Brandy are ready, willing, and able to serve as foster parents to children in South Carolina's public child welfare system.  At all relevant times, Plaintiffs have been, and continue to be, residents of the State of South Carolina.

9.     Defendant HHS is the federal agency that is charged with enhancing and protecting the health and well-being of people in the United States via the provision of health and human services.  Through its foster care grant administration regime, 42 U.S.C. § 671, HHS provides funds to DSS for the provision of child welfare services in the State of South Carolina.

10.     Defendant Alex Azar is the Secretary of HHS and is responsible for the administration and oversight of HHS.  Defendant Azar also has authority over ACF, a division of HHS.  Defendant Azar and his successors are sued in their official capacities.

11.     Defendant ACF is the division of HHS that is responsible for implementing certain human services programs, including those focused on fostering the economic and social welfare of youth and families.  ACF administers the federally appropriated Title IV-E Foster Care Program and provides funding to states to provide safe foster care placements to children and youth who cannot remain in their homes.

12.     Defendant Lynn Johnson is the Assistant Secretary for ACF. Defendant Johnson and her successors are sued in their official capacities.

13.     Defendant Steven Wagner is the Principal Deputy Assistant Secretary for ACF.  Defendant Wagner and his successors are sued in their official capacities.

14.     Defendant Henry McMaster is the Governor of the State of South Carolina.  Under Article IV, Section 15 of the South Carolina Constitution, the Governor is constitutionally required to "take care that the laws be faithfully executed" and, therefore, is responsible for ensuring that all South Carolina executive departments and agencies, including DSS, comply with all applicable laws.  *See S*.C. Const. art. IV, § 15 (1895).  As Governor, Defendant McMaster has controlling authority over DSS.  Defendant McMaster and his successors are sued in their official capacities.  At all relevant times, Defendant McMaster was acting under color of state law for purposes of 42 U.S.C. § 1983.

15.     Defendant Michael Leach is the Director of the South Carolina DSS, the State agency responsible for public child welfare services.  DSS contracts with private agencies, such as Miracle Hill, to provide public foster care services.  Defendant Leach and his successors are sued in their official capacities.  At all relevant times, Defendant Leach was acting under color of state law for purposes of 42 U.S.C. § 1983.

Jurisdiction and Venue

16.     This action for declaratory and injunctive relief arises under the First, Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. § 1331 (general federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights actions).

17.    Plaintiffs' claims for declaratory and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

18.    The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412 and 42 U.S.C. § 1988.

19.    Venue is proper in this district for the State Defendants under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  Venue is proper in this district for the Federal Defendants under 28 U.S.C. § 1391(e) because they are agencies of the United States and officers or employees of agencies of the United States acting in their official capacities and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

<u>Relevant Facts</u>

**A.    Foster Care in South Carolina**

20.    Approximately 4,600 children currently are in foster care in South Carolina.[2]  1,500 of those children live in the Region 1 counties of Anderson, Cherokee, Greenville, Oconee, Pickens and Spartanburg—the most of any region in the state.[3]

21.    Nationally, the total number of children in foster care has risen by more than 10% since 2012, in large part because of the opioid crisis.[4]  In South Carolina,

---

[2] S.C. Dep't of Soc. Servs., *Total Children in Foster Care on June 30, 2018-Office of Case Management* (Aug. 1, 2018), https://dss.sc.gov/media/1828/total-children-in-foster-care-on-june-30-2018.pdf (hereinafter "*Total Children in Foster Care on June 30, 2018*").

[3] *Id.*

[4] *See* Chron. of Soc. Change, *The Foster Care Housing Crisis*, https://chronicleofsocialchange.org/wp-content/uploads/2017/10/The-Foster-Care-Housing-Crisis-10-31.pdf.

the total number of children in foster care has grown by 26% since 2012—more than twice the national increase.[5]

22.    And yet, during the same period, South Carolina has experienced a decrease in the number of available foster homes, losing 16% of non-relative foster care bed capacity from 2012 to 2017.[6]

23.    South Carolina has fewer than 2,800 licensed foster care providers for the 4,600 children in the state's foster care system.[7]  For example, in Spartanburg County, which neighbors Greenville County, there are 152 licensed foster families, but 315 children who need placement.[8]

24.    Providing foster care services is a government function and, like other states, South Carolina, through DSS, contracts with, licenses, and provides State and federal funds to private agencies—both faith-based and secular—to serve as child placing agencies ("CPAs").  These CPAs recruit prospective foster parents and screen them for their suitability to obtain a foster care license.

25.    Prospective foster parents also can work directly with DSS, but doing so often means significantly longer wait times to obtain a foster care license and

---

[5] *See id.*

[6] *See id.*

[7] *See* Yonat Shimron, *S.C. Foster Care Agency Tests Public's Will to Exclude on the Basis of Faith*, Religion News Service (Jan. 30, 2019), https://religionnews.com/2019/01/30/s-c-foster-care-agency-tests-publics-will-to-exclude-on-the-basis-of-faith/.

[8] *See* Adam Orr, *Spartanburg's Children Need More Foster Families*, GoUpstate.com (May 19, 2019), https://www.goupstate.com/news/20190519/spartanburgs-children-need-more-foster-families.

significantly less support throughout the process.  One foster parent described waiting six months for a return phone call from DSS to ask questions about a foster child in her care.[9]

**B.      Applicable Statutes and Regulations**

26.      Foster care in South Carolina is governed by a comprehensive regulatory scheme dictating the requirements for the licensing, funding, and overall provision of foster care services throughout the state.  *See* S.C. Code §§ 63-9-10 to -80 (describing the general provisions of the South Carolina Adoption Act); S.C. Code Regs. § 114-550 (describing licensure for foster care); §§ 114-4910 to -4980 (describing regulations for CPAs).

27.      DSS issues a standard, one-year license to CPAs that meet all applicable regulations, and monitors CPAs to ensure their continued compliance.  *See* S.C. Code Regs. §§ 114-4920(E), 114-4930(E).

