**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Eden Rogers et al., | ) | |
| Plaintiffs, | ) | Civil Action No. 6:19-cv-01567-TMC |
| | ) | |
| v. | ) | **DEFENDANT HENRY MCMASTER'S** |
| | ) | **MOTION TO DISMISS**[1] |
| United States Department of Health and | ) | |
| Human Services, et al., | ) | Oral Argument Requested |
| Defendants. | ) | |

Defendant Henry McMaster ("Governor McMaster"), in his official capacity as Governor of

South Carolina, files this Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6) because Plaintiffs lack standing to assert their proffered claims and have failed to allege

facts sufficient to constitute a cause of action upon which relief could be granted.

### INTRODUCTION

The factual scenario underlying Plaintiffs' complaint is not new, unusual, or unique to

South Carolina. For hundreds of years, in South Carolina and across the nation, state and federal

governments have partnered and contracted with faith-based providers of social services whose

work is compelled by, and is itself an exercise of, their religious faith. And for hundreds of years,

these partnerships have been widely and rightly acknowledged to be constitutionally permissible.

Last year, however, a federal regulation threatened to prevent many faith-based organizations

from continuing their long-standing efforts to help children in need. Governor McMaster responded

by requesting a waiver from the federal agency responsible for the regulation and by directing South

Carolina agencies to refrain from discriminating against faith-based organizations solely on the basis

of their religious beliefs. For this, Plaintiffs charge him with two constitutional violations. Both

should be dismissed for the reasons summarized briefly here and explained in more detail below:

- Plaintiffs' claims fail because Plaintiffs lack standing. They have alleged no cognizable
  injury; the injury they allege is not fairly traceable to the Governor's actions; and the relief
  they request will not redress the alleged injury. Indeed, the complaint reveals the
  Governor's challenged actions have not prevented or even hindered Plaintiffs from pursuing
  their claimed desire to foster children. Plaintiffs also lack taxpayer standing (which does

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein,
and, accordingly, a separate supporting memorandum would serve no useful purpose.

not apply to their Equal Protection claim) to assert an Establishment Clause claim because the Governor's challenged acts are discretionary executive actions, not legislative appropriations. The ephemeral doctrine of stigmatic injury proves no more useful because it does not relieve Plaintiffs' burden to prove a concrete injury traceable to the Defendants' conduct. Here, Plaintiffs' alleged injury—their supposedly disparate treatment—cannot suffice when they admit the state itself and other private providers would gladly accept their application.

- Even if Plaintiffs had standing, their Equal Protection claim should be dismissed because (i) Governor McMaster's actions did not discriminate on the basis of religion, (ii) any alleged discriminatory conduct by a private foster care agency cannot be attributed to him, and (iii) his actions are rationally related to legitimate government interests.

- Plaintiffs' Establishment Clause claim should also be dismissed because the Supreme Court and lower courts have repeatedly upheld the constitutionality of government accommodation of and contracting with religious entities. Indeed, only two months ago, the Supreme Court noted that when (as here) a government action merely continues a long-standing and historically accepted recognition or accommodation of religion, it does not violate the Establishment Clause. Even under the outdated test established by *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Governor's actions are permissible because (i) they serve the secular purposes of maximizing opportunities for foster child placement and avoiding violation of private agencies' rights, (ii) they do not have the primary purpose of advancing religion, as they merely remove a burden on religious exercise, and (iii) they do not entangle government with religion, but rather effectuate a cleaner separation between them.

- Plaintiffs' repeated references to their sexual orientation and implication that Governor McMaster authorized invidious discrimination on the basis of orientation is both facially unsupportable and irrelevant to the disposition of this suit because (i) the Governor's challenged actions did not seek or provide authorization for private agencies to differentiate between applicants on the basis of orientation, and (ii) the complaint itself concedes that the private agency Plaintiffs applied to referred them to another provider *based on their religious beliefs and affiliation*, not based on their orientation.[2]

## I.    STATEMENT OF THE FACTS.[3]

### A.    Foster care in South Carolina.

The South Carolina Department of Social Services ("DSS"), which is tasked with caring for South Carolina children in its foster care system, oversees the training, licensing, and supervision of foster homes and residential foster facilities in the state. Consistent with

---

[2] Accordingly, the alleged discrimination in this suit is indistinguishable from that alleged in a related suit, *Maddonna v. U.S. Dept. of Health and Human Servs., et al.*, No. 6:19-cv-00448-TMC (D.S.C.).

[3] The facts set out herein are the same facts alleged by Plaintiffs—they are drawn from the allegations of the complaint and the documents relied on and incorporated by reference therein. *See generally Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion to dismiss into one for summary judgment). The court's resolution of the Motion to Dismiss need not rely on any facts outside those sources or determine the veracity of the facts alleged therein.

longstanding historical practice, DSS contracts with Child Placing Agencies ("CPAs")—private entities that recruit, train, and supervise foster homes and assist in the placement of children into those homes, *see generally* S.C. Code Ann. Regs. 114-4910 to -4980—and reimburses them for their services. DSS issues qualifying CPAs a standard one-year license or a temporary license that allows a CPA to continue to operate while working to correct any noncompliance with regulation, *see id.* 114-4930(E)–(F), and DSS may deny or revoke licenses for violations of the licensing statute or licensing regulations, *see id.* 114-4930(G)(1)(b), (d).

Licensed CPAs perform a number of valuable services: they monitor foster homes, recommend revocations of foster home licenses, select foster homes for child placement, and develop and supervise the implementation of case plans for children placed in foster homes. *See id.* 114-4980(A)–(D). A prospective foster parent's application to be licensed as a foster parent, however, is directed to DSS; the decision of whether to grant a license to the applicant is the sole prerogative of DSS. *See id.* 114-4980(A)(2)(d) and (A)(3)(b).  A number of CPAs with whom DSS contracts are private religious entities that gladly serve children of every race, color, national origin, creed, disability, sex, age, political belief, sexual orientation, and gender identity. Many faith-based CPAs see their charitable work as a religious ministry, and they view the upbringing of children and care of orphans as religious duties. *See* Stephen B. Presser, *The Historical Background of the American Law of Adoption*, 11 J. FAM. L. 443, 480 (1972) (noting the "intense religious devotion" and "zeal," "which seems to have motivated many of the men and women who were active in the reforms made for the care of dependent children"). Accordingly, while they serve children of every background and situation, many faith-based CPAs believe they should only hire employees and recruit, train, and supervise foster homes that share their religious mission and beliefs. DSS has allowed faith-based CPAs the freedom to protect the integrity of their ministries by making employment and associational choices based on their beliefs.

One such CPA is Miracle Hill Ministries ("Miracle Hill"). Miracle Hill is a faith-based organization that serves the homeless, hungry, and needy in upstate South Carolina. Besides serving the homeless in nine shelters and providing recovery centers for those seeking to overcome addictions, Miracle Hill helps hundreds of foster children by supporting over 200 families licensed

as foster homes by DSS. For 80 years, Miracle Hill has gladly served anyone in need, regardless of race, color, ethnicity, national origin, age, sex, disability, religion, sexual orientation, or identity. Miracle Hill's ability to do so nearly changed last year.

### B.    Recent regulatory events.

Because South Carolina receives reimbursements for certain foster-care expenditures from the U.S. Department of Health and Human Services ("HHS"), the state was forced to reassess its practices with regard to faith-based CPAs after HHS issued new regulations in the waning days of the Obama administration. Specifically, in January 2017, HHS amended regulations implementing Title IV-E of the Social Security Act to require that states receiving Title IV-E funds ensure they are expended in a way that does not discriminate on the basis of religion or sexual orientation. Although Title IV-E prohibits discrimination only "on the basis of the race, color, or national origin," *see* 42 U.S. Code § 671(a)(18), the amendment added a new subsection to the regulation governing recipients of Title IV-E funds:

> It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion . . . or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

45 C.F.R. § 75.300(c). This new regulation purported to apply both to DSS (as a recipient of Title IV-E funds) and to CPAs (as sub-recipients of Title IV-E funds). *See* 45 C.F.R. §§ 75.101(b)(1), 1355.30(i). Thus, when the time came for faith-based CPAs, such as Miracle Hill, to renew their licenses for 2018, DSS determined it would only issue temporary licenses. (*See* Compl. ¶¶ 54–57.)

In response, on February 27, 2018, Governor McMaster, in his official capacity, wrote to HHS seeking a deviation or waiver from the new regulation. (*See* Letter from Governor McMaster to Steven Wagner, HHS Acting Assistant Secretary (Feb. 27, 2018), attached hereto as **Exhibit A**.)[4] His request was motivated at least in part by the fact that the new regulation would require HHS to recoup funds from DSS if HHS determined DSS's contracts with faith-based CPAs

---

[4] (*See* Compl. ¶ 3 (describing the letter as "a critical, essential step"); *id.* ¶¶ 62, 95, 100–10, 129–33).

violated the new regulations. (*See id*.) Governor McMaster further explained that "faith-based CPAs are essential as our State needs more CPAs to recruit more families" for foster care, and that religious providers have been serving in that role "for years." (*Id.* at 1.) The new regulations adopted by HHS, the Governor noted, "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," which violates the CPAs' constitutional rights as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb to 2000bb-4. (*Id.* at 2.) Governor McMaster also directed HHS's attention to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), which had been decided by the Supreme Court after HHS amended its regulations, and which "made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." (*Id.*) A deviation, Governor McMaster explained, would protect the rights of faith-based CPAs and, more importantly, would maximize the number of available foster homes, as faith-based CPAs are some of the largest providers of foster families. (*See id.* ("South Carolina needs to continue growing our CPAs, not prevent them from serving our State's children.").)

