UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

EDEN ROGERS and

BRANDY WELCH,

                          Plaintiffs,

           -against-

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

ALEX AZAR, in his official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES;

LYNN JOHNSON, in her official capacity as
Assistant Secretary of the ADMINISTRATION
FOR CHILDREN AND FAMILIES;

STEVEN WAGNER, in his official capacity as
Principal Deputy Assistant Secretary of the
ADMINISTRATION FOR CHILDREN AND
FAMILIES;

HENRY MCMASTER, in his official capacity as
Governor of the STATE OF SOUTH CAROLINA;
and

MICHAEL LEACH, in his official capacity as State
Director of the SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,

                          Defendants.

Case No. 6:19-cv-01567-TMC

**PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO
FEDERAL DEFENDANTS'
MOTION TO DISMISS,
DEFENDANT MICHAEL
LEACH'S MOTION TO
DISMISS AND DEFENDANT
HENRY MCMASTER'S
MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

LEGAL STANDARD .............................................................................................................. 8

ARGUMENT ........................................................................................................................... 9

I.      Plaintiffs Have Article III Standing. ......................................................................... 9

        A.      The Stigma and Practical Barriers to Fostering Plaintiffs Experienced Are Legally Cognizable Injuries-In-Fact. ............................................................... 10

        B.      The Injuries Plaintiffs Suffered Are Fairly Traceable to the State and Federal Defendants' Conduct. ......................................................................... 14

                1.      The State Defendants Caused Plaintiffs' Injuries. ..................................... 14

                2.      The Federal Defendants Also Caused Plaintiffs' Injuries ......................... 16

                3.      Plaintiffs' Injuries Are Not Self-Inflicted. .............................................. 18

                4.      Miracle Hill's Conduct Does Not Break the Chain of Causation. ............. 19

        C.      The Requested Relief Immediately Will Redress Plaintiffs' Injuries ............... 20

                1.      No Third Party Renders Redressability Speculative .................................. 22

II.     Plaintiffs Have Stated Claims for Violations of the Establishment Clause. .................... 24

        A.      Plaintiffs Have Adequately Alleged State Action. ........................................... 24

        B.      The State Defendants Improperly Delegate a Government Function to a Religious Organization That Employs a Religious Eligibility Test ...................... 25

        C.      The Use of Government Funds for a Program Administered with Religious Restrictions Violates the Establishment Clause ................................................ 26

        D.      Defendants Coerce Prospective Foster Parents To Support Religious Exercise and Miracle Hill's Religious Beliefs. .................................................. 28

        E.      The *Lemon* Test Has Not Been Overruled. ..................................................... 30

        F.      Accommodation of Miracle Hill's Discrimination is Unconstitutional. .............. 33

III.    Plaintiffs Have Stated Claims for Equal Protection Violations. ................................... 36

        A.      The Federal Defendants Do Not Challenge the Merits of Plaintiffs' Equal Protection Claim. ........................................................................................... 37

i

B.    The State Defendants' Actions Do Not Survive Any Level of Constitutional Scrutiny. ........................................................37

1.    Religious Discrimination. ...........................................37

2.    Sexual Orientation Discrimination. .........................39

CONCLUSION..................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1500 Range Way Partners, LLC v. JPMorgan Chase Bank, Nat. Ass'n,*
 800 F. Supp. 2d 716 (D.S.C. 2011).................................................................................8

*Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.,*
 570 U.S. 205 (2013).........................................................................................................36

*Agostini v. Felton,*
 521 U.S. 203 (1997).........................................................................................................32

*Allen v. Wright,*
 468 U.S. 737 (1984).........................................................................................................23

*Am. Civil Liberties Union of Massachusetts v. Sebelius,*
 821 F. Supp. 2d 474, 484 (D. Mass. 2012) ..............................................................27

*Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic
 Bishops,*
 705 F.3d 44 (1st Cir. 2013).............................................................................................27

*American Legion v. American Humanist Association,*
 139 S. Ct. 2067 (2019).......................................................................................30, 31, 33

*Animal Legal Def. Fund, Inc. v. Glickman,*
 154 F.3d 426 (D.C. Cir. 1998).......................................................................................17

*Ariz. Christian Sch. Tuition Org. v. Winn,*
 563 U.S. 125 (2011).........................................................................................................10

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)...........................................................................................................9

*Baskin v. Bogan,*
 766 F.3d 648 (7th Cir. 2014) ........................................................................................40

*Board of Educ. of Kiryas Joel Village School Dist. v. Grumet,*
 512 U.S. 687 (1994).......................................................................................25, 26, 33

*Bowen v. Kendrick,*
 487 U.S. 589 (1988).........................................................................................................28

*Boy Scouts of Am. v. Dale,*
 530 U.S. 640 (2000).........................................................................................................35

iii

*Bradfield v. Roberts,*
    175 U.S. 291 (1899)..........................................................................................28

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014)..........................................................................................34

*Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cty. Pub. Sch.,*
    373 F.3d 589 (4th Cir. 2004) .........................................................................29

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)....................................................................................36, 39

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989)..........................................................................................13

*Cmty. House, Inc. v. City of Boise,*
    490 F.3d 1041 (9th Cir. 2007) .......................................................................27

*Columbia Union Coll. v. Oliver,*
    254 F.3d 496 (4th Cir. 2011) .........................................................................27

*Comm. for Pub. Ed. & Religious Liberty v. Nyquist,*
    413 U.S. 756 (1973)..........................................................................................26

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) .........................................................................35

*Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter,*
    492 U.S. 573 (1989)..........................................................................................33

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005)....................................................................................33, 34

*Destefano v. Emergency Hous. Grp. Inc.,*
    247 F3.d 397 (2d Cir. 2001)............................................................................28

*Disabato v. S.C. Ass'n of Sch. Adm'rs,*
    404 S.C. 433 (2013)..........................................................................................35

*Doe v. Obama,*
    631 F.3d 157 (4th Cir. 2011) ....................................................................23, 24

*Dumont v. Lyon,*
    341 F. Supp. 3d 706 (E.D. Mich. 2018)................................................... *passim*

*Engel v. Vitale,*
    370 U.S. 421 (1962)..........................................................................................30

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ................................................8

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993)................................................39

*Frank Krasner Enters. Ltd. v. Montgomery Cty*,
   401 F.3d 230 (4th Cir. 2005) ................................................23, 24

*Fulton v. City of Philadelphia*,
   922 F.3d 140 (3d Cir. 2019)................................................35

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964)................................................18, 19

*Heckler v. Mathews*,
   465 U.S. 728 (1984)................................................11, 12

*Heller v. Doe*,
   509 U.S. 312 (1993)................................................39

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
   565 U.S. 171 (2012)................................................30

*Int'l Refugee Assistance Project v. Trump*,
   883 F.3d 233 (4th Cir. 2018) ................................................12

*Johnson v. California*,
   543 U.S. 499 (2005)................................................37, 39

*Johnson v. Robison*,
   415 U.S. 361 (1974)................................................36

*Larkin v. Grendel's Den, Inc.*,
   459 U.S. 116 (1982)................................................25

*Larson v. Valente*,
   456 U.S. 228 (1982)................................................37

*Lee v. Weisman*,
   505 U.S. 577 (1992)................................................28, 36

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)................................................30, 31

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ................................................16

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992).................................................................................................10

*Maddonna v. United States Department of Health and Human Services et al.*,
　　No. 6:19-cv-00448-TMC (D.S.C. 2019)..................................................................3

*Marouf v. Azar*,
　　2019 WL 2452315 (D.D.C. June 12, 2019)....................................................*passim*

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*,
　　545 U.S. 844 (2005).................................................................................................31

*Mellen v. Bunting*,
　　327 F.3d 355 (4th Cir. 2003) ..................................................................................31

*Milburn v. Anne Arundel Cty. Dep't of Social Servs.*,
　　871 F.2d 474 (4th Cir. 1989) ..................................................................................25

*Mitchell v. Helms*,
　　530 U.S. 793 (2000)...........................................................................................26, 27

*Moss v. Spartanburg Cnty. Sch. Dist. Seven*,
　　683 F.3d 599 (4th Cir. 2012) ..................................................................................11

*Myers v. Loudoun Cty. Pub. Sch.*,
　　418 F.3d 395 (4th Cir. 2005) .............................................................................28, 30

*Mylan Labs., Inc. v. Matkari*,
　　7 F.3d 1130 (4th Cir. 1993) ......................................................................................9

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
　　508 U.S. 656 (1993)...........................................................................................11, 13

*Norwood v. Harrison*,
　　413 U.S. 455 (1973).................................................................................................26

*Ostrzenski v. Seigel*,
　　177 F.3d 245 (4th Cir. 1999) ....................................................................................9

*Rogers v. Salvation Army*,
　　No. 14-12656, 2015 WL 2186007 (E.D. Mich. May 11, 2015) .............................35

*Rutan v. Republican Party of Ill.*,
　　497 U.S. 62 (1990)...................................................................................................26

*Santa Fe Indep. Sch. Dist. v. Doe*,
　　530 U.S. 290 (2000)...........................................................................................31, 36

*Simon v. Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976) ...................................................................................................23

*Simons v. Montgomery Cnty. Police Officers*,
  762 F.2d 30 (4th Cir. 1985) .........................................................................................9

*SmithKline Beecham Corp. v. Abbott Laboratories*,
  740 F.3d 471 (9th Cir. 2014) ......................................................................................40

*Suhre v. Haywood Cty.*,
  131 F.3d 1083 (4th Cir. 1997) ....................................................................................11

*Teen Ranch, Inc. v. Udow*,
  479 F.3d 403 (6th Cir. 2007) ......................................................................................36

*Estate of Thornton v. Caldor, Inc.*,
  472 U.S. 703 (1985)...............................................................................................33, 34

*Town of Greece, New York v. Galloway*,
  572 U.S. 565 (2014)...............................................................................................32, 33

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017)................................................................................................35

*Turner v. Fouche*,
  396 U.S. 346 (1970)....................................................................................................14

*Watts v. United States*,
  No. 8:14-2659-TMC, 2015 WL 5315946 (D.S.C. Sept. 11, 2015) .............................9

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012).......................................................................................40

*Yoo v. BMW Mfg. Co., LLC*,
  No. CV7:17-03499-TMC-SVH, 2019 WL 1416882 (D.S.C. Mar. 29, 2019) .............9

**Regulations**

S.C. Code Regs. § 114-4930(F)(2)-(8) .............................................................................5

