## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| Eden Rogers and Brandy Welch, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| United States Department of | ) | |
| Health and Human Services; | ) | |
| Alex Azar, *in his official capacity* | ) | |
| *as Secretary of the United States* | ) | |
| *Department of Health and* | ) | Civil Action No. 6:19-cv-01567-TMC |
| *Human Services*; Administration | ) | |
| for Children and Families; Lynn | ) | **ORDER** |
| Johnson, *in her official capacity* | ) | |
| *as Assistant Secretary of the* | ) | |
| *Administration for Children and* | ) | |
| *Families*; Steven Wagner, *in his* | ) | |
| *official capacity as Principal* | ) | |
| *Deputy Assistant Secretary of the* | ) | |
| *Administration for Children and* | ) | |
| *Families*; Henry McMaster, *in his* | ) | |
| *official capacity as Governor of* | ) | |
| *the State of South Carolina*; and | ) | |
| Michael Leach, *in his official* | ) | |
| *capacity as State Director of the* | ) | |
| *South Carolina Department of* | ) | |
| *Social Services*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiffs Eden Rogers ("Rogers") and Brandy Welch ("Welch") (collectively,

"Plaintiffs") filed this suit alleging various constitutional violations based on their

inability to serve as foster parents through a private child-placement agency, Miracle Hill Ministries ("Miracle Hill"), because of their religion and sexual orientation.[1] *See generally* (ECF No. 1).  Plaintiffs contend that Miracle Hill receives government funding and is state-licensed and, therefore, should not be able to discriminate and deny them the ability to foster with its programs based on their religion or sexual orientation.  *See id.*  Pertinent to this action, Plaintiffs allege that Defendant Henry McMaster ("McMaster") and Defendant Michael Leach ("Leach") (collectively the "State Defendants") enabled, sanctioned, and failed to implement adequate safeguards against such discrimination by seeking a waiver from the Department of Health and Human Services ("HHS") to permit South Carolina's faith-based child-placement agencies ("CPAs") to discriminate in violation of 45 C.F.R. §§ 75.300(c) and (d), while still receiving government funding, and by McMaster issuing Executive Order No. 2018-12, directing the South Carolina Department of Social Services ("DSS") to permit faith-based CPAs to associate only with "'foster parents and homes who share the same faith'" as the subgrantee "'in recruiting, training, and retaining foster parents'" and to not deny licensure to faith-based CPAs on such basis.  *Id.* at 19–21.  Plaintiffs further contend that Defendants HHS, Alex Azar ("Azar"), the Administration for Children and Families, Lynn Johnson ("Johnson"), and Steven Wagner ("Wagner") (collectively the "Federal Defendants") have

---

[1] The court notes that Miracle Hill is not a party to this action.

enabled, sanctioned, and failed to provide adequate safeguards against such discrimination by granting the South Carolina Foster Care Program an exemption from the religious anti-discrimination component of 45 C.F.R. § 75.300(c). *Id.* at 19–23.

This matter is before the court on the Defendants' various motions to dismiss. (ECF Nos. 50, 54, 57). The State Defendants filed separate motions to dismiss,[2] (ECF Nos. 54, 57), and the Federal Defendants filed a joint motion to dismiss (ECF No. 50). Plaintiffs filed a joint response in opposition to all three of Defendants' motions to dismiss. (ECF No. 61). The State Defendants filed separate replies[3] (ECF Nos. 66, 67), and the Federal Defendants filed a joint reply (ECF No. 68). These motions to dismiss are now ripe for review. After carefully reviewing the record and the parties' extensive briefings, the court concludes a hearing is unnecessary to decide this matter. *See* Local Rule 7.08 (D.S.C.). For the reasons set forth below, the court grants Defendants' motions as to Plaintiff's equal protection claim for religious discrimination and denies the motions as to Plaintiff's remaining claims for violation of the Establishment Clause and equal protection based on sexual orientation discrimination.

---

[2] Leach indicates that he should be dismissed from the case for the same reasons as stated in McMaster's motion and that he "incorporates by reference" McMaster's motion to dismiss (ECF No. 57) and its attachments (ECF Nos. 57-1, 57-2, 57-3). (ECF No. 54).

[3] In Leach's reply, he again relies upon McMaster's reply and incorporates it by reference. (ECF No. 67).

## I.    BACKGROUND AND PROCEDURAL HISTORY[4]

South Carolina has faced an increasing need for foster homes over the past seven years, and South Carolina has been unable to meet the demand, leaving almost two thousand children without home placement. *See* (ECF No. 1 at 7–8). In an attempt to meet these growing needs, DSS contracts with private CPAs, who receive licenses from the state, as well as state and federal funding, to "recruit prospective foster parents and screen them for their suitability to obtain a foster care license." (ECF No. 1 at 8). Pursuant to Title IV-E of the Social Security Act, South Carolina receives reimbursement from HHS for a portion of the state's foster care expenditures, which the state then uses to partially reimburse the CPAs for their services. *Id*. at 10; *see also* S.C. Code Ann. § 63-9-30(5); S.C. Code Regs. § 114-4910.

DSS typically issues one-year licenses to CPAs that meet all regulatory and DSS requirements. (ECF No. 1 at 9 (citing S.C. Code Regs. § 114-4930(E)). DSS then monitors those CPAs to ensure that they continue to comply with federal and state law requirements and regulations. *Id.* (citing S.C. Code Regs. § 114-4920(E)). If a CPA is temporarily unable to comply with a state foster-care regulation, DSS

---

[4] These facts are taken from Plaintiffs' Complaint, as the court must accept Plaintiffs' factual allegations as true for purposes of motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor must the court "accept as true unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts. Inc. v. J.D. Assocs., LLP*, 213 F.3d 175, 180 (4th Cir. 2000).

may grant the agency a temporary license if the agency provides DSS with "a written plan to correct the areas of noncompliance within the probationary period." *Id.* (citing S.C. Code Regs. § 114-4930(F)). Further, if a CPA fails to comply with licensing regulations and DSS concludes that compliance cannot be accomplished within a set or reasonable time, DSS may deny or revoke the CPA's license. *Id*. (citing S.C. Code Regs. § 114-4930(G)).

DSS's Human Services Policy and Procedure Manual (the "DSS Manual") sets forth its recruitment polices and requirements. *See id*. at 10. In particular, the Manual provides that DSS "is committed to the exercise of non-discriminatory practice, and shall provide equal opportunities to all families and children, without regard to their race, color, and national origin, and religion, state of residence, age, disability, political belief, sex or sexual orientation." *Id*. (quoting DSS Manual § 710). The DSS Manual further mandates "that 'no individual shall be denied the opportunity to become a foster or adoptive parent on the basis of race, color, national origin, religion, state of residence, age, disability, political belief, sex, or sexual orientation.'" *Id*. (quoting DSS Manual § 710).

