**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Eden Rogers et al., | ) | |
| | ) | Civil Action No. 6:19-cv-01567-JD |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **GOVERNOR HENRY MCMASTER'S** |
| United States Department of Health and | ) | **MOTION FOR A PROTECTIVE ORDER**[1] |
| Human Services, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Governor McMaster moves this Court under Fed. R. Civ. P. 26(c)(1) for a protective order prohibiting Plaintiffs from forcing the Governor himself to be deposed in this case. As explained below, Governor McMaster is the Chief Executive Officer of the State of South Carolina, and his deposition is forbidden under the apex doctrine for at least three independent reasons, any one of which is a sufficient basis on which to issue a protective order: (i) deposing him would place an undue and unnecessary burden on the State and the Governor; (ii) the Governor has no unique personal knowledge of the matter in dispute that could be obtained solely from his deposition; and (iii) any information Plaintiffs seek from the Governor can be obtained from alternative discovery methods. Further, the Governor's deposition also should not be allowed for an additional and independent reason, namely that it would invade the protected deliberative and decision-making sphere of the Chief Executive. Accordingly, this Court should grant a protective order forbidding such deposition.

---

[1] Governor McMaster submits no supporting memorandum for this motion because a full explanation of the motion is set forth within, and a memorandum would serve no useful purpose. *See* Local Civ. Rule 7.04 (D.S.C.).

## BACKGROUND

### I.    Factual background as alleged by Plaintiffs.[2]

Title IV-E of the Social Security Act authorizes the United States Department of Health and Human Services ("HHS") to provide States with funding to assist in caring for children placed in foster care. *See* Complaint at ¶ 33 (ECF No. 1) (May 30, 2019). In South Carolina, the South Carolina Department of Social Services ("SCDSS") receives federal funds from HHS. *Id.* SCDSS, in turn, directs such funds, along with state funds, to reimburse private government contractors (known in the industry as "child-placing agencies" or "CPAs") for the services they provide relating to foster care. *Id.* SCDSS is also responsible for issuing and renewing licenses to CPAs, which allow them to perform services related to foster care. *Id.* at ¶¶ 27–29.

Miracle Hill Ministries ("Miracle Hill") is a private charitable nonprofit operating as a CPA in Greenville, South Carolina, and it receives government funding to reimburse some of its services relating to foster care. *Id.* at ¶¶ 41, 46. It is a Christian organization. *Id.* at ¶¶ 42, 47.

On January 27, 2018, SCDSS requested Miracle Hill address SCDSS's concerns regarding Miracle Hill's practice of partnering only with foster parents who share Miracle Hill's religious beliefs. *Id.* at ¶¶ 54–55, 57. At the same time, SCDSS declined to reissue Miracle Hill a standard CPA license and instead issued it a temporary CPA license valid for six months. *Id.* at ¶ 56. This decision was prompted by HHS's issuance of a new regulations in the final weeks of the Obama administration. Specifically, in January 2017, HHS amended federal regulations pertaining to State receipt of federal funds under Title IV-E to require that the funds be expended in a way that does not discriminate on the basis of religion, sexual orientation, or a number of other classifications.

---

[2] Although there is no requirement that a court ruling on a discovery issue must view the facts in a light most favorable to either party, Governor McMaster herein relies primarily on Plaintiffs' own version of the facts as drawn from their Complaint, though without conceding their veracity.

*See* 45 C.F.R. § 75.300(c). This new regulation purported to apply both to SCDSS (as a recipient of the funds) and to private CPAs licensed by and contracting with SCDSS (as sub-recipients of Title IV-E funds). *See* 45 C.F.R. §§ 75.101(b)(1), 1355.30(i).

Plaintiffs allege that Miracle Hill subsequently contacted Governor McMaster, who responded that he was "working with [HHS] to obtain a waiver of requirements that adversely affect religious entities." Compl. ¶ 61 (alteration in Complaint). On February 27, 2018, Governor McMaster wrote to HHS Principal Deputy Assistant Secretary Steven Wagner and requested that HHS grant a deviation or waiver from the nondiscrimination provisions of HHS regulation 45 C.F.R. § 75.300 "on behalf of South Carolina and faith-based organizations like Miracle Hill" operating under South Carolina's Title IV-E Foster Care Program. *Id.* at ¶ 62; *see also* Letter from McMaster to Wagner, attached hereto as **Exhibit A** (the "waiver request").

