IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Eden Rogers et al.,                              )
                                                 )
                              Plaintiffs,         )
                                                 )
              v.                                 )          Civil Action No. 6:19-cv-01567-JD
                                                 )
United States Department of Health and           )
Human Services et al.,                           )
                                                 )
                              Defendants.         )

**DEFENDANTS HENRY MCMASTER'S AND MICHAEL LEACH'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

OFFICE OF THE ATTORNEY GENERAL

    Robert D. Cook
    South Carolina Solicitor General
    Post Office Box 11549
    Columbia, SC 29211
    (803) 734-3970

DAVIDSON, WREN & DEMASTERS, P.A.

    Kenneth P. Woodington
    William H. Davidson, II
    1611 Devonshire Drive, 2nd Floor
    Post Office Box 8568
    Columbia, SC 29202-8568
    (803) 806-8222

NELSON MULLINS RILEY & SCARBOROUGH LLP

    Miles E. Coleman
    2 W. Washington St. / Fourth Floor
    Greenville, SC 29201
    (864) 373-2352

    Jay T. Thompson
    1320 Main Street / 17th Floor
    Post Office Box 11070 (29211-1070)
    Columbia, SC 29201
    (803) 799-2000

*Attorneys for Governor Henry McMaster
and Director Michael Leach*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

RELEVANT BACKGROUND.......................................................................................4

    I.     Foster care in South Carolina...................................................................4

    II.    Relevant regulatory events and the Defendants' responses thereto........6

    III.   Plaintiffs' factual allegations and legal claims .......................................9

    IV.   Procedural Posture.................................................................................11

LEGAL STANDARD ...............................................................................................12

ARGUMENT .........................................................................................................13

    I.     Plaintiffs' Complaint fails to state claims upon which relief can be granted because, as *Fulton* shows, the accommodations sought and granted by the State Defendants were constitutionally permissible and required ......................13

        A.    *Fulton* mandates that if the government *can* accommodate religious foster-care providers by exempting them from non-discrimination requirements while licensing, funding, and contracting with them, "it *must* do so."...................................................................................................15

        B.    The non-discrimination requirements at issue in this suit, like those in *Fulton*, are reviewed under strict scrutiny, and, just as in *Fulton*, the government can and, therefore, must, accommodate religious foster-care providers...............................................................................................17

        C.    Plaintiffs' other allegations fail to assert any claims on which relief can be granted ..........................................................................................22

        D.    The relief requested in Plaintiffs' Complaint is itself unconstitutional ........24

    II.    Plaintiffs' Equal Protection claim based on alleged sexual-orientation discrimination fails for the additional reason that the State Defendants' actions were rationally related to a legitimate government interest .....................25

CONCLUSION........................................................................................................28

<u>T</u>ABLE OF <u>A</u>UTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union of N. Cal. v. Azar*,
    C/A No. 16-cv-03539-LB, 2018 WL 4945321 (N.D. Cal. Oct. 11, 2018) .................19, 22–23

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints
    v. Amos*, 483 U.S. 327 (1987) ....................................................................................27

*Drager v. PLIVA USA, Inc.*,
    741 F.3d 470 (4th Cir. 2014) ......................................................................................12

*Freilich v. Upper Chesapeake Health, Inc.*,
    313 F.3d 205 (4th Cir. 2002) ......................................................................................25

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ........................................................................................ *passim*

*Fulton v. City of Philadelphia*,
    320 F. Supp. 3d 661 (E.D. Pa. 2018) ..........................................................................14

*Fulton v. City of Philadelphia*,
    922 F.3d 140 (3d Cir. 2019) .................................................................................13, 15

*Heller v. Doe*,
    509 U.S. 312 (1993) ....................................................................................................26

*Kenny A. v. Perdue*,
    218 F.R.D. 277 (N.D. Ga. 2003) .................................................................................19

*Lipscomb ex rel. DeFehr v. Simmons*,
    962 F.2d 1374 (9th Cir. 1992) (en banc) ....................................................................27

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................................22

*Maddonna v. U.S. Dept. of Health & Human Servs. et al.*,
    Civil Action No. 6:19-cv-03551-JD, D.S.C., Order .....................................................23

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
    No. 17-11930-NMG, 2021 WL 185243 (D. Mass. Jan. 15, 2021) ...............................27

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ........................................................................................4

*Pulte Home Corp. v. Montgomery Cnty., Md.*,
    271 F. Supp. 3d 762 (D. Md. 2017) ................................................................12

*Pulte Home Corp. v. Montgomery Cnty., Md.*,
    909 F.3d 685 (4th Cir. 2018) .............................................12, 25, 27

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ...............................................................................22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ...........................................................................7, 27

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...............................................................................22

**Statutes and Regulations**

42 U.S.C § 671(a)(18) ...............................................................................6

42 U.S.C. § 2000bb-1 ...............................................................................21

42 U.S.C. §§ 2000bb to 2000bb-4 .........................................................7

45 C.F.R. §§ 75.101(b)(1), 1355.30(i) ...................................................6

45 C.F.R. § 75.102 ...................................................................................19

45 C.F.R. § 75.300 ...................................................................................18

45 C.F.R. § 75.300(c) (2017) .....................................................6, 8, 9, 18, 19

45 C.F.R. § 87.3 ........................................................................18, 19, 20

S.C. Code Ann. §§ 1-32-10 to -60 ........................................................7, 8

S.C. Code Ann. § 1-32-40 ......................................................................21

S.C. Code of Regulations R. 114-4910 to -4980 ...................................5

S.C. Code of Regulations R. 114-4930 ...................................................5

S.C. Code of Regulations R. 114-4980 ...................................................5

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367
    (3d ed. 2004) ...........................................................................................13

Fed. R. Civ. P. 12 ...............................................................................1, 12

*Fulton v. Philadelphia*, Brief for Petitioners ............................................................................14

*Fulton v. Philadelphia*, Brief for City Respondents ...............................................................14, 15

*Fulton v. Philadelphia*, Brief of Members of Congress as *Amici Curiae* in Support
   of Respondents...........................................................................................................4, 18

*Fulton v. Philadelphia*, Brief of Prospective Foster Parents as *Amici Curiae* in
   Support of Respondents .............................................................................................4, 18

*Fulton v. Philadelphia*, Reply Brief for Petitioners ...................................................................14

*Fulton v. Philadelphia*, Supp. App. to Brief for City Respondents...............................................15

Local Civil Rule 7.04 D.S.C. .......................................................................................1

<u>**MOTION FOR JUDGMENT ON THE PLEADINGS**</u>[1]

Defendant Henry McMaster ("Governor McMaster" or "the Governor"), in his official capacity as Governor of the State of South Carolina, and Defendant Michael Leach ("Director Leach"), in his official capacity as the Director of the South Carolina Department of Social Services ("SCDSS") (collectively the "State Defendants"), move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because recent, controlling precedent from the United State Supreme Court forecloses the relief Plaintiffs seek; demonstrates that the State Defendants' actions challenged in this suit were constitutionally permissible and required; and indicates there is no basis upon which Plaintiffs can prevail on their remaining claims. Accordingly, this Court should enter judgment on the pleadings and dismiss this suit with prejudice.

