*Rogers et al. v. U.S. Dept. of Health & Human Servs. et al.*
Civil Action No. 6:19-cv-01567-JD

# Exhibit A

**to the State Defendants' Reply in Support of the Motion to Stay Discovery and Hold Pending Discovery Motions in Abeyance**

Excerpts from the Deposition of Jaqueline Lowe

Page 1

```
               UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
                    GREENVILLE DIVISION
   -------------------------------------------X

    EDEN ROGERS and

    BRANDY WELCH,

                  Plaintiffs,

           vs.                CASE NO. 6:19-cv-01567-TMC

    UNITED STATES DEPARTMENT OF HEALTH
    AND HUMAN SERVICES;
    ALEX AZAR, in his official capacity as SECRETARY of
    the UNITED STATES DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;
    ADMINISTRATION FOR CHILDREN AND FAMILIES;
    LYNN JOHNSON, in her official capacity as ASSISTANT
    SECRETARY of the ADMINISTRATION FOR CHILDREN AND
    FAMILIES;
    SCOTT LEKAN, in his official capacity as PRINCIPAL
    DEPUTY ASSISTANT SECRETARY of the ADMINISTRATION
    FOR CHILDREN AND FAMILIES;
    HENRY MCMASTER, in his official capacity as
    GOVERNOR of the STATE OF SOUTH CAROLINA;

    MICHAEL LEACH, in his official capacity as STATE
    DIRECTOR of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
    SERVICES,

                  Defendants.
   -------------------------------------------X
    VIDEOTAPED
    DEPOSITION OF:   JACQUELINE LOWE
                     (APPEARING VIA VIRTUAL ZOOM)

    DATE:            June 3, 2021

    TIME:            9:27 AM

    REPORTED BY:     TERRI L. BRUSSEAU
                     (APPEARING VIA VIRTUAL ZOOM)
```

Page 186

1   increasing the number of foster families available
2   to take children into their homes on a kinship care
3   level and -- and more generally?
4       A.   Correct.
5            MS. JANSON:  Okay.  Well, thank you
6   very, very much, Miss Lowe, for your time today.  I
7   don't have any further questions for you at this
8   point.
9            THE WITNESS:  Thank you.
10           MS. JANSON:  I'm not sure if -- if
11  other counsel have anything that they want to ask.
12           MR. COLEMAN:  I'll -- I'll take a turn.
13                   EXAMINATION
14  BY MR. COLEMAN:
15      Q.   Jackie, thank you so much for -- for
16  your time today.  I know it sounds like from your
17  testimony you've already gotten a very full plate
18  and we appreciate your taking a day off to -- to
19  come in and sit for this deposition.
20      A.   Thank you, Miles.
21      Q.   I think it is fair to say that the
22  end -- we're not at the end yet, but the end is in
23  site, so I hope not to take too too long, but there
24  are a few questions that while we're here, while
25  we've got you sitting down under oath, that I'll

Page 187

1    follow up and ask you about as well.
2             South Carolina DSS has offices in every
3    county of the state, is that right?
4         A.   Yes.
5         Q.   And at least up until July of 2020 when
6    DSS switched its focus to kinship care, up until
7    that point it was possible for any qualified person
8    or couple who wanted to be a -- to become a foster
9    parent to work through DSS in one of those local
10   offices, is that also right?
11        A.   Well, we were operating on a regional
12   basis.  And so while we served in every county, the
13   office was pretty much a regional structure, but
14   each region served a number of counties, so no
15   county was left uncovered.
16        Q.   Okay.
17        A.   So it wasn't a county-based managed
18   program, it was done regionally but serving a
19   county.
20        Q.   Okay.  Do you know, for example, at
21   least in the upstate region, would be -- would that
22   region DSS foster care licensure team be -- would
23   that be in Greenville?
24        A.   Yes.  That was the primary office
25   location, in Greenville.

