

November 18, 2021

Governor Henry McMaster
State House
1100 Gervais Street
Columbia, SC 29201

        Re: Withdrawal of Approval of Exception from
        Religious Non-Discrimination Requirement of 45 CFR 75.300(c)

Dear Governor McMaster:

On January 23, 2019, the Administration for Children and Families (ACF) sent you a letter approving South Carolina's request for an exception from the religious non-discrimination requirement of 45 CFR 75.300(c) (2016). The 2016 Rule included a requirement that no person will be subjected to discrimination in HHS federal awards. On November 19, 2019, HHS published a notification that it would exercise discretion to not enforce the 2016 Rule, including the non-discrimination provisions in § 75.300(c) and (d), due to concerns regarding whether the 2016 Rule complied with the Regulatory Flexibility Act. *See* Notification of Nonenforcement of Health and Human Services Grants Regulation*,* 84 Fed. Reg. 63,809 (Nov. 19, 2019) ("The provisions will not be enforced pending a repromulgation that complies with the Act."). Thus, the non-discrimination provisions in the 2016 Rule that the waiver issued to South Carolina sought to address are not currently being enforced. Accordingly, the religious exception South Carolina sought from the 2016 Rule is no longer warranted and, thus, is hereby rescinded.

Moreover, the January 23, 2019 exception was overbroad and did not properly apply the substantial burden requirement under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, *et seq*. HHS appreciates the historic participation of faith-based organizations in the foster care and adoption assistance programs. Nothing in this letter limits the ability of faith-based organizations to participate in HHS-funded social service programs on the same basis as other organizations.[1] However, the State did not provide evidence supporting a blanket exception from section 75.300(c)'s religious non-discrimination requirement for the benefit of all faith-based subrecipients in South Carolina. And the government maintains a strong interest in tailoring the relief provided to mitigate the potential harm of limiting the diversity of available foster homes for children in the foster care population,[2] many of whom identify as lesbian, gay,

---

[1] *See* 45 CFR Part 87.
[2] The reference to the foster care population in this letter refers to the foster care population funded under Title IV-B and IV-E of the Social Security Act, and not to the unaccompanied refugee minor or unaccompanied children's

bisexual, transgender, and queer or questioning (LGBTQ+). Accordingly, for this reason as well, ACF withdraws the January 23, 2019 exception.

Background

Title IV-E of the Social Security Act (Act), codified at 42 U.S.C. § 670 *et seq*., and implemented under the Code of Federal Regulations (CFR) at 45 CFR parts 1355, 1356, and 1357, provides funding for state foster care program costs contingent on an approved state plan meeting the requirements of title IV-E and regulations. Eligible title IV-E costs include recruitment and training of foster care providers. The broad title IV-E program goals and mission are to strengthen families so that children can depend on their parents to provide them with a safe and loving home. If that is not possible, the program goals are to find a new permanent home for the child. Foster care is considered a temporary living arrangement to ensure the child's safety and well-being until the child can be safely reunified with their parents, or, when that is not possible, while finding a permanent placement for the child through adoption, legal guardianship, or placement with a relative. Nationally, there are approximately 420,000 children in foster care, each of whom must be placed in the care of a licensed and trained foster family, making the recruitment of licensed and trained foster family homes a persistent need.[3]

On February 27, 2018, South Carolina submitted a request for a deviation from the requirements of 45 CFR 75.300(c) and (d).[4] In the request, South Carolina stated that faith-based child placement agencies (CPA) are essential to recruiting foster families for child placement. The State further claimed the nondiscrimination requirements of the rule placed a substantial burden on faith-based organizations, i.e., forgoing licensure and funding under title IV-E, due to their sincerely held beliefs that require them to exclude certain applicants, such as those that practice other religions, as potential foster home placements.

On January 23, 2019, ACF approved the State's request. ACF granted South Carolina an exception from the religious non-discrimination provisions of 45 CFR 75.300(c), which as applied to the title IV-E program and relevant here, prohibited grant recipients and subrecipients in the title IV-E program from excluding prospective foster parents on the basis of their religion. The letter cited as authority 45 CFR 75.102(b), which allows HHS to approve exceptions or deviations from grants administration requirements of 45 CFR part 75.

On November 19, 2019, HHS published a notice of nonenforcement of the regulation at 45 CFR 75.300(c) and (d), on the basis that the final rule promulgating the regulation did not comply with the Regulatory Flexibility Act.

