# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

| | | |
|---|---|---|
| Eden Rogers et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:19-cv-01567-JD |
| | ) | |
| United States Department of Health and Human Services et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS HENRY MCMASTER'S AND MICHAEL LEACH'S
## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

OFFICE OF THE ATTORNEY GENERAL

Robert D. Cook
*South Carolina Solicitor General*
Post Office Box 11549
Columbia, SC 29211
(803) 734-3970

*Counsel for Governor Henry McMaster*

THE BECKET FUND FOR RELIGIOUS LIBERTY

Lori H. Windham*
William J. Haun*
Nicholas R. Reaves*
1919 Pennsylvania Ave. NW
Suite 400
Washington, D.C. 20006
(202) 955-0095

*\*Applications for admission* pro hac vice
*forthcoming*

*Counsel for Governor Henry McMaster*

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
2 W. Washington St. / Fourth Floor
Greenville, SC 29201
(864) 373-2352

*Counsel for Governor Henry McMaster
and Director Michael Leach*

OFFICE OF THE GOVERNOR

Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Erica W. Shedd
*Deputy Legal Counsel*
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100

*Counsel for Governor Henry McMaster*

*(Additional counsel listed on following page)*

(*continued*)

DAVIDSON, WREN & DEMASTERS, P.A.

Kenneth P. Woodington
William H. Davidson, II
1611 Devonshire Drive, 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568
(803) 806-8222

*Counsel for Director Michael Leach*

# T<small>ABLE OF</small> C<small>ONTENTS</small>

Motion for Summary Judgment ...................................................................1

Introduction...............................................................................................1

Statement of Undisputed Facts ..................................................................3

    I.      Foster care in South Carolina..................................................3

    II.     Private Child Placing Agencies in Upstate South Carolina.....5

    III.   The 2017 change in federal regulations and Defendants' responses ......................7

    IV.   Plaintiffs' factual allegations and legal claims ........................9

    V.     Events following the filing of the lawsuit ...............................11

Legal Standard ........................................................................................12

Argument ...............................................................................................12

    I.      Two recent Supreme Court decisions—*Fulton* and *Kennedy*—control the outcome of this case..........................................12

    II.     *Fulton* requires Defendants to accommodate Miracle Hill.....................14

          A.     *Fulton* requires South Carolina to accommodate Miracle Hill.................14

               1.     *Fulton* confirms that SCDSS is required to accommodate Miracle Hill's religious exercise.....................15

               2.     *Fulton* confirms that forcing Miracle Hill to comply with the HHS regulation would fail strict scrutiny ...............19

          B.     Plaintiffs' counterarguments to *Fulton* are meritless................20

    III.   The Establishment Clause permits Defendants to accommodate Miracle Hill's religious exercise ........................................23

          A.     The Establishment Clause claims are moot ...............23

          B.     Accommodating Miracle Hill does not establish religion ........................24

                1.     Plaintiffs' arguments have no basis in historical practices and understandings of religious establishment ...............25

                2.     Government accommodation of private religious exercise does not violate the Establishment Clause....................30

           B.     Miracle Hill's religious exercise cannot be attributed to South Carolina..............34

    IV.   There is no Equal Protection violation....................................36

A.     Decisions of private, third parties are not attributable to South Carolina ................................................................................................ 37

B.     South Carolina's accommodation of Miracle Hill easily satisfies rational basis review ............................................................................. 39

Conclusion ......................................................................................................... 40

**Page(s)**

**Cases**

*Board of Education of Kiryas Joel v. Grumet*, 512 U.S. 687 (1994)............................................33

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)...................................................................37

*Bowen v. Kendrick*, 487 U.S. 589 (1988) .............................................................................35, 39

*Buck v. Gordon*, No. 19-286 (W.D. Mich. Jan. 26, 2022) ............................................................34

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ......................................................21

*Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995)..........................................35

*Carson v. Makin*, 142 S. Ct. 1987 (2022) ...........................................................................31

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987)...................................................31, 33, 34, 39

*Cox v. Duke Energy Inc.*, 876 F.3d 625 (4th Cir. 2017) ..............................................................37

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)...........................................................................31, 32, 39

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) .................................................................12

*Dumont v. Lyon*, 341 F. Supp. 3d 706 (E.D. Mich. 2018).........................................................33, 34

*Edmonson v. Leesville Concrete Co. Inc.*, 500 U.S. 614 (1991) ................................................37

*Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283 (4th Cir. 2000) .................................................................................................................25

*Finlator v. Powers*, 902 F.2d 1158 (4th Cir. 1990) ..................................................................25

*Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church*, 846 F.2d 260 (4th Cir. 1988) ..........................................................................................................25

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) ............................................................ *passim*

*Gillette v. United States*, 401 U.S. 437 (1971)..........................................................................31

*Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987) ............................................15, 31

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022).............................................. *passim*

*Koenick v. Felton*, 190 F.3d 259 (4th Cir. 1999) ........................................................25

*Larkin v. Grendel's Den*, 459 U.S. 116, 127 (1982) ..................................................32

*Leshko v. Servis*, 423 F.3d 337 (3d Cir. 2005) ..........................................................36

*Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013) ............................................25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ...........................................................................................................32

*Madison v. Riter*, 355 F.3d 310 (4th Cir. 2003) ...................................................25, 30

*Milburn v. Anne Arundel Cty. Dept. of Soc. Servs.*, 871 F.2d 474 (4th Cir. 1989) .............36, 37

*Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599 (4th Cir. 2012) ...........................14, 25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ........................................25

*New Hope Fam. Servs., Inc. v. Poole*, __ F. Supp. 3d __, 2022 WL 4094540 (N.D.N.Y. Sept. 6, 2022) ..............................................................................................24

*New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) ..........................34

*Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022) ................................38

*Pullings v. Jackson*, No. 2:07-0912-MBS, 2007 WL 1726528 (D.S.C. June 13, 2007) ....................................................................................................................37

*Pulte Homes Corp. v. Montgomery Cnty.*, 909 F.3d 685 (4th Cir. 2018) ..................40

*Rayburn v. Hogue*, 241 F.3d 1341 (11th Cir. 2001) ..................................................36

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...................35

*Smith v. Schlage Lock Co.*, LLC, 986 F.3d 482 (4th Cir. 2021) ................................20

*Smith v. Smith*, 523 F.2d 121 (4th Cir. 1975) ...........................................................25

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ..............................................................16

*Town of Greece v. Galloway*, 572 U.S. 565 (2014) ....................................13, 25, 26

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) .............................7

*United States v. Timms*, 664 F.3d 436 (4th Cir. 2012) ..............................................39

*Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664 (1970) .......................................32

*Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387 (4th Cir. 1990) ..................... 37

*Wilder v. Sugarman*, 385 F. Supp. 1013 (S.D.N.Y. 1974) ..................................... 27, 28

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) ............................................. 35

*Zorach v. Clauson*, 343 U.S. 306 (1952) ..................................................... 14, 24

**Statutes**

42 U.S.C. § 671(a)(18) ........................................................................... 7

42 U.S.C. §§ 2000bb to 2000bb-4 .............................................................. 8

Ala. Code § 26-10D-3(1) *et seq.* .............................................................. 31

Kan. Stat. Ann. § 60-5322(b–c) .............................................................. 31

Mich. Comp. Laws § 400.5a ................................................................... 31

Mich. Comp. Laws § 710.23g .................................................................. 31

Mich. Comp. Laws § 722.124e ................................................................. 31

Miss. Code Ann. §§ 11-62-5(2), 11-62-7(2) ................................................... 31

N.C. Gen. Stat. § 115C-218.15(a) ............................................................ 39

N.C. Gen. Stat. § 115C-218.90(a)(4) ......................................................... 39

N.D. Cent. Code § 50-12-03 ................................................................... 31

N.D. Cent. Code § 50-12-07.1 ................................................................. 31

Okla. Stat. Title 10A, § 1-8-112(A–B) ....................................................... 31

S.C. Code Ann. Regs. 114-550(G)(3) .......................................................... 17

S.C. Code Ann. §§ 1-32-10 to -60 ............................................................ 8, 18

S.C. Code Ann. § 1-32-50 ..................................................................... 18

S.C. Code Ann. § 63-11-20(A)(1) .............................................................. 39

S.C. Const. art IV, §§ 1, 15 ................................................................. 18

S.D. Codified Laws § 26-6-38 ................................................................. 31

S.D. Codified Laws § 26-6-39 ................................................................. 31

S.D. Codified Laws § 26-6-40 ...............................................................................31

Tenn. Code Ann. § 36-1-101 ...............................................................................31

Tex. Hum. Res. Code Ann. § 45.002(1) ..............................................................31

Tex. Hum. Res. Code Ann. § 45.004 ...................................................................31

Va. Code Ann. § 63.2-1709.3(A–B) .....................................................................31

**Rules and Regulations**

45 C.F.R. Part 75.................................................................................................18

45 C.F.R. § 75.102 ...............................................................................................9

45 C.F.R. § 75.102(b) .........................................................................................18

45 C.F.R. § 75.300(c) (2017) .............................................................................7, 9

45 C.F.R. § 87.3(a)...........................................................................................9, 18

84 Fed. Reg. 63,809 (Nov. 19, 2019)...................................................................12

55 Pa. Code § 3700.61 ........................................................................................36

Civil Rule 7.04 D.S.C. ..........................................................................................1

Fed. R. Civ. P. 12(c) .............................................................................................1

Fed. R. Civ. P. 56(a) ...........................................................................................12

S.C. Code Ann. Regs. 114-210 ...........................................................................16

S.C. Code Ann. Regs. 114-4910 ...........................................................................4

S.C. Code Ann. Regs. 114-4930(E), (F), (G)(1)(b), (d) ........................................4

**Other Authorities**

Brenda G. McGowan, *Historical Evolution of Child Welfare Services*, *in* CHILD
  WELFARE FOR THE TWENTY-FIRST CENTURY: A HANDBOOK OF PRACTICES,
  POLICIES, AND PROGRAMS 10, 12 (Gerald P. Mallon & Peg McCartt Hess eds.,
  2005) ............................................................................................................27

Brief of Intervenors-Appellees, *Fulton v. Philadelphia*, 922 F.3d 140 (3rd Cir.
  2019) ............................................................................................................21

Catherine E. Rymph, *Raising Government Children: A History of Foster Care and the American Welfare State* 18 (2017) ..................................................................27, 29

Grace Abbott, *The Child and the State* 15 (1938) ........................................................28

U.S. Dep't of Health & Hum. Servs., *Evolving Roles of Public and Private Agencies in Privatized Child Welfare Systems* (March 2008) ................................27

Hon. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ........................................................................................................................26

John E. Murray, *The Charleston Orphan House: Children's Lives in the First Public Orphanage in America* 13 (2013).........................................................28, 29

Newton B. Jones, *The Charleston Orphan House, 1860–1876* in THE SOUTH CAROLINA HISTORICAL MAGAZINE, October 1961 ..................................................29

SCDSS Human Servs. Policy & Procedure Manual §§ 720, 760.3...................................11

Sisters of Charity of our Ladies of Mercy, *Bishop John England, Our Founder*.........................29

Stephanie H. Barclay, *Spheres of Liberty and Free Exercise: Lessons for* Fulton *from Jefferson's Correspondence with Ursuline Nuns*, Reason (November 2, 2020) ........................................................................................................................26

Susan Vivian Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 OHIO ST. L.J. 1295 (1999)....................................................................27

Timothy A. Hacsi, *Second Home: Orphan Asylums and Poor Families in America* 19 (1997).........................................................................................................27, 28

<u>**MOTION FOR SUMMARY JUDGMENT**</u>[1]

Defendant Henry McMaster ("Governor McMaster" or "Governor"), in his official capacity as Governor of the State of South Carolina, and Defendant Michael Leach ("Director Leach"), in his official capacity as the State Director of the South Carolina Department of Social Services ("SCDSS") (collectively "State Defendants"), move for summary judgment under Federal Rule of Civil Procedure 56 because, as confirmed by nearly two years of discovery, the undisputed facts point to only one conclusion: the State Defendants' actions challenged in this suit were constitutionally permissible. In fact, they were constitutionally required. Therefore, Plaintiffs cannot prevail on their Establishment Clause or Equal Protection Clause claims. Accordingly, this Court should enter summary judgment in Defendants' favor on all claims.

