*Rogers et al. v. U.S. Dept. of Health and Human Servs., et al.*

# Exhibit B

**to Governor Henry McMaster's and Michael Leach's Motion for Summary Judgment and Memorandum in Support Thereof**

**Excerpts from Deposition of Jacqueline Lowe**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH CAROLINA
 2                  GREENVILLE DIVISION
       -----------------------------------------X
 3
       EDEN ROGERS and
 4
       BRANDY WELCH,
 5
                     Plaintiffs,
 6
            vs.               CASE NO. 6:19-cv-01567-TMC
 7
       UNITED STATES DEPARTMENT OF HEALTH
 8     AND HUMAN SERVICES;
 9     ALEX AZAR, in his official capacity as SECRETARY of
       the UNITED STATES DEPARTMENT OF
10     HEALTH AND HUMAN SERVICES;
11     ADMINISTRATION FOR CHILDREN AND FAMILIES;
12     LYNN JOHNSON, in her official capacity as ASSISTANT
       SECRETARY of the ADMINISTRATION FOR CHILDREN AND
13     FAMILIES;
14     SCOTT LEKAN, in his official capacity as PRINCIPAL
       DEPUTY ASSISTANT SECRETARY of the ADMINISTRATION
15     FOR CHILDREN AND FAMILIES;
16     HENRY MCMASTER, in his official capacity as
       GOVERNOR of the STATE OF SOUTH CAROLINA;
17
       MICHAEL LEACH, in his official capacity as STATE
18     DIRECTOR of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
       SERVICES,
19
                     Defendants.
20     -----------------------------------------X
       VIDEOTAPED
21     DEPOSITION OF:   JACQUELINE LOWE
                        (APPEARING VIA VIRTUAL ZOOM)
22
       DATE:            June 3, 2021
23
       TIME:            9:27 AM
24
       REPORTED BY:     TERRI L. BRUSSEAU
25                      (APPEARING VIA VIRTUAL ZOOM)
```

Page 44

1    bed space or household members own care needs may

2    exceed what would be time available for care and

3    all that is in foster care.  So those would be some

4    of the reasons that a family may not be

5    recommended.

6         Q.   Okay.  And if -- if a CPA reaches that

7    determination during the process of working with

8    the family, does the CPA have to let DSS know,

9    basically say, hey, we have this family, we've

10   got -- you know, we went through the process but

11   we've determined not to recommend them?

12        A.   They do not, but they do have to inform

13   the family of the reasons why they would not be

14   recommended for licensure.

15        Q.   Okay.  And the -- sort of the role that

16   the private CPAs play and the support that they

17   provide prospective foster families throughout the

18   application process, is that -- is that pretty

19   uniform or pretty standard across CPAs or are there

20   differences in the type of support that one CPA

21   might offer versus another?

22        A.   I'm not aware of any differences for

23   the most part.  I do know that they would work with

24   the applicants providing the home visits,

25   interviewing licensure.  And then once the

Page 45

```
 1     applicant or family is licensed, going to the home,
 2     meeting with the family -- meeting with the family
 3     to offer support.
 4          Q.   Okay.  I'm just looking at the -- at my
 5     transcript here to make sure I got that.
 6          A.   Yeah, I saw where it was unstable.  I
 7     just didn't know if I needed to repeat.
 8          Q.   I see.  So I believe you said I'm not
 9     aware of any differences for the most part, I do
10     know that they would work with the applicants
11     providing the home visits, interviewing licensure,
12     and then once the applicant or family is licensed,
13     going to the home meeting with the family to offer
14     support.
15          A.   Yes.
16          Q.   So there's -- there are -- there's a
17     role that the CPAs fill after -- after the family
18     is licensed by DSS, is that right?
19          A.   That is correct.
20          Q.   And what -- how do they -- what type of
21     support do they typically provide after the
22     family's been licensed?
23          A.   As part of the ongoing licensing
24     process, the family has an assigned -- for DSS it's
25     a family support worker for the CPA that's a family
```

Page 46

1   worker that will visit with the family in the home

2   on a quarterly basis, but they may go more often

3   depending upon the needs of the family as well as

4   the children's place.

