*Rogers et al. v. U.S. Dept. of Health and Human Servs., et al.*

# Exhibit X

**to Governor Henry McMaster's and Michael Leach's Motion for Summary Judgment and Memorandum in Support Thereof**

**Excerpts from Deposition of Freddie Busha**

Page 1

```
         UNITED STATES DISTRICT COURT
          DISTRICT OF SOUTH CAROLINA
             GREENVILLE DIVISION

EDEN ROGERS and

BRANDY WELCH,

             Plaintiffs,

     vs.              CASE NO. 6:19-cv-01567-TMC

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES;
ALEX AZAR, in his official capacity as
Secretary of the UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ADMINISTRATION FOR CHILDREN AND FAMILIES;
LYNN JOHNSON, in her official capacity as Assistant
Secretary of the ADMINISTRATION FOR CHILDREN AND
FAMILIES;
SCOTT LEKAN, in his official capacity as Principal
Deputy Assistant Secretary of the ADMINISTRATION
FOR CHILDREN AND FAMILIES;
HENRY MCMASTER, in his official capacity as
Governor of the STATE OF SOUTH CAROLINA;

MICHAEL LEACH, in his official capacity as State
Director of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
SERVICES,

             Defendants.

VIDEOTAPED
DEPOSITION OF:   FREDDIE KAREN BUSHA
                 (APPEARING VIA VIRTUAL ZOOM)

DATE:            June 21, 2021

TIME:            9:02 AM

REPORTED BY:     TERRI L. BRUSSEAU
                 (APPEARING VIA VIRTUAL ZOOM)
```

Page 188

1  correct that they were not treated differently?
2       A.   They were not treated differently.
3       Q.   That policy change in 2019, that was a
4  sincere change of policy and viewpoint, right?
5       A.   That's correct.
6            MS. JANSON:  Object to the form.
7  BY MR. COLEMAN:
8       Q.   We also looked earlier today at an
9  e-mail that was sent by Sharon Betts to the
10 Plaintiffs in this lawsuit.  It was before the
11 lawsuit had been filed, they weren't Plaintiffs at
12 that time, but to Eden Rogers and Brandy Welch.  Do
13 you remember looking at that e-mail?
14      A.   Yes.
15      Q.   And we talked about that for a little
16 while.  I'm going to ask you a couple follow-up
17 questions about that.  Hold on for a second.
18           One of the questions you were asked
19 while we were looking at that document was whether
20 Miracle Hill would work with a same sex marriage
21 couple.  Do you remember that?
22      A.   Yes.
23      Q.   Another question you were asked around
24 that same time was whether Miracle Hill would work
25 with a prospective foster parent who identified as

Page 189

1   LGBTQ.  Do you remember that?
2         A.   Yes.
3         Q.   So I want to -- I want to make sure
4   that I've got clarity on the latter question.  If a
5   prospective foster parent either submitted the
6   online inquiry form or came to an interest meeting
7   or called and said that they identify as LGBTQ but
8   that they believe the same doctrinal beliefs
9   memorialized in Miracle Hill's doctrine statement,
10  that the individual believes that marriage and
11  sexual activity is limited to marriage between two
12  individuals of different sexes and that they were
13  committed to only engaging in sexual conduct in
14  that context, only if married to a person of the
15  opposite gender and as a result they were committed
16  not to engaging in behaviors or actions of the same
17  sex, would Miracle Hill be willing to work with
18  that person?
19             MS. JANSON:  Object to the form.
20             THE WITNESS:  Yes.
21  BY MR. COLEMAN:
22        Q.   So if -- if earlier today you said that
23  Miracle Hill would not work with an LGBTQ person,
24  what did you mean then -- because I feel like you
25  just now gave an answer that was -- that was

Page 190

1  clearer.  What did you mean previously when you
2  said that?
3              MS. JANSON:  Object to the form.
4              THE WITNESS:  If they were not living
5  according to the doctrinal statement.
6  BY MR. COLEMAN:
7        Q.   Is it accurate to say that -- that the
8  distinction Miracle Hill draws is not based on
9  someone's identity or orientation, but instead is
10 based on their behaviors and actions?
11       A.   Yes.
12             MS. JANSON:  Object to the form.
13 BY MR. COLEMAN:
14       Q.   And relatedly, Miracle Hill would draw
15 a distinction based on a person's beliefs in terms
16 of religion or doctrine?
17       A.   Yes.
18             MS. JANSON:  Object to the form.
19 BY MR. COLEMAN:
20       Q.   When we looked at that e-mail from
21 Sharon Betts to Eden Rogers and Brandy Welch, I
22 think it was marked as Exhibit 13, the e-mail
23 referred Miss Rogers and Miss Welch to other
24 providers based on the fact that they were members
25 at a nonChristian church, is that right?

