*Rogers et al. v. U.S. Dept. of Health and Human Servs., et al.*

# Exhibit Y

**to Governor Henry McMaster's and Michael Leach's Motion for Summary Judgment and Memorandum in Support Thereof**

**Excerpts from Deposition of Sharon Betts**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION
Civil Action No. 6:19-cv-01567-JD

EDEN ROGERS, et al,              )
                                 )
       Plaintiffs,               )
                                 )
v.                               )
                                 )
UNITED STATES DEPARTMENT OF      )
HEALTH AND HUMAN SERVICES,       )
et al.,                          )
                                 )
       Defendants.               )
_____)

Videotaped Deposition of SHARON BETTS

(Taken by Plaintiffs)

(Taken virtually)

Tuesday, June 22, 2021


Reported in Stenotype by
Christine A. Taylor, RPR
Registered Professional Reporter

Page 261

1   understanding and projection or belief of what would
2   happen to the foster families affiliated with Miracle
3   Hill if Miracle Hill stopped serving as a CPA.  Do you
4   remember talking about that?
5        A.   Yes.
6        Q.   At first when that topic came up, you said
7   you didn't know how many families or percentage of
8   them would do what, do you remember that?
9             MS. SCHINDEL:  Object to form.
10            THE WITNESS:  I don't recall.
11  BY MR. COLEMAN:
12       Q.   Okay.  Well, let me ask the question then.
13  If your memory is a little hazy on it, and if, in
14  fact, I think the record will show that discussion,
15  there was some confusion related to it.  Let me just
16  ask you the questions fresh and see if we can get a
17  less hazy and a more certain understanding of what you
18  believe.
19            MS. SCHINDEL:  Objection.  Mischaracterizes
20  prior testimony.
21  BY MR. COLEMAN:
22       Q.   Would you say from your decades of employment
23  and service at Miracle Hill including many, many years
24  in the foster care ministry of Miracle Hill that you
25  have firsthand knowledge of what motivates the foster

Page 262

1    families you work with, who choose to affiliate with
2    Miracle Hill?
3         A.   Yes.
4              MS. SCHINDEL:  Objection.  Leading.
5    BY MR. COLEMAN:
6         Q.   Is that based from many, many conversations
7    with such people?
8         A.   Yes.
9              MS. SCHINDEL:  Objection.  Leading.
10   BY MR. COLEMAN:
11        Q.   If Miracle Hill could no longer serve as a
12   CPA, do you have a sense whether in numbers or
13   percentages of how many of Miracle Hill's current
14   licensed foster families, who would not otherwise have
15   dropped out due to attrition, would, as a result of
16   being unable to work with Miracle Hill, cease serving
17   as foster parents?
18        A.   I do not have a specific number or percentage,
19   but I believe earlier I testified to the 50 to
20   60 percent of families not including respite families
21   that are licensed that would close.
22        Q.   And just help me understand, just to make
23   sure I understand, when you say 50 to 60 percent not
24   including the number of families that only do respite
25   care, you're saying that the reason you believe that

Page 263

1    50 to 60 percent of the licensed families would stop
2    serving as foster families is because of their
3    inability to work with Miracle Hill as their CPA?
4         MS. SCHINDEL:  Objection.  Leading and
5    mischaracterizes testimony.
6         BY MR. COLEMAN:
7    Q.   Can you repeat your answer just to make
8    sure --
9    A.   Yes.
10   Q.   And is that estimate you just gave, the 50 to
11   60 percent who would stop providing -- stop serving as
12   foster parents if they are unable to work with Miracle
13   Hill, that's not dependent on whether or not they at
14   this moment have a child in their home or not in their
15   home, does it?
16   A.   No.
17        MS. SCHINDEL:  Objection.  Leading.
18   BY MR. COLEMAN:
19   Q.   You're familiar with the waiver or sometimes
20   called a deviation that federal HHS granted to the
21   state of South Carolina related to faith-based CPAs;
22   right?
23   A.   Yes.
24   Q.   Why don't we look for a second again at
25   Exhibit 8.  You may still have it right there in front

