# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DISTRICT

| | |
|---|---|
| EDEN ROGERS and<br>BRANDY WELCH,<br><br>                   Plaintiffs,<br><br>     -against-<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES;<br><br>XAVIER BECERRA, in his official capacity as<br>Secretary of the UNITED STATES<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES;<br><br>ADMINISTRATION FOR CHILDREN AND<br>FAMILIES;<br><br>JANUARY CONTRERAS, in her official<br>capacity as the Senior Official Performing the<br>Duties of the<br>Assistant Secretary of the ADMINISTRATION<br>FOR CHILDREN AND FAMILIES;<br><br>JEFF HILD, in his official capacity as Principal<br>Deputy Assistant Secretary of the<br>ADMINISTRATION FOR CHILDREN AND<br>FAMILIES;<br><br>HENRY MCMASTER, in his official capacity<br>as Governor of the STATE OF SOUTH<br>CAROLINA; and<br><br>MICHAEL LEACH, in his official capacity as<br>State Director of the SOUTH CAROLINA<br>DEPARTMENT OF SOCIAL SERVICES,<br><br>                  Defendants. | Case No.: 6:19-cv-01567-JD<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**PLAINTIFFS' MOTION FOR<br>SUMMARY JUDGMENT AGAINST<br>STATE DEFENDANTS** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF UNDISPUTED FACTS ............................................................. 4

I.     THE SOUTH CAROLINA FOSTER CARE SYSTEM ............................... 4

II.    MIRACLE HILL MINISTRIES ................................................................. 8

III.   DSS LEARNED OF MIRACLE HILL'S DISCRIMINATORY PRACTICES
       AND BEGAN ACTION TO ENFORCE ITS NONDISCRIMINATION
       REQUIREMENTS ................................................................................. 12

IV.    GOVERNOR MCMASTER INTERVENED ............................................. 13

V.     EDEN ROGERS AND BRANDY WELCH WERE REJECTED BY MIRACLE
       HILL BECAUSE THEY ARE A SAME-SEX COUPLE AND UNITARIAN ....... 16

VI.    OTHER CPAS DISCRIMINATE AGAINST SAME-SEX COUPLES AND/OR
       NON-CHRISTIANS ............................................................................. 18

LEGAL STANDARD ......................................................................................... 21

ARGUMENT .................................................................................................... 21

I.     THE UNDISPUTED FACTS SHOW THAT STATE DEFENDANTS
       VIOLATED PLAINTIFFS' EQUAL PROTECTION RIGHTS BY
       AUTHORIZING AND ENABLING STATE-CONTRACTED CPAS TO USE
       RELIGIOUS CRITERIA TO EXCLUDE SAME-SEX FOSTER PARENTS ....... 21

       A.     Discrimination against same-sex couples constitutes sex discrimination,
              triggering heightened equal protection scrutiny ................................ 22

       B.     Discrimination against same-sex couples constitutes sexual orientation
              discrimination, triggering heightened equal protection scrutiny ........... 23

       C.     State Defendants' actions enabled the discrimination Plaintiffs were
              subjected to based on their sex and sexual orientation ........................ 25

       D.     State Defendants' actions subjected Plaintiffs to harm ....................... 26

i

     E.     State Defendants cannot justify their infringement of Plaintiffs' Equal Protection rights .................................................................................................30

II.    STATE DEFENDANTS' ACTIONS VIOLATE THE ESTABLISHMENT CLAUSE ...........................................................................................................32

     A.    The undisputed facts establish that the State Defendants have delegated a government function to religious organizations and authorized them to use a religious eligibility test, in violation of the Establishment Clause...................33

         1.     DSS delegates the core government function of providing foster care services to private CPAs, including religiously affiliated CPAs that use religious eligibility criteria when carrying out government functions..............................................................................34

         2.     State Defendants know that at least one CPA uses religious criteria to exclude families .....................................................................35

     B.    State Defendants' actions violate the Establishment Clause because they impose significant burdens on third parties ..........................................................36

     C.    State Defendants' actions coerce private citizens into supporting CPAs' religious beliefs .....................................................................................................37

CONCLUSION ....................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Casino Queen, Inc.*,
739 F.3d 972 (7th Cir. 2014) ................................................................9

*Allen v. Wright*,
468 U.S. 737 (f1984) ...........................................................................27

*Anderson v. Liberty Lobby*,
*Inc.*, 477 U.S. 242 (1986).....................................................................21

*Bailey v. Floyd Cnty. Bd. of Educ.*,
106 F.3d 135 (6th Cir. 1997) ................................................................9

*Barber v. Bryant*,
193 F. Supp. 3d 677 (S.D. Miss. 2016)...............................................36

*Baskin v. Bogan*,
766 F.3d 648 (7th Cir. 2014) ..........................................................21, 24

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*,
512 U.S. 687 (1994)........................................................................33, 35

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020).........................................................................22

*Bowen v. Gilliard*,
483 U.S. 587 (1987)..............................................................................24

*Bowers v. Hardwick*,
478 U.S. 186 (1986)..............................................................................23

*Brent v. Wayne Cnty. Dep't of Hum. Servs.*,
901 F.3d 656 (6th Cir. 2018) ..............................................................26

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014) .............................................................................36

*Campaign for S. Equal. v. Bryant*,
64 F. Supp. 3d 906 (S.D. Miss. 2014),................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................21

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................24, 30

*Comm. for Pub. Educ. v. Nyquist*,
   413 U.S. 756 (1973)..................................................................33

*Curnow ex rel. Curnow v. Ridgecrest Police*,
   952 F.2d 321 (9th Cir. 1991) .....................................................9

*Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*,
   597 F.3d 163 (4th Cir. 2010) ...................................................34

*Dumont v. Lyon*,
   341 F. Supp. Ed 706 (E.D. Mich. 2018) ............................27, 34

*Est. of Thornton v. Caldor, Inc.*,
   472 U.S. 703 (1985)............................................................32, 36

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947)......................................................................35

*Facing Foster Care in Alaska, et al. v. U.S. Dep't of Health and Human Services et al.*,
   No. 21-cv-308, Dkt. 44 (D.D.C. June 29, 2022)........................14

*Golinski v. U.S. Off. of Personnel Mgmt.*,
   824 F. Supp. 2d 968 (N.D. Cal. 2012) ................................24, 25

*Gulf USA Corp. v. Fed. Ins. Co.*,
   259 F.3d 1049 (9th Cir. 2001) ...................................................9

*Harleysville Mut. Ins. Co. v. Packer*,
   60 F.3d 1116 (4th Cir. 1995) ...................................................21

*Heart of Atlanta Motel v. United States*,
   379 U.S. 241 (1964) .................................................................27

*Heckler v. Matthews*,
   465 U.S. 728 (1984)..................................................................26

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022)........................................................32, 37

*Kerrigan v. Comm'r of Pub. Health*,
   957 A.2d 407 (Conn. 2008) ......................................................25

*Kirchberg v. Feenstra*,
    450 U.S. 455 (1981) ........................................................................................ 30

*Kitchen v. Herbert*,
    961 F. Supp. 2d 1181 (D. Utah 2013) .......................................................... 23

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982) ................................................................................. 32, 33

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) (Berzon, J., concurring) ............................... 23

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................................................................ 24

*Lee v. Weisman*,
    505 U.S. 577 (1992) ........................................................................................ 37

*In re Marriage Cases*,
    183 P.3d 384 (Cal. 2008) ............................................................................... 25

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ................................................................................. 26, 30

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ........................................................................................ 27

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ........................................................................................ 35

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ........................................................................................ 30

*Otten v. Balt. & O.R. Co.*,
    205 F.2d 58 (2d Cir. 1953) ............................................................................ 32

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) ........................................................................................ 30

*Pedersen v. Off. of Personnel Mgmt.*,
    881 F. Supp. 2d 294 (D. Conn. 2012) ...................................................... 24, 25

*Peltier v. Charter Day Sch.*,
    37 F.4th 104 (4th Cir. 2022) ..................................................................... 26, 29

*Romer v. Evans*,
    517 U.S. 620 (1996).................................................................30

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)..................................................................35

*Sch. Dist. of Abington Twp. v. Schempp*,
    374 U.S. 203 (1963)................................................................32

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)......................................................21, 23

*Shelley v. Kraemer*,
    334 U.S. 1 (1948)....................................................................31

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022).......................................................32, 37

*SmithKline Beecham Corp. v. Abbott Lab'ys.*,
    740 F.3d 471 (9th Cir. 2014) ........................................22, 23, 24

*Thomasson v. Perry*,
    80 F.3d 915 (4th Cir. 1996) (en banc) ....................................23

*Tingey v. Radionics*,
    193 F. App'x 747 (10th Cir. 2006) ............................................9

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)................................................................30

*United States v. Virginia*,
    518 U.S. 515 (1996)..........................................................23, 29

*United States v. Windsor*,
    570 U.S. 744 (2013)..........................................................22, 23

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) ..................................................23

*Waters v. Ricketts*,
    48 F. Supp. 3d 1271 (D. Neb. 2015)........................................23

*Wengler v. Druggists Mut. Ins. Co.*,
    446 U.S. 142 (1980)................................................................30

*Whitewood v. Wolf*,
  992 F. Supp. 2d 410 (M.D. Pa. 2014) ..................................................................25

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012) ........................................................................22, 24

**Statutes & Rules**

Fed. R. Civ. P. 56 .........................................................................................9, 21

S.C. Code Ann. § 63-1-20 (1976) ........................................................................4

S.C. Code Ann. § 63-7-660 (1976) ......................................................................4

S.C. Code Ann. § 63-11-30 (1976) ......................................................................4

