# EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH CAROLINA
 2                  GREENVILLE DIVISION
    -----------------------------------------X
 3

    EDEN ROGERS and
 4
    BRANDY WELCH,
 5
                   Plaintiffs,
 6
          vs.              CASE NO. 6:19-cv-01567-TMC
 7
    UNITED STATES DEPARTMENT OF HEALTH
 8  AND HUMAN SERVICES;
 9  ALEX AZAR, in his official capacity as SECRETARY of
    the UNITED STATES DEPARTMENT OF
10  HEALTH AND HUMAN SERVICES;
11  ADMINISTRATION FOR CHILDREN AND FAMILIES;
12  LYNN JOHNSON, in her official capacity as ASSISTANT
    SECRETARY of the ADMINISTRATION FOR CHILDREN AND
13  FAMILIES;
14  SCOTT LEKAN, in his official capacity as PRINCIPAL
    DEPUTY ASSISTANT SECRETARY of the ADMINISTRATION
15  FOR CHILDREN AND FAMILIES;
16  HENRY MCMASTER, in his official capacity as
    GOVERNOR of the STATE OF SOUTH CAROLINA;
17
    MICHAEL LEACH, in his official capacity as STATE
18  DIRECTOR of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
    SERVICES,
19
                   Defendants.
20  -----------------------------------------X
    VIDEOTAPED
21  DEPOSITION OF:   JACQUELINE LOWE
                     (APPEARING VIA VIRTUAL ZOOM)
22
    DATE:            June 3, 2021
23
    TIME:            9:27 AM
24
    REPORTED BY:     TERRI L. BRUSSEAU
25                   (APPEARING VIA VIRTUAL ZOOM)
```

Page 2

```
 1     LOCATION OF
       THE DEPONENT:     Law Offices of
 2                       Davidson Wren & DeMasters
                         1611 Devonshire Drive, 2nd Floor
 3                       Columbia, SC
 4     TAKEN BY:         Counsel for the Plaintiffs
                         (Kate Janson)
 5

       APPEARANCES OF COUNSEL:
 6
                 ATTORNEYS FOR THE PLAINTIFFS
 7                    EDEN ROGERS and BRANDY WELCH:
 8                    CRAVATH SWAINES & MOORE, LLP
                      BY:  KATE JANSON
 9                        (APPEARING VIA VIRTUAL ZOOM)
                          REBECCA SCHINDEL
10                        (APPEARING VIA VIRTUAL ZOOM)
                          CRIS RAY
11                        (APPEARING VIA VIRTUAL ZOOM)
                      Worldwide Plaza
12                    825 Eighth Avenue
                      New York, NY  10019
13                    (212) 474-1989
                      kjanson@cravath.com
14                    rschindel@cravath.com
                      cray@cravath.com
15
                      AMERICAN CIVIL LIBERTIES UNION
16                    BY:  LESLIE COOPER
                          (APPEARING VIA VIRTUAL ZOOM)
17                    125 Broad Street
                      New York, NY  10004
18                    (212) 549-2500
                      lcooper@aclu.org
19
                      LAMBDA LEGAL DEFENSE AND EDUCATION
20                    FUND, INC.
                      BY:  CURREY COOK
21                        (APPEARING VIA VIRTUAL ZOOM)
                          MAIA ZELKIND
22                        (APPEARING VIA VIRTUAL ZOOM)
                      120 Wall Street, 19th Floor
23                    New York, NY  10005
                      (212) 809-8585
24                    ccook@lambdalegal.org
                      mzelkind@lambdalegal.org
25
```

Page 3

```
 1        ATTORNEYS FOR THE DEFENDANT
              MICHAEL LEACH, IN HIS OFFICIAL CAPACITY
 2            AS STATE DIRECTOR OF SOUTH CAROLINA
              DEPARTMENT OF SOCIAL SERVICES:
 3
              DAVIDSON WREN & DEMASTERS, PA
 4            BY:  JONATHAN RIDDLE
                   (APPEARING VIA VIRTUAL ZOOM)
 5            1611 Devonshire Drive, Suite 200
              Columbia, SC  29204
 6            (803) 806-8222
              jriddle@dml-law.com
 7
          ATTORNEYS FOR THE DEFENDANTS
 8            HEALTH AND HUMAN SERVICES,
              ADMINISTRATION FOR CHILDREN AND
 9            FAMILIES, THE SECRETARY OF HHS, LYNN
              JOHNSON, THE ASSISTANT SECRETARY OF
10            ADMINISTRATION OF CHILDREN AND
              FAMILIES, AND STEVEN WAGNER, ASSISTANT
11            SECRETARY OF ADMINISTRATION CHILDREN
              AND FAMILIES:
12
              UNITED STATES ATTORNEY'S OFFICE
13            DISTRICT OF SOUTH CAROLINA
              BY:  CHRISTIE NEWMAN,
14                 ASSISTANT UNITED STATES ATTORNEY
                   (APPEARING VIA VIRTUAL ZOOM)
15            55 Beattie Place, Suite 700
              Greenville, SC  29601
16            (864) 282-2100
              newman@usdoj.gov
17
          ATTORNEYS FOR THE DEFENDANT
18            HENRY MCMASTER, IN HIS OFFICIAL
              CAPACITY AS GOVERNOR OF THE STATE OF
19            SOUTH CAROLINA:
20        NELSON MULLINS RILEY & SCARBOROUGH, LLP
              BY:  MILES COLEMAN
21                 (APPEARING VIA VIRTUAL ZOOM)
                   HUNTER WINDHAM
22                 (APPEARING VIA VIRTUAL ZOOM)
              1320 Main Street, 17th Floor
23            Greenville, SC  29201
              (864) 799-2000
24            miles.coleman@nelsonmullins.com
              hunter.windham@nelsonmullins.com
25
```

Page 4

1          ALSO PRESENT:

2                 George Libbares, Concierge Technician

                  (Appearing Via Virtual Zoom)

3

                  Wale A. Akintunde, Video Technician

4                 (Appearing Via Virtual Zoom)

5                 (INDEX AT REAR OF TRANSCRIPT)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 18

```
 1    to make it clear which is which in my questions.
 2             A.    Thank you.  I appreciate that.
 3             Q.    Sure.  Just a little bit of background
 4    about you I'd like to go through.  What -- what
 5    sort of educational degrees do you hold?
 6             A.    I hold a Bachelor of Science degree in
 7    Criminal Justice, a Bachelor's of Social Work
 8    degree, Master's of Education in Rehabilitation
 9    Counseling.
10             Q.    Okay.  I'll just take those one at a
11    time.  Your Bachelor of Science in Criminal
12    Justice, from what school did you get that degree?
13             A.    From the University of South Carolina,
14    Columbia.
15             Q.    And what year was that?
16             A.    1987.
17             Q.    Okay.  And then you also said
18    Bachelor's of Social Work.  When -- what school did
19    you attain that degree from?
20             A.    That is from -- gosh, I'm drawing a
21    blank.  That was in 1991, I believe.
22             Q.    Okay.  And then the last one, Master's
23    of Education in Rehabilitation Counseling, from
24    what institution did you get that degree from?
25             A.    University of South Carolina, Columbia.
```

Page 19

```
 1              Q.   And in what year?
 2              A.   2001.
 3              Q.   Okay.
 4              A.   Yeah.
 5              Q.   Great.  And for how long have you been
 6    employed by DSS?
 7              A.   About 25 years.
 8              Q.   Okay.  And what is -- what is your
 9    current position there?
10              A.   My current position is director of
11    child welfare and licensing.
12              Q.   And can you just describe for me sort
13    of in broad strokes what your responsibilities are
14    in that role.
15              A.   Sure.  In that role I'm responsible for
16    staff across the state who are licensing foster
17    family homes who are supporting foster families,
18    also staff who license families with the child
19    placing agencies and also license child placing
20    agencies themselves as well as group homes
21    throughout the state.
22              Q.   So you're -- and how long have you held
23    that position?
24              A.   I've been in this current role since
25    2011.
```

Page 20

```
 1          Q.   And before that, what was your position
 2     at DSS?
 3          A.   Before that I was working as a -- in
 4     our specialized foster home services program, so a
 5     program manager that was responsible for the public
 6     therapeutic child welfare foster care licensing for
 7     the agency and then it rolled into the state
 8     office, statewide management.
 9          Q.   Okay.  And you said therapeutic foster
10     care, I believe.  What does therapeutic foster care
11     mean?
12          A.   So therapeutic are classification for
13     children that have more specific care needs than
14     what will be considered standard over day-to-day
15     care needs for children.  So it could be children
16     with complex medical care needs, with
17     classifications for diagnoses of behavioral
18     conditions or disorders, so those children that
19     would require more than what you would do for any
20     child on a day-to-day basis.
21          Q.   Okay.  And for those children who don't
22     fall into that category, is that type of foster
23     care, is that sometimes referred to as
24     nontherapeutic foster care?
25          A.   That is correct.
```

Page 21

1          Q.   Okay.  So in that position, that was

2     from 2001, how long did that run back for?

3          A.   A few years.  I don't have my resume in

4     front of me for these specific dates, but just a

5     few years.  Probably maybe four years or so in that

6     role or capacity.

7          Q.   Okay.  And then was there another --

8     was there another position before that that you

9     served at DSS?

10          A.   Sure.  Adoption administrator and then

11     also did technical assistance for DSS in terms of

12     foster care working with counties and regions

13     around foster care issues.  And then again the

14     adoption administrator, so served a region of the

15     state where we provided adoption specific services

16     for applicants who were wanting to be approved for

17     adoption purposes.

18          Q.   Okay.  And was that -- have we touched

19     on all of the roles that you've had at DSS in your

20     tenure there or are there others?

21          A.   I also served as a foster care worker

22     with the Department and then prior to that I worked

23     in economic services, which were financial services

24     for applicants.

25          Q.   When you say a foster care worker, what

Page 22

1    does that role entail?

2         A.    So with the foster care worker, there

3    was a caseload that I managed of children who were

4    in out-of-home placements, i.e. foster care, and

5    would visit them on a regular basis to ensure that

6    the services were being provided to them per their

7    treatment plan.

8         Q.    So that was a caseworker type role

9    where you were assigned to particular children?

10        A.    That is correct.

11        Q.    Okay.  Great.  And then before you were

12   employed at DSS, where were you employed prior to

13   that?

14        A.    I was with DSS and then I left and went

15   to one of the private therapeutic foster care

16   agencies with South Carolina MENTOR, and then I

17   also worked with the state Department of Mental

18   Health and then came back to the Department.

19        Q.    Okay.  And what was your -- what were

20   your responsibilities when you worked for South

21   Carolina MENTOR?

22        A.    With South Carolina MENTOR I was a case

23   manager for a caseload of children with complex

24   medical care needs and so I facilitated or

25   coordinated services delivery for them, supported

Page 28

1    that each of those CPAs received from -- in South
2    Carolina for the years 2017 through much of 2020.
3    Does that sound right to you?
4         A.   It does.
5         Q.   And if you just -- if you take a look
6    at the names of the CPAs listed there, does that
7    appear to be a complete list of the state
8    contracted CPAs in South Carolina?
9         A.   I can't speak to all of the state
10   contracted facilities.  That's not a part of -- my
11   responsibility is whether agencies are contracted,
12   but this does show some of the agencies that are
13   licensed by the Department and some that are paid
14   for services.
15        Q.   Okay.  Are there any CPAs that are
16   licensed by the Department that you -- that come to
17   mind that you don't see on that list?
18        A.   Yes.
19        Q.   And which are those?
20        A.   Let's see.  Well, there are -- let me
21   say that JusticeWorks Behavioral Care is not
22   licensed by the Department so -- you know, there
23   may be a contract that I'm not aware of, but that
24   agency is not licensed by DSS.  So there are newer
25   agencies that have been licensed by the Department

Page 29

```
 1      that's not on this list, like Oasis of Hope I
 2      believe is one, so there have been newer agencies
 3      licensed since this list that's not included here.
 4              Q.    Okay.
 5              A.    This list are licensed except for the
 6      JusticeWorks mentioned as well as LifeShare.
 7              Q.    LifeShare is also not licensed -- not a
 8      licensed CPA?
 9              A.    LifeShare Management Group is not
10      licensed by South Carolina DSS.
11              Q.    Okay.  And there's a CPA that we've
12      come across that's called The MENTOR Network.  I
13      didn't see that on this list.  Is that a licensed
14      South Carolina CPA?
15              A.    They are.
16              Q.    And any others that come to mind that
17      are licensed CPAs that don't show up on this chart?
18              A.    The South Carolina MENTOR is on the
19      chart.
20              Q.    So The MENTOR Network --
21              A.    It's on Page 2.
22              Q.    Okay.  So The MENTOR Network and South
23      Carolina MENTOR, that's the same thing?
24              A.    That is correct.
25              Q.    Got it.
```

                                                    Page 30

1              A.    Yeah, for South Carolina, it's South

2    Carolina MENTOR, but it is part of The MENTOR

3    Network.

4              Q.    Got it.  Okay.  Thank you.  So from

5    this list -- so -- let me back up a second.

6                    Is South Carolina divided into regions

7    for purposes of DSS's work?

8              A.    Yes, they are.

9              Q.    Okay.  And what region is the

10   Greenville area a part of?

11             A.    Greenville is a part of the upstate

12   region.

13             Q.    Is that also referred to as Region 1?

14             A.    Previously it was referred to as

15   Region 1.

16             Q.    Okay.  But now you call it the upstate

17   region?

18             A.    That is correct.

19             Q.    Okay.  If I -- I'll try to call it

20   that, but if I say Region 1, you'll understand that

21   that's what I'm talking about?

22             A.    I will, yes.

23             Q.    Great.  And can we -- can you run down

24   the list for me and let me know which of these CPAs

25   on the list here were -- are Region 1 -- or, sorry,

