# EXHIBIT 6

Page 1

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                 GREENVILLE DIVISION
 3   EDEN ROGERS
     and
 4   BRANDY WELCH,
 5            Plaintiffs,
 6        vs.            CASE NO. 6:19-CV-01567-JD
 7   UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
     SERVICES; ALEX AZAR, in his official capacity as
 8   Secretary of the UNITED STATES DEPARTMENT OF HEALTH
     AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN AND
 9   FAMILIES; LYNN JOHNSON, in her official capacity as
     Assistant Secretary of the ADMINISTRATION FOR
10   CHILDREN AND FAMILIES; STEVEN WAGNER, in his
     official capacity as Principal Deputy Assistant
11   Secretary of the ADMINISTRATION FOR CHILDREN AND
     FAMILIES; HENRY MCMASTER, in his official capacity
12   as Governor of the STATE OF SOUTH CAROLINA;
     and MICHAEL LEACH, in his official capacity as
13   State Director of the SOUTH CAROLINA DEPARTMENT OF
     SOCIAL SERVICES,
14            Defendants.
     _____/
15
     30(b)(6)
16   VIDEOTAPED VTC
     DEPOSITION OF:   SOUTH CAROLINA DEPARTMENT OF
17                    SOCIAL SERVICES
                      BY:  SUSAN ROBEN
18                    (Appearing by VTC)
19   DATE:            FEBRUARY 17, 2022
20   TIME:            9:00 a.m.
21   LOCATION:        ███████████████
                      ███████████
22
     TAKEN BY:        Counsel for the Plaintiffs
23
     REPORTED BY:     Susan M. Valsecchi, RPR, CRR
24                    Certified Realtime Reporter
                      (Appearing by VTC)
25
```

```
                                                      Page 2

 1     APPEARANCES OF COUNSEL VIA VTC:
 2          ATTORNEYS FOR THE PLAINTIFFS
                 EDEN ROGERS and BRANDY WELCH:
 3
                 CRAVATH SWAINE & MOORE
 4               BY:  KATHERINE DERINGER JANSON
                     SERENA CANDELARIA
 5                   (Appearing by VTC)
                 825 Eighth Avenue
 6               New York, NY  10019
                 (212) 474-1247
 7               scandelaria@cravath.com
                 kjanson@cravath.com
 8   - and -
                 LAMBDA LEGAL
 9               BY:  CURREY COOK
                     MAIA ZELKIND
10                   (Appearing by VTC)
                 120 Wall Street, Floor 19
11               New York, NY  10005-3919
                 (212) 809-8585
12               ccook@lambdalegal.org
                 mzelkind@lambdalegal.org
13   - and -
                 AMERICAN CIVIL LIBERTIES UNION (ACLU)
14               BY:  LESLIE COOPER
                     (Appearing by VTC)
15               125 Broad Street, 18th Floor
                 New York, NY  10004
16               lcooper@aclu.org
17
            ATTORNEYS FOR THE DEFENDANTS
18               HENRY MCMASTER, in his official
                 capacity as Governor of the STATE OF
19               SOUTH CAROLINA and MICHAEL LEACH, in
                 his official capacity as State Director
20               of the SOUTH CAROLINA DEPARTMENT OF
                 SOCIAL SERVICES:
21
                 NELSON MULLINS RILEY & SCARBOROUGH
22               BY:  MILES COLEMAN
                     (Appearing by VTC)
23               Greenville ONE
                 2 W. Washington Street, Suite 400
24               Greenville, SC  29601
                 (864) 373-2352
25               miles.coleman@nelsonmullins.com
```

Page 3

```
 1        ATTORNEYS FOR THE DEFENDANTS
                UNITED STATES DEPARTMENT OF HEALTH AND
 2              HUMAN SERVICES; ALEX AZAR, in his
                official capacity as Secretary of the
 3              UNITED STATES DEPARTMENT OF HEALTH AND
                HUMAN SERVICES; ADMINISTRATION FOR
 4              CHILDREN AND FAMILIES:
 5              UNITED STATES ATTORNEY'S OFFICE
                SOUTH CAROLINA
 6              BY: CHRISTIE NEWMAN
                    (Appearing by VTC)
 7              1441 Main Street, Suite 500
                Columbia, SC  29201
 8              (803) 929-3030
                christie.newman@usdoj.gov
 9
10
          ALSO PRESENT VIA VTC:
11              Ashley Bowler, Videographer
12
13         (INDEX AT REAR OF TRANSCRIPT)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 55

1          A.    And I will clarify that to say that

2     this report is based on when the payments are made,

3     so there could be a timing issue here as well.

4               So our accounting system -- when we run

5     this data, our accounting system has no way to know

6     when the services were actually performed.

