# EXHIBIT 7

Page 1

1              UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
2              GREENVILLE DIVISION
3   EDEN ROGERS AND BRANDY WELCH,
              Plaintiffs,
4
        vs.    C/A No. 6:19-cv-01567-JD
5
    UNITED STATES DEPARTMENT OF HEALTH &
6   HUMAN SERVICES; XAVIER BECERA, IN HIS
    OFFICIAL CAPACITY AS SECRETARY OF THE
7   UNITED STATES DEPARTMENT OF HEALTH &
    HUMAN SERVICES; ADMINISTRATION FOR
8   CHILDREN AND FAMILIES; JOOYEUN CHANG, IN
    HER OFFICIAL CAPACITY AS THE SENIOR
9   OFFICIAL PERFORMING THE DUTIES OF THE
    ASSISTANT SECRETARY OF THE
10  ADMINISTRATION FOR CHILDREN AND
    FAMILIES; JOOYEUN CHANG, IN HER OFFICIAL
11  CAPACITY AS PRINCIPAL
    DEPUTY ASSISTANT SECRETARY OF THE
12  ADMINISTRATION FOR CHILDREN AND
    FAMILIES; HENRY MCMASTER, IN HIS
13  OFFICIAL CAPACITY AS GOVERNOR OF THE
    STATE OF SOUTH CAROLINA; AND MICHAEL
14  LEACH, IN HIS OFFICIAL CAPACITY AS STATE
    DIRECTOR OF THE SOUTH CAROLINA
15  DEPARTMENT OF SOCIAL SERVICES,
              Defendants.
16
17
18  VTC  30(b)(6)     SC DSS, Through its agent:
    DEPOSITION OF:   DAWN BARTON
19
    DATE:            December 17, 2021
20  TIME:            9:33 a.m.
    LOCATION:        Zoom - Columbia, SC
21
22  TAKEN BY:        Counsel for the Plaintiffs
23  REPORTED BY:     Roxanne Easterwood, RPR
24  VIDEOGRAPHER:    Roosevelt Hamilton
25

```
                                                      Page 2
 1    APPEARANCES OF COUNSEL:
 2         ATTORNEYS FOR PLAINTIFFS:
 3              Cravath Swaine & Moore
                By:  Rebecca Schindel
 4                   Serena Candelaria
                (Appearing by VTC)
 5              825 Eighth Avenue, Suite 4043B
                New York, NY 10019
 6              rschindel@cravath.com
                scandelaria@cravath.com
 7              (212) 474-1989
 8
                Lambda Legal
 9              By:  Currey Cook
                     Maia Zelkind
10              (Appearing by VTC)
                120 Wall Street, Floor 19
11              New York, NY 10005
                ccook@lambdalegal.org
12              mzelkind@lamddalegal.org
                (212) 809-8585
13
14              American Civil Liberties Union (ACLU)
                By:  Leslie Cooper
15              (Appearing by VTC)
                125 Broad Street, 18th Floor
16              New York, NY 10004
                lcooper@aclu.org
17
18
           ATTORNEYS FOR UNITED STATES DEPARTMENT OF
19              HEALTH & HUMAN SERVICES, ET AL.:
20              United States Attorney's Office South
                Carolina
21              By:  Marshall Prince
                (Appearing by VTC)
22              1441 Main Street, Suite 500
                Columbia, SC 29201
23              marshall.prince@usdoj.gov
                (803) 929-3000
24
25
```

Page 3

1          ATTORNEYS FOR HENRY MCMASTER, IN HIS
                  OFFICIAL CAPACITY AS GOVERNOR OF THE
2                 STATE OF SOUTH CAROLINA; and MICHAEL
                  LEACH, IN HIS OFFICIAL CAPACITY AS
3                 STATE DIRECTOR OF THE SOUTH CAROLINA
                  DEPARTMENT OF SOCIAL SERVICES:
4
                  Nelson Mullins Riley & Scarborough
5                 By:  Miles Coleman
                  (Appearing by VTC)
6                 2 W Washington Street, Suite 400
                  Greenville, SC 29601
7                 miles.coleman@nelsonmullins.com
                  (864) 373-2300
8
9
10          (INDEX AT REAR OF TRANSCRIPT)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 29

```
 1   setting, and -- and they need a level of treatment
 2   that a foster home, perhaps, could not offer them
 3   in order to stabilize them, so...
 4             But, yes, to answer your question
 5   precisely, we -- we do lack enough foster homes in
 6   the state to be able to place young people in.
 7        Q.   In- -- including young people who
 8   would be -- who would -- who would do well with a
 9   foster care placement?
10        A.   Yes.  I'd say those -- the -- the --
11   the Group Care 1 kiddos, they are -- I mean,
12   they're all -- they don't have these exceptional
13   needs like your Group Care 3, and so many of those
14   young -- those kids who you see in Group Care 1
15   could easily be stepped down into a -- a foster
16   home if there was availability.
17        Q.   Are there children in Region 1 who are
18   currently eligible for adoption but for whom
19   adoptive placements have not yet been identified?
20        A.   Yes.
21        Q.   How many children are in that
22   category?
23        A.   Again, I don't have that number
24   precisely, but we have that data that we can
25   provide for you.
```

Page 30

1        Q.    Great.

2        A.    I can tell you that we have around 170

3   children legally free and waiting with no

4   resources currently in the state, but I don't know

5   what that equates for just the Upstate.

6        Q.    Got it.  Okay.  And do you know -- do

7   you have a sense of how that -- how that data has

8   changed since 2018?

9        A.    I don't, but we have -- yeah, we

10  could -- yeah, we could get you that comparative

11  data.

12       Q.    Perfect.  Great.  Is DSS the only

13  state agency that handles foster care in South

14  Carolina?

15       A.    Can you repeat that?  I'm sorry.

16       Q.    Oh, sure.  I said, is DSS the only

17  state agency that handles foster care -- foster

18  care in South Carolina?

19       A.    Yes.

20       Q.    And what was DSS's budget for the past

21  year?

22       A.    I don't know that information.

23       Q.    Do you have a sense of what percentage

24  of DSS's budget is devoted to foster care?

25       A.    I do not.

```
                                           Page 31
 1          Q.    Is that -- I'm sure that's something
 2     that DSS has.
 3          A.    Yeah, I would -- I would say that --
 4     that either Susan Roben or Dawn Grant could
 5     provide that information.
 6          Q.    Great.   Thank you.   And does DSS
 7     license potential foster parents?
 8          A.    Yes.
 9          Q.    Is DSS the only entity that can
10     license foster parents in South Carolina?
11          A.    Yes.
12          Q.    Can potential foster parents apply to
13     become foster parents directly through DSS?
14          A.    Yes.
15          Q.    And you mentioned this earlier, but
16     what is kinship care?
17          A.    So kinship care is -- is the agency's
18     effort to place children and youth that can't
19     remain with their -- in their family homes, place
20     them with people who they're already connected to
21     and know, and that could look like -- we define
22     kinship care as relations through blood, marriage,
23     or adoption, but we -- we ex- -- we extend that in
24     South Carolina to also consider fictive kin
25     underneath the kinship umbrella.
```

1              So those could be -- those could be

2     close friends, coaches, teachers, people children

3     are connected to in their communities that may not

4     be related to them by blood, marriage, or

5     adoption.

6          Q.   And at some point was there a change

7     made in DSS's policies such that it only handled

8     -- now handles applications for kinship care?

9          A.   Yes.

10         Q.   And when did that change take place?

11         A.   Last July.  So July of 2020.

12         Q.   Okay.  And before July 2020, did DSS

13    state agency work with both kinship and

14    non-kinship prospective foster parents?

15         A.   Yes.

16         Q.   And so under this change, does this

17    mean that potential foster parents who do not

18    qualify as kin under the definition you provided a

19    moment ago no longer have the option of applying

20    directly through DSS to become licensed?

21         A.   Can you repeat that question again?

22         Q.   Sure.  Let me try -- let me see if I

23    can just read it back.

24              So under the change of policy, does it

25    mean that potential foster parents who are not

Page 33

1    kin, under- -- understanding it's a broader

2    definition of kin, based on what DSS considers

3    kin, can parents who are not kin -- potential

4    foster parents who are not kin no longer apply

5    directly through DSS to become licensed?

6         A.   So this was a -- this was a practice

7    change and not a policy change.  Let me clarify

8    that.  This was something that we decided to -- we

9    needed to build some capacity to be able to really

10   intensify our search and engagement and

11   recruitment of kinship families.  And so we

12   transitioned all of that work to our child-placing

13   agencies.

14              And so with that being said, we -- we

15   wouldn't deny somebody the ability to come --

16   to -- to still come, and if they didn't want to

17   work with any of our CPAs today, they -- we would

18   still support them through the licensure process.

19   They could still -- they could still come through

20   DSS if for some reason they did not want to work

21   with one of the child-placing agencies.  So we

22   wouldn't deny anybody that -- that ability.

23        Q.   Was the reason for the change in

24   practice because DSS didn't have the capacity to

25   handle all of these applications itself; it needed

Page 34

1    to offload some of this work onto the CPAs?

2          A.    The change of practice was so that we

3    could really intensify our focus and efforts on

4    kinship care.

