# EXHIBIT 9



Deposition of:

# Eden Rogers

*May 21, 2021*

In the Matter of:

# Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Eden Rogers                                          May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 1

1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
2                        GREENVILLE DIVISION
3                 Civil Action No. 6:19-cv-01567-JD
4        Eden Rogers, et al.,
5             Plaintiffs,
6        vs.
7        United States Department of Health and Human
         Services, et al.,
8
              Defendant.
9        _____
10       VIRTUAL
         DEPOSITION OF:     EDEN ROGERS
11
         DATE:              May 21, 2021
12
         TIME:              1:01 p.m.
13
         LOCATION:          ███████████████████
14                          ████████████████████████
15       TAKEN BY:          Counsel for Governor Henry McMaster
16       REPORTED BY:       MICHELLE BAKER LEE,
                            Certified Court Reporter
17       _____
18
19
20
21
22
23
24
25

Page 2

```
 1        APPEARANCES OF COUNSEL:
 2            ATTORNEYS FOR PLAINTIFFS:
 3                AMERICAN CIVIL LIBERTIES UNION OF
                  SOUTH CAROLINA FOUNDATION
 4                Susan K. Dunn, Esquire (via VTC)
                  P.O. Box 20998
 5                Charleston, South Carolina 29413-0998
                  843-720-1423
 6                sdunn@aclusc.org
             and
 7                LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
                  M. Currey Cook, Esquire (via VTC)
 8                120 Wall Street, Floor 19
                  New York, NY 10005-3919
 9                212-809-8585
                  ccook@lambdalegal.org
10           and
                  CRAVATH SWAINE & MOORE, LLP
11                Rebecca Schindel, Esquire (via VTC)
                  825 Eighth Avenue
12                New York, NY 10019
                  212-474-1459
13                rschindel@cravath.com
14            ATTORNEY FOR FEDERAL DEFENDANTS:
15                UNITED STATES ATTORNEY'S OFFICE
                  Christie V. Newman, Esquire (via VTC)
16                1441 Main Street, Suite 500
                  Columbia, South Carolina 29201
17                803-929-3030
                  christie.newman@usdoj.gov
18
              ATTORNEY FOR DEFENDANT HENRY MCMASTER:
19
                  NELSON MULLINS RILEY & SCARBOROUGH, LLP
20                Miles E. Coleman, Esquire (via VTC)
                  2 West Washington Street, Fourth Floor
21                Greenville, South Carolina 29601
                  864-373-2352
22                miles.coleman@nelsonmullins.com
23
24
25
```

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 3

1       APPEARANCES OF COUNSEL (Continued):

2

3           ATTORNEYS FOR DEFENDANT MICHAEL LEACH:

4                   DAVIDSON WREN & DEMASTERS, PA
                    Jonathan M. Riddle, Esquire (via VTC)

5                   Kenneth P. Woodington, Esquire (via VTC)
                    1611 Devonshire Drive, Second Floor

6                   Columbia, South Carolina 29204
                    803-806-8222

7                   jriddle@dml-law.com

8

9

10                  (INDEX AT REAR OF TRANSCRIPT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                   Page 14

1          A     My wife's name and my name.

2          Q     Both of you?

3          A     Uh-huh.

4          Q     Okay.  How many bedrooms does it have?

5          A     Four.

6          Q     Okay.  Prior to the current house, I think

7     in Taylors, did you rent or own that house?

8          A     We rented that house.

9          Q     Okay.  You already told me approximately how

10    long you were there.  I've already forgotten it.  But

11    for the period of time that you were there you were

12    renting?

13         A     Yes.

14         Q     And then previously you had, I guess, two

15    other addresses in Greenville.  Were those rented or

16    owned properties?

17         A     Rented.

18         Q     Okay.  The house in Taylors prior to this

19    one that you rented, how many bedrooms in that house?

20         A     Three.

21         Q     Okay.  Who else lived with you in that

22    residence?

23         A     My wife, myself, and our children.

24         Q     Okay.  How many children?

25         A     Two.

Eden Rogers                                           May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                      Page 15

1          Q    Okay.  Are they biological children of

2     either you or Brandy?

