# EXHIBIT 10



Deposition of:

# Brandy Welch

*May 24, 2021*

In the Matter of:

# Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
2                    GREENVILLE DIVISION

3

4    Eden Rogers, et al.,

5        Plaintiffs,

6    vs.

7    United States Department of Health and Human
     Services, et al.,

8

         Defendant.

9    _____

10   VIRTUAL
     DEPOSITION OF:      BRANDY WELCH

11

     DATE:               May 24, 2021

12

     TIME:               9:04 a.m.

13

     LOCATION:           ████████████

14                       ████████

                         █████████████████████

15

     TAKEN BY:           Counsel for Governor Henry McMaster

16

     REPORTED BY:        MICHELLE BAKER LEE,

17                       Certified Court Reporter

     _____

18
19
20
21
22
23
24
25

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                      Page 2

```
 1     APPEARANCES OF COUNSEL:
 2          ATTORNEYS FOR PLAINTIFFS:
 3              AMERICAN CIVIL LIBERTIES UNION OF
                SOUTH CAROLINA FOUNDATION
 4              Susan K. Dunn, Esquire (via VTC)
                P.O. Box 20998
 5              Charleston, South Carolina 29413-0998
                843-720-1423
 6              sdunn@aclusc.org
            and
 7              LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
                M. Currey Cook, Esquire (via VTC)
 8              120 Wall Street, Floor 19
                New York, NY 10005-3919
 9              212-809-8585
                ccook@lambdalegal.org
10          and
                CRAVATH SWAINE & MOORE, LLP
11              Katherine Deringer Janson, Esquire (via VTC)
                825 Eighth Avenue
12              New York, NY 10019
                212-474-1459
13              kjanson@cravath.com
14          ATTORNEY FOR FEDERAL DEFENDANTS:
15              UNITED STATES ATTORNEY'S OFFICE
                Christie V. Newman, Esquire (via VTC)
16              1441 Main Street, Suite 500
                Columbia, South Carolina 29201
17              803-929-3030
                christie.newman@usdoj.gov
18
            ATTORNEY FOR DEFENDANT HENRY MCMASTER:
19
                NELSON MULLINS RILEY & SCARBOROUGH, LLP
20              Miles E. Coleman, Esquire (via VTC)
                2 West Washington Street, Fourth Floor
21              Greenville, South Carolina 29601
                864-373-2352
22              miles.coleman@nelsonmullins.com
23
24
25
```

Page 3

1    APPEARANCES OF COUNSEL (Continued):

2

3        ATTORNEY FOR DEFENDANT MICHAEL LEACH:

4            DAVIDSON WREN & DEMASTERS, PA
             Jonathan M. Riddle, Esquire (via VTC)

5            1611 Devonshire Drive, Second Floor
             Columbia, South Carolina 29204

6            803-806-8222
             jriddle@dml-law.com

7

8

9

10           (INDEX AT REAR OF TRANSCRIPT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1    injury by working with DSS instead of Miracle Hill, is

2    it?

3         A    I don't think that DSS is working with the

4    general public as far as I know.  I thought they were

5    doing like just like -- what's it called when they

6    work with just families?  Like kinship foster care is

7    what I thought.  And also I believe that they're --

8    from what I understood at the time that they were,

9    like, a long, long wait to -- to be able to help DSS.

10   So our understanding was that you could -- you could

11   help faster going with a big agency like Miracle Hill.

12        Q    Let me ask a couple follow-ups just to make

13   sure that I understand what you were saying.

14             So at the time you filed -- well, at the

15   time you applied to Miracle Hill back in, I think it

16   was, the end of April 2019, you -- you're saying now

17   you didn't realize at that time that you could work

18   directly with South Carolina DSS?

19        A    Well, I knew that we could but I had heard

20   that it would take a long time to be able to go

21   through DSS and be able to start helping children.

22        Q    Okay.  Where did you hear that?

23        A    Just general conversation with people that

24   we know.

25        Q    Okay.  And so I guess my question, then, is

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 9

1    if it turns out that was incorrect, if it turns out

2    those people were mistaken and DSS was just as fast as

3    Miracle Hill then it wasn't any disadvantage, it

4    wouldn't have been any disadvantage to work with DSS

5    instead of Miracle will, would it?

