# EXHIBIT 12

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                      GREENVILLE DIVISION
                Civil Action No. 6:19-cv-01567-JD
3

4      EDEN ROGERS, et al,                )
                                          )
5            Plaintiffs,                  )
                                          )
6      v.                                 )
                                          )
7      UNITED STATES DEPARTMENT OF        )
       HEALTH AND HUMAN SERVICES,         )
8      et al.,                            )
                                          )
9            Defendants.                  )
       _____ )
10
11
12
13

              Videotaped Deposition of SHARON BETTS
14
                    (Taken by Plaintiffs)
15
                     (Taken virtually)
16
                  Tuesday, June 22, 2021
17
18
19
20
21
22
23
24            Reported in Stenotype by
              Christine A. Taylor, RPR
25         Registered Professional Reporter

```
                                                Page 2
 1              REMOTE APPEARANCES
 2     ON BEHALF OF PLAINTIFFS:
 3              Rebecca Schindel, Esq.
                Mika Madgavkar, Esq.
 4              Cravath Swaine & Moore, LLP
                825 Eighth Avenue
 5              New York, New York  10019
                212.474.1459
 6              rschindel@cravath.com
 7              and
 8              Karen Loewy, Esq.
                Lambda Legal Defense
 9              1776 K Street, N.W., 8th Floor
                Washington, DC 20006
10              202.804.6245
11
12     ON BEHALF OF FEDERAL DEFENDANTS:
13              Christie V. Newman, Esq.
                United States Attorney's Office
14              1441 Main Street, Suite 500
                Columbia, South Carolina  29201
15              803.929.3030
                christie.newman@usdoj.gov
16
17     ON BEHALF OF DEFENDANT HENRY MCMASTER:
18              Miles E. Coleman, Esq.
                Nelson Mullins Riley & Scarborough, LLP
19              2 West Washington Street, Fourth Floor
                Greenville, South Carolina  29601
20              864.373.2352
                miles.coleman@nelsonmullins.com
21
22     ON BEHALF OF MIRACLE HILL MINISTRIES AND WITNESS:
23              Steve A. Matthews, Esq.
                Haynsworth Sinkler Boyd
24              1201 Main Street, 22nd Floor
                Columbia, SC  29201
25              smatthews@hsblawfirm.com
```

Page 3

1    VIDEOGRAPHER:

2            Christopher Mills

3

4

5

6

7            DEPOSITION OF SHARON BETTS, a witness called

8    on behalf of Plaintiffs, before Christine A. Taylor,

9    Registered Professional Reporter and Notary Public, in

10   and for the State of South Carolina, taken virtually,

11   on Tuesday, June 22, 2021, commencing at 9:09 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 53

```
 1          A.   I do not know.

 2          Q.   I'm asking this now as your -- as a 30(b)(6)

 3     representative.

 4               MR. MATTHEWS:  Which topic are you relating

 5     this to?

 6               MS. SCHINDEL:  Topic 4.

 7               MR. MATTHEWS:  Benefits of foster parents?

 8               MS. SCHINDEL:  I'm sorry.  I didn't catch

 9     that.

10               MR. MATTHEWS:  Topic 4 relates to the

11     benefits, support and services Miracle Hill provides.

12               MS. SCHINDEL:  That's right.

13               MR. MATTHEWS:  And this is to foster parents

14     and a question about which churches they recruit in

15     related to benefits provided to foster parents?

16               MS. SCHINDEL:  To prospective and current

17     foster parents, that's right.

18               MR. MATTHEWS:  I'm going to object to that.

19     It's not within the confines of that topic.  She's free

20     to answer, but I will object to it being considered a

21     Miracle Hill response.

22               MS. SCHINDEL:  I'm sorry, Mr. Matthews, for

23     some reason you're coming in a little bit muffled.

24               MR. MATTHEWS:  I'm sorry.  Let me move a

25     little bit closer.  I will object to that question as
```

Page 54

```
 1    being outside the bounds of topic 4.  She's free to
 2    answer the question, but I will object to it being
 3    considered as a response on behalf of Miracle Hill
 4    Ministries.
 5            BY MS. SCHINDEL:
 6        Q.  Okay.  So let's start with answering the
 7    question as the representative of Miracle Hill
 8    notwithstanding the objection, and then you can answer
 9    again in your individual capacity.
10        A.  And the question again, please.
11        Q.  So in a 30(b)(6) capacity as a representative
12    of Miracle Hill, I'm asking has Miracle Hill ever
13    attended a non-Protestant church for purposes of
14    recruitment?
15        A.  I do not know.
16        Q.  You are not aware of a representative of
17    Miracle Hill that has ever attended a
18    non-Protestant church --
19        A.  I am not aware.
20        Q.  And now I'm asking in your individual
21    capacity.  Are you aware of whether anybody from
22    Miracle Hill has ever conducted recruitment in a
23    non-Protestant church?
24        A.  I am not aware.
25        Q.  Meaning you are not aware of anybody having
```

```
                                            Page 55
 1   done so?
 2       A.   Yes.
 3       Q.   Okay.  Does Miracle Hill support foster
 4   families during the application and licensing process?
 5       A.   Yes.
 6       Q.   How does Miracle Hill do that?
 7       A.   Miracle Hill provides all of the application
 8   paperwork.  Miracle Hill has ongoing conversations and
 9   phone calls, e-mails, contact with that family.
10   Miracle Hill submits a fire inspection request to the
11   state fire marshal's office.  Miracle Hill provides
12   e-mail links to specific trainings that the foster
13   parents must complete.  And Miracle Hill conducts the
14   two home study visits that I previously referenced.
15       Q.   Is that the extent of the support that
16   Miracle Hill provides to prospective foster families
17   during the application and licensing process?
18       A.   We could add things such as prayer support.
19   We could add things if they needed a bed, dresser,
20   things like that.  They can request that to see if we
21   have availability to help them provide that.
22       Q.   Does Miracle Hill provide support to foster
23   families after they are licensed?
24       A.   Yes.
25       Q.   What support do they provide?
```

Page 56

1          A.  They, again, offer prayer and encouragement.

2    They also are required by state DSS to conduct regular

3    ongoing visits to the foster home.  Phone calls,

4    e-mails, maintaining a family file, child file, per DSS

5    request.  They help to establish an individual service

6    plan for the child.  They give resources to community

7    events activities, educational support, and contact

8    with DSS case workers regarding the needs of the child.

