# EXHIBIT 14

Page 1

1      UNITED STATES DISTRICT COURT
         DISTRICT OF SOUTH CAROLINA
2            GREENVILLE DIVISION
     Case No. 6:19-cv-01567-TMC
3    ------------------------------------x
     EDEN ROGERS and BRANDY WELCH,
4                          Plaintiffs,
              -against-
5    UNITED STATES DEPARTMENT OF HEALTH
     AND HUMAN SERVICES;
6
7    XAVIER BECERRA, in his official
     capacity as Secretary of the UNITED
8    STATES DEPARTMENT OF HEALTH AND HUMAN
     SERVICES;
9
10   ADMINISTRATION FOR CHILDREN AND
     FAMILIES;
11
12   JOOYEUN CHANG, in her official
     capacity as Assistant Secretary of
13   the ADMINISTRATION FOR CHILDREN AND
     FAMILIES;
14
     JOOYEUN CHANG, in her official
15   capacity as Principal Deputy
     Assistant Secretary of the
16   ADMINISTRATION FOR CHILDREN AND
     FAMILIES;
17
     HENRY McMASTER, in his official
18   capacity as Governor of the
     STATE OF SOUTH CAROLINA; and
19
     MICHAEL LEACH, in his official
20   capacity as State Director of the
     SOUTH CAROLINA DEPARTMENT OF SOCIAL
21   SERVICES,
                          Defendants.
22   ------------------------------------x
23               July 8, 2022
24    DEPOSITION OF SHANEKA McDANIEL-OLIVER
25

Page 2

1

2                    July 8, 2022

3                    9:02 a.m.

4

5          Remote Videotaped 30(b)(6)

6   Deposition of South Carolina Department

7   of Social Services by SHANEKA

8   McDANIEL-OLIVER, taken pursuant to Notice

9   by Plaintiffs via Zoom before Dawn

10  Matera, a Certified Shorthand Reporter

11  and Notary Public for the State of New

12  York.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3

 1
 2    A P P E A R A N C E S :
 3
 4        CRAVATH SWAINE & MOORE
          Attorneys for Plaintiffs Eden Rogers and
 5        Brandy Welch
             825 Eighth Avenue
 6           New York, New York 10019
             (212)474-1247
 7
          By:  CRISTOPHER RAY, ESQ.
 8             cray@cravath.com
               MIKA MADGAVKAR, ESQ.
 9             mmadgavkar@cravath.com
10
                      -and-
11
          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
12           125 Broad Street, 18th Floor
             New York, New York 10004
13
          By:  LESLIE COOPER, ESQ.
14             lcooper@aclu.org
15
          NELSON MULLINS RILEY & SCARBOROUGH LLP
16        Attorneys for the State Defendants
             2 W. Washington Street, Suite 400
17           Greenville, South Carolina 29601
             (864)373-2352
18
          By:  MILES COLEMAN, ESQ.
19             miles.coleman@nelsonmullins.com
20
21        UNITED STATES ATTORNEY'S OFFICE SOUTH
          CAROLINA
22        Attorneys for the Federal Defendants
             1441 Main Street, Suite 500
23           Columbia, South Carolina 29201
             (803)929-3030
24
          By:  BENJAMIN TAKEMOTO, ESQ.
25             benjamin.Takemoto@usdoj.gov
```

Page 4

1   A P P E A R A N C E S : (Continued)

2

3   Also Present:

4        ETHAN STRICKLAND, Summer Associate

5        GEORGINA WILSON, Summer Associate,
                          Cravath Swaine & Moore

6

         ROCCO MERCURIO, Videographer

7

         DAN ACOSTA, Concierge

8

                    ~oOo~

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

