# EXHIBIT 19

Page 1

```
            UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
                  GREENVILLE DIVISION
    EDEN ROGERS
    and
    BRANDY WELCH,
             Plaintiffs,
         vs.                CASE NO. 6:19-CV-01567-JD
    UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
    SERVICES; ALEX AZAR, in his official capacity as
    Secretary of the UNITED STATES DEPARTMENT OF HEALTH
    AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN AND
    FAMILIES; LYNN JOHNSON, in her official capacity as
    Assistant Secretary of the ADMINISTRATION FOR
    CHILDREN AND FAMILIES; STEVEN WAGNER, in his
    official capacity as Principal Deputy Assistant
    Secretary of the ADMINISTRATION FOR CHILDREN AND
    FAMILIES; HENRY MCMASTER, in his official capacity
    as Governor of the STATE OF SOUTH CAROLINA;
    and MICHAEL LEACH, in his official capacity as
    State Director of the SOUTH CAROLINE DEPARTMENT OF
    SOCIAL SERVICES,
             Defendants.

    VIDEOTAPED VTC
    30(b)(6)
    DEPOSITION OF:    MIRACLE HILL MINISTRIES, INC.
                      BY: REID DAVID LEHMAN
                      (Appearing by VTC)

    DATE:             June 17, 2021

    TIME:             9:20 AM

    LOCATION:         Haynsworth, Sinkler, Boyd
                      1 North Main Street, 2nd Floor
                      Greenville, SC

    TAKEN BY:         Counsel for the Plaintiffs

    REPORTED BY:      Susan M. Valsecchi, RPR, CRR
                      Certified Realtime Reporter
                      (Appearing by VTC)
```

```
                                                              Page 2

 1     APPEARANCES OF COUNSEL VIA VTC:
 2          ATTORNEYS FOR THE PLAINTIFFS
                EDEN ROGERS and BRANDY WELCH:
 3
                CRAVATH SWAINE & MOORE
 4              BY:  REBECCA SCHINDEL
                     PETER BARBUR
 5                   SERENA CANDELARIA
                825 Eighth Avenue
 6              New York, NY  10019
                (212) 474-1247
 7              rschindel@cravath.com
                pbarbur@cravath.com
 8              scandelaria@cravath.com
       - and -
 9              LAMBDA LEGAL
                BY:  CURREY COOK
10              120 Wall Street, Floor 19
                New York, NY  10005-3919
11              (212) 809-8585
                ccook@lambdalegal.org
12
            ATTORNEYS FOR THE DEFENDANTS
13              HENRY MCMASTER, in his official
                capacity as Governor of the STATE OF
14              SOUTH CAROLINA and MICHAEL LEACH, in
                his official capacity as State Director
15              of the SOUTH CAROLINE DEPARTMENT OF
                SOCIAL SERVICES:
16
                NELSON MULLINS RILEY & SCARBOROUGH
17              BY:  MILES COLEMAN
                Greenville ONE
18              2 W. Washington Street
                Suite 400
19              Greenville, SC  29601
                (864) 373-2352
20              miles.coleman@nelsonmullins.com
21        ATTORNEYS FOR THE WITNESS REID DAVID LEHMAN
                AND MIRACLE HILL MINISTRIES, INC.:
22
                HAYNSWORTH SINKLER BOYD PA
23              BY:  STEVEN MATTHEWS
                1201 Main Street, 22nd Floor
24              Columbia, SC  29201
                (803) 779-3080
25              smatthews@hsblawfirm.com
```

