# EXHIBIT 24

# Attachment 1

**Exhibit
0018**
Lauren Staudt



MIRACLE HILL MINISTRIES FOSTER CARE PROGRAM
117 Drummond Lane
Pickens, SC 29671

**Miracle Hill**
FOSTER CARE

# MIRACLE HILL FOSTER HOME PROGRAM

Miracle Hill Ministries, Inc. has been approved to license individual foster homes. The foster homes can be licensed to care for a specific age or gender child. Among the requirements for becoming foster parents, one would have to be fingerprinted and pass SLED and DSS background checks for criminal activity and child abuse. Also, any prospective home would need to pass a health and fire inspection to assure a healthy and safe environment for the child. Fourteen hours of training are also required of each foster parent and is provided by Miracle Hill staff. When the licensing process is complete, Miracle Hill foster parents are qualified to receive foster children through our agency. These children have been referred by local DSS offices.

A foster parent for Miracle Hill must: 1) be a born-again believer in the Lord Jesus Christ as expressed by a personal testimony and Christian conduct; 2) be in agreement without reservation with the doctrinal statement of Miracle Hill Ministries; 3) be an active participant in, and in good standing with, a Protestant church; 4) have a genuine concern for the spiritual welfare of children entrusted to their care; 5) have a lifestyle that is free of sexual sin (to include pornographic materials, homosexuality, and extramarital relationships); 6) abstain from activities or addictions that have a detrimental effect on clients* including: undiscerning choices related to literature and entertainment; excessive or imprudent use of alcohol; use of illegal drugs; abuse of prescription medications; and the use of tobacco in the presence of foster children and inside the foster home or foster parent's vehicle.

*According to the teachings of Romans 14:13-23, we are to keep from becoming a stumbling block to others. It is important to exercise biblical discretion by restricting your freedom and demonstrating sound judgment based on biblical principles that displays evidence of spiritual growth and maturity. This is especially important considering 2/3 of children in foster care come from homes with a substance abusing adult and individuals that have been in foster care are 50% more likely to abuse substances in their lifetime. (Titus 2:11-12)

In accordance with Title VI of the Civil Rights Act of 1964, the Multiethnic Placement Act of 1994 and Section 1808 of the Small Business Job Protection Act of 1996, 42 U.S.C. 622(b)(9), 671(a)(18), 674(d) and 1996b, Miracle Hill is prohibited from discriminating on the basis of race, color and/or national origin when making foster care decisions.

If you are interested in becoming a foster parent and feel that you meet the requirements, please complete the information in the "Getting Started" section of the website. The Miracle Hill foster home staff will review the information. If you have met the requirements, a licensing worker will contact you to make an appointment to meet your family and aid you in the licensing process.

**How can I learn more?** If you would like to know more about Miracle Hill Ministries, Inc., have a tour of our facilities, or set up an appointment regarding your needs, please call us at 864-878-9987, or write to us at:

> Miracle Hill Ministries, Foster Home Program
> 117 Drummond Lane
> Pickens, SC 29671

You can also visit our web site at *www.miraclehill.org*.

Rev September 2014

MIRACLE_HILL_SUBP_007964

# Attachment 2

MIRACLE_HILL_SUBP_007965

In March I went through 5 hours of training with a group called Fostering Great Ideas in order to be a mentor to a child in foster care. They partner with Miracle Hill Ministries, a faith based charity in the upstate of SC. After the training we were told that if we were not Christian Protestants we could not mentor a child in one of the Miracle Hill homes or shelters. We could still mentor children in SC Department of Social Services (DSS) custody. So the pool of children available to the Christian Protestants is larger than for the rest of us. As a result I was one of the last three people out of approximately 25 in the class that were assigned mentees. I was not matched until late July. The child I was matched with is in a group home run by a different faith based organization that does not discriminate.

This is a volunteer program and the training was done on a Sunday and a Monday evening. I also went through back ground checks, sexual predator screening, and other necessary steps in order to be approved as a mentor.

I spoke with the CEO of Miracle Hill, Reed Leamon, and he in no uncertain terms told me he was going to continue this policy. As a faith based organization he believes that since he can discriminate with his employment practices he can also with outside volunteer groups.

I don't often feel religious discrimination but this has gotten me quite upset. Are not these children while in Miracle Hill custody still under the umbrella of state run DSS? If so how can they be allowed to deny me as a mentor? The mentoring program is as little as two outings a month.

These children are not the property of Protestant Christians only and they have the right to interact with people from other or absent of any faith, as that is how the real world operates. They also have a right not to be proselytized to. Currently Fostering Great Ideas is searching for male Miracle Hill mentors only, which translates to Muslims, Jews, and Catholics need not apply.

DSS claims they do not discriminate but they are partnering Miracle Hill which clearly does. These discriminatory practices need to end.



Thank you

Please contact me by phone 864 ▮▮▮▮ or email ▮▮▮▮.net

RECEIVED
OCT 11 2017
By

MIRACLE_HILL_SUBP_007966

**South Carolina Department of Social Services**
# CIVIL RIGHTS DISCRIMINATION COMPLAINT FORM

To file a complaint, complete this form and send it to Office of Civil Rights, South Carolina Department of Social Services,
P.O. Box 1520, Columbia, SC 29202-9988 or fax it to 803-898-7269. If you need help filling out this form, you may call
the DSS Office of Civil Rights at 1-800-311-7220 or in the Columbia area call 803-898-8080. For TTY: 1-800-311-7219.
You are not required to use this form for making your complaint. SNAP complaints may be made verbally.

Information So We Can Contact You:

Your Name: ▓▓▓▓▓▓▓▓▓▓  Telephone: 864-▓▓▓▓▓▓

Address: ▓▓▓▓▓▓▓▓▓▓

City: ▓▓▓▓▓▓  State: SC  County: Greenville  Zip Code: ▓▓▓▓▓

Who do you think discriminated against you?

Name: Miracle Hill Ministries  Job: Reed Leomon/CEO

Address Where Person Works: Partnering w/ DSS

City: _____  County: _____  State: _____  Zip Code: _____

What happened?

See Attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

RECEIVED
OCT 1 1 2017
By_____

DSS Form 2601 (MAY 16) Edition of FEB 14 is obsolete

**What happened? (Cont'd)**

_____

_____

_____

_____

_____

_____

_____

_____

**You Believe You Were Discriminated Against Because of Your:**
☐ Race    ☐ Color    ☐ National Origin    ☐ Disability    ☐ Sex    ☐ Age    ☒ Religion    ☐ Political Beliefs

**What date did this happen?** _March 2017 (& continuing)_

**Your Signature:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉    **Date:** _10/5/17_

This institution is prohibited from discriminating on the basis of race, color, national origin, disability, age, sex and in some cases religion or political beliefs.

The U.S. Department of Agriculture also prohibits discrimination based on race, color, national origin, sex, religious creed, disability, age, political beliefs or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American Sign Language, etc.), should contact the Agency (State or local) where they applied for benefits. Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027), found online at: http://www.ascr.usda.gov/complaint_filing_cust.html, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

(1) mail: U.S. Department of Agriculture
        Office of the Assistant Secretary for Civil Rights
        1400 Independence Avenue, SW
        Washington, D.C. 20250-9410

(2) fax: (202) 690-7442; or

(3) email: program.intake@usda.gov.

For any other information dealing with Supplemental Nutrition Assistance Program (SNAP) issues, persons should either contact the USDA SNAP Hotline Number at (800) 221-5689, which is also in Spanish or call the State Information/Hotline Numbers (click the link for a listing of hotline numbers by State); found online at: http://www.fns.usda.gov/snap/contact_info/hotlines.htm.

To file a complaint of discrimination regarding a program receiving Federal financial assistance through the U.S. Department of Health and Human Services (HHS), write: HHS Director, Office for Civil Rights, Room 515-F, 200 Independence Avenue, S.W., Washington, D.C. 20201 or call (202) 619-0403 (voice) or (800) 537-7697 (TTY).

This institution is an equal opportunity provider.

You may also file a complaint of discrimination by contacting DSS. Write DSS Office of Civil Rights, P.O. Box 1520, Columbia, SC 29202-1520; or call (800) 311-7220 or (803) 898-8080 or TTY: (800) 311-7219.

DSS Form 2601 (MAY 16)                    PAGE 2

MIRACLE_HILL_SUBP_007968

# Attachment 3

MIRACLE_HILL_SUBP_007969

# Foster Care

# Manual

## MHM.CPA.900 INTRODUCTION

According to the Child Welfare League of America, family foster care "should be a planned, goal-directed service in which the temporary protection and nurturing of children takes place in the home of agency-approved resource/foster families. Resource/Foster family care is an essential child welfare service for children and their parents who must live apart from each other for a temporary period of time because of physical abuse, sexual abuse, neglect, or special circumstances necessitating out-of-home care. The Department of Social Services is the principal agency in South Carolina that has responsibility for establishing, developing, maintaining, and monitoring a resource family program in accordance with federal and state mandates.

In accordance with Federal and State laws and South Carolina Department of Social Services (SCDSS) policy, this agency and contracted providers for foster care and adoption services are prohibited from discriminating on the basis of race, color, national origin, sex, age, religion, political beliefs or disability. If services cannot be provided, or will be discontinued by the agency, the individual will be provided notice and will be entitled to an explanation.

The establishment and development of resource/foster families (adoptive, relative or non-relative) incorporates multiple functions. In order to assure the availability of resource/foster homes sufficient in number and diversity, ongoing recruitment efforts are needed. Creative, non-biased recruitment strategies are needed to attract and retain qualified foster and adoptive family applicants. SCDSS must afford every individual and family the opportunity to become a resource/foster or adoptive parent without regard to race, color or national origin (RCNO) of children or prospective families.

Following recruitment, each potential resource/foster family must be evaluated and trained. Tasks specific to assessment of the home and family members include orientation to the resource/foster home and adoption programs, home visits, interviews with all members of the applicant's household and initiation of the licensing process. The purpose of the initial licensure or approval process is to determine if the applicant, household members, and the physical structure of their home meet the minimum standards of care. The licensure process is guided by Federal and State laws and agency licensing regulations. When the preliminary assessment indicates the applicant should qualify for licensure, the developmental focus expands to include the applicant's/applicant couple's development of basic

- 1 -

MIRACLE_HILL_SUBP_007970

knowledge and skills to provide foster care to a child or children. The development of basic knowledge and skills is accomplished through their participation in the pre-licensure training. A written assessment is prepared to summarize all significant reports and findings in areas addressed in the licensing regulations and is related to the suitability of the applicant, other household members, and their home. Also, included in the assessment is a recommendation whether or not the applicant should be licensed for foster and/or adoptive care.

