# EXHIBIT 33

```
                                                    Page 1
 1            UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
 2                 GREENVILLE DIVISION
 3
    EDEN ROGERS and
 4
    BRANDY WELCH,
 5
                  Plaintiffs,
 6
          vs.                CASE NO. 6:19-cv-01567-TMC
 7
    UNITED STATES DEPARTMENT OF HEALTH
 8  AND HUMAN SERVICES;
 9  ALEX AZAR, in his official capacity as
    Secretary of the UNITED STATES DEPARTMENT OF
10  HEALTH AND HUMAN SERVICES;
11  ADMINISTRATION FOR CHILDREN AND FAMILIES;
12  LYNN JOHNSON, in her official capacity as Assistant
    Secretary of the ADMINISTRATION FOR CHILDREN AND
13  FAMILIES;
14  SCOTT LEKAN, in his official capacity as Principal
    Deputy Assistant Secretary of the ADMINISTRATION
15  FOR CHILDREN AND FAMILIES;
16  HENRY MCMASTER, in his official capacity as
    Governor of the STATE OF SOUTH CAROLINA;
17
    MICHAEL LEACH, in his official capacity as State
18  Director of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
    SERVICES,
19
                  Defendants.
20
    VIDEOTAPED
21  DEPOSITION OF:   FREDDIE KAREN BUSHA
                     (APPEARING VIA VIRTUAL ZOOM)
22
    DATE:            June 21, 2021
23
    TIME:            9:02 AM
24
    REPORTED BY:     TERRI L. BRUSSEAU
25                   (APPEARING VIA VIRTUAL ZOOM)
```

Page 2

```
 1   LOCATION OF        Haynsworth Sinkler Boyd, PA
     THE DEPONENT:      One North Main Street, 2nd Floor
 2                      Greenville, SC  29601
 3   TAKEN BY:          Counsel for the Plaintiffs
                        (Katherine Janson)
 4
     APPEARANCES OF COUNSEL:
 5
             ATTORNEYS FOR THE PLAINTIFFS
 6                EDEN ROGERS and BRANDY WELCH:
 7                CRAVATH SWAINES & MOORE, LLP
                  BY:  KATHERINE D. JANSON
 8                     (APPEARING VIA VIRTUAL ZOOM)
                       SERENA CANDELARIA
 9                     (APPEARING VIA VIRTUAL ZOOM)
                  Worldwide Plaza
10                825 Eighth Avenue
                  New York, NY  10019
11                (212) 474-1989
                  kjanson@cravath.com
12                scandelaria@cravath.com
13                LAMBDA LEGAL DEFENSE AND EDUCATION
                  FUND, INC.
14                BY:  M. CURREY COOK
                       (APPEARING VIA VIRTUAL ZOOM)
15                     MAIA ZELKIND
                       (APPEARING VIA VIRTUAL ZOOM)
16                120 Wall Street, 19th Floor
                  New York, NY  10005
17                (212) 809-8585
                  ccook@lambdalegal.org
18                mzelkind@lambdalegal.org
19
20
21
22
23
24
25
```

```
                                              Page 3

 1          ATTORNEYS FOR THE DEFENDANTS
                 HEALTH AND HUMAN SERVICES,
 2               ADMINISTRATION FOR CHILDREN AND
                 FAMILIES, THE SECRETARY OF HHS, LYNN
 3               JOHNSON, THE ASSISTANT SECRETARY OF
                 ADMINISTRATION OF CHILDREN AND
 4               FAMILIES, AND STEVEN WAGNER, ASSISTANT
                 SECRETARY OF ADMINISTRATION CHILDREN
 5               AND FAMILIES:
 6               UNITED STATES ATTORNEY'S OFFICE
                 DISTRICT OF SOUTH CAROLINA
 7               BY:  CHRISTIE V. NEWMAN,
                      ASSISTANT UNITED STATES ATTORNEY
 8                    (APPEARING VIA VIRTUAL ZOOM)
                 55 Beattie Place, Suite 700
 9               Greenville, SC  29601
                 (864) 282-2100
10               christie.newman@usdoj.gov
11          ATTORNEYS FOR THE DEFENDANTS
                 HENRY MCMASTER, IN HIS OFFICIAL
12               CAPACITY AS GOVERNOR OF THE STATE OF
                 SOUTH CAROLINA AND MICHAEL LEACH, IN
13               HIS OFFICIAL CAPACITY AS STATE DIRECTOR
                 OF THE SOUTH CAROLINA DEPARTMENT OF
14               SOCIAL SERVICES:
15               NELSON MULLINS RILEY & SCARBOROUGH, LLP
                 BY:  MILES E. COLEMAN
16                    (APPEARING VIA VIRTUAL ZOOM)
                 1320 Main Street, 17th Floor
17               Greenville, SC  29201
                 (803) 799-2000
18               miles.coleman@nelsonmullins.com
19          ATTORNEYS FOR MIRACLE HILL MINISTRIES, INC.
                 AND DEPONENT FREDDIE KAREN BUSHA:
20
                 HAYNSWORTH SINKLER BOYD, PA
21               BY:  STEVE A. MATTHEWS
                 1201 Main Street, 22nd Floor
22               Columbia, SC  29201-3232
                 (803) 779-3080
23               smatthews@hsblawfirm.com
24
25
```

Page 4

1          ALSO PRESENT:

2                  Andy Bos, Concierge Technician
                   (Appearing Via Virtual Zoom)

3
                   Darren Carreras, Video Technician

4                  (Appearing Via Virtual Zoom)

5                  (INDEX AT REAR OF TRANSCRIPT)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 5
 1                VIDEO TECHNICIAN:  Good morning,
 2     Counselors.  My name is Darren Carreras.  I'm a
 3     certified legal videographer in association with
 4     Veritext.
 5                Due to the severity of COVID-19,
 6     following the practice of social distancing, I will
 7     not be in the same room with the witness.  Instead,
 8     I will record this videotaped deposition remotely.
 9     The reporter, Terri L. Brusseau, also will not be
10     in the same room and will swear the witness
11     remotely.
12                Do all parties stipulate to the
13     validity of this video recording, remote swearing,
14     and that it will be admissible in the courtroom as
15     it had been -- as if it had been taken following
16     Rule 30 of the Federal Rules of Civil Procedures
17     and State's rules where this case is pending?
18                MR. COLEMAN:  Yes.
19                MS. JANSON:  Yes.  Plaintiffs, yes.
20                MS. NEWMAN:  Yes, federal defendants
21     do.
22                VIDEO TECHNICIAN:  Okay.  We're going
23     on the record at 9:02 AM on June 21st, 2021.  This
24     is Media Unit 1, video recorded deposition of
25     Freddie Karen Busha, taken by counsel for Plaintiff
```

Page 6

```
 1    in the matter of Rogers verse U.S. Department of
 2    Health and Human Services filed in United States
 3    District Court for the District of South Carolina,
 4    Greenville, Case Number 6:19-cv-01567-JD.
 5              This deposition is being held remotely
 6    via Zoom.  My name is Darren Carreras with the firm
 7    Veritext.  I'm the videographer.  The court
 8    reporter is Terri Brusseau for the firm Veritext.
 9    I'm not authorized to administer an oath.  I'm not
10    related to any party in this action, nor am I
11    financially interested in the outcome.
12              Counsel and all present in the room,
13    everyone attending remotely, will now state their
14    appearances and affiliations for the record.  If
15    there are any objections to proceeding, please
16    state them at the time of your appearance beginning
17    with the noticing attorney.
18              MS. JANSON:  Kate Janson from Cravath
19    Swaine & Moore for the Plaintiffs.
20              MR. COOK:  Currey Cook from Lambda
21    Legal for the Plaintiffs.
22              MS. CANDELARIA:  Serena Candelaria from
23    Cravath Swaine & Moore for the Plaintiffs.
24              MS. ZELKIND:  Maia Zelkind from Lambda
25    Legal for Plaintiffs.
```

Page 7

1            MS. NEWMAN:  Christie Newman for the
2    federal defendants.
3            MR. COLEMAN:  Miles Coleman for Henry
4    McMaster in his official capacity as Governor of
5    the State of South Carolina and Michael Leach in
6    his official capacity as director of the South
7    Carolina Department of Health and Human Services.
8            MR. MATTHEWS:  Steve Matthews with
9    Haynsworth Sinkler Boyd, lawyer for Miracle Hill
10   Ministries, Inc., here representing the witness,
11   Karen Busha.
12           VIDEO TECHNICIAN:  Will the court
13   reporter please swear in the witness.
14              FREDDIE KAREN BUSHA
15   being first remotely sworn, testified as follows:
16                  EXAMINATION
17   BY MS. JANSON:
18       Q.   Good morning, Miss Busha.  My name is
19   Kate Janson.  I'm with the firm of Cravath Swaine &
20   Moore and we represent Plaintiffs Eden Rogers and
21   Brandy Welch in this case.
22           Would you please state your full name
23   again for the record.
24       A.   Freddie Karen Busha.
25       Q.   And what is your current address?

Page 8

1      A.    ███████████████████████████

2   ████████████████

3      Q.    Have you ever had your deposition taken

4   before?

5      A.    No.

6      Q.    So I'm going to ask you a series of

7   questions today.  But before we dive in, I'll just

8   go over a couple of simple ground rules that will

9   help us make sure things run smoothly.

10          First of all, please make sure that you

11  answer audibly and verbally.  Nodding your head,

12  for instance, can't be picked up by the court

13  reporter.  Also, please wait until I've finished

14  asking my question before you begin your answer;

15  and likewise, I'll make sure that I wait until

16  you've finished your answer before I ask my -- my

17  next question.

18          Your attorney may object to some of my

19  questions.  If he does that, you should still

20  answer unless he specifically instructs you not to

21  answer.  If at any point you don't understand what

22  I'm asking you and you need clarification, please

23  ask and I'm happy to give that to you.  If you

24  don't ask for clarification, I'll assume that you

25  understand what I'm asking.  And please -- you

Page 9

```
 1   know, please direct any requests for clarification
 2   to me rather than to your lawyer.
 3              If at any time today during the
 4   deposition you need to take a break for any reason,
 5   just let me know.  I'm happy to accommodate that.
 6   I'll just ask that if there's a question pending,
 7   that you answer the question before we take a
 8   break.  I'll also be mindful of timing and how long
 9   we've been going and I'll suggest, you know, breaks
10   periodically as well.
11              And as you know, we are -- we're doing
12   this deposition remotely over Zoom, so just a
13   couple of notes regarding that.  Even though we're
14   not together in a conference room, while we are on
15   the record you're not to communicate with anybody
16   by any means other than this video conferencing
17   platform.  So that means -- that doesn't include
18   during the breaks, but while we're on the record
19   that means, you know, no e-mails, no texts, nothing
20   like that with anybody else.
21              And if for any reason you have an issue
22   with your connection and you can't see me or hear
23   me, you know, we'll obviously take a break and make
24   sure that we get that rectified as soon as
25   possible.  Does that all make sense?  Do you have
```

Page 10

```
 1   any questions with any of that?
 2           A.   Yes, and no questions.
 3           Q.   Great.  You understand that your
 4   testimony today is under oath and that you're being
 5   videotaped?
 6           A.   Yes.
 7           Q.   Is there any reason that you can't
 8   provide truthful and accurate testimony today?
 9           A.   No.
10           Q.   Are you on any medication that would
11   interfere with your ability to testify truthfully
12   today?
13           A.   No.
14           Q.   Do you have any other condition that
15   would interfere with your ability to testify
16   truthfully today?
17           A.   No.
18           Q.   Great.
19                MS. JANSON:  So, Serena, if we can just
20   put up Tab 47.  We'll mark that as our first
21   exhibit.
22                Steve, this is just a Notice of
23   Deposition, so it doesn't have a -- have a Bates
24   number.
25                MR. MATTHEWS:  Great.
```

```
                                           Page 11

 1              MS. JANSON:  We're just marking that

 2    for housekeeping purposes.

 3              (EXHIBIT 1, Letter dated 6/15/21 from

 4    Nekki Shutt, with attached Notice of Taking

 5    Deposition of Karen Busha Via Remote Means, was

 6    marked for identification.)

 7    BY MS. JANSON:

 8         Q.   So this is -- we're going to mark as

 9    Exhibit 1.  This is the Notice of Deposition of

10    Karen Busha Via Remote Means dated --

11              MR. MATTHEWS:  Kate?

12              MS. JANSON:  Yes.

13              MR. MATTHEWS:  Excuse me one moment.

14    When you -- when you turned your head away from

15    your computer, we lost your audio a bit.

16              MS. JANSON:  Okay.  I'm pulling it --

17    pulling it towards me.

18              MR. MATTHEWS:  Okay.  Yeah, you weren't

19    speaking toward the microphone and couldn't hear

20    for a second.

21              MS. JANSON:  Okay.

22              MR. MATTHEWS:  Thank you.

23              MS. JANSON:  Sorry about that.

24              MR. MATTHEWS:  It's all right.

25              MS. JANSON:  No, I was just indicating
```

```
                                               Page 12
 1    that we're marking as Exhibit 1 the Notice of
 2    Taking of Deposition of Karen Busha By Remote Means
 3    dated June 15th, 2021.
 4    BY MS. JANSON:
 5          Q.   Miss Busha, have you seen this
 6    deposition notice before?
 7          A.   Yes.
 8          Q.   Okay.  And did you receive it from --
 9    from Mr. Matthews?
10          A.   Yes.
11          Q.   Did you do anything to prepare for
12    today's deposition?
13          A.   Yes.
14          Q.   What did you do to prepare?
15          A.   I met with Mr. Matthews and some of the
16    leadership team from Miracle Hill Ministries.
17          Q.   Okay.  And who -- who were the members
18    of the Miracle Hill Ministries leadership team that
19    you met with?
20          A.   Ryan Duerk, the CEO; Reid Lehman, the
21    former CEO; Brenda Parks, the foster care director;
22    and Sharon Betts, foster care supervisor.
23          Q.   And when -- when was that meeting?
24          A.   I can't remember.  It was last week.
25          Q.   Okay.
```

```
                                          Page 13
 1            A.    I don't remember which day.  Sorry.
 2            Q.    Sure.  No, that's fine.  And was there
 3   just one meeting or more than one meeting?
 4            A.    One meeting with that group and then I
 5   had another meeting with Mr. Matthews yesterday.
 6            Q.    And approximately how long was your
 7   meeting with Mr. Matthews and the group of folks
 8   from Miracle Hill?
 9            A.    We were there from around 9:00 till
10   noon.
11            Q.    And then your second meeting with
12   Mr. Matthews yesterday, about how long was that?
13            A.    It was by phone for almost two hours.
14            Q.    Apart from the people that you've
15   mentioned, was anyone else present at either of
16   those meetings?
17            A.    No.
18            Q.    Did you speak with anyone else apart
19   from the folks we've talked about in preparing for
20   the deposition today?
21            A.    No.
22            Q.    Did you review any documents in the
23   course of your preparation for the deposition
24   today?
25            A.    Yes.
```

Page 14

```
 1          Q.   Did any of those documents that you
 2     looked at help refresh your recollection about past
 3     events?
 4          A.   Yes.
 5          Q.   Are you able to tell me which documents
 6     those were that refreshed your recollection of past
 7     events?
 8          A.   All of the documents that you included
 9     in the file that you sent to me.  Mr. Matthews sent
10     to me.
11          Q.   Sure.  Yep.  Did you look at
12     anything -- anything else in advance of the
13     deposition today, any electronic databases or
14     records on your computer or anything else?
15          A.   No.
16          Q.   So just the universe of documents that
17     we had sent over to Mr. Matthews in advance?
18          A.   Yes.
19          Q.   Okay.  Anything else that you did to
20     prepare for the deposition today?
21          A.   No.
22          Q.   Did you speak with Mr. Coleman in
23     advance of today's deposition?
24          A.   No.
25          Q.   Have you ever met Mr. Coleman before,
```

Page 15

```
 1   before today?
 2           A.    Not face-to-face.
 3           Q.    You've spoken with him on the phone?
 4           A.    Yes.
 5           Q.    And when was that?
 6           A.    Probably a year and a half ago, two
 7   years ago.
 8           Q.    Was that when Mr. Coleman was a lawyer
 9   representing Miracle Hill?
10           A.    Yes.
11           Q.    So I'll just go through a few quick
12   background questions just about your education and
13   employment history.  What is the highest level of
14   education that you obtained?
15           A.    I have a Doctorate in Christian
16   Counseling.
17           Q.    And from what institution did you
18   receive that degree?
19           A.    Omega Theological Seminary.
20           Q.    And that was in what year?
21           A.    I believe 2 -- 1998.
22           Q.    Okay.  That's fine.  Approximate is
23   fine.  And what other -- what other degrees do you
24   hold?
25           A.    I have a Master's in Education and
```

```
                                              Page 16
 1     Counseling and Guidance from Clemson University
 2     that I obtained in 1987.
 3             Q.    Um-hum.  And then before that do you
 4     have a Bachelor's degree as well?
 5             A.    I do.  I have a Bachelor's degree in
 6     Christian Education that I received from Irskin
 7     College in 1979 and an Associate degree from
 8     Anderson, it was college at that time, it's now
 9     University, in 1977.
10             Q.    Okay.  And you used to be employed at
11     Miracle Hill Ministries, is that right?
12             A.    That's correct.
13             Q.    And when did you -- when did you leave
14     Miracle Hill?
15             A.    I left Miracle Hill at the end of
16     January 2021.
17             Q.    And why did you leave?
18             A.    I left primarily because I was
19     exhausted.
20             Q.    Are you employed elsewhere at this
21     point or no?
22             A.    I work part-time for the Commission on
23     Accreditation of Rehab Facilities in Tucson,
24     Arizona.
25             Q.    Okay.
```

```
                                        Page 17
 1          A.    As a behavioral health program
 2     surveyor.
 3          Q.    And at the time of your departure from
 4     Miracle Hill at -- in January of this year, how
 5     long had you been employed at Miracle Hill?
 6          A.    Since August of 2018.
 7          Q.    And what was your position at Miracle
 8     Hill when you left?
 9          A.    I was the vice president of children's
10     ministries.
11          Q.    Can you describe for us just generally
12     what your responsibilities were in that position?
13          A.    Yes.  I was responsible for the overall
14     leadership for children's ministries, which
15     included four programs, our residential program for
16     children at Miracle Hill Children's Home in
17     Pumpkintown, South Carolina; I worked Miracle Hill
18     Boys' Shelter in Greenville, South Carolina; Homes
19     for Life, an independent living program for youth
20     transitioning out of DSS in Spartanburg, South
21     Carolina; and the foster care program for Miracle
22     Hill.
23               I was responsible for the direct
24     supervision of the four directors of those
25     programs.  I was responsible for accreditation.
```

                                    Page 18

1    Miracle Hill's children's ministry is accredited by

2    the Commission on Accreditation of Rehab

3    Facilities, better known as CARF.  I was

4    responsible for maintaining accreditation and of

5    overseeing reaccreditation in 2020.  I was

6    responsible for program development and focused

7    primarily on ensuring our staff and foster parents

8    were trained in evidence-based models regarding

9    trauma.

10           Q.   Okay.  Great.  And did you ever hold a

11   different position at Miracle Hill before your role

12   as vice president of children's ministries?

13           A.   No.

14           Q.   Where were you employed before you came

15   to Miracle Hill in 2018?

16           A.   I'm a retired state employee.  I worked

17   21 years in the alcohol and drug system in South

18   Carolina, better known as the Department of Alcohol

19   and Other Drug Studies.  I worked in their private

20   agencies, three different agencies across the

21   state.  The last ten years of my work with the

22   State of South Carolina, I worked with Lexington

23   County Community Mental Health in Lexington, South

24   Carolina.

25           Q.   If I use the abbreviation CPA, will you

1    understand that I'm referring to a child placing

2    agency?

3         A.    Yes.

4         Q.    Apart from Miracle Hill, have you ever

5    been employed by any other CPA in South Carolina?

6         A.    No.

7         Q.    Were you -- were you required in the

8    course of your work at Miracle Hill as vice

9    president for children's -- of children's

10   ministries to complete any professional training of

11   any sort?

12        A.    Not professional training.

13        Q.    Any other kind of training?

14        A.    On-the-job training.

15        Q.    And can you describe for me just

16   generally what that type of training would have

17   entailed?

18        A.    A week-long orientation by Miracle

19   Hill.  I also trained under the interim vice

20   president of children's ministry, Jason Mowen,

21   while at Miracle Hill, and my direct supervisor,

22   Ken Kruithof, who was the COO.

23        Q.    During the course of your work at

24   Miracle Hill, did you become familiar with

25   professional standards related to child welfare?

Page 20

1        A.    Yes.

2        Q.    And what are -- what are some of those

3   standards?

4        A.    So we had numerous professional

5   standards with regard to the care of children both

6   in residential care and in foster care.  We were

7   required to ensure that -- ensure their safety and

8   wellbeing, that they received appropriate

9   healthcare, that they received an appropriate

10  education.  Of course we were mandated reporters.

11  If we were aware of any abuse or neglect of

12  children, to report those to the authorities.

13       Q.    Are you familiar with the Child Welfare

14  League of America standards of excellence?

15       A.    No.

16       Q.    So Miracle Hill is a private child

17  placing agency, correct?

18       A.    Correct.

19       Q.    And if you can just describe for me

20  generally, what is a child placing agency in South

21  Carolina?

22       A.    We're licensed -- we were -- Miracle

23  Hill's licensed by the Department of Social

24  Services to license foster parents to care for

25  foster children through the Department of Social

Page 21

```
 1   Services.
 2           Q.    And so how -- how does Miracle Hill do
 3   that?  How does Miracle -- how does -- sorry.  Let
 4   me -- let me step back.  We'll get to that in a
 5   minute.
 6               Just generally what role in the South
 7   Carolina foster care system do CPAs like Miracle
 8   Hill play?
 9           A.    Our main role is to place children in
10   foster homes.
11           Q.    And as part of that, does Miracle Hill
12   work to recruit potential foster families?
13           A.    Yes.
14           Q.    How does Miracle Hill do that?
15           A.    Those duties were assigned to the
16   director of foster care, who would speak publicly
17   based on invitations from the community.
18   Our web -- I believe our website also has
19   information on contacting us to be foster parents.
20           Q.    And the director of foster care, who
21   was that?
22           A.    Brenda Parks.
23           Q.    Was she the person in that role for the
24   entirety of your time at Miracle Hill?
25           A.    She was the director of foster care the
```

1  entire time, yes.

2        Q.   And I think you said she would speak

3  publicly based on invitations from the community?

4        A.   Yes.

5        Q.   Were there certain communities within

6  the Greenville area that Miracle Hill would often

7  recruit from, like certain churches, any groups

8  like that?

9        A.   I did not have a list of where she

10 presented or recruited from.

11       Q.   Did Miracle -- does Miracle Hill also

12 advertise publicly beyond just its website in an

13 effort to recruit foster families?

14       A.   I was not aware of any advertisement

15 while I was at Miracle Hill.

16       Q.   Did Miracle Hill do work to support

17 potential foster families as they go through the

18 application process to become licensed as foster

19 parents?

20       A.   I'm sorry, I missed part of your

21 question.  Could you repeat it?

22       Q.   Sure.  Of course.  Did Miracle Hill do

23 work to support potential foster families as they

24 go through the application process to become

25 licensed as foster parents?

Page 23

1          A.    We provided orientation prior

2    to appli -- prior to application and support foster

3    families through the licensing process once they

4    apply.

5          Q.    And can you tell me a little more

6    specifically how Miracle Hill does that?  How does

7    it support the foster families through the

8    licensing process?

9          A.    I do not know the specifics of

10   everything foster care does through that process.

11         Q.    Okay.  Do you know whether Miracle Hill

12   would provide any support to foster families after

13   they're licensed?

14         A.    Yes.

15         Q.    And what types of supports were those?

16         A.    We provided case management services.

17   Each family was assigned a case manager.  Each

18   family was also assigned a licensing specialist, so

19   we assisted the families in staying in compliance

20   with the Department of Social Services standards.

21              We also supported the family with needs

22   that they may have regarding the children, if they

23   need diapers or clothes.  Each year we held a

24   foster appreciate -- foster parent appreciation day

25   where foster families could come and we would have

Page 24

```
 1   a room set up from donations that we would receive,
 2   everything from toys to clothes to blankets, to
 3   make sure that families had access to new items for
 4   their children that they had in care.
 5           Q.    You mentioned that each family would be
 6   assigned a case manager.
 7           A.    Yes.
 8           Q.    And so that -- that person would be
 9   assigned to work with the foster family as a whole
10   as opposed to being assigned to a particular child,
11   is that right?
12           A.    They were assigned to both.
13           Q.    Okay.  Are you familiar with the term
14   Region 1 or the upstate region?
15           A.    Yes.
16           Q.    And what -- what is the upstate region?
17           A.    It's the county -- it's -- the region
18   is assigned by DSS and it's all of the counties in
19   the upstate that fall under Region 1 as assigned by
20   DSS.
21           Q.    And is that the region that Miracle
22   Hill serves with respect to the foster care
23   services?
24           A.    Yes.
25           Q.    Does -- to your knowledge, does Miracle
```

```
                                         Page 25
 1   Hill have any specific criteria regarding the
 2   individuals that it will work with as foster
 3   parents?
 4        A.   Yes.
 5        Q.   And what are those criteria?
 6        A.   There's some criteria set by the
 7   Department of Social Services with regard to
 8   criminal background.  And Miracle Hill also has a
 9   doctrinal statement and license families who align
10   with their doctrinal statement.
11        Q.   You've led perfectly into my -- into my
12   next document that I'd like to look at.
13             MS. JANSON:  Serena, can you please put
14   up Tab 25?  This is a document called the doctrinal
15   statement and it has the Bates stamp Miracle Hill
16   Subpoena 000375.  And we're -- we're marking that
17   as Exhibit 2, I believe.
18             (EXHIBIT 2, Miracle Hill Ministries
19   Doctrinal Statement, MIRACLE_HILL_SUBP_00375, was
20   marked for identification.)
21   BY MS. JANSON:
22        Q.   Miss Busha, have you seen this document
23   before?
24        A.   Yes.
25        Q.   And is this, in fact, Miracle Hill's
```

```
                                         Page 26
 1    doctrinal statement that you just mentioned in your

 2    prior answer?

 3          A.    Yes.

 4          Q.    And this document lays out the

 5    religious tenets to which Miracle Hill adheres, is

 6    that right?

 7          A.    Yes.

 8          Q.    And does Miracle Hill require that all

 9    of the foster parents that it works with also agree

10    with this doctrinal statement?

11          A.    Yes.

12          Q.    All right.  Let's --

13                MS. JANSON:  Serena, let's put up Tab

14    23.  This is going to be Exhibit 3.  It is a

15    document titled Miracle Hill Ministries' Spiritual

16    Identity FAQ's and the Bates Number is Miracle Hill

17    Subpoena 012783.

18                (EXHIBIT 3, Miracle Hill Ministries'

19    Spiritual Identity FAQ's, MIRACLE_HILL_SUBP_012783

20    to 012784, was marked for identification.)

21                MR. MATTHEWS:  Kate, you did say

22    012783?

23                MS. JANSON:  I did, yep.

24                MR. MATTHEWS:  Great.  Thank you.

25    BY MS. JANSON:
```

Page 27

1      Q.    Have you seen this document before?

2      A.    Yes.

3      Q.    And this appears to be a list of FAQ's,

4    that usually stands for frequently asked question,

5    that Miracle Hill published about its spiritual

6    identity, is that right?

7      A.    I don't know the purpose of their

8    publishing this.

9      Q.    Okay.  Do you see down at the bottom of

10   the first page there's a question that reads:  How

11   will you determine if someone meets your criteria

12   to serve as a foster parent, mentor or employee?

13         Do you see that there?

14     A.    Yes.

15     Q.    And then the answer says:  Our mission

16   statement and doctrinal statement of faith will

17   guide our interview process as we invite followers

18   of Jesus Christ to partner with us in ministry to

19   share the Good News of Christ and minister to the

20   needy in His name.

21         Do you see that answer there?

22     A.    Yes.

23     Q.    So does that mean that Miracle Hill

24   only works with potential foster parents who are

25   followers of Jesus Christ?

```
                                            Page 28
 1              MR. MATTHEWS:  Object to the form of
 2    the question.  This witness is not a 30(b)(6)
 3    witness and you can't ask for Miracle Hill, but can
 4    only answer as to her understanding while she was
 5    employed there.
 6              MS. JANSON:  Fair enough.  Let me
 7    rephrase.
 8    BY MS. JANSON:
 9         Q.   To your knowledge, based on your work
10    as an employee at Miracle Hill, has Miracle Hill
11    only worked with potential foster parents who are
12    followers of Jesus Christ?
13         A.   That was my understanding, yes.
14         Q.   And was it also your understanding --
15    was it your understanding then that Miracle Hill
16    would not partner with members of a different faith
17    to serve as foster parents?
18         A.   Yes, that was my understanding.
19         Q.   And was it also your understanding that
20    Miracle Hill would not partner with people who did
21    not adhere to any faith at all as potential foster
22    parents?
23         A.   Yes, that was my understanding.
24         Q.   So to your under -- to your knowledge
25    Miracle Hill would not work, for example, with
```

Page 29

1   potential foster parents who were Jewish, right?

2          A.   Yes, that was my understanding.

3          Q.   Or Muslim, for instance?

4          A.   Correct.

5          Q.   Okay.  And is it correct based on your

6   understanding that Miracle Hill would only work

7   with potential foster parents who were Protestant

8   Christians?

9               MR. COLEMAN:  This is Miles.

10  Objection, form of the question.

11  BY MS. JANSON:

12         Q.   Do you want me to -- do you want me to

13  restate it?

14         A.   Yes.

15         Q.   Okay.  Sorry.  During -- during your

16  time at Miracle Hill as the vice president of

17  children's ministries, was there a policy at some

18  point that Miracle Hill would only work with

19  potential foster parents who were Protestant

20  Christians?

21         A.   For part of the time, yes.

22         Q.   So for part of the time that you were

23  there, Miracle Hill would not work with Catholic

24  individuals as potential foster parents, is that

25  right?

```
                                                  Page 30

  1            A.    That's correct.

  2            Q.    All right.  Let's take a look at

  3     another document.  This is going to be Exhibit 4.

  4     Serena, it's Tab 15.  And this is a document Bates

  5     numbered Miracle Hill Subpoena 4623 and it's an

  6     e-mail chain from Miss Busha to Sharon Betts and

  7     Brenda Parks dated January 3rd, 2019.

  8                  (EXHIBIT 4, E-mail chain dated 1/3/19

  9     to Sharon Betts and Brenda Parks from Karen Busha,

 10     MIRACLE_HILL_SUBP_004623 to 004626, was marked for

 11     identification.)

 12     BY MS. JANSON:

 13            Q.    Have you seen this -- this document

 14     before, Miss Busha?

 15            A.    Yes.

 16            Q.    And, first of all, I know you -- I

 17     think you mentioned her name earlier, but who is

 18     Sharon Betts?

 19            A.    Sharon is the foster care licensing

 20     supervisor for Miracle Hill.

 21            Q.    And who did -- who -- who did she

 22     report to or did she report to at this time?

 23            A.    Brenda Parks, the foster care director.

 24            Q.    Okay.  If you look at the last page of

 25     this, of this e-mail chain, Miss Betts is writing
```

Page 31

1    to a recipient whose name is redacted.  And she

2    writes:  Could you tell me about your current

3    church and involvement in the church?  Is your

4    church between pastors at the present time?  Also,

5    could blank please explain more about the time when

6    she met Jesus for salvation?

7              Do you see that there at the bottom of

8    the e-mail chain?

9         A.   Yes.

10         Q.   And then in response, the recipient

11    whose -- whose name is redacted, replied with some

12    information about their religious background and

13    writes:  I have always had a love of Jesus and

14    always wanted to be a nun and joined a future

15    sisters group when I was young.

16              And then goes on a little later to say:

17    My belief is that God sent his Son, Jesus, for all

18    who believe in Him despite the denomination or

19    church they attend.

20              Do you see that in the -- sort of in

21    the second to last e-mail in the chain there?

22         A.   Yes.

23         Q.   And then on the page with the Bates

24    ending in -- the Bates Number ending 4625, it's an

25    e-mail again from Miss Betts replying.  And in the

Page 32

```
 1    top paragraph on that page she writes:  However, by
 2    board policy, we can only recruit and shepherd
 3    foster families who are active in a Protestant
 4    church.  This is not a judgment against Catholics.
 5    It reflects our identity as a Protestant ministry,
 6    teaching traditional Protestant doctrine supported
 7    by and accountable to Protestant churches.
 8              Do you see that there?
 9         A.   Yes.
10         Q.   And thank you for bearing with me as we
11    walk through this.  I just want to make sure we --
12    we understand what's going on in this e-mail chain.
13              And then an e-mail right above that,
14    the recipient is responding to Miss Betts and she
15    writes:  Your reply to me was very disturbing.
16              And then slightly later on it says that
17    Miss Betts' response does not -- quote:  Does not
18    take into account the variations of the many
19    Protestant churches, but definitely segregates
20    Catholics.
21              Do you see that there?
22         A.   Yes.
23         Q.   And then it looks like Miss Betts
24    forwarded the e-mail to -- to Reid Lehman, who then
25    would have cc'd Ken Kruithof.  Am I saying his name
```

```
                                            Page 33
 1   correctly?

 2          A.    Yes.

 3          Q.    Kruithof?  And it looks like I think

 4   he -- and then he forwarded it on to you.  I know

 5   you mentioned Mr. Kruithof before and you said he

 6   was your -- your direct boss as the --

 7          A.    Yes.

 8          Q.    -- COO of Miracle Hill, is that right?

 9          A.    Yes, that's correct.

10          Q.    Okay.  Does he still work in that

11   position now?

12          A.    Yes.  As far as I know, yes.

13          Q.    And then after you received this chain

14   from Mr. Kruithof, you forwarded it to Miss Betts

15   and Miss Parks and you wrote:  Thanks, Sharon, for

16   doing a beautiful job on this.  I too am saddened

17   that they are wounded.

18              What was it about -- what did you mean

19   when you said that Miss Betts had done a beautiful

20   job?

21          A.    It was a compliment on her

22   communication with the -- the applicant.

23          Q.    And what was it about her communication

24   with the applicant that you felt warranted a

25   compliment?
```

Page 34

```
 1        A.    Her attempt to manage a very painful
 2   and difficult situation.
 3        Q.    And why did you believe that that --
 4   the situation was painful and difficult?
 5        A.    Because the person who had submitted
 6   the inquiry was wounded by -- by her response.
 7        Q.    So you recognized that -- the fact that
 8   this recipient's application had been rejected
 9   because of his or her Catholic faith had been --
10   had been hurtful to them, right?
11        A.    Yes.
12              MR. COLEMAN:  This is Miles.  Object to
13   the form of the question.  You can answer.
14              THE WITNESS:  Yes.
15              MS. JANSON:  Okay.  I'd like to look at
16   Tab 16, Serena.  And we're going to mark this one
17   as Exhibit 5, I think.  And this is a document with
18   the Bates label Miracle Hill Subpoena 2366 and it's
19   an e-mail thread from Miss Busha to Mr. Kruithof
20   dated March 8th, 2019.
21              (EXHIBIT 5, E-mail chain dated 3/8/19
22   to Ken Kruithof from Karen Busha,
23   MIRACLE_HILL_SUBP_002366 to 002367, was marked for
24   identification.)
25   BY MS. JANSON:
```

```
                                              Page 35

 1          Q.    Are you familiar with this document?

 2          A.    Yes.

 3          Q.    If you look at the -- at the bottom

 4    e-mail on the page marked 2366.  It's -- it's

 5    Miss Betts and she is writing to a recipient whose

 6    name is redacted.  And she writes:  We noted that

 7    you did not include your church denomination or

 8    personal testimonies of when you met Jesus for

 9    salvation.  If you would send that to us, we would

10    be glad to let you know of the next steps in our

11    licensing process.

12                Do you see that there?

13          A.    Yes.

14          Q.    And then an e-mail right above, the

15    recipient responds to Miss Betts and she says:  I

16    am confirmed Lutheran and my husband is baptized

17    Catholic.  We moved to South Carolina from Georgia

18    this past year and have attended a

19    nondenominational church a few times this winter.

20                Do you see that there?

21          A.    Yes.

22          Q.    And then you forward the e-mail chain

23    to Mr. Kruithof and -- and you write:  FYI, this is

24    the request Sharon received that I discussed with

25    you yesterday.  Again, this was not approval to be
```

Page 36

```
 1   a foster parent, but to come to orientation where
 2   Brenda shares our doctrinal statement.
 3               First of all, why -- why would you have
 4   discussed this particular applicant with
 5   Mr. Kruithof?
 6        A.   Because one of the applicants was
 7   baptized Catholic.
 8        Q.   Was it typically brought to your
 9   attention when an application was received from
10   somebody who was Catholic?
11        A.    Not initially.  That was a later
12   request that I made that any applicants that came
13   in would be discussed with -- with me.
14        Q.   Do you know -- do you know why this
15   particular application then was brought to your
16   attention?
17        A.   Because I had requested that they be
18   brought to my attention.
19        Q.   Okay.  So this was after you had -- you
20   made that request?
21        A.    I believe so.
22        Q.   Okay.  And when you brought this
23   application to Mr. Kruithof's attention, do you
24   remember whether you had a discussion with him
25   about it in particular?
```

Page 37

1        A.    I don't remember the particular

2   discussion.

3        Q.    And you don't remember what he would

4   have said about this application?

5        A.    Because we invited them to orientation,

6   we were moving forward with the app -- with the

7   inquiry.  That was the next step in the process.

8        Q.    Okay.  So at this time in March of

9   2019, in order to work with Miracle Hill as

10  prospective -- as potential foster parents, did

11  both spouses who were applying have to be

12  Protestant Christians?

13       A.    I don't recall the date that Miracle

14  Hill changed their policy.

15            MS. JANSON:  Okay.  Let's see here.

16  Serena, why don't -- why don't we look at Tab 27.

17  And this is a document bearing the Bates Number

18  Miracle Hill Subpoena 244.  This will be Exhibit 6.

19  And it's a document, a press release, titled

20  Miracle Hill Ministries Strengthens Christian

21  Identity by Opening Foster Program to Catholic

22  Foster Care Parents.

23            (EXHIBIT 6, Document entitled Miracle

24  Hill Ministries Strengthens Christian Identity by

25  Opening Foster Programs to Catholic Foster Parents,

```
                                              Page 38
 1    MIRACLE_HILL_SUBP_000244 to 000245, was marked for

 2    identification.)

 3    BY MS. JANSON:

 4          Q.    Do you have that in front of you,

 5    Miss Busha?

 6          A.    Yes, I do.

 7          Q.    And do you recognize this document?

 8          A.    Yes.

 9          Q.    If you look at the -- at the very top

10    in the first paragraph there, it's dated July 5th,

11    2019.  Do you see that?

12          A.    Yes.

13          Q.    So is it fair to say that it was right

14    around that period in -- in early July of 2019 when

15    Miracle Hill changed its policy to open the foster

16    care program to Catholic foster parents?

17          A.    I don't remember the date it was

18    actually changed.  This was the press release.

19          Q.    Okay.  So if we go back to -- to

20    Exhibit 5, that was the e-mail thread with the

21    Bates Number 2366.

22          A.    Yes.

23          Q.    And that was dated March 8th, 2019,

24    right?

25          A.    Yes.
```

Page 39

```
 1          Q.   So it was -- it was several months in

 2     advance of the press release that went out

 3     announcing Miracle Hill's change in policy to work

 4     with Catholics as potential foster parents, right?

 5          A.   Yes.

 6          Q.   Okay.  So just to revisit my -- my

 7     prior question.  Do you know whether in March of

 8     2019 Miracle Hill would have required both members

 9     of a couple who were applying to be potential -- to

10     be foster parents to be Protestant Christians?

11          A.   I don't believe so, that we would have

12     required both to be Protestant Christians at that

13     point.

14          Q.   Okay.  So in this e-mail chain in

15     Exhibit 5, the recipient says that he or she was

16     Lutheran.  Is Lutheran -- do you consider

17     Lutheranism to be Protestant denominations?

18          A.   I'm -- I'm not an expert on Protestant

19     denominations.

20          Q.   Okay.  So you don't -- you don't have

21     an understanding one way or the other as to whether

22     Lutheranism is considered Protestant?

23          A.   No.

24          Q.   Okay.  Now, this application -- I think

25     you said earlier the next step in the process with
```

Page 40

1     this application was that they would come to an

2     orientation with Miracle Hill, is that right?

3          A.     Yes.

4          Q.     And why was it then that this couple

5     who is described in the e-mail chain here that's

6     Exhibit 5 was invited to an orientation whereas the

7     applicant who we looked at in Exhibit 4 was -- had

8     their -- had their application rejected outright?

9     Do you have an understanding of that?

10          A.     I don't know which applicant you're

11     talking about that was rejected.

12          Q.     Sorry, that was -- that's the document

13     that we marked as Exhibit 4.  It has the Bates

14     Number 4623.

15          A.     I do not know.

16          Q.     Okay.  Looking back then at Exhibit 5,

17     which is the document with the Bates Number 2366.

18     And thank you for -- for bearing with me as we flip

19     back and forth among all these documents.  I know

20     it gets a little confusing.

21               Do you -- without disclosing their

22     identities, do you happen to recall who the

23     applicants that were involved in this e-mail chain,

24     who they were?

25          A.     No.

Page 41

```
 1          Q.    Okay.  Looking at that same document.
 2     The very last line of Miss Betts' original -- her
 3     original e-mail, so this is the page marked 2367,
 4     she writes:  Thank you for your interest
 5     specifically in a teenager who is in group care.
 6     These children need foster homes too.
 7               MR. MATTHEWS:  Hold on one moment,
 8     Kate.  She needs to find that document.
 9               MS. JANSON:  Sure.
10               MR. MATTHEWS:  Yes.  Second page.  I'm
11     sorry, if -- if you would repeat that last part of
12     your question.
13     BY MS. JANSON:
14          Q.    Yeah, of course.  So if you look at the
15     second page of the document with the Number 2367 at
16     the bottom, the first line there is an e-mail
17     from -- it's Miss Betts' original e-mail and she
18     writes:  Thank you for your interest specifically
19     in a teenager who is in group care.  These children
20     need foster homes too.
21               Do you see that?
22          A.    Yes, I see that.
23          Q.    Okay.  Does -- does Miracle Hill run --
24     run a group home?
25          A.    Not today.
```

Page 42

1          Q.   Did it previously?

2          A.   Yes.

3          Q.   And was that home called the Miracle

4     Hill Children's Home?

5          A.   That was one of the group homes.

6          Q.   Was there another one?

7          A.   Yes.

8          Q.   And what was that one called?

9          A.   The Miracle Hill Boys' Shelter and

10    Homes for Life.

11         Q.   So there were three total?

12         A.   Yes.

13         Q.   Are any of the -- to your knowledge,

14    are any of the three still open today?

15         A.   No.

16         Q.   When -- when did Miracle Hill stop

17    running the Miracle Hill Children's Home?

18         A.   2020.

19         Q.   Okay.  And how about the Miracle Hill

20    Boys' Shelter?

21         A.   The end of 2020.

22         Q.   And how about Homes for Life?

23         A.   I believe that was in 2019.

24         Q.   What is your understanding as to why

25    Miracle Hill stopped running the Miracle Hill

```
                                        Page 43
 1   Children's Home?
 2          A.    Lack of referrals from the Department
 3   of Social Services.
 4          Q.    Does that mean there weren't enough
 5   children to house them in the home?
 6          A.    Yes.  We didn't have enough referrals
 7   to house children.
 8          Q.    Okay.
 9          A.    Serve children.  We didn't want to
10   house children, serve them.
11          Q.    Of course.  That's a -- yeah, poor
12   choice of words on my -- on my part.  I understand.
13   And how about the Boys' Shelter, was it -- was it
14   the same reason?
15          A.    Yes.
16          Q.    And what about Homes for Life?  What
17   was the reason to your understanding that that
18   closed?
19          A.    That was the same reason.
20          Q.    And before -- before it was closed
21   during the time when you worked at Miracle Hill, do
22   you have an understanding of approximately how many
23   children resided in the Miracle Hill Children's
24   Home at any given time?
25          A.    We had the -- we were licensed for 44
```

Page 44

1  beds.

2          Q.    Do you know -- do you know how many of

3  those -- of those beds were -- you know, were

4  filled, for lack of a better word, during your time

5  at Miracle Hill?

6          A.    I don't recall the exact numbers.

7          Q.    Do you have a general sense of what

8  proportion of the children who were served through

9  the Miracle Hill Children's Home were teenagers?

10         A.    I don't have those statistics.

11         Q.    Not looking for precise numbers, but do

12  you have a general sense?  Was it half of the kids,

13  was it 75 percent of the kids, any sort of ballpark

14  kind of understanding you can give me?

15         A.    My best recollection would be probably

16  about half of the children at the children's home.

17         Q.    Do you have a sense of how many at the

18  Boys' Shelter approximately would have been

19  teenagers?

20         A.    Probably 99 percent of the youth there.

21         Q.    Okay.  Is it right that the South

22  Carolina Department of Social Services is the

23  entity that would make the ultimate decision

24  regarding placement of children in foster homes?

25  Is that right?

```
                                            Page 45
 1          A.    Yes.   They have the ultimate
 2    responsibility.
 3          Q.    And to your knowledge, based on your
 4    role at Miracle Hill, what role or what involvement
 5    did Miracle Hill have in the placement process for
 6    children that resided in its group homes?
 7          A.    Could you ask me that question again,
 8    please?
 9          Q.    Sure.   Sure.   To your knowledge, did
10    Miracle Hill play a role in the placement process
11    for children that resided in its group homes?
12          A.    Yes.
13          Q.    And what was that role?
14          A.    DSS would contact us when they had a
15    child who needed residential care, and that child
16    would be screened for admission and admitted.
17          Q.    Okay.   And was it -- was it the
18    ultimate goal that the children who were in Miracle
19    Hill's children's homes would ultimately be placed
20    with a foster family?
21          A.    Yes, and are reunited with their
22    family.
23          Q.    Okay.   With their family of origin,
24    right?
25          A.    Yes.   Yes, ma'am.
```

Page 46

1          Q.    And did -- did Miracle Hill play a role

2     in the process by which children who lived in one

3     of its group homes were placed with a foster

4     family?

5          A.    Yes.

6          Q.    And generally speaking, what -- what

7     was that role that Miracle Hill played in that

8     process?

9          A.    Our residential directors and the

10    foster care director would communicate about

11    open -- open homes that may be good placements for

12    our children.  Of course DSS was involved in that

13    conversation as well to see if the child could be

14    moved from group care to foster care.

15         Q.    Okay.  And in your experience, is it

16    typically more difficult to find foster parents who

17    are willing to foster teenagers?

18         A.    Yes.

19         Q.    Why -- why do you think that is?

20         A.    I think that teenagers, because they

21    had been oftentimes in the system of DSS a very

22    long time and they've often been moved from foster

23    home to foster home, they have more challenging

24    behaviors and some foster families are not equipped

25    to manage those behaviors.

```
                                          Page 47
 1         Q.    Okay.   Thank you.   Okay.   So we already
 2   marked as Exhibit 6 the press release where Miracle
 3   Hill announced its change in policy to start
 4   working with -- with Catholics as potential foster
 5   parents.   That's the document with the Bates number
 6   ending 244.   And I just want to take -- I just want
 7   to take a closer look at that for a minute.
 8              If you look down in the one, two,
 9   three, fourth paragraph of that press release,
10   it's -- it mentions a lawsuit filed by Aimee
11   Madonna that gave the impression that Miracle Hill
12   was in a dispute with other followers of Jesus
13   Christ.   Are you familiar at all with the lawsuit
14   mentioned there that was filed by a plaintiff named
15   Aimee Madonna?
16         A.    I am not familiar with the lawsuit.   I
17   have heard her name.
18         Q.    And in what -- in what context have you
19   heard her name?
20              MR. MATTHEWS:   I'm going to object to
21   the extent that that asks for attorney/client
22   privileged information.   To the extent that the
23   witness' knowledge of Aimee Madonna relates to
24   information she heard from an attorney, either for
25   herself or for Miracle Hill, it would be privileged
```

1   and I will instruct her not to answer.  To the

2   extent that she has knowledge that is derived from

3   some other source other than an attorney

4   representing her or Miracle Hill, she can answer

5   the question.

6            THE WITNESS:  Could you repeat the

7   question?

8   BY MS. JANSON:

9        Q.   Sure.  My question was just in what

10  context had you heard Aimee Madonna's name?

11       A.   In conversation with Brenda Parks, the

12  foster care director, she had mentioned her name.

13       Q.   Do you remember anything more about

14  what Miss Parks had told you about Aimee Madonna?

15       A.   No.

16       Q.   Do you have any understanding of what

17  it means here in the press release that the lawsuit

18  filed by Miss Madonna, quote, gave the impression

19  that Miracle Hill Ministries was in a dispute with

20  other followers of Jesus Christ?

21       A.   My recollection is that this was

22  referring to being in dispute with a Catholic

23  church.

24       Q.   Okay.  I think we touched on when we

25  first marked this -- with this document earlier.

Page 49

1    This press release is announcing that Miracle Hill

2    has opened the door for Catholics as foster parents

3    and to work with Miracle Hill as prospective foster

4    parents, is that right?

5            A.    Yes.

6            Q.    To your knowledge, though, would

7    prospective -- prospective foster parents who are

8    Catholic still be required to agree with Miracle

9    Hill's doctrinal statement?  That's the document

10   that we looked at earlier and that we marked as

11   Exhibit 2.

12           A.    Yes.

13           Q.    And the press release, in fact,

14   reflects that it states that Christians who share a

15   commitment to the gospel and embrace our doctrinal

16   statement and belief and practice are valued

17   ministry partners in employment and in fostering,

18   is that right?

19           A.    You're reading that from the doctrinal

20   statement?

21           Q.    No, that comes from the -- that comes

22   from the press release.

23           A.    Can you repeat the question, please?

24           Q.    Sure.  I'm just looking for the

25   language.  Actually, let's -- let's skip that one

```
                                                    Page 50
 1    and move on.
 2               So as we discussed -- as we discussed
 3    before Miracle Hill's doctrinal statement, and that
 4    is the document we marked as Exhibit 2 with the
 5    Bates number ending 375, does that -- that
 6    doctrinal statement sets out Miracle Hill's
 7    religious beliefs, right?
 8         A.   Yes.
 9         Q.   And is it fair to describe those
10    beliefs as Evangelical Protestant belief?
11         A.   Yes.
12               MR. COLEMAN:  This is Miles.  Object to
13    the form of the question.
14    BY MS. JANSON:
15         Q.   And the doctrinal statement required,
16    for example, if you look at -- let's see, one, two,
17    three, four, five, six, the seventh statement in
18    the doctrinal statement, it says:  We believe that
19    the Holy Spirit unites all believers in the Lord
20    Jesus Christ and together they form one body, the
21    church.
22               Do you see that there?
23         A.   Yes.
24         Q.   Do you have any understanding as to
25    whether practicing Catholics would typically agree
```

```
                                        Page 51
 1    that, quote, all believers in the Lord Jesus Christ
 2    form -- together form the church?
 3         A.    I don't know.
 4         Q.    All right.  Let's look at -- Serena,
 5    let's look at Tab 30.  This is a document with the
 6    Bates Number Miracle Hill Subpoena 4467.  We're
 7    going to mark it as Exhibit 7.  And it is a e-mail
 8    thread between Reid Lehman and Miss Busha and
 9    others dated September 24th, 2019.
10              (EXHIBIT 7, E-mail chain dated 9/24/19
11    to Karen Busha and Ken Kruithof from Reid Lehman,
12    MIRACLE_HILL_SUBP_004467 to 004470, was marked for
13    identification.)
14    BY MS. JANSON:
15         Q.    Have you seen -- have you seen this
16    e-mail chain before, Miss Busha?
17         A.    Yes.
18         Q.    If you turn to the last page of the
19    chain, it's the page with the Bates Number 4469.
20    That is -- that is an e-mail from Sharon Betts and
21    she is writing to a recipient whose name is
22    redacted.
23              She writes:  Thank you for your recent
24    inquiry into our foster parent program.  Since you
25    read our doctrinal statement on the website when
```

Page 52

1    you inquired, I have a few additional questions for

2    each of you.

3                And I think by each of you there, she's

4    referring to the foster applicants whose names are

5    redacted.  And then she lists -- lists four

6    questions there.  At this time, this is September

7    of 2019, were -- were those questions that Miracle

8    Hill asked of all the applicants that were

9    interested in working with Miracle Hill as foster

10   parents?

11         A.   I don't know.

12         Q.   You don't know whether those were

13   questions that were reserved for Catholic

14   applicants?

15              MR. COLEMAN:  This is Miles.  Objection

16   to the form of the question.

17   BY MS. JANSON:

18         Q.   Would you like me to repeat it?

19         A.   My recollection was that all applicants

20   were to be questioned the same.  There was to be no

21   difference.

22         Q.   No difference between Catholic

23   applicants and Protestant applicants?

24         A.   Neither of the applicant, correct.

25         Q.   Okay.  So if you look at the next page

```
                                              Page 53
 1    of the document with the Bates number ending 44 --
 2    4468, it looks there -- and I won't read it all,
 3    but it looks like the applicant has provided her
 4    answers to Miss Betts' questions.
 5                And then on the first page of the
 6    e-mail chain at the very bottom, Miss Betts
 7    forwards the answers to Miss Parks and she says:
 8    Here are the Catholic lady's answers.  And then it
 9    looks like just above that, ultimately those
10    answers were forwarded on to you.  Is that an
11    accurate description --
12         A.   Yes.
13         Q.   -- of what's going on here?
14         A.   Yes.
15         Q.   Do you remember why it was that the
16    Catholic lady's answers to those questions would
17    have been forwarded to you?
18         A.   I had requested the applicants be
19    forwarded to me.
20         Q.   The applications from Catholic
21    prospective foster parents, right?
22         A.   Yes.
23         Q.   Okay.  Great.  And then you forward --
24    you forward the e-mail chain to Mr. Lehman and
25    Mr. Kruithof, and you write:  You may not want this
```

Page 54

```
 1   much detail, but I'm delighted to share we have had
 2   our first inquiry from a woman who is a DSS
 3   employee and works with Miracle Hill fostering.
 4   She is Catholic and her husband is Baptist.  Brenda
 5   and I felt good about her responses below and will
 6   be taking next steps with her regarding our
 7   doctrinal statement and application.
 8              Why was it that you had forwarded this
 9   information about this applicant to -- to
10   Mr. Lehman, who at the time I believe was the
11   president and CEO of Miracle Hill, is that right?
12        A.    That's correct.
13        Q.    And why was it that you forwarded the
14   information about this applicant to Mr. Lehman?
15        A.    Because he and Mr. Kruithof had asked
16   me to keep them informed if we received Catholic
17   applicants because we were excited to have them
18   join us in foster care.
19        Q.    And then Mr. Lehman writes back to you
20   and to Mr. Kruithof and he cc's someone named
21   Sandra Furnell and he writes:  Praise God.  May
22   this prove to be an application we can move forward
23   with.  Thanks for letting us know.
24              First of all, who -- who is Sandra
25   Furnell?
```

Page 55

```
 1        A.   At that time she was the communication
 2   director for Miracle Hill Ministries.
 3        Q.   Do you know why Mr. Lehman would have
 4   cc'd her on this e-mail?
 5        A.   Miss Furnell was part of the -- my
 6   understanding is that Miss Furnell was part of
 7   the -- my understanding is that Miss Furnell was
 8   part of the communication that went out in the
 9   press release, that was part of her job duties.  I
10   can't speak to why Mr. Lehman would forward it to
11   her.
12        Q.   Okay.  Do you know whether Miss Furnell
13   in her role as a communications director ever
14   incorporated foster parent applicants' stories into
15   Miracle Hill's like press releases or PR materials?
16        A.   I'm not aware of -- of what she did.
17        Q.   Okay.  And in your e-mail where you
18   forwarded this to Mr. Lehman and Mr. Kruithof, you
19   noted that -- that you would be taking the next
20   steps with the applicant regarding the doctrinal
21   statement and application.  Do you -- without -- of
22   course without revealing their identity, do you
23   remember this particular applicant, who they were?
24        A.   No, I don't -- don't recall who they
25   were.
```

Page 56

1          Q.   Do you remember whether -- whether
2     Miracle Hill did, in fact, move forward with this
3     applicant in the next step in the application
4     process?
5          A.   The applicant was given the -- the
6     inquirer was given the opportunity to come to
7     orientation to do the application.  I do not know
8     if they followed through.
9          Q.   Okay.  So you don't ultimately know if
10    they signed the doctrinal statement, for instance?
11         A.   I don't -- I don't know for this
12    applicant, no.  This inquirer, no.
13         Q.   Okay.  You don't know ultimately what
14    ended up happening with them, whether they became
15    licensed or anything beyond what's in the e-mail?
16         A.   No.
17              MS. JANSON:  Okay.  All right.  So it's
18    about 10:15.  We've been going for, you know, about
19    an hour and a quarter.  This would be a good time
20    for a break from -- from my end if that's okay with
21    you.
22              THE WITNESS:  Yes.  Thank you.
23              MS. JANSON:  Sure.  Why don't we -- why
24    don't we take a break and come back at 10:30.
25              VIDEO TECHNICIAN:  The time is 10:17

```
                                            Page 57
 1   AM.  We are going off the record.
 2               (A recess transpired.)
 3               VIDEO TECHNICIAN:  The time is 10:31
 4   AM.  We are back on the record.
 5   BY MS. JANSON:
 6       Q.   Okay.  So let's -- let's take a look at
 7   Tab 14.  This is an e-mail with the Bates Number
 8   Miracle Hill Subpoena 2572.  We're going to mark
 9   this as Exhibit 8 and it's an e-mail chain from
10   Miss Busha to Brenda Parks dated December 19, 2019.
11               (EXHIBIT 8, E-mail chain dated 12/19/19
12   to Brenda Parks from Karen Busha,
13   MIRACLE_HILL_SUBP_002572 to 002574, was marked for
14   identification.)
15   BY MS. JANSON:
16       Q.   Do you recognize this document?
17       A.   Yes.
18       Q.   If you flip over to the second page of
19   the document with the Page 57 -- or the Page Number
20   2573 at the bottom.  You write there to Miss Parks
21   in the second paragraph:  Sharon is requesting
22   training on how to interview foster families that
23   are Catholic.
24               Do you see that there?
25       A.   Yes.
```

```
                                          Page 58
 1          Q.    And the Sharon that you're referring
 2     to, is that Miss Betts?
 3          A.    Yes.
 4          Q.    And then on the first page of the
 5     document, Miss Parks replies to you and she says:
 6     Yes, ma'am.  She's wanting staff to feel more
 7     comfortable when discussing with the potential
 8     foster families.
 9               And then it looks like the two of you,
10     Miss -- you and Miss Parks, set up a phone call to
11     talk about it the next day.  Do you remember if you
12     actually had a -- had that phone call?
13          A.    No, I don't -- I don't remember.
14          Q.    Did Brenda ever explain to you -- I'm
15     sorry, Miss Parks.  Did she ever explain to you
16     what she meant by Miss Betts' wanting staff to feel
17     more comfortable interviewing foster families that
18     are Catholic?
19          A.    Did -- can you ask me that question
20     again, please?
21          Q.    Sure.  Did Miss Parks ever explain to
22     you what she meant when she referred to Miss Betts
23     wanting staff to feel more comfortable interviewing
24     foster families that are Catholic?
25          A.    My understanding from Mrs. Parks was
```

Page 59

1    that Miss Betts and some of the staff who had been

2    with Miracle Hill a long time needed more support

3    in adjusting to the change in the organization's

4    policy.

5          Q.   And can you tell me -- can you say a

6    little bit more about that?  What was your

7    understanding of why they felt that they needed --

8    some of the staff felt that they needed more

9    support in adjusting to the change -- the change in

10   policy whereby Miracle Hill would work with

11   Catholics as prospective foster parents?

12         A.   I really did not understand their

13   struggle, not having their background with the

14   ministry.  My goal was to ensure that everyone was

15   treated equally as far as whether it was a Catholic

16   or a Protestant, that they were all treated equally

17   and that there was no difference in how they were

18   treated.

19         Q.   Did you have a sense that there were

20   employees at Miracle Hill who disagreed with the

21   policy change whereby Miracle Hill started working

22   with Catholics as prospective foster parents?

23         A.   I wasn't aware of anyone who disagreed

24   directly.

25         Q.   Anyone who disagreed indirectly?

```
                                            Page 60
 1          A.   No.  I wasn't aware of anyone that

 2    disagreed.

 3          Q.   Okay.  Let's take a look at Tab 44.

 4    And this is an e-mail with the Bates Number Miracle

 5    Hill Subpoena 2576.  We're going to mark this as

 6    Exhibit 9.  And it's an e-mail chain between Reid

 7    Lehman to Miss Busha and Miss Parks dated January

 8    9th of 2020.

 9              (EXHIBIT 9, E-mail chain dated 1/9/20

10    to Brenda Parks and Karen Busha from Reid Lehman,

11    MIRACLE_HILL_SUBP_002576 to 002577, was marked for

12    identification.)

13    BY MS. JANSON:

14          Q.   Do you recognize this -- this e-mail

15    chain?

16          A.   Yes.

17          Q.   And in the second e-mail there on the

18    first page of the document, Miss Parks writes that

19    she met with the licensing staff about engaging

20    with members of the Catholic faith and others.  As

21    stated, I reviewed the doctrinal statement and

22    presented them with the questions that are used for

23    interviewing applicants.  I believe it was well

24    received and advised them that I would be happy to

25    accompany them to any meeting with a potential
```

1   applicant with whom they were uncomfortable.

2            And then Mr. Lehman responds and he

3   writes:  Good work.  Thanks for working to help

4   free up our foster care staff to be more open in

5   their consideration.

6            Do you remember whether -- or do you

7   know whether Miss Parks' meeting that she's

8   referring to here with the licensing staff, did

9   that develop as a result of the e-mail discussion

10  that you and she had had in the prior exhibit that

11  we talked about?

12       A.   No, I don't know.

13       Q.   Okay.  And the reference here to -- in

14  Miss Parks' e-mail to questions that are used for

15  interviewing applicants, are those questions that

16  were directed only at nonProtestant applicants for

17  foster care?

18       A.   All of the -- all of the applicants

19  were to be interviewed the same.

20       Q.   Okay.  So there's a standard set of

21  questions that the Miracle Hill licensing staff

22  would use when they're interviewing an applicant

23  regardless whether that applicant identified

24  themselves as Protestant or Catholic?

25       A.   I don't remember if a set of questions

Page 62

1   was -- was established.  I do know that all

2   applicants -- staff were instructed that all

3   applicants were to be interviewed the same.

4          Q.    Okay.  Do you know whether --

5   Miss Parks indicates in her e-mail that she told

6   the licensing staff that she would be happy to

7   accompany them to any meeting with a potential

8   applicant with whom they were uncomfortable.

9              Do you know if Miss Parks ever had to

10  accompany a member of the licensing staff to meet

11  with a potential applicant with whom they were

12  uncomfortable?

13         A.    No, I don't know.

14         Q.    And looking back at Mr. Lehman's e-mail

15  at the top of the document, do you have an

16  understanding of what he meant when he wrote thanks

17  for working to help free up our foster care staff

18  to be more open in their consideration?

19         A.    No, I don't know what he meant.

20         Q.    Okay.  All right.  So after Miracle

21  Hill made -- made its policy change to begin

22  working with Catholics as prospective foster

23  parents, do you know whether Miracle Hill has, in

24  fact, worked with prospective foster parents that

25  are Catholic and had them follow through the

```
                                          Page 63
 1   process to becoming licensed?
 2           A.    When I left Miracle Hill, we had one
 3   Catholic family that was licensed that I was aware
 4   of.
 5           Q.    And so that Catholic family that became
 6   licensed would have had to sign on to Miracle
 7   Hill's doctrinal statement, right?
 8           A.    That's correct.
 9           Q.    Just ballpark, approximately how many
10   families would you say -- prospective foster
11   families does Miracle Hill work with per year?
12           A.    When I was there, it was around 200.
13           Q.    And is that -- is that the number that
14   are licensed?
15           A.    Yes.
16           Q.    Okay.  So it would -- it might be a
17   larger number if you were talking about the number
18   of initial inquiries that Miracle Hill would
19   receive, right?
20                 MR. MATTHEWS:  Object to the form of
21   the question.  I think you all are passing each
22   other in what you're asking and answering.
23   BY MS. JANSON:
24           Q.    Okay.  So, Miss Busha, you said -- I
25   asked approximately how many families would you
```

Page 64

```
 1   say -- approximately how many prospective foster
 2   families does Miracle Hill work with per year and
 3   you said when I was there, it was around 200.
 4             So what I'm trying to understand is, is
 5   200 the number of families who are actually
 6   licensed to be foster families that Miracle Hill
 7   works with in a given year or is it a different --
 8   or is that a different number?
 9        A.   I misunderstood the question when
10   you -- I missed the word prospective.  The 200
11   number or the number of licensed foster parents
12   with Miracle Hill, not those who have inquired.
13        Q.   Okay.  Do you have -- do you have a
14   sense of approximately how many new inquiries from
15   prospective foster families Miracle Hill gets in a
16   given year?
17        A.   No.  I do not know.
18        Q.   Okay.  And we covered this earlier, but
19   it's correct that Miracle Hill will not work with
20   any nonChristians as -- who are interested in
21   pursuing foster care, right?
22        A.   That's my understanding.
23        Q.   Okay.  And would that be true even if a
24   nonChristian applicant agreed to sign Miracle
25   Hill's doctrinal statement?
```

Page 65

```
 1          A.    If -- it isn't just signing the
 2     statement, it is living the statement.
 3          Q.    I've seen language in a document, and I
 4     can't point to it right now, but I think the phrase
 5     was that applicants need to agree to the doctrinal
 6     statement in belief and practice, right?
 7          A.    That was my understanding.
 8          Q.    Okay.  Are you aware that the
 9     Plaintiffs in this litigation are Eden Rogers and
10     Brandy Welch?
11          A.    I am aware of them, yes.
12          Q.    And at some point in 2019, Miracle Hill
13     received an inquiry from Miss Rogers and Miss Welch
14     about becoming potential foster parents, is that
15     right?
16          A.    That's correct.
17          Q.    Let's look at Tab 20.  This is a
18     document with the Bates Number Miracle Hill
19     Subpoena 00593.  We're going to mark this as
20     Exhibit 10.  And this is a foster care inquiry form
21     that was submitted via Miracle Hill's website by
22     Brandy Welch on April 29th -- I'm sorry, April
23     28th, 2019.
24               (EXHIBIT 10, E-mail dated 4/28/19 to
25     Sharon Betts, Brenda Parks and Yvette Bates from
```

Page 66

1   Brandy Welch, MIRACLE_HILL_SUBP_000593 to 000594,

2   was marked for identification.)

3   BY MS. JANSON:

4        Q.    Have you seen this document before,

5   Miss Busha?

6        A.    Not until you sent it to me.

7        Q.    Okay.  And does this, in fact, appear

8   to be the foster care inquiry form that Brandy

9   Welch submitted on the Miracle Hill website?

10       A.    I have -- I did not see the inquiries

11   submitted by Miss Welch on the website.

12       Q.    Okay.  We'll just look at a couple -- a

13   couple sections of it.  If you look about halfway

14   down the page, it looks like Miss Welch identifies

15   her spouse as Eden Rogers.  Do you see that there?

16       A.    Yes.

17       Q.    And then at the bottom of the page the

18   question is asked:  Why I want to be a foster

19   parent, check all that apply.  And it looks like

20   Brandy checked I would like to help a child do

21   something good with his/her life and I know there

22   are children who need homes and I think I should

23   help.

24             And then below that she writes as an

25   additional reason:  Even if it is for a short

```
                                                   Page 67
 1   period of time, we would like for more children to
 2   know what it feels like to be unconditionally loved
 3   and to be part of a loving family.  We can provide
 4   a safe and loving environment.
 5               Do you see that there?
 6          A.   Yes.
 7          Q.   Okay.  And then in the bottom section
 8   of the application, it asks:  Please give a brief
 9   personal testimony of your faith/salvation in Jesus
10   Christ.  If you are married, please indicate your
11   spouse's testimony as well.
12               And Brandy provides an answer there.
13   She writes:  My wife and I have very similar
14   testimonies.  We were both raised in Christian
15   homes and were both active in church through our
16   childhood and teenage years.  I was part of a
17   Presbyterian church and my wife was part of a
18   Baptist church.  As we have had life experiences
19   and grown into the people we are today and as a
20   same sex couple, we feel comfortable with the
21   Unitarian Universalist Church here locally, which
22   embraces diverse religious backgrounds.  For us,
23   the core religious value of love is most important.
24               Do you see that there?
25          A.   Yes.
```

Page 68

1          Q.    Do you know whether Miracle Hill's
2     foster care inquiry form on its website is the same
3     today as it was in April of 2019 when Miss Welch
4     submitted it?
5          A.    I do not know.
6          Q.    Okay.  You don't know whether there has
7     been any changes to the -- to the inquiry form on
8     the website made since then?
9          A.    That's correct, I do not know if there
10    have been any changes to the form.
11         Q.    Okay.  All right.  Let's look at Tab 1.
12    This is going to be Exhibit 11.  And it's Bates
13    numbered Miracle Hill Subpoena 6977.  So this -- so
14    this is a -- an undated note that's signed by
15    Sharon Betts and it appears to be a summary of a
16    conversation that Miss Betts had with Miss Welch.
17               (EXHIBIT 11, Statement,
18    MIRACLE_HILL_SUBP_006977, was marked for
19    identification.)
20    BY MS. JANSON:
21         Q.    Have you seen this document -- have you
22    seen this document before?
23         A.    I don't recall having seen this
24    document.
25         Q.    Okay.  And in the document Miss Betts

Page 69

1    writes that Miss Welch -- and this is approximately

2    a third of the way through the -- the big paragraph

3    on the page.  Miss Welch said that she has a wife.

4    She said, does your website indicate what type of

5    families you work with?  Would we be disqualified?

6    And then Miss Betts writes:  I said, I am not sure

7    that is specifically addressed.

8                   To your knowledge, Miss Busha, does

9    Miracle Hill work with same sex couples who are

10   interested in becoming foster parents?

11         A.    It's my understanding they do not.

12         Q.    So you're not aware of Miracle Hill

13   ever having worked with a same sex couple that was

14   interested in fostering?

15         A.    I am not aware of any, that's correct.

16         Q.    So that means Miracle Hill would not

17   work with a same sex couple even if that couple

18   signed on to Miracle Hill's doctrinal statement?

19         A.    That's my understanding.

20         Q.    Do you know whether Miracle Hill would

21   work with a lesbian, gay or bisexual individual?

22               MR. COLEMAN:  Object to the form of the

23   question.  This is Miles.

24   BY MS. JANSON:

25         Q.    You can answer.

```
                                                        Page 70

 1            A.    It's my understanding they would not

 2      based on the practice of the doctrinal statement.

 3            Q.    Let's -- let's look back at the

 4      doctrinal statement just for a minute if we can.

 5      That was Exhibit 2.  And it's the document with the

 6      Bates number ending 375.  If you were to take a

 7      look at the doctrinal statement and then point me

 8      to where -- to what it is in the doctrinal

 9      statement that leads you to your understanding that

10      Miracle Hill would not work with lesbian, gay or

11      bisexual individuals as prospective foster parents.

12            A.    I couldn't state on what Miracle

13      Hill -- which of these beliefs Miracle Hill would

14      identify as the reason they will not work with that

15      population.

16            Q.    But it's -- nonetheless, it's your

17      understanding that Miracle Hill does not work with

18      lesbian, gay or bisexual individuals as well as

19      same sex couples, right?

20                  MR. COLEMAN:  Object to the form of the

21      question.  This is Miles.  You can answer.

22                  THE WITNESS:  As foster parents.

23      BY MS. JANSON:

24            Q.    Okay.  All right, let's look at Tab 22.

25      This is going to be Exhibit 12 and it's Bates
```

Page 71

1   numbered Miracle Hill Subpoena 12572.

2              (EXHIBIT 12, E-mail chain dated 5/1/19

3   to Sharon Betts, Reid Lehman, Karen Busha and

4   Brenda Parks from Sandra Furnell,

5   MIRACLE_HILL_SUBP_012572 to 12573, was marked for

6   identification.)

7   BY MS. JANSON:

8        Q.   So this is an e-mail chain, the top

9   e-mail which is from Sandra Furnell to Sharon

10  Betts, Reid Lehman, Karen Busha and Brenda Parks

11  dated May 1st, 2019.  Do you recognize this

12  document?

13       A.   Yes.

14       Q.   Do you remember it from the time that

15  it was sent or from your preparation for the

16  deposition?

17       A.   I recall it from the time it was sent.

18       Q.   Okay.  If you look at the first e-mail

19  in the chain on the second page of the document,

20  it's from Miss Betts and she writes:  Please find

21  the latest version of our response letter to

22  Miss Welch/Miss Rogers.  Your feedback is greatly

23  appreciated.

24              Do you know why Miss Betts was asking

25  for feedback on the response letter to Miss Welch

Page 72

```
 1   and Miss Rogers from this group?
 2           A.    No.
 3           Q.    Was it typical -- was it typical when
 4   an applicant -- when Miracle Hill denied a foster
 5   care applicant that Miss Betts would reach out to
 6   this group for feedback?
 7           A.    There were times that they would reach
 8   out to me to review documentation, but I can't
 9   recall if it was related to the licensing of a
10   foster family.
11           Q.    Okay.  So you don't -- you don't have
12   an understanding of what it was about Miss Rogers'
13   and Miss Welch's application that led Miss Betts to
14   ask for feedback on her response from this group?
15           A.    I can't speak for Miss Betts and the
16   motive that she had to send this to us.
17           Q.    Okay.  Do you -- did you, in fact,
18   provide any feedback to Miss Betts on the draft
19   response that she sent?
20           A.    I don't recall giving any feedback.
21           Q.    And in that same e-mail, the first
22   e-mail in this chain, Miss Betts writes we need to
23   get this out today and with an exclamation point
24   and today is written in in all capitals.
25                 Do you know why there was a rush to get
```

```
                                           Page 73
 1    the response out to Miss Rogers and Miss Welch on
 2    May 1st of 2019?
 3           A.   I do not recall.
 4           Q.   Okay.  All right.  Let's look at Tab
 5    21.  This is going to be Exhibit 13 and it's Bates
 6    marked Miracle Hill Subpoena 592.  We're going to
 7    mark this as Exhibit 13.
 8                (EXHIBIT 13, E-mail dated 5/1/19 from
 9    Sharon Betts, MIRACLE_HILL_SUBP_000592, was marked
10    for identification.)
11    BY MS. JANSON:
12           Q.   It's an e-mail from Sharon Betts to
13    Miss Rogers and Miss Welch dated May 1st, 2019.
14    Have you seen this document before?
15           A.   Yes.
16           Q.   And when did you see this document?
17           A.   I'm assuming May 1st of 2019.
18           Q.   Did Miss Betts forward to you this
19    document on May 1st, 2019?
20           A.   I don't recall if she only forwarded me
21    the draft copy or the finalized copy.  I don't
22    recall.
23           Q.   Okay.  Did this appear to be the -- the
24    final response letter that was -- that was sent to
25    Miss Rogers and Miss Welch?
```

Page 74

```
 1          A.    Yes.
 2          Q.    And in the second paragraph there
 3    starting in the first sentence, Miss Betts writes:
 4    You stated in your inquiry that you attend the
 5    Unitarian Universalist Church and that you are in
 6    agreement with our doctrinal statement.
 7                Do you see that there?
 8          A.    Yes.
 9          Q.    And then it goes on to say:  The
10    Unitarian Universalist Church, however, does not
11    align with traditional Christian doctrine and
12    thereby would not be considered a Christian church.
13                Do you see that?
14          A.    Yes.
15          Q.    Do you know whether Miracle Hill,
16    Miss Betts or anyone else at Miracle Hill conducted
17    any research into what the beliefs or the tenets of
18    the Unitarian Universalist faith were?
19          A.    I do not know.
20          Q.    Do you know how Miss Betts determined
21    that the Unitarian Universalist faith did not align
22    with traditional Christian doctrine?
23          A.    I do not know.
24          Q.    Do you have any view personally about
25    whether the Unitarian Universalist faith aligns
```

Page 75

1    with traditional Christian doctrine?

2         A.    I do not.

3         Q.    She notes in that first sentence of the

4    e-mail that Eden -- that Miss Rogers and Miss Welch

5    were in agreement with Miracle Hill's doctrinal

6    statement, but, nonetheless, Miss Betts indicates

7    here that Miracle Hill's view was that the

8    Unitarian Universalist Church did not align with

9    traditional Christian doctrine, right?

10        A.    That's what the letter states.

11        Q.    So that suggests then that Miracle

12   Hill's view of the Unitarian Universalist faith

13   was -- was determinative here, right?

14             MR. COLEMAN:   Object to the form of the

15   question.   This is Miles.

16             THE WITNESS:   I don't know how it was

17   determined.

18   BY MS. JANSON:

19        Q.    Okay.   What I'm trying to get at is

20   Miss Rogers and Miss Welch indicated in their -- on

21   their inquiry form that they were in agreement with

22   Miracle Hill's doctrinal statement, which as we've

23   discussed is a requirement for prospective foster

24   parents, but Miss Betts' e-mail indicates that

25   Miracle Hill had determined that the Universal --

Page 76

1    Unitarian Universalist faith was not a

2    traditional -- did not align with traditional

3    Christian doctrine and that is the reason that she

4    cites for denying their application.

5              So my -- so my question is, is simply

6    does it appear to you from reading this e-mail and

7    from our discussion that Miracle Hill's view about

8    Miss Rogers' and Miss Welch's Unitarian

9    Universalist faith was determinative of the

10   decision that Miracle Hill made with regard to

11   their foster parent application, is that right?

12        A.    I was not part of the discussion and

13   can't testify to that.

14        Q.    Okay.  Do you have an understanding as

15   to how Miracle Hill would have treated Miss Rogers'

16   and Miss Welch's application if they had said that

17   they attended a Protestant church, say a Methodist

18   church?

19              MR. COLEMAN:  This is Miles.  Object to

20   the form of the question.

21   BY MS. JANSON:

22        Q.    I can rephrase it if that would be

23   helpful.

24              If Miss Rogers and Miss Welch had

25   indicated in their inquiry form that they attended

Page 77

1    a Methodist church, for example, and they said that
2    they agreed with Miracle Hill's doctrinal statement
3    and everything else about their application was the
4    same, would -- is it your understanding that
5    Miracle Hill would have accepted their application?
6              MR. COLEMAN:  Same objection.
7              THE WITNESS:  I would need to rereview
8    the inquiry.
9    BY MS. JANSON:
10         Q.    Okay.  That was -- let's see.  Looking
11   back, that was a document that we marked as Exhibit
12   10 that ends in Bates Number 593.  If you want to
13   go back and take a look at that, you can do that
14   now.
15         A.    My understanding is that Miracle Hill
16   would not have accepted the inquiry because they
17   were not living in accordance to the doctrinal
18   statement that they agreed with.
19         Q.    And what -- what do you mean when you
20   say they weren't living in accordance with the
21   doctrinal statement?
22         A.    They indicate that they are a same sex
23   couple.
24         Q.    And is it right that Miracle Hill's
25   doctrinal statement states that God's design for

```
                                              Page 78
 1    marriage is the legal joining of one man and one
 2    woman in a lifelong covenant relationship?
 3            A.    We believe God's design for marriage is
 4    a legal joining of one man and one woman in a
 5    lifelong covenant relationship is the Miracle Hill
 6    doctrine statement.
 7            Q.    And so do you have -- so if we look
 8    back at Exhibit 13, which is the response letter to
 9    Miss Rogers and Miss Welch that we just had in
10    front of us with the Bates Number 592 at the
11    bottom, does that -- does this response letter say
12    anything about Miss Rogers and Miss Welch being a
13    same sex couple?
14            A.    It does not.
15            Q.    Do you have any understanding of why
16    that was not included in the response letter of the
17    reason for why Miss Welch and Miss Rogers'
18    application was rejected?
19            A.    I do not.
20            Q.    Do you know whether there was ever
21    discussion among Miss Betts or others at Miracle
22    Hill about whether to include something in this
23    response letter about Miss Welch and Miss Rogers
24    being a same sex couple?
25            A.    I was not part of that conversation.
```

Page 79

```
 1          Q.    But do you know whether there were
 2     conversations on that topic, among others?
 3          A.    I referred them to legal counsel.
 4          Q.    You referred who to legal counsel?
 5          A.    Miss Parks when she brought the
 6     information to me.
 7          Q.    I'll go back.  At some point Miss Parks
 8     came to you with questions about Miss Welch's and
 9     Miss Rogers' application?
10          A.    Yes.
11          Q.    And what were -- what were those
12     questions that she had?
13          A.    The questions were that she had
14     received an inquiry from a couple who were part of
15     the Unitarian church and a same sex couple.
16          Q.    And -- and so what was she looking for
17     guidance on?
18          A.    How to respond to the inquiry.
19          Q.    And what did you tell her to do?
20          A.    To contact Sandy Furnell, the
21     communication director, and to have her contact our
22     attorney, Miles Coleman.
23          Q.    Do you know whether --
24          A.    And Mr. Reid Lehman.
25          Q.    Do you know whether Miss Parks actually
```

Page 80

1    contacted Miss Furnell?

2            A.    I'm assuming from the written

3    communication we have here that she did.

4            Q.    But you don't know for sure?

5            A.    I was not with her to witness her

6    contacting Miss Furnell.

7            Q.    Do you have any understanding of what

8    Miss Furnell might have told Miss Parks with regard

9    to Miss Rogers' and Miss Welch's application?

10                MR. MATTHEWS:   I'll object to the

11   question to the extent that it may be seeking

12   attorney/client privileged information.  We haven't

13   established yet whether or not any such

14   conversations included legal counsel, but we

15   know -- do know that they may have.

16                To the extent that the witness knows

17   that those communications occurred outside of the

18   presence of legal counsel, she's free to answer the

19   question; but to the extent that they may have

20   included legal counsel, asserting privilege and

21   directing the client not to respond.

22                MS. JANSON:   So Miss -- Miss Furnell is

23   not a lawyer, right?

24                MR. MATTHEWS:   Correct.  But we don't

25   know if Miss -- if the communication was with

Page 81

1    Miss Furnell or was with Miss Furnell and

2    Mr. Coleman.  If the witness has knowledge of

3    conversations that occurred outside of the presence

4    of legal counsel, she's free to answer questions

5    about that.

6              But right now, we're in an area where

7    it appears that the conversations may have included

8    Miss Furnell and Mr. Coleman pursuant to the

9    witness' instructions to Miss Parks.

10   BY MS. JANSON:

11        Q.    Okay.  Well, let's back up a bit.

12   Miss Busha, do you know whether Miss Parks, in

13   fact, contacted Miss Furnell about her questions

14   regarding Miss Rogers' and Miss Welch's

15   application?

16        A.    I did not witness her contacting

17   Miss Furnell, but I believe that she did contact

18   Miss Furnell.

19        Q.    Okay.

20        A.    Because of the e-mail communication

21   that you presented to me.

22        Q.    And do you have any understanding of

23   what was discussed between Miss Parks and

24   Miss Furnell?

25        A.    No.  I was not present.

```
                                                    Page 82
 1           Q.   Do you know whether Miss Parks
 2    contacted Mr. Lehman with her questions regarding
 3    Miss Rogers' and Miss Welch's application?
 4           A.   I do not know who she contacted.
 5           Q.   Okay.  All right.  Let's shift gears a
 6    little bit and turn to a new topic.
 7                In -- Miss Busha, in your experience at
 8    Miracle Hill, did Miracle Hill provide any
 9    religious instruction to the children that live --
10    that resided in its group homes?
11                MR. COLEMAN:  This is Miles.  Object to
12    the form of the question.
13                THE WITNESS:  The group homes typically
14    provided devotionals, but children had the ability
15    to opt out of those if they weren't comfortable in
16    attending.
17    BY MS. JANSON:
18           Q.   What is a devotional?
19           A.   I do not -- I didn't see the devotions
20    that they provided.  Typically a devotion would
21    include a reading of scripture and some type of
22    encouragement.
23           Q.   What do you mean by some type of
24    encouragement?
25           A.   Some type of positive encouragement,
```

Page 83

```
 1   something uplifting to help the children feel
 2   valuable, worthy, but I don't -- I didn't see the
 3   devotional material, so I can't speak to exactly
 4   what was shared for the children who wanted to
 5   attend.
 6           Q.   Okay.  Do you know -- was it -- who was
 7   it at Miracle Hill that would have led that
 8   devotional time?
 9           A.   At the Miracle Hill Children's Home, it
10   would primarily be the house parents.  In the Boys'
11   Shelter and Homes for Life, it would probably be
12   one of the staff members.
13           Q.   Did -- to your knowledge were the
14   children who resided at Miracle Hill Children's
15   Home or the Boys' Shelter or Homes for Life brought
16   to worship services?
17           A.   They could attend worship services.
18   They also had the option to opt out of worship
19   services.
20           Q.   And if they chose to attend, what --
21   what services were those?  What church did they go
22   to?
23           A.   I don't know the churches they
24   attended.
25           Q.   Okay.  Apart from the devotion time
```

```
                                           Page 84
 1   that we discussed, was there -- and the opportunity
 2   to attend worship services, were there other
 3   religious instruction that was -- that was provided
 4   to or offered to the children in Miracle Hill's
 5   group homes?
 6           A.   I wasn't there, so I'm not sure
 7   exactly -- I can't testify that exactly what was --
 8   what was done.
 9           Q.   Okay.  Do you know whether Miracle Hill
10   required consents from a child's family of origin
11   before encouraging or offering the child the
12   opportunity to participate in religious
13   instruction?
14           A.   I don't know.
15           Q.   You don't know whether consent --
16   whether consent was -- was sought from the family
17   of origin?
18           A.   I do not know with regard to the family
19   of origin.
20           Q.   Okay.  Did Miracle Hill offer religious
21   instruction to the children in its group homes
22   unless there was a specific objection from the
23   family of origin?
24           A.   Or the child.
25           Q.   Or the child.  Okay.  And to your
```

```
                                              Page 85
```

 1    knowledge was Miracle Hill legally obligated to

 2    honor the wishes of the family of origin when it

 3    comes to religious instruction of children in its

 4    group homes?

 5           A.   I know that we honored requests.  I

 6    don't know the legalities of that.

 7           Q.   Okay.  Can you give me an example of a

 8    time that you remember when Miracle Hill honored

 9    the request of a family of origin with respect to

10    religious instruction?

11           A.   Yes.  At the Miracle Hill's children

12    home, we did have a parent that did not want her

13    child going to -- I'm trying to remember.  She did

14    not want her child going to a Christian church.  I

15    can't remember where she wanted her child to go.  I

16    remember that we accommodated taking the child to

17    wherever her mother wanted her to attend a

18    religious service.  I just can't remember what the

19    religious service was.  Her staff took her to

20    wherever the mother wanted her to go.

21           Q.   Okay.  Why don't we look at Tab 41.

22    This is going to be Exhibit 14.  Its Bates numbered

23    Miracle Hill Subpoena 6206.  And this is an e-mail

24    thread that begins with a message that Miss Busha

25    forwarded to herself on November 26th of 2019.

```
                                            Page 86
 1                  (EXHIBIT 14, E-mail chain dated
 2      11/26/19 to Karen Busha from Karen Busha,
 3      MIRACLE_HILL_SUBP_006206 to 006211, was marked for
 4      identification.)
 5      BY MS. JANSON:
 6          Q.   After you've had a chance to take a
 7      look at that, just let me know whether -- whether
 8      you recognize this e-mail chain.  So do you
 9      recognize this e-mail chain?
10          A.   Yes.
11          Q.   And if you look down at the first
12      e-mail in the chain, you're sending a message on
13      Tuesday, November 26, 2019 to Bradley Holland,
14      Steven Hicks, Kristie Ballentine and Michelle
15      Hamilton.  Who is -- who is Bradley Holland?
16          A.    He was the director of the Miracle Hill
17      Children's Home.
18          Q.   And who was Steven -- who is Steven
19      Hicks?
20          A.   He was a staff member at the children's
21      home.
22          Q.   And how about Kristie Ballentine?
23          A.    Kristie Ballentine was also a staff
24      member at the children's home.
25          Q.   All right.  And what about Michelle
```

Page 87

1   Hamilton?

2       A.   And Michelle Hamilton was as well a

3   staff member.

4       Q.   Okay.  Great.  And in that e-mail, a

5   few paragraphs down at the second paragraph on the

6   last page of the chain you write:  So we are all --

7   so we are all on the same page regarding the

8   children of Catholic faith.  We will respect the

9   wishes of the mother conveyed through her attorney

10  and accommodate mass for her children.  In

11  addition, based on her preference, they are not, in

12  capitals and underlined, to be taken to a church

13  outside the Catholic faith.  The mother has made

14  her wishes clear and to do otherwise puts us at

15  risk due to the contact.

16          Is that last word in that -- in that

17  paragraph, was that supposed to read contract?

18      A.   Yes.

19      Q.   Okay.  And it sounds like from what you

20  have written there that there was a situation where

21  the mother of a -- of children in Miracle Hill's

22  care objected to their children -- her children

23  being taken to a church other than the Catholic

24  church, is that -- is that a fair interpretation?

25      A.   Yes.  Yes.

1          Q.    Is this the same example that you

2     were -- you were remembering before?

3          A.    Yes.

4          Q.    Obviously without disclosing the

5     identities of the people involved here, can you

6     tell me anything more about what you remember

7     regarding this particular situation?

8          A.    Based on what I wrote, it appears that

9     I was in a meeting with them.  And if I understood

10    correctly, that they were taking all children to

11    church regardless of their preferred preference.

12    And if my memory serves me correctly, it was a

13    house parent, not these staff members, but a house

14    parent had been taking all the children in the

15    cottage to the same church.

16         Q.    Okay.  Do you -- do you know how it was

17    that the mother of these children discovered that

18    her children were being taken to religious services

19    without her consent?

20         A.    The child told the mother on a visit.

21         Q.    Okay.

22         A.    Is my recollection.

23         Q.    And in your e-mail that we were just

24    looking at, you write:  If I understood correctly

25    yesterday that we make, in quotes, all kids go to

Page 89

```
 1   church regardless of their preference, then we are
 2   practicing outside the contract by forcing a child
 3   to attend a church outside their faith -- faith
 4   preference.  In addition, if we have children who
 5   voice unbelief and do not want to attend church,
 6   based on the contract we cannot force them to
 7   attend.
 8              What is the contract that you're
 9   referring to there?
10         A.   The contract with the Department of
11   Social Services.
12         Q.   And that's a contract that Miracle Hill
13   enters into with DSS to provide foster care
14   services?
15              MR. MATTHEWS:  Object to the form of
16   the question.
17              THE WITNESS:  This was -- this was a
18   contract Miracle Hill entered in with DSS to
19   provide residential services.
20   BY MS. JANSON:
21         Q.   Okay.  In that -- in that paragraph
22   that I just read from, you said if I understood
23   correctly yesterday.  Do you remember what it was
24   that happened the day before you wrote this e-mail
25   that you're referring to there?
```

Page 90

```
 1          A.    It appears I had a meeting with these
 2     four staff members.
 3          Q.    Okay.  Is it -- is it your
 4     understanding from your time at Miracle Hill that
 5     Miracle Hill considers it part of its religious
 6     mission to make children attend church?
 7          A.    No, it is not -- it was not our
 8     practice to make children attend church.
 9          Q.    But judging from the e-mail we were
10     just looking at -- we were just looking at, it
11     seems like that's what was happening at the Miracle
12     Hill Children's Home, doesn't it?
13               MR. COLEMAN:  This is Miles.  Object to
14     the form of the question.
15               THE WITNESS:  My recollection is that
16     there was a house parent -- house parents took the
17     children to church that was requiring all the
18     children in the cottage to go to church.
19     BY MS. JANSON:
20          Q.    Was it -- was it Miracle Hill's policy
21     to require the children that lived in its
22     residential homes to go to church absent an
23     objection from their families of origin?
24               MR. COLEMAN:  This is Miles.  Object to
25     the form of the question.
```

Page 91

```
 1              THE WITNESS:  Can you repeat the
 2   question, please?
 3   BY MS. JANSON:
 4        Q.   Sure.  Was it Miracle Hill's policy to
 5   require the children that lived in its residential
 6   homes to go to church unless there was an objection
 7   from their family of origin?
 8        A.   I don't recall it being in policy.
 9        Q.   Was it a practice?
10        A.   It was a practice to offer -- offer
11   children church services on Sunday while they were
12   in residential care, yes.
13        Q.   Were they encouraged to attend church
14   services?
15        A.   They were offered the opportunity to
16   attend church services.
17        Q.   But you don't know whether they were
18   encouraged to attend the church services?
19        A.   I -- I don't know.
20        Q.   And what was it -- what was it
21   specifically about the contract -- Miracle Hill's
22   contract with DSS that you referenced in this
23   e-mail that's Exhibit 14 that led you to make the
24   statement here that if we make all kids go to
25   church regardless of their preference, we are
```

Page 92

```
 1   practicing outside the contract?
 2                MR. MATTHEWS:  Object to the form of
 3   the question in that it's asking the lay witness
 4   for a legal -- legal opinion, but you're free to
 5   answer the question.
 6                MR. COLEMAN:  This is Miles.  I also
 7   object to the form and relevance of the question
 8   for residential foster care.
 9   BY MS. JANSON:
10        Q.   I'm just looking for what -- what the
11   basis was for your statement in this e-mail that
12   you wrote where you said that if we make all kids
13   go to church regardless of their preference, we are
14   practicing outside the contract.
15        A.   I would have to see the contract to
16   know what I was referencing.
17        Q.   You don't have any recollection of what
18   it was in the contract that you were referring to
19   there?
20        A.   There is obviously something in the
21   contract regarding religious activities for
22   children, but I don't recall what it is without
23   seeing the contract.
24        Q.   Okay.  Looking back at that same e-mail
25   that is Exhibit 14, further up in the chain on the
```

Page 93

1    page that's marked Bates Number 6207.  This is an

2    e-mail from Mr. Holland on November 26, 2019.  And

3    he's writing just to you in response to your e-mail

4    that we had been looking at previously.  And about

5    I think it's the fourth paragraph down on 6207 --

6                    MR. MATTHEWS:  Kate, we're just --

7                    MS. JANSON:  Sure.

8                    MR. MATTHEWS:  I apologize.  We're

9    looking for this document.

10   BY MS. JANSON:

11       Q.    Okay.  And then -- so he writes:  We

12   may limit our staff's ability to worship with this

13   decision.  We are breaking with program and as I

14   understand it MHM, Miracle Hill Ministries,

15   practices.

16                    Do you have an understanding of what he

17   means when he says we are breaking with program and

18   as I understand it Miracle Hill Ministries

19   practices?

20       A.    Can you repeat the question, please?

21       Q.    Sure.  My question was whether you have

22   an understanding of what Mr. Holland meant when he

23   wrote we are breaking with program and as I

24   understand it Miracle Hill Ministries practices.

25       A.    I don't -- I don't understand why

Page 94

1    Mr. Holland wrote that or what he believed.

2         Q.    Does it -- does that statement suggest

3    that it had, in fact, been Miracle Hill's practice

4    to insist that the children in its group homes

5    attend religious services?

6              MR. MATTHEWS:  Object to the form of

7    the question.

8              And, Miss Brusseau, I apologize.  I've

9    not been identifying myself.  Miles has been good

10   about identifying himself.  So if you have previous

11   objections with no name on it, it's probably me.

12             COURT REPORTER:  That's what I thought.

13   Thank you.

14             THE WITNESS:  My understanding from my

15   employment was that children had a choice, and that

16   was the practice of Miracle Hill.  I cannot speak

17   to Mr. Holland's practice.

18   BY MS. JANSON:

19        Q.    If you look -- if you look in the next

20   paragraph down, he writes -- in the same e-mail he

21   writes:  I have been working with Steve this

22   morning on how we are going to accommodate this

23   request.

24             And is the Steve that he's referring to

25   there Mr. Hicks?

```
                                              Page 95
 1          A.    Yes.
 2          Q.    And he was a staff member at the
 3    children's home, right?
 4          A.    Yes.  He supervised the house parents.
 5          Q.    And then Mr. Holland writes:  If the
 6    mother is not okay with this as an option, then I
 7    respect her decision.  It will be up to DSS to
 8    place the children in the best option available.
 9          Do you see that there?
10          A.    Yes.
11          Q.    Do you -- do you have an understanding
12    of what Mr. Holland meant by that?
13          A.    I can't speak for what he meant.  I can
14    only read what he stated.
15          Q.    Do you understand him to be suggesting
16    that DSS would need to find another CPA to care for
17    these children if the mother did not want Miracle
18    Hill to take her children to religious services
19    outside the Catholic faith?
20               MR. COLEMAN:  This is Miles.  Object to
21    the form of the question.
22               THE WITNESS:  His statement was that it
23    would be up to DSS to place the children in the
24    best option available.
25    BY MS. JANSON:
```

Page 96

```
 1          Q.    Has -- to your knowledge, had -- did
 2    Miracle -- had Miracle Hill when it operated its
 3    group homes ever declined to care for a child in
 4    one of its group homes because the child's family
 5    objected to the child attending Miracle Hill's
 6    religious services?
 7          A.    I did not have knowledge of that.
 8          Q.    You don't know whether -- you don't
 9    know whether that ever happened or you believe that
10    it never happened?
11          A.    I don't know if it ever happened.
12          Q.    Do you -- do you personally, do you
13    agree that that would be the appropriate course for
14    Miracle Hill to take if a family of origin objected
15    to its child's being exposed to Miracle Hill's
16    religious teachings?
17               MR. MATTHEWS:  Object to the form of
18    the question in reference to that that would be the
19    appropriate course.  I'm not sure what that refers
20    to.
21    BY MS. JANSON:
22          Q.    I can clarify.  If -- if a family of
23    origin objected to a child being -- a child in a
24    Miracle Hill group home being exposed to Miracle
25    Hill's religious teachings, would the appropriate
```

Page 97

1    course for Miracle Hill to take be to decline to

2    care for the child and ask for DSS to find another

3    CPA?

4          A.    No.

5          Q.    What do you think would be the

6    appropriate course for Miracle Hill to take in that

7    circumstance?

8          A.    To respect and accommodate the wishes

9    of the parent and the child.

10          Q.    And in your -- in your reply to

11    Mr. Holland on Exhibit 14, the page marked 6206,

12    that's the first page there, first paragraph, you

13    write at the bottom:  We accept children of all

14    faiths into care at Miracle Hill Ministries and

15    this mother's request should not disrupt their

16    placement.  We are in no way changing who we are,

17    but rather we are respecting religious differences

18    among our children and their families' preference.

19              So that's con -- that's consistent with

20    what you said about Miracle Hill respecting and

21    accommodating the wishes of the parent and the

22    child, right?

23          A.    Yes.

24          Q.    And as you say here in the e-mail, it,

25    quote, in no way changes who Miracle Hill is to

Page 98

```
 1   respect religious differences among the children in
 2   Miracle Hill's care, right?
 3        A.   That's correct.  Accommodating other
 4   religious beliefs did not change what Miracle Hill
 5   was.
 6        Q.   So to your knowledge then, why does
 7   Miracle Hill refuse to work with prospective foster
 8   parents who practice a different faith?
 9        A.   I can't speak to Miracle Hill's
10   decisions or how they operate their business.
11        Q.   Do you have -- do you have an opinion
12   or a personal view as to why Miracle Hill refuses
13   to work with prospective foster parents who
14   practice a different faith?
15        A.   Miracle Hill is a private religious
16   organization and they want to operate with people
17   of like faith is my understanding, but I can't
18   speak for the minister.
19        Q.   So what I'm trying to understand is if
20   you're clear in this e-mail that Miracle Hill
21   respects religious differences among the children
22   that are under its care and yet Miracle Hill when
23   it comes to folks that are interested in serving as
24   foster parents, Miracle Hill requires that those
25   people follow the same religious beliefs and the
```

Page 99

```
 1   same faith as Miracle Hill, do you have an opinion
 2   or an understanding as to why those two things are
 3   treated differently?
 4           A.    No.
 5                 MR. MATTHEWS:  Object to the form of
 6   the question.  I'm sorry, this is Steve Matthews
 7   again.
 8   BY MS. JANSON:
 9           Q.    And then you write a couple paragraphs
10   down in the e-mail:  As for devotions at Miracle
11   Hill Children's Home, nothing changes.  Any child
12   who does not want to actively participate can sit
13   quietly during those times.
14                 And then:  In the rare incident that
15   you have a family contact you and object based on
16   their faith, please let me know so we can staff
17   with Ken to determine the best plan for the child.
18                 So this is talking about the devotions
19   that we -- that we spoke about a little bit
20   earlier, right?
21           A.    Yes.
22           Q.    And this suggests that children who did
23   not want to actively participate could sit quietly
24   during those times, but it sounds like they still
25   had to attend the devotional time, is that right?
```

Page 100

1        A.   These are home -- the facility was a

2   home life setting, so you could sit quietly without

3   sitting in the devotion area.

4        Q.   Do you know whether Miracle Hill ever

5   had a family object to their child or their

6   children attending these daily devotions?

7        A.   I don't recall.

8        Q.   Okay.  We can put -- we can put that

9   one aside for now.  Let's mark Tab 42 as Exhibit 15

10  I think we're on.  And this is marked Miracle Hill

11  Subpoena 6220.  It's an e-mail from Miss Busha to

12  Mr. Holland dated November 26, 2019.

13              (EXHIBIT 15, E-mail dated 11/26/19 to

14  Bradley Holland from Karen Busha,

15  MIRACLE_HILL_SUBP_006220, was marked for

16  identification.)

17  BY MS. JANSON:

18       Q.   Just let me know if you recognize this

19  document.

20       A.   Yes.

21       Q.   And it looks like this was -- this

22  e-mail was sent November 26, 2019, which is the

23  same day as the prior exhibit that we were just

24  discussing, right?

25       A.   I'm sorry, what was the question?

Page 101

1          Q.   This e-mail that we're looking at,
2     Exhibit 15, is dated November 26, 2019.  Is that
3     the same day as the prior exhibit that we were
4     looking at, Exhibit 14, the prior e-mail chain?
5          A.   Yes.
6          Q.   Okay.  So you sent a separate e-mail to
7     Mr. Holland on that same day.  It appears to be
8     generally related to the same topic that we are now
9     discussing, right?
10         A.   Yes.
11         Q.   And it -- the subject line reads:
12    Placement disruption.  And you wrote:  Miracle Hill
13    Ministries' stance on their being placed with us is
14    in bold on our -- on our website under foster care.
15    The page was designed to emphasize that we do not
16    discriminate against children coming into care.
17    I'm not sure what MHCH has done in the past, but my
18    understanding is that this is our stance at the
19    present time.  So Catholic children needing
20    accommodations for mass would have nothing to do
21    with their being placed at MHCH.
22              Do you see that there?
23         A.   Yes.
24         Q.   And in the first line there where it
25    says MHM stance on their being placed with us, is

Page 102

1  this talking about the children whose -- the

2  Catholic children whose mother had objected to

3  their being -- to her children being taken to

4  churches outside the Catholic faith?

5        A.   Yes, that's what this is referring to.

6  Or any other child that would need an accommodation

7  for religious purposes.

8        Q.   Okay.  And you write in the section

9  that I read:  I'm not sure what MHCH has done in

10  the -- has done in the past.

11           Did you ever find out whether at some

12  time before this, before November of 2019, it had

13  been the practice at Miracle Hill Children's Home

14  to discriminate against nonProtestant children

15  residing at the home?

16        A.   No.

17        Q.   No, you didn't find out or no, they

18  didn't do that?

19        A.   No, I did not find out.

20        Q.   Okay.  Do you know whether Miracle Hill

21  ever tried to -- Miracle Hill Children's Home ever

22  tried to find a different placement for a child

23  because his or her family of origin did not want

24  them to attend Miracle Hill's religious services?

25        A.   Can you repeat the question, please?

1        Q.    Sure.   Do you know whether Miracle Hill

2    ever -- Miracle Hill Children's Home, sorry, ever

3    tried to find a different placement for a child

4    because the child's family of origin did not want

5    them to attend Miracle Hill's religious services?

6        A.    I am not aware of that during my tenure

7    with Miracle Hill.

8        Q.    Okay.   So the next document I want to

9    look at is Tab 43.   It's going to be Exhibit 16 and

10   it's Bates marked Miracle Hill Subpoena 6221.   And

11   this is going -- this is an e-mail from Miss Busha

12   to Bradley Holland dated November 27th, 2019.   The

13   subject line reads re followup and a bit more

14   context for Catholic request.

15              (EXHIBIT 16, E-mail chain dated

16   11/27/19 to Bradley Holland from Karen Busha,

17   MIRACLE_HILL_SUBP_006221 to 006222, was marked for

18   identification.)

19   BY MS. JANSON:

20       Q.    Just let me know if you recognize the

21   e-mails.

22       A.    Yes.

23       Q.    And, let's see.   In Mr. Holland's

24   e-mail, 10:45 AM part way down the page there, he

25   writes:   We have planned to transport to Catholic

Page 104

1    service once per week and for them to remain home

2    during Sunday church.

3                To your recollection, is that, in fact,

4    how the situation we've been discussing with the

5    Catholic children was resolved?

6        A.    What's the question again?

7        Q.    To your -- to your recollection, was

8    this, in fact, how the situation we've been

9    discussing with the Catholic children how it was

10   resolved?

11       A.    Yes.  The children were taken -- the

12   children were to be taken to the Catholic service

13   as requested and to remain home during Sunday

14   church services.

15       Q.    Okay.  Do you remember -- from your

16   time at Miracle Hill, do you remember any other

17   situations in which a child's parent objected to

18   his or her attending church services with -- with

19   Miracle Hill?

20       A.    I don't recall any other situations

21   other than this one.

22       Q.    Okay.  Do you know whether Miracle Hill

23   has a formal policy regarding religious instruction

24   of children -- or had, I should say, a formal

25   policy regarding religious instruction of children

Page 105

1    in its group home?

2           A.    I believe the instructions were

3    included in the operational manual for the ministry

4    for the children's home.

5           Q.    Okay.

6           A.    But I'm not certain without seeing the

7    manual.

8           Q.    And then just a couple more questions

9    on this one.  Mr. Holland writes a couple sentences

10   down, it looks like two names:  Redacted and

11   redacted are the two boys involved in this

12   decision.  Both professed faith in Christ while

13   attending church with house parents.  Blank asked

14   his mother's permission to be baptized, which is

15   what triggered the response from mother.

16              The names are redacted there, but it

17   looks like next to each name there's a dash and

18   then a number, dash 9 and dash 8.  Do you know

19   whether the 8 and the 9 are the children's ages?

20          A.    I do not know.

21          Q.    Okay.  And it looks like from this one

22   of the children -- one of the boys asked his mother

23   to be baptized after attending Miracle Hill's

24   religious services, right?

25              MR. COLEMAN:  Object to the form of the

Page 106

1    question.

2                    THE WITNESS:  They did not attend

3    Miracle Hill religious organization -- services.

4    Miracle Hill's services.

5    BY MS. JANSON:

6         Q.    Okay.  What I mean is after

7    attending -- after attending church -- I mean,

8    Mr. Holland says in his e-mail:  Both professed

9    faith in Christ while attending church with house

10   parents.

11                   So my question -- I'm just confirming

12   what's in the e-mail.  One of the children asked

13   his mother to be baptized after he had attended

14   church with Miracle Hill house parents, is that

15   right?

16        A.    Yes.  The children had been attending

17   church with the house parents.  The children had

18   not objected to attending church.

19        Q.    Okay.  Do you know whether Miracle Hill

20   would encourage the children at its group homes to

21   get baptized?

22        A.    I do not know that they would encourage

23   children to get baptized.

24        Q.    In your response to Mr. Holland at the

25   top of the page here, you write:  If you have a

Page 107

```
 1    staff adamant they cannot go with them to mass,
 2    please accommodate their request.  We do that with
 3    licensed foster parents.  Staff not comfortable are
 4    accommodated.
 5              When you say -- sorry.  Do you know
 6    whether staff at the -- at the Miracle Hill
 7    Children's Home ever refused to take children to
 8    different church services that they had -- that
 9    their family origin had requested that they be
10    taken to?
11         A.   I don't recall -- I don't recall if a
12    staff member was uncomfortable going to the mass or
13    if they thought the staff member would be
14    uncomfortable going to mass.
15         Q.   Okay.  And then you also -- you also
16    write there:  We do that with licensing foster
17    parents.  Staff not comfortable are accommodated.
18              What did you mean by that?
19         A.   So if a staff member is not
20    comfortable, then we wouldn't require the staff
21    member to go.  We would use another staff member
22    that was comfortable.
23         Q.   Okay.  So that -- so were there -- were
24    there times then after Miracle Hill changed its
25    policy to start working with Catholic prospective
```

Page 108

```
 1   foster parents that staff members expressed
 2   discomfort with working with the Catholic
 3   applicants?
 4        A.   I wasn't party to those conversations
 5   with the foster care staff and their supervisors.
 6        Q.   But you're -- the point that you're
 7   making in this e-mail is that to the extent staff
 8   were not comfortable working with Catholic
 9   prospective foster parents, the preference -- those
10   preferences of the staff would be accommodated, is
11   that right?
12             MR. COLEMAN:  Object to the form of the
13   question.  This is Miles.
14             THE WITNESS:  The point of my e-mail is
15   that if a staff member was not comfortable taking a
16   child to mass, we would -- we would not require the
17   staff member to go with the child, but we would
18   still accommodate the child.
19   BY MS. JANSON:
20        Q.   Right.  I understand that.  I'm looking
21   at the second -- the second piece of this where
22   you're referring to licensing foster parents.  And
23   I'm just trying to understand whether what you're
24   saying here is that Miracle Hill staff who were not
25   Miracle Hill licensing staff who were not
```

Page 109

1    comfortable working with Catholic prospective

2    foster parents would -- would be accommodated such

3    that somebody else would work with those

4    prospective foster parents, is that right?

5         A.    We do that with licensing.  I'm reading

6    what I wrote and trying to understand what I meant.

7         Q.    Sure.

8         A.    My best guess is that what I meant was

9    if we had a licensing staff that was uncomfortable

10   working with a -- with a Catholic applicant, then

11   we would use a licensing staff that was

12   comfortable.

13        Q.    Okay.  I -- I'm almost -- I just have

14   one -- a couple more questions before we switch

15   topics, so why don't I just finish up this one

16   section and then we can talk about taking another

17   break.

18             Did -- with respect to the children in

19   Miracle Hill's group homes when -- when it had

20   them, did Miracle Hill provide mentors for those

21   children?

22        A.    We did provide mentors for children

23   wanting mentors.

24        Q.    Okay.  And how did Miracle Hill find

25   people to be mentors to the children in its group

Page 110

1    homes?

2         A.   I believe our mentors were referred to

3    us through Fostering Great Ideas to our liaison at

4    Miracle Hill who worked directly with foster -- who

5    worked directly with the mentoring process with

6    Fostering Great Ideas.

7         Q.   So what is -- what is Fostering Great

8    Ideas?  Is that a separate organization?

9         A.   Yes, it is.

10         Q.   And is that an organization that

11    recruits people to be mentors for children in

12    foster care?

13         A.   That's one of the things that they do,

14    yes.

15         Q.   Would -- so who would be -- who would

16    be responsible for matching up the children in

17    Miracle Hill's group homes who wanted mentors with

18    mentors?

19         A.   Beth Sevilla.

20         Q.   And do you know whether -- whether she

21    would or others involved in the process would try

22    to match children with mentors who shared their

23    same faith?

24         A.   I don't know the process that she used

25    to match mentors.

1          Q.    Do you know whether -- whether the

2     children or their families of origin would ever

3     request the mentor be of a specific faith?

4          A.    I don't know.

5          Q.    One more document I just want to take a

6     look at quickly.  This is going to be Exhibit 17, I

7     believe.  And, Serena, this is Tab 7.  It's Bates

8     numbered Miracle Hill Subpoena 1319.  And this is

9     an e-mail thread from -- from Marques Petty to Beth

10    Williams and others dated January 4th, 2018?

11               (EXHIBIT 17, E-mail chain dated 1/4/18

12    to Lisa Yerrick from Marques Petty,

13    MIRACLE_HILL_SUBP_001319 to 001323, was marked for

14    identification.)

15               MR. MATTHEWS:  I'm sorry, Kate, could

16    you hold just one moment?  I'm having trouble

17    locating it.  Thank you.  Sorry about that.  Thank

18    you.

19    BY MS. JANSON:

20         Q.    Just take a look at that and let me

21    know if -- if you've seen this e-mail before, if

22    you recognize this.

23         A.    Not until you sent it to Mr. Matthews.

24         Q.    Okay.  If you look at -- if you look on

25    the page labeled 1320, the bottom of that page is

```
                                        Page 112
 1    an e-mail from Beth Williams.  And she writes:  I
 2    sent instruction last week regarding, and the name
 3    is redacted, mentoring the child, see below.  I am
 4    confused that staff are now stating that a pastor
 5    is going through the process.
 6                And it appears to me if you look
 7    farther down in the e-mail chain that the child
 8    that Miss Williams is referring to here was Muslim.
 9    Is that -- am I interpreting that correctly as you
10    look at this?
11          A.   I can't interpret someone else's
12    e-mails.
13          Q.   Do you have any -- do you have any
14    familiarity or any recollection of the situation
15    that's being discussed in this e-mail chain?
16          A.   I was not employed at Miracle Hill
17    during this time.
18          Q.   Okay.  This was before you started in
19    August of 2018?
20          A.   That's correct.
21          Q.   Okay.  Fair enough.  So we've been --
22    we've been discussing Miracle Hill's group homes.
23    With respect to the foster families that Miracle
24    Hill works with, does Miracle Hill in your
25    experience encourage those families to provide
```

Page 113

```
 1    Evangelical Protestant religious instruction to
 2    foster children that are placed with them?
 3           A.   I'm not aware of encouraging foster
 4    parents to provide religious instruction.
 5           Q.   Okay.  Do you know whether -- whether
 6    foster families are -- Miracle Hill foster families
 7    are supposed to respect the wishes of a foster
 8    child's family of origin with respect to the
 9    child's faith?
10           A.   Yes, they are.
11           Q.   Are they -- are the foster families
12    supposed to make sure that the -- that the children
13    can attend services at a -- at a house of worship
14    of their faith?
15           A.   Yes.
16           Q.   Do you know whether if a foster child's
17    family of origin does not express a particular
18    preference as to faith, can a foster family expose
19    the child to its own religion?
20           A.   If that's part of the family's routine,
21    yes, they can carry the child with them.
22           Q.   They can take the child to a church
23    with them, for instance?
24           A.   That's my understanding.
25           Q.   And does Miracle Hill encourage the
```

Page 114

1  foster families that it works with to do that?

2          A.   I don't know that Miracle Hill

3  encourages foster families to take children to

4  church.  I don't know if the foster care staff did

5  that.

6              MS. JANSON:  Okay.  So we've been going

7  awhile now.  It's about ten after 12:00.  I don't

8  know whether it would be a good time to take a

9  slightly longer break for lunch or what your

10 preference is, Miss Busha or Steve, as to how we

11 proceed.

12             MR. MATTHEWS:  Do you have any idea

13 about how much more you've got to do?

14             MS. JANSON:  I would say that just

15 judging from my outline, I'm, you know, well past

16 halfway, maybe two-thirds of the way through, but,

17 you know, I don't know to what extent others will

18 have -- have questions as well.

19             MR. MATTHEWS:  Why don't we go ahead

20 and take a break for lunch since it's after 12:00

21 and then we'll just reconvene after lunch.

22             MS. JANSON:  Okay.  About how long do

23 you guys want to take?

24             MR. MATTHEWS:  Do you want to say until

25 1:15?  Will that work for you all, 1:15?

Page 115

1             MS. JANSON:  That's fine by me.  All

2    right.  Great.  We'll reconvene at 1:15.

3             MR. MATTHEWS:  Great.

4             VIDEO TECHNICIAN:  The time is 12:10

5    PM.  We are going off the record.

6             (A luncheon recess transpired.)

7             VIDEO TECHNICIAN:  The time is 1:17 PM.

8    We are back on the record.

9    BY MS. JANSON:

10        Q.   So, Miss Busha, I just have a few

11   follow-ups to some of the topics we were talking

12   about before and then we'll move on to something

13   new.

14             To your knowledge, did Miracle Hill

15   make children's families aware that its group homes

16   would take the children to church and invite them

17   to participate in -- in devotions?

18        A.   I'm not aware.

19        Q.   You're not aware of whether Miracle

20   Hill informed the parents of the children and its

21   group homes of that?

22        A.   Yes, I'm not aware of whether or not we

23   did that.

24        Q.   Okay.  Do you know whether DSS was

25   aware that it was a practice in Miracle Hill's

Page 116

1    group homes to take children to church and to

2    invite them to participate in daily devotions?

3          A.    I'm not aware.

4          Q.    I would like to mark as an exhibit, see

5    if I can tell, I think we're up to 18, but Serena

6    will tell me if I've got that wrong.

7                Serena, this is going to be that Tab

8    51.  This is a document that I did not -- I did not

9    send to you in advance.  I'm just going to share my

10   screen so you can see it.  It's from Miracle Hill's

11   website, so it's likely something that you're

12   familiar with, so let me just -- let me just pop

13   that up for you and you can look at it right on the

14   screen.

15                MR. MATTHEWS:  Kate, are you showing us

16   a live copy of the website or is this a -- if this

17   is a PDF, can you tell us when this was downloaded?

18                MS. JANSON:  Just a second.  I just did

19   something funny with my -- can you guys -- I'm

20   sorry.  I've got multiple windows going.  Yes.  So

21   this is -- this is not a live copy of the website,

22   but it -- it was retrieved on -- at April 23rd of

23   this year.  So it's -- it's very recent.  Are you

24   all able to see what I have up there?

25                MR. MATTHEWS:  Yes.  We can see part of

Page 117

1    it.

2                MS. JANSON:  Let me scroll up.  How's

3    that?

4                MR. MATTHEWS:  It is with the line that

5    begins wrath, parenthesis, Genesis 1:26-27,

6    Psalms 1 something.  I can't read it.  But

7    that's -- that's the bottom line that we can see

8    while we're seeing the top of the page.

9    BY MS. JANSON:

10         Q.   I'll -- I'll scroll down slowly just

11   for the record.  So this is -- this is going to be

12   Exhibit 18 and this is a page from Miracle Hill

13   Ministries' website.

14               (EXHIBIT 18, Miracle Hill Ministries

15   Agreement with Doctrinal Statement, was marked for

16   identification.)

17   BY MS. JANSON:

18         Q.   And it's titled foster care inquiry

19   form.  And I'll represent that it was accessed on

20   April 23rd of 2021.  And I'll scroll down slowly so

21   you can -- so you can see, but this is just the

22   inquiry page that you -- that you get when you go

23   to Miracle Hill's website and you're looking to

24   inquire about being a foster parent.

25               So it starts with the agreement with

Page 118

1    doctrinal statement and then it has the whole page

2    down below.  I'm just going to ask you about what's

3    at the very top.  So earlier I think you testified

4    that you were not aware of Miracle Hill encouraging

5    foster parents to provide religious instruction to

6    the foster children in their care.  Do you remember

7    that?

8              A.    Yes.

9              Q.    And if you look at this foster care

10   inquiry form that's Exhibit 18, the first sentence

11   there under agreement with doctrinal statement

12   says:  As an Evangelical Christian foster care

13   agency, we believe foster parents are in a position

14   of spiritual influence over the children in their

15   homes.

16              Can you explain to me what you

17   understand that to mean?

18              A.    I'm not the author of that document and

19   I don't know what Miracle Hill intended when they

20   wrote that document.

21              Q.    So you don't -- you don't have any

22   understanding from your role as the vice president

23   for children's ministries at Miracle Hill as to

24   what it means that Miracle Hill believes foster

25   parents are in a position of spiritual influence

Page 119

1    over children in their homes?

2           A.    I've heard that term used.  It was --

3    that was never defined to me.

4           Q.    And you don't have any -- any

5    independent understanding or view on what that

6    might mean?

7           A.    Other than exactly what it says, that

8    they would be in a position of spiritual influence

9    in their home with children.

10          Q.    So doesn't that suggest that foster

11   parents who work with Miracle Hill are encouraged

12   to -- to teach children Miracle Hill's religious

13   beliefs?

14                MR. COLEMAN:   This is Miles.  Object to

15   the form of the question.

16                THE WITNESS:   It doesn't say that they

17   encourage it.  It says that they are in a position

18   of.

19   BY MS. JANSON:

20          Q.    Why -- why then would it be important

21   for foster parents to be in a position of spiritual

22   influence over the children in their homes if

23   the -- if the goal was not for them to expose the

24   children to Evangelical Christian religious

25   beliefs?

```
                                             Page 120
 1            A.    I can't speak on behalf of the ministry
 2     and their purpose in that.
 3            Q.    Do you know whether -- whether families
 4     of origin are -- are advised when their children
 5     are going to be placed in a home with foster
 6     parents that work with Miracle Hill, that Miracle
 7     Hill believes foster parents are in a position of
 8     spiritual influence over the children in their
 9     homes?
10            A.    I do not know.
11            Q.    You don't know if the family's origin
12     are informed of that?
13            A.    Yes, I do not know.
14            Q.    Okay.  Do you know whether any of
15     Miracle Hill's group homes have had children in
16     their care who identify as LGBTQ?
17            A.    Yes.
18            Q.    And have they, in fact, had children in
19     their care who identified as LGBTQ?
20            A.    In the group homes?
21            Q.    Yes.
22            A.    Yes.  Yes, we have had children.
23            Q.    Do you know whether any children who
24     identify as LGBTQ have been placed with foster
25     families that work with Miracle Hill?
```

Page 121

1          A.     I believe so, but I am not certain.

2          Q.     With respect to the -- to the children

3     who identify as LGBTQ who have been in Miracle

4     Hill's group homes, were you ever informed of any

5     problems or issues or anything with respect to

6     those kids in Miracle Hill's group homes?

7          A.     I can't recall a specific incident.

8          Q.     Do you ever -- do you recall any -- any

9     general issues or general concerns being brought to

10    you with regard to LGBTQ children in Miracle Hill's

11    group homes?

12         A.     I remember discussions in staff

13    meetings about making sure that children were well

14    cared for, but I don't recall any specific

15    incidents.

16         Q.     Would those discussions that you recall

17    in the staff meetings, were they -- I'm going to

18    put this away there.  There we go.  Now we're back

19    to normal.

20               Were they specific to LGBTQ children or

21    just more generally about caring for children?

22         A.     Probably both.  But again, I don't -- I

23    can't recall anything specific.

24         Q.     Okay.  Does Miracle Hill have -- have a

25    foster parent handbook?

Page 122

1          A.    They did.

2          Q.    They did.  And did Miracle Hill revise

3     its foster care parent handbook in 2020?

4          A.    They did.

5          Q.    Were you -- were you involved in that

6     process?

7          A.    I was.

8          Q.    All right.  Let's look at -- let's look

9     at Tab 46.  This is -- this is a document Bates --

10    it's going to be I guess Exhibit 19, I think.

11    Okay.  And this is a document with Bates Number

12    Miracle Hill Subpoena 6020.  And it's an e-mail

13    from Miss Busha to Brenda Parks and Sharon Betts

14    and others dated December 3rd of 2020.

15               (EXHIBIT 19, E-mail dated 12/3/20 to

16    Brenda Parks, Sharon Betts, Jacqueline Rector and

17    Jane Pulido from Karen Busha,

18    MIRACLE_HILL_SUBP_006020 to 006022, was marked for

19    identification.)

20    BY MS. JANSON:

21         Q.    Just let me know if you recognize this

22    e-mail.

23         A.    Yes.

24         Q.    And it looks like from the attachments

25    listed that one of them was the foster family

Page 123

1   handbook revised 2020 as a PDF.

2           MS. JANSON:  And, you know, Steve, I

3   would just note that -- that in our production that

4   that attachment was a -- was indicated there was a

5   processing error, so it was just -- it was just a

6   single sheet saying that there was a processing

7   error.

8           MR. MATTHEWS:  Okay.

9           MS. JANSON:  So to the extent you can

10  find us a copy of that --

11          MR. MATTHEWS:  Okay.

12          MS. JANSON:  -- and send that over,

13  that would be great.

14          MR. MATTHEWS:  So this was the

15  attachment to this e-mail?

16          MS. JANSON:  Yeah.  It's the one that's

17  saved as foster family handbook revised 2020.

18  Yeah.

19  BY MS. JANSON:

20      Q.   Okay.  So this e-mail then, Miss Busha,

21  you write:  Good morning.  A big thanks to Beth for

22  completing the revisions in the foster family

23  handbook and designing the foster parent and foster

24  child orientation checklist/signature page.

25          Is that -- Beth, is that Beth Sevilla?

Page 124

1          A.    Yes.

2          Q.    And what was her role at Miracle Hill?

3          A.    She was -- I don't recall her exact

4   title, but she provided administrative support to

5   the COO, to the HRVP and to myself.  She was also

6   responsible for mentors, and I -- I believe she did

7   that under the developmental department.

8          Q.    I think you said HRVP.  Oh.  Oh, you

9   mean human resources vice president?

10         A.    Yes.  I'm sorry, yes.

11         Q.    Got it.  And was she -- was she in

12  charge of revising the foster family handbook?

13         A.    She did the -- she did the computer

14  work to revise it and assisted with the edits, but

15  she was not solely responsible.

16         Q.    Who else was involved in the -- in the

17  process of revising the foster family handbook?

18         A.    Well, the foster care leadership team,

19  Brenda Parks, Sharon Betts, Jacqueline Rector and

20  Jane Pulido.

21         Q.    And what was your -- what was your

22  involvement in the process?

23         A.    Review and to ensure that the foster

24  parent handbook covered all of the accreditation

25  requirements.

Page 125

1          Q.    Now, I don't -- I don't have the -- I

2     don't have the document itself to show you.  But to

3     the extent you can recall, can you just describe

4     for me sort of generally what -- what the revisions

5     were that were made to the foster family handbook

6     in 2020?

7          A.    I remember that we reorganized it so

8     the flow was better.  Other than that, I can't

9     remember specific revisions without comparing the

10    documents.

11         Q.    Do you remember if any of the revisions

12    involved any changes to the application process for

13    potential foster parents?

14         A.    I don't recall.

15         Q.    Okay.  Do you remember whether any of

16    the revisions had to do with Miracle Hill's

17    relatively new policy of recruiting and working

18    with -- with Catholic families as foster parents?

19         A.    I don't recall if that issue was in the

20    hand -- in the handbook.

21         Q.    Do you recall whether there were any

22    revisions related to Miracle Hill's policies

23    regarding working with same sex couples or LGBTQ

24    individuals?

25         A.    I don't remember that being part of the

Page 126

1    handbook or revisions of the handbook.

2         Q.   Okay.  And how long was the revision --

3    how long did the revision process for the handbook

4    take, approximately?

5         A.   I would say we worked on it several

6    months.  The foster care staff did revisions

7    initially and it sat dormant for awhile and then we

8    began to work on it extensively right before

9    accreditation.  I would say it probably took three

10   months to -- to finish the revisions, but I

11   wouldn't know without actually looking back at my

12   calendar.

13        Q.   Okay.  And when you say accreditation,

14   what is the -- what's the organization that -- that

15   would accredit Miracle Hill?

16        A.   It is the Commission on Accreditation

17   of Rehab Facilities.  The acronym is CARF, C-A-R-F,

18   and it's located in Tucson, Arizona.

19        Q.   So that is -- that's not a government

20   body, is it?

21        A.   No, it's not.  It's a -- I believe a

22   for-profit body.

23        Q.   Okay.  Have you -- have you been

24   involved in your role at Miracle Hill with -- with

25   an organization called PAFCAF?

Page 127

1          A.    Yes.

2          Q.    And what is -- what does PAFCAF stand

3    for?

4          A.    It's the Palmetto Association of

5    Children and Family Services.

6          Q.    And what does that organization do?

7          A.    It's a private nonprofit organization

8    that offers support to private CPAs and

9    residential -- private residential programs that

10   serve DSS.  They provide resources, education, and

11   they -- they also work with a lobbying team.

12         Q.    Okay.  So are -- are CPAs -- can CPAs

13   join as members of PAFCAF?

14         A.    Yes.

15         Q.    Okay.  And was Miracle Hill a member of

16   PAFCAF?

17         A.    Yes, we were.

18         Q.    Okay.  And I think you said that --

19   well, does PAFCAF sort of work with or liaise

20   with -- with DSS?

21         A.    Yes, they do.

22         Q.    And what types of issues or things

23   would PAFCAF interact with DSS on?

24         A.    The primary one while I was at Miracle

25   Hill were the solicitation that DSS was developing

Page 128

1    for foster care and the solicitation that was

2    issued for group homes.

3        Q.   Okay.  All right.  Let's look at Tab

4    49, Serena.  This is -- this is an e-mail with the

5    Bates -- Bates stamp Miracle Hill Subpoena 2384.

6    It's going to be Exhibit 20, I believe.  And it's

7    an e-mail thread between Dawn Barton of DSS and

8    Miss Busha dated October 11th of 2019.

9            (EXHIBIT 20, E-mail chain dated

10   10/11/19 to Karen Busha from Dawn Barton, 002384 to

11   002386, was marked for identification.)

12   BY MS. JANSON:

13       Q.   Once you've had a chance to look at

14   that, just let me know if you recognize that

15   document.

16       A.   Yes, I recognize this document.

17       Q.   Who -- Dawn Barton works at DSS, right?

18       A.   That's correct.

19       Q.   And do you know what her -- what her

20   role there is?

21       A.   Just from the e-mail, director of

22   permanency management.

23       Q.   Okay.

24       A.   At the time of this e-mail.

25       Q.   If you flip to the second page of the

Page 129

1    document, at the bottom there it's you are writing

2    to Miss Barton on October 1st of 2019 and you say:

3    Thank you for sending PAFCAF the proposed licensure

4    for foster care document.

5              Do you remember what the -- what the

6    proposed licensure for foster care document that

7    you're referring to there was?

8         A.   I think I was actually referring to the

9    solicitation, but -- for foster care, but not sure.

10        Q.   Okay.  So then below you -- in the next

11   paragraph you write:  We at Miracle Hill Ministries

12   would like clarification on F(3), Page 13, as soon

13   as possible.  It states, furthermore, the agency

14   must not discriminate with regard to the

15   application or licensure of a foster family on the

16   basis of age, disability, gender, sexual

17   orientation, gender identity or marital -- marital

18   status.  Per the document definition, the agency

19   means the SCDSS.

20              And then you go on to say:  Since the

21   budget proviso passed by the legislature requires

22   SCDSS to protect the religious freedoms of

23   agencies, please send us written clarification that

24   this is a requirement that applies to SCDSS as an

25   agency, not a requirement on religious CPAs that

Page 130

1    contract with DSS.

2            So from that it looks to me like

3    there's this -- there was a provision in the

4    licensure for foster care document that you're

5    referring to that required -- it was a -- it was a

6    nondiscrimination provision.  Is that correct?

7        A.   Yes.

8        Q.   And -- and that provision required the

9    agency not to discriminate with regard to the

10   application or licensure of a foster family on the

11   basis of religion or sexual orientation, is that

12   right?

13       A.   That's correct.

14       Q.   And I think what you're -- what you're

15   indicating in your e-mail there is that based on

16   your -- your reading of that provision in the

17   document, it only applied to DSS and not to private

18   CPAs, is that right?

19       A.   The document defined the agency as the

20   South Carolina Department of Social Services.

21       Q.   Okay.  And why was it then that you

22   were seeking this clarification from DSS that the

23   nondiscrimination provision was, quote, not a

24   requirement on religious CPAs that contract with

25   DSS?

1          A.    We were wanting written clarification

2     that they were respecting the budget proviso.

3          Q.    And what -- what is the -- what is the

4     budget proviso that you're -- that you're referring

5     to there?

6          A.    That protects the religious freedom of

7     agencies.

8          Q.    And in your view did that budget

9     proviso respect -- I mean protect Miracle Hill's

10    ability to work only with prospective foster

11    parents who are Christian and agree with Miracle

12    Hill's doctrinal statement?

13         A.    That was my understanding, yes.

14         Q.    Do you know whether that budget proviso

15    ever actually became law?

16         A.    No, I don't know.

17         Q.    Then in the next e-mail in the chain,

18    Miss Barton replies to you and she says that she

19    would, quote, need to run this question through our

20    office of general counsel and will let you know the

21    response.  Do you see that there?

22         A.    Yes.

23         Q.    And then from the -- from the rest of

24    the e-mail chain, it looks like you -- you followed

25    up with Miss Barton about ten days later and then

Page 132

1    she responded in the top e-mail that she was still

2    awaiting a response.  I'm assuming from legal.

3              Did you ever get a substantive response

4    from Miss Barton on the question that you had posed

5    in your e-mail?

6         A.   I did not get anything in writing from

7    Miss Barton.

8         Q.   Did you -- did you speak to her about

9    it orally?

10        A.   I don't recall speaking to her orally

11   about this.

12        Q.   Do you know -- do you remember if you

13   got any response on this question from anyone else

14   at DSS?

15        A.   No.  Not that I recall.

16        Q.   Okay.  So let's look at Tab 33.  This

17   is going to be Exhibit 21 and it's marked Miracle

18   Hill Subpoena 3515 and it's an e-mail from Tony

19   Catone to Reid Lehman dated October 15th of 2019.

20              (EXHIBIT 21, E-mail chain dated

21   10/15/19 to Reid Lehman from Tony Catone,

22   MIRACLE_HILL_SUBP_003515 to 003518, was marked for

23   identification.)

24   BY MS. JANSON:

25        Q.   Do you recognize this e-mail chain?

1          A.    I'm sorry, I couldn't hear you.

2          Q.    Sorry.  Do you recognize this e-mail?

3          A.    I recognize the part of the e-mail that

4    includes me.

5          Q.    Okay.  If you go to the second page of

6    the document, you can see about halfway there --

7    halfway down there is Dawn Barton's response to you

8    that we just looked at in the prior exhibit where

9    she says I'm still awaiting a response.

10          A.    Yes.

11          Q.    And then it looks like you forwarded

12    that exchange to Mr. Lehman and Mr. Kruithof on

13    October 11th and you wrote follow-up with Dawn

14    Barton, see below.  Is that right?

15          A.    Yes, that's correct.

16          Q.    Okay.  And then it looks like -- it

17    looks like Mr. Lehman forwarded the chain on to

18    Mr. Catone.  And Attorney Catone is the general

19    counsel at DSS, is that right?

20          A.    He was during my tenure at Miracle --

21    at Miracle Hill.

22          Q.    Okay.  And it looks from here like

23    Mr. Lehman and Mr. Catone made a plan to set up a

24    meeting to discuss what was in this -- the e-mail

25    chain, is that right?

Page 134

```
 1          A.    That's what the e-mail says, yes.
 2          Q.    Do you know whether Mr. Catone and
 3    Mr. Lehman ever actually had that meeting?
 4          A.    No, I do not know.
 5          Q.    Okay.  Do you know whether Mr. Catone
 6    ever provided clarification with respect to the
 7    question that you had raised in your initial e-mail
 8    to Dawn Barton?
 9          A.    I do not know.
10          Q.    In your experience, does Miracle Hill
11    have sort of regular -- regular access to
12    high-level folks at DSS like Mr. Catone?
13               MR. COLEMAN:  This is Miles.  Object to
14    the form of the question.
15               THE WITNESS:  I don't know what type of
16    access they have.
17    BY MS. JANSON:
18          Q.    Okay.  So -- so let's look at Tab --
19    this is 40.1, Serena, and it will be Exhibit 22.
20    This is a -- this is marked Miracle Hill Subpoena
21    2462 and it's an e-mail from Paula Fendley to
22    Miss Busha from November 20th of 2019.
23               I'm just interested in, you know, the
24    first page of this.  You can obviously flip through
25    the rest of the document if you'd like, but I'm
```

Page 135

1    just going to ask you about the second e-mail down

2    on the first page.  And just let me know when

3    you're done looking at it if you recognize this

4    e-mail thread.

5              A.   Yes.

6                   MR. COLEMAN:  Can I -- I'm sorry, this

7    is Miles.  I just want to make sure that I'm

8    looking at the right document.  We're on Exhibit

9    22?

10                  MS. JANSON:  Yep.

11                  MR. COLEMAN:  What I'm looking at does

12   not appear to be an e-mail thread.

13                  MR. MATTHEWS:  Not Tab 22.  She just

14   numbered this as Exhibit 22.

15                  MR. COLEMAN:  Yeah, Exhibit 22, Tab

16   40.1?

17                  MS. JANSON:  Um-hum.  I have not -- let

18   me -- let me see if we've got the right thing there

19   or not.  Hold on.  I'm just getting into the right

20   folder here on my Exhibit Share.

21                  MR. COLEMAN:  Sure.

22                  MS. JANSON:  Oh.  Well, that's going to

23   be the next thing we look at, so it's fine that we

24   have that one up there.

25                  Serena, do we have the -- do we have

Page 136

1   the e-mail that I think comes before?

2              MS. CANDELARIA:  This is 40.1 and we

3   also have the e-mail as just 40.  I can put them as

4   the same exhibit if that would be helpful.

5              MS. JANSON:  It's okay to make them

6   separate.  Why don't we just make Tab 40 Exhibit 23

7   and I'll talk about that one, and then we'll go

8   back to this one.

9              MS. CANDELARIA:  Okay.  Perfect.

10             (EXHIBIT 22, Document entitled PAFCAF

11  Member Comments - October 2019, Section-by-Section

12  Discussion, MIRACLE_HILL_SUBP_002470 to 002487, was

13  marked for identification.)

14             (EXHIBIT 23, E-mail chain dated

15  11/20/19 to Karen Busha from Paula M. Fendley,

16  MIRACLE_HILL_SUBP_002462 to 002469, was marked for

17  identification.)

18  BY MS. JANSON:

19       Q.   Okay.  So Exhibit 23 is going to be up

20  in just a second and that will be the e-mail -- the

21  e-mail thread that I described before, Miracle Hill

22  Subpoena 2462 as the beginning Bates.

23             And, Miss Busha, did you say you

24  recognized this e-mail thread?

25       A.   Yes.

Page 137

1          Q.    Okay.  And so who is -- who is Paula

2     Fendley?

3          A.    Oh, she was the interim CEO at

4     PAFCAF -- of PAFCAF at that time.

5          Q.    Okay.  And she writes at the bottom of

6     that first page on October 21st of 2019:  Here is

7     the revised table of comments to the SCDSS FP

8     Licensing Regulation proposal based upon comments

9     at our meeting today.  I added Karen's comment and

10    added language at the end of the document

11    summarizing concerns and observations.

12              Do you see that there?

13         A.    Yes.

14         Q.    Is she -- when she says I added Karen's

15    comments, is she referring to you?

16         A.    Yes.

17         Q.    And then in the top e-mail there, which

18    is from about a month later on November 20 of 2019,

19    she writes in her second sentence:  Again, DSS and

20    the ALJ did not consider or incorporate any of the

21    providers' suggestions.

22              Do you see that there?

23         A.    Yes.

24         Q.    Okay.  And then the document that had

25    popped up on Exhibit Share first that we marked as

1    Exhibit 22, that is a chart and it has Miracle Hill

2    Subpoena 2470 as the beginning Bates number and

3    it's titled PAFCAF Member Comments, October 2019.

4                MR. MATTHEWS:  I'm sorry, what was the

5    Bates Number on that one?

6                MS. JANSON:  Sure.  It's 2470.

7    BY MS. JANSON:

8          Q.   Do you recognize this document?

9          A.   Yes.

10          Q.   Does this appear to be the version of

11    the table of comments that Miss Fendley was

12    referring to in her e-mail?

13          A.   Yes.

14          Q.   And it looks to me that the left-hand

15    column of this chart is the language of -- it looks

16    like a proposed regulation by DSS.  And then the

17    right-hand column contain various comments on

18    certain provisions of the regulation from PAFCAF

19    members.  Is that -- is that your understanding of

20    what this chart depicts?

21          A.   Yes.

22          Q.   And then if we flip ahead to the page

23    that's marked 2474 and -- and continues on into

24    2475, there is a paragraph, if you look, it says F,

25    eligibility standards and then Paragraph 3.  And it

Page 139

1    says:  The agency must not deny to any individual

2    the opportunity to become a foster parent on the

3    basis of race, color or national origin of the

4    individual or of the child.  And it goes on.

5                And then later at the -- sorry, I

6    should have -- I started reading too early.  My

7    apologies.  At the very bottom of that section on

8    2474, Paragraph 3 on the left-hand column, it says:

9    Furthermore, the agency must not discriminate with

10   regard to the application or licensure of a foster

11   family on the basis of age, disability, gender,

12   religion, sexual orientation, gender identity or

13   marital status.

14               And then in the right-hand column there

15   at the top of Page 2475, it says, Number 3:  How

16   does this impact faith-based CPAs' right to

17   religious freedom, question mark.  Per the

18   document, agency refers to SCDSS.

19               Do you see that there?

20        A.   Yes.

21        Q.   And does that -- this -- this seems to

22   me to be the same -- the same language and the same

23   question that you had raised in the e-mail that we

24   marked as Exhibit 20, which ends with 2384.  That

25   was your conversation -- that was your e-mail

Page 140

1    conversation with Dawn Barton?

2        A.    Yes.

3        Q.    And it had been regarding a proposed

4    licensure for foster care document?

5        A.    Yes.

6        Q.    Does this -- does this look like it's

7    the -- that this regulation that's being discussed

8    here in Exhibits -- Exhibit 22, is that, in fact,

9    the same document that you were writing to

10   Miss Barton about in Exhibit 20?

11       A.    I just wanted to check the number on my

12   e-mail.  Yes.  This is the document I was referring

13   to.

14       Q.    Okay.  And so this is -- these are our

15   proposed revisions to DSS's regulation related to

16   foster parent -- or foster care licensing, right?

17       A.    Yes.

18       Q.    And the section that I read on the top

19   of 2475, the right-hand column where it says how

20   does this impact faith-based CPAs' right to

21   religious freedom, per the document agency refers

22   to SCDSS, did that reflect -- that was Miracle

23   Hill's comment that you had raised to Miss Barton,

24   right?

25       A.    Yes.

Page 141

1          Q.   Do you recall whether any other PAFCAF
2    members also shared -- shared Miracle Hill's
3    concern that the nondiscrimination requirement
4    would affect a CPA's right to religious freedom?
5          A.   I do not recall.
6          Q.   Do you know whether -- whether anyone
7    at PAFCAF raised that specific concern to DSS on
8    Miracle Hill's behalf?
9          A.   I do not know.
10         Q.   And in Miss Fendley's e-mail that we
11   marked as Exhibit 23 which ends with 2462, again
12   she wrote:  DSS and the ALJ did not consider or
13   incorporate any of the providers' suggestions.
14              What does ALJ refer to, if you know?
15         A.   Yeah, I don't know.
16         Q.   Okay.  And do you have any -- any
17   understanding as to why DSS did not consider or
18   incorporate any of the PAFCAF providers'
19   suggestions?
20         A.   No, I don't -- I do not.
21         Q.   Okay.  All right.  We can put those
22   aside.  I understand from our discussion before
23   that Miracle Hill is licensed by DSS as a CPA to
24   provide foster care services, is that right?
25         A.   That's correct.

```
                                        Page 142
 1          Q.   Does Miracle Hill also have a contract
 2    or -- while you were -- while you were there as VP
 3    of children's ministries, did Miracle Hill also
 4    have a contract to provide foster care services
 5    with DSS?
 6          A.   We only had an emergency contract.
 7          Q.   Okay.  And what did it mean that it was
 8    an emergency contract?
 9          A.   DSS was not ready to issue the full
10    solicitation and they issued an emergency contract.
11    I'm not sure of the reason that they issued the
12    emergency contract.
13          Q.   Okay.  When you said they weren't ready
14    to issue a full solicitation, what is a -- what
15    does a solicitation mean in that context?
16          A.    It would be the full licensing contract
17    that -- the documents that we just looked at, those
18    are things from the full solicitation.
19          Q.   And so the solicitation is something
20    that DSS would put out essentially asking for --
21    for CPAs that wanted to contract with DSS to
22    provide foster care services, is that generally
23    right?
24          A.   That's correct.  That's correct.
25          Q.   And when DSS does put out a
```

Page 143

1    solicitation just generally and it gets -- it gets

2    CPAs that are -- that are interested in contracting

3    with DSS, do you know what those -- what those

4    contracts typically provide for?

5            A.    There had not been a solicitation for

6    contract for foster care.  This would have been the

7    first solicitation that DSS had issued for foster

8    care.

9            Q.    Okay.  And this was in the 2018 period,

10   is that -- is that right?

11           A.    I don't recall when they started

12   working on the -- I think it was 2019 they were

13   still working on the solicitation for foster care.

14   Our comments were October of 2019, so I'm not sure

15   exactly when DSS started their work on the

16   solicitation.

17           Q.    Okay.  So prior to -- prior to this,

18   that solicitation, CPAs that worked with DSS to

19   provide foster care services did not have a

20   contract with DSS, is that right?

21           A.    That's correct.

22           Q.    Okay.  They were licensed by DSS, but

23   they didn't have a specific contractual

24   relationship, right?

25           A.    Yes, we did not have a contract.

1        Q.   Okay.

2             MR. COLEMAN:   This is Miles.   Object to

3    the form of the question.

4    BY MS. JANSON:

5        Q.   Okay.   So I want to -- I want to look

6    at a couple -- a couple documents on this.   If we

7    can look at Tab 11.   Serena, this is going to be

8    Exhibit 24.

9             COURT REPORTER:   I'm sorry, what tab

10   did you say, Kate?

11            MS. JANSON:   I said 11.

12            COURT REPORTER:   Thank you.

13            MS. JANSON:   It's going to be Exhibit

14   24 and it's Bates numbered Miracle Hill Subpoena

15   8240.   It's a document titled Protest Decision

16   dated November 20th of 2018.

17            (EXHIBIT 24, Document entitled Protest

18   Decision, MIRACLE_HILL_SUBP_008240 to 008249, was

19   marked for identification.)

20   BY MS. JANSON:

21       Q.   Do you -- do you recognize this

22   document?

23       A.   Yes.

24       Q.   Okay.   So if you look at the second --

25   if you look at the second page of the document

Page 145

1  under analysis, it says:  MHM, I assume that's

2  Miracle Hill Ministries, raises three issues of

3  protest.

4            And then in the paragraph numbered 3,

5  it says -- it's summarizing Miracle Hill's issue of

6  protest and it says:  We protest the requirement

7  initially found as the third of the child placing

8  agencys' responsibilities.  This requirement

9  purports to require bidders to adhere to the

10  requirements provided in the licensing regulations

11  without adding to or taking away from said

12  requirements and purports to require the bidder to

13  suspend any such practice after being notified by

14  SCDSS that said practice allegedly violates this

15  requirement.

16            Do you see that there?

17       A.    Yes.

18       Q.    Do you have an understanding as to what

19  the requirements provided in the licensing

20  regulations that's referred to in that -- in that

21  language I just read, what that refers to?

22       A.    So what is your question again?

23       Q.    I'm just trying to understand what --

24  where it says there in the language I just read, it

25  refers to requirements provided in the licensing

Page 146

1    regulations.  And I'm wondering if you know what

2    requirements in the licensing regulation are being

3    referred to there.

4         A.    Yeah, I don't recall.  This was

5    prepared by our attorney.

6         Q.    Okay.  Do you know whether -- whether

7    the requirements referred to there included the

8    nondiscrimination provision that -- that we were

9    talking about just before this?

10         A.    I don't recall.

11         Q.    Okay.  If you look at the last -- at

12    the last page of this document with the Number

13    8242, the chief -- the DSS chief procurement --

14    well, I guess it's the chief -- chief procurement

15    officer.  He writes that after receipt of Miracle

16    Hill's protest, DSS requested cancellation of the

17    solicitation so that -- so that it may revise and

18    reissue the solicitation at a later date.  As a

19    result, the protest of Miracle Hill Ministries is

20    moot.

21              Do you know whether, in fact, DSS

22    reissued a new solicitation later as that language

23    indicates that it would?

24         A.    The foster care solicitation had not

25    been issued prior to my leaving Miracle Hill.  The

Page 147

1    final version of the solicitation had not been

2    issued before I left.

3          Q.    Okay.  So as of January 2021, the final

4    foster care solicitation still has not -- had not

5    been issued?

6          A.    That's correct.

7          Q.    Okay.  And earlier you mentioned that

8    DSS -- excuse me, that Miracle Hill had an

9    emergency contract with DSS, right?

10         A.    Yes.

11         Q.    I just want to take a look at that and

12   ask you a couple quick things about that if we can.

13               So, Serena, this is -- this is Tab

14   19.1.  It's going to be Exhibit 25 and it's Miracle

15   Hill Subpoena 5953 and it's titled Emergency

16   Contract Between the South Carolina Department of

17   Social Services and Miracle Hill Ministries, Inc.

18               (EXHIBIT 25, Emergency Contract Between

19   The South Carolina Department of Social Services

20   and Miracle Hill Ministries, Inc.,

21   MIRACLE_HILL_SUBP_005953 to 005972, was marked for

22   identification.)

23   BY MS. JANSON:

24         Q.    And is this -- is this, in fact, the

25   emergency contract that you referenced earlier in

Page 148

1    your testimony?

2        A.    Yes.

3        Q.    And I think you explained that it's

4    called an emergency contract because the official

5    solicitation had not yet gone out at the time that

6    this document was -- was entered into, is that

7    right?

8        A.    That -- that is my understanding.

9        Q.    And just so we're -- we're clear on the

10   time period here, if you look at the -- towards the

11   back of the document, the pages labeled 5968 and

12   5969.  You'll see the signatures there.  And this

13   looks like it was signed by Barbara Derrick from

14   DSS on March 29th of 2019 and signed by you on

15   March 28th of 2019, is that right?

16       A.    That's -- that's correct.

17       Q.    Okay.  And on the first page -- first

18   page of the document, it says:  This contract --

19   the second line.  It says:  This contract is

20   entered into as of January 1st, 2019.

21            Do you know why it was that it was

22   entered -- the contract was entered into as of

23   January 1st of 2019 when it was -- wasn't signed

24   until the end of March of 2019?

25       A.    I don't know why DSS issued it late.

Page 149

1          Q.    Okay.  Do you know if there was --
2    whether this was -- was the first contract that
3    Miracle Hill had with DSS to provide foster care
4    services?
5          A.    To my knowledge, this was the first
6    contract.
7          Q.    Okay.  Do you know whether at the
8    time -- as of January 1st, 2019 whether Miracle
9    Hill had a permanent or a standard CPA license from
10   DSS?
11         A.    I -- I don't remember the date that the
12   permanent license was reissued to Miracle Hill.
13         Q.    Okay.  And just generally, we won't go
14   through the full document, but what -- what type of
15   services was Miracle Hill contracting to provide to
16   DSS under the terms of -- of this emergency
17   contract?
18         A.    This emergency contract was to -- was
19   with the current licensed group homes who were also
20   CPAs to get children out of group homes and into
21   foster care homes.
22         Q.    Okay.  So this was -- this was intended
23   specifically to cover moving -- or an effort, I
24   should say, to try to transition children who were
25   in residential care facilities into foster family

```
                                              Page 150
 1    placements?

 2            A.    That was my understanding.

 3            Q.    Okay.  So it wasn't -- it wasn't a more

 4    generally applicable contract that governs all of

 5    Miracle Hill's foster care services, it was -- it

 6    was more -- more focused in that way, is that

 7    right?

 8            A.    That's what I read in the document.

 9            Q.    Okay.  Do you have any -- any

10    independent recollection of this emergency contract

11    apart from looking at the document now?

12            A.    No.  DSS just sent the document.

13            Q.    Okay.  Do you know what the -- what the

14    end date for this contract with them would have

15    been?

16            A.    The front page says through June 30th,

17    2019.

18            Q.    Okay.  Great.  I see that there, yes.

19    Okay.  Let's look at Tab -- this is going to be

20    28.1.  It will be Exhibit 26.  And it's labeled

21    Miracle Hill Subpoena 5857 (sic) and it's a

22    document titled Change Order Number 1.

23                  (EXHIBIT 26, State of South Carolina

24    Change Order #1, MIRACLE_HILL_SUBP_005882 to

25    005883, was marked for identification.)
```

Page 151

1    BY MS. JANSON:

2         Q.    And it's -- do you recognize -- do you

3    recognize this document?

4         A.    Yes.

5         Q.    If you look down in the portion of the

6    document, it has sort of the box around it.  It

7    says:  Description of change/modification.  And it

8    says:  To amend the emergency contract to extend

9    the end date.  This change order extends the end

10   date to June 30th, 2020.  This is an emergency

11   contract intended to enable South Carolina DSS to

12   immediately utilize CPAs to facilitate the

13   placement of children in foster care and is offered

14   for the limited purpose of enabling SCDSS to fill

15   this need in the interim until the full

16   solicitation is available.

17              So that description there of the

18   purpose of the emergency contract is consistent

19   with what we've been discussing, right?

20        A.    Yes.

21        Q.    Do you know whether the emergency

22   contract, the end date of this emergency contract,

23   was ever extended again beyond June 30th, 2020?

24        A.    I don't recall.

25        Q.    Okay.  Let's just look back real

Page 152

```
 1   quickly at the emergency contract that was Exhibit
 2   25.  And if we look at -- here we go.  The page
 3   that's marked 5957, halfway through that page is
 4   Section B.  It says limit on total reimbursement.
 5          A.    857?
 6              MR. MATTHEWS:  57.  It's the emergency
 7   contract.
 8              THE WITNESS:  Oh.  I see.  Yeah.
 9   BY MS. JANSON:
10          Q.    Do you see where that is where it says
11   limit on total reimbursement?
12          A.    Yes.
13          Q.    And it says -- it says total funds
14   239,075 dollars, correct?
15          A.    Yes, I see that.
16          Q.    Okay.  And then when we go -- if we go
17   back to the change order, Exhibit 26, under
18   description of change or modification, it looks
19   like that -- that total limit on total
20   reimbursement is also a provision that was modified
21   by the change order, right?
22          A.    It was included in the change order,
23   yes.
24          Q.    Um-hum.  And then the change order, it
25   says total funds, 956,300 dollars, right?
```

Page 153

1          A.    Yes.

2          Q.    Do you know why -- why it was that the

3     reimbursement limit provided for in Miracle Hill's

4     emergency contract with DSS was increased by more

5     than 700,000 dollars in the -- in the change order?

6          A.    So the change order is covering one

7     year of reimbursement and I don't believe that the

8     initial emergency solicitation was covering that

9     much time.

10          Q.    It looks to me from the emergency

11     contract like it was initially -- it was initially

12     enforced for six months, January 1st, 2019 through

13     June 30th of 2019.  Do you see that on the first

14     page under Article 1 of the emergency contract?

15          A.    Yes.  I don't know why there would be

16     an increase.

17          Q.    Okay.

18          A.    In the total funds.

19          Q.    Do you have any understanding of how

20     the reimbursement limits reflected either in the

21     emergency contract or the change order were

22     calculated?

23          A.    No.

24          Q.    Do you know whether those reimbursement

25     limits are -- are based on the number of children

Page 154

1    placed with foster families that are supported by

2    the CPA?

3         A.    No.

4         Q.    Do you have any understanding of

5    where -- where the reimbursement funds that -- that

6    are referred to in the emergency contract in the

7    change order come from?

8         A.    DSS is all I know.

9         Q.    Okay.    Do you know whether -- whether

10   those funds from DSS originate from the federal

11   government?

12        A.    No, I don't know.

13        Q.    Do you know whether the terms of the

14   emergency contract -- and again, that's Exhibit

15   25 -- required compliance with federal

16   nondiscrimination statutes, regulations and

17   policies?

18        A.    Can you repeat the question?

19        Q.    Sure.    Do you know whether the terms of

20   the emergency contract required compliance with

21   federal nondiscrimination statutes, regulations and

22   policies?

23        A.    Yes.

24        Q.    Yes, they did require compliance?

25        A.    With the Civil Rights Act, yes.

Page 155

1          Q.   And if you look at -- if you look on

2     the page marked 563 of the emergency contract, I

3     think this is the language that you're referring

4     to.   It says the contractor -- Article 9, covenants

5     and conditions.

6               Section A:   The contractor agrees to

7     comply with all applicable federal and state laws

8     and regulations, including -- I'm summarizing

9     here -- but not limited to, jumping down to Number

10    2, Title 6 of the Civil Rights Act of 1964, and

11    regulations issued pursuant thereto, 45 CFR Part

12    80.

13              Do you see that there?

14         A.   Yes.

15         Q.   And then a little farther below under

16    Paragraph 6, it says:   The Omnibus Budget

17    Reconciliation Act of 1981, which prohibits

18    discrimination on the basis of sex and religion in

19    programs and activities receiving or benefitting

20    from federal financial assistance.

21              Do you see that?

22         A.   Yes.

23         Q.   So when we looked at the -- when we

24    looked at the change order that was -- that's

25    Exhibit 26, were -- were either of the provisions

```
                                         Page 156
 1   that I just read, were those amended by the change
 2   order at all?
 3           A.    No.
 4           Q.    Do you know whether Miracle Hill
 5   negotiated the terms of its emergency contract with
 6   DSS?
 7           A.    No.
 8           Q.    No, you don't know or no, Miracle Hill
 9   didn't negotiate?
10           A.    No, I don't know.  I don't -- I don't
11   know what anyone did other than myself.
12           Q.    Okay.  Did -- and you didn't negotiate
13   the terms of the emergency contract with DSS?
14           A.    No.
15           Q.    Okay.  All right.  So just one last
16   document I want to take a peek at on this topic.
17   If we can look at Tab 19.  This will be Exhibit 27.
18   It's Miracle Hill Subpoena 5948 and it's an e-mail
19   from Stephen Taylor to Miss Busha dated March 29th
20   of 2019.
21               (EXHIBIT 27, E-mail chain dated 3/29/19
22   to Karen Busha from Stephen Taylor,
23   MIRACLE_HILL_SUBP_005948 to 005952, was marked for
24   identification.)
25   BY MS. JANSON:
```

Page 157

1          Q.    Do you recognize this e-mail chain?

2          A.    Yes.

3          Q.    If you look at -- it's the page labeled

4    5950.  It looks like it's an e-mail that you're

5    sending to Mr. Taylor at DSS.  And you say:

6    Attached is the signed CPA emergency contract for

7    Miracle Hill Ministries as requested.

8              And then you write:  Please note, our

9    understanding of Article 9, covenants and

10   conditions, Number 6, Page 11, as it pertains to

11   Miracle Hill Ministries is as follows:  The Omnibus

12   Budget Reconciliation Act of 1981, which prohibits

13   employment, underlined, discrimination on the basis

14   of sex and religion in programs and activities

15   receiving or benefitting from federal financial

16   assistance, but which exempts religious providers

17   from this requirement, see Subchapter C, it lists

18   the specific section.

19              Is it right that the language there

20   that is underlined is -- is language that -- that

21   you added to the Paragraph Number 6 of Article 9 of

22   the emergency contract when you wrote this e-mail?

23         A.    What's the question?

24         Q.    The under -- the language that's

25   underlined in your e-mail where you're writing

Page 158

1    about Paragraph 6 from Article 9 of the emergency

2    contract, is that underlined language language that

3    you added that does not exist in the emergency

4    contract as written?  And we can go back and look

5    at the emergency contract if that would be helpful.

6           A.    Yes, because I -- I don't remember.

7           Q.    Sure.  So if you look back at Exhibit

8    25, the emergency contract, and you go back to Page

9    5963.  You'll see Article 9, covenants and

10   conditions.

11          A.    Yes.

12          Q.    And then under A, Paragraph 6 is the

13   language about the Omnibus Budget Reconciliation

14   Act of 1981 that I read earlier.

15          A.    Yes.

16          Q.    And then if you compare -- if you

17   compare that paragraph from the contract to what

18   you've written in your e-mail in Exhibit 27, it

19   looks to me like you've -- you've added some

20   language there and that's indicated by the

21   underlining.  Is that your understanding?

22          A.    It appears so.

23          Q.    Okay.  Why did you think it was

24   important to include that -- that note in your

25   e-mail to Mr. Taylor when you returned the signed

Page 159

1    emergency contract?

2              MR. MATTHEWS:  I'm going to object on

3    the basis of attorney/client privilege to the

4    extent that the addition reflects advice received

5    from a lawyer for Miracle Hill or for Miss Busha.

6    I'm going to instruct her not to answer that

7    question.

8              If she had independent reason outside

9    of communications with counsel why she added that,

10   she's free to answer.  But to the extent it relates

11   to attorney/client communications, I'll object on

12   the basis of privilege and instruct the witness not

13   to answer.

14             THE WITNESS:  I have no response.

15   BY MS. JANSON:

16        Q.   Okay.  So you don't have any

17   independent understanding of why you put that in

18   your e-mail aside from what you may have discussed

19   with -- with attorneys, is that right?

20        A.   That's correct.

21        Q.   Okay.  Do you know whether -- whether

22   DSS ever either -- ever responded back to your note

23   here in Exhibit 27?

24        A.   I don't recall.

25        Q.   Okay.  All right.  We can put that

Page 160

```
 1   aside.  All right.  So we have -- we've been going
 2   about another -- about an hour and 15.  I'm -- I'm
 3   definitely getting closer to -- closish to the end
 4   of what I have.  Do -- would you like to take a
 5   break now or would you like to forge on a little
 6   bit more?
 7           A.   We can forge on a little more.
 8           Q.   Okay.  Great.  All right.  So if we
 9   look at -- if we can look at Tab 31.  This was
10   marked Miracle Hill Subpoena 7303 and it's going to
11   be Exhibit 28.  And this is -- this is a document
12   that's titled DSS Timeline.
13               (EXHIBIT 28, E-mail chain entitled DSS
14   Timeline, MIRACLE_HILL_SUBPOENA_007303 to 007307,
15   was marked for identification.)
16   BY MS. JANSON:
17           Q.   Do you have that in front of you?
18           A.   Yes.
19           Q.   Is this -- is this a document that you
20   recognize?
21           A.   Yes.
22           Q.   Had you -- had you seen this prior to
23   your preparation for this deposition?
24           A.   It appears that some of this I was
25   copied on and some of it I was not.
```

Page 161

1          Q.    So this -- this looks to me like it's a

2    collection of communications and summaries of

3    events from September 27th to October 31st of 2019.

4    Does that sound right to you?

5          A.    Yes.

6          Q.    Do you know who -- and it's called --

7    it's titled DSS timeline.  Do you know who compiled

8    this timeline?

9          A.    It appears that Ken Kruithof.  I don't

10    know.

11          Q.    You don't know.  But it wasn't you?

12          A.    No.

13          Q.    Okay.  On the first page, the first

14    e-mail there that's copied in from September 27th,

15    is an e-mail from Ken Kruithof to Michael Leach

16    cc'g you and Emily Parks.  And Mr. Leach, he is the

17    current director of South Carolina DSS, is that

18    right?

19          A.    Yes.

20          Q.    Do you know who Emily Parks is?

21          A.    Yes.

22          Q.    And who is that?

23          A.    She was his chief of staff while I was

24    at Miracle Hill.

25          Q.    Okay.  And about -- the third paragraph

Page 162

1   down, Mr. Kruithof writes:  We at Miracle Hill

2   would like to invite you and Emily to visit our

3   staff and facilities at your earliest convenience.

4           Do you know why Mr. Kruithof invited

5   Mr. Leach and Miss Parks to visit Miracle Hill?

6           A.   It was our understanding that Mr. Leach

7   wanted to see facilities throughout the state and

8   we wanted to invite him to Miracle Hill to welcome

9   him and to show him all of the services that

10  Miracle Hill provides.

11          Q.   Do you know whether the visit that's

12  being contemplated in this e-mail actually took

13  place?

14          A.   Yes, it took place.

15          Q.   And approximately when was that?

16          A.   I believe it was in November of 2019.

17          Q.   Did you participate in the -- in the

18  visit?

19          A.   I did.

20          Q.   And who else -- who else from Miracle

21  Hill participated?

22          A.   Reid -- Reid Lehman was there, Ken

23  Kruithof, Brenda Parks, myself, Emily Parks,

24  Mr. Leach.  And I can't recall who else may have

25  been in the meeting.  Sharon Betts may have been

Page 163

1    there, but I can't recall.

2         Q.    Okay.  And do you recall generally what

3    was discussed during Mr. Leach and Miss Parks'

4    visit?

5         A.    We shared with him information

6    regarding our statistics for foster care and toured

7    him through some of the adult facilities at Miracle

8    Hill to show him our efforts to keep children out

9    of the DSS system by helping their parents.

10         Q.    Okay.  All right.  If you look down at

11    the next -- the next entry in the document, it's

12    dated October 28th of 2019.  And then on the top of

13    the next page, there's a note there, Model Foster

14    Care Licensing hearing in Columbia with DSS.  DSS

15    confirmed that agency means DSS, but objected to

16    PAFCAF question on how the additional

17    discrimination indicators would affect faith-based

18    CPAs.

19              Do you see that there?

20         A.    I do.

21         Q.    Do you know what -- what it means when

22    it says that there was a Model Foster Care

23    Licensing hearing?

24         A.    I believe it refers to the licensing

25    document that we had been looking at that PAFCAF

Page 164

1   was giving feedback on.

2        Q.    Okay.  So this is talking about that --

3   the same proposed licensing regulation we discussed

4   earlier and then the question -- where you had

5   raised the question regarding the nondiscrimination

6   requirement applied, is that right?

7        A.    Yes.

8             MR. MATTHEWS:  Object to the form of

9   the question.  Mischaracterizes prior testimony.

10  And I don't think it suggests mischaracterization

11  was intentional.

12            And, Kate, if you'd like me to tell you

13  what it is outside the presence of the witness, I'm

14  happy to do that.

15            MS. JANSON:  Okay.  I'm just looking

16  back to see if I can rephrase.

17            MR. MATTHEWS:  I think it was just a

18  phrasing issue.

19  BY MS. JANSON:

20       Q.    Okay.  I'm just trying to establish

21  whether what's being referenced -- to the issue

22  that's being referenced in -- in this document that

23  we marked as Exhibit 28 is generally the same --

24  the same issue that we were discussing before with

25  respect to DSS's revisions to its licensing

```
                                            Page 165
 1   regulation.  It's -- we're generally talking about
 2   the same subject matter, right?
 3                 MR. MATTHEWS:  Again I'm going to
 4   object to the form.  May I -- just so I don't --
 5   may I ask the witness to step out in the hall for
 6   just a second and let me talk to Kate for a second?
 7   I just want to clear something up.  If you could
 8   step out.
 9                 THE WITNESS:  Yes.
10                 MR. MATTHEWS:  Thanks.
11                 (At which time, the witness exited the
12   proceedings.)
13                 MR. MATTHEWS:  I'm sorry, I don't mean
14   to intrude, but I -- you referred to it as proposed
15   modifications to the licensing regulation.  I think
16   the term's modifications to the draft solicitation,
17   not to licensing regulation.  I think that was the
18   proposed solicitation for the contract.  Was that
19   correct or am I misremembering well?
20                 MS. JANSON:  Well, the -- you know,
21   honestly it's not entirely clear from -- from the
22   document, the chart that we had looked at.
23                 MR. MATTHEWS:  Yeah.
24                 MS. JANSON:  And I don't remember which
25   exhibit that was at this point.
```

Page 166

1          MR. MATTHEWS:  It was -- hold on.

2          MS. JANSON:  Was it 30?  40 maybe?

3   Here, I'll find it.  One second.

4          MR. COLEMAN:  It's 22.

5          MS. JANSON:  22.  Yeah.  Thank you.

6   Thanks, Miles.  Yeah, it -- it wasn't clear to me

7   from --

8          MR. MATTHEWS:  And it was referred

9   to -- Miss Fendley at some point, I can't put my

10  hands on it, Miss Fendley at some point in an

11  e-mail referred to it as a licensing regulation,

12  but I thought it was that draft solicitation.

13  We're all talking about the same thing.  I'm okay

14  with that.  I just wanted to make sure that was --

15         MS. JANSON:  Yeah, it just -- it looks

16  to me from the header on the -- on this chart that

17  was Exhibit 22, that those are -- those provisions

18  are provisions listed from the -- you know, the

19  regulations, right?

20         MR. MATTHEWS:  I'm -- I'm good with

21  that.  We're all talking about the same thing

22  anyway, but I just wanted to make sure we had

23  that -- there wasn't any confusion.  The confusion

24  may have been entirely mine, so...

25         MS. JANSON:  No problem.

Page 167

```
 1                MR. MATTHEWS:  Thank you for your --
 2    thank you for your time.  Let me get the witness
 3    back in the room.
 4                MS. JANSON:  Sure.
 5                (At which time, the witness reentered
 6    the proceedings.)
 7    BY MS. JANSON:
 8        Q.   Okay.  So we were just discussing the
 9    language on the top of the second page of the DSS
10    timeline, Exhibit 28.  And it says there:  DSS
11    confirmed that agency means DSS, but objected to
12    PAFCAF question on how the additional
13    discrimination indicators would affect faith-based
14    CPAs.
15                Do you know what -- what it means there
16    that DSS objected to the question?
17        A.   No.
18        Q.   No.  Okay.  Did you attend this Model
19    Foster Care Licensing hearing with DSS?
20        A.   I don't recall.
21        Q.   Okay.  And just below, the next
22    sentence there from October 28th of 2019, it's an
23    e-mail from Jacqueline Lowe to you and Mr. Lehman
24    and others and he's asking -- it looks like she's
25    asking whether Miracle Hill had available family to
```

```
                                         Page 168
 1    foster two children from the upstate.  Do you see
 2    that there in that e-mail?
 3            A.    Yes.
 4            Q.    And Miss Lowe worked at DSS, right?
 5            A.    Yes.
 6            Q.    In your role as VP of children's
 7    ministries at Miracle Hill, were you -- were you
 8    personally involved in helping DSS find placements
 9    for foster children with Miracle Hill's foster
10    families?
11            A.    No.
12            Q.    No.  Do you have an understanding of
13    how that process typically worked?
14            A.    Yes.
15            Q.    And can you just summarize it briefly
16    for me?
17            A.    DSS makes contact with the child
18    placing agency.  I believe there's a screening form
19    that is completed and then our staff begin to look
20    for homes for the child.
21            Q.    From the foster families that Miracle
22    Hill works with?
23            A.    That is correct.
24            Q.    Okay.  And if Miracle Hill has a home
25    that it thinks would be a good fit, is that
```

                                        Page 169

1    conveyed -- is that then conveyed to DSS?

2            A.    That's correct.

3            Q.    Okay.  And if it doesn't, the -- again,

4    that information is conveyed back to DSS, right?

5            A.    Yes.

6            Q.    And it looks like that was the response

7    that was -- that was provided in this instance, it

8    says notified DSS placement that we did not have a

9    home?

10           A.    Yes.

11           Q.    And then below that, the October 29th,

12   2019 entry is an e-mail from Mr. Kruithof to

13   Mr. Leach, Miss Parks and someone by the name of

14   Carol Smoak?  Do you know who Carol Smoak is?

15           A.    I believe she was Mr. Leach's

16   assistant.

17           Q.    Okay.

18           A.    Administrative assistant.

19           Q.    Um-hum.  And you're copied on this

20   e-mail along with Mr. Lehman and Miss Parks.  And

21   Mr. Kruithof starts out by saying we are looking

22   forward to our meeting next week to take place at

23   our offices and he gives the Greenville address.

24                 Is Mr. Kruithof there referring to the

25   same -- to the same visit that was being

Page 170

1    contemplated in the first e-mail in this document?

2              A.    Yes.

3              Q.    And then in the next entry from October

4    30th, Mr. Leach -- it looks like Mr. Leach sends an

5    e-mail back to Mr. Kruithof in response to his

6    message.  And he says -- he says thank you and then

7    he goes on to say that he is anxious about the

8    visit due to the lawsuit based on the decisions

9    Miracle Hill has made.  This has put me in a

10   situation I do not like and I'm having difficulty

11   with it.

12             Did you ever speak with -- speak with

13   Mr. Leach during the course of your duties at

14   Miracle Hill?

15             A.    I spoke with him during this meeting.

16             Q.    Any other times?

17             A.    And we went to greet him and welcome

18   him to South Carolina I believe it was in June of

19   2019.

20             Q.    Okay.  Do you have any understanding --

21   and I recognize that it doesn't look like you were

22   copied on this e-mail, but do you have any

23   understanding of what -- what lawsuit he's

24   referring to in this message?

25             A.    No, I don't -- I don't know what he's

Page 171

1    referring to in this message.

2         Q.    Okay.  Do you have any understanding as

3    to why Mr. Leach would have been anxious about the

4    meeting with Miracle Hill?

5         A.    No, I -- I don't know.  I can't speak

6    for Mr. Leach.

7         Q.    Okay.  And then, let's see, if we

8    jump -- if we jump down to the bottom of that -- of

9    that same page, 7305, there's an e-mail from

10   Jacqueline Lowe to you and Miss Parks cc'g Dawn

11   Barton.

12             And she says:  Karen, I would like to

13   arrange a time for us to meet with you and Brenda

14   about placement of children in foster care with

15   families licensed through your agency.  Would you

16   offer some available times in November that we can

17   meet.

18             And then below that, a couple of

19   entries down, it's, in fact, the last entry in this

20   document on Page 7307.  On October 31st, Miss Parks

21   writes back to Miss Lowe and she proposes some

22   times that you're available to meet and she says

23   please advise as to the purpose of the meeting so

24   that we can prepare.

25             Do you remember whether the meeting

```
                                           Page 172
1    that Jacqueline Lowe asked for ever took place?
2              A.   It did not take place as far as I know.
3              Q.   Okay.  So do you remember -- do you
4    remember what happened after Miss Parks sent this
5    response to Miss Lowe's message?
6              A.   I don't believe we ever received a
7    confirmation of a date from Miss Lowe.
8              Q.   Okay.
9              A.   That included me.
10             Q.   Okay.  And you didn't hear -- you
11   didn't subsequently hear that Miss Parks had had a
12   discussion on this with DSS that you -- that you
13   weren't involved in, is that right?
14             A.   That's correct, I did not hear.
15             Q.   Okay.
16             A.   That Miss Parks had sent them.
17             Q.   And I know you testified earlier that
18   you don't -- you don't know who -- who would have
19   prepared this timeline, right?
20             A.   I don't -- I don't recognize the
21   timeline.
22             Q.   Okay.  And do you have any -- any
23   understanding as to why Miracle Hill would have
24   maintained a timeline of events related to DSS
25   during this time period?
```

Page 173

```
 1          A.    No, I don't know.

 2          Q.    Okay.  You can put that aside.  Okay.

 3                The last thing -- last document I

 4   wanted to look at for now is -- okay.  This is

 5   going to be Tab -- Tab 48, Serena.  And this is

 6   not -- this is not Bates stamped.  This is the

 7   subpoena that Plaintiffs served on Miracle Hill for

 8   the production of documents and it's dated June

 9   15th of 2020?

10                MR. MATTHEWS:  Can you put that up on

11   the screen?  We don't have a copy in the room, I

12   don't believe.

13                MS. JANSON:  Let me -- I can do that.

14   Just one second.

15                MR. MATTHEWS:  I may have one.  Hold

16   on.  I'm sorry, I don't.

17                MS. JANSON:  Okay.  No problem.  Let me

18   just -- let me just get it up here.  I'll share my

19   screen.  So let me just share this.

20                COURT REPORTER:  Kate, will that be

21   Exhibit 28?  I didn't hear you say a number.

22                MS. JANSON:  I think we're on 29.

23                COURT REPORTER:  Okay.

24                MS. JANSON:  Serena, does that sound

25   right to you?
```

```
                                          Page 174

 1              MS. CANDELARIA:  Sorry for the delay.
 2    29 is right.
 3              COURT REPORTER:  Thank you.
 4              (EXHIBIT 29, Letter dated 6/15/20 to
 5    Miracle Hill Ministries, Incorporated c/o Richard
 6    E. Ingram, Jr. from Nekki Shutt, with attachments,
 7    was marked for identification.)
 8    BY MS. JANSON:
 9         Q.    Okay.  So let me just share this.
10    Okay.  Are you able to see that, Miss Busha?
11         A.    Yes.
12         Q.    So this is just the cover letter.  I'm
13    going to scroll down through so you can see what
14    we're looking at.  This is the subpoena that
15    Plaintiffs served on Miracle Hill Ministries in
16    June of last year.  And if I go a little farther
17    down -- my mouse is not cooperating.  There we go.
18              So this says Schedule A, Miracle Hill
19    Ministries, and it has some definitions which I'm
20    not going to ask you about.  And then we get down
21    to here, it says Requests For Production and it
22    lists a number of document requests.  Have you ever
23    seen this document before?
24         A.    I haven't seen this document.  I've
25    seen a request for -- I saw a document that just
```

Page 175

```
 1   had requests for -- I don't know that it said
 2   requests.  I don't know if it was an exact copy of
 3   this page or not, but it was a -- it was a document
 4   that outlined all the things that we needed to
 5   locate for the lawsuit.
 6        Q.   Okay.  And were you -- were you
 7   involved in efforts by Miracle Hill to search for
 8   and collect documents related to this lawsuit in
 9   response to the subpoena?
10        A.   Yes.
11        Q.   And what -- what was your -- what was
12   your involvement?
13        A.   Looking for e-mails both in my -- my
14   records and in the former VP records of Beth
15   Williams that was the former VP.
16        Q.   And was she -- was she no longer at
17   Miracle Hill when you were -- when you were
18   performing those searches?
19        A.   Yes, that's correct.
20        Q.   Okay.
21        A.   She was not there.
22        Q.   So you were looking in -- in your own
23   e-mails and in Miss Williams' e-mails for documents
24   that might be responsive to the requests, is that
25   right?
```

Page 176

1          A.    Yes.

2          Q.    Do you know whether -- do you know

3    whether other members of Miracle Hill were also

4    asked to look in their -- in their e-mails for

5    documents?

6          A.    Yes.

7          Q.    Do you know generally who -- who was

8    requested to do that?

9          A.    I know Brenda Parks and Sharon

10   Bettis -- Betts.  And I believe that our IT

11   director at that time was asked to look.

12         Q.    So certain people were asked to look in

13   their own e-mails and then the IT director was also

14   asked to run -- to run some system searches, is

15   that -- is that right?

16         A.    I don't know exactly what he was asked

17   to do.  I know he was included in helping us pull

18   the documents that we needed.

19         Q.    Okay.  And so did you, in fact, when

20   you looked in your e-mail and Miss Williams'

21   e-mail, did you locate documents and subsequently

22   provide those to counsel?

23         A.    To be honest, I don't remember what I

24   located.

25         Q.    Okay.  Do you remember if you, in fact,

Page 177

```
 1   looked in your e-mail for documents that would have
 2   been responsive to the subpoena?
 3          A.   Yes.
 4          Q.   Yes, you did do it?
 5          A.   Yes.  I looked in -- I looked in my
 6   documents.
 7          Q.   Okay.  Were you asked to look in your
 8   hard copy documents as well as in e-mails?
 9          A.   Yes.
10          Q.   And did you -- did you do that?
11          A.   Yes.
12          Q.   And did you provide anything that you
13   found that might have been responsive to counsel?
14          A.   I rarely have hard documents.  I don't
15   think that I had anything in my hard documents.
16          Q.   Were you also asked to look in your
17   electronic documents outside your -- outside your
18   e-mail, but other documents you might have had
19   stored electronically?
20          A.   Yes.
21          Q.   And did you do that?
22          A.   Yes, I did.
23          Q.   And did you provide anything that you
24   found there that might have been responsive to
25   counsel?
```

Page 178

1        A.   If I found something, I would provide
2   it, but I honestly cannot remember from a year ago
3   what I found.
4        Q.   I know.  Understood.  To your
5   knowledge, is -- well, is there anything else that
6   you -- that you personally did to help search for
7   or collect documents in response to -- to
8   Plaintiffs' subpoena to Miracle Hill?
9        A.   No.
10       Q.   Are you aware of any others that
11   Miracle Hill or anyone else at Miracle Hill took to
12   search for or collect documents in response to
13   Plaintiffs' subpoena?
14       A.   I know Brenda Parks, Sharon Betts were
15   asked.  I know that Reid and Sandy were looking for
16   documents, but I don't know who else.  And the IT
17   director.  I don't know who else was asked to help.
18            MS. JANSON:  Okay.  All right.  Well,
19   why don't we -- why don't we take a short break now
20   and just give me a minute to look over my notes and
21   then when we come back I hopefully will be finished
22   at least for now or close to finished.  I don't
23   want to make any promises.
24            So why don't we go off the record and
25   we'll come back in -- is ten minutes enough for

Page 179

1    folks or would you rather 15?

2              MR. COLEMAN:  15 might be safer if you

3    think you're getting close.  I'm going to organize

4    myself so that it might be not necessary to take

5    another break.

6              MS. JANSON:  Perfect.  All right.  So

7    let's say 3:15 we'll come back.

8              VIDEO TECHNICIAN:  The time is 2:59 PM.

9    We are going off the record.

10              (A recess transpired.)

11              VIDEO TECHNICIAN:  The time is 3:22 PM.

12    We are back on the record.

13              MS. JANSON:  Miss Busha, thank you very

14    much for taking the time to talk to me today.  I

15    don't have any further questions at this point.

16              THE WITNESS:  Thank you.

17                    EXAMINATION

18    BY MR. MATTHEWS:

19         Q.   All right.  I have one question just by

20    way of cleanup, if I might.  This is Steve

21    Matthews.

22              There was some discussion earlier,

23    Miss Busha, having to do with the number of

24    licensed families with Miracle Hill.  It was

25    unclear to me if the number 200 was the number of

Page 180

1   licensed families at any given point in time or was

2   that the number of new licensed families who would

3   come on each year?  Which is it?  Did you get 200

4   new licensed families each year or was that the

5   aggregate that you had at a given point in time

6   when you were there?

7            A.   No, it was not new families, it was the

8   aggregate for each year.

9            Q.   Okay.

10           A.   The average.

11           Q.   All right.

12           A.   Yeah.

13                MR. MATTHEWS:  I have no other

14   questions.

15                MR. COLEMAN:  Before I begin, I just

16   want to check with Terri, the court reporter.  Can

17   you still hear me okay?  We're using a single

18   microphone in this room.

19                COURT REPORTER:  Yes, you're coming

20   through good, Miles.  Thanks.

21                MR. COLEMAN:  Okay.  We're just trying

22   to avoid multiplicity of microphones.

23                COURT REPORTER:  I appreciate that.

24                     EXAMINATION

25   BY MR. COLEMAN:

Page 181

1          Q.    All right, Karen.  Thank you for your

2     time today.  I've got a handful of questions for

3     you, but I think -- I think the end is in sight.

4          A.    Okay.

5          Q.    There's light at the end of this tunnel

6     of the deposition.

7                Earlier today, sort of toward the

8     beginning of your testimony, you discussed what is

9     a CPA, what role does CPAs play.  I'm going to --

10    I'm going to flesh that out a little bit and just

11    explore your answer.

12                Specifically, earlier this morning you

13    said -- or response to that, that the role of the

14    CPA was to place children in foster, close quote.

15    That's what I wrote down in my notes.  I may not be

16    exact, but do you remember talking about that early

17    on?

18         A.    Yes.

19         Q.    And I really -- I know we -- you sort

20    of lapsed into that as kind of just a colloquialism

21    or a vernacular, but really CPAs don't have the

22    authority to place a child in a foster home, do

23    they?

24         A.    That's correct.

25         Q.    And who does?

Page 182

1          A.    DSS.

2          Q.    Okay.  So when you say that -- again,

3    just kind of informal language, that CPAs, CPAs

4    licensing, CPAs don't license foster homes, do

5    they?

6                MS. JANSON:  Object to form.

7    BY MR. COLEMAN:

8          Q.    You can answer.

9          A.    DSS license -- actually license the

10   home.  The CPA does the gathering of documents,

11   information, that DSS has the final authority to

12   license homes.  A CPA cannot independently license

13   a home.

14         Q.    And is the same thing true for actually

15   placing the child?

16         A.    Yes, that's the -- the same is true.

17         Q.    Only DSS can do that?

18         A.    Only DSS can place the child, only DSS

19   can remove a child.  The CPA facilitates the

20   placement.

21         Q.    And we talked a little bit about that

22   later in the afternoon.  I just want to make sure

23   that I understand.  So if -- if DSS has a child in

24   foster care in the upstate needing placement,

25   someone from DSS will reach out to CPAs, is that

Page 183

1  right?

2          A.   Yes, that's correct.

3          Q.   And then what does the CPA do in

4  response?

5          A.   The CPA then looks for a family that

6  they license that can accommodate DSS's request.

7          Q.   The CPA looks for a family that DSS

8  licensed, right?

9          A.   Yes, that's right.

10          Q.   If the CPA finds such a family, then

11  what does it -- what does it say back to DSS?

12          A.   It lets DSS know that we have a family

13  that would be willing to take their place.

14          Q.   And then it's up to DSS to decide

15  whether and where to place the child?

16          A.   That's correct.

17               MS. JANSON:  Object to the form.

18  BY MR. COLEMAN:

19          Q.   I think you testified earlier today as

20  well that Miracle Hill has a case manager that was

21  assigned to both a foster care family and to the

22  child in their home, is that right?

23          A.   Yes.

24          Q.   Is that case manager someone on staff

25  at Miracle Hill?

```
                                      Page 184
 1          A.    Yes.
 2          Q.    And does the case manager have an
 3    ongoing relationship with the foster family?
 4          A.    Yes.
 5          Q.    Does the case manager have an ongoing
 6    relationship with the foster child while it's in
 7    that family's home?
 8          A.    Yes.
 9          Q.    So if for some reason there was a
10    change to that case manager, that would disrupt
11    those relationships, right?
12          A.    Yes.
13                MS. JANSON:   Object to form.
14    BY MR. COLEMAN:
15          Q.    If for some reason Miracle Hill stopped
16    being a CPA and those case managers could no longer
17    work with those families or children, that would
18    disrupt the case management relationship with the
19    child, right?
20          A.    That's correct.
21                MS. JANSON:   Object to form.
22    BY MR. COLEMAN:
23          Q.    And with the family?
24          A.    Correct.
25                MS. JANSON:   Object to form.
```

Page 185

1    BY MR. COLEMAN:

2          Q.    And would that be true even if the

3    foster family for whatever reason moved to a

4    different CPA or they moved to working with DSS,

5    that move, either they continued serving as foster

6    parents, that would disrupt that case manager

7    relationship between them and with the child, is

8    that right?

9          A.    That's correct.

10               MS. JANSON:    Object to the form.

11   BY MR. COLEMAN:

12         Q.    Do you remember earlier today, I

13   believe it was this morning, before lunch, we had

14   looked at a document, it was Miracle Hill's

15   doctrinal statement.

16         A.    Yes.

17         Q.    Do you remember looking at that?  And I

18   think one of the questions you were asked was

19   whether it reflected Evangelical Protestants'

20   beliefs.  Do you remember being asked or saying

21   anything about that?

22         A.    I remember being asked.

23         Q.    Okay.  Do you know whether a Roman

24   Catholic foster parent could affirm and adhere to

25   that doctrinal statement?

Page 186

1              A.    I don't know.

2              Q.    And I -- I should ask the question more

3     precisely, whether a -- it was unclear.

4                    Do you know whether a Roman Catholic

5     foster parent or foster family like the one -- at

6     least one that serve Miracle Hill could sign and

7     agree to and adhere to Miracle Hill's doctrinal

8     statement?

9              A.    Yes.

10             Q.    And you know that's because there is at

11    least one family that's done so?

12             A.    That's correct.

13             Q.    Do you know whether the Roman Catholic

14    Diocese of South Carolina has ever looked at the

15    doctrinal statement and said it's consistent with

16    the Roman Catholic Orthodox?

17             A.    I don't know.

18             Q.    Okay.  I suppose then that if, as you

19    just said, a practicing Roman Catholic could agree

20    to and sign that doctrinal statement, really

21    Miracle Hill's doctrinal statement is broader than

22    just Protestant beliefs, right?

23                    MS. JANSON:  Object to form.

24                    THE WITNESS:  Yes.

25    BY MR. COLEMAN:

```
                                              Page 187
 1          Q.    It would reflect Christian beliefs,
 2    right?
 3          A.    Yes.
 4                MS. JANSON:  Object to form.
 5    BY MR. COLEMAN:
 6          Q.    After Miracle Hill changed its policy,
 7    I think in 2019, whether it's the summer,
 8    approximately 2019, and it began with applications
 9    from Roman Catholics, Orthodox and a broader group
10    of Christians, do you know whether every applicant,
11    both Roman Catholic and Protestant, were treated in
12    view the same by Miracle Hill?
13          A.    That was our direction to the licensing
14    staff.
15          Q.    And to the best of your knowledge, that
16    was true, it was done?
17          A.    Yes.  To the best of my knowledge it
18    was done.
19          Q.    That the Roman Catholic wasn't somehow
20    in any way treated differently than a Protestant
21    Christian?
22          A.    That's correct.
23                MS. JANSON:  Object to form.
24    BY MR. COLEMAN:
25          Q.    And when you say that's correct, it's
```

Page 188

1    correct that they were not treated differently?

2        A.    They were not treated differently.

3        Q.    That policy change in 2019, that was a

4    sincere change of policy and viewpoint, right?

5        A.    That's correct.

6            MS. JANSON:  Object to the form.

7    BY MR. COLEMAN:

8        Q.    We also looked earlier today at an

9    e-mail that was sent by Sharon Betts to the

10   Plaintiffs in this lawsuit.  It was before the

11   lawsuit had been filed, they weren't Plaintiffs at

12   that time, but to Eden Rogers and Brandy Welch.  Do

13   you remember looking at that e-mail?

14       A.    Yes.

15       Q.    And we talked about that for a little

16   while.  I'm going to ask you a couple follow-up

17   questions about that.  Hold on for a second.

18            One of the questions you were asked

19   while we were looking at that document was whether

20   Miracle Hill would work with a same sex marriage

21   couple.  Do you remember that?

22       A.    Yes.

23       Q.    Another question you were asked around

24   that same time was whether Miracle Hill would work

25   with a prospective foster parent who identified as

Page 189

1    LGBTQ.  Do you remember that?

2            A.    Yes.

3            Q.    So I want to -- I want to make sure

4    that I've got clarity on the latter question.  If a

5    prospective foster parent either submitted the

6    online inquiry form or came to an interest meeting

7    or called and said that they identify as LGBTQ but

8    that they believe the same doctrinal beliefs

9    memorialized in Miracle Hill's doctrine statement,

10   that the individual believes that marriage and

11   sexual activity is limited to marriage between two

12   individuals of different sexes and that they were

13   committed to only engaging in sexual conduct in

14   that context, only if married to a person of the

15   opposite gender and as a result they were committed

16   not to engaging in behaviors or actions of the same

17   sex, would Miracle Hill be willing to work with

18   that person?

19               MS. JANSON:  Object to the form.

20               THE WITNESS:  Yes.

21   BY MR. COLEMAN:

22           Q.    So if -- if earlier today you said that

23   Miracle Hill would not work with an LGBTQ person,

24   what did you mean then -- because I feel like you

25   just now gave an answer that was -- that was

Page 190

1    clearer.  What did you mean previously when you

2    said that?

3                MS. JANSON:  Object to the form.

4                THE WITNESS:  If they were not living

5    according to the doctrinal statement.

6    BY MR. COLEMAN:

7        Q.   Is it accurate to say that -- that the

8    distinction Miracle Hill draws is not based on

9    someone's identity or orientation, but instead is

10   based on their behaviors and actions?

11       A.   Yes.

12               MS. JANSON:  Object to the form.

13   BY MR. COLEMAN:

14       Q.   And relatedly, Miracle Hill would draw

15   a distinction based on a person's beliefs in terms

16   of religion or doctrine?

17       A.   Yes.

18               MS. JANSON:  Object to the form.

19   BY MR. COLEMAN:

20       Q.   When we looked at that e-mail from

21   Sharon Betts to Eden Rogers and Brandy Welch, I

22   think it was marked as Exhibit 13, the e-mail

23   referred Miss Rogers and Miss Welch to other

24   providers based on the fact that they were members

25   at a nonChristian church, is that right?

Page 191

1          A.    Yes.

2          Q.    You said that you were not yourself

3    familiar with the distinctions, if any, between

4    Unitarian Universalists' beliefs in doctrine and

5    Christians' belief in doctrine, are you?

6          A.    That's correct.

7          Q.    Was there also a requirement of Miracle

8    Hill that not only must the applicant check the box

9    agreeing with or affirming the statement made, but

10   that the applicant also in addition had to be

11   active in a Christian church?

12         A.    Yes.

13         Q.    And so if Miss Rogers and Miss Welch

14   were members at a Unitarian church, then they

15   wouldn't have satisfied that criteria, would they?

16         A.    That's correct.

17               MS. JANSON:  Object to the form.

18   BY MR. COLEMAN:

19         Q.    If Miss Rogers and Miss Welch in their

20   own depositions that a Unitarian Universalist's

21   belief is different from Christian beliefs and that

22   their personal beliefs are different from Christian

23   beliefs, you would have no reason to dispute that,

24   would you?

25               MS. JANSON:  Object to form.

Page 192

1              THE WITNESS:  I'm sorry, what's the
2    question?
3    BY MR. COLEMAN:
4         Q.    I'll try to ask it better.
5              If -- when Miss Rogers and Miss Welch
6    had their own depositions, if they admitted that
7    Unitarian Universalists' beliefs are different from
8    Christian beliefs, you would have no reason to
9    disagree with them about that, would you?
10        A.    That's correct.
11             MS. JANSON:  Object to the form.
12   BY MR. COLEMAN:
13        Q.    And if they testified that their own
14   beliefs, individual, are different than Christian
15   rules, you would have no reason to dispute that,
16   would you?
17        A.    That's correct.
18             MS. JANSON:  Object to form.
19   BY MR. COLEMAN:
20        Q.    When Brenda Parks received the online
21   preform from Miss Rogers and Miss Welch, she either
22   forwarded it to you or at least told you about it,
23   is that correct?
24        A.    She told me about it.
25        Q.    And that's because you had -- you had

```
                                     Page 193
 1   asked to be informed of applications like that?
 2               MS. JANSON:  Object to the form.
 3               THE WITNESS:  Yes.  We were -- we were
 4   asked to be aware of applications that may be
 5   coming from the universal -- from the Unitarian
 6   church.
 7   BY MR. COLEMAN:
 8        Q.   And when Brenda informed you, you
 9   instructed her to contact Sandy Furnell, Reid
10   Lehman and legal counsel, is that right?
11        A.   Yes.  That's correct.
12        Q.   Is that because you form a lookout
13   because Miracle Hill was aware that you and other
14   groups like that were actively looking for
15   Plaintiffs to apply to Miracle Hill in hopes of
16   generating a lawsuit?
17        A.   Yes.
18               MS. JANSON:  Object to the form.
19   BY MR. COLEMAN:
20        Q.    Is it also because you were aware that
21   the Unitarian Universalists church in Greenville
22   had hosted an interest meeting for people
23   interested in applying to Miracle Hill in hopes of
24   being referred elsewhere?
25        A.   Yes.
```

1           MS. JANSON:  Object to the form.

2    BY MR. COLEMAN:

3           Q.   We talked a little bit earlier today

4    about Miracle Hill's practices and its policies and

5    manuals relating to religious exercise and

6    activities that -- that children in foster care

7    could, if they wished, participate in.  Do you

8    remember talking about that?

9           A.   Yes.

10          Q.   A good bit of what we talked about

11   earlier today -- when I say we, what you talked

12   about, I was just listening at that point, had to

13   do with Miracle Hill's residential foster care,

14   right?

15          A.   Yes.

16          Q.   Is residential foster care or sometimes

17   called group homes or group foster care, is that

18   right?

19          A.   That's correct.

20          Q.   And is that different from foster care

21   that Miracle Hill does as a CPA?

22          A.   Very different, yes.

23          Q.   Are there different licenses to operate

24   residential care versus a CPA foster care?

25          A.   Yes.

Page 195

1          Q.    Does Miracle Hill internally -- let me
2     clarify because Miracle Hill doesn't offer
3     residential care any longer, right?
4          A.    That's correct.
5          Q.    At the time, let's say from 2017
6     through approximately 2020, did Miracle Hill
7     internally have different sets of documents that
8     relate to residential foster care versus CPA foster
9     care?
10         A.    Yes.
11               MS. JANSON:  Object to form.
12    BY MR. COLEMAN:
13         Q.    To your knowledge, in 2017 and 2018
14    when DSS contacted Miracle Hill with questions
15    about Miracle Hill's practice of working with like
16    faith foster parents, did that issue and the
17    communications with DSS have to do with the CPA
18    foster care side of the ministry?
19         A.    That was my understanding, yes.
20               MS. JANSON:  Object to the form.
21    BY MR. COLEMAN:
22         Q.    And were those issues and
23    communications completely unrelated to Miracle
24    Hill's residential group home license?
25         A.    Yes.

Page 196

1              MS. JANSON:  Object to the form.

2    BY MR. COLEMAN:

3         Q.    To the best of your knowledge, when

4    South Carolina DSS granted Miracle Hill a temporary

5    or provisional six-month license, that had only to

6    do with Miracle Hill's CPA operation, correct?

7         A.    Correct.

8         Q.    And conversely, it did not have

9    anything to do with residential or group?

10        A.    That's correct.

11             MS. JANSON:  Object to form.

12   BY MR. COLEMAN:

13        Q.    When Governor McMaster issued his

14   executive order relating to faith-based CPAs, that

15   had only to do with CPAs, right?

16        A.    Correct.

17             MS. JANSON:  Object to form.

18   BY MR. COLEMAN:

19        Q.    It had no impact or effect or relation

20   to residential foster care?

21             MS. JANSON:  Object to form.

22   BY MR. COLEMAN:

23        Q.    Is that right?

24        A.    That's correct.

25        Q.    And when the United States Health and

Page 197

1    Admin Services, HHS, issued a waiver to South

2    Carolina, that had only to do with CPA operations,

3    right?

4           A.   Correct.

5                MS. JANSON:  Object to form.

6    BY MR. COLEMAN:

7           Q.   And not residential foster care?

8           A.   Correct.

9           Q.   When a foster child is placed into a

10   foster home that worked with Miracle Hill as a CPA,

11   that foster child is never -- well, coerced to

12   engage in religious conduct or activity?

13               MS. JANSON:  Object to form.

14               THE WITNESS:  That's correct.

15   BY MR. COLEMAN:

16          Q.   Correct that they are not?

17          A.   They are not.  To the best of my

18   knowledge they are not.

19          Q.   And that's a good point.  Miracle

20   Hill's policy and instruction is that they should

21   not?

22          A.   That's correct.

23               MS. JANSON:  Object to form.

24   BY MR. COLEMAN:

25          Q.   You obviously can't be present always

Page 198

1    in all the homes.

2         A.    That's right.

3         Q.    But to the best of your knowledge.  Is

4    Miracle Hill's policy and instruction and practice

5    that children in foster care in a foster home that

6    works with Miracle Hill and its CPA, as such

7    children are not in any way penalized for declining

8    to participate in religious activity?

9              MS. JANSON:  Object to form.

10             THE WITNESS:  Correct, they are not

11   penalized for not participating.

12   BY MR. COLEMAN:

13        Q.    And they're not rewarded for

14   participating?

15        A.    That's correct.

16             MS. JANSON:  Object to form.

17   BY MR. COLEMAN:

18        Q.    They're not given any better treatment

19   or worse treatment depending on whether they do or

20   don't participate or respond?

21        A.    That's correct.

22             MS. JANSON:  Object to form.

23   BY MR. COLEMAN:

24        Q.    And if at any time a child in foster

25   care or that child's biological parents or family

Page 199

1   of origin request that the child not be exposed to

2   or engage in religious activity, conduct or

3   instruction, Miracle Hill's instruction to those

4   families is to honor the wishes of the child and

5   the biological family, is that right?

6          A.    That's correct.

7                MS. JANSON:  Object to form.  I'm not

8   trying to talk over you, Miss Busha, but I -- I do

9   need time to get my objections on the record, so

10  maybe you could kind of just pause briefly after

11  Mr. Coleman's question.

12               THE WITNESS:  Okay.

13  BY MR. COLEMAN:

14         Q.    We looked at one or more documents

15  earlier today that involved specific examples of

16  children in foster care in either Miracle Hill's

17  residential home or in a -- in a family, whether

18  they were with Miracle Hill, I don't remember,

19  where the child or the parents had a specific

20  request or instruction regarding the child's

21  religious practice.  Do you remember that?

22         A.    Yes.

23         Q.    In every instance like that, whether

24  you looked at today or any others that you're aware

25  of, did Miracle Hill always honor those requests or

Page 200

1    instructions?

2            A.    To the best of my knowledge, yes.

3            Q.    Did Miracle Hill always make sure

4    through whatever internal accommodation or

5    arrangement was necessary that the child was able

6    to attend the house of worship that they or their

7    biological family requested?

8            A.    Yes.

9            Q.    We also looked at a document earlier

10   today where it referred to Miracle Hill's view that

11   foster parent rights or people in a position of,

12   quote, spiritual influence.  Do you remember

13   looking at that?

14           A.    Yes.  Yes.

15           Q.    And I think you told us you -- you were

16   not aware of that phrase had ever been defined in

17   writing anywhere, is that right?

18           A.    That's correct.

19           Q.    Can spiritual influence mean more than

20   preaching at somebody?

21           A.    Yes.

22           Q.    Can it mean modeling love?

23           A.    Yes.

24                 MS. JANSON:  Object to form.

25                 COURT REPORTER:  I'm sorry, Miles.  You

Page 201

1    said modeling what?

2            MR. COLEMAN:  Love.

3            MS. JANSON:  Object to the form.

4    BY MR. COLEMAN:

5        Q.   Could it mean offering hope?

6        A.   Yes.

7            MS. JANSON:  Object to form.

8    BY MR. COLEMAN:

9        Q.   Could it mean demonstrating humility?

10           MS. JANSON:  Object to form.

11           THE WITNESS:  Yes.

12   BY MR. COLEMAN:

13       Q.   Can spiritual influence mean a lot more

14   than just proselytizing or evangelizing somebody?

15       A.   Yes.

16           MS. JANSON:  Object to form.

17   BY MR. COLEMAN:

18       Q.   So it is possible, right, for a foster

19   parent to be a person of spiritual influence and

20   never once try to convert a child, right?

21           MS. JANSON:  Object to form.

22   BY MR. COLEMAN:

23       Q.   It could likewise be possible --

24           COURT REPORTER:  I'm sorry.  Miles, I'm

25   sorry.  I'm sorry, Miles.  I didn't get her answer

Page 202

```
 1   over Kate's objection to the last question.
 2   BY MR. COLEMAN:
 3         Q.    Do you remember what your answer was?
 4         A.    I don't remember the question.
 5         Q.    I'll ask the question again.  It's
 6   possible, right, that a foster parent can be a
 7   person of spiritual influence without ever once
 8   trying to evangelize to convert a child, right?
 9               MS. JANSON:  Same objection.
10               THE WITNESS:  That's correct.
11   BY MR. COLEMAN:
12         Q.    We looked earlier today at some
13   documents from 2019 that had to do with a contract
14   solicitation that SCDSS sent out to a variety of
15   CPAs and residential group homes, is that right?
16         A.    Yes.
17         Q.    And that was a poorly worded question.
18   Let me back it up.
19               Do you remember looking at contract
20   solicitation documents and communications from
21   around 2019?
22         A.    Yes.
23         Q.    Do you recall whether they had to do
24   with either residential care or CPA or both?
25         A.    Both.
```

Page 203

1          Q.    Okay.  One of those was an emergency

2     contract, right?

3          A.    Yes.

4          Q.    And I think you testified that that was

5     the first contract Miracle Hill had ever had with

6     SCDSS, is that right?

7                MS. JANSON:  Object to form.

8                THE WITNESS:  No.  The first contract

9     with CPA.

10    BY MR. COLEMAN:

11         Q.    Sorry.  I may have asked the question

12    poorly.

13         A.    Okay.

14         Q.    Explain your answer and I'll try again.

15         A.    So Miracle Hill had contracts with DSS

16    for residential care.  We could not have a contract

17    to be a CPA.  We only had a license.

18         Q.    Thank you.  I don't mean to ask you to

19    pretend to be a lawyer.

20         A.    Okay.

21         Q.    Prior to this emergency contract, were

22    there ever a unwritten -- unwritten contract or

23    agreement or practice between SCDSS and Miracle

24    Hill for CPA services?

25                MS. JANSON:  Object to the form.

Page 204

1                 THE WITNESS:  There was a -- an

2    agreement with regard to an administrative fee that

3    DSS would pay Miracle Hill ten dollars per child

4    per day.

5    BY MR. COLEMAN:

6         Q.    Was that for case management --

7         A.    Yes.

8         Q.    -- services?

9         A.    Yes.

10        Q.    And that predated the emergency

11   contract?

12        A.    That's right.

13        Q.    And you're not -- you don't think of

14   that -- the ten dollar per child per day, you don't

15   think of that as a contract because it was never in

16   a formal written document signed and countersigned?

17                MS. JANSON:  Object to form.

18                THE WITNESS:  That's correct.

19                MR. COLEMAN:  Give me just a moment.  I

20   think those are all the questions I have for right

21   now.

22                THE WITNESS:  Thank you.

23                MS. JANSON:  Nothing further from me.

24   Thank you again, Miss Busha, for your time.

25                THE WITNESS:  Thank you.

Page 205

1                    MS. NEWMAN:  And this is Christie

2    Newman on behalf of the federal defendants.  No

3    questions.  Thank you for your time.

4                    THE WITNESS:  You're welcome.

5                    VIDEO TECHNICIAN:  Okay.  We are off

6    the record at 3:55 PM.  This concludes today's

7    testimony given by Freddie Karen Busha.  Total

8    number of media units used was four and will be

9    retained by Veritext.

10                    (WHEREUPON, the proceedings concluded

11   at 3:55 PM.)

12                    (The witness, after having been advised

13   of her right to read and sign this transcript, does

14   not waive that right.)

15

16

17

18

19

20

21

22

23

24

25

Page 206

1              CERTIFICATE OF REPORTER

2        I, Terri L. Brusseau, Notary Public for the

3    State of South Carolina at Large, do hereby certify

4    that the foregoing transcript is a true, accurate,

5    and complete record.

6        I further certify that I am neither related

7    to nor counsel for any party to the cause pending

8    or interested in the events thereof.

9        Witness my hand, I have hereunto affixed my

10   official seal this 24th day of June, 2021 at

11   Charleston, Charleston County, South Carolina.

12

13

14

15

16                  

17

18

                        Terri L. Brusseau

19                      My Commission expires

                        April 5, 2026.

20

21

22

23

24

25

Page 207

1                    I N D E X

2                                  Page        Line

3    FREDDIE KAREN BUSHA            7           14

4    EXAMINATION                    7           16

5    BY MS. JANSON

6    EXAMINATION                    179         17

7    BY MR. MATTHEWS

8    EXAMINATION                    180         24

9    BY MR. COLEMAN

10   CERTIFICATE OF REPORTER        206         1

11                 E X H I B I T S

12                                  Page        Line

13   EXHIBIT 1, Letter dated        11          3

14   6/15/21 from Nekki Shutt, with

15   attached Notice of Taking

16   Deposition of Karen Busha Via

17   Remote Means

18   EXHIBIT 2, Miracle Hill        25          18

19   Ministries Doctrinal

20   Statement,

21   MIRACLE_HILL_SUBP_00375

22   EXHIBIT 3, Miracle Hill        26          18

23   Ministries' Spiritual Identity

24   FAQ's,

25   MIRACLE_HILL_SUBP_012783 to

```
                                        Page 208
 1    012784
 2    EXHIBIT 4, E-mail chain dated      30        8
 3    1/3/19 to Sharon Betts and
 4    Brenda Parks from Karen Busha,
 5    MIRACLE_HILL_SUBP_004623 to
 6    004626
 7    EXHIBIT 5, E-mail chain dated      34        21
 8    3/8/19 to Ken Kruithof from
 9    Karen Busha,
10    MIRACLE_HILL_SUBP_002366 to
11    002367
12    EXHIBIT 6, Document entitled       37        23
13    Miracle Hill Ministries
14    Strengthens Christian Identity
15    by Opening Foster Programs to
16    Catholic Foster Parents,
17    MIRACLE_HILL_SUBP_000244 to
18    000245
19    EXHIBIT 7, E-mail chain dated      51        10
20    9/24/19 to Karen Busha and Ken
21    Kruithof from Reid Lehman,
22    MIRACLE_HILL_SUBP_004467 to
23    004470
24    EXHIBIT 8, E-mail chain dated      57        11
25    12/19/19 to Brenda Parks from
```

```
                                    Page 209
 1    Karen Busha,

 2    MIRACLE_HILL_SUBP_002572 to

 3    002574

 4    EXHIBIT 9, E-mail chain dated    60        9

 5    1/9/20 to Brenda Parks and

 6    Karen Busha from Reid Lehman,

 7    MIRACLE_HILL_SUBP_002576 to

 8    002577

 9    EXHIBIT 10, E-mail dated         65        24

10    4/28/19 to Sharon Betts,

11    Brenda Parks and Yvette Bates

12    from Brandy Welch,

13    MIRACLE_HILL_SUBP_000593 to

14    000594

15    EXHIBIT 11, Statement,           68        17

16    MIRACLE_HILL_SUBP_006977

17    EXHIBIT 12, E-mail chain dated   71        2

18    5/1/19 to Sharon Betts, Reid

19    Lehman, Karen Busha and Brenda

20    Parks from Sandra Furnell,

21    MIRACLE_HILL_SUBP_012572 to

22    12573

23    EXHIBIT 13, E-mail dated         73        8

24    5/1/19 from Sharon Betts,

25    MIRACLE_HILL_SUBP_000592
```

Page 210

1    EXHIBIT 14, E-mail chain dated   86      1

2    11/26/19 to Karen Busha from

3    Karen Busha,

4    MIRACLE_HILL_SUBP_006206 to

5    006211

6    EXHIBIT 15, E-mail dated      100    13

7    11/26/19 to Bradley Holland

8    from Karen Busha,

9    MIRACLE_HILL_SUBP_006220

10    EXHIBIT 16, E-mail chain dated  103    15

11    11/27/19 to Bradley Holland

12    from Karen Busha,

13    MIRACLE_HILL_SUBP_006221 to

14    006222

15    EXHIBIT 17, E-mail chain dated  111    11

16    1/4/18 to Lisa Yerrick from

17    Marques Petty,

18    MIRACLE_HILL_SUBP_001319 to

19    001323

20    EXHIBIT 18, Miracle Hill      117    14

21    Ministries Agreement with

22    Doctrinal Statement

23    EXHIBIT 19, E-mail dated      122    15

24    12/3/20 to Brenda Parks,

25    Sharon Betts, Jacqueline

```
                                          Page 211
 1    Rector and Jane Pulido from
 2    Karen Busha,
 3    MIRACLE_HILL_SUBP_006020 to
 4    006022
 5    EXHIBIT 20, E-mail chain dated    128      9
 6    10/11/19 to Karen Busha from
 7    Dawn Barton, 002384 to 002386
 8    EXHIBIT 21, E-mail chain dated    132      20
 9    10/15/19 to Reid Lehman from
10    Tony Catone,
11    MIRACLE_HILL_SUBP_003515 to
12    003518
13    EXHIBIT 22, Document entitled     136      10
14    PAFCAF Member Comments -
15    October 2019,
16    Section-by-Section Discussion,
17    MIRACLE_HILL_SUBP_002470 to
18    002487
19    EXHIBIT 23, E-mail chain dated    136      14
20    11/20/19 to Karen Busha from
21    Paula M. Fendley,
22    MIRACLE_HILL_SUBP_002462 to
23    002469
24    EXHIBIT 24, Document entitled     144      17
25    Protest Decision,
```

Page 212

1    MIRACLE_HILL_SUBP_008240 to

2    008249

3    EXHIBIT 25, Emergency Contract    147    18

4    Between The South Carolina

5    Department of Social Services

6    and Miracle Hill Ministries,

7    Inc., MIRACLE_HILL_SUBP_005953

8    to 005972

9    EXHIBIT 26, State of South    150    23

10   Carolina Change Order #1,

11   MIRACLE_HILL_SUBP_005882 to

12   005883

13   EXHIBIT 27, E-mail chain dated    156    21

14   3/29/19 to Karen Busha from

15   Stephen Taylor,

16   MIRACLE_HILL_SUBP_005948 to

17   005952

18   EXHIBIT 28, E-mail chain    160    13

19   entitled DSS Timeline,

20   MIRACLE_HILL_SUBPOENA_007303

21   to 007307

22   EXHIBIT 29, Letter dated    174    4

23   6/15/20 to Miracle Hill

24   Ministries, Incorporated c/o

     Richard E. Ingram, Jr. from

25   Nekki Shutt, with attachments

Page 213

```
1                    ERRATA SHEET
                VERITEXT/NEW YORK REPORTING, LLC
2

    CASE NAME: Rogers, Et Al. v. U.S. Dept. Of Health And Human Servs.,
   Et Al.
3    DATE OF DEPOSITION: 6/21/2021
    WITNESSES' NAME: Freddie Karen Busha
4
5     PAGE   LINE (S)        CHANGE              REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
                                    _____
21
                                    Freddie Karen Busha
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS _____ DAY OF _____, 20__.
23
24
      _____              _____
25    (NOTARY PUBLIC)                        MY COMMISSION EXPIRES:
```

**[& - 14]**                                                                     Page 1

**&**

**&**   2:7 3:15 6:19,23
7:19

**0**

**000244**   38:1
208:17
**000245**   38:1
208:18
**000375**   25:16
**000592**   73:9
209:25
**000593**   66:1
209:13
**000594**   66:1
209:14
**001319**   111:13
210:18
**001323**   111:13
210:19
**002366**   34:23
208:10
**002367**   34:23
208:11
**002384**   128:10
211:7
**002386**   128:11
211:7
**002462**   136:16
211:22
**002469**   136:16
211:23
**002470**   136:12
211:17
**002487**   136:12
211:18
**002572**   57:13
209:2
**002574**   57:13
209:3

**002576**   60:11
209:7
**002577**   60:11
209:8
**003515**   132:22
211:11
**003518**   132:22
211:12
**00375**   25:19
207:21
**004467**   51:12
208:22
**004470**   51:12
208:23
**004623**   30:10
208:5
**004626**   30:10
208:6
**005882**   150:24
212:11
**005883**   150:25
212:12
**00593**   65:19
**005948**   156:23
212:16
**005952**   156:23
212:17
**005953**   147:21
212:7
**005972**   147:21
212:8
**006020**   122:18
211:3
**006022**   122:18
211:4
**006206**   86:3 210:4
**006211**   86:3 210:5
**006220**   100:15
210:9
**006221**   103:17
210:13

**006222**   103:17
210:14
**006977**   68:18
209:16
**007303**   160:14
212:20
**007307**   160:14
212:21
**008240**   144:18
212:1
**008249**   144:18
212:2
**012572**   71:5
209:21
**012783**   26:17,19
26:22 207:25
**012784**   26:20
208:1
**01567**   1:6 6:4

**1**

**1**   5:24 11:3,9 12:1
24:14,19 68:11
117:6 150:22,24
153:14 207:10,13
210:1 212:10
**1/3/19**   30:8 208:3
**1/4/18**   111:11
210:16
**1/9/20**   60:9 209:5
**10**   65:20,24 77:12
208:19 209:9
211:13
**10/11/19**   128:10
211:6
**10/15/19**   132:21
211:9
**100**   210:6
**10005**   2:16
**10019**   2:10
**103**   210:10

**10:15**   56:18
**10:30**   56:24
**10:45**   103:24
**11**   68:12,17 144:7
144:11 157:10
207:13 208:24
209:15 210:15
**11/20/19**   136:15
211:20
**11/26/19**   86:2
100:13 210:2,7
**11/27/19**   103:16
210:11
**111**   210:15
**117**   210:20
**11th**   128:8 133:13
**12**   70:25 71:2
209:17
**12/19/19**   57:11
208:25
**12/3/20**   122:15
210:24
**120**   2:16
**1201**   3:21
**122**   210:23
**12572**   71:1
**12573**   71:5 209:22
**128**   211:5
**13**   73:5,7,8 78:8
129:12 190:22
209:23 210:6
212:18
**1319**   111:8
**132**   211:8
**1320**   3:16 111:25
**136**   211:13,19
**14**   57:7 85:22 86:1
91:23 92:25 97:11
101:4 207:3 210:1
210:20 211:19

**[144 - 2nd]**

**144** 211:24
**147** 212:3
**15** 30:4 100:9,13
 101:2 160:2 179:1
 179:2 210:6,10,23
**150** 212:9
**156** 212:13
**15th** 12:3 132:19
 173:9
**16** 34:16 103:9,15
 207:4 210:10
**160** 212:18
**17** 111:6,11 207:6
 209:15 210:15
 211:24
**174** 212:22
**179** 207:6
**17th** 3:16
**18** 116:5 117:12,14
 118:10 207:18,22
 210:20 212:3
**180** 207:8
**19** 5:5 57:10
 122:10,15 156:17
 210:23
**19.1.** 147:14
**1964** 155:10
**1977** 16:9
**1979** 16:7
**1981** 155:17
 157:12 158:14
**1987** 16:2
**1998** 15:21
**19th** 2:16
**1:15** 114:25,25
 115:2
**1:17** 115:7
**1:26-27** 117:5
**1st** 71:11 73:2,13
 73:17,19 129:2
 148:20,23 149:8

153:12

**2**

**2** 15:21 25:17,18
 49:11 50:4 70:5
 155:10 207:18
 209:17
**20** 65:17 128:6,9
 137:18 139:24
 140:10 211:5,8
 213:22
**200** 63:12 64:3,5
 64:10 179:25
 180:3
**2017** 195:5,13
**2018** 17:6 18:15
 111:10 112:19
 143:9 144:16
 195:13
**2019** 30:7 34:20
 37:9 38:11,14,23
 39:8 42:23 51:9
 52:7 57:10 65:12
 65:23 68:3 71:11
 73:2,13,17,19
 85:25 86:13 93:2
 100:12,22 101:2
 102:12 103:12
 128:8 129:2
 132:19 134:22
 136:11 137:6,18
 138:3 143:12,14
 148:14,15,20,23
 148:24 149:8
 150:17 153:12,13
 156:20 161:3
 162:16 163:12
 167:22 169:12
 170:19 187:7,8
 188:3 202:13,21
 211:15

**2020** 18:5 42:18,21
 60:8 122:3,14
 123:1,17 125:6
 151:10,23 173:9
 195:6
**2021** 1:22 5:23
 12:3 16:16 117:20
 147:3 206:10
**2026** 206:19
**206** 207:10
**20th** 134:22
 144:16
**21** 1:22 18:17 73:5
 132:17,20 208:7
 211:8 212:13
**212** 2:11,17
**21906** 206:17
**21st** 5:23 137:6
**22** 70:24 134:19
 135:9,13,14,15
 136:10 138:1
 140:8 166:4,5,17
 211:13
**22nd** 3:21
**23** 26:14 136:6,14
 136:19 141:11
 208:12 211:19
 212:9
**2366** 34:18 35:4
 38:21 40:17
**2367** 41:3,15
**2384** 128:5 139:24
**239,075** 152:14
**23rd** 116:22
 117:20
**24** 144:8,14,17
 207:8 209:9
 211:24
**244** 37:18 47:6
**2462** 134:21
 136:22 141:11

**2470** 138:2,6
**2474** 138:23 139:8
**2475** 138:24
 139:15 140:19
**24th** 51:9 206:10
**25** 25:14 147:14,18
 152:2 154:15
 158:8 207:18
 212:3
**2572** 57:8
**2573** 57:20
**2576** 60:5
**26** 86:13 93:2
 100:12,22 101:2
 150:20,23 152:17
 155:25 207:22
 212:9
**26th** 85:25
**27** 37:16 156:17,21
 158:18 159:23
 212:13
**27th** 103:12 161:3
 161:14
**28** 160:11,13
 164:23 167:10
 173:21 212:18
**28.1.** 150:20
**282-2100** 3:9
**28th** 65:23 148:15
 163:12 167:22
**29** 173:22 174:2,4
 212:22
**29201** 3:17
**29201-3232** 3:22
**29601** 2:2 3:9
**29678** 8:2
**29th** 65:22 148:14
 156:19 169:11
**2:59** 179:8
**2nd** 2:1

**3**

**3**   26:14,18 129:12
  138:25 139:8,15
  145:4 207:13,22
**3/29/19**   156:21
  212:14
**3/8/19**   34:21 208:8
**30**   5:16 28:2 51:5
  166:2 208:2
**30th**   150:16
  151:10,23 153:13
  170:4
**31**   160:9
**31st**   161:3 171:20
**33**   132:16
**34**   208:7
**3515**   132:18
**37**   208:12
**375**   50:5 70:6
**3:15**   179:7
**3:22**   179:11
**3:55**   205:6,11
**3rd**   30:7 122:14

**4**

**4**   30:3,8 40:7,13
  208:2 212:22
**4/28/19**   65:24
  209:10
**40**   136:3,6 166:2
**40.1**   134:19 135:16
  136:2
**41**   85:21
**42**   100:9
**43**   103:9
**44**   43:25 53:1 60:3
**4467**   51:6
**4468**   53:2
**4469**   51:19
**45**   155:11

**46**   122:9
**4623**   30:5 40:14
**4625**   31:24
**47**   10:20
**474-1989**   2:11
**48**   173:5
**49**   128:4
**4th**   111:10

**5**

**5**   34:17,21 38:20
  39:15 40:6,16
  206:19 208:7
**5/1/19**   71:2 73:8
  209:18,24
**51**   116:8 208:19
**55**   3:8
**563**   155:2
**57**   57:19 152:6
  208:24
**5857**   150:21
**592**   73:6 78:10
**593**   77:12
**5948**   156:18
**5950**   157:4
**5953**   147:15
**5957**   152:3
**5963**   158:9
**5968**   148:11
**5969**   148:12
**5th**   38:10

**6**

**6**   28:2 37:18,23
  47:2 155:10,16
  157:10,21 158:1
  158:12 208:12
**6/15/20**   174:4
  212:23
**6/15/21**   11:3
  207:14

**6/21/2021**   213:3
**60**   209:4
**6020**   122:12
**6206**   85:23 97:11
**6207**   93:1,5
**6220**   100:11
**6221**   103:10
**65**   209:9
**68**   209:15
**6977**   68:13
**6:19**   1:6 6:4

**7**

**7**   51:7,10 111:7
  207:3,4 208:19
**700**   3:8
**700,000**   153:5
**704**   8:1
**71**   209:17
**73**   209:23
**7303**   160:10
**7305**   171:9
**7307**   171:20
**75**   44:13
**779-3080**   3:22
**799-2000**   3:17

**8**

**8**   57:9,11 105:18
  105:19 208:2,24
  209:23
**80**   155:12
**803**   3:17,22
**809-8585**   2:17
**8240**   144:15
**8242**   146:13
**825**   2:10
**857**   152:5
**86**   210:1
**864**   3:9
**8th**   34:20 38:23

**9**

**9**   60:6,9 105:18,19
  155:4 157:9,21
  158:1,9 209:4,4
  211:5
**9/24/19**   51:10
  208:20
**956,300**   152:25
**99**   44:20
**9:00**   13:9
**9:02**   1:23 5:23
**9th**   60:8

**a**

**abbreviation**
  18:25
**ability**   10:11,15
  82:14 93:12
  131:10
**able**   14:5 116:24
  174:10 200:5
**absent**   90:22
**abuse**   20:11
**accept**   97:13
**accepted**   77:5,16
**access**   24:3 134:11
  134:16
**accessed**   117:19
**accommodate**   9:5
  87:10 94:22 97:8
  107:2 108:18
  183:6
**accommodated**
  85:16 107:4,17
  108:10 109:2
**accommodating**
  97:21 98:3
**accommodation**
  102:6 200:4
**accommodations**
  101:20

**accompany** 60:25
62:7,10
**account** 32:18
**accountable** 32:7
**accredit** 126:15
**accreditation**
16:23 17:25 18:2
18:4 124:24 126:9
126:13,16
**accredited** 18:1
**accurate** 10:8
53:11 190:7 206:4
**acronym** 126:17
**act** 154:25 155:10
155:17 157:12
158:14
**action** 6:10
**actions** 189:16
190:10
**active** 32:3 67:15
191:11
**actively** 99:12,23
193:14
**activities** 92:21
155:19 157:14
194:6
**activity** 189:11
197:12 198:8
199:2
**adamant** 107:1
**added** 137:9,10,14
157:21 158:3,19
159:9
**adding** 145:11
**addition** 87:11
89:4 159:4 191:10
**additional** 52:1
66:25 163:16
167:12
**address** 7:25
169:23

**addressed** 69:7
**adhere** 28:21
145:9 185:24
186:7
**adheres** 26:5
**adjusting** 59:3,9
**admin** 197:1
**administer** 6:9
**administration**
1:11,12,14 3:2,3,4
**administrative**
124:4 169:18
204:2
**admissible** 5:14
**admission** 45:16
**admitted** 45:16
192:6
**adult** 163:7
**advance** 14:12,17
14:23 39:2 116:9
**advertise** 22:12
**advertisement**
22:14
**advice** 159:4
**advise** 171:23
**advised** 60:24
120:4 205:12
**affect** 141:4
163:17 167:13
**affiliations** 6:14
**affirm** 185:24
**affirming** 191:9
**affixed** 206:9
**afternoon** 182:22
**age** 129:16 139:11
**agencies** 18:20,20
129:23 131:7
**agency** 19:2 20:17
20:20 118:13
129:13,18,25
130:9,19 139:1,9

139:18 140:21
163:15 167:11
168:18 171:15
**agencys** 145:8
**ages** 105:19
**aggregate** 180:5,8
**ago** 15:6,7 178:2
**agree** 26:9 49:8
50:25 65:5 96:13
131:11 186:7,19
**agreed** 64:24 77:2
77:18
**agreeing** 191:9
**agreement** 74:6
75:5,21 117:15,25
118:11 203:23
204:2 210:21
**agrees** 155:6
**ahead** 114:19
138:22
**aimee** 47:10,15,23
48:10,14
**al** 213:2,2
**alcohol** 18:17,18
**alex** 1:9
**align** 25:9 74:11
74:21 75:8 76:2
**aligns** 74:25
**alj** 137:20 141:12
141:14
**allegedly** 145:14
**amend** 151:8
**amended** 156:1
**america** 20:14
**analysis** 145:1
**anderson** 16:8
**andy** 4:2
**announced** 47:3
**announcing** 39:3
49:1

**answer** 8:11,14,16
8:20,21 9:7 26:2
27:15,21 28:4
34:13 48:1,4
67:12 69:25 70:21
80:18 81:4 92:5
159:6,10,13
181:11 182:8
189:25 201:25
202:3 203:14
**answering** 63:22
**answers** 53:4,7,8
53:10,16
**anxious** 170:7
171:3
**anybody** 9:15,20
**anyway** 166:22
**apart** 13:14,18
19:4 83:25 150:11
**apologies** 139:7
**apologize** 93:8
94:8
**app** 37:6
**appear** 66:7 73:23
76:6 135:12
138:10
**appearance** 6:16
**appearances** 2:4
6:14
**appearing** 1:21,25
2:8,9,14,15 3:8,16
4:2,4
**appears** 27:3
68:15 81:7 88:8
90:1 101:7 112:6
158:22 160:24
161:9
**appli** 23:2
**applicable** 150:4
155:7

**applicant** 33:22,24
36:4 40:7,10
52:24 53:3 54:9
54:14 55:20,23
56:3,5,12 61:1,22
61:23 62:8,11
64:24 72:4,5
109:10 187:10
191:8,10
**applicants** 36:6,12
40:23 52:4,8,14,19
52:23,23 53:18
54:17 55:14 60:23
61:15,16,18 62:2,3
65:5 108:3
**application** 22:18
22:24 23:2 34:8
36:9,15,23 37:4
39:24 40:1,8 54:7
54:22 55:21 56:3
56:7 67:8 72:13
76:4,11,16 77:3,5
78:18 79:9 80:9
81:15 82:3 125:12
129:15 130:10
139:10
**applications** 53:20
187:8 193:1,4
**applied** 130:17
164:6
**applies** 129:24
**apply** 23:4 66:19
193:15
**applying** 37:11
39:9 193:23
**appreciate** 23:24
180:23
**appreciated** 71:23
**appreciation**
23:24

**appropriate** 20:8
20:9 96:13,19,25
97:6
**approval** 35:25
**approximate**
15:22
**approximately**
13:6 43:22 44:18
63:9,25 64:1,14
69:1 126:4 162:15
187:8 195:6
**april** 65:22,22
68:3 116:22
117:20 206:19
**area** 22:6 81:6
100:3
**arizona** 16:24
126:18
**arrange** 171:13
**arrangement**
200:5
**article** 153:14
155:4 157:9,21
158:1,9
**aside** 100:9 141:22
159:18 160:1
173:2
**asked** 27:4 52:8
54:15 63:25 66:18
105:13,22 106:12
172:1 176:4,11,12
176:14,16 177:7
177:16 178:15,17
185:18,20,22
188:18,23 193:1,4
203:11
**asking** 8:14,22,25
63:22 71:24 92:3
142:20 167:24,25
**asks** 47:21 67:8

**asserting** 80:20
**assigned** 21:15
23:17,18 24:6,9,10
24:12,18,19
183:21
**assistance** 155:20
157:16
**assistant** 1:12,14
3:3,4,7 169:16,18
**assisted** 23:19
124:14
**associate** 16:7
**association** 5:3
127:4
**assume** 8:24 145:1
**assuming** 73:17
80:2 132:2
**attached** 11:4
157:6 207:15
**attachment** 123:4
123:15
**attachments**
122:24 174:6
212:25
**attempt** 34:1
**attend** 31:19 74:4
83:5,17,20 84:2
85:17 89:3,5,7
90:6,8 91:13,16,18
94:5 99:25 102:24
103:5 106:2
113:13 167:18
200:6
**attended** 35:18
76:17,25 83:24
106:13
**attending** 6:13
82:16 96:5 100:6
104:18 105:13,23
106:7,7,9,16,18

**attention** 36:9,16
36:18,23
**attorney** 3:7 6:17
8:18 47:21,24
48:3 79:22 80:12
87:9 133:18 146:5
159:3,11
**attorney's** 3:6
**attorneys** 2:5 3:1
3:11,19 159:19
**audibly** 8:11
**audio** 11:15
**august** 17:6
112:19
**author** 118:18
**authorities** 20:12
**authority** 181:22
182:11
**authorized** 6:9
**available** 95:8,24
151:16 167:25
171:16,22
**avenue** 2:10
**average** 180:10
**avoid** 180:22
**awaiting** 132:2
133:9
**aware** 20:11 22:14
55:16 59:23 60:1
63:3 65:8,11
69:12,15 103:6
113:3 115:15,18
115:19,22,25
116:3 118:4
178:10 193:4,13
193:20 199:24
200:16
**awhile** 114:7
126:7
**azar** 1:9

| **b** |
| --- |

**b** 28:2 152:4
207:11
**bachelor's** 16:4,5
**back** 21:4 38:19
40:16,19 54:19
56:24 57:4 62:14
70:3 77:11,13
78:8 79:7 81:11
92:24 115:8
121:18 126:11
136:8 148:11
151:25 152:17
158:4,7,8 159:22
164:16 167:3
169:4 170:5
171:21 178:21,25
179:7,12 183:11
202:18
**background** 15:12
25:8 31:12 59:13
**backgrounds**
67:22
**ballentine** 86:14
86:22,23
**ballpark** 44:13
63:9
**baptist** 54:4 67:18
**baptized** 35:16
36:7 105:14,23
106:13,21,23
**barbara** 148:13
**barton** 128:7,10
128:17 129:2
131:18,25 132:4,7
133:14 134:8
140:1,10,23
171:11 211:7
**barton's** 133:7
**based** 18:8 21:17
22:3 28:9 29:5

45:3 70:2 87:11
88:8 89:6 99:15
130:15 137:8
139:16 140:20
153:25 163:17
167:13 170:8
190:8,10,15,24
196:14
**basis** 92:11 129:16
130:11 139:3,11
155:18 157:13
159:3,12
**bates** 10:23 25:15
26:16 30:4 31:23
31:24 34:18 37:17
38:21 40:13,17
47:5 50:5 51:6,19
53:1 57:7 60:4
65:18,25 68:12
70:6,25 73:5
77:12 78:10 85:22
93:1 103:10 111:7
122:9,11 128:5,5
136:22 138:2,5
144:14 173:6
209:11
**bearing** 32:10
37:17 40:18
**beattie** 3:8
**beautiful** 33:16,19
**becoming** 63:1
65:14 69:10
**beds** 44:1,3
**began** 126:8 187:8
**beginning** 6:16
136:22 138:2
181:8
**begins** 85:24 117:5
**behalf** 120:1 141:8
205:2

**behavioral** 17:1
**behaviors** 46:24
46:25 189:16
190:10
**belief** 31:17 49:16
50:10 65:6 191:5
191:21
**beliefs** 50:7,10
70:13 74:17 98:4
98:25 119:13,25
185:20 186:22
187:1 189:8
190:15 191:4,21
191:22,23 192:7,8
192:14
**believe** 15:21
21:18 25:17 31:18
34:3 36:21 39:11
42:23 50:18 54:10
60:23 78:3 81:17
96:9 105:2 110:2
111:7 118:13
121:1 124:6
126:21 128:6
153:7 162:16
163:24 168:18
169:15 170:18
172:6 173:12
176:10 185:13
189:8
**believed** 94:1
**believers** 50:19
51:1
**believes** 118:24
120:7 189:10
**benefitting** 155:19
157:15
**best** 44:15 95:8,24
99:17 109:8
187:15,17 196:3
197:17 198:3

200:2
**beth** 110:19 111:9
112:1 123:21,25
123:25 175:14
**better** 18:3,18
44:4 125:8 192:4
198:18
**bettis** 176:10
**betts** 12:22 30:6,9
30:18,25 31:25
32:14,17,23 33:14
33:19 35:5,15
41:2,17 51:20
53:4,6 58:2,16,22
59:1 65:25 68:15
68:16,25 69:6
71:3,10,20,24 72:5
72:13,15,18,22
73:9,12,18 74:3,16
74:20 75:6,24
78:21 122:13,16
124:19 162:25
176:10 178:14
188:9 190:21
208:3 209:10,18
209:24 210:25
**beyond** 22:12
56:15 151:23
**bidder** 145:12
**bidders** 145:9
**big** 69:2 123:21
**biological** 198:25
199:5 200:7
**bisexual** 69:21
70:11,18
**bit** 11:15 59:6
81:11 82:6 99:19
103:13 160:6
181:10 182:21
194:3,10

**blank** 31:5 105:13
**blankets** 24:2
**board** 32:2
**body** 50:20 126:20
126:22
**bold** 101:14
**bos** 4:2
**boss** 33:6
**bottom** 27:9 31:7
35:3 41:16 53:6
57:20 66:17 67:7
78:11 97:13
111:25 117:7
129:1 137:5 139:7
171:8
**box** 151:6 191:8
**boyd** 2:1 3:20 7:9
**boys** 17:18 42:9,20
43:13 44:18 83:10
83:15 105:11,22
**bradley** 86:13,15
100:14 103:12,16
210:7,11
**brandy** 1:4 2:6
7:21 65:10,22
66:1,8,20 67:12
188:12 190:21
209:12
**break** 9:4,8,23
56:20,24 109:17
114:9,20 160:5
178:19 179:5
**breaking** 93:13,17
93:23
**breaks** 9:9,18
**brenda** 12:21
21:22 30:7,9,23
36:2 48:11 54:4
57:10,12 58:14
60:10 65:25 71:4
71:10 122:13,16

124:19 162:23
171:13 176:9
178:14 192:20
193:8 208:4,25
209:5,11,19
210:24
**brief** 67:8
**briefly** 168:15
199:10
**broader** 186:21
187:9
**brought** 36:8,15
36:18,22 79:5
83:15 121:9
**brusseau** 1:24 5:9
6:8 94:8 206:2,18
**budget** 129:21
131:2,4,8,14
155:16 157:12
158:13
**busha** 1:21 3:19
5:25 7:11,14,18,24
11:5,10 12:2,5
25:22 30:6,9,14
34:19,22 38:5
51:8,11,16 57:10
57:12 60:7,10
63:24 66:5 69:8
71:3,10 81:12
82:7 85:24 86:2,2
100:11,14 103:11
103:16 114:10
115:10 122:13,17
123:20 128:8,10
134:22 136:15,23
156:19,22 159:5
174:10 179:13,23
199:8 204:24
205:7 207:3,16
208:4,9,20 209:1,6
209:19 210:2,3,8

210:12 211:2,6,20
212:14 213:3,21
**business** 98:10

**c**

**c** 126:17 157:17
174:5 212:24
**calculated** 153:22
**calendar** 126:12
**call** 58:10,12
**called** 25:14 42:3,8
126:25 148:4
161:6 189:7
194:17
**cancellation**
146:16
**candelaria** 2:8
6:22,22 136:2,9
174:1
**capacity** 1:9,12,14
1:16,17 3:12,13
7:4,6
**capitals** 72:24
87:12
**care** 12:21,22
17:21 20:5,6,6,24
21:7,16,20,25
23:10 24:4,22
30:19,23 37:22
38:16 41:5,19
45:15 46:10,14,14
48:12 54:18 61:4
61:17 62:17 64:21
65:20 66:8 68:2
72:5 87:22 89:13
91:12 92:8 95:16
96:3 97:2,14 98:2
98:22 101:14,16
108:5 110:12
114:4 117:18
118:6,9,12 120:16
120:19 122:3

124:18 126:6
128:1 129:4,6,9
130:4 140:4,16
141:24 142:4,22
143:6,8,13,19
146:24 147:4
149:3,21,25 150:5
151:13 163:6,14
163:22 167:19
171:14 182:24
183:21 194:6,13
194:16,17,20,24
194:24 195:3,8,9
195:18 196:20
197:7 198:5,25
199:16 202:24
203:16
**cared** 121:14
**carf** 18:3 126:17
**caring** 121:21
**carol** 169:14,14
**carolina** 1:1,16,18
3:6,12,13 6:3 7:5
7:7 8:2 17:17,18
17:21 18:18,22,24
19:5 20:21 21:7
35:17 44:22
130:20 147:16,19
150:23 151:11
161:17 170:18
186:14 196:4
197:2 206:3,11
212:4,10
**carreras** 4:3 5:2
6:6
**carry** 113:21
**case** 1:6 5:17 6:4
7:21 23:16,17
24:6 183:20,24
184:2,5,10,16,18
185:6 204:6 213:2

**catholic** 29:23
34:9 35:17 36:7
36:10 37:21,25
38:16 48:22 49:8
52:13,22 53:8,16
53:20 54:4,16
57:23 58:18,24
59:15 60:20 61:24
62:25 63:3,5 87:8
87:13,23 95:19
101:19 102:2,4
103:14,25 104:5,9
104:12 107:25
108:2,8 109:1,10
125:18 185:24
186:4,13,16,19
187:11,19 208:16

**catholics** 32:4,20
39:4 47:4 49:2
50:25 59:11,22
62:22 187:9

**catone** 132:19,21
133:18,18,23
134:2,5,12 211:10

**cause** 206:7

**cc'd** 32:25 55:4

**cc'g** 161:16 171:10

**cc's** 54:20

**ccook** 2:17

**ceo** 12:20,21 54:11
137:3

**certain** 22:5,7
105:6 121:1
138:18 176:12

**certificate** 206:1
207:10

**certified** 5:3

**certify** 206:3,6

**cfr** 155:11

**chain** 30:6,8,25
31:8,21 32:12

33:13 34:21 35:22
39:14 40:5,23
51:10,16,19 53:6
53:24 57:9,11
60:6,9,15 71:2,8
71:19 72:22 86:1
86:8,9,12 87:6
92:25 101:4
103:15 111:11
112:7,15 128:9
131:17,24 132:20
132:25 133:17,25
136:14 156:21
157:1 160:13
208:2,7,19,24
209:4,17 210:1,10
210:15 211:5,8,19
212:13,18

**challenging** 46:23

**chance** 86:6
128:13

**change** 39:3 47:3
59:3,9,9,21 62:21
98:4 150:22,24
151:7,9 152:17,18
152:21,22,24
153:5,6,21 154:7
155:24 156:1
184:10 188:3,4
212:10 213:5

**changed** 37:14
38:15,18 107:24
187:6

**changes** 68:7,10
97:25 99:11
125:12

**changing** 97:16

**charge** 124:12

**charleston** 206:11
206:11

**chart** 138:1,15,20
165:22 166:16

**check** 66:19
140:11 180:16
191:8

**checked** 66:20

**checklist** 123:24

**chief** 146:13,13,14
146:14 161:23

**child** 19:1,25
20:13,16,20 24:10
45:15,15 46:13
66:20 84:11,24,25
85:13,14,15,16
88:20 89:2 96:3,5
96:23,23 97:2,9,22
99:11,17 100:5
102:6,22 103:3
108:16,17,18
112:3,7 113:19,21
113:22 123:24
139:4 145:7
168:17,20 181:22
182:15,18,19,23
183:15,22 184:6
184:19 185:7
197:9,11 198:24
199:1,4,19 200:5
201:20 202:8
204:3,14

**child's** 84:10 96:4
96:15 103:4
104:17 113:8,9,16
198:25 199:20

**childhood** 67:16

**children** 1:11,12
1:15 3:2,3,4 17:16
20:5,12,25 21:9
23:22 24:4 41:6
41:19 43:5,7,9,10
43:23 44:8,16,24

45:6,11,18 46:2,12
66:22 67:1 82:9
82:14 83:1,4,14
84:4,21 85:3,11
87:8,10,21,22,22
88:10,14,17,18
89:4 90:6,8,17,18
90:21 91:5,11
92:22 94:4,15
95:8,17,18,23
97:13,18 98:1,21
99:22 100:6
101:16,19 102:1,2
102:3,14 104:5,9
104:11,12,24,25
105:22 106:12,16
106:17,20,23
107:7 109:18,21
109:22,25 110:11
110:16,22 111:2
113:2,12 114:3
115:16,20 116:1
118:6,14 119:1,9
119:12,22,24
120:4,8,15,18,22
120:23 121:2,10
121:13,20,21
127:5 149:20,24
151:13 153:25
163:8 168:1,9
171:14 181:14
184:17 194:6
198:5,7 199:16

**children's** 17:9,14
17:16 18:1,12
19:9,9,20 29:17
42:4,17 43:1,23
44:9,16 45:19
83:9,14 86:17,20
86:24 90:12 95:3
99:11 102:13,21

103:2 105:4,19
107:7 115:15
118:23 142:3
168:6
**choice** 43:12 94:15
**chose** 83:20
**christ** 27:18,19,25
28:12 47:13 48:20
50:20 51:1 67:10
105:12 106:9
**christian** 15:15
16:6 37:20,24
67:14 74:11,12,22
75:1,9 76:3 85:14
118:12 119:24
131:11 187:1,21
191:11,21,22
192:8,14 208:14
**christians** 29:8,20
37:12 39:10,12
49:14 187:10
191:5
**christie** 3:7 7:1
205:1
**christie.newman**
3:10
**church** 31:3,3,4,19
32:4 35:7,19
48:23 50:21 51:2
67:15,17,18,21
74:5,10,12 75:8
76:17,18 77:1
79:15 83:21 85:14
87:12,23,24 88:11
88:15 89:1,3,5
90:6,8,17,18,22
91:6,11,13,16,18
91:25 92:13 104:2
104:14,18 105:13
106:7,9,14,17,18
107:8 113:22

114:4 115:16
116:1 190:25
191:11,14 193:6
193:21
**churches** 22:7
32:7,19 83:23
102:4
**circumstance** 97:7
**cites** 76:4
**civil** 5:16 154:25
155:10
**clarification** 8:22
8:24 9:1 129:12
129:23 130:22
131:1 134:6
**clarify** 96:22
195:2
**clarity** 189:4
**cleanup** 179:20
**clear** 87:14 98:20
148:9 165:7,21
166:6
**clearer** 190:1
**clemson** 16:1
**client** 47:21 80:12
80:21 159:3,11
**close** 178:22 179:3
181:14
**closed** 43:18,20
**closer** 47:7 160:3
**closish** 160:3
**clothes** 23:23 24:2
**coerced** 197:11
**coleman** 3:15 5:18
7:3,3 14:22,25
15:8 29:9 34:12
50:12 52:15 69:22
70:20 75:14 76:19
77:6 79:22 81:2,8
82:11 90:13,24
92:6 95:20 105:25

108:12 119:14
134:13 135:6,11
135:15,21 144:2
166:4 179:2
180:15,21,25
182:7 183:18
184:14,22 185:1
185:11 186:25
187:5,24 188:7
189:21 190:6,13
190:19 191:18
192:3,12,19 193:7
193:19 194:2
195:12,21 196:2
196:12,18,22
197:6,15,24
198:12,17,23
199:13 201:2,4,8
201:12,17,22
202:2,11 203:10
204:5,19 207:9
**coleman's** 199:11
**collect** 175:8 178:7
178:12
**collection** 161:2
**college** 16:7,8
**colloquialism**
181:20
**color** 139:3
**columbia** 3:22
163:14
**column** 138:15,17
139:8,14 140:19
**come** 23:25 36:1
40:1 56:6,24
154:7 178:21,25
179:7 180:3
**comes** 49:21,21
85:3 98:23 136:1
**comfortable** 58:7
58:17,23 67:20

82:15 107:3,17,20
107:22 108:8,15
109:1,12
**coming** 101:16
180:19 193:5
**comment** 137:9
140:23
**comments** 136:11
137:7,8,15 138:3
138:11,17 143:14
211:14
**commission** 16:22
18:2 126:16
206:19 213:25
**commitment**
49:15
**committed** 189:13
189:15
**communicate** 9:15
46:10
**communication**
33:22,23 55:1,8
79:21 80:3,25
81:20
**communications**
55:13 80:17 159:9
159:11 161:2
195:17,23 202:20
**communities** 22:5
**community** 18:23
21:17 22:3
**compare** 158:16
158:17
**comparing** 125:9
**compiled** 161:7
**complete** 19:10
206:5
**completed** 168:19
**completely** 195:23
**completing** 123:22

**compliance** 23:19
154:15,20,24
**compliment** 33:21
33:25
**comply** 155:7
**computer** 11:15
14:14 124:13
**con** 97:19
**concern** 141:3,7
**concerns** 121:9
137:11
**concierge** 4:2
**concluded** 205:10
**concludes** 205:6
**condition** 10:14
**conditions** 155:5
157:10 158:10
**conduct** 189:13
197:12 199:2
**conducted** 74:16
**conference** 9:14
**conferencing** 9:16
**confirmation**
172:7
**confirmed** 35:16
163:15 167:11
**confirming** 106:11
**confused** 112:4
**confusing** 40:20
**confusion** 166:23
166:23
**connection** 9:22
**consent** 84:15,16
88:19
**consents** 84:10
**consider** 39:16
137:20 141:12,17
**consideration** 61:5
62:18
**considered** 39:22
74:12

**considers** 90:5
**consistent** 97:19
151:18 186:15
**contact** 45:14
79:20,21 81:17
87:15 99:15
168:17 193:9
**contacted** 80:1
81:13 82:2,4
195:14
**contacting** 21:19
80:6 81:16
**contain** 138:17
**contemplated**
162:12 170:1
**context** 47:18
48:10 103:14
142:15 189:14
**continued** 185:5
**continues** 138:23
**contract** 87:17
89:2,6,8,10,12,18
91:21,22 92:1,14
92:15,18,21,23
130:1,24 142:1,4,6
142:8,10,12,16,21
143:6,20,25 147:9
147:16,18,25
148:4,18,19,22
149:2,6,17,18
150:4,10,14 151:8
151:11,18,22,22
152:1,7 153:4,11
153:14,21 154:6
154:14,20 155:2
156:5,13 157:6,22
158:2,4,5,8,17
159:1 165:18
202:13,19 203:2,5
203:8,16,21,22
204:11,15 212:3

**contracting** 143:2
149:15
**contractor** 155:4,6
**contracts** 143:4
203:15
**contractual**
143:23
**convenience** 162:3
**conversation**
46:13 48:11 68:16
78:25 139:25
140:1
**conversations**
79:2 80:14 81:3,7
108:4
**conversely** 196:8
**convert** 201:20
202:8
**conveyed** 87:9
169:1,1,4
**coo** 19:22 33:8
124:5
**cook** 2:14 6:20,20
**cooperating**
174:17
**copied** 160:25
161:14 169:19
170:22
**copy** 73:21,21
116:16,21 123:10
173:11 175:2
177:8
**core** 67:23
**correct** 16:12
20:17,18 29:4,5
30:1 33:9 52:24
54:12 63:8 64:19
65:16 68:9 69:15
80:24 98:3 112:20
128:18 130:6,13
133:15 141:25

142:24,24 143:21
147:6 148:16
152:14 159:20
165:19 168:23
169:2 172:14
175:19 181:24
183:2,16 184:20
184:24 185:9
186:12 187:22,25
188:1,5 191:6,16
192:10,17,23
193:11 194:19
195:4 196:6,7,10
196:16,24 197:4,8
197:14,16,22
198:10,15,21
199:6 200:18
202:10 204:18
**correctly** 33:1
88:10,12,24 89:23
112:9
**cottage** 88:15
90:18
**counsel** 2:3,4 5:25
6:12 79:3,4 80:14
80:18,20 81:4
131:20 133:19
159:9 176:22
177:13,25 193:10
206:7
**counseling** 15:16
16:1
**counselors** 5:2
**countersigned**
204:16
**counties** 24:18
**county** 18:23
24:17 206:11
**couple** 8:8 9:13
39:9 40:4 66:12
66:13 67:20 69:13

69:17,17 77:23
78:13,24 79:14,15
99:9 105:8,9
109:14 144:6,6
147:12 171:18
188:16,21
**couples** 69:9 70:19
125:23
**course** 13:23 19:8
19:23 20:10 22:22
41:14 43:11 46:12
55:22 96:13,19
97:1,6 170:13
**court** 1:1 6:3,7
7:12 8:12 94:12
144:9,12 173:20
173:23 174:3
180:16,19,23
200:25 201:24
**courtroom** 5:14
**covenant** 78:2,5
**covenants** 155:4
157:9 158:9
**cover** 149:23
174:12
**covered** 64:18
124:24
**covering** 153:6,8
**covid** 5:5
**cpa** 18:25 19:5
95:16 97:3 141:23
149:9 154:2 157:6
181:9,14 182:10
182:12,19 183:3,5
183:7,10 184:16
185:4 194:21,24
195:8,17 196:6
197:2,10 198:6
202:24 203:9,17
203:24

**cpa's** 141:4
**cpas** 21:7 127:8,12
127:12 129:25
130:18,24 139:16
140:20 142:21
143:2,18 149:20
151:12 163:18
167:14 181:9,21
182:3,3,4,25
196:14,15 202:15
**cravath** 2:7 6:18
6:23 7:19
**cravath.com** 2:11
2:12
**criminal** 25:8
**criteria** 25:1,5,6
27:11 191:15
**current** 7:25 31:2
149:19 161:17
**currey** 2:14 6:20
**cv** 1:6 6:4

**d**

**d** 2:7 207:1
**daily** 100:6 116:2
**darren** 4:3 5:2 6:6
**dash** 105:17,18,18
**databases** 14:13
**date** 1:22 37:13
38:17 146:18
149:11 150:14
151:9,10,22 172:7
213:3
**dated** 11:3,10 12:3
30:7,8 34:20,21
38:10,23 51:9,10
57:10,11 60:7,9
65:24 71:2,11
73:8,13 86:1
100:12,13 101:2
103:12,15 111:10
111:11 122:14,15

128:8,9 132:19,20
136:14 144:16
156:19,21 163:12
173:8 174:4
207:13 208:2,7,19
208:24 209:4,9,17
209:23 210:1,6,10
210:15,23 211:5,8
211:19 212:13,22
**dawn** 128:7,10,17
133:7,13 134:8
140:1 171:10
211:7
**day** 13:1 23:24
58:11 89:24
100:23 101:3,7
204:4,14 206:10
213:22
**days** 131:25
**december** 57:10
122:14
**decide** 183:14
**decision** 44:23
76:10 93:13 95:7
105:12 144:15,18
211:25
**decisions** 98:10
170:8
**decline** 97:1
**declined** 96:3
**declining** 198:7
**defendants** 1:19
3:1,11 5:20 7:2
205:2
**defense** 2:13
**defined** 119:3
130:19 200:16
**definitely** 32:19
160:3
**definition** 129:18

**definitions** 174:19
**degree** 15:18 16:4
16:5,7
**degrees** 15:23
**delay** 174:1
**delighted** 54:1
**demonstrating**
201:9
**denied** 72:4
**denomination**
31:18 35:7
**denominations**
39:17,19
**deny** 139:1
**denying** 76:4
**department** 1:7,9
1:18 3:13 6:1 7:7
18:18 20:23,25
23:20 25:7 43:2
44:22 89:10 124:7
130:20 147:16,19
212:5
**departure** 17:3
**depending** 198:19
**depicts** 138:20
**deponent** 2:1 3:19
**deposition** 1:21
5:8,24 6:5 8:3 9:4
9:12 10:23 11:5,9
12:2,6,12 13:20,23
14:13,20,23 71:16
160:23 181:6
207:16 213:3
**depositions** 191:20
192:6
**dept** 213:2
**deputy** 1:14
**derived** 48:2
**derrick** 148:13
**describe** 17:11
19:15 20:19 50:9

125:3
**described** 40:5
  136:21
**description** 53:11
  151:7,17 152:18
**design** 77:25 78:3
**designed** 101:15
**designing** 123:23
**despite** 31:18
**detail** 54:1
**determinative**
  75:13 76:9
**determine** 27:11
  99:17
**determined** 74:20
  75:17,25
**develop** 61:9
**developing** 127:25
**development** 18:6
**developmental**
  124:7
**devotion** 82:20
  83:25 100:3
**devotional** 82:18
  83:3,8 99:25
**devotionals** 82:14
**devotions** 82:19
  99:10,18 100:6
  115:17 116:2
**diapers** 23:23
**difference** 52:21
  52:22 59:17
**differences** 97:17
  98:1,21
**different** 18:11,20
  28:16 64:7,8 98:8
  98:14 102:22
  103:3 107:8 185:4
  189:12 191:21,22
  192:7,14 194:20
  194:22,23 195:7

**differently** 99:3
  187:20 188:1,2
**difficult** 34:2,4
  46:16
**difficulty** 170:10
**diocese** 186:14
**direct** 9:1 17:23
  19:21 33:6
**directed** 61:16
**directing** 80:21
**direction** 187:13
**directly** 59:24
  110:4,5
**director** 1:18 3:13
  7:6 12:21 21:16
  21:20,25 30:23
  46:10 48:12 55:2
  55:13 79:21 86:16
  128:21 161:17
  176:11,13 178:17
**directors** 17:24
  46:9
**disability** 129:16
  139:11
**disagree** 192:9
**disagreed** 59:20
  59:23,25 60:2
**disclosing** 40:21
  88:4
**discomfort** 108:2
**discovered** 88:17
**discriminate**
  101:16 102:14
  129:14 130:9
  139:9
**discrimination**
  155:18 157:13
  163:17 167:13
**discuss** 133:24
**discussed** 35:24
  36:4,13 50:2,2

75:23 81:23 84:1
  112:15 140:7
  159:18 163:3
  164:3 181:8
**discussing** 58:7
  100:24 101:9
  104:4,9 112:22
  151:19 164:24
  167:8
**discussion** 36:24
  37:2 61:9 76:7,12
  78:21 136:12
  141:22 172:12
  179:22 211:16
**discussions** 121:12
  121:16
**dispute** 47:12
  48:19,22 191:23
  192:15
**disqualified** 69:5
**disrupt** 97:15
  184:10,18 185:6
**disruption** 101:12
**distancing** 5:6
**distinction** 190:8
  190:15
**distinctions** 191:3
**district** 1:1,1 3:6
  6:3,3
**disturbing** 32:15
**dive** 8:7
**diverse** 67:22
**division** 1:2
**doctorate** 15:15
**doctrinal** 25:9,10
  25:14,19 26:1,10
  27:16 36:2 49:9
  49:15,19 50:3,6,15
  50:18 51:25 54:7
  55:20 56:10 60:21
  63:7 64:25 65:5

69:18 70:2,4,7,8
  74:6 75:5,22 77:2
  77:17,21,25
  117:15 118:1,11
  131:12 185:15,25
  186:7,15,20,21
  189:8 190:5
  207:19 210:22
**doctrine** 32:6
  74:11,22 75:1,9
  76:3 78:6 189:9
  190:16 191:4,5
**document** 25:12
  25:14,22 26:4,15
  27:1 30:3,4,13
  34:17 35:1 37:17
  37:19,23 38:7
  40:12,17 41:1,8,15
  47:5 48:25 49:9
  50:4 51:5 53:1
  57:16,19 58:5
  60:18 62:15 65:3
  65:18 66:4 68:21
  68:22,24,25 70:5
  71:12,19 73:14,16
  73:19 77:11 93:9
  100:19 103:8
  111:5 116:8
  118:18,20 122:9
  122:11 125:2
  128:15,16 129:1,4
  129:6,18 130:4,17
  130:19 133:6
  134:25 135:8
  136:10 137:10,24
  138:8 139:18
  140:4,9,12,21
  144:15,17,22,25
  146:12 148:6,11
  148:18 149:14
  150:8,11,12,22

151:3,6 156:16
160:11,19 163:11
163:25 164:22
165:22 170:1
171:20 173:3
174:22,23,24,25
175:3 185:14
188:19 200:9
204:16 208:12
211:13,24
**documentation**
72:8
**documents** 13:22
14:1,5,8,16 40:19
125:10 142:17
144:6 173:8 175:8
175:23 176:5,18
176:21 177:1,6,8
177:14,15,17,18
178:7,12,16
182:10 195:7
199:14 202:13,20
**doing** 9:11 33:16
**dollar** 204:14
**dollars** 152:14,25
153:5 204:3
**donations** 24:1
**door** 49:2
**dormant** 126:7
**downloaded**
116:17
**draft** 72:18 73:21
165:16 166:12
**draw** 190:14
**draws** 190:8
**drug** 18:17,19
**dss** 17:20 24:18,20
45:14 46:12,21
54:2 89:13,18
91:22 95:7,16,23
97:2 115:24

127:10,20,23,25
128:7,17 130:1,17
130:22,25 132:14
133:19 134:12
137:19 138:16
141:7,12,17,23
142:5,9,20,21,25
143:3,7,15,18,20
143:22 146:13,16
146:21 147:8,9
148:14,25 149:3
149:10,16 150:12
151:11 153:4
154:8,10 156:6,13
157:5 159:22
160:12,13 161:7
161:17 163:9,14
163:14,15 167:9
167:10,11,16,19
168:4,8,17 169:1,4
169:8 172:12,24
182:1,9,11,17,18
182:18,23,25
183:7,11,12,14
185:4 195:14,17
196:4 203:15
204:3 212:19
**dss's** 140:15
164:25 183:6
**due** 5:5 87:15
170:8
**duerk** 12:20
**duties** 21:15 55:9
170:13

| e |
| --- |

**e** 3:15 9:19 30:6,8
30:25 31:8,21,25
32:12,13,24 34:19
34:21 35:4,14,22
38:20 39:14 40:5
40:23 41:3,16,17

51:7,10,16,20 53:6
53:24 55:4,17
56:15 57:7,9,11
60:4,6,9,14,17
61:9,14 62:5,14
65:24 71:2,8,9,18
72:21,22 73:8,12
75:4,24 76:6
81:20 85:23 86:1
86:8,9,12 87:4
88:23 89:24 90:9
91:23 92:11,24
93:2,3 94:20
97:24 98:20 99:10
100:11,13,22
101:1,4,6 103:11
103:15,21,24
106:8,12 108:7,14
111:9,11,21 112:1
112:7,12,15
122:12,15,22
123:15,20 128:4,7
128:9,21,24
130:15 131:17,24
132:1,5,18,20,25
133:2,3,24 134:1,7
134:21 135:1,4,12
136:1,3,14,20,21
136:24 137:17
138:12 139:23,25
140:12 141:10
156:18,21 157:1,4
157:22,25 158:18
158:25 159:18
160:13 161:14,15
162:12 166:11
167:23 168:2
169:12,20 170:1,5
170:22 171:9
174:6 175:13,23
175:23 176:4,13

176:20,21 177:1,8
177:18 188:9,13
190:20,22 207:1
207:11 208:2,7,19
208:24 209:4,9,17
209:23 210:1,6,10
210:15,23 211:5,8
211:19 212:13,18
212:24
**earlier** 30:17
39:25 48:25 49:10
64:18 99:20 118:3
147:7,25 158:14
164:4 172:17
179:22 181:7,12
183:19 185:12
188:8 189:22
194:3,11 199:15
200:9 202:12
**earliest** 162:3
**early** 38:14 139:6
181:16
**eden** 1:3 2:6 7:20
65:9 66:15 75:4
188:12 190:21
**edits** 124:14
**education** 2:13
15:12,14,25 16:6
20:10 127:10
**effect** 196:19
**effort** 22:13
149:23
**efforts** 163:8
175:7
**eighth** 2:10
**either** 13:15 47:24
153:20 155:25
159:22 185:5
189:5 192:21
199:16 202:24

electronic 14:13 177:17
electronically 177:19
eligibility 138:25
else's 112:11
embrace 49:15
embraces 67:22
emergency 142:6 142:8,10,12 147:9 147:15,18,25 148:4 149:16,18 150:10 151:8,10 151:18,21,22 152:1,6 153:4,8,10 153:14,21 154:6 154:14,20 155:2 156:5,13 157:6,22 158:1,3,5,8 159:1 203:1,21 204:10 212:3
emily 161:16,20 162:2,23
emphasize 101:15
employed 16:10 16:20 17:5 18:14 19:5 28:5 112:16
employee 18:16 27:12 28:10 54:3
employees 59:20
employment 15:13 49:17 94:15 157:13
enable 151:11
enabling 151:14
encourage 106:20 106:22 112:25 113:25 119:17
encouraged 91:13 91:18 119:11

encouragement 82:22,24,25
encourages 114:3
encouraging 84:11 113:3 118:4
ended 56:14
ends 77:12 139:24 141:11
enforced 153:12
engage 197:12 199:2
engaging 60:19 189:13,16
ensure 20:7,7 59:14 124:23
ensuring 18:7
entailed 19:17
entered 89:18 148:6,20,22,22
enters 89:13
entire 22:1
entirely 165:21 166:24
entirety 21:24
entitled 37:23 136:10 144:17 160:13 208:12 211:13,24 212:19
entity 44:23
entries 171:19
entry 163:11 169:12 170:3 171:19
environment 67:4
equally 59:15,16
equipped 46:24
errata 213:1
error 123:5,7
essentially 142:20
establish 164:20

established 62:1 80:13
et 213:2,2
evangelical 50:10 113:1 118:12 119:24 185:19
evangelize 202:8
evangelizing 201:14
events 14:3,7 161:3 172:24 206:8
evidence 18:8
exact 44:6 124:3 175:2 181:16
exactly 83:3 84:7 84:7 119:7 143:15 176:16
examination 7:16 179:17 180:24 207:4,6,8
example 28:25 50:16 77:1 85:7 88:1
examples 199:15
excellence 20:14
exchange 133:12
excited 54:17
exclamation 72:23
excuse 11:13 147:8
executive 196:14
exempts 157:16
exercise 194:5
exhausted 16:19
exhibit 10:21 11:3 11:9 12:1 25:17 25:18 26:14,18 30:3,8 34:17,21 37:18,23 38:20 39:15 40:6,7,13,16

47:2 49:11 50:4 51:7,10 57:9,11 60:6,9 61:10 65:20,24 68:12,17 70:5,25 71:2 73:5 73:7,8 77:11 78:8 85:22 86:1 91:23 92:25 97:11 100:9 100:13,23 101:2,3 101:4 103:9,15 111:6,11 116:4 117:12,14 118:10 122:10,15 128:6,9 132:17,20 133:8 134:19 135:8,14 135:15,20 136:4,6 136:10,14,19 137:25 138:1 139:24 140:8,10 141:11 144:8,13 144:17 147:14,18 150:20,23 152:1 152:17 154:14 155:25 156:17,21 158:7,18 159:23 160:11,13 164:23 165:25 166:17 167:10 173:21 174:4 190:22 207:13,18,22 208:2,7,12,19,24 209:4,9,15,17,23 210:1,6,10,15,20 210:23 211:5,8,13 211:19,24 212:3,9 212:13,18,22
exhibits 140:8
exist 158:3
exited 165:11
experience 46:15 82:7 112:25

134:10
experiences 67:18
expert 39:18
expires 206:19
213:25
explain 31:5 58:14
58:15,21 118:16
203:14
explained 148:3
explore 181:11
expose 113:18
119:23
exposed 96:15,24
199:1
express 113:17
expressed 108:1
extend 151:8
extended 151:23
extends 151:9
extensively 126:8
extent 47:21,22
48:2 80:11,16,19
108:7 114:17
123:9 125:3 159:4
159:10

**f**

f 126:17 129:12
138:24
face 15:2,2
facilitate 151:12
facilitates 182:19
facilities 16:23
18:3 126:17
149:25 162:3,7
163:7
facility 100:1
fact 25:25 34:7
49:13 56:2 62:24
66:7 72:17 81:13
94:3 104:3,8
120:18 140:8

146:21 147:24
171:19 176:19,25
190:24
fair 28:6 38:13
50:9 87:24 112:21
faith 27:16 28:16
28:21 34:9 60:20
67:9 74:18,21,25
75:12 76:1,9 87:8
87:13 89:3,3
95:19 98:8,14,17
99:1,16 102:4
105:12 106:9
110:23 111:3
113:9,14,18
139:16 140:20
163:17 167:13
195:16 196:14
faiths 97:14
fall 24:19
familiar 19:24
20:13 24:13 35:1
47:13,16 116:12
191:3
familiarity 112:14
families 1:11,13
1:15 3:2,4,5 21:12
22:13,17,23 23:3,7
23:12,19,25 24:3
25:9 32:3 46:24
57:22 58:8,17,24
63:10,11,25 64:2,5
64:6,15 69:5
90:23 97:18 111:2
112:23,25 113:6,6
113:11 114:1,3
115:15 120:3,25
125:18 154:1
168:10,21 171:15
179:24 180:1,2,4,7
184:17 199:4

family 23:17,18,21
24:5,9 45:20,22,23
46:4 63:3,5 67:3
72:10 84:10,16,18
84:23 85:2,9 91:7
96:4,14,22 99:15
100:5 102:23
103:4 107:9 113:8
113:17,18 122:25
123:17,22 124:12
124:17 125:5
127:5 129:15
130:10 139:11
149:25 167:25
183:5,7,10,12,21
184:3,23 185:3
186:5,11 198:25
199:5,17 200:7
family's 113:20
120:11 184:7
faq's 26:16,19
27:3 207:24
far 33:12 59:15
172:2
farther 112:7
155:15 174:16
federal 5:16,20 7:2
154:10,15,21
155:7,20 157:15
205:2
fee 204:2
feedback 71:22,25
72:6,14,18,20
164:1
feel 58:6,16,23
67:20 83:1 189:24
feels 67:2
felt 33:24 54:5
59:7,8
fendley 134:21
136:15 137:2

138:11 166:9,10
211:21
fendley's 141:10
file 14:9
filed 6:2 47:10,14
48:18 188:11
fill 151:14
filled 44:4
final 73:24 147:1,3
182:11
finalized 73:21
financial 155:20
157:15
financially 6:11
find 41:8 46:16
71:20 95:16 97:2
102:11,17,19,22
103:3 109:24
123:10 166:3
168:8
finds 183:10
fine 13:2 15:22,23
115:1 135:23
finish 109:15
126:10
finished 8:13,16
178:21,22
firm 6:6,8 7:19
first 7:15 8:10
10:20 27:10 30:16
36:3 38:10 41:16
48:25 53:5 54:2
54:24 58:4 60:18
71:18 72:21 74:3
75:3 86:11 97:12
97:12 101:24
118:10 134:24
135:2 137:6,25
143:7 148:17,17
149:2,5 153:13
161:13,13 170:1

203:5,8
**fit** 168:25
**five** 50:17
**flesh** 181:10
**flip** 40:18 57:18
  128:25 134:24
  138:22
**floor** 2:1,16 3:16
  3:21
**flow** 125:8
**focused** 18:6 150:6
**folder** 135:20
**folks** 13:7,19
  98:23 134:12
  179:1
**follow** 62:25 98:25
  115:11 133:13
  188:16
**followed** 56:8
  131:24
**followers** 27:17,25
  28:12 47:12 48:20
**following** 5:6,15
**follows** 7:15
  157:11
**followup** 103:13
**force** 89:6
**forcing** 89:2
**foregoing** 206:4
**forge** 160:5,7
**form** 28:1 29:10
  34:13 50:13,20
  51:2,2 52:16
  63:20 65:20 66:8
  68:2,7,10 69:22
  70:20 75:14,21
  76:20,25 82:12
  89:15 90:14,25
  92:2,7 94:6 95:21
  96:17 99:5 105:25
  108:12 117:19

118:10 119:15
134:14 144:3
164:8 165:4
168:18 182:6
183:17 184:13,21
184:25 185:10
186:23 187:4,23
188:6 189:6,19
190:3,12,18
191:17,25 192:11
192:18 193:2,12
193:18 194:1
195:11,20 196:1
196:11,17,21
197:5,13,23 198:9
198:16,22 199:7
200:24 201:3,7,10
201:16,21 203:7
203:25 204:17
**formal** 104:23,24
  204:16
**former** 12:21
  175:14,15
**forth** 40:19
**forward** 35:22
  37:6 53:23,24
  54:22 55:10 56:2
  73:18 169:22
**forwarded** 32:24
  33:4,14 53:10,17
  53:19 54:8,13
  55:18 73:20 85:25
  133:11,17 192:22
**forwards** 53:7
**foster** 12:21,22
  17:21 18:7 20:6
  20:24,25 21:7,10
  21:12,16,19,20,25
  22:13,17,18,23,25
  23:2,7,10,12,24,24
  23:25 24:9,22

25:2 26:9 27:12
27:24 28:11,17,21
29:1,7,19,24 30:19
30:23 32:3 36:1
37:10,21,22,25,25
38:15,16 39:4,10
41:6,20 44:24
45:20 46:3,10,14
46:16,17,22,23,24
47:4 48:12 49:2,3
49:7 51:24 52:4,9
53:21 54:18 55:14
57:22 58:8,17,24
59:11,22 61:4,17
62:17,22,24 63:10
64:1,6,11,15,21
65:14,20 66:8,18
68:2 69:10 70:11
70:22 72:4,10
75:23 76:11 89:13
92:8 98:7,13,24
101:14 107:3,16
108:1,5,9,22 109:2
109:4 110:4,12
112:23 113:2,3,6,6
113:7,11,16,18
114:1,3,4 117:18
117:24 118:5,6,9
118:12,13,24
119:10,21 120:5,7
120:24 121:25
122:3,25 123:17
123:22,23,23
124:12,17,18,23
125:5,13,18 126:6
128:1 129:4,6,9,15
130:4,10 131:10
139:2,10 140:4,16
140:16 141:24
142:4,22 143:6,7
143:13,19 146:24

147:4 149:3,21,25
150:5 151:13
154:1 163:6,13,22
167:19 168:1,9,9
168:21 171:14
181:14,22 182:4
182:24 183:21
184:3,6 185:3,5,24
186:5,5 188:25
189:5 194:6,13,16
194:17,20,24
195:8,8,16,18
196:20 197:7,9,10
197:11 198:5,5,24
199:16 200:11
201:18 202:6
208:15,16
**fostering** 49:17
  54:3 69:14 110:3
  110:6,7
**found** 145:7
  177:13,24 178:1,3
**four** 17:15,24
  50:17 52:5 90:2
  205:8
**fourth** 47:9 93:5
**fp** 137:7
**freddie** 1:21 3:19
  5:25 7:14,24
  205:7 207:3 213:3
  213:21
**free** 61:4 62:17
  80:18 81:4 92:4
  159:10
**freedom** 131:6
  139:17 140:21
  141:4
**freedoms** 129:22
**frequently** 27:4
**front** 38:4 78:10
  150:16 160:17

[full - hands]    Page 17

**full** 7:22 142:9,14
142:16,18 149:14
151:15
**fund** 2:13
**funds** 152:13,25
153:18 154:5,10
**funny** 116:19
**furnell** 54:21,25
55:5,6,7,12 71:4,9
79:20 80:1,6,8,22
81:1,1,8,13,17,18
81:24 193:9
209:20
**further** 92:25
179:15 204:23
206:6
**furthermore**
129:13 139:9
**future** 31:14
**fyi** 35:23

**g**

**gathering** 182:10
**gay** 69:21 70:10
70:18
**gears** 82:5
**gender** 129:16,17
139:11,12 189:15
**general** 44:7,12
121:9,9 131:20
133:18
**generally** 17:11
19:16 20:20 21:6
46:6 101:8 121:21
125:4 142:22
143:1 149:13
150:4 163:2
164:23 165:1
176:7
**generating** 193:16
**genesis** 117:5

**georgia** 35:17
**getting** 135:19
160:3 179:3
**give** 8:23 44:14
67:8 85:7 178:20
204:19
**given** 43:24 56:5,6
64:7,16 180:1,5
198:18 205:7
**gives** 169:23
**giving** 72:20 164:1
**glad** 35:10
**go** 8:8 15:11 22:17
22:24 38:19 77:13
79:7 83:21 85:15
85:20 88:25 90:18
90:22 91:6,24
92:13 107:1,21
108:17 114:19
117:22 121:18
129:20 133:5
136:7 149:13
152:2,16,16 158:4
158:8 174:16,17
178:24
**goal** 45:18 59:14
119:23
**god** 31:17 54:21
**god's** 77:25 78:3
**goes** 31:16 74:9
139:4 170:7
**going** 5:22 8:6 9:9
11:8 26:14 30:3
32:12 34:16 47:20
51:7 53:13 56:18
57:1,8 60:5 65:19
68:12 70:25 73:5
73:6 85:13,14,22
94:22 103:9,11
107:12,14 111:6
112:5 114:6 115:5

116:7,9,20 117:11
118:2 120:5
121:17 122:10
128:6 132:17
135:1,22 136:19
144:7,13 147:14
150:19 159:2,6
160:1,10 165:3
173:5 174:13,20
179:3,9 181:9,10
188:16
**good** 5:1 7:18
27:19 46:11 54:5
56:19 61:3 66:21
94:9 114:8 123:21
166:20 168:25
180:20 194:10
197:19
**gospel** 49:15
**government**
126:19 154:11
**governor** 1:16
3:12 7:4 196:13
**governs** 150:4
**granted** 196:4
**great** 10:3,18,25
18:10 26:24 53:23
87:4 110:3,6,7
115:2,3 123:13
150:18 160:8
**greatly** 71:22
**greenville** 1:2 2:2
3:9,17 6:4 17:18
22:6 169:23
193:21
**greet** 170:17
**ground** 8:8
**group** 13:4,7
31:15 41:5,19,24
42:5 45:6,11 46:3
46:14 72:1,6,14

82:10,13 84:5,21
85:4 94:4 96:3,4
96:24 105:1
106:20 109:19,25
110:17 112:22
115:15,21 116:1
120:15,20 121:4,6
121:11 128:2
149:19,20 187:9
194:17,17 195:24
196:9 202:15
**groups** 22:7
193:14
**grown** 67:19
**guess** 109:8
122:10 146:14
**guidance** 16:1
79:17
**guide** 27:17
**guys** 114:23
116:19

**h**

**h** 207:11
**half** 15:6 44:12,16
**halfway** 66:13
114:16 133:6,7
152:3
**hall** 165:5
**hamilton** 86:15
87:1,2
**hand** 125:20
138:14,17 139:8
139:14 140:19
206:9
**handbook** 121:25
122:3 123:1,17,23
124:12,17,24
125:5,20 126:1,1,3
**handful** 181:2
**hands** 166:10

| | | | |
|---|---|---|---|
| **happen** 40:22 | **hill** 3:19 7:9 12:16 | 93:14,18,24 94:16 | 175:17 176:3 |
| **happened** 89:24 | 12:18 13:8 15:9 | 95:18 96:2,14,24 | 178:8,11,11 |
| 96:9,10,11 172:4 | 16:11,14,15 17:4,5 | 97:1,6,14,20,25 | 179:24 183:20,25 |
| **happening** 56:14 | 17:8,16,17,22 | 98:4,7,12,15,20,22 | 184:15 186:6 |
| 90:11 | 18:11,15 19:4,8,19 | 98:24 99:1,11 | 187:6,12 188:20 |
| **happy** 8:23 9:5 | 19:21,24 20:16 | 100:4,10,15 | 188:24 189:17,23 |
| 60:24 62:6 164:14 | 21:2,8,11,14,24 | 101:12 102:13,20 | 190:8,14 191:8 |
| **hard** 177:8,14,15 | 22:6,11,15,16,22 | 102:21 103:1,2,7 | 193:13,15,23 |
| **haynsworth** 2:1 | 23:6,11 24:22 | 103:10,17 104:16 | 194:21 195:1,2,6 |
| 3:20 7:9 | 25:1,8,15,18,19 | 104:19,22 106:3 | 195:14 196:4 |
| **head** 8:11 11:14 | 26:5,8,15,16,18,19 | 106:14,19 107:6 | 197:10 198:6 |
| **header** 166:16 | 27:5,23 28:3,10,10 | 107:24 108:24,25 | 199:18,25 200:3 |
| **health** 1:7,10 3:1 | 28:15,20,25 29:6 | 109:20,24 110:4 | 203:5,15,24 204:3 |
| 6:2 7:7 17:1 18:23 | 29:16,18,23 30:5 | 111:8,13 112:16 | 207:18,21,22,25 |
| 196:25 213:2 | 30:10,20 33:8 | 112:24,24 113:6 | 208:5,10,13,17,22 |
| **healthcare** 20:9 | 34:18,23 37:9,14 | 113:25 114:2 | 209:2,7,13,16,21 |
| **hear** 9:22 11:19 | 37:18,20,24 38:1 | 115:14,20 117:12 | 209:25 210:4,9,13 |
| 133:1 172:10,11 | 38:15 39:8 40:2 | 117:14 118:4,19 | 210:18,20 211:3 |
| 172:14 173:21 | 41:23 42:4,9,16,17 | 118:23,24 119:11 | 211:11,17,22 |
| 180:17 | 42:19,25,25 43:21 | 120:6,7,25 121:24 | 212:1,6,7,11,16,20 |
| **heard** 47:17,19,24 | 43:23 44:5,9 45:4 | 122:2,12,18 124:2 | 212:23 |
| 48:10 119:2 | 45:5,10 46:1,7 | 126:15,24 127:15 | **hill's** 18:1 20:23 |
| **hearing** 163:14,23 | 47:3,11,25 48:4,19 | 127:25 128:5 | 25:25 39:3 45:19 |
| 167:19 | 49:1,3 51:6,12 | 129:11 132:18,22 | 49:9 50:3,6 55:15 |
| **held** 6:5 23:23 | 52:8,9 54:3,11 | 133:21 134:10,20 | 63:7 64:25 65:21 |
| **help** 8:9 14:2 61:3 | 55:2 56:2 57:8,13 | 136:12,16,21 | 68:1 69:18 75:5,7 |
| 62:17 66:20,23 | 59:2,10,20,21 60:5 | 138:1 141:23 | 75:12,22 76:7 |
| 83:1 178:6,17 | 60:11 61:21 62:21 | 142:1,3 144:14,18 | 77:2,24 84:4 |
| **helpful** 76:23 | 62:23 63:2,11,18 | 145:2 146:19,25 | 85:11 87:21 90:20 |
| 136:4 158:5 | 64:2,6,12,15,19 | 147:8,15,17,20,21 | 91:4,21 94:3 96:5 |
| **helping** 163:9 | 65:12,18 66:1,9 | 149:3,9,12,15 | 96:15,25 98:2,9 |
| 168:8 176:17 | 68:13,18 69:9,12 | 150:21,24 156:4,8 | 102:24 103:5 |
| **henry** 1:16 3:11 | 69:16,20 70:10,13 | 156:18,23 157:7 | 105:23 106:4 |
| 7:3 | 70:13,17 71:1,5 | 157:11 159:5 | 109:19 110:17 |
| **hereunto** 206:9 | 72:4 73:6,9 74:15 | 160:10,14 161:24 | 112:22 115:25 |
| **hhs** 3:2 197:1 | 74:16 75:25 76:10 | 162:1,5,8,10,21 | 116:10 117:23 |
| **hicks** 86:14,19 | 76:15 77:5,15 | 163:8 167:25 | 119:12 120:15 |
| 94:25 | 78:5,22 82:8,8 | 168:7,22,24 170:9 | 121:4,6,10 125:16 |
| **high** 134:12 | 83:7,9,14 84:9,20 | 170:14 171:4 | 125:22 131:9,12 |
| **highest** 15:13 | 85:1,8,23 86:3,16 | 172:23 173:7 | 140:23 141:2,8 |
| | 89:12,18 90:4,5,12 | 174:5,15,18 175:7 | 145:5 146:16 |

150:5 153:3 168:9
185:14 186:7,21
189:9 194:4,13
195:15,24 196:6
197:20 198:4
199:3,16 200:10
**history** 15:13
**hold** 15:24 18:10
41:7 111:16
135:19 166:1
173:15 188:17
**holland** 86:13,15
93:2,22 94:1 95:5
95:12 97:11
100:12,14 101:7
103:12,16 105:9
106:8,24 210:7,11
**holland's** 94:17
103:23
**holy** 50:19
**home** 17:16 41:24
42:3,4,17 43:1,5
43:24 44:9,16
46:23,23 83:9,15
85:12 86:17,21,24
90:12 95:3 96:24
99:11 100:1,2
102:13,15,21
103:2 104:1,13
105:1,4 107:7
119:9 120:5
168:24 169:9
181:22 182:10,13
183:22 184:7
195:24 197:10
198:5 199:17
**homes** 17:18 21:10
41:6,20 42:5,10,22
43:16 44:24 45:6
45:11,19 46:3,11
66:22 67:15 82:10

82:13 83:11,15
84:5,21 85:4
90:22 91:6 94:4
96:3,4 106:20
109:19 110:1,17
112:22 115:15,21
116:1 118:15
119:1,22 120:9,15
120:20 121:4,6,11
128:2 149:19,20
149:21 168:20
182:4,12 194:17
198:1 202:15
**honest** 176:23
**honestly** 165:21
178:2
**honor** 85:2 199:4
199:25
**honored** 85:5,8
**hope** 201:5
**hopefully** 178:21
**hopes** 193:15,23
**hosted** 193:22
**hour** 56:19 160:2
**hours** 13:13
**house** 43:5,7,10
83:10 88:13,13
90:16,16 95:4
105:13 106:9,14
106:17 113:13
200:6
**housekeeping** 11:2
**how's** 117:2
**hrvp** 124:5,8
**hsblawfirm.com**
3:23
**hum** 16:3 135:17
152:24 169:19
**human** 1:8,10 3:1
6:2 7:7 124:9
213:2

**humility** 201:9
**hurtful** 34:10
**husband** 35:16
54:4

**i**

**idea** 114:12
**ideas** 110:3,6,8
**identification** 11:6
25:20 26:20 30:11
34:24 38:2 51:13
57:14 60:12 66:2
68:19 71:6 73:10
86:4 100:16
103:18 111:14
117:16 122:19
128:11 132:23
136:13,17 144:19
147:22 150:25
156:24 160:15
174:7
**identified** 61:23
120:19 188:25
**identifies** 66:14
**identify** 70:14
120:16,24 121:3
189:7
**identifying** 94:9
94:10
**identities** 40:22
88:5
**identity** 26:16,19
27:6 32:5 37:21
37:24 55:22
129:17 139:12
190:9 207:23
208:14
**immediately**
151:12
**impact** 139:16
140:20 196:19

**important** 67:23
119:20 158:24
**impression** 47:11
48:18
**incident** 99:14
121:7
**incidents** 121:15
**include** 9:17 35:7
78:22 82:21
158:24
**included** 14:8
17:15 78:16 80:14
80:20 81:7 105:3
146:7 152:22
172:9 176:17
**includes** 133:4
**including** 155:8
**incorporate**
137:20 141:13,18
**incorporated**
55:14 174:5
212:24
**increase** 153:16
**increased** 153:4
**independent** 17:19
119:5 150:10
159:8,17
**independently**
182:12
**index** 4:5
**indicate** 67:10
69:4 77:22
**indicated** 75:20
76:25 123:4
158:20
**indicates** 62:5
75:6,24 146:23
**indicating** 11:25
130:15
**indicators** 163:17
167:13

**indirectly** 59:25
**individual** 69:21
  139:1,4 189:10
  192:14
**individuals** 25:2
  29:24 70:11,18
  125:24 189:12
**influence** 118:14
  118:25 119:8,22
  120:8 200:12,19
  201:13,19 202:7
**informal** 182:3
**information** 21:19
  31:12 47:22,24
  54:9,14 79:6
  80:12 163:5 169:4
  182:11
**informed** 54:16
  115:20 120:12
  121:4 193:1,8
**ingram** 174:6
  212:24
**initial** 63:18 134:7
  153:8
**initially** 36:11
  126:7 145:7
  153:11,11
**inquire** 117:24
**inquired** 52:1
  64:12
**inquirer** 56:6,12
**inquiries** 63:18
  64:14 66:10
**inquiry** 34:6 37:7
  51:24 54:2 65:13
  65:20 66:8 68:2,7
  74:4 75:21 76:25
  77:8,16 79:14,18
  117:18,22 118:10
  189:6

**insist** 94:4
**instance** 8:12 29:3
  56:10 113:23
  169:7 199:23
**institution** 15:17
**instruct** 48:1
  159:6,12
**instructed** 62:2
  193:9
**instruction** 82:9
  84:3,13,21 85:3,10
  104:23,25 112:2
  113:1,4 118:5
  197:20 198:4
  199:3,3,20
**instructions** 81:9
  105:2 200:1
**instructs** 8:20
**intended** 118:19
  149:22 151:11
**intentional** 164:11
**interact** 127:23
**interest** 41:4,18
  189:6 193:22
**interested** 6:11
  52:9 64:20 69:10
  69:14 98:23
  134:23 143:2
  193:23 206:8
**interfere** 10:11,15
**interim** 19:19
  137:3 151:15
**internal** 200:4
**internally** 195:1,7
**interpret** 112:11
**interpretation**
  87:24
**interpreting** 112:9
**interview** 27:17
  57:22

**interviewed** 61:19
  62:3
**interviewing**
  58:17,23 60:23
  61:15,22
**intrude** 165:14
**invitations** 21:17
  22:3
**invite** 27:17
  115:16 116:2
  162:2,8
**invited** 37:5 40:6
  162:4
**involved** 40:23
  46:12 88:5 105:11
  110:21 122:5
  124:16 125:12
  126:24 168:8
  172:13 175:7
  199:15
**involvement** 31:3
  45:4 124:22
  175:12
**irskin** 16:6
**issue** 9:21 125:19
  142:9,14 145:5
  164:18,21,24
  195:16
**issued** 128:2
  142:10,11 143:7
  146:25 147:2,5
  148:25 155:11
  196:13 197:1
**issues** 121:5,9
  127:22 145:2
  195:22
**items** 24:3

**j**

**jacqueline** 122:16
  124:19 167:23
  171:10 172:1

210:25
**jane** 122:17
  124:20 211:1
**janson** 2:3,7 5:19
  6:18,18 7:17,19
  10:19 11:1,7,12,16
  11:21,23,25 12:4
  25:13,21 26:13,23
  26:25 28:6,8
  29:11 30:12 34:15
  34:25 37:15 38:3
  41:9,13 48:8
  50:14 51:14 52:17
  56:17,23 57:5,15
  60:13 63:23 66:3
  68:20 69:24 70:23
  71:7 73:11 75:18
  76:21 77:9 80:22
  81:10 82:17 86:5
  89:20 90:19 91:3
  92:9 93:7,10
  94:18 95:25 96:21
  99:8 100:17
  103:19 106:5
  108:19 111:19
  114:6,14,22 115:1
  115:9 116:18
  117:2,9,17 119:19
  122:20 123:2,9,12
  123:16,19 128:12
  132:24 134:17
  135:10,17,22
  136:5,18 138:6,7
  144:4,11,13,20
  147:23 151:1
  152:9 156:25
  159:15 160:16
  164:15,19 165:20
  165:24 166:2,5,15
  166:25 167:4,7
  173:13,17,22,24

174:8 178:18
179:6,13 182:6
183:17 184:13,21
184:25 185:10
186:23 187:4,23
188:6 189:19
190:3,12,18
191:17,25 192:11
192:18 193:2,18
194:1 195:11,20
196:1,11,17,21
197:5,13,23 198:9
198:16,22 199:7
200:24 201:3,7,10
201:16,21 202:9
203:7,25 204:17
204:23 207:5
**january**  16:16
17:4 30:7 60:7
111:10 147:3
148:20,23 149:8
153:12
**jason**  19:20
**jd**  6:4
**jesus**  27:18,25
28:12 31:6,13,17
35:8 47:12 48:20
50:20 51:1 67:9
**jewish**  29:1
**job**  19:14 33:16,20
55:9
**johnson**  1:12 3:3
**join**  54:18 127:13
**joined**  31:14
**joining**  78:1,4
**jr**  174:6 212:24
**judging**  90:9
114:15
**judgment**  32:4
**july**  38:10,14

**jump**  171:8,8
**jumping**  155:9
**june**  1:22 5:23
12:3 150:16
151:10,23 153:13
170:18 173:8
174:16 206:10

## k

**karen**  1:21 3:19
5:25 7:11,14,24
11:5,10 12:2 30:9
34:22 51:11 57:12
60:10 71:3,10
86:2,2 100:14
103:16 122:17
128:10 136:15
156:22 171:12
181:1 205:7 207:3
207:16 208:4,9,20
209:1,6,19 210:2,3
210:8,12 211:2,6
211:20 212:14
213:3,21
**karen's**  137:9,14
**kate**  6:18 7:19
11:11 26:21 41:8
93:6 111:15
116:15 144:10
164:12 165:6
173:20
**kate's**  202:1
**katherine**  2:3,7
**keep**  54:16 163:8
**ken**  19:22 32:25
34:22 51:11 99:17
161:9,15 162:22
208:8,20
**kids**  44:12,13
88:25 91:24 92:12
121:6

**kind**  19:13 44:14
181:20 182:3
199:10
**kjanson**  2:11
**know**  9:1,5,9,11
9:19,23 23:9,11
27:7 30:16 33:4
33:12 35:10 36:14
36:14 39:7 40:10
40:15,19 44:2,2,3
51:3 52:11,12
54:23 55:3,12
56:7,9,11,13,18
61:7,12 62:1,4,9
62:13,19,23 64:17
66:21 67:2 68:1,5
68:6,9 69:20
71:24 72:25 74:15
74:19,20,23 75:16
78:20 79:1,23,25
80:4,15,15,25
81:12 82:1,4 83:6
83:23 84:9,14,15
84:18 85:5,6 86:7
88:16 91:17,19
92:16 96:8,9,11
99:16 100:4,18
102:20 103:1,20
104:22 105:18,20
106:19,22 107:5
110:20,24 111:1,4
111:21 113:5,16
114:2,4,8,15,17,17
115:24 118:19
120:3,10,11,13,14
120:23 122:21
123:2 126:11
128:14,19 131:14
131:16,20 132:12
134:2,4,5,9,15,23
135:2 141:6,9,14

141:15 143:3
146:1,6,21 148:21
148:25 149:1,7
150:13 151:21
153:2,15,24 154:8
154:9,12,13,19
156:4,8,10,11
159:21 161:6,7,10
161:11,20 162:4
162:11 163:21
165:20 166:18
167:15 169:14
170:25 171:5
172:2,17,18 173:1
175:1,2 176:2,2,7
176:9,16,17 178:4
178:14,15,16,17
181:19 183:12
185:23 186:1,4,10
186:13,17 187:10
**knowledge**  24:25
28:9,24 42:13
45:3,9 47:23 48:2
49:6 69:8 81:2
83:13 85:1 96:1,7
98:6 115:14 149:5
178:5 187:15,17
195:13 196:3
197:18 198:3
200:2
**known**  18:3,18
**knows**  80:16
**kristie**  86:14,22,23
**kruithof**  19:22
32:25 33:3,5,14
34:19,22 35:23
36:5 51:11 53:25
54:15,20 55:18
133:12 161:9,15
162:1,4,23 169:12
169:21,24 170:5

208:8,21
**kruithof's** 36:23

**l**

**l** 1:24 5:9 206:2,18
**label** 34:18
**labeled** 111:25
  148:11 150:20
  157:3
**lack** 43:2 44:4
**lady's** 53:8,16
**lambda** 2:13 6:20
  6:24
**lambdalegal.org**
  2:17,18
**lane** 8:1
**language** 49:25
  65:3 137:10
  138:15 139:22
  145:21,24 146:22
  155:3 157:19,20
  157:24 158:2,2,13
  158:20 167:9
  182:3
**lapsed** 181:20
**large** 206:3
**larger** 63:17
**late** 148:25
**latest** 71:21
**law** 131:15
**laws** 155:7
**lawsuit** 47:10,13
  47:16 48:17 170:8
  170:23 175:5,8
  188:10,11 193:16
**lawyer** 7:9 9:2
  15:8 80:23 159:5
  203:19
**lay** 92:3
**lays** 26:4
**leach** 1:17 3:12 7:5
  161:15,16 162:5,6

162:24 163:3
  169:13 170:4,4,13
  171:3,6
**leach's** 169:15
**leadership** 12:16
  12:18 17:14
  124:18
**leads** 70:9
**league** 20:14
**leave** 16:13,17
**leaving** 146:25
**led** 25:11 72:13
  83:7 91:23
**left** 16:15,18 17:8
  63:2 138:14 139:8
  147:2
**legal** 2:13 5:3 6:21
  6:25 78:1,4 79:3,4
  80:14,18,20 81:4
  92:4,4 132:2
  193:10
**legalities** 85:6
**legally** 85:1
**legislature** 129:21
**lehman** 12:20
  32:24 51:8,11
  53:24 54:10,14,19
  55:3,10,18 60:7,10
  61:2 71:3,10
  79:24 82:2 132:19
  132:21 133:12,17
  133:23 134:3
  162:22 167:23
  169:20 193:10
  208:21 209:6,19
  211:9
**lehman's** 62:14
**lekan** 1:14
**lesbian** 69:21
  70:10,18

**letter** 11:3 71:21
  71:25 73:24 75:10
  78:8,11,16,23
  174:4,12 207:13
  212:22
**letting** 54:23
**level** 15:13 134:12
**lexington** 18:22,23
**lgbtq** 120:16,19,24
  121:3,10,20
  125:23 189:1,7,23
**liaise** 127:19
**liaison** 110:3
**license** 20:24 25:9
  149:9,12 182:4,9,9
  182:12,12 183:6
  195:24 196:5
  203:17
**licensed** 20:22,23
  22:18,25 23:13
  43:25 56:15 63:1
  63:3,6,14 64:6,11
  107:3 141:23
  143:22 149:19
  171:15 179:24
  180:1,2,4 183:8
**licenses** 194:23
**licensing** 23:3,8,18
  30:19 35:11 60:19
  61:8,21 62:6,10
  72:9 107:16
  108:22,25 109:5,9
  109:11 137:8
  140:16 142:16
  145:10,19,25
  146:2 163:14,23
  163:24 164:3,25
  165:15,17 166:11
  167:19 182:4
  187:13

**licensure** 129:3,6
  129:15 130:4,10
  139:10 140:4
**life** 17:19 42:10,22
  43:16 66:21 67:18
  83:11,15 100:2
**lifelong** 78:2,5
**light** 181:5
**likewise** 8:15
  201:23
**limit** 93:12 152:4
  152:11,19 153:3
**limited** 151:14
  155:9 189:11
**limits** 153:20,25
**line** 41:2,16
  101:11,24 103:13
  117:4,7 148:19
  207:2,12 213:5
**lisa** 111:12 210:16
**list** 22:9 27:3
**listed** 122:25
  166:18
**listening** 194:12
**lists** 52:5,5 157:17
  174:22
**litigation** 65:9
**little** 23:5 31:16
  40:20 59:6 82:6
  99:19 155:15
  160:5,7 174:16
  181:10 182:21
  188:15 194:3
**live** 82:9 116:16,21
**lived** 46:2 90:21
  91:5
**living** 17:19 65:2
  77:17,20 190:4
**llc** 213:1
**llp** 2:7 3:15

**lobbying** 127:11
**locally** 67:21
**locate** 175:5
176:21
**located** 126:18
176:24
**locating** 111:17
**location** 2:1
**long** 9:8 13:6,12
17:5 19:18 46:22
59:2 114:22 126:2
126:3
**longer** 114:9
175:16 184:16
195:3
**look** 14:11 25:12
30:2,24 34:15
35:3 37:16 38:9
41:14 47:7,8
50:16 51:4,5
52:25 57:6 60:3
65:17 66:12,13
68:11 70:3,7,24
71:18 73:4 77:13
78:7 85:21 86:7
86:11 94:19,19
103:9 111:6,20,24
111:24 112:6,10
116:13 118:9
122:8,8 128:3,13
132:16 134:18
135:23 138:24
140:6 144:5,7,24
144:25 146:11
147:11 148:10
150:19 151:5,25
152:2 155:1,1
156:17 157:3
158:4,7 160:9,9
163:10 168:19
170:21 173:4

176:4,11,12 177:7
177:16 178:20
**looked** 14:2 40:7
49:10 133:8
142:17 155:23,24
165:22 176:20
177:1,5,5 185:14
186:14 188:8
190:20 199:14,24
200:9 202:12
**looking** 40:16 41:1
44:11 49:24 62:14
77:10 79:16 88:24
90:10,10 92:10,24
93:4,9 101:1,4
108:20 117:23
126:11 135:3,8,11
150:11 163:25
164:15 169:21
174:14 175:13,22
178:15 185:17
188:13,19 193:14
200:13 202:19
**lookout** 193:12
**looks** 32:23 33:3
53:2,3,9 58:9
66:14,19 100:21
105:10,17,21
122:24 130:2
131:24 133:11,16
133:17,22 138:14
138:15 148:13
152:18 153:10
157:4 158:19
161:1 166:15
167:24 169:6
170:4 183:5,7
**lord** 50:19 51:1
**lost** 11:15
**lot** 201:13

**love** 31:13 67:23
200:22 201:2
**loved** 67:2
**loving** 67:3,4
**lowe** 167:23 168:4
171:10,21 172:1,7
**lowe's** 172:5
**lunch** 114:9,20,21
185:13
**luncheon** 115:6
**lutheran** 35:16
39:16,16
**lutheranism** 39:17
39:22
**lynn** 1:12 3:2

**m**

**m** 2:14 136:15
211:21
**ma'am** 45:25 58:6
**madonna** 47:11,15
47:23 48:14,18
**madonna's** 48:10
**maia** 2:15 6:24
**mail** 30:6,8,25
31:8,21,25 32:12
32:13,24 34:19,21
35:4,14,22 38:20
39:14 40:5,23
41:3,16,17 51:7,10
51:16,20 53:6,24
55:4,17 56:15
57:7,9,11 60:4,6,9
60:14,17 61:9,14
62:5,14 65:24
71:2,8,9,18 72:21
72:22 73:8,12
75:4,24 76:6
81:20 85:23 86:1
86:8,9,12 87:4
88:23 89:24 90:9
91:23 92:11,24

93:2,3 94:20
97:24 98:20 99:10
100:11,13,22
101:1,4,6 103:11
103:15,24 106:8
106:12 108:7,14
111:9,11,21 112:1
112:7,15 122:12
122:15,22 123:15
123:20 128:4,7,9
128:21,24 130:15
131:17,24 132:1,5
132:18,20,25
133:2,3,24 134:1,7
134:21 135:1,4,12
136:1,3,14,20,21
136:24 137:17
138:12 139:23,25
140:12 141:10
156:18,21 157:1,4
157:22,25 158:18
158:25 159:18
160:13 161:14,15
162:12 166:11
167:23 168:2
169:12,20 170:1,5
170:22 171:9
176:20,21 177:1
177:18 188:9,13
190:20,22 208:2,7
208:19,24 209:4,9
209:17,23 210:1,6
210:10,15,23
211:5,8,19 212:13
212:18
**mails** 9:19 103:21
112:12 175:13,23
175:23 176:4,13
177:8
**main** 2:1 3:16,21
21:9

maintained 172:24
maintaining 18:4
making 108:7 121:13
man 78:1,4
manage 34:1 46:25
management 23:16 128:22 184:18 204:6
manager 23:17 24:6 183:20,24 184:2,5,10 185:6
managers 184:16
mandated 20:10
manual 105:3,7
manuals 194:5
march 34:20 37:8 38:23 39:7 148:14 148:15,24 156:19
marital 129:17,17 139:13
mark 10:20 11:8 34:16 51:7 57:8 60:5 65:19 73:7 100:9 116:4 139:17
marked 11:6 25:20 26:20 30:10 34:23 35:4 38:1 40:13 41:3 47:2 48:25 49:10 50:4 51:12 57:13 60:11 66:2 68:18 71:5 73:6,9 77:11 86:3 93:1 97:11 100:10 100:15 103:10,17 111:13 117:15 122:18 128:11 132:17,22 134:20

136:13,16 137:25 138:23 139:24 141:11 144:19 147:21 150:25 152:3 155:2 156:23 160:10,15 164:23 174:7 190:22
marking 11:1 12:1 25:16
marques 111:9,12 210:17
marriage 78:1,3 188:20 189:10,11
married 67:10 189:14
mass 87:10 101:20 107:1,12,14 108:16
master's 15:25
match 110:22,25
matching 110:16
material 83:3
materials 55:15
matter 6:1 165:2
matthews 3:21 7:8 7:8 10:25 11:11 11:13,18,22,24 12:9,15 13:5,7,12 14:9,17 26:21,24 28:1 41:7,10 47:20 63:20 80:10 80:24 89:15 92:2 93:6,8 94:6 96:17 99:5,6 111:15,23 114:12,19,24 115:3 116:15,25 117:4 123:8,11,14 135:13 138:4 152:6 159:2 164:8 164:17 165:3,10

165:13,23 166:1,8 166:20 167:1 173:10,15 179:18 179:21 180:13 207:7
mcmaster 1:16 3:11 7:4 196:13
mean 27:23 33:18 43:4 77:19 82:23 106:6,7 107:18 118:17 119:6 124:9 131:9 142:7 142:15 165:13 189:24 190:1 200:19,22 201:5,9 201:13 203:18
means 9:16,17,19 11:5,10 12:2 48:17 69:16 93:17 118:24 129:19 163:15,21 167:11 167:15 207:17
meant 58:16,22 62:16,19 93:22 95:12,13 109:6,8
media 5:24 205:8
medication 10:10
meet 62:10 171:13 171:17,22
meeting 12:23 13:3,3,4,5,7,11 60:25 61:7 62:7 88:9 90:1 133:24 134:3 137:9 162:25 169:22 170:15 171:4,23 171:25 189:6 193:22
meetings 13:16 121:13,17

meets 27:11
member 62:10 86:20,24 87:3 95:2 107:12,13,19 107:21,21 108:15 108:17 127:15 136:11 138:3 211:14
members 12:17 28:16 39:8 60:20 83:12 88:13 90:2 108:1 127:13 138:19 141:2 176:3 190:24 191:14
memorialized 189:9
memory 88:12
mental 18:23
mentioned 13:15 24:5 26:1 30:17 33:5 47:14 48:12 147:7
mentions 47:10
mentor 27:12 111:3
mentoring 110:5 112:3
mentors 109:20,22 109:23,25 110:2 110:11,17,18,22 110:25 124:6
message 85:24 86:12 170:6,24 171:1 172:5
met 12:15,19 14:25 31:6 35:8 60:19
methodist 76:17 77:1

**mhch** 101:17,21
102:9
**mhm** 93:14 101:25
145:1
**michael** 1:17 3:12
7:5 161:15
**michelle** 86:14,25
87:2
**microphone** 11:19
180:18
**microphones**
180:22
**miles** 3:15 7:3 29:9
34:12 50:12 52:15
69:23 70:21 75:15
76:19 79:22 82:11
90:13,24 92:6
94:9 95:20 108:13
119:14 134:13
135:7 144:2 166:6
180:20 200:25
201:24,25
**miles.coleman**
3:18
**mindful** 9:8
**mine** 166:24
**minister** 27:19
98:18
**ministries** 3:19
7:10 12:16,18
16:11 17:10,14
18:12 19:10 25:18
26:15,18 29:17
37:20,24 48:19
55:2 93:14,18,24
97:14 101:13
117:13,14 118:23
129:11 142:3
145:2 146:19
147:17,20 157:7
157:11 168:7

174:5,15,19
207:19,23 208:13
210:21 212:6,24
**ministry** 18:1
19:20 27:18 32:5
49:17 59:14 105:3
120:1 195:18
**minute** 21:5 47:7
70:4 178:20
**minutes** 178:25
**miracle** 3:19 7:9
12:16,18 13:8
15:9 16:11,14,15
17:4,5,7,16,17,21
18:1,11,15 19:4,8
19:18,21,24 20:16
20:22 21:2,3,7,11
21:14,24 22:6,11
22:11,15,16,22
23:6,11 24:21,25
25:8,15,18,19,25
26:5,8,15,16,18,19
27:5,23 28:3,10,10
28:15,20,25 29:6
29:16,18,23 30:5
30:10,20 33:8
34:18,23 37:9,13
37:18,20,23 38:1
38:15 39:3,8 40:2
41:23 42:3,9,16,17
42:19,25,25 43:21
43:23 44:5,9 45:4
45:5,10,18 46:1,7
47:2,11,25 48:4,19
49:1,3,8 50:3,6
51:6,12 52:7,9
54:3,11 55:2,15
56:2 57:8,13 59:2
59:10,20,21 60:4
60:11 61:21 62:20
62:23 63:2,6,11,18

64:2,6,12,15,19,24
65:12,18,21 66:1,9
68:1,13,18 69:9,12
69:16,18,20 70:10
70:12,13,17 71:1,5
72:4 73:6,9 74:15
74:16 75:5,7,11,22
75:25 76:7,10,15
77:2,5,15,24 78:5
78:21 82:8,8 83:7
83:9,14 84:4,9,20
85:1,8,11,23 86:3
86:16 87:21 89:12
89:18 90:4,5,11,20
91:4,21 93:14,18
93:24 94:3,16
95:17 96:2,2,5,14
96:15,24,24 97:1,6
97:14,20,25 98:2,4
98:7,9,12,15,20,22
98:24 99:1,10
100:4,10,15
101:12 102:13,20
102:21,24 103:1,2
103:5,7,10,17
104:16,19,22
105:23 106:3,4,14
106:19 107:6,24
108:24,25 109:19
109:20,24 110:4
110:17 111:8,13
112:16,22,23,24
113:6,25 114:2
115:14,19,25
116:10 117:12,14
117:23 118:4,19
118:23,24 119:11
119:12 120:6,6,15
120:25 121:3,6,10
121:24 122:2,12
122:18 124:2

125:16,22 126:15
126:24 127:15,24
128:5 129:11
131:9,11 132:17
132:22 133:20,21
134:10,20 136:12
136:16,21 138:1
140:22 141:2,8,23
142:1,3 144:14,18
145:2,5 146:15,19
146:25 147:8,14
147:17,20,21
149:3,8,12,15
150:5,21,24 153:3
156:4,8,18,23
157:7,11 159:5
160:10,14 161:24
162:1,5,8,10,20
163:7 167:25
168:7,9,21,24
170:9,14 171:4
172:23 173:7
174:5,15,18 175:7
175:17 176:3
178:8,11,11
179:24 183:20,25
184:15 185:14
186:6,7,21 187:6
187:12 188:20,24
189:9,17,23 190:8
190:14 191:7
193:13,15,23
194:4,13,21 195:1
195:2,6,14,15,23
196:4,6 197:10,19
198:4,6 199:3,16
199:18,25 200:3
200:10 203:5,15
203:23 204:3
207:18,21,22,25
208:5,10,13,17,22

209:2,7,13,16,21
209:25 210:4,9,13
210:18,20 211:3
211:11,17,22
212:1,6,7,11,16,20
212:23
**mischaracterizat...**
164:10
**mischaracterizes**
164:9
**misremembering**
165:19
**missed** 22:20
64:10
**mission** 27:15 90:6
**misunderstood**
64:9
**model** 163:13,22
167:18
**modeling** 200:22
201:1
**models** 18:8
**modification**
151:7 152:18
**modifications**
165:15,16
**modified** 152:20
**moment** 11:13
41:7 111:16
204:19
**month** 137:18
196:5
**months** 39:1 126:6
126:10 153:12
**moore** 2:7 6:19,23
7:20
**moot** 146:20
**morning** 5:1 7:18
94:22 123:21
181:12 185:13

**mother** 85:17,20
87:9,13,21 88:17
88:20 95:6,17
102:2 105:15,22
106:13
**mother's** 97:15
105:14
**motive** 72:16
**mouse** 174:17
**move** 50:1 54:22
56:2 115:12 185:5
**moved** 35:17
46:14,22 185:3,4
**moving** 37:6
149:23
**mowen** 19:20
**mullins** 3:15
**multiple** 116:20
**multiplicity**
180:22
**muslim** 29:3 112:8
**mzelkind** 2:18

**n**

**n** 207:1
**name** 5:2 6:6 7:18
7:22 27:20 30:17
31:1,11 32:25
35:6 47:17,19
48:10,12 51:21
94:11 105:17
112:2 169:13
213:2,3
**named** 47:14
54:20
**names** 52:4 105:10
105:16
**national** 139:3
**necessary** 179:4
200:5
**need** 8:22 9:4
23:23 41:6,20

65:5 66:22 72:22
77:7 95:16 102:6
131:19 151:15
199:9
**needed** 45:15 59:2
59:7,8 175:4
176:18
**needing** 101:19
182:24
**needs** 23:21 41:8
**needy** 27:20
**neglect** 20:11
**negotiate** 156:9,12
**negotiated** 156:5
**neither** 52:24
206:6
**nekki** 11:4 174:6
207:14 212:25
**nelson** 3:15
**nelsonmullins.c...**
3:18
**never** 96:10 119:3
197:11 201:20
204:15
**new** 2:10,16 24:3
64:14 82:6 115:13
125:17 146:22
180:2,4,7 213:1
**newman** 3:7 5:20
7:1,1 205:1,2
**news** 27:19
**nodding** 8:11
**nonchristian**
64:24 190:25
**nonchristians**
64:20
**nondenominatio...**
35:19
**nondiscrimination**
130:6,23 141:3
146:8 154:16,21

164:5
**nonprofit** 127:7
**nonprotestant**
61:16 102:14
**noon** 13:10
**normal** 121:19
**north** 2:1
**notary** 206:2
213:25
**note** 68:14 123:3
157:8 158:24
159:22 163:13
**noted** 35:6 55:19
**notes** 9:13 75:3
178:20 181:15
**notice** 10:22 11:4
11:9 12:1,6
207:15
**noticing** 6:17
**notified** 145:13
169:8
**november** 85:25
86:13 93:2 100:12
100:22 101:2
102:12 103:12
134:22 137:18
144:16 162:16
171:16
**number** 6:4 10:24
26:16 31:24 37:17
38:21 40:14,17
41:15 47:5 50:5
51:6,19 53:1 57:7
57:19 60:4 63:13
63:17,17 64:5,8,11
64:11 65:18 70:6
77:12 78:10 93:1
105:18 122:11
138:2,5 139:15
140:11 146:12
150:22 153:25

**[number - omnibus]**

155:9 157:10,21
173:21 174:22
179:23,25,25
180:2 205:8
**numbered** 30:5
68:13 71:1 85:22
111:8 135:14
144:14 145:4
**numbers** 44:6,11
**numerous** 20:4
**nun** 31:14
**ny** 2:10,16

**o**

**o** 174:5 212:24
**oath** 6:9 10:4
**object** 8:18 28:1
34:12 47:20 50:12
63:20 69:22 70:20
75:14 76:19 80:10
82:11 89:15 90:13
90:24 92:2,7 94:6
95:20 96:17 99:5
99:15 100:5
105:25 108:12
119:14 134:13
144:2 159:2,11
164:8 165:4 182:6
183:17 184:13,21
184:25 185:10
186:23 187:4,23
188:6 189:19
190:3,12,18
191:17,25 192:11
192:18 193:2,18
194:1 195:11,20
196:1,11,17,21
197:5,13,23 198:9
198:16,22 199:7
200:24 201:3,7,10
201:16,21 203:7
203:25 204:17

**objected** 87:22
96:5,14,23 102:2
104:17 106:18
163:15 167:11,16
**objection** 29:10
52:15 77:6 84:22
90:23 91:6 202:1
202:9
**objections** 6:15
94:11 199:9
**obligated** 85:1
**observations**
137:11
**obtained** 15:14
16:2
**obviously** 9:23
88:4 92:20 134:24
197:25
**occurred** 80:17
81:3
**october** 128:8
129:2 132:19
133:13 136:11
137:6 138:3
143:14 161:3
163:12 167:22
169:11 170:3
171:20 211:15
**offer** 84:20 91:10
91:10 171:16
195:2
**offered** 84:4 91:15
151:13
**offering** 84:11
201:5
**offers** 127:8
**office** 3:6 131:20
**officer** 146:15
**offices** 169:23
**official** 1:9,12,14
1:16,17 3:11,13

7:4,6 148:4
206:10
**oftentimes** 46:21
**oh** 124:8,8 135:22
137:3 152:8
**okay** 5:22 11:16
11:18,21 12:8,17
12:25 14:19 15:22
16:10,25 18:10
23:11 24:13 27:9
29:5,15 30:24
33:10 34:15 36:19
36:22 37:8,15
38:19 39:6,14,20
39:24 40:16 41:1
41:23 42:19 43:8
44:21 45:17,23
46:15 47:1,1
48:24 52:25 53:23
55:12,17 56:9,13
56:17,20 57:6
60:3 61:13,20
62:4,20 63:16,24
64:13,18,23 65:8
66:7,12 67:7 68:6
68:11,25 70:24
71:18 72:11,17
73:4,23 75:19
76:14 77:10 81:11
81:19 82:5 83:6
83:25 84:9,20,25
85:7,21 87:4,19
88:16,21 89:21
90:3 92:24 93:11
95:6 100:8 101:6
102:8,20 103:8
104:15,22 105:5
105:21 106:6,19
107:15,23 109:13
109:24 111:24
112:18,21 113:5

114:6,22 115:24
120:14 121:24
122:11 123:8,11
123:20 125:15
126:2,13,23
127:12,15,18
128:3,23 129:10
130:21 132:16
133:5,16,22 134:5
134:18 136:5,9,19
137:1,5,24 140:14
141:16,21 142:7
142:13 143:9,17
143:22 144:1,5,24
146:6,11 147:3,7
148:17 149:1,7,13
149:22 150:3,9,13
150:18,19 151:25
152:16 153:17
154:9 156:12,15
158:23 159:16,21
159:25 160:8
161:13,25 163:2
163:10 164:2,15
164:20 166:13
167:8,18,21
168:24 169:3,17
170:20 171:2,7
172:3,8,10,15,22
173:2,2,4,17,23
174:9,10 175:6,20
176:19,25 177:7
178:18 180:9,17
180:21 181:4
182:2 185:23
186:18 199:12
203:1,13,20 205:5
**omega** 15:19
**omnibus** 155:16
157:11 158:13

**once** 23:3 104:1
128:13 201:20
202:7
**ongoing** 184:3,5
**online** 189:6
192:20
**open** 38:15 42:14
46:11,11 61:4
62:18
**opened** 49:2
**opening** 37:21,25
208:15
**operate** 98:10,16
194:23
**operated** 96:2
**operation** 196:6
**operational** 105:3
**operations** 197:2
**opinion** 92:4 98:11
99:1
**opportunity** 56:6
84:1,12 91:15
139:2
**opposed** 24:10
**opposite** 189:15
**opt** 82:15 83:18
**option** 83:18 95:6
95:8,24
**orally** 132:9,10
**order** 37:9 150:22
150:24 151:9
152:17,21,22,24
153:5,6,21 154:7
155:24 156:2
196:14 212:10
**organization**
98:16 106:3 110:8
110:10 126:14,25
127:6,7
**organization's**
59:3

**organize** 179:3
**orientation** 19:18
23:1 36:1 37:5
40:2,6 56:7
123:24 129:17
130:11 139:12
190:9
**origin** 45:23 84:10
84:17,19,23 85:2,9
90:23 91:7 96:14
96:23 102:23
103:4 107:9 111:2
113:8,17 120:4,11
139:3 199:1
**original** 41:2,3,17
**originate** 154:10
**orthodox** 186:16
187:9
**outcome** 6:11
**outline** 114:15
**outlined** 175:4
**outright** 40:8
**outside** 80:17 81:3
87:13 89:2,3 92:1
92:14 95:19 102:4
159:8 164:13
177:17,17
**overall** 17:13
**overseeing** 18:5

**p**

**pa** 2:1 3:20
**pafcaf** 126:25
127:2,13,16,19,23
129:3 136:10
137:4,4 138:3,18
141:1,7,18 163:16
163:25 167:12
211:14
**page** 27:10 30:24
31:23 32:1 35:4
41:3,10,15 51:18

51:19 52:25 53:5
57:18,19,19 58:4
60:18 66:14,17
69:3 71:19 87:6,7
93:1 97:11,12
101:15 103:24
106:25 111:25,25
117:8,12,22 118:1
123:24 128:25
129:12 133:5
134:24 135:2
137:6 138:22
139:15 144:25
146:12 148:17,18
150:16 152:2,3
153:14 155:2
157:3,10 158:8
161:13 163:13
167:9 171:9,20
175:3 207:2,12
213:5
**pages** 148:11
**painful** 34:1,4
**palmetto** 127:4
**paragraph** 32:1
38:10 47:9 57:21
69:2 74:2 87:5,17
89:21 93:5 94:20
97:12 129:11
138:24,25 139:8
145:4 155:16
157:21 158:1,12
158:17 161:25
**paragraphs** 87:5
99:9
**parent** 23:24
27:12 36:1 51:24
55:14 66:19 76:11
85:12 88:13,14
90:16 97:9,21
104:17 117:24

121:25 122:3
123:23 124:24
139:2 140:16
185:24 186:5
188:25 189:5
200:11 201:19
202:6
**parenthesis** 117:5
**parents** 18:7 20:24
21:19 22:19,25
25:3 26:9 27:24
28:11,17,22 29:1,7
29:19,24 37:10,22
37:25 38:16 39:4
39:10 46:16 47:5
49:2,4,7 52:10
53:21 59:11,22
62:23,24 64:11
65:14 69:10 70:11
70:22 75:24 83:10
90:16 95:4 98:8
98:13,24 105:13
106:10,14,17
107:3,17 108:1,9
108:22 109:2,4
113:4 115:20
118:5,13,25
119:11,21 120:6,7
125:13,18 131:11
163:9 185:6
195:16 198:25
199:19 208:16
**parks** 12:21 21:22
30:7,9,23 33:15
48:11,14 53:7
57:10,12,20 58:5
58:10,15,21,25
60:7,10,18 61:7,14
62:5,9 65:25 71:4
71:10 79:5,7,25
80:8 81:9,12,23

82:1 122:13,16
124:19 161:16,20
162:5,23,23 163:3
169:13,20 171:10
171:20 172:4,11
172:16 176:9
178:14 192:20
208:4,25 209:5,11
209:20 210:24
**part** 16:22 21:11
22:20 29:21,22
41:11 43:12 55:5
55:6,8,9 67:3,16
67:17 76:12 78:25
79:14 90:5 103:24
113:20 116:25
125:25 133:3
155:11
**participate** 84:12
99:12,23 115:17
116:2 162:17
194:7 198:8,20
**participated**
162:21
**participating**
198:11,14
**particular** 24:10
36:4,15,25 37:1
55:23 88:7 113:17
**parties** 5:12
**partner** 27:18
28:16,20
**partners** 49:17
**party** 6:10 108:4
206:7
**passed** 129:21
**passing** 63:21
**pastor** 112:4
**pastors** 31:4
**paula** 134:21
136:15 137:1

211:21
**pause** 199:10
**pay** 204:3
**pdf** 116:17 123:1
**peek** 156:16
**penalized** 198:7
198:11
**pending** 5:17 9:6
206:7
**people** 13:14
28:20 67:19 88:5
98:16,25 109:25
110:11 176:12
193:22 200:11
**percent** 44:13,20
**perfect** 136:9
179:6
**perfectly** 25:11
**performing**
175:18
**period** 38:14 67:1
143:9 148:10
172:25
**periodically** 9:10
**permanency**
128:22
**permanent** 149:9
149:12
**permission** 105:14
**person** 21:23 24:8
34:5 189:14,18,23
201:19 202:7
**person's** 190:15
**personal** 35:8 67:9
98:12 191:22
**personally** 74:24
96:12 168:8 178:6
**pertains** 157:10
**petty** 111:9,12
210:17

**phone** 13:13 15:3
58:10,12
**phrase** 65:4
200:16
**phrasing** 164:18
**picked** 8:12
**piece** 108:21
**place** 3:8 21:9 95:8
95:23 162:13,14
169:22 172:1,2
181:14,22 182:18
183:13,15
**placed** 45:19 46:3
101:13,21,25
113:2 120:5,24
154:1 197:9
**placement** 44:24
45:5,10 97:16
101:12 102:22
103:3 151:13
169:8 171:14
182:20,24
**placements** 46:11
150:1 168:8
**placing** 19:1 20:17
20:20 145:7
168:18 182:15
**plaintiff** 5:25
47:14
**plaintiffs** 1:5 2:3,5
5:19 6:19,21,23,25
7:20 65:9 173:7
174:15 178:8,13
188:10,11 193:15
**plan** 99:17 133:23
**planned** 103:25
**platform** 9:17
**play** 21:8 45:10
46:1 181:9
**played** 46:7

**plaza** 2:9
**please** 6:15 7:13
7:22 8:10,13,22,25
9:1 25:13 31:5
45:8 49:23 58:20
67:8,10 71:20
91:2 93:20 99:16
102:25 107:2
129:23 157:8
171:23
**pm** 115:5,7 179:8
179:11 205:6,11
**point** 8:21 16:21
29:18 39:13 65:4
65:12 70:7 72:23
79:7 108:6,14
165:25 166:9,10
179:15 180:1,5
194:12 197:19
**policies** 125:22
154:17,22 194:4
**policy** 29:17 32:2
37:14 38:15 39:3
47:3 59:4,10,21
62:21 90:20 91:4
91:8 104:23,25
107:25 125:17
187:6 188:3,4
197:20 198:4
**poor** 43:11
**poorly** 202:17
203:12
**pop** 116:12
**popped** 137:25
**population** 70:15
**portion** 151:5
**posed** 132:4
**position** 17:7,12
18:11 33:11
118:13,25 119:8
119:17,21 120:7

200:11
**positive** 82:25
**possible** 9:25
129:13 201:18,23
202:6
**potential** 21:12
22:17,23 27:24
28:11,21 29:1,7,19
29:24 37:10 39:4
39:9 47:4 58:7
60:25 62:7,11
65:14 125:13
**pr** 55:15
**practice** 5:6 49:16
65:6 70:2 90:8
91:9,10 94:3,16,17
98:8,14 102:13
115:25 145:13,14
195:15 198:4
199:21 203:23
**practices** 93:15,19
93:24 194:4
**practicing** 50:25
89:2 92:1,14
186:19
**praise** 54:21
**preaching** 200:20
**precise** 44:11
**precisely** 186:3
**predated** 204:10
**preference** 87:11
88:11 89:1,4
91:25 92:13 97:18
108:9 113:18
114:10
**preferences**
108:10
**preferred** 88:11
**preform** 192:21
**preparation** 13:23
71:15 160:23

**prepare** 12:11,14
14:20 171:24
**prepared** 146:5
172:19
**preparing** 13:19
**presbyterian**
67:17
**presence** 80:18
81:3 164:13
**present** 4:1 6:12
13:15 31:4 81:25
101:19 197:25
**presented** 22:10
60:22 81:21
**president** 17:9
18:12 19:9,20
29:16 54:11
118:22 124:9
**press** 37:19 38:18
39:2 47:2,9 48:17
49:1,13,22 55:9,15
**pretend** 203:19
**previous** 94:10
**previously** 42:1
93:4 190:1
**primarily** 16:18
18:7 83:10
**primary** 127:24
**principal** 1:14
**prior** 23:1,2 26:2
39:7 61:10 100:23
101:3,4 133:8
143:17,17 146:25
160:22 164:9
203:21
**private** 18:19
20:16 98:15 127:7
127:8,9 130:17
**privilege** 80:20
159:3,12

**privileged** 47:22
47:25 80:12
**probably** 15:6
44:15,20 83:11
94:11 121:22
126:9
**problem** 166:25
173:17
**problems** 121:5
**procedures** 5:16
**proceed** 114:11
**proceeding** 6:15
**proceedings**
165:12 167:6
205:10
**process** 22:18,24
23:3,8,10 27:17
35:11 37:7 39:25
45:5,10 46:2,8
56:4 63:1 110:5
110:21,24 112:5
122:6 124:17,22
125:12 126:3
168:13
**processing** 123:5,6
**procurement**
146:13,14
**production** 123:3
173:8 174:21
**professed** 105:12
106:8
**professional** 19:10
19:12,25 20:4
**profit** 126:22
**program** 17:1,15
17:19,21 18:6
37:21 38:16 51:24
93:13,17,23
**programs** 17:15
17:25 37:25 127:9
155:19 157:14

208:15
**prohibits** 155:17
157:12
**promises** 178:23
**proportion** 44:8
**proposal** 137:8
**proposed** 129:3,6
138:16 140:3,15
164:3 165:14,18
**proposes** 171:21
**proselytizing**
201:14
**prospective** 37:10
49:3,7,7 53:21
59:11,22 62:22,24
63:10 64:1,10,15
70:11 75:23 98:7
98:13 107:25
108:9 109:1,4
131:10 188:25
189:5
**protect** 129:22
131:9
**protects** 131:6
**protest** 144:15,17
145:3,6,6 146:16
146:19 211:25
**protestant** 29:7,19
32:3,5,6,7,19
37:12 39:10,12,17
39:18,22 50:10
52:23 59:16 61:24
76:17 113:1
186:22 187:11,20
**protestants** 185:19
**prove** 54:22
**provide** 10:8
23:12 67:3 72:18
82:8 89:13,19
109:20,22 112:25
113:4 118:5

127:10 141:24
142:4,22 143:4,19
149:3,15 176:22
177:12,23 178:1
**provided** 23:1,16
53:3 82:14,20
84:3 124:4 134:6
145:10,19,25
153:3 169:7
**providers** 137:21
141:13,18 157:16
190:24
**provides** 67:12
162:10
**provision** 130:3,6
130:8,16,23 146:8
152:20
**provisional** 196:5
**provisions** 138:18
155:25 166:17,18
**proviso** 129:21
131:2,4,9,14
**psalms** 117:6
**public** 206:2
213:25
**publicly** 21:16
22:3,12
**published** 27:5
**publishing** 27:8
**pulido** 122:17
124:20 211:1
**pull** 176:17
**pulling** 11:16,17
**pumpkintown**
17:17
**purports** 145:9,12
**purpose** 27:7
120:2 151:14,18
171:23
**purposes** 11:2
102:7

**pursuant** 81:8
155:11
**pursuing** 64:21
**put** 10:20 25:13
26:13 100:8,8
121:18 136:3
141:21 142:20,25
159:17,25 166:9
170:9 173:2,10
**puts** 87:14

**q**

**quarter** 56:19
**question** 8:14,17
9:6,7 22:21 27:4
27:10 28:2 29:10
34:13 39:7 41:12
45:7 48:5,7,9
49:23 50:13 52:16
58:19 63:21 64:9
66:18 69:23 70:21
75:15 76:5,20
80:11,19 82:12
89:16 90:14,25
91:2 92:3,5,7
93:20,21 94:7
95:21 96:18 99:6
100:25 102:25
104:6 106:1,11
108:13 119:15
131:19 132:4,13
134:7,14 139:17
139:23 144:3
145:22 154:18
157:23 159:7
163:16 164:4,5,9
167:12,16 179:19
186:2 188:23
189:4 192:2
199:11 202:1,4,5
202:17 203:11

**questioned** 52:20
**questions** 8:7,19
10:1,2 15:12 52:1
52:6,7,13 53:4,16
60:22 61:14,15,21
61:25 79:8,12,13
81:4,13 82:2
105:8 109:14
114:18 179:15
180:14 181:2
185:18 188:17,18
195:14 204:20
205:3
**quick** 15:11
147:12
**quickly** 111:6
152:1
**quietly** 99:13,23
100:2
**quote** 32:17 48:18
51:1 97:25 130:23
131:19 181:14
200:12
**quotes** 88:25

**r**

**r** 126:17
**race** 139:3
**raised** 67:14 134:7
139:23 140:23
141:7 164:5
**raises** 145:2
**rare** 99:14
**rarely** 177:14
**reaccreditation**
18:5
**reach** 72:5,7
182:25
**read** 51:25 53:2
87:17 89:22 95:14
102:9 117:6
140:18 145:21,24

150:8 156:1
158:14 205:13
**reading** 49:19
76:6 82:21 109:5
130:16 139:6
**reads** 27:10
101:11 103:13
**ready** 142:9,13
**real** 151:25
**really** 59:12
181:19,21 186:20
**rear** 4:5
**reason** 9:4,21 10:7
43:14,17,19 66:25
70:14 76:3 78:17
142:11 159:8
184:9,15 185:3
191:23 192:8,15
213:5
**recall** 37:13 40:22
44:6 55:24 68:23
71:17 72:9,20
73:3,20,22 91:8
92:22 100:7
104:20 107:11,11
121:7,8,14,16,23
124:3 125:3,14,19
125:21 132:10,15
141:1,5 143:11
146:4,10 151:24
159:24 162:24
163:1,2 167:20
202:23
**receipt** 146:15
**receive** 12:8 15:18
24:1 63:19
**received** 16:6 20:8
20:9 33:13 35:24
36:9 54:16 60:24
65:13 79:14 159:4
172:6 192:20

**receiving** 155:19
157:15
**recess** 57:2 115:6
179:10
**recipient** 31:1,10
32:14 35:5,15
39:15 51:21
**recipient's** 34:8
**recognize** 38:7
57:16 60:14 71:11
86:8,9 100:18
103:20 111:22
122:21 128:14,16
132:25 133:2,3
135:3 138:8
144:21 151:2,3
157:1 160:20
170:21 172:20
**recognized** 34:7
136:24
**recollection** 14:2,6
44:15 48:21 52:19
88:22 90:15 92:17
104:3,7 112:14
150:10
**reconciliation**
155:17 157:12
158:13
**reconvene** 114:21
115:2
**record** 5:8,23 6:14
7:23 9:15,18 57:1
57:4 115:5,8
117:11 178:24
179:9,12 199:9
205:6 206:5
**recorded** 5:24
**recording** 5:13
**records** 14:14
175:14,14

**recruit** 21:12 22:7
22:13 32:2
**recruited** 22:10
**recruiting** 125:17
**recruits** 110:11
**rectified** 9:24
**rector** 122:16
124:19 211:1
**redacted** 31:1,11
35:6 51:22 52:5
105:10,11,16
112:3
**reentered** 167:5
**refer** 141:14
**reference** 61:13
96:18
**referenced** 91:22
147:25 164:21,22
**referencing** 92:16
**referrals** 43:2,6
**referred** 58:22
79:3,4 110:2
145:20 146:3,7
154:6 165:14
166:8,11 190:23
193:24 200:10
**referring** 19:1
48:22 52:4 58:1
61:8 89:9,25
92:18 94:24 102:5
108:22 112:8
129:7,8 130:5
131:4 137:15
138:12 140:12
155:3 169:24
170:24 171:1
**refers** 96:19
139:18 140:21
145:21,25 163:24
**reflect** 140:22
187:1

**reflected** 153:20
185:19
**reflects** 32:5 49:14
159:4
**refresh** 14:2
**refreshed** 14:6
**refuse** 98:7
**refused** 107:7
**refuses** 98:12
**regard** 20:5 25:7
76:10 80:8 84:18
121:10 129:14
130:9 139:10
204:2
**regarding** 9:13
18:8 23:22 25:1
44:24 54:6 55:20
81:14 82:2 87:7
88:7 92:21 104:23
104:25 112:2
125:23 140:3
163:6 164:5
199:20
**regardless** 61:23
88:11 89:1 91:25
92:13
**region** 24:14,14,16
24:17,19,21
**regular** 134:11,11
**regulation** 137:8
138:16,18 140:7
140:15 146:2
164:3 165:1,15,17
166:11
**regulations** 145:10
145:20 146:1
154:16,21 155:8
155:11 166:19
**rehab** 16:23 18:2
126:17

**reid** 12:20 32:24
51:8,11 60:6,10
71:3,10 79:24
132:19,21 162:22
162:22 178:15
193:9 208:21
209:6,18 211:9
**reimbursement**
152:4,11,20 153:3
153:7,20,24 154:5
**reissue** 146:18
**reissued** 146:22
149:12
**rejected** 34:8 40:8
40:11 78:18
**relate** 195:8
**related** 6:10 19:25
72:9 101:8 125:22
140:15 172:24
175:8 206:6
**relatedly** 190:14
**relates** 47:23
159:10
**relating** 194:5
196:14
**relation** 196:19
**relationship** 78:2
78:5 143:24 184:3
184:6,18 185:7
**relationships**
184:11
**relatively** 125:17
**release** 37:19
38:18 39:2 47:2,9
48:17 49:1,13,22
55:9
**releases** 55:15
**relevance** 92:7
**religion** 113:19
130:11 139:12
155:18 157:14

190:16
**religious** 26:5
31:12 50:7 67:22
67:23 82:9 84:3
84:12,20 85:3,10
85:18,19 88:18
90:5 92:21 94:5
95:18 96:6,16,25
97:17 98:1,4,15,21
98:25 102:7,24
103:5 104:23,25
105:24 106:3
113:1,4 118:5
119:12,24 129:22
129:25 130:24
131:6 139:17
140:21 141:4
157:16 194:5
197:12 198:8
199:2,21
**remain** 104:1,13
**remember** 12:24
13:1 36:24 37:1,3
38:17 48:13 53:15
55:23 56:1 58:11
58:13 61:6,25
71:14 85:8,13,15
85:16,18 88:6
89:23 104:15,16
118:6 121:12
125:7,9,11,15,25
129:5 132:12
149:11 158:6
165:24 171:25
172:3,4 176:23,25
178:2 181:16
185:12,17,20,22
188:13,21 189:1
194:8 199:18,21
200:12 202:3,4,19

**remembering** 88:2
**remote** 5:13 11:5
11:10 12:2 207:17
**remotely** 5:8,11
6:5,13 7:15 9:12
**remove** 182:19
**reorganized** 125:7
**repeat** 22:21 41:11
48:6 49:23 52:18
91:1 93:20 102:25
154:18
**rephrase** 28:7
76:22 164:16
**replied** 31:11
**replies** 58:5
131:18
**reply** 32:15 97:10
**replying** 31:25
**report** 20:12 30:22
30:22
**reported** 1:24
**reporter** 5:9 6:8
7:13 8:13 94:12
144:9,12 173:20
173:23 174:3
180:16,19,23
200:25 201:24
206:1 207:10
**reporters** 20:10
**reporting** 213:1
**represent** 7:20
117:19
**representing** 7:10
15:9 48:4
**request** 35:24
36:12,20 85:9
94:23 97:15
103:14 107:2
111:3 174:25
183:6 199:1,20

**requested** 36:17
53:18 104:13
107:9 146:16
157:7 176:8 200:7
**requesting** 57:21
**requests** 9:1 85:5
174:21,22 175:1,2
175:24 199:25
**require** 26:8 90:21
91:5 107:20
108:16 145:9,12
154:24
**required** 19:7 20:7
39:8,12 49:8
50:15 84:10 130:5
130:8 154:15,20
**requirement**
75:23 129:24,25
130:24 141:3
145:6,8,15 157:17
164:6 191:7
**requirements**
124:25 145:10,12
145:19,25 146:2,7
**requires** 98:24
129:21
**requiring** 90:17
**rereview** 77:7
**research** 74:17
**reserved** 52:13
**resided** 43:23 45:6
45:11 82:10 83:14
**residential** 17:15
20:6 45:15 46:9
89:19 90:22 91:5
91:12 92:8 127:9
127:9 149:25
194:13,16,24
195:3,8,24 196:9
196:20 197:7
199:17 202:15,24

203:16
**residing** 102:15
**resolved** 104:5,10
**resources** 124:9
127:10
**respect** 24:22 85:9
87:8 95:7 97:8
98:1 109:18
112:23 113:7,8
121:2,5 131:9
134:6 164:25
**respecting** 97:17
97:20 131:2
**respects** 98:21
**respond** 79:18
80:21 198:20
**responded** 132:1
159:22
**responding** 32:14
**responds** 35:15
61:2
**response** 31:10
32:17 34:6 71:21
71:25 72:14,19
73:1,24 78:8,11,16
78:23 93:3 105:15
106:24 131:21
132:2,3,13 133:7,9
159:14 169:6
170:5 172:5 175:9
178:7,12 181:13
183:4
**responses** 54:5
**responsibilities**
17:12 145:8
**responsibility**
45:2
**responsible** 17:13
17:23,25 18:4,6
110:16 124:6,15

**responsive** 175:24
177:2,13,24
**rest** 131:23 134:25
**restate** 29:13
**result** 61:9 146:19
189:15
**retained** 205:9
**retired** 18:16
**retrieved** 116:22
**returned** 158:25
**reunited** 45:21
**revealing** 55:22
**review** 13:22 72:8
124:23
**reviewed** 60:21
**revise** 122:2
124:14 146:17
**revised** 123:1,17
137:7
**revising** 124:12,17
**revision** 126:2,3
**revisions** 123:22
125:4,9,11,16,22
126:1,6,10 140:15
164:25
**revisit** 39:6
**rewarded** 198:13
**richard** 174:5
212:24
**right** 11:24 16:11
24:11 26:6,12
27:6 29:1,25 30:2
32:13 33:8 34:10
35:14 38:13,24
39:4 40:2 44:21
44:25 45:24 49:4
49:18 50:7 51:4
53:21 54:11 56:17
62:20 63:7,19
64:21 65:4,6,15
68:11 70:19,24

73:4 75:9,13
76:11 77:24 80:23
81:6 82:5 86:25
95:3 97:22 98:2
99:20,25 100:24
101:9 105:24
106:15 108:11,20
109:4 115:2
116:13 122:8
126:8 128:3,17
130:12,18 133:14
133:19,25 135:8
135:18,19 138:17
139:14,16 140:16
140:19,20,24
141:4,21,24
142:23 143:10,20
143:24 147:9
148:7,15 150:7
151:19 152:21,25
156:15 157:19
159:19,25 160:1,8
161:4,18 163:10
164:6 165:2
166:19 168:4
169:4 172:13,19
173:25 174:2
175:25 176:15
178:18 179:6,19
180:11 181:1
183:1,8,9,22
184:11,19 185:8
186:22 187:2
188:4 190:25
193:10 194:14,18
195:3 196:15,23
197:3 198:2 199:5
200:17 201:18,20
202:6,8,15 203:2,6
204:12,20 205:13
205:14

**rights** 154:25
155:10 200:11
**riley** 3:15
**risk** 87:15
**rogers** 1:3 2:6 6:1
7:20 65:9,13
66:15 71:22 72:1
72:12 73:1,13,25
75:4,20 76:8,15,24
78:9,12,17,23 79:9
80:9 81:14 82:3
188:12 190:21,23
191:13,19 192:5
192:21 213:2
**role** 18:11 21:6,9
21:23 45:4,4,10,13
46:1,7 55:13
118:22 124:2
126:24 128:20
168:6 181:9,13
**roman** 185:23
186:4,13,16,19
187:9,11,19
**room** 5:7,10 6:12
9:14 24:1 167:3
173:11 180:18
**routine** 113:20
**rule** 5:16
**rules** 5:16,17 8:8
192:15
**run** 8:9 41:23,24
131:19 176:14,14
**running** 42:17,25
**rush** 72:25
**ryan** 12:20

**s**

**s** 207:11 213:5
**saddened** 33:16
**safe** 67:4
**safer** 179:2

**safety** 20:7
**sagewood** 8:1
**salvation** 31:6
35:9 67:9
**sandra** 54:21,24
71:4,9 209:20
**sandy** 79:20
178:15 193:9
**sat** 126:7
**satisfied** 191:15
**saved** 123:17
**saw** 174:25
**saying** 32:25
108:24 123:6
169:21 185:20
**says** 27:15 32:16
35:15 39:15 50:18
53:7 58:5 93:17
101:25 106:8
118:12 119:7,17
131:18 133:9
134:1 137:14
138:24 139:1,8,15
140:19 145:1,5,6
145:24 148:18,19
150:16 151:7,8
152:4,10,13,13,25
155:4,16 163:22
167:10 169:8
170:6,6 171:12,22
174:18,21
**sc** 2:2 3:9,17,22
**scandelaria** 2:12
**scarborough** 3:15
**scdss** 129:19,22,24
137:7 139:18
140:22 145:14
151:14 202:14
203:6,23
**schedule** 174:18

**scott** 1:14

**screen** 116:10,14
173:11,19

**screened** 45:16

**screening** 168:18

**scripture** 82:21

**scroll** 117:2,10,20
174:13

**seal** 206:10

**search** 175:7
178:6,12

**searches** 175:18
176:14

**second** 11:20
13:11 31:21 41:10
41:15 57:18,21
60:17 71:19 74:2
87:5 108:21,21
116:18 128:25
133:5 135:1
136:20 137:19
144:24,25 148:19
165:6,6 166:3
167:9 173:14
188:17

**secretary** 1:9,12
1:14 3:2,3,4

**section** 67:7 102:8
109:16 136:11,11
139:7 140:18
152:4 155:6
157:18 211:16,16

**sections** 66:13

**see** 9:22 27:9,13
27:21 31:7,20
32:8,21 35:12,20
37:15 38:11 41:21
41:22 46:13 50:16
50:22 57:24 66:10
66:15 67:5,24
73:16 74:7,13

77:10 82:19 83:2
92:15 95:9 101:22
103:23 112:3
116:4,10,24,25
117:7,21 131:21
133:6,14 135:18
137:12,22 139:19
145:16 148:12
150:18 152:8,10
152:15 153:13
155:13,21 157:17
158:9 162:7
163:19 164:16
168:1 171:7
174:10,13

**seeing** 92:23 105:6
117:8

**seeking** 80:11
130:22

**seen** 12:5 25:22
27:1 30:13 51:15
51:15 65:3 66:4
68:21,22,23 73:14
111:21 160:22
174:23,24,25

**segregates** 32:19

**seminary** 15:19

**send** 35:9 72:16
116:9 123:12
129:23

**sending** 86:12
129:3 157:5

**sends** 170:4

**seneca** 8:1

**sense** 9:25 44:7,12
44:17 59:19 64:14

**sent** 14:9,9,17
31:17 66:6 71:15
71:17 72:19 73:24
100:22 101:6
111:23 112:2

150:12 172:4,16
188:9 202:14

**sentence** 74:3 75:3
118:10 137:19
167:22

**sentences** 105:9

**separate** 101:6
110:8 136:6

**september** 51:9
52:6 161:3,14

**serena** 2:8 6:22
10:19 25:13 26:13
30:4 34:16 37:16
51:4 111:7 116:5
116:7 128:4
134:19 135:25
144:7 147:13
173:5,24

**series** 8:6

**serve** 27:12 28:17
43:9,10 127:10
186:6

**served** 44:8 173:7
174:15

**serves** 24:22 88:12

**service** 85:18,19
104:1,12

**services** 1:8,10,18
3:1,14 6:2 7:7
20:24 21:1 23:16
23:20 24:23 25:7
43:3 44:22 83:16
83:17,19,21 84:2
88:18 89:11,14,19
91:11,14,16,18
94:5 95:18 96:6
102:24 103:5
104:14,18 105:24
106:3,4 107:8
113:13 127:5
130:20 141:24

142:4,22 143:19
147:17,19 149:4
149:15 150:5
162:9 197:1
203:24 204:8
212:5

**serving** 98:23
185:5

**servs** 213:2

**set** 24:1 25:6 58:10
61:20,25 133:23

**sets** 50:6 195:7

**setting** 100:2

**seventh** 50:17

**severity** 5:5

**sevilla** 110:19
123:25

**sex** 67:20 69:9,13
69:17 70:19 77:22
78:13,24 79:15
125:23 155:18
157:14 188:20
189:17

**sexes** 189:12

**sexual** 129:16
130:11 139:12
189:11,13

**share** 27:19 49:14
54:1 116:9 135:20
137:25 173:18,19
174:9

**shared** 83:4
110:22 141:2,2
163:5

**shares** 36:2

**sharon** 12:22 30:6
30:9,18,19 33:15
35:24 51:20 57:21
58:1 65:25 68:15
71:3,9 73:9,12
122:13,16 124:19

162:25 176:9
178:14 188:9
190:21 208:3
209:10,18,24
210:25
**sheet**  123:6 213:1
**shelter**  17:18 42:9
42:20 43:13 44:18
83:11,15
**shepherd**  32:2
**shift**  82:5
**short**  66:25 178:19
**show**  125:2 162:9
163:8
**showing**  116:15
**shutt**  11:4 174:6
207:14 212:25
**sic**  150:21
**side**  195:18
**sight**  181:3
**sign**  63:6 64:24
186:6,20 205:13
**signature**  123:24
206:17
**signatures**  148:12
**signed**  56:10 68:14
69:18 148:13,14
148:23 157:6
158:25 204:16
**signing**  65:1
**similar**  67:13
**simple**  8:8
**simply**  76:5
**sincere**  188:4
**single**  123:6
180:17
**sinkler**  2:1 3:20
7:9
**sisters**  31:15
**sit**  99:12,23 100:2

**sitting**  100:3
**situation**  34:2,4
87:20 88:7 104:4
104:8 112:14
170:10
**situations**  104:17
104:20
**six**  50:17 153:12
196:5
**skip**  49:25
**slightly**  32:16
114:9
**slowly**  117:10,20
**smatthews**  3:23
**smoak**  169:14,14
**smoothly**  8:9
**social**  1:18 3:14
5:6 20:23,25
23:20 25:7 43:3
44:22 89:11
130:20 147:17,19
212:5
**solely**  124:15
**solicitation**  127:25
128:1 129:9
142:10,14,15,18
142:19 143:1,5,7
143:13,16,18
146:17,18,22,24
147:1,4 148:5
151:16 153:8
165:16,18 166:12
202:14,20
**somebody**  36:10
109:3 200:20
201:14
**someone's**  190:9
**son**  31:17
**soon**  9:24 129:12
**sorry**  11:23 13:1
21:3 22:20 29:15

40:12 41:11 58:15
65:22 99:6 100:25
103:2 107:5
111:15,17 116:20
124:10 133:1,2
135:6 138:4 139:5
144:9 165:13
173:16 174:1
192:1 200:25
201:24,25,25
203:11
**sort**  19:11 31:20
44:13 125:4
127:19 134:11
151:6 181:7,19
**sought**  84:16
**sound**  161:4
173:24
**sounds**  87:19
99:24
**source**  48:3
**south**  1:1,16,18
3:6,12,13 6:3 7:5
7:6 8:1 17:17,18
17:20 18:17,22,23
19:5 20:20 21:6
35:17 44:21
130:20 147:16,19
150:23 151:11
161:17 170:18
186:14 196:4
197:1 206:3,11
212:4,9
**spartanburg**
17:20
**speak**  13:18 14:22
21:16 22:2 55:10
72:15 83:3 94:16
95:13 98:9,18
120:1 132:8
170:12,12 171:5

**speaking**  11:19
46:6 132:10
**specialist**  23:18
**specific**  25:1 84:22
111:3 121:7,14,20
121:23 125:9
141:7 143:23
157:18 199:15,19
**specifically**  8:20
23:6 41:5,18 69:7
91:21 149:23
181:12
**specifics**  23:9
**spirit**  50:19
**spiritual**  26:15,19
27:5 118:14,25
119:8,21 120:8
200:12,19 201:13
201:19 202:7
207:23
**spoke**  99:19
170:15
**spoken**  15:3
**spouse**  66:15
**spouse's**  67:11
**spouses**  37:11
**staff**  18:7 58:6,16
58:23 59:1,8
60:19 61:4,8,21
62:2,6,10,17 83:12
85:19 86:20,23
87:3 88:13 90:2
95:2 99:16 107:1
107:3,6,12,13,17
107:19,20,21
108:1,5,7,10,15,17
108:24,25 109:9
109:11 112:4
114:4 121:12,17
126:6 161:23
162:3 168:19

183:24 187:14
**staff's** 93:12
**stamp** 25:15 128:5
**stamped** 173:6
**stance** 101:13,18
  101:25
**stand** 127:2
**standard** 61:20
  149:9
**standards** 19:25
  20:3,5,14 23:20
  138:25
**stands** 27:4
**start** 47:3 107:25
**started** 59:21
  112:18 139:6
  143:11,15
**starting** 74:3
**starts** 117:25
  169:21
**state** 1:16,17 3:12
  3:13 6:13,16 7:5
  7:22 18:16,21,22
  70:12 150:23
  155:7 162:7 206:3
  212:9
**state's** 5:17
**stated** 60:21 74:4
  95:14
**statement** 25:9,10
  25:15,19 26:1,10
  27:16,16 36:2
  49:9,16,20 50:3,6
  50:15,17,18 51:25
  54:7 55:21 56:10
  60:21 63:7 64:25
  65:2,2,6 68:17
  69:18 70:2,4,7,9
  74:6 75:6,22 77:2
  77:18,21,25 78:6
  91:24 92:11 94:2

95:22 117:15
118:1,11 131:12
185:15,25 186:8
186:15,20,21
189:9 190:5 191:9
207:20 209:15
210:22
**states** 1:1,7,9 3:6,7
  6:2 49:14 75:10
  77:25 129:13
  196:25
**stating** 112:4
**statistics** 44:10
  163:6
**status** 129:18
  139:13
**statutes** 154:16,21
**staying** 23:19
**step** 21:4 37:7
  39:25 56:3 165:5
  165:8
**stephen** 156:19,22
  212:15
**steps** 35:10 54:6
  55:20
**steve** 3:21 7:8
  10:22 94:21,24
  99:6 114:10 123:2
  179:20
**steven** 3:4 86:14
  86:18,18
**stipulate** 5:12
**stop** 42:16
**stopped** 42:25
  184:15
**stored** 177:19
**stories** 55:14
**street** 2:1,16 3:16
  3:21
**strengthens** 37:20
  37:24 208:14

**struggle** 59:13
**studies** 18:19
**subchapter** 157:17
**subject** 101:11
  103:13 165:2
**submitted** 34:5
  65:21 66:9,11
  68:4 189:5
**subp** 25:19 26:19
  30:10 34:23 38:1
  51:12 57:13 60:11
  66:1 68:18 71:5
  73:9 86:3 100:15
  103:17 111:13
  122:18 132:22
  136:12,16 144:18
  147:21 150:24
  156:23 207:21,25
  208:5,10,17,22
  209:2,7,13,16,21
  209:25 210:4,9,13
  210:18 211:3,11
  211:17,22 212:1,7
  212:11,16
**subpoena** 25:16
  26:17 30:5 34:18
  37:18 51:6 57:8
  60:5 65:19 68:13
  71:1 73:6 85:23
  100:11 103:10
  111:8 122:12
  128:5 132:18
  134:20 136:22
  138:2 144:14
  147:15 150:21
  156:18 160:10,14
  173:7 174:14
  175:9 177:2 178:8
  178:13 212:20
**subscribed** 213:22

**subsequently**
  172:11 176:21
**substantive** 132:3
**suggest** 9:9 94:2
  119:10
**suggesting** 95:15
**suggestions**
  137:21 141:13,19
**suggests** 75:11
  99:22 164:10
**suite** 3:8
**summaries** 161:2
**summarize** 168:15
**summarizing**
  137:11 145:5
  155:8
**summary** 68:15
**summer** 187:7
**sunday** 91:11
  104:2,13
**supervised** 95:4
**supervision** 17:24
**supervisor** 12:22
  19:21 30:20
**supervisors** 108:5
**support** 22:16,23
  23:2,7,12 59:2,9
  124:4 127:8
**supported** 23:21
  32:6 154:1
**supports** 23:15
**suppose** 186:18
**supposed** 87:17
  113:7,12
**sure** 8:9,10,15
  9:24 13:2 14:11
  22:22 24:3 32:11
  41:9 45:9,9 48:9
  49:24 56:23 58:21
  69:6 80:4 84:6
  91:4 93:7,21

96:19 101:17
102:9 103:1 109:7
113:12 121:13
129:9 135:7,21
138:6 142:11
143:14 154:19
158:7 166:14,22
167:4 182:22
189:3 200:3
**surveyor** 17:2
**suspend** 145:13
**swaine** 6:19,23
7:19
**swaines** 2:7
**swear** 5:10 7:13
**swearing** 5:13
**switch** 109:14
**sworn** 7:15 213:22
**system** 18:17 21:7
46:21 163:9
176:14

**t**

**t** 207:11
**tab** 10:20 25:14
26:13 30:4 34:16
37:16 51:5 57:7
60:3 65:17 68:11
70:24 73:4 85:21
100:9 103:9 111:7
116:7 122:9 128:3
132:16 134:18
135:13,15 136:6
144:7,9 147:13
150:19 156:17
160:9 173:5,5
**table** 137:7 138:11
**take** 9:4,7,23 30:2
32:18 47:6,7
56:24 57:6 60:3
70:6 77:13 86:6
95:18 96:14 97:1

97:6 107:7 111:5
111:20 113:22
114:3,8,20,23
115:16 116:1
126:4 147:11
156:16 160:4
169:22 172:2
178:19 179:4
183:13
**taken** 2:3 5:15,25
8:3 87:12,23
88:18 102:3
104:11,12 107:10
**talk** 58:11 109:16
136:7 165:6
179:14 199:8
**talked** 13:19 61:11
182:21 188:15
194:3,10,11
**talking** 40:11
63:17 99:18 102:1
115:11 146:9
164:2 165:1
166:13,21 181:16
194:8
**taylor** 156:19,22
157:5 158:25
212:15
**teach** 119:12
**teaching** 32:6
**teachings** 96:16,25
**team** 12:16,18
124:18 127:11
**technician** 4:2,3
5:1,22 7:12 56:25
57:3 115:4,7
179:8,11 205:5
**teenage** 67:16
**teenager** 41:5,19
**teenagers** 44:9,19
46:17,20

**tell** 14:5 23:5 31:2
59:5 79:19 88:6
116:5,6,17 164:12
**temporary** 196:4
**ten** 18:21 114:7
131:25 178:25
204:3,14
**tenets** 26:5 74:17
**tenure** 103:6
133:20
**term** 24:13 119:2
**term's** 165:16
**terms** 149:16
154:13,19 156:5
156:13 190:15
**terri** 1:24 5:9 6:8
180:16 206:2,18
**testified** 7:15
118:3 172:17
183:19 192:13
203:4
**testify** 10:11,15
76:13 84:7
**testimonies** 35:8
67:14
**testimony** 10:4,8
67:9,11 148:1
164:9 181:8 205:7
**texts** 9:19
**thank** 11:22 26:24
32:10 40:18 41:4
41:18 47:1 51:23
56:22 94:13
111:17,17 129:3
144:12 166:5
167:1,2 170:6
174:3 179:13,16
181:1 203:18
204:22,24,25
205:3

**thanks** 33:15
54:23 61:3 62:16
123:21 165:10
166:6 180:20
**theological** 15:19
**thereof** 206:8
**thereto** 155:11
**thing** 135:18,23
166:13,21 173:3
182:14
**things** 8:9 99:2
110:13 127:22
142:18 147:12
175:4
**think** 22:2 30:17
33:3 34:17 39:24
46:19,20 48:24
52:3 63:21 65:4
66:22 93:5 97:5
100:10 116:5
118:3 122:10
124:8 127:18
129:8 130:14
136:1 143:12
148:3 155:3
158:23 164:10,17
165:15,17 173:22
177:15 179:3
181:3,3 183:19
185:18 187:7
190:22 200:15
203:4 204:13,15
204:20
**thinks** 168:25
**third** 69:2 145:7
161:25
**thirds** 114:16
**thought** 94:12
107:13 166:12
**thread** 34:19
38:20 51:8 85:24

111:9 128:7 135:4
135:12 136:21,24
**three** 18:20 42:11
42:14 47:9 50:17
126:9 145:2
**till** 13:9
**time** 1:23 6:16 9:3
16:8,22 17:3
21:24 22:1 29:16
29:21,22 30:22
31:4,5 37:8 43:21
43:24 44:4 46:22
52:6 54:10 55:1
56:19,25 57:3
59:2 67:1 71:14
71:17 83:8,25
85:8 90:4 99:25
101:19 102:12
104:16 112:17
114:8 115:4,7
128:24 137:4
148:5,10 149:8
153:9 165:11
167:2,5 171:13
172:25 176:11
179:8,11,14 180:1
180:5 181:2
188:12,24 195:5
198:24 199:9
204:24 205:3
**timeline** 160:12,14
161:7,8 167:10
172:19,21,24
212:19
**times** 35:19 72:7
99:13,24 107:24
170:16 171:16,22
**timing** 9:8
**title** 124:4 155:10
**titled** 26:15 37:19
117:18 138:3

144:15 147:15
150:22 160:12
161:7
**tmc** 1:6
**today** 8:7 9:3 10:4
10:8,12,16 13:20
13:24 14:13,20
15:1 41:25 42:14
67:19 68:3 72:23
72:24 137:9
179:14 181:2,7
183:19 185:12
188:8 189:22
194:3,11 199:15
199:24 200:10
202:12
**today's** 12:12
14:23 205:6
**told** 48:14 62:5
80:8 88:20 192:22
192:24 200:15
**tony** 132:18,21
211:10
**top** 32:1 38:9
62:15 71:8 106:25
117:8 118:3 132:1
137:17 139:15
140:18 163:12
167:9
**topic** 79:2 82:6
101:8 156:16
**topics** 109:15
115:11
**total** 42:11 152:4
152:11,13,19,19
152:25 153:18
205:7
**touched** 48:24
**toured** 163:6
**toys** 24:2

**traditional** 32:6
74:11,22 75:1,9
76:2,2
**trained** 18:8 19:19
**training** 19:10,12
19:13,14,16 57:22
**transcript** 4:5
205:13 206:2
**transition** 149:24
**transitioning**
17:20
**transpired** 57:2
115:6 179:10
**transport** 103:25
**trauma** 18:9
**treated** 59:15,16
59:18 76:15 99:3
187:11,20 188:1,2
**treatment** 198:18
198:19
**tried** 102:21,22
103:3
**triggered** 105:15
**trouble** 111:16
**true** 64:23 182:14
182:16 185:2
187:16 206:4
**truthful** 10:8
**truthfully** 10:11
10:16
**try** 110:21 149:24
192:4 201:20
203:14
**trying** 64:4 75:19
85:13 98:19
108:23 109:6
145:23 164:20
180:21 199:8
202:8
**tucson** 16:23
126:18

**tuesday** 86:13
**tunnel** 181:5
**turn** 51:18 82:6
**turned** 11:14
**two** 13:13 15:6
47:8 50:16 58:9
99:2 105:10,11
114:16 168:1
189:11
**type** 19:16 69:4
82:21,23,25
134:15 149:14
**types** 23:15 127:22
**typical** 72:3,3
**typically** 36:8
46:16 50:25 82:13
82:20 143:4
168:13

| u |
|---|

**u.s.** 6:1 213:2
**ultimate** 44:23
45:1,18
**ultimately** 45:19
53:9 56:9,13
**um** 16:3 135:17
152:24 169:19
**unbelief** 89:5
**unclear** 179:25
186:3
**uncomfortable**
61:1 62:8,12
107:12,14 109:9
**unconditionally**
67:2
**undated** 68:14
**underlined** 87:12
157:13,20,25
158:2
**underlining**
158:21

**understand** 8:21
8:25 10:3 19:1
32:12 43:12 59:12
64:4 93:14,18,24
93:25 95:15 98:19
108:20,23 109:6
118:17 141:22
145:23 182:23
**understanding**
28:4,13,14,15,18
28:19,23 29:2,6
39:21 40:9 42:24
43:17,22 44:14
48:16 50:24 55:6
55:7 58:25 59:7
62:16 64:22 65:7
69:11,19 70:1,9,17
72:12 76:14 77:4
77:15 78:15 80:7
81:22 90:4 93:16
93:22 94:14 95:11
98:17 99:2 101:18
113:24 118:22
119:5 131:13
138:19 141:17
145:18 148:8
150:2 153:19
154:4 157:9
158:21 159:17
162:6 168:12
170:20,23 171:2
172:23 195:19
**understood** 88:9
88:24 89:22 178:4
**unit** 5:24
**unitarian** 67:21
74:5,10,18,21,25
75:8,12 76:1,8
79:15 191:4,14,20
192:7 193:5,21

**united** 1:1,7,9 3:6
3:7 6:2 196:25
**unites** 50:19
**units** 205:8
**universal** 75:25
193:5
**universalist** 67:21
74:5,10,18,21,25
75:8,12 76:1,9
**universalist's**
191:20
**universalists**
191:4 192:7
193:21
**universe** 14:16
**university** 16:1,9
**unrelated** 195:23
**unwritten** 203:22
203:22
**uplifting** 83:1
**ups** 115:11
**upstate** 24:14,16
24:19 168:1
182:24
**usdoj.gov** 3:10
**use** 18:25 61:22
107:21 109:11
**usually** 27:4
**utilize** 151:12

**v**

**v** 3:7 213:2
**validity** 5:13
**valuable** 83:2
**value** 67:23
**valued** 49:16
**variations** 32:18
**variety** 202:14
**various** 138:17
**verbally** 8:11
**veritext** 5:4 6:7,8
205:9 213:1

**vernacular** 181:21
**verse** 6:1
**version** 71:21
138:10 147:1
**versus** 194:24
195:8
**vice** 17:9 18:12
19:8,19 29:16
118:22 124:9
**video** 4:3 5:1,13
5:22,24 7:12 9:16
56:25 57:3 115:4
115:7 179:8,11
205:5
**videographer** 5:3
6:7
**videotaped** 1:20
5:8 10:5
**view** 74:24 75:7,12
76:7 98:12 119:5
131:8 187:12
200:10
**viewpoint** 188:4
**violates** 145:14
**virtual** 1:21,25 2:8
2:9,14,15 3:8,16
4:2,4
**visit** 88:20 162:2,5
162:11,18 163:4
169:25 170:8
**voice** 89:5
**vp** 142:2 168:6
175:14,15
**vs** 1:6

**w**

**wagner** 3:4
**wait** 8:13,15
**waive** 205:14
**waiver** 197:1
**walk** 32:11

**wall** 2:16
**want** 29:12,12
32:11 43:9 47:6,6
53:25 66:18 77:12
85:12,14 89:5
95:17 98:16 99:12
99:23 102:23
103:4,8 111:5
114:23,24 135:7
144:5,5 147:11
156:16 165:7
178:23 180:16
182:22 189:3,3
**wanted** 31:14 83:4
85:15,17,20
110:17 140:11
142:21 162:7,8
166:14,22 173:4
**wanting** 58:6,16
58:23 109:23
131:1
**warranted** 33:24
**way** 39:21 69:2
97:16,25 103:24
114:16 150:6
179:20 187:20
198:7
**we've** 9:9 13:19
56:18 75:22 104:4
104:8 112:21,22
114:6 135:18
151:19 160:1
**web** 21:18
**website** 21:18
22:12 51:25 65:21
66:9,11 68:2,8
69:4 101:14
116:11,16,21
117:13,23
**week** 12:24 19:18
104:1 112:2

[week - yvette]    Page 41

169:22
welch 1:4 2:6 7:21
  65:10,13,22 66:1,9
  66:11,14 68:3,16
  69:1,3 71:22,25
  73:1,13,25 75:4,20
  76:24 78:9,12,17
  78:23 188:12
  190:21,23 191:13
  191:19 192:5,21
  209:12
welch's 72:13 76:8
  76:16 79:8 80:9
  81:14 82:3
welcome 162:8
  170:17 205:4
welfare 19:25
  20:13
wellbeing 20:8
went 39:2 55:8
  170:17
wife 67:13,17 69:3
williams 111:10
  112:1,8 175:15,23
  176:20
willing 46:17
  183:13 189:17
windows 116:20
winter 35:19
wished 194:7
wishes 85:2 87:9
  87:14 97:8,21
  113:7 199:4
witness 5:7,10
  7:10,13 28:2,3
  34:14 47:23 48:6
  56:22 70:22 75:16
  77:7 80:5,16 81:2
  81:9,16 82:13
  89:17 90:15 91:1
  92:3 94:14 95:22

106:2 108:14
  119:16 134:15
  152:8 159:12,14
  164:13 165:5,9,11
  167:2,5 179:16
  186:24 189:20
  190:4 192:1 193:3
  197:14 198:10
  199:12 201:11
  202:10 203:8
  204:1,18,22,25
  205:4,12 206:9
witnesses' 213:3
woman 54:2 78:2
  78:4
wondering 146:1
word 44:4 64:10
  87:16
worded 202:17
words 43:12
work 16:22 18:21
  19:8,23 21:12
  22:16,23 24:9
  25:2 28:9,25 29:6
  29:18,23 33:10
  37:9 39:3 49:3
  59:10 61:3 63:11
  64:2,19 69:5,9,17
  69:21 70:10,14,17
  98:7,13 109:3
  114:25 119:11
  120:6,25 124:14
  126:8 127:11,19
  131:10 143:15
  184:17 188:20,24
  189:17,23
worked 17:17
  18:16,19,22 28:11
  43:21 62:24 69:13
  110:4,5 126:5
  143:18 168:4,13

197:10
working 47:4 52:9
  59:21 61:3 62:17
  62:22 94:21
  107:25 108:2,8
  109:1,10 125:17
  125:23 143:12,13
  185:4 195:15
works 26:9 27:24
  54:3 64:7 112:24
  114:1 128:17
  168:22 198:6
worldwide 2:9
worse 198:19
worship 83:16,17
  83:18 84:2 93:12
  113:13 200:6
worthy 83:2
wounded 33:17
  34:6
wrath 117:5
write 35:23 53:25
  57:20 87:6 88:24
  97:13 99:9 102:8
  106:25 107:16
  123:21 129:11
  157:8
writes 31:2,13
  32:1,15 35:6 41:4
  41:18 51:23 54:19
  54:21 60:18 61:3
  66:24 67:13 69:1
  69:6 71:20 72:22
  74:3 93:11 94:20
  94:21 95:5 103:25
  105:9 112:1 137:5
  137:19 146:15
  162:1 171:21
writing 30:25 35:5
  51:21 93:3 129:1
  132:6 140:9

157:25 200:17
written 72:24 80:2
  87:20 129:23
  131:1 158:4,18
  204:16
wrong 116:6
wrote 33:15 62:16
  88:8 89:24 92:12
  93:23 94:1 101:12
  109:6 118:20
  133:13 141:12
  157:22 181:15

x

x 207:1,11

y

yeah 11:18 41:14
  43:11 123:16,18
  135:15 141:15
  146:4 152:8
  165:23 166:5,6,15
  180:12
year 15:6,20 17:4
  23:23 35:18 63:11
  64:2,7,16 116:23
  153:7 174:16
  178:2 180:3,4,8
years 15:7 18:17
  18:21 67:16
yep 14:11 26:23
  135:10
yerrick 111:12
  210:16
yesterday 13:5,12
  35:25 88:25 89:23
york 2:10,16
  213:1
young 31:15
youth 17:19 44:20
yvette 65:25
  209:11

[zelkind - zoom]     Page 42

| z |
|---|
| **zelkind**   2:15 6:24 |
| 6:24 |
| **zoom**   1:21,25 2:8 |
| 2:9,14,15 3:8,16 |
| 4:2,4 6:6 9:12 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.