# EXHIBIT 36

Page 1

```
         UNITED STATES DISTRICT COURT
           DISTRICT OF SOUTH CAROLINA
                GREENVILLE DIVISION
EDEN ROGERS AND BRANDY WELCH,
            Plaintiffs,

     vs.         C.A. No. 6:19-cv-01567-JD

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; XAVIER BECCERA, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF THE
UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ADMINISTRATION FOR
CHILDREN AND FAMILIES; JOOYEUN CHANG, IN
HER OFFICIAL CAPACITY AS THE SENIOR
OFFICIAL PREFORMING THE DUTIES OF THE
ASSISTANT SECRETARY OF THE
ADMINISTRATION FOR CHILDREN AND
FAMILIES; JOOYEUN CHANG, IN HER OFFICIAL
CAPACITY AS PRINCIPAL
DEPUTY ASSISTANT SECRETARY OF THE
ADMINISTRATION FOR CHILDREN AND
FAMILIES; HENRY MCMASTER, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF THE
STATE OF SOUTH CAROLINA; AND MICHAEL
LEACH, IN HIS OFFICIAL CAPACITY AS STATE
DIRECTOR OF THE SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,
            Defendants.


VTC  30(b)(6)
DEPOSITION OF:    SC DSS, Through its agent:
                  DIANA TESTER
DATE:             December 16, 2021
TIME:             9:32 a.m.
LOCATION:         Zoom-Columbia, SC
TAKEN BY:         Counsel for the Plaintiffs
REPORTED BY:      Roxanne Easterwood, RPR
VIDEOGRAPHER:     Roosevelt Hamilton
```

```
                                                        Page 2

 1    APPEARANCES OF COUNSEL:
 2
 3         ATTORNEYS FOR PLAINTIFFS:
 4              Cravath Swaine & Moore
                By:  Mika Madgavkar
 5                   Katherine Deringer Janson
                (Appearing by VTC)
 6              825 Eighth Avenue, Suite 4043B
                New York, NY 10019
 7              mmadgavkar@cravath.com
                kjanson@cravath.com
 8              (212) 474-1989
 9
10              Lambda Legal
                By:  Currey Cook
11                   Maia Zelkind
                (Appearing by VTC)
12              120 Wall Street, Floor 19
                New York, NY 10005
13              ccook@lambdalegal.org
                mzelkind@lamdalegal.org
14              (212) 809-8585
15
                American Civil Liberties Union (ACLU)
16              By:  Leslie Cooper
                (Appearing by VTC)
17              125 Broad Street, 18th Floor
                New York, NY 10004
18              lcooper@aclu.org
19
           ATTORNEYS FOR UNITED STATES DEPARTMENT OF
20              HEALTH AND HUMAN SERVICES, ET AL.:
21              United States Attorney's Office South
                Carolina
22              By:  Barbara M. Bowens
                (Appearing by VTC)
23              1441 Main Street, Suite 500
                Columbia, SC 29201
24              barbara.bowens@usdoj.gov
                (803) 929-3000
25
```

Page 3

1  ATTORNEYS FOR HENRY MCMASTER, IN HIS
   OFFICIAL CAPACITY AS GOVERNOR OF THE
2  STATE OF SOUTH CAROLINA; and MICHAEL
   LEACH, IN HIS OFFICIAL Capacity AS
3  STATE DIRECTOR OF THE SOUTH CAROLINA
   DEPARTMENT OF SOCIAL SERVICES:
4
   Nelson Mullins Riley & Scarborough
5  BY:  Miles Coleman
   (Appearing by VTC)
6  2 W Washington Street, Suite 400
   Greenville, SC 29601
7  miles.coleman@nelsonmullins.com
   (864) 373-2300
8
9
10
11    (INDEX AT REAR OF TRANSCRIPT)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 35

1      A.   It -- you know, it bounces.  I'm
2   sorry, my eye.  It looks like it went up from 2017
3   to '18 to 2018, 2019, and then it looks
4   like -- I'm having trouble seeing the last column.
5   It looks like it did increase, yes.
6      Q.   And do these numbers include the
7   number of families interested in kinship care?
8      A.   Yes, they would be kin homes inside
9   those numbers.
10     Q.   And -- and could you just briefly
11  explain kinship care?
12     A.   Kinship care is a -- it is a relative
13  or fictive kin who steps forward and says that
14  they are able to -- to take care of the child, and
15  they do have to be licensed -- in this report,
16  these are licensed homes -- so that the child is
17  in a safe setting, but with -- with family instead
18  of somebody that they are not familiar with.
19     Q.   Is it possible that these numbers
20  increased due to DSS's increased focus on kinship
21  care during the same period, so that 2017 to 2018
22  period?
23          MR. COLEMAN:  Object to the form of the
24  question.
25          You can answer.

