**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DISTRICT**

EDEN ROGERS and
BRANDY WELCH,

                          Plaintiffs,

             -against-

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

XAVIER BECERRA, in his official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES;

JANUARY CONTRERAS, in her official
capacity as the Senior Official Performing the
Duties of the
Assistant Secretary of the ADMINISTRATION
FOR CHILDREN AND FAMILIES;

JEFF HILD, in his official capacity as Principal
Deputy Assistant Secretary of the
ADMINISTRATION FOR CHILDREN AND
FAMILIES;

HENRY MCMASTER, in his official capacity
as Governor of the STATE OF SOUTH
CAROLINA; and

MICHAEL LEACH, in his official capacity as
State Director of the SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,

                         Defendants.

Case No.: 6:19-cv-01567-JD

## DECLARATION OF NEKKI SHUTT

I, NEKKI SHUTT, hereby declare as follows:

I am a member of the bar of South Carolina and a Partner in the law firm Burnette Shutt McDaniel, PA, counsel for Eden Rogers and Brandy Welch (together "Plaintiffs").

I submit this declaration in support of Plaintiffs' motion for summary judgment, filed on November 17, 2022.

1.      Since 2019, I have served on the team of lawyers representing Plaintiffs in the above-captioned litigation, along with members of my co-counsel group, who are from Cravath, Swaine & Moore LLP, American Civil Liberties Union Foundation, South Carolina Equality Coalition, Inc., Lambda Legal Defense and Education Fund, Inc.

2.      In this litigation, the South Carolina Department of Social Services ("DSS") has taken the position that it "is unaware of any CPA serving in the Upstate Region [other than Miracle Hill] who will decline to work with a prospective foster parent on the basis of the prospective foster parent's religion or same-sex marriage." (Ex. A, February 18, 2022 Letter from Miles Coleman to Kate Janson at 2.)

3.      DSS's counsel stated that DSS's knowledge is based on its review of "information provided to it by CPAs and its own records of any requests for exemptions and the receipt of any complaints (or the lack thereof)". (Ex. B, April 4, 2022 Letter from M. Coleman to K. Janson at 1.)

4.      While discovery was ongoing, counsel for Plaintiffs learned through deposing DSS representatives that Heartfelt Calling contracts with DSS to serve as a "centralized application and intake line" for DSS. (Ex. C, Barton Tr. at 40:14-23.) DSS conducts "a large

portion" of its intake work "through [its] central intake system through Heartfelt Calling." (*Id.* at 35:08-11.)

5.       When prospective foster families apply through Heartfelt Calling, they are directed to a list of CPAs and are provided information about each of those CPAs to find "the right fit for their family . . . for licensure." (*Id.* at 135:23-136:06.)  Heartfelt Calling has a website listing CPAs serving the Upstate Region and this website specifically notes whether CPAs do *not* have religious requirements.  (Ex. D, Staudt Tr. 99:23-100:04; Exhibit E, Staudt Dep. Ex. 13.)

6.       On June 3, 2021, Heartfelt Calling's website stated that SC Church of God Home for Children serves only "Christian individuals and families of any denomination who want to foster and meet the basic requirements to do so in addition to signing a statement of faith and morality statement."  (Ex. E, Staudt Dep. Ex. 13.)

7.       On July 12, 2022, Heartfelt Calling's website stated that, "Miracle Hill serves Christian foster parents and requires families to complete a statement of faith."  (Ex. F, Heartfelt Calling Website, July 12, 2022.)  The website also stated that Connie Maxwell "serves Christian families who want to foster."  (*Id.*)

8.       On November 15, 2022, the foster care inquiry form on Miracle Hill's website stated:  "As an evangelical Christian foster care agency, we believe foster parents are in a position of spiritual influence over the children in their homes.  Therefore, we require that foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement".  (Ex. G, Miracle Hill Website, November 15, 2022.)

9.      **Exhibit A** is a true and correct copy of a letter from Miles Coleman to Kate Janson, dated February 18, 2022.

10.      **Ex. B** is a true and correct copy of a letter from Miles Coleman to Kate Janson, dated April 4, 2022.

11.      **Exhibit C** is a true and correct excerpted copy of Dawn Barton's deposition transcript.

12.      **Exhibit D** is a true and correct excerpted copy of Lauren Staudt's deposition transcript.

13.      **Exhibit E** is a true and correct copy of a page from Heartfelt Calling's website as it appeared on June 3, 2021 and as it was presented as an exhibit at Lauren Staudt's deposition on June 4, 2021.

14.      **Exhibit F** is a true and correct copy of a page from Heartfelt Calling's website as it appeared on July 12, 2022.

15.      **Exhibit G** is a true and correct copy of the foster care inquiry form as it appeared on Miracle Hill's website on November 15, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2022.

_____
                                    Nekki Shutt

# EXHIBIT A



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

2 W. Washington Street | Fourth Floor
Greenville, SC 29601
T 864.250.2300  F 864.232.2925
nelsonmullins.com

Miles E. Coleman
T 864.373.2352  F 864.373.2925
miles.coleman@nelsonmullins.com

February 18, 2022

<u>**Via electronic mail**</u>
Kate Janson
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
kjanson@cravath.com

RE:    *Rogers et al. v. U.S. Dept. of Health and Human Servs. et al.*
       Civil Action No. 6:19-cv-01567-JD (D.S.C.)
       Our File No. 059326/01501

Kate:

I am writing in further response to your letter of January 11, 2022 and our subsequent written and telephonic correspondence relating to your informal discovery requests. This letter and the enclosed materials provide the requested information to the extent of SCDSS's ability, and this concludes our efforts related to your requests.

Enclosed with this communication are updated version of two documents discussed during Ms. Tester's deposition (Exhibits A and B of your letter of December 23, 2021). The enclosed versions of these documents contain data through December 31, 2021. Also enclosed are documents showing the number of children in foster care in the Upstate Region for each year of the past five years and the number of staff members providing support to foster families for each CPA serving the Upstate Region for each year of the past five years.

Earlier this week you received from me copies of SCDSS's current contracts for non-therapeutic foster care services with CPAs serving the Upstate Region.  I have not gathered the contracts between adoption agencies and SCDSS even though adoption agencies can and sometimes do assist individuals and couples seeking licensure by SCDSS as foster parents, sometimes, though not always, in relation to an adoption. In addition, enclosed with this letter are SCDSS's current contracts for therapeutic foster care serves with the CPAs serving the Upstate Region.

In addition, you asked for information regarding the number of children in the Upstate Region who are eligible for adoption but for whom adoption placements have not been identified. As of February 1, 2022, there are 77 children in the Upstate Region who are legally free for adoption but for whom no adoptive placement has been identified. SCDSS further notes that due to the way

*Rogers v. HHS et al.*
February 18, 2022
Page 2

its database and records are organized, and due to changes in that database and records organization in past years, any attempt to calculate these numbers for prior dates is both extremely labor intensive and may, in fact, yield inaccurate results. Accordingly, SCDSS has not and, indeed, cannot accurately calculate the number of children eligible for adoption but for whom an adoptive placement had not been identified in the Upstate Region in prior years.

