**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DISTRICT**

EDEN ROGERS and
BRANDY WELCH,

      Plaintiffs,

   -against-

HENRY MCMASTER, in his official capacity
as Governor of the STATE OF SOUTH
CAROLINA; and

MICHAEL LEACH, in his official capacity as
State Director of the SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES,

     Defendants.

Case No.:  6:19-cv-01567-JD

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .............................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

I.   DEFENDANTS' ASSERTIONS REGARDING ALTERNATIVE OPTIONS
     FOR PROSPECTIVE FOSTER PARENTS ARE IMMATERIAL AND, AT A
     MINIMUM, DISPUTED. ............................................................................................2

     A.   Defendants incorrectly assert Miracle Hill is the only CPA that
          discriminates. ...............................................................................................3

     B.   Defendants' attempt to downplay Miracle Hill's outsized role among the
          CPAs available to Plaintiffs is misplaced. ...................................................5

     C.   Defendants' assertion that they have acted to ensure there are numerous
          options for families like Plaintiffs' is immaterial and unsupported.........................7

II.  DEFENDANTS' ASSERTION THAT CPAS' SCREENING OF FOSTER
     FAMILIES IS PRIVATE ACTIVITY OUTSIDE OF ITS STATE CONTRACT
     IS INCORRECT. .........................................................................................................8

III. DEFENDANTS' ASSERTION THAT ALLOWING DISCRIMINATION BY
     CPAS RESULTS IN MORE AVAILABLE FOSTER FAMILIES IS
     IMMATERIAL AND DISPUTED. .............................................................................9

IV.  DEFENDANTS' ASSERTION THAT MIRACLE HILL DID NOT REJECT
     PLAINTIFFS BASED ON SEXUAL ORIENTATION IS IMMATERIAL AND
     DISPUTED. ...............................................................................................................11

V.   DEFENDANTS' EFFORT TO MALIGN PLAINTIFFS IS PURE
     DISTRACTION. .......................................................................................................12

LEGAL STANDARD............................................................................................................12

ARGUMENT .........................................................................................................................13

I.   DEFENDANTS' EQUAL PROTECTION ARGUMENTS ARE WITHOUT
     MERIT. .....................................................................................................................13

     A.   Defendants fail to refute that the State authorized and enabled state-
          contracted CPAs to discriminate on the basis of sex and sexual orientation
          in carrying out a government program..................................................................13

i

B.    Defendants' actions do not survive any level of scrutiny. ....................................15

    1.    Heightened scrutiny applies to Plaintiffs' claim. ........................................15

    2.    Defendants cannot satisfy any level of equal protection scrutiny..............16

II.    DEFENDANTS' ARGUMENT THAT THE ESTABLISHMENT CLAUSE PERMITS THEM TO "ACCOMMODATE MIRACLE HILL'S RELIGIOUS EXERCISE" IS UNAVAILING.................................................................................19

A.    Defendants' arguments about accommodation are misplaced..............................19

B.    Defendants' arguments based on history fail.........................................................22

C.    Plaintiffs' Establishment Clause claim is not moot. .............................................27

D.    Defendants' argument that CPA's are exercising a private function rather than a government function is without basis...........................................................27

III.    DEFENDANTS' RELIANCE ON *FULTON* IS MISPLACED. ....................................28

A.    *Fulton* does not apply to this case. .........................................................................29

B.    Even in a hypothetical free exercise lawsuit brought by a CPA against the State challenging enforcement of a nondiscrimination policy, *Fulton* would not dictate the outcome. ...............................................................................31

CONCLUSION....................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  447 U.S. 242 (2986)................................................................................................12

*Anderson v. Martin*,
  375 U.S. 399 (1964)................................................................................................14

*Bailey v. Bazzle*,
  628 F. Supp. 2d 651 (D.S.C. 2008)........................................................................12

*Barghout v. Bureau of Kosher Meat & Food Control*,
  66 F.3d 1337 (4th Cir. 1995) .................................................................................20

*Baskin v. Bogan*,
  766 F.3d 648 (7th Cir. 2014) ...........................................................................15, 16

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*,
  512 U.S. 687 (1994)......................................................................................19, 20, 21

*Beall v. London City School District Board of Education*,
  No. 2:04-cv-290 (S.D. Ohio June 8, 2006) ...........................................................18

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020)...............................................................................12, 15, 31

*Bowen v. Kendrick*,
  487 U.S. 589 (1988)..........................................................................................27, 28

*Buck v. Gordon*,
  ECF No. 113, 1:19-cv-00286-RJJ-PJG (W.D. Mich. 2019)..................................30

*Campaign for S. Equal. v. Bryant*,
  64 F. Supp. 3d 906 (S.D. Miss. 2014)*, aff'd on other grounds,* 791 F.3d 625 (5th Cir.
  2015) ......................................................................................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................12

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. at 446 (1985).........................16, 17

*Corp. of Presiding Bishop of the Church of Jesus Christ of Latterday Saints v. Amos*,
  483 U.S. 327 (1987)................................................................................................20

*Doe ex. rel. Johnson v. S.C. Dept. of Soc. Servs.*,
   597 F.3d 163 (4th Cir. 2010) ...................................................................19

*Dumont v. Lyon*,
   341 F. Supp. 3d 706 (E.D. Mich. 2018)...................................................14

*Engel v. Vitale*,
   370 U.S. 421 (1962)..................................................................................26

*Est. of Thornton v. Caldor, Inc.*,
   472 U.S. 703 (1985)......................................................................20, 21, 22

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ....................................................................... passim

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ...................................................................15

*Heller v. Doe ex rel. Doe*,
   509 U.S. 312 (1993)..................................................................................17

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
   480 U.S. 136 (1987)..................................................................................20

*Kennedy v. Bremerton School District*,
   142 S. Ct. 2407 (2022) ....................................................................... passim

*Larkin v. Grendel's Den, Inc.*,
   459 U.S. 116 (1982)............................................................................19, 21

*Lawrence v. Texas*,
   539 U.S. 558 (2003) (O'Connor, J., concurring).....................................12

*Maryland Highways Contractors Ass'n v. State of Md.*,
   933 F.2d 1246 (4th Cir. 1991) .................................................................22

*Mathews v. Lucas*,
   427 U.S. 495 (1976)..................................................................................17

*McCreary Cty., Ky. v. ACLU of Ky.*,
   545 U.S. 844 (2005)..................................................................................26

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)..................................................................................16

*New Hope Family Services, Inc. v. Poole*,
   966 F.3d 145 (2d Cir. 2020).....................................................................28

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)..................................................................................18

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)..................................................................................18

*Peltier v. Charter Day Schs., Inc.*,
    37 F.4th 104 (4th Cir. 2022) ................................................12, 14, 19, 31

*Perez v. Sugarman*,
    499 F.2d 761 (2d Cir. 1974)......................................................................19

*Perry v. Jones*,
    No. 3:14CV71, 2016 WL 2747262 (E.D. Va. May 10, 2016)................................22

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..................................................................................32

*Rock for Life—UMBC v. Hrabowski*,
    643 F. Supp. 2d 729 (D. Md. 2009) .........................................................18

*Romer v. Evans*,
    517 U.S. 620 (1996)..................................................................................18

*Sch. Dist. of Abington Twp. v. Schempp*,
    374 U.S. 203 (1963)..................................................................................19

*Schweiker v. Wilson*,
    450 U.S. 221 (1981)..................................................................................17

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017)..............................................................................15

*Shelley v. Kraemer*,
    334 U.S. 1 (1948)......................................................................................14

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022)........................................................................20, 26

*SmithKline Beecham Corp. v. Abbott Lab'ys*,
    740 F.3d 471 (9th Cir. 2014) ....................................................................15

*Sylvia Dev. Corp. v. Calvert Cnty.*,
    48 F.3d 810 (4th Cir. 1995) ......................................................................13

*Tuck v. Henkel Corp.*,
    973 F.2d 371 (4th Cir. 1992) ....................................................................13

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973).................................................................................19

*United States v. Windsor,*
    570 U.S. 744 (2013).................................................................................15

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012)......................................................................15

**Statutes & Rules**

DSS Policy and Procedure Manual, Ch. 7 § 710 ...........................................31

42 U.S.C. §§ 2000bb *et seq.*.........................................................................32

Fed. R. Civ. P. 56(a) .......................................................................................12

S.C. Code Regs. §114–550(G)(3)....................................................................31

S.C. Code Regs. 114-210(B)(2) ......................................................................31

S.C. Code Regs. § 114-200 ...............................................................................3

S.C. Code Regs. § 114-210 ...............................................................................3

S.C. Code Regs. § 114-550(D)(1)-(2).............................................................19

S.C. Code Regs. § 114-4920(E).........................................................................3

S.C. Code Regs. § 114-4930(E).........................................................................3

S.C. Code Regs. § 114-4980 ..............................................................................9

S.C. Code Regs. § 114-4980(A)(2)(c) ............................................................19

S.C. Code Regs. § 114-4980(A)(9)(a) ............................................................19

**Other Authorities**

Brenda G. McGowan, *Historical Evolution of Child Welfare Services*, in CHILD WELFARE
    FOR THE TWENTY-FIRST CENTURY: A HANDBOOK OF PRACTICES, POLICIES, AND
    PROGRAMS 12, 10-14 (Gerald P. Mallon & Peg McCartt Hes eds., 2005).................23, 25, 26

