# EXHIBIT 3

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                      GREENVILLE DIVISION
               Civil Action No. 6:19-cv-01567-JD
3
4      EDEN ROGERS, et al,               )
                                         )
5             Plaintiffs,                )
                                         )
6      v.                                )
                                         )
7      UNITED STATES DEPARTMENT OF       )
       HEALTH AND HUMAN SERVICES,        )
8      et al.,                           )
                                         )
9             Defendants.                )
       _____  )
10
11
12
13
                 Videotaped Deposition of SHARON BETTS
14
                      (Taken by Plaintiffs)
15
                       (Taken virtually)
16
                    Tuesday, June 22, 2021
17
18
19
20
21
22
23
24                  Reported in Stenotype by
                  Christine A. Taylor, RPR
25             Registered Professional Reporter

Page 2

```
 1          REMOTE APPEARANCES
 2    ON BEHALF OF PLAINTIFFS:
 3          Rebecca Schindel, Esq.
            Mika Madgavkar, Esq.
 4          Cravath Swaine & Moore, LLP
            825 Eighth Avenue
 5          New York, New York  10019
            212.474.1459
 6          rschindel@cravath.com
 7          and
 8          Karen Loewy, Esq.
            Lambda Legal Defense
 9          1776 K Street, N.W., 8th Floor
            Washington, DC 20006
10          202.804.6245
11
12    ON BEHALF OF FEDERAL DEFENDANTS:
13          Christie V. Newman, Esq.
            United States Attorney's Office
14          1441 Main Street, Suite 500
            Columbia, South Carolina  29201
15          803.929.3030
            christie.newman@usdoj.gov
16
17    ON BEHALF OF DEFENDANT HENRY MCMASTER:
18          Miles E. Coleman, Esq.
            Nelson Mullins Riley & Scarborough, LLP
19          2 West Washington Street, Fourth Floor
            Greenville, South Carolina  29601
20          864.373.2352
            miles.coleman@nelsonmullins.com
21
22    ON BEHALF OF MIRACLE HILL MINISTRIES AND WITNESS:
23          Steve A. Matthews, Esq.
            Haynsworth Sinkler Boyd
24          1201 Main Street, 22nd Floor
            Columbia, SC  29201
25          smatthews@hsblawfirm.com
```

Page 3

1   VIDEOGRAPHER:

2           Christopher Mills

3

4

5

6

7           DEPOSITION OF SHARON BETTS, a witness called

8   on behalf of Plaintiffs, before Christine A. Taylor,

9   Registered Professional Reporter and Notary Public, in

10   and for the State of South Carolina, taken virtually,

11   on Tuesday, June 22, 2021, commencing at 9:09 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 55
 1    done so?

 2         A.   Yes.

 3         Q.   Okay.  Does Miracle Hill support foster

 4    families during the application and licensing process?

 5         A.   Yes.

 6         Q.   How does Miracle Hill do that?

 7         A.   Miracle Hill provides all of the application

 8    paperwork.  Miracle Hill has ongoing conversations and

 9    phone calls, e-mails, contact with that family.

10    Miracle Hill submits a fire inspection request to the

11    state fire marshal's office.  Miracle Hill provides

12    e-mail links to specific trainings that the foster

13    parents must complete.  And Miracle Hill conducts the

14    two home study visits that I previously referenced.

15         Q.   Is that the extent of the support that

16    Miracle Hill provides to prospective foster families

17    during the application and licensing process?

18         A.   We could add things such as prayer support.

19    We could add things if they needed a bed, dresser,

20    things like that.  They can request that to see if we

21    have availability to help them provide that.

22         Q.   Does Miracle Hill provide support to foster

23    families after they are licensed?

