# EXHIBIT 6

```
                                                    Page 1

 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  GREENVILLE DIVISION
     -----------------------------------------X
 3
      EDEN ROGERS and
 4
      BRANDY WELCH,
 5
                   Plaintiffs,
 6
           vs.              CASE NO. 6:19-cv-01567-TMC
 7
     UNITED STATES DEPARTMENT OF HEALTH
 8   AND HUMAN SERVICES;
 9   ALEX AZAR, in his official capacity as SECRETARY of
     the UNITED STATES DEPARTMENT OF
10   HEALTH AND HUMAN SERVICES;
11   ADMINISTRATION FOR CHILDREN AND FAMILIES;
12   LYNN JOHNSON, in her official capacity as ASSISTANT
     SECRETARY of the ADMINISTRATION FOR CHILDREN AND
13   FAMILIES;
14   SCOTT LEKAN, in his official capacity as PRINCIPAL
     DEPUTY ASSISTANT SECRETARY of the ADMINISTRATION
15   FOR CHILDREN AND FAMILIES;
16   HENRY MCMASTER, in his official capacity as
     GOVERNOR of the STATE OF SOUTH CAROLINA;
17
     MICHAEL LEACH, in his official capacity as STATE
18   DIRECTOR of the SOUTH CAROLINA DEPARTMENT OF SOCIAL
     SERVICES,
19
                   Defendants.
20   -----------------------------------------X
     VIDEOTAPED
21   DEPOSITION OF:   JACQUELINE LOWE
                      (APPEARING VIA VIRTUAL ZOOM)
22
     DATE:            June 3, 2021
23
     TIME:            9:27 AM
24
     REPORTED BY:     TERRI L. BRUSSEAU
25                    (APPEARING VIA VIRTUAL ZOOM)
```

```
                                                      Page 2

 1      LOCATION OF
        THE DEPONENT:      Law Offices of
 2                         Davidson Wren & DeMasters
                           1611 Devonshire Drive, 2nd Floor
 3                         Columbia, SC
 4      TAKEN BY:          Counsel for the Plaintiffs
                           (Kate Janson)
 5

        APPEARANCES OF COUNSEL:
 6

                ATTORNEYS FOR THE PLAINTIFFS
 7                   EDEN ROGERS and BRANDY WELCH:
 8                   CRAVATH SWAINES & MOORE, LLP
                     BY:  KATE JANSON
 9                        (APPEARING VIA VIRTUAL ZOOM)
                          REBECCA SCHINDEL
10                        (APPEARING VIA VIRTUAL ZOOM)
                          CRIS RAY
11                        (APPEARING VIA VIRTUAL ZOOM)
                     Worldwide Plaza
12                   825 Eighth Avenue
                     New York, NY  10019
13                   (212) 474-1989
                     kjanson@cravath.com
14                   rschindel@cravath.com
                     cray@cravath.com
15
                     AMERICAN CIVIL LIBERTIES UNION
16                   BY:  LESLIE COOPER
                          (APPEARING VIA VIRTUAL ZOOM)
17                   125 Broad Street
                     New York, NY  10004
18                   (212) 549-2500
                     lcooper@aclu.org
19
                     LAMBDA LEGAL DEFENSE AND EDUCATION
20                   FUND, INC.
                     BY:  CURREY COOK
21                        (APPEARING VIA VIRTUAL ZOOM)
                          MAIA ZELKIND
22                        (APPEARING VIA VIRTUAL ZOOM)
                     120 Wall Street, 19th Floor
23                   New York, NY  10005
                     (212) 809-8585
24                   ccook@lambdalegal.org
                     mzelkind@lambdalegal.org
25
```

