# EXHIBIT 7

Page 1

```
1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2              GREENVILLE DIVISION
3    EDEN ROGERS AND BRANDY WELCH,
               Plaintiffs,
4
          vs.   C/A No. 6:19-cv-01567-JD
5
     UNITED STATES DEPARTMENT OF HEALTH &
6    HUMAN SERVICES; XAVIER BECERA, IN HIS
     OFFICIAL CAPACITY AS SECRETARY OF THE
7    UNITED STATES DEPARTMENT OF HEALTH &
     HUMAN SERVICES; ADMINISTRATION FOR
8    CHILDREN AND FAMILIES; JOOYEUN CHANG, IN
     HER OFFICIAL CAPACITY AS THE SENIOR
9    OFFICIAL PERFORMING THE DUTIES OF THE
     ASSISTANT SECRETARY OF THE
10   ADMINISTRATION FOR CHILDREN AND
     FAMILIES; JOOYEUN CHANG, IN HER OFFICIAL
11   CAPACITY AS PRINCIPAL
     DEPUTY ASSISTANT SECRETARY OF THE
12   ADMINISTRATION FOR CHILDREN AND
     FAMILIES; HENRY MCMASTER, IN HIS
13   OFFICIAL CAPACITY AS GOVERNOR OF THE
     STATE OF SOUTH CAROLINA; AND MICHAEL
14   LEACH, IN HIS OFFICIAL CAPACITY AS STATE
     DIRECTOR OF THE SOUTH CAROLINA
15   DEPARTMENT OF SOCIAL SERVICES,
               Defendants.
16
17
18   VTC  30(b)(6)     SC DSS, Through its agent:
     DEPOSITION OF:   DAWN BARTON
19
     DATE:            December 17, 2021
20   TIME:            9:33 a.m.
     LOCATION:        Zoom - Columbia, SC
21
22   TAKEN BY:        Counsel for the Plaintiffs
23   REPORTED BY:     Roxanne Easterwood, RPR
24   VIDEOGRAPHER:    Roosevelt Hamilton
25
```

```
                                                  Page 2

 1    APPEARANCES OF COUNSEL:
 2         ATTORNEYS FOR PLAINTIFFS:
 3              Cravath Swaine & Moore
                By:  Rebecca Schindel
 4                   Serena Candelaria
                (Appearing by VTC)
 5              825 Eighth Avenue, Suite 4043B
                New York, NY 10019
 6              rschindel@cravath.com
                scandelaria@cravath.com
 7              (212) 474-1989
 8

                Lambda Legal
 9              By:  Currey Cook
                     Maia Zelkind
10              (Appearing by VTC)
                120 Wall Street, Floor 19
11              New York, NY 10005
                ccook@lambdalegal.org
12              mzelkind@lamddalegal.org
                (212) 809-8585
13
14              American Civil Liberties Union (ACLU)
                By:  Leslie Cooper
15              (Appearing by VTC)
                125 Broad Street, 18th Floor
16              New York, NY 10004
                lcooper@aclu.org
17
18
           ATTORNEYS FOR UNITED STATES DEPARTMENT OF
19              HEALTH & HUMAN SERVICES, ET AL.:
20              United States Attorney's Office South
                Carolina
21              By:  Marshall Prince
                (Appearing by VTC)
22              1441 Main Street, Suite 500
                Columbia, SC 29201
23              marshall.prince@usdoj.gov
                (803) 929-3000
24
25
```

