# EXHIBIT 9

# EXPERT REBUTTAL REPORT OF DAVID M. BRODZINSKY, PH.D.

## Rogers v HHS et al

## Case No. 6:19-cv-01567-TMC

I, David M. Brodzinsky, do solemnly attest as follows:

**Assignment**

1. I submitted an expert report in this case on March 5, 2021. Plaintiff's counsel provided me with the report of Defendant's expert, Steven Roach, dated April 6, 2021. I offer this expert report to address some of the opinions and conclusions offered by Mr. Roach.

**Opinions**

2. Mr. Roach opines that if Miracle Hill and other children placing agencies (CPAs) that are unwilling to accept all qualified families discontinue providing public foster care services rather than comply with non-discrimination requirements, it would reduce the number of foster families available to care for children. He speculates that if some CPAs discontinued public foster care services, even if other CPAs took over that work, some prospective foster or adoptive families will choose not to foster or adopt because there is not an agency in the system that shares their faith. *See* Roach report, p. 7. The only data he cites in support of this speculation—a survey published by the Chronicle of Social Change (CSC Survey)[1]—provides no such support.

---

[1] *Foster Care Housing Crisis*, (2017) The Chronical of Social Change. https://imprintnews.org/wp-content/uploads/2017/10/The-Foster-Care-Housing-Crisis-10-

1

3. Mr. Roach claims that that the CSC Survey shows that the termination of Catholic Charities' foster care services in Illinois in 2011 because it would not accept same-sex couples caused a reduction in the number of foster families in the state from 2012 - 2017.  *See* Roach report, pp. 6-7.  As I will explain, the CSC Survey does not support this conclusion.[2]

Misleading presentation of the data

4. First, Mr. Roach's presentation of the CSC Survey data is extremely misleading.  He suggests Illinois stands out with the most significant loss of foster families among the states reporting data (1,547).  He neglects to mention that only ten states made that particular data—the number of "licensed, non-relative foster homes"—available.  And he ignores the fact that the more meaningful way of comparing states is not to look at absolute number of increases or decreases in foster homes or beds, but in the percentage change from year to year.  Focusing on absolute numbers ignores the fact that states vary in population, and therefore, in the number of children within the child welfare system.  Mr. Roach fails to mention that other states had far steeper reductions in "licensed, non-relative foster homes" or "bed capacity in non-relative foster homes" when you look at percentages.  Examination of Appendix C of the CSC report indicates

---

31.pdf#:~:text=The%20Foster%20Care%20Housing%20Crisis%20As%20the%20number,struggle%20to%20recruit%20and%20keep%20enough%20foster%20homes.

[2] Mr. Roach also opines that if an agency such as Miracle Hill were to cease providing public foster care services, it would result in caseworker disruption.  I am not addressing that opinion in this rebuttal report because I do not have personal knowledge of how caseworkers are assigned to children in South Carolina.  However, as I noted in my opening report (see p. 32, par. 53), in some states when agencies have chosen to discontinue foster care services rather than comply with non-discrimination requirements, those agencies affiliated with other organizations and continued providing the same services through the same staff.

2

that of the 34 states, plus the District of Columbia, reporting data on either "licensed, non-relative foster homes" or "bed capacity in non-relative foster homes", 15 states had decreases in their non-relative foster home or bed capacity between 2012 and 2017. The range of decreases over this timeframe was considerable – from 1.4% for North Carolina to 50.5% for the District of Columbia. Illinois had a 13.6% decrease in foster home capacity, a median decrease among these states.

5. By cherry picking one point of data and presenting it in a misleading way, Mr. Roach creates a distorted picture of Illinois' foster care capacity compared to other states.

<u>There is no basis for his claim of causation</u>

6. In addition to a misleading presentation of how Illinois compares to other states in terms of changes in foster care capacity from 2012 to 2017, Mr. Roach attempts to attribute the decrease in licensed, non-relative foster homes in Illinois to a single source – the termination of Catholic Charities' foster care services. There is simply no evidence to support that conclusion. Moreover, it is both illogical given the timing and ignores the multitude of factors that influence the number of available licensed, non-relative foster homes.

7. First, the CSC Survey shows a decline in non-relative foster families in 2017 compared to 2012. Catholic Charities ceased providing public foster care services in Illinois in 2011. There is a temporal disconnect between the claimed cause and effect.

8. Second, the change in the number of licensed, non-relative homes in Illinois during this five-year period cannot be attributed to a single source, and specifically to the termination of Catholic Charities' foster care services. There is simply no evidence

3

offered by Mr. Roach to support this conclusion and it is well-known in the field of child welfare that a multitude of factors impact the number of foster homes available. The numbers of non-relative foster homes routinely shift from year to year in all states for many reasons, including but not limited to the following:

(a) States' needs for foster families shift based on the number of children in care. The more children in care, the more foster families that are needed; conversely, when there are fewer children in care, states need fewer foster families. The CSC Survey notes that many states providing data that reported a reduction in the number of children in foster care during the survey period also reported a reduction in the number of foster families or available beds. Illinois was one of those states. In contrast, most states that reported an increase in foster families or beds also had an increase in the number of children in foster care.[3]

(b) Although all states utilize both non-relative foster homes and relative caregivers (either as licensed or unlicensed foster families), they do so at different rates. As the CSC Survey notes, "in some states, a growing reliance on kinship care has offset the demand for non-relative homes."[4] Data reported by the Who Cares Project indicate that kinship care in Illinois steadily increased from 2010, when 31% of youth in care lived with relatives, to 2018, when 45% of children in care did so. These rates far outpaced the national average for kinship care during this timeframe.[5] Moreover, as

---

[3] *Foster Care Housing Crisis*, at 4.
[4] *Foster Care Housing Crisis*, at 1.
[5] The Imprint, *Who Cares? A National Count of Foster Homes and Families*, https://www.fostercarecapacity.com/states/illinois.