28.      If a CPA is temporarily unable to comply with an applicable regulation, DSS may grant the CPA a temporary license for up to six months, provided the CPA has a written plan to correct the areas of noncompliance within the probationary period.  A temporary license may be extended once for an additional six months after consideration of noted deficiencies.  *See* S.C. Code Regs. § 114-4930(F).

29.      DSS may deny or revoke a CPA's license if the CPA has failed to comply with licensing regulations and DSS determines that compliance cannot be accomplished within established or reasonable time limits, among other reasons.  *See* S.C. Code Regs. § 114-4930(G).

---

[9] *See* Yonat Shimron, *S.C. Foster Care Agency Tests Public's Will to Exclude on the Basis of Faith*, Religion News Service (Jan. 30, 2019), https://religionnews.com/2019/01/30/s-c-foster-care-agency-tests-publics-will-to-exclude-on-the-basis-of-faith/.

30.    The DSS Human Services Policy and Procedure Manual ("DSS

Manual") § 710 states:

> The unnecessary consideration of race, color, national origin, religion,
> state of residence, age, disability, political belief, sex, or sexual orientation
> when making decisions regarding a child's placement can result in unfair
> outcomes for prospective families and substantial delays in permanency
> for children.   The agency is committed to the exercise of non-
> discriminatory practice, and shall provide equal opportunities to all
> families and children, without regard to their race, color, and national
> origin, and religion, state of residence, age, disability, political belief, sex,
> or sexual orientation. . . .

31.    It further states that "no individual shall be denied the opportunity

to become a foster or adoptive parent on the basis of race, color, national origin, religion,

state of residence, age, disability, political belief, sex, or sexual orientation."  *Id.*

32.    DSS Manual § 730 states that "[i]n order for children to thrive

while in foster care, families must be available to meet their specific needs", and

establishes recruitment policies to "promote the availability and diversity of foster family

homes".

33.    Title IV-E of the Social Security Act authorizes HHS to provide

states with funding to assist in caring for children placed in foster care.  *See* 42 U.S.C.

§ 670.  In South Carolina, HHS directs such funds to DSS, which uses those funds, as

well as State funds, to reimburse licensed CPAs for the services they provide.

34.    As a recipient of federal funding from HHS pursuant to Title IV-E

of the Social Security Act, DSS—and any CPAs like Miracle Hill with whom DSS

contracts—must also abide by certain federal statutory and regulatory requirements.  The

Social Security Act requires states receiving federal funding to provide for the safety,

permanency, and well-being of all youth in government custody, 42 U.S.C. § 671(a)(15),

and maintain standards for family foster homes and child care institutions that are

10

"reasonably in accord with recommended standards of national organizations concerned with standards for the institutions of homes, including standards relating to admissions policies, safety, sanitation, and protection of civil rights[.]" 42 U.S.C. § 671(a)(10)(A). Professional standards regarding the treatment and placement of children in foster care are clear that discrimination against families for reasons unrelated to their ability to care for a child undermine the well-being of children by reducing the number of qualified placements for children.

35.    45 C.F.R. § 87.3 entitles faith-based organizations to participate in HHS programs—such as foster care programs—on the same basis as any other organization, but prohibits religious discrimination in the provision of services.  *See* 45 C.F.R. § 87.3(d) ("An organization that participates in any programs funded by financial assistance from an HHS awarding agency shall not, in providing services or in outreach activities related to such services, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.").

36.    45 C.F.R. § 87.3(b) also specifically prohibits agencies that receive federal funds from engaging in "explicitly religious activities" including proselytization. *Id.* ("Organizations that apply for or receive direct financial assistance from an HHS awarding agency may not support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization), as part of the programs or services funded with direct financial assistance from the HHS awarding agency, or in any other manner prohibited by law.  If an organization conducts such activities, the activities must be offered separately,

in time or location, from the programs or services funded with direct financial assistance from the HHS awarding agency, and participation must be voluntary for beneficiaries of the programs or services funded with such assistance.").

37.     Title IV-E of the Social Security Act provides:  "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— . . . not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—(A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved."  42 U.S.C. § 671(a)(18).

38.     45 C.F.R. § 75.300, which HHS promulgated pursuant to the statutory authority in 42 U.S.C. § 671, establishes additional requirements to which DSS and any subgrantee must adhere.  45 C.F.R. 75.300(a) ("The Federal awarding agency must manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements:  Including, but not limited to, those protecting public welfare, the environment, and prohibiting discrimination.").

39.     45 C.F.R. § 75.300(c) specifically provides that:  "It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age,

disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards."

40.    45 C.F.R. § 75.300(d) provides that: "In accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients [of federal funds] must treat as valid the marriages of same-sex couples."

## C.    Miracle Hill Ministries

41.    Founded in 1937, Miracle Hill is a nonprofit organization in Greenville, South Carolina, that, according to its website, provides "services to individuals and families in the form of food, shelter, clothing, counseling, personal development, addiction recovery support, and residential and foster care for children."[10]

42.    Miracle Hill "exists [so] that homeless children and adults receive food and shelter with compassion, hear the Good News of Jesus Christ, and move toward healthy relationships and stability". Miracle Hill's vision is "[t]hat each South Carolina Upstate county has adequate and accessible resources for homeless children, women, and men" and that "[c]ompassionate services point individuals to Christ and move them toward wholeness, stability, and healthy relationships".[11]

43.    Miracle Hill is South Carolina's largest provider of foster care services for children requiring nontherapeutic foster care, recruiting 15% of the state's foster families. CPAs classified as "therapeutic" serve children with complex needs, including significant emotional, behavioral, or medical needs.