Shortly after seeking a deviation from HHS, Governor McMaster issued Executive Order No. 2018-12. The Order affirmed the well-founded principle that "faith-based organizations may retain their religious character and participate in government programs," a right protected by the First Amendment to the U.S. Constitution, by the analogous provision of the South Carolina Constitution, and by the South Carolina Religious Freedom Act of 1999, S.C. Code Ann. §§ 1-32-10 to -60. (*See* Exec. Order No. 2018-12 (Mar. 13, 2018), at 1, attached hereto as **Exhibit B**).[5] The Order also acknowledges the historical fact that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing constitutionally permissible practice" and that faith-based CPAs "fulfill[] a crucial need for the State and provid[e] a critical service to the children of South Carolina." (*Id.* at 2.) Mindful that "DSS licenses many CPAs and provides a variety of CPA options from which foster parents may choose," the Order recognizes that "faith-based CPAs should not be asked to compromise sincerely held religious

---

[5] (*See* Compl. ¶ 64 and n.24 (quoting and citing to the Executive Order, which is available online).

beliefs in recruiting, training, and retaining foster parents" and should be able to freely "associate [with] foster parents and homes who share the same faith." (*Id.*) In short, "religious observers and organizations should not be required to sacrifice the tenets of their faith to serve the children of South Carolina," especially when doing so would only decrease the availability of desperately needed foster homes. (*Id.*) Accordingly, the Order directs DSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "review and revise its policies and manuals" to "ensure that DSS does not directly or indirectly penalize religious identity or activity" in issuing licenses. (*Id.* at 3.)

On January 23, 2019, HHS responded to Governor McMaster's request for a deviation from 45 C.F.R. § 75.300(c). (*See* Letter from Steven Wagner, Principal Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs., to Governor Henry McMaster (Jan. 23, 2019), attached as **Exhibit C**.)[6] The response noted Governor McMaster's concerns about the decrease in available foster homes that would result if HHS enforced the new regulation against faith-based CPAs as well as his concerns that enforcement would unlawfully force faith-based CPAs to either abandon their religious beliefs or forego licensure. (*See id.* at 1–2.) HHS understood that faith-based CPAs, such as Miracle Hill, faced imminent revocation of their licenses unless they agreed to abandon their religious beliefs, which, as HHS recognized, CPAs such as Miracle Hill plainly would refuse to do. (*See id.* at 2.) After reviewing this information, HHS determined that requiring subgrantees who use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable under RFRA." (*Id.* at 3.) Accordingly, HHS granted the deviation Governor McMaster requested. (*See id.* at 4.)

### C. Allegations in the Complaint.

The allegations in Plaintiffs' complaint illustrate the necessity of the deviation Governor McMaster requested and the Order he issued affirming faith-based CPAs' right to make associational decisions based on their religious beliefs. As Plaintiffs allege, South Carolina desperately needs foster homes to serve the growing number of children in its foster-care system.

---

[6] (*See* Compl. ¶¶ 3, 5–7, 68–72, 96, 115–20, 143–49).

(*See* Compl. ¶¶ 6, 20–23, 84, 86.) Miracle Hill, one of the largest CPAs in the state, performs vital foster-home recruitment as well as other foster-care services, including comprehensive training and support for foster parents. (*See id.* ¶¶ 4, 43, 46, 89, 100.) Without Miracle Hill and other faith-based CPAs, the state's foster-care services would be strained even further than they already are.

Miracle Hill gladly serves any adult or child in need, regardless of his or her race, color, ethnicity, national origin, age, sex, disability, religion, lack of religion, orientation, or identity, and Miracle Hill gladly works with volunteers without regard to such factors. (*See id.* ¶¶ 41–42).[7] As part of its religious faith and practice, however, Miracle Hill believes that those it places in positions of spiritual influence—including foster parents and mentors—must share its religious beliefs, mission, and motivation. (*See id.* ¶¶ 47–51, 81). Miracle Hill makes no secret of its strongly and sincerely held religious beliefs, including its conviction that those whom it places in positions of spiritual influence and formation should share those beliefs. It has acknowledged these beliefs on its website; it has explained them in its application forms and foster-care manual; its officers and employees politely and respectfully discuss them with prospective foster parents; and its leaders emphasize them in staff training. (*See id.* ¶¶ 48–51, 54, 81–82.)

Plaintiffs acknowledge they do not share  Miracle Hill's religious beliefs. (*See id.* ¶¶ 5, 8, 84, 92.) After Plaintiffs contacted Miracle Hill regarding an interest in fostering, Miracle Hill requested that they complete an online inquiry form. (*See id.* ¶¶ 78–79.)  As it has done consistently in similar circumstances (*see id.* ¶¶ 2, 45, 51), when Miracle Hill learned Plaintiffs did not share its deeply-held religious beliefs and did not attend a Christian church, Miracle Hill politely informed Plaintiffs they should seek licensure through another CPA or through DSS, and provided Plaintiffs with a list of nine other CPAs in the area. (*See id.* ¶¶ 81–82.) Miracle Hill explained it "feels a religious obligation to partner with foster parents who share [Miracle Hill's] beliefs and who are active in a Christian church" as well as its religious belief that "those who hold positions of

---

[7] *See also* Miracle Hill Ministries, Introduction to Foster Care, http://miraclehill.org/how-we-help/childrens-ministries/foster-care/ (last visited August 19, 2019). Notably, Plaintiffs' complaint contains copious references to Miracle Hill's website. (*See* Compl. ¶¶ 41–42, 44, 47–50, 94.)

spiritual responsibility or influence—including foster parents"—should "share [Miracle Hill's] Christian mission, motivation, and beliefs." (*Id.* ¶ 81.)

As evident from the factual allegations of the complaint itself, Miracle Hill's decision to refer Plaintiffs to other providers was not due to Plaintiffs' sexual orientation. Rather, Miracle Hill referred Plaintiffs to other CPAs because Plaintiffs are not members of a Christian church and do not share Miracle Hill's religious beliefs. Despite this admitted fact, Plaintiffs' complaint is replete with irrelevant speculation regarding possible motivations Miracle Hill *might* have had other than its clearly-stated reasons for referring Plaintiffs elsewhere.

Although Plaintiffs were aware of other opportunities to foster through other CPAs in their area or with DSS directly (*see id.* ¶¶ 4, 24–25, 45, 82, 90), they admit they have made no attempt whatsoever to do so (*see id.* ¶¶ 8, 77; *see also* ECF No. 38 at 13–15 (citing Compl. ¶¶ 8, 75, 77, 90)). Instead, less than a month after receiving Miracle Hill's response, Plaintiffs filed a 40-page complaint in federal court with the backing of three advocacy groups and two law firms and supported by a team of ten lawyers from across the country.

Plaintiffs complaint asserts two claims against Governor McMaster, alleging the actions he has taken to maximize foster-care opportunities for South Carolina's disadvantaged children and to protect the free-exercise and associational rights of South Carolina's faith-based CPAs prevented Plaintiffs from obtaining licensure through the only CPA they deigned to approach, which, they claim, violates the Establishment Clause and the Equal Protection Clause. (*See id.* ¶¶ 97–113, 127–40.)

## II.    ARGUMENT.

### A.    Plaintiffs lack standing.

"Standing implicates the court's subject-matter jurisdiction and may be challenged in a motion to dismiss under Rule 12(b)(1) . . . ." *Meyer v. McMaster*, No. 3:19-cv-00173, ___ F. Supp. 3d ___, 2019 WL 2394051, at *5 (D.S.C. June 6, 2019) (quoting *Heindel v. Andino*, 359 F. Supp. 3d 341, 351 (D.S.C. 2019)). When ruling on a motion to dismiss for lack of standing, the court must accept the material allegations in the complaint and construe them in the plaintiff's favor, *see Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019), but the court may

consider evidence outside the pleadings without converting the motion to one for summary judgment, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

"In order to satisfy the standing requirements of Article III of the Constitution, a plaintiff must demonstrate that: (1) [she] has suffered an injury in fact; (2) the asserted injury in fact is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely rather than just conjectural that the asserted injury in fact will be redressed by a decision in the plaintiff's favor." *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)). "The party invoking federal jurisdiction has the burden of establishing all three elements of standing." *Smith v. Catamaran Health Sols., LLC*, 205 F. Supp. 3d 699, 705 (D.S.C. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Here, Plaintiffs have failed to carry their burden, and the claims against Governor McMaster must be dismissed.

  1.  *Plaintiffs may not base their standing on mere speculation and conclusory statements.*

Plaintiffs bear the burden of establishing standing, and "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *Lujan*, 504 U.S. at 561) (alteration in original). In a facial challenge to the complaint at the motion to dismiss stage, the factual allegations upon which Plaintiffs assert standing are assessed under the same standard they would be assessed in addressing their sufficiency under a Rule 12(b)(6) motion to dismiss. *Id.*; *see also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). Under that standard, although the court must "accept all *well-pleaded* facts in a complaint and construe them in the light most favorable to the plaintiff[s,] . . . legal conclusions pleaded as factual allegations, 'unwarranted inferences,' 'unreasonable conclusions,' and 'naked assertions devoid of further factual enhancement' are not entitled to the presumption of truth." *Wikimedia Found.*, 857 F.3d at 208 (emphasis added) (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)); *see Beck*, 848 F.3d at 270 (refusing to "apply the . . . presumption of truth to 'conclusory

statements' and 'legal conclusions' contained in [the plaintiffs'] complaint" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

Where, as here, a plaintiff's standing theory hinges on the independent actions of a private third party that is not a named defendant in the litigation, failure to allege sufficient factual matter to support the traceability (or causation) and redressability elements of standing can be particularly problematic. As the Fourth Circuit recently noted, drawing conclusions about non-party conduct "requires speculation into the subjective motives of independent actors who are not before the court," which "undermin[es] a finding of causation," as "the link" between the actors' motives and the alleged injury "is simply too attenuated." *In re Trump*, 928 F.3d 360, 375–76 (4th Cir. 2019) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 42–43, 45–46 (1976); *Linda R.S. v. Richard D.*, 410 U.S. 614, 615–19 (1973); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002); *Am. Soc. of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 150 (D.C. Cir. 1977)). This is so, in part, "because the third parties may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct." *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (citing *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 448 (D.C. Cir. 2013)). Thus, "mere unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016).