**Other Authorities**

U.S. Const. amend. V.......................................................................................................36

U.S. Const. amend. XIV ..................................................................................................36

Plaintiffs Eden Rogers and Brandy Welch ("Plaintiffs") respectfully submit this memorandum of law in opposition to the Federal Defendants' Motion To Dismiss (ECF No. 50, "Federal MTD"), Defendant Michael Leach's Motion To Dismiss (ECF No. 54)[1], and Defendant Henry McMaster's Motion To Dismiss (ECF No. 57, "State MTD").[2]

## PRELIMINARY STATEMENT

Contrary to Defendants' assertions, it is clear that, accepting the well-pleaded factual allegations of the Complaint (ECF No. 1, "Compl.") as true, Plaintiffs have more than adequately alleged Establishment Clause and Equal Protection violations. Defendants fund and contract with an organization, Miracle Hill Ministries ("Miracle Hill"), to provide a government service—foster care—to wards of the State of South Carolina knowing that the organization accepts as prospective foster parents only families that share its religious beliefs. Such conduct fails to pass constitutional muster under the Establishment Clause. The State Defendants unlawfully have delegated the government function of finding foster families for wards of the State to an organization that employs a religious litmus test to decide who is eligible to participate in this government program. Defendants' actions coerce prospective foster parents to engage in religious exercise and results in the proselytization of children in foster care. All of this is prohibited by longstanding Supreme Court precedent. Plaintiffs' allegations likewise establish Equal Protection violations. The Complaint alleges that prospective foster parents who

---

[1] Defendant Leach does not advance any independent arguments in support of his motion to dismiss. Instead, he "refers to, relies upon, and incorporates by reference the Motion to Dismiss filed by Defendant Henry McMaster". (ECF No. 54.) Accordingly, Plaintiffs address Defendant McMaster's and Defendant Leach's arguments in support of their motions to dismiss together.

[2] This Memorandum of Law refers to Defendants United States Department of Health and Human Services ("HHS"), Administration for Children and Families ("ACF"), Alex Azar, Lynn Johnson and Steven Wagner as the "Federal Defendants", Henry McMaster and Michael Leach as the "State Defendants", and all Defendants collectively as "Defendants".

are not both evangelical Christian and heterosexual are denied the same array of foster care agency options available to evangelical Christian, heterosexual applicants.  Defendants can point to no conceivable justification under any level of scrutiny for permitting government-funded agencies providing public foster care services to exclude potentially qualified families based on religious criteria, especially given that all parties recognize the pressing need for such parents in the South Carolina foster care system.

Moreover, Plaintiffs have Article III standing to assert claims based on these Establishment Clause and Equal Protection violations.  The law is clear that the discriminatory and stigmatic harms, and the practical barriers to fostering, that Plaintiffs suffered are legally cognizable.  Despite Defendants' attempt to redefine the harm Plaintiffs suffered as the inability to work with a specific state-contracted foster care agency, to obtain a foster care license and to foster a child, these are not among the injuries Plaintiffs actually allege in the Complaint. Defendants' redefinition of the injury fails to appreciate the harms Plaintiffs faced from being categorically disadvantaged as prospective foster parents in the state foster care system on the basis of their religion and sexual orientation, including the stigmatic harm of discrimination and the practical barriers to fostering that such discrimination erects.  Not only were these injuries caused by the State and Federal Defendants, but the requested injunctive and declaratory relief directed at Defendants are the only remedies capable of redressing the injuries suffered.

Indeed, two district courts have denied motions to dismiss in closely analogous cases.  In *Dumont v. Lyon*, two same-sex couples seeking to adopt children from foster care sued the State of Michigan for permitting state-contracted child placing agencies ("CPAs") to use religious eligibility criteria to exclude same-sex couples.  341 F. Supp. 3d 706, 713 (E.D. Mich. 2018).  Like Plaintiffs here, they sued state officials for Establishment Clause and Equal

Protection violations, and, like Defendants here, the defendants in *Dumont* moved to dismiss for lack of standing and for failure to state a claim. *Id.* The court denied the defendants' motions to dismiss, holding that the plaintiffs' experience of discrimination by state-contracted, taxpayer-funded agencies constituted an injury sufficient to satisfy standing, and that their allegations that the state permitted these agencies to use religious eligibility criteria to exclude same-sex couples stated both Establishment Clause and Equal Protection claims. *Id.* at 714, 730.[3]

Similarly, in *Marouf v. Azar*, a married lesbian couple sued the Secretary of HHS and various other federal officials and agencies, among others, for funding and contracting with a religiously affiliated organization that would not qualify the couple as foster parents because of the organization's religious beliefs regarding the marriages of same-sex couples. No. 18-CV-00378 (APM), 2019 WL 2452315, at *1 (D.D.C. June 12, 2019). Among other claims, the couple asserted Establishment Clause and Equal Protection violations. *Id.* The defendants moved to dismiss for lack of standing, but the court found that the individual plaintiffs had sufficiently pleaded standing to pursue their causes of action. *Id.* Surprisingly, neither the State nor the Federal Defendants attempts to distinguish or even cites to these factually similar cases.[4]

Ignoring *Dumont* and *Marouf*, Defendants attempt to shirk responsibility for their actions by blaming the other defendants, Miracle Hill, and even the victims of the discrimination themselves. But the harm to Plaintiffs could not have occurred but for the actions of the State and Federal Defendants in authorizing and enabling the use of religious eligibility criteria by

---

[3] The court granted the defendants' motion to dismiss the claims of another plaintiff who solely based her claims on taxpayer standing. Plaintiffs here do not rely on taxpayer standing to assert any of their claims. *See infra* n.5.

[4] This is especially peculiar because Defendant McMaster is clearly aware of *Marouf*, having filed a response to the plaintiffs' notice of supplemental authority discussing the *Marouf* decision in the related case *Maddonna v. United States Department of Health and Human Services et al.*, No. 6:19-cv-00448-TMC (D.S.C. 2019), ECF No. 44.

state-contracted, government-funded foster care agencies providing public foster care services on behalf of the State.  When it comes to redressing government-inflicted harm, only Defendants can shoulder that responsibility.  And, Plaintiffs' injuries would be redressed if the Court ordered the relief requested, which includes injunctive relief barring Defendants from contracting with and funding CPAs that discriminate against prospective foster parents based on religion or sexual orientation.  Such relief would result in Plaintiffs' having the same array of CPAs from which to choose as evangelical Christian, different-sex couples and the ability to pursue fostering without the risk of facing discrimination.

## STATEMENT OF FACTS

The State of South Carolina is responsible for the care of children the State has removed from their families and placed in foster care.  Compl. ¶¶ 15, 20-21, 24-25.  South Carolina contracts out foster care services to private organizations and pays them with state and federal tax dollars.  Compl. ¶¶ 15, 24.  Miracle Hill is the largest state-contracted, government-funded CPA in South Carolina.  Compl. ¶¶ 2, 4, 43.  Because it receives substantial government funding, it has the resources to provide comprehensive support to foster families.  Compl. ¶ 46.  For families in the Greenville area interested in providing traditional foster care—as opposed to therapeutic foster care for youth with significant medical and emotional needs—there are limited other agency options.  *See infra* I.A.  However, Miracle Hill restricts eligibility for participation in its foster care programs to prospective foster parents who meet its religious requirements—individuals must share its evangelical Christian beliefs and be heterosexual.  Compl. ¶¶ 2, 47-51.

As of at least 2018, the South Carolina Department of Social Services ("DSS") has been aware that Miracle Hill discriminates against prospective foster parents on the basis of their religion and sexual orientation.  Compl. ¶¶ 53-55.  Accordingly, after determining that

Miracle Hill likely was in violation of state and federal law, Compl. ¶ 2, DSS rescinded Miracle

Hill's CPA license and issued a temporary license, which required Miracle Hill to adopt a written

plan to correct the areas of noncompliance within a six-month probationary period, Compl.

¶¶ 28, 56-57.

But, rather than requiring Miracle Hill to amend its practices to comply with state

and federal laws and policies, the State Defendants departed from the normal licensure process to

enable Miracle Hill to continue to turn away prospective foster parents on the basis of their

religion and sexual orientation—all while providing government funding to Miracle Hill to

administer its public foster care program.  Compl. ¶¶ 9, 11, 24, 33; S.C. Code Regs. § 114-

4930(F)(2)-(8).

*First*, Defendant McMaster requested a waiver from the federal government to

allow South Carolina to continue to receive federal funding for its public child welfare system

despite violating a federal regulation barring discrimination based on non-merit factors,

including religion and sexual orientation.  Compl. ¶¶ 3, 62.  While the waiver request was

pending, Miracle Hill operated under a temporary license, which would not have been converted

to a permanent license but for issuance of a federal waiver.  Compl. ¶¶ 56, 65-66.

Correspondence between Miracle Hill and Defendant McMaster's staff reveals that "DSS

continues to wait on the federal response before giving [Miracle Hill] the permanent license" and

it was "expected that if no guidance from Washington has come through . . . that [Miracle Hill

will] receive another provisional license".  Compl. ¶ 65.  Correspondence between Miracle Hill

and HHS similarly confirmed that in the absence of a federal waiver, DSS "will not license

Miracle Hill".  Compl. ¶ 67.

*Second*, while the waiver request was pending, Defendant McMaster issued

Executive Order 2018-12, which ordered that "DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs". Compl. ¶ 64. The Executive Order further ordered "DSS to review and revise its policies and manuals in accordance with [the] Order and ensure that DSS does not directly or indirectly penalize religious identity or activity". Compl. ¶ 64.

The Federal Defendants conditionally granted South Carolina the requested waiver in January 2019. Compl. ¶¶ 3, 68-69. The waiver allows Miracle Hill and any other subgrantees to use "religious criteria in selecting among prospective foster care parents" as long as they refer potential foster parents who they reject to other subgrantees or to DSS. Compl. ¶ 69.

*Finally*, once this hurdle was cleared, DSS issued Miracle Hill a new standard license to continue its public foster care work while allowing it to discriminate against prospective foster parents on the basis of religion and sexual orientation. Compl. ¶¶ 3, 70. Collectively, these actions undertaken by the State and Federal Defendants allowed Miracle Hill to continue to discriminate on the basis of religion and sexual orientation in the provision of state-contracted, government-funded public child welfare services.