In addition to the State policies and regulations, DSS and any CPAs with which it contracts must also comply by federal statutory and regulatory requirements in order to receive federal funding under Title IV-E of the Social Security Act. *See id*. Although faith-based organizations like Miracle Hill are entitled to participate

in HHS-funded foster care programs, HHS explicitly prohibits any organization participating in its programs from "'discriminat[ing] against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.'" *Id*. at 11 (quoting 45 C.F.R. § 87.3(d)). Title IV-E also provides that, in order for a state to receive federal funding for its foster care system, "'neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—(A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person . . . .'" *Id*. at 12 (quoting 42 U.S.C. § 671(a)(18)). Additionally, as a part of its contracts with the state foster care systems, HHS requires "'that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as . . . religion . . . or sexual orientation.'" *See id*. at 12–13 (quoting 45 C.F.R. § 75.300(c)).

Miracle Hill is one of the CPAs in Greenville, South Carolina, and it serves the counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee, Pickens, and Spartanburg (known as "Region 1"). *Id.* at 13–14. Miracle Hill is a faith-based ministry, and it is the largest CPA in both the state and

the upstate South Carolina region. *Id.* at 13–15. As a CPA, Miracle Hill provides comprehensive services to foster families and children, including assisting prospective foster parents through the licensing process, conducting regular home visits, and accompanying foster parents to all court hearings. *Id.* at 14. However, Miracle Hill works exclusively with prospective foster parents who subscribe to the evangelical Protestant Christian faith and expressly refuses to accept anyone who does not share its religious beliefs, including same-sex couples. *Id*. at 16–17.

In reviewing Miracle Hill's 2018 application to renew its license as a CPA, DSS discovered that Miracle Hill's website mentioned the "'recruitment of specifically Christian foster parents/families'" and that foster-care applicants were asked to provide information regarding their families' religious beliefs and practices. *See id.* at 18–19. DSS further determined that Miracle Hill "instructs its workers to inquire as to a family's particular religious belief and practices." *Id*. at 18. DSS followed up with Miracle Hill to determine the purpose of such inquiries and confirmed that Miracle Hill used the religious information "to refuse to provide its services as a licensed CPA to families who are not specifically Christians from a Protestant denomination[.]" *Id*.

Accordingly, DSS determined that Miracle Hill's practices constituted discrimination on the basis of religion, in violation of several state and federal policies and regulations, including DSS's own policy statement prohibiting such

discrimination.  *Id.*  Therefore, on January 27, 2018, DSS issued Miracle Hill only a temporary six-month CPA license under S.C. Code Reg. § 114-4930(F).  *Id.* at 19. DSS notified Miracle Hill that it had thirty days to address DSS's concerns and issue a written plan of compliance.  *Id.*  To Plaintiffs' knowledge, Miracle Hill has not issued a written plan of compliance to date.  *Id.*

On February 27, 2018, McMaster, in his capacity as Governor of South Carolina, wrote a letter to Defendant Wagner, the then-Acting Secretary for the Administration of Children and Families within HHS, requesting that HHS provide South Carolina with a "deviation or waiver from [HHS's] current policy to recoup grant funds from DSS if [HHS] determines the new regulations are violated by any DSS CPA contracts due to religiously held beliefs[.]"  *Id.* at 20.  After sending the letter requesting the waiver, on March 13, 2018, McMaster issued Executive Order No. 2018-12, directing DSS to permit faith-based foster-care child-placement subgrantees to associate only with "foster parents and homes who share the same faith . . . in recruiting, training, and retaining foster parents," and ordering DSS not to deny licensure of faith-based programs based on these actions.  *Id.* at 20–21.  The Executive Order further dictated that DSS "not directly or indirectly penalize religious identity or activity" when applying the state's requirements for licensure for foster care.  *Id.* at 21.

On January 23, 2019, HHS conditionally granted the South Carolina Foster Care Program an exemption from the antidiscrimination requirement of 45 C.F.R. § 75.300(c) (the "HHS Waiver").  *Id.* at 22.  In granting the exemption, Defendant Wagner stated that the South Carolina Foster Care Program subgrantees, like Miracle Hill, could use "religious criteria in selecting among prospective foster care parents," on the condition that any subgrantee making use of the exception must refer potential foster parents that do not adhere to the subgrantee's religious beliefs to other CPAs or to DSS itself.  *Id.*  Subsequently, relying on the HHS Waiver, DSS reissued a standard CPA license to Miracle Hill and has taken no further action to prevent Miracle Hill or any other religiously-affiliated CPA from rejecting prospective foster parents based on their religious beliefs or sexual orientation.  *Id.* at 22–23.

As it pertains to this case, Plaintiffs desired to foster children through Miracle Hill Ministries, in hopes of allowing "more children to know what it feels like to be unconditionally loved and to be part of a loving family[.]"  *Id.* at 24.  Plaintiffs are a same-sex couple who were married in South Carolina on November 28, 2015, and they have two daughters. *Id*. at 23, 24.  On April 10, 2019, Plaintiffs called Miracle Hill and left a voicemail indicating their interest in becoming foster parents.  *Id*. at 24.  The next day, Welch received a call back from one of Miracle Hill's representatives.  *Id*.  However, according to Plaintiffs, when the representative from

Miracle Hill learned that Plaintiffs are a same-sex couple, the representative told them to complete the online inquiry form and advised to read about Miracle Hill on its website. *Id.* The representative also repeatedly stated that "Miracle Hill is a Christian ministry that follows Christian values." *Id.*

On April 28, 2019, Plaintiffs completed and submitted Miracle Hill's online inquiry form for prospective foster parents, identifying themselves as a same-sex couple and members of the local Unitarian Universalist Church. *Id.* A few days later, on May 1, 2019, Miracle Hill's Foster Care Licensing Supervisor emailed Plaintiffs and rejected them as potential foster parents because their faith "does not align with traditional Christian doctrine." *Id.* at 25. Specifically, the email stated that, because Miracle Hill "feel[s] a religious obligation to partner with foster parents who share [its] beliefs and who are active in a Christian church[,] . . . Miracle Hill would not be a good fit to assist [Plaintiffs] in [their] quest to secure state licensure to become foster parents." *Id.*

Plaintiffs allege that their inability to become foster parents through Miracle Hill was directly caused by the actions of the State Defendants and Federal Defendants because they have affirmatively enabled the discrimination against Plaintiffs by authorizing Miracle Hill and other religiously-affiliated CPAs to use religious criteria to reject prospective foster parents. *Id.* at 26. Additionally, Plaintiffs contend that Defendants have failed to consider the best interests of the

children and have "limit[ed] the diversity of family placement options for children in State custody[,]" *id*. at 27, "den[ied] children access to loving families," *id*. at 29, thereby exacerbating South Carolina's foster-care crisis, *see id.* at 26–29.

In their Complaint, Plaintiffs assert causes of action for violation of the Establishment Clause of the First Amendment against all Defendants, and violation of the Equal Protection clauses of the Fifth and Fourteenth Amendments by the Federal and State Defendants, respectively. *Id*. at 29–38.