On March 13, 2018, while awaiting a response from HHS, Governor McMaster issued Executive Order No. 2018-12, which provided, in pertinent part, as follows:

> [F]aith-based CPAs associate foster parents and homes who share the same faith and should not be asked to compromise sincerely held religious beliefs in recruiting, training, and retaining foster parents . . . . [T]o the fullest extent permitted by state and federal law . . . DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs.

Compl. ¶ 64; *see also* Executive Order No. 2018-12, attached hereto as **Exhibit B**.

On January 23, 2019, HHS granted South Carolina an exception to the religious nondiscrimination requirements of 45 C.F.R. § 75.300(c). *See* Compl. ¶ 68. On April 28, 2019, Plaintiffs completed Miracle Hill's online inquiry form for prospective foster parents and submitted it. *Id.* at ¶ 80. On May 1, 2019, a Foster Care Licensing Supervisor at Miracle Hill sent an email to Plaintiffs, informing them that Miracle Hill partnered only with foster parents who share Miracle Hill's Christian beliefs, and that because Plaintiffs were members of the Unitarian

Universalist Church—a sect whose belief "does not align with traditional Christian doctrine"—Miracle Hill would not be a good fit for them. *Id.* at ¶ 81; *see also* Email from S. Betts to E. Rogers and B. Welch (May 1, 2019), attached hereto as **Exhibit C**. The email also contained a list and the contact information for nine other agencies in the upstate of South Carolina, along with SCDSS, that would assist Plaintiffs should they be interested in fostering, ensuring that no opportunity was withheld from Plaintiffs and no burden created. *See* Compl. ¶ 82; Email from S. Betts to E. Rogers and B. Welch. The email further invited Plaintiffs to explore other volunteer opportunities at Miracle Hill that were available to them. *See* Email from S. Betts to E. Rogers and B. Welch. Plaintiffs did not contact SCDSS or any other CPA suggested by Miracle Hill either before or after filing their Complaint on May 30, 2019. (Pls' Resps. to Def. McMaster's First Set of Interrogs., #15, Jan. 25, 2021.)

## II.    The proposed deposition.

This litigation is in the discovery phase, and much discovery has already taken place during the 11 months since discovery began. Governor McMaster has produced 843 pages of documents in response to Plaintiffs' Requests for Production; he has responded to Plaintiffs' Interrogatories; and he has responded to Plaintiffs' Requests for Admissions. Defendant Michael Leach, the Director of SCDSS, has likewise produced documents, responded to interrogatories, and responded to requests for admission. The Federal Defendants have produced a 439-page Administrative Record.

On March 4, 2021, Plaintiffs' counsel informed counsel for Governor McMaster that they intended to notice the deposition of a Rule 30(b)(6) witness from the Office of the Governor as well as the depositions of two employees from that Office. *See* Letter from P. Barbur to M. Coleman (March 4, 2021), attached hereto as **Exhibit D**. Plaintiffs' counsel likewise informed

counsel for SCDSS Director Michael Leach that they intend to depose a Rule 30(b)(6) witness from SCDSS and two separate SCDSS employees. *See* Letter from P. Barbur to K. Woodington (March 4, 2021), attached hereto as **Exhibit E**. Plaintiffs have not requested or noticed the depositions of any of the Federal Defendants or their employees.

Counsel for Governor McMaster responded and informed Plaintiffs' counsel that Governor McMaster could not produce witnesses from the Office of the Governor because neither the Office of the Governor nor its employees were named as defendants in this suit. *See* Letter from M. Coleman to P. Barbur (Mar. 23, 2021), attached hereto as **Exhibit F**. Director Leach's counsel responded to Plaintiffs by email, agreeing to produce the requested witnesses if Plaintiffs would serve a subpoena on the desired witnesses. Plaintiffs subsequently served subpoenas on SCDSS, which did not oppose or object to the subpoenas. The depositions of the individuals employed at SCDSS are scheduled for April 27 and 28, and the parties are finalizing a date to depose SCDSS's 30(b)(6) designee.