## INTRODUCTION

For hundreds of years, in South Carolina and across the nation, state and federal governments have partnered and contracted with faith-based providers of social services whose work is compelled by, and is itself an exercise of, their religious faith. And for hundreds of years, these partnerships have been widely and rightly acknowledged to be constitutionally permissible.

In 2017, however, a federal regulation threatened to prevent faith-based organizations from continuing their long-standing efforts to help children in need. Governor McMaster responded by requesting a waiver from the federal agency responsible for the regulation and by issuing an Executive Order directing South Carolina's state government agencies to refrain from discriminating against or penalizing such organizations—for example, by denying them licensure or by refusing to contract with them—on the basis of their religious beliefs. Accordingly, SCDSS

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

continued to license and contract with at least one faith-based foster care provider that, as a matter of religious conviction, partners only with prospective foster parents who share its religious beliefs.

Plaintiffs claim that the State Defendants' actions violated the Constitution, and they ask this Court to declare that the State Defendants' accommodation of religious foster-care providers constituted the establishment of religion and deprived Plaintiffs of equal protection. Plaintiffs further ask this Court to issue a permanent injunction (i) ordering the Governor and Director Leach to cease licensing and contracting with private providers that partner only with co-religionists and (ii) directing the Governor and Director Leach to require all state-licensed and state-contracted providers to work with prospective foster parents whose beliefs and conduct are contrary to the provider's sincerely held religious beliefs.

Plaintiffs' claims lacked merit from the start, and any veneer of plausibility they may have once had was stripped away by the Supreme Court's recent, unanimous judgment in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), in which the Court held that the government *must*, whenever possible, accommodate the religious and associational rights of faith-based foster-care providers who, as a matter of their religious beliefs, limit the group of foster parents and prospective foster parents with whom they partner. The parallels between *Fulton* and this suit are striking. In *Fulton* (as here), a private, faith-based, government-licensed, government-contracted, and government-funded provider of foster-care services could not, as a matter of religious conviction, partner with prospective foster parents whose beliefs or behaviors were inconsistent with the provider's religious beliefs. Accordingly, in *Fulton* (as here), the provider could not in good conscience comply with the government's non-discrimination requirements. In *Fulton* (as here), the government could have accommodated the faith-based provider and continued to license and contract with it. But in *Fulton*, the local government responded not by accommodating the

provider, but, rather, by doing the very thing that Plaintiffs in *this* suit ask the Court to do, namely revoking the provider's license, refusing to contract with it, denying it funding, and mandating that it must abandon either its beliefs or its foster-care ministry. The Supreme Court unanimously concluded that this response—the same one Plaintiffs ask this Court to impose in South Carolina— was unconstitutional. *See Fulton*, 141 S. Ct. 1868 (2021).

The holding in *Fulton* requires the dismissal of this suit for at least two reasons. First, *Fulton* makes clear that the State Defendants' accommodation of faith-based providers is not only constitutionally permissible but constitutionally required. *See id.* at 1881 (holding that when "the government *can* achieve its interests in a manner that does not burden religion, it *must* do so" (emphasis added)). Such actions cannot, therefore, form the basis for any claim of constitutional violation. Second, *Fulton* makes clear that—as the State Defendants have maintained from the start—neither they nor this Court may provide the relief Plaintiffs have requested because that relief is itself unconstitutional. *See id.* at 1882 ("The refusal of Philadelphia to contract with CSS for the provision of foster-care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment."); *see also id.* (noting the Court's "conclusion that the actions of the City violate the Free Exercise Clause").

That *Fulton* requires dismissal here should be no surprise to Plaintiffs: In an *amicus* brief they filed in *Fulton*, they argued to the Supreme Court that a ruling for the faith-based foster-care provider in *that* case would be dispositive of *this* case. *See* Brief of Prospective Foster Parents as *Amici Curiae* in Supp. of Resps. at 2–4, 12–15, 29, 31, *available at* https://tinyurl.com/Fulton AmicusRogersWelch. A separate *amicus* brief authored by Plaintiffs' counsel and filed in *Fulton* makes the same point, specifically discussing the facts of this litigation and  arguing that if the Court ruled in favor of the faith-based provider in *Fulton*, it "would enable *any* government service

provider that so wishes to exclude any individual that does not share its religious beliefs." *See* Brief of Members of Congress as *Amici Curiae* in Supp. of Resps. at 16–17 *available at* https://tiny url.com/FultonMembersAmicusRespondents (emphasis added); *see also* n.12, *infra*, and accompanying text. They were (at least on this point) correct.

*Fulton* compels the dismissal of the Establishment Clause and Equal Protection claims asserted against the State Defendants. Furthermore, the Equal Protection claim, which was previously dismissed in part, should be dismissed for the additional reasons that the State Defendants' actions were rationally related to legitimate government purposes and, therefore, cannot be an unconstitutional deprivation of Equal Protection. Because the Complaint fails to state any claim on which relief can be granted, and because Plaintiffs have requested relief the Court cannot grant, Plaintiffs' claims against Governor McMaster and Director Leach should be dismissed with prejudice.

## RELEVANT BACKGROUND[2]

### I. Foster care in South Carolina.

SCDSS operates South Carolina's foster-care system and oversees the training, licensing, and supervision of foster homes and residential foster facilities in the State. SCDSS has a longstanding practice of contracting with private entities—known in the field as Child Placing Agencies ("CPAs")—that recruit, train, and supervise foster homes and assist in the placement of

---

[2] The facts set out herein are the same facts alleged by Plaintiffs. They are drawn from the allegations of the Complaint and the documents, statutes, and regulations relied on and incorporated by reference therein. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion under Rule 12 into one for summary judgment). The State Defendants do not concede the truth of the Complaint's allegations, but the Court's resolution of this Motion does not require a determination of the veracity of the facts alleged therein nor does it require consideration of any facts outside of the Complaint and the materials incorporated therein.

children into those homes. *See* S.C. Code of Regulations R. 114-4910 to -4980; *see also* Compl. ¶¶ 24, 26. SCDSS issues CPAs a standard one-year license or a temporary license that allows a CPA to continue to operate while working to correct any noncompliance with regulation, and SCDSS may deny or revoke licenses for violations of the licensing statute or regulations. *See* S.C. Code of Regulations R. 114-4930(E), (F), (G)(1)(b), (d); *see also* Compl. ¶¶ 27–29.

Licensed CPAs perform many valuable services: They monitor foster homes, recommend revocations of foster home licenses, assist SCDSS in its selection of foster homes for child placement, and develop and supervise the implementation of case plans for children placed in foster homes. *See* S.C. Code of Regulations R. 114-4980(A)–(D). A prospective foster parent's application to be licensed as a foster parent, however, is directed to SCDSS; the decision of whether to grant a license to the applicant is the sole prerogative of SCDSS. *See id*. 114-4980(A)(2)(d) and (A)(3)(b).