Page 188

1         Q.   Is that -- do you know is that
2    University Ridge where all the state and county
3    offices are?
4         A.   Yes, that is correct.
5         Q.   Okay.  And you may have already said
6    this.  South Carolina DSS will gladly accept any
7    application from anyone who is qualified and who
8    wishes to be licensed as a foster parent without
9    regard to their religion, lack of religion, sexual
10   orientation or marital status, is that correct?
11        A.   That is correct.
12        Q.   So a person who applies -- a
13   prospective foster parent who applies with a CPA,
14   we use that figure of speech, they apply to or
15   apply with a CPA, really the application to be a
16   foster parent is submitted to DSS, right?
17        A.   To issue the license, that's correct.
18   DSS is the only state entity that can issue a
19   foster family license.
20        Q.   Okay.  And a CPA couldn't prevent
21   someone from being licensed even if they -- even if
22   the CPA didn't want to -- didn't want to work with
23   a particular person, they refer them to another
24   agency or to DSS, they can't prevent them from
25   getting licensed, can they?

Page 189

1      A.   No.  An individual can go to any entity
2  or to DSS.
3      Q.   Okay.  And I think you said -- I think
4  you said -- and I touched on this a second ago.  In
5  or around July of 2020, for what sounds like a
6  variety of reasons that you already touched on,
7  that SCDSS has decided to focus on what you called
8  kinship care, right?
9      A.   That's correct.
10     Q.   And I think you said a family can, if
11 they want, however -- let me -- I didn't ask that
12 well.
13          Even when SCDSS has focused on kinship
14 care in the past year or so, a family who wants to
15 be licensed as a foster parent, not in the kinship
16 care but as a -- more generally as a foster parent,
17 can, if they want, still work directly with SCDSS,
18 is that right?
19     A.   What was that last part?  It went away.
20     Q.   It's still possible for a prospective
21 foster parent or couple to work directly with DSS,
22 is that right?
23     A.   Yes.  Yes.
24     Q.   So if -- if a prospective foster parent
25 can't or doesn't want to work with a CPA, they can

Page 190

1    work with DSS?
2         A.   They can.
3         Q.   Even today?
4         A.   Even today.
5         Q.   And it's still -- has been and still is
6    the policy of DSS that the decision of where a
7    child in foster care will be placed, what foster
8    parent's home that child will be placed in, that's
9    DSS's decision, not the CPA's decision, right?
10        A.   That's correct.
11        Q.   Okay.  You might -- you probably
12   remember Exhibit 3.  It was a two-page like a table
13   or a chart with a lot of amounts.  It listed all I
14   think 28 CPAs and a whole bunch of different
15   amounts of funding over various periods of years.
16             Do you remember we talked about that I
17   think early on --
18        A.   Yes.
19        Q.   -- today?  Okay.  I don't -- I don't
20   mean to be tedious, but I do want to go through a
21   couple of -- I don't think it will take super long,
22   but I know we came back to that document several
23   times and it may be that my note taking got a
24   little bit disjointed.  I just want to make sure
25   we -- we've covered all the bases there.

Page 191

1    　　　　　If you have it in front of you, that's
2    fine.  I don't think you need to pull it up in
3    front of you if you don't.
4    　　　　A.   I have it.
5    　　　　Q.   Basically -- okay.  Basically what I
6    want to do is I'm going to try to go through in
7    alphabetical order.  I just want to -- just so
8    that -- so we've got a clear record and so my own
9    notes can get clearer, figure out which CPAs are
10   operating in the upstate that offer nontherapeutic,
11   perhaps along with therapeutic care, whether they
12   have an office in the upstate and approximately how
13   long they've been licensed.
14   　　　　　So I think we can -- we can run through
15   these hopefully without it being too tedious, but I
16   apologize in advance if it is a little bit
17   mechanical.  So I'm trying to go through them.
18   　　　　　Church of God Home For Children.  They
19   offer nontherapeutic care and they have an office
20   in the upstate, right?
21   　　　　A.   Yes.
22   　　　　Q.   And they've been licensed I think you
23   said for maybe ten years or so, is that ballpark
24   correct?
25   　　　　A.   Yes.