---

programs, which implicate unique programmatic expertise in working with refugee and immigrant populations, whom are served by a highly select group of care providers.

[3] U.S. Department of Health and Human Services. Administration for Children and Families, Children's Bureau. "Trends in Foster Care and Adoption: FY 2009-2018." https://www.acf.hhs.gov/cb/resource/trends-in-foster-care-and-adoption.

[4] The State initially requested an exception from the requirements of both paragraphs (c) and (d) of 45 CFR 75.300. According to ACF's approval letter, the State later amended its request in a phone call to include only exception from paragraph (c) of section 75.300.

On January 12, 2021, HHS published a final rule (2021 Rule) amending 45 CFR 75.300(c) and (d) by removing the requirement prohibiting discrimination based on a variety of factors, including explicit, blanket prohibitions on discrimination on the basis of sexual orientation and gender identity, as well as the specific language that HHS grant recipients implement the *United States v. Windsor* and *Obergefell v. Hodges* decisions in the administration of HHS awards by treating as valid the marriages of same-sex couples. The 2021 Rule requires grant recipients to adhere to non-discrimination requirements in applicable federal statutes and to follow Supreme Court decisions in the administration of HHS grants programs. The 2021 Rule is currently stayed.

Review of the Exception under 45 CFR 75.102

In 2018, South Carolina requested an exception from the requirements of 45 CFR 75.300(c) for the State's foster care program funded under title IV-E, and with respect to faith-based organizations participating in the State's program with a religious objection to the non-discrimination requirements of section 45 CFR 75.300(c).

Section 75.300(c) (2018) states:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

In its request, South Carolina identified one grant subrecipient, Miracle Hill Ministries (Miracle Hill). Miracle Hill describes itself as "an evangelical, gospel-infused mercy ministry, [and] Jesus Christ is at the center of all that we do."[5] According to the State's exception request letter, Miracle Hill is the State's largest foster care family provider, recruiting 15% of the State's foster parents.[6] Because it believes that "foster parents are in a position of spiritual influence over the children in their homes," Miracle Hill requires "foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement."[7]

---

[5] https://miraclehill.org/who-we-are/.
[6] South Carolina Letter requesting exception from administrative grant requirements, dated February 27, 2018 at p. 2.
[7] *See* Doctrinal Statement, available at: https://miraclehill.org/foster-care-inquiry-form/. According to the Complaint in *Maddonna v. Dep't of Health & Human Servs.*, in July 2019, Miracle Hill altered its religious requirement, "lifting its formal prohibition against Catholics and Orthodox Christians" while still requiring all prospective foster parents and mentors to "be followers of Jesus Christ" who are "active in and accountable to a Christian church" and agree with Miracle Hill's doctrinal statement. Case No. 6:19-cv-03551-TMC (D.S.C. Dec. 20, 2019), ECF No. 1 at ¶ 59.

Miracle Hill has indicated in public statements that it will not accept married, same-sex couples as foster parents.[8] Despite its unwillingness to work with all eligible foster parent applicants, Miracle Hill states that it will "absolutely never turn away a foster child," and will refer people who may not meet Miracle Hill's beliefs and requirements to other organizations.[9] According to the Complaint filed in *Maddonna v. Dep't of Health and Human Servs.,* No. 6:19-cv-03551 (D.S.C., Dec. 20, 2019), Miracle Hill is the largest nontherapeutic foster program in South Carolina, and is one of only three nongovernmental CPAs working in Greenville County.[10] It is unclear how many other CPAs in the State work with foster home applicants of other faiths, of no faith, and in the LGBTQ+ community.

ACF approved the State's request for an exception under 45 CFR 75.102(b), which provides:

> (b) Exceptions on a case-by-case basis for individual non-Federal entities may be authorized by the HHS awarding agency or cognizant agency for indirect costs, except where otherwise required by law or where OMB or other approval is expressly required by this part.