**INTRODUCTION**

Plaintiffs ask this Court to do something that no other court has done: declare that it is unconstitutional to offer a religious accommodation to a private child welfare agency. Such a ruling would be contrary to the U.S. Constitution, would be contrary to the precedent of the Supreme Court and the Fourth Circuit, and would call into question the laws of South Carolina and at least ten other States that have laws accommodating the religious beliefs of private child welfare agencies. After extensive discovery, the facts do not support Plaintiffs' claims, and intervening changes in the law make State Defendants' consistent position and defenses stronger than ever.

First, discovery wholly undermined the basic premise of Plaintiffs' assertions that they would be disadvantaged if they did not work with one particular agency, Miracle Hill; that

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

accommodating Miracle Hill would cause same-sex couples to suffer from a lack of options; that Miracle Hill supports a disproportionate number of foster families; and that State Defendants' religious accommodation of any private foster agency meant that Miracle Hill's actions were, therefore, attributable to the State. None of those allegations proved true. Most foster families in the State work with SCDSS, not a private agency. And SCDSS welcomes families of all faiths or no faith and regardless of sexual orientation or marital status. That's also true of the overwhelming majority of private agencies; of the 18 in the Upstate, only Miracle Hill is known to limit its work to those who share its faith. Miracle Hill serves only a fraction of families, and it offers no special support, resources, or expedited path to become licensed. Despite knowing of other options to pursue licensure as foster parents, Plaintiffs never did. Instead, they chose to pursue litigation. But the Governor and SCDSS cannot be held responsible for Miracle Hill's actions. Miracle Hill is a private agency which was never reimbursed by the State for its recruitment and support of foster parents in the licensing process. Even if that were relevant, Miracle Hill no longer receives any government funding, and therefore Plaintiffs' claims are moot.

Second, the law has changed. The Supreme Court's decisions in *Fulton* and *Kennedy*, when applied to the facts here, confirm that Plaintiffs cannot succeed. Under *Fulton*, accommodation of Miracle Hill's religious exercise is perfectly permissible—even more, it is constitutionally required. Plaintiffs cannot prevail because South Carolina took action to comply with the Free Exercise Clause. And Plaintiffs' Establishment Clause claims fail under *Kennedy*, which confirmed that the *Lemon* test relied upon by Plaintiffs is no longer good law. Instead, courts look to historical practices and understandings to interpret the Establishment Clause, and our Nation has a long history of accommodating the work of religious orphanages and child welfare agencies which help to find homes for children in need. *Kennedy* also confirmed that the First Amendment's

Religion Clauses are not at war with one another, such that obeying one violates the other. The accommodation required by the Free Exercise Clause does not—and cannot—violate the Establishment Clause. Nor can Plaintiffs' Equal Protection claims succeed where South Carolina had a more than rational basis to permit the private actions of a private actor.

At bottom, South Carolina has protected the religious freedom of its citizens in a way that helps to provide homes for children in need. It provides those services itself, without discrimination, and it allows diverse private agencies to continue their good work of helping find and support homes for children. The Constitution protects, not prohibits, this critical work.

STATEMENT OF UNDISPUTED FACTS

## I.    Foster care in South Carolina.

South Carolina takes seriously its obligation to find homes for children who cannot be with their families of origin. Its foster care system is overseen by SCDSS, which has legal custody of all foster children in South Carolina, licenses all foster families, and oversees the training and supervision of foster homes and residential foster facilities in the State. SCDSS has final authority over and responsibility for all children in foster care in South Carolina. *See* Ex. A (Barton Dep. 67:2–14). Only SCDSS can place a child with a foster family, and only SCDSS can license a prospective foster family. *See* S.C. Code Ann. Regs. 114-4980(A)(2)(d) and (A)(3)(b); *see also* Ex. B (Lowe Dep. 188:5–19, 190:5–10); Ex. A (Barton Dep. 31:9–11, 67:2–5, 70:11–13, 254:20–24).

SCDSS licenses and works directly with foster parents and prospective foster parents of any faith (or of no faith) or sexual orientation, including those in same-sex marriages.[2] *See* Ex. B

---

[2] In recent years (after the events giving rise to this litigation), SCDSS has focused primarily on kinship foster care and directs prospective non-kin foster parents to CPAs to assist them with seeking licensure and to provide support once they are licensed. *See* Ex. B (Lowe Dep. 189:13 to 190:10). Even so, however, a foster parent or prospective foster parent who cannot or prefers not

(Lowe Dep. 188:5–19); Ex. E (Staudt Dep. 124:2–25). SCDSS likewise intentionally and affirmatively recruits from a full cross-section of South Carolinians to ensure the foster care system includes an array of foster placements as diverse as the children it serves. *See* Ex. A (Barton Dep. 51:18 to 52:20); Ex. B (Lowe Dep. 188:5–11).

In addition to working directly with foster families, SCDSS has also licensed private entities known as Child Placing Agencies ("CPAs") to assist foster families and SCDSS, including by identifying licensed foster families into which children can be placed by SCDSS, developing and supervising the implementation of case plans for children placed in foster homes, monitoring foster homes, and providing support and encouragement to those foster families. *See* S.C. Code Ann. Regs. 114-4910 to -4980. Like SCDSS, the overwhelming majority of CPAs partner with foster parents and prospective foster parents of any faith (or of no faith) or sexual orientation. *See* Ex. B (Lowe Dep. 240:3–12). State statutes and regulations govern the licensure and requirements for CPAs. *See*, *e.g.*, S.C. Code Ann. Regs. 114-4930(E), (F), (G)(1)(b), (d).

In the last few years, SCDSS began contracting with most CPAs in the State. *See* Ex. C (McDaniel-Oliver Dep. 73:13–25). The contract governs services provided by the CPA to assist SCDSS in determining which licensed foster families are available and interested when SCDSS has a foster child in need of placement. *See* Ex. D (SCDSS Contract with Miracle Hill). CPAs also provide administrative support and services when a foster child is in the home of a family affiliated with that CPA. *See id.*; *see also* Ex. B (Lowe Dep. 44:15 to 46:16).

For the services they provide pursuant to the contract, CPAs are paid an "administrative payment" of $20 to $30 per-child per-day (depending on the age of the child) while the child is

---

to work with a CPA still has the option of working directly with SCDSS. *See id.*; *see also* Ex. A (Barton Dep. at 255:9–15).

living with a foster family affiliated with that CPA.[3] *See* Ex. D (contract); *see also* Ex. H (Roben Dep. 23:4–11). If foster families change CPAs, the administrative fee follows them to their new CPA. *See* Ex. A (Barton Dep. 275:5–25). And if a child is moved to a new foster family's home, the administrative fee follows the child. *See id.* When SCDSS removes a child from a foster home—*e.g.*, to be returned to her family of origin or to be adopted—the administrative fee to the CPA stops. *See* Ex. B (Lowe Dep. 209:6–15).

The contract does not require CPAs to recruit prospective foster parents or to assist them in seeking licensure. *See* Ex. D (contract); Ex. C (McDaniel-Oliver Dep. 68:24 to 69:20). The contract provides funding that partially reimburses CPAs for the cost of providing the administrative services governed by the contract. *See* Ex. D (contract). The contract does not require, fund, or reimburse CPAs' efforts to recruit, screen, or assist prospective foster parents seeking licensure from SCDSS. *See* Ex. B (Lowe Dep. 205:15 to 207:16); Ex. E (Staudt Dep. 120:1–18). Indeed, the reimbursement provided under the contract is not even sufficient to reimburse the CPAs' contractual administrative services, much less any extra-contractual efforts that CPAs undertake. *See* Ex. F (Lehman Dep. 115:20 to 117:23).

## II.     Private Child Placing Agencies in Upstate South Carolina.

For the minority of families who choose not to work with SCDSS directly, 27 CPAs partner with foster families across the State. *See* Ex. G. Eighteen CPAs serve in the Upstate of South Carolina. *See id*. Most have been licensed for over a decade. *Id*. All 18 are licensed to assist in the provision of "non-therapeutic" foster care (also known as "regular" foster care), and nine are also

---

[3] In 2019, the administrative rate was $10 per child per day. *See* Ex. H (Roben Dep. 130:6–9). The amounts were adjusted to their present rates in 2021 pursuant to a Change Order. *See id*. at 23:4–11. A separate amount, known as a "board payment" or a "maintenance payment" is paid by SCDSS to the foster family itself to help defray costs associated with housing and caring for the child. *Id.* at 34:11 to 36:13. The board payment amount also varies based on the age of the child. *Id*.

licensed to assist in the provision of therapeutic foster care for children with heightened needs. *Id.* Of the 27 CPAs across the State, only one is known to limit its partnerships based upon the prospective family's faith or same-sex marriage.[4] *See* Ex. B (Lowe Dep. 240:3–12). Ex. E (Staudt Dep. 58:7–11, 92:12 to 93:8).

That sole exception is Miracle Hill Ministries, a Christian nonprofit organization that serves the homeless, hungry, and needy in upstate South Carolina and that has been licensed as a non-therapeutic CPA since 1992. *See* Ex. G. Miracle Hill serves any child in need regardless of race, color, national origin, religion, or sexual orientation. *See* Ex. B (Lowe Dep. at 230:5–15); Ex. I at 2. Miracle Hill also works with volunteers without regard to such factors. But because Miracle Hill believes its foster care ministry is an exercise of its religious beliefs, Miracle Hill partners only with prospective foster parents who share its religious mission and affirm its Christian doctrinal statement in belief and practice. *See* Ex. F (Lehman Dep. 20:22 to 21:11); *see also* Exhibit J (Letter from R. Lehman to Sec. Alex Azar).