5           And it's an opportunity to meet with

6   the children, meet with the family to discuss any

7   concerns, to hear from them how things are going,

8   to answer questions, to make sure they are

9   connected to services and identify any unmet needs

10  to see what resources the family may need and then

11  also to see if there's been any changes that need

12  to be reported that may impact the continued

13  eligibility for licensure.  So it's a means of

14  staying connected with the family to offer support

15  to the family as well as to any children that might

16  be placed.

17          Q.   And is there a system in place by which

18  the CPA would report back to DSS about a given

19  family that has had a child placed with them and

20  how everything is going or is that not a formalized

21  process?

22          A.   It is a formalized process in a couple

23  of ways.  If there is a child placed, that there's

24  a foster care worker with the Department, so any

25  concerns about the child in the home will be

Page 176

1  asking in your personal capacity.  If a family who

2  is interested in being a foster family goes to a

3  CPA and faces discrimination in -- in that process,

4  they're turned away, can you necessarily count on

5  them to apply to be a foster parent through a

6  different CPA?

7             MR. COLEMAN:  Object to the form of the

8  question.

9             THE WITNESS:  Families are aware that

10 there are a number of agencies that are available

11 that they can apply through to become licensed or

12 that they could consult with the Department of

13 Social Services.

14 BY MS. JANSON:

15      Q.   Do you -- do you think families are

16 necessarily aware of the particular beliefs or

17 requirements of any given CPA?

18      A.    They may not be until they've either

19 done research or talked with others.  I think on

20 the surface, just with the name, they wouldn't know

21 about a specific agency.

22             MS. JANSON:  Okay.  I think we are -- I

23 think we are getting -- not making any promises,

24 but I think we're getting to the end, so thank you

25 very much for bearing -- bearing with me.  Okay.

Page 188

1          Q.    Is that -- do you know is that

2     University Ridge where all the state and county

3     offices are?

4          A.    Yes, that is correct.

5          Q.    Okay.  And you may have already said

6     this.  South Carolina DSS will gladly accept any

7     application from anyone who is qualified and who

8     wishes to be licensed as a foster parent without

9     regard to their religion, lack of religion, sexual

10     orientation or marital status, is that correct?

11          A.    That is correct.

12          Q.    So a person who applies -- a

13     prospective foster parent who applies with a CPA,

14     we use that figure of speech, they apply to or

15     apply with a CPA, really the application to be a

16     foster parent is submitted to DSS, right?

17          A.    To issue the license, that's correct.

18     DSS is the only state entity that can issue a

19     foster family license.

20          Q.    Okay.  And a CPA couldn't prevent

21     someone from being licensed even if they -- even if

22     the CPA didn't want to -- didn't want to work with

23     a particular person, they refer them to another

24     agency or to DSS, they can't prevent them from

25     getting licensed, can they?

Page 189

```
 1              A.    No.   An individual can go to any entity
 2       or to DSS.
 3              Q.    Okay.   And I think you said -- I think
 4       you said -- and I touched on this a second ago.   In
 5       or around July of 2020, for what sounds like a
 6       variety of reasons that you already touched on,
 7       that SCDSS has decided to focus on what you called
 8       kinship care, right?
 9              A.    That's correct.
10              Q.    And I think you said a family can, if
11       they want, however -- let me -- I didn't ask that
12       well.
13              Even when SCDSS has focused on kinship
14       care in the past year or so, a family who wants to
15       be licensed as a foster parent, not in the kinship
16       care but as a -- more generally as a foster parent,
17       can, if they want, still work directly with SCDSS,
18       is that right?
19              A.    What was that last part?   It went away.
20              Q.    It's still possible for a prospective
21       foster parent or couple to work directly with DSS,
22       is that right?
23              A.    Yes.  Yes.
24              Q.    So if -- if a prospective foster parent
25       can't or doesn't want to work with a CPA, they can
```

Page 190

```
 1    work with DSS?
 2           A.    They can.
 3           Q.    Even today?
 4           A.    Even today.
 5           Q.    And it's still -- has been and still is
 6    the policy of DSS that the decision of where a
 7    child in foster care will be placed, what foster
 8    parent's home that child will be placed in, that's
 9    DSS's decision, not the CPA's decision, right?
10           A.    That's correct.
11           Q.    Okay.  You might -- you probably
12    remember Exhibit 3.  It was a two-page like a table
13    or a chart with a lot of amounts.  It listed all I
14    think 28 CPAs and a whole bunch of different
15    amounts of funding over various periods of years.