Page 197

1  Admin Services, HHS, issued a waiver to South
2  Carolina, that had only to do with CPA operations,
3  right?
4         A.   Correct.
5              MS. JANSON:  Object to form.
6  BY MR. COLEMAN:
7         Q.   And not residential foster care?
8         A.   Correct.
9         Q.   When a foster child is placed into a
10 foster home that worked with Miracle Hill as a CPA,
11 that foster child is never -- well, coerced to
12 engage in religious conduct or activity?
13             MS. JANSON:  Object to form.
14             THE WITNESS:  That's correct.
15 BY MR. COLEMAN:
16        Q.   Correct that they are not?
17        A.   They are not.  To the best of my
18 knowledge they are not.
19        Q.   And that's a good point.  Miracle
20 Hill's policy and instruction is that they should
21 not?
22        A.   That's correct.
23             MS. JANSON:  Object to form.
24 BY MR. COLEMAN:
25        Q.   You obviously can't be present always

Page 198

1  in all the homes.
2       A.   That's right.
3       Q.   But to the best of your knowledge.  Is
4  Miracle Hill's policy and instruction and practice
5  that children in foster care in a foster home that
6  works with Miracle Hill and its CPA, as such
7  children are not in any way penalized for declining
8  to participate in religious activity?
9            MS. JANSON:  Object to form.
10           THE WITNESS:  Correct, they are not
11  penalized for not participating.
12  BY MR. COLEMAN:
13      Q.   And they're not rewarded for
14  participating?
15      A.   That's correct.
16           MS. JANSON:  Object to form.
17  BY MR. COLEMAN:
18      Q.   They're not given any better treatment
19  or worse treatment depending on whether they do or
20  don't participate or respond?
21      A.   That's correct.
22           MS. JANSON:  Object to form.
23  BY MR. COLEMAN:
24      Q.   And if at any time a child in foster
25  care or that child's biological parents or family

Page 199

1  of origin request that the child not be exposed to
2  or engage in religious activity, conduct or
3  instruction, Miracle Hill's instruction to those
4  families is to honor the wishes of the child and
5  the biological family, is that right?
6       A.   That's correct.
7            MS. JANSON:  Object to form.  I'm not
8  trying to talk over you, Miss Busha, but I -- I do
9  need time to get my objections on the record, so
10 maybe you could kind of just pause briefly after
11 Mr. Coleman's question.
12           THE WITNESS:  Okay.
13 BY MR. COLEMAN:
14      Q.   We looked at one or more documents
15 earlier today that involved specific examples of
16 children in foster care in either Miracle Hill's
17 residential home or in a -- in a family, whether
18 they were with Miracle Hill, I don't remember,
19 where the child or the parents had a specific
20 request or instruction regarding the child's
21 religious practice.  Do you remember that?
22      A.   Yes.
23      Q.   In every instance like that, whether
24 you looked at today or any others that you're aware
25 of, did Miracle Hill always honor those requests or

Page 200

1    instructions?
2         A.   To the best of my knowledge, yes.
3         Q.   Did Miracle Hill always make sure
4    through whatever internal accommodation or
5    arrangement was necessary that the child was able
6    to attend the house of worship that they or their
7    biological family requested?
8         A.   Yes.
9         Q.   We also looked at a document earlier
10   today where it referred to Miracle Hill's view that
11   foster parent rights or people in a position of,
12   quote, spiritual influence.  Do you remember
13   looking at that?
14        A.   Yes.  Yes.
15        Q.   And I think you told us you -- you were
16   not aware of that phrase had ever been defined in
17   writing anywhere, is that right?
18        A.   That's correct.
19        Q.   Can spiritual influence mean more than
20   preaching at somebody?
21        A.   Yes.
22        Q.   Can it mean modeling love?
23        A.   Yes.
24             MS. JANSON:  Object to form.
25             COURT REPORTER:  I'm sorry, Miles.  You

Page 201

1   said modeling what?
2            MR. COLEMAN:  Love.
3            MS. JANSON:  Object to the form.
4   BY MR. COLEMAN:
5       Q.   Could it mean offering hope?
6       A.   Yes.
7            MS. JANSON:  Object to form.
8   BY MR. COLEMAN:
9       Q.   Could it mean demonstrating humility?
10           MS. JANSON:  Object to form.
11           THE WITNESS:  Yes.
12  BY MR. COLEMAN:
13      Q.   Can spiritual influence mean a lot more
14  than just proselytizing or evangelizing somebody?
15      A.   Yes.
16           MS. JANSON:  Object to form.
17  BY MR. COLEMAN:
18      Q.   So it is possible, right, for a foster
19  parent to be a person of spiritual influence and
20  never once try to convert a child, right?
21           MS. JANSON:  Object to form.
22  BY MR. COLEMAN:
23      Q.   It could likewise be possible --
24           COURT REPORTER:  I'm sorry.  Miles, I'm
25  sorry.  I'm sorry, Miles.  I didn't get her answer

Page 202

1  over Kate's objection to the last question.
2  BY MR. COLEMAN:
3          Q.  Do you remember what your answer was?
4          A.  I don't remember the question.
5          Q.  I'll ask the question again.  It's
6  possible, right, that a foster parent can be a
7  person of spiritual influence without ever once
8  trying to evangelize to convert a child, right?
9              MS. JANSON:  Same objection.
10             THE WITNESS:  That's correct.
11 BY MR. COLEMAN:
12         Q.  We looked earlier today at some
13 documents from 2019 that had to do with a contract
14 solicitation that SCDSS sent out to a variety of
15 CPAs and residential group homes, is that right?
16         A.  Yes.
17         Q.  And that was a poorly worded question.
18 Let me back it up.
19             Do you remember looking at contract
20 solicitation documents and communications from
21 around 2019?
22         A.  Yes.
23         Q.  Do you recall whether they had to do
24 with either residential care or CPA or both?
25         A.  Both.