Page 272

1    says -- it actually says 35 page.
2        A.   Yes, I have it.
3        Q.   Okay.  At the top of that page in all capital
4    letters and bold text, it says expression of religious
5    or spiritual beliefs policy; is that right?
6        A.   Yes.
7        Q.   Underneath the heading "procedures" on that
8    page, I want to look at the second bullet point, let
9    me know when you --
10       A.   I have it.
11       Q.   I'm going to read it into the record and you
12   follow along.  It says, quote, Miracle Hill is aware
13   that religious is a personal matter and encourages
14   families to be sensitive to the spiritual needs of the
15   child and biological family while avoiding anything
16   that might be viewed as coercion to accept a
17   particular set of beliefs, end quote.
18            Did I read that correctly?
19       A.   You left out the word "each."
20       Q.   Hang on.  I see.  It says, "the spiritual
21   needs of each child and biological family."
22       A.   Yes.
23       Q.   Thank you.  With that one exception though, I
24   read it accurately.  Does that bullet point that I
25   just read, does that reflect or -- to be clear, this

Page 273

1  document was in force from at least May 2018 through
2  fall 2020?
3      A.  Yes.
4      Q.  During that time period, does that bullet
5  point reflect Miracle Hill's position, policy, and
6  expectation?
7      A.  Yes.
8      Q.  Was it Miracle Hill's position, policy, and
9  expectation that foster parents affiliated with
10 Miracle Hill should not coerce foster children to
11 engage in religious activity or to make any sort of
12 religious decisions or to hold any set of religious
13 beliefs?
14     A.  Yes.
15         MS. SCHINDEL:  Objection.  Leading.
16 BY MR. COLEMAN:
17     Q.  Foster parents affiliated with Miracle Hill
18 weren't loud to penalize children for not
19 participating in religious exercise, were they?
20         MS. SCHINDEL:  Objection.  Leading.
21         THE WITNESS:  No.
22         BY MS. SCHINDEL:
23     Q.  Foster parents weren't allowed to give
24 preference to a rewards to children who did
25 participate in religious activities?

Page 274

1   A.  No.
2       MS. SCHINDEL:  Objection.  Leading.
3   BY MR. COLEMAN:
4   Q.  Miracle Hill's policy and procedure was that
5   each foster child would have the opportunity to
6   participate in religious observance or instruction,
7   but that each foster child could decline to do so;
8   right?
9   A.  Correct.
10      MS. SCHINDEL:  Objection.  Leading.
11      BY MS. SCHINDEL:
12  Q.  And that Miracle Hill -- sorry, go ahead.
13      MS. SCHINDEL:  That was an objection to the
14  last question.
15  BY MR. COLEMAN:
16  Q.  I didn't want to talk over you.
17      Miracle Hill's policy, practice, and
18  expectation and instruction in the foster families was
19  that if a child in foster care or his or her family of
20  origin declined to participate in such activities the
21  foster family must respect that; right?
22  A.  Yes.
23      MS. SCHINDEL:  Objection.  Leading.
24  BY MR. COLEMAN:
25  Q.  The third bullet point on that page, the next

Page 275

1   one down, let me read that, quote, religious education
2   is to be in accordance with the expressed wishes, if
3   any, of the birth parents, closed quote; is that
4   correct?
5        A.   Correct.
6        Q.   Was that Miracle Hill's policy, practice,
7   expectation, instruction and understanding to foster
8   parents?
9        A.   Yes.
10           MS. SCHINDEL:   Objection.   Leading.
11  BY MR. COLEMAN:
12       Q.   Turn with me now to page 46 of the document.
13       A.   I have it.
14       Q.   Okay.  At the top of this page in all capital
15  letters bold font, it says children's rights and
16  responsibilities.  Below that is a heading A, it says
17  children's rights well and care, and below that is a
18  lengthy list of numbered items.
19       A.   Yes.
20       Q.   I want to look at -- let's start with number
21  3, let me read that, quote, all children should be
22  provided an opportunity for spiritual development and
23  will not be denied the right to practice religious
24  beliefs, closed quoted.
25           Did I read that correctly?