S.C. Code Regs. § 114-200 ..................................................................................5

S.C. Code Regs. § 114-210 ..................................................................................5

S.C. Code Regs. § 114-550 ................................................................................12

S.C. Code Regs. § 114-4910 ............................................................................4, 6

S.C. Code Regs. §§ 114-4910 to 114-4980 ......................................................25

S.C. Code Regs. § 114-4920 ................................................................................5

S.C. Code Regs. § 114-4930 ............................................................................5, 6

S.C. Code Regs. § 114-4980 ..............................................................................12

45 C.F.R. § 75.300 ..............................................................................12, 13, 14

81 Fed. Reg. 89,393 (Dec. 12, 2016) ................................................................14

84 Fed. Reg. 63,809 (Nov. 19, 2019) ...............................................................14

86 Fed. Reg. 2,257 (Jan. 12, 2021) ...................................................................14

## PRELIMINARY STATEMENT

Plaintiffs Eden Rogers and Brandy Welch ("Plaintiffs") would like to become foster parents to care for one of the more than 4,000 children in South Carolina's foster care system. They are a married same-sex couple living in Simpsonville, South Carolina, where they are raising their two children, and where they belong to a Unitarian Universalist church.  In 2019, they applied to foster with Miracle Hill Ministries ("Miracle Hill"), a private entity with which the South Carolina Department of Social Services ("DSS") contracts to recruit and screen prospective foster parents for children in State custody and to provide support for families once they are licensed and children are placed in their care ("foster care services").  The State of South Carolina ("State"), as part of its duty to care for children it has removed from their families based on concerns about their safety or well-being, has chosen to contract out these government services to private entities to serve as what are known as child placing agencies ("CPAs").  Miracle Hill is DSS's largest CPA providing nontherapeutic[1] foster care services in the Upstate Region where Ms. Rogers and Ms. Welch live.  The vast majority of children placed by DSS in foster families in the Upstate Region are placed with Miracle Hill families, who receive extra support not provided by all CPAs.

After Ms. Rogers and Ms. Welch submitted an application to Miracle Hill, which required them to identify their church, they received an email from Miracle Hill rejecting their application because their Unitarian Universalist church "does not align with traditional Christian

---

[1] "Therapeutic" foster care providers serve children with complex needs, including emotional, behavioral, or medical needs.  (*See* Ex. 1, Lowe Tr. 20:9-20.)  "Nontherapeutic" providers serve children who do not require therapeutic care.  (*See id.* at 20:9-25.)

1

doctrine." Ms. Rogers and Ms. Welch also learned that Miracle Hill would have rejected their application regardless of their faith because of their status as a same-sex couple.

The discrimination Ms. Rogers and Ms. Welch faced based on their faith and because they are a same-sex couple was made possible by actions taken by Defendants Henry McMaster and Michael Leach. Mr. McMaster and Mr. Leach, acting in their respective official capacities as Governor and Director of DSS (collectively, "State Defendants"), enabled CPAs to impose religious eligibility criteria on prospective foster parents. Before 2018, this kind of discrimination was prohibited by state and federal regulations and policies, and DSS took action to enforce its nondiscrimination requirements when it became aware of Miracle Hill's discriminatory practices by declining to renew the agency's standard license until a compliance plan was put into place. That all changed when Defendant McMaster intervened to enable Miracle Hill and other CPAs to continue to discriminate.

Governor McMaster sought a waiver of compliance with a federal nondiscrimination regulation from the United States Department of Health and Human Services ("HHS") so that all faith-based foster care providers in South Carolina could discriminate without the State losing federal foster care funding. He also issued an Executive Order to prevent DSS from denying licensure to agencies that use religious criteria to discriminate against potential foster parents. Governor McMaster ultimately directed DSS to renew Miracle Hill's standard license despite its failure to comply with DSS's nondiscrimination requirements. Since 2017, Miracle Hill has turned away at least 25 families because of their faith or because they were headed by same-sex couples. Miracle Hill is not the only CPA that has discriminatory practices. There is evidence that several other CPAs in the Upstate Region discriminate against prospective foster parents based

2

on their religion and/or sexual orientation.  It is unknown how many families have been affected by these discriminatory practices because DSS does not track this information.

The State Defendants violate the Equal Protection Clause of the Fourteenth Amendment and the Establishment Clause of the First Amendment by authorizing and enabling state-contracted agencies to use religious eligibility criteria to exclude individuals seeking to participate in a government program.  The State Defendants' actions violate Plaintiffs' right to equal protection because they subject Plaintiffs to discrimination based on their sex (because each plaintiff is a woman married to another woman) and their sexual orientation—both of which trigger heightened scrutiny—and the State cannot meet its burden of showing that this unequal treatment is substantially related to furthering an important government interest.

These actions also violate the Establishment Clause for three reasons.  *First*, State Defendants have delegated a government function—the screening of prospective foster parents to care for children in State custody—to religiously affiliated organizations and have authorized them to impose religious eligibility requirements on applicants seeking to participate in this government program.  *Second*, State Defendants' accommodation of these private agencies' religious beliefs by enabling them to exclude participants based on failure to meet religious requirements imposes significant burdens on third parties—non-Christians and same-sex couples who wish to become foster parents.  The burden includes the dignitary harm of being denied equal participation in a government program because of their faith or lack thereof and/or because they are a same-sex couple, and the practical harms of having more limited agency options than Christian different-sex couples and being relegated to those that have substantially less experience and resources.  *Third*, by enabling CPAs to condition participation in a public program on adherence to their religious

beliefs, State Defendants unduly coerce people seeking to become foster parents to engage in and support those CPAs' religious beliefs.

The undisputed facts establish that State Defendants authorized and enabled CPAs, including Miracle Hill, to impose religious eligibility criteria on prospective foster families, resulting in discriminatory treatment in the government's foster care program in violation of the Equal Protection and Establishment Clauses of the United States Constitution.

## **STATEMENT OF UNDISPUTED FACTS**

### **I.    THE SOUTH CAROLINA FOSTER CARE SYSTEM.**

The State of South Carolina is responsible for the care of children the State has removed from their families due to concerns for their safety or well-being.  (*See* S.C. Code Ann. §§ 63-1-20(D), 63-7-660 (1976).)  That responsibility includes the government's obligation to find foster families for each child while they are in the State's custody.  DSS manages and administers the State's foster care program.  (*See* S.C. Code Ann. § 63-11-30 (1976).)

To help it operate its foster care program, South Carolina, through DSS, contracts with private agencies to serve as CPAs and to recruit, screen, and support foster families.  (*See* S.C. Code Regs. §§ 114-4910(B)-(C); Ex. 1, Lowe Tr. 36:11-37:3.)  Some of these CPAs are religiously affiliated, faith-based organizations.  (Ex. 2, Lowe Ex. 17 at -024.)  CPAs classified as "therapeutic" are licensed to serve children with complex needs, including significant emotional, behavioral or medical needs.  (*See* Ex. 1, Lowe Tr. at 20:9-20.)  CPAs classified as "nontherapeutic" are licensed to serve children who do not require therapeutic foster care.  (*See* Ex. 1, Lowe Tr. 20:9-25.)  South Carolina is divided into regions for purposes of DSS's work, (Ex. 1, Lowe Tr. 30:6-8), and the Greenville area is part of the Upstate Region, previously referred to

4

as Region 1 (Ex. 1, Lowe Tr. 30:9-18). Twelve CPAs with offices in the Upstate Region provide nontherapeutic foster care services.[2]

DSS issues a standard, one-year license to CPAs that meet all applicable regulations and policies, and DSS is directed to monitor CPAs to ensure their continued compliance with those regulations. (See S.C. Code Regs. §§ 114-4920(E), 114-4930(E).) These regulations and policies include nondiscrimination requirements prohibiting discrimination based on religion, sex and sexual orientation.[3] If a CPA is temporarily unable to comply with an applicable regulation, DSS may grant the CPA a temporary license for up to six months, provided the CPA has a written plan to correct the areas of noncompliance within the probationary period. (See S.C. Code Regs. § 114-4930(F).) A temporary license may be extended once for an additional six months after consideration of noted deficiencies. (See id.) DSS may deny or revoke a CPA's license if the CPA has failed to comply with licensing regulations and DSS determines that compliance cannot

---

[2] They are Church of God Home for Children, Connie Maxwell Children's Ministries, Epworth Children's Home, Lifeline Children's Services, Miracle Hill, New Foundations Home for Children, Inc., Nightlight Christian Adoptions, South Carolina Mentor, Southeastern Children's Home, Specialized Alternatives for Families and Youth, the Bair Foundation and Thornwell. (Ex. 3, 10545-G0716 at -721-23; Ex. 1, Lowe Tr. 191:5-197:8.) One other agency, Adoption Advocacy, Inc., is an adoption agency that is considered a CPA because it can assist in the licensure of a foster parent related to adoption. (See Ex. 3, 10545-G0716 at -722.)

Other CPAs that offer nontherapeutic foster care services in the Upstate Region are Family Preservation Community Services, Growing Home Southeast, Lutheran Services Carolinas, and South Carolina Youth Advocate Program, which do not have offices in the region, and Hope Embraced Adoption Agency and Oasis of Hope, for which there is no evidence that they have offices in the region. (Ex. 3, 10545-G0716 at -721-723; Ex. 1, Lowe Tr. 191:5-197:8.) Tamassee DAR School had offered such services but closed in 2019. (Ex. 3, 10545-G0716 at -722.)