```
 1      I already messed up, upstate region CPAs?
 2             A.    Can I also just mention that although
 3      some of these are located in the upstate, they also
 4      work statewide.  Okay?
 5             Q.    Yes.
 6             A.    So --
 7             Q.    Okay.
 8             A.    So Church of God Home For Children are
 9      in the upstate, Connie Maxwell.  Epworth Children's
10      Home has a presence in the upstate.  Family
11      Preservation is statewide, so is Growing Home.
12      Crosswell is Pee Dee.  Miracle Hill Ministry,
13      upstate.  New Foundations Home for Children,
14      upstate.  Nightlight Christian Adoptions, upstate.
15      South Carolina Youth Advocate, statewide, so if
16      somehow you want to classify that.
17                   South Carolina MENTOR is statewide.
18      Southeastern, upstate.  Tamassee, upstate.
19      Thornwell, upstate.  The Bair Foundation is
20      statewide but has an upstate presence.  SAFY, which
21      is the same as Specialized Alternatives For Youth,
22      so it's listed out here a couple different ways,
23      they are statewide but has an upstate presence.
24      The Bair Foundation, statewide, has an upstate
25      presence as well.
```

1          Q.   Okay.  Great.  So you said -- I think

2     you called it SAFY, is that the -- how it's

3     pronounced?

4          A.   Yes.  That's it.  That's the acronym,

5     but it's Specialized Alternatives For Youth.

6          Q.   And there's three lines I think that

7     look like they all refer to that CPA in some

8     capacity, right?  There's SAFY, Inc., SAFY of South

9     Carolina, Inc. and Specialized Alternatives For

10    Children.  That got cut off of it.  So is that

11    all -- are those lines all referring to the same

12    entity?

13         A.   Yes.

14         Q.   Do you have any understanding of why

15    it's broken out into those three separate entries

16    on the chart?

17         A.   I do not.

18         Q.   Okay.  In addition to the ones that you

19    mentioned there that serve either Region 1 in

20    particular or that are statewide, is Lutheran

21    upstate region CPA Lutheran Family Services?

22         A.   Lutheran is primarily in the midlands,

23    but they may serve statewide.

24         Q.   Okay.  And then how about South

25    Carolina Church of God?

Page 34

1          Q.   Any other upstate area CPAs that
2     provide nontherapeutic services that we haven't
3     mentioned?
4          A.   I don't -- I think of the ones we've
5     mentioned, that was it for the upstate.
6          Q.   Great.  I'm just going to walk through
7     that list that we just went over.  And for each
8     one, if you can tell me when they began to the
9     extent -- you know, ballpark when they began
10     providing foster care services for Connie Maxwell.
11          A.   They've got a longstanding history with
12     the Department and with the state, so it's been a
13     long time.  Certainly more than 20 years.
14          Q.   Okay.  And how about Epworth?
15          A.   The same.  I think on their website
16     you'll see they're probably a 100-year history of
17     providing services to children throughout the
18     state.
19          Q.   And Lutheran?
20          A.   Lutheran has been licensed for a number
21     of years as well with the Department.
22          Q.   Do you think ten years or more, less
23     than ten years?
24          A.   Ten years or more.
25          Q.   Okay.  And how about Miracle Hill?

```
                                        Page 35
 1          A.    Longstanding, so long time, more than
 2     20 years.
 3          Q.    What about Nightlight?
 4          A.    Nightlight is a newer licensed agency,
 5     so less than ten years.
 6          Q.    And how about the Church of God Home
 7     For Children?
 8          A.    They've been licensed for a few years,
 9     probably around ten years.
10          Q.    Okay.  And then what about Thornwell?
11          A.    Thornwell has a long -- longer history,
12     so more than ten.
13          Q.    I just want to confirm.  I know you had
14     mentioned that there were a couple of other CPAs
15     that worked in the upstate region.  One of those is
16     called Tamassee, I believe.  Is that a therapeutic
17     or a nontherapeutic CPA?
18          A.    They are currently closed, but they
19     were a nontherapeutic.
20          Q.    Okay.  But they are not providing
21     foster care services right now, they're closed?
22          A.    That is correct.
23          Q.    Okay.  And what about The Bair
24     Foundation, is that therapeutic or nontherapeutic?
25          A.    They're both.
```

1          Q.    And for about how long have they been

2     licensed as a CPA in South Carolina?

3          A.    More than ten years.

4          Q.    Okay.  And then what about the entities

5     that we talked about earlier, the SAFY entities, is

6     that therapeutic or nontherapeutic or both?

7          A.    They're providing both therapeutic and

8     nontherapeutic services and more than ten years.

9          Q.    Perfect.  You're asking the questions

10    for me now.  This is great.  Okay.

11               So can you describe for me generally

12    what role child placing agencies, private child

13    placing agencies, play in the foster care system in

14    South Carolina?

15         A.    Sure.  I'll talk about it in sort of

16    two roles.  They're one as a child placing agency

17    as an entity itself, and so the agency would make

18    an application with the Department to become a

19    licensed child placing agency for the state.

20               In that request they are asking to be

21    considered for licensure to be able to provide

22    foster care services, meaning that they can

23    recruit, train, license families or make

24    recommendations for licensure to the Department.

25    That's the agency license.  And that license for

Page 37

1    the agency is renewable annually.  So they have a
2    license that's good for one year and then they go
3    through the process again for the renewal.
4                    The second part to that with the child
5    placing agencies is that they are recruiting
6    families or individuals who want to be licensed to
7    provide foster care services for children who are
8    in need of out-of-home placements or in need of
9    temporary foster care services.  So those
10   individuals or families would make application to
11   one of those CPAs.
12                   And they go through an application
13   process, submit the required documentations to be
14   reviewed, evaluated, and then the applicant or the
15   family, individual, submits to a home study process
16   in that one of the workers from the child placing
17   agency would meet with the family, conduct a
18   walk-through of the home, assess the family,
19   interview household -- applicable household
20   members, arrange for inspections through partner
21   agencies, like our state fire marshal as well as
22   our state health and sanitation for those
23   requirements.
24                   The family would pass those
25   requirements and then the CPA would complete the

Page 38

```
 1     written home study assessment, submit that to the
 2     Department or DSS and recommend the family for
 3     licensure.  DSS receives the information, reviews
 4     it.  And if they are in agreement or we are in
 5     agreement with that, would issue the license for
 6     that family for the CPA.
 7          Q.    Okay.  Great.  That's extremely
 8     helpful.  I'm going to ask some more -- some more
 9     detailed questions about some of the steps of that
10     process.
11               So you mentioned that the private CPAs
12     will recruit families who are interested in being
13     foster families.  How did they go about that
14     recruiting?  What did they do to recruit potential
15     foster families?
16          A.    Individual CPAs may do print media,
17     other communications, mail-outs, have workshops or
18     presentations in the community.  So there are a
19     number of ways that they get information out to the
20     public about the need for foster parents or to be a
21     foster parent with a specific child placing agency.
22     They have billboards, there are yard signs, word of
23     mouth, speaking engagements, so there are a number
24     of ways that a CPA may go about asking for
25     individuals to become licensed with their agency.
```

1           Q.    Do they ever recruit potential foster

2    parents like through particular communities, for

3    example, through a church or a house of worship?

4           A.    They may, um-hum.

5           Q.    How about in the LGBTQ community?

6           A.    We do not restrict anyone from whatever

7    method of communication.  So if they recruit

8    through a particular group, that's certainly

9    acceptable.  We are looking for individuals who

10   want to foster and care for children that are in

11   need of placement.

12               So each CPA also develops an

13   individualized recruitment plan in terms of what

14   families they would like based upon what they see

15   as a need.  And so we don't restrict a CPA from any

16   recruitment method or population or avenue for

17   recruitment.  That's left to each CPA.

18          Q.    Okay.  And personally what percentage

19   of the foster families in South Carolina would you

20   say are recruited by private CPAs?

21          A.    So probably an equal amount from the

22   Department as well as from private CPAs.

23          Q.    Okay.

24          A.    Or decide, you know, whether they want

25   to go to DSS or whether they want to go to one of

1    the CPAs, so I think it's pretty equal.

2           Q.    It's about 50/50.  Okay.  All right.

3    We'll get back to the DSS role in a minute.  So you

4    mentioned -- you mentioned some of the work that

5    the private CPAs would do to assist the families in

6    the application process to become -- to become

7    licensed, right?  Do the CPAs help the families

8    complete the application?

9           A.    That's left to the CPA.  If they've

10   identified that the family needs assistance with

11   completing the application, they may.

12          Q.    Okay.  And I think you mentioned that

13   the private CPAs will actually perform the home

14   study or will do the home study themselves, is that

15   right?

16          A.    Yes.

17          Q.    Okay.  And then the -- and then the

18   CPAs will take that information and ultimately make

19   a recommendation to DSS as to whether the foster

20   family should be licensed -- the prospective foster

21   family should be licensed, is that right?

22          A.    That's correct.

23          Q.    Okay.  And am I right that it's only --

24   it's only DSS itself that can actually issue a

25   license to foster -- to a prospective family to be

Page 41

1    a foster family?

2            A.   Yes.

3            Q.   The CPAs themselves can't actually

4    license the families to be foster families, right?

5            A.    The CPAs do not issue a license.  They

6    make a recommendation and submit that to DSS.  DSS

7    is the entity for the state that issues foster

8    family licenses.

9            Q.   And generally speaking does DSS tend to

10   follow the recommendations that it receives for --

11   from the private CPAs with respect to whether a

12   given family should be licensed as a foster family?

13           A.   Yes.  I will add there may be some

14   situations where the CPA has questions or are not

15   really sure, have concerns, they may discuss those

16   with my team and we will review the information.

17   They consult with our office of general counsel to

18   make a recommendation for the family moving forward

19   with licensure.  But those are very, very few.

20           Q.   Okay.  So as a general -- sort of as a

21   general role, DSS will follow the recommendation

22   that comes from the CPA, but there may be some

23   instances where there would be questions or where

24   DSS would depart from the CPAs recommendation with

25   regard to licensing, is that fair?

Page 42

1          A.    That's fair.

2          Q.    Okay.  When they make their -- when

3     they make their recommendations to DSS with respect

4     to whether a prospective foster family should be

5     licensed, do you know whether CPAs take into

6     account factors like the family's religion?

7          A.    That is a question that's asked in

8     terms of how important religion is to the applicant

9     and so that would be a part of the written home

10    study assessment that's submitted.

11         Q.    Okay.  So the home study would include

12    or would answer questions regarding what -- you

13    know, whether the family follows a particular

14    religion, whether they go to services, is that

15    the -- are those the type of questions that would

16    be -- would be considered?

17         A.    It would be general questions like

18    that, yes.

19         Q.    Okay.  How about sexual orientation?

20    Are there -- are there questions as part of the

21    home study that go to the family's sexual

22    orientation?

23         A.    What I'm aware of is that there is a

24    question about household composition.  We look at

25    the relationship of the household members and

Page 43

```
 1    whether they are married, in a committed
 2    relationship.  That's how that's addressed on the
 3    application, the home study and for our data
 4    system.
 5         Q.   Okay.  If a CPA, a private CPA, were to
 6    recruit a family and to work with the family going
 7    through the application process and the home study,
 8    are there situations where they -- where a CPA
 9    might determine not to recommend the family for
10    licensure with DSS?
11         A.   Yes.
12         Q.   And what -- what might be some of
13    the -- some of the reasons why a CPA would not
14    recommend a family for licensure?
15         A.   A few reasons would be the medical, so
16    the applicants have to complete a medical
17    evaluation report.  The physician completing that
18    or healthcare practitioner may not recommend the
19    applicant for various reasons.  It may not be
20    advisable due to health conditions.
21              Another one could be related to
22    finances, for instance, in that the family expenses
23    exceed their income and it would not be recommended
24    for them to be licensed.  Also, it could be
25    capacity in the home, that maybe there's not enough
```

Page 44

1    bed space or household members own care needs may

2    exceed what would be time available for care and

3    all that is in foster care.  So those would be some

4    of the reasons that a family may not be

5    recommended.

6         Q.   Okay.  And if -- if a CPA reaches that

7    determination during the process of working with

8    the family, does the CPA have to let DSS know,

9    basically say, hey, we have this family, we've

10   got -- you know, we went through the process but

11   we've determined not to recommend them?

12        A.   They do not, but they do have to inform

13   the family of the reasons why they would not be

14   recommended for licensure.

15        Q.   Okay.  And the -- sort of the role that

16   the private CPAs play and the support that they

17   provide prospective foster families throughout the

18   application process, is that -- is that pretty

19   uniform or pretty standard across CPAs or are there

20   differences in the type of support that one CPA

21   might offer versus another?

22        A.   I'm not aware of any differences for

23   the most part.  I do know that they would work with

24   the applicants providing the home visits,

25   interviewing licensure.  And then once the

Page 45

1    applicant or family is licensed, going to the home,

2    meeting with the family -- meeting with the family

3    to offer support.

4            Q.    Okay.  I'm just looking at the -- at my

5    transcript here to make sure I got that.

6            A.    Yeah, I saw where it was unstable.  I

7    just didn't know if I needed to repeat.

8            Q.    I see.  So I believe you said I'm not

9    aware of any differences for the most part, I do

10   know that they would work with the applicants

11   providing the home visits, interviewing licensure,

12   and then once the applicant or family is licensed,

13   going to the home meeting with the family to offer

14   support.

15           A.    Yes.

16           Q.    So there's -- there are -- there's a

17   role that the CPAs fill after -- after the family

18   is licensed by DSS, is that right?

19           A.    That is correct.

20           Q.    And what -- how do they -- what type of

21   support do they typically provide after the

22   family's been licensed?

23           A.    As part of the ongoing licensing

24   process, the family has an assigned -- for DSS it's

25   a family support worker for the CPA that's a family

Page 46

1    worker that will visit with the family in the home
2    on a quarterly basis, but they may go more often
3    depending upon the needs of the family as well as
4    the children's place.
5            And it's an opportunity to meet with
6    the children, meet with the family to discuss any
7    concerns, to hear from them how things are going,
8    to answer questions, to make sure they are
9    connected to services and identify any unmet needs
10   to see what resources the family may need and then
11   also to see if there's been any changes that need
12   to be reported that may impact the continued
13   eligibility for licensure.  So it's a means of
14   staying connected with the family to offer support
15   to the family as well as to any children that might
16   be placed.
17           Q.   And is there a system in place by which
18   the CPA would report back to DSS about a given
19   family that has had a child placed with them and
20   how everything is going or is that not a formalized
21   process?
22           A.   It is a formalized process in a couple
23   of ways.  If there is a child placed, that there's
24   a foster care worker with the Department, so any
25   concerns about the child in the home will be

Page 47