7               So take, for example, Lutheran Family

8     Services, while it could have been that they had

9     some families in fiscal year '20, maybe at the

10    later part, maybe April, May, June, but that those

11    payments weren't actually made until July or maybe

12    August of the next fiscal year.

13              Well, those payments are not going to

14    show up, then, until that next fiscal year.  So our

15    accounting system is going to show them in fiscal

16    year '21.  But if we dig into the data and pull --

17    drill down into each specific invoice, we'll see,

18    then -- possibly -- this is my -- I'm speculating

19    here -- but I have seen this on some of the

20    invoices -- that it's actually for a previous

21    fiscal year.

22              In our -- in the accounting system,

23    it's not based on service dates, it's based -- it

24    is literally based on this is when the invoice was

25    paid.  And so it's not -- there could be timing

```
                                                  Page 56
 1    issues here as well.  I just want to have -- I just
 2    want to add that caveat.
 3           Q.    Okay.  So -- so I can understand, so
 4    there -- so if I'm a CPA, and I have, you know,
 5    five families that I'm supporting that have
 6    children placed with them and those children are
 7    placed on, you know, day one, that's when I guess
 8    we would -- that's when we would start sort of
 9    counting, I suppose, for purposes of calculating
10    the number -- you know, the number of days for
11    which, you know, I'm entitled -- I being the
12    CPA -- the CPA is entitled to that admin rate,
13    right?
14           A.    Uh-huh, correct.
15           Q.    But what it sounds like you're
16    explaining is that, you know, the CPA doesn't get
17    that $20 a day, or $25 a day, or $30 a day,
18    beginning on the first day the child is actually
19    placed, so there may be some lag time, processing
20    time, in terms of when the payment is actually made
21    to the -- from DSS to the CPA; is that correct?
22           A.    Yeah, we don't pay the CPA daily.  It's
23    a daily rate --
24           Q.    I understand that, yeah.
25           A.    But, yeah, we don't pay them daily.  We
```

```
                                          Page 57
 1   pay them on a -- we pay them monthly --
 2           Q.    Okay.
 3           A.    -- and there is a -- there is a delay,
 4   so...
 5           Q.    Yep, okay, understood.
 6                 Yeah, you couldn't possibly pay
 7   daily --
 8           A.    Yeah.
 9           Q.    -- that would be -- that would --
10                 Okay.  All right, so that's an
11   important -- an important caveat.
12                 Okay.  So looking down, then, at the
13   line for Miracle Hill Ministries, do you see
14   that --
15           A.    I do.
16           Q.    -- that line on the chart?
17           A.    Yes.
18           Q.    Okay.  So Miracle Hill is a -- is a
19   nontherapeutic CPA; is that right?
20           A.    Yes, I believe so.
21           Q.    Okay.  So I think what you just
22   testified to just a little while ago is that the
23   nontherapeutic CPAs didn't start to receive the
24   administrative fee -- that per-day, per-child
25   fee -- until halfway through fiscal year '19,
```

Page 58

1    right?

2          A.    Yes.

3          Q.    So then what I'm -- what I'm trying to

4    understand, then, is this chart reflects that in

5    fiscal year '17, Miracle Hill received $620,800 and

6    in fiscal year '18, Miracle Hill received $592,080

7    in administrative fees.  So I'm not understanding

8    what -- what those -- what those amounts are.

9          A.    So Miracle Hill was an exception.

10   There was a decision made with a previous

11   administration, you know, way back in -- you know,

12   before this -- this chart started -- so prior to,

13   you know, July of 2016.

14               Um, and, again, I had -- I have gone

15   back, I have talked to Laura, I have tried to

16   figure out why we have tracked, so we've -- we've

17   tracked Miracle Hill's admin payments separately.

18   Miracle Hill is the only CPA that received, back at

19   that time, an admin fee of $10 per day per child.

20               We've tried to go back to figure out

21   why that is and look at -- try to find

22   documentation, try to find reasoning, and we're

23   not -- we were not able to come up with -- we were

24   not able to find any reasonable explanation as to,

25   you know, why that was.

1             Again, it was a previous

2    administration, previous decisions that were made.

3    I have -- I have done research, I have asked other

4    people.  Um, for some reason, though, we -- you

5    know, we were -- we had tracked Miracle Hill

6    separately, um, and so we are able to show the

7    amount of administrative fees that they have been

8    paid back to that time.

9             And so they -- they are the -- they

10   were the only ones that were receiving that

11   administrative fee.

12            And I will say that that $188,000 that

13   shows in the current fiscal year is another one of

14   those -- those timing issues -- that because they

15   are no longer receiving an administrative fee; that

16   stopped.  They're -- you know, they have said we

17   don't -- we don't want to receive an administrative

18   fee anymore, we're not going to accept the

19   administrative fee.