5          Q.    But -- but just so I understand, the

6    idea being that you couldn't do both; you couldn't

7    focus your efforts on kinship care and also handle

8    all of these non-kinship applications?

9          A.    Yes.    It was a way for us to be able

10   to have the capacity to -- to do a targeted focus

11   on recruiting and licensing and engaging our

12   kinship opportunities for our kids, and it also

13   was a way to really try to build our placement

14   array, frankly, because if you -- if you're just

15   focused on recruiting non-kin families, A, kids do

16   better when they're with people that they're

17   connected to and they already know.    It's less

18   traumatic.    There's so many benefits to kinship

19   care; and B, if you have kinship and non-kin

20   families that you are able to place kids with,

21   that just expands your family-like settings for --

22   for kids.

23         Q.    Right.    But assuming that -- that

24   people who previously were able to work with DSS

25   are now able to work with CPAs; is that right?

```
                                          Page 35
 1          A.    I don't understand the question.

 2          Q.    Well, your answer about expanding the

 3   array assumes that the people who previously were

 4   able to work with DSS can now work with private

 5   CPAs; is that right?

 6          A.    They can work with private.  They've

 7   always been able to work with -- with private

 8   CPAs.  That's always been an -- an option.  We

 9   just really, we just shifted a large portion of

10   the work through our central intake system through

11   Heartfelt Calling.

12               That -- that's the centralized place

13   that all of the applications and intakes funnel

14   through.  We contract with -- with them to -- to

15   do that piece of the work for us, and so now that

16   families were just given more choices other than

17   DSS.

18          Q.    So -- so Heartfelt Calling is a

19   central place -- so -- so if I'm a potential

20   foster parent, I'm not kinship, I'm not kin to any

21   potential child, I would go to Heartfelt Calling

22   to apply to become a foster parent?

23          A.    That -- you can go -- that -- that's

24   where most people go because it's -- it's sort of

25   the centralized place that is designated to do
```

Page 36

```
 1    that.  They could go directly to a CPA.  So I
 2    think it happens both ways.
 3         Q.   Do you have a sense -- you -- you said
 4    most people do Heartfelt Calling.  Is that
 5    something that DSS tracks?
 6         A.   Yes.
 7         Q.   Okay.  And do you have a sense of --
 8    of the breakdown and how many people go through
 9    Heartfelt Calling versus working directly with a
10    private CPA?
11         A.   I don't -- I don't have -- I don't
12    know if I have the private CPA data, like -- well,
13    I shouldn't say I.
14              I think we could get the C- -- the
15    private CPA data.  Heartfelt Calling tracks all of
16    the calls and applicants that they get through --
17    through our centralized line.
18         Q.   And when you say we, DSS, could get
19    the private CPA data, does that mean that DSS has
20    that data or that DSS could ask for that data?
21         A.   I'm not sure if that's something we
22    track through the contracts.  If that's -- you
23    know, they have reporting requirements through the
24    contracts.  So I don't know if that's the natural
25    part of what they report, or if we would have to
```

Page 37

1    actually ask them for it.

2         Q.    Has DSS ever asked private CPAs how

3    many people are applying through them to become

4    foster care parents?

5         A.    Yes.

6         Q.    When does it ask that question?

7         A.    We -- I know we started tracking this

8    somewhat.  We have to report through our annual

9    progress and services reporting for the federal

10   government, and so, you know, that's some of the

11   information that -- that I believe we supply for

12   that -- those reporting purp- -- reporting

13   purposes annually.  So I do think that -- if

14   that's data that you -- you would be interested

15   in, I do think that's something that we could get

16   for you.

17        Q.    Fantastic.  Okay.  And so just -- just

18   to make sure I'm clear about what it is, it would

19   be data that would show how many people are

20   applying directly through private CPAs to become

21   foster parents, you -- you think that would be

22   data you would have?

23        A.    Yes.  I can def- -- I -- I can most

24   definitely say that Heartfelt Calling has been

25   tracking that since -- at least since July, since

1   we started transitioning that work over to the

2   child-placing agencies.  They have a breakdown

3   of -- of what that is.

4           Q.   Okay.  And -- and then, hopefully,

5   there would also be a breakdown for the private C-

6   -- for the direct channel in --

7           A.   Yes.

8           Q.   -- the Heartfelt Calling -- okay.

9   Terrific.

10          MS. SCHINDEL:  So, Miles, I may not

11  call this out every time, but I will -- we will

12  make sure to gather all of this up and make sure

13  that we're following up with you afterwards.

14          MR. COLEMAN:  Yes.  That's on -- I

15  think this one, too, we can -- we can figure it

16  out, you know, next week.  I think we may -- if

17  I'm understanding what you're looking for, you may

18  already have that data from Diana's deposition

19  yesterday, but we -- we can -- we can figure that

20  out Monday or something like that.

21          MS. SCHINDEL:  Okay.  Great.  Thank you.

22  BY MS. SCHINDEL:

23          Q.   And if -- if someone applied to work

24  directly with a CPA and were turned away by that

25  CPA for whatever reason, would DSS learn about

Page 39

1  that?

2        A.    The only way we would learn about it

3  would be if -- if the family contacted us or --

4  or -- and -- and that's the only way we would know

5  about it.

6        Q.    Okay.  So DSS wouldn't -- there's no,

7  sort of, tracking mechanism for DSS to account for

8  who's applying and being turned away?

9        A.    Each CPA, as I understand, tracks

10  that, but that is not something that we track.

11        Q.    And when you say each CPA tracks that,

12  is it tracked -- what makes you say that each CPA

13  tracks that data?

14        A.    I mean, I'm -- I'm making a large

15  assumption that -- that that would be something

16  that a CPA would track, but we do not -- we do not

17  track that.  We actually don't even get -- from --

18  from a child-placing agency, we -- we don't get

19  the actual packet for licensure.  That's kind of

20  when we become aware that -- that -- that an

21  applicant has applied and -- and the CPA has been

22  working with them.

23              Now, Heartfelt Calling, obviously,

24  collects data on the front end.  So if that

25  applicant came in through Heartfelt Calling,

Page 40

1    Heartfelt Calling would -- would track -- they

2    follow up with the child-placing agencies that

3    these families have chosen to go to, and they

4    follow up to -- to -- to determine, because

5    they're tracking how -- you know, when -- when

6    they actually finish the process.  So when they

7    started the application and then when an -- when a

8    license was actually issued.

9                 So if they came through Heartfelt

10    Calling, I'd say, again, starting last July to

11    current, we probably would be able to have that

12    information, but otherwise, prior to that time we

13    would not have necessarily known.

14         Q.   Got it.  And what -- why don't you

15    explain, sort of, what Heartfelt Calling is?

16         A.   So we have a contract with the South

17    Carolina Foster Parent Association, and there's

18    several components within that contract that they

19    provide support to the agency for, and one of the

20    components is Heartfelt Calling.

21                 And so it is the centralized

22    application and intake line that they have.  It's

23    HeartfeltCalling.org.  There's a, like, 1-88 (sic)

24    number that people can call.  They have a couple

25    of folks on staff that, if you call, if you email,

Page 41

```
 1   they will walk you through the application
 2   process, and they have -- and so they do all of
 3   that upfront work, and then they -- they send that
 4   application to whatever -- today, to whatever
 5   child-placing agency a family chooses.
 6             So they don't choose the family for --
 7   choose the CPA for the family.  The family is
 8   given a list of all of the available CPAs, and --
 9   and they -- they then choose their own.
10        Q.   And did Heartfelt Calling exist before
11   July 2020?
12        A.   Oh, yes.
13        Q.   But it played, it sounds like, a
14   different -- a slightly different role before that
15   time; is that right?
16        A.   They were -- they were just main -- I
17   mean, at that time, prior to last July -- prior to
18   July 2020, they were just screening applicants for
19   us, for -- for DSS, and then we -- when we shifted
20   some of that work and shared that work with the
21   CPAs, they began doing that upfront screening and
22   -- and work for -- to help -- help the CPAs and
23   the families get to where they wanted to go.
24        Q.   So I'm going to ask you a couple of
25   more state-related questions, and you can just
```

Page 42

1   tell me.  If it's something that you know the

2   answer, terrific.  Otherwise, tell me if -- DSS to

3   provide is, which is, before July 2020, how many

4   families per year, say, roughly, starting in 2018,

5   did DSS recruit who were not applying under the

6   kinship care umbrella?

7           A.    So I don't have that data in my head,

8   but that is data that we would be able to -- to

9   get you.

10          Q.    And then the -- the same question

11  slightly different is, before July 2020, how many

12  families were trying to serve as kinship care

13  foster parents?

14          A.    Yeah, I -- we would -- we could -- we

15  could try to get you that data.  Again, we -- we

16  began tracking that data pretty closely, and our

17  big push with kinship started roughly two years

18  ago.  So -- so you will -- you will see a huge

19  increase between, I'd say, like, 20- -- the end of

20  2018 to -- to now or either 20- -- early 2019 to

21  now.