3          A    Yes.

4          Q    Of which?

5          A    Me.

6          Q    Okay.

7          A    They're my biological children.

8          Q    Okay.  So are they from a prior marriage?

9          A    Yes.

10         Q    Okay.  When was that?  That's a poorly

11    worded question.  When did you -- let me back up and

12    ask this in a way that's more sequential.

13              When did you and Brandy get married?

14         A    End of 2015.

15         Q    Okay.  Prior to that when did you and Brandy

16    meet?

17         A    We met in 2009, the end of 2009.

18         Q    Okay.  How did you meet?

19         A    We were next-door neighbors.

20         Q    Okay.  And where was that?

21         A    In St. Marys, Georgia.

22         Q    Okay.  So you met in 2009.  When did you and

23    Brandy whether you call it, you know, develop a

24    romantic relationship or begin dating or when did that

25    occur?

Eden Rogers            May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 16

1       A    I am going to need to count.  We began

2   dating in 2000 -- the end of 2013.

3       Q    Okay.  So you knew Brandy from 2009 to 2013

4   approximately, began dating at that point.  Did you

5   have an engagement thereafter?

6       A    We had an informal engagement, I suppose.

7       Q    And then you were married in 2015, you said?

8       A    Yes.

9       Q    Where -- geographically where did you get

10   married?

11       A    In Greenville.

12       Q    Okay.  Because you were living in Greenville

13   at the time?

14       A    Yes.  Actually, we were technically

15   married -- the ceremony was in Pendleton, South

16   Carolina.

17       Q    Okay.  Where in Pendleton?  I'm just

18   curious.

19       A    There's an old farmhouse that --

20       Q    Is it called Farmer's Hall?  It's like on

21   the -- kind of the city plaza, the city square?

22       A    No, it's a private property.

23       Q    Okay.  I was just curious.  I grew up

24   spending a lot of time in Pendleton --

25       A    Oh.

Page 17

1          Q     -- so I was curious.  It doesn't really
2     matter at all but just wondered.
3               Okay.  So you -- and I'm sorry if I keep
4     kind of going over the same ground again but I'm
5     trying to learn as much as I can.
6               So you met Brandy in 2009, you -- as
7     neighbors.  Did you continue as neighbors from 2009
8     through 2013?
9          A     No.  I don't recall when she moved but at
10    some point in that period of time she moved to
11    Jacksonville, Florida.
12         Q     Okay.  Obviously you must have stayed in
13    touch?
14         A     Yes.
15         Q     I guess explain a little bit -- so I guess
16    what I'm trying to figure out, between 2009 and 2013
17    there was -- was it like a professional relationship
18    or a friendship relationship or there was a distance
19    involved?
20         A     Yes.  We --
21         Q     Tell me a little bit about that.
22         A     We quickly became best friends after
23    leaving.
24         Q     Okay.  And in 2013 -- I'm sorry.  In 2009
25    when you met, were you at that point single or were

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 18

1      you at that point married?

2            A     At that point I was married and separated.

3            Q     Okay.  When -- when did that marriage begin?

4            A     In 2006.

5            Q     Okay.  And when did it, like, finally

6      conclude in a divorce or a decree of divorce?

7            A     I'm counting.  One second.

8            Q     Sure.  Take your time.

9            A     February of 2013.

10           Q     Okay.  And what was the name of your spouse

11     during that marriage?

12           A     James Hoffmeyer.

13           Q     Okay.  When were -- when were your children

14     born?

15           A     My first child was born May of 2009 and my

16     second was born in April of 2012.

17           Q     Okay.  Prior -- prior to that -- you were

18     married to James; is that right?

19           A     Yes.

20           Q     Prior to that were there any -- did you have

21     any marriage prior to that?

22           A     No.

23           Q     Okay.  What's the highest level of education

24     or the highest degree that you've received?