6        A    Well, I believe that Miracle Hill provides

7    additional services that are helpful for prospective

8    foster parents.  So, like, we wanted to go with the

9    biggest agency in our area.

10       Q    Okay.  So, yeah, I guess there's -- I guess

11   there's two things there that you felt like you

12   were -- you would have been missing out on.  There was

13   the speed or the length of time it could take to get

14   licensed, and the I guess -- I don't remember the

15   exact phrase you used but, in general, the -- for the

16   services or the types of support available?

17       A    Right.

18       Q    Let's stick with that first one for a

19   second, though, the length of time it takes to get

20   licensed.

21            If it turns out that DSS or other private

22   agencies could get you licensed by the state --

23   because everybody has to be licensed by the state.

24   They're the only ones who can grant the license.  So

25   if it turns out that DSS or another private agency

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 10

1    could have gotten you licensed as fast as Miracle Hill
2    could have done it, then working with DSS or another
3    private agency as far as length of time goes, working
4    with DSS or another private agency wouldn't have been
5    any disadvantage to you, would it?
6         A    Well, the problem with that is that there's
7    a huge number of kids that are with Miracle Hill that
8    need foster homes.  It's advertised regularly on the
9    radio and it was at the time at least around here.  I
10   don't really listen to the radio much now because we
11   don't drive very much because we work from home.
12        Q    Sure.
13        A    But previously it was on the radio about how
14   many homes they needed.  So that was like -- you know,
15   we were hearing it all the time that they needed so
16   many foster parents, so that was our go-to.  Like
17   that's who we knew of and that's who we went with.
18        Q    Do you know whether DSS also has an even
19   larger number of kids in its care that need foster
20   homes?
21        A    I do not.
22        Q    Do you know if anywhere maybe in your
23   Complaint it says that?
24        A    I do not.
25        Q    So let me go back again, though, because I'm

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 11

1    still trying to figure out this piece about the length

2    of time.

3            If DSS or another private agency could have

4    gotten you from application to licensure as fast or

5    even faster than Miracle Hill then there's no time

6    disadvantage, there's no speed disadvantage to working

7    with DSS or another agency, is there?

8        A    I don't know.  Could they have done it as

9    fast?

10       Q    Well, I don't know.  We haven't gotten to

11   talk to DSS yet.  We'll -- there'll be a deposition of

12   DSS folks coming up and we'll be able to find out what

13   they think.

14           But I guess what I'm asking is in the sense

15   of a question, if -- and we'll find out -- if DSS or

16   another private agency could get you from application

17   through licensure as fast or faster than Miracle Hill

18   could have done it then there's no disadvantage to you

19   to working with DSS or another private agency, is

20   there?

21       A    Well, there is still a disadvantage because

22   of the services they're offering by Miracle Hill.

23       Q    And we'll -- yeah, we'll definitely talk

24   about that.

25       A    So you're -- but you're saying there's no

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                    Page 12

 1    disadvantage.  There is --

 2        Q    Okay.

 3        A    -- in my opinion.

 4        Q    I'll rephrase it a little bit more narrowly.

 5        A    Okay.

 6        Q    If it turns out that DSS or another private

 7    agency could get you from application through

 8    licensure as a foster family, a foster parent just as

 9    fast or faster than Miracle Hill could have done it

10    then from a length of time standpoint there is no

11    disadvantage to working with DSS or another private

12    agency, is there?

13        A    I don't know.  I mean, it really depends on

14    if they could have done it as fast.  But it seems

15    irrelevant to me because that's -- that's not who we

16    applied with and Miracle Hill is known to be the

17    largest agency in the state.

18        Q    Right.  And so let me ask the question

19    again, though, because your job is to answer the

20    questions here in a deposition, not to decide if you

21    think it's relevant or not.  And I'm still just trying

22    to get an answer to this.  Let me try to phrase it a

23    different way.