9          Q.  You said they give resources to community

10   events activities, what does that mean?

11         A.  From time to time there may be a donor who

12   give us tickets to an event such as the Children's

13   Museum in the upstate.  We often are invited by various

14   churches for other kinds of places like that would

15   invite us to a -- an event that they were holding for

16   foster families or just in general to support children.

17         Q.  You said we're often invited by various

18   churches or places like that.  What other than

19   churches are you referring to?

20         A.  There might be some community type

21   organizations, the Lion's Club, et cetera.

22         Q.  And in your previous answer, you also

23   mentioned support, that you provide educational

24   support.  What does that mean?

25         A.  We have a person on our staff who does

Page 57

1  research connections with the local -- specifically
2  Greenville County School District, in helping to find
3  resources for children that may have educational needs.
4  It might be tutoring.  It might be helping them as a
5  foster family deals with Individual Educational Plan
6  meeting.
7       Q.  And is that sort of service required by DSS?
8       A.  No.
9       Q.  Do all child placing agencies provide that
10  service?
11       A.  I do not know.
12       Q.  Are you aware of other child placing agencies
13  that provide that service?
14       A.  No.
15       Q.  And the community events that we spoke about
16  a few moments ago, tickets to museums or access to
17  other community spaces, is that sort of service
18  required by DSS?
19       A.  No.
20       Q.  Do all other CPAs provide that benefit?
21       A.  I do not know.  I do know some do.
22       Q.  Which -- which do?
23       A.  Personally, I'm aware of Thornwell and Connie
24  Maxwell.
25       Q.  And what are you aware of when you say --

                                                                Page 58
1    what are you thinking of when you say that they
2    provide these benefits?
3         A.   Thornwell had foster families to the
4    Greenville Drive baseball game.  Connie Maxwell has
5    donors who also give various items as well as tickets
6    to events.
7         Q.   Are you aware of any other CPAs that provide
8    similar benefits?
9         A.   Not personally.
10        Q.   We mentioned earlier in our -- in this
11   deposition that Miracle Hill has a position known as a
12   placement coordinator; is that right?
13        A.   I'm sorry?
14        Q.   Miracle Hill has a position known as a
15   placement coordinator?
16        A.   Yes.
17        Q.   What is a placement coordinator?
18        A.   A placement coordinator works with the
19   placement units of each of the regions -- regions of
20   DSS.  They are sent universal applications from DSS and
21   they look through those applications.  They look at our
22   available families to see if we have a family that
23   would be suitable and appropriate for the needs of
24   those children.  That coordinator then discusses all of
25   those universal applications with a supervisor and then

Page 95

1     statement in their belief and in their practice.

2         Q.   Right.  So if they agreed with the statement

3     in their belief and in their practice but identified

4     as LGBTQ, Miracle Hill would work with that individual

5     or would not?

6         A.   Individually, I'm going to answer that as that

7     is not in my scope of making that decision.

8         Q.   But part of your job is handling inquiries;

9     right?

10        A.   Yes.  I review --

11        Q.   I'm sorry?

12        A.   I review them.

13        Q.   And so what would you do with an inquiry from

14    somebody who says that they are -- identifies as LGBTQ

15    but are not in a same-sex relationship and do not

16    intend to enter one?

17        A.   I would take it to my supervisor.  I would

18    also look it over for the sake of are they attending a

19    Christian church, do they have -- do they have a

20    personal -- are they following Christ on a daily basis.

21        Q.   And if an individual identified as LGBTQ and

22    followed Christ on a daily basis and was willing to

23    sign the doctrinal statement and was not in a same-sex

24    relationship, would that person be approved?

25        A.   Speaking personally, that's a lot of ifs, and

```
                                            Page 96
 1   I do not make those type of decisions.
 2        Q.  When you say "that's a lot of ifs," do you
 3   mean that you don't think that person could exist?
 4        A.  No, I'm not saying that.
 5        Q.  So if someone is willing -- identified as
 6   LGBTQ, is willing to sign the doctrinal statement,
 7   attends church, and is in a relationship -- a romantic
 8   relationship of the same sex but no sexual contact,
 9   would that person be able to work with Miracle Hill?
10            MR. MATTHEWS:  I'm going to object.  The
11   witness has testified in that situation she would take
12   it to a higher official inside Miracle Hill Ministries
13   and she is not here to testify on topic 1.
14            MS. SCHINDEL:  I'm asking in her individual
15   capacity.  And I actually think this is a slightly
16   different question than the one --
17            MR. MATTHEWS:  But you asked her what would
18   Miracle Hill would do.  And she has told you what she
19   would do, which is take it to a higher official inside
20   Miracle Hill.  I don't mean to be difficult and
21   argumentative, but this is going way outside the scope
22   of what she's here for.
23            BY MS. SCHINDEL:
24        Q.  All right.  Let's move on for now.
25            Since 2017, how many families have been
```

Page 97

1    turned away because of their faith or lack thereof or

2    because they're in a same-sex relationship?

3            And I ask this as a representative of Miracle

4    Hill.  I'm sorry, I'm going to stop sharing my screen.

5        A.  I do not have a specific number.

6        Q.  And does Miracle Hill keep this information

7    anywhere?

8        A.  Yes.  There would probably be hard copies of

9    those inquiries, but I do not know that it would be

10   kept in any kind of a format or report of any kind.