```
 1              Did I read that correctly?
 2      A.      Yes, I believe you did.
 3      Q.      Thank you.  Can you tell me why
 4   this is called an emergency contract?
 5      A.      It is called an emergency
 6   because -- well, if you ever worked for
 7   Department of Social Services, we have
 8   kids coming into foster care at all times
 9   of the day and all times of the night.
10   At this time we did not have a contract
11   in place, so we needed time to do a full
12   solicitation in order to get something
13   out there.  So this is the way to make
14   sure the kids are safe and their
15   well-being is taken care of, otherwise we
16   would have kids in offices, we would have
17   kids in hotels and other means, which is
18   definitely not appropriate.  It is best
19   for them to be in a foster home.  So this
20   was a way for us to do that, by an
21   emergency contract.  We typically do that
22   if an emergency situation arrives and we
23   have to give justification for that.
24      Q.      So just to make sure I'm
25   understanding that correctly, does that
```

Page 24

1    mean there was not a standard contract in

2    place with non-therapeutic CPAs prior to

3    this one?

4        A.    There was not a therapeutic --

5    non-therapeutic contract in place before

6    this contract.

7        Q.    And can you just briefly

8    explain before this contract how DSS did

9    partner with CPAs if it wasn't through a

10   DSS contract?

11       A.    So we have non-therapeutic and

12   therapeutic.   Therapeutic contracts are

13   under -- was under a contract.

14   Non-therapeutics, which we considered as

15   our regular, I don't know how else to

16   define it, but it's our regular foster

17   home.   They give a particular board rate.

18   So they didn't have a contract until this

19   time frame because we treated them like

20   we would for our DSS foster homes,

21   although they were CPA providers.

22       Q.    I'm sorry, can you repeat, you

23   said you treated them as something foster

24   homes?

25       A.    So DSS had foster homes also.

Page 25

1    They still have to go through the
2    licensing process.  And then you have
3    your private CPAs, which would be this,
4    our child placing agencies.  Miracle
5    Hill, a couple of other ones are, was
6    treated like our DSS foster homes.  When
7    they got this centralized board rate,
8    non-therapeutic kids placed in
9    non-therapeutic homes.
10       Q.    I see.  Thank you for that
11   clarification.  Were there some that I
12   think happened prior to this contract
13   that motivated DSS to enter into a
14   standard contract with all CPAs at that
15   time?
16       A.    So prior to the 2019 contract,
17   there was, Miracle Hill was receiving a
18   subsidy of $10 per day per child.  Other
19   organizations did not receive that.  So
20   in 2019 we made sure that all of the
21   other organizations did receive that same
22   $10 per day per child.
23       Q.    And do you know if there was a
24   reason that only Miracle Hill received
25   that -- is there a name for that $10 per

Page 26

1   child per day, is it an administrative

2   fee?

3        A.    Yes, it is considered an

4   administrative fee.  So there was a memo

5   in around 2015.  The memo's intent was

6   for kids -- we were having a very hard

7   time placing kids.  We didn't have enough

8   non-therapeutic foster kids.  There was a

9   memo that non-therapeutic kids can now be

10  placed in CPAs.

11            That memo was meant for

12  non-therapeutic kids to be placed in

13  therapeutic homes that have more of a

14  capacity than our non-therapeutic

15  providers, even our internal DSS

16  providers.  So that is how this came

17  about, with Miracle Hill.  And they saw

18  the memo.  There was a word missing from

19  the memo that says therapeutic providers.

20  And Miracle Hill was a group care

21  provider, not a therapeutic provider.

22  Saw the memo and said we qualify.

23        Q.    I see.  And I think you

24  answered the question I am about to ask.

25  When you say that Miracle Hill was a DSS

Page 27