1   ATTORNEYS FOR THE DEFENDANTS
         UNITED STATES DEPARTMENT OF HEALTH AND
2        HUMAN SERVICES; ALEX AZAR, in his
         official capacity as Secretary of the
3        UNITED STATES DEPARTMENT OF HEALTH AND
         HUMAN SERVICES; ADMINISTRATION FOR
4        CHILDREN AND FAMILIES:
5        UNITED STATES ATTORNEY'S OFFICE
         SOUTH CAROLINA
6        BY: CHRISTIE NEWMAN
         1441 Main Street, Suite 500
7        Columbia, SC  29201
         (803) 929-3030
8        christie.newman@usdoj.gov
9
    ALSO PRESENT:
10       Darren Carreras, Videographer
         Rick Christian, Concierge
11       Maia Zelkind, Paralegal
12
13
14     (INDEX AT REAR OF TRANSCRIPT)
15
16
17
18
19
20
21
22
23
24
25

Page 48

1    interview that they conduct and their assessment of
2    that person's lifestyle?
3         A.   So if someone said to me that I have --
4    I have experienced same-sex attraction, but I agree
5    with your doctrinal statement and I'm living in
6    celibacy and purity, we would be glad to work with
7    them as a foster parent.
8              If someone said to me --
9         Q.   If --
10        A.   I'm sorry?
11        Q.   No, no, go on.  My apologies.
12        A.   If someone said to me I struggle with
13   my gender identity, but I am -- I agree with your
14   doctrinal statement and I'm living according to the
15   gender I received at birth, we would be glad to
16   work with them as a foster parent.
17        Q.   And what if someone -- to meet your
18   terminology -- was experiencing same-sex attraction
19   and were in a same-sex marriage, would you be
20   willing -- and were willing to sign the doctrinal
21   statement -- would you be willing to work with that
22   person?
23        A.   No, because that's a violation of our
24   Bible -- Biblical statement on what marriage is.
25        Q.   To your knowledge, how many families

Page 49

1   have been turned away because of their faith or
2   lack thereof or because they're in a same-sex
3   relationship?
4            A.   I don't have knowledge of that.  More
5   than 15.
6            Q.   Do you know whether any of those
7   families went on to approach other CPAs?
8            A.   I do not know.
9            Q.   So I think we've been going for about
10  an hour.  I would be fine taking a five-minute
11  break if you'd like, or I'm happy to continue.
12           A.   A five-minute break would be welcome,
13  thank you.
14                MS. SCHINDEL:  All right.
15                MR. MATTHEWS:  Rebecca --
16                THE VIDEOGRAPHER:  The time is 10:17
17  a.m.  We are going off the record.
18                (A brief recess was held.)
19                THE VIDEOGRAPHER:  The time is 10:25
20  a.m.  We are back on the record.
21  BY MS. SCHINDEL:
22           Q.   Mr. Lehman, I want to make sure I
23  understand Miracle Hill's position with respect to
24  its doctrinal statement.
25                If an applicant identified with a sex

Page 50

1  different than the sex that that person was
2  assigned at birth and were willing to sign the
3  doctrinal statement, would Miracle Hill work with
4  that individual?
5      A.   So I'm not sure what you mean with
6  'identifies with a different sex.'
7           What I'm saying is that if they
8  struggle with their identity, their gender
9  identity, but they were willing to live according
10 to their birth -- their gender identity given at
11 birth -- and agree with our doctrinal statement,
12 they would qualify to serve as a foster parent.
13     Q.   So if this person struggled with their
14 gender identity but dressed in accordance -- if
15 they were born a man and dressed as a man but
16 struggled with their gender identity, that person
17 would be qualified; is that right?
18     A.   Yes, that's correct.
19     Q.   And if that same person, same struggle
20 with the gender identity, born as a man, dressed as
21 a woman, would that person qualify?
22     A.   No, because they would not be living
23 according to our doctrinal statement.
24     Q.   And if a person experienced same-sex
25 attraction but did not have any sex with somebody