All persons performing licensing duties on behalf of SCDSS in county offices, adoption regions, or contracted providers are required to provide services to all potential applicants without regard to race, color, national origin of a child or prospective caregiver. Licensing staff located in county offices serve as the primary entity through which resource/foster families are recruited, receive initial training to assist in the development of skills and knowledge about resource/foster parenting and adoption, and are initially licensed or approved. Depending on the applicant's expressed interests, assessments and training may be completed by other area offices or by contracted providers. Recruitment plans for individual offices are developed based on county offices' self-assessments. Counties will document recruitment activities and track contacts with prospective resource/foster families. A primary objective is to develop community and neighborhood resource/foster families who can offer foster care placement to children within the same community or neighborhood. Trainers schedule training sessions, plan curriculum, and assist with the initial assessment process as necessary. Recruitment, training, and licensure of resource/foster families solely interested in resource/foster parenting is the responsibility of county offices. Staff in Adoption offices work with families who wish to pursue both adoption and foster parenting.

A final area of responsibility for all staff involved in licensing of foster homes is that of team member. All staff involved with recruitment, training, licensing, and resource/foster family monitoring/support, along with child protective services workers, adoption and foster care workers, and IFCCS (Intensive Foster Care & Clinical Services) workers are members of the child welfare services team. All staff providing child welfare services are working toward the same goals; protection of children and permanency for each child. In particular, when a child is in the foster home, the licensing worker and foster care, adoption, and/or IFCCS worker for the child should share relevant information with each other about the child and the foster home, as well as any concerns about the placement. If the foster home is also a licensed day care provider, information should be shared with day care regulatory staff.

MIRACLE_HILL_SUBP_007971

**MHM.CPA.901 POLICIES**

SCDSS Agency policies directly related to foster home licensing and adoption are as follows:

1. SCDSS child welfare staff, foster home licensing workers, as well as contracted providers and their employees are prohibited from discriminating on the basis of race, color, national origin RCNO(NOTE: Hereafter, race, color and national origin will be referred to as RCNO), sex, age, religion, political beliefs, or disability. If service cannot be provided, or will be discontinued by SCDSS, the individual is entitled to explanation and notice.

2. Miracle Hill staff must assure that each applicant and household member is in compliance with current state law governing individuals who are eligible for participation in the foster home or adoption programs. Cross reference Regulations 114-550, "Licensure for Foster Care," finalized 3-28-2003. (Found in the Reference Section beginning on page 62)

3. Miracle Hill staff providing child welfare services are working toward goals of protection and permanency of children. Miracle Hill child welfare staff will not engage in activities that delay or deny the placement of a child for foster care on the basis of RCNO of the resource/foster caregiver, or the child involved. Likewise, Miracle Hill child welfare staff is prohibited from delaying and denying foster placements on the basis of RCNO. Miracle Hill staff will not deny any individual the opportunity to become a resource/foster parent based on RCNO of the child or prospective resource/foster parent.

4. To assure safety of children, staff must determine the composition of the household. Every household member must be part of the assessment process. A complete assessment must include but is not limited to, how household members relate to one another and to the foster child. It also includes whether a member of the household is a paramour of the foster parent.

5. Recruitment initiatives must be developed based on the counties' self-assessments and the needs of the counties and geared toward placing children in family homes within their communities and neighborhoods whenever possible. SCDSS regulations support diligent recruitment of potential foster and adoptive caregivers that reflect the ethnic and racial diversity of children in South Carolina for whom foster and adoptive homes are needed. The use of diligent recruitment requirements in no way implies that RCNO can be utilized to deny or delay licensing or placement events.

6. The role of staff involved in foster family licensing or re-licensing includes functioning as a part of the child welfare services team and sharing with other child welfare staff members information obtained while performing designated tasks associated with initial screening and orientation, initial assessment and re-licensure, pre-licensure and ongoing training, monitoring, and support. (Note: Licensing specialists should not solicit, record or use information on potential caregiver preferences regarding RCNO).

7. Staff performing foster family licensing and re-licensing services are mandated reporters of suspected child abuse and neglect.

8. Action must be taken by foster family licensing staff on all licensing and re-licensing applications. Approval or denial of a potential foster caregiver application must not be made on the basis of the RCNO of the children in care or the RCNO of the applicant.

9. Staff must complete re-licensing studies on each foster home on a timely basis to assure that a foster child is not residing in an unlicensed facility and that foster care board payments are not jeopardized. Licensing specialists, prior to re-licensure, will ensure that studies do not include impermissible RCNO references regarding children and/or caregivers.

MIRACLE_HILL_SUBP_007972

10. When a licensed resource/foster family moves, foster home licensing staff must update the licensing study or, if the move is to another county, close the foster home. The issued license is not transferrable from the address or the resource/foster family on the license.

11. Discrimination will not be tolerated, whether directed toward adults who wish to serve as resource/foster caregivers, toward children who need safe and appropriate homes, or toward communities where a specific RCNO is dominant.

12. All activities associated with child specific recruitment, licensing, and placement for foster care must be in the "best interest of the child." Routine consideration of RCNO cannot ever be considered to be in the child's best interests.

MIRACLE_HILL_SUBP_007973

**MHM.CPA.910 FOSTER FAMILY RECRUITMENT**

This section outlines procedures to be followed to recruit and develop new resource/foster family homes. The Foster Home Recruiter will develop a recruitment plan annually in joint effort with the Director of Foster Care and the Miracle Hill Development team. The purpose of the plan will be to reduce the number of placement moves of foster children, preserve family relationships and connections, increase the number of siblings placed together and move children from group care into foster homes. As provided in SCDSS' MEPA Corrective Action Plan, all recruitment material must inform potential foster applicants that SCDSS and any entity that receives funds from the Federal Government are prohibited from denying to any person the opportunity to become a resource/foster parent, on the basis of RCNO of the applicant or of the child involved. Delay or denial of the placement of a child for foster care or adoption, on the basis of the RCNO of the resource/foster parent or the child involved is strictly prohibited.

1. In coordination with the Director of Foster Care and the Miracle Hill Development Department, the Foster Home Recruiter will assess the needs of the Upstate of South Carolina and work in collaboration with SCDSS county directors.
   a. Assess available resources for recruitment.
   b. Establish recruitment priorities and goals.
   c. Does not engage in any activity that attempts to discourage prospective foster caregivers from parenting a child of a particular RCNO.
2. Identifies community resources and strategies for recruitment, publicity, and implementation.
   a. Works with Miracle Hill Development staff in contacting local print, broadcast and social media.
   b. Works with current resource/foster families, volunteers, churches, and community groups.
   c. Responds to community requests for involvement in recruitment activities.
3. Works with Miracle Hill Development initiating recruitment strategies on a planned, on-going basis, including (as appropriate) articles and notices in area newspaper and other appropriate print resources and social media.
4. Assists with the assessment process of recruitment goals, strategies and outcomes.

MIRACLE_HILL_SUBP_007974

**MHM.CPA.911 INITIAL CONTACTS AND GENERAL ORIENTATION**

This section outlines procedures for initial contacts and general orientations for potential foster family applicants. Compliance requirements for actual evaluation and licensing are detailed in Section 911.01 through 918. The SCDSS adheres to federal laws, including MEPA and the Civil Rights Act of 1967, which prohibit policies, procedures or actions that serve to deny any person the opportunity to become a foster caregiver or an adoptive parent on the basis of RCNO of that person, or of the child involved; or which delay or deny any placement of a child in foster care or for adoption on the basis of the RCNO of the foster caregiver(s), of the adoptive parent(s) or of the child involved.

Licensing Coordinator
1. Upon receipt of a foster parent inquiry (whether on-line or written), reviews it to make sure it meets the Miracle Hill requirements.
2. Invites them to group orientation or assigns the prospective resource/foster parent(s) to a licensing specialist for an individual orientation.
3. Registers them for a specific group orientation.
4. Receives the initial paperwork from the prospective family which includes the applications and background check forms.
5. Assigns prospective family to licensing specialist (based on geographical area as well as caseload size).

[The inquiry packet includes: Resource Parent Information Sheet (explanation of what a resource parent is), Miracle Hill Doctrinal Statement, Introduction to Foster Care, Resource/Foster Parent Applicant Information, Resource/Foster Parent Requirements, Resource/Foster Parent Info Sheet, and Why I Want to be a Resource/ Foster Parent form.]

Licensing Specialist
1. When assigned a prospective resource/foster family, contacts to schedule a home visit.
2. Sends application to South Carolina Heartfelt Calling.
3. While meeting with the potential family, discusses their personal testimony of salvation, assesses the home, and reviews the purpose of the licensing study process, including such topics as:
   a. Protection of foster children from harmful experiences and to provide the child with the most appropriate placement;
   b. Conducting a licensing study and to obtain reliable information to evaluate the applicant's ability to meet licensing standards. Advising a family that they cannot be licensed by more than one agency, or by more than one division in an agency.
   c. Purpose of foster care;
   d. Board payment rates and purpose (food, shelter, clothing, school, minor medical, daycare and other expenses);
   e. Reimbursable expenditures;
   f. Transportation to comply with state public safety laws;
   g. Medical care including Medicaid and non-emergency medical care;
   h. The reasons for and process through which children are placed in foster care;
   i. Common problems experienced by children in foster care;
   j. Involvement of biological parents, including the need for regular contact/visitation between the child and parent(s), siblings, and significant relatives;
   k. The role of the resource/foster family and of the biological parents;

- 6 -

MIRACLE_HILL_SUBP_007975

    c. Ensures that all deficiencies are corrected and all recommendations are addressed in the record (DHEC form should clearly document when the corrections were made). Some deficiencies cited may require follow-up by DHEC (e.g. water supply) while others (e.g. rabies vaccination) can be verified by the Licensing Specialist.
       *NOTE: Review Section 915. (page 21)

6. Ensures that all firearms and ammunition in the home are kept in a locked storage container.

7. Obtains a minimum of three written references from persons who have known the resource/foster family applicants for at least three years prior to the application and, unless specifically requested, not related to the applicant. At least one reference must be someone who speaks to their faith/church attendance.
    a. If a reference is initially obtained verbally (rather than written), the reference source must submit to the Licensing Specialist a written statement confirming their recommendation.
    b. Does not promise that references will be confidential since the applicant may see their licensing file.
    c. Explores further with the reference any problem identified/noted by the reference, (e.g. receipt of a bad reference report).
    d. If deemed necessary, obtains additional references.

8. Requests completion of medical forms on all family members and household members. All applicants and household members must submit a medical report completed by a duly licensed physician or nurse practitioner verifying that such individuals are in reasonably good health, including an evaluation as to communicable or contagious diseases.

9. Conducts additional interviews with applicants, the actual number is dependent on the individual situation and supporting information.