Page 36

1           THE WITNESS: You know, kin homes have
2    increased. We, at DSS, believe that's a good
3    thing, because children are being placed with
4    family.
5    BY MS. MADGAVKAR:
6         Q. So -- so that might be responsible for
7    the uptick in numbers we see here?
8         A. It could be.
9         Q. Are you aware of any of the factors
10   that -- that led to this increase in the number of
11   foster homes?
12        A. I do know that the program area has
13   been actively recruiting. There's been these town
14   hall meetings with foster home associations to try
15   to increase foster homes. We, of course, want an
16   increase in family-like settings, but specifically
17   kin.
18        Q. And are you familiar with the
19   executive order Governor McMaster passed in 2018
20   related to faith-based CPAs?
21        A. I would not have recalled specifically
22   on that order. I may be aware of it, but I -- I
23   don't know which order you're referring to, to be
24   honest.
25        Q. So it's -- it's the order that -- that

1   directs DSS not to deny licensure to faith-based
2   CPAs solely on account of their religious identity
3   or religious belief.  Does that -- does that sound
4   familiar?
5           A.   I -- I think -- I -- I don't know.
6   I -- I'm sure that I've heard of it.  I -- you
7   know, I -- quite honestly, I don't keep track of
8   orders like that.  I -- I just don't.  I'm sorry.
9           Q.   Is there any way to know
10  whether -- whether the granting of that order or
11  of the waiver had any impact on the number of
12  foster homes?
13              MR. COLEMAN:  Object to the form of the
14  question.
15              But you can answer.
16              THE WITNESS:  No.  I mean, there would
17  have to be, like, a huge research,
18  statistical-type study to see if there's an
19  association, and -- and, really, I -- I don't even
20  know how they would control all of the variables.
21  BY MS. MADGAVKAR:
22          Q.   Right.  The DSS didn't look
23  into -- into whether the -- the waiver or the
24  executive order affected the number of foster
25  homes, right?  We talked about that earlier.

Page 38

1        A.   Not that I'm aware of, no.
2        Q.   So I'm about to -- to move into a
3   different topic.  I don't know if -- if now is a
4   good time for a break for you, Ms. Tester, or --
5        A.   It would be a lovely break -- time for
6   a break.  Thank you.
7        Q.   Okay.  All right.  No problem.  So
8   is -- is ten minutes okay?
9        A.   Yeah, ten, is good.
10            VIDEOGRAPHER:  All right.  The time on
11  the monitor is 10:19 a.m.  We're going off the
12  record.
13            (A recess was taken.)
14            VIDEOGRAPHER:  Time on the monitor
15  is 10:32 a.m., and we're back on the record.
16  BY MS. MADGAVKAR:
17       Q.   Okay.  So before moving on to -- to
18  the next topic, I just wanted to loop back,
19  briefly.  And it might be helpful if you look
20  at -- at Exhibit 1, which is the subpoena.  And
21  you can let me know when -- when you have it up.
22       A.   I see it.
23       Q.   So as we discussed earlier, you're the
24  designee for Topic 9, correct?
25       A.   That's correct.

Page 39

1        Q.   And just to make sure I have it right,
2   your -- your testimony was that DSS has no
3   knowledge about whether permitting South Carolina
4   CPAs to restrict eligibility of prospective foster
5   parents based on religion, same-sex relationship,
6   or LGBTQ status had any effect on the number of
7   available foster parents in South Carolina?
8             MR. COLEMAN:  Object to the form of the
9   question.
10            But you can answer, if you're able.
11            THE WITNESS:  As far as I know, we did
12  not do any studies like this.  I did not do any
13  studies like this.  I do not know.
14  BY MS. MADGAVKAR:
15       Q.   And -- and you're testifying on behalf
16  of DSS, right?
17       A.   Yes, I am.  Again, I -- I am not aware
18  of it.
19       Q.   So you said you're not aware of it,
20  and that means that DSS has not done any kind of
21  study about that infor- -- information, right?
22            MR. COLEMAN:  Object to the form of the
23  question.
24            But you can answer.
25            THE WITNESS:  I am not aware of DSS

Page 40

1   doing any study on that particular subject.  I
2   -- I -- I am not aware.  I'm sorry.
3   BY MS. MADGAVKAR:
4        Q.   And -- and you're -- you're the only
5   DSS employee that would have done such a study?
6        A.   I really -- I -- I'm not sure.  I -- I
7   don't believe that anybody else would have done it
8   at DSS, but DSS is a very large agency.  But I'm
9   not aware of anybody having done that study.
10       Q.   And as part of your preparation for
11  the deposition, did you attempt to find out if
12  anybody had conducted the study?
13       A.   No, I did not, because I -- no -- no,
14  I did not.
15       Q.   And did you discuss with anyone, or
16  did you attempt to find out whether anyone at DSS,
17  beyond a specific study, made any effort to
18  examine the impact that these restrictions would
19  have on the number of available foster parents in
20  South Carolina?
21       A.   So say your question again.  Let me
22  make sure I'm understanding it.
23       Q.   Sure.  So beyond a -- a specific
24  study, did you attempt to discern from anyone at
25  DSS whether DSS had looked into or examined the