You also asked for information regarding the number of foster parents working with Heartfelt Calling as compared to the number of foster parents working directly with a private CPA for each year of the past five years. After consultation with SCDSS's Accountability, Data, and Research Division, the Placement Division, and the Procurement Division, we have determined that SCDSS does not collection this information and, therefore, is unable to provide it to you.

In regard to your request for information relating to the CPAs listed in Exhibits A and B to your letter of December 23, Jackie Lowe previously testified regarding the CPAs that serve in or have offices in the Upstate and support non-therapeutic foster homes. *See* Lowe dep. Tr. at 190–97. In addition to the CPAs she discussed in her testimony, three additional CPAs listed in Exhibits A and B of your letter have offices in the Upstate and support non-therapeutic foster homes: (1) New Foundations – Therapeutic CPA (which is licensed both for therapeutic and non-therapeutic foster care), (2) Lifeline Children's Services, and (3) Adoption Advocacy, Inc. For the avoidance of doubt, enclosed with this letter is a document listing the CPAs serving in the Upstate Region along with their dates of licensure and whether they are licensed for therapeutic foster care, nontherapeutic foster care, or both.

You asked whether any therapeutic CPAs operating in the Upstate Region have also offered non-therapeutic foster care services, and, if so, how many non-therapeutic foster families been licensed by SCDSS in association with those CPAs during each of the past five years. As shown in the documents produced concurrently with this letter, all of the CPAs in the Upstate Region who are licensed for therapeutic foster care services are also licensed for non-therapeutic foster care, and some of the placements with which therapeutic CPAs assist are non-therapeutic placements. SCDSS was unable to determine, however, the number of non-therapeutic foster care licenses were assisted by the therapeutic component of those CPAs.

Finally, in regard to your questions regarding which CPAs serving in the Upstate Region "accept" or "exclude" prospective foster parents on the basis of the prospective foster parents' same-sex marriage or religion, as noted in my prior response to your letter, Ms. Lowe has already testified on behalf of SCDSS in response to those questions. SCDSS's answer remains the same: with the exception of Miracle Hill Ministries, SCDSS is unaware of any CPA serving in the Upstate Region who will decline to work with a prospective foster parent on the basis of the prospective foster parent's religion or same-sex marriage.

Very truly yours,

Miles E. Coleman

*Rogers v. HHS et al.*
February 18, 2022
Page 3


CC:     (by electronic mail):

Peter Barbur
M. Malissa Burnette
Serena Candelaria
Bob Cook
Currey Cook
Leslie Cooper
William Jordan
Daniel Mach
Mika Madgavkar
Christie Newman
James Powers
Christopher Ray
Rebecca Schindel
Nekki Shutt
Jay Thompson
Ken Woodington

# EXHIBIT B



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

2 W. Washington Street | Fourth Floor
Greenville, SC 29601
T 864.250.2300  F 864.232.2925
nelsonmullins.com

Miles E. Coleman
T 864.373.2352
miles.coleman@nelsonmullins.com

April 4, 2022

**<u>Via electronic mail</u>**
Kate Janson
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
kjanson@cravath.com

RE:    *Rogers et al. v. U.S. Dept. of Health and Human Servs. et al.*
       Civil Action No. 6:19-cv-01567-JD (D.S.C.)
       Our File No. 059326/01501

Dear Kate:

Pursuant to our discussion with Judge Dawson on March 15, 2022 and our subsequent meet-and-confer on March 30, 2022, I write in further reply to your letter of February 23, 2022 and, in particular, to your inquiry about SCDSS's knowledge regarding CPAs in the Upstate Region that will work with prospective foster parents, including same-sex couples, without regard to the CPA's religious beliefs or the prospective foster parents' religious beliefs. Over more than 18 months of discovery, Plaintiffs have repeatedly asked—and SCDSS has repeatedly answered—this question. Nevertheless, in a good-faith effort to resolve outstanding areas of disagreement, and pursuant to Judge Dawson's instructions, SCDSS provides this additional response.

As explained previously, SCDSS's knowledge is based on its review of the information provided to it by CPAs and its own records of any requests for exemptions and the receipt of any complaints (or the lack thereof). Accordingly, SCDSS's response to your question is based on the fact that no CPAs other than Miracle Hill have sought to claim an exception or exemption; the fact that extensive discovery in this case and a related case has not uncovered any evidence of CPAs other than Miracle Hill which, on the basis of the CPA's religious beliefs or the prospective foster parents' same-sex marriage or religious beliefs, will refer to other CPAs or to SCDSS inquiries or applications they receive from prospective foster parents; the fact that SCDSS's personnel annually request and review each CPA's policies, procedures, and materials as part of the annual CPA licensing process (which is the way that SCDSS became aware of Miracle Hill's policy) but have found no indication therein of any CPA other than Miracle Hill that will refer applications to another CPA or to SCDSS if the prospective foster parent cannot affirm and adhere to the CPA's religious beliefs and requirements; and the fact that SCDSS provides avenues for prospective foster

*Rogers v. HHS et al.*
April 4, 2022
Page 2

parents to submit complaints to SCDSS, including complaints regarding CPAs, and SCDSS has received no complaints regarding any other CPA that, on the basis of its religious beliefs or the prospective foster parents' same-sex marriage or religious beliefs, is unwilling to work with individuals or couples who inquire about becoming foster parents.

Based on this information and review, to SCDSS's knowledge, all of the CPAs serving in the Upstate, with the exception of Miracle Hill Ministries, are willing to work with prospective foster parents, including same-sex couples, without regard to additional criteria based on the CPA's own religious beliefs or the prospective foster parents' religious beliefs.

Very truly yours,

Miles E. Coleman

CC:     (by electronic mail):
        Peter Barbur
        M. Malissa Burnette
        Serena Candelaria
        Bob Cook
        Currey Cook
        Leslie Cooper
        William Jordan
        Daniel Mach
        Mika Madgavkar
        Christie Newman
        James Powers
        Christopher Ray
        Rebecca Schindel
        Nekki Shutt
        Ken Woodington