CATHERINE E. RYMPH, RAISING GOVERNMENT CHILDREN: A HISTORY OF FOSTER CARE
    AND THE AMERICAN WELFARE STATE 18 (2017) ........................................................23, 25, 26

Hon. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part
    I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2170 (2003) ...................24, 25

JOHN E. MURRAY, THE CHARLESTON ORPHAN HOUSE, CHILDREN'S LIVES IN THE FIRST
    PUBLIC ORPHANAGE IN AMERICA xiv (2013)..............................................................23, 24, 25

Newton B. Jones, *The Charleston Orphan House, 1860-1876*, 62 THE SOUTH CAROLINA
    HISTORICAL MAGAZINE 203, 203-04 (1961).....................................................................23, 24

*The Quarterly Bulletin: State Board of Charities and Corrections of South Carolina* 9
    (1919)...........................................................................................................................................23

Stephanie H. Barclay, *Spheres of Liberty and Free Exercise: Lessons for* Fulton *from
    Jefferson's correspondence with Ursuline Nuns*, Reason, https://perma.cc/5C33-6E2U
    (Nov. 2, 2020).............................................................................................................................23

Susan Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 Ohio
    St. L. J. 1295, 1301 (1999) .................................................................................................23, 24, 25

TIMOTHY A. HACSI, SECOND HOME: ORPHAN ASYLUMS AND POOR FAMILIES IN AMERICA
    12-13 (1997)............................................................................................................................25, 26

## PRELIMINARY STATEMENT

In this case, Plaintiffs challenge the State's authorization and facilitation of discrimination by child-placing agencies ("CPAs") to which it has delegated the state function of vetting prospective foster families for children in state custody.  As a result of Defendants' actions, families headed by same-sex couples and/or non-Christians who seek to participate in this government program have fewer and noncomparable CPA options than heterosexual Christians.  The following key facts are undisputed—(i) Governor McMaster issued an Executive Order to permit state-contracted CPAs to discriminate against prospective foster families by using religious criteria, and (ii) as a result of that directive, DSS renewed the license of at least one CPA that it knew had discriminatory practices—Miracle Hill Ministries ("Miracle Hill").  These facts alone preclude summary judgment in Defendants' favor and evidence their violation of the Equal Protection and Establishment Clauses of the U.S. Constitution.

In support of their motion, Defendants offer a litany of allegedly material undisputed facts.  Defendants contend that Miracle Hill is the only CPA that discriminates and that there are many other comparable CPAs available to families like Plaintiffs.  They also claim that screening foster families falls outside the terms of their contracts with CPAs, that permitting CPAs to discriminate results in greater numbers of foster families, that Miracle Hill's discrimination was limited to religious criteria rather than explicitly turning Plaintiffs away based on sexual orientation and that Plaintiffs sought legal recourse rather than applying to other CPAs.  Most of these asserted facts are immaterial.  Moreover, as discussed below, all of them are at the very least disputed, and many are contradicted by uncontroverted evidence, such that summary judgment for Defendants would be inappropriate.

Ultimately, Defendants' motion fails on the law.  Defendants cannot establish that they did not violate Plaintiffs' Equal Protection rights because the State authorized and facilitated

discrimination against Plaintiffs on the basis of sex and sexual orientation, and such conduct cannot survive heightened scrutiny or even rational basis review. Defendants likewise cannot secure summary judgment on Plaintiffs' Establishment Clause claim as they misconstrue the relevant standards, the history of the State's foster care system, and the factual record. They rely heavily on *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), which this Court has already decided is inapplicable. This Court should reject Defendants' attempt to justify government-sanctioned discrimination and religious favoritism in South Carolina's public child welfare system.

## **FACTUAL BACKGROUND**

I.    **DEFENDANTS' ASSERTIONS REGARDING ALTERNATIVE OPTIONS FOR PROSPECTIVE FOSTER PARENTS ARE IMMATERIAL AND, AT A MINIMUM, DISPUTED.**

Defendants' assertions regarding available options for prospective foster parents are immaterial to the claims at issue. Defendants claim that Miracle Hill is the only CPA that discriminates and is one of many comparable options for prospective foster parents seeking to get licensed. (Dkt. 242, Defs.' Br. at 5-7, 10.) Even if this were all true—and it is not—it would be immaterial because it goes only to the breadth of Defendants' discrimination, not its existence. Defendants concede that Miracle Hill discriminates against prospective foster families based on its religious requirements.[1] (*See* Dkt. 242, Defs.' Br. at 6.) In fact, when DSS learned of Miracle Hill's discrimination in 2018 during the license renewal process, DSS concluded that Miracle

---

[1] Defendants suggest that Miracle Hill does not discriminate against children or volunteers and does not proselytize to children. (*See* Dkt. 242 at 6, 10-11.) Although the evidence suggests otherwise (*See* Ex. 1, Staudt Dep. Tr. 59:1-60:25; Ex. 2, Miracle Hill -- MIRACLE_HILL_SUBP_002056 (suggesting Miracle Hill discriminates against mentors)), these putative facts are immaterial to Plaintiffs' claims. Whether Miracle Hill *also* discriminates against children or volunteers or coerces children to practice Miracle Hill's preferred faith is irrelevant to whether state-contracted CPAs discriminate against prospective foster parents, which is the basis for Plaintiffs' claims.

Hill's discrimination violated state law and policy and federal regulations (Dkt. 243-23, Lowe Ex. 7 at -013) and accordingly provided Miracle Hill only a temporary provisional license until Miracle Hill provided a written plan of compliance (Dkt. 243-23, Lowe Ex. 7 at -012 to -013; Dkt. 243-26, Lowe Ex. 9 (temporary provisional license)).[2] It was not until the Governor's office issued Executive Order No. 2018-12 and compelled DSS to renew Miracle Hill's license notwithstanding its discrimination, that DSS did so. (Dkt. 243-29, Rogers_McMaster_000010 at -013 to -015; Dkt. 243-30, MIRACLE_HILL_SUBP_003817; Ex. 6, Lowe Tr. 150:6-20; Ex. 7, Barton Tr. 219:22-220:2.) This is undisputed; therefore, Defendants concede that they have authorized discrimination by CPAs that perform government functions under State contract. Defendants' actions have resulted in at least one CPA—Miracle Hill—discriminating against Plaintiffs and about 25 other families. (Ex. 3, Betts Tr. 97:11-98:2.) Because this discrimination would not have happened but for Defendants' authorization, Defendants have violated both the Equal Protection Clause and the Establishment Clause. Although Plaintiffs need not show more than this to prevail, the evidence shows that the harm caused by Defendants' actions is not as limited as they suggest.

A.    **Defendants incorrectly assert Miracle Hill is the only CPA that discriminates.**

Defendants' claim that "[t]here is no evidence to rebut the testimony of the DSS employees . . . that all CPAs other than Miracle Hill work with prospective foster parents of any faith (or no faith) and sexual orientation." (Dkt. 242, Defs.' Br. at 6 n.3.) This is a

---

[2] Defendants wrongly claim that federal regulations requiring entities receiving federal funds not to discriminate based on religion or sexual orientation are the only reason why DSS originally issued Miracle Hill a temporary license and a warning. (*See* Dkt. 242 at 7.) In fact, state laws and DSS's internal manuals and policies prohibited renewal of Miracle Hill's license in light of its discrimination. *See* S.C. Code Regs. §§ 114-4920(E), 114-4930(E), 114-200 and 114-210. This is confirmed by the Governor's Executive Order, which asked DSS to review its policies. (Dkt. 243-29, Rogers_MCMaster_00010 at -015.)

3

misrepresentation of Lauren Staudt's testimony.  Staudt is a supervisor of the group home and

CPA unit at DSS.  (Ex. 1, Staudt Dep. Tr. at 15:15-18.)  Staudt testified that DSS was not *aware*

of other CPAs discriminating based on religion or sexual orientation.  (*Id*. at 92:12-93:8.)  This

lack of knowledge does not establish that no other CPAs discriminate; in fact, as shown by

Plaintiffs' motion for summary judgment, any lack of knowledge by certain DSS officials about

other discriminating CPAs would not be surprising given that DSS does not require CPAs to notify

it when they turn prospective foster parents away on discriminatory grounds.  (Ex. 7, Barton Tr. at

115:16-116:4; Dkt. 243, Pls.' Br. at 35-36.)  Contrary to Defendants' claim, no DSS employee has

testified that *all* other CPAs work with foster parents of any faith and sexual orientation.  In fact,

a DSS foster care policy official could only identify three CPAs that do *not* discriminate.  (Ex. 7,

Barton Tr. 133:21-134:25; Ex. 6, Lowe Tr. 191:5-197:8.)

> Moreover, undisputed evidence establishes that, in addition to Miracle Hill, at least
three other CPAs of the 12 that provide non-kinship, nontherapeutic foster care services in the
Upstate Region also discriminate against prospective foster parents on the basis of faith or sexual
orientation.[3]  (Ex. 1, Lowe Tr. 191:5-197:8; *see also* Dkt. 243-4, 10545-G0716 at -721 to -723.)
Indeed, DSS's Statewide Foster Parent Liaison is aware that there are other upstate CPAs apart
from Miracle Hill that exclude families based on sexual orientation.[4]  Defendants even concede

---

[3]  *See* Dkt. 243-38 ¶¶ 6-7 ("Connie Maxwell Children's Ministries serves Christian families who
want to foster."); Dkt. 243-35, Staudt Ex. 13 at 2 ("SC Church of God Home for Children serves
Christian individuals and families of any denomination who want to foster and meet the basic
requirements to do so in addition to signing a statement of faith and morality statement."); Ex. 3,
Betts Dep. Tr. 207:2-6 (Southeastern Children's Home, excludes prospective foster families
based on same-sex relationship status).); *see also* (Dkt. 243, Pls.' Br. at 18-20.)