24         A.   Yes.

25         Q.   What support do they provide?
```

Page 56

1          A.  They, again, offer prayer and encouragement.

2     They also are required by state DSS to conduct regular

3     ongoing visits to the foster home.  Phone calls,

4     e-mails, maintaining a family file, child file, per DSS

5     request.  They help to establish an individual service

6     plan for the child.  They give resources to community

7     events activities, educational support, and contact

8     with DSS case workers regarding the needs of the child.

9          Q.  You said they give resources to community

10    events activities, what does that mean?

11         A.  From time to time there may be a donor who

12    give us tickets to an event such as the Children's

13    Museum in the upstate.  We often are invited by various

14    churches for other kinds of places like that would

15    invite us to a -- an event that they were holding for

16    foster families or just in general to support children.

17         Q.  You said we're often invited by various

18    churches or places like that.  What other than

19    churches are you referring to?

20         A.  There might be some community type

21    organizations, the Lion's Club, et cetera.

22         Q.  And in your previous answer, you also

23    mentioned support, that you provide educational

24    support.  What does that mean?

25         A.  We have a person on our staff who does

1    research connections with the local -- specifically

2    Greenville County School District, in helping to find

3    resources for children that may have educational needs.

4    It might be tutoring.  It might be helping them as a

5    foster family deals with Individual Educational Plan

6    meeting.

7         Q.   And is that sort of service required by DSS?

8         A.   No.

9         Q.   Do all child placing agencies provide that

10   service?

11        A.   I do not know.

12        Q.   Are you aware of other child placing agencies

13   that provide that service?

14        A.   No.

15        Q.   And the community events that we spoke about

16   a few moments ago, tickets to museums or access to

17   other community spaces, is that sort of service

18   required by DSS?

19        A.   No.

20        Q.   Do all other CPAs provide that benefit?

21        A.   I do not know.  I do know some do.

22        Q.   Which -- which do?

23        A.   Personally, I'm aware of Thornwell and Connie

24   Maxwell.

25        Q.   And what are you aware of when you say --

1          A.   Just foster children.

2          Q.   Do -- roughly, what portion of Miracle Hill's

3     families -- foster families, by which I mean families

4     that are working with Miracle Hill to obtain a

5     license, are serving solely as respite care providers?

6          A.   I would approximate right now 30 families.

7          Q.   Does Miracle Hill have a position known as a

8     family support specialist?

9          A.   Yes.

10         Q.   And what is a family support specialist?

11         A.   Family support specialist is the communicator

12    with the foster families on behalf of the Miracle Hill

13    staff.  They communicate by e-mail typically regarding

14    trainings that are available in the community as well

15    as Miracle Hill.  She also is in charge of the schedule

16    and maintaining the monthly webinar that we offer our

17    families, and so she's usually live on those webinars.

18    She also is in charge of a closet, if you want to call

19    it that, area where we have donations that people

20    donate toys clothes, et cetera.  And she plans events

21    so that people can come there and pick up those items

22    and also encourages the care coordinators and this

23    other staff to take them to the foster homes when they

24    visit.

25              She also sets up any kind of get-togethers,

Page 67

1    whether that's an annual celebration altogether or

2    whether we do it based upon county by county area.  And

3    she also sends out birthday cards, prepares those for

4    the foster children.  She prepares letters that we send

5    to foster parents to let them know we're praying for

6    them.  All of those things.

7        Q.  Are any of the services that you just listed

8    required by DSS?

9        A.  No.

10       Q.  Do all other CPAs provide these services?

11       A.  We do not know.

12       Q.  Is there Miracle Hill aware of any other CPAs

13   provide these services?

14       A.  Yes.  Thornwell, Connie Maxwell, both of those

15   would provide, again, donations as they are given to

16   them by their donors.

17       Q.  And do these CPAs also provide birthday

18   cards.

19       A.  I do not know.  I do know Oasis of Hope does

20   provide birthday cards, but they provide them to foster

21   children and biological children as well.

22       Q.  I think I missed -- which CPA did you say

23   that -- did that?

24       A.  Oasis of Hope.

25       Q.  Oasis of Hope.  Does Miracle Hill have a

Page 97

1    turned away because of their faith or lack thereof or

2    because they're in a same-sex relationship?

3            And I ask this as a representative of Miracle

4    Hill.  I'm sorry, I'm going to stop sharing my screen.

5        A.  I do not have a specific number.

6        Q.  And does Miracle Hill keep this information

7    anywhere?

8        A.  Yes.  There would probably be hard copies of

9    those inquiries, but I do not know that it would be

10   kept in any kind of a format or report of any kind.

11       Q.  So topic 9, for which you were designated,

12   was prospective foster families who are not accepted

13   by Miracle Hill because of their religion or lack

14   thereof or same-sex relationship or LGBTQ status.  So

15   did you undertake any effort to ascertain how many

16   families have been turned away because of their faith

17   or lack thereof or because they're in a same-sex

18   relationship?

19       A.  Yes.  I did look at some of those hard copies

20   of those inquiries.

21       Q.  And so how many families have been turned

22   away on these bases?

23       A.  I don't have a specific number.  I will use an

24   approximate number, 25 to 30.

25       Q.  And this is 25 to 30 since 2015 -- excuse

Page 98

1    me -- since 2017, or is this a different time frame?

2         A.  Yes, during that -- during that time frame.

3         Q.  So how many of those individuals or families

4    that were turned away were Catholic?

5         A.  As I said, I don't have the specifics, so I

6    would say majority.

7         Q.  Majority.  And do majority mean more than

8    half or does it mean most?

9         A.  More than half.

10         Q.  And how many were non-Christian of the

11    remaining -- so setting apart the Catholics, how many

12    were non-Christian?

13         A.  Again, I don't have the specific numbers.

14         Q.  Do you have an approximation?

15         A.  Five.  Five to seven.

16         Q.  And then how many prospective foster parents

17    were turned away because they were LGBTQ?

18              MR. COLEMAN:  This is Miles.  Object to the

19    form of the question.  If you know, you can answer.

20              THE WITNESS:  So anybody who is -- did not

21    follow Jesus, did not agree to the doctrinal statement,

22    did not attend a Christian church would be directed to

23    another agency, another child placing agency.

24              BY MS. SCHINDEL:

25         Q.  Right.  But they wouldn't be able to work