Page 3

```
 1          ATTORNEYS FOR THE DEFENDANT
                 MICHAEL LEACH, IN HIS OFFICIAL CAPACITY
 2               AS STATE DIRECTOR OF SOUTH CAROLINA
                 DEPARTMENT OF SOCIAL SERVICES:
 3
                 DAVIDSON WREN & DEMASTERS, PA
 4               BY:  JONATHAN RIDDLE
                     (APPEARING VIA VIRTUAL ZOOM)
 5               1611 Devonshire Drive, Suite 200
                 Columbia, SC  29204
 6               (803) 806-8222
                 jriddle@dml-law.com
 7
            ATTORNEYS FOR THE DEFENDANTS
 8               HEALTH AND HUMAN SERVICES,
                 ADMINISTRATION FOR CHILDREN AND
 9               FAMILIES, THE SECRETARY OF HHS, LYNN
                 JOHNSON, THE ASSISTANT SECRETARY OF
10               ADMINISTRATION OF CHILDREN AND
                 FAMILIES, AND STEVEN WAGNER, ASSISTANT
11               SECRETARY OF ADMINISTRATION CHILDREN
                 AND FAMILIES:
12
                 UNITED STATES ATTORNEY'S OFFICE
13               DISTRICT OF SOUTH CAROLINA
                 BY:  CHRISTIE NEWMAN,
14                   ASSISTANT UNITED STATES ATTORNEY
                     (APPEARING VIA VIRTUAL ZOOM)
15               55 Beattie Place, Suite 700
                 Greenville, SC  29601
16               (864) 282-2100
                 newman@usdoj.gov
17
            ATTORNEYS FOR THE DEFENDANT
18               HENRY MCMASTER, IN HIS OFFICIAL
                 CAPACITY AS GOVERNOR OF THE STATE OF
19               SOUTH CAROLINA:
20          NELSON MULLINS RILEY & SCARBOROUGH, LLP
                 BY:  MILES COLEMAN
21                   (APPEARING VIA VIRTUAL ZOOM)
                     HUNTER WINDHAM
22                   (APPEARING VIA VIRTUAL ZOOM)
                 1320 Main Street, 17th Floor
23               Greenville, SC  29201
                 (864) 799-2000
24               miles.coleman@nelsonmullins.com
                 hunter.windham@nelsonmullins.com
25
```

Page 4

1          ALSO PRESENT:

2                  George Libbares, Concierge Technician
                   (Appearing Via Virtual Zoom)

3
                   Wale A. Akintunde, Video Technician

4                  (Appearing Via Virtual Zoom)

5                  (INDEX AT REAR OF TRANSCRIPT)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 48

```
 1          Q.   Okay.  And that caseworker is -- as a
 2   DSS employee is not affiliated with the private CPA
 3   that might be involved with the family, right?
 4          A.   Yes, there's a DSS caseworker.
 5          Q.   Okay.  And you had mentioned earlier, I
 6   think we had said that about 50/50, about half of
 7   the foster families in the state are recruited by
 8   private CPAs and about half of them are recruited
 9   directly by DSS, is that right?
10          A.   Yes.  Roughly, yes.
11          Q.   Roughly.  And how does -- how does DSS
12   go about recruiting families to serve as foster
13   families?
14          A.   The Department fosters with the state
15   foster parent association, who also message the
16   need for foster families.  They go about
17   information on social media, print media, other
18   groups that partner with the Department through
19   billboards, messaging, some of the same recruitment
20   efforts as our child placing agencies.
21          Q.   Okay.  And then what is the -- well,
22   just -- let me back up for a second.
23               Does DSS recruit through particular
24   communities, through churches or other houses of
25   worship, for instance?
```

Page 54

```
1            Q.    Okay.  So you said about a year or so
2       ago there was a change such that DSS is only
3       handling directly families that are interested in
4       providing kinship care?  Did I get that right?
5            A.    That's correct.
6            Q.    Okay.  And when we talk about kinship
7       care, what does that mean?
8            A.    So the kinship care are those children
9       who are entering care and instead of going to an
10      unrelated individual or family, that the Department
11      would identify a relative or a next of kin, some of
12      the kin being someone who has a significant
13      relationship with the child, who knows that child
14      and is interested in being licensed to care for
15      that child to prevent going into an unrelated
16      foster family home.
17           Q.    Okay.  And so currently then and for
18      about the past year, families that were seeking to
19      become foster families outside of the kinship care
20      piece of it, they no longer have the opportunity of
21      working directly with DSS to go through the
22      application and licensing process, is that right?
23           A.    The focus is that DSS would do the kin.
24      Now, if the family is unable to work with a CPA,
25      they certainly would come to DSS.  I mean, we are
```

                                                    Page 127

1     whether someone -- what faith somebody ascribes to

2     and whether they could be a good parent?