Page 3

```
 1        ATTORNEYS FOR HENRY MCMASTER, IN HIS
                  OFFICIAL CAPACITY AS GOVERNOR OF THE
 2                STATE OF SOUTH CAROLINA; and MICHAEL
                  LEACH, IN HIS OFFICIAL CAPACITY AS
 3                STATE DIRECTOR OF THE SOUTH CAROLINA
                  DEPARTMENT OF SOCIAL SERVICES:
 4
                  Nelson Mullins Riley & Scarborough
 5                By:  Miles Coleman
                  (Appearing by VTC)
 6                2 W Washington Street, Suite 400
                  Greenville, SC 29601
 7                miles.coleman@nelsonmullins.com
                  (864) 373-2300
 8
 9
10        (INDEX AT REAR OF TRANSCRIPT)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 115

1    that?  No, I don't think we're concerned about

2    that, because I think that families have a variety

3    of choices of pathways for all -- for different

4    organizations that -- that are the pathway to

5    support them towards the licensure process.

6    BY MS. SCHINDEL:

7         Q.    Is DSS aware of -- of families that

8    have been discriminated against by CPAs based on

9    sexual orientation or faith?

10        A.    We're aware of each organization -- of

11   organizations' criteria in which they lay out

12   within their -- their organizations of the kinds

13   of families that they want to work with, but I --

14   I'm not -- other than this particular case, I'm

15   not -- I'm not aware of anyone.

16        Q.    Are CPAs that turn away families based

17   on faith or sexual orientation required to tell

18   DSS that they have done so, that they have turned

19   away families who applied, on those -- based on

20   those criteria?

21        A.    I'm not -- I'm not aware of a

22   mechanism in which that's reported back to us,

23   unless -- unless -- unless the family themselves

24   contact our state office and make us aware.

25        Q.    So does -- DSS doesn't require CPAs to

Page 116

```
 1    notify DSS when they turn away families based on
 2    religion or sexual orientation so that DSS -- DSS
 3    could follow up with those families?
 4         A.   No.
 5         Q.   Is allowing CPAs to exclude families
 6    based on religious criteria consistent with best
 7    practices in the field of child welfare?
 8         A.   Can you repeat the question?
 9         Q.   Is allowing CPAs to exclude families
10    based on religious criteria consistent with best
11    practices in the field of child welfare?
12         A.   No.
13         Q.   Why not?
14         A.   Again, we -- we don't -- we don't --
15    we don't believe in discrimination.  That's not --
16    that's not a part of -- that's not a part of -- of
17    what -- of what we do in -- in the -- in the
18    licensing process.
19              Our -- our regulations, our policies
20    specifically -- specifically say that -- you know,
21    around the licensing piece related to this matter,
22    that we -- we will -- we, the agency, will not
23    discriminate.
24         Q.   And so it sounds like DSS itself will
25    not discriminate on the basis of religion or
```

Page 133

1    aware of the screening criteria implemented by the

2    CPAs in South Carolina?

3         A.    Yes.

4         Q.    And DSS tracks that information?

5         A.    Again, I think -- I think your -- your

6    track is -- is -- is throwing me.  We're aware of

7    the CP- -- of each individual CPA's criteria,

8    but -- but as far as -- I don't know what you mean

9    by tracking that.

10        Q.    And you're aware of each individual

11   CPA criteria how?  By -- by simply by looking at

12   the CPA's website, or does DSS follow up with the

13   CPAs or in some way ask CPAs to tell them what

14   their screening criteria are?

15        A.    So that would be a part of -- of their

16   submission when they become a CPA.  That -- that

17   would be part of information that -- that they

18   provide to us as a child-placing agency, when

19   they're issued -- when they're the child-placing

20   agency license.

21        Q.    Okay.  Can you tell me on this list

22   which CPAs that DSS knows accepts families

23   regardless of sexual orientation or religion?

24        A.    DSS would know all of them.

25        Q.    And can you tell me which ones on the

```
                                          Page 134
```

1    list DSS knows accepts families regardless of

2    sexual orientation or religion?

3          A.   I can tell you the ones that -- that

4    I, today, as the DSS representative know, which

5    may not -- which may not be inclusive of all of --

6    you know, of all of them on the list.

7          Q.   Yeah, I think -- I think you should go

8    ahead and do that, because I do think that this is

9    a topic that you were meant to be educated on.  So

10   I think you should -- I think you should go ahead

11   and do that.

12         A.   So ask -- so can you ask the question

13   again?

14         Q.   Yes.  Which of these on this list does

15   DSS know accepts families regardless of sexual

16   orientation or religion?

17         A.   Okay.  So it would be Alston Wilkes,

18   Broadstep, CAPA, Family Preservation, Growing

19   Homes Southeast, Crosswell, Justice Works -- which

20   Justice Works, I wasn't aware they even had

21   families.  They -- they provide services.  So I

22   don't even know that that's related to this -- but

23   New Foundations, SC Mentor, SC YAP, Specialized

24   Alternative Youth.  And those are the ones that

25   I'm aware of.