4

noted previously, this is roughly the same time in which there was a decline in the number of non-relative foster homes in Illinois.

(c) Foster parent recruitment and support depends on child welfare budgets which change from year to year. As budgets increase, agencies can hire and train more workers to recruit and support foster placements and/or may launch specific foster parent recruitment campaigns, resulting in a greater number of foster homes and beds. During periods of fiscal austerity, child welfare services, including home-finding and child/family support, can suffer. Also, agency policy priorities and associated funding may shift from a focus on non-relative foster parent recruitment to increasing the use of relative placements and prioritizing licensing of those families.

(d) The number of relative and non-relative foster homes in any state also reflects the success in implementing family recruitment strategies which vary from state to state. The CSC Survey notes that states have different ratings in how diligent they are regarding their recruitment efforts.[6] Furthermore, given that foster families are one of the best resources for foster parent recruitment, reductions in the number of foster families can undermine recruitment of new foster parents.[7]

(e) The ability to retain foster parents also impacts the number of available foster homes and beds. The higher the retention rate, the greater the number of foster

---

[6] *Foster Care Housing Crisis*, at 5.
[7] James Bell Associates (2019). *Diligent recruitment of families for children in the foster care system: Challenges and recommendations for policy and practice.* Washington, DC: Children's Bureau, Administration for Children and Families, U.S. Department of Health and Human Services, https://www.jbassoc.com/resource/diligent-recruitment-of-families-for-children-in-the-foster-care-system-challenges-and-recommendations-for-policy-and-practice/.

5

    homes. It is well known that foster parent turnover is a serious problem nationwide. In one study, for example, it was found that 25% of first-time foster homes close within months of initial foster placement.[8] There are numerous reasons why foster homes close, including but not limited to: inadequate foster parent training; poor relationships between the family and the child welfare agency; too little financial support by the agency; family seeks closure because of personal issues such as increasing age, illness, marital problems, and/or difficulty coping with grief when a child leaves the home; family decides to no longer foster other children if they adopt the child(ren) in their care; agency initiates closure because of concerns regarding quality of care (including neglect and abuse); child-related issues such as challenging special needs that overtax the family; and lack of adequate support for the family in meeting the child's special needs.[9]

9. Mr. Roach's claim that the reduction in the number of licensed, non-relative foster homes in Illinois from 2012 to 2017 is attributable to the termination of Catholic Charities' foster care services ignores these factors, which are well-known to those who have experience in the child welfare field.

---

[8] Wulczyn, F., Orlebeke, B., Hislop, K., Schmits, F., McClanahan, J. & Huang, L. (2018). The dynamics of foster home recruitment and retention. The Center for State Child Welfare Data: University of Chicago, https://fcda.chapinhall.org/wp-content/uploads/2018/10/Foster-Home-Report-Final_FCDA_October2018.pdf.

[9] James Bell Associates (2019), ibid; DeGarmo, Dr. John N. (2017) *Foster parent retention: What are the foster parents saying?* Foster Focus, https://www.fosterfocusmag.com/articles/foster-parent-retention-what-are-foster-parents-saying; Casey Family Programs (2014), *Effective practices in foster parent recruitment, infrastructure, and retention*, https://calswec.berkeley.edu/sites/default/files/effective_practices_in_foster_parent_recruitment_and_retention.pdf.

6

10. Finally, Mr. Roach links the decline in foster homes across the country to challenges in achieving permanency for children. *See* Roach report, p. 5. Yet he ignores the fact that in the years following the termination of Catholic Charities' foster care services in Illinois in 2011, the rate of adoption, which is typically the preferred permanency goal when reunification fails, increased in the state. From 2007 to 2011, the average number of adoptions per year in Illinois was 1,369, whereas the average number from 2012 to 2017 was 1,647 – an increase of 20%.[10] In contrast, the average number of adoptions per year nationally across these two timeframes was essentially unchanged (53,654 versus 53,941).[11] The increase in adoptions following Catholic Charities' discontinuance of public foster care services in Illinois is inconsistent with the conclusion that enforcement of anti-discrimination provisions in state child welfare contracts will jeopardize the ability to achieve permanency for children in care.

11. In summary, Mr. Roach's conclusion that the termination of Catholic Charities' public foster care services in Illinois caused a reduction in foster families is without merit. He has offered data in a misleading and inaccurate way, ignored other relevant data, and disregarded the many reasons why there are changes in licensed, non-relative foster home capacity across time frames and from state to state.

---

[10] For FY 2007-2009, the total number of adoptions in Illinois was determined by using data presented for children of different races adopted during each year;
for FY2007 see https://www.acf.hhs.gov/sites/default/files/documents/cb/race_2007.pdf;
for FY 2008 see https://www.acf.hhs.gov/sites/default/files/documents/cb/race_2008.pdf;
for FY 2009 see https://www.acf.hhs.gov/sites/default/files/documents/cb/race2009.pdf;
for FY 2010-2017 see
https://www.acf.hhs.gov/sites/default/files/documents/cb/afcars_state_data_tables_10thru19.xlsx
[11] Adoption and Foster Care Analysis and Reporting System (AFCARS) Reports #15-25.
https://www.acf.hhs.gov/cb/research-data-technology/statistics-research/afcars.

7

_David Brodzinsky Ph.D_ (signature)

David Brodzinsky Ph.D.

5/5/21

Date

8