---

[10] *See* Miracle Hill Website, "Who We Are", https://miraclehill.org/who-we-are/.
[11] *See id.*

44.    Specifically, according to its website, Miracle Hill assists those interested in being licensed as foster parents in the South Carolina Region 1 counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens and Spartanburg.[12]

45.    Miracle Hill is one of only a handful of nontherapeutic foster care CPAs primarily serving Region 1, which includes Greenville County, where Eden and Brandy reside.  And practically, the options are even more limited.  Of the other four agencies, one—like Miracle Hill—does not accept same-sex couples; one had no licensed foster homes as of April 2019; one is new to the field, offering foster care services only since 2017; and one is located over an hour away from Greenville.  As one Jewish parent who was turned away by Miracle Hill because of her religion put it, "in the upstate of South Carolina, if you want to be a foster parent or a mentor, there's DSS, which is the government.  And there's Miracle Hill.  There really isn't anybody else".[13]

46.    Moreover, as the largest CPA in the state—and in Region 1—Miracle Hill receives substantial government funding and has the resources to provide comprehensive support to families throughout the licensing process and beyond. Families have reported that case workers respond promptly to foster parents' inquiries, conduct regular home visits, and accompany foster parents to all court hearings.[14]

---

[12] *See* Miracle Hill Website, "Foster Care", https://miraclehill.org/how-we-help/childrens-home/foster-care/.

[13] *See* Akela Lacy, *South Carolina is Lobbying to Allow Discrimination Against Jewish Parents*, The Intercept (Oct. 19, 2018), https://theintercept.com/2018/10/19/south-carolina-foster-parent-discrimination-miracle-hill-ministries/.

[14] *See* Yonat Shimron, *S.C. Foster Care Agency Tests Public's Will to Exclude on the Basis of Faith*, Religion News Service (Jan. 30, 2019), https://religionnews.com/2019/01/30/s-c-foster-care-agency-tests-publics-will-to-exclude-on-the-basis-of-faith/.

47.    According to its website, Miracle Hill "has made it [its] mission to find Christian foster parents" and, since 1988, "has been recruiting Christian foster families—both single and married—and providing them with vital support throughout the licensing process, placements and beyond".[15]

48.    Miracle Hill's website directs those interested in becoming foster parents to complete an online form, which first requires applicants to indicate their agreement with Miracle Hill's doctrinal statement.  The form states:

> As an evangelical Christian foster care agency, we believe foster parents are in a position of spiritual influence over the children in their homes. Therefore, we require that foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement (found below and on our website at https://miraclehill.org/who-we-are/doctrinal-statement/). Before proceeding, please read our doctrinal statement. If after reading our doctrinal statement you find that Miracle Hill Foster Care is not a good fit for you, please let us connect you with another agency that can meet your needs.[16]

49.    Miracle Hill's doctrinal statement reads:

We believe . . .

- the Bible to be the only inspired, infallible, inerrant and authoritative Word of God.

- that there is one God, creator of heaven and earth, eternally existent in three distinctive persons: the Father, Son and Holy Spirit.

- in the deity and humanity of Jesus Christ; that He was born of a virgin; that we are redeemed by His atoning death through His shed blood; that He bodily resurrected and ascended into heaven and that He will come again in power and great glory to judge the living and the dead.

---

[15] *See* Miracle Hill Website, "Foster Care", https://miraclehill.org/how-we-help/childrens-home/foster-care/.

[16] *See* Miracle Hill Website, "Foster Care Inquiry", https://miraclehill.org/foster-care-inquiry-form/3/.

- in the value and dignity of all people created in God's image, but alienated from God and each other because of our sin and guilt and justly subject to God's wrath.

- that regeneration by the Holy Spirit by grace through faith is essential for the salvation of lost and sinful people.

- in the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ.

- that the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body—the church.

- God ordained the family as the foundational institution of human society. It is composed of persons related to one another by marriage, blood or adoption, and that God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship.

- God creates each person as either male or female, and these two distinct, complementary sexes, together reflect the image and nature of God."[17]

50. Miracle Hill's online form also asks for prospective foster parents to state the "church you currently attend", and to give a "brief, personal testimony of your faith/salvation in Jesus Christ".[18]

51. In accordance with its mission and doctrinal statement, Miracle Hill recruits exclusively prospective foster parents who are evangelical Protestant Christians and will not accept prospective foster parents who do not share its religious beliefs. Indeed, according to media reports, Miracle Hill has refused to work with a Jewish couple who sought to foster a child and rejected a Jewish woman who wanted to

---

[17] *See* Miracle Hill Website, "Doctrinal Statement", https://miraclehill.org/who-we-are/doctrinal-statement/.

[18] *See* Miracle Hill Website, "Foster Care Inquiry", https://miraclehill.org/foster-care-inquiry-form/3/.

volunteer to mentor foster children.[19]  And Miracle Hill turned away, because they were

Catholic, a former schoolteacher who wanted to foster a child and a family that wanted to

mentor children as a first step toward fostering.[20]

        52.     Furthermore, Miracle Hill has stated publicly that it will not accept

married, same-sex couples as foster parents.  Miracle Hill's President and CEO Reid

Lehman has stated that that policy is based on the belief that "God's design for marriage

is the legal joining of one man and one woman in a life-long covenant relationship."[21]

Moreover, by requiring prospective foster parents to subscribe to its stated belief that

marriage is the "legal joining of one man and one woman", Miracle Hill ensures no same-

sex couples will meet its requirements.

---

[19] *See* Lydia Currie, *I Was Barred from Becoming a Foster Parent Because I Am Jewish*, Jewish Telegraphic Agency, Feb. 5, 2019, https://www.jta.org/2019/02/05/opinion/i-was-barred-from-becoming-a-foster-parent-because-i-am-jewish; Angela Davis, *Scrutiny of Miracle Hill's Faith-Based Approach Reaches New Level*, Greenville News, Mar. 1, 2018, https://www.greenvilleonline.com/story/news/2018/03/01/miracle-hill-foster-care/362560002/.

[20] *See* Yonat Shimron, *S.C. Foster Care Agency Tests Public's Will to Exclude on the Basis of Faith*, Religion News Service (Jan. 30, 2019), https://religionnews.com/2019/01/30/s-c-foster-care-agency-tests-publics-will-to-exclude-on-the-basis-of-faith/; Complaint, *Maddonna v. U.S. Dept. of Health and Human Services*, No. 6:19-cv-00448-TMC (D.S.C. Feb. 15, 2019).