Here, Plaintiffs' complaint fails to plausibly allege a number of facts on which they attempt to assert standing. *First*, Plaintiffs fail to plausibly allege that Miracle Hill made its decision to refer them to other CPAs and DSS based on Plaintiffs' sex, sexual orientation, or status as a same-sex married couple. Although Plaintiffs scatter such references liberally throughout their complaint in an attempt to inject irrelevant, but controversial, issues into their case, most of this language involves speculation that Miracle Hill discriminates on these bases *in general*, and *not* that it made the specific decision to refer Plaintiffs elsewhere based on their sex, sexual orientation, or marital status. (*See* Compl. ¶¶ 1–2, 4–7, 45, 52–53, 63, 71–72, 84–85, 89, 92, 107, 120, 130, 132–33, 146, 148–49.) When it comes to the specific actions Miracle Hill took that are at issue in this case,

Plaintiffs provide only speculative, conclusory allegations that are not entitled to the presumption of truth. (*See id.* ¶ 83 ("[Plaintiffs] were turned away . . . , on information and belief, based on Miracle Hill's religious objection to accepting same-sex couples"); *id.* ¶¶ 134, 150 (speculating, without factual elaboration, the "discrimination against Plaintiffs based on their . . . sex, sexual orientation, and exercise of the fundamental right to marry")); *see also Wikimedia Found.*, 857 F.3d at 208; *Beck*, 848 F.3d at 270. The speculative, conclusory nature of these allegations fails to meet the plausibility standard, and they are even more implausible given the fact that Miracle Hill expressly asserted a different reason for its decision, namely that Plaintiffs are not members of a Christian church and do not share Miracle Hill's Christian mission, motivation, and beliefs. (*See* Compl. ¶ 81–82); *see also In re Trump*, 928 F.3d at 375–76; *Massy v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) ("[Courts] are not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)).

      *Second*, even assuming *arguendo* that Plaintiffs have sufficiently alleged Miracle Hill made its decision based on Plaintiffs' sex, sexual orientation, or marital status, Plaintiffs fail plausibly to allege that Miracle Hill did so *because* of the actions of Governor McMaster that they challenge. Again, Plaintiffs' allegations that Governor McMaster "authorized" discrimination based on sex, sexual orientation, or marital status are conclusory and not entitled to the presumption of truth. (*See* Compl. ¶¶ 5–7, 84, 92, 130; *id.* at 38 (Prayer for Relief A)); *see also Wikimedia Found.*, 857 F.3d at 208; *Beck*, 848 F.3d at 270. And, again, these conclusory allegations merit even more suspicion given the actual text of Governor McMaster's letter requesting an HHS deviation and the Executive Order, which nowhere contemplate, let alone "authorize," discrimination on these bases. (*See* Ex. A; Ex. B); *see also In re Trump*, 928 F.3d at 375–76; *Massy v. Ojaniit*, 759 F.3d at 353. Further, these allegations simply draw a too-attenuated line between Governor McMaster's actions that Plaintiffs challenge and the reason for Miracle Hill's decision. In other words, Plaintiffs' allegations in this regard amount to nothing more than "mere unadorned speculation as to the existence of a relationship" between Governor McMaster's and Miracle Hill's actions and thus "will not suffice" for purposes of standing. *See Scenic Am.*, 836 F.3d at 50.

*Third*, Plaintiffs' allegations that Miracle Hill uses public funding to proselytize foster children and that Governor McMaster authorized this practice should not be accorded the presumption of truth because they are conclusory and the product of gross speculation.[8] Nothing in Plaintiffs' complaint provides the factual enhancement needed to make Plaintiffs' naked assertions in this regard plausible. (*See* Compl. ¶¶ 94, 108); *see also Wikimedia Found.*, 857 F.3d at 208. And, yet again, neither Governor McMaster's deviation request nor his Executive Order contemplate or authorize the use of public funds for proselytization of any kind (*see* Ex. A; Ex. B); *see also In re Trump*, 928 F.3d at 375–76; *Massy v. Ojaniit*, 759 F.3d at 353, and Plaintiffs' attempt to attribute Miracle Hill's alleged proselytizing activity to Governor McMaster's actions with nothing more than unadorned speculation fails, *see Scenic Am.*, 836 F.3d at 50.

### 2.     Plaintiffs have not alleged a cognizable injury.

The injury-in-fact required for standing purposes must consist of "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent" as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. The interest that Plaintiffs allege has been invaded is their ability to foster through a specific, private CPA of their choice. (*See* Compl. ¶¶ 1, 4–5, 107, 120, 134, 150.)[9] However, there is no constitutionally protected right to become a foster parent by means of volunteering *with a CPA of one's own choosing*. *See Smith v. Org. of the Foster Families for Equality & Reform*, 431 U.S. 816, 844–47 (1977); *Rivera v. Marcus*, 696 F.2d 1016, 1020 & n.8 (2d Cir. 1982); *Ross v. Cecil Cty. Dep't of Social Servs.*, 878 F. Supp. 2d 606, 619 (D. Md. 2012). There is also no constitutional right for prospective foster parents to force a faith-based entity to associate with them merely because the entity is licensed by the state to perform foster-care services. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) ("'Freedom of association plainly presupposes a freedom not to associate.'") (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609,

---

[8] Speculation regarding the proselytization *of foster children* is also patently irrelevant (and thus intentionally inflammatory) because it is unrelated to any putative injury to *Plaintiffs*.

[9] Plaintiffs do not and cannot plausibly allege that the Governor's actions actually prevented them from becoming foster parents. Had they wished to pursue their claimed desire, they could have done so with other private CPAs or DSS itself and could likely be fostering a child right now.

623 (1984)). In the absence of a legally protected interest, Plaintiffs cannot show an injury sufficient for standing, and their claims should be dismissed on this basis.

Plaintiffs' attempts to ground their standing on *someone else's* alleged injuries are unavailing. In their complaint, Plaintiffs appear to seek redress for injuries that they speculate are incurred by foster children (*see* Compl. ¶¶ 1, 6, 84, 90, 92–93, 95–96, 106, 108, 121, 138, 154), including their conjecture, based on nothing more than unsupported "information and belief," that Defendants allow Miracle Hill to subject foster children to religious proselytization (*see id.* ¶¶ 94, 108, 121). However, to the extent Plaintiffs seek relief for alleged injuries to this group, they first must show that they are "among the injured" group. *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)); *see Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties."). Here, Plaintiffs have not alleged they among the group—foster children—that are alleged to have suffered these injuries or even that they themselves have actually suffered them. In fact, the complaint demonstrates Plaintiffs are not among this group (*see* Compl. ¶¶ 8, 73–77), and they do not allege they were proselytized. They have no standing to bring claims based on hypothetical injuries to group they do not belong to.

### 3. *Plaintiffs' alleged injuries are not fairly traceable to Governor McMaster.*

Plaintiffs have also failed to allege injuries that are fairly traceable to Governor McMaster because they do not account for "a fundamental tenet of standing doctrine: where a third party such as a private [organization] makes the independent decision that causes an injury, that injury is not fairly traceable to the government." *Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)). Indeed, "when the 'asserted injury arises from the government's allegedly unlawful . . . lack of regulation[] of *someone else*,' satisfying standing requirements will be 'substantially more difficult . . . because 'the existence of . . . the essential elements of standing depends on the *unfettered choices made by independent actors not before the courts* and whose exercise of broad and legitimate

discretion the courts cannot presume either to control or to predict.'" *Frank Krasner Enters. Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234–35 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562).

Courts have consistently "denied standing because the actions of an independent third party, who was not a party to the lawsuit, stood between the plaintiff and the challenged actions." *Id.* at 235. Thus, where an executive order allows a private third-party actor to make a donation and safeguards the independence of that action by removing financial incentives for the actor to decide either in favor of or against donation, injuries arising from the donation are not traceable to the executive order because "the connection between injury and policy is a 'purely speculative' one." *Doe v. Obama*, 631 F.3d at 162. Similarly, where a private third-party entity with discriminatory enrollment policies is alleged to have wrongfully received tax-exemption benefits, injuries arising from the discriminatory policies are not traceable to the government's conferral of benefits, in part because "it is entirely speculative . . . whether withdrawal of the [benefits] . . . would lead the [private entity] to change its policies." *Allen*, 468 U.S. at 758.