As a result, when Plaintiffs Eden Rogers and Brandy Welch applied to work with Miracle Hill as prospective foster parents, they were summarily rejected on the basis of their religion and sexual orientation. Compl. ¶¶ 8, 80-81. By knowingly enabling Miracle Hill to discriminate against Plaintiffs on the basis of their religion and sexual orientation, Defendants have stigmatized Plaintiffs as inferior and less worthy of serving as foster parents because of these constitutionally protected characteristics. Compl. ¶ 90. Defendants also have denied Plaintiffs the same agency options available to families headed by evangelical Christian,

heterosexual couples and, specifically, barred Plaintiffs from working with the largest and most well-resourced CPA in the state. Compl. ¶¶ 5, 43, 45-46, 89.

Accordingly, on May 30, 2019, Plaintiffs filed a complaint against Defendants HHS, Alex Azar in his official capacity as Secretary of HHS, ACF, Lynn Johnson in her official capacity as Assistant Secretary of ACF, Steven Wagner in his official capacity as Principal Deputy Assistant Secretary of ACF, Henry McMaster in his official capacity as Governor of the State of South Carolina, and Michael Leach in his official capacity as State Director of DSS for violating the Establishment, Equal Protection, and Due Process Clauses of the United States Constitution. Compl. ¶¶ 1, 114-156. Plaintiffs seek declaratory and injunctive relief against Defendants for unlawfully authorizing and enabling state-contracted, government-funded CPAs to use religious criteria to exclude prospective parents that are not evangelical Christian and heterosexual. Compl. 38-39. Contrary to Defendants' assertions, Federal MTD 18-20, State MTD 10, Plaintiffs do not seek to hold Defendants liable for the actions of a third party, Miracle Hill. Instead, Plaintiffs seek to hold Defendants liable for their own actions, without which there could be no such discrimination in the public child welfare system.

In an attempt to avoid liability, Defendants engage in an array of procedurally improper tactics to mischaracterize the relevant facts. *First*, the State Defendants improperly fail to accept as true Plaintiffs' well-pleaded factual allegations that Defendants discriminated against Plaintiffs on the basis of their sexual orientation by claiming that Plaintiffs only asserted conclusory allegations. *See* State MTD 8, 10-11. But this simply is not true. Among other factual allegations, Plaintiffs cite to multiple instances of public reporting for support that "Miracle Hill has stated publicly that it will not accept married, same-sex couples as foster parents", Compl. ¶ 52, and underscore that "DSS has acknowledged that Miracle Hill

discriminates based on the sexual orientation of prospective foster parents and has received complaints from same-sex couples who have been turned away by the CPA", Compl. ¶ 53. Moreover, Plaintiffs allege that Miracle Hill requires prospective foster parents to complete an online form in which they must "agree in belief and practice" with Miracle Hill's doctrinal statement, which in part states that "God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship".  Compl. ¶¶ 48, 49; *see supra* III.B.2.

*Second*, Defendants similarly dispute, rather than accept, Plaintiffs' allegations that Miracle Hill seeks prospective foster parents of a particular faith in order to engage in religious proselytization of children in foster care.  Federal MTD 21; State MTD 12.  But, this again is belied by the factual allegations in the Complaint, Compl. ¶ 94, and even the State Defendants' own contentions, State MTD 3.  *Finally*, the State Defendants improperly try to inject extrinsic evidence not incorporated in or relied upon in the Complaint, which is wholly improper on a motion to dismiss.  Beyond relying on portions of the Miracle Hill website that are never referenced in the Complaint, State MTD 7, the State Defendants rely on a host of extraneous articles to contend that the government has partnered with religious organizations for "hundreds of years".  State MTD 29.

## LEGAL STANDARD

"A motion to dismiss under [Rule] 12(b)(1) examines whether the complaint fails to state facts upon which jurisdiction can be founded." *1500 Range Way Partners, LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 800 F. Supp. 2d 716, 719 (D.S.C. 2011).  The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law".  *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

8

"A Rule 12(b)(6) motion should not be granted unless it appears certain that the pleading party can prove no set of facts that would support his claim and would entitle him to relief." *Yoo v. BMW Mfg. Co., LLC*, No. CV7:17-03499-TMC-SVH, 2019 WL 1416882, at *2 (D.S.C. Mar. 29, 2019) (Cain, J.) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). "When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the pleading party." *Yoo*, 2019 WL 1416882, at *2 (citing *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs.*, 7 F.3d at 1134). "To survive a motion to dismiss, a [claim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Yoo*, 2019 WL 1416882, at *2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the [pleading party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"For purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference". *Watts v. United States*, No. 8:14-2659-TMC, 2015 WL 5315946, at *4 (D.S.C. Sept. 11, 2015) (Cain, J.) (citing *Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985)).

## ARGUMENT

## I.     PLAINTIFFS HAVE ARTICLE III STANDING.

Plaintiffs have pleaded facts sufficient to show they have Article III standing to assert Establishment Clause and Equal Protection claims against Defendants:  (1) the stigma and practical barriers to fostering that Plaintiffs experienced as a result of the discrimination against them are legally cognizable injuries-in-fact that are "concrete and particularized", as well as

"actual or imminent"; (2) these injuries are fairly traceable to the State Defendants, who authorized this discrimination by a state-contracted, government-funded CPA, and the Federal Defendants, who granted Defendant McMaster's request for a waiver from a federal nondiscrimination regulation to enable the CPA to continue discriminating; and (3) the requested injunctive and declaratory relief immediately will redress the stigmatic harm of discrimination and remove the practical barriers that the discrimination imposes on Plaintiffs' ability to participate in the South Carolina foster care system.[5] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Thus, Defendants' motions to dismiss for lack of subject matter jurisdiction are meritless and should be denied in their entirety.

A.  The Stigma and Practical Barriers to Fostering Plaintiffs Experienced Are Legally Cognizable Injuries-In-Fact.

Plaintiffs have suffered at least two legally cognizable injuries-in-fact: (1) the stigma resulting from the discrimination they suffered based on their religion and sexual orientation when they sought to participate in the South Carolina foster care system; and (2) the practical barriers to participation in that government program imposed by that discrimination. Only the State Defendants assert that Plaintiffs have not suffered any injury-in-fact, State MTD 12-13; the Federal Defendants recognize that Plaintiffs have suffered a legally cognizable injury, Federal MTD 12.[6]

---

[5] Despite Defendants' claims to the contrary, Federal MTD 14-17; State MTD 18-19, Plaintiffs do not and need not rely on their status as taxpayers or the assertion of claims on behalf of proselytized children in the foster care system for Article III standing. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145 (2011) ("[I]f a law or practice . . . disadvantages a particular religious group or a particular nonreligious group, the disadvantaged party would not have to rely on [taxpayer standing] to obtain redress for a resulting injury.").

[6] While correctly recognizing Plaintiffs have suffered an injury-in-fact, the Federal Defendants mischaracterize Plaintiffs' injury as the loss of the opportunity to serve as foster parents. Federal MTD 12. However, as discussed below, Plaintiffs have alleged that they

*First*, at the core of the injuries Plaintiffs suffered is the stigma of being turned away from a government program because of their religious beliefs and sexual orientation. Courts have held that discriminatory harm and stigmatic injuries experienced by those subjected to discrimination are legally cognizable injuries under Establishment Clause and Equal Protection jurisprudence. *See Dumont*, 341 F. Supp. 3d at 721 ("Plaintiffs allege stigmatic injury because they were personally turned away by certain faith-based child placing agencies—they allege that they personally encountered the stigmatic harm about which they complain through that act of being turned away as prospective adoptive parents. They have alleged injury-in-fact with respect to their Establishment Clause claim."); *see also Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community . . . can cause serious non-economic injuries") (citation omitted); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) ("Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context"); *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997) ("[R]ules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.").

Defendants assert that Plaintiffs have not suffered any legally cognizable injury-in-fact because they have not faced "personal contact" with the offensive conduct and because

---

experienced stigma and practical barriers to fostering resulting from the discrimination they suffered.

they have no direct relationship with Defendants.  State MTD 20.[7]  This is both factually and

legally wrong.  Plaintiffs were personally turned away as prospective foster parents on the basis

of their religion and sexual orientation.  Compl. ¶¶ 81, 83.  And that rejection happened because

Defendants authorized and enabled discrimination by CPAs providing state-contracted,

government-funded public child welfare services.  Compl. ¶¶ 3, 5, 81, 83.  This is legally

sufficient to establish an injury-in-fact.  *See Int'l Refugee Assistance Project v. Trump*, 883 F.3d

233, 258-59 (4th Cir. 2018) ("The common thread among these different forms of cognizable

legal injury is 'personal contact' with the alleged establishment or disfavoring of religion.")

(citation omitted); *Dumont*, 341 F. Supp. 3d at 721 ("The Prospective Parent Plaintiffs suggest

that they are not just part of a larger group that claims unequal treatment—they personally

encountered the unequal treatment about which they complain through that act of being turned

away as prospective adoptive parents.  They have alleged injury-in-fact with respect to their

Equal Protection claim."); *see also Heckler*, 465 U.S. at 739-40 (noting that discrimination may

cause serious injuries "to those persons who are personally denied equal treatment solely because

of their membership in a disfavored group") (citation omitted).

> *Second*, Plaintiffs suffered harm from the practical barriers that Defendants have

erected to Plaintiffs' ability to foster through the South Carolina foster care system.  *See* Compl.

¶¶ 5, 25, 82, 107, 120.  Plaintiffs allege that, as a result of Defendants' authorization of

discrimination by CPAs providing public foster care services, they are being shut out from the

largest and most well-resourced CPA in the state, which, because of the substantial government

---

[7] Although the Federal Defendants do not move to dismiss on the basis that Plaintiffs have
not suffered any injury-in-fact, they do repeatedly assert that Plaintiffs have not had any personal
contact with the offensive conduct sufficient to otherwise sustain their claims.  Federal MTD 28.
For the same reasons that the State Defendants are incorrect that Plaintiffs have not had any
personal contact with the offensive conduct sufficient to confer standing, the Federal Defendants
are also incorrect.

funding it receives, can provide comprehensive support to foster families.  *See* Compl. ¶¶ 43, 46.