As to these claims, Plaintiffs seek for this court to (1) declare that the State Defendants have violated and continue to violate the First and Fourteenth Amendments to the Constitution by authorizing state-contracted, government-funded CPAs to use religious criteria to exclude prospective foster parents and families; (2) declare that the Federal Defendants have violated and continue to violate the First and Fifth Amendments of the Constitution by granting the HHS Waiver to South Carolina and enabling the use of religious criteria to reject prospective foster families by state-contract, government-funded CPAs; (3) enter a permanent injunction prohibiting State Defendants from contracting with, licensing, and funding any CPA that discriminates against prospective foster parents on the basis of religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex; (4) enter a permanent injunction ordering Federal Defendants to rescind the HHS Waiver and prohibiting them from granting any

future waivers that would enable discrimination based on religion or sexual orientation in any state's federally-funded child welfare system; (5) enter a permanent injunction requiring State Defendants to ensure all prospective foster parents in South Carolina are treated equally, regardless of religion or sexual orientation, by state-contracted, government-funded CPAs; (6) award Plaintiffs attorneys' fees, costs, and disbursements incurred as a result of this action; and (7) award such further and additional relief as the court deems just and proper. *Id*. at 38–39.

The State Defendants have filed motions to dismiss, arguing that Plaintiffs lack standing to assert their claims and that they have failed to allege sufficient facts to constitute cognizable causes of action. (ECF Nos. 54, 57). Specifically, as to standing, the State Defendants assert that Plaintiffs have not alleged a cognizable injury; that any injury they suffered is a result of the conduct of Miracle Hill and/or Plaintiffs and is, therefore, not fairly traceable to State Defendants; and that Plaintiffs' alleged injuries would not be redressed by the relief they seek. (ECF No. 57 at 8–18, 19–22). Furthermore, State Defendants assert that, to the extent Plaintiffs assert taxpayer standing as to their Establishment Clause claim, such argument fails because the Executive Order and the request for the HHS Waiver were the "result [of] Governor McMaster's executive discretion[,]" and, therefore, are not legislative appropriations that can be challenged via taxpayer standing. *Id.*

at 18–19.  As to the merits of Plaintiffs' claims, State Defendants argue that such claims should be dismissed because Plaintiffs have failed plausibly to allege interference with a fundamental right in the face of "numerous legitimate government purposes" for State Defendants' actions, *id.* at 23–27; that State Defendants' actions did not discriminate among religions, *id.*; that these sorts of actions have been "historically permissible," *id.* at 28–31; and that the government's "accommodation of faith-based child welfare providers is not only permitted by the First Amendment, it is required by decades of Supreme Court precedent, state and federal law, and the First Amendment itself," *id.* at 35 (emphasis omitted).  Plaintiffs responded to these motions to dismiss (ECF No. 61), and State Defendants filed replies (ECF Nos. 66, 67).

Federal Defendants filed a separate motion to dismiss, also asserting that Plaintiffs lack standing to bring their claims against Federal Defendants because Plaintiffs cannot show that their alleged injuries are traceable to them or that the relief Plaintiffs seek will redress their alleged injuries.  (ECF No. 50-1 at 10–16).  Federal Defendants also assert that Plaintiffs lack taxpayer standing because "Plaintiffs have not identified any act of Congress that appropriates funds specifically for faith-based organizations under the Title IV-E program," and no act of Congress "expressly contemplates, let alone requires, the involvement of faith-based organizations in the program."  *Id.* at 16–18.  Finally, Federal Defendants

assert that Plaintiffs have failed to raise cognizable constitutional claims because Plaintiffs have failed to identify a state action for which Federal Defendants can be held responsible; the HHS waiver was driven by a secular purpose with the primary effect of neither advancing nor inhibiting religion and did not excessively entangle church and state; the exemption was not fatally arbitrary; and the exemption is rationally related to legitimate government interests. *Id.* at 19–30. Plaintiff responded to the motion (ECF No. 61), and Federal Defendants replied (ECF No. 68). The motions to dismiss are now ripe for review.

## II.    LEGAL STANDARD

Article III of the Constitution restricts federal courts' jurisdiction to the adjudication of cases and controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). One element of the case-or-controversy requirement is that a plaintiff must have standing to sue, or, in other words, that the plaintiff is the proper party to bring suit. *See id.* The standing doctrine upholds this restriction by "ensur[ing] that a plaintiff has a personal stake in the outcome of a dispute, and that judicial resolution of the dispute is appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 287, 396 (4th Cir. 2011) ("*Gaston II*"). Thus, "[t]o meet the constitutional requirement for standing, a plaintiff must prove that: 1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant;

and 3) the injury likely will be redressed by a favorable decision." *Id.* Such alleged injury must be particularized to that plaintiff, and courts have consistently held that "a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not have an Article III case or controversy." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573–74 (1992). Additionally, to be "fairly traceable" to the defendant, there must be a "causal connection between the injury and the conduct complained of" and the injury must not be the result of "the independent action of some third party not before the court." *Id.* at 561. Furthermore, the Plaintiffs must show more than mere conjecture or speculation as to the redressability of their alleged injury should they prevail on the merits of their case.

The party invoking federal jurisdiction bears the burden of establishing the three elements of standing. *Id.* Because standing is not a pleading requirement but rather an "indispensable part of the plaintiff's case" that speaks directly to whether the claims establish a "case or controversy" within the parameters of federal court jurisdiction, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof" at that stage in the litigation. *Id.* Accordingly, here, the court considers Plaintiffs' burden regarding standing with the

same scrutiny that it would within the context of a motion to dismiss at the pleading stage.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted)." *Id*. Rule 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard requires that a complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

In *Ashcroft v. Iqbal*, the United States Supreme Court stated that to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [a party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a [party] has acted

unlawfully." *Id.* Rather, "[i]t requires [a party] to articulate facts, when accepted as true, that 'show' that [the party] has stated a claim entitling [them] to relief[.]" *Francis*, 588 F.3d at 193 (*quoting Twombly*, 550 U.S. at 557). Such "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—"'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III. ANALYSIS

### A. Plaintiffs Have Adequately Alleged General Article III Standing for Their Establishment Clause and Equal Protection Claims.

Before the court can address the merits of Plaintiffs' Complaint to determine if they have set forth cognizable claims for relief, the court must first consider whether Plaintiffs have standing to bring this action. *See Raines*, 521 U.S. at 818 (recognizing that standing is jurisdictional because without standing, there is no "case-or-controversy"); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction

to actual cases or controversies.").  As noted above, Plaintiffs bear the burden of proving the following elements with sufficient factual allegations as would survive a motion to dismiss: (1) a particularized injury in fact; (2) traceability of that injury to the defendants; and (3) the likelihood that the injury will be redressed by a favorable decision of this court.  *See Lujan,* 504 U.S. at 560–61.