Plaintiffs' counsel also responded to Governor McMaster's counsel, stating that if the Governor was unable to produce a 30(b)(6) witness and individual witnesses from the Office of the Governor, Plaintiffs intended to subpoena the Office and the two individual witnesses and also intended to notice the deposition of the Governor himself. *See* Letter from P. Barbur to M. Coleman (April 2, 2021), attached hereto as **Exhibit G**. On April 15, 2021, Plaintiffs' counsel sent subpoenas via certified mail to the Office of the Governor seeking deposition testimony from two individual employees, and, on April 19, 2021, Plaintiffs' counsel wrote to in-house counsel in the Office of the Governor regarding the proposed 30(b)(6) deposition. *See* Letter from P. Barbur to T. Limehouse (April 19, 2021), attached hereto as **Exhibit H**.

In the meantime, counsel for the Governor wrote to Plaintiffs' counsel to note that the Governor objected to any intent to depose him, as such a deposition is impermissible under the apex doctrine as well as the privilege that surrounds the deliberations and decisional process of high-ranking executive officials. *See* Letter from M. Coleman to P. Barbur (April 14, 2021), attached hereto as **Exhibit I**. Counsel for Governor McMaster offered to meet and confer with Plaintiffs' counsel about the issue and noted that if such a conference would prove fruitless and Plaintiffs' intended to persist in noticing the Governor's deposition, the Governor would move for a protective order to prevent the deposition. *See id*. A week later, Plaintiffs' counsel responded and refused the offer to meet and confer regarding the proposed deposition, baldly stating instead only that the Governor's assertion of the apex doctrine and deliberative privilege were "untenable," and stating the Notice of Deposition would be served shortly. *See* Letter from P. Barbur to M. Coleman (April 21, 2021), attached hereto as **Exhibit J**. As a result of Plaintiffs' position and their counsel's refusal to confer regarding the same, Governor McMaster is compelled to file this Motion seeking a protective Order.

## STANDARD OF REVIEW

"The scope and conduct of discovery are within the sound discretion of the district court." *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 56 F.3d 556, 568 n.16 (4th Cir. 1995). A district court "may, for good cause, issue an order to protect a party . . . from . . . [an] undue burden" that discovery would impose upon that party. Fed. R. Civ. P. 26(c)(1). "High-ranking government officials are not normally subject to depositions." *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010) (citing *Kyle Engineering Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979)). When a high-ranking government official seeks a protective order, the official

does not bear the burden of establishing good cause; rather "the burden shifts to the party seeking to depose the high-ranking official" to demonstrate extraordinary circumstances. *Id.* at 1049.

**ARGUMENT**

Plaintiffs' proposed deposition would place an undue and unnecessary burden on Governor McMaster and, therefore, violates the apex doctrine. Furthermore, it would invade the protected deliberative and decision-making sphere of Governor McMaster, the chief executive officer for the state of South Carolina. Accordingly, this Court should grant a protective order forbidding such deposition.

**I.    Governor McMaster should not be deposed because, as a high-ranking government official, he is protected by the apex doctrine, which prohibits depositions that would constitute an undue burden.**

In the Fourth Circuit, "[i]t is well established that high-ranking government officials may not be deposed or called to testify about their reasons for taking official actions absent 'extraordinary circumstances.'" *In re McCarthy*, 636 F. App'x 142, 143 (4th Cir. 2015); *see also Estate of Latoya Nicole Valentine v. State of South Carolina*, C/A No. 3:18-00895-JFA (D.S.C. Dec. 23, 2020) (Anderson, Joseph, J.) (ECF No. 196) (granting Governor McMaster's Motion seeking a protective order against being deposed and quashing deposition subpoenas).

This rule is often called the "apex doctrine." *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528 (N.D. Ill. Feb. 21, 2020). "[A]lthough the apex doctrine is often presented as a stand-alone maxim used to prevent a party from deposing a high-level official, it is more accurately described as a tailored application of the rules regulating discovery in specific instances involving high-level or 'apex' officials." *Estate of Latoya Nicole Valentine v. State of South Carolina*, C/A No. 3:18-00895-JFA (D.S.C. Aug. 18, 2020) (Anderson, Joseph, J.) (ECF No. 166 at 5). Specifically, the doctrine is an application of the presumption that "the deposition of a high-

7

ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes 'good cause' for such an order as an 'annoyance' or 'undue burden' within the meaning of Rule 26(c)(1)." *Id.* (quoting *Performance Sales & Mktg. LLC v. Lowe's Companies, Inc.*, No. 5:07-CV-00140-RLV, 2012 WL 4061680, at *3 (W.D.N.C. Sept. 14, 2012)).