Some CPAs with which SCDSS contracts are private religious entities that serve children of every race, color, national origin, creed, disability, sex, age, political belief, sexual orientation, and gender identity. While faith-based CPAs serve children of every background and situation, some of these faith-based CPAs believe they should only hire employees and recruit, train, and supervise foster homes that share their religious mission and beliefs.

One such CPA is Miracle Hill Ministries ("Miracle Hill"). Miracle Hill is a faith-based organization that serves the homeless, hungry, and needy in upstate South Carolina. *See generally* Compl. ¶¶ 41–43. Besides serving the homeless in nine shelters and providing recovery centers for those seeking to overcome addictions, Miracle Hill helps hundreds of foster children by supporting over 200 families licensed as foster homes by SCDSS. *See id*. ¶ 43. For 80 years, Miracle Hill has gladly served anyone in need, regardless of race, color, ethnicity, national origin,

age, sex, disability, religion, sexual orientation, or identity. *See id.* ¶ 41. As explained in the following section, however, Miracle Hill's ability to serve children in foster care nearly changed in 2018 due to an amended federal regulation promulgated in the waning days of President Obama's administration that imposed onerous burdens on faith-based CPAs and the states that license and contract with them.

## II.    Relevant regulatory events and the Defendants' responses thereto.

South Carolina, like every other State, receives reimbursements for certain foster-care expenditures from the U.S. Department of Health and Human Services ("HHS") as authorized by Title IV-E of the Social Security Act. Title IV-E prohibits states from using funds in a discriminatory fashion "on the basis of the race, color, or national origin." 42 U.S.C § 671(a)(18); *see also* Compl. ¶ 31. In January 2017, however, HHS amended regulations implementing Title IV-E of the Social Security Act by adding "religion" and "sexual orientation" as unlawful bases for discrimination. 45 C.F.R. § 75.300(c) (2017); *see also* Compl. ¶¶ 38–40. This new regulation purported to apply both to SCDSS (as a recipient of Title IV-E funds) and to CPAs (as sub-recipients of Title IV-E funds). *See* 45 C.F.R. §§ 75.101(b)(1), 1355.30(i); *see also* Compl. ¶ 34.

When it came time for Miracle Hill's annual renewal of its CPA license in 2018, SCDSS determined it would issue Miracle Hill only a temporary license in light of Miracle Hill's practice of recruiting and partnering only with foster parents who share Miracle Hill's religious beliefs. *See* Compl. ¶¶ 54–57. In response, on February 27, 2018, Governor McMaster wrote to HHS seeking a "deviation" or waiver from the new regulation. *See* Compl. ¶ 62 & n.23 (containing URL link to a copy of the letter);[3] *see also* Letter from Governor McMaster to Steven Wagner, HHS Acting

---

[3] *See also* Compl. ¶ 3 (describing the letter as "a critical, essential step"); *id.* ¶¶ 62, 95, 100–10, 129–33.

Assistant Secretary (Feb. 27, 2018) (attached as **Exhibit A)**. His request was motivated partly by the fact that the new regulation would require HHS to recoup funds from SCDSS if HHS determined SCDSS's contracts with faith-based CPAs violated the new regulations. *See* Ex. A.

Governor McMaster's letter further explained that "faith-based CPAs are essential as our State needs more CPAs to recruit more families" for foster care, and that religious providers have been serving in that role "for years." Ex. A at 1. The new regulations adopted by HHS, the Governor noted, "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," which violates the CPAs' constitutional rights, as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4. *See* Ex. A at 2; *see also* S.C. Code Ann. §§ 1-32-10 to -60 (South Carolina Religious Freedom Act of 1999). Governor McMaster also directed HHS's attention to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), issued after HHS amended its regulations, and which "made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." *Id.* A waiver, Governor McMaster explained, would protect the rights of faith-based CPAs and, more importantly, would maximize the number of available foster homes, as faith-based CPAs are some of the largest providers of foster families. *See id.* ("South Carolina needs to continue growing our CPAs, not prevent them from serving our State's children.").

Shortly after seeking a waiver from HHS, Governor McMaster issued Executive Order No. 2018-12. *See* Compl. ¶ 64 & n.24 (containing URL link to a copy of the Order); *see also* Exec. Order No. 2018-12 (Mar. 13, 2018), at 1 (attached as **Exhibit B)**. The Order affirmed the well-founded principle that "faith-based organizations may retain their religious character and participate in government programs," a right protected by the First Amendment to the U.S.

Constitution, by the analogous provision of the South Carolina Constitution, and by the South Carolina Religious Freedom Act of 1999, S.C. Code Ann. §§ 1-32-10 to -60. *See* Ex. B. at 1.

The Order also acknowledges the historical fact that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing constitutionally permissible practice" and that faith-based CPAs "fulfill[] a crucial need for the State and provid[e] a critical service to the children of South Carolina." *Id.* at 2. Mindful that "DSS licenses many CPAs and provides a variety of CPA options from which foster parents may choose," the Order recognizes that "faith-based CPAs should not be asked to compromise sincerely held religious beliefs in recruiting, training, and retaining foster parents" and should be able to freely "associate [with] foster parents and homes who share the same faith." *Id.* In short, "religious observers and organizations should not be required to sacrifice the tenets of their faith to serve the children of South Carolina," especially when doing so would only decrease the availability of desperately needed foster homes. *Id.* Accordingly, the Order directs SCDSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "review and revise its policies and manuals" to "ensure that SCDSS does not directly or indirectly penalize religious identity or activity" in issuing licenses. *Id.* at 3.

On January 23, 2019, HHS responded to Governor McMaster's request for a waiver from 45 C.F.R. § 75.300(c). *See* Compl. ¶¶ 68–69 & n.26 (containing URL link to a copy of the letter); *see also* Letter from Steven Wagner, Principal Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs., to Governor Henry McMaster (Jan. 23, 2019) (attached as **Exhibit C**).[4] The response noted Governor McMaster's concerns about the decrease in available foster homes that would result if HHS enforced the new regulation against faith-based CPAs as well as his concerns

---

[4] *See also* Compl. ¶¶ 3, 5–7, 68–72, 96, 115–20, 143–49.

that enforcement would unlawfully force faith-based CPAs to either abandon their religious beliefs or forgo licensure. *See id.* at 1–2. HHS understood that faith-based CPAs, such as Miracle Hill, faced imminent revocation of their licenses unless they agreed to abandon their religious beliefs, which, as HHS recognized, CPAs such as Miracle Hill plainly would refuse to do. *See id.* at 2. After reviewing this information, HHS determined that requiring subgrantees who use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable under RFRA." *Id.* at 3. Accordingly, HHS granted the waiver Governor McMaster requested. *See id.* at 4.