Page 192

1   Q.   Okay.  Connie Maxwell Children's
2   Ministries, they are also in the upstate.  They
3   serve the upstate.  They have an office in the
4   upstate, offer nontherapeutic foster care and
5   they've been licensed for several decades, is that
6   correct?
7   A.   That is correct.
8   Q.   Epworth Children's Home serve in the
9   upstate, have an office in the upstate, offer
10  nontherapeutic foster care and they've been
11  licensed for several years?
12  A.   Several decades.  And they also have
13  nontherapeutic and therapeutic.
14  Q.   Okay.  Growing Home Southeast.  This is
15  over my notes are complete.  I think they serve the
16  upstate.  Do you know if they have an office in the
17  upstate?
18  A.   They do not have an office in the
19  upstate, but they do work statewide.
20  Q.   Okay.  And they do both therapeutic and
21  nontherapeutic, is that right?
22  A.   That's correct.
23  Q.   And they've been licensed for 15 years
24  or so?
25  A.   Or so, yes.

Page 193

1       Q.    Okay.  Lutheran Services Carolinas.
2  They serve the upstate, they don't have an office
3  in the upstate, but they offer nontherapeutic and
4  therapeutic and they've been licensed for a couple
5  decades?
6       A.    Correct.
7       Q.    Okay.
8       A.    Yes.
9       Q.    Miracle Hill Ministries, which we've
10  talked about, they have an office in the upstate,
11  they do nontherapeutic foster care, they've been
12  licensed for several decades and they serve the
13  upstate?
14       A.    Yes.
15       Q.    New Foundations Home For Children, I
16  believe they serve the upstate, have an office in
17  the upstate, offer nontherapeutical foster care and
18  been licensed for several years, is that right?
19       A.    Yes.  That is correct.
20       Q.    I think we're about halfway -- halfway
21  through the list.  Thanks for hanging with me.
22             Nightlight Christian Adoptions serve
23  the upstate, have an office in the upstate,
24  nontherapeutic foster care, and they've been
25  licensed for several years?

Page 194

1  A. They've been licensed for several years
2  as an adoption agency and only most recently added
3  foster care services to their list.
4  Q. Okay. Do you know when -- when they
5  were licensed as a CPA to be foster care?
6  A. It's probably been a couple of years,
7  not very long.
8  Q. Okay. Two to three, four years, that
9  ballpark?
10  A. That ballpark, yes.
11  Q. Okay. South Carolina MENTOR serve the
12  upstate. Do they have an office in the upstate, do
13  you know?
14  A. They do.
15  Q. Okay. They offer nontherapeutic foster
16  care, have been licensed for several decades --
17  A. Therapeutic --
18  Q. -- is that right?
19  A. Therapeutic and nontherapeutic services
20  are offered.
21  Q. Okay. South Carolina Youth Advocate or
22  SCYAP sometimes I think later referred to as, they
23  serve the upstate, they don't have an office in the
24  upstate, they do therapeutic and nontherapeutic and
25  they've been licensed for about 30 years, is that

Page 195

1   right?
2         A.   Yes.
3         Q.   Okay.  Southeastern Children's Home,
4   they serve the upstate.  Do they have an office in
5   the upstate?
6         A.   Southeastern, yes.
7         Q.   Okay.  They do nontherapeutic foster
8   care and it looks like they also have been licensed
9   for looks like about 40ish years.  Does that sound
10  right?
11        A.   Yes.
12        Q.   Specialized Alternative For Family and
13  Youth, I think you said sometimes it's -- they go
14  by the acronym SAFY or SAFY?
15        A.   SAFY.
16        Q.   They serve the upstate, have an office
17  in the upstate, offer both therapeutic and
18  nontherapeutic and been licensed since the 1990s.
19  Is that all correct?
20        A.   That is correct.
21        Q.   Okay.  Tamassee DAR School, if I'm
22  pronouncing that right, I think you said they
23  closed at some point in 2019.  But prior to that,
24  and at least you said, into some part of 2019 they
25  were licensed as a CPA, is that --