Part 75 establishes uniform administrative requirements, cost principles, and audit requirements for HHS awards. Section 75.102(b) is best read to, and has been historically used to, address requests for exceptions that pertain to financial and administrative management of federal grants, such as deviations from normal allowable costs, requirements applicable to for-profit subrecipients, costs requiring prior approval, or computation of depreciation. In describing other paragraphs of the exception authority, the Office of Management and Budget has focused on program design and data-driven frameworks that enhance performance, for example, explaining:

> Federal awarding agencies are encouraged to consider innovative program designs that apply a risk-based, data-driven framework to alleviate select compliance requirements and hold recipients accountable for good performance. Agencies are encouraged to employ innovative solutions to reduce burden, such as fixed amount awards, braided funding, and blended funding. As agencies consider these approaches, they should reach out to OMB to work together and discuss proposed innovative program designs . . . The culmination of this correspondence with OMB may result in a waiver or exception to the requirements in the Uniform Guidance. (See §200.102(c).)[11]

---

[8] See Mary Katherine Wildeman, South Carolina Foster Care Group Defends Policy that Allows Only for Christian Foster Families, Post & Courier (Mar. 17, 2018), https://www.postandcourier.com/health/south-carolina-foster-care-group-defends-policythat-allows-only/article_ce9c717a-2922-11e8-a5d9-8b4e1d05f01c.html; Josh Barlow, Path to Miracle Hill: Understanding the Legal Battle Between Civil Rights and Religious Liberty, CGTN America (Feb. 9, 2019), https://america.cgtn.com/2019/02/08/path-tomiracle-hill-understanding-the-legal-battle-between-civil-rights-and-religious-liberty.
[9] https://miraclehill.org/how-we-help/childrens-ministries/foster-care/
[10] Case No. 6:19-cv-03551 (D.S.C., Dec. 20, 2019), ECF No. 1 at 11.
[11] https://www.cfo.gov/assets/files/2CFR-FrequentlyAskedQuestions_2021050321.pdf

Using long-standing exception authority in government-wide rules to provide broad exceptions to civil rights or anti-discrimination laws was a novel use of the authority. On further review, ACF believes such use was improper.

Application of the Religious Freedom Restoration Act

ACF takes seriously its obligation to comply with RFRA, 42 U.S.C. § 2000bb, *et seq*. Where RFRA requires modifying program requirements, ACF will do so. After further consultation within the Department, however, ACF has now concluded that the justification offered in the exemption letter to South Carolina misapplied the applicable RFRA standards. The government maintains important civil rights interests in a proper application of RFRA, and for the reasons set forth below, hereby rescinds the exemption.

RFRA requires the federal government to justify actions that substantially burden religious exercise by identifying a compelling interest and showing that its actions are the least restrictive means of achieving that interest. The exception provided with respect to the religious organizations participating in South Carolina's IV-E program was overbroad and failed to apply the substantial burden requirement under RFRA.

First, it granted a broader exception than required, providing relief to more parties than was justified. RFRA requires evaluating the burden an individual or organization faces in determining whether to grant a religious exception, and to create class-wide regulatory exceptions that apply throughout a state, as the exception to South Carolina provides (even when not requested by the other CPAs), runs contrary to that analysis.

Second, the Department maintains a strong interest in accounting for the harms such a broad exemption could have on third parties. *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (In addressing religious accommodation requests, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries."). In this case, the exception was granted in response to the burden on one specific religious organization, yet applied to "any other subgrantee of the SC Foster Care Program that uses similar religious criteria in selecting among prospective foster care parents." Moreover, the State did not provide any evidence that other organizations using similar selection criteria considered complying with antidiscrimination protections a substantial burden on their beliefs. Nor did the State proffer evidence regarding the effect the waiver would have on third parties under a class-wide exemption. *See Estate of Thornton v. Caldor*, 472 U.S. 703, 710-11 (1985) (striking down a Connecticut statute "which provides Sabbath observers with an absolute and unqualified right not to work on their Sabbath" because it failed to consider "special circumstances" or "whether the employer has made reasonable accommodation proposals," which "contravenes a fundamental principle of the Religion Clauses" by going "beyond having an incidental or remote effect of advancing religion"). Because the State did not provide information regarding the other unidentified religious organizations that were granted an exemption, the burden on those other organization's religious exercise was not established.

Any exception should be tailored to reduce the burden on a religious organization while accounting for harms to other parties. In the case of Miracle Hill and other faith-based organizations participating in the State's foster care program, the exception could have been limited to the particular application of the religious nondiscrimination provision to which Miracle Hill objected. *Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006) ("[C]ourts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address *the particular practice at issue*."). Instead, the exception letter granted Miracle Hill an exemption to the religious nondiscrimination provision in whole. In our view, accommodations could have been explored that could have the potential for addressing both the specific religious burden identified by Miracle Hill, while also minimizing the harms passed onto third parties.