Miracle Hill works with only a fraction of the prospective foster parents and foster child placements handled by SCDSS each year. In 2019, for example—the year Plaintiffs inquired with Miracle Hill about becoming foster parents—SCDSS licensed 797 new foster parents. Of that number, only 337 of them (42% of the total) were assisted by a CPA, including 54 (6.7% of the total) who were assisted by Miracle Hill. *See* Exhibit K at 1–2. Similarly, in 2018—the year the State Defendants took the actions that Plaintiffs challenge in this lawsuit—8,435 unique children

---

[4] There is some evidence that one other CPA limits its recruitment efforts to individuals from within its religious denomination, and that another CPA does not affirmatively recruit same-sex couples. But that evidence supports, at most, only a conclusion that these two CPAs target their *recruiting* efforts. *See* Ex. B (Lowe Dep. 232:8 to 237:22). There is no evidence to rebut the testimony of the SCDSS employees responsible for licensing, monitoring, and reviewing CPAs that all CPAs other than Miracle Hill work with prospective foster parents of any faith (or no faith) and sexual orientation. *See id.* at 240:3–12; Ex. E (Staudt Dep. 58:7–11, 92:12 to 93:8).

were served in foster care, of whom only 2,120 (25% of the total) were placed with the assistance of a CPA, including 261 (3% of the total) who were placed with the assistance of Miracle Hill. *See id*. at 3. Thus more than 93% of newly licensed foster families and 97% of foster children statewide are served by someone other than Miracle Hill, as are more than 90% of foster placements in the Upstate Region. *See id.* at 1–3.

## III.    The 2017 change in federal regulations and Defendants' responses.

South Carolina, like every other State, receives foster care reimbursements from the U.S. Department of Health and Human Services ("HHS") as authorized by statute. That statute prohibits States from using funds in a discriminatory fashion "on the basis of the race, color, or national origin." 42 U.S.C. § 671(a)(18). In 2017, in the waning weeks of President Obama's administration, HHS amended its regulations to add "religion" and "sexual orientation." 45 C.F.R. § 75.300(c) (2017). This new regulation purported to apply both to SCDSS and to CPAs as sub-recipients of the funds. *See id.* §§ 75.101(b)(1), 1355.30(i).

As a result, in 2018 SCDSS determined it would issue Miracle Hill only a temporary license renewal in light of Miracle Hill's practice of recruiting and partnering only with foster parents who share its religious beliefs. *See* Ex. L (Letter from SCDSS to Miracle Hill (Jan. 26, 2018)). Governor McMaster then wrote to HHS seeking a "deviation" or waiver from the new regulation. *See* Ex. M. (Letter from Gov. McMaster to Steven Wagner, HHS Acting Assistant Secretary (Feb. 27, 2018)). His letter explained that the new regulations "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," which violates the CPAs' constitutional rights, as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4. *See id.* at 2. Governor McMaster also directed HHS's attention to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), issued after HHS amended its

regulations, which "made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." *See id.* A waiver, Governor McMaster explained, would protect the rights of faith-based CPAs and, more importantly, would maximize the number of available foster homes. *Id.*

Shortly thereafter, Governor McMaster issued Executive Order No. 2018-12. *See* Ex. N (Exec. Order No. 2018-12 (March 13, 2018)). The Order acknowledged the "long-standing constitutionally permissible practice" of, and the "crucial need" for, faith-based CPAs' participation in the foster care system and affirmed the well-founded principle that "faith-based organizations may retain their religious character and participate in government programs," a right protected by the First Amendment to the U.S. Constitution, by the analogous provision of the South Carolina Constitution, and by the South Carolina Religious Freedom Act of 1999, S.C. Code Ann. §§ 1-32-10 to -60. *See id.* at 1–2. The Order directed SCDSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "ensure that SCDSS does not directly or indirectly penalize religious identity or activity." *Id.* at 3.

On January 23, 2019, HHS responded to Governor McMaster's request for a waiver. *See* Ex. O (Letter from Steven Wagner, Principal Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs., to Governor Henry McMaster (Jan. 23, 2019)). The response noted Governor McMaster's concerns about the decrease in available foster homes that would result if HHS enforced the new regulation against faith-based CPAs, as well as his concerns that enforcement would unlawfully force faith-based CPAs to either abandon their religious beliefs or forgo licensure. *See id.* at 1–2. HHS determined that requiring subrecipients which use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable

under RFRA." *Id.* at 3. Accordingly, HHS granted the waiver. *See id.* at 4.[5] SCDSS then issued Miracle Hill a regular annual CPA license.

## IV.    Plaintiffs' inquiry to Miracle Hill and the subsequent filing of this lawsuit.

Immediately following HHS's issuance of the waiver, the American Civil Liberties Union and an allied organization, Equality SC, engaged in extensive Twitter solicitation of individuals who could apply to Miracle Hill in hopes of being "rejected" and bringing litigation. *See* Exhibits. P, Q, R, and S. Through the encouragement of friends associated with that effort, Plaintiffs decided to contact Miracle Hill about becoming foster parents. *See* Ex. T (Welch Dep. 20:11 to 21:5, 26:12 to 27:14, 60:14 to 61:25). Accordingly, in late April, 2019, they submitted an inquiry form on Miracle Hill's website to inquire about partnering with Miracle Hill to become foster parents. Miracle Hill responded by email, noting that Miracle Hill partners only with foster parents who share Miracle Hill's deeply-held religious beliefs and are active in a Christian church. *See* Ex. U at 3–4 (email of May 1, 2019). Miracle Hill further noted that because Plaintiffs, who attend a Unitarian Universalist church, do not share Miracle Hill's beliefs or attend a Christian church, Miracle Hill would be glad to help connect them with another CPA or SCDSS, and Miracle Hill provided them with a list of other CPAs in the area and ways to contact them. *Id*. Almost immediately after receiving the email from Miracle Hill, Plaintiffs forwarded it to their lawyers. *Id*. at 2–3.

Although Plaintiffs were aware of opportunities to foster through other CPAs in their area or with SCDSS directly, they admit they made no attempt to do so. *See* Compl. ¶¶ 4, 8, 24–25, 45,

---

[5] Such waivers or exemptions are permitted by the exemption mechanism found in 45 C.F.R. § 75.102, on which HHS's waiver relied. *See* Ex. O (Letter from Wagner to Governor McMaster). Other federal regulations pertaining to foster care funds are likewise subject to discretionary exemptions. *See* 45 C.F.R. § 87.3(a).

77, 82, 90, ECF No. 1; Ex. V (Rogers Dep. 75:15–21); Ex. T (Welch Dep. 83:2–10). Instead, Plaintiffs filed a 40-page Complaint in federal court with the backing of three advocacy groups and two law firms and supported by a team of ten lawyers from across the country. *See* Compl., ECF No. 1. Plaintiffs' Complaint asserts two claims against the State Defendants: alleged violation of the Establishment Clause and alleged violation of the Equal Protection Clause. *See id.* ¶¶ 97–113, 127–40. It also asserted Establishment Clause and Equal Protection claims against the Federal Defendants based on the same factual allegations. *Id.* ¶¶ 114–26, 141–56.

The undisputed evidence has shown many of the Complaint's allegations—even assuming they were relevant to the constitutional analysis—to be false:

- Contrary to Plaintiffs' allegations, there are far more than a mere "handful" of other CPAs (and supposedly inexperienced ones at that) serving the Upstate. *See* Ex. G (listing 18 CPAs providing therapeutic and non-therapeutic foster care in the Upstate); *contra* Compl. ¶¶ 45, 82, ECF No. 1.

- Contrary to Plaintiffs' allegations, all CPAs and SCDSS provide resources and support that are comparable to those offered by Miracle Hill,[6] and SCDSS does not license Miracle Hill's foster homes more speedily than it licenses other prospective foster parents. *See* Ex. B (Lowe Dep. 44:15 to 45:3); Ex. A (Barton Dep. 77:1–13); Ex. E (Staudt Dep. 122:21–24); Ex. W (showing that for each year from 2017 to 2020, Miracle Hill was neither the fastest nor the slowest CPA in terms of the speed of licensure of the prospective foster parents it assisted, and that in every year but one, prospective foster parents associated with Miracle Hill waited longer for licensure than the prospective foster parents who worked directly with SCDSS); *contra* Compl. ¶¶ 25, 46, 89, ECF No. 1.

- Contrary to Plaintiffs' allegations, Miracle Hill's allegedly discriminatory recruiting and screening of prospective foster parents is not funded or reimbursed by State or federal funds. *See* Ex. B (Lowe Dep. 205:15 to 207:16); Ex. E (Staudt Dep. 120:1–18); *see also* Ex. V (Rogers Dep. 82:8 to 83:4) (agreeing that if Miracle Hill's and other CPAs' recruiting and screening efforts were not government funded, Plaintiffs had not been harmed by Defendants and there was no constitutional violation); Ex. T (Welch Dep. 19:4 to 20:10) (same); *contra* Compl. ¶¶ 90, 95, 96, 103, Prayer for Relief A–E, ECF No. 1.

- Contrary to Plaintiffs' allegations, Miracle Hill does not proselytize children in foster care or coerce them to engage in religious exercise against their will. *See* Ex. F (Lehman Dep.

---

[6] Miracle Hill has more foster care support staff than other CPAs, but it also has more foster families, so the per capita support is analogous. *See* Ex. AA.

242:11 to 252:6); Ex. X (Busha Dep. 197:9 to 202:11); Ex. Y (Betts Dep. 272:11 to 281:10, 293:22 to 297:11); *contra* Compl. ¶¶ 94, 108, 121, ECF No. 1. Indeed, such actions would be contrary to the express requirements of SCDSS regulations and contracts. *See* Ex. EE (SCDSS Human Servs. Policy & Procedure Manual §§ 720 Policy 1(j), 760.3 Policy 5(e)).

- Contrary to Plaintiffs' allegations, the Defendants' actions to accommodate CPAs like Miracle Hill has not reduced the pool of foster parents in the State. *See* Ex. Z (showing that in South Carolina in the years following the Defendants' accommodation of Miracle Hill, the number of foster parents in the State rose); *contra* Compl. ¶¶ 1, 6, 34, 84, ECF No. 1. The parties' experts disagreed over the hypothetical question of whether religious accommodation was likely to increase or decrease the pool of foster parents; but witnesses with personal knowledge indicated that if Miracle Hill were to shut down, as many as 60% of their foster parents would choose to cease serving as foster parents altogether. *See* Ex. F (Lehman Dep. 277:1 to 278:5); Ex. Y (Betts Dep. 261:22 to 263:16).