16                 Do you remember we talked about that I
17    think early on --
18           A.    Yes.
19           Q.    -- today?  Okay.  I don't -- I don't
20    mean to be tedious, but I do want to go through a
21    couple of -- I don't think it will take super long,
22    but I know we came back to that document several
23    times and it may be that my note taking got a
24    little bit disjointed.  I just want to make sure
25    we -- we've covered all the bases there.
```

1              If you have it in front of you, that's

2      fine.  I don't think you need to pull it up in

3      front of you if you don't.

4              A.   I have it.

5              Q.   Basically -- okay.  Basically what I

6      want to do is I'm going to try to go through in

7      alphabetical order.  I just want to -- just so

8      that -- so we've got a clear record and so my own

9      notes can get clearer, figure out which CPAs are

10     operating in the upstate that offer nontherapeutic,

11     perhaps along with therapeutic care, whether they

12     have an office in the upstate and approximately how

13     long they've been licensed.

14              So I think we can -- we can run through

15     these hopefully without it being too tedious, but I

16     apologize in advance if it is a little bit

17     mechanical.  So I'm trying to go through them.

18              Church of God Home For Children.  They

19     offer nontherapeutic care and they have an office

20     in the upstate, right?

21              A.   Yes.

22              Q.   And they've been licensed I think you

23     said for maybe ten years or so, is that ballpark

24     correct?

25              A.   Yes.

Page 192

1           Q.   Okay.  Connie Maxwell Children's
2      Ministries, they are also in the upstate.  They
3      serve the upstate.  They have an office in the
4      upstate, offer nontherapeutic foster care and
5      they've been licensed for several decades, is that
6      correct?
7           A.   That is correct.
8           Q.   Epworth Children's Home serve in the
9      upstate, have an office in the upstate, offer
10     nontherapeutic foster care and they've been
11     licensed for several years?
12          A.   Several decades.  And they also have
13     nontherapeutic and therapeutic.
14          Q.   Okay.  Growing Home Southeast.  This is
15     over my notes are complete.  I think they serve the
16     upstate.  Do you know if they have an office in the
17     upstate?
18          A.   They do not have an office in the
19     upstate, but they do work statewide.
20          Q.   Okay.  And they do both therapeutic and
21     nontherapeutic, is that right?
22          A.   That's correct.
23          Q.   And they've been licensed for 15 years
24     or so?
25          A.   Or so, yes.

Page 193

1          Q.    Okay.   Lutheran Services Carolinas.
2     They serve the upstate, they don't have an office
3     in the upstate, but they offer nontherapeutic and
4     therapeutic and they've been licensed for a couple
5     decades?
6          A.    Correct.
7          Q.    Okay.
8          A.    Yes.
9          Q.    Miracle Hill Ministries, which we've
10    talked about, they have an office in the upstate,
11    they do nontherapeutic foster care, they've been
12    licensed for several decades and they serve the
13    upstate?
14         A.    Yes.
15         Q.    New Foundations Home For Children, I
16    believe they serve the upstate, have an office in
17    the upstate, offer nontherapeutical foster care and
18    been licensed for several years, is that right?
19         A.    Yes.   That is correct.
20         Q.    I think we're about halfway -- halfway
21    through the list.   Thanks for hanging with me.
22               Nightlight Christian Adoptions serve
23    the upstate, have an office in the upstate,
24    nontherapeutic foster care, and they've been
25    licensed for several years?

Page 194

1                A.   They've been licensed for several years

2       as an adoption agency and only most recently added

3       foster care services to their list.

4                Q.   Okay.  Do you know when -- when they

5       were licensed as a CPA to be foster care?

6                A.   It's probably been a couple of years,

7       not very long.

8                Q.   Okay.  Two to three, four years, that

9       ballpark?

10               A.   That ballpark, yes.

11               Q.   Okay.  South Carolina MENTOR serve the

12      upstate.  Do they have an office in the upstate, do

13      you know?

14               A.   They do.

15               Q.   Okay.  They offer nontherapeutic foster

16      care, have been licensed for several decades --

17               A.   Therapeutic --

18               Q.   -- is that right?

19               A.   Therapeutic and nontherapeutic services

20      are offered.