Page 276

1   A.  Correct.
2   Q.  Was it Miracle Hill's policy, practice,
3   instruction, and expectation of foster parents that,
4   as it says here, the children be provided an
5   opportunity for spiritual development?
6   A.  Yes.
7       MS. SCHINDEL:  Objection.  Leading.
8   BY MR. COLEMAN:
9   Q.  But that children of foster care could not be
10  compelled or coerced or pressured to engage in
11  spiritual or religious activities; right?
12  A.  Correct.
13      MS. SCHINDEL:  Objection.  Leading.
14      BY MS. SCHINDEL:
15  Q.  Again, the latter half of that sentence, was
16  it also Miracle Hill's policy, practice, instruction,
17  and expectation of foster parents that the child in
18  foster care would never be denied the right or the
19  opportunity to practice his or her own religious
20  beliefs or exercise?
21  A.  Correct.
22      MS. SCHINDEL:  Objection.  Leading.
23  BY MR. COLEMAN:
24  Q.  If a child in foster care was placed into a
25  foster home affiliated with Miracle Hill, and if that

Page 277

1  child or his or her biological family, birth family,
2  family of origin, had a different preference, request,
3  or set of religious beliefs, was the foster family
4  expected to honor and accommodate that child or his or
5  her family of origin's religious beliefs?
6       A.   Yes.
7            MS. SCHINDEL:  Objection.  Leading.
8  BY MR. COLEMAN:
9       Q.   If such a child or his family of origin
10 wanted to be able to go to a different house of
11 worship not of the Christian faith or not where the
12 foster family went to, was the foster family expected
13 to accommodate or find some way to make arrangements
14 to honor that wish?
15      A.   Yes.
16      Q.   And in such instances, did foster families
17 affiliated with Miracle Hill honor such requests?
18      A.   I would have not personal knowledge of that
19 because my caseload and the people that I supervise do
20 not have children in those homes.
21      Q.   Okay.  So you don't know one way or the
22 other?
23      A.   No.
24      Q.   Okay.  Let's look at the next numbered item
25 on that page, number 4, I'll read it.  It says, quote,

Page 278

1  all children shall be free from coercion by foster
2  parents or staff with regard to religious or cultural
3  decisions.  Whenever practical, the wishes of the
4  birth parent with regard to a child's religious and
5  cultural participation are ascertained and followed,
6  closed quote.
7           Did I read that correctly?
8       A.  Yes.
9       Q.  We've already talked a little bit about some
10 of those ideas, but I'll ask it again.  Does that
11 statement, those two sentences under number 4, does
12 that reflect Miracle Hill's policy, practice,
13 procedure, expectation, and instruction to the foster
14 families affiliated with Miracle Hill?
15      A.  Yes.
16      Q.  Let me ask you in particular about the second
17 sentence there.  It says that whenever practical, the
18 wishes of the birth parent with regard to a child
19 religious cultural participation are to be
20 ascertained.  Does that mean when possible it was
21 expected or desirable to determine whether a birth
22 parent had any preference or instruction?
23          MS. SCHINDEL:  Objection.  Leading.
24          THE WITNESS:  Ask that question again.
25 BY MR. COLEMAN:

Page 279

1    Q.  Well, does that mean that when it was
2  possible, when it was practical, it was expected that
3  the wishes of a birth parent with regard to a child's
4  religious participation would be ascertained and would
5  be followed?
6         MS. SCHINDEL:  Objection.  Leading.
7         THE WITNESS:  Yes.
8         BY MR. COLEMAN:
9    Q.  Turn with me to page 59 of this document.  At
10  the top of this page in all capital letters and bold
11  font it says "Miracle Hill Ministries Foster Care
12  Program Description."  Underneath that there's a
13  couple of roman numeral headings, look at the third
14  one.  Roman numeral three, philosophy, if you go down
15  to the third paragraph underneath that heading.  I'm
16  going to read that into the record and you follow
17  along.  It says, quote, children do not have to
18  conform to our system, we will conform to the needs of
19  the child -- of the children, sorry.  I read that
20  poorly.  Let me take another run at it.  I'm going to
21  start at the beginning of that sentence again.  Quote,
22  children do not have to conform to our system, we will
23  conform to the needs of children, closed quote.
24         Did I read that correctly?
25    A.  Yes.