[3] See S.C. Code Regs. §§ 114-200 and 114-210; Ex. 1, Lowe Tr. 106:11-19; Ex. 4, Lowe Ex. 15, at 4 (mandating that "no individual shall be denied the opportunity to become a foster or adoptive parent on the basis of . . . religion . . . sex, or sexual orientation" among other things).

be accomplished within established or reasonable time limits, among other reasons. (*See* S.C. Code Regs. § 114-4930(G).)

DSS's contracts with CPAs set out the CPAs' responsibilities, which include "mak[ing] foster homes available for placement of a child." (*See, e.g.*, Ex. 5, 10545-G0335, at -336; *see also* Ex. 6, Roben Tr. 104:6-12); S.C. Code Ann. Regs. § 114-4910(C).) CPAs do this by recruiting prospective foster parents and screening them for their suitability to obtain a foster care license. (Ex. 1, Lowe Tr. 37:4-38:6; 40:17-22.) While DSS issues the licenses (Ex. 1, Lowe Tr. 40:23-41:8; Ex. 7, Barton Tr. 31:9-11), CPAs make suitability recommendations including home assessments, (Ex. 1, Lowe Tr. 37:24-38:6; *see also* Ex. 7, Barton Tr. 106:6-17), which DSS generally follows, (Ex. 1, Lowe Tr. 41:9-42:1). CPAs also support families during and after the licensing process. (Ex. 1, Lowe Tr. 45:16-46:16.)

CPAs vary in terms of their experience in providing nontherapeutic foster care services. Some have been licensed by DSS for decades, while others only became licensed in the past few years.[4] Some have helped dozens—or, in the case of Miracle Hill, hundreds—of families get nontherapeutic foster home licenses since 2017, while others have assisted far fewer.[5] And

---

[4] Miracle Hill, Connie Maxwell Children's Ministries, the Bair Foundation, South Carolina Mentor, Southeastern Children's Home and Specialized Alternative for Families and Youth have been licensed for 20 years or more. (Ex. 3, 10545-G0716 at -721-723.) By contrast, New Foundations Home for Children, Inc. was licensed in 2017 and Nightlight Christian Adoptions in 2019. (*Id.*)

[5] For example, between 2017 and 2021, Miracle Hill assisted 338 families in procuring licenses to provide nontherapeutic foster care, Connie Maxwell Children's Ministries assisted 59 families in procuring such licenses, New Foundations Home for Children, Inc. assisted 2 families, and Southeastern Children's Home did not assist any families in procuring licenses. (Ex. 3, 10545-G0716 at -717.)

some CPAs have had hundreds of children placed by DSS with their families over the past five years and others, just a small handful.[6]

CPAs also vary in the forms of support they provide to families beyond those required by their contracts with DSS.  (Ex. 7, Barton Tr. 76:20-25; 83:20-84:2.)  For instance, at least one CPA provides house cleaning services, which is not a DSS-required benefit.  (Ex. 7, Barton Tr. 289:18-290:19; Ex. 8, Barton Ex. 11.)  Ms. Barton explained that some CPAs are "constantly doing fundraising" and "reaching out to the community . . . for . . . donations", which "may be gifts for Christmas" or meals for foster families.  (Ex. 7, Barton Tr. 82:17-83:3.)  In addition, some CPAs have larger staffs than others.  For example, in 2021, 21 staff members at Miracle Hill provided support to foster families, whereas several other CPAs had three or fewer staff members.  (Ex. 3, 10545-G0716 at -720.)  Larger CPAs tend to have a greater presence in the community and are better known than smaller CPAs.  (Ex. 7, Barton Tr. 79:10-20.)

In addition to contracting with CPAs for foster care services for the State, DSS also directly recruits, screens and supports prospective foster families.  In July 2020, however, DSS began to focus its own services on kinship foster care, leaving nonkinship foster care to the CPAs.  (Ex. 1, Lowe Tr. 54:1-5; 61:6-8; *see also* Ex. 7, Barton Tr. 32:6-11.)  "Kinship care" refers to when

---

[6] Between 2017 and 2021, Miracle Hill families had 1,278 children placed with them for nontherapeutic foster care services, Epworth families had 288 children placed with them for such services, Thornwell families had 186, Lifeline Children's Services families had 185, Connie Maxwell families had 130, The Bair Foundation families had 106, Nightlight Christian Adoptions families had 62, South Carolina Mentor families had 57, Church of God Home for Children families had 43, Specialized Alternatives for Families and Youth families had 34, South Carolina Mentor families had 20, New Foundations families had 8 and Southeastern Children's Home families had 0 children placed with them for nontherapeutic foster care services.  (*Id.* at -718.)

7

a child entering foster care is placed with a relative, next of kin, or someone known to the child—instead of a foster family who are strangers.  (Ex. 1, Lowe Tr. 54:6-16.)  A DSS representative testified that, if a prospective nonkinship foster family is unable to find a CPA that will work with them, it could work with DSS.  (Ex. 1, Lowe Tr. 54:17-55:8.)  However, DSS does not take applications from nonkin applicants; families would have to go through Heartfelt Calling and if unable to find a CPA, Heartfelt calling can consult with the DSS state office and the matter would "feed[] down" to the DSS regional office.[7]  (*See* Ex. 7, Barton Tr. 139:1-140:15; 138:7-18; Declaration of Nekki Shutt ("Shutt Decl.") ¶¶ 4-5.)  Few if any nonkinship applicants have been handled by DSS since the July 2020 change in policy.  (Ex. 7, Barton Tr. at 138:7-18, 139:1-5.)

## II.    MIRACLE HILL MINISTRIES.

Miracle Hill is a CPA located in the Upstate Region of South Carolina.  (Ex. 1, Lowe Tr. 193:9-14.)  It is South Carolina's largest provider of foster care services for children requiring nontherapeutic foster care, recruiting 15% these foster families.  (Ex. 2, Lowe Ex. 17 at -025.)  From 2017 to 2021, Miracle Hill assisted more families in procuring a foster home license than any other nontherapeutic CPA in the entire state of South Carolina.  During this period, Miracle Hill helped a total of 338 families get licensed—nearly twice as many as the CPA with the next largest share of nontherapeutic placements (the Bair Foundation with 193). (Ex. 3, 10545-G0716 at -717.)  Between 2017 and 2021, there were 1,278 children placed in nontherapeutic foster care families licensed through Miracle Hill—more than 4 times as many children as the CPA with

---

[7] Heartfelt Calling serves as DSS's "centralized application and intake line," and conducts a "large portion" of its intake.  (Ex. 7, Barton Tr. at 40:14-23; 35:8-11.)  When prospective foster families apply through Heartfelt Calling, they are directed to a list of CPAs with information about those CPAs policies and practices.  (*Id.* at 135:23-136:6.)

the next largest share—Epworth Children's Home with 288. (*Id.* at -718.) The overwhelming majority of children placed in foster families in the Upstate Region were placed by DSS with Miracle Hill families—almost as many children were placed with Miracle Hill as *all* the other Upstate nontherapeutic CPAs combined (1,141). (*See id.*) In addition, Miracle Hill has a much larger staff—21 as of 2021, compared to 9 or fewer for all other CPAs in the Upstate Region, with almost all others having 5 or fewer. (*Id.* at -720.)

Miracle Hill is also well known in the community. Eden Rogers testified that Miracle Hill was "the only [CPA] that I knew about" and that Miracle Hill is "who you think of here when you think of . . . fostering a child." (Ex. 9, Rogers Tr. 58:20-59:5.) Brandy Welch testified that Miracle Hill advertised regularly on the radio and "we were hearing it all the time that they needed so many foster parents." (Ex. 10, Welch Tr. 10:6-17.) Aimee Maddonna, a plaintiff in a related case—*Maddonna v. U.S. Dept. of Health & Human Servs.*, 6:19-cv-03551-JD—who was turned away by Miracle Hill because she is Catholic, testified that "in [her] community the only one that anybody is aware of is Miracle Hill. . . . That's the option that is discussed. That's . . . still the one that's the most known." (Ex. 11, Maddonna Tr. 142:10-14.)[8]

Miracle Hill also provides beds, dressers, toys, and clothes when needed; access to community events and activities, such as museum tickets; and educational support, such as tutoring

---

[8] A deposition taken in an unrelated action can be considered on a motion for summary judgment. *See Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014); *Tingey v. Radionics*, 193 F. App'x 747, 765-66 (10th Cir. 2006). Because Plaintiffs could call Ms. Maddonna as a live witness to testify at trial, her deposition is admissible as a substitute at the summary judgment stage. *See* Fed. R. Civ. P. 56(c); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 323-24 (9th Cir. 1991); *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

and resources for children with special needs. (Ex. 12, Betts Tr. 55:15-21; 56:9-16; 56:22-57:8.) Family support specialists also schedule monthly webinars, plan events for foster families, and send birthday cards to foster children. (*Id.* at 66:10-67:9.)

Miracle Hill received $3,326,880 in administrative fees from DSS for foster care services provided between July 1, 2016 and June 30, 2021. (Ex. 13, 10545-G0001; *see also* Ex. 6 Roben Tr. 59:20-60:1, 92:21-93:2.) Prior to January 1, 2019, Miracle Hill was the only nontherapeutic CPA to receive such fees from DSS (Ex. 6, Roben Tr. 57:21-58:19; Ex. 14, McDaniel-Oliver Tr. 25:16-22; 56:12-57:5; 65:15-66:1; 84:15-22); the other CPAs provided services without receiving administrative fees. (Ex. 6, Roben Tr. 70:7-71:15; 129:21-131:22; Ex. 14, McDaniel-Oliver Tr. 65:15-66:1). Since January 1, 2019, other CPAs have received administrative fees from DSS. (Ex. 13, 10545-G0001 at 001-002.) The list of CPAs that have received administrative fees from DSS since January 1, 2019 includes, among others, Church of God Home for Children, Connie Maxwell, Nightlight Christian Adoptions and The Bair Foundation. (*Id.*)

Miracle Hill received nearly half—48%—of the $6,905,755 total administrative fees DSS paid to nontherapeutic CPAs from July 1, 2016 to January 31, 2022. (Ex. 13, 10545-G0001.) Miracle Hill requested to stop receiving these fees starting July 1, 2021 (*see* Ex. 15, 10545-G0250) and has not received them since (*see* Ex. 6, Roben Tr. at 92:21-93:2).