```
 1      reported to the DSS foster care worker.  If there
 2      are concerns regarding the foster home in terms of,
 3      say, any regulatory requirements, sanitary
 4      conditions, those things would fall for licensure
 5      and would be reported to the licensing worker.
 6                  So -- and then they also document
 7      quarterly on a form, it's a standard form, about
 8      the condition of the home, how the needs of the
 9      child are being met, if there are any changes in
10      composition, in employment, any of those things
11      that would impact licensure.
12                  So there's a formalized process where
13      information is shared and reported to the
14      Department, but at any time they can certainly pick
15      up the phone or e-mail any of those concerns, they
16      don't have to wait for those specific timeframes,
17      but it's an ongoing communication flow from the CPA
18      to DSS and vice-versa.
19          Q.   Okay.  And in addition to the sort of
20      regular contact that the CPA would have with the
21      family that it had recruited and that had been
22      licensed, every -- am I right that every foster
23      child has a DSS caseworker that's assigned to them,
24      is that right?
25          A.   Yes.
```

1          Q.    Okay.  And that caseworker is -- as a

2     DSS employee is not affiliated with the private CPA

3     that might be involved with the family, right?

4          A.    Yes, there's a DSS caseworker.

5          Q.    Okay.  And you had mentioned earlier, I

6     think we had said that about 50/50, about half of

7     the foster families in the state are recruited by

8     private CPAs and about half of them are recruited

9     directly by DSS, is that right?

10         A.    Yes.  Roughly, yes.

11         Q.    Roughly.  And how does -- how does DSS

12    go about recruiting families to serve as foster

13    families?

14         A.    The Department fosters with the state

15    foster parent association, who also message the

16    need for foster families.  They go about

17    information on social media, print media, other

18    groups that partner with the Department through

19    billboards, messaging, some of the same recruitment

20    efforts as our child placing agencies.

21         Q.    Okay.  And then what is the -- well,

22    just -- let me back up for a second.

23              Does DSS recruit through particular

24    communities, through churches or other houses of

25    worship, for instance?

Page 52

1    completing the application process?

2         A.    Overall statewide, we probably have

3    about 50 or so.  We've had turnovers, so that's

4    across the state that are working either to

5    initially license the family and then the staff

6    that are there to support the family once they're

7    licensed.

8         Q.    Okay.  And how about in the upstate

9    region in particular, do you have a sense of that?

10        A.    For the upstate, there's probably about

11   five, less than ten workers who are doing the

12   initial licensing and a supervisor as well as a

13   program coordinator that oversee that work.

14        Q.    Okay.  And so that group -- that group

15   of folks is handling we said about 50 percent of

16   the -- you know, the prospective foster families

17   that are being evaluated, is that right?

18        A.    Right.  The statewide, yes.  But if you

19   want to compare that to the upstate region versus

20   what CPAs in the upstate are doing, then, yes, it's

21   about the equal amount of work.

22        Q.    Okay.  So the about 50/50 split that

23   we've talked about, that applies both statewide and

24   statewide upstate region in particular?

25        A.    I won't say 50 percent upstate.  I

                                                        Page 53

1     don't have numbers for -- specific for upstate.
2             Q.   Is it generally in that ballpark would
3     you say?
4             A.   As compared to statewide or just to --
5             Q.   Yeah.
6             A.   -- upstate?
7             Q.   As compared to -- I'm just trying to
8     understand for the upstate in particular how
9     much -- you know, how many families are being
10    recruited and working directly with DSS versus
11    working with the private CPAs.
12            A.   I can't answer that right now.  I don't
13    know.
14            Q.   Okay.  Do you have any reason to
15    believe that it's markedly different from that
16    50/50 split that we've talked about statewide?
17            A.   I don't think it's markedly different.
18    I will say, though, that for the past year or so
19    we've only been doing the non-kin licensing, so
20    we're not right now even seeing the, you know --
21    we're only doing kin, I should say.  The non-kin
22    are being referred to our CPAs, so those numbers
23    would look different now and so that's why the
24    50/50 split won't really apply today because of
25    that shift in our workload.

1      Q.    Okay.  So you said about a year or so

2  ago there was a change such that DSS is only

3  handling directly families that are interested in

4  providing kinship care?  Did I get that right?

5      A.    That's correct.

6      Q.    Okay.  And when we talk about kinship

7  care, what does that mean?

8      A.    So the kinship care are those children

9  who are entering care and instead of going to an

10  unrelated individual or family, that the Department

11  would identify a relative or a next of kin, some of

12  the kin being someone who has a significant

13  relationship with the child, who knows that child

14  and is interested in being licensed to care for

15  that child to prevent going into an unrelated

16  foster family home.

17      Q.    Okay.  And so currently then and for

18  about the past year, families that were seeking to

19  become foster families outside of the kinship care

20  piece of it, they no longer have the opportunity of

21  working directly with DSS to go through the

22  application and licensing process, is that right?

23      A.    The focus is that DSS would do the kin.

24  Now, if the family is unable to work with a CPA,

25  they certainly would come to DSS.  I mean, we are

Page 55

```
 1       the entity that's responsible for licensing, would
 2       have to, you know, have that as an avenue for
 3       families as well, but our directive or guidance to
 4       families is that they go with one of the child
 5       placing agencies and then -- because our focus is
 6       for the kin work.  But if the family is unable to,
 7       they can certainly come to DSS and we would work
 8       with the applicant.
 9            Q.   What -- what would be a reason why a
10       family would be unable to work with a CPA?
11            A.   I'm trying to think.  I can't think of
12       a reason right now other than sometimes there's
13       personality conflicts and people just don't get
14       along.  But, you know, we all have the same
15       regulations and guidance for applicants to work,
16       whether it's DSS or whether it's a child placing
17       agency, and so we have not had situations where
18       families were not able to go to a CPA since we've
19       made this change.  And so, you know, I can't think
20       of a situation other than maybe folks just don't
21       get along.
22            Q.   Okay.  Fair enough.  And so the numbers
23       that we talked to -- talked about before, that sort
24       of general statewide 50/50 split between families
25       that work with private CPAs and families that work
```

Page 56

1    directly with DSS, that would have applied in the

2    period before this change where DSS is focused more

3    on the kinship care piece of it, right?

4         A.    Yes.  Yes, that's correct.

5              MS. JANSON:  Okay.  All right.  Great.

6    So -- and, you know, we've been -- I think we've

7    been going -- I don't know what time we started,

8    but we've been going for, I don't know, an hour and

9    15 minutes or so.  How are you -- how are you

10   feeling?  Would you like to take a break now or

11   would you like to keep going for a bit?

12             THE WITNESS:  I think we'll take a

13   break right now.

14             MS. JANSON:  Okay.  That sounds great.

15   Let's go ahead and take our first break then and --

16   it's 10:45, so why don't we plan to be back and

17   ready to go at 11:00?

18             THE WITNESS:  Sounds good.

19             MS. JANSON:  Okay.  Great.

20             VIDEO TECHNICIAN:  We are now going off

21   the record.  The time is 10:45 AM.

22             (A recess transpired.)

23             VIDEO TECHNICIAN:  We are now going

24   back on the record.  The time is 11:03 AM.

25   BY MS. JANSON:

Page 57

```
 1            Q.   Great.  Okay.  So just a couple things
 2      I wanted to circle back to that we had touched on
 3      before.  When we talked about the list of CPAs,
 4      there were a couple I just wanted to confirm
 5      whether they provide nontherapeutic or therapeutic
 6      services or both.  And those that are new
 7      foundations, do they -- which type of foster care
 8      services do they provide or is it both?
 9            A.   Nontherapeutic.
10            Q.   Okay.  And how about South Carolina
11      Youth Advocate Program?
12            A.   Both.
13            Q.   Both?  And are those both active in the
14      upstate region?
15            A.   Yes.
16            Q.   And then of the list that we went
17      through, and I'm just going to go through it
18      quickly, what I'd like to know for each of these is
19      whether they actually have an office located, you
20      know, a location located in the upstate region.
21            A.   Okay.
22            Q.   So Connie Maxwell?
23            A.   Yes.
24            Q.   Epworth?
25            A.   Yes.
```

1          Q.    So, for instance, Church of God Home
2     For Children, is that a -- is that a group home?
3          A.    They are the child placing agency and a
4     group home.
5          Q.    Okay.  So they do -- they do both the
6     work that we've been talking about and -- and they
7     are a group home?
8          A.    Yes.
9          Q.    Okay.  And all of the other ones on the
10     list, the upstate region CPAs providing
11     nontherapeutic foster care, they all work directly
12     with recruiting families and helping families get
13     licensed?
14          A.    Connie Maxwell has a group home and a
15     CPA.  Thornwell has a group home and a CPA.  I
16     believe -- and Epworth has a CPA and a group home.
17          Q.    Okay.  And also for that same list,
18     I'll go through them -- I'll go through them each
19     one by one, but what I'm interested in knowing is
20     approximately how many foster families does each of
21     those CPAs have that are currently licensed that
22     they're currently working with that have foster
23     children placed with them right now.  If I walk --
24     if I run through that list, will you be able to
25     give me a general sense of that?

```
                                              Page 60
 1          A.    Probably not.  Not offhand today.
 2          Q.    Okay.  Are there -- okay.  All right.
 3     We can -- we'll follow up on that.  Okay.
 4            And then we talked just -- we talked
 5     briefly about how DSS assigns a caseworker to each
 6     foster child within the system.  Do -- am I right
 7     that there is not a separate caseworker assigned by
 8     a CPA to each child?
 9          A.    Correct.  The CPA assigns a family
10     worker and so that worker is visiting the foster
11     family and seeing the child that's connected with
12     that family.
13          Q.    Okay.  And then you had described the
14     change that occurred, you know, about a year ago
15     such that DSS is focusing on the kinship care piece
16     as opposed to, you know, I'll call it traditional
17     foster care.  Can you just explain to me why that
18     change took place?
19          A.    So it was an effort to streamline some
20     of the processes and focus on the kinship care work
21     because we were wanting to have children connected
22     with their families as opposed to an unrelated
23     individual whenever possible as well as some
24     staffing issues for the Department and that our
25     work would be more focused for the kinship care.
```

Page 61

1           And so for those children who we could

2      place with relatives, we could immediately license

3      with a provisional license and they wouldn't be

4      with an unrelated person while the family was

5      going -- the kin family was going through the

6      licensing process.  And so that change occurred

7      effective July 2020, so it's been almost a year

8      through that process, but that -- that was the

9      reason to focus those efforts for the kinship care

10     and have children with their families.

11          Q.   You mentioned there were some staffing

12     issues in the Department.  What were those staffing

13     issues?

14          A.   Turnover.

15          Q.   Having some -- can you tell -- having

16     some DSS employees who worked with the recruiting

17     and supporting of foster families?  Was there a

18     reduction in the number of staff members that DSS

19     had performing that work?

20          A.   There was turnover on the foster care

21     side of the house.  We -- and the licensing was

22     granted specific staff and positions to do the

23     kinship care work.  So some of the work was just

24     shifted, if you will, to our initial -- what we

25     call our initial licensing team who would work with

Page 62

1    families on the front end and so we had specific
2    staff assigned for kinship care.
3        Q.    Okay.  Was there a concern that DSS
4    staffing-wise wasn't able to handle the -- sort of
5    the number of families that were interested in
6    fostering or to do that recruiting and supporting
7    of foster families who were interested in the
8    traditional foster care as opposed to kinship care?
9        A.    I don't think it was so much that the
10   Department couldn't handle that.  It was more that
11   the agencies or the department's focus shifted to
12   the kinship care licensing and so wanted to direct
13   those efforts and staff towards the kinship care
14   licensing, and so this was an opportunity for the
15   CPAs, the child placing agencies, to do the non-kin
16   licensing.
17       Q.    Okay.  In general before that change
18   occurred where DSS was focused on the kinship care
19   piece, on average how long would you say it would
20   take for a foster family, a prospective foster
21   family, to -- to be licensed by DSS starting from,
22   you know, when they were initially recruited or
23   when they first expressed interest all the way
24   until when they were licensed to serve as a foster
25   family?

Page 63

1           A.   Sure.  And so our tracking for time to
2      licensure begins at the point the family signs an
3      application.  So they may have an interest six
4      months, 12 months prior when we're not tracking
5      that.  But at the point that they sign an
6      application, the clock starts for us and we have
7      120 days to process an application for licensure.
8      That's per regulations.

9                And there are certainly circumstances
10     where an application would be stayed, meaning that
11     we wouldn't take action because of some requirement
12     that is outside of the family's control in getting
13     a document or a piece of information to us to
14     determine eligibility.

15                But on average, we were within that 120
16     days.  At one point in time it was 112 days, others
17     was just right around that 120-day mark.  And
18     again, that's when the point that the family signs
19     the application to the point that the license is
20     generated.

21           Q.   Okay.  And you said there are certain
22     situations when that time period might be stayed.
23     How often does that tend to happen?
24           A.   It does not.  The rare circumstance
25     would be if the family is, say, leaving another

Page 71

1    now, so no thank you?

2         A.    No.

3         Q.    Okay.  Has the list of CPAs that we

4    went through both with respect to the state as a

5    whole and the upstate region, has that group of --

6    or those groups of CPAs, has their makeup changed

7    significantly over the past five years or so?

8         A.    And what do you mean by their makeup?

9         Q.    Like are there times when new CPAs get

10   licensed and start performing foster care services?

11        A.    Oh, yes.  We have new child placing

12   agencies that inquire about licensure and some

13   become licensed, so there are some that's not

14   listed here that have been licensed that's the past

15   year.

16        Q.    Are any of those newly licensed CPAs

17   ones that provide nontherapeutic foster care in the

18   upstate region?

19        A.    No.  And they have not -- they're so

20   new that they have not recruited any families to

21   become licensed yet, so we have not issued

22   individual family licenses, we have licensed the

23   agency itself.  So the entity is licensed --

24        Q.    Okay.

25        A.    -- to work in South Carolina.

Page 72

1          Q.   Okay.  And are there situations when a
2     CPA, I think we mentioned -- we mentioned one
3     before, I think, Tamassee, but are there situations
4     when a CPA would stop providing foster care
5     services in South Carolina?
6          A.   Yes.
7          Q.   And let's talk about CPAs just as an
8     example.  Can you explain why they -- why they
9     stopped?
10          A.   A CPA may elect on their own to
11     voluntarily end services.  LifeShare, for instance,
12     ended services several years ago.  They were a
13     smaller group and they just did not produce
14     families to sustain.  And JusticeWorks was the
15     same.  They were a smaller group that came into
16     South Carolina and just did not produce to be able
17     to be sustainable.
18          Q.   And would you say it's relatively rare
19     that a CPA would decide to stop providing services
20     or, you know, how many times would you say that's
21     happened in, you know, ten years or so?
22          A.   Probably on average maybe one a year or
23     so.  And we usually see that with the newer ones
24     that start up and they generally don't make it past
25     the first year.  And during that time, there's not

Page 73

1    even the recruitment of families to license or take

2    through the process, so those are the ones that we

3    see close within that first year of being licensed.

4           The ones who've been in existence for

5    years tend to, of course, remain because they have

6    families, they have the resources to operate, but

7    the newer ones have not been able to sustain and

8    make it past the first year.

9        Q.   Can you think of an example of a time

10   when a more established CPA had to close its doors

11   and stop providing foster care services?

12       A.   I cannot.

13       Q.   If that were to happen and the CPA had,

14   you know, a network of families that it was working

15   with and supporting, you know, in -- through the

16   application process as well as those that had been

17   licensed and it had to shut its doors or stop

18   providing foster care services, what would -- what

19   would DSS do to basically fill the gap left by the

20   closure of that -- of that agency?

21       A.   And if I could go back and correct, I

22   just recall Neighbor -- I think it was Neighbor To

23   Family was a child placing agency that was in South

24   Carolina and they opted to close a few years ago

25   and they offered the families to go to another CPA.