20            So that $188,000 that you see in the

21   current fiscal year actually was paid in the

22   current fiscal year, but it was -- I looked up -- I

23   specifically looked up those invoices.  It was for

24   the previous fiscal year.  It was for services that

25   they -- you know, that were provided in June of

Page 60

1   2021.

2          Q.   Okay.  Yeah, you anticipated what some

3   of my next questions --

4          A.   I did.

5          Q.   -- were going to be there, because --

6   and we'll get into this a little -- a little bit

7   more in detail later, but there was a point in the

8   middle of last year when Miracle Hill determined

9   that it was going to stop accepting the

10  administrative fee from DSS; is that right?

11         A.   That's correct.

12         Q.   And so but you're saying that -- and do

13  you know when -- do you know when -- what date that

14  decision was -- was effective as of?

15         A.   It was effective as of -- they -- as of

16  June 30th, 2021, would be the ending, so then July

17  1st they were receiving -- July 1st, 2021 they

18  would receive no more administrative fee payments.

19         Q.   Okay, so effective as of the start of

20  the 2022 fiscal year?

21         A.   Correct.

22         Q.   Okay.  So the number here in this

23  chart, in the far right, or the

24  second-to-farthest-right column, about $188,305,

25  you're explaining that that is -- those are

```
                                              Page 61
 1   administrative fees that would have been paid for
 2   the -- for the first -- services provided in the
 3   first part -- in the second half of fiscal year
 4   '21 -- but they just -- they just weren't paid,
 5   because, like you said, there's sometimes a delay
 6   in payments, that the money actually wasn't paid
 7   out until -- until the fiscal year 2022.
 8           A.    Correct.
 9           Q.    Am I getting right?
10           A.    Yes, that's correct.
11           Q.    Okay.  So going back to -- I guess to
12   the first -- the first two years, fiscal years '17
13   and '18, well, I guess for --
14                 Yeah, for those -- for those first two
15   years, Miracle Hill is the only CPA on this list
16   for which administrative -- nontherapeutic CPA or
17   any CPA on this list -- for which administrative
18   fees were paid in those two years.
19                 And you described to us that you've
20   looked into it, you're not sure why that is the
21   case, but, for whatever reason, that's the case and
22   those are the -- those are the numbers that are
23   reflected there.
24                 As we move sort of into the later
25   years, in fiscal year '19, '20, and '21, just by
```

Page 62

```
 1   comparison, if you look at the figures that were
 2   paid to Miracle Hill for administrative fees and
 3   the figures that were paid to any of the
 4   other -- the amounts that were paid to any of the
 5   other CPAs in administrative fees in those years,
 6   is it -- is it fair to say that Miracle Hill
 7   received, by far, the largest amount of funding in
 8   administrative fees during those years --
 9              MR. COLEMAN:  Object to the form.
10   BY MS. JANSON:
11        Q.   -- compared to the other CPAs?
12              MR. COLEMAN:  I apologize, Kate, I cut
13   off the last part of your question there, sorry.
14              MS. JANSON:  No, that's okay.
15              Um, yeah, I was just -- think we got
16   it.
17   BY MS. JANSON:
18        Q.   My question is, Is it fair to say that
19   Miracle Hill received, by far, the largest amount
20   of funding in administrative fees during the fiscal
21   years reflected in this chart?
22              MR. COLEMAN:  Object to the form of the
23   question, but you can answer it.
24              THE WITNESS:  Um, yes, according to the
25   chart, that is what is showing.
```

Page 68

1    year 2019.

2            Is that right?

3        A.    Um, prior to January '19.

4        Q.    Prior to January of 2019, got it, thank

5    you.  And so were there -- prior to January 2019,

6    there were nontherapeutic CPAs licensed by the

7    State of South Carolina that were providing foster

8    care services; is that right?

9        A.    I believe so, but that would be a

10    question for Jackie or Dawn.

11        Q.    Okay.  You -- you can't tell me for

12    certainty that prior to January of 2019, there were

13    any nontherapeutic CPAs operating under license in

14    South Carolina?

15        A.    So I don't do the licensing.  I'm in

16    the fiscal side.  We made -- I can tell you what

17    payments we made, but I am not certain at this time

18    which are therapeutic and which are nontherapeutic,

19    so I would need to verify that with Jackie, which

20    are therapeutic and which are nontherapeutic; and

21    then I would be able to tell, from the payments we

22    made, if we -- you know, if they were -- based on

23    the payments we made -- if they were therapeutic,

24    nontherapeutic, if they were licensed -- you know,

25    that we were making those payments, but --

1          Q.    Okay.

2          A.    -- based on this information right now,

3    I -- I can't with certainty tell -- answer that

4    question.