22              We -- we have had a large spike in the

23  number of licensed kinship care providers, because

24  we started off with, really, like, around, I want

25  to say, 5 and -- and now we're -- we're into the

Page 74

```
 1    families who can accommodate and care for children
 2    with medically complex needs.  It -- it's really,
 3    you -- you -- you need a diverse group of -- of --
 4    of foster families who can assume responsibilities
 5    and care for lots of different types of children.
 6           Q.   So returning to the line of questions
 7    we were just talking about.  You -- you had
 8    mentioned that private CPAs support foster parents
 9    during the application process; is that right?
10           A.   Yes.  Well, yes.  It's -- again, going
11    back to that Heartfelt Calling piece, when you say
12    application process, once they get through the
13    application process, they're -- they're then at
14    the licensing process then, in my mind, I guess.
15           Q.   So it sounds like the answer -- I
16    mean, it sounds like the answer is, yes, CPAs do
17    provide support during the application, the sort
18    of application/licensing process; is that right?
19           A.   Yes.  Yes.
20           Q.   And do all private CPAs provide
21    support during this process?
22           A.   Yes.
23           Q.   Are there differences among the CPAs
24    in terms of what support they provide?
25           A.   They -- they all have to -- have to
```

Page 75

1    provide a -- a general area of -- of support.  You

2    know, we have a contract.  There's certain

3    supports that are outlined in that contract, and

4    many of them do things perhaps beyond that, and it

5    may -- so it may look a little bit different, but

6    the general requirements of what they have to do

7    to support to meet the requirements of the

8    contracts are the same.

9         Q.   Is DSS aware of the fact that some --

10    some CPAs go above and beyond what's required by

11    the contract in terms of providing support during

12    the application process?

13         A.   I don't -- I mean, I don't have

14    knowledge specifically of -- of -- of who does

15    what for their families outside of -- that sits

16    outside of the contract.  You know, we have a lot

17    of -- we have a lot of child-placing agencies that

18    have a lot of donor dollars, and they do those --

19    those kind of supports, help provide those extra

20    supports outside -- that sits out -- outside of a

21    contract.

22              It could be something as simple as,

23    you know, they've put together -- and I'm totally

24    making this up as an example.  But they have put

25    together a -- a group of people who are -- who are

Page 76

```
 1    going to go and take meals to foster families when
 2    they get a new placement or mow their grass or --
 3    I mean, you know, those -- those kind of things
 4    sit outside of a contract.
 5           Q.   Right.   Is -- is Miracle Hill one of
 6    the CPAs that you're envisioning when you talk
 7    about CPAs that have all the donor dollars that
 8    are able to go above and beyond what's required by
 9    the contract?
10           A.   So I'm not aware of how -- what kind
11    of donor dollars Miracle Hill has or any other
12    CPA.   I mean, I do know, obviously, some are more
13    blessed than others in that way, and -- and they
14    have -- they have a lot of, you know, donor
15    support for their organizations that -- that allow
16    them to do things -- do -- support foster families
17    and our kids outside -- that sit outside of our
18    contract, but I'm not aware specifically of
19    what -- what Miracle Hill has.
20           Q.   So it sounds like you're aware -- it
21    sounds like DSS is aware that some CPAs are able
22    to do more, but DSS doesn't know which ones they
23    are?
24           A.   That's correct.   I don't know that
25    information specifically.
```

Page 77

```
 1          Q.    So then how did DSS know that some
 2    provide more services than others?
 3          A.    You -- I mean, you just -- you hear
 4    and -- I mean, you hear about folks in the
 5    community.  You see it all over social media of --
 6    of -- of certain organizations that are
 7    fundraising and supporting children and families
 8    who are supporting the foster care system.
 9          Q.    And is Miracle Hill one of the
10    organizations that you've -- that you're heard
11    about in these anecdotal settings about providing
12    extra support to its families?
13          A.    Not Miracle Hill specifically.
14          Q.    Are there differences between the
15    CPAs' reputations?
16          A.    No.
17          Q.    All CPAs are viewed as
18    interchangeable?
19                MR. COLEMAN:  Object to the form of the
20    question.
21                But you can answer.
22                THE WITNESS:  What -- what do you mean
23    by interchangeable?
24    BY MS. SCHINDEL:
25          Q.    Well, I guess I'm a little confused by
```

Page 78

1  your answer, though, because you -- about how you
2  see on social media that -- that certain CPAs are
3  doing certain things, supporting families in
4  certain ways.
5           So it sounds like CPAs do have sort of
6  reputations within the communities; is that fair?
7      A.    That's fair, yes.
8      Q.    And so are there differences among
9  those reputations?  Are some known to -- to -- to
10 have particularly good reputations within the
11 community?
12     A.    I'm -- I'm not -- I'm not aware of --
13 of anyone judging a particular CPA on their
14 reputation.  What I will say is, is that you
15 have -- we have some really tiny, small, small
16 CPAs.  So you have CPAs who maybe only have two
17 foster homes.  They have just two licensed foster
18 homes.  And then you have some who have 50 foster
19 homes, and you have some --
20           So -- so I would say, it stands to
21 reason that your larger child-placing agencies who
22 have the -- the sort of more foster homes, likely
23 are maybe recruiting, actually, you know, asking
24 for support for their organizations maybe a little
25 bit more because they have more foster families

1    that have more needs.

2              I mean, if you only have two foster --

3    foster families over here, CPA A has two foster

4    families versus over here CPA B as 100 foster

5    families, that's -- that's a pretty significant

6    difference, and so if you looked at the number of

7    licensed foster homes over all of the CPAs, both

8    non-therapeutic and therapeutic, you would see a

9    vast difference in their size.

10         Q.   Got it.   That makes sense.   And so

11   that -- that difference in size may affect how

12   well known they are in the community and how

13   they're perceived in the community; is that right?

14         A.   Yes.

15         Q.   And just -- just to hone it in one --

16   one step further, with the idea being that the

17   larger CPAs would have a larger presence in the

18   community, would be more well known and -- and

19   have more -- people would know more about them?

20         A.   Yes.

21         Q.   Do -- do private CPAs provide any

22   support to foster families after they are

23   licensed?

24         A.   Yes.

25         Q.   Do they provide training on -- on the

Page 80

1    unique needs of foster children?

2         A.    So some CPAs have their -- it looks a

3    little bit different.  Some CPAs do have -- they

4    offer their own training, but Heart- -- again,

5    going back to that Heartfelt Calling component,

6    another big component of that foster parent, South

7    Carolina -- South Carolina Foster Parent

8    Association contract is training.

9              And so they have a learning management

10   system where they have online trainings.  They do

11   live webinar trainings.  The last couple of years,

12   obviously, we haven't been doing very many

13   in-person trainings because of COVID.  So we

14   really did transition everything to virtual.

15             So the majority of our CPAs utilize

16   that learning management system to do that ongoing

17   continuous training for their foster families,

18   because we're always adding topics, and then

19   there's some -- you know, there's -- for instance,

20   with the new -- with the new regulations that went

21   into effect in September, we now require CP- --

22   CPR and first aid.  So that's an added requirement

23   to be -- to be licensed.  And so that's -- that's

24   a training that we just recently had to add to our

25   menu of trainings, if you will.

Page 81

1              So some of them do do their own
2     trainings and offer them, while others -- and --
3     and so sometimes it might be a hybrid, where
4     you've got the CPA doing some training, but they
5     also send their foster parent -- parents over
6     to -- to our -- our Heartfelt Calling team that --
7     where there's an education director and she
8     provides -- she -- she built the learning
9     management system and makes sure that all of the
10    trainings are -- are up to date, and she keeps
11    adding.
12         Q.   Do CPAs provide counseling for the
13    foster parents?
14         A.   Counseling?  I'm -- I'm not aware that
15    they provide counseling to the foster parents.
16    Consultation -- consultation and coaching, yes, I
17    think that's part of the -- the support that --
18    that you provide to a foster family.
19         Q.   And -- and the consultation and
20    coaching, they provide those services to the
21    foster children and other members of the foster
22    family?
23         A.   The child-placing agency would not be
24    responsible for that.  Again, the foster care case
25    manager is responsible for anything involving the

Page 82

1    child.

2        Q.    Do private CPAs help families at all

3    in caring for a foster child, by -- by which I

4    mean, you know, helping to make doctors'

5    appointments, assisting with transportation,

6    providing care for -- for other children in the

7    home, anything like that?

8        A.    No.    That's the responsibility of the

9    foster parent or the foster care worker.

10       Q.    Do -- so -- so foster private CPAs

11   never provide those types of services?

12       A.    I'm not aware that any non-therapeutic

13   child-placing agency provider provides those

14   services.    That's the responsibility of -- of the

15   foster care case manager and -- and/or the foster

16   parent.

17       Q.    Do private CPAs donate clothing for

18   foster children or food or provide birthday or

19   holiday gifts?