25           A     High school diploma.

Eden Rogers                                              May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 39

1          Q    So when you moved to Greenville it must have
2     been early 2015?
3          A    Yes.
4          Q    At that time in Georgia, whether by statute
5     or constitutional amendment, the state of Georgia did
6     not recognize same-sex marriage?
7          A    Right.
8          Q    And when you -- and South Carolina did as a
9     result of I think it was the Bradacs case in 2014.
10    And then a second ago when you said -- you referred to
11    the joke, you're talking about the Supreme Court --
12    the US Supreme Court's decision in Obergefell later in
13    2015?
14         A    Yes.
15         Q    I got all that?
16         A    Yes.
17         Q    Okay.  I was pretty sure -- and it's hard,
18    right, especially in a written record.  When we're all
19    talking, we probably know what we're talking about,
20    but the record, it's just typed words on it.  So I
21    wanted to make sure all that subtext is -- makes sense
22    to whoever ends up reading this later.
23              Whose idea was it to sue Governor McMaster
24    and federal HHS and the other Defendants?
25         A    I don't recall.

Eden Rogers                                      May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 40

1       Q    Okay.  Did somebody suggest it to you?

2       A    No.  I don't recall as in I don't recall if

3   the idea initially came to myself or my wife.

4       Q    I see.

5       A    And that is what I mean by I don't recall.

6       Q    Okay.  Okay.  Thank you for clarifying.

7            Did the two of you discuss it over a period

8   of time?

9       A    Not really, no.  And if by period of time

10  you mean years, obviously, no.  We took time after

11  finding ourselves in the situation we were in being

12  denied, we took time to talk about it and discuss

13  what -- discuss our feelings and what we were, you

14  know, willing to do.  And so by time if you mean

15  years, no.  By time if you mean weeks, of course we

16  discussed it with each other, what we felt like we

17  needed to do.

18      Q    Did you talk to anyone else other than

19  Brandy when you were weighing those options and

20  thinking through what you wanted to do?

21      A    I do not recall the context of

22  conversations, but I was at the time confiding in our

23  pastor for, I guess you could say, some moral support.

24  This was -- this was very difficult for us so I was

25  having regular conversations with our pastor, like I

Eden Rogers                                                May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 41

```
 1      said, for moral support.
 2           Q    What is your -- what was the pastor's name?
 3           A    Lisa Bovee-Kemper.
 4           Q    And she's a pastor at the UU, Unitarian
 5      Universalist Church you mentioned?
 6           A    Yes.
 7           Q    Okay.  Was there anyone else that you talked
 8      to about the situation?
 9           A    Before -- before we decided to move forward
10      or about being denied?
11           Q    Let me -- I'll ask multiple questions, then.
12                Before you applied to Miracle Hill, did you
13      talk to anyone else other than Brandy about applying
14      to Miracle Hill?
15           A    We did not talk to anyone else about
16      specifically applying to Miracle Hill.  We had talked
17      to people, though, about wanting to foster and trying
18      to become foster parents.
19           Q    Okay.  Who had you talked to about that?
20           A    It would have to be a very long list because
21      I believe everyone that knows us knew that we wanted
22      to foster.  In detail we would talk to my kids' dad.
23      He's -- we're a very close-knit family so he's a part
24      of their lives and our lives, and he knew we wanted to
25      foster.  He had said he wanted to be a father figure
```

Eden Rogers                                              May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 42

1    to any children that we bring into the family

2    (indiscernible audio) another.  My siblings have

3    always known we wanted to foster, our closest friends.

4    Before all of this, everyone that knew us knew that we

5    wanted to be foster parents.

6         Q    Would it be fair to say -- and, again, don't

7    let me put words in your mouth but this is the easiest

8    way to ask the question.  Would it be fair to say that

9    from the time that you and Brandy -- you moved in

10   together back in 2013 -- from even starting at that

11   time that you two were interested in and wanted

12   someday to be foster parents?

13        A    Absolutely.

14        Q    Okay.  You mentioned a second ago that James

15   is still very involved.

16        A    Yes.

17        Q    Does he live in this area?

18        A    He still lives in St. Marys, Georgia.

19        Q    Okay.  About how often do you see him in

20   person?  Well, that's a bad question, right?  Because

21   of COVID, nobody sees anybody anymore.