24            In your Complaint you said that one of the

25    disadvantages you suffered by not being able to work

Brandy Welch                              May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 39

1    Twitter?

2         A    I mean, in the last month, zero times.  I

3    used to look at it, I'd say, maybe like once a month,

4    maybe like -- yeah, not very often.

5         Q    How often do you think you post on Twitter?

6         A    It's been a long time.  Not often at all.

7         Q    Okay.  Did you used to be more of an active

8    user?

9         A    I've never really been extremely active.  I

10   used to maybe, like, share stuff that people I

11   followed, like, posted, but I didn't really write my

12   own posts very often.

13        Q    Who -- like what kind of stuff and whose

14   posts would you share?

15        A    I don't recall offhand.

16        Q    Okay.  Have you ever -- on Twitter since

17   applying to Miracle Hill till now, have you ever

18   removed, deleted, or taken down anything related to

19   fostering, foster care, Miracle Hill, or the lawsuit?

20        A    No.

21        Q    Eden doesn't have a Twitter account, does

22   she?

23        A    I don't think so.

24        Q    Do you remember seeing in January, February,

25   March of 2019 -- so this would be the couple of months

Brandy Welch                                                May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                              Page 40

1    leading up to the time you applied to Miracle Hill.

2    Do you remember seeing -- well, let me ask it this

3    way, to back up.  On Twitter do you follow the ACLU or

4    Lambda Legal or organizations like that?

5         A    I know I follow Lambda Legal.  I don't know

6    about ACLU for sure.

7         Q    Okay.  So do you happen to remember back in

8    the first couple of months of 2019 before you applied

9    to Miracle Hill seeing tweets from ACLU, Equality SC,

10   and Lambda talking about how they are looking for

11   people who have applied to Miracle Hill and been

12   turned away; did you ever see any of those?

13        A    No, I didn't follow any of them at that

14   time.

15        Q    Okay.  When did you start following them?

16        A    I would assume that I started following

17   Lambda at some point after we filed the case.

18        Q    Okay.  But you don't remember for sure?

19        A    No, I don't.

20        Q    Okay.  You and -- you and Eden live with two

21   daughters; is that right?

22        A    We have two children, yes.

23        Q    And those are her biological daughters from

24   a prior marriage, right?

25        A    Yes.

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 41

```
 1        Q    Do you have any children, biological
 2   children, of your own?
 3        A    No.
 4        Q    Do you have any children other than those
 5   two?
 6        A    No.
 7        Q    And are -- have you adopted them or you
 8   consider them to be children but have not sort of gone
 9   through the legal process?
10        A    No, because they have a dad so --
11        Q    Okay.
12        A    Yeah.
13        Q    So you are -- I guess you're sort of like a
14   parent figure but in a technical legal sense not a
15   parent of them; is that right?
16        A    Correct.  Sure.
17        Q    And where do y'all live?
18        A    ████████████ █████████
19        Q    Okay.  Where at?  What's your address?
20        A    ███████████████████.
21        Q    Okay.  And I think you-all moved there not
22   too long ago, right?
23        A    In October.
24        Q    Prior to that you were at a house in Taylors
25   that you rented?
```

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 42

1          A    Correct.

2          Q    Okay.  And prior to that a couple -- or I

3    think there were a couple of moves once you came to

4    South Carolina before you got to where you're at now.

5    And you own the house you're at now, right?

6          A    That's correct.

7          Q    Are you taking any medications that could

8    affect or give you any difficulty with your memory

9    today?

10         A    No.

11         Q    Anything else?  Have a sleepless night or

12   anything like that that might affect your ability to

13   remember accurately and testify truthfully today?