11       Q.  So topic 9, for which you were designated,

12   was prospective foster families who are not accepted

13   by Miracle Hill because of their religion or lack

14   thereof or same-sex relationship or LGBTQ status.  So

15   did you undertake any effort to ascertain how many

16   families have been turned away because of their faith

17   or lack thereof or because they're in a same-sex

18   relationship?

19       A.  Yes.  I did look at some of those hard copies

20   of those inquiries.

21       Q.  And so how many families have been turned

22   away on these bases?

23       A.  I don't have a specific number.  I will use an

24   approximate number, 25 to 30.

25       Q.  And this is 25 to 30 since 2015 -- excuse

Page 98

1    me -- since 2017, or is this a different time frame?

2         A.  Yes, during that -- during that time frame.

3         Q.  So how many of those individuals or families

4    that were turned away were Catholic?

5         A.  As I said, I don't have the specifics, so I

6    would say majority.

7         Q.  Majority.  And do majority mean more than

8    half or does it mean most?

9         A.  More than half.

10        Q.  And how many were non-Christian of the

11   remaining -- so setting apart the Catholics, how many

12   were non-Christian?

13        A.  Again, I don't have the specific numbers.

14        Q.  Do you have an approximation?

15        A.  Five.  Five to seven.

16        Q.  And then how many prospective foster parents

17   were turned away because they were LGBTQ?

18             MR. COLEMAN:  This is Miles.  Object to the

19   form of the question.  If you know, you can answer.

20             THE WITNESS:  So anybody who is -- did not

21   follow Jesus, did not agree to the doctrinal statement,

22   did not attend a Christian church would be directed to

23   another agency, another child placing agency.

24             BY MS. SCHINDEL:

25        Q.  Right.  But they wouldn't be able to work

```
                                                  Page 99
 1    with Miracle Hill?

 2         A.   Right.

 3         Q.   So how many of the people that were told they

 4    could work with Miracle Hill, how many of those

 5    prospective foster parents were LGBTQ?

 6              MR. MATTHEWS:  Object to the form of the

 7    question.  This is Steve Matthews.  Are you saying how

 8    many of them were LGBTQ or how many were rejected

 9    because they were LGBTQ.

10              BY MS. SCHINDEL:

11         Q.   That's a fair question.  So let's start with

12    how many were rejected because they were LGBTQ?

13         A.   I don't know.  No more than one.

14         Q.   No more than one?

15              MR. MATTHEWS:  I believe you all may have

16    misheard each other.  You may want to ask her to repeat

17    that answer.

18              BY MS. SCHINDEL:

19         Q.   How many of the families that were turned

20    away from working with Miracle Hill as the prospective

21    foster parents, how many of those individuals or

22    families were turned away because they were LGBTQ?

23         A.   I don't recall that -- not just for that, no

24    not -- not for that.

25         Q.   Miracle Hill has never turned away a foster
```

Page 100

1    family because they were LGBTQ?

2        A.   I personally am not aware of that.  And so it

3    may have been a discussion higher than me, but I don't

4    have knowledge of that.

5        Q.   But you testified earlier that a person who

6    is LGBTQ would not be able to work with Miracle Hill

7    under the tenets of the doctrinal statement; is that

8    right?

9            MR. COLEMAN:  Object to form of the question.

10   Misstates prior testimony.

11           BY MS. SCHINDEL:

12       Q.   Sorry.  When -- you still have to answer the

13   question.

14       A.   I'm sorry.  The question again.

15       Q.   When -- as I understood your testimony

16   earlier, you said that if somebody -- that somebody

17   who is LGBTQ would not comply -- comport with Miracle

18   Hill's doctrinal statement would not be able to work

19   with Miracle Hill; is that right?

20           MR. COLEMAN:  Same objection.

21           THE WITNESS:  The three things I mentioned

22   before, if they were following Christ, if they agreed

23   to the doctrinal statement, and they attended a

24   Christian church.

25           BY MS. SCHINDEL:

1        Q.   Right.  Would somebody who is in a same-sex

2    relationship be able to work with Miracle Hill as a

3    prospective foster parent?

4        A.   I keep going back to the three things that are

5    required.  Following Christ, agreeing and practicing --

6    belief and practice of the doctrinal statement, and

7    attending a Christian church.

8        Q.   I'm going to insist that you answer the

9    question, which is:  Would somebody who's in a

10   same-sex relationship be able to work with Miracle

11   Hill as a prospective foster parent?

12            MR. MATTHEWS:  I'm going to object to the

13   form.  Are you asking would they be able to or would

14   Miracle Hill be willing to accept them?  I just want to

15   make sure that the question is clear.  Is it -- would

16   the couple be willing to or would Miracle Hill be

17   willing to?  And if it's the latter, I'm going to

18   restate my earlier objection that that's outside the

19   scope of this witness's 30(b)(6) testimony.

20            BY MS. SCHINDEL:

21       Q.   Let's try it this way.  Before a few minutes

22   ago I was asking how many individuals were turned away

23   because they were LGBTQ.  So let me ask this:  How

24   many individuals were turned away as prospective

25   foster parents, how many of those were LGBTQ?

Page 102

1        A.   I only saw four.

2        Q.   Four.

3        A.   That inquired.

4        Q.   And has Miracle Hill ever worked with someone

5    who is LGBTQ?

6        A.   No.

7        Q.   And is a person who is LGBTQ compliant --

8    would such a person be able to comply with the

9    doctrinal statement?

10           MR. MATTHEWS:   Same objection with regard to

11    topic 1.

12           BY MS. SCHINDEL:

13        Q.   You still have to answer, Ms. Betts.

14        A.   No.

15        Q.   Okay.  Of the families that were -- that were

16    rejected by Miracle Hill prospective foster parents

17    because of their religious beliefs or sexual

18    orientation, did those families go on to approach

19    other CPAs?

20        A.   So tell me your understanding -- or what

21    you're asking -- rejected those words that were in that

22    middle of that question.