```
 1   foster home, are you referring to Miracle
 2   Hill group, as a group foster care home?
 3        A.    So Miracle Hill is a
 4   non-therapeutic foster care CPA agency
 5   and they were a group home.  So they had
 6   two different structures.
 7        Q.    And they no longer have a group
 8   home; is that right?
 9        A.    That is correct.
10        Q.    Thank you.  So the last part of
11   this sentence refers to, "This contract
12   is needed in the interim until the full
13   solicitation is available."  Can you tell
14   me what solicitation that refers to?
15        A.    So at that time we were in the
16   process of scoping a solicitation for
17   non-therapeutic providers.
18        Q.    Was that solicitation ever
19   completed?
20        A.    It was completed "and I am not
21   sure, but I believe that we actually put
22   out the solicitation, and because we had
23   a protest on our group care contract, we
24   did not want two protests going on at
25   the same time, because some of the
```

Page 54

1    did not list it into this contract, then

2    I cannot tell you.   There are licensing

3    requirements that requires training and

4    we have Foster Parent Association that

5    does training.   But for me to sit here

6    and tell you to list that, that's not in

7    my capacity.

8         Q.    So you wouldn't be able to say,

9    for example, what kinds of training and

10   support around cultural sensitivities DSS

11   requires CPAs to provide?

12        A.    So we have a contract with the

13   Foster Parent Association that has

14   trainings in it.   There are a list of

15   trainings in that contract.   I did not

16   bring that contract with me to go through

17   what trainings that are offered, but I do

18   know that we have Foster Parent

19   Association that has particular trainings

20   related and to assist CPAs.   And I am

21   sure that some CPAs may have their own

22   training also.   But I can tell you that

23   we have a contract with the Foster Parent

24   Association for training.

25        Q.    Do you know if this provision

Page 55

1  requires compliance with the trainings

2  and that contract that you just

3  described?

4      A.    So that contract is for the

5  Foster Parent Association, so it is

6  pretty much for foster parents to go

7  through training.  I don't know if it's a

8  requirement, but I do know that we have

9  Foster Parent Association and there is a

10 list of trainings that they must comply.

11 I am sure that there is probably

12 information in the licensing regulations.

13 Maybe, you know, I would say I would lean

14 on licensing to tell you that more so

15 than me.  I don't want to tell you

16 something that is incorrect.

17     Q.    So those trainings might have

18 been, but not necessarily, those specific

19 trainings aren't necessarily required?

20     A.    So again, I will tell you that

21 licensing would be the best person, the

22 best, you know, part of the organization

23 to answer that, because that's their role

24 and responsibility.  I can tell you that

25 we have the CPA, we have the FPA

Page 56

1    contract, which we call Foster Parent
2    Association that has training in it.
3    Again, I did not bring that contract to
4    go over which trainings there were, but
5    there is that contract that has
6    trainings, and those trainings are geared
7    towards foster parents.
8        Q.    Thank you very much.  I want to
9    go back to what we were talking about
10   earlier, how this contract has changed
11   over time, and specifically with Miracle
12   Hill.  So you had mentioned before that
13   Miracle Hill, and please correct me if I
14   am misstating anything that you said, but
15   I believe you mentioned that at one point
16   Miracle Hill was the only non-therapeutic
17   CPA that was providing foster care
18   services that was being reimbursed for
19   those services; is that right?  And that
20   had to do with the missing word in the
21   memo that Miracle Hill felt they -- that
22   they were entitled to those funds?
23       A.    So Miracle Hill started
24   receiving the $10 per day per child.  The
25   intent was to go to our therapeutic

```
                                    Page 57
 1   organizations, not non-therapeutic
 2   organizations.
 3              And because of the
 4   interpretation of that language, Miracle
 5   Hill received that $10 per day per child.
 6       Q.    And at that time Miracle Hill
 7   was providing group home foster care
 8   services and was receiving that payment
 9   for those particular group home services;
10   is that right?
11       A.    So Miracle Hill had a group
12   home at that time and they were under a
13   contract for group home.  And they didn't
14   have a therapeutic agency.
15       Q.    Does the fact that Miracle Hill
16   was receiving those funds at that time,
17   does that mean that Miracle Hill was the
18   only non-therapeutic CPA providing those
19   foster care services at that time?
20       A.    So repeat that?
21       Q.    So the fact that Miracle Hill
22   was receiving $10 per day per child at
23   that time, does that mean that Miracle
24   Hill was the only non-therapeutic CPA
25   providing those foster care services at
```

```
                                      Page 58
 1   that time?