Page 51

1  of the same sex, would that person qualify -- and
2  was willing to sign the doctrinal statement --
3  would that person qualify?
4       A.   Yes, if they're a committed Christian
5  and these doctrinal statements reflect their
6  beliefs, yes, they would.
7       Q.   And if that same person were willing to
8  sign the doctrinal statement, experienced same-sex
9  attraction and had sex with people of the same sex,
10 would that person qualify?
11      A.   No.  But I should point out that a
12 heterosexual who is having sex with people they're
13 not married to would not qualify either.
14      Q.   Right.  What are -- are you familiar
15 with Miracle Hill Main Street's Childrens
16 Residential Services?
17      A.   Somewhat familiar with them, yes.
18      Q.   What are those?
19      A.   Well, they've changed.  At the time of
20 the filing of the lawsuit, we had three children's
21 homes and we also had our foster care division.
22 Today the three children's homes are all closed and
23 we have only foster care in terms of children
24 services.  And we also care for mothers with their
25 children.

Page 52

1   Q.  And when did those -- so those
2   children's homes are essentially group homes for
3   foster children; is that right?
4   A.  That's correct.
5   Q.  And when did they close?
6   A.  Homes For Life closed -- I don't
7   remember exactly -- I think it was in 2018 or '19.
8   Miracle Hill Children's Home closed in the spring
9   of 2020.  And Miracle Hill Boys Shelter closed in
10  December of 2020.
11              MS. SCHINDEL:  Okay.  So let's take a
12  look now at the document ending in 7759, and we'll
13  mark this as Exhibit 8.
14              And, Serena, this is Tab 66.
15              (EXHIBIT 8, Miracle Hill Ministries
16  Children's Residential Services Operations Manual,
17  was marked for identification.)
18              THE WITNESS:  I have it.
19              MS. SCHINDEL:  Okay, we're just waiting
20  for it to upload here.
21              This is Exhibit 8, Bates-stamped
22  MIRACLE_HILL_SUBP_007759 to 7868.
23  BY MS. SCHINDEL:
24  Q.  Do you recognize this document?
25  A.  Yes, I do.

Page 53

1        Q.   And this is Miracle Hill Ministries
2    Children's Residential Services Operations Manual;
3    is that right?
4        A.   As of that date, yes.
5        Q.   And when you say as of that date, do
6    you know what date that is?
7        A.   In the table of contents it says
8    revised in 2015 by Lori Bailey.
9        Q.   And do you know if this document has
10   been updated since 2015?
11       A.   I'm sure that it has, but I don't
12   know -- I don't know when and I don't know how --
13   if it's been more than once.
14       Q.   So this was at least the operative
15   manual as of 2015?
16       A.   I'm sorry, it was the appropriate
17   manual as of 2015, yes.
18       Q.   To your knowledge, does Miracle Hill
19   staff -- is Miracle Hill's staff required to abide
20   by this document to the extent that they're
21   involved in Miracle Hill's group homes?
22       A.   I don't know where the question is
23   going.  The parts of the document that accurately
24   reflect Miracle Hill, yes, our staff are required
25   to abide by it.

Page 123

1    instead of getting a 1-year license we were given a
2    6-month license, understanding that it was a
3    provisional license.
4         Q.   And to comply, Miracle Hill understood
5    that would mean that it would need to stop
6    discriminating against potential foster parents on
7    the basis of sexual orientation and religion?
8         A.   Yes.
9         Q.   And was a condition of the provisional
10   license that Miracle Hill submit a written plan of
11   compliance?
12             MR. MATTHEWS:  Object to the form of
13   the question.
14             THE WITNESS:  I don't -- I don't
15   remember seeing the need for a written plan, but I
16   don't know that.  I don't recall the documentation
17   said that.
18             MS. SCHINDEL:  So let's mark Tab 12,
19   which is Bates-stamped 10545-B, as in boy, 012.
20             (EXHIBIT 15, License Status Letter, was
21   marked for identification.)
22             THE WITNESS:  Okay.  As I look at the
23   letter, I see that -- I told you I didn't think
24   they asked for a written plan, but on Page 2 it
25   does say that they asked for a written plan of