10. Obtains a copy of the drivers' licenses from all licensed drivers for identity verification.

11. Requests MVR form to be completed on all drivers who would be driving while the foster child was in the vehicle. Submits MVR to Miracle Hill Human Resources Office for checking the driving records.

12. Reviews the training notes/impressions of the resource/foster family applicants. These notes are to be used as another resource to help evaluate the prospective family's suitability to serve as a caretaker.

13. Assesses the applicants' capacity to reasonably serve as a resource/foster family including evidence of:
    a. Ability to care about others and be responsible for them,
    b. Ability to appropriately express affection,
    c. Enjoyment in the parental role,
    d. Ability to care for a child, including use of appropriate discipline, and meet that child's needs without expecting immediate appreciation and response from the child,
    e. A satisfactory and stable marriage (for applicant couples),
    f. Maintenance of appropriate relationships with other family members and with the community,
    g. Stability, maturity, and functioning,
    h. Ability to be flexible in expectations and attitudes in helping meet a child's needs and in addressing a child's problems,
    i. Ability to request and use assistance when needed to deal with problems in the family,
    j. Ability to accept and support the child's relationship and reunification with biological family,
    k. Ability to cooperate and appropriately work with Miracle Hill staff and DSS on behalf of the child and the child's best interest and willingness to accommodate the monthly contacts or interviews from DSS staff as required by statute,

MIRACLE_HILL_SUBP_007976

h. Any parent figures (e.g., grandmother who provides parenting) in the home have each received a minimum of 14 hours of foster care pre-service training;

i. Current medical reports on all household members;

j. Three positive written references by non-related persons (unless a relative reference is specifically requested) who have known the applicant(s) for 3 years prior to the application. One of these must be someone who can attest to the applicant's faith and church attendance.

k. Document interview with any proposed day care provider/babysitter to assess the provider's availability, appropriateness, vacancy status, and willingness to provide for childcare.

l. Written home study which at a minimum, includes topics of:
   (1) Motivation to be a foster parent;
   (2) Preferences related to placements (age and behavior);
   (3) Family history, relationships, parenting experience, and coping ability;
   (4) Educational, health and work history of family members;
   (5) Information on other household members, adult children, and related children not in the physical custody of the applicant or spouse, including whether any household member is a paramour of the applicant;
   (6) Home environment and community resources;
   (7) Working with foster children;
   (8) Preparation training;
   (9) Results of CPS/Sex Offender/SLED and FBI checks;
   (10) Religious affiliation and discipline;
   (11) Income is reasonable, secure and not dependent on board payments;
   (12) Appropriateness of child care and babysitting arrangements;
   (13) Overall understanding of the purpose of foster care and ability to provide quality foster care.

m. Written disaster preparedness plan for resource/foster parent(s).
   *NOTE: Reference Section 916 for additional information. (Page 22)

n. Discipline Agreement form signed by both resource/foster parents.

o. Recommendation for issuance of a Standard license if all requirements are met and this is Miracle Hill's intent.
   *NOTE: It is advised that homes be licensed only for the specific age range/gender requested by the resource/foster parent and recommended by the licensing specialist.

p. If the specialist cannot recommend the applicant to be licensed, the file should contain documentation that:
   (1) The specialist has discussed any potential barriers with the family and discussion with the family resulted in a written confirmation of withdrawal;
   (2) Resolution is not possible, the family does not choose to voluntarily withdraw and denial is the current course of action (refer to Section 922 page 40).

3. Consults with Foster Home Coordinator for permission prior to:
   a. Placement of more than two (2) infants (ages birth to one year of age) in the same foster home;
   b. Placement of more children in a foster home than stipulated in the current license.
      *NOTE: Reference 918.02.

4. See Section 919 for actual issuance of the license. (Page 34)

- 26 -

MIRACLE_HILL_SUBP_007977

# Attachment 4

MIRACLE_HILL_SUBP_007978

Foster Care - Miracle Hill Ministries                                    Page 1 of 2

Search                   🔍



**Miracle Hill**
**MINISTRIES**

(/)

## FOSTER CARE

Home (https://miraclehill.org/) > How We Help (https://miraclehill.org/how-we-help/) > Children's Ministries (https://miraclehill.org/how-we-help/childrens-home/) > Foster Care

Homeless Ministries (https://miraclehill.org/how-we-help/homeless-shelters/)

Children's Ministries (https://miraclehill.org/how-we-help/childrens-home/)

Boy's Shelter (https://miraclehill.org/how-we-help/childrens-home/boys-shelter/)

Children's Home (https://miraclehill.org/how-we-help/homeless-shelters/miracle-hill-childrens-home/)

Foster Care >

Homes for Life (https://miraclehill.org/how-we-help/childrens-home/homes-for-life/)

Addiction Recovery (https://miraclehill.org/how-we-help/addiction-recovery/)

Community Resources (https://miraclehill.org/how-we-help/community-resources/)

Request a Speaker (https://miraclehill.org/request-a-speaker/)

## FOSTER CARE

Over 2,000 children are in foster care in the Upstate of South Carolina, and because of a shortage of foster homes hundreds more children are waiting. In need of a foster home. Miracle Hill has made it our mission to find Christian foster parents. Being a resource foster parent is a tremendous blessing and directly answers God's call in James 1.27

Since 1988, Miracle Hill has been recruiting Christian foster families – both single and married — and providing them with vital support throughout the licensing process, placements and beyond. In addition to developing relationships with our resource foster parents, our skilled team prays for them, and accompanies them to various meetings and proceedings within the court system.

While loving Christian homes for children of all ages are always needed, there is a special need for toddlers, ages 2 to 5, teenagers, and sibling groups.





**Brenda Parks, Director**

490 S. Pleasantburg Drive

(https://www.google.com/maps/dir/ /490
3m13b14m8!4m7!1m0!1m5!
1m1!
1s0x88582fc64bfaadbb:0xef33d650929367
2m2!1d 82.36989761
2d34.8309088!)

Greenville, SC 29607

Phone (864) 605 6689

MIRACLE_HILL_SUBP_007979

Foster Care - Miracle Hill Ministries

Page 2 of 2

**WHAT IS FOSTER CARE? (HTTP://MIRACLEHILL.ORG/WP-CONTENT/UPLOADS/2016/11/FOSTER-CARE-WHAT-IS-FOSTER-CARE-INTRO.PDF)**

**FREQUENTLY ASKED QUESTIONS (HTTP://MIRACLEHILL.ORG/FREQUENTLY-ASKED-QUESTIONS/)**

## Licensing Requirements

We are currently licensing homes in the SC Region 1 counties of Abbeville
Anderson, Cherokee, Greenville, Greenwood, Laurens, Newberry, Oconee
Pickens and Spartanburg

**SC REQUIREMENTS (HTTP://MIRACLEHILL.ORG/WP-CONTENT/UPLOADS/2017/08/SC-REQUIREMENTS-FOR-FOSTER-FAMILIES.PDF)**

## Next Steps

If you are interested in becoming a foster parent, please fill out the inquiry
below, and one of our foster care licensing specialists will contact you

**ONLINE FOSTER CARE INQUIRY (HTTP://MIRACLEHILL.ORG/FOSTER-CARE-INQUIRY-FORM/3)**

**LIKE OUR FACEBOOK PAGE (HTTPS://WWW.FACEBOOK.COM/MIRACLEHILLFOSTERCARE/?FREF=TS)**



**CONNECT WITH US:**

 

**SIGN UP FOR E-NEWS:**

First Name    Last Name    Email Address

**SUBMIT**

Privacy Policy (https://miraclehill.org/privacy-policy/)  Sitemap
Contact Us (http://miraclehill.org/who-we-are/contact-us/)
Login (https://miraclehill.org/staff-member-login/)
© 2018 Miracle Hill Ministries    Privacy Policy (https://miraclehill.org/privacy-

policy/)

490 S. Pleasantburg Drive
Greenville, SC 29607
Phone (864) 268-4357

https://miraclehill.org/how-we-help/childrens-home/foster-care/                1/25/2018

MIRACLE_HILL_SUBP_007980

Foster Care Inquiry Form - Miracle Hill Ministries                    Page 1 of 6

5/SEE:/MEDILATION2?DF_ID=1660&MFC_PREF=T&1660.DONATION=FORM1%20)



**Miracle Hill**
M I N I S T R I E S

(/)

## Foster Care Inquiry

### NAME

**First**

**Last**

### EMAIL

### ADDRESS *

**Street Address**

MIRACLE_HILL_SUBP_007981

Foster Care Inquiry Form - Miracle Hill Ministries

**Address Line 2**

**City**

**State / Province / Region**

**ZIP / Postal Code**

## PHONE *

## DATE OF BIRTH *

☐ **Yes, I would like to receive e-mail from Miracle Hill Ministries.**

## MARITAL STATUS

**Married**

1/25/2018

MIRACLE_HILL_SUBP_007982

**SPOUSE NAME**

**SPOUSE'S DATE OF BIRTH**

**SPOUSE'S EMAIL**

**SPOUSE'S PHONE**

**HOW DID YOU HEAR ABOUT MIRACLE FOSTER CARE? \***

**WHY I WANT TO BE A FOSTER PARENT (CHECK ALL THAT APPLY) \***

☐ **My children are older, or gone, and I want to have children around again.**

☐ **I would like for my child(ren) to have someone to play with.**

☐ **I would like to help a child to something good with his/her life.**

MIRACLE_HILL_SUBP_007983

Foster Care Inquiry Form - Miracle Hill Ministries                    Page 4 of 6

☐ I need the money and I would rather work in my home.

☐ I think I am a good parent.

☐ I have no children and would like to try being a parent.

☐ I would really like to adopt a child, but the wait is so long.

☐ I know there are children who need homes, and I think I
should help.

☐ I think I have good skills for working with children and would
like to use them.

☐ My spouse really wants to get into foster parenting.

## TELL US ANY OTHER REASONS YOU WOULD LIKE TO BE A FOSTER PARENT.

Miracle Hill Ministries is a non-denominational Christian organization based upon protestant statement of faith. All children entrusted to our care are to be cared for in an atmosphere that is conducive to spiritual growth, development, and moral direction. Each child is expected to participate in worship with the foster family at their local church as well as in the home. However, if the child does not accept the Christian principles of the family, he/she is to be loved unconditionally as if he does embrace them. Rewards are not to be based upon spiritual "decisions" but rather upon the display of proper behavior.

## DENOMINATIONAL AFFILIATION

## PASTOR'S NAME

https://miraclehill.org/foster-care-inquiry-form/3/                    1/25/2018

MIRACLE_HILL_SUBP_007984

Foster Care Inquiry Form - Miracle Hill Ministries                              Page 5 of 6

**PASTOR'S PHONE**

**PLEASE GIVE A BRIEF, PERSONAL TESTIMONY OF YOUR FAITH/SALVATION. IF YOU ARE MARRIED, PLEASE INCLUDE YOUR SPOUSE'S TESTIMONY AS WELL.**

**Miracle Hill Mission Statement**
Miracle Hill exists that homeless men, women and children receive food and shelter with compassion, hear the Good News of Jesus Christ and become productive members of society.