# EXHIBIT C

Page 1

```
1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2              GREENVILLE DIVISION
3   EDEN ROGERS AND BRANDY WELCH,
               Plaintiffs,
4
         vs.   C/A No. 6:19-cv-01567-JD
5
   UNITED STATES DEPARTMENT OF HEALTH &
6   HUMAN SERVICES; XAVIER BECERA, IN HIS
   OFFICIAL CAPACITY AS SECRETARY OF THE
7   UNITED STATES DEPARTMENT OF HEALTH &
   HUMAN SERVICES; ADMINISTRATION FOR
8   CHILDREN AND FAMILIES; JOOYEUN CHANG, IN
   HER OFFICIAL CAPACITY AS THE SENIOR
9   OFFICIAL PERFORMING THE DUTIES OF THE
   ASSISTANT SECRETARY OF THE
10  ADMINISTRATION FOR CHILDREN AND
   FAMILIES; JOOYEUN CHANG, IN HER OFFICIAL
11  CAPACITY AS PRINCIPAL
   DEPUTY ASSISTANT SECRETARY OF THE
12  ADMINISTRATION FOR CHILDREN AND
   FAMILIES; HENRY MCMASTER, IN HIS
13  OFFICIAL CAPACITY AS GOVERNOR OF THE
   STATE OF SOUTH CAROLINA; AND MICHAEL
14  LEACH, IN HIS OFFICIAL CAPACITY AS STATE
   DIRECTOR OF THE SOUTH CAROLINA
15  DEPARTMENT OF SOCIAL SERVICES,
               Defendants.
16
17
18  VTC  30(b)(6)    SC DSS, Through its agent:
   DEPOSITION OF:   DAWN BARTON
19
   DATE:           December 17, 2021
20  TIME:           9:33 a.m.
   LOCATION:       Zoom - Columbia, SC
21
22  TAKEN BY:       Counsel for the Plaintiffs
23  REPORTED BY:    Roxanne Easterwood, RPR
24  VIDEOGRAPHER:   Roosevelt Hamilton
25
```

```
                                                    Page 2
 1    APPEARANCES OF COUNSEL:
 2         ATTORNEYS FOR PLAINTIFFS:
 3              Cravath Swaine & Moore
                By:  Rebecca Schindel
 4                   Serena Candelaria
                (Appearing by VTC)
 5              825 Eighth Avenue, Suite 4043B
                New York, NY 10019
 6              rschindel@cravath.com
                scandelaria@cravath.com
 7              (212) 474-1989
 8
                Lambda Legal
 9              By:  Currey Cook
                     Maia Zelkind
10              (Appearing by VTC)
                120 Wall Street, Floor 19
11              New York, NY 10005
                ccook@lambdalegal.org
12              mzelkind@lamddalegal.org
                (212) 809-8585
13
14              American Civil Liberties Union (ACLU)
                By:  Leslie Cooper
15              (Appearing by VTC)
                125 Broad Street, 18th Floor
16              New York, NY 10004
                lcooper@aclu.org
17
18
           ATTORNEYS FOR UNITED STATES DEPARTMENT OF
19              HEALTH & HUMAN SERVICES, ET AL.:
20              United States Attorney's Office South
                Carolina
21              By:  Marshall Prince
                (Appearing by VTC)
22              1441 Main Street, Suite 500
                Columbia, SC 29201
23              marshall.prince@usdoj.gov
                (803) 929-3000
24
25
```

```
                                              Page 3

 1        ATTORNEYS FOR HENRY MCMASTER, IN HIS
                  OFFICIAL CAPACITY AS GOVERNOR OF THE
 2                STATE OF SOUTH CAROLINA; and MICHAEL
                  LEACH, IN HIS OFFICIAL CAPACITY AS
 3                STATE DIRECTOR OF THE SOUTH CAROLINA
                  DEPARTMENT OF SOCIAL SERVICES:
 4
                  Nelson Mullins Riley & Scarborough
 5                By:  Miles Coleman
                  (Appearing by VTC)
 6                2 W Washington Street, Suite 400
                  Greenville, SC 29601
 7                miles.coleman@nelsonmullins.com
                  (864) 373-2300
 8
 9
10            (INDEX AT REAR OF TRANSCRIPT)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 33

1    kin, under- -- understanding it's a broader

2    definition of kin, based on what DSS considers

3    kin, can parents who are not kin -- potential

4    foster parents who are not kin no longer apply

5    directly through DSS to become licensed?

6          A.    So this was a -- this was a practice

7    change and not a policy change.  Let me clarify

8    that.  This was something that we decided to -- we

9    needed to build some capacity to be able to really

10   intensify our search and engagement and

11   recruitment of kinship families.  And so we

12   transitioned all of that work to our child-placing

13   agencies.

14               And so with that being said, we -- we

15   wouldn't deny somebody the ability to come --

16   to -- to still come, and if they didn't want to

17   work with any of our CPAs today, they -- we would

18   still support them through the licensure process.

19   They could still -- they could still come through

20   DSS if for some reason they did not want to work

21   with one of the child-placing agencies.  So we

22   wouldn't deny anybody that -- that ability.

23          Q.    Was the reason for the change in

24   practice because DSS didn't have the capacity to

25   handle all of these applications itself; it needed

Page 34

```
1    to offload some of this work onto the CPAs?
2          A.   The change of practice was so that we
3    could really intensify our focus and efforts on
4    kinship care.
5          Q.   But -- but just so I understand, the
6    idea being that you couldn't do both; you couldn't
7    focus your efforts on kinship care and also handle
8    all of these non-kinship applications?
9          A.   Yes.  It was a way for us to be able
10   to have the capacity to -- to do a targeted focus
11   on recruiting and licensing and engaging our
12   kinship opportunities for our kids, and it also
13   was a way to really try to build our placement
14   array, frankly, because if you -- if you're just
15   focused on recruiting non-kin families, A, kids do
16   better when they're with people that they're
17   connected to and they already know.  It's less
18   traumatic.  There's so many benefits to kinship
19   care; and B, if you have kinship and non-kin
20   families that you are able to place kids with,
21   that just expands your family-like settings for --
22   for kids.
23         Q.   Right.  But assuming that -- that
24   people who previously were able to work with DSS
25   are now able to work with CPAs; is that right?
```

1          A.    I don't understand the question.

2          Q.    Well, your answer about expanding the

3    array assumes that the people who previously were

4    able to work with DSS can now work with private

5    CPAs; is that right?

6          A.    They can work with private.  They've

7    always been able to work with -- with private

8    CPAs.  That's always been an -- an option.  We

9    just really, we just shifted a large portion of

10   the work through our central intake system through

11   Heartfelt Calling.

12              That -- that's the centralized place

13   that all of the applications and intakes funnel

14   through.  We contract with -- with them to -- to

15   do that piece of the work for us, and so now that

16   families were just given more choices other than

17   DSS.

18         Q.    So -- so Heartfelt Calling is a

19   central place -- so -- so if I'm a potential

20   foster parent, I'm not kinship, I'm not kin to any

21   potential child, I would go to Heartfelt Calling

22   to apply to become a foster parent?

23         A.    That -- you can go -- that -- that's

24   where most people go because it's -- it's sort of

25   the centralized place that is designated to do

Page 36