[4]  Dkt. 243-39, Wood Decl. ¶¶ 11-13 (Connie Maxwell Children's Ministries, SC Church of God
Home for Children, and Southeastern Children's Home not included in list of LGTBQ-friendly
agencies provided by DSS's Statewide Foster Parent Liaison).

4

that "there is some evidence that one other CPA limits its recruitment efforts to individuals from within its religious denomination, and that another CPA does not affirmatively recruit same-sex couples." (*See* Dkt. 242, Defs.' Br. at 6 n.4.)  While they claim "that evidence supports, at most, only a conclusion that these two CPAs target their *recruiting* efforts," (*see id.*), the uncontroverted evidence discussed above shows that this discrimination extends beyond recruitment efforts.

### B.    Defendants' attempt to downplay Miracle Hill's outsized role among the CPAs available to Plaintiffs is misplaced.

Defendants' attempt to portray Miracle Hill as just one of many comparable options for prospective foster families like Plaintiffs is highly misleading.  To start, Defendants incorrectly focus on *all* foster families and placements in South Carolina.  (*See* Dkt. 242, Defs.' Br. at 2, 6-7.)  But Ms. Rogers and Ms. Welch are seeking to provide nontherapeutic foster care in the Upstate Region, and they are not seeking to provide kinship care to a child to whom they are related.  (Dkt. 243-11, Welch Dep. Tr. 8:3-11.)  Thus, only CPAs that offer nontherapeutic foster care services in the Upstate Region are relevant to the discrimination they faced.  (While DSS also assists families in getting licenses, DSS only directly serves prospective kinship foster parents. (*See* Ex. 6, Lowe Dep. Tr. 54:1-5 (stating DSS has been focusing solely on kinship for the last year).[5])  As discussed above, there are only 12 CPAs with offices in the Upstate Region that offer

---

[5] Contrary to Defendants' suggestion that prospective non-kinship foster parents may "choose" to work with a CPA rather than DSS (Dkt. 242 at 5), the undisputed evidence shows that non-kinship foster families are directed to CPAs.  (*See* Dkt. 242 at 3 n.2).  While DSS testified that non-kinship families who are unable to find a CPA can go to DSS, DSS does not take applications from applicants who are not related to the child.  Families who are not kin would have to go through Heartfelt Calling and, if they are unable to find a CPA, Heartfelt Calling can consult with the DSS state office and the matter would "feed[] down" to the DSS regional office. (*See* Ex. 7, Barton Dep. Tr. 139:1-140:15; 138:7-18; Dkt. 243-38, Shutt Decl. ¶¶ 4-5).  Few if any non-kinship applicants have been handled by DSS since DSS began limiting its own services to kinship care in July 2020.  (Ex. 7, Barton Dep. Tr. at 138:7-18, 139:1-5.)

nontherapeutic services, and undisputed evidence exists that three CPAs beyond Miracle Hill discriminate based on faith or sexual orientation. (*See supra*, at Factual Background Section I.A.)

Defendants assert that Miracle Hill handles only "a fraction of the prospective foster parents and foster child placements." (Dkt. 242, Defs.' Br. at 6.) However, this "fraction" is taken out of all families receiving foster placements in South Carolina, including those served directly by DSS and both therapeutic and nontherapeutic foster families. Defendants' denominator is misleading because roughly half of all foster placements are kinship placements (which DSS handles on its own), and because Miracle Hill does not offer therapeutic foster care. (*See* Ex. 6, Lowe Dep. Tr. 48:05-10.) When the analysis is properly limited to only non-kinship and nontherapeutic foster care—the type of care Plaintiffs seek to provide—Miracle Hill handles the lion's share of families, who foster the overwhelming majority of children in the Upstate Region. Miracle Hill families had more than four times the number of children placed with them as the CPA with the next largest share, and Miracle Hill helped procure foster licenses for five times as many families as the CPA with the next largest share.[6]

Defendants also assert that Miracle Hill does not have greater resources or support for families. (Dkt. 242, Defs.' Br. at 2, 10.) However, Miracle Hill is more well-known and has more staff than other CPAs in the community. (*See* Dkt. 243-10, Rogers Dep. Tr. 58:18-59:5; Dkt. 243-11, Welch Dep. Tr. 10:6-17; Ex. 3, Betts Dep. Tr. 55:15-21; 56:9-16; 56:22-57:8; 66:10-67:9; Dkt. 243-4, 10545-G0716 at -720.) Defendants concede Miracle Hill has more foster staff but

---

[6] Between 2017 and 2021, Miracle Hill families had 1,278 children placed with them for nontherapeutic foster care services and the CPA with the second largest number of placements (Epworth families) had only 288 children. (Dkt. 243-4, 10545-G0716 at -718.). Overall, Miracle Hill families had over 53% of the nontherapeutic foster care placements in the Upstate Region during this timeframe. (*See id.*) During the same period, Miracle Hill assisted 338 families in procuring licenses to provide nontherapeutic foster care, while the second largest provider (Connie Maxwell Children's Ministries) assisted only 59 families. (*Id.* at -717.)

claim that its support is analogous because it serves more families. (*See* Dkt. 242, Defs.' Br. at 10 n.6.) In fact, testimony from Miracle Hill showed that Miracle Hill provides a number of support services to families beyond what the DSS contract requires. (Ex. 3, Betts Dep. Tr. 55:15-21; 56:9-16; 56:22-57:8; 66:10-67:9; Ex. 4, DSS Contract with Miracle Hill; Ex. 5, McDaniel Dep Tr. 53:20-54:24.) Furthermore, Miracle Hill has decades of experience, has worked with many more families, and has had more children placed with its families by DSS than any other nontherapeutic CPA. (Dkt. 243-4, 10545-G0716 at -717 to -718, -721 to -723.) Finally, before it chose to stop doing so, Miracle Hill was for several years the only nontherapeutic CPA receiving an administrative fee. (*See* Dkt. 243-7, Roben Dep. Tr. 57:21-58:19; Ex. 5, McDaniel Dep. Tr. 25:16-22; 56:12-57:5; 65:15-66:1; 84:15-22.)

### C.    Defendants' assertion that they have acted to ensure there are numerous options for families like Plaintiffs' is immaterial and unsupported.

Defendants say they have acted to ensure "numerous options" are available to prospective foster families. Even if true, that would not sanitize the discrimination that the State is facilitating. But it is not true. While Defendants assert that no other CPAs besides Miracle Hill discriminate (Dkt. 242, Defs.' Br. at 6 n.4)—although apparently they are not confident in that assertion because elsewhere in the brief they say that of the CPAs, Miracle Hill is the only CPA that "is known" to discriminate (*id.* at 2, 6)—in fact, Defendants do not know which or how many agencies discriminate. The DSS Director of Child Welfare and Licensing, Jacqueline Lowe (who was the 30(b)(6) designee on the topic of discrimination by CPAs) was unaware of any CPAs besides Miracle Hill that discriminate even though Plaintiffs provided evidence that at least three other Upstate CPAs discriminate (Ex. 6, Lowe Dep. Tr. 127:17-133:1, 135:10-136:15.)[7] And DSS

---

[7] When Ms. Lowe was confronted at her deposition with documents indicating discriminatory practices by two Upstate nontherapeutic CPAs—Epworth and Southeastern Children's Home—

does not require CPAs to let them know if they turn families away to ensure that those families

have an agency to work with. (Ex. 7, Barton Dep. Tr. at 115:16-116:4).

*        *        *

Even if Defendants were correct that Miracle Hill was the only CPA to

discriminate, that it was just one of several comparable options for nontherapeutic foster care by

non-kin in the Upstate Region and that DSS ensured numerous other options for same-sex families,

these facts would be immaterial to Plaintiffs' claims. These facts do not negate Defendants'

violations of the Equal Protection and Establishment Clauses; they merely go to the breadth of the

violations. However, each of these purported facts is also disputed, making summary judgment

for Defendants on the basis of those facts inappropriate.

## II. DEFENDANTS' ASSERTION THAT CPAS' SCREENING OF FOSTER FAMILIES IS PRIVATE ACTIVITY OUTSIDE OF ITS STATE CONTRACT IS INCORRECT.

Defendants argue that CPAs' work recruiting, screening and assisting foster parents

in getting licensed is private activity that falls outside of its contracts with DSS.[8]  In short, they

state that CPAs are not "require[d] [] to recruit" or "assist" prospective foster parents under the

contract with DSS. (Dkt. 242, Defs.' Br. at 5.)  Whether the contract requires this explicitly is of

no consequence. DSS acknowledges it has "final authority" over the foster care system in South

Carolina, (Dkt. 242, Defs.' Br. at 3-4),[9] and CPAs are delegated functions pertinent to recruitment

_____

she acknowledged that the documents indicated discriminatory practices but that she was
unaware of those practices. (Ex. 6, Lowe Dep. Tr. 127:17-133:1, 135:10-136:15.)