```
                                                    Page 99

 1    with Miracle Hill?

 2         A.  Right.

 3         Q.  So how many of the people that were told they

 4    could work with Miracle Hill, how many of those

 5    prospective foster parents were LGBTQ?

 6              MR. MATTHEWS:  Object to the form of the

 7    question.  This is Steve Matthews.  Are you saying how

 8    many of them were LGBTQ or how many were rejected

 9    because they were LGBTQ.

10              BY MS. SCHINDEL:

11         Q.  That's a fair question.  So let's start with

12    how many were rejected because they were LGBTQ?

13         A.  I don't know.  No more than one.

14         Q.  No more than one?

15              MR. MATTHEWS:  I believe you all may have

16    misheard each other.  You may want to ask her to repeat

17    that answer.

18              BY MS. SCHINDEL:

19         Q.  How many of the families that were turned

20    away from working with Miracle Hill as the prospective

21    foster parents, how many of those individuals or

22    families were turned away because they were LGBTQ?

23         A.  I don't recall that -- not just for that, no

24    not -- not for that.

25         Q.  Miracle Hill has never turned away a foster
```

```
                                          Page 100
 1    family because they were LGBTQ?
 2         A.   I personally am not aware of that.  And so it
 3    may have been a discussion higher than me, but I don't
 4    have knowledge of that.
 5         Q.   But you testified earlier that a person who
 6    is LGBTQ would not be able to work with Miracle Hill
 7    under the tenets of the doctrinal statement; is that
 8    right?
 9              MR. COLEMAN:  Object to form of the question.
10    Misstates prior testimony.
11              BY MS. SCHINDEL:
12         Q.   Sorry.  When -- you still have to answer the
13    question.
14         A.   I'm sorry.  The question again.
15         Q.   When -- as I understood your testimony
16    earlier, you said that if somebody -- that somebody
17    who is LGBTQ would not comply -- comport with Miracle
18    Hill's doctrinal statement would not be able to work
19    with Miracle Hill; is that right?
20              MR. COLEMAN:  Same objection.
21              THE WITNESS:  The three things I mentioned
22    before, if they were following Christ, if they agreed
23    to the doctrinal statement, and they attended a
24    Christian church.
25              BY MS. SCHINDEL:
```

Page 101

1      Q.  Right.  Would somebody who is in a same-sex
2  relationship be able to work with Miracle Hill as a
3  prospective foster parent?
4      A.  I keep going back to the three things that are
5  required.  Following Christ, agreeing and practicing --
6  belief and practice of the doctrinal statement, and
7  attending a Christian church.
8      Q.  I'm going to insist that you answer the
9  question, which is:  Would somebody who's in a
10  same-sex relationship be able to work with Miracle
11  Hill as a prospective foster parent?
12          MR. MATTHEWS:  I'm going to object to the
13  form.  Are you asking would they be able to or would
14  Miracle Hill be willing to accept them?  I just want to
15  make sure that the question is clear.  Is it -- would
16  the couple be willing to or would Miracle Hill be
17  willing to?  And if it's the latter, I'm going to
18  restate my earlier objection that that's outside the
19  scope of this witness's 30(b)(6) testimony.
20          BY MS. SCHINDEL:
21      Q.  Let's try it this way.  Before a few minutes
22  ago I was asking how many individuals were turned away