3          A.   No.

4          Q.   So has DSS ever become aware that any

5     other child placing agency apart from -- I'm going

6     to stop sharing my screen.  We don't need to look

7     at these topics anymore.  Sorry, everybody.  There

8     we go.  I'll start over.

9               Has DSS ever become aware that any

10    other CPA apart from Miracle Hill discriminates

11    against prospective foster parents on the basis of

12    their religion?

13         A.   Not that I'm aware of.

14         Q.   How about on the basis of sexual

15    orientation?

16         A.   No, not that I'm aware of.

17         Q.   Did DSS ever become aware that

18    Southeastern Children's Home discriminates against

19    prospective foster parents on the basis of their

20    religion?

21         A.   Not that I'm aware of.

22              MS. JANSON:  Cris, do you want to

23    show -- do you want to put up Tab 28 for me?

24              MR. RAY:  That exhibit has been

25    introduced.

Page 128

```
 1              MS. JANSON:  Okay.  Great.
 2    BY MS. JANSON:
 3         Q.   Before we look at that specifically, is
 4    South -- is Southeastern Children's Home a private
 5    CPA in South Carolina?
 6         A.   It is.
 7         Q.   Do you know -- do you know which region
 8    it serves?
 9         A.   Upstate.
10         Q.   It serves the upstate.  Okay.  And if
11    we take a look at that document in particular -- so
12    we've marked as -- are we on Exhibit 12?
13              MR. RAY:  Yes, that's right.
14              MS. JANSON:  12.  Okay.
15              (EXHIBIT 12, E-mail dated 10/30/19 to
16    ███████████████ from Reid Lehman,
17    MIRACLE_HILL_SUBP_003524, was marked for
18    identification.)
19    BY MS. JANSON:
20         Q.   We've marked as Exhibit 12 an e-mail
21    from Reid Lehman to -- it looks like someone with
22    an e-mail address ████████████████ dated October
23    30th of 2019.
24              Have you seen this document before,
25    Miss Lowe?
```

Page 129

1            A.    I have not.

2            Q.    Okay.  Take a minute to scan over it

3       and then I'll ask my questions.

4            A.    Okay.

5            Q.    So in that -- I guess it's the third

6       paragraph down here, Mr. Lehman asks of the

7       recipient of the e-mail, who it looks from the

8       e-mail address is, you know, someone affiliated

9       with Southeastern Children's Home.  He says:  Would

10      you be -- Robert, would you be willing for me to

11      tell -- sorry.  Let me back up.

12                  First sentence of the e-mail,

13      Mr. Lehman says Michael Leach will be coming to

14      tour portions of Miracle Home Ministries next

15      Tuesday.

16                  Michael Leach is the current director

17      of DSS, right?

18           A.    Yes.

19           Q.    And then in the third paragraph

20      Mr. Lehman writes:  Would you be willing for me to

21      tell him, him being Michael Leach, that

22      Southeastern Children's Home and your board's

23      expectation that you'll recruit only among the

24      churches of Christ.

25                  Do you see that there?

```
                                         Page 130
 1           A.   I do.

 2           Q.   Does that -- does that suggest to you

 3      that Southeastern Children's Home will not work

 4      with prospective foster parents who are not members

 5      of the churches of Christ?

 6           A.   Right.  It indicates they would recruit

 7      only among churches of Christ.

 8           Q.   But DSS -- has DSS been aware that this

 9      is a policy of Southeastern Children's Home?

10           A.   No.

11           Q.   No.  And has DSS ever -- ever become

12      aware that Epworth discriminates against

13      prospective foster parents on the basis of their

14      sexual orientation?

15           A.   I've not been aware.

16           MS. JANSON:  Cris, why don't we look at

17      Tab 27.  We'll make that Exhibit 13 if we can.

18           MR. RAY:  That exhibit has been

19      introduced.

20           (EXHIBIT 13, E-mail chain dated

21      10/31/19 to Reid Lehman from Beth Williams,

22      MIRACLE_HILL_SUBP_003561 to 003563, was marked for

23      identification.)

24           MS. JANSON:  Great.  Okay.

25      BY MS. JANSON:
```