```
                                        Page 138
 1    could that harm efforts to grow the pool of foster
 2    families in Region 1?
 3            A.   I -- I would say, no, because we would
 4    serve -- we would serve those families.  There --
 5    there's still an option for those families through
 6    the department.
 7            Q.   Since DSS changed its practice to
 8    handle just kinship applicants, you said that, and
 9    you're saying now, that DSS would handle
10    non-kinship applicants if the family didn't want
11    to work with a particular CPA; is that right?
12            A.   Yes.
13            Q.   Has DSS handled any non-kinship
14    applicants since the change in policy?
15            A.   I -- I don't -- I don't know.  I would
16    have to look at -- at each region to make that
17    determination, if -- if we've actually accepted.
18    It's been very few, if -- if any.
19                MS. SCHINDEL:  Okay.  Well, this is
20    definitely Topic 5.  So this -- this is
21    information we absolutely will need to get from
22    DSS, which is whether DSS has handled any non- --
23    non-kinship applicants since the change in
24    practice or policy.  And if so, how many.
25    BY MS. SCHINDEL:
```

```
                                        Page 139
 1          Q.    Sitting here today, you're not aware
 2   of whether DSS has handled any non-kinship
 3   applicants since the change in practices or
 4   policies?
 5          A.    No.
 6          Q.    Does Heartfelt Calling know that it
 7   can inform non-kin applicants that they can go
 8   directly to DSS if they prefer?
 9          A.    It's strongly encouraged, yes, but
10   they strongly encourage families to work with one
11   of the child-placing agencies.
12          Q.    And how does Heartfelt Calling know
13   that it can inform that?  Has DSS told Heartfelt
14   Calling that they can tell non-kin applicants to
15   go directly to DSS?
16          A.    They consult with -- they -- they
17   consult with our -- our director of child welfare
18   licensing on any -- any individuals that are --
19   are not feeling like they -- they have -- there is
20   a good match between them and the CPA.
21          Q.    Sorry, it sounds like the answer is,
22   yes, DSS tells Heartfelt Calling that they can
23   tell non-kin applicants to go directly to DSS, or
24   is the answer, no, DSS does not relay that
25   information?
```

Page 140

```
 1        A.   The answer is -- is yes, and Heartfelt
 2   Calling actually reaches out for DSS to consult on
 3   those applicants that would like to come to DSS,
 4   as opposed to a CPA.
 5        Q.   Do local DSS offices know they can
 6   handle non-kin applicants?
 7        A.   Yes, on a case -- on a -- in a -- on a
 8   very situational basis.  So if you do have
 9   families that we -- like we just spoke of,
10   they're -- they're consulted, but they're not --
11   they don't -- they don't take applications at the
12   regional offices for non-kin families.  So the
13   pathway through that would be Heartfelt Calling to
14   our -- our state office, and then it feeds down
15   into the region.
16        Q.   So, as we just discussed, Heartfelt
17   Calling's website did not necessarily let
18   individuals know which agencies accept people of a
19   particular faith or of a sexual orientation, but
20   if somebody called Heartfelt Calling, does
21   Heartfelt Calling provide that information?
22        A.   I don't know if they provide that
23   information to families or not.  They -- it's my
24   understanding that Heartfelt Calling directs them
25   direct to the website or to the -- to the -- the
```

Page 155