[21] *See* Mary Katherine Wildeman, *South Carolina Foster Care Group Defends Policy that Allows Only for Christian Foster Families*, Post & Courier (Mar. 17, 2018), https://www.postandcourier.com/health/south-carolina-foster-care-group-defends-policy-that-allows-only/article_ce9c717a-2922-11e8-a5d9-8b4e1d05f01c.html; Josh Barlow, *Path to Miracle Hill: Understanding the Legal Battle Between Civil Rights and Religious Liberty*, CGTN America (Feb. 9, 2019), https://america.cgtn.com/2019/02/08/path-to-miracle-hill-understanding-the-legal-battle-between-civil-rights-and-religious-liberty.

53.     For its part, DSS has acknowledged that Miracle Hill discriminates based on the sexual orientation of prospective foster parents and has received complaints from same-sex couples who have been turned away by the CPA.[22]

**D.     DSS's Response to Discrimination by Miracle Hill**

54.     After receiving complaints from families that were turned away by Miracle Hill for failing to meet its religious criteria, DSS investigated Miracle Hill's practices.  It "discovered that Miracle Hill's website refers to its recruitment of specifically Christian foster parents/families and that Miracle Hill's application requests information regarding a foster parent/family's religious beliefs and practice".  DSS also found that Miracle Hill's Foster Care Manual instructs its workers to inquire as to a family's particular religious belief and practices.  DSS sought to determine whether Miracle Hill "uses the information in response to these inquiries in order to assess a home for an appropriate foster care placement or if the information is used to determine whether Miracle Hill will or will not serve a foster parent or family on the basis of the family's religion."

55.     As a result of its investigation, DSS concluded that "Miracle Hill has given [DSS] reason to believe Miracle Hill intends to refuse to provide its services as a licensed [CPA] to families who are not specifically Christians from a Protestant denomination", and that "[s]uch discrimination on the basis of religion contravenes" both state and federal laws, including 45 C.F.R. § 75.300(c).  DSS also noted that Miracle Hill's foster care practices violate DSS's own policy statement, which prohibits discrimination on the basis of religion.

---

[22] *See id.*

56.     Accordingly, DSS declined to reissue Miracle Hill a standard CPA license, and, on January 27, 2018, instead issued a temporary CPA license to Miracle Hill.  This temporary license was valid for six months and would expire on July 26, 2018.

57.     DSS further required Miracle Hill to "address these concerns and issue a written plan of compliance within thirty days" of receiving the temporary CPA license.  Upon DSS's review and approval of the compliance plan, Miracle Hill would have an additional 30 days to implement the plan.  If Miracle Hill failed to address these concerns, DSS would allow Miracle Hill's temporary CPA license to expire.  Absent a CPA license, Miracle Hill would no longer be able to provide public child welfare services in South Carolina.

58.     On information and belief, Miracle Hill never issued a written plan of compliance as required by DSS.

**E.     Governor McMaster's Request to HHS and Executive Order 2018-12**

59.     After the dispute about Miracle Hill's CPA license arose between DSS and Miracle Hill, Miracle Hill reached out to South Carolina Governor McMaster for help.

60.     Rather than requiring Miracle Hill to comply with applicable state and federal nondiscrimination requirements as DSS had, Governor McMaster sought to create and obtain exemptions from such requirements to enable Miracle Hill to continue excluding prospective foster parents based on its religious criteria.

61.     On February 21, 2018, Governor McMaster sent a letter to Mr. Lehman, Miracle Hill's President and CEO, indicating that the Governor's staff had met with representatives from Miracle Hill and was "already working with [HHS] to obtain a waiver of requirements that adversely affect religious entities".

62.     On February 27, 2018, Governor McMaster requested that HHS ACF Principal Deputy Assistant Secretary Steven Wagner grant a deviation or waiver from the nondiscrimination provisions of HHS regulation 45 CFR § 75.300 "on behalf of South Carolina and faith-based organizations like Miracle Hill" operating under South Carolina's Title IV-E Foster Care Program.  Specifically, Governor McMaster "ask[ed] that [HHS] provide a deviation or waiver from its current policy to recoup grant funds from DSS if [HHS] determines the new regulations are violated by any DSS CPA contracts due to religiously held beliefs"—effectively seeking permission for South Carolina's CPAs to engage in religiously motivated discrimination while the State continues to receive federal funding for its foster care program.[23]

63.     While HHS was considering the request for the waiver, it was aware that Miracle Hill's religious criteria excluded same-sex couples.  On November 19, 2018, Lambda Legal and a coalition of organizations sent a letter to HHS Secretary Azar, copying Roger Severino, the Director of the HHS Office for Civil Rights, and ACF Principal Deputy Assistant Secretary Wagner, asking that the requested waiver be denied. Among other things, the letter flagged that Miracle Hill's religious criteria exclude a wide variety of families including those headed by LGBTQ people.  It specifically cited Miracle Hill's religious criteria, which included that foster families "have a lifestyle that is free of sexual sin (to include . . . homosexuality . . .)".

64.     While awaiting a response from HHS, on March 13, 2018, Governor McMaster issued Executive Order 2018-12, in which he stated that "faith-based

---

[23] *See* Letter from Henry McMaster to Steven Wagner, "Request for Deviation or Exception from HHS Regulations 45 CFR § 75.300(c)" (Feb. 27, 2018), https://governor.sc.gov/sites/default/files/Documents/newsroom/Scanned%20from%20E COS-XR-SH119.pdf.

CPAs associate foster parents and homes who share the same faith and should not be asked to compromise sincerely held religious beliefs in recruiting, training, and retaining foster parents", and ordered that "to the fullest extent permitted by state and federal law . . . DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs." He further directed "DSS to review and revise its policies and manuals in accordance with [the] Order and ensure that DSS does not directly or indirectly penalize religious identity or activity . . . ".[24]

65.     DSS would not issue Miracle Hill a standard CPA license unless and until HHS granted the requested waiver. On June 19, 2018, Mr. Lehman wrote to Governor McMaster's staff that "DSS continues to wait on the federal response before giving us the permanent license. Our Provisional license expires on July 25th. With the action of the legislature and the Governor's actions, I expected that if no guidance from Washington has come through by mid July that we'll receive another provisional license."