Here, the independent actions of Miracle Hill stand between Plaintiffs and the actions of Governor McMaster that they attempt to challenge. In both seeking an HHS deviation and issuing Executive Order No. 2018-12, Governor McMaster ensured that faith-based CPAs such as Miracle Hill would have unfettered discretion to choose the employees, volunteers, and foster parents they would associate with. Indeed, unlike Plaintiffs' proposed remedy, which would force faith-based CPAs to abandon their sincerely-held beliefs, Governor McMaster's policies impose no incentive one way or the other on Miracle Hill's decision whether to accept Plaintiffs as foster parents or else to direct them to other CPAs or DSS to obtain licensure. Because these policies safeguard the independence of Miracle Hill's decisions, Plaintiffs' alleged injuries arising from those decisions are not fairly traceable to the policies. *See Doe v. Obama*, 631 F.3d at 162; *see also Meyer*, ___ F. Supp. 3d at ___, 2019 WL 2394051, at *7 (explaining that, even where official policies "create barriers" to a private third party's service to consumers, "ultimately, it is [the third party] that has made the decision" not to offer the service "*when it is not completely foreclosed from doing so under the [policy]*"). Additionally, because it is speculative, at best, that the reversal of Governor McMaster's policies challenged by Plaintiffs would lead Miracle Hill to associate with those, like

Plaintiffs, who do not share its beliefs, alleged injuries arising from Miracle Hill's associational practices cannot be fairly traced to Governor McMaster's policies for purposes of standing analysis. *See Allen*, 468 U.S. at 758.

Further, where putative injuries are caused by the independent actions of an intervening third party, establishing traceability to a governmental policy is even more difficult when the policy *does not*, by its own terms, authorize or permit the third party's actions. *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 450–53 (D.C. Cir. 1998) (en banc) (Sentelle, J., dissenting) (explaining injury is traceable when it "arose from conduct on the part of a regulated entity whose conduct was *expressly* authorized by some regulation enacted by the sued regulator" and that traceability is lacking where the plaintiff "has pointed to no such express authorization of any conduct that inflicts his alleged injuries"); *see also San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (finding harm of increased price not traceable to statute because, although the statute "may tend to restrict supply, nothing in the [statute] directs [third parties] to raise the price"), *quoted with approval in Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012); *accord Calvey v. Obama*, 792 F. Supp. 2d 1262, 1270–71 (W.D. Okla. 2011). And demonstrating traceability is particularly difficult when the plain terms of the challenged government policy actually *forbid* the third party's independent actions that are supposed to have caused the putative injury. *See Mirant Potomac River, LLC v. U.S. Envtl. Prot. Agency*, 577 F.3d 223, 229 (4th Cir. 2009) (finding no standing where "plain language" of challenged regulations "explicitly prohibit" conduct allegedly causing injury); *Carcaño v. Cooper*, 350 F. Supp. 3d 338, 409 (M.D.N.C. 2018) (explaining injury alleged to have been caused by regulation of transgender restroom access is not traceable to statute that expressly prohibits regulation of restroom access).

Thus, Plaintiffs' allegations regarding discrimination on the basis of their sex, sexual orientation, or status as a same-sex married couple—which, in any event, amount to no more than facially implausible speculation—cannot be fairly traced to Governor McMaster. Neither of his challenged actions—Executive Order No. 2018-12 or seeking a deviation from HHS—authorized or permitted CPAs to discriminate against potential foster parents on these bases, nor do they even contemplate that CPAs would do so. Instead, on their faces, both the letter to HHS and the

Executive Order sought to ensure that faith-based CPAs would not be denied licenses to provide vital foster care services or equal access to funding solely on account of their religious identity or sincerely held religious beliefs. Even assuming these actions provide Plaintiffs standing to pursue claims involving *religious* discrimination—which they do not—the actions provide no basis at all for standing to bring claims for *other kinds* of discrimination that did not occur and were never permitted or contemplated by Governor McMaster's actions. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." (alteration omitted) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982))). Likewise, Governor McMaster's actions provide no basis for Plaintiffs to pursue their speculations involving proselytization. Even assuming Plaintiffs could pursue claims based on this speculation—which, because they do not belong to the supposedly affected group, they cannot—the Executive Order expressly recognizes that CPAs may not use public funds to support religious activities, such as proselytization. *See* Ex. B at 1. Because the Executive Order specifically notes that CPAs cannot engage in activities like proselytization using government funds, the proselytization that Plaintiffs speculate others might have encountered is simply not traceable to Governor McMaster.

Besides arising from a third-party's independent actions, Plaintiffs' alleged injuries also cannot satisfy the causation requirement because they are self-inflicted. *See McInnes v. Lord Balt. Emp. Ret. Income Account Plan*, 823 F. Supp. 360, 363 (D. Md. 2011) (finding lack of standing where alleged injury "would be the result of Plaintiff's own conduct"). Neither Governor McMaster nor Miracle Hill, as a third-party CPA, has prevented Plaintiffs from fostering through other CPAs or DSS itself. In fact, Plaintiffs remains free to foster through many other CPAs in South Carolina. Despite being aware of opportunities to volunteer and foster through other CPAs, Plaintiffs instead decided to contact Miracle Hill alone. Thus, Plaintiffs' alleged injury—the inability to foster children—is the result of their own refusal to take advantage of the opportunities to do so through other available CPAs or DSS. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013) ("Because the harm that forms the basis for [plaintiff's claims] arises from her

inability to access [certain] property, and because the statute allows for third parties to grant her permission to enter these properties, she cannot demonstrate traceability . . . .").

Because Plaintiffs' alleged injuries result from Miracle Hill's conduct as well as their own, the alleged injuries are not fairly traceable to Governor McMaster, and for this reason Plaintiffs' claims against him should be dismissed.

4.     *Plaintiffs' alleged injuries would not be redressed by the relief they seek.*

"The redressability requirement ensures that the plaintiff would personally benefit in a tangible way from the court's intervention." *Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc.*, 248 F. Supp. 3d 733, 747 (D.S.C. 2017) (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000)). Thus, to meet this requirement, "the plaintiff must demonstrate that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). The requirement of "a non-speculative likelihood that the injury would be redressed by a favorable judicial decision" means that where a court "c[an] not be sure" that the relief sought would remedy the alleged injury, the plaintiff lacks standing. *Krasner*, 401 F.3d at 234. As with other standing requirements, when the alleged injury arises from the government's decision not to regulate the independent choices of a third party, redressability is "substantially more difficult to establish," as "it becomes the burden of the plaintiff to adduce facts showing that [the third party's] choices . . . will be made in such manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

Here, Plaintiffs ask the court to declare that Governor McMaster's actions to ensure faith-based CPAs are not denied licensure or equal access to public funding based solely on their religious beliefs are unconstitutional; to enjoin the State from contracting with, funding, or even licensing faith-based CPAs unless they forsake any deeply-held religious belief that they should not associate with those who do not share their beliefs; and to direct the Governor to force all CPAs to associate with all prospective foster parents, despite any religious compunction about doing so, on pain of being deprived of generally available state funding or contracting opportunity. (*See* Compl. at 38–39 (Prayer for Relief A, C, and E.) However, none of the relief Plaintiffs request is

certain to cure the injuries they allege. Plaintiffs assume that faith-based CPAs would respond to these court-ordered requirements by forsaking their religious beliefs and offering foster care services according to Plaintiffs' preferences (rather than discontinuing their foster care ministry to avoid compromising their religious identity and beliefs).[10] This assumption, however, is mere speculation. Thus, Plaintiffs have failed to carry their burden to show a non-speculative likelihood that their inability to foster through Miracle Hill would be redressed by the relief they seek. For this reason, Plaintiffs' claims against Governor McMaster must be dismissed.

> 5.    *Plaintiffs lack taxpayer standing to bring their Establishment Clause claim.*

Plaintiffs' complaint repeatedly attempts to tie their theory of liability to Miracle Hill's receipt of public funding (*see* Compl. ¶¶ 2, 4, 7, 46, 99, 102, 115; *id.* at 38–39 (Prayer for Relief A, B, and E)), though it is not entirely clear whether, by doing so, Plaintiffs are attempting to assert taxpayer standing. To the extent they attempt to do so, the court should reject it. Courts have consistently held that the interest of a taxpayer in seeing that government funds are spent in accordance with law "does not give rise to the kind of redressable 'personal injury' required for Article III standing" because "this type of interest is too generalized and attenuated" from the "interest[] of the public at large." *Hein v. Freedom from Religion Found.*, 551 U.S. 587, 599–600 (2007) (citing *Frothingham v. Mellon*, 262 U.S. 447 (1923)). In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court "carved out a narrow exception to the general constitutional prohibition against taxpayer standing" in the context of alleged Establishment Clause violations. *Id.* at 600.[11]

---

[10] Similarly, if Plaintiffs expect that faith-based CPAs like Miracle Hill will instead respond by shuttering their doors, then the relief Plaintiffs seek could not possibly redress their alleged injuries. Yet the very tenor of Plaintiffs' requested relief—which asks the court to enjoin the licensing of faith-based CPAs, regardless of whether they contract with the state or receive public funding (*see* Compl. at 38–39 (Prayer for Relief C))—demonstrates this is precisely the result they seek. Plaintiffs want not only to deny otherwise qualified CPAs generally available contractual and funding benefits solely because of the CPAs' religious beliefs, but Plaintiffs also hope to deprive these CPAs of their ability to offer any foster care services to needy children whatsoever.