The other CPAs that provide traditional foster care services in the Greenville, South Carolina

area, where Plaintiffs live, are not equivalent to Miracle Hill, nor is DSS.  *See* Compl. ¶¶ 25

("Prospective foster parents also can work directly with DSS, but doing so often means

significantly longer wait times to obtain a foster care license and significantly less support

throughout the process."), 45 ("Of the other four agencies, one—like Miracle Hill—does not

accept same-sex couples; one had no licensed foster homes as of April 2019; one is new to the

field, offering foster care services only since 2017; and one is located over an hour away from

Greenville."); *see also* Compl. ¶ 82.  Even if there were other equivalent CPAs nearby,

permitting discrimination against prospective foster parents because of their religion and sexual

orientation reduces the number of CPAs from which they can choose, erecting a practical barrier

to fostering that heterosexual, evangelical Christians do not face.  This is a legally cognizable,

independent injury-in-fact.  *See Dumont*, 341 F. Supp. 3d at 722 ("Plaintiffs have sufficiently

alleged an injury separate from the stigmatic harm they claim to have suffered—the unequal

treatment they received as a result of being turned away based upon their status as a same-sex

couple, a barrier that makes 'it more difficult for [same-sex couples to adopt] than it is for

[heterosexual couples].'") (citation omitted); *see also City of Richmond v. J.A. Croson Co.*, 488

U.S. 469, 493 (1989) (holding that a city-mandated program that required contractors awarded

municipal contracts to subcontract to a minimum percentage of minority business enterprises

unconstitutionally "denie[d] certain citizens the opportunity to compete for a fixed percentage of

public contracts based solely upon their race"); *Associated Gen. Contractors*, 508 U.S. at 666

(plaintiff has standing where "the government erects a barrier that makes it more difficult for

members of one group to obtain a benefit than it is for members of another group").

13

The State Defendants, however, mischaracterize the nature of the harm Plaintiffs have suffered, arguing that the "interest that Plaintiffs allege has been invaded is their ability to foster through a specific, private CPA of their choice". State MTD 12. This ignores the facts actually alleged in the Complaint. Indeed, the Complaint alleges that the harms Plaintiffs suffered are "discrimination and stigma", and the denial of the "same opportunities to foster that are available to families that meet Miracle Hill's religious requirements". Compl. ¶¶ 107, 120; *see also* Compl. ¶¶ 134, 150. Plaintiffs are not claiming a right to work with Miracle Hill or any particular agency. Rather, they simply seek to have the same array of options that are available to others, whether or not that includes Miracle Hill. It is therefore irrelevant that, as the State Defendants claim, there is no constitutional right to become a foster parent by volunteering with a CPA of one's own choosing, or that there is no constitutional right to force Miracle Hill to associate with Plaintiffs. State MTD 12. There is a constitutionally protected right to be free from disfavor on the basis of religion and sexual orientation in a government program—a fact the State Defendants choose to ignore. *See Turner v. Fouche*, 396 U.S. 346, 362 (1970) ("We may assume that [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory qualifications.") (footnote omitted). Plaintiffs have suffered legally cognizable injuries-in-fact sufficient to support standing.

B.    The Injuries Plaintiffs Suffered Are Fairly Traceable to the State and Federal Defendants' Conduct.

1.    *The State Defendants Caused Plaintiffs' Injuries.*

Plaintiffs' alleged injuries are fairly traceable to the State Defendants. *First*, the harms Plaintiffs suffered are directly traceable to Defendant McMaster, who is sued in his official capacity as South Carolina's governor. When Defendant McMaster learned that Miracle

14

Hill was using religious criteria to discriminate against prospective foster parents—instead of enforcing the laws and policies prohibiting such discrimination in the public child welfare system—he issued an Executive Order to permit Miracle Hill and other CPAs to impose these religious tests. *See* Compl. ¶ 64. But Defendant McMaster did not stop there. He lobbied HHS for a waiver from a federal nondiscrimination regulation so that South Carolina could continue to receive federal funding for its public child welfare system while permitting discrimination in violation of that regulation. *See* Compl. ¶ 62. Because Defendant McMaster disrupted the normal licensure process designed to prevent discrimination (which would have resulted in the denial of a permanent license to Miracle Hill), *see* Compl. ¶¶ 56, 65-67, and instead, took these actions to permit state-contracted, government-funded CPAs to discriminate, the harms Plaintiffs suffered from being turned away by a state-contracted, government-funded CPA because of their religion and sexual orientation are directly traceable to Defendant McMaster's actions.

*Second*, an agency's ability to operate as a CPA is directly traceable to Defendant Leach because he, in his official capacity as the director of DSS, oversees DSS and its decision to license CPAs.[8] Absent the state-issued license, Miracle Hill legally would not be able to operate as a CPA providing public foster care services within South Carolina and, thus, could not discriminate against prospective foster parents like Plaintiffs. *See* Compl. ¶¶ 3, 70. Thus, it is because DSS, under Defendant Leach's direction, licensed Miracle Hill as a CPA and funded it with government dollars, knowing of its discriminatory conduct, that Plaintiffs suffered the injuries resulting from their discriminatory treatment. *See* Compl. ¶¶ 26, 33-34; *see Dumont*, 341 F. Supp. 3d at 724 ("Plaintiffs allege that because of the State Defendants' practice of

---

[8] As governor, Defendant McMaster "is responsible for ensuring that all South Carolina executive departments and agencies, including DSS, comply with all applicable laws". Compl. ¶ 14. Thus, for the same reasons that the injuries are directly traceable to Defendant Leach, they also are traceable to Defendant McMaster.

continuing to enter into contracts that allow the child placing agencies to use religious criteria in excluding same-sex couples, they have suffered both stigmatic and practical harm.  This injury is at least 'fairly traceable' to the State Defendants based on the allegations before the Court.").

2.     *The Federal Defendants Also Caused Plaintiffs' Injuries.*

Plaintiffs' alleged injuries also are fairly traceable to the Federal Defendants because the Federal Defendants knowingly funded and continue to fund through South Carolina Miracle Hill's discriminatory conduct,[9] and granted a waiver from a generally applicable nondiscrimination regulation to enable South Carolina to continue to receive that federal funding notwithstanding discrimination by one of its contracted agencies.  *See* Compl. ¶¶ 68, 116, 146; *see generally Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315-16 (4th Cir. 2013) (recognizing that "the concept of concurrent causation" applies to standing).  As a preliminary matter, HHS funds the child-placement activities of private agencies in South Carolina, which include the discriminatory conduct alleged in this case, through grants to the State.  Compl. ¶¶ 10-11.  The Federal Defendants knew when they exempted CPAs in South Carolina from complying with a federal nondiscrimination regulation that they were authorizing those entities to discriminate in the provision of government services on the basis of religion and sexual orientation.  Indeed, the waiver request specifically sought an exception for South Carolina CPAs to engage in religiously motivated discrimination, highlighting the example of Miracle Hill, Compl. ¶¶ 62, 115, and the Federal Defendants were on notice that the largest CPA in the

---

[9] The Federal Defendants assert that they cannot be held liable because it is South Carolina that decides how it funds or administers its foster care program.  Federal MTD 21-22 ("Instead, it is South Carolina that licenses child-placing agencies for participation in the state's foster care system, and it is South Carolina that contracts with and distributes money to these entities as reimbursement for applicable expenses.").  To the extent that the Federal Defendants suggest that South Carolina is liable in part for the discriminatory conduct at issue, Plaintiffs agree.  But that does not insulate the Federal Defendants from liability for their own role in causing the injuries Plaintiffs have suffered and continue to suffer.

state uses religious criteria that excludes non-evangelical Christians and same-sex couples, Compl. ¶ 63.

By funding South Carolina's foster care program and issuing a waiver that allows South Carolina's CPAs to discriminate on the basis of religion while knowing that it would also result in discrimination on the basis of sexual orientation, the Federal Defendants caused the injuries Plaintiffs suffered as a result of being turned away from a state-contracted, government-funded program. Indeed, it is only because the Federal Defendants issued the waiver that DSS relicensed Miracle Hill. *See* Compl. ¶¶ 65 ("DSS continues to wait on the federal response before giving [Miracle Hill] the permanent license"), 68, 116, 146. The Complaint alleges facts demonstrating that without the federal waiver ensuring that South Carolina would not lose federal funding by permitting discrimination in its public child welfare system, DSS would not have allowed such conduct by one of its CPAs.

The *Marouf* court rejected a virtually identical standing argument raised by the federal government:

> According to the [] Defendants, a federal agency cannot be held to account for a grantee's known exclusion of persons from a federally funded program on a prohibited ground. That is an astonishing outcome. . . . Yet, despite conceding that there is no agency policy that prevents child placement with same sex couples, the [] Defendants in this case wish to avoid the responsibility that comes with being good stewards of federal funds. They cannot do so.

2019 WL 2452315, at *8 (citation omitted); *see also Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 442 (D.C. Cir. 1998) ("[T]he Supreme Court [has] repeatedly found causation where a challenged government action permitted the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal. [The] court has [n]ever stated that the challenged law must compel the third party to act in the allegedly injurious way.").

17

The *Marouf* court's astonishment at the federal government's disavowal of responsibility for a grantee's discriminatory exclusion of same-sex couples included that court's speculating that "[s]urely, the government would not take this position if, say, Plaintiffs here were excluded from fostering a child based on their . . . religious faith."  2019 WL 2452315, at *8.  Yet that is precisely the position the Federal Defendants have taken here, and their responsibility for the actions of their grantees is no different.

        3.    *Plaintiffs' Injuries Are Not Self-Inflicted.*

Defendants argue that Plaintiffs' harms are "self-inflicted" because Plaintiffs sought to apply to Miracle Hill instead of going to a different agency.  Federal MTD 12; State MTD 16.  In support of this proposition, Defendants rely on the fact that the waiver requires Miracle Hill and other South Carolina CPAs to refer people with whom they refuse to work to other agencies.  Federal MTD 12; State MTD 8.  But this is irrelevant.  Plaintiffs suffered stigmatic harm as a result of being turned away by an agency operating a government program because of their religion and sexual orientation, and that harm is not remedied by the possibility that they might be able to work with another CPA or with DSS.  As the *Dumont* court concluded, "Plaintiffs[] need not demonstrate that they would have been completely foreclosed – only that they could not compete for the right to [foster] on the same footing as everyone else."  341 F. Supp. 3d at 722.

Indeed, the Supreme Court has recognized that "go elsewhere" is no answer to a charge of discrimination in the provision of public services or accommodations.  For example, in a case involving a motel and a restaurant that refused to serve African Americans, the Court recognized that "[d]iscrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public".  *Heart of Atlanta Motel, Inc. v. United States,*

379 U.S. 241, 292 (1964) (quoting S. Rep. No. 872, 88th Cong.).  Much like the African

American patrons in *Heart of Atlanta Motel* who were categorically denied service because of

their race, Plaintiffs here neither inflict injury upon themselves nor absolve Defendants of

liability when they choose not to undertake the additional burden of hunting for alternatives from

a smaller set of options after being categorically turned away by their first-choice CPA.