*1. Injury in Fact*

In the Complaint, Plaintiffs allege the following injuries: (1) that "Defendants' actions have created a public child welfare system in South Carolina, funded by taxpayer dollars, in which the suitability of prospective foster parents is assessed based on religious requirements[;]"[5] and (2) that they were "den[ied] . . . the same opportunities [to foster or volunteer with foster children] that are afforded to families that meet Miracle Hill's religious test[,]" such that Defendants have "create[d] a practical barrier to fostering . . . and also stigmatize[d] [Plaintiffs], branding them as

---

[5] Although Plaintiffs assert that they do not rely on their status as taxpayers to bring their claims, (ECF No. 61 at 3 n.3, 10 n.5), to the extent their allegation in the Complaint regarding the government's use of taxpayer dollars to support faith-based CPAs can be construed to raise taxpayer standing, the court finds such injury is not particularized to Plaintiffs and cannot support standing.  Courts have consistently held that "plaintiff[s] raising only a generally available grievance about government—claiming only harm to [their] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more tangibly benefits [them] than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.  Plaintiffs' alleged injury involving tax dollars being used to support faith-based CPAs is separate and distinct from their alleged injuries of stigmatization and practical barriers to their participation in the foster-parent program, and is not particularized to Plaintiffs but could apply to every other taxpaying citizen in the public at large.  Therefore, the court finds Plaintiffs' alleged injury regarding the government's use of their tax dollars to fund religiously-discriminatory CPAs, to the extent they raise such an argument, is insufficient to establish standing.

inferior and less worthy of serving as foster parents." (ECF No. 1 at 3, 4). In their response to the motions to dismiss, Plaintiffs clarify their injuries as "(1) the stigma resulting from the discrimination they suffered based on their religion and sexual orientation when they sought to participate in the South Carolina foster care system; and (2) the practical barriers to participation in that government program imposed by that discrimination." (ECF No. 61 at 10). For purposes of their motions to dismiss, the Federal Defendants do not contest that Plaintiffs have satisfied the first element of standing by sufficiently alleging an injury in fact. *See* (ECF Nos. 50-1 at 12–16 (addressing traceability and redressability, but assuming injury in fact has been satisfied); 61 at 10, 10 n.6). The State Defendants, on the other hand, attempt to recharacterize Plaintiffs' stated injury as denial of "their ability to foster through a specific, private CPA of their choice[,]" and argue that "there is no constitutionally protected right to become a foster parent by means of volunteering with a CPA of one's own choosing." (ECF No. 57 at 12 (emphasis omitted)).

The court first notes that, at this stage in the litigation, it must accept the well-pled allegations in the Complaint as true. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). Accordingly, the court must accept Plaintiffs' characterization of their injuries—namely, the stigma resulting from the discrimination Plaintiffs' suffered and the practical barriers to their participation in the South Carolina state foster care program—and disregard the State Defendant's recharacterization of such

injuries as the ability to foster specifically through Miracle Hill.  Additionally, to the extent the State Defendants contend that the Plaintiffs' stated injuries fail to satisfy the injury in fact element of standing, this argument must also fail.

As the United States Supreme Court has explained, stigmatic injury "accords a basis for standing . . . to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]"  *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)).   Indeed, the Supreme Court has recognized that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 739–40.  Similarly, the Fourth Circuit has held that "[f]eelings of marginalization and exclusion are cognizable forms of injury" in the context of Establishment Clause claims, "because one of the core objections of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are outsiders, not full members of the political community.'"  *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (quoting *McCreary Cty. v. ACLU*, 545 U.S. 844, 860 (2005)).  In this case, Plaintiffs allege stigmatic injury

because they were personally turned away by Miracle Hill, a government-funded, faith-based CPA, on the grounds that they did not conform to Miracle Hill's religious standards. Therefore, Plaintiffs have sufficiently alleged an injury-in-fact with respect to both their Equal Protection and Establishment Clause claims.

Plaintiffs also allege that the Defendants' actions have created practical barriers to Plaintiffs' participation in the state foster care program "as not all foster care agencies are equivalent or offer the same services[.]" (ECF No. 1 at 4). Specifically, Plaintiffs allege that, by authorizing discrimination by CPAs providing public foster care services, Defendants have denied Plaintiffs access to "the largest and most well-resourced CPA in the state, which, because of the substantial government funding it receives, can provide comprehensive support to foster families." (ECF No. 61 at 20–21). Plaintiffs need not allege that they have been excluded entirely from participation in the state foster care program or even that they have been rejected by a majority of CPAs. On the contrary, it is well-established that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993). In the context of equal protection cases, the injury in fact is nothing

more than "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*. Plaintiffs allege in the Complaint that Miracle Hill recruits fifteen percent of the foster families in South Carolina. (ECF No. 1 at 13). "Thus it is reasonable to infer that the ability of faith-based agencies [like Miracle Hill] to employ religious criteria as a basis to turn away same-sex couples erects at least a [15]% barrier to the [Plaintiffs'] ability to . . . foster a child in the State of [South Carolina]." *Dumont v. Lyon*, 341 F. Supp. 3d 706, 722 (E.D. Mich. 2018). Therefore, Plaintiffs have adequately alleged an injury in fact for both their Establishment Clause and Equal Protection claims.

### 2. Traceability

With respect to the second element of standing—traceability—both the State and Federal Defendants argue Plaintiffs' injuries are not fairly traceable the Defendants because a third party, Miracle Hill, "declined to assist Plaintiffs in become foster parents because of its own religious beliefs." (ECF No. 50-1 at 13); *see also id*. at 10; (ECF No. 57 at 13–14). In response, Plaintiffs assert that their injuries are directly traceable to the Defendants, because Defendants took affirmative steps to permit Miracle Hill to discriminate against and refuse to work with Plaintiffs because of their religious beliefs and sexual orientation. *See* (ECF No. 61 at 22–26).

For a Plaintiff to establish that her injuries are traceable to the defendant, she must show that there is a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The injury must be fairly traceable to the "challenged action of the defendant[,] . . . not the result of independent action of some third party not before the court." *Id.* Nevertheless, the Fourth Circuit has explained that "[i]mposition of the stringent proximate cause standard, derived from principles of tort law, has been held to 'wrongly equate injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)) (internal alterations omitted). Accordingly, the relevant inquiry to determine traceability is simply whether the Defendants' alleged actions are "at least in part responsible for" Plaintiffs' injuries. *Id.*

As an initial matter, this court notes—as have courts from other circuits—the potential implications of the Defendants' position. *See Marouf v. Azar*, 391 F. Supp. 3d 23, 34 (D.D.C. 2019). Essentially, according to Defendants, neither a state nor a federal agency can be held accountable for a grantee's known, and *explicitly permitted*, exclusion of persons from a government-funded program based on religious criteria. *See id.*; *see also* (ECF Nos. 50, 57). As the District Court for the District of Columbia explained, "[s]urely, the government would not take this

position if, say, Plaintiffs here were excluded from fostering a child based on their gender (both are women), national origin, or *religious faith*." *Marouf*, 391 F. Supp. 3d at 34 (emphasis added). In this case, that is the same argument Defendants make to defend their actions which allowed Plaintiffs to have been rejected from South Carolina's public foster care program.

Nevertheless, despite Defendants' attempt to pass-the-buck on to Miracle Hill, courts in this circuit have held that "a 'challenged agency action *authorizing* the conduct that allegedly caused' [Plaintiffs'] injuries" is sufficient to establish causation and traceability for purposes of standing. *Mathis v. Geo Group, Inc.*, No. 2:08-CT-21-D, 2010 WL 3835141, at *6 (E.D.N.C. Sept. 29, 2010) (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc)) (internal alterations omitted) (emphasis added). Plaintiffs have met that standard. As discussed above, Plaintiffs allege they suffered the stigma resulting from being discriminated against on the basis of their religion and sexual orientation, as well as the practical barriers to their participation in the State foster care program. (ECF Nos. 1 at 4; 61 at 10). To show that the stigma and practical barriers to fostering were the result of the Defendants' conduct, Plaintiffs' Complaint details the progression of events within both the federal and state governments that ultimately lead to McMaster's 2018 Executive Order and the HHS Waiver which they challenge. *See* (ECF No. 1 at 7–23).