The apex doctrine "recognizes that depositions of high-level officers severely burdens those officers and the entities they represent, and that adversaries might use this severe burden to their unfair advantage." *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 696 (D.N.M. 2019). Unlike other witnesses, "[h]igh ranking government officials have greater duties and time constraints . . . [and their] time is very valuable." *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993). Governor McMaster qualifies as a high-ranking government official since he is the "Chief Magistrate" in the State, and the "supreme executive authority" of the State of South Carolina is vested in him. S.C. Const. art. IV, § 1.

In "any one of the following circumstances," a court may grant a protective order to protect a high-level government official from the burdens of a deposition:

> (1) the executive has no unique personal knowledge of the matter in dispute; (2) the information sought from the executive can be obtained from another witness; (3) the information sought from the executive can be obtained through an alternative discovery method; or (4) sitting for the deposition is a severe hardship for the [official] in light of his obligations to his [office].

*Tierra Blanca*, 329 F.R.D. at 696; *see also Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528 at *1 (N.D. Ill. Feb. 21, 2020); *Cross by and Through Steele v. XPO Express, Inc.*, C/A No. 4:16-1254-BHH, 2017 WL 10544634 (D.S.C., May 8, 2017).

Although only one of these four circumstance need be met to invoke the apex doctrine, in Governor McMaster's case *at least* three of them are applicable and easily satisfied: the first, third,

and fourth. Therefore, this Court should grant Governor McMaster's Motion for a Protective Order to protect him from the burdens of the deposition.

> A.    Governor McMaster has *no* unique *personal knowledge of the matter in dispute that can be obtained* solely *from his deposition.*

Plaintiffs seek discovery for the purpose of supporting the causes of action pled in the Complaint. Plaintiffs pled claims under the Establishment and Equal Protection Clauses of the First and Fourteenth Amendments to the United States Constitution.[3] As explained more fully below, however, there is no information relevant to those claims that is known solely by the Governor and could be obtained solely from his deposition.

Knowledge of the *facts* surrounding the challenged actions is not unique to the Governor, and his deposition is not the sole way in which such facts may be ascertained. *See* section I.C, *infra*. Nor is the Governor's deposition justified to discover the *intentions* behind the challenged actions. For one, the Governor's intentions are legally irrelevant to the Equal Protection claim. The Executive Order and waiver request are facially neutral with respect to religion or, at most, afford a uniform benefit to all religions.[4] Accordingly, they must be sustained if there is *any* plausible governmental purpose to support them, regardless of whether that purpose was the actual, subjective motivation for the actions. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) (holding that government actions "affording

---

[3] This Court previously dismissed Plaintiffs' Equal Protection claim based on religious discrimination, but Plaintiffs' claim on sexual-orientation discrimination remains. *See* Order Granting in Part Defendants' Motions to Dismiss, 44–45 (ECF No. 81) (May 8, 2020).

[4] This Court has already concluded that the challenged actions are facially neutral and, therefore, must be evaluated under rational basis standard. Accordingly, it is the law of the case. *See* Order Granting in Part Defendants' Motions to Dismiss, 41–42 (ECF No. 81) (May 8, 2020) ("The Court agrees with State Defendants" that the waiver request and Executive Order were "facially neutral" and "treat all religions equally," and thus must "only withstand rational basis review to pass under the Equal Protection Clause").

a uniform benefit to *all* religions" are assessed under rational basis review) (emphasis in original); *FCC v. Beach Comm's, Inc.*, 508 U.S. 307, 113 (1993) (holding a governmental action "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis" for the action); *Pulte Homes Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018) (analyzing an Equal Protection claim under the rational basis standard and stating: "The test is not a subjective one. [] 'The actual motivation for the [local government's] actions [is] irrelevant.' . . . Pulte had alleged that the Amendment, a legislative document of public record, violated its constitutionally protected rights. If the Amendment reveals any rational reason for its adoption, it passes rational basis review even if its purported rationale was not the actual motivation behind it.") (alterations in original) (citations omitted).