## III.     Plaintiffs' factual allegations and legal claims.

Plaintiffs allege South Carolina needs additional foster homes to serve the children in its foster-care system, and that Miracle Hill, one of the larger CPAs in the state, performs foster-home recruitment and other foster-care services, including providing training and support for foster parents. *See id.* ¶¶ 4, 6, 20–23, 43–44, 46, 84, 86. Miracle Hill gladly serves any adult or child in need, regardless of his or her race, color, ethnicity, national origin, age, sex, disability, religion, lack of religion, orientation, or identity, and Miracle Hill gladly works with volunteers without regard to such factors. *See id.* ¶¶ 41–42, 94 & n.30 (containing URL link to Miracle Hill FAQ document describing its policy).[5] As part of its religious faith and practice, however, Miracle Hill believes that those it places in positions of spiritual responsibility—including foster parents—must share its religious beliefs, mission, and motivation. *See id.* ¶¶ 47–51, 81. Miracle Hill makes no secret of its strongly and sincerely held religious beliefs, including its conviction that those whom it

---

[5] Plaintiffs' Complaint contains copious references to Miracle Hill's website. *See* Compl. ¶¶ 41–42, 44, 47–50, 94.

places in positions of spiritual responsibility or influence should share those beliefs. It has acknowledged these beliefs on its website; it has explained them in its application forms and foster-care manual; its officers and employees politely and respectfully discuss them with prospective foster parents; and its leaders emphasize them in staff training. *See id.* ¶¶ 48–51, 54, 81–82.

Plaintiffs admit they do not share Miracle Hill's religious beliefs. *See id.* ¶¶ 5, 8. After Plaintiffs contacted Miracle Hill regarding an interest in fostering, Miracle Hill requested that they complete an online inquiry form. *See id.* ¶¶ 78–79.  As it has done consistently in similar circumstances, *see id.* ¶¶ 2, 45, 51, when Miracle Hill learned Plaintiffs did not share its deeply-held religious beliefs and did not attend a Christian church, Miracle Hill politely informed Plaintiffs they should seek licensure through another CPA or through SCDSS, and provided Plaintiffs with a list of nine other CPAs in the area. *See id.* ¶¶ 81–82. Miracle Hill explained it "feels a religious obligation to partner with foster parents who share [Miracle Hill's] beliefs and who are active in a Christian church" as well as its religious belief that "those who hold positions of spiritual responsibility or influence—including foster parents"—should "share [Miracle Hill's] Christian mission, motivation, and beliefs." *Id.* ¶ 81.

Although Plaintiffs were aware of other opportunities to foster through other CPAs in their area or with DSS directly, *see id.* ¶¶ 4, 24–25, 45, 82, 90, they admit they have made no attempt to do so, *see id.* ¶¶ 8, 77, 90. Instead, Plaintiffs filed a 40-page Complaint in federal court with the backing of three advocacy groups and two law firms and supported by a team of ten lawyers from across the country. And although the factual allegations of the Complaint concede that Miracle Hill referred Plaintiffs to other CPAs because Plaintiffs are not members of a Christian church and do not share Miracle Hill's religious beliefs, the Complaint is nevertheless replete with speculation

that Miracle Hill *really* referred them to other providers due to their sexual orientation. *See*, *e.g.*, *id*. ¶¶ 1–2, 7, 45, 52, 83, 107, 130.

Plaintiffs' Complaint asserts two claims against the State Defendants, alleging the actions the State Defendants took to maximize foster-care opportunities and to protect the Free Exercise and associational rights of South Carolina's faith-based CPAs prevented Plaintiffs from obtaining licensure through the only CPA they deigned to approach and, thereby, violated the Establishment Clause and the Equal Protection Clause. *See id.* ¶¶ 97–113, 127–40. Specifically, Plaintiffs claim that by requesting and granting exceptions to the non-discrimination requirements in state and federal regulations and in SCDSS policies, the State Defendants have privileged, preferred, advanced, and endorsed certain religious beliefs and have coerced prospective foster parents to support Miracle Hill's religious beliefs in violation of the Establishment Clause. *Id*. ¶¶ 97–113. They likewise claim that requesting and granting these exceptions subjected Plaintiffs to different and unfavorable treatment on the basis of their religion, sexual orientation, or marital status, and, therefore, violated the Equal Protection Clause. *Id*. ¶¶ 127–40.

## IV.    Procedural Posture.

Plaintiffs filed this action against the State Defendants and various Federal Defendants on May 30, 2019. In response to Governor McMaster's Motion to Dismiss (ECF No. 57), this Court dismissed Plaintiffs' Equal Protection claim based on religious discrimination; noted that the Equal Protection claim based on sexual orientation or same-sex marriage would likewise be dismissed if and when the same arguments were leveled against it; and allowed the Establishment Clause claim to proceed (ECF No. 81). The Defendants subsequently filed Answers, and the parties began discovery. Discovery is not yet complete. Presently, there are several pending discovery motions

relating to the Plaintiffs' attempts to depose the Governor and employees of the Office of the Governor and to compel the production of more expansive privilege logs.

The Supreme Court's opinion in *Fulton v. City of Philadelphia*, issued on June 17, 2021, clarified the dispositive issues in this case such that it is unnecessary to conduct further discovery and wait for summary judgment because Governor McMaster and Director Leach are entitled to judgment on the pleadings as a matter of law. Accordingly, concurrently with this Motion for Judgment on the Pleadings, the State Defendants have filed a Motion to Stay Discovery and to Hold the Pending Discovery Motions in Abeyance.

### LEGAL STANDARD

"The standard of review for Rule 12(c) motions is the same as that under Rule 12(b)(6)." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Thus, a Rule 12(c) motion should be granted when, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" *Id.*

A Rule 12(c) motion is properly filed and granted during the pendency of discovery when a change in controlling precedent makes the relief sought in the suit unobtainable or when a plaintiff is incapable of prevailing on the constitutional claims she has asserted. *See Drager*, 741 F.3d at 474–76; *Pulte Home Corp. v. Montgomery Cnty., Md.*, 909 F.3d 685, 691, 695–96 (4th Cir. 2018).

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c), (h)(2)(B). "The mere fact that discovery has commenced is not enough to invalidate [a motion for judgment on the pleadings]," especially where "there is a case dispositive issue for which discovery is unnecessary to resolve." *Pulte Home Corp. v. Montgomery Cnty., Md.*, 271 F. Supp. 3d 762, 768 n.3 (D. Md. 2017). In fact, "if it seems

clear that the motion may effectively dispose of the case on the pleadings, the district court should permit it regardless of any possible delay consideration of the motion may cause." Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367 (3d ed. 2004).

ARGUMENT

**I.    Plaintiffs' Complaint fails to state claims upon which relief can be granted because, as *Fulton* shows, the accommodations sought and granted by the State Defendants were constitutionally permissible and required.**

The parallels between *Fulton* and this suit are striking, and the holding of *Fulton*, as explained below, is dispositive here. In *Fulton*, Catholic Social Services ("CSS"), a faith-based entity, had been contracting with the City of Philadelphia for decades to provide foster-care services. *See Fulton*, 141 S. Ct. at 1874. CSS's ministry was a continuation of "over two centuries" of the Catholic Church's service to the needy children of Philadelphia. *Id*. at 1874–75.