Page 196

1    A.   That is -- that's correct.
2    Q.   They do nontherapeutic foster care,
3    serve the upstate, they -- do you know if they have
4    an office in the upstate?
5    A.   They did.
6    Q.   Okay.  The Bair Foundation has an
7    office in the upstate, serves the upstate, have
8    therapeutic and nontherapeutic foster care and
9    they've been licensed for about 20 years.  Is that
10   all correct?
11   A.   That's correct.
12   Q.   Then -- let's see.  Thornwell.  Let's
13   see.  Serves the upstate, office in the upstate,
14   nontherapeutic foster care and they've been
15   licensed for a number of years?
16   A.   Um-hum.  Yes.
17   Q.   And then I think the last -- the last
18   one, this is one that I have written in, so -- from
19   your testimony -- so correct me here.  I can't read
20   my own writing.  Family Preservation?  Is that --
21   A.   Um-hum.  Family Preservation Community
22   Services.
23   Q.   Okay.  So they serve the upstate.  Do
24   they have an office in the upstate?
25   A.   They serve statewide, but they do not

Page 197

1    have an office in the upstate.
2         Q.   Okay.  They do nontherapeutic foster
3    care?
4         A.   And therapeutic.
5         Q.   And do you know ballpark how long
6    they've been licensed as a CPA?
7         A.   It's been awhile, so certainly more
8    than ten years.
9         Q.   Okay.  I just wanted to -- for the ones
10   we just -- we just discussed, I think it's around
11   15 or 16 or so that at least serve the upstate,
12   some of them you said don't have an office here.
13   I'm trying to find an example.
14              Southeastern Children's Home, they
15   do --
16        A.   Right.
17        Q.   So let's use Southeastern as an
18   example.  If -- if I wanted to be licensed as a
19   foster parent, I did a Google search for a foster
20   care agency in Greenville, South Carolina and I
21   think -- I just like the sound of that name, I
22   click on it.  If I wanted to talk to and to apply
23   through that to DSS, how would I go about doing
24   that if they don't have an office?
25        A.   You would -- sure.  There is a main

Page 198

1  contact number for each CPA and you would contact
2  either by e-mail or telephone to inquire and you
3  will be connected with someone at that agency who
4  would follow up with you.  The staff travels
5  statewide even if they don't have an office
6  presence, and so there is staff that are assigned
7  and would meet with you and your family and take
8  you through the application process.
9       Q.   Okay.  Is that process -- would that
10 process be any less convenient to me as a
11 prospective foster parent than if I went with
12 Southeastern Children's Home that has an office
13 nearby?
14      A.   I don't think it would.  The staff
15 would be required to make contact with you, visit
16 with you, as would any other CPA that may have a
17 presence in the county in which you reside.
18      Q.   Okay.  Thanks for marching through that
19 with me.  Look again at -- I think you still have
20 Exhibit 3 in front of you.  You didn't yourself
21 prepare this document, did you?
22      A.   I did not.
23      Q.   Okay.  By my count there are about 28
24 CPAs listed here.  There were two or three,
25 JusticeWorks Behavioral Care and LifeShare

Page 202

1  Q. Then down toward the bottom, the Bair
2  Foundation, also 16 million, is that correct?
3  A. Yes.
4  Q. And then Specialized Alternatives for
5  Youth, or SAFY, which actually has looks like three
6  separate listings there that total up to about 33
7  or 34 million. Does that also look right?
8  A. Yes.
9  Q. So we just went through a list of 15 or
10 16 CPAs that serve the upstate that most of which
11 have offices in the upstate that offer
12 nontherapeutic foster care.
13           Is it accurate to say that Miracle Hill
14 is not the only show in town when it comes to being
15 a CPA in Greenville?
16 A. They are not.
17 Q. And we just looked at this document
18 here with the funding. Is it fair to say -- and I
19 know we skipped through, we didn't go line by line,
20 but is it also fair to say from what we just talked
21 about, Miracle Hill is not even the best funded
22 when it comes to state and federal funding
23 reimbursements, Miracle is not even the most -- the
24 most lucrative, most reimbursed show in town, is
25 that also right?