Third, the IV-E program is unique, as numerous studies have confirmed that LGBTQ+ children are over-represented in the domestic foster care population, and the important role the states necessarily play in providing a broad array of foster care services to serve the domestic population under the title IV-E program.[12] We believe that the prior exception might affect such children, as well as impact the State's ability to achieve the goals of the program by providing children with stable temporary or permanent homes, especially given that the exception applied State-wide.

As for potential foster parents, the government has a strong interest in a diverse population of foster parents where possible, especially given the over-representation of LGBTQ+ children in the domestic foster care population.[13] Such children could suffer psychological harm from placement in homes that do not accept them or require participation in the religious practices with beliefs contrary to the child's beliefs. Moreover, research has shown that same-sex couples are much more likely to raise a foster child.[14]

---

[12] *See e.g.,* Bianca Wilson et al., *Sexual and Gender Minority Youth in Foster Care: Assessing Disproportionality and Disparities in Los Angeles* 6 (2014), https://bit.ly/3auWk3g (19.1 percent of youth surveyed in the Los Angeles County system identified as LGBTQ, suggesting that "there are between 1.5 and 2 times as many LGBTQ youth living in foster care as LGBTQ youth estimated to be living outside foster care."); University of Maryland School of Social Work Institute for Innovation and Implementation et al., *The Cuyahoga Youth Count Report* (2021), https://theinstitute.umaryland.edu/media/ssw/institute/Cuyahoga-Youth-Count.6.8.1.pdf, (just over one third (32%) of youth in Cuyahoga County, Ohio's foster care system identified as LGBTQ (compared to 9.2% nationwide average of youth age 13-17 identifying as LGBTQ+); Christina Wilson Remlin et al., *Safe Havens: Closing the Gap Between Recommended Practice and Reality for Transgender and Gender-Expansive Youth in Out-of-Home Care* (April 2017), https://bit.ly/2xAXlVa (LGBTQ youth make up about 5 to 7 percent of the general youth population, but research estimates that 25 percent of youth in child welfare systems are LGBTQ.); Laura Baams et al., *LGBTQ Youth in Unstable Housing and Foster Care,* 143 Pediatrics 3 (March 2019), https://bit.ly/3kW8Ihl (Survey of youth across California found that 30.4 percent of youth living in foster care identify as LGBTQ, as compared to 11.2 percent nationally); Cooper, K., Kastanis, A., Nezhad, S., & Wilson, B. (2014, August). *Sexual and gender minority youth in foster care: Assessing disproportionality and disparities in Los Angeles,* p. 37 (LGBTQ youth are 1.5 to 2 times more likely than their peers to be living in foster care), p. 7 (LGBTQ youth are 2.5 times as likely to be placed in congregate care settings like group homes). Retrieved from http://williamsinstitute.law.ucla.edu/research/safe-schools-and-youth/lafys-aug-2014/

[13] See studies listed in footnotes 11, *supra*.

[14] Shoshana K. Goldberg & Kerith J. Conron, *How Many Same-Sex Couples in the U.S. are Raising Children,* THE WILLIAMS INSTIT. 1 (July 2018), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Same-Sex-Parents-

Finally, the approval suggested that applying the non-discrimination provisions of section 75.300(c) would reduce the available pool of foster or adoptive parents in the State. However, the State proffered no evidence that other religious CPAs would similarly object to working with LGBTQ+ foster parent applicants, nor did it show how eliminating discriminatory eligibility criteria would not also result in a potential increase in the pool of available foster parents, as additional populations feel welcomed by the State and by individual child placing agencies.

For these reasons, as well as the 2019 Notice of Nonenforcement of the 2016 Rule, ACF hereby withdraws the January 23, 2019 exception letter granted to South Carolina, with respect to Miracle Hill and any other subgrantee in the South Carolina foster care program using religious criteria to select among prospective foster care parents.

If you require any additional information, please contact me at 202-401-7229.

Sincerely,

Joo Yeun Chang
Principal Deputy Assistant Secretary
Administration for Children and Families

---

Jul-2018.pdf (Same-sex couples with children were also approximately seven times more likely than different-sex couples with children to be raising a foster child (2.9 percent versus 0.4 percent)).