- Contrary to Plaintiffs' claims, Miracle Hill's response to Plaintiffs' online inquiry did not "reject" them on the basis of their sexual orientation or same-sex marriage, but, rather, referred them to other CPAs because Plaintiffs did not agree with Miracle Hill's religious beliefs. *See* Ex. U at 3–4 (email of May 1, 2019). Miracle Hill will work with LGBTQ prospective foster parents who can affirm and abide by Miracle Hill's Doctrinal Statement. *See* Exhibit F (Lehman Dep. 48:3–16); Exhibit X (Busha Dep. 188:23 to 190:17); *contra* Compl. ¶¶ 2, 4, 7, 53, 83, 107, 130, ECF No. 1.

## V.    Events following the filing of the lawsuit.

Plaintiffs filed this action on May 30, 2019. In response to Governor McMaster's Motion to Dismiss (ECF No. 57), this Court dismissed Plaintiffs' Equal Protection claim based on religious discrimination; noted that the Equal Protection claim based on sexual orientation or same-sex marriage would likewise be dismissed if and when the same arguments were leveled against that claim; and allowed the Establishment Clause claim to proceed (ECF No. 81). The Defendants subsequently filed Answers, and the parties began discovery.

The parties engaged in extensive discovery. Around six months after the Complaint was filed, HHS published a Notification of Nonenforcement of Health and Human Services Grants Regulation. *See* 84 Fed. Reg. 63,809 (Nov. 19, 2019). In 2021, Miracle Hill notified SCDSS that, going forward, Miracle Hill was voluntarily declining to receive all government funding for its work as a CPA. *See* Ex. A (Barton Dep. 285:3 to 286:24); Ex. C (McDaniel-Oliver Dep. 60:11 to

61:13). Miracle Hill remains licensed by SCDSS and, like nearly every other CPA in the State, still has a contract with SCDSS, but does not receive any government funding for its services. *See* Ex. A (Barton Dep. 285:3 to 286:24).

LEGAL STANDARD

The Court must grant summary judgment "when 'there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.'" *Dash v. Mayweather*, 731 F.3d 303, 310–11 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). In reviewing a motion for summary judgment, the court "construe[s] the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party." *Id.* at 310. Even so, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Id*. at 311. Once the movant satisfies that initial burden of showing "the absence of a genuine dispute as to any material fact," the burden shifts to the nonmoving party to demonstrate the opposite. *Id.*. Whether a party sufficiently raises a genuine issue of material fact is determined based on the court's judgment as to whether "a reasonable jury could return a verdict for that party on each element necessary to that claim." *Id.*

ARGUMENT

**I.  Two recent Supreme Court decisions—*Fulton* and *Kennedy*—control the outcome of this case.**

In the time since Plaintiffs filed their complaint more than three years ago, the legal landscape has shifted dramatically. The Supreme Court has addressed the legal issues underlying Plaintiffs' claims in two separate cases, and in both cases the Supreme Court issued decisions showing that Plaintiffs' claims are meritless.

First, in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court

considered whether the Constitution *required* a government child welfare department to accommodate a child-placing agency. That agency could not, consistent with its religious beliefs, certify same-sex couples for foster care. The Supreme Court ruled that the Free Exercise Clause required the City to accommodate the agency because the City retained discretion to accommodate other agencies for secular reasons. *Id.* at 1878, 1882. That decision was 9-to-0.

Discovery has confirmed that this case is controlled by *Fulton*. South Carolina is not just permitted, but legally required to accommodate religious foster agencies like Miracle Hill. If South Carolina failed to accommodate Miracle Hill, it would violate the Free Exercise Clause, just as Philadelphia did in *Fulton*. This is because South Carolina, like Philadelphia, retains discretion to exempt foster agencies, *see* State Defendants' Mot. for J. on the Pleadings (ECF No. 173) at 17–22, meaning that it must exempt religious agencies if they need a religious exemption. Any decision *not* to offer those exemptions would have to pass the strictest constitutional scrutiny. *Fulton* at 1881. South Carolina wouldn't be able to pass that scrutiny, especially when the State has numerous less restrictive options available—including by welcoming and certifying qualified foster parents directly through SCDSS. If South Carolina chose not to accommodate religious foster agencies, it would violate the First Amendment.

Second, in *Kennedy v. Bremerton School District*, the Supreme Court changed Establishment Clause law in a way that dooms Plaintiffs' claims. The Court overturned the *Lemon* test and confirmed that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 142 S. Ct. 2407, 2428 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Before *Kennedy*, Plaintiffs relied on the *Lemon* test, and the Court denied a motion to dismiss on the grounds that they properly pled claims under *Lemon*. ECF No. 1 ¶¶ 109–10; ECF No. 81 at 30–35. *Lemon* is no longer the governing standard. Instead, this

Court must look to historical practices and understandings, which show a long history of religious agencies serving at-risk children, in cooperation with the State, without giving up their status as private, religious entities. *See Fulton*, 141 S. Ct. at 1875 ("The Philadelphia foster care system depends on cooperation between the City and private foster agencies like CSS."); *id.* at 1925 (Alito, J., concurring) ("[T]he function that CSS and other private foster care agencies have been performing for decades has not historically been an exclusively governmental function."). The Supreme Court and the Fourth Circuit have also repeatedly confirmed the ability of the government to accommodate religious exercise, holding that such accommodations "follow[] the best of our traditions." *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 609 (4th Cir. 2012) (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)); *see also infra* 25–29. Under the new governing standard, historical practices and understandings demonstrate that accommodating private religious foster care agencies is perfectly permissible under the Establishment Clause.

State Defendants acted to ensure they have numerous options available for children in need, and for the families willing to care for them. Among them, SCDSS itself is available to welcome and work with Plaintiffs and with any other prospective foster parents. Cutting off religious agencies like Miracle Hill helps no one and instead limits the options for families and children in need.

## II. *Fulton* requires Defendants to accommodate Miracle Hill.

The undisputed facts discussed above confirm that the Supreme Court's unanimous ruling in *Fulton* resolves this case.

### A. *Fulton* requires South Carolina to accommodate Miracle Hill

This case has the same origins as the Supreme Court's unanimous decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868. In both, governments considered whether they must end their longstanding collaborations with religious foster agencies because an agency's religious

beliefs seemed to be at odds with nondiscrimination rules. In both, foster parents could find ample alternative providers, and the government's nondiscrimination rules permitted exceptions. The result should be the same: In *Fulton*, the religious agency unanimously prevailed at the U.S. Supreme Court and received a religious accommodation. Here, South Carolina should similarly prevail, because *Fulton* confirms that it is constitutionally required to accommodate Miracle Hill.

As *Fulton* confirmed, the Free Exercise Clause is triggered when governments attempt to sever their partnerships with religious foster agencies because "religious views . . . inform [their] work in this system." *Id.* at 1875. And here, as in *Fulton*, neither South Carolina nor the federal government has generally applicable nondiscrimination rules for CPAs licensing foster parents. Because there is no generally applicable rule, neither South Carolina nor HHS can "refuse to extend [an exemption] to cases of religious hardship without compelling reason." *Id.* at 1877 (cleaned up). And *Fulton* has already determined the outcome of this strict scrutiny analysis, holding that even when the nondiscrimination interest "is a weighty one," it cannot prevail where the government "offers no compelling reason why it has a particular interest in denying an exception to [the religious agency] while making them available to others." *Id.* at 1882. In other words, as *Fulton* concluded, "so long as the government can achieve its interests in a manner that does not burden religion, *it must do so*." *Id.* at 1881 (emphasis added). This constitutional command required South Carolina to accommodate Miracle Hill, which it did. *See Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144–45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices . . . .").

      **1.**      ***Fulton* confirms that SCDSS is required to accommodate Miracle Hill's religious exercise.**

*Fulton*'s first two holdings—on the type of burden that triggers the Free Exercise Clause and when the Free Exercise Clause requires strict scrutiny—apply squarely to this case. After

Miracle Hill served children for 80 years, "DSS issued Miracle Hill only a temporary six-month CPA license" because of "concerns" over Miracle Hill's policy of working with those who share its faith. ECF No. 81 at 7–8; *see also* Ex. L (SCDSS Letter to Miracle Hill identifying "concerns"). As in *Fulton*, a religious agency was thus being forced to choose between "curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 141 S. Ct. at 1876. This triggered the Free Exercise Clause, and potential liability for the State Defendants if they did not lift the burden on religious exercise. *See id.*

*Fulton*'s second holding, on when strict scrutiny applies under the Free Exercise Clause, also applies here. That's because South Carolina, just like Philadelphia in *Fulton*, doesn't have a generally applicable nondiscrimination policy. Where there is a burden on religion and no generally applicable policy to justify it, strict scrutiny applies. *See id.* at 1878; *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.") (emphasis in original) (citations omitted).

South Carolina's nondiscrimination policies do not cover Miracle Hill's actions here. The first non-discrimination provision, S.C. Code Ann. Regs. 114-210, does not list sexual orientation or marital status as protected classes, so Plaintiffs' status of being in a same-sex marriage would not be covered by this regulation. It also prohibits only "unlawful" discrimination, so it must be interpreted and applied by the State Defendants with reference to other non-discrimination laws *Id.* As described below, State Defendants correctly concluded that it is not unlawful for a religious agency to operate according to religious principles, an action which is protected by state and federal law.

The second nondiscrimination requirement expressly applies to SCDSS, not to private agencies. The regulation states that "the agency must not discriminate with regard to the application or licensure of a foster family or approval of an adoptive family on the basis of age, disability, gender, religion, sexual orientation, gender identity or marital status." *See* S.C. Code Ann. Regs. 114-550(G)(3). But "'Agency' means the South Carolina Department Social Services." *Id.* at 114-550(B)(2). There is a separate definition for "Child Placing Agency," which would include Miracle Hill. *Id.* at 114-550(B)(6). The nondiscrimination provision specifically mentions "the agency," not "Child Placing Agency," and so can only be read to apply to SCDSS. Where a nondiscrimination provision does not squarely apply, the government cannot prevail against a Free Exercise claim. *See Fulton*, 141 S. Ct. at 1879–81 (city could not apply nondiscrimination ordinance that did not cover foster agencies).

State Defendants also have discretion. Even if the nondiscrimination rule that binds SCDSS were somehow applicable to CPAs as well, SCDSS's Policy Manual on foster care licensing gives SCDSS discretion to make exceptions to that nondiscrimination rule when doing so "is in the best interest of the child." Ex. EE at 4 (SCDSS Policy Manual § 710(1)). State Defendants also have the power to make exceptions under South Carolina's Religious Freedom Act, which requires "all state and local laws and ordinances and the implementation of those laws and ordinances, whether statutory or otherwise, and whether adopted before or after" the Act to accommodate substantial burdens on religious claimants with the "test of compelling state interest." S.C. Code Ann. §§ 1-32-60, -30. South Carolina must use "the least restrictive means of furthering that compelling interest." *See id.* § 1-32-40(2). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, *it must do so*." *Fulton*, 141 S. Ct. at 1881 (emphasis added). State Defendants were therefore required by law to make an exception for

Miracle Hill, or face a lawsuit. S.C. Code Ann. § 1-32-50 (authorizing private lawsuits and fee awards).