21               Q.   Okay.  South Carolina Youth Advocate or

22      SCYAP sometimes I think later referred to as, they

23      serve the upstate, they don't have an office in the

24      upstate, they do therapeutic and nontherapeutic and

25      they've been licensed for about 30 years, is that

Page 195

```
 1     right?
 2             A.    Yes.
 3             Q.    Okay.  Southeastern Children's Home,
 4     they serve the upstate.  Do they have an office in
 5     the upstate?
 6             A.    Southeastern, yes.
 7             Q.    Okay.  They do nontherapeutic foster
 8     care and it looks like they also have been licensed
 9     for looks like about 40ish years.  Does that sound
10     right?
11             A.    Yes.
12             Q.    Specialized Alternative For Family and
13     Youth, I think you said sometimes it's -- they go
14     by the acronym SAFY or SAFY?
15             A.    SAFY.
16             Q.    They serve the upstate, have an office
17     in the upstate, offer both therapeutic and
18     nontherapeutic and been licensed since the 1990s.
19     Is that all correct?
20             A.    That is correct.
21             Q.    Okay.  Tamassee DAR School, if I'm
22     pronouncing that right, I think you said they
23     closed at some point in 2019.  But prior to that,
24     and at least you said, into some part of 2019 they
25     were licensed as a CPA, is that --
```

Page 196

1              A.    That is -- that's correct.

2              Q.    They do nontherapeutic foster care,

3     serve the upstate, they -- do you know if they have

4     an office in the upstate?

5              A.    They did.

6              Q.    Okay.  The Bair Foundation has an

7     office in the upstate, serves the upstate, have

8     therapeutic and nontherapeutic foster care and

9     they've been licensed for about 20 years.  Is that

10    all correct?

11             A.    That's correct.

12             Q.    Then -- let's see.  Thornwell.  Let's

13    see.  Serves the upstate, office in the upstate,

14    nontherapeutic foster care and they've been

15    licensed for a number of years?

16             A.    Um-hum.  Yes.

17             Q.    And then I think the last -- the last

18    one, this is one that I have written in, so -- from

19    your testimony -- so correct me here.  I can't read

20    my own writing.  Family Preservation?  Is that --

21             A.    Um-hum.  Family Preservation Community

22    Services.

23             Q.    Okay.  So they serve the upstate.  Do

24    they have an office in the upstate?

25             A.    They serve statewide, but they do not

Page 197

1      have an office in the upstate.

2          Q.    Okay.  They do nontherapeutic foster

3      care?

4          A.    And therapeutic.

5          Q.    And do you know ballpark how long

6      they've been licensed as a CPA?

7          A.    It's been awhile, so certainly more

8      than ten years.

9          Q.    Okay.  I just wanted to -- for the ones

10     we just -- we just discussed, I think it's around

11     15 or 16 or so that at least serve the upstate,

12     some of them you said don't have an office here.

13     I'm trying to find an example.

14              Southeastern Children's Home, they

15     do --

16         A.    Right.

17         Q.    So let's use Southeastern as an

18     example.  If -- if I wanted to be licensed as a

19     foster parent, I did a Google search for a foster

20     care agency in Greenville, South Carolina and I

21     think -- I just like the sound of that name, I

22     click on it.  If I wanted to talk to and to apply

23     through that to DSS, how would I go about doing

24     that if they don't have an office?

25         A.    You would -- sure.  There is a main

Page 205

```
1      for it.  So I'll give you an example that like I'm
2      familiar with myself.
3                   SCYAP, the South Carolina Youth
4      Advocate Program, they offer transportation
5      services to foster children through a contract with
6      DSS, is that right?
7           A.   That is correct.
8           Q.   So if a child -- a child in foster care
9      in Columbia needs to do a visit with his or her
10     biological family in Greenwood, SCYAP would send a
11     driver, transport the child there and back, that --
12     that's something that's funded -- that's separate
13     from CPA work, right?
14          A.   Yes.
15          Q.   Okay.  So leaving that aside, let's
16     just talk about that the -- that the reimbursement
17     that a CPA received for doing CPA work.  Is it
18     accurate to say that a CPA's expenses and efforts
19     to recruit foster parents is not in any way
20     reimbursed under or funded by state or federal
21     dollars, is that correct?