Page 280

1      Q.   And does that accurately reflect Miracle
2  Hill's policy, practice, philosophy, and instruction
3  to and expectation of foster families?
4      A.   Yes.
5           MS. SCHINDEL:  Objection.  Leading.
6  BY MR. COLEMAN:
7      Q.   It reflects that children placed into a
8  foster home affiliated with Miracle Hill are not
9  expected to conform to some system of belief that they
10 do not themselves believe; right?
11     A.   Correct.
12          MS. SCHINDEL:  Objection.  Leading.
13          BY MR. COLEMAN:
14     Q.   And, instead, the foster family is the one
15 who needs to accommodate and conform to needs of the
16 child?
17     A.   Yes.
18          MS. SCHINDEL:  Objection.  Leading.
19 BY MR. COLEMAN:
20     Q.   Let's look one more page over, last page of
21 this document that we'll look at, page 60.
22          The second full paragraph on page 60, the
23 second sentence of that paragraph, I'll read it, let
24 you follow along.  It says, quote, if the child so
25 desires, provision will be made for his individual

1     religious preferences, closed quote.
2             Did I read that correctly?
3         A.  Yes.
4         Q.  We've already talked about this a little bit,
5     but again since it's written here, does that
6     accurately reflect Miracle Hill's practice, its
7     policies, philosophy, its instruction to, and
8     expectation of foster families?
9             MS. SCHINDEL:  Objection.  Leading.
10            THE WITNESS:  Yes.
11    BY MR. COLEMAN:
12        Q.  I think we can set this document away for the
13    moment.  Take a look now at the 2020 foster family
14    handbook.  Do you have a copy of that with you?
15            MR. MATTHEWS:  We do not have a copy of that.
16    That was Rebecca's Exhibit 29, I think.  Is that right,
17    Rebecca?
18            MS. SCHINDEL:  I will find you the number.
19            MR. COLEMAN:  That's what I've got.
20            MS. SCHINDEL:  It was Exhibit 29.  That's
21    right.
22            MR. MATTHEWS:  We do not have hard copies of
23    that.
24            MR. COLEMAN:  Give me just a moment.  If I can
25    master the technology, I may be able to make it appear

Page 293

1     the foster children in their care?
2          A.   Yes.
3               MS. SCHINDEL:  Objection.  Leading.
4     BY MR. COLEMAN:
5          Q.   And, to your knowledge, do they, in fact --
6     do they, the foster parents associated with Miracle
7     Hill, actually accommodate the religious choices of
8     the children in their care?
9          A.   Again, as individual supervisor of staff who
10    do not have children in their homes, I could not answer
11    that.
12         Q.   So you don't have personal knowledge of it
13    because it's outside of your responsibilities?
14         A.   Right.
15         Q.   All right.  Let me stop sharing my screen.
16    Let me -- give me just a moment, be patient.  Let me
17    take a quick look.  I think I'm getting close to the
18    end.  I'm hopeful I can wrap up in enough time.  I'd
19    like to get home in enough time to put my kids in bed
20    tonight.  So give me a moment just to check and make
21    sure.  I may have a couple of more questions here.
22              Is it your understanding that in the normal
23    daily life and routine of a foster family associated
24    with Miracle Hill that there will be some religious
25    observances that happen as part of the normal daily