Miracle Hill describes itself as "an evangelical, Gospel-infused Christian mercy ministry that is committed to sharing the Gospel of Jesus Christ while serving the needy and vulnerable in Christ's name." (Ex. 16, MIRACLE_HILL_SUBP_012783.) Miracle Hill's website directs those interested in becoming foster parents to complete an online form, which explains

"[a]s an evangelical Christian foster care agency, we believe foster parents are in a position of spiritual influence over the children in their homes." (Shutt Decl. ¶ 8.) The form requires applicants to indicate their agreement with Miracle Hill's doctrinal statement, (Ex. 17, MIRACLE_HILL_SUBP_000593 at -593), which includes: "We believe . . . God ordained the family as the foundational institution of human society. . . . [and that] God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship", (Ex. 18, MIRACLE_HILL_SUBP_000375). Miracle Hill's online form also requires prospective foster parents to state the "church you currently attend" and to give a "brief, personal testimony of your faith/salvation in Jesus Christ." (Ex. 17, MIRACLE_HILL_SUBP_000593) at -594.)

Miracle Hill restricts eligibility to prospective foster parents who meet its religious requirements—individuals must share its Christian beliefs and may not be in a same-sex relationship. (Ex. 12, Betts Tr. 169:7-17; Ex. 19, Lehman Tr. 50:24-51:6; Ex. 20, MIRACLE_HILL_SUBP_007062 at -062, 064-065; Ex. 2, Busha Ex. 18.) In fact, its website states that it "require[s] that foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement". (Ex. 21, Busha Ex. 18.) Since 2017, Miracle Hill has turned away approximately 25 to 30 prospective foster families because of their faith, or lack thereof, or because they were in a same-sex relationship. (Ex. 12, Betts Tr. 97:11-98:2.) More than half of these families were Catholic, and approximately four were same-sex couples. (Ex. 12, Betts Tr. 98:3-9, 101:21-102:14.)

11

III.    **DSS LEARNED OF MIRACLE HILL'S DISCRIMINATORY PRACTICES AND BEGAN ACTION TO ENFORCE ITS NONDISCRIMINATION REQUIREMENTS.**

During the CPA license renewal period for 2018, DSS became aware of information indicating that Miracle Hill discriminates against prospective foster parents on the basis of religion. (Ex. 1, Lowe Tr. at 77:6-78:10; Ex. 24, Lowe Ex. 7 at -012-014.)  On January 26, 2018, Jacqueline Lowe, DSS's Licensing Director for Child Placing Agency and Group Home Licensing, sent a letter to Miracle Hill stating that "the Department has received information that Miracle Hill discriminates against potential foster and adoptive parents/families on the basis of [] religion". (Ex. 24, Lowe Ex. 7 at -012.)  According to DSS, "[u]pon Miracle Hill's application to renew its CPA license for 2018, the Department discovered that Miracle Hill's website refers to its recruitment of specifically Christian foster parents/families and that Miracle Hill's application requests information regarding a foster parent/family's religious beliefs and practice." (*Id*.)  DSS further noted that "Miracle Hill's Foster Care Manual also instructs its workers to inquire as to a family's particular religious belief and practice". (*Id*.)  Separately, DSS received materials in Miracle Hill's 2017 license renewal packet which state that Miracle Hill foster families must "[h]ave a lifestyle that is free . . . of homosexuality". (Ex. 22, Staudt Tr. 159:7 165:13; Ex. 23, Staudt Ex. 18 at -964.)  Ms. Lowe did not address this information in her 2018 letter to Miracle Hill. (Ex. 24, Lowe Ex. 7.)

DSS eventually concluded that "Miracle Hill has given the Department reason to believe Miracle Hill intends to refuse to provide its services as a licensed [CPA] to families who are not specifically Christians from a Protestant denomination." (*Id.*)  DSS further concluded that "[s]uch discrimination on the basis of religion contravenes" state and federal regulations, including

12

S.C. Code Regs. §§ 114-4980(A)(2)(a) and 114-550, 45 C.F.R. § 75.300(c) and DSS's policy statement § 710. (Ex. 24, Lowe Ex. 7 at -013.) DSS decided that "it [was] appropriate to issue" Miracle Hill a temporary six-month provisional CPA license (*id.* at -012), which it did on January 27, 2018 (Ex. 25, Lowe Ex. 9). DSS required Miracle Hill to "issue a written plan of compliance within thirty days" of receiving the letter. (Ex. 24, Lowe Ex. 7 at -013.) Upon DSS's approval of the compliance plan, Miracle Hill would have an additional 30 days to implement the plan. (*Id.* at -014.)

DSS was prepared to terminate Miracle Hill's CPA license if it did not comply. (Ex. 1, Lowe Tr. 172:20-173:3.) If DSS were to terminate Miracle Hill's license, DSS would have assumed the responsibility for Miracle Hill's foster families, or the families could transfer to another CPA. (*Id.* at 73:13-74:23.)[9] Miracle Hill never issued a written plan of compliance or otherwise addressed DSS's concerns. (*Id.* at 107:21-108:4; 112:24-113:4; 115:21-116:3.)

## IV.     GOVERNOR MCMASTER INTERVENED.

After DSS informed Miracle Hill that it would need to comply with nondiscrimination requirements in order to receive a permanent license, Miracle Hill reached out to Governor McMaster for help. (Ex. 19, Lehman Tr. 125:4-12.) On February 21, 2018, Governor McMaster sent a letter to Richard Lehman, Miracle Hill's President and CEO, indicating that the Governor's staff had met with representatives from Miracle Hill and was "already working with [HHS] to obtain a waiver of requirements. . . ." (Ex. 26, MIRACLE_HILL_SUBP_000641.)

---

[9] Indeed, this is what happened when Neighbor to Family, another CPA, closed its doors. (Ex. 1, Lowe Tr. 73:13-75:14.) Dawn Barton, a DSS representative, testified she has no basis to expect that, if Miracle Hill were to close, its foster families would not continue fostering. (*See* Ex. 7, Barton Tr. 159:10-161:9.)

13

On February 27, 2018, Governor McMaster sent a letter to then-HHS Administration for Children and Families ("ACF") Principal Deputy Assistant Secretary Steven Wagner requesting a waiver from the nondiscrimination provisions of 45 C.F.R. § 75.300 for "South Carolina and faith-based organizations like Miracle Hill" operating under South Carolina's Title IV-E Foster Care Program.[10]  (Ex. 2, Lowe Ex. 17 at -024-025.)  Specifically, Governor McMaster asked "on behalf of South Carolina and faith-based organizations like Miracle Hill" that "[HHS] provide a deviation or waiver from its current policy to recoup grant funds from DSS if [HHS] determines the new regulations are violated by any DSS CPA contracts due to religiously held beliefs."  (*Id*.)  On July 26, 2018, DSS issued a second temporary CPA license to Miracle Hill that was valid for six months.  (Ex. 25, Lowe Ex. 9; Ex. 1, Lowe Tr. 112:14-23.)  Ms. Lowe testified that the DSS "general counsel directed me to issue the license."  (Ex. 1, Lowe Tr. 113:18-25.)

On January 23, 2019, in a letter from then-HHS ACF Principal Deputy Assistant Secretary Wagner to Governor McMaster, HHS conditionally granted South Carolina an exception from the religious nondiscrimination requirements of 45 CFR § 75.300(c).  (Ex. 27, Lowe Ex. 19 at -444-447.)  The exception "applie[d] with respect to Miracle Hill or any other subgrantee in the

---

[10] The "grants rule", 45 C.F.R. § 75.300(c), passed in 2016, prohibits foster care agencies from, among other things, discriminating on the basis of sex, religion or sexual orientation.  (HHS Grants Regulation, 81 Fed. Reg. 89,393 (Dec. 12, 2016).)  In 2019, HHS issued a Notification of Nonenforcement of HHS Grants Regulation (the "nonenforcement policy"), which made clear that the 2016 grants rule would not be enforced against HHS grants recipients.  84 Fed. Reg. 63,809 (Nov. 19, 2019).  On January 12, 2021, HHS promulgated a new rule stripping back certain nondiscrimination provisions in the 2016 grants rule.  86 Fed. Reg. 2,257 (Jan. 12, 2021).  The 2021 rule never became effective and has since been vacated, *see Facing Foster Care in Alaska, et al. v. U.S. Dep't of Health and Human Services et al.*, No. 21-cv-308, Dkt. 44 (D.D.C. June 29, 2022), but the nonenforcement policy is still in effect.