```
                                                    Page 74
 1              And so the Department did work
 2    alongside.  The families had freewill, so they
 3    chose.  They were presented the names for each of
 4    the licensed child placing agencies and then the
 5    families themselves decided which agency they
 6    wanted to transfer to.  So I do recall that was
 7    Neighbor To Family was the name of that child
 8    placing agency.
 9              Q.   Okay.  And so the families that had
10    been working with Neighbor To Family were given the
11    option of then moving to work with one of the
12    other -- one of the other CPAs.  Is Neighbor To
13    Family Region 1 or is that a different area of the
14    state?
15              A.   Different area of the state.
16              Q.   Okay.  But they were -- they were given
17    the opportunity to then affiliate with a different
18    CPA, is that right?
19              A.   With a different -- with a different
20    CPA or with DSS.  And some of them elected to
21    close, so that was an option for them as well.
22    They could go to a CPA, to DSS, but then some
23    decided not to continue licensing.
24              Q.   When you say some of them decided to
25    close, you mean the foster families decided to stop
```

Page 75

1     being foster families?

2              A.    Yes.

3              Q.    Okay.  And was that the -- do you know

4     whether that was the case for just a few or?

5              A.    I'm sure it probably was a few.  If any

6     of them did that, it wasn't many.  It wasn't a

7     large number of families with the Neighbor To

8     Family organization, and so I'm pretty certain it

9     was -- if there was any, it was just a few.

10             Q.    Okay.  And so generally those families

11    that had worked with Neighbor To Family were able

12    to -- to move to a different CPA or to DSS and to

13    continue serving as foster families?

14             A.    Yes.

15             Q.    When -- would the -- would there have

16    been any change in the caseworker relationships,

17    the DSS caseworker relationships, as a result of

18    the closure of a CPA like that?

19             A.    No.  For the child?

20             Q.    Yes.

21             A.    No, there would not.  So the child

22    worker is assigned from DSS, so there wasn't a

23    change on the DSS side but certainly on the side of

24    the CPA, so they would have a new family worker

25    once they moved to a different child placing

Page 76

```
 1        agency, but DSS remained consistent.
 2             Q.   Okay.  And when -- when a CPA closes
 3        and stops providing foster care services for
 4        whatever reason, what happens -- is the money that
 5        would have gone to that CPA, the funding from the
 6        government, is that reallocated to the existing --
 7        to the remaining pool of CPAs?
 8             A.   So the payment is for reimbursement for
 9        the child.  So wherever that child is placed, the
10        money would then follow that child in placement.
11             Q.   Okay.  Now, have -- you know, I think
12        we've been talking about times when CPAs
13        voluntarily decide to cease providing foster care
14        services.  Has DSS ever terminated a CPA's license?
15             A.   DSS has not.
16             Q.   Okay.
17             A.   That I'm aware of.  And since I've been
18        in my role, I'm not aware of any that's been
19        terminated.
20             Q.   So that's -- and when you say your
21        role, do you mean your current role or your full
22        tenure at DSS?
23             A.   Since 2011 I'm not aware of any CPAs
24        whose licenses were terminated by DSS.
25             Q.   Okay.  Great.  Okay.  We've talked --
```

Page 77

```
 1    we've talked a little bit about -- about Miracle
 2    Hill Ministries so far.  And Miracle Hill is a CPA
 3    that provides nontherapeutic foster care in
 4    Region 1, right?
 5            A.    That's correct.
 6            Q.    Prior to the filing of this lawsuit,
 7    did DSS become aware that Miracle Hill was refusing
 8    to work with prospective foster families because of
 9    their religion?
10            A.    During the license renewal period I
11    believe for the 2018 renewal, the licensing worker
12    in review of information that was submitted as well
13    as a review of their website, it was discovered
14    that there was information that could be considered
15    discriminatory.
16            Q.    Okay.  When you say review of
17    information that was -- that was submitted, that's
18    information that was submitted by Miracle Hill in
19    connection with its license renewing -- renewal
20    application?
21            A.    Yes.
22            Q.    And do you know what specific
23    information that was?
24            A.    So documents like related to their
25    policy.  We do a policy review if there are any
```

1    updates or whether looking for certain things, for

2    instance, related to disaster planning, how they

3    interact with families, what are their

4    requirements, staffing requirements.

5              And so the application is reviewed.

6    Information for staff, medical, background check

7    requirements, all of those documents are all

8    reviewed, and I believe it was found within their

9    policy as part of the license renewal that it was

10   discovered.

11        Q.   Okay.  And prior -- prior to that 2018

12   licensing renewal period, did DSS or had DSS ever

13   received a complaint from a family, an applicant,

14   who had been rejected by Miracle Hill because of

15   their religion?

16        A.   Not that I'm aware of.

17        Q.   And prior to the filing of this

18   lawsuit, did DSS become aware that Miracle Hill was

19   refusing to accept prospective foster parents

20   because of their sexual orientation?

21        A.   No, just during the license renewal was

22   the information we found.

23        Q.   But did that -- did that information

24   suggest to DSS that Miracle Hill was -- would

25   refuse to work with a prospective foster family if

```
                                            Page 79
 1      they were a same sex couple or an LGBTQ individual?
 2              A.   That was not.  I believe it was related
 3      to religion.
 4              Q.   Okay.
 5                   MS. JANSON:  Cris, why don't we put up
 6      Tab 39.
 7                   MR. RAY:  That exhibit has been
 8      introduced.
 9                   MS. JANSON:  What number are we on
10      here?
11                   MR. RAY:  That is 4.
12                   (EXHIBIT 4, E-mail chain dated 3/16/18
13      to Chrysti E. Shain and Brian Symmes from Karen L.
14      Wingo, ROGERS_MCMASTER_000028 to 000032, was marked
15      for identification.)
16      BY MS. JANSON:
17              Q.   Okay.  So we're introducing -- we're
18      marking as Exhibit 4 an e-mail chain that -- the
19      top e-mail in the chain is from Karen Wingo to
20      Chrysti Shain and Brian Symmes, subject line draft
21      response.  It's dated March 16th, 2018 and it bears
22      Bates numbers Rogers_McMaster_000028 through 32.
23      Do you have that in front of you?
24              A.   I do.
25              Q.   Okay.  You can feel free to scroll
```

Page 80

1      through it and to familiarize yourself with it, but

2      I just want to ask you about the date at the top

3      e-mail in the chain.

4              A.   Okay.  I've read it.

5              Q.   Okay.  Have you seen this document

6      before?

7              A.   I have not.

8              Q.   And can you tell me who Karen Wingo is?

9              A.   Karen Wingo is a former employee of DSS

10     and she's as listed there director of

11     communications and legislative affairs.

12             Q.   So she no longer works with DSS?

13             A.   That's correct.

14             Q.   Okay.  If you read -- if you read the

15     first paragraph of that e-mail, it says -- there's

16     a reference to Miracle Hill there.  Do you see

17     that?

18             A.   I do.

19             Q.   Okay.  And then when you read the

20     second paragraph, that reads:  To our knowledge, no

21     other CPAs restrict services based on sexual

22     orientation of the foster or adoptive parents.

23                  Do you see that?

24             A.   I do.

25             Q.   Okay.  And the fact that it says no

Page 104

1    licensed child placing agency to families who are

2    not specifically Christians from a Protestant

3    denomination.

4              Do you see that language there?

5        A.   Yes.

6        Q.   Looking back at Exhibit 8, the note to

7    file, would you agree with me that that summary of

8    the conversation on January 18th, 2018 does not

9    reflect that Beth Williams said Miracle Hill would

10   refuse to provide its services to families who were

11   not Protestant Christian?

12       A.   That it does not reflect?

13       Q.   Yeah.

14       A.   I think it's -- it reflects.  There

15   was -- it was nonresponsive, so that's the basis

16   for how this is crafted in -- in the letter that I

17   signed, that we did not have a clear indication

18   from Miss Williams.

19       Q.   Okay.  What -- the way -- the way I

20   read this is like you said, you know, Lauren posed

21   the question if she were an applicant and was not

22   comfortable giving a personal statement or if not

23   active in a church, would she be screened.  Beth

24   did not answer the question posed.

25              So there's some ambiguity there.  Does

Page 105

1    that -- did that suggest that there were -- there

2    were other conversations between Miracle Hill and

3    DSS prior to when you sent the January 26th letter

4    during which Miracle Hill would have definitively

5    said we are not going to provide services to

6    non-Protestant Christian families?

7         A.    I don't recall any conversation --

8    additional conversations with -- with me or with my

9    team.

10        Q.    Okay.  Okay.  And then going back to

11   the January 26th, 2018 letter.  On the second page

12   of that letter that is Exhibit 7, you -- the first

13   line on that page says:  Such discrimination on the

14   basis of religion contravenes the following

15   regulations and policy.

16             And it goes through a number -- a

17   number of numbered -- numbered paragraphs there.

18   The first one makes reference to the South Carolina

19   Code of Regulations.  Do you see that there?

20        A.    I do.

21        Q.    Okay.  And then the second paragraph

22   references a couple of provisions from the Code of

23   Federal Regulation, is that right?

24        A.    That is correct.

25        Q.    And then the third paragraph -- or,

Page 106

1      sorry, that would be the second answer of

2      paragraphs.  Then the fourth paragraph references a

3      DSS policy, is that right?

4           A.   That's correct.

5           Q.   And then -- and then finally in the

6      paragraph below, there is a reference to Miracle

7      Hill's own policy which had been submitted in

8      support of its license renewal application, is that

9      right?

10          A.   That is correct.

11          Q.   Okay.  With respect to the DSS policy,

12     it's referenced there as DSS Policy Section 710,

13     and it says -- it's quoted.  It says:  The agency

14     is committed to the exercise of nondiscriminatory

15     practice and shall provide equal opportunities to

16     all families and children without regard to their

17     religion.

18               Do you see that there?

19          A.   Yes.

20          Q.   Why is it that DSS prohibits

21     discrimination against foster families based on

22     their religion?

23          A.   And it's one of the protected groups

24     and the Department wants to be inclusive to all

25     applicants who want to foster or -- and/or adopt

Page 107

1       through the Department.

2               Q.    Does DSS recognize that this

3       nondiscrimination policy serves to increase the

4       pool of available qualified families for foster

5       children?

6               A.    I don't know that it increases the

7       pool, but it does allow individuals, whether they

8       are connected to a religious body or not, the

9       opportunity to apply.

10              Q.    Does the policy enhance the diversity

11      of the pool of available foster families?

12              A.    It does.

13              Q.    So then at the end of -- the very last

14      line there on the bottom of the second page of the

15      letter, it says:   The Department requests that

16      Miracle Hill address these concerns and issue a

17      written plan of compliance within 30 days of

18      receipt of this letter.

19                    Do you see that?

20              A.    I do.

21              Q.    Did Miracle Hill ever address DSS's

22      concerns as they were articulated in the letter

23      that's Exhibit 7?

24              A.    They did not submit to the Department a

25      corrective plan of action.

1          Q.   All right.  Did they ever -- did they

2     address the concerns that had been raised in any

3     other way?

4          A.   No.

5          Q.   Okay.  And then -- let's see.  Looking

6     back just at the first page of that letter in the

7     second paragraph at the bottom.  It says:  The

8     Department has determined that under these

9     circumstances it is appropriate to issue a

10    temporary CPA license pursuant to South Carolina

11    Code of Regulations and it gives the specific

12    provision.

13              Do you see where that is?

14         A.   What page again?

15         Q.   It's the first page of the letter in

16    the last sentence of the second paragraph.

17         A.   First page, last sentence.  I don't see

18    that.

19         Q.   It's the second paragraph, the last

20    sentence, where it says:  The Department has

21    determined that under these circumstances it is

22    appropriate to issue a temporary CPA license.

23         A.   Yes, I see that.

24              MS. JANSON:  Cris, can we mark Tab 9?

25              MR. RAY:  That exhibit is introduced.

Page 109