5          Q.    Okay.  So let's assume that there were

6    nontherapeutic CPAs that were licensed by the State

7    of South Carolina prior to January 2019 and that

8    they were performing, you know, this work, you

9    know, pursuant to their contracts of recruiting,

10   screening, supporting foster -- prospective foster

11   families and foster families after -- after

12   licensure.

13          Assuming that there were nontherapeutic

14   CPAs doing that work prior to January 2019, we've

15   established that they were not receiving

16   administrative fees prior to January 2019 --

17          A.    Correct.

18          Q.    -- so would they have been receiving

19   any payments from the State of South Carolina for

20   the work that they were doing?

21          A.    In terms of the work -- I'm trying

22   to -- I'm trying to understand.

23          Are we getting back to the question of,

24   like, the different contracts, transportation

25   contracts again, or are you talking strictly on the

Page 70

```
 1   work with -- specifically the work with the foster
 2   families in --
 3        Q.   Yeah, the --
 4        A.   Yeah.
 5        Q.   -- specifically the work with the
 6   foster families.
 7             What I'm trying to get at is we've
 8   established that they were not getting this
 9   administrative fee, this per-child-per-day payment
10   for children placed with the families that those
11   CPAs supported prior to January 2019?
12        A.   Okay.
13        Q.   So my question is, you know, were
14   they -- were they getting paid by the State in some
15   other way to do this work or were they doing it for
16   free?
17        A.   So they were getting -- the regular
18   nontherapeutic were not getting paid an
19   administrative fee prior to that time.
20        Q.   Were they getting paid anything?
21   Another type of fee?  Was there a different payment
22   structure in place at that time apart from
23   the -- that's different from the administrative
24   fee?  I'm just trying to understand, if they're not
25   getting the admin fee, and they're doing all of
```

Page 71

1    this work to bring in the families, screen them,

2    help them get licensed, support them, train them,

3    you know, how are they getting paid for that?  Or

4    are they doing it for free?

5             A.   So we don't -- we don't know.  We were

6    paying -- um, well, let me back up.  There's a lot

7    of dates and I'm trying to keep them all straight

8    in my head.

9                 So, yeah, we were paying the

10   foster -- the regular foster homes directly, so

11   that would be correct, they were -- they were not

12   receiving any fee.  They were not receiving an

13   administrative fee, and they were -- I

14   would -- that would be true, that they were doing

15   it for no -- for no -- for no payment.

16            Q.   They were doing it for free, um, okay.

17                 And that is, of course, Miracle Hill

18   being the exception, as we've discussed --

19            A.   Correct.

20            Q.   -- because Miracle Hill was receiving

21   substantial amounts in administrative fees during

22   the years prior to January 2019 that are reflected

23   on this chart, right?

24            A.   Yes.

25            Q.   Okay.  So if we can look at the

```
 1    two -- the two columns on the chart for fiscal year
 2    2021 and the first half of fiscal year 2022.
 3              If you -- is it fair to say that if a
 4    CPA is not included on this chart, that would mean
 5    that they received no administrative fees in fiscal
 6    year 2021 or the first portion of fiscal year 2022;
 7    is that right?
 8         A.    That's correct.
 9         Q.    And if they received no administrative
10    fees, that would mean that they had no children
11    placed with foster families that those CPAs
12    supported; is that right?
13              MR. COLEMAN:  Object to the form of the
14    question, but you can answer.
15              THE WITNESS:  Yes, that would
16    be -- that would be my assumption, yes.
17    BY MS. JANSON:
18         Q.    Okay.  There isn't any reason that a
19    foster family -- or a CPA -- would have children
20    placed with families it supported during those
21    years but not be receiving the administrative rate,
22    right?
23         A.    Not to my knowledge, no.
24         Q.    And you're speaking as the
25    representative for DSS on this topic.  So when you
```

```
                                                  Page 73
 1    say "not to my knowledge," you're really saying not
 2    to DSS's knowledge, right?
 3          A.    Correct, yes.
 4          Q.    Okay, uh, so -- all right, looking back
 5    to the last of the chart, under each of
 6    these -- under each of the provider names, the CPA
 7    names listed, and there's two rows.  There's state
 8    general funds and federal funds.
 9                Um, and we talked a little -- we talked
10    some about this -- about this earlier -- but can
11    you describe to me what -- what state general funds
12    means?
13          A.    Uh, well, so that -- I mean, I'm not
14    sure how to describe it in really any other way.
15    It's really our state appropriations, the state
16    appropriations from the General Assembly.
17          Q.    Okay.
18          A.    And, I'm sorry, I do need to back up; I
19    apologize.  But there -- there are -- I misspoke
20    just a minute ago.  I believe that there are a few
21    CPAs that did not sign -- we -- we issued a new
22    contract effective January 1st of 2021.
23                When the -- when the providers started
24    receiving the new administrative rate of $20, $25
25    and $30 a day, there were, I believe, a few -- and
```

1  between those two numbers and what we know about

2  and what we've discussed about what the two charts

3  reflect, that there was -- there's a significant

4  amount of funding that Miracle Hill was receiving

5  separate and apart from the administrative fees,

6  right?