20       A.    Again, this seems very case specific

21   to me.    But I'm not aware of a specific case, but

22   they're constantly doing fundraising, which speaks

23   to what I -- what I just answered before, which is

24   reaching out to the community and asking for

25   certain donations.    That may be gifts for

```
                                          Page 83
 1    Christmas.  That may be meals.  I think that's --
 2    they -- they ask for -- for lots of different
 3    kinds of support for their families.
 4           Q.   So then tying back to that answer you
 5    gave earlier, is it -- is it fair to say that CPAs
 6    with larger presences are able to provide those
 7    types of services:  getting donations for
 8    clothing, getting birthday cakes, more readily
 9    than some of the smaller CPAs with, say, two
10    families in their network?
11                MR. COLEMAN:  Object to the form of the
12    question.
13                But you can answer.
14                THE WITNESS:  And I would say no, I
15    don't -- I don't think that's fair to say.  I
16    think it's about how you -- how you recruit.
17    It's -- it has everything to do with how you're
18    marketing your needs.
19    BY MS. SCHINDEL:
20           Q.   Is DSS aware of private CPAs that
21    provide these types of services:  donate --
22    clothing donations, birthday cakes, to families
23    with whom they're working?
24           A.   I don't know about birthday cakes and
25    clothing specifically, but I do know that they
```

```
                                                   Page 84
1    provide supports -- you know, some of them do
2    provide supports that set outside of the contract.
3            Q.    And are there differences in the level
4    of support among -- that CPAs are able to provide?
5            A.    I can't answer that, because I'm not
6    aware.  I'm -- I'm not -- I don't know the answer
7    to that.
8            Q.    I -- I guess I find that answer a
9    little surprising.  DSS is not aware of any
10   differences in the support that is provided by
11   private CPAs?
12           A.    Again, I'm -- I'm not aware of that,
13   of the differences.
14           Q.    Is DSS aware of the differences?
15           A.    I'm -- I'm not aware of the
16   differences.  And if I'm DSS, I guess I'm going to
17   say, no, we're not aware of the differences.
18           Q.    So it's DSS's position that all
19   private CPAs are providing the exact same level of
20   support and services to the families with whom
21   they're working?
22                 MR. COLEMAN:  Objection to the extent
23   it misstates the witness's testimony.
24                 But you can answer.
25                 THE WITNESS:  The -- so all of the CPAs
```

```
                                         Page 85
 1   are required to buy -- to provide a -- a certain
 2   level of support and service that -- that sit
 3   inside and are governed by our contract.  Anything
 4   that sits outside of that we think is wonderful.
 5   BY MS. SCHINDEL:
 6        Q.   And DSS is aware that some things are
 7   done that fit outside of those -- the -- the --
 8   the bare minimum that's required by the contract,
 9   right?
10        A.   Again, we're -- we're aware of --
11   of -- of what we see or what we hear of the
12   different levels of support that sit outside of
13   the -- of the actual contract itself.  What those
14   acts or supports look like for every single
15   certain CPA, I -- I could not tell you.
16        Q.   Is -- is -- is Miracle Hill a CPA that
17   is known to DSS to provide extra support beyond
18   what's required by the contract?
19        A.   I cannot say what specifically Miracle
20   Hill does to support their -- their foster
21   families that sit outside of our contract.
22        Q.   But is Miracle Hill a CPA that is
23   known to provide extra support, even if you can't
24   specifically say what that extra support is, to
25   families outside of what's required by the
```

```
                                              Page 86
 1   contract?
 2          A.   I -- I don't know.  I don't know what
 3   other additional supports Miracle Hill provides.
 4          Q.   Does DSS view Miracle Hill as a CPA
 5   that only does what is required by the contract?
 6          A.   DSS views Miracle Hill -- Hill just
 7   like other -- every other CPA, and -- and we're
 8   focused on the terms and -- the terms and
 9   conditions of what they agreed to to provide
10   foster parents within the parameters of the
11   contract.
12          Q.   So beyond what is done -- what is
13   required by the contract, DSS is not aware of what
14   other things any CPA does --
15              MR. COLEMAN:  Objection to the --
16   objection.
17              MS. SCHINDEL:  I'm not finished, Miles.
18   Miles, I have to finish my question first.
19              MR. COLEMAN:  Please do.
20   BY MS. SCHINDEL:
21          Q.   -- beyond what is required by the
22   contract, DSS is not aware of what other things --
23   supports and services the CPA provides to the
24   families that it's working with?
25              MR. COLEMAN:  Objection to the form of
```

Page 104

1    have swimming pools, because most of them are

2    going to have to make changes in order to come up

3    to meet the regulatory requirements now.

4              And so we get lots of questions about

5    that.  Vaccinations were added to the new

6    regulations.  We're getting lots of questions

7    about -- from child-placing agencies on what that

8    means for their applicant.

9              So there is a level of consultation

10   that that comes naturally as they might have

11   questions about things.

12        Q.   Does Miracle Hill have any particular

13   reputation in the foster care community?

14        A.   I don't know of a particular

15   reputation.  They're a child -- they're a

16   child-placing agency.  They're a faith-based

17   child-placing agency.

18        Q.   How would you describe Miracle Hill's

19   reputation within the foster care community?

20        A.   I -- I mean, I think it's -- I would

21   describe it as good.  I have never heard anything

22   adverse from -- from the families that they serve.

23   So I -- they -- they have a lot of -- they have a

24   lot of foster homes.  And, in fact -- now, I don't

25   know what the numbers are today, but initially

Page 105

1    they were the largest non-therapeutic foster care

2    agency in the state.  They had the most homes at

3    one point in time.

4         Q.    Is Miracle Hill's reputation similar

5    or different to other CPAs in the Upstate region?

6         A.    I wouldn't -- I don't -- I don't know

7    of any difference.  I don't know of any difference

8    of -- of their reputation versus another CPA in

9    the Upstate region.

10        Q.    Let's take a look at what will be

11   Exhibit 4, which is Tab 15.

12             (Exhibit 4, Document Titled, All

13   Placements, Therapeutics Placements, File Number

14   10545-E-0003-0003, marked for identification.)

15             THE WITNESS:  Can we take, like, a

16   quick bathroom break?

17   BY MS. SCHINDEL:

18        Q.    Oh, of course.  Yes.  Would you

19   like -- I think lunch is around the corner.  So

20   it's -- is five minutes sufficient for now?

21        A.    Yes.  I just need to go down the hall,

22   and I'll be right back.

23             MS. SCHINDEL:  Perfect.  Then let's

24   take five minutes.

25             VIDEOGRAPHER:  The time on the monitor

                                                    Page 106

1    is 11:39 a.m., and we're going off the record.

2                   (A recess was taken.)

3                   VIDEOGRAPHER:   The time on the monitor

4    is 11:55 a.m.  We are back on the record.

5    BY MS. SCHINDEL:

6         Q.   Okay.  Ms. Barton, does -- do CPAs

7    provide recommendations to DSS about the

8    suitability of prospective foster parents?

9         A.   They provide the assessment.  So part

10   of their home study is -- is assessing that family

11   and in various -- and in various areas.  And so,

12   certainly, they -- they bring a level of

13   recommendation.  They're not the -- they're not

14   the final decisionmakers.

15        Q.   And -- and is that -- DSS is relying

16   on CPAs to -- to play that role in the process?

17        A.   Yes.

18        Q.   Okay.  Let's take a look at -- I'm

19   sorry, I don't even know if we marked it yet.  We

20   have not.  So Tab 15, which will be Exhibit 4,

21   which is 10545-0003-0003.

22                   Okay.  Okay.  So do you have this

23   exhibit up?

24        A.   Not yet.  It's loading.

25        Q.   Okay.

```
                                              Page 107
 1              MR. COLEMAN:  It's Exhibit 4, right?
 2              MS. SCHINDEL:  Yes, Exhibit 4.
 3              MR. COLEMAN:  Got it.
 4              THE WITNESS:  It's up.
 5   BY MS. SCHINDEL:
 6         Q.   Okay.  Have you -- have you seen this
 7   document before, Ms. Barton?
 8         A.   Yes.
 9         Q.   Okay.  And -- and you recognize this
10   as a document that was provided to us by your
11   counsel?
12         A.   Yeah.  I have not seen -- I've seen --
13   I've seen this data before in this format.  I'm
14   not aware that our counsel provided it to you,
15   so...
16         Q.   I see.  So is this a -- a true and
17   accurate representation of the data that you have
18   seen in the ordinary course of your work?
19         A.   Yes.
20         Q.   So what I would like to do is go
21   through the -- the CPAs on this list.  I believe
22   this document reflects a list of CPAs and -- and
23   placements from 2017 to 2021; is that accurate?
24         A.   Yes.
25         Q.   And I would just like to go through
```

```
                                              Page 108
 1   them and ask questions -- a couple of questions
 2   about each placement.
 3            A.    Okay.
 4            Q.    So the first -- the first question for
 5   each of these, and we can just go down the list,
 6   is, does this CPA serve Region 1 or the Upstate
 7   region.
 8                 So going down the list, does Alston
 9   Wilkes Society serve Region 1, what I refer to as
10   Region 1, what you refer to as the Upstate region?
11                 MR. COLEMAN:  Objection to the form,
12   and I think Jackie Lowe was designated and
13   testified as to the answer to that question.
14                 But if you're answer -- able, you can
15   --
16                 THE WITNESS:  Yeah, and I'm not going
17   to be able to tell you which of these CPAs serves
18   which part of the state.  That's not information
19   that I was aware that I needed to prep for related
20   to today's deposition.
21   BY MS. SCHINDEL:
22            Q.    So you cannot tell me which CPA served
23   which parts of the state going down this whole
24   list?
25            A.    No.
```

Page 113

1          Q.    Is DSS concerned that discriminating

2    against foster families on the basis of faith or

3    sexual orientation would reduce the number of

4    foster families available to serve?