22             Prior to COVID about how often would you see

23   him in person?

24        A    At least every couple months.

25        Q    Okay.  During COVID, let's say since early

Eden Rogers                                              May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 43

1    2020 to the present, how often do you or your children

2    see him in person?

3         A    It was -- there were about eight months

4    maybe nine months -- well, there were a number of

5    months in the beginning of COVID where he was not able

6    to visit because he's in the military and he had

7    orders -- no-travel orders.  Since then he has been

8    able to visit more frequently.  I'd say since November

9    he's visited four or five times with another visit in

10   the next month.

11        Q    Okay.  Why did your marriage to James end?

12        A    I was really young when we got married and

13   we just realized that being married wasn't probably

14   the relationship that best suited us.  We still wanted

15   to have a relationship and be friends and co-parent

16   and share, you know, our lives together, but we

17   realized that being married and having that sort of

18   relationship was not -- we weren't best suited for.

19        Q    Was it an amicable separation and divorce?

20        A    Yes, absolutely.  We did it all ourselves.

21        Q    At the time you married James, did you

22   consider yourself to be heterosexual?

23        A    Yes.

24        Q    And what do you consider your sexual

25   orientation to be now?

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 44

1        A      That's complicated.  I don't know if you're

2     looking for this in-depth of an answer, but there is a

3     term called demisexual which it describes someone that

4     doesn't fall in love with a person with a specific

5     gender.  I feel like I fall in love and am attracted

6     to someone's brain and the -- the intellectual

7     connection that you can have with someone and the

8     emotional connection.

9              So, yeah, I -- I don't consider myself

10    specifically -- I'm not heterosexual but I don't think

11    it's fair to say, like, that I am specifically a

12    lesbian because I could have just as easily fallen in

13    love with somebody of another gender that had the same

14    emotional and intellectual connection with me.

15       Q      And just to make sure I heard the word right

16    and the court reporter, did you describe it as

17    demisexual, like d-e-m-i?

18       A      Yes.

19       Q      Okay.  Is that different than bisexual?

20       A      I -- I find it to be different.

21       Q      In what way?

22       A      Well, bisexual implies that you are only

23    sexually attracted to -- or you are sexually attracted

24    to men or women, male or female.  And I recognize that

25    those -- those two things have nothing to do with

Eden Rogers                                        May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 56

1          Q     So the text of the tweet and the image in

2     the tweet are, I think, either very close or maybe

3     identical.  This one was tweeted out by SC Equality --

4          A     Oh.

5          Q     -- (indiscernible audio) the ACLU of South

6     Carolina.  I think that's -- that's the difference.

7     But I think you're right that they're very similar.

8          A     Okay.

9          Q     Had you ever seen this tweet?

10         A     No.

11         Q     Are you familiar with SC Equality?

12         A     I've heard of it.

13         Q     Okay.  Have you ever spoken with anyone from

14    there?

15         A     To be fair, probably, yes, since all of

16    this, but before the Complaint was filed, no.

17         Q     Okay.  You can set those exhibits aside.

18               In early 2019 it was national news that

19    federal HHS had granted a waiver specifically to

20    Governor McMaster, to South Carolina related to

21    Miracle Hill.  It was in the Washington Post, it

22    was -- it was all over the news.  Were you aware of

23    that at that time?

24         A     No.

25         Q     Okay.  At the time you applied to -- you

Page 57

1          submitted an application to Miracle Hill, were you

2          aware that they worked only at that time with

3          Protestant Christian foster parents?

4                  A     No, I wasn't.

5                  Q     Did you know at that time -- and when I say

6          "at that time," to be a little bit more precise we're

7          talking about like April and May approximately of

8          2019, around the time you applied.  At that time did

9          you know that the South Carolina Department of Social

10         Services, SCDSS, would work with any qualified foster

11         parent or prospective foster parent of any religion or

12         no religion and any marital status?