14         A    No.

15         Q    Are you taking any prescription medications?

16         A    Yes.

17         Q    I think the audio cut out there.  I

18   couldn't --

19         A    Oh.  Yes, I am.

20         Q    Okay.  What?

21         A    You want the full list?

22         Q    Sure.

23         A    Okay.

24         Q    Well, again, I -- let's start on it and

25   depending on how long it goes, I reserve the right to

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 48

1        Q    Have you ever -- let's say that sort of --
2    that same period of time, let's say the last ten
3    years, have you seen any counselors or therapists?
4        A    Yeah.  Eden and I went to counseling for --
5    this was a few months before we got married.
6        Q    Okay.  And what kind of counseling was it?
7    Was it like pre-marriage counseling?
8        A    Well, I mean, that's what we were using it
9    for.  It was just a regular, like, counselor that we
10   went to see to make sure that like -- like we were --
11   not that we were ready to be married because we were
12   definitely ready but just to work through some, like,
13   communication practicing.  Like she worked through,
14   like, conflict resolution and it was basically just
15   some relationship counseling and stuff.
16       Q    Okay.  Where was that?
17       A    I don't recall.  It was here in Greenville
18   but I don't recall what --
19       Q    That's fine.  I don't need the name.
20       A    Okay.  Yeah.
21       Q    So that would have been in 2015, early 2015,
22   sounds like?
23       A    Yeah, yeah.
24       Q    Anything since then; have you seen a
25   counselor or therapist for anything?

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 49

1          A     No, I haven't.

2          Q     How did you decide to file this lawsuit?

3          A     Eden and I had had a long talk about, like,

4     how we felt afterwards.  And I think, like, honestly

5     for me it was I had never been discriminated against

6     or felt discriminated against in any way basically my

7     whole life.  And I think that that feeling that

8     happened from that like -- and realizing that it's

9     such a marginalized group of people that are even

10    allowed to use Miracle Hill kind of brought us to that

11    conclusion.

12         Q     When you and Eden lived together as a couple

13    in Georgia, you couldn't get married, could you?

14         A     No, we couldn't get married anywhere.  I

15    think when we first lived together -- well, maybe, we

16    could have.  We could have somewhere, yeah.  But, no,

17    we couldn't get married.

18         Q     Not in Georgia, at least?

19         A     Right, yeah, that's true.

20         Q     And you didn't feel like that was being

21    discriminated against?

22         A     Sure.  I mean, yeah.

23         Q     Okay.  That discrimination, though, didn't

24    stop you from moving to South Carolina where you could

25    get married and getting married, right?

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 50

1         A    Right.  I mean, we didn't move to South
2    Carolina so we could get married, though, but, yeah.
3         Q    But when you got here you took advantage of
4    the chance to get married?
5         A    Sure.  Yeah, I mean, you could get married
6    anywhere by the time we lived here.
7         Q    So you moved here before the decision in
8    Obergefell, right?  You moved to South Carolina in --
9         A    Well, we didn't get married until after that
10   decision, though.
11        Q    Okay.
12        A    I don't know -- I don't know timing-wise
13   when we -- if we moved here before or after, but we
14   didn't get married until after.
15        Q    What was the -- what's your anniversary date
16   or the date of your wedding?
17        A    November 11, 2015 -- or November 28th -- I'm
18   sorry -- 2015.  Don't tell Eden.
19        Q    Unfortunately, this is now part of the
20   record.
21        A    Awesome.
22        Q    The good news is let the record reflect you
23   caught your mistake very quickly and it was just a
24   slip of the tongue.
25             But I guess my point was the fact that you'd

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 51

1    been denied the ability to get married by Georgia
2    didn't leave you so scared and afraid that you never
3    got married, did it?
4         A    No, we weren't -- I mean, we weren't trying
5    to get married yet when we lived in Georgia.  Like, so
6    it didn't -- we weren't like -- I mean, obviously we
7    had plans to get married at some point but that wasn't
8    where we were at at that point so --
9         Q    And obviously you didn't go down to the
10   clerk of court in Georgia, ask for a marriage
11   certificate and get told no?
12        A    Right.  I mean, we weren't even in the
13   planning stages of getting married yet.
14        Q    You weren't literally denied but you --
15        A    Correct.
16        Q    A better way to phrase it is the fact that
17   you could not have been, the state of Georgia at that
18   time wouldn't, didn't think you should be allowed to
19   get married, correct?
20        A    Yes.
21        Q    But when the opportunity became available,
22   you took it?
23        A    Once we were ready to get -- I mean, we were
24   ready to get married, not because it was an
25   opportunity to take.