23        Q.   So we were just asking about and we were

24    talking about families that Miracle Hill has rejected

25    or turned away because of their faith or lack thereof

```
                                                Page 103
 1   or because they are in a same-sex relationship?
 2        A.   They were directed elsewhere.
 3        Q.   Right.  Did Miracle Hill know whether any of
 4   those families or individuals went on to actually
 5   approach another CPA?
 6        A.   No.  I don't know how we would know that.
 7        Q.   Does Miracle Hill follow up or track what
 8   happened to these parents in any way?
 9        A.   No, not usually.
10        Q.   And when you say "not usually," what do you
11   mean by that?
12        A.   Once we -- once we let them know and give them
13   a list or other child listing agencies to pursue
14   licensure with, we do not follow up with those
15   families.
16        Q.   Has any other CPA contacted Miracle Hill
17   about families that Miracle Hill had turned away or
18   refused to work with?
19        A.   Are you asking that from me personally or are
20   you asking that on behalf of Miracle Hill?
21        Q.   On behalf of Miracle Hill.
22        A.   None that we're aware of.
23             (Exhibit 12 marked for identification.)
24        Q.   Let's mark Tab 22 which is 12850.  This is
25   Exhibit 12.
```

Page 104

1        A.   That number again, please.

2        Q.   It's 12850.   This is Exhibit 12.   Do you have

3    the document in front of you?

4        A.   Yes.

5        Q.   Okay.   This is Exhibit 12.   It's

6    MIRACLE_HILL_SUBP_012850 to 51.   And this is an

7    e-mail, the top e-mail is from Brenda Parks to Reid

8    Lehman and Ken Kruithof copying you and Jason Mowen,

9    and the subject is foster parent inquiry, the

10   importance is marked high.   Do you recognize this

11   e-mail?

12       A.   Yes.

13       Q.   And do you -- and then the e-mail below is an

14   e-mail from you to a redacted individual or

15   individuals; is that right?

16       A.   Correct.

17       Q.   Did you send and receive these e-mails in the

18   ordinary course of your work at Miracle Hill?

19       A.   Yes.

20       Q.   And in the e-mail at the top, Ms. Parks

21   explain that Miracle Hill received an inquiry from a

22   same-sex couple for the foster parent program.   And

23   she says that you did a Facebook check for the couple

24   and was able to find one of them; is that right?

25       A.   Yes.

1          A.   To let her know what I had already -- what I
2     already was asking for and what was my response going
3     to be.
4          Q.   When you say "what was my response going to
5     be," you mean what would your response be going
6     forward if the couple sent their testimony and their
7     church denomination?
8          A.   Well, she includes in her e-mail "if they do
9     respond, we will need to discuss how you would have us
10    to reply."
11         Q.   And did that discussion take place?
12         A.   Not that I recall.
13         Q.   Do you recall what happened with this
14    inquiry?
15         A.   My recollection, they did not respond.
16         Q.   So I do think I need to go back and make sure
17    I understand.  Why did you send this inquiry to
18    Ms. Parks?
19         A.   This is an e-mail.  This is not the actual
20    inquiry.  The actual inquiry is not attached here
21    because, as I said, she has privy to that just like I
22    do.  I sent this -- yeah.
23         Q.   Why did you send this e-mail to Ms. Parks?
24         A.   I wanted her to be able to see what I was
25    asking for and what was missing in the inquiry if she

Page 112

1   had not noticed it missing.

2       Q.  But you wouldn't have sent this -- we are

3   going a little bit in circles.  You've testified that

4   you would not have sent this to Ms. Parks if this had

5   come from a couple that was not same sex.

6       A.  Okay.

7       Q.  I understand --

8       A.  I think I also testified that it was because

9   we believed that to have the same -- that their names

10  led us to believe that they were two women.

11      Q.  So --

12      A.  I think I've answered that a couple of times.

13      Q.  So I suppose my question is:  Do you feel

14  that -- were you asking whether Miracle Hill would be

15  able to accept these -- this couple if they were same

16  sex regardless of what they sent you if they sent a

17  testimony and a -- and a church denomination that

18  otherwise satisfied Miracle Hill's requirements?

19      A.  Yes.

20      Q.  Thank you.  And would Miracle Hill have been

21  willing to work with those women if they sent a

22  testimony and church denomination that otherwise

23  satisfied Miracle Hill's requirements?

24          MR. COLEMAN:  Object to the form.  Clarify,

25  are you asking individually or what capacity you're

```
                                                Page 113
 1    asking that?

 2              BY MS. SCHINDEL:

 3         Q.  You can answer the question.

 4              MR. COLEMAN:  Sorry, my objection may not have

 5    been clear.  Are you asking her in her individual

 6    capacity or in her 30(b)(6) designee capacity?

 7              BY MS. SCHINDEL:

 8         Q.  I'm asking you if you think Miracle Hill --

 9    if you understand whether Miracle Hill would have been

10    willing to work with those women if they had otherwise

11    sent a church denomination and a testimony that

12    satisfied Miracle Hill's requirements?

13         A.  I would say no.

14              (Exhibit 13 marked for identification.)

15         Q.  All right.  Let's mark Tab 66 and this is

16    6977.  Do you have the document?

17         A.  Yes.

18         Q.  This is an undated note that is signed by you

19    which appears to be a summary of a conversation that

20    you had with Brandy Welch on April 11, 2019.  It's

21    Bates stamped MIRACLE_HILL_SUBP_006977 and it is

22    Exhibit 13.  Have you seen this document before?

23         A.  Yes.

24         Q.  Did I describe it accurately?

25         A.  Yes.
```

1          Q.   Did you draft and sign this note?

2          A.   I did.

3          Q.   When did you draft and sign this note?

4          A.   I do not have a date written on it.  I'm going

5     to approximate it either April 11 or April 12 of 2019.