 2        A.    No, that does not mean that.

 3   But I will tell you that if another

 4   non-therapeutic CPA requested, we would

 5   have given them the $10 per day per child

 6   also.

 7        Q.    So I want to turn to a

 8   different section of this contract, to

 9   the page ending in 250, which I think is

10   the very end.  Let me know when you see

11   that.  Are you on that page?

12        A.    Yes.

13        Q.    So this page is titled Change

14   Order Number 5 and dated July 15th, 2021;

15   is that right?

16        A.    It's at the bottom?  July 15th,

17   that change order was sent out and the

18   procurement office was asking for that to

19   be sent back by that date.

20        Q.    I see.  So we discussed change

21   orders a little bit earlier, but this is

22   generally how the standard

23   non-therapeutic CPA contract has changed

24   its terms and provisions?

25        A.    Correct.  If anything is
```

Page 59

```
 1   changed, the one that we were first on
 2   was the first one, and if anything was
 3   changed from that one on would have been
 4   done through a change order.
 5        Q.    And you said these are
 6   generally not individually negotiated.
 7   But DSS issues them and there might be a
 8   conversation about the contents of the
 9   change order.  But otherwise, they aren't
10   rejected by the CPA or negotiated by the
11   CPA?
12        A.    So individually negotiated?
13   Typically not, because when you have
14   Miracle Hill and a couple of other
15   providers that are doing the same work,
16   you don't want to have that kind of
17   closed door conversation, because you are
18   doing the same work.  You may be doing it
19   a little bit differently, but you're
20   doing the same type of work.  So anything
21   that we would like to see as an
22   organization as DSS, we would have that
23   conversation collaboratively to make sure
24   that we are all on the same page, unless
25   it's something that just totally falls
```

```
                                       Page 63
 1   administrative rate affect whether DSS
 2   expects Miracle Hill to comply with the
 3   contract service requirements?
 4       A.    No, DSS expects Miracle Hill to
 5   comply with the service requirements.
 6       Q.    And is that true regarding
 7   Federal and State law as well?
 8       A.    So anything that is not in this
 9   change order we still expect Miracle Hill
10   and any other provider to comply with.
11       Q.    And that also would include any
12   non-discrimination provisions that might
13   be included in the contract or Federal or
14   State law?
15       A.    If it's included in the
16   contract, then we expect Miracle Hill and
17   other providers to comply.
18       Q.    If you look on the next page on
19   251, it says at the top, "The provider
20   must provide SCDSS a yearly foster home
21   recruitment and retention plan by
22   August 15th, 2021."
23            The way I understand this
24   change order, that means that was a new
25   requirement that was not in the contract
```

Page 64

1    before but was applicable to all other

2    non-therapeutic CPAs in South Carolina;

3    is that right?

4        A.    So all of the providers have to

5    send in to licensing, to FP health, their

6    plans for obtaining foster homes.

7        Q.    Can you just briefly describe

8    what those plans look like and what

9    information they include?

10       A.    I can't provide or tell you

11   what that is.  Again, you see that it

12   says to that FP statewide foster parent

13   liaison.  That's outside of my scope.  I

14   can't provide or tell you anything about

15   that because I am not sure.

16       Q.    And is the statewide foster

17   parent liaison, is that part of DSS?

18       A.    It is.

19            MR. RAY:  This might be all I

20       have, but if you wouldn't mind if we

21       could take a quick break so I can look

22       over my notes to see if there is

23       anything else.

24            MR. COLEMAN:  You're saying

25       that's the end of all of your

Page 65