Page 124

1    compliance within 30 days.
2    BY MS. SCHINDEL:
3         Q.   Does that refresh your recollection,
4    that this is required?
5         A.   Yes, it does.
6         Q.   And did Miracle Hill ever issue the
7    written plan of compliance as required by DSS?
8         A.   We did not.
9         Q.   And why is that?
10        A.   Because we felt it was infringing upon
11   our religious liberty.
12        Q.   Did DSS ultimately require Miracle Hill
13   to submit a written plan of compliance before
14   issuing a --
15        A.   No.
16        Q.   I'm sorry, what was that?
17        A.   They did not.
18        Q.   Did Miracle Hill otherwise address the
19   concerns that DSS had raised with regard to Miracle
20   Hill's discrimination against prospective foster
21   parents?
22        A.   We made no changing -- we made no
23   changes in our recruitment process, no.
24        Q.   What did Miracle Hill do, instead, upon
25   receiving this information from DSS?

Page 125

1    A.    I'm sorry, would you repeat the
2    question?
3    Q.    Sure.
4          What did Miracle Hill do -- rather than
5    submit a written plan of compliance, what did
6    Miracle Hill do in response to receiving this
7    request from DSS that it change its policies and
8    practices?
9    A.    We approached the Governor's office and
10   asked for help with the situation, and we began
11   talking to state legislators, asking for their
12   help.
13   Q.    Who approached the Governor's office?
14   A.    I don't know if our attorney approached
15   them or not, but Beth Williams, who is our vice
16   president of children's ministries, talked to
17   Richele Taylor in the governor's office.
18   Q.    Did anybody else participate in those
19   conversations?
20   A.    No.
21   Q.    And just for the record, we actually
22   ended up talking about this exhibit before I
23   introduced it, but the document that we were
24   looking at was Exhibit 15, and it was Bates-stamped
25   10545-B-012 to 014.  And you recognize this as the

Page 126

1  letter that Miracle Hill received from DSS; is that
2  right?
3       A.  I'm sorry, would you give me the name
4  again.
5       Q.  Oh, this -- yes.  This is the 10545-B,
6  as in boy, 012.
7            MR. MATTHEWS:  The one we were just
8  looking at.
9            THE WITNESS:  Okay.  Yes, I do
10 recognize this as the letter that we received from
11 DSS.
12           MS. SCHINDEL:  And now let us take a
13 look at a document with the Bates stamp Miracle --
14 It's a Miracle Hill document ending in 12724.  And
15 this is Tab 18.
16           (EXHIBIT 16, Help Protecting Miracle
17 Hill's Foster Care Program E-mail, was marked for
18 identification.)
19           THE WITNESS:  Okay, I have it.
20 BY MS. SCHINDEL:
21      Q.  And the second e-mail in the
22 chain -- well, apologies, let me back up.  Do you
23 recognize this document as e-mails between you and
24 Beth Williams and others?
25      A.  012724.  Hang on, I'm not sure I have

Page 127

1    the right document.  Let me ask my attorney, if
2    that's all right.
3              MR. MATTHEWS:  Ask Ms. Schindel.  What
4    page are you starting at?  This document, Rebecca,
5    begins at Page 12721 for us.  12724 appears in the
6    middle of it.  So what are you looking at?
7              MS. SCHINDEL:  You're right, I am
8    looking at the -- it appears to be a document
9    that's a composite of e-mails, but I am looking at
10   012724.
11             MR. MATTHEWS:  724, okay.
12             This is the e-mail from Beth Williams
13   to Richele Taylor, is that the one?
14             MS. SCHINDEL:  That's right.
15             MR. MATTHEWS:  Got it, okay.
16             THE WITNESS:  Yes, I have it.  Thank
17   you for your patience.
18   BY MS. SCHINDEL:
19        Q.   Oh, no, thank you.  And this is -- do
20   you recognize this e-mail as -- as an e-mail that
21   was sent from Beth Williams to Richele Taylor,
22   copying you, on February 21st, 2018?
23        A.   Yes, I do.
24        Q.   And did you receive this e-mail in the
25   normal course of your work at Miracle Hill?

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400