**Terms and Conditions**
I have read and agree to the requirements set forth by both the state of SC and Miracle Hill Ministries and located on the Foster Care page of MHM's website. To the best of my knowledge, all the information provided on this form is correct. I understand that Miracle Hill will use this information for preliminary screening, and at this time I am not committing to becoming a foster parent, but rather indicating an interest, and I will be contacted for further discussion.

## ACCEPT TERMS? *

☐  **I accept the Terms & Conditions.**

| SUBMIT |
| --- |

MIRACLE_HILL_SUBP_007985

Foster Care Inquiry Form - Miracle Hill Ministries                              Page 6 of 6

**CONNECT WITH US:**



**SIGN UP FOR E-NEWS:**

First Name          Last Name          Email Address

**SUBMIT**

490 S. Pleasantburg Drive
Greenville, SC 29607
Phone: (864) 268-4357

Privacy Policy (https://miraclehill.org/privacy-policy/)  Sitemap
Contact Us (http://miraclehill.org/who-we-are/contact-us/)
Login (https://miraclehill.org/staff-member-login/)

© 2018 Miracle Hill Ministries    Privacy Policy (https://miraclehill.org/privacy-policy/)

MIRACLE_HILL_SUBP_007986

# Attachment 5

MIRACLE_HILL_SUBP_007987

Miracle Hill Ministries
Note to File

01/18/2018
Jacqueline Lowe met with Taron Davis to discuss the "draft" letter to Miracle Hill Ministries. The CPA License is due to expire January 27, 2018. Concerns were the language in their policies and on the website that were discriminatory on the basis of religion. Taron reviewed the "draft" letter and recommended I contact Miracle Hill Ministries to inform of our intent to issue a temporary license, request for the removal of discriminatory information, and to change practice.

01/18/2018
Jacqueline Lowe telephoned Beth Williams of Miracle Hill Ministries. Lauren Staudt was also present for the conference call. Jacqueline discussed the information on the website and informed that a temporary license will be issued. Beth commented that she thought this issue had been resolved last year and that their attorney had met with our (DSS) attorney. During the call, we asked her to pull up the website to review the foster care inquiry page along with us as there was still information about a doctrinal statement and requiring foster parents to acknowledge a specific religious faith. Lauren asked if she were an applicant and was not comfortable giving a personal statement or if not active in a church, would she be screened. Beth did not answer the question posed. Beth asked us to hold off on sending the letter until she had an opportunity to speak with Reid (Lehman, the CEO) and their attorney Miles (Coleman) hopefully by Monday (01/22/2018).

MIRACLE_HILL_SUBP_007988

# Attachment 6

MIRACLE_HILL_SUBP_007989

 WSPA.com

# DSS threatens Upstate faith-based foster care program

By WSPA Nickelle Smith (http://wspa.com/author/wspanickellesmith/)
Published: February 23, 2018, 12:06 am  |  Updated: February 23, 2018, 12:08 am



GREENVILLE, SC (WSPA) – A faith based foster care program is at risk of losing its license.

South Carolina Department of Social Services is challenging Miracle Hill Ministries (https://miraclehill.org/who-we-are/about-us/) to stop recruiting only Christian families.

"A year ago, they [DSS] say that they received communication from the Department of Health and Human Services in Washington saying that it was illegal and they wanted to be sure no one in South Carolina was doing this," said Miracle Hill Ministries CEO Reid Lehman. "I think that was the catalyst for it."

The Greenville based non-profit organization has been doing foster care for 29 years, having been licensed with the state since 1995.

"We've always been open and completely above board about our practices and nobody had a problem with it before," said Lehman.

Miracle Hill Foster Care served 418 children in 2017, with 31 of those being adopted into forever homes. The program has 241 foster families currently serving to care for abused, neglected or abandoned children.

MIRACLE_HILL_SUBP_007990

"There's a state lawsuit called the Michelle H Lawsuit that essentially says South Carolina has had two many kids in residential facilities – they need to use more families," said Lehman. "Miracle Hill has done its very best to ramp up the number of families we've been working with and we've gone from 45 to 241 in the last five years."

Jason and Mary Reardon have always wanted to be parents.

"We weren't able to have children," said Mary Reardon. "We thought we would have our own children and eventually adopt children because we both agreed we wanted to adopt but we thought it would be in a different way."

A conference about adoptions and fostering granted that dream through Miracle Hill Ministries.

"We were very excited to not only have a means of getting into foster care but a means that stayed strong with us as a Christian family," said Jason Reardon. "Miracle Hill is there to help the community. This country was founded upon God. We may not want to agree with that these days, sadly enough. So, as a Christian based organization – who's impacted the community – I think we need to step back and look at whatever's in place and begin to evaluate that for the sake of these children."

Miracle Hill Ministries said it's the largest and most successful foster care program in South Carolina.

"DSS believes and Miracle hill believes that family style care is the very best form of care," said Lehman. "As a non-denominational christian ministry, we work hard to recruit them out of churches."

Lehman said DSS believes screening on the basis of religion is unacceptable under state and federal law, but he said families of other faiths – or no religion at all – can use other agencies.

"If they inquire with us, we'll introduce them to the right place and help them as much as we can because kids need these families," said Lehman. "We're just committed that our belief is that we're to work with Christian families."

MIRACLE_HILL_SUBP_007991

They took their concerns to Governor Henry McMaster.

McMaster sent a letter to Miracle Hill Wednesday saying he's "committed to protecting religious freedom and to ensuring that miracle hill continues serving our state's foster children."

"I just need to say this about DSS – they're good people. They're sincere people. They're job is to keep children safe and to obey laws and regulations as best they know so it's not a case of us against them," said Lehman. "It's a case of we need to get together to clarify these regulations and to clarify that religious freedom is not circumscribed by regulations that say you can't discriminate on the basis of sex and ethnicity and things like that."

The governor's office is working with the Department of Health and Human Services to get a waiver of requirements that adversely affect religious entities.

"Hoping and praying through this whole process that the state will realize the seriousness," said Jason Reardon.

The couple has fostered 15 children, and adopted 4 as their own.

"We've been blessed with four beautiful girls – two sets of sisters – one who's now 18, graduating, who came to live with us as a teenager," said Jason Reardon. "There's such a need for foster parents in the scheme of things, especially for children who are starting to age out of the system."

DSS has given Miracle Hill a provisional license for 6 months instead of a year. Lehman said they don't think this will affect current families caring for children.

"We've had 15 foster children come through our home and we've loved each one like our own," said Mary Reardon. "I just feel like God's really given us a huge family. We have four we've adopted but we have all these other children that we love so much and always pray for and remember."

### Related Posts

MIRACLE_HILL_SUBP_007992

DSS threatens Upstate faith-based foster care program                    Page 4 of 4

 **Teen sexually assaulted in foster care files lawsuit (http://wspa.com/2017/12/19/teen-sexually-assaulted-in-foster-care-files-lawsuit/)**

(http://wspa.com/2017/12/19/teen-

 **Rev. Billy Graham passes at the age of 99 (http://wspa.com/2018/02/21/evangelist-billy-graham-passes-at-the-age-of-99/)**

(http://wspa.com/2018/02/21/evangelist-

 **Reaction to the death of Rev. Billy Graham (http://wspa.com/2018/02/21/reaction-to-the-death-of-rev-billy-graham/)**

(http://wspa.com/2018/02/21/reaction-

WSPA.com (http://wspa.com/)

 Nexstar Media Group, Inc.  (http://www.nexstar.tv/)

© 1998-2017 WSPA.com | Nexstar Broadcasting, Inc. (http://www.nexstar.tv/) | All rights reserved.

Powered by WordPress.com VIP (https://vip.wordpress.com/?utm_source=vip_powered_wpcom&utm_medium=web&utm_campaign=VIP%20Footer%20Credit&utm_term=wspa.com)

MIRACLE_HILL_SUBP_007993

# Attachment 7

MIRACLE_HILL_SUBP_007994

South Carolina Code of State Regulations Annotated
Regulations
Chapter 114. Department of Social Services (Refs & Annos)
Article 5. Licensing
Subarticle 5. Foster Care (Refs & Annos)

S.C. Code of Regulations R. 114-550

114-550. Licensure for Foster Care.

Currentness

A. Definitions.

(1) Foster Care--This is care for children in the custody of the South Carolina Department of Social Services who must be separated from their parents or guardians. It is a temporary living arrangement within the structure and atmosphere of a private family home (kin and non relative), or a group home, emergency shelter, residential facility, child care institution, or pre adoptive home, and is utilized while permanent placement plans are being formulated for the involved children.

(2) Board Payments--These are monthly funds appropriated for daily care and maintenance for eligible children in foster care.

(3) The Foster Family--A family that is generally composed of a father and mother, but may be widowed, divorced or single adults, who are licensed by SCDSS, and who are mutually interested in and evidence a capability to care for foster children.

(4) Kinship Care Foster Family--This is a relative family that has been identified and licensed to provide foster care for a specified child or children. Unless otherwise stated, the term foster parent or foster family includes kinship foster care parents and families.

(5) Assessment Study--This is the actual documentation of the assessment study of a family or related family applying to provide foster care services, completed by designated agency staff of the South Carolina Department of Social Services or designated staff of a child placing agency.

(6) Child Placing Agency--For the purposes of these regulations, any person or entity who holds legal or physical custody of a child for the purpose of placement for foster care or adoption or a private placement, or a person or entity who facilitates the placement of children for the purpose of foster care or adoption or a private placement and, which for the purpose of these regulations, retain their own system of foster homes, is a child placing agency. Homes assessed by child placing agencies are licensed in accordance with the Department of Social Services licensing regulations and issued a license by SCDSS.

(7) Agency--South Carolina Department of Social Services.

MIRACLE_HILL_SUBP_007995

(8) Foster child--for the purposes of these regulations, a child in the custody of SCDSS.

(9) Household member--for the purposes of licensing interviews and assessment, an individual who spends significant amounts of time (as defined by SCDSS or the child placing agency) in an applicant's household, can be considered a household member.

B. Applications.

(1) An application form shall be completed by all foster families desiring to be licensed and relicensed.

(2) Applicants must supply thorough, complete and accurate information. Incomplete or erroneous information or violation of regulations can be grounds for denial of an application, revocation of a current license or denial of a renewal.

(3) SCDSS or a licensed child placing agency reserves the right to request and consider additional information if needed during the licensing or renewal process. This additional information may be considered during the licensing or renewal decision-making process.