```
 1    that.  They could go directly to a CPA.  So I
 2    think it happens both ways.
 3         Q.   Do you have a sense -- you -- you said
 4    most people do Heartfelt Calling.  Is that
 5    something that DSS tracks?
 6         A.   Yes.
 7         Q.   Okay.  And do you have a sense of --
 8    of the breakdown and how many people go through
 9    Heartfelt Calling versus working directly with a
10    private CPA?
11         A.   I don't -- I don't have -- I don't
12    know if I have the private CPA data, like -- well,
13    I shouldn't say I.
14              I think we could get the C- -- the
15    private CPA data.  Heartfelt Calling tracks all of
16    the calls and applicants that they get through --
17    through our centralized line.
18         Q.   And when you say we, DSS, could get
19    the private CPA data, does that mean that DSS has
20    that data or that DSS could ask for that data?
21         A.   I'm not sure if that's something we
22    track through the contracts.  If that's -- you
23    know, they have reporting requirements through the
24    contracts.  So I don't know if that's the natural
25    part of what they report, or if we would have to
```

Page 37

```
 1   actually ask them for it.
 2          Q.    Has DSS ever asked private CPAs how
 3   many people are applying through them to become
 4   foster care parents?
 5          A.    Yes.
 6          Q.    When does it ask that question?
 7          A.    We -- I know we started tracking this
 8   somewhat.  We have to report through our annual
 9   progress and services reporting for the federal
10   government, and so, you know, that's some of the
11   information that -- that I believe we supply for
12   that -- those reporting purp- -- reporting
13   purposes annually.  So I do think that -- if
14   that's data that you -- you would be interested
15   in, I do think that's something that we could get
16   for you.
17          Q.    Fantastic.  Okay.  And so just -- just
18   to make sure I'm clear about what it is, it would
19   be data that would show how many people are
20   applying directly through private CPAs to become
21   foster parents, you -- you think that would be
22   data you would have?
23          A.    Yes.  I can def- -- I -- I can most
24   definitely say that Heartfelt Calling has been
25   tracking that since -- at least since July, since
```

Page 38

```
 1   we started transitioning that work over to the

 2   child-placing agencies.  They have a breakdown

 3   of -- of what that is.

 4         Q.   Okay.  And -- and then, hopefully,

 5   there would also be a breakdown for the private C-

 6   -- for the direct channel in --

 7         A.   Yes.

 8         Q.   -- the Heartfelt Calling -- okay.

 9   Terrific.

10              MS. SCHINDEL:  So, Miles, I may not

11   call this out every time, but I will -- we will

12   make sure to gather all of this up and make sure

13   that we're following up with you afterwards.

14              MR. COLEMAN:  Yes.  That's on -- I

15   think this one, too, we can -- we can figure it

16   out, you know, next week.  I think we may -- if

17   I'm understanding what you're looking for, you may

18   already have that data from Diana's deposition

19   yesterday, but we -- we can -- we can figure that

20   out Monday or something like that.

21         MS. SCHINDEL:  Okay.  Great.  Thank you.

22   BY MS. SCHINDEL:

23         Q.   And if -- if someone applied to work

24   directly with a CPA and were turned away by that

25   CPA for whatever reason, would DSS learn about
```

Page 39

1   that?

2          A.    The only way we would learn about it

3   would be if -- if the family contacted us or --

4   or -- and -- and that's the only way we would know

5   about it.

6          Q.    Okay.  So DSS wouldn't -- there's no,

7   sort of, tracking mechanism for DSS to account for

8   who's applying and being turned away?

9          A.    Each CPA, as I understand, tracks

10  that, but that is not something that we track.

11         Q.    And when you say each CPA tracks that,

12  is it tracked -- what makes you say that each CPA

13  tracks that data?

14         A.    I mean, I'm -- I'm making a large

15  assumption that -- that that would be something

16  that a CPA would track, but we do not -- we do not

17  track that.  We actually don't even get -- from --

18  from a child-placing agency, we -- we don't get

19  the actual packet for licensure.  That's kind of

20  when we become aware that -- that -- that an

21  applicant has applied and -- and the CPA has been

22  working with them.

23               Now, Heartfelt Calling, obviously,

24  collects data on the front end.  So if that

25  applicant came in through Heartfelt Calling,

Page 40

```
 1   Heartfelt Calling would -- would track -- they
 2   follow up with the child-placing agencies that
 3   these families have chosen to go to, and they
 4   follow up to -- to -- to determine, because
 5   they're tracking how -- you know, when -- when
 6   they actually finish the process.  So when they
 7   started the application and then when an -- when a
 8   license was actually issued.
 9            So if they came through Heartfelt
10   Calling, I'd say, again, starting last July to
11   current, we probably would be able to have that
12   information, but otherwise, prior to that time we
13   would not have necessarily known.
14       Q.   Got it.  And what -- why don't you
15   explain, sort of, what Heartfelt Calling is?
16       A.   So we have a contract with the South
17   Carolina Foster Parent Association, and there's
18   several components within that contract that they
19   provide support to the agency for, and one of the
20   components is Heartfelt Calling.
21            And so it is the centralized
22   application and intake line that they have.  It's
23   HeartfeltCalling.org.  There's a, like, 1-88 (sic)
24   number that people can call.  They have a couple
25   of folks on staff that, if you call, if you email,
```

Page 41

```
 1    they will walk you through the application
 2    process, and they have -- and so they do all of
 3    that upfront work, and then they -- they send that
 4    application to whatever -- today, to whatever
 5    child-placing agency a family chooses.
 6              So they don't choose the family for --
 7    choose the CPA for the family.  The family is
 8    given a list of all of the available CPAs, and --
 9    and they -- they then choose their own.
10         Q.   And did Heartfelt Calling exist before
11    July 2020?
12         A.   Oh, yes.
13         Q.   But it played, it sounds like, a
14    different -- a slightly different role before that
15    time; is that right?
16         A.    They were -- they were just main -- I
17    mean, at that time, prior to last July -- prior to
18    July 2020, they were just screening applicants for
19    us, for -- for DSS, and then we -- when we shifted
20    some of that work and shared that work with the
21    CPAs, they began doing that upfront screening and
22    -- and work for -- to help -- help the CPAs and
23    the families get to where they wanted to go.
24         Q.   So I'm going to ask you a couple of
25    more state-related questions, and you can just
```

Page 42