[8] Defendants explain how CPAs are paid administrative fees under their contract and how these
fees are a "partial reimbursement for their services." (*See* Dkt. 242 at 4-5.) How much CPAs
are paid by the government, or whether they are paid at all, is irrelevant to whether they are
carrying out a government function. (*See infra* Argument, Section II.C.)

[9] DSS's final authority over children does nothing to disprove that Defendants permit CPAs to

and licensing under South Carolina law.  *See* S.C. Code Regs. § 114-4980.  The uncontroverted

evidence shows that DSS's contract with CPAs requires them to "make homes available for

placement of a child," which necessarily requires recruitment and screening of families.  (*See* Ex.

4, DSS Contract with Miracle Hill at 2; *see also* Ex. 5, McDaniel Dep. Tr. 43:11-47:8.)

## III.    DEFENDANTS' ASSERTION THAT ALLOWING DISCRIMINATION BY CPAS RESULTS IN MORE AVAILABLE FOSTER FAMILIES IS IMMATERIAL AND DISPUTED.

Defendants claim that allowing discrimination by CPAs results in more foster

families.  This point is immaterial and disputed.  Even if authorizing discrimination by CPAs

ultimately resulted in more available foster families, that would not be a justification for excluding

families based on religious criteria in a government program.  (*See infra* Argument Sections I, II.)

And in any event, Defendants' suggestion that allowing CPAs to discriminate has

resulted in an increase in the number of foster parents in the State (Dkt. 242, Defs.' Br. at 11) is

disputed.  Defendants point to data on the number of foster parents but they offer no evidence it

was the State's policy of allowing CPAs to discriminate that caused a rise in available foster

families.  The State's own witness, Director of Accountability, Data and Research at DSS, Diana

Tester, testified that it is not possible to show that the policy caused an increase in numbers because

there are too many variables.  (Dkt. 243-37, Tester Dep. Tr. 37:9-20.)[10]  Defendants ignore these

---

discriminate on the basis of religion and sexual orientation in the delegated government function
of screening prospective foster parents.  That DSS does not itself discriminate in the screening of
kinship foster placements has nothing to do with the claims in this case apart from further
emphasizing that DSS has a nondiscrimination policy that it authorizes CPAs to violate.

[10] Defendants mischaracterize Ms. Tester's testimony by saying she said she cannot prove that
discrimination reduces the number of families.  (Dkt. 242 at 20 n.7.)  In reality, Ms. Tester stated
that she cannot prove that the HHS waiver or the Governor's Executive Order allowing
discrimination *increases* the number of families.  (Dkt. 243-37, Tester Dep. 37:9-20.)

many factors, including the fact there was a *national* rise in the number of available foster families during the same time period.  (*See* Ex. 9, Brodzinsky Rpt. at ¶¶ 3-5.)

       While Defendants offer nothing but speculation that authorizing discrimination by CPAs increases the number of available foster families, the evidence shows that discrimination has resulted in at least 25 families being turned away by Miracle Hill since 2017 (Ex. 3, Betts Tr. 97:11-98:2), and DSS does not track whether any of these families ever became foster parents (Ex. 7, Barton Dep. Tr. at 155:4-18) as opposed to standing down to avoid further rejection as Plaintiffs have.  (Dkt. 243-10, Rogers Tr. 127:14-23; 128:3-4.).

       Defendants also claim that "witnesses with personal knowledge indicated that if Miracle Hill were to shut down, as many as 60% of their foster parents would choose to cease serving as foster parents altogether." (Dkt. 242, Defs.' Br. at 11.)  However, when Sharon Betts,[11] Foster Care Licensing Supervisor at Miracle Hill, was asked what percentage of Miracle Hill families would cease fostering rather than work with another agency, she said, "I have no idea.  I mean, we have not even discussed that."  (Ex. 3, Betts Dep Tr. 188:23-189:3.)  The 60% figure she later provided was nothing more than the percentage of Miracle Hill families that did not currently have placements, who she just assumed would stop serving as foster parents if Miracle Hill were no longer a CPA.  (Ex. 3, Betts Dep Tr. 191:10-193:24.)  Furthermore, DSS official Dawn Barton testified that if Miracle Hill were to stop providing services, she would expect most families to work with another agency.  (*See* Ex. 7, Barton Tr. 159:9-161:9.)  As Plaintiffs' expert Dr. David M. Brodzinsky, an expert in foster care, explained, there is no basis to suggest that the

---

[11] When questioned on a similar issue, Reid Lehman, Miracle Hill's 30(b)(6) witness, stated Ms. Betts would "have a better estimate" than him.  (Ex. 8, Lehman Dep. Tr. 278:1-14.)

number of available foster families would decrease if Miracle Hill and other discriminatory CPAs discontinued providing services. (*See* Ex. 9, Brodzinsky Rebuttal Rpt. At ¶ 2.)

Finally, the assertion that allowing discrimination by faith-based agencies maximizes the number of families is inconsistent with testimony from DSS's top foster care officials indicating that it best serves children's interests to have all agencies accept all qualified families—and that it would be their preference to do so. (Ex. 7, Barton Tr. 222:1-223:25.) It is also inconsistent with DSS's initial decision to end Miracle Hill's contract because of its discrimination, which the Governor countermanded. (Ex. 6, Lowe Tr. 172:20-173:3.)

## IV.    DEFENDANTS' ASSERTION THAT MIRACLE HILL DID NOT REJECT PLAINTIFFS BASED ON SEXUAL ORIENTATION IS IMMATERIAL AND DISPUTED.

Defendants claim that Miracle Hill rejected Plaintiffs based on their religious beliefs rather than "on the basis of their sexual orientation or same-sex marriage." (*See* Dkt. 242, Defs.' Br. at 11.) *First*, this is immaterial to Plaintiffs' claims because it is undisputed that Miracle Hill employed religious criteria to reject Plaintiffs, and that criteria include Miracle Hill's religious beliefs against the marriages of same-sex couples. (Dkt. 242, Defs.' Br. at 9, 11; Dkt. 243, Pls.' Br. at 1-2; Dkt. 243-38, Shutt Decl. Ex. G.)

*Second*, there is uncontroverted evidence that both Plaintiffs' sexual orientation and their faith motivated Miracle Hill's discrimination. Miracle Hill witnesses testified that, even if Ms. Rogers and Ms. Welch attended an acceptable church and agreed with its doctrinal statement, Miracle Hill still would have refused them because they are a same-sex couple and, thus, do not follow its doctrinal statement, which says "God's design for marriage is the legal joining of one man and one woman." (*See* Dkt. 243-34, Busha Dep. Tr. 69:16-19; Ex. 3, Betts Dep. Tr. 113:8-13; Dkt. 243-38, Shutt Decl. Ex. G.) Regardless of whether Miracle Hill would discriminate against single LGBT persons, excluding same-sex couples is exclusion based on sex and sexual

11

orientation. *See Bostock*, 140 S. Ct. at 1737; *Lawrence v. Texas*, 539 U.S. 558, 581 (2003) (O'Connor, J., concurring).

## V.    DEFENDANTS' EFFORT TO MALIGN PLAINTIFFS IS PURE DISTRACTION.

Defendants also fault Plaintiffs for contacting their lawyers rather than seeking other opportunities to foster.  (*See* Dkt. 242, Defs.' Br. at 9-10.)  However, the possibility that other CPAs might accept them does not make the State's authorization of discrimination by CPAs constitutionally permissible.  Plaintiffs were not required to investigate which CPAs might not discriminate in order to "opt out of discrimination" from Miracle Hill. *See Peltier v. Charter Day Schs., Inc.*, 37 F.4th 104, 119 (4th Cir. 2022).[12]  And, as Plaintiffs explained, they did not want to risk facing additional discrimination from other CPAs.  They had good reason to fear that they would have been turned away from another CPA, given the breadth of the Governor's exemption (Dkt. 243-10, Rogers Dep. Tr. 127:14-23; 128:3-4) and the evidence that other CPAs in the Upstate Region discriminate as well.  Defendants' effort to shift focus from their discrimination to Plaintiffs' decision to pursue recourse is a pure distraction and should be ignored.

## LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247 (1986).  The moving party bears the initial burden and once it is met, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Bailey v. Bazzle*, 628 F. Supp. 2d 651, 655 (D.S.C. 2008) (citing *Celotex*

---

[12] Defendants suggest Plaintiffs initiated this suit because the ACLU "solicit[ed]" individuals to apply "to Miracle Hill in hopes of being 'rejected' and bringing litigation."  (*See* Dkt. 242 at 9.) This claim is immaterial to Plaintiffs' claims, as it does not negate Defendants' discriminatory conduct.  It is also unsupported by the evidence, which shows that the ACLU merely offered its services in assisting parents who had been turned away from CPAs.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "In reviewing a motion for summary judgment, the court must 'draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion.'" *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 817-18 (4th Cir. 1995) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)).

## ARGUMENT

### I.    DEFENDANTS' EQUAL PROTECTION ARGUMENTS ARE WITHOUT MERIT.

#### A.    Defendants fail to refute that the State authorized and enabled state-contracted CPAs to discriminate on the basis of sex and sexual orientation in carrying out a government program.