23  because they were LGBTQ.  So let me ask this:  How
24  many individuals were turned away as prospective
25  foster parents, how many of those were LGBTQ?

Page 102

1          A.   I only saw four.

2          Q.   Four.

3          A.   That inquired.

4          Q.   And has Miracle Hill ever worked with someone

5     who is LGBTQ?

6          A.   No.

7          Q.   And is a person who is LGBTQ compliant --

8     would such a person be able to comply with the

9     doctrinal statement?

10              MR. MATTHEWS:   Same objection with regard to

11    topic 1.

12              BY MS. SCHINDEL:

13         Q.   You still have to answer, Ms. Betts.

14         A.   No.

15         Q.   Okay.  Of the families that were -- that were

16    rejected by Miracle Hill prospective foster parents

17    because of their religious beliefs or sexual

18    orientation, did those families go on to approach

19    other CPAs?

20         A.   So tell me your understanding -- or what

21    you're asking -- rejected those words that were in that

22    middle of that question.

23         Q.   So we were just asking about and we were

24    talking about families that Miracle Hill has rejected

25    or turned away because of their faith or lack thereof

Page 103

```
 1    or because they are in a same-sex relationship?
 2         A.   They were directed elsewhere.
 3         Q.   Right.  Did Miracle Hill know whether any of
 4    those families or individuals went on to actually
 5    approach another CPA?
 6         A.   No.  I don't know how we would know that.
 7         Q.   Does Miracle Hill follow up or track what
 8    happened to these parents in any way?
 9         A.   No, not usually.
10         Q.   And when you say "not usually," what do you
11    mean by that?
12         A.   Once we -- once we let them know and give them
13    a list or other child listing agencies to pursue
14    licensure with, we do not follow up with those
15    families.
16         Q.   Has any other CPA contacted Miracle Hill
17    about families that Miracle Hill had turned away or
18    refused to work with?
19         A.   Are you asking that from me personally or are
20    you asking that on behalf of Miracle Hill?
21         Q.   On behalf of Miracle Hill.
22         A.   None that we're aware of.
23              (Exhibit 12 marked for identification.)
24         Q.   Let's mark Tab 22 which is 12850.  This is
25    Exhibit 12.
```

Page 113

1    asking that?

2            BY MS. SCHINDEL:

3        Q.  You can answer the question.

4            MR. COLEMAN:  Sorry, my objection may not have

5    been clear.  Are you asking her in her individual

6    capacity or in her 30(b)(6) designee capacity?

7            BY MS. SCHINDEL:

8        Q.  I'm asking you if you think Miracle Hill --

9    if you understand whether Miracle Hill would have been

10   willing to work with those women if they had otherwise

11   sent a church denomination and a testimony that

12   satisfied Miracle Hill's requirements?

13       A.  I would say no.

14           (Exhibit 13 marked for identification.)

15       Q.  All right.  Let's mark Tab 66 and this is

16   6977.  Do you have the document?

17       A.  Yes.

18       Q.  This is an undated note that is signed by you

19   which appears to be a summary of a conversation that

20   you had with Brandy Welch on April 11, 2019.  It's

21   Bates stamped MIRACLE_HILL_SUBP_006977 and it is

22   Exhibit 13.  Have you seen this document before?

23       A.  Yes.

24       Q.  Did I describe it accurately?

25       A.  Yes.

Page 188