1          Q.    So we've marked as Exhibit 13 an e-mail

2     chain between Beth Williams and Reid Lehman from

3     October 31st, 2019 and it has the Bates Number

4     Miracle_Hill_Subp_003561 through 3562 (sic).  Do

5     you have that in front of you?

6          A.    I do now.

7          Q.    Just go ahead and take a look at that.

8          A.    Okay.

9          Q.    Have you seen this document before?

10          A.    I have not.

11          Q.    Looking down about halfway -- halfway

12     down the page, there's an e-mail from Mr. Lehman

13     and he's writing to Beth Williams.

14          A.    Okay.

15          Q.    Do you know whether this Beth Williams

16     who works at Epworth is the same Beth Williams who

17     you addressed your letter to, your January 26, 2018

18     letter to, to Miracle Hill?

19          A.    Yes, it's the same Beth Williams.

20          Q.    Okay.  So at some point after January

21     2018 and before October of 2019 she left Miracle

22     Hill and went to work at Epworth?

23          A.    That is correct.

24          Q.    Okay.  And Epworth, as we talked about,

25     is another CPA that serves the upstate region,

```
                                           Page 132

 1    right?
 2            A.    Portions of the upstate, but it's based
 3    in the midlands or Columbia.
 4            Q.    Okay.  But it does have a -- it does
 5    have a presence in that state?
 6            A.    Yes, it does.  Yes.
 7            Q.    Okay.  And then -- and then looking at
 8    the document, Mr. Lehman writes, Beth, and then I'm
 9    skipping a couple of the paragraphs there, but he
10    says:  Michael Leach will be coming to tour
11    portions of Miracle Hill -- MHM, Miracle Hill
12    Ministries -- next Tuesday.  It says that he
13    continues to believe that Miracle Hill is the only
14    agency that needs the waiver granted by HHS and
15    then would you be willing for me to tell him about
16    Epworth and your denomination's expectation that
17    you'll recruit heterosexual couples.  Do you see
18    that there?
19            A.    I do.
20            Q.    Has -- was -- has DSS been aware that
21    Epworth will only recruit heterosexual couples?
22            A.    No.
23            Q.    But you would agree with me that that
24    is, in fact, what the language in this document
25    suggests, right?
```

Page 133

```
1            A.    It does.
2            Q.    At any point has DSS become aware that
3      there is another -- another CPA that discriminates
4      against potential foster parents on the basis of
5      their marital status?
6            A.    Not that I'm aware of.
7                  MS. HANSON:  Okay.  Let's look at Tab
8      18 if we can, Cris.
9                  MR. RAY:  That has been introduced.
10                 (EXHIBIT 14, E-mail chain dated 5/1/18
11     to Beth Williams from REDACTED,
12     MIRACLE_HILL_SUBP_002301 to 002303, was marked for
13     identification.)
14     BY MS. JANSON:
15           Q.    Let me know when you have that in front
16     of you.
17           A.    Still coming up.
18           Q.    Okay.
19                 MR. RIDDLE:  Taking a moment.
20                 THE WITNESS:  Okay.  I have it.
21     BY MS. JANSON:
22           Q.    Okay.  Great.  So we've marked as
23     Exhibit 14 a document that is an e-mail chain
24     from -- between Beth Williams and a redacted
25     recipient dated May 1st of 2018.  Subject line, re
```

1    was refusing to work with prospective foster

2    parents if they were -- based on their marital

3    status and living arrangements?

4         A.    I'm not aware.

5         Q.    What's being talked about here is

6    not -- doesn't sound familiar to you?