```
 1    could be higher, based on other agencies; is that
 2    right?
 3           A.    Yes.  I think that's reasonable.
 4           Q.    And -- and DSS -- am I right in saying
 5    that DSS would not know if more than 100 families
 6    had been turned away based on religious criteria?
 7                 MR. COLEMAN:  Object to the form of the
 8    question.
 9                 But you can answer.
10                 THE WITNESS:  We would only know,
11    again, for those applicants that applied through
12    Heartfelt Calling over the last -- well, since,
13    like, last July, when we transitioned all of that
14    non-kin work, but prior to that time, we -- if
15    they were going directly to those -- those
16    child-placing agencies and got turned away, we --
17    we wouldn't -- we wouldn't -- we don't track that
18    information.  We wouldn't know.
19    BY MS. SCHINDEL:
20           Q.    Are prospective foster parents aware
21    that they can apply directly through DSS for a
22    non-kinship care foster license?
23                 MR. COLEMAN:  Object to the form of the
24    question.
25                 But you can answer, if you're able.
```

Page 159

```
 1          Q.   Was it because DSS had determined that
 2    Miracle Hill was violating DSS's
 3    non-discrimination policy?
 4                MR. COLEMAN:  Object to the form of the
 5    question.
 6                But you can answer.
 7                THE WITNESS:  I don't know.
 8    BY MS. SCHINDEL:
 9          Q.   Is Miracle Hill -- if DSS were to
10    terminate Miracle Hill's license, does DSS have a
11    plan to ensure that there would not be a gap in
12    service?
13          A.   A gap in service for the families?
14          Q.   For the -- for the families, that's
15    right.
16          A.   We -- yes, we -- I mean, we would have
17    made sure that they are -- I mean, I can only tell
18    you what would have happened, is we would have
19    likely assumed supporting those families
20    ourselves.
21          Q.   So would DSS or other CPAs be able to
22    fill the gap in service that would have been
23    created if Miracle Hill's license had been
24    terminated?
25                MR. COLEMAN:  Object to the form of the
```

Page 160

```
 1   question.
 2              But you can answer.
 3              THE WITNESS:  So families -- I mean, so
 4   you can tran- -- you can transfer -- you know,
 5   families can transfer to who they want to transfer
 6   to, if they decide they want to -- that happens
 7   sometimes.
 8              Sometimes you have a -- a DSS family
 9   that wants to do therapeutic foster care, and DSS,
10   we -- we don't support therapeutic foster care
11   parents at -- at the regional level.  So they
12   would have to go to a -- they would have to go to
13   a therapeutic CPA.  So they may leave -- leave our
14   regional folks and go to a therapeutic agency.
15              So I think families can -- could --
16   could choose, should that -- if that would have
17   happened.  Families would have been, similar to
18   the Heartfelt Calling process, they could have --
19   they had -- could have chosen to transition
20   their -- their home over to a different CPA for --
21   for support.
22   BY MS. SCHINDEL:
23        Q.   So if Miracle Hill were to close,
24   would you expect that families that were working
25   with Miracle Hill would just go to other CPAs and
```

Page 161

1   continue fostering?

2              MR. COLEMAN:  Object to the form of the

3   question.

4              But you can answer.

5              THE WITNESS:  I would hope so.

6   BY MS. SCHINDEL:

7        Q.   Do you have any basis to expect that

8   that would not happen?

9        A.   No.

10        Q.   Are there other evangelical Christian

11   agencies that a family could work with in South

12   Carolina?

13        A.   Yes.

14        Q.   And in Region 1?

15        A.   Again, I would have to -- because I

16   don't have that information today, I would -- I

17   would have to look at -- at the -- our breakdown

18   of that to determine if there were other -- other

19   options for them.

20        Q.   Are there any agencies in Region 1

21   that are Jewish affiliated or Catholic affiliated

22   or Muslim affiliated or Hindu affiliated?

23        A.   No.

24        Q.   But there are Jewish, Catholic,

25   Muslim, and Hindu -- or I should say, or Hindu

                                                    Page 219

1    express their views to you in support or against

2    of allowing CPAs to exclude families based on

3    religious criteria?

4           A.    No.

5           Q.    You've had no conversations with DSS

6    officials or staff about this issue?

7           A.    Not -- not about how they felt about

8    it.

9           Q.    Before the waiver went into effect,

10   did you consider it appropriate to implement a

11   policy of allowing CPAs to exclude families based

12   on religious requirements?

13          A.    Can you repeat that question?

14          Q.    Before the waiver did you, in your

15   capacity as someone who sets the policy for DSS's

16   prospective foster care, think it would be

17   appropriate to implement a policy of allowing CPAs

18   to exclude families based on religious

19   requirements?

20          A.    No, we did not consider implementing a

21   policy.

22          Q.    So was the -- the policy that allowed

23   CPAs to exclude families based on religious

24   requirements implemented only because the

25   governor's office intervened and told DSS to

Page 220

1    implement this type of policy?

2         A.   Yes.

3         Q.   As one of the top foster care policy

4    makers here at DSS, would you permit CPAs to

5    exclude families based on religious criteria, if

6    the whole issue were up to you?

7              MR. COLEMAN:  Object to the form of the

8    question, and ask -- I'll ask for clarification.

9    Is that -- are you asking her as 30(b)(6) or as an

10   individual?

11             MS. SCHINDEL:  Well, I think that's --

12   that's pretty clearly in her individual capacity.

13             MR. COLEMAN:  You can -- you can answer

14   the question, as it -- sorry.  Go ahead.

15             THE WITNESS:  Can you repeat it?  I'm

16   sorry, go ahead.  Can you repeat it?

17   BY MS. SCHINDEL:

18        Q.   As one -- sure.  Sure.  So -- well,

19   let me back up and ask you this part.

20             I understand that you have somebody

21   that you report to, but is it fair to say that you

22   are one of the top policy makers in the foster

23   care space at DSS?

24        A.   Yes.

25        Q.   So in that role, and if it were up to

Page 222