66.     As Mr. Lehman anticipated, DSS renewed Miracle Hill's temporary CPA license on July 26, 2018.

67.     On December 18, 2018, Miracle Hill sent a letter to HHS Secretary Azar asking that he "issue guidance to explain 45 C.F.R. § 75.300 does not infringe on Miracle Hill's constitutional and statutory rights and [] take steps to amend the regulation to make clear that it accommodates Miracle Hill's sincerely held religious beliefs". The

---

[24] S.C. Exec. Order No. 2018-12 (Apr. 27, 2018), https://www.scstatehouse.gov/Archives/ExecutiveOrders/exor2018-12.pdf.

letter further noted that "[Miracle Hill's] temporary license expires in a matter of weeks, and in the absence of such guidance, [DSS] will not license Miracle Hill."[25]

## F.    HHS Waiver

68.    On January 23, 2019, in a letter from HHS ACF Principal Deputy Assistant Secretary Wagner to Governor McMaster, HHS conditionally granted South Carolina an exception to the religious nondiscrimination requirements of 45 CFR § 75.300(c) (the "HHS Waiver").[26]

69.    The exception applies with respect to Miracle Hill or any other subgrantee in the South Carolina Foster Care Program that uses "religious criteria in selecting among prospective foster care parents" on the condition that Miracle Hill or any other subgrantee making use of the exception is required to refer potential foster parents that do not adhere to the subgrantee's religious beliefs to other subgrantees, or refer them to South Carolina Foster Care Program staff themselves if such staff is equipped to refer those persons to other willing subgrantees.[27]

70.    In reliance on the HHS Waiver, DSS issued a standard CPA license to Miracle Hill.  Without the HHS Waiver, Miracle Hill would not have been granted a standard CPA license to continue its foster care work.

---

[25] *See* Letter from Reid Lehman to Alex Azar, "Re: HHS regulation infringing on the First Amendment and statutory rights of faith-based community services providers." (Dec. 18, 2018), https://miraclehill.org/wp-content/uploads/2019/03/2018.12.17-complaint-letter-from-Reid-Lehman-to-Sec.-Azar.pdf.

[26] *See* Letter from Steven Wagner to Henry McMaster, "Request for Deviation or Exception from HHS Regulations 45 CFR § 75.300(c)" (Jan. 23, 2019), https://governor.sc.gov/sites/default/files/Documents/newsroom/HHS%20Response%20Letter%20to%20McMaster.pdf.

[27] *Id.*

71.    Upon information and belief, DSS has taken no further steps to prevent discrimination by Miracle Hill against prospective foster parents based on religion or sexual orientation.

72.    On March 14, 2019, Plaintiffs' counsel asked DSS to clarify its position regarding discrimination by licensed CPAs against prospective foster parents based on their sexual orientation. Specifically, Plaintiffs' counsel asked "whether it is DSS's position that the HHS waiver permits Miracle Hill and other South Carolina [CPAs] to discriminate against prospective foster or adoptive parents based on their sexual orientation if based on the agency's sincerely held religious beliefs" and "whether it is DSS's position that state-contracted child placing agencies including Miracle Hill may discriminate against prospective foster or adoptive parents based on their sexual orientation if based on the agency's sincerely held religious beliefs". Despite following up with DSS, Plaintiffs' counsel has not received a response. Although DSS is on notice that Miracle Hill will not accept prospective foster parents who are same-sex couples, upon information and belief, DSS has taken no action to require the foster care agency to comply with federal and state laws and policies barring such discrimination.

G.    **Plaintiffs Eden Rogers and Brandy Welch**

73.    Plaintiffs Eden Rogers and Brandy Welch are a same-sex couple and were married in South Carolina on November 28, 2015. At all relevant times, Eden and Brandy have been, and continue to be, residents of the Greenville, South Carolina, area.

74.    Eden is a teacher at the UU World of Children, a Montessori school in Greenville located in the Greenville Unitarian Universalist Church. Prior to

this, Eden was a teacher and a nanny for many years.  Brandy works at an accounting

firm as a cost engineer.

75.    Eden and Brandy have two daughters, ages seven and ten.

76.    Due to family challenges, Eden helped raise her siblings.  As a

result of that experience, she and Brandy have always considered fostering or fostering to

adopt a child in the foster care system.

77.    Eden and Brandy are now ready, willing, and able to become foster

parents.  They recently moved to a larger home to accommodate more children.

78.    On April 10, 2019, Eden and Brandy called Miracle Hill and left a

voicemail message indicating their interest in fostering.

79.    The following day, a representative from Miracle Hill returned

their call and spoke with Brandy.  When Brandy mentioned that they were a same-sex

couple, the representative from Miracle Hill said they should fill out the online inquiry

form and advised that the couple read about Miracle Hill on its website.  The

representative from Miracle Hill mentioned multiple times that Miracle Hill is a Christian

ministry that follows Christian values.

80.    On April 28, 2019, Eden and Brandy completed and submitted

Miracle Hill's online inquiry form for prospective foster parents.  In their submission,

Eden and Brandy indicated they are interested in foster parenthood because they "would

like for more children to know what it feels like to be unconditionally loved and to be

part of a loving family", offering to "provide a safe and loving environment".  They also

identified themselves as a same-sex couple and as members of the local Unitarian

Universalist Church.  At the time they submitted the online form, the form was not the

same form that appears on Miracle Hill's website today and did not include the text of the doctrinal statement.