[11] The Supreme Court has only ever applied taxpayer standing to Establishment Clause claims, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347 (2006) (citing *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988)), and the Fourth Circuit has emphasized the reasons why the exception is unavailable outside that context, *see Ansley v. Warren*, 861 F.3d 512, 518–19 (4th Cir. 2017). To the extent Plaintiffs assert taxpayer standing to bring their Equal Protection Clause claim against Governor McMaster, they may not do so. *See Storino v. Borough of Point Pleasant Beach*, 322

Under this "narrowly circumscribed" exception,[12] taxpayer standing is not permitted for "challenges that do not involve specific legislative appropriations under the taxing and spending power." *Ansley*, 861 F.3d at 519. Specifically, expenditures that result from executive discretion—such as through an executive order—do not provide a basis for taxpayer standing. *See Hein*, 551 U.S. at 602–03; *see also Bilbro v. Haley*, 299 F. Supp. 3d 397, 421 (D.S.C. 2017) ("[T]he narrow exception in *Flast* does not extend to executive orders . . . .").

With respect to Governor McMaster, Plaintiffs' complaint primarily challenges his requesting a deviation from HHS regulations and issuing Executive Order No. 2018-12. The deviation request cannot give rise to taxpayer standing because Plaintiffs point to no specific legislative appropriation enacted to expressly fund the request, and any funds expended on making the request appear to result from Governor McMaster's executive discretion. *See Hein*, 551 U.S. at 602–03; *Ansley*, 861 F.3d at 519. Likewise, Executive Order No. 2018-12 is an executive order, the quintessential vehicle for implementing executive discretion, and, because Plaintiffs have not alleged any specific legislative appropriation underlying it, the Order does not provide a basis for taxpayer standing. *See Hein*, 551 U.S. at 602–03; *Bilbro*, 299 F. Supp. 3d at 421.

> ### 6.     *Plaintiffs lack stigmatic injury standing.*

Although Plaintiffs' causes of action contain bald assertions that Defendants' actions subject Plaintiffs to stigma (*see* Compl. ¶¶ 107, 120, 134, 150), the factual allegations of the

---

F.3d 293, 298 n.2 (3d Cir. 2003) (no taxpayer standing for Equal Protection Clause claims); *Ansley v. Warren*, No. 1:16-cv-00054-MOC-DLH, 2016 WL 5213937, at *16 (W.D.N.C. Sept. 20, 2016) ("[T]axpayer standing is simply not an appropriate means for Plaintiffs to bring their . . . Equal Protection claim[] before the court."). Because Plaintiffs lack standing for this claim under general standing analysis, the court should dismiss it without any need to assess Plaintiffs' ability to bring it under taxpayer standing analysis. *See Cuno*, 547 U.S. at 352 ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Allen*, 468 U.S. at 752 ("Typically, . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

[12] The Supreme Court has gone out of its way to emphasize that *Flast* represents the "outer boundary" of permissible taxpayer standing, and, because "the *Flast* exception has largely been confined to its facts," it "only 'slightly lowered' the bar" on standing and "must be applied with rigor." *Hein*, 551 U.S. at 609–10 (citation and internal quotation marks omitted). Further, developments in the Court's First Amendment and Article III standing jurisprudence have left *Flast* an anomalous and unsupported aberration that, if given the chance, the Court should overrule.

complaint offer little elaboration (*see* Compl. ¶¶ 5, 90), and it is unclear whether Plaintiffs intend to premise their standing on stigmatic injury. To the extent they attempt to do so, the court should reject it. Where plaintiffs rely on stigmatic injuries, the Fourth Circuit has emphasized that they "still must carry the burden of demonstrating each element of standing," *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 188 (4th Cir. 2018), as "there is of course no sliding scale of standing." *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1085 (4th Cir. 1997) (quotation marks omitted). Here, Plaintiffs have not met their burden.

*First*, Plaintiffs fail to assert an injury-in-fact. Courts have cautioned that the concept of stigmatic injury is "particularly elusive" in the context of Establishment Clause claims.[13] *Suhre*, 131 F.3d at 1085. "[T]he allegation of injury in the form of a stigma alone is insufficient to support standing; there must also be a 'cognizable injury caused by personal contact with the offensive conduct.'" *Sarsour v. Trump*, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017) (emphasis added) (quoting *Suhre*, 131 F.3d at 1090). Plaintiffs must "identify a[] personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Here, the only injury asserted in connection with the allegedly offensive conduct is "a practical barrier to fostering." (Compl. ¶ 5; *see id.* ¶¶ 90, 120 (asserting as a putative injury the "den[ial] . . . [of] the same opportunities to foster"); *id.* ¶¶ 135, 150 (asserting as a putative injury the "den[ial] . . . [of] access to the same opportunities to foster").) As explained above, however, none of the Governor's actions erected a barrier of any kind to Plaintiffs becoming foster parents.

As for their Equal Protection claim, Plaintiffs' asserted stigmatic injury is likewise insufficient because they failed to apply for foster care licensing through other CPAs or through DSS when those options were presented to them. *See MGM Resorts Int'l Global Gaming Dev.,*

---

[13] The Fourth Circuit's recent expansive view of stigmatic-injury standing goes beyond the Constitution's case-or-controversy limitation, and the Fourth Circuit or Supreme Court, given the chance, should rein in the more extravagant holdings in this area. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (declining to "decide whether the claimed dignitary interest establishes an adequate ground for standing" because other grounds for standing existed).

*LLC v. Malloy*, 861 F.3d 40, 47, 50 (2d Cir. 2017) (rejecting stigmatic injury because plaintiff had "not made any serious attempt to obtain the benefit it claims that it was denied" (applying *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656 (1993) and *Heckler v. Mathews*, 465 U.S. 728 (1984)). Further, neither the waiver request nor the Executive Order expressly favor any religion; Plaintiffs concede they failed to take available opportunities to obtain a foster care license, and there is no indication Plaintiffs would be barred from becoming foster parents if they applied through other CPAs or DSS. *See Am. Atheists, Inc. v. Shulman*, 21 F. Supp. 3d 856, 864, 866 (E.D. Ky. 2014) (rejecting stigmatic injury where plaintiffs failed to "establish that [plaintiff] expressing [disfavored] beliefs could *never* qualify" for a benefit, as (i) the policy at issue "do[es] not expressly favor certain [religious beliefs]," (ii) plaintiffs still "may be eligible" for the benefit, and (iii) plaintiffs "never sought classification" to obtain the benefit (emphasis added) (interpreting *City of Jacksonville*, 508 U.S. 656)).

*Second*, Plaintiffs' asserted injury is not traceable to Governor McMaster. Even when asserting a stigmatic injury, a plaintiff is required to show that the putative injury is fairly traceable to the defendant's challenged conduct. *See Deal*, 911 F.3d at 188; *see also Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (explaining that plaintiff alleging "dignitary harm" "must still satisfy the elements of standing"). As explained above, Plaintiffs' alleged injury—their inability to obtain a foster license through a CPA of their choice—is not attributable to Governor McMaster because his actions merely allow Miracle Hill the choice of whether to partner with prospective foster parents in accordance with its religious beliefs. Instead, this "injury" is attributable, if at all, to the independent actions of an intervening third party, Miracle Hill. *See Wright*, 468 U.S. 737; *Doe*, 631 F.3d at 162; *Krasner*, 401 F.3d at 234.

*Third*, Plaintiffs' asserted injury would not be redressed by the relief they seek. Even dressed up as a stigmatic harm, Plaintiffs' "asserted injury arises from the government's allegedly unlawful . . . lack of regulation[] of *someone else*," and therefore their attempt to demonstrate redressability still "hinge[s] on the response of the . . . regulable[] third party to the government action or inaction." *Lujan*, 504 U.S. at 562. It is thus Plaintiffs' burden "to adduce facts showing [the third party's unfettered] choices have been or will be made in such manner as to . . . permit

21

redressability of injury." *Id.* Here, Plaintiffs have failed to allege that the injunctions they ask the court to issue against Governor McMaster would cause Miracle Hill or any other CPA to alter their associational policies in a way that allows Plaintiffs to foster through them when they previously could not have done so, and there is no indication any such injunction would have that effect. Further, if it is Plaintiffs' goal, as it seems to be, not to foster through faith-based CPAs but to strip them of their licenses to offer foster care services at all—even if they do not contract with the government or accept public funding—then Plaintiffs have instead demonstrated that they have no interest in redressing injuries to them personally but rather are interested in "invalidat[ing] laws" because they "disagrees with them," an endeavor courts may not aid. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011).

In sum, Plaintiffs lack standing to bring their claims against Governor McMaster because they have not met their burden to allege an injury in fact that is fairly traceable to Governor McMaster and redressable by a favorable decision, and any attempt to rescue their claims by asserting taxpayer or stigmatic-injury standing fails.

**B.    Plaintiffs fail to state a claim for an Equal Protection Clause violation.**

Even assuming Plaintiffs could demonstrate standing, their claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim for which the court could grant relief. A Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). When considering a Rule 12(b)(6) motion, the court should accept as true only the complaint's well-pleaded allegations and then should view them in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs allege that Governor McMaster's actions violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against them on the basis of their religion, sex, sexual orientation, and status as a same-sex married couple. (*See* Compl. ¶¶ 127–40). Under equal

protection analysis, if a classification "impinges upon a fundamental right protected by the Constitution or operates to the particular disadvantage of a suspect class," the classification receives strict scrutiny, while other classifications "will be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 172 (2000). Importantly, "[t]he Constitution's protections of individual liberty and equal protection apply in general only to action *by the government*." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (emphasis added).