Moreover, and as discussed *supra* I.A, Miracle Hill, due to its substantial government funding,

has the capacity to provide comprehensive support to foster families, while the few other

traditional CPAs in the Greenville area are hardly comparable.  Plaintiffs' unwillingness to settle

for more limited options and more limited support services does not deprive them of standing.

4.      *Miracle Hill's Conduct Does Not Break the Chain of Causation.*

Defendants try to evade responsibility for their actions by asserting that the

independent actions of Miracle Hill render any injury not fairly traceable to them; this

purportedly is because Miracle Hill could have engaged in injury-inflicting actions even in the

absence of government conduct and any state action.  Federal MTD 18-20; State MTD 10.

Defendants are wrong.  Plaintiffs are not challenging the ability of a private entity to discriminate

on the basis of religion and sexual orientation in conducting private activity.  Plaintiffs challenge

Defendants' actions in authorizing and enabling the use of religious eligibility criteria in the

*public* child welfare system.  Compl. ¶ 1 ("Plaintiffs bring this action seeking declaratory and

injunctive relief against Defendants in their official capacities for unlawfully authorizing *state-

contracted, government-funded* foster care agencies to use religious eligibility criteria to exclude

qualified families from fostering children in *the public child welfare system*.") (emphasis added).

Such discrimination against prospective foster parents like Plaintiffs would not be

possible absent Defendants' conduct:  Miracle Hill simply could not cause these harms on its

own.  The discriminatory harms Plaintiffs allege require Defendants' authorization through

licensing as well as funding decisions.  Indeed, without Defendants' permission, Miracle Hill could not discriminate against prospective foster parents in the state's public child welfare system.  Thus, Defendants' assertions that Plaintiffs are trying "[t]o hold the government legally responsible for the action of a private party", Federal MTD 18, or that the "complaint alleges only that a private entity engaged in religious discrimination", State MTD 24, are false.  Plaintiffs ask the Court to hold Defendants responsible *for their own actions* in sanctioning and funding the discriminatory conduct, not to hold them liable for the activities of others.  *See Marouf*, 2019 WL 2452315, at *8-9 (by partnering with and funding agencies that disfavor same-sex couples, the government "permitted or authorized third-party conduct . . . that would otherwise be illegal in the absence of the Government's action", and it is the government programs the Plaintiffs seek to change rather than the agency's views on same-sex couples) (quotation omitted).

C.    The Requested Relief Immediately Will Redress Plaintiffs' Injuries.

When Plaintiffs' injuries are correctly understood as the stigma and practical barriers to fostering that Plaintiffs experienced as a result of discrimination in South Carolina's foster care system, *see supra* I.A, it is clear that the requested relief would redress those injuries.[10]  If the State Defendants are no longer permitted to allow CPAs to discriminate based on religion or sexual orientation, there will be no more CPAs that discriminate—only CPAs that accept all qualified families.  Thus, Plaintiffs will no longer face discriminatory treatment in a government program.  Whether that is because Miracle Hill changes its policies limiting the prospective foster parents with whom it will work or the State contracts with other agencies to

---

[10] "[I]t need not be likely that the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement." *Dumont*, 341 F. Supp. 3d at 724 (citation omitted) (emphasis in original).

provide these services, Plaintiffs' injuries will be redressed.[11]  *Dumont*, 341 F. Supp. 3d at 725 ("If [Plaintiffs] are granted the [injunctive] relief they seek, [the discriminatory] barriers will be eliminated and they will be able to pursue adoption on equal footing with other [] families.  No speculative inferences are necessary here to conclude that the relief requested will result in the Plaintiffs receiving the dignity and equal treatment they seek.").

The same applies for the Federal Defendants.  If granted, the relief requested[12] would remedy the discriminatory harms Plaintiffs suffered because, without the HHS waiver, every licensed CPA in South Carolina will be required to provide government-funded, public child welfare services in a nondiscriminatory fashion consistent with federal law.  Therefore, in order to continue to receive federal funding, DSS would be required to either:  (1) ensure that Miracle Hill stops discriminating on the basis of religion and sexual orientation, or (2) discontinue allowing Miracle Hill to provide public child welfare services.  Either way, because Plaintiffs would no longer be turned away from a government program because of their religion or sexual orientation, and would have the same array of agency options available to other families, the requested relief would necessarily redress their constitutional injuries.

---

[11] As to the State Defendants, Plaintiffs seek:  (1) a declaration that the State Defendants violated the Establishment and Equal Protection Clauses; (2) a permanent injunction ordering the State Defendants to cease contracting with any CPA that discriminates against prospective foster parents based on their religion, sex, sexual orientation or exercise of the fundamental right to marry a person of the same sex; and (3) a permanent injunction directing the State Defendants to ensure that all prospective foster parents, regardless of religion, sex, sexual orientation or exercise of the fundamental right to marry a person of the same sex are treated equally by state-contracted, government-funded CPAs.  Compl. 38-39.

[12] As to the Federal Defendants, Plaintiffs seek:  (1) a declaration that the Federal Defendants violated the Establishment and Due Process Clauses; and (2) a permanent injunction ordering the Federal Defendants to rescind the HHS waiver and prohibiting them from granting any other waiver that would enable discrimination against prospective foster parents in any state's federally funded child welfare system based on religion, sex, sexual orientation or exercise of the fundamental right to marry a person of the same sex.  Compl. 38-39.

*Marouf*, 2019 WL 2452315, at *10 ("[T]he relief that Plaintiffs seek requires no speculation. Ordering the Federal Defendants to develop a system that removes barriers to same-sex couples becoming foster parents and evaluates their eligibility by the same criteria as any heterosexual couple or person will make Plaintiffs whole.").

1.     *No Third Party Renders Redressability Speculative.*

Defendants argue that third-party conduct renders the redressability of Plaintiffs' injuries speculative, rather than likely.  The Federal Defendants point their fingers at South Carolina, Federal MTD 13-14, 21-22, and both the State and Federal Defendants point their fingers at Miracle Hill.  Federal MTD 10-13; State MTD 17-18.  But Defendants are wrong because no third-party intermediary stands in the way of the relief requested, which is directed at government actors, whom Plaintiffs seek to enjoin from authorizing and enabling the use of religious eligibility criteria in South Carolina's public child welfare system.

*First*, the Federal Defendants erroneously argue that it is speculative that the relief requested would cause South Carolina to stop licensing Miracle Hill as a CPA because the Federal Defendants do not control state licensing decisions.  Federal MTD 13-14, 21-22. However, as discussed *supra* I.C, absent the federal waiver, DSS would not have issued a standard CPA license to Miracle Hill.  *See* Compl. ¶¶ 65, 68, 116, 146.  Thus, if injunctive relief is granted ordering the Federal Defendants to rescind the waiver, DSS would no longer license CPAs that discriminate, and Plaintiffs' injuries will be redressed.

*Second*, all Defendants argue that it is speculative that rescission of the HHS waiver or reversal of DSS's policies would lead Miracle Hill to agree not to discriminate instead of to discontinue its foster care work.  Federal MTD 10-13; State MTD 17-18.  However, for purposes of redressability, it does not matter what Miracle Hill ultimately decides to do. Regardless of whether Miracle Hill agrees to work with Plaintiffs or to discontinue its state-

contracted CPA work[13], if the relief sought by Plaintiffs is granted, there will be no CPAs that discriminate based on religion or sexual orientation.  Plaintiffs will be able to pursue fostering without the risk of facing further discrimination and with access to the full array of agencies available to other families, thus redressing their injuries.

        Therefore, the cases Defendants cite about third parties standing between the relief requested and redressing the injuries alleged, which might render redress speculative, are inapposite:

- In *Allen v. Wright*, the Supreme Court considered whether it was speculative that withdrawal of a tax exemption for racially discriminatory private schools (the relief requested) would rectify entrenched racial segregation in public schools (the injury alleged); redressability necessarily depended on the independent decisions of parents (the third parties) who ultimately decided where to send their children to school.  468 U.S. 737, 758 (1984); *see* Federal MTD 10; State MTD 13.

- In *Simon v. Eastern Kentucky Welfare Rights Organization*, the Supreme Court considered whether it was speculative that withdrawing the tax-exempt status of a hospital that discriminated against indigent patients (the relief requested) would affect the hospital's denial of service to indigent patients (the injury alleged); redressability necessarily depended on independent treatment decisions made by the hospitals (the third parties).  426 U.S. 26, 45-46 (1976), *see* Federal MTD 13.

- In *Doe v. Obama*, the Fourth Circuit considered whether it was speculative that the withdrawal of federal funding for embryonic stem cell research (the relief requested) would prevent embryos from being used for stem cell research (the injury alleged); redressability necessarily depended on the "independent decision of biological parents to donate embryos for research" (the third parties).  631 F.3d 157, 160-61 (4th Cir. 2011); *see* Federal MTD 9-11; State MTD 13-14.

- In *Frank Krasner Enters. Ltd. v. Montgomery Cty.*, the Fourth Circuit considered whether it was speculative that rescission of a county law that denies public funding to venues that display and sell guns (the relief requested) would cause venues to change their decision not to lease space to the gun show proprietors (the injury alleged); redressability

---

    [13] The State Defendants' assertions that Plaintiffs "hope to deprive these CPAs of their ability to offer any foster care services to needy children whatsoever" and "to strip them of their licenses to offer foster care services at all—even if they do not contract with the government or accept public funding"—are baseless.  State MTD 18 n.10, 22.  Plaintiffs only seek to prevent state-contracted, government-funded CPAs that are providing public foster care services from discriminating on the basis of religion and sexual orientation.

necessarily depended on independent leasing decisions by gun show venue owners (the third parties).  401 F.3d 230, 235-36 (4th Cir. 2005); *see* Federal MTD 9-10, 12; State MTD 13-14, 17, 21.

Defendants' reliance on the Supreme Court's decisions in *Allen* and *Simon*, and the Fourth Circuit's decisions in *Doe v. Obama* and *Frank Krasner*, is misplaced because the constitutional harms Plaintiffs suffered here—the authorization of the use of religious eligibility criteria by state-contracted, government-funded CPAs—only can be inflicted and redressed by government defendants.  Thus, redressability requires no speculative inferences about third-party conduct.