To begin, the Complaint sets forth the processes by which CPAs are licensed through DSS, including the requirement that they comply with all State and federal policies and regulations, and reimbursed by DSS with funds from HHS. (ECF No. 1 at 9–10). Both DSS and HHS prohibit government-funded CPAs from discriminating against foster children or prospective foster parents on the bases of religion and sexual orientation. *Id*. at 10, 11, 12–13 (citing DSS Manual; 45 C.F.R. §§ 75.300(c), 87.3). When DSS became aware that Miracle Hill was rejecting prospective foster families who did not meet Miracle Hill's religious criteria, in contravention of both state and federal regulations, DSS declined to renew Miracle Hill's standard CPA license. *Id*. at 18–19. Instead, DSS issued Miracle Hill a temporary six-month license and required that Miracle Hill "issue a written plan of compliance within thirty days[.]" *Id*. at 19. "*If* Miracle Hill failed to address these concerns, DSS would [have] allow[ed] Miracle Hill's temporary CPA license to expire[,] [and] [a]bsent a CPA license, Miracle Hill would no longer be able to provide public child welfare services in South Carolina[,]" subject to its discriminatory criteria. *Id*. As the Complaint explains, however, that is not what happened.

Plaintiffs claim that, "[r]ather than requiring Miracle Hill to comply with the applicable state and federal non-discrimination requirements as DSS had, Governor McMaster sought to create and obtain exemptions from such requirements to enable

Miracle Hill to continue excluding prospective foster parents based on its religious criteria." *Id*. Accordingly, McMaster requested that HHS grant South Carolina a waiver from the non-discrimination provisions of 45 C.F.R. § 75.300(c), which would allow "South Carolina's CPAs to engage in religiously motivated discrimination while the State continues to receive federal funding for its foster care program." *Id*. at 20. While awaiting's response, DSS refused to issue a standard CPA license to Miracle Hill "unless and until HHS granted the requested waiver." *Id*. at 21. Only after the HHS Waiver was granted did DSS reissue a standard CPA license to Miracle Hill. *Id*. at 22.

Additionally, before the HHS Waiver was granted, McMaster entered the Executive Order requiring DSS "to review and revise its policies and manuals . . . [to] ensure that DSS does not directly or indirectly penalize religious identity or activity[,]" and prohibiting DSS from "deny[ing] licensure to faith-based CPAs solely on account of their . . . sincerely held religious beliefs." *Id*. at 20–21. As a result of the Executive Order and the HHS Waiver, "DSS has taken no further steps to prevent discrimination by Miracle Hill against prospective foster parents based on religion or sexual orientation." *Id*. at 23. Thus, Plaintiffs have alleged that the injuries they claim "could not have occurred but for the actions of the State and Federal Defendants in authorizing and enabling the use of religious eligibility criteria by state-contracted, government-funded foster care agencies providing

public foster care services on behalf of the State." (ECF No. 61 at 11–12). Accordingly, the well-pled allegations in the Complaint clearly establish that Defendants are "at least in part responsible for" Plaintiff's alleged injuries, *Judd*, 718 F.3d at 316, and the traceability requirement of standing has been met.

### 3. *Redressability*

Finally, the Defendants argue that (1) because Miracle Hill was the cause of Plaintiff's injuries, the relief requested against Defendants "would do nothing more than raise a speculative chance of remedying Plaintiffs' alleged injur[ies];" and (2) since Miracle Hill is not a party to this action, the court cannot issue relief compelling Miracle Hill to refrain from taking actions causing Plaintiffs' injuries or to redress them. (ECF No. 50-1 at 10–11); *see also* (ECF No. 57 at 17–18). In reply, Plaintiffs argue that, "[i]f the State Defendants are no longer permitted to allow CPAs to discriminate based on religion or sexual orientation, there will be no more CPAs that discriminate," thus removing any stigma resulting from the allowance of such discrimination as well as any practical barriers to Plaintiffs' ability to participate in the state foster care program. (ECF No. 61 at 28). Plaintiffs assert the same logic also applies to the relief sought against the Federal Defendants. *See id*. at 29. Plaintiffs allege that, without the HHS waiver, DSS would be required to ensure that all state-licensed CPAs conduct their activities in compliance with federal law. *Id*. Miracle Hill, and other faith-based CPAs, can choose whether to

stop discriminating on the bases of religion and sexual orientation or to stop providing public child welfare services; either way, the ultimate result is the same: "Plaintiffs would no longer be turned away from a government program because of their religion or sexual orientation, and would have the same array of agency options available to other families[.]" *Id.*

Again, at this stage of the proceedings, the court must accept the well-pled factual allegations in the Complaint. The Supreme Court has recognized that "[w]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 465 U.S. at 740 (quoting *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247 (1931)) (emphasis in original). In this case, Plaintiffs ask the court, *inter alia*, to enjoin Defendants from funding or licensing "any CPA that discriminates against prospective foster parents based on their religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex[.]" (ECF No. 1 at 38–39). In other words, Plaintiffs seek a mandate of equal treatment with respect to participation in South Carolina's public child welfare and foster program. Plaintiffs allege injury by reason of the stigma of discrimination and practical barriers to fostering enabled by the actions of the Defendants. Accepting the factual allegations in the complaint as true, as it must as this stage of the

proceedings, the court finds that, for purposes of this order, the remedies Plaintiffs seek would redress the harms alleged.

The Federal Defendants argue that it is purely speculative whether "granting relief against [them] would cause South Carolina to cease licensing Miracle Hill as a [CPA], a decision over which Federal Defendants have no control."  (ECF No. 50-1 at 15).  Similarly, the State Defendants contend "it is speculative, at best, that the reversal of Governor McMaster's policies challenged by Plaintiffs would lead Miracle Hill to associate with those, like Plaintiffs, who do not share its beliefs[.]" (ECF No. 57 at 14–15); *see also id*. at 17–18.  Defendants' arguments might be persuasive if the harm alleged by Plaintiffs was the ability to foster specifically through Miracle Hill.  However, that is not the harm Plaintiffs allege or seek to remedy by the relief requested.  For purposes of standing at this stage of the litigation, Plaintiffs have sufficiently alleged that Defendants caused Plaintiffs' injuries by creating a system that permits religiously-affiliated CPAs to use religious eligibility criteria to deny federally- and state-funded public services to prospective foster families.  Thus, an order requiring "Defendants to develop a system that removes barriers to same-sex couples becoming foster parents and evaluates their eligibility by the same criteria as any heterosexual couple or person will make Plaintiffs whole." *Marouf*, 391 F. Supp. 3d at 37.  The same logic applies to removing religious criteria to evaluate all prospective foster parents on the same

bases regardless of their religious beliefs. Accordingly, "'[n]o speculative inferences are necessary here to conclude that the relief requested will result in the Plaintiffs receiving the dignity and equal treatment they seek.'" *Id*. (quoting *Dumont*, 341 F. Supp. 3d at 725).