Similarly, the Governor's deposition is not needed to determine the "purpose" behind the actions in Plaintiffs' Establishment Clause claim. *See Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (noting that one element of *Lemon*'s eponymous Establishment Clause test is whether the challenged government action had a secular purpose).[5] Here, the Governor's purpose or intent behind Executive Order No. 2018-12 and the waiver request are not a mystery that can be discerned solely by questioning him. Rather, the motivation behind the challenged actions can be discerned from the faces of the documents themselves. *See Bowen v. Kendrick*, 487 U.S. 589, 602 (1988) (holding there was no Establishment Clause violation under *Lemon* when "it is clear from the face of the statute that the AFLA was motivated primarily, if not entirely, by a legitimate secular purpose"); *Edwards v. Aguillard*, 482 U.S. 578, 594–595 (1987) (noting that, when applying the

---

[5] As noted in prior filings, the Supreme Court has not relied on the *Lemon* test in over a decade, relying instead in Establishment Clause cases on a historically-informed analysis. *See* Gov. McMaster's Mot. to Dismiss at 28 n.18 and 31 n.20 (ECF No. 57) (Aug. 30, 2019) (collecting cases). Governor McMaster mentions the *Lemon* test here only in an effort to consider and rebut any possible basis Plaintiffs might assert in support of their proposed deposition.

*Lemon* test, a "court's finding of improper purpose behind a statute is appropriately determined by the statute on its face, its legislative history, or its interpretation by a responsible administrative agency."); *Ehlers-Renzi v. Connelly School of the Holy Child, Inc*., 224 F.3d 283, 288 (4th Cir. 2000) ("This secular purpose prong presents a 'fairly low hurdle,' [] which may be cleared by finding 'a plausible secular purpose' on the face of the regulation.") (citations omitted); *Glassman v. Arlington County*, 628 F.3d 140, 146 (4th Cir. 2010) (stating the same in an opinion holding a county's financing of church construction project did not violate the Establishment Clause); *see also McCreary County v. ACLU*, 545 U.S. 844, 862 (2005) ("The eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act.") (citation and internal quotation marks omitted).

Here, the purposes of the Governor's actions are apparent on the face of the two documents by which Governor McMaster allegedly violated the Establishment Clause. The Executive Order and waiver request expressly state they were motivated by the purpose of complying with the South Carolina and United States Constitutions, statutory law, and controlling precedent by protecting the religious and associational liberty of faith-based CPAs. *See* Executive Order No. 2018-12, at 1, Mar. 13, 2018, attached hereto as **Exhibit B** ("[G]overnment at any level should not and shall not penalize religious activity by denying any person or organization an equal share of the rights, benefits, and privileges enjoyed by other individuals or organizations solely on account of one's religious identity and sincerely held beliefs."); *id*. ("[F]aith-based organizations may retain their religious character and participate in government programs, provided that public funds are not used to directly subsidize or support religious worship activities."); *id*. ("[T]he foregoing rights are guaranteed by, *inter alia*, the First Amendment to the United States Constitution and

article I, section 2 of the South Carolina Constitution, both of which provide that there shall be no laws prohibiting the free exercise of religion, abridging the freedom of speech, or inhibiting the corresponding right to associate with others."); *id.* ("[T]he rights of faith-based organizations to exercise religious beliefs while participating in government are also protected by the South Carolina Religious Freedom Act of 1999"); *see also* Letter from Governor McMaster to Acting Assistant Secretary Wagner at 2, Feb. 27, 2018, attached hereto as **Exhibit A** ("[T]he new regulatory subsections effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding, which violates the constitutional rights of faith-based organizations."); *id.* ("A regulation used to limit the free exercise of faith-based providers violates the Religious Freedom Restoration Act."); *id.* ("In *Trinity Lutheran Church of Columbia, Inc. v. Cromer*, the Supreme Court held that the state policy of denying a 'qualified religious entity a public benefit solely because of its religious character . . . goes too far' and violates the Establishment Clause."); *see also* Gov. McMaster's Mot. to Dismiss at 26–27, 32 (ECF No. 57) (Aug. 30, 2019) (explaining the legitimate, secular purposes motivating the Executive Order and waiver request); Gov. McMaster's Ans. to the Compl. at 3 (ECF No. 84) (May 22, 2020) ("Plaintiffs at all times have been and are still welcome to seek licensure as foster parents from the South Carolina Department of Social Services [], which evaluates and licenses all foster parents in the state, and which does so without regard to their religion, lack of religion, sexual orientation, or marital status.").

Governor McMaster has no unique personal knowledge relevant to the matter in dispute that can be obtained solely from his deposition. Accordingly, the Court should grant a protective order to protect the State's chief executive from the undue burdens of a deposition. *Tierra Blanca*, 329 F.R.D. at 696.