In Philadelphia, the City's Department of Human Services, which has custody of all children in foster care, "enters standard annual contracts with private foster agencies to place some of those children with foster families." *Id*. at 1875. These state-licensed, government-contracted private entities evaluate prospective foster families and conduct a home study before determining whether to approve, disapprove, or provisionally approve of their potential service as a foster family. *Id*. "The agency continues to support the family throughout the placement." *Id.* Whenever the City needs to place a foster child, it sends a request to entities such as CSS, which, in turn, report whether any of their families are available. *Id*. The City then determines the most suitable placement for the child. *Id*.

Under its contract with the City, CSS received millions of dollars in government funding for foster-care services and, had it continued to contract with the City, would have received millions more. *See Fulton v. City of Philadelphia*, 922 F.3d 140, 150 (3d Cir. 2019) (noting record

13

evidence indicating CSS provided "government-funded" services); *Fulton v. City of Philadelphia*, 320 F. Supp. 3d 661, 668, 671–72, 679 (E.D. Pa. 2018) (noting CSS's receipt of government funds under the contract with the City); *see also* Brief for Petitioners at 22, 33, and 51 (discussing government funding available to CSS under the contract);[6] Brief for City Respondents at 2, 3, 7–8, 15, 24, 28, and 42 (same);[7] Reply Brief for Petitioners at 16 (same).[8]

Things changed in 2018, when the City learned that CSS's religious beliefs would not allow it to comply with the City's non-discrimination requirement imposed on all contracted foster care agencies to forbid them from discriminating against any person on the basis of, among other things, sexual orientation or religion. *See Fulton*, 141 S. Ct. at 1875, 1878. Because CSS views "the certification of prospective foster families to be an endorsement of their relationships, it will not certify unmarried couples—regardless of their sexual orientation—or same-sex married couples." *Id*. at 1875. If CSS were to receive an inquiry or application from a same-sex couple, "CSS would direct the couple to one of the more than 20 other agencies in the City." *Id*.

Upon learning of CSS's religious belief and practice, the City launched an investigation. At its conclusion, the City "informed CSS that it would no longer refer children to the agency," and "stated that it would not enter a full foster care contract with CSS in the future unless the agency agreed to certify same-sex couples." *Id*. at 1875–76. CSS responded by suing the City, alleging, among other things, that the City's refusal to contract with CSS violated CSS's rights under the First Amendment's Free Exercise Clause. *Id*. The District Court disagreed, holding that the City's exclusion of CSS was permissible. *Fulton*, 320 F. Supp. 3d 661. The Third Circuit

---

[6] *Available at* https://tinyurl.com/FultonPetitionersBrief.

[7] *Available at* https://tinyurl.com/FultonCityBrief.

[8] *Available at* https://tinyurl.com/FultonPetitionersReplyBrief.

affirmed. *Fulton*, 922 F.3d at 153. The Supreme Court, however, unanimously reversed. Its reasoning and ruling and the effect of both on this suit are explained more fully below.

A. ***Fulton* mandates that if the government *can* accommodate religious foster-care providers by exempting them from non-discrimination requirements while licensing, funding, and contracting with them, "it *must* do so."**

The *Fulton* Court's legal analysis began with the unremarkable recognition that the government burden's a faith-based CPA's religious exercise by putting it to the choice either of curtailing its mission or partnering with prospective foster parents whose beliefs or behaviors are inconsistent with its beliefs. *Fulton*, 141 S. Ct. at 1876–77. In *Fulton*, the governmental restrictions at issue were two non-discrimination requirements contained in the contract with the City. *See id*. at 1878–79. One forbade foster services providers from declining to work with prospective foster parents based on their sexual orientation unless the Commissioner or her designee granted an exception. *See id*. at 1878. The other, "a separate provision in the contract[,] independently prohibits discrimination in the certification of foster parents . . . on the basis of sexual orientation, and it does not on its face allow for exceptions." *Id*. at 1879; *see also* Supp. App. to Brief for City Respondents at 31 (containing contract section 15.1 in its entirety, which prohibited CPAs from "discrimination against any individual on the basis of . . . sexual orientation, gender, identity, [or] religion").[9]

The Court held that because one of the non-discrimination requirements could be waived by the Commissioner, neither of them was generally applicable, so they would both be reviewed "under the strictest scrutiny." *Id*. at 1881; *see also id*. at 1877 (noting in pertinent part that a "law is not generally applicable if it . . . provid[es] a mechanism for individualized exemptions") citations and internal quotation marks omitted)); *id*. at 1879 (holding that as long as one of the City's non-discrimination requirements for foster services providers permitted exceptions, the

---

[9] *Available at* https://tinyurl.com/FultonSupplementalAppendix.

other such requirement—which lacked an exception mechanisms—was likewise susceptible to exceptions and thus would also be reviewed under strict scrutiny); *id*. at 1880–81 (noting that recruiting and screening prospective foster parents necessarily "involves a customized and selective assessment" and inherently requires a subjective, "uniquely selective" process).

Under this demanding legal standard, the government "*must*," whenever possible, accommodate the religious beliefs of faith-based CPAs, including by exempting them from non-discrimination requirements:

> A government policy can survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. [] Put another way, so long as the government can achieve its interests in a manner that does not burden religion, *it must do so*.

*Id*. at 1881 (emphasis added) (citation omitted); *see also id*. at 1878 (noting that when the possibility of an exception exists, "the City 'may not refuse to extend that [exemption] system to cases of "religious hardship" without compelling reason'" (alteration in original) (citation omitted)).

Applying this rigorous standard in the context of non-discrimination requirements related to foster-care service providers, the *Fulton* Court concluded that none of the governmental interests that Philadelphia asserted in support of its non-discrimination requirement—including maximizing the number of foster homes and ensuring equal treatment of prospective foster homes—were sufficient to justify denying CSS an exception for its religious beliefs and practices. *See id*. at 1881–82. Indeed, the *Fulton* majority (authored by Chief Justice Roberts and joined by Justices Breyer, Sotomayor, Kagan, Kavanaugh, and Barrett) specifically noted that the accommodation of faith-based CPAs "seems likely to *increase*, not reduce, the number of available foster parents." *Id*. at 1882 (emphasis added).[10]

---

[10] Plaintiffs have asserted the contrary, facially implausible view. *See* Compl. ¶¶ 34, 88–92 (alleging the continued operation of Miracle Hill, which they admit is the largest private CPA in the state, somehow shrinks the pool of available foster homes).

Accordingly, the Court unanimously held that the City's refusal to contract with CSS for the provision of foster-care services unless CSS agreed to comply with government requirements contrary to its religious beliefs violated CSS's Free Exercise rights and was, therefore, unconstitutional. *Id*. ("CSS seeks only an accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs; it does not seek to impose those beliefs on anyone else. The refusal of Philadelphia to contract with CSS for the provision of foster-care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment.").

**B.     The non-discrimination requirements at issue in this suit, like those in *Fulton*, are reviewed under strict scrutiny, and, just as in *Fulton*, the government can and, therefore, must, accommodate religious foster-care providers.**

*Fulton* established the analytical framework to determine whether and when private faith-based providers of foster-care services may be compelled to hew to government mandates that conflict with their religious identity and beliefs. And *Fulton* demonstrates what the outcome of that analysis must be in a situation that is functionally identical to the one presented in this lawsuit. The multiple parallels between *Fulton* and this suit are striking,[11] and *Fulton*'s holding compels the dismissal of Plaintiffs' remaining claims.[12]

---

[11] A notable difference, of course, is that in this suit the governmental parties acted to *uphold* the Constitution in the manner required by *Fulton*, whereas in *Fulton* the governmental parties violated the Constitution by penalizing, rather than accommodating, a faith-based CPA.