Page 203

1             A.    Based on this document.
2             Q.    And looking at the very bottom of -- of
3     that Exhibit 3, this is the grand total of the
4     grand totals, so the grand sum amount of state and
5     federal funds that have been spent to reimburse or
6     for contract services on all these CPAs over this
7     four-year period, the very bottom right corner, 193
8     million dollars, right?
9             A.    Yes.
10            Q.    I'm a lawyer, so I'm bad at math.
11    Don't expect -- doing math in your head, but does
12    it sound at least approximately right?
13                  If we look at that -- the total of the
14    total is 193 million and Miracle Hill got 7.7
15    million of that.  I took out my calculator earlier
16    and ran it.  Basically over that period of time
17    Miracle Hill received 4 percent of the total amount
18    that the state has spent on CPAs during that time
19    period.
20                  Does that -- again, I'm not trying to,
21    you know, actually run the numbers in your head,
22    but does that sound about right?
23            A.    Based on what -- on your calculation, I
24    would agree.
25            Q.    Okay.  While we're -- while we're on

Page 204

1  the topic, and I may have just, first, fallen into
2  a -- a phraseology I think a lot of us have used
3  today and would probably just use it in sort of
4  common conversation.
5           We talked about the state or the
6  federal government funding a CPA. And you -- I
7  think you, in fact, earlier, you sort of clarified
8  saying no, no, no, no, no, the state doesn't fund
9  CPAs, the state -- it would -- it would reimburse,
10  I think they used the word, used a -- reimburse
11  them either for specific contracted services or in
12  their role as a CPA when a child is placed. Is
13  that an accurate high-level summary of -- of how it
14  works?
15           A.   Yes.
16           Q.   Okay. Let me -- let me drill down a
17  little bit on that just -- just to make sure that I
18  understand and that we know how that works. Let
19  me -- let me start with the piece that may be
20  easiest to slice off. You had said in response to
21  a question earlier that some of these CPAs also
22  provide other services --
23           A.   Yes.
24           Q.   -- either apart from or in addition to
25  their CPA service and they're contracted with SCDSS

Page 205

1    for it.  So I'll give you an example that like I'm
2    familiar with myself.
3            SCYAP, the South Carolina Youth
4    Advocate Program, they offer transportation
5    services to foster children through a contract with
6    DSS, is that right?
7        A.   That is correct.
8        Q.   So if a child -- a child in foster care
9    in Columbia needs to do a visit with his or her
10   biological family in Greenwood, SCYAP would send a
11   driver, transport the child there and back, that --
12   that's something that's funded -- that's separate
13   from CPA work, right?
14       A.   Yes.
15       Q.   Okay.  So leaving that aside, let's
16   just talk about that the -- that the reimbursement
17   that a CPA received for doing CPA work.  Is it
18   accurate to say that a CPA's expenses and efforts
19   to recruit foster parents is not in any way
20   reimbursed under or funded by state or federal
21   dollars, is that correct?
22       A.   That would be correct.
23       Q.   Say, for example, if -- if The Bair
24   Foundation took out a billboard on Bull Street in
25   Columbia that said South Carolina needs foster

Page 206

1    parents, call Bair Foundation today, they would pay
2    somebody to do -- the ad agency for that billboard,
3    they would never get that expense reimbursed from
4    SCDSS or the federal government, would they?
5         A.   That's correct.
6         Q.   That they would not?
7         A.   They would not submit an invoice for
8    reimbursement to DSS.
9         Q.   Okay.  Or if -- I'm trying to think of
10   another example.  Let's say Connie Maxwell.  Let's
11   say that they send someone to go visit the Rotary
12   Club in Hartsville to talk to the Rotary Club about
13   the need for foster parents.  The time and the
14   expense, the salary of that person from Connie
15   Maxwell going to that, that's never reimbursed or
16   paid by state or federal funds, is it?
17        A.   It is not.
18        Q.   Let's pick a different one.  How about
19   SCYAP.  When someone comes to them and expresses
20   interest in being a foster parent and SCYAP helps
21   walk with them through the home study and make sure
22   they have got the fire extinguishers and the smoke
23   detectors and that sort of thing, the time and the
24   effort that SCYAP spends on that piece of it,
25   that's never reimbursed by the state or federal