Governor McMaster also has discretion, since his office is vested with the State's "supreme executive authority" and must "take care that the laws be faithfully executed." S.C. Const. art. IV, §§ 1, 15. As such, Governor McMaster had his own independent duty to harmonize the application of the First Amendment, South Carolina's Religious Freedom Act, and state regulations.

Similar discretion exists at the federal level. When implementing "any HHS awarding agency program or service," HHS "shall provide such accommodation[s] as [are] consistent with" RFRA, other "Federal law," and "the Religion Clauses of the First Amendment." 45 C.F.R. § 87.3(a). Also at the federal level, 45 C.F.R. § 75.102(b) authorizes HHS to make "[e]xceptions on a case-by-case basis" made to "the [nondiscrimination] requirements" in 45 C.F.R. Part 75. *Id.* As in *Fulton*, the "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable." 141 S. Ct. at 1879. HHS came to the same conclusion. *See* ECF No. 173.

The similarities between this case and *Fulton* demonstrate that SCDSS could not exclude Miracle Hill from its foster care system without violating the First Amendment. To that end, Governor McMaster promulgated an Executive Order "direct[ing] that [SC]DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs." ECF No. 173-2 at 4. This accommodation ensured that religious agencies which would otherwise be kept out of the system were not "effectively require[d] . . . to abandon their religious beliefs or forgo the available public licensure." Ex. M at 2 These efforts therefore avoided an unconstitutional result: "burden[ing] the religious exercise of [Miracle Hill] through policies that do not meet the requirement of being neutral and generally applicable." *Fulton*, 141 S. Ct. at 1877.

## 2. *Fulton* confirms that forcing Miracle Hill to comply with the HHS regulation would fail strict scrutiny.

*Fulton*'s third holding applies squarely here too. *Fulton* concluded that "[t]he refusal of Philadelphia to contract with [Catholic Social Services] for the provision of foster care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment." 141 S. Ct. at 1882. The same result is required here.

To satisfy strict scrutiny, a burden on religious exercise must be "advanc[ing] interests of the highest order and is narrowly tailored to achieve those interests." *Id.* at 1881 (cleaned up). "Put another way," *Fulton* said, "so long as the government can achieve its interests in a manner that does not burden religion, *it must do so*." *Id.* (emphasis added). Under that standard, Governor McMaster and HHS correctly concluded that a religious accommodation for Miracle Hill was necessary—because not accommodating Miracle Hill would fail strict scrutiny.

There is no compelling government interest justifying this burden on Miracle Hill. As *Fulton* explained, even when the nondiscrimination interest "is a weighty one," it cannot prevail where the government "offers no compelling reason why it has a particular interest in denying an exception to [the religious agency] while making them available to others." *Id.* at 1882 Just so here, where South Carolina law (to say nothing of the HHS regulations) lacks any generally applicable nondiscrimination rule applying to CPAs when they consider potential foster families. *Supra* 16–17.

Moreover, just as in *Fulton*, accommodating Miracle Hill here "seems likely to increase, not reduce, the number of available foster parents." 141 S. Ct. at 1882; *see also* Ex B. (Lowe Dep. 248:4–11) ("I would agree" that certain CPAs specialize in recruiting potential foster parents from "their faith community," and that is valuable); *id.* at 220; Ex. Z (showing increasing number of South Carolina foster parents since Miracle Hill's accommodation); Ex. CC (Brodzinsky Dep.

111:7–12) (plaintiffs' expert conceding he has no studies or data showing a reduction in foster families); Ex. E (Staudt Dep. 143:5 to 144:11) (faith-based CPA's distinctiveness can result in a greater number of foster homes).[7] Indeed, the evidence shows that South Carolina "families [are] aware that there are a number of agencies that are available"—including at least 15 serving those in the Upstate regardless of religion. *See* Ex. B (Lowe Dep. 176:9–10); *see also id.* at 191–97, 240; Ex. DD (Ltr. Listing Upstate CPAs (Feb. 18, 2022)). "[O]r," as families are also aware, "they could consult [directly] with the Department of Social Services." Ex. B (Lowe Dep. 176:11–13). In fact, the State is undisputedly the largest license provider. *Supra* 6–7. South Carolina issues licenses directly, without private agency involvement—and most foster parents choose this option. *See* Ex. K at 1 (listing number of licenses by agency). That means families always have an alternative which cannot claim any religious accommodation: the State itself. Plaintiffs do not dispute this.

In sum, here, as in Philadelphia, there is "no compelling reason" to deny a religious accommodation. *Fulton*, 141 S. Ct. at 1882. Therefore, as the Supreme Court held, the government "must do so." *Id.* at 1881.

### B.     Plaintiffs' counterarguments to *Fulton* are meritless.

Plaintiffs' core argument is that it "does not violate any provision of the United States Constitution, or any federal or state law," to "[r]equir[e] state-contracted, government-funded CPAs, like Miracle Hill, to comply with nondiscrimination requirements." Compl. ¶ 111 (Count I), ECF No. 1. But *Fulton* said the opposite: The Free Exercise Clause is triggered by "putting [a

---

[7] Plaintiffs' claim the opposite, but this belies the evidence and is, at best, unsupportable speculation. *See Smith v. Schlage Lock Co.*, LLC, 986 F.3d 482, 486 (4th Cir. 2021) ("Of course, '[u]nsupported speculation is not sufficient to defeat a summary judgment motion.'" (citation omitted)). As the SCDSS data expert put it, supporting Plaintiffs' speculation with evidence would require "a huge research, statistical-type study to see if there's an association, . . . [and] I don't even know how they would control all the variables." Ex. BB (Tester Dep. 37:16–20).

religious foster agency] to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Fulton*, 141 S. Ct. at 1876. To agree with Plaintiffs is, by necessity, to disagree with *Fulton*. The Supreme Court even warned in *Kennedy* that the Establishment Clause should be read consistently with the Free Exercise Clause: "A natural reading of [the First Amendment] would seem to suggest the Clauses have complimentary purposes, not warring ones where one Clause is always sure to prevail over the others." *Kennedy*, 142 S. Ct. at 2426 (cleaned up).

Plaintiffs' only response is to claim that *Fulton* "did not speak to" their Establishment Clause arguments. ECF No. 180 at 12. Far from it. The ACLU in *Fulton* raised the *same* Establishment Clause arguments at issue here. They argued at length that it "would violate the Establishment Clause" for "the City to permit agencies to use religious eligibility criteria." Brief of Intervenors-Appellees at 40, *Fulton v. Philadelphia*, 922 F.3d 140 (3rd Cir. 2019). When Catholic Social Services petitioned the Supreme Court for review, however, Plaintiffs' counsel relegated the Establishment Clause to a footnote, and repackaged their Establishment Clause arguments as reasons why Philadelphia should not be required to accommodate CSS. *See* ACLU Opp. to Pet. for Cert. at 26 n.12, https://perma.cc/GS3Q-BU2K (Establishment Clause argument). Their *amici* made the Establishment Clause arguments. *See, e.g.*, Church-State Scholars Br. at 14 & n.5, https://perma.cc/4XAZ-2FX3 (citing this case and claiming that accommodating Catholic Social Services results in "material" and "dignitary" harms prohibited by the Establishment and Free Exercise Clauses). Revised labels do not require a different result, because the compelling interest test already incorporates Establishment Clause concerns. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 729 n.37 (2014). The Court should follow *Fulton* and reject the recycled arguments from Plaintiffs' counsel.

*Fulton* foreclosed each of Plaintiffs' repackaged "Establishment Clause" arguments. *Fulton* confirmed that accommodating religious agencies is not tantamount to unconstitutional preferencing or endorsement. *Compare* 141 S. Ct. at 1876 (declining to impute the "religious exercise of CSS" to Philadelphia); *with* Compl. ¶¶ 104–06, ECF No. 1 (alleging the accommodation of Miracle Hill "prefer[s] certain religious beliefs over others and over nonreligion"). And *Fulton* confirmed that the government's interest in "equal treatment" of "prospective foster parents," while "weighty," could not justify "denying CSS an exception for its religious exercise," particularly when other nearby agencies could provide the same licensing function. *Compare Fulton*, 141 S. Ct. at 1875, 1882 *with* Compl. ¶¶ 104–106, ECF No. 1 (alleging the Miracle Hill accommodation "privileg[es] religion to the detriment of third parties—both prospective foster families and children in foster care.").[8]

Although it is no longer relevant whether public funds are involved, since Miracle Hill no longer receives public funds, *Fulton* rejected that argument, too. Earlier in the case, Plaintiffs argued that public funding of religious foster agencies means that government funds are used for a religious purpose. *Compare Fulton*, 141 S. Ct. at 1882 (CSS is not "impos[ing] beliefs on anyone"); *with* ECF No. 180 at 12 (claiming Miracle Hill is "using government funds for religious purposes and activities").

Ultimately, *Fulton* confirmed that accommodating religious agencies in the foster care system does not establish religion: Here, as in *Fulton*, the CPA "does not seek to impose [its]

---

[8] This argument is a direct rejection of that made by counsel for Plaintiffs here, who argued in an *amicus* brief in *Fulton* that reversing the Third Circuit—as the Supreme Court did—would cause "a tidal wave of similar requests" from all manner of federal antidiscrimination statutes. *See* Members of Congress Br. in support of Respondents at 4 (https://perma.cc/37GE-AJC5). This case—where South Carolina sought a waiver for exactly one entity—confirms that these fears were significantly overstated, and *Fulton* was right to set aside these speculative concerns.

beliefs on anyone else." *Fulton*, 141 S. Ct. at 1882. Accommodation is not religious imposition. *Id.* Nor does partnering with religious foster agencies impermissibly entangle church and state—instead, the "foster care system depends on cooperation between the City and private foster agencies." *Id.* at 1875. "States and cities were latecomers to this field, and even today, they typically leave most of the work to private agencies." *Id.* at 1925 (Alito, J., concurring); *infra* 25–29 (detailing history of religious foster care in America).

The Supreme Court was well aware of the countervailing Establishment Clause arguments in *Fulton* and rejected them at every turn—indeed, they did not win a single vote. On the fully developed record, *Fulton* applies, and the State Defendants are entitled to summary judgment.

### III. The Establishment Clause permits Defendants to accommodate Miracle Hill's religious exercise.

Plaintiffs' claims fail for a second, independent reason: they have not come close to showing that South Carolina violated the Establishment Clause. This is especially true now, since Miracle Hill no longer receives government funding. And it was true even before that change: The Supreme Court has long recognized that religious accommodations "follow[] the best of our traditions," *Zorach*, 343 U.S. at 314. Consistent with this tradition, South Carolina and ten other States have adopted explicit policies to accommodate religious exercise by CPAs. Plaintiffs seek to invalidate all such laws and contravene decades of precedent on religious accommodations.