22          A.   That would be correct.
23          Q.   Say, for example, if -- if The Bair
24     Foundation took out a billboard on Bull Street in
25     Columbia that said South Carolina needs foster
```

Page 206

1    parents, call Bair Foundation today, they would pay

2    somebody to do -- the ad agency for that billboard,

3    they would never get that expense reimbursed from

4    SCDSS or the federal government, would they?

5            A.    That's correct.

6            Q.    That they would not?

7            A.    They would not submit an invoice for

8    reimbursement to DSS.

9            Q.    Okay.  Or if -- I'm trying to think of

10   another example.  Let's say Connie Maxwell.  Let's

11   say that they send someone to go visit the Rotary

12   Club in Hartsville to talk to the Rotary Club about

13   the need for foster parents.  The time and the

14   expense, the salary of that person from Connie

15   Maxwell going to that, that's never reimbursed or

16   paid by state or federal funds, is it?

17           A.    It is not.

18           Q.    Let's pick a different one.  How about

19   SCYAP.  When someone comes to them and expresses

20   interest in being a foster parent and SCYAP helps

21   walk with them through the home study and make sure

22   they have got the fire extinguishers and the smoke

23   detectors and that sort of thing, the time and the

24   effort that SCYAP spends on that piece of it,

25   that's never reimbursed by the state or federal

Page 207

1    government, is it?

2         A.    Not for going and working with them at

3    their home.  Now, the Department does cover the

4    cost for fire inspections.  That is a separate

5    contract with -- that the state has with the

6    Department of Labor, Licensing and Regulation.

7         Q.    Okay.  But that's not -- the CPA

8    doesn't get funded for that?

9         A.    That is correct.  The CPA is not funded

10   nor are they submitting an invoice for any

11   reimbursements for that.

12        Q.    So kind of up to that point in the

13   process, is it accurate to say that a CPA is never

14   reimbursed or funded for their recruiting and

15   screening activities, is that right?

16        A.    That is correct.

17        Q.    The only time a CPA starts getting

18   reimbursed for its work as a CPA is after the

19   foster parent or parents as a couple have been

20   licensed by SCDSS and after a child in foster care

21   has been placed by SCDSS into that home, is that

22   right?

23        A.    That is correct.

24        Q.    And at that point the CPA -- is it --

25   is it kind of like a per diem, daily rate or a

Page 209

1    if you don't know, you don't know, but do you know

2    what that -- what that daily rate is that goes to

3    the CPA and what the daily rate is that goes to the

4    foster parent or parents?

5           A.    I do not, no.

6           Q.    Okay.  If a foster child who had been

7    placed by SCDSS in a particular foster home, for

8    whatever reason, if that child -- let's say they

9    were reunited with their -- with their biological

10   family or for some other reason, for any reason

11   removed out of that foster home, the CPA at that

12   point would stop getting daily reimbursements

13   related to that child's placement, right?

14          A.    Yes.  It would end the day the child

15   left the home.

16          Q.    Similar question.  If a -- if a foster

17   parent or parents who are working with the CPA, if

18   for whatever reason they decided that they would

19   rather go and work directly with DSS or they

20   decided -- let's say maybe they moved to a new area

21   of the state, they wanted to switch to a different

22   CPA or they -- they just felt tired and burnt out

23   and they wanted to take a break from foster.

24               Under any of those scenarios when they

25   either moved to DSS, moved to a different CPA or

Page 230

1          Q.   So I guess what I'm wondering -- and,
2     again, I -- I recognize that it is not your policy,
3     it is not DSS's policy, you're quoting a
4     third-party's policy.
5                But to your knowledge, does Miracle
6     Hill serve all children in foster care without
7     regard to the children's race, color, national
8     origin, sex, age, religion, political beliefs or
9     disability?
10         A.   I believe so.  I mean, the
11    discrimination complaint was regarding the
12    applicants who would have been the adults, so
13    that's what this was addressing, the foster
14    parents, so I don't believe there was any
15    discrimination towards children.
16         Q.   Okay.  When earlier when you were being
17    asked questions about this letter and both SCDSS's
18    nondiscrimination policy and the nondiscrimination
19    requirement in the federal regulation that's quoted
20    in there, you said that someone's faith is
21    unrelated to their ability to be a good foster
22    parent, right?