Page 294

1    rhythm and life of that family that a foster child in
2    that home would observe?
3        A.   Yes.
4        Q.   They might say grace before their meals?
5        A.   Yes.
6             MS. SCHINDEL:  Objection.  Leading.
7    BY MR. COLEMAN:
8        Q.   They might pray before bedtime?
9        A.   Yes.
10            MS. SCHINDEL:  Objection.  Leading.
11   BY MR. COLEMAN:
12       Q.   The family likely would go to church on
13   Sunday?
14       A.   Yes.
15            MS. SCHINDEL:  Objection.  Leading.
16   BY MR. COLEMAN:
17       Q.   And by virtue of being in the home, the child
18   would be aware of or exposed to observing those
19   practices; right?
20       A.   Yes.
21            MS. SCHINDEL:  Objection.  Leading.
22   BY MR. COLEMAN:
23       Q.   But as we've just discussed, the child would
24   not be coerced, compelled, pressured, encouraged to
25   participate in, or adopt or adhere to any set of

1  beliefs that they do not wish to?
2       A.  Correct.
3           MS. SCHINDEL:  Objection.  Leading.
4  BY MR. COLEMAN:
5       Q.  I think just a moment ago the questions I
6  asked you most recently I asked you in your individual
7  capacity.  Let me ask you those again in your 30(b)(6)
8  capacity because I believe you're designated to talk
9  about any religious instruction or exposure currently
10 have.  Now I've got to go back and try to remember
11 what the questions were so that I can ask them again.
12          Is it Miracle Hill's understanding and even
13 expectation that in the normal daily rhythm of life of
14 a foster family affiliated with Miracle Hill, there
15 will be certain religious events or observances that
16 occur?
17      A.  Yes.
18          MS. SCHINDEL:  Objection.  Leading.
19 BY MR. COLEMAN:
20      Q.  For example, saying grace before meals?
21      A.  Yes.
22          MS. SCHINDEL:  Objection.  Leading.
23 BY MR. COLEMAN:
24      Q.  Praying before bedtime?
25      A.  Yes.

1            MS. SCHINDEL:  Objection.  Leading.
2    BY MR. COLEMAN:
3        Q.  Things of that nature, that in the normal
4    course of a Christian family's life they do or say?
5        A.  Yes.
6            MS. SCHINDEL:  Objection.  Leading.
7            BY MR. COLEMAN:
8        Q.  Include going to church on Sunday?
9        A.  Yes.
10           MS. SCHINDEL:  Objection.  Leading.
11   BY MR. COLEMAN:
12       Q.  But is it also Miracle Hill's understanding
13   and expectation and requirement that the foster family
14   will never coerce, pressure -- I'm trying to think of
15   another synonym for that -- let's go with coerce,
16   pressure, require, force, or expose a child to
17   religious beliefs or practices or exercise that the
18   child does not believe or does not wish to participate
19   in or affirm or adhere to?
20       A.  Correct.
21           MS. SCHINDEL:  Objection.  Leading.
22   BY MR. COLEMAN:
23       Q.  Do you think -- first, as an individual, do
24   you think it's possible to share the Good News, and I
25   use that phrase of Good News in the sense of some of

Page 297

1  Miracle Hill's use it, which I think is to refer to
2  the Christian gospel.  Do you think it's possible to
3  share the Good News through deeds of good work?
4            MS. SCHINDEL:  Objection.  Leading.
5            THE WITNESS:  Yes.
6  BY MR. COLEMAN:
7       Q.  Okay.  Let me ask you as Miracle Hill's
8  30(b)(6).  Does Miracle Hill believe that one can
9  share the Good News through doing deeds of good work
10 or mercy or compassion, for that matter?
11      A.  Yes.
12           MS. SCHINDEL:  Objection.  Leading.
13 BY MR. COLEMAN:
14      Q.  I'm getting close.  In terms of the
15 motorcycles are driving down the street one more time.
16           MR. MATTHEWS:  Let me interrupt for just a
17 moment.  It is 6:47.  This is not my home office, so
18 I'm not that familiar with it.  This is an energy
19 efficient building and the lights go out at 7:00.  Can
20 we stop for just a couple of minutes and let me make a
21 call to make sure we're not going to lose a power
22 connection to the Internet or if there's anything I
23 need to do to prevent that.  Can we stop --
24           MR. COLEMAN:  Let me ask you this.  I think
25 I've got one minute left.  I don't know if Rebecca --