14

SC Foster Care Program that uses similar religious criteria in selecting among prospective foster care parents." (*Id.* at -447.)  Ms. Lowe testified that "in addition to Miracle Hill, any other CPA in South Carolina that discriminates based on the religion of prospective foster parents is able to take advantage of [the] waiver." (Ex. 1, Lowe Tr. 164:13-18.)  The exception "applie[d] on the condition that Miracle Hill, or any other subgrantee making use of this exception, be required to refer potential foster parents that do not adhere to the subgrantee's religious beliefs to other subgrantees . . . ." (Ex. 27, Lowe Ex. 19 at -447.)[11]

On March 13, 2018—while the waiver request was pending—Governor McMaster issued Executive Order 2018-12, in which he stated that "faith-based CPAs associate foster parents and homes who share the same faith and should not be asked to compromise sincerely held religious beliefs in recruiting, training, and retaining foster parents". (Ex. 28, Rogers_McMaster_000010 at -013-15.)  The Executive Order ordered that "DSS shall not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs." (*Id.*)  The Executive Order further ordered "DSS to review and revise its policies and manuals" to "ensure that DSS does not directly or indirectly penalize religious identity or activity". (*Id.* at -015.)  DSS never changed its policies or manuals, as it had been ordered to do. (Ex. 1, Lowe Tr. 179:2-181:4.)

On January 26, 2019, when Miracle Hill's temporary license was due to expire, at Governor McMaster's direction, DSS issued Miracle Hill a new standard CPA license. (Ex. 29, MIRACLE_HILL_SUBP_003817; Ex. 1, Lowe Tr. 150:6-11; Ex. 7, Barton Tr. 219:22-220:2.)

---

[11] During the pendency of this litigation, on November 18, 2021, HHS withdrew the waiver. (ECF No. 204-1.)  However, as noted above, the federal nonenforcement policy remains in effect.

Had Governor McMaster not intervened, DSS would have required Miracle Hill to submit and implement a compliance plan. (Ex. 1, Lowe Tr. 150:12-20; *see also* Ex. 7, Barton Tr. 219:22-220:2 ("[T]he policy that allowed CPAs to exclude families based on religious requirements [was] implemented only because the governor's office intervened and told DSS to implement this type of policy.")) No one from DSS or the Governor's Office studied or consulted with child welfare experts to determine the potential impact the waiver or the Executive Order would have on the state's foster care system. (*Id.* at 157:8-158:2, 159:19-25.) However, foster care policy officials at DSS testified that, in their view, the better practice is to require all CPAs to accept all qualified families. (Ex. 7, Barton Tr. at 221:16-18; *see also* Ex. 1, Lowe Tr. 264:6-11.) They testified that the best practice in the field of child welfare is not to permit such discrimination, that non-discrimination based on religion or sexual orientation of foster parents furthers the best interests of children in foster care, and that it would be best to have all CPAs serving all families. (Ex. 7, Barton Tr. 116:9-23, 220:25-221:23); Ex. 1, Lowe Tr. 174:9-174:4.)

## V.   EDEN ROGERS AND BRANDY WELCH WERE REJECTED BY MIRACLE HILL BECAUSE THEY ARE A SAME-SEX COUPLE AND UNITARIAN.

Plaintiffs Eden Rogers and Brandy Welch live in Simpsonville, South Carolina, which is in the Greenville, South Carolina area. (*See* Ex. 10, Welch Tr. 41:17-42:1.) They were married in South Carolina on November 28, 2015. (Ex. 9, Rogers Tr. 16:9-16; Ex. 10, Welch Tr. 50:15-18).) They have two children, now ages 10 and 13. (Ex. 30, Pls.' Resp. to McMaster Rog. No. 8.)

Ms. Rogers and Ms. Welch have been interested in fostering children since they first started living together in 2013, and they made this desire known to their closest friends and family members. (Ex. 9, Rogers Tr. at 41:12-42:13.) Ms. Rogers and Ms. Welch knew about

16

Miracle Hill from billboards, signs and radio advertisements.  (Ex. 9, Rogers Tr. 58:20-59:5; Ex. 10, Welch Tr. at 10:6-17.)  On April 2019, Ms. Rogers and Ms. Welch called Miracle Hill and left a voicemail message indicating their interest in fostering.  (Ex. 31, Betts Ex. 13 at -977.)  A Miracle Hill representative returned their call and spoke with Ms. Welch.  *Id.*  When Ms. Welch mentioned that they were a same-sex couple, the representative said they should fill out the online inquiry form and advised the couple to read Miracle Hill's website.  *Id.*  The representative mentioned multiple times that Miracle Hill is a Christian ministry that follows Christian values.  (*Id.*)

Ms. Rogers and Ms. Welch completed and submitted Miracle Hill's online form for prospective foster parents on April 28, 2019.  (Ex. 17, MIRACLE_HILL_SUBP_000593.)  In their submission, Ms. Rogers and Ms. Welch indicated they are interested in foster parenting because they "would like for more children to know what it feels like to be unconditionally loved and to be part of a loving family" offering to "provide a safe and loving environment."  (*Id.* at -594.)  They also identified themselves as a same-sex couple and as members of the local Unitarian Universalist Church.  (*Id.*)  At the time, the form was not the same as it appears on Miracle Hill's website today and did not include the text of the doctrinal statement.  (*Id.* at -593.)[12]

On May 1, 2019, Sharon Betts, Foster Care Licensing Supervisor at Miracle Hill, sent an email to Ms. Rogers and Ms. Welch rejecting them as potential foster parents because, as members of the Unitarian Universalist Church, their faith "does not align with traditional Christian doctrine".  (Ex. 10, Welch Tr. 77:19-79:11; Ex. 32, ROGERS_WELCH_00049 at -051.)  Miracle

---

[12] Miracle Hill later updated its online form to state that it "require[s] that foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement".  (*See* Ex. 21, Busha Ex. 18.)

17

Hill further explained this rejection by stating that "those who hold positions of spiritual responsibility or influence—including foster parents" are required "to share our Christian mission, motivation, and beliefs." (*Id.* at -051.) Miracle Hill witnesses testified that, even if Ms. Rogers and Ms. Welch attended a church acceptable to Miracle Hill and agreed with its doctrinal statement, Miracle Hill still would have refused them because they are a same-sex couple and, thus, do not follow Miracle Hill's doctrinal statement. (*See* Ex. 33, Busha Tr. 69:16-19; Ex. 12, Betts Tr. 113:8-13.)

When describing her feelings about the rejection by Miracle Hill, Ms. Rogers explained her reluctance to approach other agencies, stating that she did not "want to knowingly walk into risk after risk after risk having to go through what [she] just went through" because she knew "how hurtful it was to be rejected like that". (Ex. 9, Rogers Tr. 127:20-23; 128:3-4.) Ms. Welch testified that, prior to the rejection by Miracle Hill, she hadn't "really faced much discrimination" for being gay and when she and Eden received the rejection email from Miracle Hill, she "felt really sick to [her] stomach and upset . . . because it had never happened and [she] know[s] what kind of parents [they] are". (Ex. 10, Welch Tr. 59:3-16.)

## VI.    OTHER CPAS DISCRIMINATE AGAINST SAME-SEX COUPLES AND/OR NON-CHRISTIANS.

Miracle Hill is not the only South Carolina CPA that discriminates based on religion and/or sexual orientation. According to the website run by DSS's central intake system, Heartfelt Calling, at least two other CPAs in the Upstate Region—Connie Maxwell and Church of God Home for Children—discriminate based on religion. (Shutt Decl. ¶¶ 6-7 (Connie Maxwell Children's Ministries' description on Heartfelt Calling states "Connie Maxwell Children's

18

Ministries (CMCM) serves Christian families who want to foster.")[13]; Ex. 34, Staudt Ex. 13 (Church of God's description on Heartfelt Calling stated "SC Church of God Home for Children serves Christian individuals and families of any denomination who want to foster and meet the basic requirements to do so in addition to signing a statement of faith and morality statement.").) In addition, there was testimony from a Miracle Hill representative that another Upstate CPA, Southeastern Children's Home, excluded prospective foster families based on same-sex relationship status. (Ex. 12, Betts Tr. 207:02-06.)[14]

        DSS has not offered evidence that no other CPAs discriminate. Rather, its position is that it "is unaware of any CPA serving in the Upstate Region [other than Miracle Hill] who will decline to work with a prospective foster parent on the basis of the prospective foster parent's religion or same-sex marriage." (Shutt Decl. ¶ 2; *see also* Ex. 1, Lowe Tr. 127:9-16.) Being unaware of other CPAs that discriminate does not mean such CPAs do not exist. And after being ordered by the Court to provide the basis of DSS's knowledge, or lack thereof, regarding discrimination by other CPAs, the State Defendants' response indicates willful ignorance of such information. DSS's counsel stated that DSS's knowledge is based on its review of "information provided to it by CPAs and its own records of any requests for exemptions and the receipt of any complaints (or the lack thereof)". (Shutt Decl. ¶ 3.) DSS did not take any steps to find out if other

---

[13] *See also* Connie Maxwell website, which states "[o]ur mission is to provide safe, loving homes for children in need by connecting South Carolina churches and Christian families with community partners", (Ex. 35, Barton Ex. 5).

[14] A DSS foster care policy official who was asked which CPAs DSS knows accept families regardless of sexual orientation or religion was only able to identify three Upstate CPAs—South Carolina Mentor, SAFY and New Foundations. (Ex. 7, Barton Tr. 133:21-134:25; Ex. 1, Lowe Tr. 191:5-187:8.)

CPAs discriminated against prospective foster parents beyond reviewing materials the CPAs submitted and noting the lack of requests for exemptions or complaints. The inadequacy of reliance on this information is readily apparent as it is possible that (a) CPAs would not mention that they discriminate in their submissions to DSS, (b) CPAs would not seek an exemption from DSS in order to discriminate because it would be unnecessary in light of the blanket exemptions granted by the waiver and Executive Order, and (c) prospective foster parents who are turned away may not file a DSS complaint.