```
 1        It should be Exhibit 9.
 2                    (EXHIBIT 9, Miracle Hill Ministries,
 3        Inc. license, 10545-B-015, was marked for
 4        identification.)
 5        BY MS. JANSON:
 6             Q.   So we've marked as Exhibit 9 a document
 7        Bates stamped 10545-B-015.  And so, Miss Lowe, have
 8        you -- do you recognize what this document is?
 9                    MR. RIDDLE:  It's still loading.
10                    THE WITNESS:  It's still loading.
11                    MS. JANSON:  Still loading.  Okay.
12        Sorry.  Getting ahead of myself.  Has that popped
13        up for you yet?
14                    MR. RIDDLE:  It still hasn't.  There it
15        goes.  Sorry.  All right.  You said Exhibit 9,
16        right?
17                    MS. JANSON:  That's right.
18                    MR. RIDDLE:  Still loading.  All right.
19        There it goes.  It's only one page.
20        BY MS. JANSON:
21             Q.   Okay.  So this is -- sorry.  I think my
22        question was do you -- do you recognize this
23        document?
24             A.   Yes, I do.
25             Q.   Okay.  And what is this?
```

Page 111

1    one year?

2         A.    That is correct.  On the agency it is

3    good for one year.  On the family homes, it's

4    two-year license.

5         Q.    Okay.  Yeah.  On the CPA, yeah.

6         A.    Um-hum.

7         Q.    And are there -- if a CPA has a

8    temporary license like this one, is there -- are

9    there any -- are there any services that that CPA,

10   you know, can't provide under a temporary license

11   versus a permanent license?

12        A.    No, they would continue to operate

13   while they made the corrections or provided the

14   information requested.  If there were any

15   restrictions, it would be listed on the license.

16        Q.    Okay.  Are there any restrictions

17   listed on this license?

18        A.    None.

19        Q.    With respect to the letter that we've

20   been talking about, Exhibit 7, your January 26,

21   2018 letter to Beth Williams, did you -- did you

22   meet with DSS legal staff before -- well, I know

23   that you had met with Miss Davis before you sent

24   the letter, but did you meet with staff before

25   you -- before you actually drafted the letter?

Page 112

```
 1          A.   Yes, I did.
 2          Q.   Okay.  And was that Miss Davis also or
 3     someone else?
 4          A.   Mr. Catone would have been the other
 5     person.
 6          Q.   And apart from -- from legal counsel,
 7     was there anyone else at DSS that you consulted
 8     in -- consulted with in drafting the letter?
 9          A.   No.
10          Q.   You didn't speak to the DSS director at
11     the time about the letter?
12          A.   I did not directly.  Mr. Catone may
13     have, but I did not.
14          Q.   So with respect to the temporary CPA
15     license that is Exhibit 9 that was scheduled to
16     expire on July 26, 2018, what -- do you recall what
17     happened at that point?  Was there another
18     temporary license that was issued?
19          A.   Yes, there was another temporary
20     license that was issued.
21          Q.   And would that have also been a
22     six-month temporary license?
23          A.   Yes.
24          Q.   And when DSS issued that second
25     temporary license, Miracle Hill had not
```

Page 113

1      submitted -- addressed DSS's concerns or submitted

2      a compliance plan as requested in the letter,

3      right?

4              A.   Miracle Hill had not.

5              Q.   So why was it that DSS issued a new

6      temporary license if Miracle Hill had not addressed

7      the concerns that had been raised in your letter?

8              A.   It was my understanding that we were

9      being directed from information from the Governor's

10     office.  I believe there was some contact from

11     Miracle Hill and we were asked to issue another

12     temporary -- my area was asked to issue another

13     temporary license while the other information was

14     either being gathered or addressed, so I was not

15     involved in those conversations so I don't know

16     what specifically other than being asked to issue

17     a -- to extend the temporary license.

18             Q.   So it's your understanding that DSS was

19     directed to issue a second temporary license to

20     Miracle Hill by Governor McMaster's office?

21             A.   I don't know that it was from the

22     Governor's office.  I know that my general counsel

23     directed me to issue the license.

24             Q.   Okay.  And that's Mr. Catone?

25             A.   Correct.

Page 114

1              Q.   At some point after that second
2       temporary license was issued, was -- was Miracle
3       Hill then reissued a permanent CPA license?
4              A.   They were then issued a standard
5       license.
6              Q.   Okay.  And do you know when that
7       took -- when that happened?
8              A.   It would have been like January of
9       2019.
10             Q.   Okay.
11                  MS. JANSON:  Cris, can we put that one
12      up?  I don't have the tab number handy, but the
13      permanent license from January 29, 2019.
14                  MR. RAY:  Yeah, Kate, that's the
15      photograph, right?
16                  MS. JANSON:  Yes.
17                  MR. RAY:  Okay.  Just one second.
18                  MS. JANSON:  I'm wondering if it's
19      going to take a minute because of the photo, it's
20      going to be a bigger file.
21                  MR. RAY:  Looks like it might.
22                  MS. JANSON:  I can try to just show you
23      this on my screen the way we've done before.  Let
24      me see if that works.  Okay.  Can you see that?
25                  THE WITNESS:  Yes.

Page 115

1    BY MS. JANSON:

2         Q.    And this -- I apologize that it's --

3    that it's grainy.  This is actually -- I zoomed in

4    a portion of a photograph and this was -- this was

5    produced to us and it bears Bates Number

6    Miracle_Hill_Subp_003817.  We're going to mark this

7    as -- I think we're on Exhibit 10?

8              MS. JANSON:  Is that right, Cris,

9    Exhibit 10?

10             MR. RAY:  That's right.

11             (EXHIBIT 10, Photograph,

12   MIRACLE_HILL_SUBP_003817, was marked for

13   identification.)

14   BY MS. JANSON:

15        Q.    Yeah.  And I know it's a little bit

16   grainy, but does this appear to be the permanent

17   license that was issued to Miracle Hill in January

18   of 2019?

19        A.    Yes, it is the license that was issued

20   as a standard license to Miracle Hill.

21        Q.    Okay.  And at the time that this

22   license was issued in January of 2019, had -- had

23   Miracle Hill submitted a compliance plan as

24   requested in the January 2018 letter?

25        A.    No, they had not.

Page 125

1    Tester.

2         A.    Okay.

3         Q.    And then we had -- we spoke earlier

4    about, you know, the role that the private CPAs

5    perform in the foster care system for South

6    Carolina.  And I understand that one of the things

7    that as part of that role is to take the

8    prospective foster parents that they work with

9    through the application process to become licensed

10   through the home study process and then ultimately

11   to make a recommendation to DSS as to whether that

12   foster family should be licensed.  Is that -- is

13   that a fair summary of what we talked about?

14        A.    It is.

15        Q.    And when a CPA makes that

16   recommendation to DSS that a particular foster

17   family should be licensed, are they making -- are

18   they essentially making a determination that

19   those -- that that -- those parents are suitable to

20   be foster parents?

21        A.    They're making the recommendation that

22   they have met the requirements for licensure.

23        Q.    And one of those requirements is that

24   they're, you know, suitable to serve as foster

25   parents, right?

Page 126

```
 1            A.    Correct.
 2            Q.    Okay.  And when -- when CPAs are doing
 3      this -- this work, we discussed that they -- the
 4      CPAs themselves have to be licensed by DSS,
 5      correct?
 6            A.    That's correct.
 7            Q.    And that an agency can't perform this
 8      type of work without a license from DSS, is that
 9      correct?
10            A.    That's correct.
11            Q.    Okay.  We also spoke briefly about
12      DSS's own nondiscrimination policy.  And I think we
13      looked at it in the context of Exhibit 7, which is
14      the letter that you sent to Beth Williams of
15      Miracle Hill in January of 2018 and we talked about
16      how DSS Policy Section 710 prohibits discrimination
17      on grounds of religion.
18                  Just a follow-up question that I had
19      there.  Is part of the reason for DSS having that
20      policy because whether someone -- what faith
21      someone believes in, whether they follow no faith
22      at all, that that is unrelated to their ability to
23      be a good parent?
24            A.    Yes.
25            Q.    So there's no connection between
```

Page 127

```
 1      whether someone -- what faith somebody ascribes to
 2      and whether they could be a good parent?
 3              A.    No.
 4              Q.    So has DSS ever become aware that any
 5      other child placing agency apart from -- I'm going
 6      to stop sharing my screen.  We don't need to look
 7      at these topics anymore.  Sorry, everybody.  There
 8      we go.  I'll start over.
 9                    Has DSS ever become aware that any
10      other CPA apart from Miracle Hill discriminates
11      against prospective foster parents on the basis of
12      their religion?
13              A.    Not that I'm aware of.
14              Q.    How about on the basis of sexual
15      orientation?
16              A.    No, not that I'm aware of.
17              Q.    Did DSS ever become aware that
18      Southeastern Children's Home discriminates against
19      prospective foster parents on the basis of their
20      religion?
21              A.    Not that I'm aware of.
22                    MS. JANSON:  Cris, do you want to
23      show -- do you want to put up Tab 28 for me?
24                    MR. RAY:  That exhibit has been
25      introduced.
```

```
                                                    Page 128
 1                MS. JANSON:  Okay.  Great.
 2       BY MS. JANSON:
 3            Q.   Before we look at that specifically, is
 4       South -- is Southeastern Children's Home a private
 5       CPA in South Carolina?
 6            A.   It is.
 7            Q.   Do you know -- do you know which region
 8       it serves?
 9            A.   Upstate.
10            Q.   It serves the upstate.  Okay.  And if
11       we take a look at that document in particular -- so
12       we've marked as -- are we on Exhibit 12?
13                MR. RAY:  Yes, that's right.
14                MS. JANSON:  12.  Okay.
15                (EXHIBIT 12, E-mail dated 10/30/19 to
16       ███████████████████ from Reid Lehman,
17       MIRACLE_HILL_SUBP_003524, was marked for
18       identification.)
19       BY MS. JANSON:
20            Q.   We've marked as Exhibit 12 an e-mail
21       from Reid Lehman to -- it looks like someone with
22       an e-mail address ██████████████████ dated October
23       30th of 2019.
24                Have you seen this document before,
25       Miss Lowe?
```

Page 129

```
 1              A.    I have not.

 2              Q.    Okay.   Take a minute to scan over it

 3       and then I'll ask my questions.

 4              A.    Okay.

 5              Q.    So in that -- I guess it's the third

 6       paragraph down here, Mr. Lehman asks of the

 7       recipient of the e-mail, who it looks from the

 8       e-mail address is, you know, someone affiliated

 9       with Southeastern Children's Home.  He says:  Would

10       you be -- Robert, would you be willing for me to

11       tell -- sorry.  Let me back up.

12                    First sentence of the e-mail,

13       Mr. Lehman says Michael Leach will be coming to

14       tour portions of Miracle Home Ministries next

15       Tuesday.

16                    Michael Leach is the current director

17       of DSS, right?

18              A.    Yes.

19              Q.    And then in the third paragraph

20       Mr. Lehman writes:  Would you be willing for me to

21       tell him, him being Michael Leach, that

22       Southeastern Children's Home and your board's

23       expectation that you'll recruit only among the

24       churches of Christ.