7       A.   Um, yes, I know at some point -- at one

8  point -- and I don't know when they stopped -- but

9  they were also running a group home.  They also had

10  a group home --

11       Q.   Okay.

12       A.   -- obviously apart from their -- their

13  CPA provider.

14            Um, so, but I believe that that -- and,

15  again, I would have to double check -- but I'm

16  pretty sure that they no longer run a group home,

17  but I -- but I don't have that date of when that

18  stopped.  It may have been sometime in 2020.

19       Q.   Okay.  So some of that difference

20  between those two numbers might be accounted for by

21  the fact that they were running a group home at

22  some point and they were receiving payments from

23  that?

24       A.   That could be, uh-huh.

25       Q.   Is it possible that there are other

Page 91

1    amounts of funding that Miracle Hill was receiving?

2    Maybe they had -- and I know you don't have the

3    specifics on this -- but maybe they had a

4    transportation contract, like we talked about, or I

5    think we said that -- yeah, maybe they had a

6    transportation contract, for example.

7                MR. COLEMAN:  Object to the form of the

8    question to the extent it calls for speculation,

9    but you can answer.

10               THE WITNESS:  Yeah, again, I would be

11   speculating on that; but, to my knowledge, Miracle

12   Hill has not had a transportation contract with

13   DSS.

14   BY MS. JANSON:

15         Q.   Okay.  Bad example.

16               What I'm trying to understand is simply

17   when -- when Miracle Hill announced that it was

18   going to stop accepting government funding, we know

19   that that means it's no longer accepting the

20   administrative fee; but does that also mean it's no

21   longer accepting any funding whatsoever from DSS

22   related in any way to foster care?

23         A.   I would be --

24               MR. COLEMAN:  Object to the form.

25               THE WITNESS:   I would be speculating on

Page 92

1   what they mean by what they're saying in that

2   paragraph.

3   BY MS. JANSON:

4           Q.    Okay, okay, that's fair enough.

5                 And so when we were looking at -- when

6   we were looking at Tab 2 earlier -- and that's the

7   chart of the Child Placing Agency Administrative

8   Fees -- we looked at the fact that there's a

9   number, a $188,000 number, included there for the

10  first half of fiscal year '22 -- '20 -- yeah,

11  fiscal year 2022 -- and we -- we discussed the fact

12  that even though those payments were made after the

13  effective date of Miracle Hill's announcements that

14  it wasn't going to accept anymore government

15  funding, it's really just a timing issue there and

16  that those were administrative fees being paid for

17  children placed in the later months, for instance,

18  the later months of fiscal year 2021.

19                Do you remember that discussion?

20          A.    Yes.

21          Q.    And so, uh, can you tell us with

22  certainty that all of that -- all of that $188,000

23  is, in fact, accounted for by that explanation and

24  that Miracle Hill, in fact, has not received any

25  administrative fees for services provided in fiscal

Page 93

1    year 2022 after its announcement?

2           A.    Yes, I have verified that.

3           Q.    Okay, great.  So you've verified that

4    they're not getting any administrative rates

5    after -- they have not received any administrative

6    rates for services provided after June 30th, 2021.

7                 Do you know whether Miracle Hill

8    is -- has gotten any funding whatsoever from DSS in

9    the period after June 30th, 2021?

10          A.    I can't answer that right now.

11          Q.    Okay.

12          A.    I would have to check.

13          Q.    Okay.  Is that something that would

14   be -- would be knowable if you had -- if you had

15   time to check?

16          A.    Um, I mean, it's something that we

17   certainly -- that somebody could certainly look

18   into, yes.

19          Q.    Okay.  Do you know whether Miracle Hill

20   is still receiving the -- that board payment, the

21   maintenance payment, from DSS to pass along to the

22   families that it worked with that have children

23   placed with them?