5          A.    Can you repeat that question?

6          Q.    Sure.   Is DSS concerned that

7    discriminating -- excuse me -- that discriminating

8    against foster families on the basis of faith or

9    sexual orientation would reduce the number of

10   foster families available in the state?

11         A.    DSS is -- I -- I wouldn't say -- I

12   don't know that the word concerned is correct.   I

13   think my response is, is that, as you can see, we

14   have a laundry list of child-placing agencies that

15   serve various parts of the state.   So you have

16   lots of -- you have -- you have a lot of CPAs that

17   are -- you have some CPAs that are faith-based,

18   like Miracle Hill, or who are attached to other

19   parts of the community.

20              For example, Epworth is connected to

21   the Methodist Church.   Connie Maxwell is connected

22   to the Baptist Church.   Thornwell is connected to

23   the Presbyterian community.   The Bair Foundation

24   focuses on recruiting and licensing foster

25   families who can take on medically-complex needs

                                              Page 114

1    of children in foster care.

2                 So I would say that there's a variety

3    of child-placing agencies across the state that

4    target and recruit particular communities or

5    particular -- who -- who can serve a variety of --

6    of different -- different areas and -- and types

7    of children.

8          Q.    I'm not -- I just -- I'm not sure that

9    that -- that answered my question, which I think

10   is at least initially a yes-or-no question, and

11   then to the extent you need to provide context,

12   you, of course, can.

13                But I -- but the first part is yes or

14   no, is DSS concerned that discriminating against

15   foster families on the basis of faith or sexual

16   orientation would reduce the number of foster

17   families available?

18                MR. COLEMAN:  Object to the form of the

19   question.

20                But you can answer and explain.

21                THE WITNESS:  I -- I would say -- I

22   would say, I mean, we don't support

23   discrimination, but I would say do I think that

24   it -- it's going to impact the number of families

25   that are recruited, and are we concerned about

Page 115

1    that?  No, I don't think we're concerned about

2    that, because I think that families have a variety

3    of choices of pathways for all -- for different

4    organizations that -- that are the pathway to

5    support them towards the licensure process.

6    BY MS. SCHINDEL:

7         Q.    Is DSS aware of -- of families that

8    have been discriminated against by CPAs based on

9    sexual orientation or faith?

10        A.    We're aware of each organization -- of

11   organizations' criteria in which they lay out

12   within their -- their organizations of the kinds

13   of families that they want to work with, but I --

14   I'm not -- other than this particular case, I'm

15   not -- I'm not aware of anyone.

16        Q.    Are CPAs that turn away families based

17   on faith or sexual orientation required to tell

18   DSS that they have done so, that they have turned

19   away families who applied, on those -- based on

20   those criteria?

21        A.    I'm not -- I'm not aware of a

22   mechanism in which that's reported back to us,

23   unless -- unless -- unless the family themselves

24   contact our state office and make us aware.

25        Q.    So does -- DSS doesn't require CPAs to

                                                        Page 116

1    notify DSS when they turn away families based on

2    religion or sexual orientation so that DSS -- DSS

3    could follow up with those families?

4          A.    No.

5          Q.    Is allowing CPAs to exclude families

6    based on religious criteria consistent with best

7    practices in the field of child welfare?

8          A.    Can you repeat the question?

9          Q.    Is allowing CPAs to exclude families

10   based on religious criteria consistent with best

11   practices in the field of child welfare?

12         A.    No.

13         Q.    Why not?

14         A.    Again, we -- we don't -- we don't --

15   we don't believe in discrimination.  That's not --

16   that's not a part of -- that's not a part of -- of

17   what -- of what we do in -- in the -- in the

18   licensing process.

19              Our -- our regulations, our policies

20   specifically -- specifically say that -- you know,

21   around the licensing piece related to this matter,

22   that we -- we will -- we, the agency, will not

23   discriminate.

24         Q.    And so it sounds like DSS itself will

25   not discriminate on the basis of religion or

                                                            Page 117

1    sexual orientation, but it understands that it

2    works with CPAs who do; is that right?

3           A.    Our -- there are CPAs that, again,

4    have -- have a certain criteria and are looking

5    for particular families that they are going to

6    work with.

7           Q.    Right.  And -- and -- and you

8    testified earlier that DSS is relying on CPAs to

9    provide -- it -- it -- it relies on CPAs to

10   provide recommendations for placements for the

11   children that are in need of homes?

12          A.    Yeah.  I mean, yes, they are -- they

13   do -- at this point in particular, since July,

14   they are predominantly licensing all of our

15   non-kin families.

16          Q.    So then taken together, what -- what

17   you're telling me is that DSS understands that

18   CPAs or substantive CPAs it works with are culling

19   out prospective families based on religion or

20   sexual orientation, and then DSS takes who is

21   recommended, who makes it through that screen, and

22   then DSS does not discriminate further against

23   those families based on religion or sexual

24   orientation; is that right?

25                    MR. COLEMAN:  Object to the form of the

                                              Page 118

1    question.

2              But you can answer.

3              THE WITNESS:  And I'm going to need you

4    to repeat that.  It was a lot.

5    BY MS. SCHINDEL:

6         Q.   DSS -- DSS works with CPAs who cull

7    out families, screen out families, based on their

8    own set of religious criteria or criteria based on

9    sexual orientation, and then DSS relies on CPAs to

10   recommend whoever has made it past that screening

11   process to become a prospective foster parent in

12   South Carolina; is that right?

13        A.   Yes.

14        Q.   If there were a CPA that had a

15   religious objection to working with black or

16   interracial families, would DSS permit it to do

17   so?

18              MR. COLEMAN:  Object to the form of the

19   question.

20              You can answer, if you're able.

21              THE WITNESS:  Can you repeat the

22   question?

23   BY MS. SCHINDEL:

24        Q.   If -- if a CPA had a religious

25   objection to working with black or interracial

Page 132

1    South Carolina, including the role of the DSS and

2    the role of private child-placing agencies,

3    including faith-based CPAs.

4                So I think your objection is

5    unwarranted, and to the extent you're trying to

6    coach the witness, I think it's improper.

7                MR. COLEMAN:  Well, I disagree.  I'm

8    not coaching the witness.  And we can have

9    different views on which specific topics

10   designated are relevant.  I have made my

11   objection.

12               MS. SCHINDEL:  That's fine.  You have

13   made your objection.  The witness should be

14   answering these questions.

15               MR. COLEMAN:  And she is.

16   BY MS. SCHINDEL:

17         Q.   I have to look at where I was.

18         A.   I think we were at Epworth.  I think

19   we were still going down the list.

20         Q.   We were going down the list, but I did

21   have -- I think I had a question about -- right,

22   so you had just said:  I'm sure the licensed

23   consultants that work with the individual CPA

24   provide -- that they're aware of the criteria.

25               So my -- and my question is, is DSS

Page 133

1    aware of the screening criteria implemented by the

2    CPAs in South Carolina?

3              A.    Yes.

4              Q.    And DSS tracks that information?

5              A.    Again, I think -- I think your -- your

6    track is -- is -- is throwing me.  We're aware of

7    the CP- -- of each individual CPA's criteria,

8    but -- but as far as -- I don't know what you mean

9    by tracking that.

10             Q.    And you're aware of each individual

11   CPA criteria how?  By -- by simply by looking at

12   the CPA's website, or does DSS follow up with the

13   CPAs or in some way ask CPAs to tell them what

14   their screening criteria are?

15             A.    So that would be a part of -- of their

16   submission when they become a CPA.  That -- that

17   would be part of information that -- that they

18   provide to us as a child-placing agency, when

19   they're issued -- when they're the child-placing

20   agency license.

21             Q.    Okay.  Can you tell me on this list

22   which CPAs that DSS knows accepts families

23   regardless of sexual orientation or religion?

24             A.    DSS would know all of them.

25             Q.    And can you tell me which ones on the

                                                      Page 134

1    list DSS knows accepts families regardless of

2    sexual orientation or religion?

3            A.    I can tell you the ones that -- that

4    I, today, as the DSS representative know, which

5    may not -- which may not be inclusive of all of --

6    you know, of all of them on the list.

7            Q.    Yeah, I think -- I think you should go

8    ahead and do that, because I do think that this is

9    a topic that you were meant to be educated on.  So

10   I think you should -- I think you should go ahead

11   and do that.

12           A.    So ask -- so can you ask the question

13   again?

14           Q.    Yes.  Which of these on this list does

15   DSS know accepts families regardless of sexual

16   orientation or religion?

17           A.    Okay.  So it would be Alston Wilkes,

18   Broadstep, CAPA, Family Preservation, Growing

19   Homes Southeast, Crosswell, Justice Works -- which

20   Justice Works, I wasn't aware they even had

21   families.  They -- they provide services.  So I

22   don't even know that that's related to this -- but

23   New Foundations, SC Mentor, SC YAP, Specialized

24   Alternative Youth.  And those are the ones that

25   I'm aware of.

Page 135

1          Q.    Okay.  And so then for the rest, does

2    DSS know which agencies exclude families based on

3    religion or sexual orientation?