13                 A     I actually was aware of that.  However, I

14         have had lots of contact with a number of people that

15         I do not know personally that worked for DSS through

16         the school that I taught at.  We would go through

17         regular evaluations.  And I had been -- I guess I had

18         heard a number of times that going through them was

19         lengthy and not easy, and the agencies in the area had

20         the ability to shorten the process significantly and

21         do a very thorough job with a lot of support.  So I

22         was aware that that was possible, but how realistic it

23         was as far as becoming a foster parent anytime soon, I

24         was not confident in that.

25                 Q     Okay.  And when -- just to make sure I am

Eden Rogers                                           May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 58

1     hearing what you're saying and understanding, right,

2     when you say through SCDSS, I think you said the

3     process was lengthy.  Are you talking about the

4     process of becoming licensed as a foster parent, the

5     application and licensure process?

6           A     Yes.

7           Q     And you also said that your understanding

8     was that other agencies -- you're talking about

9     private foster agencies?

10          A     Private organizations, yeah.

11          Q     Okay.  And you said agencies plural, that

12    there's more than one in your area and in the state

13    generally but specifically in your area?

14          A     Yeah, I'm assuming so.  I only know of

15    Miracle Hill because they're the only one that

16    advertises so -- but I'm assuming at this point that

17    there's more than one.

18          Q     And maybe you just answered the last -- so

19    how did you decide -- you'd explained why you didn't

20    at the time want to apply directly with DSS.  How did

21    you decide on Miracle Hill instead of one of the --

22    one of the other private agencies in your area?

23          A     They're the only one that I knew about.

24    Every day on the way to work I passed billboards and,

25    you know, little signs that you stick in the grass

Eden Rogers                                          May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 59

1    that line Wade Hampton saying become a foster parent,

2    contact Miracle Hill today.  Like every single day.

3    And, I mean, they as far as -- like they were who you

4    think of here when you think of, you know, fostering a

5    child --

6         Q    (Indiscernible audio) -- I'm sorry, I didn't

7    mean to interrupt.

8         A    They are just the only ones that I knew of.

9         Q    Okay.  How did you -- how and when did you

10   first make contact with Miracle Hill?

11        A    When we applied.  Well, my wife had made

12   phone calls to them prior to ask about the application

13   process and if we needed to come in or do it online,

14   those things.  I was never in contact with anyone

15   prior to our application.

16        Q    Okay.  So you hadn't spoken with anyone on

17   the phone but Brandy had?

18        A    (Nods head.)

19        Q    Okay.  Do you -- and if you don't know,

20   that's fine, you don't know because I can ask her,

21   too.  Do you know how many -- how many phone calls she

22   had, approximately?

23        A    I don't know.

24        Q    Okay.  That's fine.

25             Do you know when you submitted -- I think

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 60

1      you said it was online.  Do you know when you

2      submitted an application or a form or -- I'm asking

3      that question wrong.  Let me back up.

4              You said it was -- the process was online.

5      What was the process?

6         A    Filling out an application.

7         Q    Okay.  Is it -- was it like a PDF form or

8      like a website, a web page that you'd fill in

9      information and click submit?

10        A    I don't recall.

11        Q    Okay.  That's fine.  Do you remember when

12     you filled that out in whatever form it was and

13     submitted it?

14        A    I don't remember.

15        Q    Okay.  And you said -- earlier this

16     afternoon you said that -- I don't remember your exact

17     wording but that the response from Miracle Hill was

18     like really quick?

19        A    Uh-huh, yes.

20        Q    Can you give me a time frame on that?

21     What -- do you have a sense or a recollection of --

22        A    Within about a couple of days.

23        Q    Okay.

24        A    Maybe four but less than a week.

25        Q    Okay.  Do you think a private foster care

Eden Rogers                              May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 61

1    agency should take longer than that to reply to an

2    applicant?

3           A    Well, I think what I anticipated was them

4    to -- for them to see if we were qualified to foster,

5    as in home studies and, you know, interviews and

6    references and all of those things.  I did not realize

7    that they would find us disqualified to foster based

8    on a simple form with basic information.

9           Q    And let me -- let me drill in on that a

10   little bit.  Did they -- did Miracle Hill find you

11   disqualified or unqualified to be a foster parent?