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 52

1      Q    Yeah.  I'll phrase it a little bit
2  differently.  Subsequently when you were ready to get
3  married and you could, you did?
4      A    Yes.
5      Q    So I guess my question is this:  You applied
6  to Miracle Hill and they referred you either to DSS or
7  to, I think, eight other private agencies.  You didn't
8  call any of those other agencies, did you?
9      A    No.
10     Q    And you didn't even look at their websites
11 to see if they would work with you, did you?
12     A    No.
13     Q    And you know that Lisa and Cindy
14 Bovee-Kemper, a same-sex married couple who couldn't
15 work with Miracle Hill, they got licensed as foster
16 parents in South Carolina through some agency, right?
17     A    Yes.  I don't -- I don't know when they did
18 that, though, but, yeah.
19     Q    But at some point in between 2017 and now,
20 they did?
21     A    Right, that's correct.
22     Q    And you want to be a foster parent, right?
23     A    Yes.
24     Q    So why, knowing that there is an opportunity
25 and availability to be licensed as a foster parent,

Brandy Welch                                          May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 57

1       Why don't we go off the record.  Let's take maybe
2       a ten-minute break.  I think that would be ample
3       for me to be ready to go again, and we can come
4       back on in about ten minutes.
5            I'll just remind you, even though we're off
6       the record you're still under oath and the
7       deposition is still open.  So anyone or anything
8       that you talk about or do during the next ten
9       minutes I can still ask you about and you have to
10      tell me.  Once we come back on the record you're
11      still under oath and you still have to keep
12      testifying truthfully.  Sound good?
13           THE WITNESS:  Yep, sounds good.
14           MR. COLEMAN:  Let's go off at 10:07.  We'll
15      be back at 10:17.
16           (Break taken from 10:07 a.m. to 10:18 a.m.)
17           MR. COLEMAN:  All right.  So we're back on
18      the record at 10:18.
19   BY MR. COLEMAN:
20      Q    I think we're -- I think the end is in
21   sight.  I won't keep you here all morning much less
22   all day, but I do have a couple of -- a couple more to
23   ask.
24           When we talked a little bit earlier, I asked
25   you about how you decided -- after receiving the

Brandy Welch                          May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 58

1   e-mail from Miracle Hill in response to your

2   application, I asked you how you decided to file the

3   lawsuit and you talked a little bit about that.  Who

4   did you talk to as you were wrestling through that

5   process?

6        A    Eden.

7        Q    Anybody else?

8        A    That day, no, just Eden and I.  Like, I

9   mean, we talked about it, like about making the

10  decision, like, between the two of us.

11       Q    The decision of whether you wanted to

12  proceed with filing a lawsuit?

13       A    Yeah.

14       Q    How --

15       A    Well, I mean, I don't know if we knew that

16  it was going to be a lawsuit yet but -- but with

17  talking to Currey.

18       Q    Okay.  And don't tell me any conversations

19  you had with Currey or other lawyers.  That's all

20  confidential stuff but --

21       A    Okay.

22       Q    -- I guess I'm kind of just trying to sort

23  of get a sense of -- so you got the e-mail back from

24  Miracle Hill.  And so the first conversations you were

25  having with Eden were -- you said it wasn't

Brandy Welch                                      May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 59

1    necessarily about a lawsuit at that point.  I guess

2    what were you talking through?

3          A    I mean, we talked about how it felt, like,

4    to get that e-mail.  I think, like, I've never -- I

5    guess, like, I've always felt fairly privileged.  I

6    don't think I realized it until this happened that --

7    I don't know, being white and middle class in the US

8    like, you know, I haven't really faced much

9    discrimination, even as being gay for as many years as

10   I have been gay really hadn't run into any issues.

11          But I think it was -- I mean, I instantly,

12   like, felt really sick to my stomach and upset like

13   because it had never happened and I know what kind of

14   parents we are, and I guess I just didn't see it going

15   that way like -- so, yeah, like, we talked about how

16   that felt and what we felt like we should do.

17          Q    Okay.  Whose idea was it, then, to file a

18   lawsuit?

19          A    I mean, it was -- it came to that like

20   having the discussion with Eden and I and Currey.