6          Q.   And why did you sign it?

7          A.   Because I used the word "I" throughout the

8     document and I wanted it to be known who was writing

9     it.  And we sign -- we sign all documents typically in

10    the course of our work.

11         Q.   Do you -- why did you draft this note?

12         A.   I drafted this note to help me recall my

13    conversation with Ms. Welch if she did complete an

14    inquiry.

15         Q.   And is that your typical --

16         A.   No.

17         Q.   So why did you do it in this instance?

18         A.   I felt the type of questions that she was

19    asking me were not our typical questions that we get

20    from prospective foster parents who are interested in

21    working with Miracle Hill.  When I get -- reiterated to

22    her that Miracle Hill was a Christian ministry and we

23    viewed our work as a religious exercise and want those

24    who work with us to share our mission, motivation, and

25    beliefs, she continued to ask kind of the same question

Page 115

1    over again.  And, again, I felt there was much more --

2    perhaps something behind what she was asking, and I

3    just wanted to have something to go back to if she did

4    inquire.

5          Q.  So in the call Ms. Welch expressed her

6    family's interest in serving as a foster care family;

7    is that right?

8          A.  That was -- that was stated in a voicemail

9    message that I was then forwarded from a receptionist.

10          Q.  And she stated that she -- so in the

11    voicemail she stated that she was interested in foster

12    care and then you called her; is that right?

13          A.  Yes.

14          Q.  And did she reiterate that point during the

15    phone call?

16          A.  She said that she and her family were

17    interested in foster care.

18          Q.  And she said that she has a wife and she

19    asked if she would be disqualified based on your

20    website; is that right?

21          A.  She said she had a wife and then she asked a

22    question, did our website indicate what type of

23    families we work with.

24          Q.  So -- right.  And so -- and then she asked if

25    she would be disqualified; is that right?

Page 133

1    Miracle Hill staff as far up in the chain of command as

2    Reid Lehman.

3         Q.  And what were those conversations?

4         A.  I do not recall other than just a discussion

5    of what a Universalist -- Unitarian Universalist Church

6    would believe and whether it was considered a Christian

7    church.

8         Q.  So Miracle Hill's rejection of Ms. Welch and

9    Ms. Rogers is squarely within topic 9 of the

10   designated topics.  So I do need to understand Miracle

11   Hill's basis for this letter and this communication.

12        So why did Miracle Hill tell Ms. Rogers and

13   Ms. Welch that the Unitarian Universalist Church is

14   not considered a Christian church?

15        A.  Because the Unitarian Universalist Church

16   would not claim to be a Christian church.

17        Q.  And --

18        A.  Their doctrine would not -- their doctrine

19   would not align with our doctrine.

20        Q.  How did Miracle Hill come to that conclusion?

21        A.  I do not know.

22        Q.  You are the person designated most

23   knowledgeable on this topic; is that right?

24        A.  Yes.  I also believe Reid Lehman spoke on

25   Thursday to point number 1 in the deposition about that

Page 134

1    specific --

2        Q.   No.   This is not -- this is not topic number

3    1.   This is topic number 9.

4        A.   Okay.

5        Q.   So how did Miracle Hill come to the

6    conclusion that the Universalist Unitarian -- or the

7    Unitarian Universalist Church is not a Christian

8    church?

9        A.   I'm going to say either personal knowledge

10   and/or research by looking it up as to what their

11   doctrinal statement would include.

12       Q.   If an applicant went to a Methodist church

13   and the spiritual leader of that church performed

14   same-sex marriages, would you reject the application

15   of a member of that church even if the member agreed

16   with the doctrinal statement?

17       A.   If they are active in a Christian church, if

18   they are -- can adhere to the doctrinal statement in

19   faith and practice and if they can give a personal

20   testimony that they're following Christ, they could be

21   considered.

22       Q.   Even if the spiritual leader of that church

23   engaged in practices that would not adhere to the

24   doctrinal statement?

25            MR. MATTHEWS:   Object to the form.

```
                                                    Page 135
 1            BY MS. SCHINDEL:
 2       Q.  You can still answer the question.
 3       A.  Okay.
 4            MR. MATTHEWS:  Yeah, I'm sorry.
 5            THE WITNESS:  Yes.
 6            BY MS. SCHINDEL:
 7       Q.  So why then if Ms. Rogers and Ms. Welch told
 8   Miracle Hill that they adhered to the doctrinal
 9   statement did it matter that they went to a church
10   that might not in all forms align with the doctrinal
11   statement?
12       A.  No.  As it's stated in this letter is that the
13   Unitarian Universalist Church is not considered a
14   Christian church.
15       Q.  So if Ms. Rogers and Ms. Welch attended a
16   different church, say a Methodist church and agreed
17   with doctrinal statement and everything else about
18   their application was the same, would Miracle Hill
19   have accepted their application?
20            MR. COLEMAN:  This is Miles.  Object to the
21   form of the question.
22            BY MS. SCHINDEL:
23       Q.  You can still answer.
24       A.  No, I do not believe they would.
25       Q.  Why is that?
```

1          A.   Because they are in a practicing -- that would
2     not agree with our doctrinal -- in a practice that
3     would not agree with our doctrinal statement.
4          Q.   And what practice is that?
5          A.   That they are a same-sex married couple.
6          Q.   Did you note to Ms. Welch and Ms. Rogers when
7     rejecting their foster application that their --
8     excuse me.
9               Did the note to Ms. Welch and Ms. Rogers
10    rejecting their foster application cite the fact that
11    they're a same-sex couple as an additional reason for
12    their rejection?
13         A.   No.
14         Q.   Why not?
15         A.   Based --
16              MR. MATTHEWS:  To the extent it involves
17    privileged communication, I'll object.  To the extent
18    it doesn't, feel free to answer.
19              BY MS. SCHINDEL:
20         Q.   Go ahead.
21         A.   Based on conversations and understanding from
22    legal counsel, I cannot --
23              MR. COLEMAN:  Objection.
24              MR. MATTHEWS:  Object.  If that's where the
25    answer is going, I'll object and assert privilege and

Page 137

1    direct her not the answer.