```
 1       questions or just for this document?
 2            MR. RAY:  I might have more
 3       questions, I just want to take a look
 4       at my notes to make sure.
 5            MR. COLEMAN:  Okay.
 6            THE VIDEOGRAPHER:  Now going off
 7       the record, the time is 10:27.
 8            (Off the record.)
 9            THE VIDEOGRAPHER:  Now back on,
10       the time is 10:37.
11  BY MR. RAY:
12       Q.    I think I just have a few more
13  clarifying questions and I will be
14  finished.
15            So going back to DSS's
16  relationship with non-therapeutic CPAs
17  before this contract was entered into, I
18  believe you indicated that there were
19  other non-therapeutic CPAs providing
20  foster care services, but they weren't
21  receiving the administrative rate for it;
22  is that right?
23       A.    So we had other non-therapeutic
24  CPAs that were not receiving the $10 per
25  day per child, but if they requested it,
```

```
                                      Page 66
 1   we would have given it to them also.
 2        Q.    And does that mean that those
 3   CPAs were not receiving funding through
 4   DSS before this contract was entered
 5   into?
 6        A.    No, that doesn't mean that.  So
 7   the provider, the foster homes get a
 8   board rate.  They weren't receiving the
 9   $10 per day per child.  But the providers
10   are given a board rate and those go to
11   the foster homes.
12        Q.    And so that's just a different
13   type of reimbursement that the
14   non-therapeutic CPAs were receiving,
15   that's different than the $10 per child
16   per day?
17        A.    So those go straight to the
18   foster homes that CPA providers have
19   licensed.  The $10 per child per day is
20   an administrative rate.
21        Q.    I see.  And then another
22   question.  Sorry, if you can just clarify
23   what a board rate was before this
24   contract was entered into.
25        A.    So a board rate, so for a,
```

Page 67

```
 1   quote unquote, and this is how I defined
 2   it and used to define it before we called
 3   it non-therapeutic.  Our regular foster
 4   home, even a DSS foster home, we have a
 5   rate that we give foster parents.  It's a
 6   rate that's set by legislators and this
 7   is the rate.  So that's what CPA
 8   providers, known as non-therapeutic to me
 9   previously before this contract was
10   regular foster homes.
11       Q.    I see.  And they received that
12   rate because at that time DSS considered
13   them to be DSS foster homes; is that
14   right?
15       A.    They are all, to me, they are
16   all homes that could be utilized for DSS
17   because they are licensed foster homes.
18   They are CPA providers, although the
19   private agency licensed them.  They are
20   homes that DSS can still utilize because
21   they are foster homes, so our kids need
22   foster homes so we can still utilize
23   them.  But they were getting a regular
24   board rate.  I think the difference is
25   that you have non-therapeutic and
```

Page 68

```
 1   therapeutic.  Those are the only two
 2   differences that you would have in a
 3   rate.
 4       Q.    I see, okay.  That was very
 5   clear, thank you.  And one other
 6   question.  If a CPA was refusing to
 7   conduct home studies to get any families
 8   licensed, would that CPA be in compliance
 9   with the requirement that it have
10   families available for placement?
11       A.    So, again, I think for the
12   contract, it says contractor must make
13   foster homes for placement of children
14   approved.  So we expect CPAs to have
15   those foster homes.  If there was
16   something going on with the licensing
17   process, that's before we would actually
18   get involved.  That's a licensing
19   standard and regulation.
20       Q.    So if for whatever reason none
21   of a CPA's families were getting licensed
22   and the CPA was causing that, would that
23   put that CPA in breach of the contract?
24       A.    So there is no recruitment,
25   there is no recruitment and pieces in
```

Page 82

```
 1        Q.      There are a number of different
 2   ways that a CPA could comply with this
 3   requirement, right?
 4        A.      That is correct.  We didn't
 5   ascribe that in the contract.
 6        Q.      The requirement is that they
 7   submit a plan?
 8        A.      Correct.
 9        Q.      As to how they go about doing
10   that, the contract is silent and so
11   that's a subject that you don't know
12   about, because that's someone else's area
13   and that is beyond what is required by
14   the contract?
15        A.      That is correct.
16        Q.      And then lastly, toward the end
17   of your testimony you said something, I
18   think, but I want to clarify, you may
19   have lapsed into a phrasing that
20   sometimes we use that may not technically
21   be correct.  And I think we all
22   understand.  But I want to make sure the
23   record is clear.
24                You're referring to what's
25   sometimes called the board rate or the
```