C. Licensing Procedure.

(1) Any application for licensure pursuant to these regulations shall be studied by SCDSS or a licensed child placing agency.

(2) A decision regarding each application for a license shall be made within 120 days subsequent to the date the standard application is completed by the applicant(s) and is received by SCDSS or the child placing agency. If SCDSS or the child placing agency has requested information that has not been received within 120 days, then the decision is stayed pending receipt of all information.

(3) An initial Standard license shall be issued or denied by the director of SCDSS or his/her designee based on the result of the assessment study and recommendation of SCDSS or child placing agency.

D. Licenses.

(1) The issued license shall not be transferable from either the address or foster family specified on the license.

(2) A Standard license shall be issued when all requirements of these regulations are met. A Standard license is valid for two years from the date of issuance.

MIRACLE_HILL_SUBP_007996

(3) A Standard with Temporary Waiver license may be issued for up to 90 days. The utilization of this type of license is warranted when SCDSS or the child placing agency is acting in the best interest of children already in placement and for whom stability is necessary. The Standard with Temporary Waiver license shall include language that reflects the expiration period and the reason for the temporary waiver. No additional children may be placed during temporary waiver periods. Standard with Temporary Waiver licenses can be issued under the following circumstances:

(a) A standard licensed foster parent moves to a new home and SCDSS or child placing agency is waiting to receive written documentation that the fire and health inspections have been completed and any noted deficiencies have been corrected; or

(b) A standard license has previously been issued to a foster family and subsequently a household member reaches the age of eighteen years, or a new adult household member has entered the home since licensure, and SCDSS or child placing agency is waiting to receive written clearance on all background checks for that individual.

(4) A Standard-Exceeds Maximum Number Allowed license may be issued when a standard licensed foster parent receives placement of more children than allowed under requirements due to SCDSS or child placing agency trying to preserve unity of a sibling group or making an adoptive placement. This license can continue until the number of children again satisfies licensing requirements.

(5) No license issued shall be effective for more than two years from the date of issuance. Subsequent relicensure studies must be completed prior to the expiration of the last license.

(6) A foster home shall not be licensed for more than five (5) children, including the foster parents' own children and/ or other children who are household members unless SCDSS or child placing agency is keeping siblings together or the placement has been court ordered.

(7) Foster Home licensure by more than one agency, or by more than one division within an agency, is not permitted.

E. Assessment Study.

(1) Each prospective foster family shall be assessed by designated staff of SCDSS or by designated staff of a licensed child placing agency.

(2) Such assessment shall be conducted in order to determine:

(a) Whether the applicant(s) complies with licensing requirements and standards;

(b) For which gender and age range of children the home can be licensed;

MIRACLE_HILL_SUBP_007997

(c) Whether the prospective foster parents fully understand the purpose of foster care; and

(d) Applicant(s) and other household members ability to provide quality foster care.

(3) All members of the household over six years of age shall be assessed and interviewed in order to determine their willingness to accept a child and to evaluate the stability of the family unit.

(a) A minimum of one family interview, and one interview per individual, shall be conducted in the home with the prospective applicant, spouse, their children and other household members.

(b) The applicant and spouse shall provide information to SCDSS or the child placing agency staff that enables the licensing staff to interview adult children of the applicant and spouse.

(4) Documentation for the assessment summary at a minimum includes the following issues:

(a) motivations to foster parent;

(b) preferences related to placements;

(c) family history, relationships, parenting experiences, and coping ability;

(d) educational, health, and work history of family members;

(e) information on other household members, adult children, and related children not in the physical custody of the applicant or spouse;

(f) home environment and community resources;

(g) completion of preparation training;

(h) results of CPS/Sex Offender/SLED and FBI background checks;

(i) compliance with all requirements;

(j) income is reasonably secure and not dependent on board payments;

(k) appropriateness of day care arrangements for foster children; and

MIRACLE_HILL_SUBP_007998

(l) family's overall understanding of the purpose of foster care and ability to provide quality foster care.

(5) The assessment summary and the SCDSS or child placing agency's recommendation shall be explained to the applicant. If SCDSS or the child placing agency is not recommending licensure, the applicant family should be offered the opportunity to elect to withdraw their application. If the applicant elects to continue their request to be licensed and if the application is denied, the reason(s) for the denial shall be provided in writing. The applicant shall be advised regarding the right to appeal.

F. Working Foster Parents.

(1) If foster parents are employed outside the home, a written statement outlining a total plan of care, including plans for any necessary emergency care for the child, shall be submitted by the foster family.

(2) Individuals who are to provide child care on behalf of employed foster parents must be interviewed by SCDSS or child placing agency staff prior to the issuance of a Standard license to a foster home.

G. The Requirements for Licensing of a Foster Family.

(1) The following requirements shall be met prior to the issuance of a Standard license to provide foster care:

(a) Background checks shall be documented including a review of abuse and neglect history, criminal history found with SLED and the FBI, and the Sex Offender Registry.

(i) The applicant(s) cannot be considered for licensure if an applicant and/or any household member over age eighteen has a substantiated history of child abuse and/or neglect and/or convictions of those crimes listed in SC Code 20-7-1642 and/or is listed on the SC Sex Offender Registry.

(ii) The applicant(s) may be considered for licensure if an applicant and/or any household member over age eighteen has a conviction, or has been pardoned for a conviction of an offense other than those offenses listed in SC Code 20-7-1642. The Director of SCDSS or his/her designee shall review the conviction or pardoned conviction taking into account the nature of the offense(s), any implications of the offense which have bearing on the individual having access to foster children; the length of time that has elapsed since the conviction(s); the applicant's life experiences indicating reform or rehabilitation during the ensuing period of time; and the fitness and ability to perform as a caregiver or the degree of risk which an individual may pose to children placed in the home. The Director of SCDSS or his/her designee shall document the basis of the decision to approve applicant in light of applicant's and/or household member's criminal record.

(2) The applicant(s) shall be able to access community services and activities.

MIRACLE_HILL_SUBP_007999

(3) The applicant's home and property shall be inspected by licensing or child placing agency staff, State Fire Marshal authorities, and health authorities.

(a) A fire inspection by State Fire Marshal authorities who are required or permitted to inspect and enforce fire regulations must be conducted prior to the initial standard licensure.

(b) Annual fire inspections are required thereafter.

(c) A health inspection by such health authorities who are required or permitted to inspect and enforce health and sanitation regulations must be conducted prior to the initial licensure and as needed thereafter.

(d) Additional fire and health inspections are required if there is a change in residence.

(e) Additional fire and health inspections may be required if there are structural changes made to a residence or if such an inspection is deemed necessary by SCDSS or the licensed child placing agency.

(f) Any deficiencies must be corrected prior to initial licensure and/or relicensure.

(4) The applicants/foster parents shall:

(a) Be at least twenty one years of age or older. Age of foster parents should be considered only as it affects their ability to care for children within the age group applicant has expressed an interest in, and in relation to the probable duration of placement of a particular child.

(b) Have knowledge of the needs of children, be capable of meeting the needs of foster children and provide adequate foster care services;

(c) Be capable of handling an emergency situation;

(d) Be cooperative with SCDSS or child placing agency staff in furthering the best interest of the child; and

(e) Provide all relevant and factual information to SCDSS or the child placing agency.

(5) Foster parents must each have a minimum of fourteen (14) hours of appropriate foster care pre service training and which includes training on licensing requirements and expected standards of care prior to licensure commencing January 1, 2003.

MIRACLE_HILL_SUBP_008000

(a) The foster parents will each subsequently be required to complete a minimum of fourteen (14) hours training each year, or twenty (28) hours prior to each subsequent relicensure commencing January 1, 2003.

(b) Viewing standard television programs or reading popular news or magazine articles will not be accepted for training hours and the training shall be provided by SCDSS or via another source which is approved by SCDSS.

(6) The applicant's or current foster family's income shall be reasonably secure and not dependent upon foster care boarding payments. The family shall supply verifiable information on family income and expenditures whenever requested to do so by SCDSS or the child placing agency.

(7) All applicants and household members shall submit an initial medical report by a duly licensed physician or licensed nurse practitioner verifying that such individuals are in reasonably good health, including an evaluation as to any communicable or contagious diseases. If deemed necessary by SCDSS or the child placing agency, additional medical reports may be required.

(a) If applicant/household member has sought treatment for issues related to mental health or drug or alcohol abuse, such information must be disclosed to SCDSS or the child placing agency during the assessment. Applicants shall only be licensed after consultation between SCDSS or the child placing agency staff and appropriate therapist, counselor or physician, if applicable, of the applicant/household member to obtain a history of rehabilitation and to assess the potential effects on their ability to care for children placed in the home.

(b) SCDSS or the child placing agency has the authority to request a psychological report on an applicant or household member, at the expense of the applicant, pursuant to securing information during the assessment study process that could indicate a need for professional consultation.

(c) Applicants/household members will execute the necessary releases to allow SCDSS or the child placing agency to access this information.

(8) A minimum of three written letters of reference shall be initially obtained in regard to foster parent applicants.

(a) If deemed necessary by SCDSS or the child placing agency, additional references may be required.

(b) References should have known the applicants three years prior to the application and, unless specifically requested, should not be related to the applicants.

H. The following standards of care shall be maintained by foster families. Failure to comply with one or more of these standards of care may result in removal of foster children from the home and revocation of the foster home license:

(1) The child's daily routine shall be planned to promote the development of good health habits.

MIRACLE_HILL_SUBP_008001

(2) Each child shall be provided with adequate health and hygiene aids.

(3) Space for a child's possessions shall be provided.

(4) The foster family home shall be able to comfortably accommodate a foster child as well as their own family.

(a) Each child in care shall be provided with his or her own bed and storage space, however same sex siblings may be allowed to share a bed or storage.

(b) No child may routinely share a bed or a bedroom with an adult and except for a child under one year of age, a child must not share a bedroom with an adult unless SCDSS or the child placing agency staff document extenuating circumstances exist.

(c) Children of opposite sex sleeping in the same bed must be limited to siblings under the age of four years. Children of opposite sex sleeping in the same room must be limited to children under the age of four years.

(d) Children shall sleep within calling distance of an adult member of the family, with no child sleeping in a detached building, unfinished attic or basement, stairway, hall, or room commonly used for other than bedroom purposes.

(e) No biological children of the foster family shall be displaced and made to occupy sleeping quarters prohibited in (b), (c) and (d) above because of a foster child being placed in the home.

(f) The top level of bunk beds shall not be used for children under the age of six years.

(5) If deemed appropriate by SCDSS or the child placing agency, the foster family will cooperate in assuring that foster children are able to maintain regular contact with their birth parents, siblings, and other significant relatives.