```
 1   tell me.  If it's something that you know the
 2   answer, terrific.  Otherwise, tell me if -- DSS to
 3   provide is, which is, before July 2020, how many
 4   families per year, say, roughly, starting in 2018,
 5   did DSS recruit who were not applying under the
 6   kinship care umbrella?
 7        A.    So I don't have that data in my head,
 8   but that is data that we would be able to -- to
 9   get you.
10        Q.    And then the -- the same question
11   slightly different is, before July 2020, how many
12   families were trying to serve as kinship care
13   foster parents?
14        A.    Yeah, I -- we would -- we could -- we
15   could try to get you that data.  Again, we -- we
16   began tracking that data pretty closely, and our
17   big push with kinship started roughly two years
18   ago.  So -- so you will -- you will see a huge
19   increase between, I'd say, like, 20- -- the end of
20   2018 to -- to now or either 20- -- early 2019 to
21   now.
22             We -- we have had a large spike in the
23   number of licensed kinship care providers, because
24   we started off with, really, like, around, I want
25   to say, 5 and -- and now we're -- we're into the
```

Page 133

1   aware of the screening criteria implemented by the
2   CPAs in South Carolina?
3           A.    Yes.
4           Q.    And DSS tracks that information?
5           A.    Again, I think -- I think your -- your
6   track is -- is -- is throwing me.  We're aware of
7   the CP- -- of each individual CPA's criteria,
8   but -- but as far as -- I don't know what you mean
9   by tracking that.
10          Q.    And you're aware of each individual
11  CPA criteria how?  By -- by simply by looking at
12  the CPA's website, or does DSS follow up with the
13  CPAs or in some way ask CPAs to tell them what
14  their screening criteria are?
15          A.    So that would be a part of -- of their
16  submission when they become a CPA.  That -- that
17  would be part of information that -- that they
18  provide to us as a child-placing agency, when
19  they're issued -- when they're the child-placing
20  agency license.
21          Q.    Okay.  Can you tell me on this list
22  which CPAs that DSS knows accepts families
23  regardless of sexual orientation or religion?
24          A.    DSS would know all of them.
25          Q.    And can you tell me which ones on the

Page 134

```
 1    list DSS knows accepts families regardless of
 2    sexual orientation or religion?
 3           A.   I can tell you the ones that -- that
 4    I, today, as the DSS representative know, which
 5    may not -- which may not be inclusive of all of --
 6    you know, of all of them on the list.
 7           Q.   Yeah, I think -- I think you should go
 8    ahead and do that, because I do think that this is
 9    a topic that you were meant to be educated on.  So
10    I think you should -- I think you should go ahead
11    and do that.
12           A.   So ask -- so can you ask the question
13    again?
14           Q.   Yes.  Which of these on this list does
15    DSS know accepts families regardless of sexual
16    orientation or religion?
17           A.   Okay.  So it would be Alston Wilkes,
18    Broadstep, CAPA, Family Preservation, Growing
19    Homes Southeast, Crosswell, Justice Works -- which
20    Justice Works, I wasn't aware they even had
21    families.  They -- they provide services.  So I
22    don't even know that that's related to this -- but
23    New Foundations, SC Mentor, SC YAP, Specialized
24    Alternative Youth.  And those are the ones that
25    I'm aware of.
```

1      Q.    Okay.  And so then for the rest, does

2   DSS know which agencies exclude families based on

3   religion or sexual orientation?

4      A.    DSS --

5            MR. COLEMAN:  Same -- same objection.

6            But you can answer.

7            THE WITNESS:  DSS would know -- would

8   know -- would know that information or does know

9   that information, so yes.

10  BY MS. SCHINDEL:

11     Q.    Okay.  And so how many -- so DSS knows

12  exactly how many CS- -- CPA options are available

13  for non-Christians and for same-sex couples?

14     A.    Yes.

15     Q.    And what -- does DSS do anything to

16  relay that information to anybody?

17     A.    So if -- if you go on the -- the

18  HeartfeltCalling.org website, there is a list of

19  the CPAs, and -- and it -- it does -- they -- they

20  share just a little bit about who -- what their

21  mission is and -- and -- and so that's -- I mean,

22  that's how families are directed.

23            When they -- when they apply today

24  through Heartfelt Calling, they're directed to a

25  list of CPAs, and -- and there's -- there's

Page 136

```
 1    information about each of those CPAs the CPA has
 2    provided about their organizations, so the
 3    families can make the right -- you know, make the
 4    right fit for their family for who they want to
 5    work with on collecting all of the requirements
 6    for licensure.
 7            Q.   So does that -- that website that
 8    you're referring me to, does it say Miracle Hill
 9    will not work with same-sex couples?
10            A.   I have not looked at -- looked at that
11    in some time.  So I -- I can't say that it says
12    that specifically or not.  I would -- I would have
13    to -- I would have to look at it.
14            Q.   Then how do you reconcile those two
15    statements that you just gave me?  You said a
16    family can go to the website and know exactly who
17    they can work with, but you actually don't know if
18    the website, in fact, does provide that
19    information; is that right?
20                 MR. COLEMAN:  Object to the form of the
21    question.
22                 You can answer.
23                 THE WITNESS:  It gives information
24    about the organization, which could include that.
25    BY MS. SCHINDEL:
```

Page 137

```
 1          Q.    Right.  But the information might not
 2    actually tell families who they can and cannot
 3    work with; is that right?
 4          A.    That's correct.
 5          Q.    In total, how many non-therapeutic
 6    CPAs serve Region 1?
 7          A.    I don't have -- I don't have that
 8    information.  I -- I didn't -- I don't have those
 9    numbers.
10               MR. COLEMAN:  Same objection.  I object
11    to --
12               (Crosstalk.)
13               THE WITNESS:  I mean, we have those
14    numbers.  I just don't have those numbers here
15    today.
16    BY MS. SCHINDEL:
17          Q.    If DSS learns that most of the
18    non-therapeutic CPAs that serve Region 1 excludes
19    same-sex couples, would that concern DSS?
20          A.    I think it would -- I -- I think it
21    would concern us, but I also would say that, in
22    the same light, families always have another
23    option.  They can always come through DSS.
24          Q.    If most of the non-therapeutic CPAs
25    that serve Region 1 excluded same-sex couples,
```

```
                                          Page 138
 1    could that harm efforts to grow the pool of foster
 2    families in Region 1?
 3           A.    I -- I would say, no, because we would
 4    serve -- we would serve those families.  There --
 5    there's still an option for those families through
 6    the department.
 7           Q.    Since DSS changed its practice to
 8    handle just kinship applicants, you said that, and
 9    you're saying now, that DSS would handle
10    non-kinship applicants if the family didn't want
11    to work with a particular CPA; is that right?
12           A.    Yes.
13           Q.    Has DSS handled any non-kinship
14    applicants since the change in policy?
15           A.    I -- I don't -- I don't know.  I would
16    have to look at -- at each region to make that
17    determination, if -- if we've actually accepted.
18    It's been very few, if -- if any.
19                MS. SCHINDEL:  Okay.  Well, this is
20    definitely Topic 5.  So this -- this is
21    information we absolutely will need to get from
22    DSS, which is whether DSS has handled any non- --
23    non-kinship applicants since the change in
24    practice or policy.  And if so, how many.
25    BY MS. SCHINDEL:
```

# EXHIBIT D