The undisputed facts establish that Defendants sanctioned and facilitated discrimination by CPAs against same-sex couples in carrying out public foster care services.

*First*, while Defendants argue that "Miracle Hill . . . did not 'reject' [the Plaintiffs] on the basis of their sexual orientation or same-sex marriage" (Dkt. 242, Defs.' Br. at 11), the uncontroverted evidence shows otherwise. Numerous witnesses testified Miracle Hill will not accept married, same-sex couples as foster parents as a general matter and specifically would not accept Plaintiffs on that basis. (Dkt. 243-34, Busha Dep. Tr. 69:16-19; Ex. 3, Betts Dep. Tr. 113:8-13.) Furthermore, Miracle Hill's doctrinal statement, to which prospective foster parents must adhere, states, in part, that "God's design for marriage is the legal joining of one man and one woman." (Dkt. 243-38, Shutt Decl. Ex. G.) This exclusion is embedded in the religious criteria by which Miracle Hill considers potential foster parents in carrying out its role in the public child welfare system. At a minimum, a dispute of fact exists.

*Second*, Defendants wrongly contend that Miracle Hill must be a state actor for Defendants to be held liable. (Dkt. 242, Defs.' Br. at 36.) But Defendants are responsible for *their own actions* in authorizing and enabling CPAs' discrimination. It is undisputed that Governor

McMaster issued an Executive Order compelling DSS to allow CPAs to discriminate and that DSS renewed Miracle Hill's license knowing that the CPA was discriminating based on its religious beliefs. (*See* Dkt. 243, Pls.' Br. at 1-2, 13-16; Dkt. 242, Defs.' Br. at 7-9.) "Here Plaintiffs are challenging a specific state procedure—the State's procedure of contracting with faith-based child placing agencies that discriminate on the basis of sexual orientation. The 'gravamen' of Plaintiffs' [motions] is not the purely private decisions of the faith-based agencies in turning them away." *Dumont v. Lyon*, 341 F. Supp. 3d 706, 745 (E.D. Mich. 2018). It is the State's facilitating and sanctioning of that discrimination by entities acting on its behalf that violates Plaintiffs' Equal Protection rights, and the State may not place "the full coercive power of government" behind a CPA's desire to exclude same-sex couples in a manner that deprives Plaintiffs of the "full enjoyment of [their] rights on an equal footing." *Shelley v. Kraemer*, 334 U.S. 1, 19 (1948). Defendants cannot enable CPAs to implement discriminatory requirements that the State could not itself impose. *Anderson v. Martin*, 375 U.S. 399, 404 (1964).

      *Third*, Defendants' claim that Plaintiffs cannot establish an Equal Protection claim because there are other CPAs available to Plaintiffs that do not discriminate misses the mark. (*See* Dkt. 242, Defs.' Br. at 9, 10-11.) Even if Defendants' characterization of the alternative options were true, it is immaterial because the State still authorized Miracle Hill's discrimination against Plaintiffs and others. *See Dumont*, 341 F. Supp. 3d at 745.[13] And in any event, Plaintiffs have submitted uncontroverted evidence that other CPAs do in fact discriminate and that same-sex couples like Plaintiffs do not have options that are comparable to Miracle Hill. (*See* Dkt. 243-38, Shutt Decl. ¶¶ 6-7; Dkt. 243-35, Staudt Ex. 13; Ex. 3, Betts Tr. 207:02-06.).

---

[13] In any event, the Fourth Circuit has held that the ability to opt out of discrimination has no bearing on the existence of an Equal Protection violation. *See Peltier*, 37 F.4th at 119.

14

**B.    Defendants' actions do not survive any level of scrutiny.**

Because Defendants authorized and enabled discrimination against Plaintiffs because of their sex and sexual orientation, heightened scrutiny applies to Plaintiffs' Equal Protection claims. But Defendants cannot satisfy any level of equal protection scrutiny. At the very least, disputes of material fact preclude summary judgment for Defendants.

*1.    Heightened scrutiny applies to Plaintiffs' claim.*

Discrimination on the basis of sexual orientation *is* discrimination on the basis of sex, which is undeniably subject to heightened scrutiny. "[I]t is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020). Discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017).

Separately, discrimination based on sexual orientation warrants heightened scrutiny in its own right. *See Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014); *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 484 (9th Cir. 2014); *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013). The Supreme Court's decision in *Windsor*, while not explicit in its use of nomenclature, applied heightened scrutiny to sexual orientation discrimination. *See Smithkline*, 740 F.3d at 480-81 (citing *Windsor*, 570 U.S. at 769).

Furthermore, the factors the Fourth Circuit looks to in determining whether a quasi-suspect classification exists are present for sexual orientation discrimination: (1) lesbian, gay and bisexual people have "historically been subject to discrimination"; (2) their sexual orientation bears no "relation to [their] ability to perform or contribute to society"; (3) their sexual orientation is a "distinguishing characteristic[]"; and (4) as a minority group, they "lack[] political power." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020); *see also, e.g.*, *Windsor*,

15

699 F.3d at 181-85; *Baskin*, 766 F.3d at 655; *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 929 (S.D. Miss. 2014), *aff'd on other grounds,* 791 F.3d 625 (5th Cir. 2015).  Defendants offer no rationale as to why heightened scrutiny should not apply.[14]

### 2.    *Defendants cannot satisfy any level of equal protection scrutiny.*

Defendants' conduct does not satisfy heightened scrutiny.  Classifications that are subject to heightened scrutiny require an "exceedingly persuasive justification," *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982), and must be "substantially related to a sufficiently important government interest," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985).  Defendants provide no exceedingly persuasive justification that is substantially related to authorizing the discrimination at issue here.

First, Defendants assert that allowing discrimination by CPAs increases the number of foster homes for children (Dkt. 242, Defs.' Br. at 39).  As discussed above, this assertion is not only disputed but is also pure speculation unsupported by evidence.  Rather, the evidence shows that at least 25 families have been turned away due to Defendants' facilitation of CPAs' discrimination, that DSS has no way of knowing whether those families ever became foster parents, and that DSS officials themselves believe that discriminating based on sexual orientation is not in foster children's best interest.  (*See supra*, Factual Background, Section III.)

Moreover, Defendants' claim that the number of foster parents rose after they "accomodat[ed]" Miracle Hill's discrimination is misleading at best.  (Dkt. 242, Defs.' Br. at 39.)

---

[14] Defendants mischaracterize this Court's assessment of Plaintiffs' Equal Protection claim in ruling on Defendants' motion to dismiss.  (*See* Dkt. 242 at 11.)  As noted in Plaintiffs' opening brief (Dkt. 243, Pls.' Br. at 22, n.16), the Court's ruling on the motion to dismiss acknowledged that the parties had not fully briefed the applicable level of review for sexual orientation discrimination, and it did not address Plaintiffs' sex discrimination claim and predated the Supreme Court's decision in *Bostock*.

There is no evidence in the record establishing a causal connection. Indeed, the State's own witness testified it would be impossible to make such a causal connection, and given the simultaneous nationwide increase in foster parents, there is no way to attribute the increase to Defendants' conduct here. (*See supra*, Factual Background, Section III.) Defendants also attempt to support this assertion by claiming that, if Miracle Hill shut down, 60% of its foster parents would stop serving. (Dkt. 242, Defs.' Br. at 11.) This is disputed. Not only is this number based on speculation and misrepresentation of a Miracle Hill staff member's testimony, but the evidence actually shows that when a CPA closes, families continue fostering with DSS or other CPAs. Indeed, a DSS official testified that she had no reason to think Miracle Hill's foster families would stop fostering if the CPA were to close. (*See supra*, Factual Background, Section III.)

Not only does this purported justification fail under heightened scrutiny, it also fails rational basis review. Even setting aside that the State's own officials have disavowed this justification, (*see supra id.*), it is irrational to pursue a goal of *increasing* numbers of foster families by facilitating the *exclusion* of foster families. The scrutiny required by rational basis review is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). To survive this review, the State's facilitation of CPAs' desire to discriminate must "rationally advance[] a reasonable and identifiable governmental objective . . . ." *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981). It is not enough that the interest in increasing numbers of foster placements may itself be reasonable. To pass muster, the State's actions "must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993). The testimony of DSS's own 30(b)(6) witnesses demonstrates that the Defendants' actions have no such footing. When the relationship between a classification and its goal is "so attenuated as to render the distinction arbitrary or irrational," that distinction violates equal protection. *Cleburne*, 473 U.S. at 446.

Defendants also wrongly attempt justify its authorization and facilitation of discrimination by CPAs as an accommodation of religion. But the accommodation of private religious beliefs cannot justify harming third parties. *See Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015) (holding religion does not justify government denial to same-sex couples of the same freedom to marry afforded different-sex couples); *Romer v. Evans*, 517 U.S. 620, 635 (1996) (rejecting accommodation of personal or religious objections to homosexuality as justification for government discrimination based on sexual orientation); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.") Accommodation has its limits, both as a matter of equal protection and the Establishment Clause, where that accommodation actively harms third parties like the Plaintiffs.