```
 1    non-therapeutic setting would also be equally
 2    interested in fostering children with therapeutic
 3    needs?
 4         A.  Some of them would and some of them would not.
 5         Q.  Is it fair to say that there's a
 6    non-insignificant portion of parents who would be
 7    willing to work with children who do not have
 8    non-therapeutic needs who would be unwilling to work
 9    with children who have therapeutic needs?
10              MR. COLEMAN:  This is Miles.  Object to form
11    of the question.
12              BY MS. SCHINDEL:
13         Q.  You can still answer.
14         A.  I'm sorry.  Can you say that one more time
15    then?
16         Q.  Is it fair to say that there's a
17    non-insignificant or a substantial portion of parents
18    with whom Miracle Hill has interacted with who would
19    be willing to work with children who have
20    non-therapeutics needs who do not -- but unwilling to
21    work with children who have therapeutic needs?
22         A.  Yes.
23         Q.  In your understanding, if Miracle Hill were
24    to stop serving as a CPA, what percentage of Miracle
25    Hill families would stop serving as foster care
```

Page 189

1    parents rather than work with another CPA?

2        A.  I have no idea.  I mean, we have not even

3    discussed that.

4        Q.  So if I were to tell you that Mr. Lehman said

5    that you were the best person to ask that question,

6    what would you say to that?

7        A.  I could make an approximation.

8        Q.  And what would your -- well, having just said

9    that you have no idea, what would be the basis for

10   that approximation?

11       A.  Based on the number of families that I know we

12   currently have, based on the families that are

13   currently only licensed to do respite care as we had

14   previously mentioned, as well as the number of families

15   who currently do not have placements that may not be

16   taking placements for various reasons.  Yeah, I think

17   that's where that approximation would come from.

18       Q.  And when you say based on placements that are

19   currently licensed to do respite care -- excuse me,

20   only placements to do respite care, why does that --

21   how does that number influence your estimate, which I

22   haven't asked yet, I understand.  But I'm just

23   wondering why that number plays a role in how you

24   would answer the question?

25       A.  Often people who are licensed, and let me

Page 191

1          Q.   Generally with the understanding there may be

2    outliers, are respite families generally serving fewer

3    than five times a year?

4          A.   Yes.

5          Q.   And the respite care is for a day or two; is

6    that right?

7          A.   It can be up to a week to two weeks, but

8    typically it's a weekend or three, four nights.

9    Summertime, it may expand to a week or two.

10         Q.   My apologies if I asked this earlier, but

11   what percentage -- oh, I think you did tell me, is it

12   30 -- what percentage of Miracle Hill's families are

13   serving exclusively as respite care providers?

14         A.   Currently, we have between 30 and 35 families

15   that are providing respite care.

16         Q.   Okay.  So setting aside those families, the

17   ones that you think are -- know or think are

18   exclusively providing respite care, what percentage of

19   Miracle Hill families would stop serving as foster

20   care parents rather than work with another CPA if

21   Miracle Hill were to stop serving as a CPA?

22         A.   You're asking for an approximation?

23         Q.   Yes.

24         A.   I would say 50 to 60 percent.

25         Q.   50 to 60 percent.  Of Miracle Hill's total

Page 192

1    families?

2         A.   Yes.

3         Q.   Well -- not --

4         A.   Not counting those that are doing respite

5    care.

6         Q.   And the basis for this estimate is what

7    exactly?

8         A.   I believe that they have chosen Miracle Hill

9    because of their own faith and their ability to feel

10   supported by an agency who supports their faith as well

11   as perhaps their relationship to be with a staff

12   member, it could be also because they're in a situation

13   where a child has been with them for, perhaps, a long

14   period of time.  We have several people that because of

15   COVID could not have court hearings for cases such as

16   termination of parental rights.  And so they're now

17   waiting for those to occur and/or legally free letters

18   to come so that they could finalize an adoption.

19        Q.   And so based on that information, how are you

20   reaching an estimate of 50 to 60 percent?

21        A.   Well, I'm looking at, again, the number of

22   respite families we have, the number of families that

23   currently do not have placements versus the number of

24   families who currently do have placements.

25        Q.   What percentage of Miracle Hill families

1    currently have placements?

2         A.  Again, I'm going to guess, 50 to 60 percent.

3         Q.  So are you certainly assuming that the

4    families that don't have placements would stop working

5    as a foster care parent if Miracle Hill were to stop

6    serving as a CPA?

7         A.  Some of them.  And perhaps some who have

8    children, I don't know.

9         Q.  Is it fair to say that the bulk of your

10   estimate of 50 to 60 percent is being driven by the

11   fact that a good number of Miracle Hill families

12   currently do not have placements?

13        A.  Yes.  That probably would be an accurate

14   statement.

15             (Exhibit 24 marked for identification.)

16        Q.  Let's take a look at Tab 47.  This is 4133.

17        A.  I have the document.

18        Q.  Unfortunately, we don't yet.  I guess I'll do

19   a screen share.  This is a infographic Bates labeled

20   MIRACLE_HILL_SUBP_004133 to 34; is that right?  Excuse

21   me, it says on the top, "The Truth about Today's

22   Foster Care Crisis and the Role of Faith-Based

23   Agencies."  Have you seen this before?

24        A.  I have seen it in the course of documents that

25   were sent to me by my attorney.