7         A.    I have not been made aware of these

8    letters or these instances and this is the first

9    time I'm seeing these communications.

10         Q.    Okay.  And I think you told me -- you

11    said earlier that apart from Miracle Hill and apart

12    from the two -- the three examples that we've just

13    gone over, DSS is not aware of any other CPAs that

14    discriminate against prospective foster parents on

15    the basis of religion, is that right?

16         A.    Right.  I'm not aware of any.

17         Q.    And how about on the basis of sexual

18    orientation?

19         A.    Same.

20         Q.    But based on -- based on what we've --

21    we have just discussed, would you agree with me

22    that Miracle Hill is not the only CPA serving the

23    upstate region that discriminates based on religion

24    and/or sexual orientation?

25                   MR. COLEMAN:  Object to the form of the

Page 136

```
 1    question.
 2               COURT REPORTER:  Who was that, please?
 3    BY MS. JANSON:
 4         Q.   I'm sorry, I missed your answer.
 5               COURT REPORTER:  I didn't hear an
 6    answer and who objected, please?
 7               MR. COLEMAN:  It was Miles Coleman that
 8    objected.
 9               COURT REPORTER:  Thank you.  And, Miss
10    Lowe, I didn't hear your answer.  If you did
11    answer, would you please repeat it?
12               THE WITNESS:  I didn't answer.  I was
13    waiting.  But based on the information submitted,
14    yes, there would be discrimination based on sexual
15    orientation or religion for these documents.
16    BY MS. JANSON:
17         Q.   By -- by these -- these CPAs that we've
18    discussed, which are separate and apart from
19    Miracle Hill, right?
20         A.   Yes.
21         Q.   We spoke -- we spoke earlier about
22    DSS's own nondiscrimination policy, and I just want
23    to pull -- I just want to pull that up quickly if
24    we -- if we can.
25               MS. JANSON:  So Cris, this is Tab 38.
```

1           Q.   Okay.  Do you know if there had been

2     such conversations, would there likely to be

3     documents that -- that would reflect those

4     discussions?

5           A.   I don't know.

6           Q.   Okay.  And earlier we talked about how

7     DSS issued Miracle Hill a couple of temporary

8     licenses and then ultimately in January of 2019

9     issued Miracle Hill a permanent license at Governor

10    McMaster's direction, right?

11          A.   A standard license, yes.

12          Q.   And had Governor McMaster not

13    intervened, would -- would DSS have required

14    Miracle Hill to issue and implement the compliance

15    plan that DSS requested in your January 26, 2018

16    letter to Miracle Hill?

17               MR. COLEMAN:  Object to the form of the

18    question.

19               COURT REPORTER:  Was that you, Miles?

20               THE WITNESS:  Yes.

21               COURT REPORTER:  Miles, was that you?

22               MR. COLEMAN:  Yeah, that was me.

23    BY MS. JANSON:

24          Q.   And that letter which again we marked

25    as an Exhibit 7 -- Exhibit 7, your letter to

Page 172

1    when the waiver was granted until before when DSS

2    made the shift to focusing on the kinship care.

3              You said you did -- you have seen --

4    you have seen -- you saw during that period since

5    after the waiver was issued, you saw a decline in

6    the number of applications that DSS received from

7    prospective foster parents?

8         A.   Overall.  So I believe, if I remember,

9    in '18 it went up a little bit, but then it's been

10   declining '19 and certainly during 2020 there was a

11   decline.