```
 1    would -- you would not permit CPAs to exclude
 2    families based on religious criteria, why is that?
 3          A.    Say that again.
 4          Q.    I think the answers may be similar,
 5    but I just want to make sure that to the extent
 6    there are any differences.
 7                Is -- is -- why when I asked you would
 8    you allow -- would you allow CPAs to exclude
 9    families based on religious criteria, and you said
10    no, and I just wanted to follow up and ask, you
11    know, why?  Why is that your opinion, as the top
12    policy -- one of the top policy makers at DSS?
13          A.    I see.  I see.  You -- you're asking
14    me -- and, again, I think it aligns with the same
15    thing I responded to before, which is if it were
16    me as the policy maker's sole decision, then I --
17    I -- I think that it -- it doesn't -- it would --
18    it doesn't align, if -- if you're practicing
19    differently, but yet you're serving -- you're
20    really -- you're really trying to support the same
21    mission, then I think that, again, we say we're
22    not -- we, DSS, the agency, that we're not going
23    to discriminate against anything.
24                We -- we don't -- we don't care
25    whether you're purple or green or you're single or
```

Page 223

1   you live in a house or you live in an apartment,

2   and as -- as long as you can care for and support

3   and you meet all of those regulatory requirements

4   and you want to sign up to help support our

5   mission to temporally care for children, I think

6   having everybody practicing the same way is -- is

7   best.

8        Q.   And do you think that that policy, you

9   know, that explanation that you just provided, do

10  you think it's best because it's best for the

11  children in foster care?

12            MR. COLEMAN:   And for the sake of the

13  record, you're answering this in your individual

14  capacity.

15            THE WITNESS:   Yeah.  Yeah.  So I --

16  I -- I don't know that it's best for the sake of

17  the children in foster care, but -- because I

18  think this -- while -- while, ultimately, I guess,

19  it might impact the children that are placed with

20  those families, and, I mean, if you think about

21  the -- the recruitment and sort of the initial

22  engagement of an applicant to a particular CPA or

23  our department, that's really what this is, right,

24  is -- is that -- that -- is that how does it --

25  who is going to work with the family towards