81. On May 1, 2019, Sharon Betts, Foster Care Licensing Supervisor at Miracle Hill, sent an email to Eden and Brandy rejecting them as potential foster parents because, as members of the Unitarian Universalist Church, their faith "does not align with traditional Christian doctrine". "Because we feel a religious obligation to partner with foster parents who share our beliefs and who are active in a Christian church", the email stated, "Miracle Hill would not be a good fit to assist you in your quest to secure state licensure to become foster parents". Ms. Betts's email also noted that, while Eden and Brandy would be welcome to pursue other volunteer opportunities with Miracle Hill, "those who hold positions of spiritual responsibility or influence— including foster parents" are required "to share our Christian mission, motivation, and beliefs".

82. Ms. Betts's email provided a list of "agencies which may be able to assist you in your pursuit of a foster license". Of the nine agencies listed, six license families for therapeutic foster care, not the traditional foster care that Eden and Brandy seek to provide. Of the remaining three, one is the State DSS office, one has only recently started offering foster care services, and one is located over an hour away from Greenville.

83. Eden and Brandy were turned away by Miracle Hill because of their religious beliefs and, on information and belief, based on Miracle Hill's religious objection to accepting same-sex couples.

**H.    The Impact of Defendants' Actions on Children in Foster Care**

84.    By authorizing CPAs like Miracle Hill to use religious criteria to exclude prospective foster families who do not share the agency's religious beliefs, or who are same-sex couples of any faith, Defendants are denying children access to safe, stable, and loving homes they desperately need.

85.    Same-sex couples are far more likely to foster and adopt children than different-sex couples.  One in five same-sex couples is raising adopted children, compared with only 3% of different-sex couples.[28]

86.    There are 4,600 children in the foster care system in South Carolina and not enough families to care for them.[29]  This shortage results in children's being separated from their siblings, living in group homes instead of with families, and aging out of foster care without ever becoming part of a family.

87.    South Carolina's DSS recognizes that "[t]he unnecessary consideration of race, color, national origin, religion, state of residence, age, disability, political belief, sex, or sexual orientation when making decisions regarding a child's placement can result in . . . substantial delays in permanency for foster children."  DSS Manual § 710.  Thus, "[t]he agency is committed to the exercise of non-discriminatory practice . . . ."  *Id.*

88.    The major child welfare advocacy organizations in the United States uniformly oppose allowing the use of religious criteria in the public child welfare

---

[28] Shoshana K. Goldberg & Kerith J. Conron, *How Many Same-Sex Couples in the U.S. are Raising Children?*, The Williams Institute (July 2018), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Parenting-Among-Same-Sex-Couples.pdf.

[29] *Total Children in Foster Care on June 30, 2018.*

system because it undermines efforts to enlist more families to help meet the need for foster families.

89.     If prospective foster parents are turned away by a foster care agency because of their faith or sexual orientation, and there are no other agencies in the same area that provide comparable services and support, those families may decide not to move forward in their pursuit of fostering children.  That is even more likely when the agency that discriminates is the largest, best-resourced agency in the area, like Miracle Hill is in the Greenville, South Carolina, area.

90.     Even where there are comparable foster care agencies nearby, families subjected to the sting of discrimination may not be willing to reapply to foster through another agency.  And some families may not be willing to proceed at all in a system in which such discrimination is permitted.  Subjecting prospective foster families to the risk of suffering the painful and humiliating experience of government-funded discrimination—which is not erased by being able to work with another agency—creates a deterrent that denies children in the foster care system access to loving families.

91.     Professional child welfare standards therefore insist on an individualized assessment of every prospective foster parent's ability to care for a child and oppose discrimination against prospective foster parents for reasons unrelated to their ability to care for a child, such as a family's religious beliefs or sexual orientation.

92.     By authorizing Miracle Hill to discriminate against prospective foster parents who do not share its religious beliefs, or who are same-sex couples of any faith, Defendants also limit the diversity of family placement options for children in State custody.  When families are turned away because they are Jewish, Catholic, Muslim, or

members of any other faith besides evangelical Protestant Christianity, that reduces opportunities for children of those faiths to be placed with a family that shares their faith. Similarly, children for whom a same-sex couple would be the preferred or otherwise optimal placement may not receive the placement that is in their best interest.

93.    This undermines South Carolina DSS policy, which recognizes that "[i]n order for children to thrive while in foster care, families must be available to meet their specific needs" and, thus, establishes recruitment policies to "promote the availability and diversity of foster family homes".  DSS Manual § 730.

94.    Moreover, by authorizing the use of religious eligibility criteria by Miracle Hill, Defendants are supporting the impermissible proselytization of children in State custody.  Miracle Hill requires those who hold positions of spiritual responsibility or influence—including foster parents—to share its Christian mission and beliefs, in order to spread the agency's religious beliefs to the children in their care.  As Miracle Hill stated on its website, "we're a *Christian* ministry, and thus people who serve with Miracle Hill in positions of spiritual leadership or authority must embrace our Christian faith.  We can't *share* the Good News if we don't *believe* the Good News!"[30]

95.    By successfully seeking the HHS Waiver, reissuing Miracle Hill's standard CPA license, and providing Miracle Hill with government funding, the State Defendants have authorized and enabled the use of religious eligibility criteria to

---

[30] *See* Miracle Hill Website, "Foster Care FAQ," https://miraclehill.org/wp-content/uploads/2018/11/FtF-Miracle-Hill-Foster-Care-FAQ.pdf (emphases in original); *id.* ("[P]eople who don't embrace our Christian faith obviously wouldn't be a good fit for Christian leadership roles at Miracle Hill, such as in our foster-care and mentoring programs . . .").

discriminate against qualified prospective foster parents who seek to help children in South Carolina's public child welfare system, denying children access to loving families.

96.    By issuing the HHS Waiver and providing federal funding to South Carolina's foster care system in general and specifically to Miracle Hill despite the State's and the agency's violation of federal nondiscrimination regulations, the Federal Defendants have authorized and enabled the use of religious eligibility criteria to discriminate against qualified prospective foster parents who seek to help children in South Carolina's public child welfare system, denying children access to loving families.

COUNT I

First Amendment—Establishment Clause
U.S. Const. amends. I, XIV
(STATE DEFENDANTS)

97.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs one through 96.