1. *Plaintiffs fail to plausibly allege discrimination based on sex, sexual orientation, and marital status.*

Under the plausibility standard, a court need not "accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" *Ojaniit*, 759 F.3d at 353 (quoting *Blankenship*, 471 F.3d at 529). As explained *supra* Part II.A.1, Plaintiffs speculate that Miracle Hill discriminates on the bases of sex, sexual orientation, and same-sex marital status, but fail to allege, beyond mere conclusory assertions, that Miracle Hill discriminated against them on any of these bases. Further, even assuming Plaintiffs had plausibly pled Miracle Hill discriminated against them on these bases, they provide nothing more than conclusory allegations that Governor McMaster authorized Miracle Hill to do so. These conclusory allegations are simply not entitled to the presumption of truth, especially when they are at odds with Miracle Hill's stated reasons for its actions, Governor McMaster's letter requesting a deviation, and the Executive Order—all of which are cited in Plaintiffs' complaint and are integral to it.

2. *Plaintiffs fail to state a claim for an Equal Protection Clause violation based on religious discrimination.*

The facts alleged in the complaint show only that Governor McMaster affirmatively did not discriminate on the basis of religion and that any alleged religious "discrimination" is attributable to Miracle Hill, which is not a state actor, rather than to Governor McMaster. In the context of an equal protection claim, government actions "discriminating *among* religions are subject to strict scrutiny," but actions "affording a uniform benefit to *all* religions" are assessed

23

under rational basis review. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (internal quotation marks omitted). In the latter case, "where a [policy] is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, [there is] no justification for applying strict scrutiny," and "[t]he proper inquiry is whether [the government] has chosen a rational classification to further a legitimate end." *Id.*

Plaintiffs have not plausibly alleged—nor can they—that Governor McMaster's challenged actions discriminate among religions. On its face, Governor McMaster's request for a deviation (a document the complaint relies upon and incorporates by reference) does not differentiate among religious beliefs, but instead asks for a deviation applicable to *all* faith-based CPAs, specifically so that *no* "religious organization" would have "to choose between the tenets of its faith or applying for a CPA license to serve the children of South Carolina." (Ex. A, at 2.) This fact is confirmed in HHS's response, which grants a deviation to *any* faith-based CPA that would be affected by HHS's new regulation. (*See* Ex. C, at 4.) Likewise, Executive Order No. 2018-12 does not discriminate against any religious belief but, instead, expressly directs that *no* faith-based CPAs "be den[ied] licensure . . . solely on account of their religious identity or sincerely held religious beliefs" and that DSS and other agencies ensure that *no* person or organization is "directly or indirectly penalize[d] [for] religious identity or activity . . . by denying *any* person or organization an equal share of . . . benefits . . . solely on account of religious identity or beliefs." Exec. Order No. 2018-12, at 3 (emphasis added). Both the request and the Order are facially neutral with respect to religion and, at most, might be said to afford a uniform benefit to *all* religions.

The complaint alleges only that a *private* entity engaged in religious discrimination—not Governor McMaster. Because Miracle Hill is not a state actor, its private actions are neither circumscribed by the Equal Protection Clause nor actionable here. *See Edmonson*, 500 U.S. at 619; *Cox v. Duke Energy Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) ("Merely private conduct, no matter how discriminatory or wrongful, is excluded from the reach of[ 42 U.S.C.] § 1983.") (citation and internal quotation marks omitted). A private entity's conduct will be regarded as state action only

24

if the entity in all fairness can be described as a state actor and its conduct is fairly attributable to the state. *See Mentavlos v. Anderson*, 249 F.3d 301, 313 (4th Cir. 2001); *United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995). Plaintiffs do not allege that Miracle Hill is a state actor or that its conduct is fairly attributable to the state, and neither Miracle Hill nor its conduct meets any of the myriad tests for determining that otherwise private conduct should be deemed state action. *See Mentavlos*, 249 F.3d at 313–14; *Gaston Festivals*, 43 F.3d at 906–10. Indeed, the Fourth Circuit and this court have consistently concluded that private parties providing foster care services are not state actors. *See, e.g.*, *Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *Pullings v. Jackson*, No. 2:07-0912-MBS, 2007 WL 1726528, at *3 (D.S.C. June 13, 2007); *see also Weller v. Dept. of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 392 (4th Cir. 1990).

Plaintiffs only challenge Governor McMaster's actions requesting a deviation and issuing the Executive Order. Because these actions are facially neutral with respect to religion and designed to limit South Carolina's interference with religious exercise, they are subject to rational basis review. *See Amos*, 483 U.S. at 339. Under that deferential standard, the challenged actions are presumed valid if they are rationally related to a legitimate government purpose. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 211 (4th Cir. 2002).[14] "The test is not a subjective one," and "'[t]he actual motivation for the [local government's] actions [is] irrelevant.'" *Pulte Homes Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018) (alterations in original) (citations omitted). "Under this standard, a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Rather, the Governor's actions "must be upheld . . . if there is any reasonably

---

[14] It is appropriate at this stage of litigation to analyze whether a plaintiff has alleged a claim sufficient to overcome the presumption of rationality. *See Freilich*, 313 F.3d at 211 (affirming dismissal of Equal Protection claim pursuant to Rule 12(b), concluding the challenged conduct was rationally related to a legitimate government interest); *see also Shanks v. Forsyth Cty. Park Auth.*, 869 F. Supp. 1231, 1236–37 (M.D.N.C. 1994) (dismissing Equal Protection claim pursuant to Rule 12(b)(6) because, even taking plaintiff's allegations as true, plaintiff "has not alleged facts sufficient to overcome the presumption of rationality coupled with a readily apparent justification for the ban").

conceivable state of facts that could provide a rational basis for" the actions. *Id.* (citation and internal quotation marks omitted).

Governor McMaster's actions easily pass muster. There are numerous legitimate government purposes for requesting the deviation and issuing Executive Order No. 2018-12. For instance, South Carolina has legitimate (and even compelling) interests in the following:

(1) Increasing community support and options for foster child placement by maximizing the number and diversity of CPAs, *see Lipscomb ex rel. DeFehr v. Simmons*, 962 F.2d 1374, 1380 (9th Cir. 1992) (en banc) (state has a "legitimate purpose of maximizing the level of benefits available to all the children in the foster care program"); (*see also* Compl. ¶¶ 1, 6, 20–24, 84–90 (acknowledging South Carolina's interest in maximizing placement opportunities for foster children));[15]

(2) Avoiding unnecessary violations of faith-based CPAs' free-exercise rights that would result from forcing them to renounce their beliefs in order to participate in generally available state programs, *see Trinity Lutheran*, 137 S. Ct. at 2022 ("To condition the availability of benefits … upon a [recipient's] willingness to … surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties." (ellipses and alterations in original) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978))); *Forest Hills Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 241 (4th Cir. 1984) ("[W]e cannot question the appropriateness of the state's seeking to defend [a] challenged exemption … on the basis that the accommodation it makes to the activities of 'religious institutions' was constitutionally compelled or at least constitutionally permitted by reason of the existence of free exercise rights in those institutions . . . . Protection of constitutional rights can properly be advanced by government as justification for governmental action that is under challenge for violation of other constitutional rights." (citing *Widmar v. Vincent*, 454 U.S. 263 (1981)));

(3) Avoiding unnecessary violations of faith-based CPAs' free-speech and associational rights that would result from forcing them to partner with unwelcome individuals who perform ministerial functions[16] in order to participate in generally available state

---

[15] As part of rational-basis review, courts may not invalidate the action merely because they or plaintiffs, after weighing the relative costs and benefits, would have chosen a different policy to effectuate the purpose. *See Lipscomb*, 962 F.2d at 1380–81. Plaintiffs' own policy preferences for achieving maximum foster care placement opportunities (*see* Compl. ¶¶ 1, 6, 84–85, 88–90, 92–93, 95–96, 106, 108) provide no ground to challenge Governor McMaster's actions.

[16] The Fourth Circuit has yet to address the scope of positions constituting ministerial functions following the *Hosana-Tabor* decision. *See Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 813 (D.S.C. 2018). The "general rule," however, established by decades of precedent is that if an employee's duties "consist of teaching [or] spreading the faith," then "the ministerial exception applies." *E.E.O.C. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)); *see also Sterlinski v. Catholic Bishop of Chi.*, ___ F.3d ___, 2019 WL 3729495, at *2 (7th

programs, *see Hosana-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188–89 (2012) ("By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments . . . [and] also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."); *Dale*, 530 U.S. at 648 ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."); *Roberts*, 468 U.S. at 622 ("Government actions that may unconstitutionally infringe upon th[e] freedom [to associate with others] can [include] . . . withhold[ing] benefits from individuals because of their membership in a disfavored group . . . and . . . interfer[ing] with the internal organization of the group . . . ."); *see also Widmar*, 454 U.S. at 271 ("[T]he interest of the [state] in complying with its constitutional obligations may be characterized as compelling"); and

(4) Avoiding unnecessary entanglement in religion that would result from the enforcement of its religious-matching statute and regulation in the absence of faith-based CPAs, *see* S.C. Code. Ann. § 63-15-20 (requiring courts to place children with person or agency of the same religious faith as natural parents whenever practicable); S.C. Code Ann. Regs. 114-550(H)(11) (requiring that foster child's religious education be in accordance with express wishes of natural parents); Joseph R. Ganahl, *Foster Free Exercise*, 88 Notre Dame L. Rev. 457, 472 (2012) ("Considering the significant number of entangling issues that may arise as the State makes reasonable efforts to provide for the religious formation of children in its care, the ideal solution is for a State to contract with religious foster care agencies."); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("[A] state interest in avoiding an Establishment Clause violation 'may be characterized as compelling' . . . ." (quoting *Widmar*, 454 U.S. at 271)).[17]

Governor McMaster's actions are rationally related to achieving these (as well as other) legitimate

purposes because they operate to maximize the number and diversity of CPAs and help to avoid

violations of CPAs' constitutional rights.