## II.    PLAINTIFFS HAVE STATED CLAIMS FOR VIOLATIONS OF THE ESTABLISHMENT CLAUSE.

Plaintiffs have adequately alleged that the actions of both the State and Federal Defendants violate the Establishment Clause.  While Defendants mischaracterize the facts in an attempt to redefine the conduct challenged by Plaintiffs, they cite no cases allowing an organization to administer a government program using religious eligibility criteria for prospective participants.

### A.    Plaintiffs Have Adequately Alleged State Action.

Defendants attempt to deflect allegations about their conduct by arguing that they cannot be held responsible for the actions of private party Miracle Hill.  *See* Federal MTD 18-21.[14]  Plaintiffs, however, do not seek to hold Defendants liable for Miracle Hill's actions, but rather for their own conduct.  The State Defendants acted unconstitutionally by authorizing Miracle Hill to use religious criteria to exclude prospective foster families when providing public foster care services.  The Federal Defendants acted unconstitutionally by granting a waiver from

---

[14] The State Defendants make a similar argument in the standing context.  State MTD 13-14. *See supra* I.B.

a federal nondiscrimination regulation to allow for religious discrimination by Miracle Hill and other faith-based South Carolina CPAs.  All Defendants acted unconstitutionally by providing funding to Miracle Hill with the knowledge that such funds would be used for religious discrimination.[15]  *See also* Section I.B (demonstrating that the injuries Plaintiffs have suffered are traceable to both the State and Federal Defendants' conduct).

> B.    The State Defendants Improperly Delegate a Government Function to a Religious Organization That Employs a Religious Eligibility Test.

The care of children in state custody is a government function.  The State Defendants have delegated to faith-based CPAs, including Miracle Hill, the public function of recruiting, screening and supporting prospective foster parents.  Such delegation of "governmental power to religious institutions, inescapably implicates the Establishment Clause". *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982).

Delegation to religious organizations is impermissible where there is a risk that the organization will perform the delegated function in a religious manner.  *See id.* at 125 (holding that because the churches' power to deny an applicant a liquor license "*could* be employed for explicitly religious goals" it violated the Establishment Clause) (emphasis added); *see also Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 696 (1994) (holding that the delegation of authority over a public school to a religious group was improper where there was "no assurance that governmental power has been or will be exercised neutrally").  In these cases, the Supreme Court found that the delegation of governmental power

---

[15] The Federal Defendants improperly cite *Milburn v. Anne Arundel Cty. Dep't of Social Servs.*, 871 F.2d 474 (4th Cir. 1989), for the proposition that the court has "previously affirmed dismissal of foster-care-related claims against government defendants".  Federal MTD 19.  But in that case, the state was found not to be liable for abuse suffered by a child in foster care.  The state did not knowingly fund or license abusive foster parents, nor did it provide a waiver to allow these parents to continue to foster despite their abusive behavior.

violated the Establishment Clause where that power *could* be used for religious reasons. Here, the facts alleged in the Complaint demonstrate that Miracle Hill *is* performing this delegated government function using religious criteria, selecting only prospective foster parents who share its faith and meet its religious requirements and rejecting all others.[16] Compl. ¶¶ 47-52, 81. This the Establishment Clause does not allow.[17] *See*, *e.g.*, *Dumont*, 341 F. Supp. 3d at 736-41.

C.    The Use of Government Funds for a Program Administered with Religious Restrictions Violates the Establishment Clause.

By knowingly funding an agency that uses religious eligibility criteria to screen prospective foster parents, Defendants commit one of the primary "evils" targeted by the Establishment Clause: "sponsorship [and] financial support" of religion. *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 772 (1973). Indeed, no court has held that government funds may be used for public programs administered with religious restrictions. *See, e.g., id*. at 780 (holding that "state aid derived from public funds" must be "used exclusively for secular [and] neutral" ends); *Mitchell v. Helms*, 530 U.S. 793, 840, 857 (2000) (controlling opinion of O'Connor, J.) ("[O]ur decisions provide no precedent for the use of public funds to

---

[16] Additionally, Defendants cannot accomplish indirectly what they are prohibited from accomplishing directly. *See* Federal MTD 18-21; *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."); *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("[A] state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") (internal quotations omitted). Defendants do not (and could not) contend that they themselves could discriminate based on religious criteria in the administration of a public program, and they cannot escape the Establishment Clause by funding and licensing a private organization to do so.

[17] The Supreme Court has "never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation". *Kiryas,* 512 U.S. at 706.

finance religious activities.") (internal quotation marks and citations omitted).[18]  *See also Am.*

*Civil Liberties Union of Massachusetts v. Sebelius*, 821 F. Supp. 2d 474, 484-86 (D. Mass. 2012)

(holding that government defendant violated the Establishment Clause by providing funds to a

Catholic group that imposed a religiously based restriction on the use of those public funds for

reproductive services), *vacated on other grounds sub nom. Am. Civil Liberties Union of*

*Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44 (1st Cir. 2013); *Cmty.*

*House, Inc.*, 490 F.3d at 1059 (holding that the use of city funds for Christian chapel services, in

addition to secular services for the homeless, violated the Establishment Clause).

> Defendants mischaracterize the facts by responding to an argument Plaintiffs have

not made:  that the government may never partner or contract with religious organizations

without violating the Establishment Clause.  Federal MTD 24-25; State MTD 29.  Plaintiffs do

not challenge the eligibility of religious organizations to receive government contracts to provide

government services.  They do object, however, to the government's funding religious activity,

including the operation of a government program with religious eligibility criteria.  Despite

Defendants' attempts to obfuscate the issues at play, that is exactly the case here.[19]  As alleged in

the Complaint, Miracle Hill openly and notoriously applies a religious eligibility test in

conducting the very activity for which it receives public funding from the State and Federal

---

[18] The State Defendants incorrectly cite the plurality opinion in *Mitchell*.  State MTD 30,
n.19. *See Columbia Union Coll. v. Oliver*, 254 F.3d 496, 504 & n.1 (4th Cir. 2011) (recognizing
Justice O'Connor's concurrence as controlling); *Cmty. House, Inc. v. City of Boise*, 490 F.3d
1041, 1058 (9th Cir. 2007) (same).

[19] In denying defendants' motions to dismiss, the court in *Dumont* clarified the same issue:
"[I]t is critical to our endeavor to understand what the Plaintiffs have alleged in their Complaint
and what they have not alleged.  Plaintiffs do *not* challenge the eligibility of religious
organizations to receive government contracts to provide social services. . . .  Rather, Plaintiffs
challenge the State's practice of contracting with child placing agencies and authorizing those
agencies to use religious eligibility criteria in the public child welfare system." 341 F. Supp. 3d
at 733 (emphasis in original) (quotations omitted).

Defendants:  recruiting and screening foster parents.  *See* Compl. ¶¶ 2, 47-51; Federal MTD 5;

State MTD 8.  By permitting Miracle Hill to use government funds to administer a public

program using religious eligibility criteria, Defendants violate the Establishment Clause.[20]

> D.    Defendants Coerce Prospective Foster Parents To Support Religious Exercise and Miracle Hill's Religious Beliefs.

By enabling all South Carolina CPAs to use government funds and licenses to

discriminate against prospective foster parents because of their religion, Defendants unduly

coerce Plaintiffs to engage in and support religious exercise in order to participate fully in the

state's child welfare system.  The Supreme Court has made clear that such conduct violates the

Establishment Clause:  "It is beyond dispute that, at a minimum, the Constitution guarantees that

government may not coerce anyone to support or participate in religion or its exercise."  *Lee v.*

*Weisman*, 505 U.S. 577, 587 (1992).  "[T]he type of coercion that violates the Establishment

Clause need not involve . . . the forcible subjection of a person to religious exercises."  *Destefano*

*v. Emergency Hous. Grp. Inc.*, 247 F3.d 397, 412 (2d Cir. 2001).  Even "subtle coercive

pressures" and "indirect coercion" may be unconstitutional.  *Lee*, 505 U.S. at 592; *Myers v.*

*Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005).  Here, by funding and licensing

religious discrimination, Defendants ensure that Plaintiffs will never be able fully to participate

---

[20] Cases cited by the State Defendants support this proposition.  *See* State MTD 30-31.  In *Bradfield v. Roberts*, the Supreme Court upheld a government-funded program because it was managed by "people who hold to the doctrines of the Roman Catholic Church, but who nevertheless are managing the corporation according to the law under which it exists".  175 U.S. 291, 298-99 (1899).  The Supreme Court emphasized that there was no allegation that "[the corporation's] hospital work is confined to members of that church".  *Id*. at 298.  While the religious *identity* of a state-funded organization does not violate the Establishment Clause, state-funded programs must be administered in a secular manner and according to the law (including antidiscrimination laws).  In *Bowen v. Kendrick*, the Supreme Court upheld the challenged act on its face but remanded to the district court to consider whether the funding had "been used to fund specifically religious activities in an otherwise substantially secular setting".  487 U.S. 589, 621 (1988) (internal quotations and citations omitted).  This included, for example, grantees' use of explicitly religious materials in executing the program for which they were provided funding.  *Id*.

28

as prospective foster parents in South Carolina's child welfare system unless Plaintiffs engage in a particular form of religious worship and, in doing so, unconstitutionally coerce Plaintiffs into religious practice.

Defendants' coercion of religious practice is most egregious with respect to the pressures they have placed on Plaintiffs to adopt Miracle Hill's religious beliefs. "To determine whether government has engaged in unconstitutional coercion, [the Court] must initially view the purportedly coerced activity in context." *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cty. Pub. Sch.*, 373 F.3d 589, 598 (4th Cir. 2004). Here, the well-pleaded factual allegations in the Complaint reveal that Miracle Hill is unlike any other CPA in South Carolina: It is the largest CPA (recruiting 15% of the entire state's foster families), and it receives substantial government funding, which allows it to provide unparalleled support to prospective foster parents throughout the licensing process and beyond. Compl. ¶¶ 43, 46. In the DSS region in which Plaintiffs reside, there are no other nontherapeutic CPAs that can offer Plaintiffs even remotely comparable services. *See supra* I.A.