Therefore, the court concludes, for purposes of the pending motions to dismiss, that Plaintiffs have sufficiently alleged an injury in fact, fairly traceable to the Defendants, which is redressable by the relief sought in the Complaint and, therefore, have established standing to bring their claims.

### B. Plaintiffs' Complaint sets forth a claim for violation of the Establishment Clause.

The Establishment Clause requires that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. 1, cl. 1. When evaluating a claim for violation of the Establishment Clause, the Fourth Circuit has repeatedly indicated that the applicable test is that set forth by the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See, e.g.*, *Wood v. Arnold*, 915 F.3d 308, 313 (4th Cir. 2019). To pass scrutiny under the *Lemon* test, the government's conduct "'(1) must be driven in part by a secular purpose; (2) must have a primary effect that neither advances nor inhibits religion; and (3) must not excessively entangle church and State.'" *Id.* at 314 (quoting *Moss v. Spartanburg Cty. Sch. Dist. 7*, 683 F.3d 599, 608 (4th Cir. 2012)) (emphasis omitted). Government action violates the Establishment Clause if

it fails any of the *Lemon* factors. *Id*. In this case, although the parties dispute whether the Defendants' can identify a secular purpose for their actions under the first prong,[6] the well-pled allegations in the Complaint clearly set forth a cause of action based on Defendants' alleged violation of the second and third prongs of the *Lemon* test.

To satisfy the second *Lemon* factor, the primary effect of the challenged action must neither be to advance nor to inhibit religion. *Wood*, 915 F.3d at 316. "This requirement sets an objective standard, which 'measures whether the principal effect of government action is to suggest government preference for a particular religious view or for religion in general.'" *Id.* (quoting *Mellen*, 327 F.3d at 374) (internal alterations omitted). When deciding what the primary purpose or effect of the government's conduct is, courts in this circuit "consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion." *Id*. at 314. Additionally, the Fourth Circuit has included within this objective analysis the United States Supreme Court's "endorsement test," which considers whether a reasonable, informed observer would conclude that the

---

[6] Defendants claim the secular purpose for their actions was to maximize the number and diversity of available foster and adoption agencies in the state. (ECF Nos. 50-1 at 25–26; 57 at 32). In response, Plaintiffs argue this is merely a "sham" purpose and that the allegations in the Complaint demonstrate that "allowing CPAs to exclude qualified foster families based on religious criteria unrelated to the ability to care for a child does not maximize the number of families for children but rather, the opposite." (ECF No. 61 at 39). The court need not address this prong however, because it finds that the complaint alleges violation of the two remaining prongs of the *Lemon* test, as discussed below, sufficiently to avoid dismissal at this stage of the case.

government's action amounts to the endorsement of a particular religion or religion generally. *Id.* at 316. "Thus, in this Circuit, the primary effect prong asks whether, irrespective of government's actual purpose, a reasonable, informed observer would understand that the practice under review in fact conveys a message of endorsement or disapproval of a religion." *Id.* (quoting *Mellen*, 327 F.3d at 374) (internal quotation marks omitted). In this context, a reasonable, informed observer is presumed to be "'aware of the history and context of the forum in which the [challenged conduct] takes place.'" *Id.* (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).

With this standard in mind, at this stage of the proceedings the court must consider only whether, accepting as true the allegations in the Complaint and all reasonable inferences arising therefrom, Plaintiffs have plausibly alleged that Defendants' conveyed a message endorsing religion by allowing state-licensed, government-funded CPAs to reject prospective foster parents based on religious criteria. The court finds that they have.

Specifically, as to the State Defendants, Plaintiffs allege that "[w]hen it came to light that . . . Miracle Hill[] was excluding prospective foster parents based on religious criteria, [McMaster] took action to ensure that the discrimination could continue despite DSS's recognition that it violated state and federal law and policy[;]" and "[o]nce the HHS Waiver was granted to South Carolina, DSS issued

a new standard CPA license to Miracle Hill, with full knowledge that Miracle Hill would continue to exclude prospective foster parents, like [Plaintiffs], based on religious criteria." (ECF No. 1 at 29–30). Similarly, Plaintiffs allege the Federal Defendants "authorized and enabled the use of religious eligibility criteria to discriminate against prospective foster parents, like [Plaintiffs], in the South Carolina public child welfare system by exempting the State from a federal regulation that prohibits such discrimination . . . and continuing to provide federal funding to South Carolina for its foster care program, with the knowledge that the State requested the exemption in order to allow Miracle Hill to turn away prospective foster parents who are not evangelical Protestant Christians." *Id*. at 32. Plaintiffs assert that, but for the Federal Defendants' issuance of the HHS Waiver, "the State Defendants would not have provided Miracle Hill with a standard CPA license and authorized its continued use of religious criteria in recruiting and screening prospective foster parents." *Id*. As a result, Plaintiffs claim the effect of Defendants' actions is to "harm prospective foster families whose faith is other than evangelical Protestant Christianity and prospective foster families headed by same-sex couples regardless of their faith, denying them the same opportunities to foster that are available to families that meet Miracle Hill's religious requirements[,]. . . [and] coerce prospective foster parents to support the specific religious beliefs of Miracle

Hill so that they will be permitted to foster children through the agency." (ECF No.

1 at 30–31, 33).

Although the Defendants dispute these facts, *see* (ECF Nos. 50-1 at 26–28; 57

at 32), the court must assume their veracity based on the present procedural posture.

Accepting the truth of the factual allegations above, as well as those set forth in the

rest of the Complaint, the court finds that a reasonable, informed observer could

conclude that the Defendants' actions were taken in an effort to protect a specific

CPA, Miracle Hill, and permit discrimination within South Carolina's foster care

program on the basis of Miracle Hill's religious criteria. Other courts have similarly

held that where, as Plaintiffs allege occurred in this case, a state's authorization for

faith-based CPAs to use religious criteria to exclude prospective foster parents

"objectively endorses the religious views of those agencies[,] . . . sending a message

. . . that [those prospective foster parents who are rejected] are outsiders, not full

members of the community." *Dumont*, 341 F. Supp. 3d at 734 (internal quotation

marks omitted). Accordingly, taking all facts set forth in the Complaint as true,

Plaintiffs have set forth sufficient allegations that Defendants' actions had the

primary effect of advancing and endorsing religion and, thereby, violate the *Lemon*

test and the requirements of the Establishment Clause.

Moreover, Plaintiffs have also stated a plausible claim for violation of the

Establishment clause based on the third prong of the *Lemon* test, which requires

courts to determine whether the challenged government action has created "'an excessive entanglement between government and religion,' which 'is a question of kind and degree.'" *Wood*, 915 F.3d at 318. One way in which plaintiffs commonly establish excessive entanglement is to show that the government's action "has 'the effect of advancing or inhibiting religion.'" *Id*. (citing *Agostini v. Felton*, 521 U.S. 203, 232–33 (1997)). As discussed above, the court has already found that the Defendants' action as alleged in the Complaint had the primary effect of advancing religion. Consequently, Plaintiffs' have sufficiently pled that the challenged actions excessively entangled the government and religion. *See id*. Thus, the well-pled allegations in the Complaint sufficiently assert, for purposes of this order, that Defendants have violated both the second and third prongs of the *Lemon* test and, thereby, set forth a claim for violation of the Establishment Clause.