B.     *Plaintiffs can obtain the information sought from Governor McMaster from alternative discovery methods.*

The use of multiple discovery methods—namely, Plaintiffs' document requests, interrogatories, and requests to admit to which Governor McMaster has responded, not to mention the deponents, documents, and discovery responses produced by the other defendants—can (and here have) enabled Plaintiffs to obtain the information relevant to their claims.

First, Plaintiffs have already sent Governor McMaster numerous document requests that have resulted in the Governor's production of 843 pages of documents to Plaintiffs. (As a point of comparison, Plaintiffs produced only 76 pages in response to Governor McMaster's document requests.) The Governor produced these documents in response to 22 separately numbered document requests seeking materials including documents and communications between Governor McMaster and anyone regarding the Executive Order or waiver request (numbers 1–3), documents and communications "regarding religious accommodations for faith-based foster care or adoption agencies (number 12), documents and communications concerning the effect of the Executive Order and waiver request (numbers 13–14), documents and communications regarding private CPAs' policies and practices regarding prospective foster parents (numbers 8, 15–17), documents and communications regarding HHS's response to the waiver request (numbers 4–5), and documents and communications relating to SCDSS's interactions with Miracle Hill (number 9). It is clear, considering the expansive nature of Plaintiffs' document requests, that Plaintiffs have canvassed all nonprivileged materials within Governor McMaster's possession relating to the issues in this case.

Second, if Plaintiffs have questions for Governor McMaster, they may ask them via interrogatories. Interrogatories may be used as evidence in support of a motion or at trial. *See* Fed. R. Civ. P. 33(c). Accordingly, they are available as an alternative, less burdensome method by

which Plaintiffs may request the information they seek. For example, the Plaintiff in a related proceeding—*Maddonna v. U.S. Dept. of Health & Human Servs. et al.*, C/A No. 6:19-cv-03551-JD (D.S.C.), which, like this lawsuit, asserts an Establishment Clause claim arising from the Executive Order and waiver request—served interrogatories on the Governor inquiring about the governmental interests that were served by the Executive Order and waiver request and inquiring about the reasons and bases to believe the enforcement of the unconstitutional and *ultra vires* requirements found in 45 C.F.R. § 75.300(c) would force faith-based CPAs either to abandon their sincerely held religious beliefs or forgo licensure and funding; would infringe on the constitutional and statutory rights of CPAs and foster parents; and would otherwise harm the State's foster care system and the children who depend on it.  Plaintiffs in *this* suit could likewise explore such topics through interrogatories rather than through deposition testimony.

Third, if Plaintiffs wish to pin Governor McMaster to any factual or legal position, they may do so by using a request for admission. A party may use requests for admission to ascertain another party's position on the "facts, the application of law to fact, or opinions about either" or "the genuineness of any described documents." *See* Fed. R. Civ. P. 36(a)(1). The combination of the use of document requests, interrogatories, and requests for admission enable Plaintiffs to obtain all the information they seek from Governor McMaster, without subjecting him to a deposition. Therefore, this Court should grant the Governor's motion for a protective order and prevent Governor McMaster from being deposed. *See Estate of Latoya Nicole Valentine v. State of South Carolina*, C/A No. 3:18-00895-JFA (D.S.C. Dec. 23, 2020) (Anderson, Joseph, J.) (ECF No. 196) (quashing attempt to depose Governor McMaster, noting in part that the relevant information could be "obtained from some other source that is more convenient, less burdensome," and "could have been obtained in a myriad of other ways" including "written interrogatories" or deposing "other

defendants" or "other witnesses"); *see also Coleman v. Schwarzenegger*, Nos. CIV S–90–0520 LKK JFM P, C01–1351 TEH, 2008 WL 4300437, at *4 (E.D. Cal. Sept. 15, 2008) (ruling that interrogatories and requests to admit could be used in lieu of deposing a governor).

  C. *Sitting for the deposition would be a significant hardship on Governor McMaster considering the obligations of his position.*

As the highest-ranking executive officer in the State of South Carolina, Governor McMaster oversees Cabinet agencies that range from the Department of Commerce to the Department of Veterans Affairs, as well as other agencies, departments, and officials within the Executive Branch. *See* S.C. Code Ann. § 1-30-10; *Cabinet Agencies*, Governor, https://governor. sc.gov/executive-branch. The Governor's management and oversight of these agencies, as well as his other gubernatorial obligations and policy initiatives, such as economic development projects, impose significant demands on his time.