[12] Notably, Plaintiffs filed an *amicus* brief in *Fulton* recognizing that a ruling in CSS's favor would likewise uphold the right of similarly situated government-contracted CPAs, including Miracle Hill, to decline to work with Plaintiffs because they do not share the CPAs' religious beliefs. *See* Brief of Prospective Foster Parents as *Amici Curiae* in Supp. of Resps. at 2–4, 12–15, 29, 31, *available at* https://tinyurl.com/FultonAmicusRogersWelch.

Likewise, Plaintiffs' counsel argued in a separate *amicus* brief they authored in *Fulton* that a ruling in favor of CSS would be dispositive of this suit. *See* Brief of Members of Congress as *Amici Curiae* in Supp. of Resps. at 16–17 ("In South Carolina, for instance, the state requested and received a waiver from federal antidiscrimination regulations for the state's largest, government-funded agency . . . . Accepting [CSS's] argument in this case would enable any government service

Plaintiffs in this suit will, one presumes, strain to find some minor difference between this suit and *Fulton*—perhaps noting that the non-discrimination requirement in *Fulton* was contractual rather than regulatory—to argue that *Fulton* is distinguishable and thus does not compel the dismissal of Plaintiffs' action. Such variances, however, are distinctions that make no difference and, more importantly, miss the critical holdings in *Fulton*, namely (1) that when strict scrutiny applies—whether compelled by statute or by the presence of an exemption mechanism—the government *must* accommodate religion if it can do so while still advancing its compelling interest, and (2) that in the foster care context, the government's interest in increasing the number of foster homes and in treating prospective foster parents equally can and, therefore, *must* be achieved while accommodating religious CPAs. *See Fulton*, 141 S. Ct. at 1878–79, 1881–82.

Plaintiffs' claims against the State Defendants arise solely and completely from actions taken by the State Defendants to seek and grant exceptions to non-discrimination requirements that, like those in *Fulton*, are susceptible to exceptions. Specifically, Plaintiffs allege the State Defendants violated the Establishment and Equal Protection clauses by granting and seeking accommodations from non-discrimination requirements found in 45 C.F.R. § 87.3; 45 C.F.R. § 75.300; and SCDSS Human Services Policy & Procedure Manual § 710. *See* Compl. ¶¶ 30, 34–35, 38–40, 55, 62, 68. Because each of the three the non-discrimination requirements raised in Plaintiffs' Complaint is susceptible to exceptions, they must be strictly scrutinized, and accommodations must, if possible, be made. *See Fulton*, 141 S. Ct. at 1876–77 (noting strict scrutiny of a law is required if the law provides a mechanism for exemptions to its requirements).

provider that so wishes to exclude any individual that does not share its religious beliefs."), *available at* https://tinyurl.com/FultonMembersAmicusRespondents.

18

*First*, the federal requirement from which Governor McMaster requested an exemption—45 C.F.R. § 75.300(c)—is subject to an exception mechanism found in 45 C.F.R. § 75.102. That was the mechanism used by HHS to grant the waiver requested by Governor McMaster.

*Second*, 45 C.F.R. § 87.3 is inapplicable here and, in any event, contains an exception mechanism. The regulation is inapplicable because one subsection that Plaintiffs' Complaint relies upon states only that a subgrantee may not "discriminate against a program *beneficiary* or prospective program *beneficiary* on the basis of religion." 45 C.F.R. § 87.3(d) (emphasis added). Part 87 of the CFR does not define "beneficiary," but courts interpreting federal statutes pertaining to foster care and funding have concluded "foster *children* are the clearly intended beneficiaries." *Kenny A. v. Perdue*, 218 F.R.D. 277, 292 (N.D. Ga. 2003) (emphasis added); *see also Am. Civil Liberties Union of N. Cal. v. Azar*, C/A No. 16-cv-03539-LB, 2018 WL 4945321, at *22 n.107 (N.D. Cal. Oct. 11, 2018) (granting judgment in Secretary Azar's favor on a claim alleging that the federal government violated the Establishment Clause by funding a faith-based organization that supposedly proselytized minors in government custody, and noting that evidence indicated the intended "beneficiaries" of the funds were the *children* cared for by the provider).[13]

Additionally, 45 C.F.R. § 87.3 recognizes that exemptions can—and in some instances *must*—be made. Specifically, it states that HHS "shall provide" accommodations to faith-based organizations to the extent "consistent with Federal Law . . . and the Religion Clauses of the First Amendment." 45 C.F.R. § 87.3(a). It further states that HHS may not penalize a religious

---

[13] Plaintiffs' additional reliance on subsection 45 C.F.R. § 87.3(b)—which prohibits recipients of direct federal financial assistance from using those funds for explicitly religious activities—is facially deficient as it is contradicted by the Complaint and the documents it incorporates and relies upon. *See* Compl. ¶ 36. The Complaint concedes the State Defendants never sought or granted CPAs any exception to that requirement. In contrast, State Defendants specifically required "that public funds are *not* used to directly subsidize or support religious worship activities." *See* Ex. A (Executive Order No. 2018-12), at 1 (emphasis added).

organization "[b]ecause of conduct that must or could be granted an appropriate accommodation in a manner consistent with the Religious Freedom Restoration Act [] or the Religion Clauses of the First Amendment." *Id*.

*Third*, SCDSS Policy § 710 likewise contains a non-discrimination requirement that is not expressly applicable to CPAs and, in any event, is subject to discretionary exemptions:

> The unnecessary consideration of race, color, national origin, religion, state of residence, age, disability, political belief, sex, or sexual orientation when making decisions regarding a child's placement can result in unfair outcomes for prospective families and substantial delays in permanency for foster children. *The agency* is committed to the exercise of nondiscriminatory practice, and shall provide equal opportunities to all families and children, without regard to their . . . religion . . . or sexual orientation. . . .
>
> *     *     *
>
> [N]o individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion . . . or sexual orientation. . . . Licensing decisions will not be made on the above basis *except in rare cases* in which such consideration is in the best interests of the child. . . .