#### A. The Establishment Clause claims are moot.

Plaintiffs' case hinges on SCDSS *funding* Miracle Hill. Compl. ¶¶ 99, 102–04, ECF No. 1 ("[T]he State Defendants are using government funds for religious purposes and activities."); Ex. V (Rogers Dep. 82:24–83:4) (confirming that there would be no constitutional violation if Miracle Hill did not receive government funding); Ex. T (Welch Dep. 19:4 to 20:10) (same). But Miracle Hill has never received government funding to support, reimburse, or otherwise fund its foster care

recruitment and screening. Ex. F (Lehman Tr. 260:10–15). Indeed, during discovery SCDSS confirmed that a CPA's "expenses and efforts to recruit foster parents is not in any way reimbursed or funded by state or federal dollars." Ex. A (Lowe Dep. 205:18–22) ("correct"). And on July 1, 2021 (the start of the State's fiscal year), Miracle Hill voluntarily declined to receive the administrative fee that normally compensates CPAs for their services. Ex. A (Barton Tr. 277:16). Plaintiffs' claims must therefore be dismissed because they rely on factual allegations which proved to be untrue—and if they had ever been true, the issue is now moot.[9]

### B.   Accommodating Miracle Hill does not establish religion.

To show an Establishment Clause violation, Plaintiffs must prove that accommodating Miracle Hill is contrary to our Nation's longstanding tradition of religious accommodation. They have not made, and cannot make, this showing. The historical record shows that religious ministries long partnered with the government to serve children in need through orphanages and foster care programs. What is more, the Fourth Circuit has repeatedly upheld government accommodations of private religious exercise in many contexts: land use exemptions for houses of worship, exemptions from day care regulations for churches, Affordable Care Act exemptions for religious ministries, protection for the religious exercise of prison inmates, and religious accommodations for public school students.[10] Indeed, Plaintiffs would have to go back 30 years to

---

[9] There is no question that private, unfunded religious exercise cannot be attributed to the government, and Plaintiffs have not alleged otherwise. *See New Hope Fam. Servs., Inc. v. Poole*, __ F. Supp. 3d __ , 2022 WL 4094540, at *4 (N.D.N.Y. Sept. 6, 2022) (rejecting, on remand from the Second Circuit, argument that private religious foster agency's private unfunded speech can be attributed to the state foster care system).

[10] *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 101 (4th Cir. 2013) (upholding religious exemptions in Affordable Care Act); *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 610 (4th Cir. 2012) (upholding released-time accommodation in schools); *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283 (4th Cir. 2000) (upholding land use exemption for religious

find any case in which the Fourth Circuit struck down the government's attempt to lift a regulatory burden on religion.[11] South Carolina's protection for religious CPAs fits within this long tradition of constitutional accommodation. Because Defendants' actions both comport with the historical record and merely lift a regulatory burden on a religious organization, they do not violate the Establishment Clause.

### 1. Plaintiffs' arguments have no basis in historical practices and understandings of religious establishment.

The Supreme Court this past term held that the *Lemon* test is not good law. As the Court explained, *Lemon*'s "'shortcomings'" became so "'apparent' that this Court long ago abandoned *Lemon*." *Kennedy*, 142 S. Ct. at 2427 (quoting *American Legion*, 139 S. Ct. at 2079–81). *Kennedy* further confirmed that the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id.* (cleaned up). And the Court held that "[i]n place of *Lemon* and the endorsement test, . . . the Establishment Clause must be interpreted by 'reference to historical practices and understandings' at the time of the founding." *Id.* at 2428 (quoting *Town of Greece,* 572 U.S. at 576); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022) ("[W]hen a litigant claims a violation of his rights under the Establishment Clause, Members of this Court 'loo[k] to history for guidance.'") (second alteration in original) (quoting *Am. Legion*, 139 S. Ct. at 2087)). This approach, the Court explained, "has long represented the rule rather than some

---

schools); *Koenick v. Felton*, 190 F.3d 259, 261 (4th Cir. 1999) (upholding public school holiday for Easter); *Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church*, 846 F.2d 260, 264 (4th Cir. 1988) (upholding regulatory exemption for church-run day cares); *Madison v. Riter*, 355 F.3d 310, 317 (4th Cir. 2003) (upholding RLUIPA protection for prisoners); *Smith v. Smith*, 523 F.2d 121, 125 (4th Cir. 1975) (upholding released-time accommodation).

[11] In *Finlator v. Powers*, 902 F.2d 1158, 1159 (4th Cir. 1990), the Fourth Circuit struck down a tax exemption that applied only to the Bible. That is a far cry from this case, where the Executive Order and state law protect religious exercise for all faith groups.

'exception' within the 'Court's Establishment Clause jurisprudence.'" *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece*, 572 U.S. at 575).

Applying this "analysis focused on original meaning and history," "the line [courts] must draw between the permissible and the impermissible [under the Establishment Clause] is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Kennedy*, 142 S. Ct. at 2428 (*quoting Town of Greece*, 572 U.S. at 577). Here, history shows religious ministries pioneering both orphanages and foster care across the United States, followed by a long tradition of partnership between religious ministries and the government. This confirms that continuing to accommodate religious ministries does not violate the Establishment Clause. *Id.* at 2428. Nor do such religious accommodations implicate any of the concerns associated with "established" churches at the time of the founding. *See Kennedy*, 142 S. Ct. at 2429 (analyzing government actions in light of the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment"); *see also* Hon. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131–80 (2003) (describing hallmarks).

In the mid-1700s, the Catholic Church began providing homes for children in need across the United States. *See*, *e.g.*, *Fulton*, 141 S. Ct. at 1874–75 (noting that "[t]he Catholic Church has served the needy children of Philadelphia for over two centuries," and highlighting that history); Stephanie H. Barclay, *Spheres of Liberty and Free Exercise: Lessons for* Fulton *from Jefferson's Correspondence with Ursuline Nuns*, Reason (November 2, 2020), https://perma.cc/YN6H-79WP (documenting long history of religious foster care agencies in the United States); *see also Wilder v. Sugarman*, 385 F. Supp. 1013, 1019–21 (S.D.N.Y. 1974) ("The history of the child welfare system in New York is necessarily intertwined with the religious history and cultural development

of the State.").[12] Shortly thereafter, Protestant and Jewish orphanages began to do the same. *See* Timothy A. Hacsi, *Second Home: Orphan Asylums and Poor Families in America* 19, 25 (1997) (documenting Protestant and Jewish orphanages emerging in the 1800s).

Religious institutions also spearheaded what we now know as the foster care system. "[T]he history of private providers in the foster care system . . . depicts a privately operated child welfare system that preceded the entry of public agency participation." Susan Vivian Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 OHIO ST. L.J. 1295, 1298 (1999); *see* U.S. Dep't of Health & Hum. Servs., *Evolving Roles of Public and Private Agencies in Privatized Child Welfare Systems,* at 2 (March 2008), bit.ly/2T0GMg6 ("[C]hild welfare services actually originated in the private sector."). Beginning in the 1850s, a Methodist theologian instituted a "placing out" program in New York that sent children "to live, often permanently, with rural families in nearby states and eventually in farther away parts of the Midwest, the South, and the West." Rymph, *supra*, at 21. Over the next 50 years, this program "had been established in most of the other major eastern cities," with "40,000 homeless or destitute children" given homes. McGowan, *supra*, at 14. The Children's Home Society movement also emerged in 1883, which consisted of "statewide child-placing agencies under Protestant auspices . . . designed to provide free foster homes for dependent children." *Id.* And, by 1916, "there were 36 Children's Home

---

[12] *See also* Brenda G. McGowan, *Historical Evolution of Child Welfare Services*, *in* CHILD WELFARE FOR THE TWENTY-FIRST CENTURY: A HANDBOOK OF PRACTICES, POLICIES, AND PROGRAMS 10, 12 (Gerald P. Mallon & Peg McCartt Hess eds., 2005) ("A few private institutions for orphans were also established during the early colonial period. The first such orphanage in the United States was the Ursuline Convent," a Catholic institution, "founded in New Orleans in 1727"); Brief Amici Curiae of the United States Conference of Catholic Bishops and Pennsylvania Catholic Conference in Support of Petitioners at 12–15, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (No. 19-123) (listing examples of Catholic orphanages founded in the United States from the nineteenth and twentieth centuries); Catherine E. Rymph, *Raising Government Children: A History of Foster Care and the American Welfare State* 18 (2017) ("Almost half of children in orphanages at the end of the nineteenth century were living in Catholic institutions.").

Societies, located primarily in midwestern and southern states." *Id.*

It was not until after the Civil War that county- and state-based orphan asylums "appeared in meaningful numbers for the first time." Hacsi, *supra*, at 27. "Most of the states drifted into the policy of aiding private institutions because they were unwilling to accept responsibility for the care of the dependent, and because it seemed to be cheaper to grant some aid to private institutions than for the state to provide public care." McGowan, *supra*, at 18 (quoting Grace Abbott, *The Child and the State* 15 (1938)). For example, in New York, "local communities paid a per capita subsidy to voluntary, primarily sectarian, agencies for the care of dependent children." *Id.*; *see* Hacsi, *supra*, at 31 ("Sectarian asylums, including Catholic institutions, could … receive public funds from any level of government that chose to distribute them."); *see also Wilder*, 385 F. Supp. at 1020 ("[Throughout the 1880s], the number of private institutions throughout the State of New York increased dramatically from 132 institutions carrying for 11,907 children to 204 institutions carrying for 23,592 children in 1885. By 1888, in New York City alone, 15,000 children were being cared for in private institutions."). Private orphan asylums also received public funding in Louisiana, Connecticut, and California, as did orphanages in North Carolina, including the Masons' Oxford Orphan Asylum. Hacsi, *supra*, at 31.

South Carolina's history mirrors the Nation's. For example, Charleston "supported its orphaned and destitute children through its two Anglican parishes, St. Philip's (founded 1683) and daughter congregation St. Michael's (first building dedicated 1761)." John E. Murray, *The Charleston Orphan House: Children's Lives in the First Public Orphanage in America* 13 (2013). In 1790, the Charleston City Council decided to open the Charleston Orphan House—the first publicly managed orphanage in the United States. Rymph, *supra*, at 18. As a decedent institution of St. Philip's Church, the publicly run Orphan House maintained a strong religious character. *See*

Murray, *supra*, at 27. Beginning in 1791, the commissioners, staff, and children of the Orphan House attended weekly services at a variety of Protestant churches, along with St. Mary's Catholic Church and Beth Elohim Synagogue, in order to raise funds for operating expenses and the construction of a new orphanage building. *Id.* at 17–18, 34. Throughout the nineteenth century, the Orphan House's charge was to enable each dependent child to become "a useful, virtuous, and religious member of Society." *Id.* at 21. This mission was reflected by the Orphan House's chapel, which opened in 1802. *Id.* at 35. With Bible verses and depictions of Christ adorning the walls, the Orphan House commissioners "contacted representatives of the Episcopal, Independent [Congregational], Presbyterian, Baptist, German Lutheran, and Catholic churches to come to the chapel in rotating order and 'perform divine service.'" *Id.* at 34–36 (alteration in original).