23         A.   Right.  Yes.
24         Q.   And Governor McMaster has never said
25    that anyone's faith is relevant to their ability to

Page 232

1    marked as Exhibit 12.  Let me know when you've got
2    that up in front of you.
3           A.    Okay.
4                 MR. RIDDLE:  You said 12?
5                 MR. COLEMAN:  12.
6                 THE WITNESS:  Okay.  I have it.
7    BY MR. COLEMAN:
8           Q.    Do you remember you looked at and
9    talked about this, you know, a little bit earlier,
10   this e-mail from Reid Lehman to someone named
11   R. Kimberly, who is at -- we believe based on this
12   e-mail address is at Southeastern Children's Home.
13   Do you remember looking at this earlier?
14          A.    I do.
15          Q.    So I'm going to -- I'm going to look
16   specifically at the third paragraph of that e-mail.
17   You've got the salutation to Robert and then the
18   third paragraph after that begins with the words
19   would you be willing.  Do you see that paragraph?
20          A.    Yes, I do.
21          Q.    And that first sentence there which we
22   talked about earlier, it said -- it says, quote:
23   Would you be willing for me to tell him, referring
24   to Mike Leach, Southeastern Children Homes and your
25   board's expectation that you'll recruit only among

Page 233

1    the churches of Christ, end quote.

2              Do you remember talking about that?

3         A.   Yes.

4         Q.   And I guess what I wanted to get a

5    little bit of clarity on, and again recognizing

6    that you didn't write the e-mail but you're looking

7    at it with fresh eyes just like we are, is what

8    exactly we can discern from that.

9              And here's what I'm trying to get at,

10   is do you agree all that that section says is

11   that -- and we'll even assume that Mr. Lehman's

12   understanding was correct.  We don't know that to

13   be true.  He's referring to his understanding.  But

14   even let's assume it to be correct just for the

15   sake of argument.

16              All we can learn from that statement is

17   that Southeastern Children's Home doesn't recruit,

18   they do not actively or proactively go out to seek

19   foster parents other than from the churches of God.

20              Is that a correct statement of what

21   that sentence says?

22        A.   My understanding, that that sentence

23   says they would only recruit among the churches of

24   Christ.

25        Q.   So we don't know from this e-mail, at

Page 234

1    least, whether Southeastern Children's Home would

2    work with someone outside the churches of Christ

3    who came to them and applied?  We can't tell that

4    from this e-mail, can we?

5              A.    We cannot.

6              Q.    And you don't have any independent

7    knowledge apart from this e-mail that Southeastern

8    Children's Home refuses to work with people outside

9    of that denomination, do you?

10             A.    I don't have any additional information

11   or knowledge.

12             Q.    And the same is true in regard to

13   sexual orientation, we don't know from this e-mail

14   what Southeastern Children Home's policy is if they

15   were to receive an application or an inquiry from

16   an LGBT person or same sex couple, do we?

17             A.    I do not.

18             Q.    Let's look next at the document that

19   was marked as Exhibit 13.  And let me know when

20   you've got that in front of you.

21             A.    I will.

22                   MR. RIDDLE:  Give me just a second.

23                   THE WITNESS:  Okay.  I have it.

24   BY MR. COLEMAN:

25             Q.    So this is an e-mail chain.  The top

1    e-mail is from someone named Beth Williams and it's

2    to Reid Lehman.  We've already -- we've already

3    previously discussed who those folks are.  Scroll

4    down to Page 2 --

5         A.    Okay.

6         Q.    -- of this e-mail chain.

7         A.    Okay.  I'm there.

8         Q.    Okay.  So toward the top of Page 2,

9    this e-mail chain, we are in the middle of an

10   e-mail from Reid Lehman at MiracleHill.org to Beth

11   Williams at Epworth.

12             So on Page 2, I want you to look at --

13   it's the first paragraph at the top of Page 2.

14   Mr. Lehman says, quote:  Would you be willing for

15   me to tell him, that's referring to Michael Leach,

16   about Epworth and your denomination's expectation

17   that you'll recruit heterosexual couples, close

18   quote.