An email exchange with a DSS representative indicates that at least some individuals within DSS are aware that only a limited subset of CPAs are willing to accept lesbian, gay, bisexual, transgender and queer ("LGBTQ") people as foster parents. (*See* Declaration of David Wood ("Wood Decl.")) On January 24, 2022, David Wood—a former foster parent in Greenville who liaises between people interested in fostering and DSS—emailed Amber Peeples, Statewide Foster Parent Liaison at DSS, asking for a list of agencies that "are licensing LGBTQ families at this time". (*Id.* ¶ 13.) In response, Amber Peeples provided him a list of CPAs "who have no relational or identity restrictions". (*Id.* ¶ 14.) That list conspicuously did not identify several CPAs in the Upstate Region, including Church of God Home for Children, Connie Maxwell, Lifeline Children's Services, Nightlight Christian Adoptions, Southeastern Children's Home, the Bair Foundation and Miracle Hill as CPAs that are willing to work with LGBTQ foster parents. (*Id.*) In addition, the Governor's use of plural language in the waiver request letter to HHS and the Executive Order suggests he believed there were multiple CPAs who applied religious criteria. (*See* Ex. 2, Lowe Ex. 17 at -024 (seeking a deviation or waiver "on behalf of . . . faith-based *organizations*" (emphasis added); Ex. 28, Rogers_McMaster_000010 at 013-15

(referring to "faith-based organizations").)    But whether or not the State Defendants had

knowledge of other CPAs' discriminatory practices, they have not refuted the fact that other CPAs

have such practices.[15]

## LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must "show[] that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  *See* Fed. R. Civ. P. 56(a); *Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119 (4th Cir.

1995).   Although the moving party bears the initial burden of demonstrating that there is no

genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), once the movant

has made this threshold demonstration, the non-moving party, to survive the motion for summary

judgment, must offer more than a mere "scintilla of evidence" to support its position.  *Anderson v.

Liberty Lobby*, *Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

**I.    THE UNDISPUTED FACTS SHOW THAT STATE DEFENDANTS VIOLATED
PLAINTIFFS' EQUAL PROTECTION RIGHTS BY AUTHORIZING AND
ENABLING STATE-CONTRACTED CPAS TO USE RELIGIOUS CRITERIA TO
EXCLUDE SAME-SEX FOSTER COUPLES.**

State Defendants authorized and enabled state-contracted CPAs to categorically

exclude same-sex couples when providing public child welfare services on the State's behalf if the

exclusion is based on the CPA's religious beliefs.  State Defendants denied Plaintiffs access to the

---

[15] DSS does not know how many families have been subjected to discrimination by CPAs because of their religion or sexual orientation, as DSS does not require CPAs to tell DSS when they reject applicants based on religious criteria.  (Ex. 7, Barton Tr. at 115:16-116:4)  And the State does not track whether prospective foster parents who are turned away by a CPA go on to other agencies or decline to pursue fostering altogether.  (*Id.* at 155:04-18.)

same opportunities to foster children that are made available to different-sex couples and subjected

Plaintiffs to the stigma of being turned away from a government program because they are a same-

sex couple.   This discrimination based on sex and sexual orientation is presumptively

unconstitutional and subject to heightened scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct.

1678, 1689 (2017) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014) (sexual orientation);

*SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 484 (9th Cir. 2014) (sexual

orientation); *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012), *aff'd on other

grounds*, 570 U.S. 744 (2013) (sexual orientation).[16]   Under any level of scrutiny, however, State

Defendants' actions violate Plaintiffs' equal protection rights under the Fourteenth Amendment.

### A.    Discrimination against same-sex couples constitutes sex discrimination, triggering heightened equal protection scrutiny.

State Defendants' actions deprived the Plaintiffs of equal treatment because of their

sex.  As the Supreme Court recognized in *Bostock*, sexual orientation discrimination "necessarily

entails discrimination based on sex" because "it is impossible to discriminate against a person for

being homosexual . . . without discriminating . . . based on sex."  140 S. Ct. at 1747.  Here, State

Defendants have classified based on sex by permitting differential treatment of individuals seeking

to become foster parents based on having same-sex spouses.  More specifically, both Ms. Rogers

---

[16] Although the Court's ruling on Defendants' Motion to Dismiss suggested that rational basis review would apply to sexual orientation discrimination (ECF 81 at 45-46), the Court also acknowledged that this issue had not been fully briefed.  In any event, Plaintiffs preserve this argument for appeal.  Moreover, Plaintiffs' sex discrimination argument, which was not addressed at all in the Motion to Dismiss, provides an independent reason for applying heightened scrutiny. The Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which was issued after this Court's decision on the Motion to Dismiss, held that sexual orientation discrimination "necessarily entails discrimination based on sex".  *Id.* at 1747.

and Ms. Welch were turned away by a state-contracted CPA from pursuing licensure as a foster parent because each is a woman married to another woman, whereas a man married to either Ms. Welch or Ms. Rogers would not have suffered such discrimination. Thus, each was rejected because she is a woman.

Courts have recognized that government actions that treat same-sex and different-sex couples disparately facially classify on the basis of sex. *See, e.g.*, *Waters v. Ricketts*, 48 F. Supp. 3d 1271, 1281 (D. Neb. 2015) (a law "that mandates that women may only marry men and men may only marry women facially classifies on the basis of gender"), *aff'd*, 798 F.3d 682 (8th Cir. 2015); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1206 (D. Utah 2013) (finding that Utah's marriage laws prohibiting "a man from marrying another man," but not "from marrying a woman," classify based on sex), *aff'd on other grounds*, 755 F.3d 1193 (10th Cir. 2014); *see also Latta v. Otter*, 771 F.3d 456, 479 (9th Cir. 2014) (Berzon, J., concurring). Such sex-based discrimination is subject to heightened scrutiny and requires an "exceedingly persuasive justification." *See Morales-Santana*, 137 S. Ct. at 1690; *United States v. Virginia*, 518 U.S. 515, 532-33 (1996).

## B. Discrimination against same-sex couples constitutes sexual orientation discrimination, triggering heightened equal protection scrutiny.

State Defendants' actions also deprived Plaintiffs of equal treatment because of their sexual orientation. Permitting CPAs to exclude families headed by same-sex couples constitutes sexual orientation discrimination where families headed by different-sex couples are not similarly excluded. In assessing whether State Defendants' actions here are permissible, courts "are required by *Windsor* to apply heightened scrutiny to classifications based on sexual orientation for purposes of equal protection." *SmithKline*, 740 F.3d at 484 (citing *United States v.*

23

*Windsor*, 570 U.S. 744 (2013)).[17]  Though the Supreme Court did not use the nomenclature of heightened scrutiny in *Windsor*, it nonetheless applied that framework, closely examining the Defense of Marriage Act's principal purpose and effect of imposing inequality on same-sex couples, finding that no government purpose can overcome the law's imposition of a second-class status on lesbian, gay and bisexual people.  *See Windsor*, 570 U.S. at 769-75; *SmithKline*, 740 F.3d at 483 ("*Windsor* requires that when state action discriminates on the basis of sexual orientation, [the court] examine its actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status."); *see also Baskin*, 766 F.3d at 654 (sexual orientation discrimination proceeds "along suspect lines" and is "constitutionally suspect").

Numerous courts also have applied heightened scrutiny to classifications based on sexual orientation because they bear each of the independent indicia that courts historically have considered when determining whether to identify unequal treatment of individuals with a particular trait as suspect or quasi-suspect:  the history of discrimination against lesbian, gay and bisexual people; the lack of any connection between a person's sexual orientation and ability to perform or contribute to society; sexual orientation being a sufficiently distinguishing characteristic to identify lesbian, gay and bisexual people as a discrete minority group; and lesbian, gay and bisexual

---

[17] No controlling circuit law addresses the appropriate level of scrutiny for classifications based on sexual orientation.  The only Fourth Circuit decisions to address the issue, *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996) (en banc), and *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002), relied on *Bowers v. Hardwick*, 478 U.S. 186 (1986), and were necessarily abrogated when the Supreme Court overruled *Bowers* in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).  *See Pedersen v. Off. of Personnel Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Off. of Personnel Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

24

people's lack of sufficient political power to "adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor*, 699 F.3d at 181-85 (citing *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-42, 472 (1985)); *see also, e.g.*, *Baskin*, 766 F.3d at 655; *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 929 (S.D. Miss. 2014), *aff'd on other grounds*, 791 F.3d 625 (5th Cir. 2015); *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 427-30 (M.D. Pa. 2014); *Pedersen*, 881 F. Supp. 2d at 310-33; *Golinski*, 824 F. Supp. 2d at 985-90; *see also Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-32 (Conn. 2008); *In re Marriage Cases*, 183 P.3d 384, 441-44 (Cal. 2008). "[A]s a minority group that continues to suffer the enduring effects of centuries of legally sanctioned discrimination, laws singling [lesbian, gay, and bisexual people] out for disparate treatment are subject to heightened judicial scrutiny . . . ." *Kerrigan*, 957 A.2d at 432.

**C.    State Defendants' actions authorized and enabled the discrimination Plaintiffs were subjected to based on their sex and sexual orientation.**

State Defendants' actions authorized and enabled discrimination by Miracle Hill and other CPAs. (*See* Statement of Undisputed Facts § VI, *supra*.) Before Governor McMaster intervened, DSS enforced nondiscrimination regulations against CPAs and was in the process of enforcing them against Miracle Hill after learning of its discriminatory practices. (*Id.* § III.) Governor McMaster acted to permit Miracle Hill and other CPAs to discriminate, by seeking the HHS waiver (ECF No. 173-1), issuing the Executive Order (ECF No. 173-2) and directing DSS to discontinue enforcement of state nondiscrimination regulations and policies and instead issued a new permanent license to Miracle Hill. (Statement of Undisputed Facts § IV.) DSS did so *knowing* that Miracle Hill discriminated against prospective foster parents who are same-sex couples. (*Id.* § III.) As a result of these actions, Miracle Hill operates under state contract to carry

out a government function while turning away same-sex couples.  (Ex. 33, Busha Tr. 76-77; Ex. 12, Betts Tr. 135-38.)  The same is true of other CPAs.  (*See* Statement of Undisputed Facts § VI, *supra*.)