25                    Do you see that there?
```

Page 148

1      2018 between Richele Taylor, chief legal counsel,

2      Governor McMaster's office, Beth Williams and Reid

3      Lehman, and it's Bates stamped

4      Rogers_McMaster_00000 -- I think that's the right

5      number, 01 to 3.

6                  Is this a document that you've seen

7      before, Miss Lowe?

8            A.   I have not.

9            Q.   No.  Okay.  If you look at the

10     beginning of the top of the second page, this is --

11     this is Beth Williams writing to Richele Taylor.

12     And she says:  I want to thank you for meeting with

13     Miles and I yesterday regarding the issue between

14     Miracle Hill Ministries and South Carolina

15     Department of Social Services.

16                  Do you see that?

17           A.   I do.

18           Q.   And the reference there to Miles, I

19     believe it's to -- is to Miles Coleman, who is here

20     today.  At the time I believe he was counsel for

21     Miracle Hill just to give you the context.

22                  Was -- was DSS aware that there had

23     been a meeting between Miracle Hill, its counsel

24     and Governor McMaster's counsel to discuss the

25     issue between Miracle Hill Ministries and DSS?

Page 149

1          A.   Was DSS aware?

2          Q.   Yes.  It indicates --

3          A.    If I'm reading this, it's like DSS was

4    a part of this meeting?

5          Q.   Where -- where do you see that in the

6    document?

7          A.   Okay.  I misread that part, the first

8    instance.  So it was a meeting with Miles and then

9    about the issue between Miracle Hill and DSS.

10         Q.   Okay.

11         A.   But no, I was not aware of the meeting.

12         Q.   So to your knowledge DSS was not

13   invited to attend the meeting?

14         A.   I'm not aware of that.

15         Q.   Okay.  And did DSS ever -- ever have

16   any conversations with anyone at Governor

17   McMaster's office regarding the issues in the

18   letter to Miracle Hill that are referenced here in

19   Exhibit 16?

20         A.   I was not involved in any of those.  If

21   anybody from DSS, it would have been our general

22   counsel.

23         Q.   But you're not -- you're not sure

24   whether or not there were conversations?

25         A.   I'm not.

Page 150

1           Q.    Okay.  Do you know if there had been

2    such conversations, would there likely to be

3    documents that -- that would reflect those

4    discussions?

5           A.    I don't know.

6           Q.    Okay.  And earlier we talked about how

7    DSS issued Miracle Hill a couple of temporary

8    licenses and then ultimately in January of 2019

9    issued Miracle Hill a permanent license at Governor

10   McMaster's direction, right?

11          A.    A standard license, yes.

12          Q.    And had Governor McMaster not

13   intervened, would -- would DSS have required

14   Miracle Hill to issue and implement the compliance

15   plan that DSS requested in your January 26, 2018

16   letter to Miracle Hill?

17                MR. COLEMAN:  Object to the form of the

18   question.

19                COURT REPORTER:  Was that you, Miles?

20                THE WITNESS:  Yes.

21                COURT REPORTER:  Miles, was that you?

22                MR. COLEMAN:  Yeah, that was me.

23   BY MS. JANSON:

24          Q.    And that letter which again we marked

25   as an Exhibit 7 -- Exhibit 7, your letter to

Page 151

1    Miracle Hill from January of 2018, that letter
2    indicates that DSS intended to enforce the
3    nondiscrimination regulations and policies
4    mentioned in the letter as to Miracle Hill, right?
5            A.   Yes.
6            Q.   And there's nothing in the letter that
7    would suggest that DSS intended to waive those
8    nondiscrimination requirements with respect to
9    Miracle Hill, right?
10           A.   That's correct.
11           Q.   Okay.  Okay.  So next I want to look at
12   Tab 13 if we can.
13               MR. RAY:  That exhibit has been
14   introduced.
15               (EXHIBIT 17, Letter dated 2/27/18 to
16   The Honorable Steven Wagner from Henry McMaster,
17   10545-B-024 to 10545-B-025, was marked for
18   identification.)
19   BY MS. JANSON:
20           Q.   Let me know when you have that.
21               MR. RIDDLE:  There it is.
22               THE WITNESS:  Okay.  I have it.
23   BY MS. JANSON:
24           Q.   Great.  So we're marking as Exhibit 17.
25   This is a letter dated February 27, 2018 to Steven

Page 152

1    Wagner at the Administration For Children and

2    Families at the U.S. Department of Health and Human

3    Services from Governor Henry McMaster of South

4    Carolina and it's Bates stamped 10545-B-024 through

5    25.  I'll give you a second to read through this,

6    but have you seen this document before?

7              A.   I have seen this one.

8              Q.   You have.  And when have you seen it?

9              A.   Probably either the day it was issued

10   and sent to us or shortly thereafter.

11             Q.   Okay.

12             A.   So in 2018.

13             Q.   If you want to take just a second to

14   scan through it, feel free to do that and then I'll

15   direct you to the parts that I'm interested in.

16             A.   Okay.  I've read it.

17             Q.   Okay.  Great.  So if you look on the

18   last paragraph of the letter about halfway through,

19   Governor McMaster writes:  I ask that the

20   Department provide a deviation or waiver from its

21   current policy to recruit -- recoup grant funds

22   from DSS if the Department determines the new

23   regulations are violated by any DSS CPA contracts

24   due to religiously held beliefs.

25                  Do you see that there?

Page 155

1    Tony Catone maybe.

2           Q.    Okay.  And I think we said earlier

3    Karen Wingo doesn't work with DSS anymore, is that

4    right?

5           A.    That's correct, she no longer works at

6    DSS.

7           Q.    Okay.  Does -- so does the fact that

8    DSS was, according to this, working with Governor

9    McMaster to obtain a waiver from the feds, does

10   that represent a change in DSS's position with

11   respect to Miracle Hill's treatment --

12   discriminatory treatment of certain prospective

13   foster parents?

14          A.    I don't -- I don't know the answer to

15   that.

16          Q.    Okay.  So as we talked about before,

17   about less than a month before this, this is

18   February of 2018, and in January of 2018 you sent

19   Exhibit 7, the letter to Beth Williams, that

20   revoked Miracle Hill's standard license and

21   indicated that Miracle Hill was in contravention of

22   certain nondiscrimination policies, is that right?

23          A.    That's correct.

24          Q.    Okay.  And one of the regulations you

25   indicated in your letter that Miracle Hill was in

Page 156

```
 1    contravention was that -- is that a federal
 2    nondiscrimination regulation, is that right?
 3              A.    That's correct.
 4              Q.    Okay.  And in your letter you indicated
 5    that DSS would issue Miracle Hill a temporary
 6    license, right?
 7              A.    Yes.
 8              Q.    And you asked that Miracle Hill address
 9    the issues raised in the letter with respect to its
10    discriminatory treatment of prospective foster
11    parents based on religion and you asked that they
12    submit a compliance plan, is that right?
13              A.    Yes.
14              Q.    Okay.  So what I'm trying to understand
15    is why did DSS go from taking that position and
16    taking those steps to address what it understood to
17    be discriminatory practices by Miracle Hill against
18    prospective foster parents based on religion to now
19    as requested in this document working with the
20    Governor's office to obtain a waiver from the
21    federal nondiscrimination regulations that applied
22    to Miracle Hill?
23              A.    And I don't know the answer to that.
24              Q.    Okay.  And you think the person who
25    would know the answer to that is Mr. Catone?
```

1          A.    That would be my recommendation.

2          Q.    Okay.  Do you know -- do you know

3     whether at any time Governor McMaster's office

4     inquired of DSS or asked DSS whether the waiver

5     that it was asking, requesting in Exhibit -- now

6     I've lost track of my numbers.  Exhibit 17, I

7     believe.

8                Let me start that over.  Did Governor

9     McMaster's office ever ask DSS whether the waiver

10    that it was requesting in Exhibit 17 from HHS

11    would, if granted, have an impact on foster care

12    services in South Carolina?

13         A.    I don't know that.

14         Q.    You don't know.  Okay.  Did -- did DSS

15    ever study -- conduct any studies or otherwise

16    consider what effects this -- the waiver that's

17    being requested in Exhibit 17 would have on the

18    South Carolina foster care system if granted?

19         A.    There were no studies conducted.

20         Q.    Was that ever anything that was

21    discussed at DSS?

22         A.    Not that I'm aware of.

23         Q.    And there weren't any studies conducted

24    by DSS regarding what effects this waiver if

25    granted would have on children in foster care in

Page 158

1    South Carolina in particular, right?

2         A.    No studies were conducted.

3         Q.    All right.  If we can look back at -- I

4    can't remember which exhibit this one is.  I think

5    it's Exhibit 6.  Okay.  Yep.  Exhibit 16.  This is

6    the e-mail chain between Beth Williams and Richele

7    Taylor from February 21st, 2018.  And on the first

8    page there in the second paragraph --

9         A.    We're still getting it.

10        Q.    I'm sorry.

11        A.    No problem.

12        Q.    I'm getting ahead of myself.

13        A.    Okay.  I have it.  16.

14        Q.    And then if we look -- if we look on

15   the second page of that, second paragraph there,

16   Beth Williams is writing and she says:  I willingly

17   admit my ignorance on this issue and wanted to ask

18   if the deviation that HHS may grant will cover all

19   faith-based foster care providers in South Carolina

20   or just Miracle Hill.  We have many colleagues in

21   other faith-based agencies in the state that are

22   providing foster care.  The desire of Miracle Hill

23   is that all faith-based child placing agencies will

24   be covered under this deviation until legislation

25   can hopefully be changed.

Page 159

1              Do you see that?

2         A.    Yes.

3         Q.    Okay.  And we discussed earlier that

4    Miracle Hill is -- is not the only CPA in South

5    Carolina that discriminates against potential

6    foster parents on the basis of religion, right?

7              MR. COLEMAN:  Object to the form of the

8    question.

9              THE WITNESS:  So yes, based on the

10   information that was presented here today, yes.

11   BY MS. JANSON:

12        Q.    Okay.  And in the response here on Page

13   1, Richele Taylor's responding to Beth Williams of

14   the e-mail.  The second paragraph there, she says:

15   The letter will request a deviation for all

16   faith-based agencies.

17              Do you see that?

18        A.    I do.

19        Q.    Do you know whether -- whether anyone

20   at DSS consulted with any child welfare experts

21   about the potential impact of the waiver that

22   Governor McMaster requested, if granted, the

23   potential impact of that on the foster care system

24   in South Carolina?

25        A.    I'm not aware that DSS did.

1          Q.   Okay.  Do you know whether it was the

2     position of -- whether it is the position of

3     Michael Leach that Miracle Hill was the only CPA in

4     South Carolina that needed the waiver that Governor

5     McMaster requested in Exhibit 17?

6          A.   Miracle Hill was the only agency that

7     we were aware of that was requesting it.

8          Q.   Do you know if DSS faced political

9     pressure to help ensure that Miracle Hill could

10    obtain an exemption or a waiver from the

11    nondiscrimination policies and regulations that you

12    flagged in your January 2018 letter?

13              MR. RIDDLE:  Object to the form of the

14    question.  This is Jonathan.  You can answer.

15              THE WITNESS:  Okay.  What was the

16    question again?

17    BY MS. JANSON:

18          Q.   Yeah.  It was not a good question.  It

19    was not a good question.  Let me try again.

20              Do you know whether there were any --

21    well, I guess start with South Carolina citizens,

22    for instance, that -- that breached that -- that

23    contacted DSS and requested that some sort of

24    exemption or waiver be provided to Miracle Hill to

25    allow it to continue its foster care work while

Page 161

1    discriminating against potential foster parents

2    based on religion?

3         A.   I'm not aware.

4         Q.   Are you aware of whether there was any

5    sort of political pressure from -- from

6    politicians -- state-level politicians, folks in

7    federal government, to that end?

8         A.   I'm not aware of any.

9         Q.   Okay.  Did you know whether HHS, the

10   U.S. Department of Health and Human Services --

11   I've been referring to it as HHS.  You understand

12   it to be -- to be that?

13        A.   Yes.

14        Q.   Okay.  Do you know whether HHS

15   ultimately granted the waiver that Governor

16   McMaster requested in Exhibit 17?

17        A.   Yes.

18        Q.   And -- and did HHS grant the waiver?

19        A.   I believe that's where the letter came

20   from, yes.

21        Q.   Okay.  Why don't we take a look at

22   that.

23             MS. JANSON:  That will be Tab 23, Cris,

24   if we can mark that.

25             MR. RAY:  That's Exhibit 19 and that's

Page 162

1    been introduced.

2            (EXHIBIT 19, Letter dated 1/23/19 to

3    Governor Henry McMaster from Steven Wagner,

4    Rogers_McMaster_000444 to 000447, was marked for

5    identification.)

6            MS. JANSON:  Great.

7            MR. RIDDLE:  We're loading.

8    BY MS. JANSON:

9        Q.    Okay.  Oh, sorry.  Let us know when

10   you've got it.

11       A.    Okay.  I have it.

12       Q.    Okay.  So we've marked as Exhibit 19 a

13   letter dated January 23rd, 2019 from Steven Wagner

14   at the Administration For Children and Families to

15   Governor McMaster.  Have you -- have you seen this

16   document before?

17       A.    I have seen this document.

18       Q.    And when have you seen it?

19       A.    Shortly there in 2019.

20       Q.    Okay.  Do you want to take a minute to

21   scan through it?  I'll direct you to the -- to the

22   portions I'm interested in.

23       A.    Okay.  Okay.

24       Q.    Okay.  So if you -- if you skip -- if

25   you skip ahead to the last page of the letter,

Page 163

1    it's -- it has the Bates stamp ending 447, the top
2    paragraph there.
3            It says:  HHS is hereby conditionally
4    granting the requested exception from the religious
5    nondiscrimination requirement of 45 CFR, Section
6    75.300(c).  Do you see that there?
7        A.    I do.
8        Q.    And is that -- that provision that's
9    cited there, 45 CFR 75.300(c), is that the same
10   federal regulation that you had listed in your
11   January 2018 letter?
12       A.    I believe that would be.  I'd have to
13   look back at that letter to say for certain, but...
14       Q.    That one is Tab 7.
15           MS. JANSON:  And are you able to pull
16   that up real quickly just so we can confirm that
17   that's the same provision?
18           MR. RAY:  There we go.
19   BY MS. JANSON:
20       Q.    Okay.  So if you look at the second
21   page of that letter, the paragraph marked 3, it
22   says 45 CFR 75.300(c) prohibits discrimination on
23   grounds of religion.
24           So that's that same -- same federal
25   regulation being -- being referenced in the letter

Page 164

1    from Steven Wagner that we just marked as Exhibit

2    19, right?

3         A.   That is correct.

4         Q.   Okay.  And then looking back at Exhibit

5    19, the language there that I was reading goes

6    on -- goes on to say that the exception applies

7    with respect to Miracle Hill or any other

8    subgrantee in the South Carolina foster care

9    program that uses similar religious criteria in

10   selecting among prospective foster parents.

11             Do you see that?

12        A.   Getting back to that one.  I do.

13        Q.   Okay.  So that means that in addition

14   to Miracle Hill, any other CPA in South Carolina

15   that discriminates based on the religion of

16   prospective foster parents is able to take

17   advantage of this waiver, right?

18        A.   Yes.

19        Q.   And so based on our discussion before,

20   that would -- that would include Southeastern

21   Children's Home, right?

22        A.   Yes.

23        Q.   Okay.  And would that include the CPA

24   that we spoke about, we didn't know which one it

25   was in particular, but it indicated in the document

Page 170

1      Then that would be something outside of a child

2      being placed with one of their families.

3            Q.    So what -- can you give me an example

4      of what -- what other services might be -- might be

5      covered by a contract?

6            A.    So a contract could be in place for

7      providing behavioral modification services or

8      what's commonly called BMOD services.  And that

9      would be they could provide an individual to do

10     supportive services or mentoring services.  They

11     could also do -- have a contract to do diagnostic

12     assessments.  So there's different contracts and

13     different provisions of services by different child

14     placing agencies.

15           Q.    Okay.

16           A.    Foster family licensing is just one

17     component.

18           Q.    Okay.  But there's no limitation in

19     South Carolina that says there can only be 20 CPAs

20     that provide foster family licensing services, for

21     instance?

22           A.    No.  There's no limitation.

23           Q.    Okay.  Okay.  And since the waiver that

24     we've been talking about -- which I've now lost.

25     Where is it?

1          The waiver that we -- I think we marked

2     as Exhibit 19, the waiver that was granted from HHS

3     to South Carolina, since that waiver was granted

4     has DSS experienced any drop in the number of

5     potential foster parents seeking licensure?

6          A.   We have not.  It's been pretty steady

7     in terms of applications to licensure, so there's

8     not been a significant change.

9          Q.   And is that -- does that apply both to

10    families that were seeking to be licensed directly

11    through DSS -- to work with DSS through the

12    licensing process versus families that were working

13    with private CPAs?

14          A.   That's correct.

15          Q.   Okay.  Has DSS experienced any -- any

16    change in the number of prospective foster parents

17    that are referred to DSS from private CPAs?

18          A.   We've not received a significant

19    number, particularly since we've changed to doing

20    the kinship care licensure.  But during the time

21    period before we made the switch, the number of

22    applications we do see a decline.

23          Q.   And thank you for the clarification.  I

24    should have -- I should have made that clear, you

25    know, that we're talking about the period following

Page 172

1    when the waiver was granted until before when DSS

2    made the shift to focusing on the kinship care.

3              You said you did -- you have seen --

4    you have seen -- you saw during that period since

5    after the waiver was issued, you saw a decline in

6    the number of applications that DSS received from

7    prospective foster parents?

8         A.    Overall.  So I believe, if I remember,

9    in '18 it went up a little bit, but then it's been

10   declining '19 and certainly during 2020 there was a

11   decline.

12        Q.    And is that just the number -- a

13   decline in the number of applicants that have gone

14   through the application and home study process

15   directly with DSS or is that total, including

16   coming from -- including those who would have gone

17   through the licensing process through the private

18   CPA?

19        A.    That's total.

20        Q.    Total.  Before Governor McMaster's

21   office intervened in the issue between DSS and

22   Miracle Hill with respect to Miracle Hill's

23   license, was DSS prepared to end its relationship

24   with Miracle Hill as a -- as a licensed CPA if

25   Miracle Hill did not comply with the requirements

Page 173

1    set forth in your January 2018 letter?

2         A.   DSS was prepared to terminate the child

3    placing agency license.

4         Q.   So we've generally been speaking in

5    your capacity as a representative of DSS.  I have a

6    few questions I wanted to ask you just in your

7    personal -- in your personal capacity.

8              And one of those is:  Have you

9    personally -- have you ever had conversations with

10   others at DSS or with leadership at DSS about how

11   allowing CPAs to exclude families based on their --

12   their religious beliefs would impact the pool of

13   foster parents available in South Carolina?

14        A.   I have not.

15        Q.   You have not.  Okay.  And are you

16   generally aware of if some of the professional

17   standards that govern in the -- in the field of

18   child welfare?

19        A.   Yes.

20        Q.   And -- and are those standards

21   generally the ones published by CWLA or the Child

22   Welfare League of America?

23        A.   Yes.

24        Q.   Okay.  And does -- and you're familiar

25   with CWLA?

1          A.    I am.

2          Q.    Okay.  And you're familiar with those

3    standards?

4          A.    Yes.

5          Q.    And are the -- are the standards

6    referred to as the CW -- CWLA standards of

7    excellence?

8          A.    Yes.

9          Q.    And does DSS use the CWLA standards of

10   excellence as a guide in its -- in its work in

11   foster care and in licensing foster parents?

12         A.    Yes, that's -- refers or talks about

13   the standards in its work and some of its

14   practices.  It also talks about best interests of

15   children, and so those are some of the guiding

16   principles.

17         Q.    Okay.  And are you aware that there's a

18   CWLA standard that opposes discrimination against

19   foster parents based on their religion, sexual

20   orientation or other characteristics that are

21   unrelated to the ability to care for a child?

22         A.    Yes, ma'am.

23         Q.    And do you -- do you generally agree

24   with that -- with that standard?

25         A.    I do.

1          Q.   And do you agree that that standard

2     furthers the best interests of children in foster

3     care?

4          A.   Yes.  Yeah.

5          Q.   And in your experience in the child

6     welfare field, do you believe that allowing private

7     agencies, private CPAs, to exclude families based

8     on the agency's religious objections either to the

9     family's religion or to their sexual orientation,

10    do you believe that that has an impact on the pool

11    of families that are available for children?

12         A.   I believe that there are certain

13    restrictions that would limit the number of

14    families who could go through the process to become

15    licensed and offer their home and services for

16    children in care.

17         Q.   Do you think it has a detrimental

18    impact on children in foster care when CPAs can

19    exclude families based on religious objections?

20         A.   I don't think that in and of itself has

21    a detrimental impact for children in care.  I think

22    it does limit the number and availability that

23    could be, you know, realized for children who are

24    in need of out-of-home placement.

25         Q.   Okay.  If a family -- and again, I'm