24          A.    So I believe that we are paying the

25   Miracle Hill CPA homes directly.  Again, that's

```
                                              Page 94
 1    another nuance.  I -- I may not have mentioned that
 2    earlier, but we are paying those homes directly
 3    under Miracle Hill.
 4              So we don't pay that to Miracle Hill
 5    and then expect them to pay, to pass it on.  We pay
 6    those homes, directly to the homes.
 7         Q.   Has it always worked that way?
 8         A.   I believe it has, yes.
 9         Q.   Okay.  So that was not a -- that was
10    not a change that was made as a result of Miracle
11    Hill's decision last year to --
12         A.   No.
13         Q.   -- stop accepting funds?
14         A.   No.
15         Q.   Okay.  How did Miracle Hill notify DSS
16    of its decision to stop accepting government
17    funding for its foster care program effective July
18    1st, 2021?
19         A.   That, I'm not sure of.  I believe --
20    I'm not sure.  That would be something that Dawn
21    Barton and/or Jackie Lowe would -- would have the
22    answer to.
23              MS. JANSON:  Serena, let's look at Tab
24    9, if we can.
25              (EXHIBIT 5, State of South Carolina
```

```
 1   Change Order 5; Bates 10545-G0250, was marked for
 2   identification.)
 3                 MS. JANSON:  Let me know when you have
 4   that up.
 5                 MR. COLEMAN:  Okay, we've got it.
 6                 MS. JANSON:  Okay.
 7   BY MS. JANSON:
 8       Q.   So we are up to Exhibit 5, I believe.
 9   So let's mark as Exhibit 5 a document that's
10   entitled State of South Carolina Change Order
11   Number 5, and it's Bates stamped 10545-G0250 to
12   251.
13                 Have you seen this document before,
14   Ms. Roben?
15       A.   Yes.
16       Q.   I see that you signed it at the bottom,
17   or you digitally signed it?
18       A.   Correct.
19       Q.   Can you describe for me what this is?
20       A.   Um, so this is -- this is what we call
21   one of our change orders.  And this was sent out
22   to -- well, all of our nontherapeutic foster
23   families -- or not our foster families, our CPAs.
24                 And this is basically we had a -- we
25   had a change in our monthly rate, or the -- well,
```

Page 102

1    Roben?

2            A.    I have.

3            Q.    And can you explain to me what this is?

4            A.    Let's see.  All right.  Sorry, I've got

5    to get back to the top one.

6            Q.    Okay.

7            A.    It might help if I do this with my

8    right hand and not my left hand.

9                  So this is -- this looks like this is

10   our emergency -- one of our emergency contracts

11   for, um -- between South Carolina DSS and South

12   Carolina Mentor, um, for them to provide -- as a

13   CPA for nontherapeutic services.

14           Q.    Okay.  And what does it mean -- what

15   does it mean that it's an emergency contract?

16           A.    So, again, I am not the procurement

17   expert, and so I am -- I am probably not the best

18   one to answer this.  I'm trying to think of

19   the -- so we issue emergency contracts

20   when -- basically when there is -- there is

21   not -- when the health and wellbeing of the

22   children of South Carolina are, you know, in harms

23   way, basically.

24                  So if we were -- if we were -- if we

25   did not issue this contract, then we would not be

Page 103

1   able to, um, have a contract with South Carolina

2   Mentor, they would not be able to take children,

3   or, you know, become a -- we would not be able to

4   pay them, they would not be able to basically start

5   taking children under their -- under the CPA

6   provisions, um, and then we would

7   have -- potentially we would have children that

8   would not be able to find a foster home.

9           And that, obviously, is not in the best

10   interest -- we don't want children -- I mean, we

11   know that children are best suited in loving foster

12   families, not necessarily in congregate care

13   facilities, or in other facilities.  We want them

14   in a stable environment.  So that's -- that's

15   really what we mean by an emergency contract.  So

16   there's -- we are -- we are working on a -- on a

17   procurement, but regular procurements take a long

18   time, sometimes a year and a half, and so until

19   that gets done, we really -- I don't want to say we

20   don't have a choice, but we really have -- this is

21   the way to get this done in a quick manner for

22   something that really is for the best interest and

23   the health and well being of the children in South

24   Carolina's care and custody.

25       Q.   Okay, that's helpful; thank you.

Page 104

```
1              So I picked, just an example, an

2    example of a contract between DSS, and, you know,

3    one of the nontherapeutic CPAs here, South Carolina

4    Mentor, just so we can look at some of the

5    provisions in here.

6              But does DSS enter into the same

7    emergency contract, or an equivalent emergency

8    contract, with all of the nontherapeutic CPAs that

9    are licensed?

10        A.   At this point, yes, until we're able to

11   move forward with a full solicitation RFP process,

12   uh-huh.

13        Q.   If we look at Article I here about

14   halfway through the first page, it says Contract

15   Period and it says, The emergency contract must

16   take effect as of August 1, 2020 and must continue

17   in full force and effect through December 31, 2022

18   [sic].

19              So that's the -- that's the time period

20   of this; is that right?

21        A.   December 31st, 2020.  I think you said

22   2022.

23        Q.   I said it wrong again.  Thank you for

24   catching my error.  Yes, December 31st, 2020.

25              Okay.  And then if we go -- if we flip
```

Page 105

1    ahead to Page 5 of the document itself, there's a

2    heading there, B, Limit on Total Reimbursement.