4          A.    DSS --

5                MR. COLEMAN:  Same -- same objection.

6                But you can answer.

7                THE WITNESS:  DSS would know -- would

8    know -- would know that information or does know

9    that information, so yes.

10   BY MS. SCHINDEL:

11         Q.    Okay.  And so how many -- so DSS knows

12   exactly how many CS- -- CPA options are available

13   for non-Christians and for same-sex couples?

14         A.    Yes.

15         Q.    And what -- does DSS do anything to

16   relay that information to anybody?

17         A.    So if -- if you go on the -- the

18   HeartfeltCalling.org website, there is a list of

19   the CPAs, and -- and it -- it does -- they -- they

20   share just a little bit about who -- what their

21   mission is and -- and -- and so that's -- I mean,

22   that's how families are directed.

23                When they -- when they apply today

24   through Heartfelt Calling, they're directed to a

25   list of CPAs, and -- and there's -- there's

```
                                         Page 136
 1   information about each of those CPAs the CPA has
 2   provided about their organizations, so the
 3   families can make the right -- you know, make the
 4   right fit for their family for who they want to
 5   work with on collecting all of the requirements
 6   for licensure.
 7            Q.   So does that -- that website that
 8   you're referring me to, does it say Miracle Hill
 9   will not work with same-sex couples?
10            A.   I have not looked at -- looked at that
11   in some time.  So I -- I can't say that it says
12   that specifically or not.  I would -- I would have
13   to -- I would have to look at it.
14            Q.   Then how do you reconcile those two
15   statements that you just gave me?  You said a
16   family can go to the website and know exactly who
17   they can work with, but you actually don't know if
18   the website, in fact, does provide that
19   information; is that right?
20                 MR. COLEMAN:  Object to the form of the
21   question.
22                 You can answer.
23                 THE WITNESS:  It gives information
24   about the organization, which could include that.
25   BY MS. SCHINDEL:
```

1          Q.    Right.  But the information might not

2     actually tell families who they can and cannot

3     work with; is that right?

4          A.    That's correct.

5          Q.    In total, how many non-therapeutic

6     CPAs serve Region 1?

7          A.    I don't have -- I don't have that

8     information.  I -- I didn't -- I don't have those

9     numbers.

10               MR. COLEMAN:  Same objection.  I object

11     to --

12               (Crosstalk.)

13               THE WITNESS:  I mean, we have those

14     numbers.  I just don't have those numbers here

15     today.

16     BY MS. SCHINDEL:

17          Q.    If DSS learns that most of the

18     non-therapeutic CPAs that serve Region 1 excludes

19     same-sex couples, would that concern DSS?

20          A.    I think it would -- I -- I think it

21     would concern us, but I also would say that, in

22     the same light, families always have another

23     option.  They can always come through DSS.

24          Q.    If most of the non-therapeutic CPAs

25     that serve Region 1 excluded same-sex couples,

Page 138

1    could that harm efforts to grow the pool of foster

2    families in Region 1?

3           A.   I -- I would say, no, because we would

4    serve -- we would serve those families.  There --

5    there's still an option for those families through

6    the department.

7           Q.   Since DSS changed its practice to

8    handle just kinship applicants, you said that, and

9    you're saying now, that DSS would handle

10   non-kinship applicants if the family didn't want

11   to work with a particular CPA; is that right?

12          A.   Yes.

13          Q.   Has DSS handled any non-kinship

14   applicants since the change in policy?

15          A.   I -- I don't -- I don't know.  I would

16   have to look at -- at each region to make that

17   determination, if -- if we've actually accepted.

18   It's been very few, if -- if any.

19              MS. SCHINDEL:  Okay.  Well, this is

20   definitely Topic 5.  So this -- this is

21   information we absolutely will need to get from

22   DSS, which is whether DSS has handled any non- --

23   non-kinship applicants since the change in

24   practice or policy.  And if so, how many.

25   BY MS. SCHINDEL:

```
                                          Page 139

 1          Q.    Sitting here today, you're not aware

 2   of whether DSS has handled any non-kinship

 3   applicants since the change in practices or

 4   policies?

 5          A.    No.

 6          Q.    Does Heartfelt Calling know that it

 7   can inform non-kin applicants that they can go

 8   directly to DSS if they prefer?

 9          A.    It's strongly encouraged, yes, but

10   they strongly encourage families to work with one

11   of the child-placing agencies.

12          Q.    And how does Heartfelt Calling know

13   that it can inform that?  Has DSS told Heartfelt

14   Calling that they can tell non-kin applicants to

15   go directly to DSS?

16          A.    They consult with -- they -- they

17   consult with our -- our director of child welfare

18   licensing on any -- any individuals that are --

19   are not feeling like they -- they have -- there is

20   a good match between them and the CPA.

21          Q.    Sorry, it sounds like the answer is,

22   yes, DSS tells Heartfelt Calling that they can

23   tell non-kin applicants to go directly to DSS, or

24   is the answer, no, DSS does not relay that

25   information?
```

Page 140

1          A.    The answer is -- is yes, and Heartfelt

2     Calling actually reaches out for DSS to consult on

3     those applicants that would like to come to DSS,

4     as opposed to a CPA.

5          Q.    Do local DSS offices know they can

6     handle non-kin applicants?

7          A.    Yes, on a case -- on a -- in a -- on a

8     very situational basis.  So if you do have

9     families that we -- like we just spoke of,

10    they're -- they're consulted, but they're not --

11    they don't -- they don't take applications at the

12    regional offices for non-kin families.  So the

13    pathway through that would be Heartfelt Calling to

14    our -- our state office, and then it feeds down

15    into the region.

16         Q.    So, as we just discussed, Heartfelt

17    Calling's website did not necessarily let

18    individuals know which agencies accept people of a

19    particular faith or of a sexual orientation, but

20    if somebody called Heartfelt Calling, does

21    Heartfelt Calling provide that information?

22         A.    I don't know if they provide that

23    information to families or not.  They -- it's my

24    understanding that Heartfelt Calling directs them

25    direct to the website or to the -- to the -- the

1    CPAs, either their web page or their information

2    that they have provided to put on the website.

3            Q.   And as we discussed, that information

4    does not necessarily relay whether an agency will

5    or will not work with a Catholic family or will or

6    will not work with somebody of a same-sex marriage

7    or whatever --

8            A.   They --

9                 (Crosstalk.)

10           Q.   -- right?

11           A.   Yes, that's correct.

12           Q.   And those -- those families would

13   instead have to call around and ask the CPA

14   directly if they would work with them, if it's not

15   clear from the website; is that right?

16                MR. COLEMAN:  Object to the form of the

17   question.

18                But you can answer.

19                THE WITNESS:  Yes.

20   BY MS. SCHINDEL:

21           Q.   I think you had mentioned that

22   Crosswell accepts families regardless of religion

23   or sexual orientation; is that right?

24           A.   Yes.  I'm not aware that they don't.

25           Q.   Okay.  You had mentioned that DSS

Page 142

```
 1    takes into account family preferences of children
 2    when making placement decisions, and we talked
 3    about that a little bit.  Does that include a
 4    youth who prefers a family who shares his or her
 5    faith?
 6            A.    Yes.
 7            Q.    And would it include an
 8    LGBTQ-identified individual who would prefer -- or
 9    child, who would prefer to live in an LGBTQ
10    family?
11            A.    Yes.
12            Q.    And are LGBTQ youth overrepresented in
13    South Carolina's foster care system?
14            A.    Sorry, I missed that last part of that
15    question.
16            Q.    Are LGBTQ youth overrepresented in
17    South Carolina's foster care system?
18            A.    Like, overrepresented, as in what
19    respect?
20            Q.    By that, I mean are there -- is there
21    a larger percentage of -- of youths in foster care
22    in South Carolina LGBTQ than the percentage of
23    youth in the -- in the country or in the state
24    that are LGBTQ?
25            A.    No.  I would -- I would say they're
```

```
                                         Page 153
 1   outlined is the process that DSS has set up; is
 2   that right?
 3            A.   Yes.
 4            Q.   Has this practice of allowing CPAs to
 5   turn away families based on their sexual
 6   orientation caused a loss of available families
 7   for children in South Carolina?
 8            A.   Can you repeat that question?
 9            Q.   Has the practice of allowing CPAs to
10   turn away prospective foster parents based on
11   their sexual orientation caused a loss of
12   available families for children in South Carolina?
13            A.   I would say, yes.  If you turned -- I
14   mean, just one is -- is one less available family,
15   right?
16            Q.   Right.  If an applicant went directly
17   to a CPA and got turned away based on religious
18   criteria, then no one would follow up with that
19   family to ensure that they find a CPA, right?
20                 The process we were talking about
21   earlier is just if you start with Heartfelt
22   Calling; is that right?
23            A.   Yes.  I mean, you're asking if the
24   family went directly to the CPA.  Yes, that's
25   correct.
```

Page 154

1          Q.   Right.  No one would follow up with

2     that family; is that right?