12          A    They denied our ability to be able to even,

13   like, be licensed to foster with them.  Like they

14   denied our ability to have their services as far as

15   the entire process from beginning to end with

16   fostering.

17          Q    But they didn't stop you from applying

18   elsewhere to be a foster parent, did they?

19          A    No.

20          Q    Did they suggest to you other private

21   agencies or public agencies that would work with you

22   to become a foster parent?

23          A    I believe that they did send my wife an

24   e-mail.  I don't know what the contents of that was.

25   They might have called her.  It was not my

Eden Rogers                                          May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 124

1      it's -- it's been -- we gave courtesy calls and then

2      they may or may not have checked in on us, but there's

3      nothing for us to share because there's never any

4      news.  But, yeah, it's all -- I mean, it's all

5      basically the same.

6          Q    Okay.  Give me just a minute to glance

7      through notes I had here.

8               During the time leading up to your decision

9      to apply to Miracle Hill at the time where Brandy made

10     a couple of -- I say "a couple of" and I don't want to

11     put words in your mouth.  I think she made a phone

12     call.  It may have been more than one and she can

13     probably remember better than you can.  But there was,

14     you know, one or more phone calls that she made, there

15     was internal discussion between the two of you, and

16     you were -- were you at that time -- did you talk to

17     Cindy and Lisa Bovee-Kemper about sort of that

18     decision process that you were going through at that

19     time?

20         A    Do you mean did we share with them that,

21     like, we were ready and that we were moving forward

22     with trying to become foster parents, like the next

23     step since applying?

24         Q    Yeah, let's start there.  Yeah.

25         A    Then, yes.

Eden Rogers                                May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 125

1          Q    Okay.  Let me make it a little more precise,

2    then.  Did they know that you were thinking about or

3    planning to or contemplating applying to Miracle Hill

4    specifically?

5          A    I'm not sure.

6          Q    Okay.  You just don't remember?

7          A    Yeah, I don't remember.

8          Q    Okay.

9               MR. COLEMAN:  I think those are all the

10              questions that I have for right now.  It is

11              possible that some of the other lawyers may

12              themselves have questions, so I'll give a chance

13              for the others to ask what they need to ask.  But

14              I am, at least for the time being, done.

15              MS. NEWMAN:  This is Christie Newman.  I

16              don't have any questions.

17              MS. DUNN:  Jonathan, do you have questions?

18              MR. RIDDLE:  Yeah, this is Jonathan.  I

19              don't have any other questions.

20              MS. DUNN:  I just have a few.  That's all

21              the Defendants' attorneys, correct?

22              MR. COLEMAN:  Yeah.  Me, Christie,

23         Jonathan --

24              MS. DUNN:  I don't want to be overlooking

25              anybody.

Eden Rogers                              May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 126

1          MS. NEWMAN:  I think that's everybody.

2          MS. DUNN:  Okay.  Well, I just have a few

3      questions.

4                      EXAMINATION

5      BY MS. DUNN:

6          Q    When you received the e-mail that we

7      discussed earlier in this deposition from Miracle

8      Hill, was it your clear understanding that your

9      application to foster through them had been rejected?

10         A    Yes.

11         Q    And I believe you answered some questions

12     from Mr. Coleman dealing with what kinds of monies

13     that Miracle Hill might receive from the state,

14     correct?  Do you have any information at all about

15     what the actual contractual relationship is in terms

16     of finances between South Carolina Department of

17     Social Services and Miracle Hill?

18         A    No.  All I know is that they receive federal

19     and state funding.

20         Q    But you don't know what funding or what?

21         A    No.

22         Q    And I believe you indicated that the times

23     that you've talked in public in the press conference

24     and in Dallas, you're talking about the rejection was

25     hard to do?

Eden Rogers                                      May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 127

1           A    Sure.

2           Q    But it's not so much -- you were talking

3       about a past rejection, right?

4           A    Right.

5           Q    When you indicated that you were reluctant

6       to apply to other fostering agencies because you

7       didn't want to experience new rejection, was that a

8       different kind of pain?

9           A    Yes.

10          Q    Could you contrast them for us just to be a

11      little clearer?