21          Q    Okay.  And, again, I don't -- I'm not trying

22   to ask a conversation that you had with --

23          A    Sure.

24          Q    But was it -- was it your idea or Eden's

25   idea like -- that you came up with it like we could

Brandy Welch                                           May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 60

1    sue?

2         A    I mean, we, like, just mutually talked about

3    it.   I mean, it wasn't like her idea or my idea.

4    We -- it was a mutual decision that we needed to do

5    something to try and change this so we decided

6    together.

7         Q    Okay.   But it was between the two of you

8    sort of jointly that the idea of filing a lawsuit had

9    its origination; is that right?

10        A    Well, I mean, yeah, yeah.   Well, I mean,

11   we -- like, we talked about what our options would be

12   and obviously a lawsuit is one of those options.   And

13   so, yeah, but that idea originated with us, yes.

14        Q    Did you talk to Cindy or Lisa Bovee-Kemper

15   about it?

16        A    Before or after?

17        Q    Well, let's start with before sending in the

18   application.   Did they know you were applying to

19   Miracle Hill?

20        A    Yeah, they knew we were applying to Miracle

21   Hill.

22        Q    And did they encourage you to do that?

23        A    Yes.

24        Q    Okay.   And they didn't tell you that -- that

25   they knew that Miracle Hill wouldn't work with

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 61

1    Unitarian Universalists or same-sex couples?

2         A    No.  Like they -- like they're the ones who

3    introduced us to Currey so we -- I think we knew that

4    there was a chance, but, like, honestly I still didn't

5    feel like that was ever going to happen just because I

6    know us as parents and I guess I never had really

7    faced a whole lot of rejection in my life.  So, like,

8    I think I knew it was a possibility but I didn't know

9    it was guaranteed by any means.

10        Q    When did they introduce you to Currey?

11        A    I don't recall.

12        Q    Was it before you applied to Miracle Hill or

13   after?

14        A    It was before.

15        Q    And had you talked to -- talked on the phone

16   or e-mails with Currey before applying?

17        A    I believe Eden did.  I don't think that -- I

18   don't recall talking to him beforehand but I think

19   that Eden did.

20        Q    Okay.

21        A    I may have.  I just don't recall for sure.

22        Q    Okay.  Was Currey your first point of

23   contact to the people that eventually became your

24   lawyers?

25        A    Yes.

Brandy Welch                                      May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 73

1    bullet-point list.  I think it was nine other groups.

2    That e-mail never said anything about sexual

3    orientation, did it?

4         A    No, it did not.

5         Q    Or same-sex marriage?

6         A    No, it did not.

7         Q    What is your sexual orientation?

8         A    Lesbian.

9         Q    And you said something earlier this morning.

10   I don't remember exactly what it was.  But you said

11   something to the effect of that you hadn't experienced

12   a lot of difficulty, you led sort of a privileged

13   American upper middle-class lifestyle, and I think you

14   said even after -- even after identified as a gay or

15   lesbian person, which made we wonder, like, at what

16   point -- at what point did you identify as being

17   lesbian?

18        A    Maybe 1998 I think is -- yeah, yeah, that's

19   about -- around that time frame.

20        Q    And give me a ballpark.  Like how old were

21   you at the time?

22        A    Oh, probably 19 or 20.

23        Q    Okay.  I just wasn't sure from your previous

24   answer if there had been a period of life where you

25   did not identify as LGBTQ and then a later period of

Brandy Welch                              May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 74

1    life when you did and sort of when that happened

2    generally.  So around kind of college age, it sounds

3    like?

4          A    (Indiscernible audio.)

5          Q    Your audio cut out again.

6          A    Yes.  Can you hear me?

7          Q    I can now.

8               MR. COLEMAN:  I think those are all the

9          questions I have for right now, though as all

10         lawyers do in all (indiscernible audio), I

11         reserve the right to ask a few more after -- and

12         I think of some more after the other lawyers have

13         their say.  So I'm going to stop for now.

14         Christie may have some questions, Jonathan may

15         have some questions, Susan may have some

16         questions, and you'll answer those.  If I have

17         any follow-ups, I'll ask them then.