2              BY MS. SCHINDEL:

3         Q.  So let me ask this -- and feel free to pause

4    to the extent your counsel has any objection -- do you

5    have any understanding as to why -- does Miracle Hill

6    -- I'm asking you as a representative for Miracle

7    Hill.  Does Miracle Hill have any understanding as to

8    why Ms. Welch and Ms. Rogers rejection letter, the

9    letter to them rejecting their foster application does

10   not cite the fact that they are same-sex couple as an

11   additional reason for their rejection other than

12   communications with legal counsel?

13             MR. MATTHEWS:  Just to make sure I understand.

14   You're asking if --

15             MS. SCHINDEL:  I'm asking does Miracle Hill --

16             MR. MATTHEWS:  -- of any reason why same-sex

17   couple was not included in the letter for any reason

18   other than communications that involved legal counsel;

19   is that correct?

20             MS. SCHINDEL:  Not quite.

21             BY MS. SCHINDEL:

22        Q.  Does -- the question is:  Does Miracle Hill

23   have any knowledge as to why or have any -- yes.  Does

24   Miracle Hill have any knowledge as to why Ms. Welch

25   and Ms. Rogers, the rejection letter did not cite the

                                                      Page 138

1    fact that they were a same-sex couple as an additional

2    reason for the rejection that is based on anything

3    other than communications with legal counsel?

4              MR. MATTHEWS:  To the extent that you

5    clarified it that way, excluding any discussions,

6    whatever, with legal counsel, if there is any other

7    understanding, you're free to conditions answer the

8    question.  But, again, if it involved the discussions

9    with legal counsel, then you're not.

10             THE WITNESS:  No, we're not aware.

11             MS. SCHINDEL:  So I realize it's a little

12   after 1:00.  I'm happy to take a lunch break if that

13   would be amenable to others or we're happy to keep

14   going.

15             MR. MATTHEWS:  Probably now is a good time.

16             THE WITNESS:  Now is a good time.

17             MS. SCHINDEL:  I believe last time we did

18   45 minutes.  Is that still a good time?

19             MR. MATTHEWS:  Yesterday we found out so we

20   don't underestimate it --

21             (Off-the-record discussion.)

22             MR. MATTHEWS:  Is an hour okay?

23             MS. SCHINDEL:  That's perfectly fine.  We'll

24   see you back at 2:05.

25             THE VIDEOGRAPHER:  Off the record at 1:05.

```
                                               Page 139
 1          (Recess taken from 1:05 p.m. until 2:16 p.m.)
 2              THE VIDEOGRAPHER:  On the record at 2:16.
 3              BY MS. SCHINDEL:
 4         Q.  Ms. Betts, does Miracle Hill assign mentors
 5    to work with foster children?
 6         A.  No.
 7         Q.  Does Miracle Hill work with mentors?
 8         A.  We no longer work with mentors.  We have in
 9    the past.
10         Q.  When did Miracle Hill stop working with
11    mentors?
12         A.  December of 2020.
13         Q.  And were those -- I'm just adjusting my
14    camera so it's not just my forehead.
15         A.  That's helpful.  Thank you.
16         Q.  Were those -- were those mentors working with
17    foster children or just within Miracle Hill's group
18    homes?
19         A.  I am unaware of any foster children that they
20    were working with.  Mostly it was group home related.
21         Q.  Got it.  And is it your understanding that
22    Miracle Hill will work now with -- well, let me phrase
23    this.  Was it your understanding at some point Miracle
24    Hill determined that it would be willing to work with
25    Catholic individuals who wanted to serve as mentors or
```

1    prospective foster parents if those individuals were

2    willing to serve -- willing to sign the doctrinal

3    statement?

4        A.  Yes.

5        Q.  And is it your understanding that the

6    doctrinal statement sets out Evangelical beliefs?

7        A.  Yes.

8        Q.  Do you -- do you think that all Catholics

9    would be able to sign the doctrinal statement?

10       A.  I do not know.

11       Q.  Do you -- do you think that some people

12   adhering to Catholic faith would be unable to sign the

13   doctrinal statement?

14           MR. COLEMAN:  This is Miles.  Object to the

15   form of the question.

16           BY MS. SCHINDEL:

17       Q.  You can still answer.

18       A.  I do not know that answer either.

19       Q.  Has Miracle Hill always been willing to work

20   with Catholic individuals as prospective foster

21   parents?

22       A.  No.

23       Q.  Do you know when the policy changed?

24       A.  May of 2019.

25       Q.  Are you familiar with a lawsuit brought

Page 167

1  orientation but never completed an application.  We

2  have received one application from a Catholic couple

3  from Heartfelt Calling, but they have not -- again,

4  they have not registered for an orientation.

5      Q.  Okay.  So, unfortunately, for some reason --

6  it must be the servers because exhibit share

7  completely isn't working.  So I'm going to again

8  screen share the document that you have in front of

9  you.  So give me one moment.  So this is -- this is

10  Exhibit 23 and it's Bates stamped

11  MIRACLE_HILL_SUBP_004958 to 962.  And it is a -- it

12  appears to be an inquiry form that Miracle Hill

13  received from applicant which you then forwarded to

14  Brenda Parks, and she responded to your e-mail.  Is

15  that all right?

16      A.  Yes.

17      Q.  Do you recognize this document?

18      A.  I've seen it.

19      Q.  And were your e-mails and inquiry sent and

20  received in the normal course of your business at

21  Miracle Hill?

22      A.  It was.

23      Q.  So this inquiry is from an applicant that

24  indicated that she attended Catholic church; is that

25  right.  I'm looking particular at the page ending in

Page 168

1    4960.