```
                                    Page 83
 1   maintenance rate or payment that goes to
 2   the family to provide foster care.  And I
 3   think you said that money goes to
 4   families the CPAs have licensed.  But
 5   really the CPAs don't license any
 6   families, do they, only DSS?
 7       A.    DSS does the licensing and
 8   those funds go to those foster homes that
 9   are licensed through DSS.
10       Q.    The families might work with
11   the CPAs, but ultimately they are
12   licensed by DSS?
13       A.    All homes are licensed by DSS
14   in South Carolina.  All have to go
15   through the licensing process.
16            MR. COLEMAN:  All right.  Those
17       are the only questions I have.
18       Mr. Ray may have a few, Mr. Takemoto
19       may have a few, but I think I'm done.
20            MR. TAKEMOTO:  I don't have any
21       further questions for the Federal
22       Defendants.
23            MR. RAY:  I'm sorry, I just have
24       like two questions and then I promise
25       I will be finished.
```

```
                                        Page 84
```

1    EXAMINATION (Continued)

2    BY MR. RAY:

3         Q.    So after the mistake in the

4    memo that resulted in Miracle Hill giving

5    that administrative rate, did DSS ever

6    tell any non-therapeutic CPA that they

7    would be eligible to receive that rate?

8         A.    So I can imagine during that

9    time if a provider asked for that rate,

10   DSS would honor and provide them that

11   rate, that $10 per day per child.

12        Q.    But none of the other CPAs may

13   have known that that rate was available

14   to them?

15        A.    So I've asked around, because

16   again in preparation for this, to ask why

17   didn't other providers get this rate, and

18   it is my understanding from asking around

19   that no other providers asked for this

20   rate.  And so they were, Miracle Hill was

21   the only one getting the $10 per day per

22   child until we did an emergency contract.

23        Q.    And that might have been

24   because you didn't know about it, but you

25   just didn't know?

```
                                      Page 85

 1      A.     Again, I asked around, and

 2  again in preparation for this, to see and

 3  find out and did my due diligence of

 4  trying to figure out, okay, Miracle Hill

 5  is receiving this rate.  Did other

 6  providers receive this rate.  Did other

 7  providers request.  And again, I wasn't

 8  able to get that question answered.

 9      Q.     And then just one or two more

10  questions about the second page of the

11  change order regarding the foster home

12  recruitment and retention plan.  I

13  believe you indicated in response to

14  Mr. Coleman's questions that there is no

15  specific form that plan must be submitted

16  in to DSS?

17      A.     So when we sent out this change

18  order, we put the information in

19  accordance to what our program area

20  needs, the foster care recruitment plan,

21  and this is the information that's on

22  there.  That plan actually goes to the

23  statewide foster parent liaison.  So I

24  can't tell you how that form is sent to

25  them.
```

Page 86

```
 1      Q.    But the plan must include
 2  something about recruitment, right?
 3      A.    So it says foster home
 4  recruitment and retention efforts.
 5      Q.    And if a CPA did not submit a
 6  plan describing their recruitment
 7  efforts, would they be in compliance with
 8  this provision?
 9      A.    So if the CPA didn't submit a
10  plan, in whatever format, then I would
11  expect that our licensing department and
12  whoever uses statewide foster parent
13  liaison would get in contact and say we
14  didn't receive a plan from a particular
15  CPA.
16      Q.    And because they didn't receive
17  a plan, that CPA would not be in
18  compliance with this requirement; is that
19  right?
20      A.    So if the CPA didn't submit the
21  plan, the statewide foster parent liaison
22  would let me know and then I would follow
23  up with that CPA provider.
24      Q.    And if that CPA provider
25  refused to provide a plan in response to
```