(6) Unless advised otherwise by the responsible agency, each foster child shall be prepared by foster parents to eventually leave the home.

(7) Foster parents shall follow instructions and suggestions of providers of medical and health related services. If receiving medication, a child's prescription shall be filled on a timely basis and medications will be administered as prescribed, and otherwise be kept secured.

(8) Foster parents shall obtain emergency medical treatment immediately as need arises, and shall notify SCDSS and child placing agency staff, no later than 24 hours of receiving such care.

MIRACLE_HILL_SUBP_008002

(a) If the primary source of payment for medical care is medicaid, foster parents must insure that the child's card is accessible at all times.

(b) Foster parents should contact SCDSS for coordination of any elective or non-emergency surgical procedures as far in advance of the procedure(s) as possible.

(c) Any injuries sustained by a foster child must be reported as they occur and no later than 24 hours of incident.

(9) Foster parents are responsible for notifying SCDSS and child placing agency staff as soon as possible when a critical incident has occurred such as:

(a) Death of any child in the home;

(b) Attempted suicide by the child;

(c) Child is caught with a weapon or illegal substance;

(d) Child is charged with a juvenile or adult offense;

(e) Child is placed on homebound schooling or is suspended or expelled from school;

(f) Child has left the home without permission and has not returned.

(10) School attendance shall be in accordance with State law requirements and be in accordance with the ability and in the best interest of the child.

(a) The foster parents will assure that each foster child has access to education, educational opportunities and related services. Foster parents must emphasize the value of education and encourage and support children in their care to fully participate in educational activities;

(b) SCDSS will choose school foster child attends.

(c) SCDSS will not pay for costs associated with private tuition.

(d) Unless extenuating circumstances exist, foster parents shall not home school foster children. SCDSS must approve any such plan.

MIRACLE_HILL_SUBP_008003

(11) Religious education shall be in accordance with the expressed wishes of the natural parents, if such wishes are expressed.

(12) All discipline must be reasonable in manner, moderate in degree and responsibly related to the child's understanding and need.

    (a) Discipline should be constructive or educational in nature (e.g. withdrawal of privileges).

    (b) Cruel, inhumane and inappropriate discipline is prohibited. This would include but not necessarily be limited to the following: head shaving or any other dehumanizing or degrading act; prolonged/frequent deprival of food or serving foster children meals which are not as nutritionally adequate as those served to other family members or requiring children to be isolated from other family members when eating, deprival of mail, slapping or shaking; a pattern of threats of removal from the home as punishment; disciplining a child for a medical or psychological problem over which he/she has no control (e.g. bedwetting, stuttering, etc.).

    (c) All foster homes are subject to South Carolina laws relating to child abuse and neglect.

    (d) The use of corporal punishment as a form of discipline is prohibited.

(13) Tasks which are assigned to foster children shall be appropriate to the ability of the child, similar to responsibilities assigned to other children, and geared toward teaching personal responsibility.

(14) Foster parents must assist older foster adolescents in their care in learning skills that are necessary for successful independent living.

(15) Varied recreational activities shall be available to each child.

(16) Infants and children shall not be left without competent supervision.

(17) Foster parents, in conjunction with SCDSS, shall keep a life book/scrapbook on each foster child placed in their home. Children's records and reports shall be kept confidential and shall be returned to SCDSS when a foster child leaves the foster home.

(18) Firearms and any ammunition shall be kept in a locked storage container except when being legally carried upon the foster parent's person; being used for educational, recreational, or defense of self or property purposes by the foster parent; or being cleaned by the foster parent.

(19) Applicant must be able to secure/supervise access to in ground or above ground swimming pools and maintain adequate supervision during periods of swimming.

MIRACLE_HILL_SUBP_008004

(20) Fire escape plans must be developed, posted and routine drills conducted.

(21) A plan for how the family will respond and travel in the event of a disaster (e.g., a hurricane evacuation) must be developed and shared with SCDSS or child placing agency.

(22) All pets must be kept current with rabies vaccinations and proof of such provided. Pets must not pose a safety concern. SCDSS or the child placing agency will determine what constitutes a safety concern.

(23) Applicants and current licensed families must make themselves reasonably available on an ongoing basis to SCDSS or the child placing agency for statutorily required contacts or other contacts SCDSS or the child placing agency deems necessary. SCDSS or the child placing agency has the right to make unannounced visits, and talk to any foster child on an as needed basis.

(24) Board payments shall be utilized but not limited to reimbursement for a foster child's board, school expenses, food, clothing, incidentals, minor medical needs and other expenses.

(25) A foster home shall not provide full time care for more than five (5) children, including the foster parents' own children and/or other children who are household members unless SCDSS or the child placing agency is keeping siblings together or making an adoptive placement or the placement has been court ordered.

(a) No more than two (2) infants (age birth to one year) shall be placed in the same foster home without prior approval from SCDSS or child placing agency management staff.

(b) No foster home shall exceed the number of children stipulated on their issued license without permission from SCDSS or child placing agency staff.

(c) No foster home shall accept children referred by another public or private source without obtaining the permission of SCDSS or child placing agency staff prior to the actual placement.

(26) When a home is licensed to provide care for an unmarried mother, a plan for medical and hospital care, as well as appropriate protection from community stresses associated with pregnancy, must be made.

(27) A foster family is required to notify SCDSS or child placing agency staff of any significant change in the family/ home including, but not limited to, any structural changes in the home; plans involving a change of residence; any major changes in the health of anyone living in the home; change in marital status and the addition of any occupants to the home; significant changes in finances; and criminal and/or child abuse allegation charges and/or investigations.

(28) No unrelated lodger or boarder shall be allowed to move into a foster home without the agency's concurrence. Foster children may be placed or remain in a foster home where there is an unrelated lodger or boarder or room mate after necessary safety checks have been made and written concurrence obtained by SCDSS or the child placing

MIRACLE_HILL_SUBP_008005

agency. Anyone over the age of eighteen years and living in the home must undergo a fingerprinting, SLED, Sex Offender, and CPS check. If children are already in placement, an affidavit must be submitted by the household member confirming there is no record. The license must be amended to a Standard with Temporary Waiver until the results of the submitted checks have been received.

(29) Applicants or current foster families must advise SCDSS or the child placing agency staff prior to opening a day care or other home based business in the home.

(30) Foster parents shall transport children in accordance with state public safety laws.

I. Records Documentation Required for Child Placing Agencies.

(1) All child placing agencies in the State shall keep records regarding each of their foster children containing the following information:

(a) The child's name;

(b) The child's birth date;

(c) The date of his admission and discharge from each foster care placement;

(d) Name, address and telephone number of relatives;

(e) Place and hours of employment of child's relatives; and

(f) Name, address and telephone number of available physician.

(2) All child placing agencies in the State shall keep records regarding each of their foster homes and said records shall contain documentation of compliance with these regulations and SCDSS procedures related to foster home licensing.

J. Adoption of Foster Children by Foster Parents.

(1) Foster parents may apply to adopt a foster child.

(2) Foster families who have been approved for adoption will be given first consideration for the adoption of a foster child under the following conditions:

MIRACLE_HILL_SUBP_008006

(a) The child has been in the same foster home for a consecutive six months period of time or more; and

(b) The child is legally free for adoption; and

(c) Placement for adoption with the foster family is deemed to be in the best interest of the child by SCDSS or the child placing agency.

K. Initial Licensing, Renewal, Denial, Revocation, and Termination of License.

(1) Foster family licenses shall be studied for renewal every two years and prior to the expiration of the last license.

(2) Renewal process requirements include documentation of annual fire inspection, additional training hours, background checks through CPS, SLED, and Sex Offender Registry, home visit, assessment of ongoing compliance with requirements and standards of care, and any additional requirements as SCDSS or the child placing agency staff may deem necessary.

(3) A license will not be issued or renewed if licensing requirements are not met, or standards of care have not been maintained as prescribed within these regulations or if, in the opinion of SCDSS, it would be detrimental for children to be placed in the home. Written notification of the denial, signed by the director of SCDSS or his/her designee will be mailed via certified mail from SCDSS to the applicant(s) or license holder. The notification will inform the applicant(s) or license holder of any right to appeal this decision pursuant to established SCDSS procedure.

(4) A foster home license may be revoked by SCDSS if minimum licensing requirements or standards within these regulations are not met, or, if in the opinion of SCDSS or child placing agency staff, it would be detrimental for additional children to be placed in the home. Written notification of the revocation, signed by the director of SCDSS or his/her designee will be mailed via certified mail from SCDSS to the license holder. The notification will inform the license holder of any right to appeal this decision pursuant to established SCDSS procedure.

(5) A foster family license shall be terminated when:

(a) The time specified on the license has elapsed; or

(b) The foster family has moved to a new location without applying for a change in license; or

(c) The license has been revoked or renewal denied and the time frame for appeal has elapsed; or

(d) A foster family voluntarily returns the current license to SCDSS of the child placing agency for cancellation or otherwise informs SCDSS or the child placing agency that they no longer desire to be licensed.

MIRACLE_HILL_SUBP_008007

L. Kinship Foster Parents.

(1) Per federal policy, relatives being licensed must be licensed in accordance with the same requirements as non-relative applicants. SCDSS may waive, on a case by case basis, for relatives or non-relatives, non-safety elements as SCDSS deems appropriate. Safety elements such as history of child abuse/neglect, state and/or federal criminal history checks must not be waived. SCDSS must note on the standard license if there was a waiver of non-safety element and identify the element being waived.

(2) Relatives are given preference in placement options provided such placement is in the best interest of the child(ren).

M. Confidentiality.

(1) No foster family shall directly or indirectly disclose any information regarding foster children, their biological families/relatives or other individuals who have had control of the foster children, other than to professionals treating, caring and providing services for the child or others as SCDSS or the licensed child placing agency deems appropriate.

(2) Information that is disclosed shall be limited to information that is necessary to provide for the child's needs and in their best interest.

N. Prior Regulations Repealed.

All regulations concerning foster family homes previously promulgated by the agency are hereby repealed, including: Regulations 114-550 (Vol. 27).

O. Regulations Review.

These regulations are to be evaluated at a minimum, every five (5) years from the date of initiation, to assess the need for revision.

**Credits**
HISTORY: Amended by State Register Volume 27, Issue No. 3, eff March 28, 2003.

Notes of Decisions (3)

Current through State Register Volume 42, Issue 1, eff January 26, 2018.

COPYRIGHT (c) 2018 BY THE STATE OF SOUTH CAROLINA

S.C. CODE REGS. 114-550, SC ADC 114-550

MIRACLE_HILL_SUBP_008008

**114-550. Licensure for Foster Care., SC ADC 114-550**

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

MIRACLE_HILL_SUBP_008009

# Attachment 8

MIRACLE_HILL_SUBP_008010

South Carolina Code of State Regulations Annotated
  Regulations
    Chapter 114. Department of Social Services (Refs & Annos)
      Article 49. Child Placing Agencies Regulations (Refs & Annos)

S.C. Code of Regulations R. 114-4980

114-4980. Procedures and Practices of Child Placing Agencies.