```
                                              Page 1
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  GREENVILLE DIVISION
      ------------------------------------------------X
 3
      EDEN ROGERS and
 4
      BRANDY WELCH,
 5
                   Plaintiffs,
 6
            vs.               CASE NO. 6:19-cv-01567-TMC
 7
      UNITED STATES DEPARTMENT OF HEALTH
 8    AND HUMAN SERVICES;
 9    ALEX AZAR, in his official capacity as SECRETARY of
      the UNITED STATES DEPARTMENT OF
10    HEALTH AND HUMAN SERVICES;
11    ADMINISTRATION FOR CHILDREN AND FAMILIES;
12    LYNN JOHNSON, in her official capacity as ASSISTANT
      SECRETARY of the ADMINISTRATION FOR CHILDREN AND
13    FAMILIES;
14    SCOTT LEKAN, in his official capacity as PRINCIPAL
      DEPUTY ASSISTANT SECRETARY of the ADMINISTRATION
15    FOR CHILDREN AND FAMILIES;
16    HENRY MCMASTER, in his official capacity as
      GOVERNOR of the STATE OF SOUTH CAROLINA;
17
      MICHAEL LEACH, in his official capacity as STATE
18    DIRECTOR of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
      SERVICES,
19
                   Defendants.
20    ------------------------------------------------X
      VIDEOTAPED
21    DEPOSITION OF:   LAUREN COLLINS STAUDT
                       (APPEARING VIA VIRTUAL ZOOM)
22
      DATE:            June 4, 2021
23
      TIME:            9:05 AM
24
      REPORTED BY:    TERRI L. BRUSSEAU
25                     (APPEARING VIA VIRTUAL ZOOM)
```

```
                                                    Page 2

1     LOCATION OF
      THE DEPONENT:      Law Offices of
2                        Davidson Wren & DeMasters
                         1611 Devonshire Drive, 2nd Floor
3                        Columbia, SC
4     TAKEN BY:          Counsel for the Plaintiffs
                         (Rebecca Schindel)
5

      APPEARANCES OF COUNSEL:
6
              ATTORNEYS FOR THE PLAINTIFFS
7                 EDEN ROGERS and BRANDY WELCH:
8                 CRAVATH SWAINES & MOORE, LLP
                  BY:  KATE JANSON
9                      (APPEARING VIA VIRTUAL ZOOM)
                       REBECCA SCHINDEL
10                     (APPEARING VIA VIRTUAL ZOOM)
                       MALAVIKA (MIKA) MADGAVKAR
11                     (APPEARING VIA VIRTUAL ZOOM)
                  Worldwide Plaza
12                825 Eighth Avenue
                  New York, NY  10019
13                (212) 474-1989
                  kjanson@cravath.com
14                rschindel@cravath.com
                  mmadgavkar@cravath.com
15
                  LAMBDA LEGAL DEFENSE AND EDUCATION
16                FUND, INC.
                  BY:  CURREY COOK
17                     (APPEARING VIA VIRTUAL ZOOM)
                       MAIA ZELKIND
18                     (APPEARING VIA VIRTUAL ZOOM)
                  120 Wall Street, 19th Floor
19                New York, NY  10005
                  (212) 809-8585
20                ccook@lambdalegal.org
                  mzelkind@lambdalegal.org
21
22
23
24
25
```

```
                                                      Page 3

 1          ATTORNEYS FOR THE DEFENDANT
                 MICHAEL LEACH, IN HIS OFFICIAL CAPACITY
 2               AS STATE DIRECTOR OF SOUTH CAROLINA
                 DEPARTMENT OF SOCIAL SERVICES:
 3
                 DAVIDSON WREN & DEMASTERS, PA
 4               BY:  JONATHAN RIDDLE
                      (APPEARING VIA VIRTUAL ZOOM)
 5               1611 Devonshire Drive, Suite 200
                 Columbia, SC  29204
 6               (803) 806-8222
                 jriddle@dml-law.com
 7
            ATTORNEYS FOR THE DEFENDANTS
 8               HEALTH AND HUMAN SERVICES,
                 ADMINISTRATION FOR CHILDREN AND
 9               FAMILIES, THE SECRETARY OF HHS, LYNN
                 JOHNSON, THE ASSISTANT SECRETARY OF
10               ADMINISTRATION OF CHILDREN AND
                 FAMILIES, AND STEVEN WAGNER, ASSISTANT
11               SECRETARY OF ADMINISTRATION CHILDREN
                 AND FAMILIES:
12
                 UNITED STATES ATTORNEY'S OFFICE
13               DISTRICT OF SOUTH CAROLINA
                 BY:  CHRISTIE NEWMAN,
14                    ASSISTANT UNITED STATES ATTORNEY
                      (APPEARING VIA VIRTUAL ZOOM)
15               55 Beattie Place, Suite 700
                 Greenville, SC  29601
16               (864) 282-2100
                 newman@usdoj.gov
17
            ATTORNEYS FOR THE DEFENDANT
18               HENRY MCMASTER, IN HIS OFFICIAL
                 CAPACITY AS GOVERNOR OF THE STATE OF
19               SOUTH CAROLINA:
20               NELSON MULLINS RILEY & SCARBOROUGH, LLP
                 BY:  MILES COLEMAN
21                    (APPEARING VIA VIRTUAL ZOOM)
                 1320 Main Street, 17th Floor
22               Greenville, SC  29201
                 (803) 799-2000
23               miles.coleman@nelsonmullins.com
24
25
```

```
                                              Page 4
1          ALSO PRESENT:

2               George Libbares, Concierge Technician

                (Appearing Via Virtual Zoom)
3

                Darin Weaver, Video Technician
4               (Appearing Via Virtual Zoom)

5               (INDEX AT REAR OF TRANSCRIPT)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                        Page 98

 1           A.   We are not -- we have not been made
 2      aware of any others.
 3           Q.   Have you taken any steps to figure out
 4      which ones will only work with foster parents that
 5      share their religious beliefs?
 6           A.   Not -- no.
 7           Q.   Are you familiar with the South
 8      Carolina Foster Parent Association?
 9           A.   To some degree, yes.
10           Q.   What is the South Carolina Foster
11      Parent Association?
12           A.   It's a -- it's an association to
13      support foster parents and the -- you know, the
14      overall community that involves, you know,
15      providers, potential applicants, et cetera.
16           Q.   Is it affiliated with DSS?
17           A.   I mean, they're kind of a partner or
18      stakeholder, but not employees of DSS.
19           Q.   Are you -- excuse me.  Are you familiar
20      with Heartfelt Calling?
21           A.   Yes.
22           Q.   What is Heartfelt Calling?
23           A.   I think it's kind of an arm of that,
24      that -- that's where all the initial -- or when
25      potential foster parents' applicants, they go to
```

Page 99

1    Heartfelt Calling first to kind of -- I mean, they

2    can go to the individual CPAs, but most of them go

3    through Heartfelt Calling so that they can kind of

4    get their training and get a lot of the initial

5    things done before they go to a CPA.

6           Q.   Is DSS affiliated with Heartfelt

7    Calling?

8           A.   I don't know exactly the -- how

9    intertwined it is, if it's a contract or what, but,

10   you know, it's kind of a partner as well.

11              MS. SCHINDEL:  Can we mark Tab 43.

12              (EXHIBIT 13, Document entitled DSS

13   Licensing Partners for the Upstate SC, was marked

14   for identification.)

15              MS. JANSON:  Okay.  That one's been

16   marked.

17   BY MS. SCHINDEL:

18          Q.   I'll just read into the record while

19   waiting for you.  This is Exhibit 13.  It's not

20   Bates stamped.  It's a printout from a Web page.

21   And if you could let me know when you have it

22   available.

23              I'm sorry, do you -- okay.  This is a

24   printout of the Heartfelt Calling website for the

25   page called DSS Licensing Partners for the Upstate