Moreover, even rational basis review requires ensuring that Defendants' actions "rationally further[] some legitimate, articulated state purpose and therefore do[] not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *Rock for Life—UMBC v. Hrabowski*, 643 F. Supp. 2d 729, 749 (D. Md. 2009). Defendants' sanctioning of CPAs' discrimination based on sex and "sexual orientation cannot be described as objectively reasonable," *Beall v. London City Sch. Dist. Bd. of Educ.*, No. 2:04-cv-290, 2006 WL 1582447, at *27 (S.D. Ohio June 8, 2006), because it amounts to little more than endorsing and enabling a bare desire to harm a politically unpopular group, regardless of the religious nature of that desire. For this reason, Defendants' purpose of facilitating a contracted agency's known discrimination fails on its own merits. *See Romer*, 517 U.S. at 634-35; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

## II.    DEFENDANTS' ARGUMENT THAT THE ESTABLISHMENT CLAUSE PERMITS THEM TO "ACCOMMODATE MIRACLE HILL'S RELIGIOUS EXERCISE" IS UNAVAILING.

Defendants' arguments against Plaintiffs' Establishment Clause claim fails for several reasons:  (a) their accommodation argument is misplaced; (b) their historical arguments misconstrue the relevant law; and (c) they incorrectly characterize Miracle Hill as engaging in private activity.  (*See* Dkt. 242, Defs.' Br. at 24-36.)  Therefore, Defendants fail to show they are entitled to summary judgment on Plaintiffs' Establishment Clause claim.

### A.    Defendants' arguments about accommodation are misplaced.

Relying on *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), Defendants claim that they are simply accommodating Miracle Hill's religious beliefs.  But *Kennedy* did not overturn the relevant Establishment Clause case law regarding the delegation of government functions, harm to third parties or coercion, *see id.* at 2428, and this case is about delegation, harm and coercion, not accommodation.

*First*, Defendants' actions cannot be justified as accommodation because they are delegating a government function to a religious organization that uses religious criteria to perform its role.  *See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126-27 (1982) (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963)).  Both the government's well-established role in caring for wards of the state, *see Doe ex. rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010), and the state statutory scheme enabling the delegation of government foster care functions to private agencies, *see Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974); *Peltier*, 37 F.4th at 118; *see also* S.C. Code Regs §§ 114-550(D)(1)-(2), 114-4980(A)(9)(a), 114-4980(A)(2)(c), confirm that CPAs perform a government function in recruiting and vetting foster families to care for children in state custody.  This delegation is unconstitutional when made with

19

"no assurance" that it "will be exercised neutrally" with respect to religion. *See Kiryas Joel*, 512 U.S. at 686; *see also Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1343 (4th Cir. 1995). "[A]ccommodation is not a principle without limits." *Kiryas Joel*, 512 U.S. at 706; *cf. Corp. of Presiding Bishop of the Church of Jesus Christ of Latterday Saints v. Amos*, 483 U.S. 327, 334-35 (1987) ("At some point, accommodation may devolve into 'an unlawful fostering of religion[.]'" (quoting *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 145 (1987))). Here, the State not only failed to ensure that a government function would be carried out with religious neutrality, it affirmatively authorized the use of religious criteria by the CPAs to which it delegated this government function.

*Second*, Defendants are "accommodating" Miracle Hill's religious exercise in a way that imposes significant burdens and harms on third parties, including Plaintiffs. That is not permissible. *Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985). Heterosexual, Protestant Christian prospective foster parents seeking to provide nontherapeutic care for non-relative children are able to work with all South Carolina CPAs, including CPAs with the most services and experience. Same-sex couples and non-Christians are not. (*See supra* Factual Background, Section I.)

*Third*, Defendants' actions coerce prospective foster parents into supporting CPAs' religious beliefs by authorizing CPAs to restrict eligibility to families that affirm their beliefs. (*See id*.) The government may not, consistent with the Establishment Clause, coerce any individual to support a particular religion. *See Kennedy*, 142 S. Ct. at 2429 (2022); *see also Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring). There is uncontroverted evidence that the Defendants permit CPAs to impose religious requirements, and multiple CPAs do. (*See* Dkt. 243-38, Shutt Decl. ¶¶ 5-8; Dkt. 243-35, Staudt Ex. 13; Ex. 3, Betts Dep. Tr. 206:15-207:6.)

20

In order to have the same choice as others among all CPAs when seeking to become foster parents, prospective parents must adhere to faith-based doctrines to do so, thus being coerced into religion.[15]

Defendants' only counterargument to the issues of delegation, harm and coercion is a misplaced attempt to distinguish three relevant cases: *Larkin*, *Kiryas Joel* and *Caldor*. (*See* Dkt. 242, Defs.' Br. at 32-33.) These efforts are unavailing.

*First,* Defendants misinterpret *Larkin* as holding that only unilateral delegations of power are forbidden. According to Defendants, no CPA can unilaterally block families from becoming foster parents because other CPAs and DSS exist, and therefore *Larkin* is inapposite. (Dkt. 242, Defs.' Br. at 32.) But the principal holding in *Larkin* was about delegation of a *government function* without any assurances that the delegee would use that power in a secular manner, not about whether others carry out that same function. *See* 459 U.S. at 123 ("[T]he statute, by delegating a governmental power to religious institutions, inescapably implicates the Establishment Clause.") This argument thus fails.

*Second*, Defendants argue that *Kiryas Joel* does not apply because Governor McMaster's Executive Order is not limited to one agency and instead applies to all CPAs that discriminate for religious reasons. (Dkt. 242, Defs.' Br. at 33.) Defendants misread *Kiryas Joel*. Although the accommodation at issue in *Kiryas Joel* improperly "single[d] out a particular religious sect," the Court never held that *only* those types of accommodations are unlawful. *Kiryas*

---

[15] Defendants try to pose hypothetical legal questions before this Court by raising the implications of this matter on the laws of other states. (Dkt. 242 at 23.) None of that is relevant to the particular inquiry here, which focuses on the specifics of South Carolina's actions in authorizing and facilitating CPAs' use of religious criteria in carrying out their delegated public functions and its impact on South Carolina families.

*Joel*, 512 U.S. at 706. Rather, any delegation that allows the use of religious criteria in the exercise of a government function is unconstitutional.

*Third*, Defendants attempt to distinguish *Thornton* by stating that the Executive Order does not give "force of law" to religious exercise like in *Thornton*. (Dkt. 242, Defs.' Br. at 33.) This, too, is wrong. *Thornton* precludes government actors from permitting an "unyielding weighting" of particular religious views over "all other interests"—religious and secular. *Thornton*, 472 U.S. at 710. That is precisely what Defendants have done. By permitting CPAs to impose "their own interests [that] others . . . conform their conduct to [their] own religious necessities," *id.*, in the performance of a delegated government function, Defendants run afoul of the principles laid out in *Thornton*.

**B.     Defendants' arguments based on history fail.**

Defendants' reliance on historical information about child welfare is flawed in several respects. To start, even if the *Kennedy* historical test applied here, there is no record evidence of historical practices in this case. Defendants' extensive reliance on academic articles is inappropriate on summary judgment, as these materials constitute hearsay, and evidence on summary judgment must be admissible. *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991); *see also Perry v. Jones*, No. 14-CV=71, 2016 WL 2747262, at *2 (E.D. Va. May 10, 2016) ("While the Federal Rules of Evidence do provide a hearsay exception for learned treatises, such documents are only admissible if they are called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." (internal quotations omitted)). Defendants offered no expert testimony into the record whatsoever, let alone by anyone qualified to provide expertise on any relevant historical inquiry, to the extent one exists. Defendants are inviting the Court into the role of armchair historian based on their own

cherry-picked version of the history they argue is relevant. The Court should reject that invitation, particularly on a motion for summary judgment.

Even looking outside the record as they have, Defendants misunderstand the inquiry they purport to be required under *Kennedy*. Defendants claim that the relevant question is whether there has been "a long tradition of partnership between religious ministries and the government," such that the continued accommodation of religious ministries does not run afoul of the Establishment Clause. (Dkt. 242, Defs.' Br. at 26.) But to the extent any historical account is relevant, the historical information Defendants reference does not support their proposed Establishment Clause analysis because there was no public foster care system at the time of the founding, as Defendants' own cited sources make clear. *See* Susan Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 Ohio St. L.J. 1295, 1301 (1999) ("Before the last quarter of the nineteenth century, there were no public *or private* [foster care] agencies.") Much of the history on which Defendants' rely is therefore inapposite because it largely focuses on religious involvement in the management of private orphanages, not foster care.[16]  Even the

---

[16] Stephanie H. Barclay, *Spheres of Liberty and Free Exercise: Lessons for* Fulton *from Jefferson's correspondence with Ursuline Nuns*, Reason, https://perma.cc/5C33-6E2U (Nov. 2, 2020) (discussing an *orphanage* run by Ursuline nuns of New Orleans and not discussing anything relevant to foster care); *see* Brenda G. McGowan, *Historical Evolution of Child Welfare Services*, in Child Welfare for the Twenty-First Century: A Handbook of Practices, Policies, and Programs 12, 10-14 (Gerald P. Mallon & Peg McCartt Hes eds., 2005) (describing a *private* institution for orphans overseen by the Ursuline Convent and the rise of orphanages in the early 19th century); *see* Catherine E. Rymph, *Raising Government Children: A History of Foster Care and the American Welfare State* 19 (2017) (discussing how over half of children in *orphanages* lived in Catholic institutions at the end of the nineteenth century); John E. Murray, The Charleston Orphan House, *Children's Lives in the First Public Orphanage in America* xiv (2013) (discussing an *orphanage* hosted by an Anglican parish that received government support); 5 *The Quarterly Bulletin: State Board of Charities and Corrections of South Carolina* 9 (1919) (speaking about the inadequate funds and support for orphanages in South Carolina); Newton B. Jones, *The Charleston Orphan House, 1860-1876* in The South Carolina Historical Magazine, October 1961, xiv (discussing the first "public orphanage"); Brief of Amici Curiae of the United States

---

examples of religious organizations placing children out with families to care for them was a private endeavor.[17]

Sometimes the government offered subsidies to private organizations that cared for children. For example, the Charleston Orphan House was a municipally supported orphanage, which received funds from a "yearly appropriation by City Council and . . . endowment funds." Newton B. Jones, *The Charleston Orphan House, 1860-1876*, 62 The S. C. Historical Magazine 203, 203-04 (1961). Children at the Charleston Orphan House were not in state custody. They were often voluntarily turned over to the orphanage by indigent parents and could be retrieved by their families. *See* Murray, *supra* xiv, 51. These examples thus have no bearing on Defendants' purported application of a historical test to their delegation of the public function of screening foster parents for children in state custody.