```
                                              Page 206

 1    not accepting prospective foster families because of

 2    their religion, same-sex relationship, or LGBTQ

 3    status; is that right?

 4         A.  Yes.

 5         Q.  And you were tasked with being the person

 6    most knowledgeable about Miracle Hill's understanding

 7    of these communications.

 8         A.  Okay.

 9         Q.  So as a designee for Miracle Hill, does

10    Miracle Hill have any reason to believe that Epworth

11    will not recruit -- will only recruit heterosexual

12    couples?

13         A.  I'm sorry, the last part of that question

14    threw me off.

15         Q.  Does Miracle Hill have reason to believe that

16    Epworth will recruit only heterosexual couples?

17         A.  According to this e-mail, they will only

18    recruit heterosexual couples.

19         Q.  Are you aware of any other communications --

20    and as a designee of Miracle Hill, is Miracle Hill

21    aware of any other communications with other South

22    Carolina CPAs regarding their policies or practices of

23    not accepting prospective foster families because of

24    their religion, same-sex relationship or LGBTQ status?

25         A.  Yes.  Mr. Lehman had e-mails with Southeastern
```

Page 207

 1    Children's Home.

 2         Q.  And does Miracle Hill understand that

 3    Southeastern Children's Home will not accept

 4    prospective foster families because of their religion,

 5    same-sex relationship, or LGBTQ status?

 6         A.  Yes.

 7         Q.  Are there any other communications of which

 8    you're aware?

 9         A.  Brenda Parks -- Brenda Parks told me of

10    conversations that she had with some, but none of which

11    would give one -- one way or another they would not

12    speak for their agency.

13         Q.  And which agencies were that -- was that --

14    which agencies are you speaking of when you say that

15    she had conversations with some?

16         A.  Connie Maxwell was one that she mentioned to

17    me.

18         Q.  Any others?

19         A.  Not -- Thornwell, but they would not -- they

20    would not state one way or another for their agency.

21         Q.  Okay.  Earlier in this deposition you

22    mentioned that in the initial home study a Miracle

23    Hill licensing specialist would ask prospective

24    parents about the church that the family attends; is

25    that right?