12        Q.   And is that just the number -- a

13   decline in the number of applicants that have gone

14   through the application and home study process

15   directly with DSS or is that total, including

16   coming from -- including those who would have gone

17   through the licensing process through the private

18   CPA?

19        A.   That's total.

20        Q.   Total.  Before Governor McMaster's

21   office intervened in the issue between DSS and

22   Miracle Hill with respect to Miracle Hill's

23   license, was DSS prepared to end its relationship

24   with Miracle Hill as a -- as a licensed CPA if

25   Miracle Hill did not comply with the requirements

Page 173

```
 1      set forth in your January 2018 letter?
 2           A.    DSS was prepared to terminate the child
 3      placing agency license.
 4           Q.    So we've generally been speaking in
 5      your capacity as a representative of DSS.  I have a
 6      few questions I wanted to ask you just in your
 7      personal -- in your personal capacity.
 8                 And one of those is:  Have you
 9      personally -- have you ever had conversations with
10      others at DSS or with leadership at DSS about how
11      allowing CPAs to exclude families based on their --
12      their religious beliefs would impact the pool of
13      foster parents available in South Carolina?
14           A.    I have not.
15           Q.    You have not.  Okay.  And are you
16      generally aware of if some of the professional
17      standards that govern in the -- in the field of
18      child welfare?
19           A.    Yes.
20           Q.    And -- and are those standards
21      generally the ones published by CWLA or the Child
22      Welfare League of America?
23           A.    Yes.
24           Q.    Okay.  And does -- and you're familiar
25      with CWLA?
```

Page 191

```
 1              If you have it in front of you, that's
 2      fine.  I don't think you need to pull it up in
 3      front of you if you don't.
 4              A.   I have it.
 5              Q.   Basically -- okay.  Basically what I
 6      want to do is I'm going to try to go through in
 7      alphabetical order.  I just want to -- just so
 8      that -- so we've got a clear record and so my own
 9      notes can get clearer, figure out which CPAs are
10      operating in the upstate that offer nontherapeutic,
11      perhaps along with therapeutic care, whether they
12      have an office in the upstate and approximately how
13      long they've been licensed.
14              So I think we can -- we can run through
15      these hopefully without it being too tedious, but I
16      apologize in advance if it is a little bit
17      mechanical.  So I'm trying to go through them.
18              Church of God Home For Children.  They
19      offer nontherapeutic care and they have an office
20      in the upstate, right?
21              A.   Yes.
22              Q.   And they've been licensed I think you
23      said for maybe ten years or so, is that ballpark
24      correct?
25              A.   Yes.
```

Page 192

1           Q.   Okay.  Connie Maxwell Children's
2      Ministries, they are also in the upstate.  They
3      serve the upstate.  They have an office in the
4      upstate, offer nontherapeutic foster care and
5      they've been licensed for several decades, is that
6      correct?
7           A.   That is correct.
8           Q.   Epworth Children's Home serve in the
9      upstate, have an office in the upstate, offer
10     nontherapeutic foster care and they've been
11     licensed for several years?
12          A.   Several decades.  And they also have
13     nontherapeutic and therapeutic.
14          Q.   Okay.  Growing Home Southeast.  This is
15     over my notes are complete.  I think they serve the
16     upstate.  Do you know if they have an office in the
17     upstate?
18          A.   They do not have an office in the
19     upstate, but they do work statewide.
20          Q.   Okay.  And they do both therapeutic and
21     nontherapeutic, is that right?
22          A.   That's correct.
23          Q.   And they've been licensed for 15 years
24     or so?
25          A.   Or so, yes.

Page 193

1              Q.    Okay.   Lutheran Services Carolinas.

2    They serve the upstate, they don't have an office

3    in the upstate, but they offer nontherapeutic and

4    therapeutic and they've been licensed for a couple

5    decades?

6              A.    Correct.

7              Q.    Okay.

8              A.    Yes.

9              Q.    Miracle Hill Ministries, which we've

10   talked about, they have an office in the upstate,

11   they do nontherapeutic foster care, they've been

12   licensed for several decades and they serve the

13   upstate?

14             A.    Yes.

15             Q.    New Foundations Home For Children, I

16   believe they serve the upstate, have an office in

17   the upstate, offer nontherapeutical foster care and

18   been licensed for several years, is that right?

19             A.    Yes.   That is correct.

20             Q.    I think we're about halfway -- halfway

21   through the list.   Thanks for hanging with me.

22                   Nightlight Christian Adoptions serve

23   the upstate, have an office in the upstate,

24   nontherapeutic foster care, and they've been

25   licensed for several years?

Page 194

1          A.    They've been licensed for several years

2     as an adoption agency and only most recently added

3     foster care services to their list.