98.    DSS has delegated to religious organizations including Miracle Hill the public function of providing foster care services to children in State custody, including recruiting and screening prospective foster parents.

99.    DSS pays these organizations with government funds for the foster care services they perform.

100.    When it came to light that South Carolina's largest state-contracted foster care agency, Miracle Hill, was excluding prospective foster parents based on religious criteria, the Governor took action to ensure that the discrimination could continue despite DSS's recognition that it violated state and federal law and policy.

101.    Once the HHS Waiver was granted to South Carolina, DSS issued a new standard CPA license to Miracle Hill, with full knowledge that Miracle Hill would continue to exclude prospective foster parents, like Eden and Brandy, based on religious criteria.

102.    Upon information and belief, DSS continues to provide government funding to Miracle Hill.

103.    Through these actions, the State Defendants have authorized a state-contracted, government-funded agency to use religious eligibility criteria when performing the delegated public function of recruiting and screening prospective foster parents for children in State custody.

104.    Through these actions, the State Defendants are using government funds for religious purposes and activities.

105.    Through these actions, the State Defendants are preferring certain religious beliefs over others and over nonreligion.

106.    Through these actions, the State Defendants are privileging religion to the detriment of third parties—both prospective foster families and children in foster care.

107.    The State Defendants' actions harm prospective foster families whose faith is other than evangelical Protestant Christianity and prospective foster families headed by same-sex couples regardless of their faith, denying them the same opportunities to foster that are available to families that meet Miracle Hill's religious requirements, and subjecting them to discrimination and stigma.  Their actions also

coerce prospective foster parents to support the specific religious beliefs of Miracle Hill so that they will be permitted to foster children through the agency.

108.    The State Defendants' actions also harm children in the foster care system by denying them access to needed families and limiting their family placement options.  Upon information and belief, their actions also harm children in foster homes supported by Miracle Hill by subjecting them to religious proselytizing and coercing them to believe and practice Miracle Hill's faith.

109.    The State Defendants acted with the predominant purpose of advancing religion.

110.    The State Defendants' actions have the predominant effect of advancing and endorsing religion.

111.    Requiring state-contracted, government-funded CPAs, like Miracle Hill, to comply with religious nondiscrimination requirements does not violate any provision of the United States Constitution, or any federal or state law, including the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 *et seq.*, and the South Carolina Religious Freedom Act, S.C. Code § 1-32-40.

112.    The State Defendants have violated and continue to violate the Establishment Clause of the First Amendment to the United States Constitution, made applicable to the states by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and made actionable against the states by 42 U.S.C. § 1983.

113.    Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

COUNT II

First Amendment—Establishment Clause
U.S. Const. amend. I
(FEDERAL DEFENDANTS)

114.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs one through 96.

115.    The Federal Defendants have authorized and enabled the use of religious eligibility criteria to discriminate against prospective foster parents, like Eden and Brandy, in the South Carolina public child welfare system by exempting the State from a federal regulation that prohibits such discrimination by recipients of federal funding and continuing to provide federal funding to South Carolina for its foster care program, with the knowledge that the State requested the exemption in order to allow Miracle Hill to turn away prospective foster parents who are not evangelical Protestant Christians.

116.    But for the HHS Waiver, the State Defendants would not have provided Miracle Hill with a standard CPA license and authorized its continued use of religious criteria in recruiting and screening prospective foster parents.

117.    Through these actions, the Federal Defendants are using government funds for religious purposes and activities.

118.    Through these actions, the Federal Defendants are preferring certain religious beliefs over others and over nonreligion.

119.    Through these actions, the Federal Defendants are privileging religion to the detriment of third parties—both prospective foster families and children in the foster care system.

120.    The Federal Defendants' actions harm prospective foster families whose faith is other than evangelical Protestant Christianity and prospective foster families headed by same-sex couples regardless of their faith, denying them the same opportunities to foster that are available to families that meet Miracle Hill's religious requirements, and subjecting them to discrimination and stigma.  Their actions also coerce prospective foster parents to support the specific religious beliefs of Miracle Hill so that they will be permitted to foster children through the agency.

121.    The Federal Defendants' actions also harm children in the foster care system by denying them access to needed families and limiting their family placement options.  Upon information and belief, their actions also harm children in foster homes supported by Miracle Hill by subjecting them to religious proselytizing and coercing them to believe and practice Miracle Hill's faith.

122.    The Federal Defendants acted with the predominant purpose of advancing religion.

123.    The Federal Defendants' actions have the predominant effect of advancing and endorsing religion.

124.    Requiring state-contracted, government-funded CPAs, like Miracle Hill, to comply with religious nondiscrimination requirements does not violate any provision of the United States Constitution, or any federal or state law, including the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and the South Carolina Religious Freedom Act, S.C. Code § 1-32-40.

125.    The Federal Defendants have violated and continue to violate the Establishment Clause of the First Amendment to the United States Constitution.

126.    Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

COUNT III

Fourteenth Amendment—Equal Protection
U.S. Const. amend. XIV
(STATE DEFENDANTS)

127.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs one through 96.

128.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states and state officials from denying any person the equal protection of the laws.

129.    The State Defendants intentionally have discriminated and continue to discriminate against prospective foster parents, like Eden and Brandy, who are not evangelical Protestant Christians, by authorizing Miracle Hill to engage in such discrimination when providing public child welfare services on the State's behalf, and continuing to fund Miracle Hill despite being aware of this conduct.

130.    The State Defendants intentionally have discriminated and continue to discriminate against prospective foster parents, like Eden and Brandy, who are same-sex couples, by authorizing Miracle Hill to engage in such discrimination when providing public child welfare services on the State's behalf, and continuing to fund Miracle Hill despite being aware of this conduct.

131.    The State Defendants' actions subject prospective foster parents, like Eden and Brandy, who are not evangelical Protestant Christians, to different and unfavorable treatment based on religion.

132.    The State Defendants' actions subject prospective foster parents, like Eden and Brandy, who are same-sex couples, to different and unfavorable treatment based on sex and sexual orientation.