---

Cir. Aug. 8, 2019) (Easterbrook, J.) ("If the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree? Only by subjecting religious doctrine to discovery and, if necessary, jury trial, could the judiciary reject a church's characterization of its own theology and internal organization. Yet it is precisely to avoid such judicial entanglement in, and second-guessing of, religious matters that the Justices established the rule of *Hosanna-Tabor*."); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015) (recognizing and applying *Hosanna-Tabor*'s "ministerial exception" to para-church organizations and to employees who performed a "spiritual formation" role but who did not have the formal title or training of a minister); *Rogers v. Salvation Army*, 2015 WL 2186007 (E.D. Mich., May 11, 2015) (same).

[17] Plaintiffs do not challenge South Carolina's religious-matching statute or regulation, and they concede foster children should be "placed with a family that shares their faith." (Compl. ¶¶ 6, 92.)

C.     **Plaintiffs fail to state a claim for an Establishment Clause violation.**

Finally, Plaintiffs allege Governor McMaster's challenged actions constituted an impermissible establishment of religion. As explained more fully below, however, a State's licensure of, accommodation of, and contracting with faith-based providers is permissible under the Establishment Clause. Such partnerships are historically permissible, have been upheld by the courts, and are supported by a legitimate secular purpose that neither advances religion nor excessively entangles the state with it. Further, such accommodations are permitted—and, in some cases, required—by state and federal law and Supreme Court precedent.

1.     *The Establishment Clause does not prohibit government partnerships and contracts with religious organizations.*

Plaintiffs allege the state's accommodation of and contracts with religious child welfare providers violate the Establishment Clause. (*See* Compl. ¶¶ 97–113.) Even assuming the factual allegations of the complaint to be true, Plaintiffs have not alleged a plausible claim that Governor McMaster's challenged actions violate the Establishment Clause. The exact types of conduct Plaintiffs challenge here have long been held to be permissible under the Establishment Clause.

In recent cases, the Supreme Court has explicitly "taken a more modest approach" to Establishment Clause claims "that focuses on the particular issue at hand and looks to history for guidance." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087 (2019) (plurality op.);[18] *see also Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) ("[T]he Establishment Clause must be interpreted by reference to historical practices and understandings." (internal quotation marks omitted)); *accord Hosanna-Tabor*, 565 U.S. 171 (2012) (closely examining historical under-

---

[18] Although the lead opinion in *American Legion* garnered four votes for the part espousing this approach, three of the remaining Justices agreed that assessing longstanding practices with an analysis that was sensitive to history is the proper approach. *See Am. Legion*, 139 S. Ct. at 2091 (Breyer, J., joined by Kagan, J., concurring) ("The Court appropriately looks to history for guidance" and "upholds the constitutionality of [a memorial] . . . after considering its particular historical context and its long-held place in the community."); *id.* at 2102 (Gorsuch, J., joined by Thomas, J., concurring) (agreeing with the plurality opinion's "more modest, historically sensitive approach" that "recogniz[es] that the Establishment Clause must be interpreted by reference to historical practices and understandings" because "what matters . . . is whether the challenged practice fits within the tradition of this country" (citations and internal quotation marks omitted)).

standing to determine the contours of an Establishment Clause claim). Here, history demonstrates that state and federal governments have been partnering and contracting with religious ministries to provide a variety of services to vulnerable populations for hundreds of years:

> For example, in 1806 the New York Orphan Asylum, a decidedly Protestant organization, established an orphanage, which by decade's end, received state monies to support over 200 orphans.
>
> \*    \*    \*
>
> In New York City, an 1880s study of 200 private organizations found that these organizations received twice as much of their funding from government support as they received from legacies, donations, and private contributions. . . .
>
> . . . . Most orphanages during that time were established along religious lines and served orphans of a particular faith. In fact, they were subsidized by New York and other cities for doing exactly that. That both the state government and others recognized this fact is illustrated by the 1863 act of the New York legislature to charter the Roman Catholic Protectory to receive truant, vagrant, and delinquent children whose parents or guardians had requested the courts to commit them to a Catholic establishment rather than to the House of Refuge or other predominantly Protestant institutions.
>
> . . . . By the beginning of the twentieth century, the use of private non-profit organizations for the provision of services to the orphaned, the sick, and the destitute was widespread throughout the United States. A 1901 federal survey of governmental subsidies of private charities found that "except possibly two territories and four western states, there is probably not a state in the union where some aid is not given to religious organizations either by state or by counties and cities." While the Constitutions of some states prevented government monies from going to religious organizations, cities still found them appropriate providers, as did many other states.

Edward Queen, *History, Hysteria, and Hype: Government Contracting with Faith-Based Social Service Agencies*, RELIGIONS 2017, at 4–5; *see generally* Carl H. Esbeck, *Government Regulation of Religiously Based Social Services: The First Amendment Considerations*, 19 HASTINGS L.Q. 343, 350 (1992); Tracey L. Meares & Kelsi Brown Corkran, *When 2 or 3 Come Together*, 48 WM. & MARY L. REV. 1315, 1372 (2007); Martha Minow, *Public and Private Partnerships: Accounting for the New Religion*, 116 HARV. L. REV. 1229, 1238 (2003); *see also* 114 Cong. Rec. H3288 (daily ed. May 26, 2016) (statement of Rep. Russell) ("More than 2,000 Federal Government contracts a

year are awarded to religious organizations and contractors that provide essential services in many vital programs.").

The Supreme Court and lower federal courts have upheld such contracts and partnerships against Establishment Clause challenges. *See*, *e.g.*, *Bowen v. Kendrick*, 487 U.S. 589 (1988) (holding the direct federal funding of faith-based counseling centers to provide social services did not violate the Establishment Clause, and noting "that this Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs"); *Bradfield v. Roberts*, 175 U.S. 291 (1899) (holding federal contract with a Roman Catholic hospital operated by nuns to serve the poor did not violate the Establishment Clause); *Hartmann v. Stone*, 68 F.3d 973 (6th Cir. 1995) (holding the Army did not violate the Establishment Clause by providing funding to religious childcare providers who engage in religious practices during the daycare time).[19]

In *Bowen*, for example, the Supreme Court upheld the constitutionality of a government program that partnered with organizations "that were affiliated with religious denominations and that had corporate requirements that the organizations abide by religious doctrines" to provide publicly funded social services. *Bowen*, 487 U.S. at 599. The Court reached this holding even though the law "*expressly contemplated* that some of those moneys might go to projects involving

---

[19] The Supreme Court and lower courts have repeatedly reached this conclusion in other contexts too, holding the government does not violate the Establishment Clause when it provides official recognition, benefits, and funds to religious groups on the same basis as to secular groups. *See Mitchell v. Helms*, 530 U.S. 793 (2000) (plurality op.) (holding the provision of public funds to private elementary and secondary schools—including sectarian ones—was permissible under the Establishment Clause); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 842–44 (1995) (holding a public university's provision of facilities and services to a religious group on the same bases as to secular groups does not violate the Establishment Clause); *Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 247–50 (1990) (holding public school's policy giving official recognition and benefits to a religious student group on the same basis as to secular student groups did not violate the Establishment Clause); *Widmar*, 454 U.S. at 274 (same); *Comm. for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646 (1980) (holding state's reimbursement of religious schools for testing and reporting services was permissible under Establishment Clause); *Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084 (8th Cir. 2000) (holding federal statute did not violate Establishment Clause by permitting persons with religious objections to medical care to receive government funding for care rendered at religious nonmedical health care institutions, *i.e.*, Christian Science sanitoriums).

religious groups." *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 607 (2007) (discussing *Bowen*) (emphasis added). The *Bowen* Court specifically rejected the claim "that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs," *id.* at 608, and noted that a "symbolic link" between the religious organization and the government was not an establishment of religion, *id.* at 613.

Further, courts are particularly skeptical of Establishment Clause claims where, as here, the government partners with an array of religious and secular providers from which participants can freely choose. *See Freedom from Religion Found., Inc. v. McCallum*, 324 F.3d 880 (7th Cir. 2003) (finding no Establishment Clause violation when government contracts with, and offers parolees the option to choose from among, a list of religious and secular halfway houses) (citing *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)). Thus, when funding is available without regard to a provider's religious status, and participants have a "genuine choice" to partner with either religious or wholly secular providers, no Establishment Clause issues inhere. *Ams. United for the Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 425 (8th Cir. 2007). In short, the government's accommodation of, contracting with, and provision of funding to child welfare providers—including religious ones—does not violate the Establishment Clause.

> 2.     *Even under the outdated* Lemon *test, the Establishment Clause is not offended by state licensure of and contracting with religious providers and parents.*

As noted above, the Supreme Court's recent Establishment Clause precedent has consistently and repeatedly relied on a historically informed analysis rather than the test established by *Lemon*.[20] But even if this court were to apply the *Lemon* test,[21] the government's licensure of and contracting with religious agencies complies with the Establishment Clause.

---

[20] *See Am. Legion*, 139 S. Ct. 2067 (declining to apply *Lemon* and, instead, relying on historical approach);   *Town of Greece*, 572 U.S. at 576 (same); *Hosanna-Tabor*, 565 U.S. 171 (ignoring *Lemon*); *Zelman*, 536 U.S. 639 (same); *Good News Club*, 533 U.S. 98 (same). In addition, members of the Supreme Court have repeatedly criticized the *Lemon* test. *See Am. Legion*, 139 S. Ct. at 2079–85 (plurality op.); *id.* at 2092–93 (Kavanaugh, J., concurring); *id.* at 2101–03 (Gorsuch, J., concurring); *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 12–23 (2011) (Thomas, J., dissenting); *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality op.); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring).