Exercising its powerful influence over foster care licensure in the region, Miracle Hill mandates that prospective foster parents actively engage in religious worship, requiring that prospective foster parents not only pledge that they "agree in belief and practice" with Miracle Hill's statement of religious doctrine, Compl. ¶¶ 48-49, but also name the church where they "currently attend" services, Compl. ¶ 50. Moreover, given that "Miracle Hill requires those who hold positions of spiritual responsibility or influence—including foster parents—to share its Christian mission and beliefs", Miracle Hill effectively commands prospective foster parents "to spread the agency's religious beliefs to the children in their care"—that is, to proselytize children. Compl. ¶ 94 (Miracle Hill's website states "we're a *Christian* ministry, and thus

29

people who serve with Miracle Hill in positions of spiritual leadership or authority must embrace our Christian faith.  We can't *share* the Good News if we don't *believe* the Good News!") (emphasis in original); *see also* State MTD 7 ("Miracle Hill believes that those it places in positions of spiritual influence—including foster parents and mentors—must share its religious beliefs, mission, and motivation").[21]  Against this factual backdrop, Defendants' conduct "orchestrates the performance" of religion that "practically obliges" Plaintiffs' involvement. *Myers*, 418 F.3d at 406 (quotations omitted).  "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure . . . to conform to the prevailing officially approved religion is plain." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).  In practice, Defendants' actions effectively "coerce prospective foster parents to support the specific religious beliefs of Miracle Hill so that they will be permitted to foster children".  Compl. ¶¶ 107, 120.

E.    The *Lemon* Test Has Not Been Overruled.

Defendants appear to disagree with one another about whether the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), is good law.  *Compare* Federal MTD 23, *with* State MTD 31.  The State Defendants argue that recent Supreme Court precedent, including *American Legion v. American Humanist Association*, 139 S. Ct. 2067 (2019), "has consistently and repeatedly relied on a historically informed analysis rather than the test established by *Lemon*".  State MTD 31.  However, while the Court in *American Legion* declined to apply *Lemon* to determine the constitutionality of a memorial cross on government property, the majority merely held that "retaining established, religiously expressive monuments, symbols, and practices is

---

[21] Indeed, in seeking to apply the "ministerial exception" established in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S. 171 (2012), the State Defendants acknowledge the role that foster parents ultimately play in proselytizing foster children.

quite different from erecting or adopting new ones". 139 S. Ct. at 2085.[22] That holding does not

in any way diminish *Lemon*'s applicability to cases like this one.

To withstand constitutional scrutiny under the *Lemon* test, government action

must have a secular purpose. Both the State and Federal Defendants claim the secular purpose of

maximizing the number and availability of foster and adoption agencies and homes, but this is a

"sham" purpose.[23] *See* Federal MTD 24; State MTD 32. Plaintiffs have alleged facts

demonstrating that allowing CPAs to exclude qualified foster families based on religious criteria

unrelated to the ability to care for a child does not maximize the number of families for children,

but rather, the opposite.[24] Compl. ¶¶ 84-85, 87-93; *see also infra* pp. 38-39.

But even if this were accepted as a secular purpose, under *Lemon*, government

action violates the Establishment Clause if it has the primary effect of advancing or inhibiting

religion by suggesting a "preference for a particular religious view or for religion in general".

*Mellen,* 327 F.3d at 374; *Lemon*, 403 U.S. at 612-13. Here, a reasonable observer would

conclude that Defendants are promoting a specific religion, as well as religion over non-religion,

by privileging Miracle Hill's beliefs over Plaintiffs' and all others who do not share the agency's

---

[22] The language quoted here is part of the majority opinion in *American Legion*, 139 S. Ct. at 2085, while the language on which the State Defendants rely to discredit *Lemon*, State MTD 28 n.18, is not.

[23] "[T]he secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective". *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 864 (2005). "[A] state may disingenuously profess a secular purpose for what is, in fact, a religious practice. While the state's characterization of its purpose is entitled to deference, it is our obligation to distinguish 'a sham secular purpose from a sincere one'". *Mellen v. Bunting*, 327 F.3d 355, 372-73 (4th Cir. 2003) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

[24] The Federal Defendants also claim that compliance with the Religious Freedom Restoration Act ("RFRA") is a valid secular purpose. Federal MTD 24. As discussed *infra* II.F, RFRA cannot protect otherwise unconstitutional behavior, and this claimed secular purpose therefore fails.

Christian beliefs.  In *Dumont*, the court held that plaintiffs had plausibly alleged that the state's authorization of a CPA's use of religious criteria to exclude same-sex couples "objectively endorses the religious view of those agencies that same-sex marriage is wrong, sending a message [to Plaintiffs] that they are outsiders, not full members of the community".  341 F. Supp. 3d at 734 (quotations omitted).[25]

Even assuming the historical analysis discussed in *Town of Greece, New York v. Galloway*, 572 U.S. 565 (2014), and *American Legion* were applicable here, the practice challenged by Plaintiffs would still fail.  The State Defendants make broad assertions about the historical practice of governmental partnerships with religious social-service providers, arguing that "governments have been partnering and contracting with religious ministries to provide a variety of services to vulnerable populations for hundreds of years".  State MTD 1, 29.  In so doing, the State Defendants improperly rely on a collection of law review articles to contend that governments have been funding and partnering with religious organizations for centuries— which, even if true, would not impact the analysis here.  State MTD 1, 29.  The Federal Defendants, for their part, maintain that Miracle Hill's recruiting and supporting foster parents is the kind of "religiously expressive . . . *practice*[]" discussed in *American Legion*.  Federal MTD 27 (emphasis in original).  As discussed *supra* II.C, Defendants mischaracterize the "practice" Plaintiffs challenge here.  Nowhere in the Complaint do Plaintiffs challenge government partnerships with religious organizations.  It is the use of religious criteria by a government-

---

[25] An additional criterion to "evaluate whether government aid has the effect of advancing religion" is whether it "result[s] in government indoctrination".  *Agostini v. Felton*, 521 U.S. 203, 234 (1997).  Miracle Hill uses government funds to recruit and screen prospective foster parents, whose role, as the State Defendants concede, "include[s] religious teaching, guidance, counseling, mentoring, and spiritual formation".  State MTD 34; *see also* Compl. ¶¶ 48, 94. Absent the government's funding and licensing, Miracle Hill would be unable to exert this religious influence over the population of foster parents in South Carolina.

funded social service agency to discriminate in the provision of public services that is the

challenged practice, and that is not an "established, religiously expressive . . . practice",

*American Legion*, 139 S. Ct. at 2085, or one that was "accepted by the Framers", *Town of*

*Greece*, 572 U.S. at 577.

      F.    <u>Accommodation of Miracle Hill's Discrimination is Unconstitutional.</u>

      Finally, both the Federal and State Defendants contend that, through their actions,

they are merely accommodating the religious freedoms of Miracle Hill.  Federal MTD 25, 27;

State MTD 33-35.  The State Defendants argue that the Supreme Court "has long recognized that

the government . . . may accommodate religious practices without violating the Establishment

Clause."  State MTD 33 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005)).  But while "the

Constitution allows the State to accommodate religious needs by alleviating special burdens . . .

accommodation is not a principle without limits".  *Kiryas*, 512 U.S. at 705-06.  To be

constitutional, religious accommodations must satisfy two requirements:  (1) they must lift

substantial, government-imposed burdens on the exercise of religion; and (2) they must not

impose undue burdens on third parties.  *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,

492 U.S. 573, 613 n.59 (1989); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985).

      Here, Defendants are not able to point to any government-imposed burden on

religious exercise that is alleviated by allowing Miracle Hill to discriminate against prospective

foster parents when providing foster care services for the government.  In fact, Miracle Hill

voluntarily has chosen to accept government funding to provide public child welfare services.  It

is not required to do so.  If complying with applicable nondiscrimination requirements conflicts

with its religious beliefs, it need not participate.  And Defendants' purported accommodation of

Miracle Hill plainly burdens Plaintiffs and other prospective foster parents who do not share

Miracle Hill's religious beliefs by inflicting discriminatory harm and erecting practical barriers

to fostering.  *See supra* I.A and II.D; *see also Thornton*, 472 U.S. at 710 (invalidating a religious

accommodation for employees who are Sabbath observers, in part, because it imposed

"substantial economic burdens" on employers and "significant burdens on other employees");

*Wilkinson*, 544 U.S. at 720 ("[C]ourts must take adequate account of the burdens a requested

accommodation may impose on nonbeneficiaries."); *Burwell v. Hobby Lobby Stores, Inc.*, 573

U.S. 682, 693, 729 n.37 (2014) (holding that corporations do not "have free rein to take steps that

impose 'disadvantages . . . on others' or that require 'the general public [to] pick up the tab.'").

Defendants' conduct not only burdens prospective foster parents, but it also burdens children in

foster care.  *See* Compl. ¶¶ 84-93.  By enabling CPAs to discriminate against prospective foster

parents who do not share their religious beliefs, or who are same-sex couples of any faith,

Defendants "limit the diversity of family placement options for children in State custody".

Compl. ¶ 92 ("When families are turned away because they are Jewish, Catholic, Muslim, or

members of any other faith besides evangelical Christianity, that reduces opportunities for

children of those faiths to be placed with a family that shares their faith.  Similarly, children for

whom a same-sex couple would be the preferred or otherwise optimal placement may not receive

the placement that is in their best interest.").

        Moreover, contrary to both the Federal and State Defendants' assertions, the

government is certainly not *required* to accommodate Miracle Hill's discrimination.  *See* Federal

MTD 25; State MTD 34-5.  The State Defendants cite *Hosanna-Tabor's* "ministerial exception",

which allows "faith-based groups to consider an individual's beliefs and behaviors when making

employment decisions" for employees whose roles include "religious teaching, guidance,

counseling, mentoring, and spiritual formation".  State MTD 34.  But Plaintiffs are not seeking to

become employees of Miracle Hill; they seek to participate in South Carolina's foster care

program by caring for wards of the State.  Thus, *Hosanna-Tabor* has no application here.[26]  For

the same reason, the cases the State Defendants cite for the proposition that the government must

"accommodate faith-based providers' free association rights when making personnel recruiting,

screening, and selection decisions" are inapposite.[27]  State MTD 34.