### 1. Accommodation vs. Establishment Clause

Both State and Federal Defendants argue that they cannot be liable for violation of the Establishment Clause because their actions merely accommodated Miracle Hill's and other faith-based CPAs' religious beliefs by allowing them to participate in the State child welfare system as CPAs without compromising those sincerely-held beliefs. *See* (ECF Nos. 50-1 at 25–26, 28–29; 57 at 33–35). However, the United States Supreme Court has made it clear that "accommodation is not a principle without limits[.]" *Board of Educ. of Kiryas Joel Village Sch. Dist. v.*

*Grumet*, 512 U.S. 687, 706 (1994).  In this case, "[t]he fact that [the Executive Order and the HHS Waiver] facilitate[] the practice of religion is not what renders it an unconstitutional establishment."  *Id*.  Supreme Court precedent "allow[s] religious communities and institutions to pursue *their own interests* free from governmental interference, but [the Supreme Court] ha[s] never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation."  *Id*. (emphasis added); *see also Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982) ("Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, but the concept of a 'wall' of separation is a useful signpost.  Here that 'wall' is substantially breached by vesting discretionary governmental powers in religious bodies." (internal citations omitted)).  As the Supreme Court has explained,

> The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause.  It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so.

*Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (quoting *Lee v. Weisman*, 505 U.S. 577, 587 (1992)) (internal alterations and quotation marks omitted).  This is what Plaintiffs allege in this case: that "[b]y knowingly funding an agency that uses religious eligibility criteria to screen prospective foster parents,

Defendants commit[ted] one of the primary 'evils' targeted by the Establishment Clause: 'sponsorship and financial support' of religion." (ECF No. 61 at 34 (quoting *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 772 (1973)); *see also id*. at 33–34 (arguing that State Defendants delegated a government function to a religious organization and improperly allowed the use of religious criteria in the exercise of that function in violation of the Establishment Clause); (ECF No. 1 at 30–31; 33 (alleging Defendants' actions coerce prospective foster parents to adopt Miracle Hill's religious beliefs in order to be able to foster through that agency)).

"[T]he core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions[.]" *Larkin*, 459 U.S. at 126 (quoting *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 222 (1963)). According to the Complaint, the system which Defendants' "accommodations" have created "does not by its terms require that [religiously affiliated CPAs'] power be used in a religiously *neutral* way." *Id.* at 125 (emphasis added). Rather, under the Executive Order and the HHS Waiver, religiously-affiliated CPAs' power to accept or reject prospective foster parents is completely "standardless, calling for no reasons, findings, or reasoned conclusions." *Id.* "'The potential for conflict inheres in the situation,'" yet Defendants appear to argue that it is not their responsibility to ensure "that the delegated power '[is] used exclusively for secular, neutral, and nonideological purposes.'" *Id.* (quoting *Levitt v. Comm. for Pub. Ed.*, 413 U.S. 472,

480 (1973); *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973)) (internal alterations omitted).    Contrary to Defendants' argument, the Supreme Court has long recognized that the Constitution does not permit "a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127.    Therefore, to the extent Defendants' assert that their actions are immune from challenge under the Establishment Clause as "religious accommodation," such argument is directly contrary to the well-pled allegations in the Complaint and long-established federal jurisprudence and must be rejected at this stage of the proceedings.[7]

### C. Equal protection.

The Equal Protection Clause of the Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."    U.S. Const. Amend. XIV, § 1.    In other words, the Equal Protection clause "'keeps governmental decisionmakers from treating

---

[7] Finally, Defendants also raise a related argument that, had they done nothing and permitted DSS to revoke Miracle Hill's CPA license for failure to comply with state and federal non-discrimination requirements, Miracle Hill's free exercise rights would have been violated. This argument is based solely on speculation regarding what Miracle Hill, a non-party to this action, would have done if its license had been revoked. More importantly, however, such an argument is unsupported by the law. "The Free Exercise Clause does not . . . relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)) (internal quotation marks omitted). In other words, Miracle Hill's "religious or conscientious objections do not supersede the basic obligation to comply with generally applicable civil rights laws provided those laws are applied neutrally." *Id.* at 153 (citing *Masterpiece Cakeshop, Ltd. V. Colo. Civil Rights Comm'n*, --- U.S. ---, 138 S. Ct. 1719, 1727 (2018)).

differently persons who are in all relevant respects alike.'" *Moss v. Spartanburg Cty. School Dist. No. 7*, 676 F. Supp. 2d 452, 459 (D.S.C. 2009) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  In order to survive dismissal on an equal protection claim, a plaintiff must allege facts sufficient to show that he was "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  *Id*.  Unless the challenged classification violates a fundamental right or is drawn upon a suspect class such as race, religion, or gender, it is presumed valid and need only be rationally related to a legitimate state interest to pass under the Equal Protection clause.  *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)); *Johnson v. Hall*, Civ. A. Nos. 4:08-cv-2726-TLW-TER, 4:09-cv-0102-TLW-TER, 2010 WL 3724746, at *10 (D.S.C. Aug. 23, 2010) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)).

In this case, for purposes of the motions to dismiss, Plaintiffs have met the first hurdle, alleging that Defendants' actions resulted in Plaintiffs being treated differently from other similarly-situated prospective foster parents on the basis of their religion and sexual orientation.  *See, e.g.*, (ECF No. 1 at 22 (alleging that

"[w]ithout the HHS Waiver, Miracle Hill would not have been granted a standard CPA license" and would not have been able to reject Plaintiffs based on their religion or sexual orientation), 23 (alleging that, due to the Executive Order and HHS Waiver, "DSS has taken no further steps to prevent discrimination by Miracle Hill against prospective foster parents based on religion or sexual orientation"), 36 (alleging that "[b]y authorizing and funding Miracle Hill's discrimination, Defendants subjected Plaintiffs to different and unfavorable treatment based on religion and sexual orientation"). Now the court must consider whether Plaintiffs have alleged a lack of justification for Defendants' action and this disparate treatment under the requisite level of scrutiny. *See Morrison*, 239 F.3d at 654.

### 1. Religious Discrimination

As noted above, under the Equal Protection Clause, challenged government action that "caus[es] disparate treatment based on a 'suspect classification' such as race or religion . . . receives very strict scrutiny by the courts." *Prudential Prop. & Cas. Co. v. Ins. Comm'n of S.C. Dep't of Ins.*, 534 F. Supp. 571, 575–76 (D.S.C. 1982). Plaintiffs argue that the State Defendants' actions "clearly afforded a denominational preference to evangelical Christianity[,]" and, consequently, must be evaluated under strict scrutiny. (ECF No. 61 at 37). The State Defendants,[8] on

---

[8] Although Federal Defendants purport to argue that Plaintiffs failed to state a claim for equal protection violations, Federal Defendants' arguments amount to no more than a recitation of their injury in fact and traceability arguments with respect to standing. *See* (ECF No. 50-1 at 19–24

the other hand, argue that their actions in requesting the HHS Waiver and issuing the Executive Order were "facially neutral with respect to religion and designed to limit South Carolina's interference with religious exercise" and are, therefore, only subject to rational basis review. (ECF No. 57 at 25). In particular, State Defendants argue that their actions treat all religions equally by allowing any religiously-affiliated CPA to apply its own religious criteria to select prospective foster parents. *See id.* at 23–24. The court agrees with State Defendants.