The Governor's duties, however, extend beyond just the executive branch. He must keep himself abreast of legislation proposed and passed by the General Assembly, South Carolina's legislative body, since the Constitution requires that bills and joint resolutions passed by the General Assembly be presented to the Governor for approval. *See* S.C. Const. art. IV, § 21. Governor McMaster must ensure that those measures are constitutional and that they represent good policy for the State of South Carolina, which requires much legal and factual research and analysis. Since the General Assembly is in session, Governor McMaster must devote a substantial amount of time to keeping himself informed on pending legislation, budget proposals, and other matters before the legislature, as well as enrolled and ratified acts for his time-sensitive review and approval.

In addition, the State of South Carolina is amidst a global pandemic due to COVID-19, and South Carolina is currently in a State of Emergency and subject to a presidentially declared major disaster declaration. *See* Executive Order No. 2021-20 (Apr. 22, 2021). Naturally, responding to

the ongoing and evolving public health emergency requires Governor McMaster's utmost attention, which includes regular coordination and collaboration with public health and emergency management experts and federal, state, county, and municipal officials on emerging issues ranging from vaccine distribution to government operations. *See id*. § 1(A) ("The State of South Carolina must take further proactive action and enhance mitigation efforts to reduce community transmission of COVID-19 and implement narrowly tailored extraordinary measures to prepare for, respond to, and address the evolving public health threat posed by the COVID-19 pandemic, to include the continued utilization and coordination of state and federal intergovernmental and interagency financial and operational resources and collaborative response efforts to facilitate and accelerate the large-scale administration of the limited supplies of authorized COVID-19 vaccines allocated to the State and the continued expansion of testing capacity."). Subjecting Governor McMaster to a deposition that would fail to further this litigation would constitute an undue burden on the Governor given his important duties and time constraints.

Courts frequently grant protective orders or quash efforts to depose a sitting Governor in circumstances like those presented here. *See*, *e.g.*, *Estate of Latoya Nicole Valentine v. State of South Carolina*, C/A No. 3:18-00895-JFA (D.S.C. Dec. 23, 2020) (Anderson, Joseph, J.); *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528, at *3 (N.D. Ill. Feb. 21, 2020); *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 698–99 (D.N.M. 2019); *EMW Women's Surgical Ctr., P.S.C. v. Glisso*n, No. 3:17CV-00189-GNS, 2017 WL 3749889, at *3 (W.D. Ky. Aug. 30, 2017); *Babin v. Breaux*, No. 10–368–BAJ–DLD, 2012 WL 83672, at *3 (M.D. La. Jan. 11, 2012); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010); *Coleman v. Schwarzenegger*, Nos. CIV S–90–0520 LKK JFM P, CO1–1351 TEH, 2008 WL 4300437, at *4 (E.D. Cal. Sept. 15, 2008); *Warzon v. Drew*, 155 F.R.D. 183, 186 (E.D. Wisc. 1994).

Governor McMaster respectfully moves the Court for a Protective Order preventing his deposition pursuant to the apex doctrine for the reasons set out above.

II.    **The deliberative-process privilege protects Governor McMaster from a deposition because interrogating him regarding the decision-making behind his Executive Order and waiver request would chill internal deliberations of legal and policy matters.**

The deliberative-process privilege "is an evidentiary privilege sometimes accorded to the government to protect documents from discovery that are involved in the government's deliberative decision-making functions." *Crosby v. United States*, C/A No.: 3:07-3668-JFA, 2009 WL 10678825 at *2 (D.S.C. Mar. 24, 2009) (Anderson, Joseph, J.). Most often, it "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). However, the privilege also protects the "mental processes" of a government official involved in making a governmental decision. *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *E.E.O.C. v. BMW Mfg. Co., LLC*, C.A. No. 7:13-1583-HMH, 2015 WL 5449086 at *2 (D.S.C. 2015). The purposes behind the privilege include to

> encourage free-ranging discussion of alternatives; prevent confusion that might result from the premature release of such nonbinding deliberations; and insulate against the chilling effect likely were officials to be judged not on the basis of their final decisions, but "for matters they considered before making up their minds."