SCDSS Human Servs. Policy & Proc. Manual § 710 (emphasis added);[14] *see also id*. § 700 ("At all points in the agency's partnership with foster families, staff personnel shall treat families and children with respect and fairness. As part of this mission, staff personnel shall avoid any and all forms of discrimination, with consideration of a child or family's race, color, national origin, religion, state of residence, age, disability, political belief, sex, or sexual orientation only occurring when, after a thorough and individualized assessment, such consideration is the only manner of

---

[14] State Defendants note that Plaintiffs were never "denied the opportunity" to become foster parents (to use the words of section 710), much less by "the agency." SCDSS was and still is willing gladly to receive their application for licensure as foster parents if they ever take action to achieve their stated goal of serving as foster parents.

serving a child's best interests (see Section 710).").  Because these requirements are susceptible to exemptions, strict scrutiny is required. *See Fulton*, 141 S. Ct. at 1877, 1881.[15]

Under a strict scrutiny analysis, the State Defendants' actions challenged in this suit were constitutionally permissible and required. Plaintiffs' Establishment Clause and Equal Protection claims stem from the State Defendants seeking and granting accommodations or exemptions to the non-discrimination requirements discussed above. And, under *Fulton* (as well as RFRA and the RFA), the question of how these regulations should or should not apply to faith-based CPAs is analyzed under strict scrutiny. The law is clear that when, as here, the government can accommodate the religious beliefs of faith-based CPAs while still achieving the governmental purpose behind the regulation, the government must accommodate the faith-based CPAs. *See Fulton*, 141 S. Ct. at 1881. The law is likewise clear that the government's interest in maximizing the number of available foster homes and in treating all prospective foster parents equally can be achieved while simultaneously accommodating faith-based CPAs who, as a matter of religious belief, can partner only with certain foster parents. *Id.* at 1881–82. Accordingly, the State Defendants' actions challenged in this suit were not only constitutionally permissible; they were, according to *Fulton*,

---

[15] In addition to the fact that these three non-discrimination requirements contain exception mechanisms that invoke strict scrutiny, that exacting standard is already *independently* required here by statutes, namely the Religious Freedom Restoration Act ("RFRA") and the South Carolina Religious Freedom Act ("RFA"). *See* 42 U.S.C. § 2000bb-1 ("Government may substantially burden a person's religious exercise only if it demonstrates that the application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."); S.C. Code Ann. § 1-32-40 ("The State may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the State demonstrates that application of the burden to the person is: (1) in furtherance of a compelling state interest; and (2) the least restrictive means of furthering that compelling state interest."). Accordingly, even if there were any meaningful differences between the requirements and available exceptions in *Fulton* and in this suit, the governmental requirements and responses in this suit must still be evaluated under a strict scrutiny standard.

constitutionally required. Those actions cannot, therefore, have violated the Constitution, and Plaintiffs' allegations and claims thus do not and cannot state claims on which relief can be granted. Plaintiffs' request for this Court to command what the Supreme Court recently and unequivocally prohibited in *Fulton* fails as a matter of law and logic.

### C. Plaintiffs' other allegations fail to assert any claims on which relief can be granted.

As explained above, Plaintiffs allegations and claims relating to the State Defendants' actions to accommodate faith-based CPAs whose beliefs compel them to partner only with those who share their deeply held religious beliefs fail to state claims on which relief can be granted. Plaintiffs also pepper their Complaint with allegations that the State Defendants' actions supposedly coerce prospective foster parents to support the specific religious beliefs of Miracle Hill. *See*, *e.g.*, Compl. ¶¶ 107, 120. The *Fulton* Court disposed of that line of argument in short order, ruling that a CPA "does not seek to impose [its] beliefs on anyone else" merely by screening prospective foster parents on the basis of its religious beliefs. *Fulton*, 141 S. Ct. at 1882. If a faith-based CPA's screening policy is not coercive, even less so can the government's accommodation of such a policy be considered coercive, particularly given the availability of other CPAs and licensing directly through SCDSS.

Plaintiffs allegations regarding the supposed proselytization of children in foster care, *see*, *e.g.*, Compl. ¶¶ 94, 108, 121, fare no better, for Plaintiffs lack standing to assert such speculative claims, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (holding that plaintiffs seeking to establish standing to assert a claim must first show that they are "among the injured" group (citing *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972))); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties."); *Am. Civil Liberties Union of Northern*

*California v. Azar*, C/A No. 16-cv-03539-LB, 2018 WL 4945321, at *31 (N.D. Cal. Oct. 11, 2018) ("[T]he ACLU lacks standing to advance a claim based on the harms imposed on unaccompanied minors.").

Plaintiffs concede—as they must—that they lack standing to assert claims for supposed harms to third parties such as children in foster care. *See* Pls.' Mem. in Opp. to the Mot. to Dismiss (ECF No. 61) at 10 n.5 ("Plaintiffs do not . . . rely on . . . the assertion of claims on behalf of proselytized children in the foster care system for Article III standing."). And this Court already ruled that Plaintiffs have standing to assert only those claims relating to alleged injuries that they suffered personally. *See* ECF No. 81 at 20–21 (concluding Plaintiffs had standing based only on the alleged injury they suffered when "they were *personally* turned away by Miracle Hill" and encountered alleged "barriers to *Plaintiffs'* participation in the state foster care program" (emphasis added)); *id*. at 19 (noting that Plaintiffs' briefing had "clarified" that the only injuries on which their claims could rest were those they suffered themselves); *see also Maddonna v. U.S. Dept. of Health & Human Servs. et al.*, Civil Action No. 6:19-cv-03551-JD, D.S.C., Order (ECF No. 43) at 17 n.6 (ruling in a companion case to this one that although "Plaintiff attempts to raise claims for alleged injuries of others, including foster children, their biological parents, and LGBTQ youth, Plaintiff recognizes that she does not have standing to sue for such alleged harms and clarifies that she does not premise her standing on those alleged harms to others." (internal citations omitted)).

Further, Plaintiffs' allegations that the State Defendants authorized, permitted, or encouraged private CPAs to proselytize children in foster care are contradicted by the very documents referred to and incorporated into Plaintiffs' Complaint. The documents that supposedly constitute the constitutional violations (e.g., the Executive Order and the waiver request letter) are entirely devoid of any such authorization, permission, encouragement, or request. Indeed, Governor

McMaster's Executive Order specifically notes that CPAs *cannot* engage in religious activities of that nature using government funds. *See* Ex. A (Executive Order No. 2018-12), at 1. Accordingly, any allegations that the State Defendants supported the proselytization of foster children are both baseless and inadequately pled, and cannot support any claim in this suit.

### D.    The relief requested in Plaintiffs' Complaint is itself unconstitutional.

The infirmities of Plaintiffs' lawsuit are further underscored by the fact that the relief they seek is itself unconstitutional and cannot be awarded by the Court. Plaintiffs ask this Court to declare "that the State Defendants, by authorizing a state-contracted, government-funded CPA to use religious criteria to exclude prospective foster families who are not evangelical Protestant Christians and heterosexual, violate the Establishment Clause of the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Compl., Prayer for Relief "A." But *Fulton* makes abundantly clear that this Court cannot make such a declaration. Indeed, *Fulton* held precisely the *opposite*, namely that the Constitution *requires* the government to allow state-contracted, government-funded, faith-based CPAs to use religious criteria to select the prospective foster families with whom it will work. This Court cannot award the relief sought by Plaintiffs, for such relief is forbidden by the First Amendment. *See Fulton*, 141 S. Ct. at 1882.