In addition to running the Orphan House, Charleston also partnered with several religious organizations to care for dependent children. In 1831, the Sisters of the Order of our Ladies of Mercy opened a home in Charleston to care for orphans. 5 *The Quarterly Bulletin: State Board of Charities and Corrections of South Carolina* 9 (1919). While this orphanage was initially supported through private charity, the Charleston City Council appropriated $6,000 annually to support no less than 75 orphans, beginning in the 1870s through 1900. *Id.*; Newton B. Jones, *The Charleston Orphan House, 1860–1876* in THE SOUTH CAROLINA HISTORICAL MAGAZINE, October 1961, at 213 & n.22; Sisters of Charity of our Ladies of Mercy, *Bishop John England, Our Founder* (last accessed Oct. 13, 2022), https://perma.cc/KUC2-6DFH. Similarly, the Holy Communion Church Institute cared for orphans in Charleston and began receiving public financial aid from the city in 1874. Jones, *supra*, at 213 & n.22. And during the Civil War, the Orphan House partnered with the Episcopal Church Home, taking on 22 children from the latter institution at a temporary location due to military bombardments. *Id.* at 210.

This history confirms that, since the founding era, governments have worked alongside religious foster agencies to support and care for children in need. *See Fulton*, 141 S. Ct. at 1874–75 (recounting history of "cooperation between the City and private foster agencies"). This history of positive cooperation between governments and religious agencies finding homes for children also confirms that there is no Establishment Clause violation here, when South Carolina's actions are consistent with historical practice and tradition. *Kennedy*, 142 S. Ct. at 2428; *see American Legion*, 139 S. Ct. at 2089 ("[W]here categories of … practices with a longstanding history follow in [the traditions of the founding era], they are likewise constitutional.").

### 2. Government accommodation of private religious exercise does not violate the Establishment Clause.

Plaintiffs' claims also fail because accommodating private religious exercise does not violate the Establishment Clause. The Supreme Court and Fourth Circuit have repeatedly upheld government actions that lift regulatory burdens on religious exercise. The "secular goal of exempting religious exercise from regulatory burdens in a neutral fashion, as distinguished from advancing religion in any sense, is indeed permissible under the Establishment Clause," even where government "has no constitutional duty to remove or to mitigate the government-imposed burdens." *Madison v. Riter*, 355 F.3d 310, 317 (4th Cir. 2003). To rule otherwise would imperil the laws of ten States, which explicitly accommodate religious CPAs,[13] as well as state and federal laws protecting religious exercise.

That is why the Supreme Court has repeatedly upheld religious exemptions and

---

[13] *See* Ala. Code §§ 26-10D-4(1–2), 26-10D-3(1), 26-10D-5(a) (Alabama); Kan. Stat. Ann. § 60-5322(b–c) (Kansas); Mich. Comp. Laws §§ 722.124e(2–3) & (7)(a), 710.23g, 400.5a (Michigan); Miss. Code Ann. §§ 11-62-5(2), 11-62-7(2) (Mississippi); N.D. Cent. Code §§ 50-12-03, 50-12-07.1 (North Dakota); Okla. Stat. tit. 10A, § 1-8-112(A–B) (Oklahoma); S.D. Codified Laws §§ 26-6-38, 26-6-39, 26-6-40 (South Dakota); Tenn. Code Ann. § 36-1-101 (Tennessee); Tex. Hum. Res. Code Ann. §§ 45.002(1), 45.004 (Texas); Va. Code Ann. § 63.2-1709.3(A–B) (Virginia).

accommodations. For example, when Congress enacted Title VII, it exempted religious organizations from many claims of employment discrimination, down to a janitor at a church-owned gym. He challenged Title VII under the Establishment Clause. But the Supreme Court upheld the exemption, even when its application exceeded the accommodation allowed by the Free Exercise Clause: "'This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' It is well established, too, that '[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334 (1987) (internal quotation and citation omitted). The Court upheld this protection even though the resulting burden on employees was heavy—they lost their jobs. *See also Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022) (neutral government aid program that includes religious recipients through private choice of beneficiaries does not violate Establishment Clause); *Hobbie*, 480 U.S. at 144–45 ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."); *Gillette v. United States*, 401 U.S. 437, 453 (1971) ("[I]t is hardly impermissible for Congress to attempt to accommodate free exercise values.").

The Supreme Court's unanimous decision in *Cutter v. Wilkinson* to uphold RLUIPA, which protects the religious exercise of prisoners, similarly confirms this point. Justice Ginsburg, writing for a unanimous Court, explained that RLUIPA "qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause." 544 U.S. 709, 719–20 (2005). If the Court ruled otherwise, "all manner of religious accommodations would fall." *Id.* at 724. Here, too, accepting Plaintiffs' arguments would cause all manner of religious

accommodations to fall—starting with the laws of the ten States that accommodate religious child welfare providers. *See also Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664 (1970) (tax exemptions for religious entities do not violate the Establishment Clause); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2396 (2020) (Alito, J., concurring) ("there is no basis for" claim that religious accommodation violates the Establishment Clause).

What is more, the accommodation here comes nowhere close to the outer bounds of religious accommodation identified by the Supreme Court in *Cutter*. There, the Court identified three Establishment Clause limits on religious accommodation: (1) An unyielding religious preference; (2) favoring a particular denomination; and (3) not considering harms to others. *See Cutter*, 544 U.S. at 719–20. But just as *Cutter* held, there is "no cause to believe that" an accommodation afforded under the compelling-interest analysis—what Governor McMaster and HHS used here—would be problematic. *Id.* at 722–23.

Absent some extraordinary circumstance—so extraordinary the Supreme Court and Fourth Circuit have not seen one in 30 years—government accommodation of religious exercise is permissible under the Establishment Clause. *Supra* n.10 (collecting Fourth Circuit cases). Plaintiffs point to a trio of cases from the 1980s finding that accommodation crossed the line, but none of those cases is comparable. In *Larkin v. Grendel's Den*, the government granted a religious organization "unilateral and absolute power" to block private entities from obtaining a liquor license. 459 U.S. 116, 127 (1982). Here, neither Miracle Hill nor any other private agency can unilaterally block a family from becoming foster or adoptive parents. Multiple agencies are available, and SCDSS welcomes all families—regardless of their religion or sexual orientation. Indeed, SCDDS conducts active outreach and recruitment efforts to encourage same-sex couples to become foster parents and contact the state to do so. *See* Ex. A (Barton Dep. 51:18 to 52:20);

Ex. B (Lowe Dep. 188:5–19, 240:3–12); Ex. E (Staudt Dep. 58:7–11, 124:2–25, 92:12 to 93:8).

In *Board of Education of Kiryas Joel v. Grumet*, a badly splintered decision, the Supreme Court struck down a statute which "singl[ed] out a particular religious sect for special treatment," and there was no evidence that other religious groups would be treated similarly. 512 U.S. 687, 706 (1994). But here, Governor McMaster's executive order is not limited to any one agency and instead ensures that the religious beliefs of diverse CPAs are accommodated. And in *Estate of Thornton*, the Supreme Court struck down a state employment statute that created an "unyielding weighting in favor of Sabbath observers over all other interests," which *Amos* later distinguished because it "had given the force of law to the employee's designation of a Sabbath day . . . ." *Amos*, 483 U.S. at 337 n.15. Here, as explained above, no private agency is given such power. Ex. N (Exec. Order No. 2018-12 (Mar. 13, 2018)). The Order does not, like *Thornton*, give "force of law" to religious exercise—if prospective parents are dissatisfied with a religious agency, they can simply seek out another agency, or even SCDSS itself.

Plaintiffs can point to no case—because there isn't one—holding that it violates the Establishment Clause to allow a religious foster agency to partner with members of its same faith. Plaintiffs want this Court to be the first.[14] This accommodation is ordinary. It follows the practice of the majority of states, which continue to partner with religious agencies. And it is consistent

---

[14] Previously, Plaintiffs pointed to *Dumont v. Lyon* as "closely analogous." *See* Pltfs' Opp'n to Mot. to Dismiss at 2–3 (Sept. 27, 2019), ECF No. 61. There, a district court allowed Establishment Clause claims identical to those made here—the parties share the same counsel—to go forward. *Dumont v. Lyon*, 341 F. Supp. 3d 706, 753 (E.D. Mich. 2018). That case settled prior to *Fulton*. But, after *Fulton*, Michigan admitted that it had violated the First Amendment by excluding a religious agency, and a federal court agreed. *See* Stipulated Order, *Buck v. Gordon*, No. 19-286 (W.D. Mich. Jan. 26, 2022), ECF No. 113. The *Dumont* plaintiffs, represented by Plaintiffs' counsel here, subsequently acknowledged that they could no longer seek penalties for Michigan religious agencies, dismissing their request to reopen *Dumont* and stop the state from accommodating a Catholic agency. Withdrawal of Mot. to Reopen, *Dumont*, No. 17-13080 (E.D. Mich. Feb. 22, 2022), ECF No. 98.

with the only two appellate cases to address comparable accommodations. Both the Supreme Court in *Fulton* and the Second Circuit in *New Hope* ruled in favor of the religious agencies, concluding that the government couldn't exclude either agency based on its religious exercise. *Fulton*, 141 S. Ct. at 1882; *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 156 (2d Cir. 2020) (describing how the agency "uses prayer and religious literature in conducting the ... 'home study.'"). What is more, at least ten States have even gone a step further, passing laws to require protection of religious foster agencies. *Supra* 18 n.8. There is nothing unusual about South Carolina's decision to sometimes partner with private agencies and more often screen families itself—it is what many States have done and continue to do. Plaintiffs ask this Court to strike down a perfectly ordinary practice and constitutionally required accommodation, and throw the child welfare systems of numerous other States into peril in the process.

## C.    Miracle Hill's religious exercise cannot be attributed to South Carolina.

Plaintiffs' claims also fail for a more fundamental reason: the religious conduct Plaintiffs challenge cannot be attributed to the government and therefore cannot support their Establishment Clause arguments. The Supreme "Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bowen v. Kendrick*, 487 U.S. 589, 609 (1988). Accordingly, the Establishment Clause is violated only if "the government *itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 336–37; *see also Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 763–64 (1995) ("The test petitioners propose, which would attribute to a neutrally behaving government private religious expression, has no antecedent in our jurisprudence, and would better be called a 'transferred endorsement' test."). Indeed, the Supreme Court has repeatedly confirmed that only *government* action advancing religion can violate the Establishment Clause. *See*, *e.g.*, *Zelman v.*

*Simmons-Harris*, 536 U.S. 639, 652 (2002) (private religious exercise in neutral government aid program is "not readily subject to challenge under the Establishment Clause."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995) (highlighting the distinction between "government speech endorsing religion, which the Establishment Clause forbids," and "private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.").