19             Did I read that accurately?

20        A.    You did.

21        Q.    Do you remember talking about that

22   sentence in particular a little bit earlier with

23   Miss Janson, the Plaintiffs' lawyer?

24        A.    Yes.

25        Q.    So I want to ask you a couple of

Page 236

1    similar questions to the one we just looked at a
2    few minutes ago, the e-mail to Robert Kimberly that
3    was marked as Exhibit 12.
4              So this one is an e-mail from Reid
5    Lehman to Beth Williams.  Again, let's assume for
6    the sake of argument that Reid Lehman's
7    understanding of Epworth's policy is correct.  We
8    don't know that to be true.  We don't know what
9    Epworth's policy is.  But for the sake of argument,
10   let's assume that Reid's correct about it.
11             Even with that assumption, is it
12   correct to say that the only thing we can discern
13   from that sentence or from this e-mail chain is
14   that Epworth does not actively proactively go out
15   recruiting, seeking other than heterosexual
16   couples?  Is it right to say that's -- that's the
17   only thing we can figure out from that sentence of
18   this e-mail?
19        A.   Yes.
20        Q.   And relatedly, we don't know whether
21   from this e-mail or elsewhere what Epworth would do
22   if they received an application from an LGBTQ
23   person or from a same sex couple who is interested
24   in inquiring or applying, we don't know what
25   Epworth would do, do we?

Page 237

1          A.    No, not based on this e-mail, we do

2    not.

3          Q.    And we don't know if, for example,

4    Epworth got an inquiry from a couple and it didn't

5    disclose their genders or that they were in the

6    same situation, we don't know if Epworth tries to

7    find that information out or asks or we don't know,

8    maybe they have a -- they just don't even ask, they

9    don't care, we don't know that, do we?

10         A.    I don't think on the initial inquiry

11   that's known, but certainly as they work with the

12   applicants that becomes known.

13         Q.    Sure.  We can -- we can presume that

14   once they meet them in person and do a home study,

15   they'll probably figure out whether they were a

16   same sex couple.  But we don't know, do we -- if in

17   the home study if Epworth figures out that someone

18   is a married or unmarried same sex couple, we -- we

19   just don't know what Epworth would do.  They might

20   just continue on the process and work with them,

21   right?

22         A.    That's true.

23         Q.    And then let's take a look at Exhibit

24   14.  Let me know when you've got that.

25         A.    Okay.  I have it.

1      kind of looked a little bit more precisely at what

2      they say and maybe more importantly what they don't

3      say, is it -- is your testimony from earlier

4      accurate that to your knowledge both in 2018 when

5      you wrote that letter to Miracle Hill regarding the

6      licensure and since then, that to your knowledge

7      other than Miracle Hill you are not aware of any

8      CPAs who will not work with foster parents or

9      prospective foster parents outside a particular

10     religion or outside of a particular sexual

11     orientation or marital status?

12             A.    I'm not aware.

13             Q.    And I recognize that was a very long

14     runoff sentence and I appreciate you hanging with

15     me through that.  Give me just a moment.  We can

16     stay on the record.  I want to flip through my

17     notes and see if there is -- there might be one or

18     two more things to ask you about, but I think -- I

19     think we're drawing near to the end.

20             A.    Okay.

21             Q.    You said there have been instances in

22     the past where SCDSS has done community outreach,

23     I'll call it, for lack of a better term, community

24     outreach or awareness work or interest-generating

25     work at the request of a religious organization or

1    are LGBTQ+, everybody is welcome to participate in

2    the system, would you agree that that's an ideal

3    scenario?

4         A.   I would agree.

5         Q.   Would you agree that certain CPAs are

6    especially good at leveraging their own ties either

7    to their geographic community or to their faith

8    community in getting folks from either that area or

9    from that group to be interested in and apply to be

10   foster parents?

11        A.   I would agree.  And I think it's also

12   related to personal relationships with the

13   community at large and locally that we are able to

14   cross on lines and genders for people who want to

15   foster groups of people from different spectrums,

16   so I think that's really important for the children

17   that we're serving.

18        Q.   So, for example, to my knowledge there

19   is not a specifically Jewish CPA that does, you

20   know, outreach to the Jewish communities across the

21   state.  But if there were, do you agree that that

22   agency might be more effective than DSS when it

23   comes to reaching members of the Jewish community

24   of South Carolina and encouraging them and making

25   them willing and interested in becoming foster