Moreover, when the State delegated its obligation to recruit and screen qualified foster families to CPAs, the State assumed direct responsibility for their practices.  *See Peltier v. Charter Day Sch.*, 37 F.4th 104, 115-17 (4th Cir. 2022) (holding that "when a state has outsourced or otherwise delegated certain duties to a private entity," the State may be held responsible for that private entity's decisions because "the state's engagement or encouragement is so significant.");  *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 676-77 (6th Cir. 2018) (finding that when Michigan contracted with a private CPA, it delegated its constitutional obligation to "protect children who are wards of the state").  Miracle Hill and other CPAs provide foster care services for children who are wards of the State, under the authority granted to it by the State.  *See* S.C. Code Regs. §§ 114-4910 to 114-4980.  Because the State has contracted with Miracle Hill and other CPAs to fulfill the State's duties under South Carolina law, the State may not now "ignore blatant, unconstitutional discrimination committed" in the fulfillment of those duties.  *Peltier*, 37 F.4th at 118.

**D.    State Defendants' actions subjected Plaintiffs to harm.**

As a result of the State Defendants' actions, Plaintiffs face the harms of being excluded from participation in a government program on equal terms because of their sex and sexual orientation.  The degradation and stigma of being denied equal treatment by the State themselves cause constitutional injury.

> [D]iscrimination itself, . . . by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political

26

> community, . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

*Heckler v. Matthews*, 465 U.S. 728, 739 (1984) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).

Being turned away from a CPA based on their sex and sexual orientation burdens Plaintiffs and others by subjecting them to the pain of discrimination. "'Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of'" a protected aspect of their identity, such as sex or sexual orientation. *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 292 (1964) (Goldberg, J., concurring) (quoting S. Rep. No. 88-872, at 16 (1964). Ms. Rogers described not only the pain she experienced after Miracle Hill's initial rejection of her application, but also the discomfort she felt at the prospect of being rejected by another CPA in the Upstate Region. (Ex. 9, Rogers Tr. 126:22-128:4.) And Ms. Welch testified to the emotional harm she experienced when she discovered State Defendants were seeking to allow CPAs to discriminate against people like her, seeking to foster children in foster care. (Ex. 10, Welch Tr. 75:12-23.) The "stigmatizing injury often caused by . . . discrimination . . . is one of the most serious consequences of discriminatory government action." *Allen v. Wright*, 468 U.S. 737, 755 (1984).

Plaintiffs are also subjected to practical harms as a result of the Defendants' conduct. DSS recognizes the benefits of families having the ability to choose the CPA that best suits their needs. (Ex. 7, Barton Tr. 287:25-288:3.) But same-sex couples are offered a reduced list of choices. As this Court recognized, that alone is sufficient to constitute harm under the Equal

Protection Clause. (ECF No. 81 at 39); *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier . . . ."); *Dumont v. Lyon*, 341 F. Supp. Ed 706, 722 (E.D. Mich. 2018) ("Plaintiffs' [sic] need not demonstrate that they would have been completely foreclosed—only that they could not compete for the right to adopt on the same footing as everyone else."). Even if Miracle Hill were the only CPA that excluded same-sex couples, denying same-sex couples that option that is available to other families would constitute a denial of equal treatment. But Miracle Hill is not the only CPA serving the Upstate Region that discriminates. As discussed above, in response to an inquiry earlier this year asking which CPAs "are licensing LGBTQ families at this time," DSS's Statewide Foster Parent Liaison Amber Peeples provided a list indicating that only a subset of Upstate CPAs "have no relational or identity restrictions." (Wood Decl. ¶¶ 13-14.) Miracle Hill was not the only CPA missing from that list; it also did not include Church of God Home for Children, Connie Maxwell, Lifeline Children's Services, Nightlight Christian Adoptions, Southeastern Children's Home and the Bair Foundation. (*See* Statement of Undisputed Facts § VI, *supra*.)

Moreover, CPAs are not interchangeable, so the harm is not only quantitative but also qualitative. Miracle Hill is substantially larger and better resourced and staffed than all of the other nontherapeutic CPAs in the Upstate Region and, thus, able to offer support not offered elsewhere; has decades of experience while others are new to the field; has helped license lion's share of foster families in the region—hundreds over the past five years versus many others handling less than a dozen; and the overwhelming majority of nontherapeutic foster care

28

placements in the region are with Miracle Hill families.  (*See supra*, Statement of Undisputed Facts § I.)  And the remaining 11 CPAs in the Upstate Region vary significantly in terms of experience (*id.*)[18] and some of the other CPAs that were not included in Ms. Peeple's list of CPAs that would work with same-sex couples are among the more experienced CPAs (e.g. Connie Maxwell, Lifeline and the Bair Foundation).  (*Id.*)  Thus, Plaintiffs are prevented from accessing the same quality of CPAs in terms of experience and support as different-sex couples, in contravention of the Equal Protection Clause. *See Virginia*, 518 U.S. at  553 (finding unconstitutional the state's provision of a women's military education program "unequal in tangible and intangible benefits" because it lacked the same "range of curricular choices and faculty stature, funding, prestige, alumni support and influence" as the program for men).

Even if the other alternatives available to same-sex couples were comparable, that would be inconsequential.  The ability of prospective foster parents to "opt out of discriminatory treatment" does not excuse State Defendants from engaging in discrimination. *Peltier*, 37 F.4th at 119 (holding that "the option of attending a traditional public school" does not relieve the state of responsibility for sex-based discrimination at a charter school because "[*n*]*o* public school in North Carolina can violate the constitutional rights of its students").  Here, as in *Peltier*, State Defendants may not authorize and enable Miracle Hill and other CPAs to discriminate on the basis of sex and sexual orientation simply because some other CPAs do not do so.

---

[18] *See* Ex. 3, 10545-G0716 at -718, 720-21; Ex. 13, 10545-G0001.  Of the 11 other CPAs in the Upstate Region handling nontherapeutic foster care, five have helped license a total of fewer than 15 families since 2017; three have only been operating or providing nontherapeutic foster care services since 2020.  (Ex. 3, 10545-G0716 at -718.)

E.    **State Defendants cannot justify their infringement of Plaintiffs' Equal Protection rights.**

No justification State Defendants might offer to support their actions can survive any level of scrutiny, let alone the heightened scrutiny required for sex and sexual orientation discrimination.    Under that standard, State Defendants have the burden of establishing an "exceedingly persuasive justification" for their actions, showing that their actions serve "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."    *Hogan*, 458 U.S. at 724 (first quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981); and then quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980)).    Even under rational basis review, the state may not disadvantage a disfavored group for its own sake, *see U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and state action that relies on a classification must bear at least a rational relationship to a legitimate governmental interest, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). State Defendants have cited as reasons for its actions accommodation of CPAs' religious beliefs and "increasing community support and options for foster child placement by maximizing the number and diversity of CPAs".    (ECF No. 57 at 26.)    Neither of these interests passes constitutional muster.

*First*, as discussed in Part II, *infra*, the State's interest in accommodating private religious beliefs cannot justify harming third parties like the Plaintiffs.    The government cannot justify discrimination with the desire to accommodate private views.    *See Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015) (religious opposition does not justify government denial to same-sex couples of the same freedom to marry afforded different-sex couples); *Romer v. Evans*, 517 U.S. 620, 635 (1996) (rejecting accommodation of personal or religious objections to homosexuality as

30

justification for government discrimination based on sexual orientation); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948).

*Second*, DSS's top foster care officials disavowed any purported interest in increasing foster family options for children as a basis for allowing discrimination against families by CPAs. They testified that the best practice in the field of child welfare is not to permit such discrimination, that non-discrimination based on religion or sexual orientation of foster parents furthers the best interests of children in foster care, and that it would be best to have all CPAs serving all families. (Ex. 7, Barton Tr. 116:9-23, 220:25-221:23; Ex. 1, Lowe Tr. 174:9-25.)

State Defendants have not and cannot provide any evidence that the waiver or Executive Order resulted in a greater availability of foster families. (*See* ECF No. 204-1 at 7; Ex. 36, Tester Tr. 37:9-38:1 (showing that DSS did not study the impact of the waiver or the Executive Order on the availability of foster homes and that a DSS representative did not know if doing so would even be possible).) On the contrary, DSS's admitted lack of any system to identify or ensure that those families that are turned away for failing to meet religious criteria—including the 25-30 families turned away by Miracle Hill alone—are connected to other CPAs, underscores the disconnect between the State's proffered interest and its actions. Given these undisputed facts, the State Defendants' asserted interest in increasing foster family opportunities for children cannot be credited.

Plaintiffs' Equal Protection rights under the Fourteenth Amendment have been violated.

## II.    STATE DEFENDANTS' ACTIONS VIOLATE THE ESTABLISHMENT CLAUSE.

State Defendants violate the Establishment Clause by authorizing and enabling state-contracted CPAs to use religious criteria to exclude prospective foster parents.

*First*, State Defendants have delegated a government function—recruiting and screening foster parents to care for children in State custody—to religiously affiliated organizations that exclude prospective foster parents based on religious criteria. This violates "the core rationale underlying the Establishment Clause"—namely, "preventing 'a fusion of governmental and religious functions'". *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126 (1982) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963)).