```
                                          Page 176
 1    asking in your personal capacity.  If a family who
 2    is interested in being a foster family goes to a
 3    CPA and faces discrimination in -- in that process,
 4    they're turned away, can you necessarily count on
 5    them to apply to be a foster parent through a
 6    different CPA?
 7               MR. COLEMAN:  Object to the form of the
 8    question.
 9               THE WITNESS:  Families are aware that
10    there are a number of agencies that are available
11    that they can apply through to become licensed or
12    that they could consult with the Department of
13    Social Services.
14    BY MS. JANSON:
15        Q.   Do you -- do you think families are
16    necessarily aware of the particular beliefs or
17    requirements of any given CPA?
18        A.   They may not be until they've either
19    done research or talked with others.  I think on
20    the surface, just with the name, they wouldn't know
21    about a specific agency.
22               MS. JANSON:  Okay.  I think we are -- I
23    think we are getting -- not making any promises,
24    but I think we're getting to the end, so thank you
25    very much for bearing -- bearing with me.  Okay.
```

```
                                         Page 177
 1              So Cris, why don't we mark Tab 16.
 2              MR. RAY:  That's Exhibit 20 and that
 3     has been introduced.
 4              (EXHIBIT 20, Office of the Governor
 5     Executive Order No. 2018-12, Rogers_McMaster_000013
 6     to 000015, was marked for identification.)
 7     BY MS. JANSON:
 8          Q.  Great.  Just let me know when that
 9     comes up for you.
10              MR. RIDDLE:  Doing it right now.
11              THE WITNESS:  Okay.  I have it.
12     BY MS. JANSON:
13          Q.  Okay.  So this is Exhibit 20 and this
14     is a Executive Order Number 2018-12 dated March
15     13th, 2018 and it's Bates numbered
16     Rogers_McMaster_000013 through 15.  Have you seen
17     this document before?
18          A.  Yes, I have.
19          Q.  And when have you seen it?
20          A.  In -- shortly thereafter it was issued
21     in 2018.
22          Q.  Okay.  And -- and this was -- just in
23     terms of timing, this was issued relatively shortly
24     after Governor McMaster sent his letter to DSS
25     requesting the waiver, right?
```

```
                                             Page 178
 1              A.   Yes, that would be correct.
 2              Q.   And do you see -- I'm skipping ahead to
 3         the third page of the document, the first paragraph
 4         that's now, therefore, and then part way through
 5         that sentence it reads:  I direct that DSS shall
 6         not deny licensure to faith-based CPAs solely on
 7         account of their religious identity or
 8         sincerely-held religious beliefs.
 9                   Do you see that?
10              A.   I do.
11              Q.   And since Governor McMaster issued the
12         executive order, has DSS denied licensure to any
13         faith-based CPAs?
14              A.   DSS has not.
15              Q.   Has DSS denied licensure to any
16         faith-based CPA -- I'm sorry, to any CPA, not
17         faith-based?
18              A.   DSS has not denied licensure to any CPA
19         that has submitted required documents for
20         licensure.
21              Q.   And before this executive order was --
22         was issued, had DSS ever denied licensure to any
23         faith-based CPA that met the applicable
24         requirements?
25              A.   No, there was none that fell within
```

Page 179

1     this timeframe.

2          Q.    And if you see in that same paragraph

3     right after where I stopped reading, it continues:

4     I hereby direct DSS to review and revise its

5     policies and manuals in accordance with this order

6     and ensure that DSS does not directly or indirectly

7     penalize religious activity -- identity or activity

8     in applying -- and it lists specific sections of

9     the South Carolina Code of Regulations with regard

10    to licensure for foster care.

11               Do you see that there?

12         A.    I do.

13         Q.    Did -- did DSS make any changes to its

14    policies or manuals in response to this executive

15    order?

16         A.    We did not make any changes to policy.

17         Q.    Did you make any -- were there any

18    changes made by DSS to manuals?

19         A.    No, not to policies or manuals.

20         Q.    Okay.  And during the period of time,

21    you know, that we have been discussing, has DSS

22    made any other changes to its policies or manuals

23    even if not specifically in response to the

24    executive order?

25         A.    We have not.

Page 180

1          Q.   And then has -- did DSS make any
2     changes to the relevant provisions of the South
3     Carolina Code of Regulations in response to
4     Governor McMaster's executive order?
5          A.   Not in response to the Governor's
6     order, we have not.
7          Q.   Any other -- any changes for any other
8     reasons?
9          A.   Just the regulatory review period for
10    updating regulations, which was just done this last
11    past legislative session that won't go into effect
12    until the fall of 2021 and as a part of the Family
13    First Prevention Services Act, so that's the reason
14    the regulations were updated, to comply with Family
15    First.
16         Q.   Okay.  Are those regulations
17    specifically related to -- to foster care services
18    or no?
19         A.   It is related to foster family
20    licensure and -- and we also updated our group home
21    regulations, but certainly to Foster Family to
22    comply with the Family First Prevention Services
23    Act, another federal requirement.
24         Q.   Okay.  All right.  Do those -- do those
25    revisions have anything to do with religion,

```
                                          Page 181
 1      religious identity or activity with respect to
 2      CPAs?
 3             A.   No.  There was no change with respect
 4      to religion.
 5             Q.   We're going to switch to a totally
 6      different topic now, which shouldn't take too long,
 7      but can we --
 8                  MS. JANSON:  Cris, can we mark Tab 33?
 9                  MR. RAY:  That exhibit has been
10      introduced.
11                  (EXHIBIT 21, Plaintiffs' First Set of
12      Requests For Production to Michael Leach, was
13      marked for identification.)
14                  MS. JANSON:  Great.  I think this is
15      Exhibit 21, right?
16                  MR. RAY:  That's right.
17      BY MS. JANSON:
18             Q.   All right.  So let me know when you --
19      when you have that in front of you.
20             A.   I will.
21             Q.   Great.
22             A.   Okay.  I have it.
23             Q.   Okay.  Great.  So this is -- we're
24      marking this as Exhibit 21.  This is Plaintiffs'
25      First Set of Requests for Production to Michael
```

Page 182

1     Leach that was served on June 4th, 2020.

2                    Have you ever seen this document

3     before?

4            A.    I don't think I've seen this one.

5            Q.    Okay.  So this is -- this is a series

6     of document requests that the Plaintiffs in this

7     litigation served on Director Leach.

8                    Were you involved -- were you --

9     personally were you involved in any efforts by

10    Director Leach or anyone at DSS to search for,

11    collect and produce documents in response to these

12    requests?

13           A.    I'm just looking at this now.  Where

14    does the request appear?

15           Q.    So the actual requests themselves start

16    on Page 9 of the document.

17           A.    Okay.  I don't think specifics.  I

18    mean, we certainly provided the file document to

19    our office of general counsel, but I don't know if

20    there was specifics from this document that we were

21    asked to produce other than the paper file or for

22    their review.

23           Q.    When you say the paper file, what paper

24    file?

25           A.    The licensing file for Miracle Hill.

Page 183

1          Q.    Were there -- apart from the licensing
2     file for Miracle Hill, are you aware of other --
3     were you involved in collecting any other documents
4     that you provided to general counsel?
5          A.    No.
6          Q.    Are you aware at all of what -- what
7     was done by Director Leach or other members of DSS
8     staff to search for, collect and produce documents
9     in response to these requests?
10         A.    I'm not.
11         Q.    So you don't know what steps might have
12    been taken by Director Leach or anyone on his staff
13    to search for documents in response to these
14    requests?
15         A.    I personally don't know.
16         Q.    Okay.  I know we just -- we just came
17    back from a break, but if we can take another short
18    break, I can look back over my notes and see -- and
19    see if I have anything else, but we're
20    definitely -- we're definitely getting toward the
21    end, so hopefully the next segment will be the last
22    that you hear from me.
23              THE WITNESS:  Okay.
24              MS. JANSON:  So why don't we take --
25    why don't we take 15 minutes and come back at 3:45.

Page 189

1              A.    No.    An individual can go to any entity
2       or to DSS.
3              Q.    Okay.    And I think you said -- I think
4       you said -- and I touched on this a second ago.    In
5       or around July of 2020, for what sounds like a
6       variety of reasons that you already touched on,
7       that SCDSS has decided to focus on what you called
8       kinship care, right?
9              A.    That's correct.
10             Q.    And I think you said a family can, if
11      they want, however -- let me -- I didn't ask that
12      well.
13                   Even when SCDSS has focused on kinship
14      care in the past year or so, a family who wants to
15      be licensed as a foster parent, not in the kinship
16      care but as a -- more generally as a foster parent,
17      can, if they want, still work directly with SCDSS,
18      is that right?
19             A.    What was that last part?    It went away.
20             Q.    It's still possible for a prospective
21      foster parent or couple to work directly with DSS,
22      is that right?
23             A.    Yes.    Yes.
24             Q.    So if -- if a prospective foster parent
25      can't or doesn't want to work with a CPA, they can

Page 190