3              Do you see that?

4         A.   I do.

5         Q.   And I'm just going to read that.  It

6    says, SCDS -- SCDSS -- will reimburse the licensed

7    regular child placing agency under this emergency

8    contract a monthly rate of $300 per child, or $10

9    per child per day if less than 30 days in a given

10   month.

11             And so that's a reference to the

12   administrative rate that we've been discuss, right?

13        A.   Correct.

14        Q.   And so at the time of this emergency

15   correct, which was August 1 through December 31,

16   2020, the rate was $30 per month per child, or

17   $10 -- I'm sorry -- $300 per month per child, or

18   $10 per child if less than 30 days in a given

19   month; is that right?

20        A.   That's correct.

21        Q.   And so at this point, there wasn't --

22   there wasn't a distinction between the ages of the

23   children, or there were not different -- different

24   rates provided for different -- different brackets

25   of ages --

Page 106

```
 1          A.    No.
 2          Q.    -- like we discussed earlier?
 3          A.    No, no, that started on
 4   January -- January 1st of 2021.
 5          Q.    Okay.  And underneath the part I just
 6   read it says -- in bold there it says, Total funds,
 7   $150,000.  What does that indicate?
 8          A.    So with each contract, we have to issue
 9   a dollar amount on -- on the contract, on the
10   purchase order, there has to be a dollar amount.
11               And so this was our -- this was the
12   estimate given to this -- this particular contract.
13   That doesn't mean that they're absolutely limited
14   and then cut off at that point in time.  We can
15   always increase that dollar amount if -- if need
16   be, but there has to be a -- there has to be a
17   dollar amount on each contract.  And so it's -- on
18   contracts like this where it's -- it's really just
19   based on the number of children.  And we're not
20   going to cut that off, obviously.  If they're
21   placing more children, then we're going to increase
22   that dollar amount.  But they won't necessarily --
23   they may not use that total $150,000; it may be
24   less.  So it's somewhat arbitrary for these types
25   of contracts.
```

Page 127

1    nontherapeutic CPAs, right?

2         A.    Yes.

3         Q.    And if you look at the columns for

4    fiscal year '17 and fiscal year '18, you'll note

5    that all of those -- that for every CPA on this

6    list, apart from Miracle Hill, for every other CPA,

7    there are no amounts listed as administrative fees

8    having been paid in fiscal year '17 or '18,

9    right --

10        A.    Correct.

11        Q.    -- except for Miracle Hill, right?

12        A.    Correct.

13        Q.    So my question is, for the therapeutic

14   CPAs on this list, does that mean that they were

15   also not receiving any administrative fee in fiscal

16   year '17 or '18?

17        A.    So I believe I talked about this

18   earlier.  The therapeutic CPA providers were being

19   paid $10 a day per child if they had a

20   nontherapeutic child placed in their therapeutic

21   home, but it was not -- it was not called or

22   separated out as an administrative -- as a separate

23   administrative fee, it was in addition to their

24   regular board payment, so it was added on as part

25   of their board payment.  So we cannot separate that

Page 128

```
 1   out.  We don't have any way of separating that out
 2   as an administrative fee, so we can't -- it's not
 3   going to be -- we're not able to pull that amount
 4   into this report.  So we don't have any way of
 5   knowing what that separate $10-per-day/per-child
 6   fee is because it was added onto their maintenance
 7   payment.
 8          Q.    Okay, understood.  So that's -- that's
 9   an accounting sort of record -- recordkeeping issue
10   that leads to the blanks here for -- for the
11   nontherapeutic CPAs, right?
12          A.    I don't know that I would say it's an
13   accounting issue.  It really was not considered --
14   back in that time, '17 and '18, it was not
15   considered, really, an administrative -- it wasn't
16   called an administrative fee.  It was a -- it was a
17   payment that was added on to their -- as part of
18   their -- their maintenance payment.  And, again,
19   I'm speculating, because that was a long time ago.
20          Q.    Yes.
21          A.    But from my talking to other staff and
22   from my research, it was -- it was a fee that was
23   added onto their maintenance fee -- their
24   maintenance payment, not their maintenance fee.
25          Q.    Okay.  And that $10, was that added on
```