3          A.   Well, we -- right.  We wouldn't know.

4          Q.   Does South Carolina -- excuse me.

5               Did DSS have any idea of how many

6     foster families in -- South Carolina loses each

7     year because Miracle Hill and other agencies

8     exclude potential families based on religion?

9          A.   I think the only way we would know --

10    and I'm -- and, again, I -- we would have to check

11    with Heartfelt Calling to determine if they could

12    extract this data, but we would really only know

13    that over the last year, since -- since last

14    summer, when we transitioned all that work, but

15    prior to that time, I -- I don't think we have any

16    of -- any of that information.

17         Q.   Right.  And -- and you would only know

18    based on individuals who started the process with

19    Heartfelt Calling?

20         A.   Yes.

21         Q.   Is that right?

22         A.   Yes.

23         Q.   So that number could be significant, I

24    mean, given the fact that I told you Miracle Hill

25    turned away 25 to 30 families.  The -- the number

Page 155

1    could be higher, based on other agencies; is that

2    right?

3            A.    Yes.  I think that's reasonable.

4            Q.    And -- and DSS -- am I right in saying

5    that DSS would not know if more than 100 families

6    had been turned away based on religious criteria?

7                    MR. COLEMAN:  Object to the form of the

8    question.

9                    But you can answer.

10                   THE WITNESS:  We would only know,

11   again, for those applicants that applied through

12   Heartfelt Calling over the last -- well, since,

13   like, last July, when we transitioned all of that

14   non-kin work, but prior to that time, we -- if

15   they were going directly to those -- those

16   child-placing agencies and got turned away, we --

17   we wouldn't -- we wouldn't -- we don't track that

18   information.  We wouldn't know.

19   BY MS. SCHINDEL:

20           Q.    Are prospective foster parents aware

21   that they can apply directly through DSS for a

22   non-kinship care foster license?

23                   MR. COLEMAN:  Object to the form of the

24   question.

25                   But you can answer, if you're able.

Page 156

```
 1              THE WITNESS:  Can you repeat that
 2    question?
 3    BY MS. SCHINDEL:
 4         Q.    Sure.  Are prospective foster parents
 5    made aware that they can apply directly through
 6    DSS for a non-kinship care foster license?
 7         A.    It's given -- I mean, it's given to
 8    them after they have -- have -- are not successful
 9    with the CPA.  Like, that's their option if -- if
10    they -- if they are -- are -- can't find a CPA
11    that's a good fit to work with them.
12         Q.    And how is that information
13    communicated?
14         A.    Through Heartfelt Calling.
15         Q.    So it's only communicated to families
16    that begin the process with Heartfelt Calling?
17         A.    Yes.
18         Q.    Are there currently sibling groups
19    that are separated because there is not a home
20    available that has the capacity to serve all
21    siblings?
22              MR. COLEMAN:  Object to the form of the
23    question, and to the extent that Ms. Tester was
24    designated for and testified to it.
25              But you can answer, if you can.
```

```
 1            THE WITNESS:  Yes, there are siblings
 2   separated because we don't have -- we don't have
 3   capacity in foster homes to take all of them to
 4   get them -- to get to keep all sibling groups
 5   together.
 6   BY MS. SCHINDEL:
 7        Q.   And how many?
 8        A.   I don't have that information.  DSS
 9   has that information available, but I -- I do not
10   have that information today.
11        Q.   Have any CPAs in South Carolina shut
12   down before?
13        A.   You mean closed?
14        Q.   Sorry.  Yes.  Like, closed --
15   closed -- closed shop?
16        A.   I'm not aware of -- I'm not -- I'm --
17   I mean, I'm sure there has been, but since --
18   since my time in this role for the last several
19   years, I'm not aware that -- that we have -- we
20   have closed a -- a child-placing agency.
21        Q.   Has any CPA shut down for fail- -- or
22   closed for failure to comply with DSS's policies?
23   It sounds like the answer is no --
24        A.   Not that I'm aware, no.
25        Q.   Was DSS prepared to terminate Miracle
```

Page 218

1    governor's request for a -- a waiver?

2         A.    I don't remember.

3         Q.    But you -- you did hear about it at

4    some point, you testified?

5         A.    Yes.  Yes.

6         Q.    Did you think it was a good idea from

7    the perspective of child welfare policy?

8              MR. COLEMAN:  Object to the form of the

9    question.

10             But you can answer.

11             THE WITNESS:  I think it -- I think it

12   certainly has caused -- I guess it's -- it's --

13   I -- I don't -- I don't really know.  I don't

14   really have an opinion.

15   BY MS. SCHINDEL:

16        Q.    So you're -- you're responsible for

17   setting foster care policy in the state of

18   California -- excuse me, in South Carolina, but

19   you don't have a view on whether or not that's

20   good policy or not?

21        A.    I -- I don't -- I don't have -- I

22   don't have an opinion about that.  I think it's

23   very controversial, and -- and so I -- I don't

24   have an opinion about it.

25        Q.    Did any other DSS officials or staff

Page 219

1  express their views to you in support or against

2  of allowing CPAs to exclude families based on

3  religious criteria?

4        A.    No.

5        Q.    You've had no conversations with DSS

6  officials or staff about this issue?

7        A.    Not -- not about how they felt about

8  it.

9        Q.    Before the waiver went into effect,

10 did you consider it appropriate to implement a

11 policy of allowing CPAs to exclude families based

12 on religious requirements?

13       A.    Can you repeat that question?

14       Q.    Before the waiver did you, in your

15 capacity as someone who sets the policy for DSS's

16 prospective foster care, think it would be

17 appropriate to implement a policy of allowing CPAs

18 to exclude families based on religious

19 requirements?

20       A.    No, we did not consider implementing a

21 policy.

22       Q.    So was the -- the policy that allowed

23 CPAs to exclude families based on religious

24 requirements implemented only because the

25 governor's office intervened and told DSS to

```
                                        Page 220

 1   implement this type of policy?

 2        A.    Yes.

 3        Q.    As one of the top foster care policy

 4   makers here at DSS, would you permit CPAs to

 5   exclude families based on religious criteria, if

 6   the whole issue were up to you?

 7             MR. COLEMAN:  Object to the form of the

 8   question, and ask -- I'll ask for clarification.

 9   Is that -- are you asking her as 30(b)(6) or as an

10   individual?

11             MS. SCHINDEL:  Well, I think that's --

12   that's pretty clearly in her individual capacity.

13             MR. COLEMAN:  You can -- you can answer

14   the question, as it -- sorry.  Go ahead.

15             THE WITNESS:  Can you repeat it?  I'm

16   sorry, go ahead.  Can you repeat it?

17   BY MS. SCHINDEL:

18        Q.    As one -- sure.  Sure.  So -- well,

19   let me back up and ask you this part.

20             I understand that you have somebody

21   that you report to, but is it fair to say that you

22   are one of the top policy makers in the foster

23   care space at DSS?

24        A.    Yes.

25        Q.    So in that role, and if it were up to
```

Page 221

1    you, would you permit CPAs to exclude families

2    based on religious criteria?

3         A.    No.

4         Q.    What do you think is better from a

5    child welfare or foster care policy perspective,

6    to allow CPAs to exclude families based on their

7    religious criteria or to require all CPAs to

8    accept all qualified families?

9              MR. COLEMAN:  Same -- same request, is

10    that -- is that asking her speaking on behalf of

11    DSS or individually?

12    BY MS. SCHINDEL:

13         Q.    Well, let's ask -- I think -- I think

14    let's do it with -- with your -- in your

15    individual capacity as a policy maker.

16         A.    Okay.  So I think it would be -- I do

17    think it would be best to -- to -- to have all

18    CPAs treating all families, serving all families.

19         Q.    And -- and why is that?

20         A.    I think it -- it fits with -- it

21    aligns better with what our organization says we

22    will do, which is not discriminate against any of

23    the things, and so -- yeah.

24         Q.    And going back to the question I just

25    asked a moment ago, that if it were up to you, you

Page 222

1    would -- you would not permit CPAs to exclude

2    families based on religious criteria, why is that?

3            A.    Say that again.

4            Q.    I think the answers may be similar,

5    but I just want to make sure that to the extent

6    there are any differences.

7                  Is -- is -- why when I asked you would

8    you allow -- would you allow CPAs to exclude

9    families based on religious criteria, and you said

10   no, and I just wanted to follow up and ask, you

11   know, why?  Why is that your opinion, as the top

12   policy -- one of the top policy makers at DSS?

13           A.    I see.  I see.  You -- you're asking

14   me -- and, again, I think it aligns with the same

15   thing I responded to before, which is if it were

16   me as the policy maker's sole decision, then I --

17   I -- I think that it -- it doesn't -- it would --

18   it doesn't align, if -- if you're practicing

19   differently, but yet you're serving -- you're

20   really -- you're really trying to support the same

21   mission, then I think that, again, we say we're

22   not -- we, DSS, the agency, that we're not going

23   to discriminate against anything.