12          A    Am I allowed to use a metaphor?

13          Q    Yes.

14          A    Okay.  If I skin my knee, that is a pain.

15      And then I go to clean it and it's likely to cause

16      more pain.  Rubbing alcohol hurts when it's raw.  But

17      I would still go clean it and put a Band-Aid on it

18      rather than go and knowingly intentionally risk

19      skinning my knee more and more and more times.  So it

20      is a different kind of pain because, I mean, you just

21      don't want to knowingly walk into risk after risk

22      after risk having to go through what you just went

23      through and you know it's uncomfortable.

24               I had never done all these interviews

25      before.  I had never talked to the press before.  I

Eden Rogers                          May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 128

1    had never done anything like this.  I was not sure,

2    did not know how uncomfortable it might be, but I knew

3    how uncomfortable and how hurtful it was to be

4    rejected like that.

5         Q    And, again, in response to questions from

6    Mr. Coleman, you indicated that you've -- you have

7    dealt with epilepsy for some time.  Has your epilepsy

8    ever affected your ability to parent children?

9         A    Oh, absolutely not.

10        Q    You also talked about concussions, hence the

11   headaches and the effects that you had from those

12   events of your past.  Have any of those head injuries

13   ever affected your ability to parent?

14        A    No.

15        Q    And you identified Lisa as the -- what, is

16   it Bovee-Kemper?

17        A    Yeah.

18        Q    Let me get these names right.  Lisa is the

19   minister at UU Church and Cindy is her wife?

20        A    Yes.

21        Q    Is Cindy also a minister?

22        A    Yes.

23        Q    And what denomination is Cindy a minister

24   in?

25        A    I think it's Church of Christ or something.

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 129

 1         I know she's -- she's Christian.

 2         Q    Is she Protestant Christian?

 3         A    I believe so.

 4              MS. DUNN:  I have no further questions.

 5              MR. COLEMAN:  Nor do it.  That may be the

 6         conclusion of your first deposition.  I think the

 7         court reporter wants us to stay on the record to

 8         place our orders but --

 9              THE COURT REPORTER:  I do.  Ms. Dunn, is she

10         going to read and sign or waive?

11              MS. DUNN:  She's going to read and sign.

12              THE COURT REPORTER:  Okay.  Are you handling

13         the read and sign or should I send it to the

14         witness directly?

15              MS. DUNN:  You shouldn't send it to me.  I'm

16         a lame duck.

17              Currey, should they send it to you?

18              MS. SCHINDEL:  Why don't they send it to us

19         because we'll order the transcript, also, so we

20         can have it all come to us.

21              MS. DUNN:  Okay.  So it should go to

22         Cravath, the Cravath firm.  Send it to you,

23         Rebecca?

24              MS. SCHINDEL:  Right, yeah.  I sent you my

25         full information for purposes of ordering the

Eden Rogers                                    May 21, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                    Page 130

1          transcript, also.

2                THE COURT REPORTER:  Okay.  And, Mr.

3          Coleman, I'm assuming you're ordering, and then I

4          just need everyone's copy orders on the record,

5          how you like those, hard copies, electronic.

6                MS. NEWMAN:  This is Christie Newman.  I

7          like a e-trans, please.

8                THE COURT REPORTER:  Okay.

9                MR. RIDDLE:  This is Jonathan Riddle.  Yeah,

10         we just need the e-tran.

11               THE COURT REPORTER:  All right.

12               MS. SCHINDEL:  Rebecca Schindel and we'll

13         also do the e-transcript.

14               THE COURT REPORTER:  Okay.  Mr. Cook, did

15         you want a copy?

16               MR. COOK:  No, no, not directly.  We're

17         co-counsel with Rebecca.

18               THE COURT REPORTER:  Okay.  And I'm not sure

19         if Maia is co-counsel as well.

20               MS. DUNN:  She's with us.

21               MR. COOK:  Maia's with Lambda Legal with me

22         so, yes, she's part of Plaintiffs' co-counsel.

23               THE COURT REPORTER:  All right.  Very good.

24         I think that's it right now.

25               MS. SCHINDEL:  In terms of the transcript,