18              MS. NEWMAN:  Okay.  Thank you.  This is

19         Christie.  I have no questions.

20              MR. RIDDLE:  This is Jonathan.  I also have

21         no questions.

22              MS. DUNN:  And I'd like to take just a brief

23         break to check in with my colleagues and then

24         come back.  Can we do that?

25              MR. COLEMAN:  What do you think, five

Brandy Welch                                      May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 75

1        minutes?  Ten?

2                    MS. DUNN:  Yeah, I think that's fine.

3                    MR. COLEMAN:  Five minutes?

4                    MS. DUNN:  Yeah.

5                    MR. COLEMAN:  Be back at 10:53-ish?

6                    MS. DUNN:  Okay.  Actually, give me ten.

7                    MR. COLEMAN:  All right.  We'll call it ten.

8                    MS. DUNN:  Okay.  We'll be back then.

9                    (Break taken from 10:48 a.m. to 10:58 a.m.)

10                           EXAMINATION

11   BY MS. DUNN:

12       Q    Brandy, just a few questions.  How did it

13   make you feel to know that your state government was

14   seeking permission to allow Child Placing Agencies to

15   discriminate against people like you?

16       A    It makes me feel like disgusted or really

17   upset because, yeah, I mean, it's -- it's a horrible

18   feeling to feel like people like me -- and by people

19   like me I mean loving parents who already have two

20   children, who are phenomenal humans, aren't given the

21   opportunity to bring children to our house and be able

22   to help them in a way that we would love to be able to

23   do.

24       Q    And, Brandy, when a child is placed in

25   foster care, is it your understanding that it's the

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 76

1    state that is responsible for their care, that they're

2    in the custody of the state?

3        A    Yes.

4        Q    And so that if Miracle Hill is providing

5    services for foster children, they're doing it because

6    it's a government function that they're taking over?

7        A    Right.

8        Q    And when you received the e-mail from

9    Miracle Hill, was your understanding that that e-mail

10   meant that Miracle Hill would not consider your

11   ability to parent?

12       A    Yes.

13       Q    And that Miracle Hill, based upon the

14   information on a simple online filing, decided you

15   were not Christian?

16       A    Yes.

17            MS. DUNN:  I have no further questions.

18                        EXAMINATION

19   BY MR. COLEMAN:

20       Q    I'll have a few follow-ups.  We won't let

21   you -- we won't let you go too early but I think we'll

22   get you out of here in time for lunch.

23            Why don't we do this:  Let me add another

24   exhibit that we can look at together.

25       A    Okay.

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                                    Page 77

1        Q    Give me just a moment to upload it.

2        A    You tell me when you've uploaded it and then

3    I'll refresh on this end.

4        Q    Okay.  It is uploading.  It appears to have

5    completed.

6        A    Okay.

7        Q    I don't see the Exhibit C sticker.  I'm not

8    sure why it didn't appear but it should be marked as

9    Exhibit C.

10       A    Okay.  Well, it's here.

11       Q    Okay.  Well, while you're taking a look at

12   it, let me -- I'll give you a second.

13            MR. COLEMAN:  I'll just ask the court

14       reporter if it's possible afterwards to put the

15       exhibit sticker on.  I must somehow not have

16       clicked the right button in the process but we

17       can fix that afterward.

18            THE COURT REPORTER:  No problem.

19            (Exhibit C, E-Mail Chain, was marked for

20       identification.)

21   BY MR. COLEMAN:

22       Q    Take a minute and look over that.

23       A    Okay.

24       Q    So this is a -- as a PDF it's a five-page

25   printout of an e-mail chain.  If you scroll all the

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 78

1   way down to the original, the oldest e-mail, it starts

2   on Page 3.  You see that?

3       A    Yes.

4       Q    This is the e-mail that you got from Sharon

5   Betts at Miracle Hill on Wednesday, May 1, 2019 in

6   response to the online application form you submitted

7   to Miracle Hill, right?