2        A.   Yes.

3        Q.   So why did you forward this inquiry to Brenda

4    Parks?

5        A.   I do not recall.

6        Q.   Did you send -- this is from February 26,

7    2020.  At this point Miracle Hill was working with

8    had -- was willing to work with Catholic applicants

9    provided they met all of Miracle Hill's other

10   requirements; is that right?

11       A.   Yes, that they could sign the doctrinal

12   statement in belief and practice and be a follower of

13   Jesus.

14       Q.   At this point were you sending all

15   applications from Catholic families to Ms. Parks?

16       A.   This was an inquiry.  And I do not recall how

17   many inquiries would have come from the time that

18   policy was changed in May of 2019 up until this date of

19   2/26/2020.

20       Q.   So let me try re-asking that you're right, it

21   is an inquiry.  At this point, to your knowledge, were

22   you forwarding all inquiries from Catholic applicants

23   or Catholic individuals who indicated they were

24   interested in fostering with Miracle Hill, were you

25   forwarding all such inquiries to Ms. Parks?

Page 169

1          A.   I do not recall.

2          Q.   Do you have -- I'm going to stop sharing if

3     that's okay.  Do you have any reason to believe that

4     there were inquiries you received from Catholic

5     families that you did not forward to Ms. Parks?

6          A.   Perhaps.

7          Q.   Okay.  So when there is a prospective foster

8     parent with whom Miracle Hill will not work because of

9     that individual's religious beliefs or sexual

10    orientation, did Miracle Hill refer that prospective

11    foster family or parent to another CPA?

12         A.   Again, we would look at whether the person was

13    attending a Christian church, whether they could sign

14    the doctrinal statement and -- in faith and practice,

15    and that they were a follower of Jesus.  If one of

16    those three were not there, not yes answers, then we

17    would refer them to another CPA.

18         Q.   And just to be clear, when you say whether

19    they could sign the doctrinal statement in faith and

20    in practice, that's based in part on Miracle Hill's

21    assessment on whether they would be able to sign the

22    doctrinal statement in faith and in practice, right,

23    not just whether they assert that they are able to

24    sign the doctrinal statement in faith and in practice;

25    is that right?

Page 170

1      A.  Again, asking those four questions that are
2   asked of all applicants.
3      Q.  And based on Miracle Hill's assessment,
4   following those four questions, if Miracle Hill
5   determines that it's unwilling to work or unable to
6   work with any given individual because of that
7   individual's religious beliefs or sexual orientation,
8   Miracle Hill would then refer those individuals along
9   to other CPAs; is that right?
10      A.  Because of their religious beliefs, yes, we
11   would refer them to other CPAs.
12      Q.  Well, just -- so it's not necessarily because
13   of their religious beliefs, it's because their
14   practices may not align with Miracle Hill's doctrinal
15   statement; right?
16      A.  Correct.
17      Q.  So -- okay.  And did Miracle Hill always send
18   the individuals to the same -- refer the individuals
19   to the same set of CPAs or did it vary depending on
20   the family with whom you're engaging?
21      A.  It probably varies on when I'm answering the
22   e-mail.  I often give them a large variety and
23   sometimes, as you've noticed in some of the e-mails, I
24   might give them one or two or I may refer them straight
25   to Heartfelt Calling which has basically all of the

```
                                        Page 171
 1    CPAs and has knowledge of what one's -- they might be
 2    willing to or interested in finding out more
 3    information about.
 4         Q.  And is it -- are there specific factors that
 5    you consider when deciding which CPAs to recommend to
 6    any given foster parent or prospective foster parent?
 7         A.  I don't think that I -- necessarily that
 8    that's true.
 9         Q.  Okay.  Let's go back to -- let me figure out
10    what exhibit it is.  Hold on.  It's Exhibit 16 and
11    this is the document 592.
12         A.  Yes, I have it.
13         Q.  Okay.  And we established earlier that this
14    is the note you sent to Ms. Rogers and Ms. Welch
15    explaining that Miracle Hill could not work with them
16    as foster parents; is that right?
17         A.  This is where I referred to other agencies.
18         Q.  And rejected their application to work with
19    Miracle Hill; is that right?
20              MR. COLEMAN:  This is Miles.  Object to the
21    form of the question.  Go ahead.
22              THE WITNESS:  They never did apply to be a
23    foster parent.
24              BY MS. SCHINDEL:
25         Q.  This is the e-mail where you explained that
```

Page 203

```
 1    that, in fact, Epworth would not work with LGBTQ
 2    individuals or non-Christians?
 3         A.  No.
 4         Q.  Let's take a look at Tab 49 and this is --
 5    MIRACLE_HILL -- for you to find it, 3561.
 6         A.  I have the document.
 7         Q.  I'm still waiting for it.  This is -- all
 8    right.  I will again have to do screen share.  So this
 9    is going to be Exhibit 25 and let me pull it up.
10              (Exhibit 25 marked for identification.)
11         Q.  And this is an e-mail chain with the Bates
12    stamp MIRACLE_HILL_SUBP_003561 to 63.  Have you seen
13    those e-mails before?
14         A.  Yes.
15         Q.  And the first e-mail is on -- is actually the
16    second on the page.  And it's an e-mail from Reid
17    Lehman to Beth Williams who's now at Epworth; is that
18    right?
19         A.  Yes.
20         Q.  And he says, "Michael Leach will be coming to
21    tour portions of MHM next Tuesday.  He continues to
22    believe that Miracle Hill is the only agency that
23    needs the waiver given by HHS last winter.  Would you
24    be willing for me to tell him about Epworth and your
25    denomination's expectation that you'll recruit
```

Page 204

```
 1      heterosexual couples?  I'm not suggesting that we tell
 2      the media, but I'm like to tell Mr. Leach."  Is that
 3      right?
 4           A.  It's what the sentence -- or the paragraph
 5      says.
 6           Q.  And does this not indicate that Epworth --
 7      that Mr. Lehman understood that Epworth would not --
 8      would only recruit heterosexual couples?
 9           A.  I did not discuss that specifically with him.
10           Q.  Do you have any reason to believe that
11      Epworth will not work with same-sex couples?
12           A.  Again, are you talking personally or are you
13      talking --
14           Q.  You personally, do you have any reason to
15      believe that Epworth will not work with same-sex
16      couples?
17           A.  No, I do not.
18           Q.  I see.  So -- and Mr. Lehman, he relayed this
19      conversation to you as the Miracle Hill
20      representative?
21           A.  As Miracle Hill representative, he discussed
22      or talked with me that he had indeed had communication
23      with Beth Williams, but the specifics as what you just
24      read, I didn't have knowledge of.
25           Q.  But you testified that you've seen this
```

Page 205

1    e-mail before; right?