Currentness

A. Foster Home Licensing/Relicensing

(1) Child placing agency foster homes shall be licensed/relicensed in accordance with R. 114-550 C(1).

(2) Foster Home Licensing procedure is as follows:

(a) The child placing agency shall utilize the regulations established by the Department to conduct the foster home investigations;

(b) The child placing agency shall record the licensing study in their foster home records and make results available to the applicant(s);

(c) The child placing agency shall notify the applicant(s) in writing if the license is denied or revoked;

(d) The Department may issue a license based on the foster home study and retains the sole authority for issuing, denying and revoking that license.

(3) Foster Home Relicensing procedure is as follows:

(a) The child placing agency shall conduct annual relicensing studies on all licensed foster homes to determine continued compliance with the regulations;

(b) The Department may issue, deny or revoke a license based on the relicensing study.

(4) Monitoring Foster Homes. The child placing agency shall monitor all of its licensed foster homes for compliance with the foster home regulations established by the Department.

(5) Complaints in Licensed Foster Homes. When receiving a complaint which may indicate possible violations of the foster home regulations, the child placing agency shall:

MIRACLE_HILL_SUBP_008011

(a) Conduct an investigation to assess compliance with applicable licensing rules;

(b) Send a written report to the foster home stating findings, conclusions, and any anticipated action affecting the license;

(c) Notify the Department of the complaint with pertinent information and the identity of both the complainant and the foster home;

(d) Notify the Department of its recommendation as to revocation or continuation of the license;

(e) The Department will investigate complaint(s) according to established policy and procedure.

(6) With regard to child protective services, the child placing agency shall report any suspected cases of abuse or neglect to the local Department of Social Services, as required by law.

(7) Amendments to a Foster Home License. The child placing agency shall utilize the regulations established by the Department whenever there is an amendment to the foster home license.

(8) Recommendations to Revoke a License. The child placing agency shall maintain on file an assessment that includes the specific regulation(s) violated and the act of violation to support their recommendation for revocation.

(9) Selection of Home

(a) The child placing agency shall select the most appropriate home for a child consistent with the family assessment, the child's needs, and the terms of the license;

(b) If the child is placed, must be placed with a licensed provider;

(c) The child placing agency shall not place children in licensed foster homes which are in use by another agency without written permission of that agency.

B. Intake Procedures and Practices

(1) At the time of a referral or application, the child placing agency shall assess the needs and strengths of the child and/or the adoptive family.

MIRACLE_HILL_SUBP_008012

114-4980. Procedures and Practices of Child Placing Agencies., SC ADC 114-4980

(2) A comprehensive written intake study shall be completed, and this intake study shall contain sufficient information to substantiate the formation of a case plan.

(3) The child placing agency shall provide referral assistance to persons requesting services not provided by the agency.

C. Case Plan

(1) The child placing agency shall develop a written case plan upon completion of the intake study and prior to placement. The assessment and case plan shall be completed within sixty (60) days of placement. The plan shall include, but not be limited to, specific initial case goals for the clients, a clear designation of responsibilities for those goals, and appropriate time frames for the completion of those responsibilities and achievement of those goals.

(2) The child placing agency shall include the parent(s), other significant persons, and the child (twelve years or older) in the development of placement and care plans. The parent(s) and child must sign the placement and case plan. The child does not have to sign if she/he is unable to do so because of physical and/or mental impairments.

(3) The child placing agency, prior to accepting a child for placement, shall secure from the parent(s), guardian(s), or agency holding custody, written authority to place the child adoptively.

(4) The child placing agency, prior to accepting a child for adoptive placement, shall secure from the parent(s), guardian(s), or agency holding custody, written authority to provide routine medical care and to sign educational plans.

(5) The child placing agency shall help the parent(s) or legal guardian to understand the legal rights and obligations that they retain and those delegated to the child placing agency, and shall document this in writing.

(6) The child placing agency shall have a signed agreement with the parent(s) or legal guardian(s) of the child in care which includes, but is not limited to, the expectations and responsibilities of the child placing agency and the parent(s) or legal guardian(s) for carrying out the steps to meet the case plan goals, in the financial arrangements for the child in care, and visitation plans.

D. Supervision and Review of the Case Plan

(1) The child placing agency shall complete a review of the case plan at least every six (6) months indicating progress toward goal achievement and changes made in the service plan.

(2) The child placing agency shall include in the review an assessment of the child in care, the progress of the growth and development of the child, the relationships between the child and caregivers, and any problems which have occurred.

MIRACLE_HILL_SUBP_008013

(3) The parent(s) and the child shall participate in these reviews.

E. Adoptive Services

(1) The child placing agency shall provide information to prospective adoptive parent(s) about the adoption process, the agency's policies and practices, legal procedures, adoptive record content, types of children available, the fees, structure and the availability of subsidy.

(2) Adoptive Home Application

(a) The child placing agency shall provide an application form or prospective adoptive parent(s);

(b) The child placing agency in response to an application for adoption and acceptable screening interview shall conduct an adoptive study to assess the applicant(s) appropriateness to be an adoptive parent(s).

(3) Adoptive Study

(a) The child placing agency should include in any home study at least two (2) face to face interviews. These interviews may be in the form of one (1) office visit if possible and one (1) home visit or two (2) home visits. Separate face to face interviews with each member of the household must be conducted. The study process shall be a joint effort of the child placing agency and the applicant(s).

(b) The child placing agency shall also study the following areas and shall record the information in the adoptive applicant(s) record:

(1) Motivation for adoption;

(2) Strengths and weaknesses of each member of the household;

(3) The attitudes and feelings of the family, extended family, and significant others involved with the family toward accepting adoptive children, and parenting children who are not born to them;

(4) Attitudes of the applicant(s) toward the birth parent(s) and the reason(s) the child is in need of adoption;

(5) The applicant's plan for discussing adoption with the child;

(6) Record of arrests and criminal convictions and checks with the Central Registry for Child Abuse and Neglect.

MIRACLE_HILL_SUBP_008014

(7) Adjustment of birth children, foster children or previously adopted children, including school reports, if applicable;

(8) A report of a physical examination for members of the adoptive family living in the household within six (6) months of the study which verifies that each person suffers no communicable disease, specific illness, or disabilities which would interfere with the family's ability to parent a child;

(9) Ability to provide financially for the child or children to be adopted with or without agency financial assistance through adoption subsidy;

(10) Personal and community character references;

(11) Religious orientation, if any;

(12) Location and physical environment of the home;

(13) Plan for child care if parent(s) work; and

(14) Recommendations for adoption in regard to number, age, sex, characteristics, and special needs of children best served by the family.

(4) Notification Regarding Application

(a) The child placing agency shall notify applicant(s) in writing within thirty (30) days of completion of the adoption investigation of the acceptance or denial of their application;

(b) When applicant(s) are not accepted, the child placing agency shall inform them of the reasons why the application is denied.

(5) Service to Adoptive Parent(s)

(a) The child placing agency shall prepare the adoptive family or the placement of a particular child. Preparation shall include:

(1) Information about the needs, characteristics, expectations of the child, the child's biological family and foster family, excluding identifying information on the child's biological family;

MIRACLE_HILL_SUBP_008015

(2) Review of medical histories of the child and of the child's biological family; and

(3) Visits with the child prior to placement, where age appropriate to the child.

(b) The caseworker shall be in contact with the adoptive family at least monthly after the placement of a child prior to final decree. Information obtained from the contact shall be used in making recommendations for the finalization of the adoption.

F. Services to Families

(1) The child placing agency shall make appropriate agency services available to parent(s). When custody of the child is held by another agency, these services may only be made available upon that agency's approval.

(2) The child placing agency shall make every reasonable effort to help the parent(s) to assume or to prepare them to resume their parental roles and responsibilities.

(3) The child placing agency shall help the family gain access to the services necessary to preserve and strengthen the family and to accomplish the case plan goals. While the child is in care, the child placing agency shall assist parent(s) or legal guardian(s) with the problems and needs that led to the necessity for placement.

(4) The child placing agency shall encourage contacts between parent(s) or legal guardian(s) and children after placement, in accordance with the case plan.

(5) The child placing agency shall have a signed agreement with the parent(s) or legal guardian(s) of the child in care which includes, but is not limited to, the expectations and responsibilities of the child placing agency and the parent(s) or legal guardian(s) for carrying out the steps to meet the case plan goals, the financial arrangements for the child in care, and visitation plans.

G. Services to Unmarried Parents

(1) Upon request, the child placing agency shall make counseling services available to unmarried parents considering adoptive placement both prior to and after the birth of the child.

(2) After the birth of the child, counseling services shall continue for a reasonable period of time to assist the unmarried parent(s) to accept their decision to release the child for adoption or to keep the child.

H. Selection of Care

MIRACLE_HILL_SUBP_008016

**114-4980. Procedures and Practices of Child Placing Agencies., SC ADC 114-4980**

(1) The child placing agency shall select the most appropriate form of substitute care for the child consistent with the child's and family's needs. In choosing such care, the child placing agency shall arrange for any specialized services the child may need and shall make every placement effort to select the most appropriate setting for the child and within as close proximity to the family as possible.

(2) The child placing agency shall select substitute care that has the capacity to assist in the achievement of the steps and goals in the child's case plan.

I. Aftercare Service

(1) The child placing agency shall make supportive services available for children and families for at least six (6) months following an adoption or a child's return to his/her family in order to strengthen and support new or renewed family functioning.

(2) The child placing agency shall offer referral services to parent(s) who decide not to place their child.

**Credits**
HISTORY: Amended by State Register Volume 32, Issue No. 2, eff February 22, 2008.

Current through State Register Volume 42, Issue 1, eff January 26, 2018.

COPYRIGHT (c) 2018 BY THE STATE OF SOUTH CAROLINA

S.C. CODE REGS. 114-4980, SC ADC 114-4980

End of **Document**                                                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

MIRACLE_HILL_SUBP_008017

# Attachment 9

MIRACLE_HILL_SUBP_008018

§ 87.3 Grants., 45 C.F.R. § 87.3

Code of Federal Regulations
  Title 45. Public Welfare
    Subtitle A. Department of Health and Human Services (Refs & Annos)
      Subchapter A. General Administration (Refs & Annos)
        Part 87. Equal Treatment for Faith–Based Organizations (Refs & Annos)

45 C.F.R. § 87.3

§ 87.3 Grants.