```
                                          Page 100
 1      of South Carolina.  Have you seen this Web page
 2      before?
 3              A.    It's been awhile, but, yeah, I have
 4      seen it at some point.
 5              Q.    And you see it's just the Greenville
 6      button is expanded.  Do you see that?
 7              A.    Um-hum.
 8              Q.    And do you see for Epworth it says:
 9      Epworth serves married couples and singles who want
10      to foster.  The agency serves families from any
11      faith background and training is not faith-based.
12                    Is that right?
13              A.    Yeah.
14              Q.    This indicates that Epworth did not
15      serve unmarried cohabitating couples, is that
16      right?
17              A.    I mean, it could mean that.  I don't --
18      I don't know.
19              Q.    Do you know whether Epworth serves
20      unmarried cohabitating couples?
21              A.    I'm not aware one way or the other.
22              Q.    Do you see Lutheran -- Lutheran, it
23      says -- oh, interesting.  I apologize.  It was --
24      it seems this has been cut off.
25                    Do you see for -- for Miracle Hill and
```

Page 101

1    the South Carolina Church of God Home For Children

2    it says that both CPAs require statements of faith?

3            A.    Um-hum.  Yes, I see that.

4            Q.    Were you aware that Miracle -- Miracle

5    Hill requires that -- applicants to complete a

6    statement of faith?

7            A.    Yes, I'm aware from the past, yes.

8            Q.    Were you aware that South Church --

9    South Carolina Church of God Home For Children

10    requires families to complete a statement of faith?

11            A.    I don't know if I was.  I don't

12    think -- I don't think I was aware of that.

13            Q.    Is it fair to say that you aren't aware

14    of what the requirements are for that statement of

15    faith?

16            A.    That's fair.

17            Q.    Do you know whether it's clear from

18    South Carolina -- do you know whether South

19    Carolina Church of God Home For Children makes

20    clear that they require a statement of faith to

21    potential applicants or to DSS?

22            A.    No, I don't know.

23            Q.    Do you know who provides the

24    information that appears on this Heartfelt Calling

25    web page?