Not only is this proffered history factually distinguishable, it is temporally irrelevant. Defendants acknowledge that government played no role in child welfare until after the Civil War. (Dkt. 242, Defs.' Br. at 28.) In fact, according to Defendants' own sources, the government did not assume custody of children as it does today until the late nineteenth century. *See, e.g.*, Timothy A. Hacsi, *Second Home: Orphan Asylums and Poor Families in America* 12-13 (1997) ("Government involvement in asylums, previously limited to occasional grants of money or land," did not "increase[] greatly" until the "last decades of the nineteenth century" and that "foster care" only began to supplant orphan asylums "between the 1920s and 1940s");

---

Conference of Catholic Bishops & Pennsylvania Catholic Conference in Support of Petitioners at 12-15, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (No. 19-123) (discussing the prevalence of Catholic *orphanages* in the United States in the nineteenth and twentieth centuries).

[17] *See, e.g., supra* Mangold at 1305-06; Hon. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2170 (2003).

Mangold, *supra* 1301 (the relevant history regarding private and public foster care agencies began at the last quarter of the 19th Century); McGowan, *supra* 16-17 (development of foster homes and children's institutions had not "evolved" until the "last quarter of the nineteenth century"). This history is therefore irrelevant to the historical test on which Defendants claim to rely because it postdates the founding. *See Kennedy*, 142 S.Ct. at 2428.

Defendants fail to consider how the conduct actually challenged by Plaintiffs' claims was viewed at the time of the founding. The history as improperly proffered by the State does not allow for any assessment of how the Framers would view government-contracted foster care agencies using religious criteria to screen families to care for wards of the state because nothing remotely resembling the modern foster care system existed at the time.

In fact, Defendants ask the Court to tether its Establishment Clause analysis to a time when the very notion of childhood or children's rights did not exist. During the time of the founding, children were viewed as chattel, and the provision of aid to poor children and orphans was focused on ensuring children would be able to work and provide an income for their families. *See* McGowan, *supra* 11-12. The modern public child welfare system bears no relation to this period of history. Defendants ignore that the "child welfare system" to which they point was limited to white children, *see* Murray *supra* xiv, 3, 11, 12 (explaining the orphanage's goal of "white unity"); McGowan, *supra* 14, 24-25; Hacsi *supra* 35; actively harmed children by placing them in unhealthy, abusive and unsanitary conditions, *see* Murray *supra* 42, 51; subjected children to informal indentured servitude, *see* Rymph, *supra* 21; Mangold, *supra* 1306; McConnell, *supra* 2170; Hacsi, *supra* 16; McGowan at 12; removed children from faith traditions considered bad influences, *see* Hacsi, *supra* 56, 66-67; or shipped children on "orphan trains" thousands of miles away from their homes because their communities were deemed undesirable, *see* Mangold *supra*

1305-06.[18]  A main goal of many of these groups was to inculcate the children in the organization's faith.  *See* Hacsi *supra* 11, 59, 62; McGowan, *supra* 12, 14.  The modern child welfare system, including state involvement and control, reflected, in part, a recognition that children should be protected from such treatment, and that all children regardless of race should be provided services.  *See* McGowan *supra* 13, 19, Rymph *supra* 19-20.  Defendants' proffered history is ahistorical and anachronistic, and crediting Defendants' arguments would give sanction to practices long since deemed abhorrent, harmful to children, and inconsistent with well-established constitutional jurisprudence.

To the extent history is relevant to the assessment of Plaintiffs' Establishment Clause claims, this court must consider the "historical practices and understandings" that most "faithfully reflec[t] the understanding of the Founding Fathers".  *Kennedy*, 142 S.Ct. at 2428 (internal quotations omitted).  This includes the key principle that government remain neutral between religions or between religion and nonreligion without favoring one over the other.  *McCreary Cty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 875-81 (2005).  It also includes the key principle that people must be shielded from the "coercive pressure" that results "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief," *Engel v. Vitale*, 370 U.S. 421, 431 (1962), including when the government relies on religious entities to carry out civil functions, *Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring).  Defendants' actions violate these core principles.

---

[18] *See also* Rymph, *supra* 21-22 (noting "orphan trains" are often cited as origins of the modern foster care system but resembled informal adoption and indenture more than modern foster care).

### C.    Plaintiffs' Establishment Clause claim is not moot.

Defendants argue that Plaintiffs' Establishment Clause claim is moot because it "hinges on DSS funding Miracle Hill." (Dkt. 242, Defs.' Br. at 23.)  It does not.  Plaintiffs' claim focuses on the delegation of a government function to religious organizations while allowing those religious organizations to use religious criteria in executing this government function.  (*See* Dkt. 243, Pls'. Br. at 32-38.)  It does not turn on funding.[19]

### D.    Defendants' argument that CPA's are exercising a private function rather than a government function is without basis.

Defendants wrongly represent their actions as accommodating "private" religious exercise, instead of what they actually authorized—the use of religious criteria in performing a government function.  CPAs' use of religious criteria to exclude foster families is an Establishment Clause violation because they are carrying out a government function.  Religious organizations that carry out public social welfare programs like the state's foster care system must do so in a secular manner.  *Bowen v. Kendrick,* 487 U.S. 589, 609 (1988)*.*

The cases Defendants cite as upholding government accommodation of private religious exercise are not pertinent here because they do not involve an entity carrying out a government function.  Instead, Defendants exclusively cite instances of private religious exercise, including "land use exemptions for houses of worship, exemptions from day care regulations for churches, Affordable Care Act exemptions for religious ministries, protection for the religious exercise of prison inmates, and religious accommodations for public school students." (Dkt. 242, Defs.' Br. at 24-25.)  At issue here, however, is not private religious exercise of CPAs but use of

---

[19] The fact that Miracle Hill previously received funding merely made Defendants' Establishment Clause violation more egregious.  While government funding can form the basis of an Establishment Clause claim, it is not a required element. Furthermore, while Miracle Hill no longer takes government funds, other CPAs do.

religious requirements in performing the public function of foster family screening. This case is thus unlike *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) ,in which the court held that a faith-based agency that facilitated *private* adoptions need not process applications from same-sex couples. *Id.* at 156. New Hope, unlike Miracle Hill and the other South Carolina CPAs, was not providing a government function.

Defendants also wrongly claim that Plaintiffs take issue with a "religious institution . . . participating in [a] publicly sponsored welfare program". (Dkt. 242, Defs.' Br. at 34 (quoting *Bowen*, 487 U.S. at 609).) Defendants are confusing concepts. Plaintiffs are not challenging participation of religious organizations in government social welfare programs; rather, Plaintiffs are challenging CPAs' use of religious eligibility criteria when they carry out those programs. *Bowen*, relied on by Defendants, makes clear that while religious organizations have the right to participate when the government partners with private entities to carry out government social welfare programs, they must do so in a secular manner. 487 U.S. at 612 (assuming the religiously affiliated grantees are "capable of carrying out their functions" in a "secular manner").

Finally, State Defendants' argument that "Miracle Hill's religious exercise cannot be attributed to South Carolina" misses the mark. (Dkt. 242, Defs.' Br. at 34.) Defendants made Miracle Hill's conduct possible by authorizing discrimination by CPAs and reissuing a full license to Miracle Hill even though it used religious criteria in its contracted foster care work. But for the Governor and DSS's actions, Miracle Hill's and other CPAs' discrimination would not have been possible.

## III.    DEFENDANTS' RELIANCE ON *FULTON* IS MISPLACED.

Defendants' argument that *Fulton* mandates that that they prevail is unavailing. As this Court has already concluded, *Fulton* does not apply to this case. (Order Den. Defs.' Mot. J. on Pleadings ("Order") 5-6, Dec. 2, 2021, Dkt. 201.) Here, Plaintiffs brought claims under the

Equal Protection Clause and Establishment Clause, neither of which were addressed in *Fulton*, which involved a free exercise challenge to the government's enforcement of a non-discrimination policy against a foster care agency. Even considering a hypothetical free exercise match-up between a CPA and South Carolina in the event the state were to enforce its non-discrimination requirements against CPAs, the different context would not result in the same outcome as *Fulton.*

    A.    ***Fulton* does not apply to this case.**

        In ruling on Defendants' motion for judgment on the pleadings—where Defendants raised this exact argument—the Court held that "[t]his case is distinguishable [from *Fulton*] in that no party claims that a nondiscrimination policy has been unconstitutionally applied to them, or applied at all. On the contrary, the State Defendants provided a broad exemption from the applicable non-discrimination regulations for all child placing agencies in South Carolina that asserted a sincerely held religious objection to complying." (Dkt. 201, Order at 6.) Defendants do not acknowledge this ruling, let alone explain why it no longer controls.