4          Q.    Okay.  Do you know when -- when they

5     were licensed as a CPA to be foster care?

6          A.    It's probably been a couple of years,

7     not very long.

8          Q.    Okay.  Two to three, four years, that

9     ballpark?

10         A.    That ballpark, yes.

11         Q.    Okay.  South Carolina MENTOR serve the

12    upstate.  Do they have an office in the upstate, do

13    you know?

14         A.    They do.

15         Q.    Okay.  They offer nontherapeutic foster

16    care, have been licensed for several decades --

17         A.    Therapeutic --

18         Q.    -- is that right?

19         A.    Therapeutic and nontherapeutic services

20    are offered.

21         Q.    Okay.  South Carolina Youth Advocate or

22    SCYAP sometimes I think later referred to as, they

23    serve the upstate, they don't have an office in the

24    upstate, they do therapeutic and nontherapeutic and

25    they've been licensed for about 30 years, is that

Page 195

1    right?

2            A.    Yes.

3            Q.    Okay.  Southeastern Children's Home,

4    they serve the upstate.  Do they have an office in

5    the upstate?

6            A.    Southeastern, yes.

7            Q.    Okay.  They do nontherapeutic foster

8    care and it looks like they also have been licensed

9    for looks like about 40ish years.  Does that sound

10    right?

11            A.    Yes.

12            Q.    Specialized Alternative For Family and

13    Youth, I think you said sometimes it's -- they go

14    by the acronym SAFY or SAFY?

15            A.    SAFY.

16            Q.    They serve the upstate, have an office

17    in the upstate, offer both therapeutic and

18    nontherapeutic and been licensed since the 1990s.

19    Is that all correct?

20            A.    That is correct.

21            Q.    Okay.  Tamassee DAR School, if I'm

22    pronouncing that right, I think you said they

23    closed at some point in 2019.  But prior to that,

24    and at least you said, into some part of 2019 they

25    were licensed as a CPA, is that --

1          A.    That is -- that's correct.

2          Q.    They do nontherapeutic foster care,

3     serve the upstate, they -- do you know if they have

4     an office in the upstate?

5          A.    They did.

6          Q.    Okay.  The Bair Foundation has an

7     office in the upstate, serves the upstate, have

8     therapeutic and nontherapeutic foster care and

9     they've been licensed for about 20 years.  Is that

10    all correct?

11         A.    That's correct.

12         Q.    Then -- let's see.  Thornwell.  Let's

13    see.  Serves the upstate, office in the upstate,

14    nontherapeutic foster care and they've been

15    licensed for a number of years?

16         A.    Um-hum.  Yes.

17         Q.    And then I think the last -- the last

18    one, this is one that I have written in, so -- from

19    your testimony -- so correct me here.  I can't read

20    my own writing.  Family Preservation?  Is that --

21         A.    Um-hum.  Family Preservation Community

22    Services.

23         Q.    Okay.  So they serve the upstate.  Do

24    they have an office in the upstate?

25         A.    They serve statewide, but they do not

Page 197

1    have an office in the upstate.

2        Q.    Okay.  They do nontherapeutic foster

3    care?

4        A.    And therapeutic.

5        Q.    And do you know ballpark how long

6    they've been licensed as a CPA?

7        A.    It's been awhile, so certainly more

8    than ten years.

9        Q.    Okay.  I just wanted to -- for the ones

10   we just -- we just discussed, I think it's around

11   15 or 16 or so that at least serve the upstate,

12   some of them you said don't have an office here.

13   I'm trying to find an example.

14            Southeastern Children's Home, they

15   do --

16       A.    Right.

17       Q.    So let's use Southeastern as an

18   example.  If -- if I wanted to be licensed as a

19   foster parent, I did a Google search for a foster

20   care agency in Greenville, South Carolina and I

21   think -- I just like the sound of that name, I

22   click on it.  If I wanted to talk to and to apply

23   through that to DSS, how would I go about doing

24   that if they don't have an office?

25       A.    You would -- sure.  There is a main