133.    The State Defendants' actions subject prospective foster parents, like Eden and Brandy, to different and unfavorable treatment based on their exercise of the fundamental right to marry a person of the same sex.

134.    The discrimination against Plaintiffs based on their religion, sex, sexual orientation, and exercise of the fundamental right to marry harms them by denying them access to the same opportunities to foster children that are available to evangelical Protestant Christian families headed by a different-sex couple, and subjects them to stigma.

135.    Discrimination based on religion, sex, sexual orientation, or the exercise of the fundamental right to marry is presumptively unconstitutional and subject to heightened scrutiny.

136.    There is no constitutionally adequate justification for the State Defendants' actions.

137.    The State Defendants' actions fail any level of constitutional scrutiny because they do not rationally advance any legitimate governmental interest.

138.    There is no legitimate government interest served by denying children access to potentially qualified families based on a religious exclusion.

139.    The State Defendants have deprived and continue to deprive Plaintiffs of their rights protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

140.    Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

COUNT IV

Fifth Amendment—Equal Protection
U.S. Const. amend. V
(FEDERAL DEFENDANTS)

141.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs one through 96.

142.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from denying any person the equal protection of the laws.

143.    The Federal Defendants intentionally have discriminated and continue to discriminate against prospective foster parents, like Eden and Brandy, based on religion by issuing the HHS Waiver and authorizing the continued government funding of the South Carolina foster care system (including Miracle Hill) despite the fact that they are aware that, Miracle Hill, with the State's authorization, uses religious criteria to exclude prospective foster families.

144.    But for the HHS Waiver, the State Defendants would not have provided Miracle Hill with a standard CPA license and authorized its continued use of religious criteria in recruiting and screening prospective foster parents.

145.    The HHS Waiver is facially discriminatory with respect to religion.

146.    The Federal Defendants knew, or should have known, that the HHS Waiver would be used by Miracle Hill as a basis to discriminate against same-sex couples like Eden and Brandy.

36

147.     The Federal Defendants' actions subject prospective foster parents, like Eden and Brandy, who are not evangelical Protestant Christians, to different and unfavorable treatment based on religion.

148.     The Federal Defendants' actions subject prospective foster parents, like Eden and Brandy, who are same-sex couples, to different and unfavorable treatment based on sex and sexual orientation.

149.     The Federal Defendants' actions subject prospective foster parents, like Eden and Brandy, to different and unfavorable treatment based on their exercise of the fundamental right to marry a person of the same sex.

150.     The discrimination against Plaintiffs based on their religion, sex, sexual orientation, and exercise of the fundamental right to marry harms them by denying them access to the same opportunities to foster children that are available to evangelical Protestant Christian families headed by a different-sex couple, and subjects them to stigma.

151.     Discrimination based on religion, sex, sexual orientation, or the exercise of the fundamental right to marry is presumptively unconstitutional and subject to heightened scrutiny.

152.     There is no constitutionally adequate justification for the Federal Defendants' actions.

153.     The Federal Defendants' actions fail any level of constitutional scrutiny because they do not rationally advance any legitimate governmental interest.

154.     There is no legitimate government interest served by denying children access to potentially qualified families based on a religious exclusion.

155.    The Federal Defendants have deprived and continue to deprive Plaintiffs of their rights protected by the equal protection guarantee of the Fifth Amendment to the United States Constitution.

156.    Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

<u>Prayer for Relief</u>

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring, pursuant to 28 U.S.C. § 2201, that the State Defendants, by authorizing a state-contracted, government-funded CPA to use religious criteria to exclude prospective foster families who are not evangelical Protestant Christians and heterosexual, violate the Establishment Clause of the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

B.    Declaring, pursuant to 28 U.S.C. § 2201, that the Federal Defendants, by granting the HHS Waiver to South Carolina and enabling the use of religious criteria by a state-contracted, government-funded CPA to exclude prospective foster families who are not evangelical Protestant Christians and heterosexual, and by continuing to provide federal funding to South Carolina's foster care system in general and specifically to Miracle Hill, violate the Establishment Clause of the First Amendment to the United States Constitution and the Due Process Clause of the Fifth Amendment to the United States Constitution;

C.    Entering a permanent injunction ordering the State Defendants to cease contracting with, licensing, and funding any CPA that discriminates against

prospective foster parents based on their religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex;

D.    Entering a permanent injunction ordering the Federal Defendants to rescind the HHS Waiver and prohibiting them from granting any other waiver that would enable discrimination against prospective foster parents in any state's federally funded child welfare system based on religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex;

E.    Entering a permanent injunction directing the State Defendants to ensure that all prospective foster parents, regardless of religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex are treated equally by state-contracted, government-funded CPAs;

F.    Awarding Plaintiffs attorneys' fees, costs, and disbursements incurred as a result of this action; and

G.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

May 30, 2019

/s/Susan K. Dunn

SUSAN K. DUNN


Susan K. Dunn (Federal Bar No. 647)
American Civil Liberties Union
of South Carolina Foundation
P.O. Box 20998
Charleston, SC 29413
(843) 282-7953
sdunn@aclusc.org

Peter T. Barbur*
Katherine D. Janson*
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pbarbur@cravath.com
kjanson@cravath.com

Leslie Cooper*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
lcooper@aclu.org

Daniel Mach*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org

M. Currey Cook*
Karen L. Loewy*
Cathren Cohen*
Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ccook@lambdalegal.org
kloewy@lambdalegal.org
ccohen@lambdalegal.org


South Carolina Equality Coalition, Inc.
M. Malissa Burnette (Federal Bar No. 1616)
Nekki Shutt (Federal Bar No. 6530)
Burnette Shutt McDaniel
912 Lady Street, 2nd floor
P.O. Box 1929
Columbia, SC 29202
(803) 850-0912
mburnette@burnetteshutt.law
nshutt@burnetteshutt.law


*Attorneys for the Plaintiffs*

* *Pro hac vice* application forthcoming