[21] *See Lemon*, 403 U.S. at 612–13 ("First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion;

*First*, the government's accommodation of and cooperation with faith-based providers and parents achieves the undoubtedly legitimate "secular purpose" of having as many qualified foster and adoption agencies and homes as possible. *See Lipscomb*, 962 F.2d at 1380 (state has a "legitimate purpose of maximizing the level of benefits available to all the children in the foster care program"); *see generally N. Valley Baptist Church v. McMahon*, 696 F. Supp. 518 (E.D. Cal. 1988) (holding the purpose of a preschool daycare program, established as a religiously-motivated "ministry" to address "physical, spiritual, or emotional" needs was "secular, not religious, in nature," and thus a state DSS licensing and regulatory scheme applicable to daycares did not raise Establishment Clause concerns), *aff'd* 893 F.2d 1139 (9th Cir. 1989); *see also Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 12 n.2 (1989) (plurality op.) (noting a state may reasonably conclude "that religious groups generally contribute to the cultural and moral improvement of the community . . . and enhance a desirable pluralism of viewpoint and enterprise."); *Gaylord v. Mnuchin*, 919 F.3d 420, 431–32 (7th Cir. 2019) (upholding an exemption challenged on Establishment Clause grounds and holding the avoidance of governmental interference with religious groups' decision-making and operations was itself a legitimate secular purpose).

*Second*, the principal effect of accommodating religious providers "neither advances nor inhibits religion." A reasonable observer would see the accommodation as the government's good faith effort to generate the greatest possible number of qualified foster and adoptive homes. This perception would be reinforced by the fact known to any reasonable observer that the State of South Carolina and its agencies work with *all* qualified individuals and foster care providers regardless of the provider's or individual's religious beliefs. *See Mitchell v. Helms*, 530 U.S. 793, 809 (2000) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government."); *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 291 (4th Cir. 2000) ("An exemption's effect of simply allowing a religious [organization] to 'better . . . advance [its] purposes' does not rise to a constitutionally prohibited magnitude." (ellipses and second alteration in original) (citation omitted)).

---

finally, the statute must not foster 'an excessive government entanglement with religion.'").

*Third*, the government's licensure of and contracting with private religious providers and parents while *avoiding* interference with or involvement in their religious beliefs or practices avoids any excessive entanglement with religion. A federal district court has articulated why state supervision of religious child services providers does not entail the "excessive governmental entanglement with religion" forbidden by *Lemon*:

> Some incidental entanglement between church and state authority is inescapable. . . . The central focus should be on the extent that the state becomes involved in *religious* affairs or doctrine. *Walz v. Tax Commission of the City of New York*, 397 U.S. 664 (1970). The state may involve itself . . . in the purely secular affairs of religious organizations. *Id*.
>
> *     *     *
>
> The licensing scheme clearly establishes a pervasive regulatory relationship, complete with ongoing monitoring and supervision. That relationship, however, in no manner affects the religious objectives of the Preschool. Rather, the state can and in the past has implemented its licensing scheme without involving itself in any doctrinal matters of the Preschool or the Church. In the context of direct aid programs, even pervasive monitoring schemes are upheld where the state need not assess doctrinal matters to implement the program.

*N. Valley Baptist Church*, 696 F. Supp. at 534–36. Further, providing foster care services through faith-based CPAs allows state agencies to avoid entanglement that would arise from implementing South Carolina's religious matching statute and regulation. *See* Ganahl, *supra*, at 472. In short, even if *Lemon* is still the controlling test, state licensure of, contracting with, and accommodation of religious child welfare providers does not run afoul of the Establishment Clause.

3.    *The accommodation of faith-based providers' constitutional and statutory rights cannot constitute an establishment of religion.*

Plaintiffs' Establishment Clause claim seeks to turn the law on its head by penalizing Governor McMaster for doing what is permitted and, in some instances—including this one—is *required* by the First Amendment, by Supreme Court precedent, and by state and federal law. The Supreme Court "has long recognized that the government . . . may accommodate religious practices without violating the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005). *See also Amos*, 483 U.S. at 338 (1987) (upholding exemption of religious organizations from

antidiscrimination laws, even as to employees such as building engineers, and noting "there is ample room for accommodation of religion under the Establishment Clause").

Such accommodations are, in some situations, mandatory. For example, the Constitution and Supreme Court precedent not only permit but *require* the government to allow faith-based groups to consider an individual's beliefs and behaviors when making employment decisions related to employees whose role and functions include religious teaching, guidance, counseling, mentoring, and spiritual formation. *See Hosanna-Tabor*, 565 U.S. 171. The "general rule" established by decades of precedent is that, if an employee's duties "consist of teaching [or] spreading the faith," then "the ministerial exception applies." *Roman Catholic Diocese of Raleigh*, 213 F.3d at 801 (quoting *Rayburn*, 772 F.2d at 1169); *accord Shaliehsabou v. Hebrew Home of Greater Wash.*, 363 F.3d 299, 308 (4th Cir. 2004); *see also Conlon*, 777 F.3d 829 (recognizing and applying *Hosanna-Tabor's* "ministerial exception" to para-church organizations and to employees who performed a "spiritual formation" role but who did not have the formal title or training of a minister); *Rogers*, 2015 WL 2186007 (same).

Likewise, the Constitution and binding precedent *require* the government to accommodate faith-based providers' free association rights when making personnel recruiting, screening, and selection decisions. *See Dale*, 530 U.S. 640 (holding the application of a state anti-discrimination statute to require the Boy Scouts to allow an avowed homosexual and gay rights activist to serve as an assistant scoutmaster violated Boy Scouts' First Amendment right of expressive association).[22] Similarly, the government's accommodation of Miracle Hill and other religious

---

[22] The Supreme Court has noted that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622; *see also Disabato v. S.C. Ass'n of Sch. Admin.*, 746 S.E.2d 329, 335 (S.C. 2013) ("The United States Supreme Court has interpreted the First Amendment as encompassing an implicit right to associate for the purpose of engaging in speech and the other activities protected by the First Amendment."). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is 'intrusion into the internal structure or affairs of an association" like a "regulation that forces the group to accept members it does not desire." *Dale*, 530 U.S. at 648; *see also Roberts*, 468 U.S. at 623 ("Freedom of association . . . plainly presupposes a freedom not to associate."); *Disabato*, 746 S.E.2d at 335 ("Among the protections afforded by the freedom of association are the rights not to associate . . . and to be free from governmental interference with

providers is required by South Carolina's Religious Freedom Act ("RFA"), S.C. Code Ann. §§ 1-32-10 to -60, and the analogous federal RFRA.

Further, refusing to accommodate religious organizations and preventing them from participating in government programs would create a clear Free Exercise problem. *See Trinity Lutheran*, 137 S. Ct. at 2025 (holding the state's policy of "expressly denying a qualified religious entity a public benefit solely because of its religious character . . . goes too far" and "violates the Free Exercise Clause"); *Hartmann*, 68 F.3d 973 (striking down an Army regulation prohibiting on-base child care providers from engaging in religious exercise, holding that even where the Army funded, insured, and owned the facilities, and reimbursed provider costs, the Army's goal of avoiding entanglement with religion was an insufficient basis to encroach on the providers' First Amendment rights).[23]

In short, the government's accommodation of faith-based child welfare providers is not only permitted by the First Amendment, it is *required* by decades of Supreme Court precedent, state and federal law, and the First Amendment itself.

### III.   CONCLUSION.

For the foregoing reasons, and on the basis of any applicable arguments asserted in other Defendants' filings, which arguments are incorporated herein by reference, the court should dismiss with prejudice Plaintiffs' claims against Governor McMaster in his official capacity as Governor of South Carolina (Counts I and III).

---

the internal affairs and organization of one's associations."). Accordingly, the government's demand that an organization accept leaders and volunteers whose beliefs and behaviors differ from the organization's infringes on the organization's associational right. *Dale*, 530 at 654–58.

[23] *See also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring) ("[T]he Religion Clauses . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1239 (11th Cir. 2004) ("[T]o deny equal treatment to a [religious organization] on the grounds that it conveys religious ideas is to penalize it for being religious. Such unequal treatment is impermissible based on the precepts of the Free Exercise, Establishment and Equal Protection Clauses."); *Christian Legal Soc'y v. Walker,* 453 F.3d 853 (7th Cir. 2006) (holding a public university erred by revoking a religious student group's status due to its requirement that its student leaders adhere to beliefs and behaviors consistent with its religious tenets).

Respectfully submitted

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  s/ Miles E. Coleman
     Miles E. Coleman
     Federal Bar No. 11594
     E-Mail: miles.coleman@nelsonmullins.com
     104 S. Main Street, 9th Floor
     Greenville, SC 29601

     Jay T. Thompson
     Federal Bar No. 09846
     E-Mail: jay.thompson@nelsonmullins.com
     1320 Main Street / 17th Floor
     Post Office Box 11070 (29211-1070)
     Columbia, SC  29201
     (803) 799-2000

OFFICE OF THE ATTORNEY GENERAL

     Robert D. Cook, South Carolina Solicitor General
     Federal Bar No. 285
     E-Mail: bcook@scag.gov
     Post Office Box 11549
     Columbia, SC  29211
     (803) 734-3970

     *Attorneys for Governor Henry McMaster*

Greenville, South Carolina
August 30, 2019