The State Defendants further argue that refusing to accommodate Miracle Hill's

discriminatory practices prevents it from participating in government programs and creates a free

exercise problem.  State MTD 35.  The primary case cited by the State Defendants involves state

denial of a grant to a church-run preschool "solely because of [the preschool's] religious

character".  *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 137 S. Ct. 2012, 2017-18,

2021, 2024-25 (2017); *see also id.* at 2024 n.3 ("This case involves express discrimination based

on religious identity with respect to playground resurfacing.  We do not address religious uses of

funding or other forms of discrimination.").  Again, Plaintiffs do not argue that Miracle Hill

should be prevented from receiving government funding or providing public foster care services

because of its religious character.  Plaintiffs seek only to require that the government ensure its

funding is employed and its programs are delivered in a manner that does not exclude

participants based on religious criteria in violation of the Establishment Clause.  Courts that have

considered similar free exercise claims have rejected them.  *See Fulton v. City of Philadelphia*,

---

[26] Indeed, cases cited by the State Defendants apply the ministerial exception only to individuals seeking employment or membership with religious organizations.  *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015); *Rogers v. Salvation Army*, No. 14-12656, 2015 WL 2186007 (E.D. Mich. May 11, 2015).

[27] *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655-56 (2000) (holding antidiscrimination law violated First Amendment by requiring Boy Scouts to allow "avowed homosexual and gay rights activist" to hold position of "assistant scoutmaster" with the organization); *Disabato v. S.C. Ass'n of Sch. Adm'rs*, 404 S.C. 433, 445 (2013) (holding right to associational privacy was breached where the Freedom of Information Act would have required group receiving some public funds to disclose membership lists and open its meetings to the public).

922 F.3d 140, 152-59 (3d Cir. 2019); *Dumont*, 341 F. Supp. 3d at 748-53; *see also Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 409-10 (6th Cir. 2007).

Finally, contrary to the Federal Defendants' assertion, there is no "requirement of religious accommodation imposed by RFRA". Federal MTD 25. No statute, including RFRA, can insulate otherwise unconstitutional behavior. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302 ("[T]he principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause.") (quoting *Lee*, 505 U.S. at 587). Moreover, there is no burden placed on religious exercise when a faith-based CPA voluntarily chooses to accept government funding to provide public services. If Miracle Hill does not wish to perform those services in a non-discriminatory manner, it can decline to contract with the State in the first place. *See Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("[I]f a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds.").

## III.    PLAINTIFFS HAVE STATED CLAIMS FOR EQUAL PROTECTION VIOLATIONS.

The Constitution mandates that the government may not "deny to any person within its jurisdiction the equal protection of the laws", U.S. Const. amend. XIV, § 1[28], and that "all persons similarly situated should be treated alike", *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). By authorizing and funding Miracle Hill's discrimination, Defendants subjected Plaintiffs to different and unfavorable treatment based on religion and sexual orientation. Compl. ¶¶ 129-32, 143, 147-48. Plaintiffs' allegations are more than

---

[28] The Fourteenth Amendment applies to the states, but the Fifth Amendment requires the same of the federal government. U.S. Const. amend. V; *Johnson v. Robison*, 415 U.S. 361, 364 n.4 (1974) (noting that classifications that violate the Equal Protection Clause equally violate the Fifth Amendment Due Process Clause).

sufficient to state claims for Equal Protection violations.

A.     The Federal Defendants Do Not Challenge the Merits of Plaintiffs' Equal Protection Claim.

The Federal Defendants only move to dismiss Plaintiffs' Equal Protection claim on the basis that Plaintiffs have not suffered "personal denial of equal treatment", that is, that Plaintiffs lack standing to assert their Equal Protection claim.  Federal MTD 28.  However, as discussed *supra* I.A, Plaintiffs suffered personal denial of equal treatment when they were categorically excluded from participation in a government-sponsored program on the basis of their religion and sexual orientation—discrimination that was explicitly authorized by the Federal Defendants through their issuance of the waiver.  Thus, Plaintiffs have standing to assert their Equal Protection claim against the Federal Defendants.

B.     The State Defendants' Actions Do Not Survive Any Level of Constitutional Scrutiny.

1.     *Religious Discrimination.*

State action that favors or disfavors a particular religious denomination, or religion over non-religion, is inherently suspect and must be evaluated under strict scrutiny. *Larson v. Valente*, 456 U.S. 228, 246 (1982) ("[W]hen we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality.").  Under strict scrutiny, the government bears the burden of showing that the challenged state action is "necessary to further a compelling government interest" and "narrowly tailored to that end".  *Johnson v. California*, 543 U.S. 499, 514 (2005).

The State Defendants' actions clearly afford a denominational preference to evangelical Christianity.  Indeed, Defendant McMaster was motivated by a desire to accommodate Miracle Hill and only sought the waiver from federal nondiscrimination

37

requirements after learning Miracle Hill was at risk of losing its license.  Compl. ¶¶ 54-59, 61-62.  And Defendant McMaster specifically mentions Miracle Hill in his letter seeking the waiver.  Compl. ¶ 62.  It therefore should be no surprise that, when granted, Defendant McMaster's waiver request did not result in a uniform impact on all religious denominations, but, as applied, uniquely privileged Christianity over other religions and evangelical Christianity over other Christian denominations.  *See* Compl. ¶¶ 51, 70 (noting that "[i]n reliance on the HHS Waiver, DSS issued a standard CPA license to Miracle Hill" permitting it to "recruit[] exclusively prospective foster parents who are evangelical Protestant Christians").  Thus, strict scrutiny applies to Plaintiffs' Equal Protection claim for religious discrimination.

The State Defendants claim there are "numerous" government purposes for Defendant McMaster's issuing the Executive Order and requesting the waiver:  (1) increasing community support and options for foster child placement by maximizing the number and diversity of CPAs; and (2) avoiding unnecessary violation of faith-based CPAs' free exercise, free speech and associational rights, and avoiding entanglement in religion that would result from the enforcement of South Carolina's religious-matching statute and regulation in the absence of faith-based CPAs.  State MTD 26-27.  However, both of these proffered reasons are pretextual.

*First*, if the true purpose of the State Defendants' actions was to increase community support and options for foster child placement, then the relevant metric is not the number of CPAs, but rather the number and diversity of licensed families available to foster.  There is no basis to claim that allowing faith-based CPAs to turn away prospective foster parents increases the number and diversity of foster families available to support children in the state.  *See* Compl. ¶¶ 84-96.  In fact, allowing otherwise qualified prospective foster parents to be

38

excluded because of their religion is directly contrary to that mission. Every dollar spent on an organization that refuses to work with a large swath of the population of potential foster parents is a dollar that could have been spent to expand the services provided by organizations (or the State itself) that work with the entire population of potential foster parents.

*Second*, there is no legitimate concern that requiring CPAs not to discriminate on the basis of religion would violate the CPAs' free exercise, free speech or associational rights. *See supra* II.F. Indeed, permitting discrimination on the basis of religion by state-contracted, government-funded CPAs entangles the State in religion, rather than fostering separation between them. *See supra* II.E. Absent a "compelling government interest", the State Defendants' actions necessarily fail strict scrutiny. *Johnson*, 543 U.S. at 514.

Indeed, the State Defendants cannot show that the challenged state actions are even "rationally related to a legitimate state interest" under rational basis review. *Cleburne*, 473 U.S. at 440. A plaintiff can successfully challenge a policy under rational basis review as long as the plaintiff can "negative every conceivable basis which might support it". *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (citation omitted). And "even the standard of rationality . . . must find some footing in the realities of the subject addressed by the [state action]". *Heller v. Doe*, 509 U.S. 312, 321 (1993). Here, for the same reasons the State Defendants do not have any compelling government interest, they also cannot assert any legitimate state interest that is furthered by permitting discrimination against prospective foster families by state-contracted, government funded agencies.

2.    *Sexual Orientation Discrimination.*

With respect to Plaintiffs' Equal Protection claim based on sexual orientation discrimination, the State Defendants only assert that Plaintiffs "fail to allege, beyond mere conclusory assertions, that Miracle Hill discriminated against them" on the basis of sexual

orientation.  State MTD 23.  The facts actually alleged in the Complaint belie this baseless

assertion.  The Complaint is replete with well-pleaded factual allegations—which must be

accepted as true on a motion to dismiss—that Plaintiffs faced discrimination on the basis of

sexual orientation.  In support of the allegation that Plaintiffs "were turned away by Miracle Hill

. . . based on Miracle Hill's religious objection to accepting same-sex couples", Compl. ¶ 83:

- Plaintiffs cite Miracle Hill's doctrinal statement, which notes that "God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship".  Compl. ¶ 49.

- Plaintiffs cite to multiple forms of public reporting for support that "Miracle Hill has stated publicly that it will not accept married, same-sex couples as foster parents". Compl. ¶ 52.

- Plaintiffs cite multiple forms of public reporting that "DSS has acknowledged that Miracle Hill discriminates based on the sexual orientation of prospective foster parents and has received complaints from same-sex couples who have been turned away by the CPA".  Compl. ¶ 53.

Accordingly, the State Defendants have not indicated what standard of scrutiny

should apply to sexual orientation discrimination claims.  Discrimination based on sexual

orientation "is presumptively unconstitutional and subject to heightened scrutiny".  Compl.

¶ 135, *see, e.g.*, *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014); *SmithKline Beecham Corp.*

*v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014); *Windsor v. United States*, 699 F.3d

169, 181-82 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).  For the same reasons discussed *supra*

III.B.1, the State Defendants' actions would fail rational basis review.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny all of Defendants' pending motions to dismiss the Complaint.

September 27, 2019

/s/ Nekki Shutt

NEKKI SHUTT

South Carolina Equality Coalition, Inc.
Nekki Shutt (Federal Bar No. 6530)
M. Malissa Burnette (Federal Bar No. 1616)
Burnette Shutt & McDaniel, PA
912 Lady Street, 2nd floor
P.O. Box 1929
Columbia, SC 29202
(803) 850-0912
mburnette@burnetteshutt.law
nshutt@burnetteshutt.law

Susan K. Dunn (Federal Bar No. 647)
American Civil Liberties Union
of South Carolina Foundation
P.O. Box 20998
Charleston, SC 29413
(843) 282-7953
sdunn@aclusc.org

Peter T. Barbur (admitted *pro hac vice*)
Katherine D. Janson (admitted *pro hac vice*)
Derek K. Mong*
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pbarbur@cravath.com
kjanson@cravath.com
dmong@cravath.com

Leslie Cooper (admitted *pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
lcooper@aclu.org

Daniel Mach (admitted *pro hac vice*)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org

M. Currey Cook (admitted *pro hac vice*)
Karen L. Loewy (admitted *pro hac vice*)
Cathren Cohen (admitted *pro hac vice*)
Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ccook@lambdalegal.org
kloewy@lambdalegal.org
ccohen@lambdalegal.org

*Attorneys for Plaintiffs*

\* *Pro hac vice* application forthcoming