When government action is "neutral on its face" and "afford[s] a uniform benefit to *all* religions," the proper inquiry is whether the action is rationally related to a legitimate government purpose. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) (emphasis in original). The facts set forth in the Complaint, and undisputed by Defendants, establish that the Executive Order and the HHS Waiver do not distinguish between religions, but apply equally to all faith-based CPAs "so that no 'religious organization' would have 'to choose between the tenets of its faith or applying for a CPA license . . . .'" (ECF No. 57 at 24); *see also* (ECF No. 1 at 20–21, 22).

---

(arguing that Miracle Hill and the State Defendants are the cause of Plaintiffs' alleged injuries such that the claims cannot properly be brought against Federal Defendants); 30 (arguing Plaintiffs' equal protection claim fails because they have failed to allege a "cognizable injury" and any injury they did suffer was caused by Miracle Hill, not Federal Defendants)). The court has already addressed and rejected these arguments. Nevertheless, although only State Defendants actually challenge whether Plaintiffs have plausibly stated a claim for equal protection, the court analyzes the sufficiency of the claim as against both the State and Federal Defendants.

Accordingly, to the extent State Defendants' actions permit religious discrimination in the administration of the State foster care program, their actions need only withstand rational basis review to pass under the Equal Protection Clause. *See Amos*, 483 U.S. at 339.

"To be irrational in the Constitutional sense, 'the relationship of the classification to its goal' must be 'so attenuated as to render the distinction arbitrary.'" *Johnson*, 2010 WL 3724746, at *10 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)). Thus, "[i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). Further, the burden is on Plaintiffs "'to negate every conceivable basis which might support'" Defendants' actions. *Johnson*, 2010 WL 3724746, at *10 (quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)). In other words, "the State has no obligation to produce evidence to support the rationality of [its challenged action], which 'may be based on rational speculation unsupported by any evidence or empirical data.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *FCC v. Beach Comms., Inc*., 508 U.S. 307, 315 (1993)).

The dilemma of how this rational basis standard interacts with the dismissal standard under Fed. R. Civ. P. 12(b)(6) was resolved by the Fourth Circuit in *Giarratano*:

> The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if relief could be granted under any set of facts that could be proved consistent with the allegations. The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim. . . .
>
> While we therefore must take as true all of the complaint's allegations and reasonable inferences that follow, we apply the resulting "facts" in the light of the deferential rational basis standard. To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.

521 F.3d at 303–04 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459–60 (7th Cir. 1992)) (internal citations and quotation marks omitted). In that case, the Fourth Circuit held that dismissal was proper because the complaint's "conclusory assertion" that the challenged action "'is not rationally related to any legitimate government interest'" was "insufficient to overcome the presumption of rationality . . . ." *Id*. at 304. Applying this analysis to the matter at hand, the court finds that

dismissal of the equal protections claims regarding religion is also proper in this case.

In support of their equal protection claims against Defendants, Plaintiffs simply allege that the "State Defendants' [and Federal Defendants'] actions fail any level of constitutional scrutiny because they do not rationally advance any legitimate government interest." (ECF No. 1 at 35, 37). This is a legal conclusion, not a factual allegation, and the court need not accept it when ruling on a motion to dismiss. *ACA Fin. Guaranty Corp. v. City of Buena Vista, Va*., 917 F.3d 206, 212 (4th Cir. 2019). Additionally, in response to Plaintiffs' allegations, Defendants' proffered numerous legitimate government interests rationally related to their actions permitting the use of religious criteria by faith-based CPAs including, *inter alia*, "increasing community support and options for foster child placement by maximizing the number and diversity of CPAs[.]"  (ECF No. 57 at 26); *see also* (ECF No. 50-1 at 25–26). Thus, Plaintiffs' "conclusory assertion[s]" are "insufficient to overcome the presumption of rationality" afforded to Defendants' actions which are facially neutral with respect to religion. *See Giarratano*, 521 F.3d at 304.  "As long as the [challenged action] chosen by [Defendants] rationally advances a reasonable and identifiable governmental objective, [courts] must disregard the existence of other methods of allocation that [judges], as individuals, perhaps would have preferred." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981).  Accordingly, Plaintiffs' equal

protection claim for religious discrimination fails as a matter of law and Defendants are entitled to dismissal of that claim.

### 2. Sexual Orientation Discrimination

As to sexual orientation discrimination, State Defendants merely challenge whether Plaintiffs have sufficiently pled that they were discriminated against because they are a same-sex couple.  (ECF No. 57 at 23).  The court finds that they have.  *See* (ECF No. 1 at 25 (alleging Plaintiffs "were turned away by Miracle Hill . . . based on Miracle Hill's religious objection to accepting same-sex couples"); *see also id.* at 16–18 (setting forth Miracle Hill's doctrinal statement which states, in part, that "God's design for marriage is the legal joining of one man and one woman" and citing to numerous public reports supporting allegations that Miracle Hill "will not accept married, same-sex couples as foster parents" and that "DSS has acknowledged that Miracle Hill discriminates based on the sexual orientation of prospective foster parents").

Because State Defendants limit their argument on sexual orientation discrimination to whether Plaintiffs have in fact alleged such discrimination, they provide no argument as to what level of scrutiny would apply should the court find that such discrimination occurred.  Although Plaintiffs argue that classifications based on sexual orientations are "presumptively unconstitutional and subject to heightened scrutiny[,]" (ECF No. 61 at 40), neither the Fourth Circuit nor the

Supreme Court has expressly recognized sexual orientation as a classification subject to heightened or strict scrutiny.    Thus, the classification drawn by McMaster's Executive Order and the HHS Waiver, permitting CPAs to use religious criteria to deny same-sex couples access to South Carolina's state- and federally-funded public foster care program, is governed by rational basis review and will be presumed valid and sustained if it is rationally related to a legitimate state interest. *See Giarratano*, 521 F.3d at 303.    However, since neither the State nor Federal Defendants presented any arguments as to how their actions rationally related to a legitimate State purpose, the court concludes that the Complaint has sufficiently alleged that there is no legitimate purpose for Defendants' actions and states a claim under the Equal Protection Clause for sexual orientation discrimination such that dismissal is in appropriate at this time.

## IV.    CONCLUSION

Accordingly, for the reasons set forth herein, the Defendants' motions to dismiss (ECF Nos. 50, 54, 57) are **GRANTED in part and DENIED in part**. Defendants' motions are granted with respect to Plaintiffs' claim for violation of the Fourteenth Amendment equal protection based on religious discrimination, which is hereby **DISMISSED**.    However, Defendants' motions are denied as to Plaintiffs' claims for equal protection based on sexual orientation discrimination and violation of the Establishment Clause.

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

May 8, 2020
Anderson, South Carolina