*City of Virginia Beach, Va. v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1252–53 (4th Cir. 1993) (citation omitted). Stated differently, the privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 372 (4th Cir. 2009).[6]

---

[6] Although South Carolina's state courts do not recognized the deliberative-process privilege, federal privilege law governs in federal court and supplants state law. *See* Fed. R. Evid. 501; *see*

Here, Plaintiffs' supposed need to depose Governor McMaster is to question him about his Executive Order and letter to Assistant Secretary Wagner. Both documents, however, are clear on their faces and speak for themselves, and any line of inquiry relating to the rationale, considerations, deliberations, motivation, and intent behind them is protected by the deliberative-process privilege because it would invade the Governor's decision-making process. Any discussions that the Governor may have had regarding South Carolina's foster care system, CPAs, and the protection of the exercise of sincerely held religious beliefs fall within the scope of this privilege (if not already falling within the scope of the attorney-client privilege) because these discussions influenced the Governor's decision and reflect his mental processes surrounding making the decision.

If the deliberative-process privilege does not protect Governor McMaster from questions on the rationale behind his actions, then he would be subject to a deposition on *any* policy position he takes and *every* Executive Order he issues. Such a situation would discourage free and robust internal discussion of the various alternatives available in any situation requiring gubernatorial action and would create a chilling effect on open and candid discussion between and among the Governor and his advisors. The effect would be to disincentivize the Governor from seeking information in forming and carrying out policy decisions because every bit of information he received and every mental impression or deliberation could be sought in litigation. This is the precisely the situation that the Supreme Court sought to prevent when it recognized the deliberative-process privilege and stated that "it [is] not the function of the court to probe the

---

*also Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998) ("The current matter is a civil case based upon a federal cause of action . . . .Therefore, following the mandate of Rule 501, we must apply 'the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'") (citation omitted); *Crosby v. United States*, C/A No.: 3:07-3668-JFA, 2009 WL 10678825 (D.S.C. March 24, 2009) (applying federal common law to analyze a claim of deliberative process privilege).

mental processes of [high-ranking executive officials]." *United States v. Morgan*, 313 U.S. 409, 422 (1941) (citation omitted).

Nor is such probing needed here. The Governor's rationale and completed actions are clearly expressed in the explicit text of the Executive Order and the letter to Assistant Secretary Wagner. As stated therein, Governor McMaster sought to uphold the United States and South Carolina Constitutions and the best interests of children in foster care, current and prospective foster parents, and the State's foster care system by protecting the exercise of sincerely held religious beliefs and by ensuring that critically necessary CPAs could continue providing invaluable foster care services in the State of South Carolina while also ensuring avenues were available for any qualified foster parent to serve. *See* Letter from McMaster to Wagner, attached hereto as **Exhibit A**; Executive Order 2018-12, attached hereto as **Exhibit B.**

Because the deliberative-process privilege protects Governor McMaster from having to give his reasons behind his executive actions, this Court should grant his motion for a protective order prohibiting his deposition.

## CONCLUSION

Because Plaintiffs' proposed deposition would invade Governor McMaster's protected deliberative and decision-making sphere as the Chief Executive and would impose an undue and unnecessary burden on Governor McMaster, this Court should grant a protective order forbidding such deposition.

## AFFIRMATION

Counsel for Governor McMaster, in good faith, offered and attempted to confer with Plaintiffs' Counsel, consistent with their obligations under Fed. R. Civ. P. 26(c)(1) and Local Civ.

Rule 7.02 (D.S.C.), but Plaintiffs' counsel refused the offer, apparently believing the parties would be unable to resolve their dispute.

Respectfully submitted

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ Miles E. Coleman
Miles E. Coleman
Federal Bar No. 11594
E-Mail: miles.coleman@nelsonmullins.com
2 W. Washington St. / Fourth Floor
Greenville, SC 29201
(864) 373-2352

Jay T. Thompson
Federal Bar No. 09846
E-Mail: jay.thompson@nelsonmullins.com
1320 Main Street / 17th Floor
Post Office Box 11070 (29211-1070)
Columbia, SC 29201
(803) 799-2000

OFFICE OF THE ATTORNEY GENERAL

Robert D. Cook, South Carolina Solicitor General
Federal Bar No. 285
E-Mail: bcook@scag.gov
Post Office Box 11549
Columbia, SC 29211
(803) 734-3970

*Attorneys for Governor Henry McMaster*

Greenville, South Carolina
April 24, 2021