Plaintiffs also ask this Court to enter "a permanent injunction ordering the State Defendants to cease contracting with, licensing, and funding any CPA that discriminates against prospective foster parents based on their religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex." Compl., Prayer for Relief "C." One can hardly imagine a request more squarely foreclosed by *Fulton*. The injunction Plaintiffs seek would impose the exact state of

affairs that all nine Justices concluded was unconstitutional. This Court cannot award the relief sought by Plaintiffs.

Plaintiffs finally ask this Court to enter "a permanent injunction directing the State Defendants to ensure that all prospective foster parents, regardless of religion, sex, sexual orientation, or exercise of the fundamental right to marry a person of the same sex are treated equally by state-contracted, government-funded CPAs." Compl., Prayer for Relief "E." Yet again, *Fulton* makes clear that this Court cannot enter such an injunction, which would impose precisely the scenario the *Fulton* Court unanimously held to be unconstitutional. *See Fulton*, 141 S. Ct. at 1882.

Because every type of relief that Plaintiffs request against the State Defendants is forbidden by *Fulton*, there is no scenario in which this Court could enter the judgment Plaintiffs seek. This Court should enter judgment on the pleadings and dismiss the suit with prejudice.

## II.    Plaintiffs' Equal Protection claim based on alleged sexual-orientation discrimination fails for the additional reason that the State Defendants' actions were rationally related to a legitimate government interest.

In a prior order, this Court dismissed Plaintiffs' Equal Protection claim based on religious discrimination because rational basis review applied, and because Governor McMaster had "proffered numerous legitimate government interests rationally related to their actions." ECF No. 81, at 44. In regard to Plaintiffs' Equal Protection claim based on sexual orientation discrimination, this Court recognized that neither "the Fourth Circuit nor the Supreme Court has expressly recognized sexual orientation as a classification subject to heightened or strict scrutiny," and, therefore, that claim is also subject to rational basis review. *Id.* at 45–46.[16] The Court declined to

---

[16] Under this standard, government actions are presumed valid if they are rationally related to a legitimate government purpose. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 211 (4th Cir. 2002). "'The actual motivation for the [local government's] actions [is] irrelevant.'" *Pulte Homes Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018) (alterations in original) (citations omitted). "[A] government entity 'need not actually articulate at any time the purpose or

dismiss the claim at that time, however, "since neither the State nor Federal Defendants presented any arguments as to how their actions rationally related to a legitimate State purpose." *Id.* at 46. The Court indicated, however, that dismissal of the remnant of the Equal Protection claim would be forthcoming if and when the State Defendants presented arguments explaining the legitimate governmental purpose for their actions. *Id.*

Governor McMaster and Director Leach previously enumerated legitimate governmental purposes supporting their actions, *see* ECF No. 57 at 26–27, which are the same actions giving rise to Plaintiffs' Equal Protection claim based on sexual orientation. Accordingly, the State Defendants ask the Court to dismiss the Equal Protection claim based on sexual orientation discrimination for the same reason the Court dismissed the Equal Protection claim based on religion. Even assuming Plaintiffs had experienced any disparate treatment on the basis of their sexual orientation or same-sex marriage (which the facts alleged in the Complaint do not demonstrate), and even assuming the State Defendants had authorized, permitted, or allowed third parties to engage in such disparate treatment on those bases (which they did not), the State Defendants' actions were rationally related to legitimate government purposes. Although there are numerous legitimate government purposes underlying their challenged actions,[17] for brevity's sake, the State Defendants assert only two here, both of which courts (including this one) have held are legitimate government interests.

---

rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Rather, the actions "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for" the actions. *Id.* (citation and internal quotation marks omitted).

[17] These other purposes are enumerated and described in Governor McMaster's Motion to Dismiss (ECF No. 57) at 26–27, and are incorporated by reference herein.

First, the Governor's Executive Order and waiver request and SCDSS's issuance of a CPA license to Miracle Hill had the purpose of increasing community support and options for foster child placement by maximizing the number and diversity of CPAs.[18] *Lipscomb ex rel. DeFehr v. Simmons*, 962 F.2d 1374, 1380 (9th Cir. 1992) (en banc) (a state has a "legitimate purpose of maximizing the level of benefits available to all the children in the foster care program"); *see also* ECF No. 81 at 44.

Second, the purpose of the State Defendants' actions challenged in this suit was to avoid forcing CPAs to renounce their religious beliefs to participate in a generally available state program, which would have violated their free-exercise rights. *See Fulton*, 141 S. Ct. at 1882; *Trinity Lutheran*, 137 S. Ct. at 2022 ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties." (cleaned up) (citations omitted); *see also Massachusetts v. U.S. Dep't of Health & Human Servs.*, No. 17-11930-NMG, 2021 WL 185243 at *10 (D. Mass. Jan. 15, 2021) ("The Supreme Court has indicated . . . that the accommodation of sincerely held religious and moral beliefs is an important government interest." (citing *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987))).

Both of the State Defendants' proffered purposes for their challenged actions have been recognized as legitimate government interests. Because under rational basis review the government need only set forth "any reasonably conceivable state of facts that could provide a rational basis for" the actions to survive an Equal Protection claim, *Pulte*, 909 F.3d at 693, the Plaintiffs' Equal Protection claims against Governor McMaster and Director Leach should be dismissed.

---

[18] This Court already recognized this was a legitimate government purpose for the challenged actions in a prior Order. *See* ECF No. 81 at 44.

CONCLUSION

The Supreme Court's unanimous judgment in *Fulton* makes clear that the State Defendants' actions challenged in this suit were constitutionally permissible and constitutionally required; that the relief sought against Governor McMaster and Director Leach in this suit is contrary to and foreclosed by the ruling in *Fulton*; and that the purported disparate treatment and alleged denial of Equal Protection on the basis of sexual orientation, even if plausibly pled, were supported by legitimate government purposes. For these reasons, Plaintiffs have failed to state any claim upon which relief can be granted, and the relief they have requested cannot be awarded by this Court as a matter of law. Accordingly, Governor McMaster and Director Leach, in their official capacities, respectfully request the Court enter judgment on the pleadings and dismiss Plaintiffs' claims against them with prejudice.

Respectfully submitted

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  s/ Miles E. Coleman
    Miles E. Coleman
    Federal Bar No. 11594
    E-Mail: miles.coleman@nelsonmullins.com
    2 W. Washington St. / Fourth Floor
    Greenville, SC 29201
    (864) 373-2352

    Jay T. Thompson
    Federal Bar No. 09846
    E-Mail: jay.thompson@nelsonmullins.com
    1320 Main Street / 17th Floor
    Columbia, SC  29201
    (803) 799-2000

OFFICE OF THE ATTORNEY GENERAL
    Robert D. Cook, South Carolina Solicitor General
    Federal Bar No. 285
    E-Mail: bcook@scag.gov
    Post Office Box 11549
    Columbia, SC  29211
    (803) 734-3970

DAVIDSON, WREN & DEMASTERS, P.A.

Kenneth P. Woodington, #4741
William H. Davidson, II #425
1611 Devonshire Drive, 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568
wdavidson@dml-law.com
kwoodington@dml-law.com
(803) 806-8222

*Attorneys for Governor Henry McMaster and
Director Michael Leach*

July 15, 2021
Greenville, South Carolina