Plaintiffs therefore must rely on the imputation of Miracle Hill's religious actions to the State. *See* Compl. ¶¶ 102–06, ECF No. 1. But this argument fails—as it did when Plaintiffs' counsel made the same argument in *Fulton*. Plaintiffs claim that "DSS has delegated to religious organizations including Miracle Hill the public function of providing foster care services to children in State custody, including recruiting and screening prospective foster parents." *Id*. ¶ 98. This "public function," according to Plaintiffs, means that it is illegal to "create and obtain" religious exceptions to discretionary nondiscrimination rules. *Id.* ¶ 60. Plaintiffs' counsel made the same claim in *Fulton*. *See, e.g.*, ACLU Br. at 44 (Catholic Social Services "cho[]se to take on the delegated governmental responsibility of being a gatekeeper for who can be certified as foster parents"), *available at* https://perma.cc/8MFP-3XVZ; *id.* at 12, 14. Indeed, in *Fulton*, the state actually delegated Catholic Social Services the power to certify families. *Fulton*, 141 S. Ct. at 1875 (citing 55 Pa. Code § 3700.61). Here, there is no such delegation, since only SCDSS grants licenses. *Supra* at 3. But even there, the Supreme Court recognized that Catholic Social Service remained a "private" agency, and that "the inclusion of a formal system of entirely discretionary exemptions" means the "non-discrimination requirement [is] not generally applicable," so religious accommodations "must" be granted absent a compelling reason. *Fulton* at 1878, 1881. That's exactly what Governor McMaster and HHS did here.

Moreover, there is no legal basis to claim that Miracle Hill is, itself, South Carolina. The

State's foster care contracts confirm that a CPA "is an independent Contractor and does not act as an agent, servant, or employee of SCDSS or the State of South Carolina in the performance of this contract." Ex. D at 13; *see also Fulton*, 141 S. Ct. at 1878 (rejecting argument that managerial role of government makes them responsible for conduct of private entities); *Milburn v. Anne Arundel Cty. Dept. of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989) ("The care of foster children is not traditionally the exclusive prerogative of the State."); *Leshko v. Servis*, 423 F.3d 337, 343–344 (3d Cir. 2005) ("No aspect of providing care to foster children in Pennsylvania has ever been the exclusive province of the government."); *Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (same). And discovery further confirmed that the State does not endorse or favor religious exercise, encourage, facilitate, or permit proselytization, or impermissibly favor any one foster agency over another. *Supra* 10–11. There is thus no basis on which this Court could find that Miracle Hill's religious conduct was adopted or endorsed by the State. *See Fulton*, 141 S. Ct. at 1881 (rejecting argument that religious foster agency is a public accommodation, much less an arm of the state); *id.* at 1925–26 (Alito, J., concurring) (same).

## IV.    There is no Equal Protection violation.

The Court has already dismissed Plaintiffs' Equal Protection claims based upon religious classification, leaving only the sexual orientation discrimination claims. This claim fails for at least two reasons.[15] First, Plaintiffs complain about the actions of Miracle Hill, a private religious agency, which cannot be attributed to the State. Second, South Carolina's accommodation of Miracle Hill easily satisfies rational basis review.

---

[15] Additionally, neither the U.S. Supreme Court nor the Fourth Circuit have ever held that sexual orientation is a "suspect or quasi-suspect classification"—the threshold for heightened scrutiny under the Equal Protection Clause. *See Bostic v. Schaefer*, 760 F.3d 352, 375 n.6 (4th Cir. 2014) (declining to revisit Fourth Circuit cases holding sexual orientation is not a suspect classification).

## A.    Decisions of private, third parties are not attributable to South Carolina.

First, it is important to clarify what Plaintiffs challenge. To allege an Equal Protection violation, Plaintiffs must identify *government* action—not private action—that they believe violates the Clause. But Plaintiffs here challenge the conduct of a private party, Miracle Hill—not of South Carolina. Compl. ¶¶ 129, 130, ECF No. 1 (complaining only that the State "authorize[d]" Miracle Hill's private actions, not that the State itself engaged in any discriminatory conduct). Accordingly, Plaintiffs must show that Miracle Hill's actions are in fact state action. *See Edmonson v. Leesville Concrete Co. Inc.*, 500 U.S. 614, 619 (1991); *Cox v. Duke Energy Inc.*, 876 F.3d 625, 632 (4th Cir. 2017) ("Merely private conduct, no matter how discriminatory or wrongful, is excluded from the reach of [42 U.S.C.] § 1983." (citation and internal quotation marks omitted)).

On this score, the Fourth Circuit and this Court have consistently concluded that private parties providing foster care services are not state actors. *See, e.g., Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *Pullings v. Jackson*, No. 2:07-0912-MBS, 2007 WL 1726528, at *3 (D.S.C. June 13, 2007); *see also Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 392 (4th Cir. 1990).

Further, the Fourth Circuit has held that actions by private parties violate the Equal Protection Clause only when "there is a 'sufficiently close nexus' between the defendant's challenged action and the state so that the challenged action 'may be fairly treated as that of the State itself.'" *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 115 (4th Cir. 2022). This inquiry can be satisfied only if "(1) [the state] is required under its constitution" to engage in certain conduct; "(2) [the state] has fulfilled this duty in part by creating and funding" entities to that end; "and (3) [the state] has exercised its sovereign prerogative to treat these state-created and state-funded" entities "as public institutions that perform [a] traditionally exclusive government function." *Id.* at

122 (holding that charter school was state actor).

Here, the test is not met. Religious foster agencies are not created by South Carolina, and they do not depend upon public funds. In *Peltier*, the schools were created by a special charter approved and granted by a county board, the school was a "public school" by statute, and its employees were "public employees" entitled to public employee benefits. 37 F.4th at 117, 120 (citing N.C. Gen. Stat. §§ 115C-218.15(a), 115C-218.90(a)(4)). But here, South Carolina law presumes the preexistence of various child welfare agencies and governs religious agencies only to a limited extent. *See*, *e.g.*, S.C. Code Ann. § 63-11-20(A)(1) ("This article does not apply to: (1) child welfare agencies operating under the active supervision of a governing board representing an established religious denomination, except as these agencies voluntarily assume the obligations and acquire the rights provided by this article."). And in Miracle Hill's case, its employees are private, not public. Nor does South Carolina maintain detailed oversight of the recruitment or screening process of private agencies; instead, SCDSS makes its own independent licensing decision when a family is submitted for consideration. State Defendants are not responsible for the actions of Miracle Hill.

Finally—and fatally—Miracle Hill's foster care work is simply not a traditional government function. *See Peltier*, 37 F.4th at 120 ("[E]valuating whether a private entity's conduct amounts to state action" requires identifying "the specific conduct of which the plaintiff complains to determine whether the conduct is fairly attributable to the state." (cleaned up)). To the contrary, Miracle Hill's work—the assisting and supporting of families—has never been the "exclusive prerogative" of the State. This work has historically been performed by private actors and continues to be today. *Supra* 25–29. As the Supreme Court has already held, "lifting a regulation" that burdens religious exercise does not give another private party a cause of action against a

government. *See Amos*, 483 U.S. at 337–38 ("Where . . . government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities."). This case is thus a far cry from what the Fourth Circuit has held to be state action. Were this Court to hold otherwise, it would jeopardize the "long history of cooperation and interdependence between governments and charitable or religious organizations." *Bowen*, 487 U.S. at 609.

**B.      South Carolina's accommodation of Miracle Hill easily satisfies rational basis review.**

Accordingly, rational basis review applies, making the only remaining question: whether South Carolina's own actions are rationally related to a legitimate state interest. Of course they are. The Governor's Order had the purpose of increasing options for foster placement by maximizing the number and diversity of CPAs; it also accommodated religious exercise. *See Cutter*, 544 U.S. at 720 (approving government purpose of "alleviat[ing] exceptional government-created burdens on private religious exercise"); *Fulton*, 141 S. Ct. at 1882 ("[I]ncluding CSS in the program seems likely to increase, not reduce, the number of available foster parents."). These are legitimate government interests. *United States v. Timms*, 664 F.3d 436, 447 (4th Cir. 2012) (government action "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). "Under this standard, a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Pulte Homes Corp. v. Montgomery Cnty.*, 909 F.3d 685, 693 (4th Cir. 2018). "Choices like those challenged here . . . 'may be based on rational speculation unsupported by evidence or empirical data' . . . [and] 'must be upheld against equal protection challenge if there

is any reasonably conceivable state of facts that could provide a rational basis . . . .'" *Id.* at 693 (citations omitted). Plaintiffs' Equal Protection Clause claim must therefore be dismissed.

CONCLUSION

For the reasons above, the Court should grant Defendants' motion for summary judgment.

Respectfully submitted

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ Miles E. Coleman
　　　Miles E. Coleman
　　　Federal Bar No. 11594
　　　E-Mail: miles.coleman@nelsonmullins.com
　　　2 W. Washington St. / Fourth Floor
　　　Greenville, SC 29201
　　　(864) 373-2352

　　　*Counsel for Governor Henry McMaster and*
　　　*Director Michael Leach*

OFFICE OF THE GOVERNOR
　　　Thomas A. Limehouse, Jr.
　　　Fed. Bar No. 12148
　　　*Chief Legal Counsel*
　　　Wm. Grayson Lambert
　　　Fed. Bar No. 11761
　　　*Senior Legal Counsel*
　　　Erica W. Shedd
　　　Fed. Bar No. 13206
　　　*Deputy Legal Counsel*
　　　E-Mail: tlimehouse@governor.sc.gov
　　　E-Mail: glambert@governor.sc.gov
　　　E-Mail: eshedd@governor.sc.gov
　　　South Carolina State House
　　　1100 Gervais Street
　　　Columbia, South Carolina 29201
　　　(803) 734-2100

　　　*Counsel for Governor Henry McMaster*

OFFICE OF THE ATTORNEY GENERAL

Robert D. Cook
*South Carolina Solicitor General*
Federal Bar No. 285
E-Mail: bcook@scag.gov
Post Office Box 11549
Columbia, SC 29211
(803) 734-3970

*Counsel for Governor Henry McMaster*

THE BECKET FUND FOR RELIGIOUS LIBERTY

Lori H. Windham*
William J. Haun*
Nicholas R. Reaves*
E-Mail: lwindham@becketlaw.org
E-Mail: whaun@becketlaw.org
E-Mail: nreaves@becketlaw.org
1919 Pennsylvania Ave. NW
Suite 400
Washington, D.C. 20006
(202) 955-0095

*\*Applications for admission* pro hac vice *forthcoming*

*Counsel for Governor Henry McMaster*

DAVIDSON, WREN & DEMASTERS, P.A.

Kenneth P. Woodington, #4741
William H. Davidson, II #425
1611 Devonshire Drive, 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568
wdavidson@dml-law.com
kwoodington@dml-law.com
(803) 806-8222

*Counsel for Director Michael Leach*

November 17, 2022
Greenville, South Carolina