*Second*, while State Defendants argue they are simply accommodating Miracle Hill's religious exercise, they are doing so in a way that imposes significant burdens and harms on third parties—non-Christians and same-sex couples seeking to provide loving homes to children in the care of the State. As such, State Defendants' actions "contravene[] a fundamental principle of the Religion Clauses": that "no one [has] the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (quoting *Otten v. Balt. & O.R. Co.*, 205 F.2d 58, 61 (2d Cir. 1953)).

*Third*, State Defendants' actions coerce prospective foster parents into supporting CPAs' religious beliefs in order to become a foster parent. As the Supreme Court has reiterated, the government may not, consistent with the Establishment Clause, coerce any individual to

support a particular religion. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2429 (2022);

*see also Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring).

A.      **The undisputed facts establish that the State Defendants have delegated a government function to religious organizations and authorized them to use a religious eligibility test, in violation of the Establishment Clause.**

A state may not delegate government power to religious organizations absent some

assurance that the governmental power "will be exercised neutrally". *Bd. of Educ. of Kiryas Joel*

*Village Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994). Thus, in *Larkin*, the Supreme Court held

that a state statute that vested authority in a house of worship to veto applications for liquor licenses

violated the Establishment Clause. 459 U.S. at 123-27. The Court explained that licensing

merchants to sell liquor was "a power ordinarily vested in agencies of government", *id.* at 121, and

that delegating this veto power to churches could result in its being "employed for explicitly

religious goals, for example, favoring liquor licenses for members of that congregation or

adherents of that faith," *id.* at 125. Moreover, there was no "'effective means of guaranteeing' that

the delegated power 'will be used exclusively for secular, neutral, and nonideological purposes.'"

*Id.* (quoting *Comm. for Pub. Educ. v. Nyquist*, 413 U.S. 756, 780 (1973)); *see also Kiryas Joel*,

512 U.S. at 696 (holding that the delegation of authority over a public school to a religious group

was improper where there was "no assurance that governmental power has been or will be

exercised neutrally").

Here, State Defendants have delegated to CPAs, including religiously affiliated

CPAs, the governmental function of screening prospective foster families, and authorized the

CPAs—including Miracle Hill—to carry out such function  out using religious eligibility criteria

to exclude prospective foster families. Moreover, State Defendants are aware that at least one

33

CPA—Miracle Hill—is using religious criteria to exclude prospective foster families headed by individuals who do not share the CPA's religious beliefs and same-sex couples of any or no faith. As Judge Cain held in denying State Defendants' motion to dismiss Plaintiffs' Establishment Clause claim, these facts establish a violation of the Establishment Clause. (*See* ECF No. 81 at 35-37; *see also Dumont*, 341 F. Supp. 3d at 736-40.)

This case presents an even clearer violation of the Establishment Clause than *Larkin* and *Kiryas Joel* because those cases concerned the mere *risk* of government functions being carried out in a way that is not neutral to religion. Here, however, the actions of State Defendants specifically authorize CPAs to use religious criteria, and State Defendants know that at least one CPA is carrying out this government function in a way that is not religiously neutral.

### 1. DSS delegates the core government function of providing foster care services to private CPAs, including religiously affiliated CPAs that use religious eligibility criteria when carrying out government functions.

The provision of foster care services to children in the government's custody is a core government function. Having removed children from their families due to concerns about abuse or neglect, the State has a duty to take care of these youth in its custody. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010) ("[W]hen a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause and imposing 'some responsibility for [the child's] safety and general well-being.'"). That includes providing them with safe housing and care. *See id.* DSS, like many states, uses foster families to house and care for children in its custody. *Id.* And as in many states, DSS contracts

out the job of finding and screening foster families for children in state custody to private CPAs, thereby delegating its duties to private CPAs.

Before the Governor's office interceded, DSS enforced nondiscrimination provisions that ensured religiously affiliated CPAs did not impose religious eligibility criteria on prospective foster parents. Indeed, DSS was prepared to revoke Miracle Hill's license, because of its religious exclusions. (Ex. 1, Lowe Tr. 172:20-173:3.) But the Governor prevented DSS from ensuring that religiously affiliated CPAs carry out a government function in a manner that is neutral as to religion; rather, the Governor *authorized* CPAs to exclude families based on religion.

It is well settled that the State cannot accomplish indirectly what it is constitutionally prohibited from accomplishing directly. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990); *Norwood v. Harrison*, 413 U.S. 455, 464–65 (1973). It would clearly violate the Establishment Clause if DSS itself refused to accept prospective foster parents based on a religious test. *See, e.g.*, *Everson v. Bd. of Educ.*, 330 U.S. 1, 18 (1947) ("[The First] Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers."). It is no less a violation for the State to authorize private entities to do so.

### 2. *State Defendants know that at least one CPA uses religious criteria to exclude families.*

State Defendants know that at least one CPA—Miracle Hill—performs its foster care services in a manner that is not neutral with respect to religion by excluding all Christians and same-sex couples. (Ex. 34, Staudt Ex. 13.) State Defendants are aware of Miracle Hill's practices; indeed, they took action to ensure that Miracle Hill could continue to exclude families based on religion. DSS claims it is "unaware" of any other CPAs besides Miracle Hill that exclude applicants based on religious criteria. (Shutt Decl. ¶ 2.) That would not be surprising given that

DSS does not require CPAs to notify it when it turns prospective foster parents away on this basis. (Ex. 7, Barton Tr. at 115:16-116:4.)  But, as discussed above, there are other CPAs that discriminate, and DSS's Statewide Foster Parent Liaison is aware that some CPAs exclude families based on sexual orientation.  (Wood Decl.)  But, whether it is just one CPA or many that take up the State's invitation to discriminate based on religious criteria in performing this delegated government function, it is a violation of the Establishment Clause.

**B.**     **State Defendants' actions violate the Establishment Clause because they impose significant burdens on third parties.**

Although "the Constitution allows the State to accommodate religious needs by alleviating special burdens . . . accommodation is not a principle without limits." *Kiryas Joel*, 512 U.S. at 705-06.  To pass constitutional muster, an accommodation must not impose significant burdens on third parties.  *Caldor*, 472 U.S. at 709-10; *see also Burwell v. Hobby Lobby*, 573 U.S. 682, 739 (2014) (Kennedy, J., concurring) (explaining that religious exercise cannot "unduly restrict other persons . . . in protecting their own interests").

State Defendants' actions in this case cause significant burdens on third parties.  As noted above, Plaintiffs were one of approximately 25 to 30 prospective foster families who were turned away by Miracle Hill since 2017 because of its religious requirements.  (Ex. 12, Betts Tr. 97:11-98:2.)  Moreover, there are additional CPAs that discriminate based on religion and/or sexual orientation.  *See supra*, Statement of Undisputed Facts § VI.  But even if it were just Miracle Hill, a system that provides a reduced set of choices for applicants who fail to meet a CPA's religious test—and as discussed above, the reduced options are not comparable—imposes a marked burden on the excluded families and thereby violates the Establishment Clause.  *See Barber v. Bryant*, 193 F. Supp. 3d 677, 721-22 (S.D. Miss. 2016) (finding, on a motion for

36

preliminary injunction, that plaintiffs were likely to win on the merits of their Establishment Clause claim because the state law at issue allowed employees to refuse service for religious reasons on the basis of sexual orientation and thus result[ed] in LGBT citizens being personally and immediately confronted with a denial of service"), *rev'd on other grounds*, 860 F.3d 345 (5th Cir. 2017).

**C.    State Defendants' actions coerce private citizens into supporting CPAs' religious beliefs.**

Because State Defendants' actions authorize and enable CPAs to condition access to public programs on adhering to its religious beliefs, State Defendants unduly coerce people seeking to be foster parents, like Plaintiffs, to engage in and support CPAs' religion in violation of the Establishment Clause. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Indeed, coercing private citizens to engage in a particular religious exercise "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 142 S. Ct. at 2429. The "traditional hallmarks" of coercion include (1) punishment for failure to participate in a particular religion, (2) governmental financial support of religion "in a way that preferred the established denomination" and (3) using preferred religious organizations "to carry out certain civil functions." *Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring).

That is precisely what happened here. The State has granted religious CPAs the power to carry out the civil function of recruiting and screening prospective foster parents and authorized them to deny applications from families that do not adhere to their religious beliefs. Notably, the evidence shows that a number of CPAs that have discriminatory practices receive

administrative fees from DSS. (*See* Ex. 13, 10545-G0001 at 001-002; Statement of Undisputed

Facts § VI, *supra*.) In order to access their services, prospective foster parents must either adhere

to its faith-based doctrines or be relegated to a limited pool of CPAs that have fewer resources and

less experience. The coercive effects of State Defendants' actions violate the Establishment

Clause.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their

motion for summary judgment.

November 17, 2022

/s/ Nekki Shutt
South Carolina Equality Coalition, Inc.
Nekki Shutt (Federal Bar No. 6530)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd floor
P.O. Box 1929
Columbia, SC 29202
(803) 904-7912
nshutt@burnetteshutt.law

Peter T. Barbur (admitted *pro hac vice*)
Rebecca Schindel (admitted *pro hac vice*)
Mika Madgavkar (admitted *pro hac vice*)
Cristopher W. Ray (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pbarbur@cravath.com
rschindel@cravath.com
mmadgavkar@cravath.com

38

cray@cravath.com

Leslie Cooper (admitted *pro hac vice*)
Jon Davidson (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
lcooper@aclu.org

Daniel Mach (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org

M. Currey Cook (admitted *pro hac vice*)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ccook@lambdalegal.org

Karen L. Loewy (admitted *pro hac vice*)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street NW, 8th Fl.
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org

**ATTORNEYS FOR PLAINTIFFS**