```
 1    work with DSS?
 2            A.    They can.
 3            Q.    Even today?
 4            A.    Even today.
 5            Q.    And it's still -- has been and still is
 6    the policy of DSS that the decision of where a
 7    child in foster care will be placed, what foster
 8    parent's home that child will be placed in, that's
 9    DSS's decision, not the CPA's decision, right?
10            A.    That's correct.
11            Q.    Okay.  You might -- you probably
12    remember Exhibit 3.  It was a two-page like a table
13    or a chart with a lot of amounts.  It listed all I
14    think 28 CPAs and a whole bunch of different
15    amounts of funding over various periods of years.
16                  Do you remember we talked about that I
17    think early on --
18            A.    Yes.
19            Q.    -- today?  Okay.  I don't -- I don't
20    mean to be tedious, but I do want to go through a
21    couple of -- I don't think it will take super long,
22    but I know we came back to that document several
23    times and it may be that my note taking got a
24    little bit disjointed.  I just want to make sure
25    we -- we've covered all the bases there.
```

1            If you have it in front of you, that's

2    fine.  I don't think you need to pull it up in

3    front of you if you don't.

4            A.   I have it.

5            Q.   Basically -- okay.  Basically what I

6    want to do is I'm going to try to go through in

7    alphabetical order.  I just want to -- just so

8    that -- so we've got a clear record and so my own

9    notes can get clearer, figure out which CPAs are

10   operating in the upstate that offer nontherapeutic,

11   perhaps along with therapeutic care, whether they

12   have an office in the upstate and approximately how

13   long they've been licensed.

14            So I think we can -- we can run through

15   these hopefully without it being too tedious, but I

16   apologize in advance if it is a little bit

17   mechanical.  So I'm trying to go through them.

18            Church of God Home For Children.  They

19   offer nontherapeutic care and they have an office

20   in the upstate, right?

21            A.   Yes.

22            Q.   And they've been licensed I think you

23   said for maybe ten years or so, is that ballpark

24   correct?

25            A.   Yes.

Page 192

```
1          Q.   Okay.  Connie Maxwell Children's
2     Ministries, they are also in the upstate.  They
3     serve the upstate.  They have an office in the
4     upstate, offer nontherapeutic foster care and
5     they've been licensed for several decades, is that
6     correct?
7          A.   That is correct.
8          Q.   Epworth Children's Home serve in the
9     upstate, have an office in the upstate, offer
10    nontherapeutic foster care and they've been
11    licensed for several years?
12         A.   Several decades.  And they also have
13    nontherapeutic and therapeutic.
14         Q.   Okay.  Growing Home Southeast.  This is
15    over my notes are complete.  I think they serve the
16    upstate.  Do you know if they have an office in the
17    upstate?
18         A.   They do not have an office in the
19    upstate, but they do work statewide.
20         Q.   Okay.  And they do both therapeutic and
21    nontherapeutic, is that right?
22         A.   That's correct.
23         Q.   And they've been licensed for 15 years
24    or so?
25         A.   Or so, yes.
```

Page 193

1              Q.    Okay.   Lutheran Services Carolinas.
2       They serve the upstate, they don't have an office
3       in the upstate, but they offer nontherapeutic and
4       therapeutic and they've been licensed for a couple
5       decades?
6              A.    Correct.
7              Q.    Okay.
8              A.    Yes.
9              Q.    Miracle Hill Ministries, which we've
10      talked about, they have an office in the upstate,
11      they do nontherapeutic foster care, they've been
12      licensed for several decades and they serve the
13      upstate?
14             A.    Yes.
15             Q.    New Foundations Home For Children, I
16      believe they serve the upstate, have an office in
17      the upstate, offer nontherapeutical foster care and
18      been licensed for several years, is that right?
19             A.    Yes.   That is correct.
20             Q.    I think we're about halfway -- halfway
21      through the list.   Thanks for hanging with me.
22                   Nightlight Christian Adoptions serve
23      the upstate, have an office in the upstate,
24      nontherapeutic foster care, and they've been
25      licensed for several years?

Page 194

```
1              A.    They've been licensed for several years
2       as an adoption agency and only most recently added
3       foster care services to their list.
4              Q.    Okay.  Do you know when -- when they
5       were licensed as a CPA to be foster care?
6              A.    It's probably been a couple of years,
7       not very long.
8              Q.    Okay.  Two to three, four years, that
9       ballpark?
10             A.    That ballpark, yes.
11             Q.    Okay.  South Carolina MENTOR serve the
12      upstate.  Do they have an office in the upstate, do
13      you know?
14             A.    They do.
15             Q.    Okay.  They offer nontherapeutic foster
16      care, have been licensed for several decades --
17             A.    Therapeutic --
18             Q.    -- is that right?
19             A.    Therapeutic and nontherapeutic services
20      are offered.
21             Q.    Okay.  South Carolina Youth Advocate or
22      SCYAP sometimes I think later referred to as, they
23      serve the upstate, they don't have an office in the
24      upstate, they do therapeutic and nontherapeutic and
25      they've been licensed for about 30 years, is that
```

Page 195

1    right?

2            A.    Yes.

3            Q.    Okay.  Southeastern Children's Home,

4    they serve the upstate.  Do they have an office in

5    the upstate?

6            A.    Southeastern, yes.

7            Q.    Okay.  They do nontherapeutic foster

8    care and it looks like they also have been licensed

9    for looks like about 40ish years.  Does that sound

10   right?

11           A.    Yes.

12           Q.    Specialized Alternative For Family and

13   Youth, I think you said sometimes it's -- they go

14   by the acronym SAFY or SAFY?

15           A.     SAFY.

16           Q.    They serve the upstate, have an office

17   in the upstate, offer both therapeutic and

18   nontherapeutic and been licensed since the 1990s.

19   Is that all correct?

20           A.    That is correct.

21           Q.    Okay.  Tamassee DAR School, if I'm

22   pronouncing that right, I think you said they

23   closed at some point in 2019.  But prior to that,

24   and at least you said, into some part of 2019 they

25   were licensed as a CPA, is that --

Page 196

1            A.    That is -- that's correct.

2            Q.    They do nontherapeutic foster care,

3     serve the upstate, they -- do you know if they have

4     an office in the upstate?

5            A.    They did.

6            Q.    Okay.  The Bair Foundation has an

7     office in the upstate, serves the upstate, have

8     therapeutic and nontherapeutic foster care and

9     they've been licensed for about 20 years.  Is that

10    all correct?

11           A.    That's correct.

12           Q.    Then -- let's see.  Thornwell.  Let's

13    see.  Serves the upstate, office in the upstate,

14    nontherapeutic foster care and they've been

15    licensed for a number of years?

16           A.    Um-hum.  Yes.

17           Q.    And then I think the last -- the last

18    one, this is one that I have written in, so -- from

19    your testimony -- so correct me here.  I can't read

20    my own writing.  Family Preservation?  Is that --

21           A.    Um-hum.  Family Preservation Community

22    Services.

23           Q.    Okay.  So they serve the upstate.  Do

24    they have an office in the upstate?

25           A.    They serve statewide, but they do not

Page 197

1       have an office in the upstate.

2              Q.    Okay.   They do nontherapeutic foster

3       care?

4              A.    And therapeutic.

5              Q.    And do you know ballpark how long

6       they've been licensed as a CPA?

7              A.    It's been awhile, so certainly more

8       than ten years.

9              Q.    Okay.  I just wanted to -- for the ones

10      we just -- we just discussed, I think it's around

11      15 or 16 or so that at least serve the upstate,

12      some of them you said don't have an office here.

13      I'm trying to find an example.

14                   Southeastern Children's Home, they

15      do --

16             A.    Right.

17             Q.    So let's use Southeastern as an

18      example.  If -- if I wanted to be licensed as a

19      foster parent, I did a Google search for a foster

20      care agency in Greenville, South Carolina and I

21      think -- I just like the sound of that name, I

22      click on it.  If I wanted to talk to and to apply

23      through that to DSS, how would I go about doing

24      that if they don't have an office?

25             A.    You would -- sure.  There is a main

Page 198

1    contact number for each CPA and you would contact
2    either by e-mail or telephone to inquire and you
3    will be connected with someone at that agency who
4    would follow up with you.  The staff travels
5    statewide even if they don't have an office
6    presence, and so there is staff that are assigned
7    and would meet with you and your family and take
8    you through the application process.
9         Q.   Okay.  Is that process -- would that
10   process be any less convenient to me as a
11   prospective foster parent than if I went with
12   Southeastern Children's Home that has an office
13   nearby?
14        A.   I don't think it would.  The staff
15   would be required to make contact with you, visit
16   with you, as would any other CPA that may have a
17   presence in the county in which you reside.
18        Q.   Okay.  Thanks for marching through that
19   with me.  Look again at -- I think you still have
20   Exhibit 3 in front of you.  You didn't yourself
21   prepare this document, did you?
22        A.   I did not.
23        Q.   Okay.  By my count there are about 28
24   CPAs listed here.  There were two or three,
25   JusticeWorks Behavioral Care and LifeShare

Page 199

1    Management Group, that I think you clarified for us
2    are not, in fact, CPAs, is that right?
3         A.    They're not currently licensed as CPAs.
4         Q.    Do you know if they were previously
5    licensed as CPAs?
6         A.    Yes, they were previously licensed and
7    closed.
8         Q.    Okay.  So I'm looking, for example, at
9    JusticeWorks Behavioral Care.  It's listed twice.
10   From the second time it's listed there, for
11   example, there's numbers for 2017, 2018, 2019 and
12   there's nothing for the last half of 2020.  Is that
13   the time when it -- when it closed and stopped
14   operating as a CPA?
15        A.    No, it would have been before 2020.
16   JusticeWorks provides a different service for the
17   Department and so they no longer do -- work with
18   families under the child placing agency, but
19   there's a different contract for services.
20        Q.    Okay.  I see.  Do you know when -- and
21   I apologize if you said this and I just wasn't
22   taking good notes.
23              Do you know when JusticeWorks
24   Behavioral Care stopped operating as a CPA?
25        A.    It's been a number of years now and I

Page 262

1    numbers here, whether those include other payments

2    for other contracted services that a CPA might

3    provide apart from the specific work that it does

4    in recruiting and helping foster families to get

5    licensed, is that right?

6            A.    Again, I can't answer as to what was

7    included here.

8            Q.    Okay.  But we -- and we don't know then

9    that this -- from looking just at the face of this

10   document that this only shows money that went to

11   CPAs to reimburse them for or to compensate them

12   for any work that they did in recruiting or helping

13   foster -- prospective foster families get licensed,

14   right?

15               MR. COLEMAN:  Object to the form of the

16   question.

17               THE WITNESS:  Again, I have no way of

18   knowing what was included here on the surface.

19   This just shows the total amount that was paid per

20   fiscal year.

21   BY MS. HANSON:

22           Q.    Okay.  And then when you were -- when

23   you were speaking with Mr. Coleman, he asked you a

24   series of questions about, you know, whether

25   somebody would feel more -- possibly feel more

Page 263

1    comfortable going to a CPA that shared -- shared

2    their particular faith, right, than maybe -- maybe

3    going to a different CPA, is that right?

4         A.   Yes.

5         Q.   And do you think that -- well, does

6    South Carolina have a CPA that focuses on

7    recruiting people from every given faith?

8         A.   Not that I'm aware of.  I think the

9    idea is that we recruit for families that can meet

10    the needs of children that we have in foster care,

11    and those efforts should be based on families that

12    can serve the children we have.

13              I mean, I don't know that it would be

14    much benefit to have a group of families that we

15    can't place children with.  And so generally we're

16    looking for families to serve children who are for

17    our sibling groups, who are teenagers, who are

18    adolescents and are in need of temporary care.

19         Q.   And assuming that there -- assuming --

20    and I understand that there isn't, but assuming

21    that there were a CPA that focused on every

22    possible faith, a Jewish CPA, a Muslim CPA, you

23    know, you name it, across the board, would that --

24    would that really -- would that be preferable or

25    would that be better than having more of an equal

Page 264

1    level playing field where if I'm a prospective

2    foster parent I could feel comfortable going to any

3    of the -- any of the CPAs that -- that serve my

4    area?

5              A.    I would agree with that.

6              Q.    You would agree that the level playing

7    field option would be better?

8              A.    I would agree that families should have

9    a choice in where they want to go to become

10   licensed where they're most comfortable with and

11   where they feel they can serve.

12             Q.    And if we were talking here instead of

13   religion, if we were talking about race or

14   ethnicity and we said, well, it's fine because, you

15   know, there's an agency that -- you know, that

16   focuses on recruiting from the African American

17   community and there's an agency that focuses on

18   recruiting from the Asian American community and so

19   forth, I don't need to belabor the examples, but

20   would we -- would we -- would you generally think

21   that that would be fair?

22             A.    I would not.

23             MS. JANSON:   Okay.  I think -- I think

24   that you've heard all you're going to hear from me.

25   Again, thank you very, very much for your time.  I

Page 265

1    know it's been a really long day.  I don't know if
2    anyone has -- Miles has got a finger up.
3                    MR. COLEMAN:  Yeah.  Let me ask just
4    one follow-up.
5                         EXAMINATION
6    BY MR. COLEMAN:
7          Q.    So Exhibit 3 that we just looked at,
8    and again, Kate just made the point and you agreed
9    that -- and you said this earlier, right, that you
10   didn't compile this data, you know, you can't speak
11   authoritatively to how it was published.  Who --
12   who should we talk to to find that out, do you
13   know?
14         A.    Susan Roebin --
15         Q.    Okay.  Do you --
16         A.    -- I believe was designated.
17                   MR. COLEMAN:  Okay.  All right.  Thank
18   you.
19                   THE WITNESS:  You're welcome.
20                   MR. RIDDLE:  Nothing further from me.
21   This is Jonathan.
22                   MS. JANSON:  Okay.  I think we're done.
23                   MS. NEWMAN:  Thank you, Miss Lowe.
24                   VIDEO TECHNICIAN:  Attorney Janson, can
25   I read my closing to take us off the record?

Page 266

1              MS. JANSON:  Yes, please do.

2              VIDEO TECHNICIAN:  Okay.  We are off

3    the record at 5:34 PM.  This concludes today's

4    testimony given by Jacqueline Lowe.  The total

5    number of media units was six and will be retained

6    by Veritext New York.

7                   (WHEREUPON, the proceedings concluded

8    at 5:34 PM.)

9                   (The witness, after having been advised

10   of her right to read and sign this transcript, does

11   not waive that right.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25