Page 129

```
 1   just for -- I think you had said earlier that it
 2   was added on in the case where there was a
 3   nontherapeutic placement with a therapeutic
 4   foster -- foster home -- is that right?
 5          A.   With a therapeutic foster child, a
 6   non -- a thera -- so a therapeutic -- a therapeutic
 7   home that had a nontherapeutic child in that home.
 8          Q.   Okay.  And so -- and so was there any
 9   admin rate or extra amount on top of the board
10   payment that was being paid for therapeutic foster
11   placements in those homes, or was it just for a
12   nontherapeutic foster placement within a
13   therapeutic foster home, if that makes sense?
14          A.   I believe it does.  I -- I can't answer
15   that.  I would need to go back and do some more
16   research on that -- on that one.
17          Q.   Okay.  And are you -- are you
18   able -- you know, we -- I keep -- I keep going back
19   to this question of no administrative fee being
20   paid to nontherapeutic CPAs prior to 2019.
21               Do you know with certainty that those
22   nontherapeutic foster -- or those nontherapeutic
23   CPAs were, in fact, providing their foster care
24   services for free prior to January 1st of 2019?
25          A.   Based on the information that I have
```

1    gathered and the research that I have done, that is

2    the conclusion that I have come to.

3            Q.    So you don't know for sure?

4            A.    I mean, I don't know where -- I

5    mean -- I'm -- well --

6                 Effective January -- what I know is

7    that effective January '19 is when the regular CPA

8    providers began to receive the $10 per day per

9    child.  They did not receive it before then.

10           Q.    But you don't know for sure, or you

11   can't tell me with certainty right now whether

12   there may have been some other -- or whether there

13   was some other funding mechanism whereby those

14   nontherapeutic CPAs were being paid for their

15   foster care services prior to that January 2019

16   initiation of the admin fee, right?

17           A.    There wouldn't have been any other

18   funding mechanism.

19           Q.    There would not have been, or there was

20   not?

21           A.    There wouldn't -- there was not any

22   other funding mechanism.  We were not paying them

23   any other -- any other way.

24           Q.    So they were providing those foster

25   care services -- recruiting, screening,

```
1   supporting/training prospective foster families and
2   families after they received licensure from DSS --
3   they were doing all of that work for free?
4              MR. COLEMAN:  Object to the form of the
5   question to the extent that "for free" is a little
6   bit ambiguous, but you can answer.
7              THE WITNESS:  I am saying that,
8   effective January of 2019, is when the regular
9   nontherapeutic CPA providers began to receive the
10  $10-per-child/per-day administrative fee.  They did
11  not receive it before then.
12  BY MS. JANSON:
13       Q.   But they were -- but they were -- at
14  least some of them -- were working as licensed CPAs
15  and providing those foster care services before
16  then, right?
17       A.   That is my understanding, yes.
18       Q.   Okay.  And so they -- and so then they
19  were -- they must have been doing all of those --
20  providing all of those service and all of that work
21  without receiving any government funding from DSS?
22       A.   Yes.
23       Q.   Why would they do that?  How would they
24  pay -- how would those CPAs pay their employees,
25  for instance?
```

Page 132

1                MR. COLEMAN:  Object to the form of the

2     question on the basis that it calls for

3     speculation.  But if you know the answer, you can

4     answer it.

5                THE WITNESS:  I can't answer that

6     question.

7     BY MS. JANSON:

8          Q.    With regard to Miracle Hill, I think

9     you testified earlier that the Miracle Hill -- the

10    foster families that are supported by Miracle Hill

11    have always gotten their -- have their board

12    payments paid directly by DSS; is that right?

13         A.    Yes.

14         Q.    And that's not the case for other

15    nontherapeutic CPAs, right?

16               MR. COLEMAN:  Object to the form of the

17    question to the extent it misstates prior

18    testimony, but you can answer.

19               THE WITNESS:  Sorry.  Can you repeat

20    that question?

21    BY MS. JANSON:

22         Q.    Sure.

23               I think you testified earlier that at

24    some point there was a change by which the board

25    payment that goes to the foster families was paid

```
                                        Page 133
1    from DSS to the CPA and then passed on to the

2    family, right?

3         A.    Yeah, so the -- DSS paid the regular

4    CPA homes, or the nontherapeutic homes, directly

5    through December of 2020.

6              And then starting on January 1st, 2021,

7    DSS started paying the CPA providers directly for

8    those homes, and they passed it on to the homes.

9         Q.    But not for Miracle Hill, right?

10        A.    Yes, with that exception.

11        Q.    Why -- why was it that that was handled

12   differently for Miracle Hill than for the other

13   nontherapeutic CPAs?

14        A.    I can't answer that.  I'm not sure.

15        Q.    We talked a little bit earlier about

16   how you had -- how you had learned of Miracle

17   Hill's decision to stop funding -- or to stop

18   accepting government funding -- and I believe you

19   said that you had learned from Dawn Barton; is that

20   right?

21        A.    Yes.

22        Q.    What exactly did Dawn tell you in that

23   conversation?

24        A.    What exactly did she say?  I don't

25   remember.  It was quite a while ago.
```