24                 We -- we don't -- we don't care

25   whether you're purple or green or you're single or

Page 223

1    you live in a house or you live in an apartment,

2    and as -- as long as you can care for and support

3    and you meet all of those regulatory requirements

4    and you want to sign up to help support our

5    mission to temporally care for children, I think

6    having everybody practicing the same way is -- is

7    best.

8         Q.    And do you think that that policy, you

9    know, that explanation that you just provided, do

10   you think it's best because it's best for the

11   children in foster care?

12              MR. COLEMAN:  And for the sake of the

13   record, you're answering this in your individual

14   capacity.

15              THE WITNESS:  Yeah.  Yeah.  So I --

16   I -- I don't know that it's best for the sake of

17   the children in foster care, but -- because I

18   think this -- while -- while, ultimately, I guess,

19   it might impact the children that are placed with

20   those families, and, I mean, if you think about

21   the -- the recruitment and sort of the initial

22   engagement of an applicant to a particular CPA or

23   our department, that's really what this is, right,

24   is -- is that -- that -- is that how does it --

25   who is going to work with the family towards

Page 285

1    this -- on here, with the exception of Miracle

2    Hill, and -- and they're signed on the contract.

3    Everybody is signed on the contract.  Miracle Hill

4    is the only one that has chosen not to receive the

5    admin rate.

6            Q.    And why did Miracle Hill choose not to

7    receive the admin rate?

8                  MR. COLEMAN:  Object to form.

9                  But you can answer.

10                 THE WITNESS:  Yeah, I don't know.

11   They -- they didn't give reason.  They -- they

12   just requested that -- that they were interested

13   in still being a part of the contract, but did not

14   feel it necessary to receive the admin rate.

15   BY MS. SCHINDEL:

16           Q.    And who -- who did Miracle Hill make

17   the request to when it -- when it asked to no

18   longer receive the admin rate?

19           A.    I believe that went through our

20   contract division, our procurement division.

21           Q.    And do you know what was discussed?

22           A.    I do not, other than the request that

23   they -- they did not want the admin rate.

24           Q.    Are you the person most knowledgeable

25   about whether Miracle Hill -- about why Miracle

Page 286

1    Hill chose to no longer receive the admin rate
2    within DSS?
3            A.   I would say -- I would say yes.
4    Although, I -- the request didn't come to me
5    directly.  But, again, I -- I don't know the re-
6    -- there was no reason.  They -- they were --
7    just said they -- they didn't -- they didn't want
8    the admin rate, and so we -- we said, okay.
9                I mean, we can certainly use those
10   dollars towards other things.  So there's still --
11           Q.   You mentioned -- oh, sorry.
12           A.   I was just going to say, just to --
13   just to be clear, they're still signed on to the
14   non-therapeutic contract and have agreed to abide
15   by those terms of -- of that -- of that contract.
16   They're just not being paid anything related to
17   that.
18           Q.   Does the fact that Miracle Hill no
19   longer receives the admin rate change any of their
20   obligations as the CPA?
21           A.   No.
22           Q.   Is Miracle Hill still providing
23   services for DSS?
24           A.   Yes.
25           Q.   You had mentioned, in response to my

Page 287

```
 1   questions and in response to some of Mr. Coleman's
 2   questions, that -- that some families may not be
 3   comfortable with certain CPAs.  Are there specific
 4   reasons a family might prefer one CPA over
 5   another?
 6            A.   Sure.  I mean, if -- you know, I'll
 7   give you the same example I gave to Mr. Coleman,
 8   which is, you know, if you're -- if you -- if I'm
 9   a member of the United Methodist Church and, you
10   know, Epworth is promoting the foster care,
11   promoting foster care and recruiting foster
12   parents within my church, I might naturally be
13   more comfortable and choose to go with that
14   particular CPA because it's affiliated with
15   something I'm already connected to.
16            Q.   Is it possible that one of the things
17   that might draw families to particular CPAs over
18   others is because they feel more comfortable with
19   the people working at that CPA?
20            A.   Perhaps.  Perhaps they have -- already
21   have connections there.
22            Q.   Or -- or perhaps because the CPA has
23   offices closer to their home?
24            A.   Possibly.
25            Q.   Is it important for families to have
```

Page 288

```
 1   various CPAs to choose from so that they can find
 2   one that they're comfortable working with?
 3          A.   Yes.
 4               MS. SCHINDEL:  I'm going to put on one
 5   more exhibit, which is Tab 17 for us.  It will be
 6   Exhibit 10 -- well, no, I suppose -- I guess it's
 7   Exhibit 11.
 8               MR. COLEMAN:  Yeah.
 9               (Exhibit 11, Oasis Website Page, marked
10   for identification.)
11               MS. SCHINDEL:  We have to -- we --
12   it's written as Exhibit 10 here, but we're going
13   to have to fix that and make it Exhibit 11.
14   BY MS. SCHINDEL:
15          Q.   But let me know when you have that
16   open.
17          A.   I do.
18          Q.   Do you recognize this document?  It's
19   a printout from the Oasis website.
20          A.   I do not.  They're one of our newer
21   CPAs.  So I'm not as familiar.
22          Q.   Well, it says:  Benefits of fostering
23   with Oasis.  And it lists several benefits on the
24   left-hand side.  Do you see that?
25          A.   Uh-huh.  Yes.
```

Page 289

1           Q.   And one of the -- in bold, about five
2     lines down, one of the benefits, it says, is free
3     monthly home cleaning service; is that right?
4           A.   That's what it says, yes.
5           Q.   Did you know that -- does DSS know
6     that that's a benefit that Oasis provides to the
7     foster families with which it works?
8           A.   I did not know that that was a benefit
9     of Oasis.
10          Q.   Is that benefit required by all CPAs?
11          A.   No.
12          Q.   Excuse me.  Let me rephrase that
13    question.  Well, I think you got it, but let me
14    just make it cleaner.
15          A.   Okay.
16          Q.   Is that -- is that -- is that benefit
17    required by DSS's contract such that all CPAs must
18    provide it?
19          A.   No.
20          Q.   And do you know -- does DSS know
21    whether all CPAs provide this benefit?
22          A.   No.
23          Q.   Does DSS know that some CPAs do not
24    provide this benefit?
25          A.   No.  I mean, I -- I could not tell you

Page 290

1    who -- who does and who does not.

2          Q.    All right.  One point that I just

3    wanted to make clear.  You've been asked a couple

4    of times about case workers and -- and the fact

5    that DSS assigns case workers, and I -- I just

6    want to make sure I understand.

7                Non-therapeutic CPAs, do they assign

8    case workers to the families that they work with?

9          A.    They have what they would, I think,

10   refer to as support, like family support workers,

11   that supports the family.  We have case managers

12   or foster care workers.  You'll hear people refer

13   to them differently.  But they're -- they're

14   attached specifically to the child.

15               So for the CPA, they have a support

16   worker that's attached to the family.  Our person

17   is attached to the child, but works with the --

18   with the family, if that -- I hope that makes

19   sense.

20         Q.    I think so.  So is it -- so the --

21         A.    I was just going to say, so when a

22   child comes into foster care, they're immediately

23   assigned a foster care case manager, and that case

24   manager, whether they leave -- they might go to

25   Ms. Smith's house, and they might have to go to a

Page 291

```
 1   different placement at some point.  That case
 2   manager still holds on to that child and is
 3   responsible for the case management of -- of that
 4   child, wherever -- wherever they go while they're
 5   in custody, our -- our custody.
 6        Q.   And there's not a comparable role
 7   played by somebody affiliated with the CPA that --
 8   that stays with the child wherever they go?
 9        A.   No.
10        Q.   I think -- I'm sorry.  Back to this
11   exhibit that I still have up.  Hopefully, you
12   still have it near you.
13             The free -- the free monthly home
14   cleaning services, is that something that DSS
15   provides to the families that it's working with
16   directly?
17        A.   No.  Great perk, though.
18        Q.   Yeah.  And then, I don't have the
19   documents that Miles -- Mr. Coleman showed, but I
20   think he showed you this -- the very last thing
21   that was shown was Section J about religious
22   education.
23             MS. SCHINDEL:  Would you mind putting
24   that back up, Miles?  I just don't have it.
25             MR. COLEMAN:  Yeah.  Hang on here, real
```

Page 292

1    quick.  I've got it running off of a different

2    computer.  So hold on.  I think this is it.  Is

3    that -- is that what you were looking for?

4                MS. SCHINDEL:  Oh, I can't -- hold on.

5    Let me try popping it up.  Yes.  Yes.

6    BY MS. SCHINDEL:

7         Q.    And so this section which talks about

8    religious education being in accordance with the

9    express wishes, if any, of the birth parents.

10                So if -- if a -- if a CPA wants to

11   provide religious teachings to a child that's

12   living with a family that it's supporting and

13   working with and the birth parents have not

14   expressed wishes about the nature of the religious

15   teachings that the children are meant to receive,

16   can the CPA do that?  Can the CPA provide

17   religious teachings to -- to those children?

18        A.    No.  Any -- any religious -- anything

19   related to -- to -- to this matter needs to --

20   their -- the birth parents need to be -- need --

21   need to be approached and support.

22        Q.    So could Miracle Hill, for instance,

23   could it encourage the families with which it

24   works to take children to church?

25        A.    No, not without the -- not without the