8       A    Yes.

9       Q    Look for me at the first full paragraph.  It

10  starts off with the salutation, "Dear Ms. Welch and

11  Ms. Rogers," and then I'm going to read from that

12  first paragraph.  "We appreciate your interest in

13  foster care and we hope we can help you find a way to

14  serve foster children in South Carolina."  Did I read

15  that accurately?

16      A    Yes, you did, except "Ms." should be

17  Mrs. and Mrs., but that was her error, not yours.

18      Q    Okay.  A second ago you said that when

19  Miracle Hill responded it was like they wouldn't even

20  consider your ability or your -- your fitness to be a

21  foster parent.  It seems to me, they say:  We

22  appreciate your interest and we hope we can help you

23  find a way to serve foster children.  Right?

24      A    Well, I'll clarify.  They wouldn't consider

25  it with them.

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 79

1        Q    Okay.  If we look a little bit further down
2    in the second full paragraph, let me read the first
3    sentence there.  I'll read the first two.  "You stated
4    in your inquiry that you attend the Unitarian
5    Universalist Church and that you are in agreement with
6    our" -- meaning Miracle Hill -- "doctrinal statement.
7    The Unitarian Universalist Church, however, does not
8    align with traditional Christian doctrine and thereby
9    would not be considered a Christian church."  Did I
10   read that accurately?
11       A    Yes.
12       Q    You and Eden are Unitarian Universalists,
13   right?
14       A    Yes.
15       Q    And I guess let me ask you --
16       A    We go to that church.  I don't know if that
17   makes us Unitarian Universalists but we go to that
18   church, yeah.
19       Q    Okay.  Would you -- would you disagree that
20   you're Unitarian Universalists?
21       A    No.
22       Q    And as I understand it from having looked
23   at -- looked at the Greenville Unitarian Universalist
24   Church website, its doctrinal statement, that sort of
25   thing, looking at the denominational -- the Unitarian

Brandy Welch                                    May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

Page 80

1    Universalist denominational website, it seems to me

2    that it diverges from Christianity in a number of

3    fairly significant ways; do you agree?

4         A    I don't really know.  I mean, I know that

5    anyone -- any religion can go there and feel at home

6    there.  So I guess in that sense that they're open to

7    all religions then that would be different than a

8    Christian church.

9         Q    In the sense --

10        A    Like a purely only Christian church, I

11   guess.

12        Q    Yeah.  In the sense that -- I guess I'll --

13   to use the -- sort of a metaphor, the Unitarian

14   Universalist Church takes the viewpoint that there are

15   many different paths to the top of the mountain that

16   all lead to the same place; is that the idea?

17        A    Yes, yes.

18        Q    And that the Christian faith is a more

19   exclusive religion; it believes that there is only one

20   way to eternal life, salvation, new birth, heaven and

21   the afterlife and that sort of thing, right?

22        A    Correct.

23        Q    So if you've got one group that believes

24   there is only one way and another group that believes

25   no, any way will do, that those are not the same

Brandy Welch                          May 24, 2021
Rogers, Eden, et al v. U.S. Dept. of Health and Hu

                                        Page 81

1    thing?

2         A    That's correct.

3         Q    Okay.  So it's not entirely surprising,

4    then, that Miracle Hill would say if you're a

5    Unitarian Universalist you're not a Christian who's

6    going to mesh well and be a good fit with our beliefs

7    which are -- that are Christian, that there is only

8    one way, right?  That's kind of to be expected that --

9         A    I don't -- I don't actually think -- I don't

10   agree with that, like, because they never asked if we

11   were Christian or not and if we -- and there are

12   Christians that go to Unitarian -- that Unitarian

13   church and they would believe the same thing, that

14   there's only one way as far as their beliefs go.

15        Q    So let me see.  Let me look back at that --

16   that e-mail.

17             So as we said a second ago, right,

18   they've -- they, Miracle Hill, in this e-mail has

19   identified that you attend the Unitarian Universalist

20   Church.  You've agreed that that's where you go, that

21   that describes your -- that you are Unitarian

22   Universalists?

23        A    Yes.

24        Q    And in Miracle Hill's viewpoint, because

25   Unitarian Universalism as a doctrinal system, as a