2         A.   I have seen this e-mail, yes, in scanning it

3    in preparation for today's deposition.

4         Q.   So I'm trying to understand Miracle Hill's

5    testimony that it has no reason to believe that

6    Epworth will recruit only heterosexual couples.  Could

7    you please explain the basis for that testimony?

8         A.   One more time that question, please.

9         Q.   What is the basis for your testimony as a

10   representative of Miracle Hill that Miracle Hill has

11   no understanding or no reason to believe that Epworth

12   will only recruit heterosexual couples?

13        A.   I'm still confused on the question.

14        Q.   Did Miracle Hill have any reason to believe

15   that Epworth will only work with heterosexual couples?

16             MR. MATTHEWS:  Object to the form of the

17   question.

18             BY MS. SCHINDEL:

19        Q.   You can still answer.

20        A.   I'm going to go on the basis of what's in this

21   e-mail that just says that you will -- or that you'll

22   recruit heterosexual couples.

23        Q.   Ms. Betts, you were designated as the

24   representative on communications with other South

25   Carolina CPAs regarding their policies or practices of

1    not accepting prospective foster families because of

2    their religion, same-sex relationship, or LGBTQ

3    status; is that right?

4        A.  Yes.

5        Q.  And you were tasked with being the person

6    most knowledgeable about Miracle Hill's understanding

7    of these communications.

8        A.  Okay.

9        Q.  So as a designee for Miracle Hill, does

10   Miracle Hill have any reason to believe that Epworth

11   will not recruit -- will only recruit heterosexual

12   couples?

13       A.  I'm sorry, the last part of that question

14   threw me off.

15       Q.  Does Miracle Hill have reason to believe that

16   Epworth will recruit only heterosexual couples?

17       A.  According to this e-mail, they will only

18   recruit heterosexual couples.

19       Q.  Are you aware of any other communications --

20   and as a designee of Miracle Hill, is Miracle Hill

21   aware of any other communications with other South

22   Carolina CPAs regarding their policies or practices of

23   not accepting prospective foster families because of

24   their religion, same-sex relationship or LGBTQ status?

25       A.  Yes.  Mr. Lehman had e-mails with Southeastern

Page 207

1  Children's Home.

2      Q.  And does Miracle Hill understand that

3  Southeastern Children's Home will not accept

4  prospective foster families because of their religion,

5  same-sex relationship, or LGBTQ status?

6      A.  Yes.

7      Q.  Are there any other communications of which

8  you're aware?

9      A.  Brenda Parks -- Brenda Parks told me of

10  conversations that she had with some, but none of which

11  would give one -- one way or another they would not

12  speak for their agency.

13      Q.  And which agencies were that -- was that --

14  which agencies are you speaking of when you say that

15  she had conversations with some?

16      A.  Connie Maxwell was one that she mentioned to

17  me.

18      Q.  Any others?

19      A.  Not -- Thornwell, but they would not -- they

20  would not state one way or another for their agency.

21      Q.  Okay.  Earlier in this deposition you

22  mentioned that in the initial home study a Miracle

23  Hill licensing specialist would ask prospective

24  parents about the church that the family attends; is

25  that right?

Page 208

1          A.   Yes.

2          Q.   And you would ask whether they take the kids

3     there; is that right?

4          A.   Yes.

5          Q.   And how involved the kids are -- to the

6     extent that they have children in their home how

7     involved those children are in the church; is that

8     right?

9          A.   Correct.

10          Q.   And I asked why Miracle Hill would ask those

11     questions, and you said we would want the family to be

12     attending church together and we would want to see

13     what they're teaching their children.  Do you recall

14     that?

15          A.   Yes.

16          Q.   Now, as a representative for Miracle Hill on

17     topic 11, why does Miracle Hill want the family to be

18     attending church together?

19          A.   To show a cohesiveness in a family unit just

20     as if a family member was involved in a opera, a sports

21     team, dance lessons, things like that, we would want

22     them to -- to be a stable family that would be able to

23     provide for foster children and to show a stable secure

24     family setting.

25          Q.   And when you say that it is just -- to show

Page 209

1    cohesiveness in a family just like going to sports

2    team and dance lessons, is there nothing unique about

3    going to church and what that represents to Miracle

4    Hill?

5        A.   Yes, it is important, and it is part of our

6    requirements for partnering with us in becoming a

7    foster parent.  So, yes, it would be important.

8        Q.   Why does it matter whether the children are

9    taken to church?

10           MR. COLEMAN:  This is Miles.  Object to the

11   form of the question.

12           BY MS. SCHINDEL:

13       Q.   You can answer.

14       A.   The question one more time.

15       Q.   Why does it matter to Miracle Hill in its

16   initial home study whether prospective foster family's

17   biological children are attending church with the

18   parents?

19       A.   To show the foster family's, again,

20   cooperation together, family life, and what their

21   teaching and expectations for their children would be.

22       Q.   And when you say teaching and expectations

23   for children, do you mean religious teaching?

24       A.   Yes, as part of that.  Uh-huh.

25       Q.   Does it matter to Miracle Hill as part of its