Effective: May 4, 2016
Currentness

(a) Faith-based or religious organizations are eligible, on the same basis as any other organization, to participate in any HHS awarding agency program for which they are otherwise eligible. Neither the HHS awarding agency, nor any State or local government and other pass-through entity receiving funds under any HHS awarding agency program shall, in the selection of service providers, discriminate for or against an organization on the basis of the organization's religious character or affiliation. As used in this section, "program" refers to activities supported by discretionary, formula or block grants.

(b) Organizations that apply for or receive direct financial assistance from an HHS awarding agency may not support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization), as part of the programs or services funded with direct financial assistance from the HHS awarding agency, or in any other manner prohibited by law. If an organization conducts such activities, the activities must be offered separately, in time or location, from the programs or services funded with direct financial assistance from the HHS awarding agency, and participation must be voluntary for beneficiaries of the programs or services funded with such assistance. The use of indirect Federal financial assistance is not subject to this restriction. Nothing in this part restricts HHS's authority under applicable Federal law to fund activities, such as the provision of chaplaincy services, that can be directly funded by the Government consistent with the Establishment Clause.

(c) A faith-based or religious organization that participates in HHS awarding agency-funded programs or services will retain its independence from Federal, State, and local governments, and may continue to carry out its mission, including the definition, practice, and expression of its religious beliefs, provided that it does not use direct financial assistance from an HHS awarding agency (including through a prime or sub-award) to support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization). A faith-based or religious organization may use space in its facilities to provide programs or services funded with financial assistance from the HHS awarding agency without removing religious art, icons, scriptures, or other religious symbols. In addition, a faith-based or religious organization that receives financial assistance from the HHS awarding agency retains its authority over its internal governance, and it may retain religious terms in its organization's name, select its board members on a religious basis, and include religious references in its organization's mission statements and other governing documents in accordance with all program requirements, statutes, and other applicable requirements governing the conduct of HHS funded activities.

(d) An organization that participates in any programs funded by financial assistance from an HHS awarding agency shall not, in providing services or in outreach activities related to such services, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a

MIRACLE_HILL_SUBP_008019

refusal to attend or participate in a religious practice. However, an organization that participates in a program funded by indirect financial assistance need not modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program.

(e) No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by an HHS awarding agency or a State or local government in administering financial assistance from the HHS awarding agency shall require only faith-based or religious organizations to provide assurances that they will not use monies or property for explicitly religious activities. Any restrictions on the use of grant funds shall apply equally to religious and non-religious organizations. All organizations that participate in HHS awarding agency programs, including organizations with religious character or affiliations, must carry out eligible activities in accordance with all program requirements and other applicable requirements governing the conduct of HHS awarding agency-funded activities, including those prohibiting the use of direct financial assistance to engage in explicitly religious activities. No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by the HHS awarding agency or a State or local government in administering financial assistance from the HHS awarding agency shall disqualify faith-based or religious organizations from participating in the HHS awarding agency's programs because such organizations are motivated or influenced by religious faith to provide social services, or because of their religious character or affiliation.

(f) A faith-based or religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion, set forth in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1, is not forfeited when the faith-based or religious organization receives direct or indirect financial assistance from an HHS awarding agency. Some HHS awarding agency programs, however, contain independent statutory provisions requiring that all recipients agree not to discriminate in employment on the basis of religion. Accordingly, recipients should consult with the appropriate HHS awarding agency program office if they have questions about the scope of any applicable requirement.

(g) In general, the HHS awarding agency does not require that a recipient, including a faith-based or religious organization, obtain tax-exempt status under section 501(c)(3) of the Internal Revenue Code to be eligible for funding under HHS awarding agency programs. Many grant programs, however, do require an organization to be a "nonprofit organization" in order to be eligible for funding. Funding announcements and other grant application solicitations that require organizations to have nonprofit status will specifically so indicate in the eligibility section of the solicitation. In addition, any solicitation that requires an organization to maintain tax-exempt status will expressly state the statutory authority for requiring such status. Recipients should consult with the appropriate HHS awarding agency program office to determine the scope of any applicable requirements. In HHS awarding agency programs in which an applicant must show that it is a nonprofit organization, the applicant may do so by any of the following means:

(1) Proof that the Internal Revenue Service currently recognizes the applicant as an organization to which contributions are tax deductible under section 501(c)(3) of the Internal Revenue Code;

(2) A statement from a State or other governmental taxing body or the State secretary of State certifying that:

(i) The organization is a nonprofit organization operating within the State; and

(ii) No part of its net earnings may benefit any private shareholder or individual;

MIRACLE_HILL_SUBP_008020

§ 87.3 Grants., 45 C.F.R. § 87.3

(3) A certified copy of the applicant's certificate of incorporation or similar document that clearly establishes the nonprofit status of the applicant; or

(4) Any item described in paragraphs (g)(1) through (3) of this section, if that item applies to a State or national parent organization, together with a statement by the State or parent organization that the applicant is a local nonprofit affiliate.

(h) If a recipient contributes its own funds in excess of those funds required by a matching or grant agreement to supplement HHS awarding agency-supported activities, the recipient has the option to segregate those additional funds or commingle them with the Federal award funds. If the funds are commingled, the provisions of this section shall apply to all of the commingled funds in the same manner, and to the same extent, as the provisions apply to the Federal funds. With respect to the matching funds, the provisions of this section apply irrespective of whether such funds are commingled with Federal funds or segregated.

(i)(1) Faith-based or religious organizations providing social services in the United States to beneficiaries under an HHS program that is supported by direct Federal financial assistance must give written notice to beneficiaries or prospective beneficiaries of certain protections. This written notice must be given to beneficiaries prior to the time they enroll in the program or receive services from such programs. Notice must be given in a manner prescribed by the HHS awarding agency. This notice must state that:

(i) The organization may not discriminate against beneficiaries or prospective beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice;

(ii) The organization may not require beneficiaries to attend or participate in any explicitly religious activities that are offered by the organization, and any participation by beneficiaries in such activities must be purely voluntary;

(iii) The organization must separate in time or location any privately funded explicitly religious activities from activities supported by direct Federal financial assistance;

(iv) If a beneficiary or prospective beneficiary objects to the religious character of the organization, the organization will undertake reasonable efforts to identify and refer the beneficiary to an alternative provider to which the beneficiary has no objection; however, the organization cannot guarantee that in every instance an alternative provider will be available; and

(v) Beneficiaries or prospective beneficiaries may report violations of these protections, including any denials of services or benefits that violate these regulations, by contacting or filing a written complaint with the HHS awarding entity.

(2) When the nature of the service provided or exigent circumstances make it impracticable to provide such written notice in advance of the actual service, service providers must advise beneficiaries of their protections at the earliest available opportunity.

MIRACLE_HILL_SUBP_008021

§ 87.3 Grants., 45 C.F.R. § 87.3

(j) If a beneficiary or prospective beneficiary of a social service program supported by the HHS awarding agency objects to the religious character of an organization that provides services in the United States under the program, that organization must promptly undertake reasonable efforts to identify and refer the beneficiary to an alternative provider to which the beneficiary has no objection. A referral may be made to another faith-based or religious organization, if the beneficiary has no objection to that provider. But if the beneficiary requests a secular provider, and a secular provider is available, then a referral must be made to that provider. Except for services provided by telephone, internet, or similar means, the referral must be to an alternative provider that is in reasonable geographic proximity to the organization making the referral and that offers services that are similar in substance and quality to those offered by the organization. The alternative provider also must have the capacity to accept additional beneficiaries.

(k) When the organization determines that it is unable to identify an alternative provider, the organization must promptly notify the prime recipient entity from which it has received funds. The prime recipient of Federal financial assistance must notify the HHS awarding agency when a sub-recipient is unable to identify an alternative provider. If the organization is successful in making a referral, it shall maintain a record of the referral.

(l) Decisions about awards of Federal financial assistance must be free from political interference or even the appearance of such interference and must be made on the basis of merit, not on the basis of the religious affiliation, or lack thereof, of a recipient organization.

(m) If a pass-through entity, acting under a contract, grant, or other agreement with the Federal Government or with a State or local government that is administering a program supported by Federal financial assistance, is given the authority under the contract, grant, or agreement to select non-governmental organizations to provide services funded by the Federal Government, the pass-through entity must ensure compliance with the provisions of this part and any implementing regulations or guidance by the sub-recipient. If the pass-through entity is a non-governmental organization, it retains all other rights of a non-governmental organization under the program's statutory and regulatory provisions.

SOURCE: 62 FR 16955, 17005, April 8, 1997; 62 FR 31669, June 10, 1997; 81 FR 19426, April 4, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301.

Current through February 22, 2018; 83 FR 7922.

End of Document                                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

MIRACLE_HILL_SUBP_008022

# Attachment 10

MIRACLE_HILL_SUBP_008023

§ 75.300 Statutory and national policy requirements., 45 C.F.R. § 75.300

---

Code of Federal Regulations
  Title 45. Public Welfare
    Subtitle A. Department of Health and Human Services (Refs & Annos)
      Subchapter A. General Administration (Refs & Annos)
        Part 75. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards (Refs & Annos)
          Subpart D. Post Federal Award Requirements
            Standards for Financial and Program Management

45 C.F.R. § 75.300

§ 75.300 Statutory and national policy requirements.

Effective: January 11, 2017
Currentness

(a) The Federal awarding agency must manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements: Including, but not limited to, those protecting public welfare, the environment, and prohibiting discrimination. The Federal awarding agency must communicate to the non–Federal entity all relevant public policy requirements, including those in general appropriations provisions, and incorporate them either directly or by reference in the terms and conditions of the Federal award.

(b) The non–Federal entity is responsible for complying with all requirements of the Federal award. For all Federal awards, this includes the provisions of FFATA, which includes requirements on executive compensation, and also requirements implementing the Act for the non–Federal entity at 2 CFR part 25 and 2 CFR part 170. See also statutory requirements for whistleblower protections at 10 U.S.C. 2324 and 2409, and 41 U.S.C. 4304, 4310, and 4712.

(c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.

(d) In accordance with the Supreme Court decisions in United States v. Windsor and in Obergefell v. Hodges, all recipients must treat as valid the marriages of same-sex couples. This does not apply to registered domestic partnerships, civil unions or similar formal relationships recognized under state law as something other than a marriage.

**Credits**
[81 FR 89395, Dec. 12, 2016]

SOURCE: 62 FR 16955. 17005, April 8, 1997; 62 FR 31669, June 10, 1997; 79 FR 75889, Dec. 19, 2014, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301.

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.     1

MIRACLE_HILL_SUBP_008024

**§ 75.300 Statutory and national policy requirements., 45 C.F.R. § 75.300**

Current through February 22, 2018; 83 FR 7922.

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

MIRACLE_HILL_SUBP_008025