```
                                       Page 102
 1          A.   No, I don't.
 2          Q.   Is someone at DSS responsible for
 3     assessing which CPAs require statements of faith or
 4     limit individuals in terms of their work?
 5          A.   I'm not aware of someone with that
 6     task.
 7          Q.   In your experience in the child welfare
 8     field, do you believe that allowing agencies to
 9     exclude families based on their religious
10     objections to those families' religion or sexual
11     orientation has any effect on the pool of families
12     available for children?
13               MR. COLEMAN:  Object to the form of the
14     question.
15               THE WITNESS:  Do I think it limits it?
16     Yes.
17     BY MS. SCHINDEL:
18          Q.   In your experience has allowing such
19     discrimination hindered DSS's efforts to meet the
20     need for potential foster families?
21          A.   DSS needs many foster families and
22     we're in need of fosters now, so we're, you know,
23     eliminating potentials that I think it does hurt
24     that.
25          Q.   Would you agree that more than one CPA
```

# EXHIBIT E



# DSS Licensing Partners
## for the Upstate of SC

| + | Abbeville |
|---|-----------|

| + | Anderson |
|---|----------|

| + | Cherokee |
|---|----------|

| — | Greenville |
|---|-----------|

**FOSTER HOME LICENSING AGENCY SELECTION**

Select the agency you would like to use for taking you through the licensing process.

**Oasis of Hope** is a Christian-based agency, but works with any individual or family who has a desire to make a difference in a child's life. There is no requirement for additional training beyond the 14 hours of pre-service training, unless specific needs of the child warrant additional instruction.

**Thornwell** began licensing foster families in 2017 and serves all types of families.

**Epworth** serves married couples and singles who want to foster. The agency serves families from any faith background and training is not faith-based.

**SC YAP** works with any individual or family who has a desire to serve children.

Call Us: - 888-828-3555      

**Growing Homes SE** works with any individual or family who has a desire to serve children.

**Connie Maxwell** serves married couples and single parents who want to foster.

**Miracle Hill** serves Christian foster parents and requires families to complete a statement of faith.

**SC Church of God Home for Children** serves Christian individuals and families of any denomination who want to foster and meet the basic requirements to do so in addition to signing a statement of faith and morality statement.

**Nightlight Foster Care Program** serves married couples that have been together at least two years and singles over the age of 25 who want to foster. The agency serves families from any faith background and training is not faith-based.

**New Foundations' CONNECTIONS** Foster Care Program works with all individuals and families who have a desire to care for the needs of children. We are here to serve those willing to make a difference in a child's life.

+ **Greenwood**

+ **Oconee**

+ **Laurens**

+ **Newberry**

+ **Pickens**

+ **Spartanburg**

Call Us: - 888-828-3555

DSS Licensing Partners - Upstate SC - Heartfelt Calling - SC Foster Parents

☰  DSS Licensing Partners

Privacy · Terms

# EXHIBIT F

Heartfelt Calling
a program of foster parent

Home    About    DSS Licensing Partners    Contact

## Greenville
## Foster Home Licensing Agency Selection

Select the agency you would like to use for taking you through the licensing process.



### Nightlight Foster Care Program

Nightlight Foster Care Program serves married couples that have been together at least two years and singles over the age of 25 who want to foster. The agency serves families from any faith background and training is not faith-based.



### The Bair Foundation

The Bair Foundation is a Christian therapeutic agency that licenses families for foster children 0-21. We work with therapeutic, medically fragile and special needs foster children. To serve the needs of DSS, they will place non-therapeutic children as well. We do not discriminate and open our doors to married, single, cohabitating, same sex couples, and all religious backgrounds. 32 recertification hours are required every two years for re-licensure for therapeutic homes.



### Thornwell

Thornwell began licensing foster families in 2017 and serves all types of families. Thornwell serves Anderson, Greenville, Laurens, Spartanburg, Lexington, Sumter, Richland and Horry Counties. Thornwell only licenses non-therapeutic homes. The training hours required to become licensed are a total of 14 hours completed prior to licensing. 28 hours of recertification training hours are required within 24 months of licensure in order to maintain foster home license. Re-certification training/topics are at the discretion of the foster parent/family



### Oasis of Hope

Oasis of Hope is a Christian-based agency but works with any individual or family who has a desire to make a difference in a child's life. There is no requirement for additional training beyond pre-service training unless specific needs of the child warrant additional instruction.



### Epworth

Epworth licenses and supports individuals or married couples/families who desire to provide a loving, safe, and temporary home where hurts are healed, and hope is nurtured for children in foster care. Epworth trains those individuals through evidence-based models to equip them with interventions to work with children that have encountered traumatic situations.



### Growing Homes SE

Growing Homes SE works with any individual or family who has a desire to serve children.



### SC YAP

SC YAP works with any individual or family who has a desire to serve children.



### Lutheran

Lutheran is affiliated with the Lutheran Church, but serves all families and does not require a statement of faith. Families do not need to be Christian to foster with Lutheran.



### Connie Maxwell

Connie Maxwell Children's Ministries (CMCM) serves Christian families who want to foster. CMCM seeks to establish relationships with local churches where the foster parent attends to provide a framework for volunteer services that can support and encourage families during their foster care journey.



### Miracle Hill

Miracle Hill serves Christian foster parents and requires families to complete a statement of faith.

1   2

## Foster Home Licensing Agencies in S.C.

Select the **region** and then **county** to display agencies in your area that can help you with the licensing process.

 **Upstate**     **Midlands**     **Pee Dee**    Lowcountry

# EXHIBIT G

11/16/22, 7:23 PM                                       Foster Care Inquiry Form - Miracle Hill Ministries



## Agreement with Doctrinal Statement *

As an evangelical Christian foster care agency, we believe foster parents are in a position of spiritual influence over the children in their homes. Therefore, we require that foster parents who partner with us be followers of Jesus Christ, be active in and accountable to a Christian church, and agree in belief and practice with our doctrinal statement (found below and on our website at http://miraclehill.org/who-we-are/doctrinal-statement/). Before proceeding, please read our doctrinal statement. If after reading our doctrinal statement you find that Miracle Hill Foster Care is not a good fit for you, please let us connect you with another agency that can meet your needs. --------Doctrinal Statement------- We believe: ---the Bible to be the only inspired, infallible, inerrant and authoritative Word of God. (2 Tim. 3:16; 2 Pet. 1:20-21) ---that there is one God, creator of heaven and earth, eternally existent in three distinctive persons: the Father, Son and Holy Spirit. (1 Tim. 2:5; Gen. 1:1; Mt. 3:16-17; Mt. 28:19; 2 Cor. 13:14; John 10:30) ---in the deity and humanity of Jesus Christ; that He was born of a virgin; that we are redeemed by His atoning death through His shed blood; that He bodily resurrected and ascended into heaven and that He will come again in power and great glory to judge the living and the dead. (Eph. 1:7-10; Acts 1:9-11; Mt. 1:23-25; 1 Cor 15:1-8; 2 Tim 4:1) ---in the value and dignity of all people created in God's image, but alienated from God and each other because of our sin and guilt and justly subject to God's wrath. (Gen. 1:26-27; Psalm 139:13; Mt. 22:37-39; Rom. 12:20-21; Gal. 6:10; Eph. 2:1-3; Rom. 5:12) ---that regeneration by the Holy Spirit by grace through faith is essential for the salvation of lost and sinful people. (Tit. 3:4-7; Eph. 2:8-9; 2 Cor. 6:2) ---in the forgiveness of sins, the resurrection of the body, and life everlasting solely through repentance and faith in Jesus Christ. (Col. 1:13-14; 1 Thess. 4:16-17; John 3:16) ---that the Holy Spirit unites all believers in the Lord Jesus Christ and that together they form one body – the church. (1 Cor. 12:12-13; 1 Cor. 12:27) ---God ordained the family as the foundational institution of human society. It is composed of persons related to one another by marriage, blood or adoption, and that God's design for marriage is the legal joining of one man and one woman in a life-long covenant relationship. (Gen. 1:26-28; Eph. 5:21-6:4; Mt. 19:4-6) ---God creates each person as either male or female, and these two distinct, complementary sexes, together reflect the image and nature of God. (Gen. 1:27; Gen. 2:18)

☐ Yes, I have read and agree with Miracle Hill's doctrinal statement.

## Name *

First

11/16/22, 7:23 PM                                    Foster Care Inquiry Form - Miracle Hill Ministries

Last

Email *

Address *

Street Address

Address Line 2

City

State / Province / Region

ZIP / Postal Code

Phone *

Date of Birth *

mm/dd/yyyy

11/16/22, 7:23 PM                       Foster Care Inquiry Form - Miracle Hill Ministries

☐ Yes, I would like to receive e-mail from Miracle Hill Ministries.

## Marital Status *

Married ⌄

## Spouse Name

## Spouse's Date of Birth

mm/dd/yyyy

## Spouse's Email

## Spouse's Phone

## How did you hear about Miracle Foster Care? *

## Why I want to be a foster parent (Check all that apply) *

☐ My children are older, or gone, and I want to have children around again.

☐ I would like for my child(ren) to have someone to play with.

☐ I would like to help a child do something good with his/her life.

☐ I need the money and I would rather work in my home.

☐ I think I am a good parent.

☐ I have no children and would like to try being a parent.

☐ I would really like to adopt a child, but the wait is so long.

☐ I know there are children who need homes, and I think I should help.

☐ I think I have good skills for working with children and would like to use them.

☐ My spouse really wants to get into foster parenting.

What age ranges of children are you are willing to foster? *

How many children are you willing to foster at the same time? *

Tell us any other reasons you would like to be a foster parent.

Miracle Hill Ministries is a non-denominational, Christian organization based upon a protestant statement of faith. All children entrusted to our care are to be cared for in an atmosphere that is conducive to spiritual growth, development, and moral direction.

## Church you currently attend *

Please give a brief, personal testimony of your faith/salvation in Jesus Christ. If you are married, please include your spouse's testimony as well. *

**Miracle Hill Mission Statement**

Miracle Hill exists that homeless men, women and children receive food and shelter with compassion, hear the Good News of Jesus Christ and become productive members of society.

**Terms and Conditions**

I have read and agree to the requirements set forth by both the state of SC and Miracle Hill Ministries and located on the Foster Care page of MHM's website. To the best of my knowledge, all the information provided on this form is correct. I understand that Miracle Hill will use this information for preliminary screening, and at this time I am not committing to becoming a foster parent, but rather indicating an interest, and I will be contacted for further discussion.

Accept Terms? *

☐ I accept the Terms & Conditions.

**Submit**



490 S. Pleasantburg Drive
Greenville, SC 29607

864.268.4357

Privacy Policy
**QUICK LINKS**

Contact Us

Media Resources

News Coverage

Financial Accountability

Employment

Internship Program

Shop Merchandise
**KEEP UP WITH US**



**AFFILIATIONS**

   

    



© 2022 Miracle Hill Ministries. Miracle Hill Ministries. Miracle Hill Ministries is a 501 (c)(3) nonprofit organization.     Finely Tuned ⚙ by Engenius