        The claims at issue in *Fulton* were entirely different from those at issue here. In *Fulton* a foster care agency ("CSS") sued the City of Philadelphia, asserting a free exercise violation after the City refused to enter future contracts with CSS unless the agency agreed not to discriminate against same-sex couples, which it said would conflict with its religious beliefs. *Fulton*, 141 S. Ct. at 1875-76. The City argued it was applying a generally applicable contract requirement prohibiting discrimination. *Id.* The Court concluded the contract was not generally applicable because the contract's non-discrimination provision allowed for exemptions at the "sole discretion" of the commissioner and, thus applied strict scrutiny to the government's action. *Id.* at 1879. Ultimately, the Court concluded the City could not overcome strict scrutiny, emphasizing that no same-sex parents had actually been discriminated against by CSS and more than 20 other agencies in the City were available to same-sex couples. *Id.* at 1875, 1881-82.

*Fulton* was a Free Exercise Clause case and did not involve an Establishment Clause or Equal Protection claim.[20]  This case, by contrast, does not involve any Free Exercise claims and instead raises Equal Protection and Establishment Clause claims.  This core difference makes *Fulton* irrelevant here, and *Fulton* does not—as Defendants claim—require the state to allow CPAs to use religious criteria to exclude families.[21]

Defendants are asking this Court to speculate about what might have happened if South Carolina had enforced its antidiscrimination laws against CPAs including Miracle Hill, and if Miracle Hill or another CPA brought a Free Exercise Clause claim before this Court.  As this Court has already recognized, this is not the appropriate analysis.  (Dkt. 201, Order at 5-6 (holding that *Fulton* does not control because here "no party claims that a nondiscrimination policy has been unconstitutionally applied to them, or applied at all").).  Because there is no actual application of any specific non-discrimination policy before this Court and no dispute between a CPA and the State, the Court cannot possibly determine (a) if strict scrutiny would apply to this hypothetical dispute and, if so, (b) whether the State would meet that burden in this hypothetical dispute.

Therefore, Defendants' arguments that *Fulton* requires the accommodation of Miracle Hill's free exercise rights are pure speculation and not based on any facts in the record.  This argument, therefore, cannot be the basis for summary judgment.

---

[20] While intervenor-defendants in *Fulton* raised Establishment Clause concerns associated with allowing government-contracted agencies to discriminate, Br. in Opp'n for Intervenor-Respondents at 26 n. 12, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the *Fulton* Court did not address those concerns, presumably because there was no family that was subjected to discrimination before the Court.

[21] Michigan settled a Free Exercise case after *Fulton*, because the state, like Philadelphia, had a system of discretionary exemptions.  *See Buck v. Gordon*, 19-cv-00286 (W.D. Mich. 2019) (ECF No. 113) at 4.

**B.    Even in a hypothetical free exercise lawsuit brought by a CPA against the State challenging enforcement of a nondiscrimination policy, *Fulton* would not dictate the outcome.**

Even if the Court were to imagine an alternative universe where, rather than authorize discrimination by CPAs, Defendants enforced a non-discrimination requirement against discriminating CPAs, and in that universe, a CPA brought a free exercise lawsuit against the state, *Fulton* still would not control.

The State's enforcement would not be subject to strict scrutiny because the State's nondiscrimination requirements are generally applicable. A law is *not* generally applicable if it (1) "provid[es] a mechanism for individualized exemptions" or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in similar ways." *See Fulton,* 141 S. Ct. at 1877. The state has several pertinent non-discrimination requirements that are generally applicable. *See* S.C. Code Regs. 114-210(B)(2) (DSS shall not "[a]id or perpetuate unlawful discrimination against a client by contracting with, licensing, or otherwise utilizing providers who discriminate on the basis of" sex and religion, *inter alia*),[22] 114-550(G)(3) (prohibiting DSS from "discriminat[ing] with regard to the application or licensure of a foster family or approval of an adoptive family on the basis of . . . gender, religion, sexual orientation, . . . or marital status")[23]; DSS Policy and Procedure Manual, Ch. 7 § 710 (DSS "is

---

[22] Defendants claim that the code does not list sexual orientation, so it does not cover "Plaintiffs' status of being in a same-sex marriage." (Dkt. 242 at 16.) But, as discussed above, discrimination against same-sex couples constitutes sex discrimination as a matter of law. *See Bostock*, 140 S. Ct. at 1747.

[23] Defendants claim that this provision only governs DSS, not CPAs. But DSS is authorizing discrimination by CPAs; thus, DSS is itself discriminating with regard to "the application or licensure of a foster family." (*See* S.C. Code Regs. 114-550(G)(3).). DSS cannot outsource its discrimination to a third party to avoid compliance with its nondiscrimination requirements. *See Peltier*, 37 F.4th at 115-16.

committed to the exercise of non-discriminatory practice, and shall provide equal opportunities to all families and children, without regard to" religion, sex and sexual orientation, *inter alia*).[24]

Defendants argue that state and federal Religious Freedom Restoration Acts and the Governor's duty to faithfully execute the laws allow for discretionary exceptions to the non-discrimination requirements. (*See* Dkt. 242, Defs.' Br. at 17-18.) RFRA is neither a discretionary nor a secular exemption. 42 U.S.C. §§ 2000bb *et seq.* (barring government action that substantially burdens religious exercise without compelling justification). And given that RFRA applies to *any* law, if it were considered an exemption to laws of general applicability, then no generally applicable laws would exist. The same is true of the Governor's duty to faithfully execute the laws.

Because the state's non-discrimination laws and policies that apply to CPAs[25] are generally applicable, a hypothetical lawsuit between the State and a CPA would be subject to rational basis review. These non-discrimination requirements easily satisfy rational basis review, as prohibiting discrimination is a well-established legitimate government interest. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

But even if heightened scrutiny were somehow applicable to the hypothetical free exercise match-up between South Carolina and a CPA, there are key differences between the

---

[24] Defendants claim that this rule is not generally applicable because it gives DSS discretion to make exceptions when in the best interest of the child. (Dkt. 242 at 17.) This is wrong. Protected characteristics may be considered in making a placement decision for an individual child, but this is not discrimination. Members of all groups are treated equally—a child may be placed with them if the placement is deemed to be in the best interest of the child.

[25] As discussed above, three different non-discrimination laws and policies are applicable to CPAs. Moreover, the suggestion that the state anti-discrimination requirements do not apply is undercut by Defendants' own actions. DSS threatened to pull Miracle Hill's license and issued Miracle Hill a temporary license due to its violation of those requirements. (Dkt. 243-23, Lowe Ex. 7 at -012 to -013; Dkt. 243-26, Lowe Ex. 9).

instant case and *Fulton* that would affect any strict scrutiny inquiry, which Defendants ignore.  In *Fulton*, no family experienced discrimination and there were more than 20 other agencies all within the city limits of Philadelphia that accepted same-sex couples with no evidence of disparities in services and experience.  *Fulton*, 141 S. Ct at 1875.  In this case, by contrast, at least 25 families were subjected to discrimination by Miracle Hill.  (Ex. 3, Betts Dep. Tr. 97:11-103:22.)  Given that at least three other CPAs also discriminate (*see supra* note 3), there may be additional families who have faced discrimination, which DSS does not know because it does not track families that are turned away by agencies based on religious criteria.  (Ex. 7, Barton Dep. Tr. at 155:4-20.)  In addition, unlike in *Fulton*, there are not 20 other comparable CPAs available nearby.  Rather, of the 12 CPAs that provide non-therapeutic foster care services, at least four discriminate, and the options available to same-sex couples and non-Christians are not comparable to the options available to heterosexual Christians. (*See supra* Factual Background, Section I.)  Thus, even if strict scrutiny were applicable to this hypothetical litigation, there is no basis to presume the outcome would be the same as in *Fulton*.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.

January 17, 2023

/s/ Nekki Shutt

South Carolina Equality Coalition, Inc.
Nekki Shutt (Federal Bar No. 6530)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd floor

33

P.O. Box 1929
Columbia, SC 29202
(803) 904-7912
nshutt@burnetteshutt.law

Peter T. Barbur (admitted *pro hac vice*)
Rebecca Schindel (admitted *pro hac vice*)
Mika Madgavkar (admitted *pro hac vice*)
Cristopher W. Ray (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pbarbur@cravath.com
rschindel@cravath.com
mmadgavkar@cravath.com
cray@cravath.com

Leslie Cooper (admitted *pro hac vice*)
Jon Davidson (admitted *pro hac vice*)
(admitted only in California)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
lcooper@aclu.org
jdavidson@aclu.org

Daniel Mach (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org

M. Currey Cook (admitted *pro hac vice*)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ccook@lambdalegal.org

34

Karen L. Loewy (admitted *pro hac vice*)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street NW, 8th Fl.
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org

**ATTORNEYS FOR PLAINTIFFS**