IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DISTRICT

| | | |
|---|---|---|
| Eden Rogers et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:19-cv-01567-JD |
| | ) | |
| United States Department of Health and Human Services et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS HENRY MCMASTER'S AND MICHAEL LEACH'S
BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

THE BECKET FUND FOR RELIGIOUS LIBERTY

Daniel H. Blomberg*
1124 Park West Blvd.
Suite 204
Mount Pleasant, SC 29466
(202) 349-7222
  *Admitted *pro hac vice*
*Counsel for Governor Henry McMaster*

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
2 W. Washington St. / Fourth Floor
Greenville, SC 29201
miles.coleman@nelsonmullins.com
(864) 373-2352

*Counsel for Governor Henry McMaster and
Director Michael Leach*

THE BECKET FUND FOR RELIGIOUS LIBERTY

Lori H. Windham*
William J. Haun*
Nicholas R. Reaves*
1919 Pennsylvania Ave. NW
Suite 400
Washington, D.C. 20006
(202) 955-0095

  *Admitted *pro hac vice*

*Counsel for Governor Henry McMaster*

OFFICE OF THE GOVERNOR

Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Erica W. Shedd
*Deputy Legal Counsel*
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100

*Counsel for Governor Henry McMaster*

*(Additional counsel listed on following page)*

(*continued*)

DAVIDSON, WREN & DEMASTERS, P.A.

    Kenneth P. Woodington
    William H. Davidson, II
    1611 Devonshire Drive, 2nd Floor
    Post Office Box 8568
    Columbia, SC 29202-8568
    (803) 806-8222

*Counsel for Director Michael Leach*

OFFICE OF THE ATTORNEY GENERAL

    Robert D. Cook
    *South Carolina Solicitor General*
    Post Office Box 11549
    Columbia, SC 29211
    (803) 734-3970

*Counsel for Governor Henry McMaster*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

COUNTER STATEMENT OF MATERIAL FACTS ..................................................... 3

ARGUMENT ................................................................................................................ 7

    I.    South Carolina is not responsible for the private, unfunded actions of a third party.................................................................................................... 7

        A.    Miracle Hill's recruitment and screening of foster parents is not state action. ......................................................................................... 8

        B.    Even if Miracle Hill were a state actor, South Carolina cannot be held liable for its actions. ............................................................... 14

    II.    Plaintiffs' Equal Protection Clause claim is meritless, unprecedented, and creates a needless conflict with the Free Exercise Clause. ............................ 17

        A.    Plaintiffs cannot identify a suspect classification needed to trigger the Equal Protection Clause. ................................................. 17

        B.    Plaintiffs have no evidence of a discriminatory purpose. .................... 20

        C.    Plaintiffs' theory of Equal Protection liability conflicts with the Free Exercise Clause and decades of precedent............................... 22

        D.    Under any level of scrutiny, Plaintiffs' Equal Protection claim fails. .................. 24

    III.    South Carolina's accommodation of Miracle Hill does not violate the Establishment Clause ................................................................................ 27

        A.    Accommodating Miracle Hill does not impose "significant burdens" on third parties ................................................................ 27

        B.    Plaintiffs cannot show that South Carolina has coerced religious beliefs. ......................................................................................... 29

CONCLUSION................................................................................................................ 31

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Legion v. Am. Humanist Ass'n,*
  139 S. Ct. 2067 (2019) .................................................................................23

*Barber v. Bryant,*
  193 F. Supp. 3d 677 (S.D. Miss. 2016), *rev'd*, 860 F.3d 345 (5th Cir. 2017) ..................27, 28

*Barnes v. Montgomery County,*
  798 F.Supp.2d 688 (D. Md. 2011) ...............................................................6

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
  512 U.S. 687 (1994) ......................................................................................12

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ......................................................................................13

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ...................................................................22, 23, 26

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001) ........................................................................................8

*Brown v. Hatch,*
  984 F. Supp. 2d 700 (E.D. Mich. 2013) .....................................................11

*Buchanan v. JumpStart S.C.,*
  No. 1:21-cv-00385-DCN-SVH, 2022 WL 3754732 (D.S.C. Aug. 30, 2022) .......................13

*Buck v. Gordon,*
  No. 19-286 (W.D. Mich. Jan. 26, 2022), Stipulated Order, ECF No. 113 .............................27

*Califano v. Boles,*
  443 U.S. 282 (1979) ................................................................................17, 20

*Crawford v. Bd. of Educ.,*
  458 U.S. 527 (1982) ........................................................................19, 20, 22

*Disability Rts. S.C. v. McMaster,*
  24 F.4th 893 (4th Cir. 2022) ..................................................................15, 16

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) ....................................................................... *passim*

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) .........................................................................23, 24

*Grimm v. Glouester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert denied*, 141 S.
    Ct. 2878 (2021) ...............................................................................................17, 19

*Harris v. McRae*,
    448 U.S. 297 (1980)..........................................................................................20, 22

*Heckler v. Matthews*,
    465 U.S. 728 (1984)................................................................................................14

*Hobbie v. Unemployment Appeals Comm'n*,
    480 U.S. 136 (1987)................................................................................................18

*Holmes v. General Dynamics Mission Systems, Inc.*,
    835 Fed. App'x 688 (4th Cir. 2020) (per curiam)...................................................5

*Howell v. Father Maloney's Boys' Haven*,
    976 F.3d 750 (6th Cir. 2020) ...........................................................................10, 11

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) ..................................................................................5

*Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*,
    597 F.3d 163 (4th Cir. 2010) ...........................................................................11, 12

*Kennedy v. Bremerton*,
    142 S. Ct. 2407 (2022).........................................................................2, 27, 29, 30

*Langley v. Dolgencorp, LLC*,
    No. 4:11-cv-3324-RBH-TER, 2013 WL 4459844 (D.S.C. Aug. 16, 2013) .............6

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982)..........................................................................................12, 13

*Lee v. Weisman*,
    505 U.S. 577 (1992)................................................................................................29

*Leshko v. Servis*,
    423 F.3d 337 (3d Cir. 2005)....................................................................................10

*Lintz v. Skipski*,
    807 F. Supp. 1299 (W.D. Mich. 1992), *aff'd*, 25 F.3d 304 (6th Cir. 1994)............11

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019)..............................................................................................9

*Maryland Highways Contractors Ass'n v. Maryland,*
    933 F.2d 1246 (4th Cir. 1991) ........................................................................6

*McCleskey v. Kemp,*
    481 U.S. 279 (1987)........................................................................21

*McGowan v. Maryland,*
    366 U.S. 420 (1961)........................................................................17

*Mentavlos v. Anderson,*
    249 F.3d 301 (4th Cir. 2001) ........................................................8, 9, 13

*Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.,*
    871 F.2d 474 (4th Cir. 1989) ........................................................8, 11

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993)........................................................................14

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992)........................................................................17, 19, 20

*Obergefell v. Hodges,*
    576 U.S. 644 (2015)........................................................................22, 23, 25

*Peltier v. Charter Day Sch., Inc.,*
    37 F.4th 104 (4th Cir. 2022) (en banc), pet. for cert. pending, No. 20-1023................9, 13, 14

*Pers. Adm'r v. Feeney,*
    442 U.S. 256 (1979)........................................................................20, 21, 22

*Philips v. Pitt County Mem. Hosp.,*
    572 F.3d 176 (4th Cir. 2009) ........................................................9

*Pullings v. Jackson,*
    No. 2:07-0912-MBS, 2007 WL 1726528 (D.S.C. June 13, 2007) ........................................8

*Rayburn ex rel. Rayburn v. Hogue,*
    241 F.3d 1341 (11th Cir. 2001) ........................................................11

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982)........................................................................9, 13

*Romer v. Evans,*
    517 U.S. 620 (1996)........................................................................25

*Rutan v. Republican Party of Illinois,*
    497 U.S. 62 (1990)........................................................................12

iv

*Shurtleff v. City of Bos.*,
142 S. Ct. 1583 (2022)..................................................................................30

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
212 F.R.D. 489 (D.S.C. 2001) ........................................................................5

*Tann v. Ludwikoski*,
393 F. App'x 51 (4th Cir. 2010) .....................................................................8

*Town of Greece v. Galloway*,
572 U.S. 565 (2014)................................................................................27, 29

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)...................................................................................15

*Trinity Lutheran of Columbia v. Comer*,
137 S. Ct. 2012 (2017)...................................................................................18

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977).......................................................................................21

*Washington v. Davis*,
426 U.S. 229 (1976).......................................................................................20

*Weaver v. Champion Petfoods USA Inc.*,
3 F.4th 927 (7th Cir. 2021) ...........................................................................21

*Weller v. Dept. of Soc. Servs. for City of Baltimore*,
901 F.2d 387 (4th Cir. 1990) ...........................................................................9

*Wickersham v. City of Columbia*,
481 F.3d 591 (8th Cir. 2007) .........................................................................13

*Zorach v. Clauson*,
343 U.S. 306 (1952).................................................................................2, 23

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................5

Fed. R. Civ. P. 37 ...............................................................................................5

Fed. R. Civ. P. 56 .......................................................................................5, 6, 9

**Statutes and Regulations**

28 U.S.C. § 1746 .................................................................................................6

S.C. Code Regs. § 114-4910 ..............................................................................4

S.C. Code Ann. Regs. 114-4980 ................................................................................10

Social Security Act .....................................................................................................14

South Carolina Constitution, and by the South Carolina Religious Freedom Act of
 1999, S.C. Code Ann. §§ 1-32-10 to -60 ...............................................................19

**Other Authorities**

Michael W. McConnell, *Establishment and Disestablishment at the Founding,
 Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105 (2003) ...........................29

## INTRODUCTION

Plaintiffs ask this Court to create new law on state action, adopt a new constitutional tort, and apply a new standard in order to rule for them. Plaintiffs' arguments fail for multiple reasons—and that's before their complete failure to address *Fulton v. Philadelphia*, the controlling case.

Plaintiffs' arguments fail at the first step. South Carolina is not Miracle Hill, and therefore is not responsible for Miracle Hill's actions. That's true for several reasons. First, Miracle Hill is not a state actor—meaning Miracle Hill is not capable of violating anyone's constitutional rights. Second, Miracle Hill is not transformed into a state actor merely because it is licensed by and contracts with SCDSS. Third, even if Miracle Hill were a state actor, the actions that Plaintiffs have challenged here are not attributable to the State Defendants. Without those links in the chain of causation, Plaintiffs' claims fail before the Court even begins to consider Equal Protection or Establishment Clause analysis.

If the Court were to reach the merits, Plaintiffs' Equal Protection claim still fails. Just because South Carolina recognized a religious exemption does not mean that it distinguished based upon a suspect classification—especially since the Executive Order said nothing whatsoever about sexual orientation. Accordingly, the only way Plaintiffs can salvage their Equal Protection claim is with evidence of discriminatory intent. Yet after two years of discovery, they have no such evidence—because there is none. The right answer—the one upheld by decades of law and reflective of this case's facts—is to subject South Carolina's actions only to rational basis review. South Carolina's actions easily pass that bar. And they would even withstand heightened scrutiny, because the State has established its interests in improving options in the child welfare system.

Plaintiffs' Establishment Clause claim fares no better. Plaintiffs claim that South Carolina has imposed a significant burden on third parties. This is the wrong answer and the wrong question.

1

Lifting a religious burden is not an Establishment Clause violation. And in any case, such violations are established based on history and tradition, not nebulous theories of "third party harms." Applying the proper historical standard, South Carolina has not coerced anyone's religious exercise. Rather, it did what ten other States do: "follow[] the best of our traditions" and lift a burden on religious providers of foster and adoption services. *See Zorach v. Clauson*, 343 U.S. 306, 313–14 (1952). Plaintiffs, by contrast, want to render the tradition (and requirement) of religious accommodation constitutionally suspect. And that gets to the fundamental problem here.

At bottom, Plaintiffs' claims seek a sea change in constitutional law. To accept any of their claims, the Court must embrace unprecedented approaches to state action and standing. Accepting Plaintiffs' Equal Protection claim requires creating a *new* form of Equal Protection liability (disparate impact), a *new* suspect class ("sexual orientation," either on its own or as a form of "sex" discrimination), and a *new* standard of review—all triggered simply by accommodating religion. Plaintiffs' theory places the Equal Protection Clause at odds with the Free Exercise Clause. The first casualties of this needless constitutional conflict would be religious foster and adoption providers like Miracle Hill, and by extension, the children and the families that they serve. In the Establishment Clause context, the Supreme Court just rejected the notion that the Establishment Clause is at "warring purposes" with the Free Exercise Clause. *Kennedy v. Bremerton*, 142 S. Ct. 2407, 2426 (2022). For Plaintiffs to succeed on their Establishment Clause claim, the Court must accept and endorse Plaintiffs' unprecedented theories of "third-party harms" and "coercion." These theories are irreconcilable with the history-and-tradition analysis now required by the Establishment Clause.

Governor McMaster and the SCDSS Director followed the best of our traditions by ensuring that religious ministries—and the families that depend on them—are not banished from

public life. Plaintiffs want this Court to hold that tradition unconstitutional. But in fact, the opposite is true: "the Constitution neither permits nor tolerates that kind of discrimination" against religion. *See id.* at 2433. Plaintiffs' Cross-Motion for Summary Judgment should be denied.

## COUNTER STATEMENT OF MATERIAL FACTS

State Defendants provided a thorough statement of undisputed material facts in their Motion for Summary Judgment (ECF No. 242) ["Defs' MSJ"] and will not repeat it here. But some of the factual assertions in Plaintiffs' Cross-Motion demand correction, not the least of which is Plaintiffs' impermissible reliance on the untimely hearsay testimony of a purported fact witness who was never disclosed and whose Declaration does not comply with the requirements of the relevant statute and Rules.

In a number of instances, Plaintiffs' Motion asserts ostensibly "undisputed" facts that are just plain wrong. For example, Plaintiffs erroneously claim that the "vast majority of children placed by DSS in foster families in the Upstate Region are placed with Miracle Hill families." Pls' Mot. For Summ. J. at 1 (ECF No. 243) ["Pls' MSJ"]; *see also id.* at 9, 28. But that's simply not true. Not by a long shot. To the contrary, the undisputed record evidence shows that during the years in question, Miracle Hill's foster families served, on average, only around 9–10% of the children placed in foster homes in the Upstate. *See* Ex. A.[1] In 2018, for example—the year State Defendants took the actions that Plaintiffs challenge in this lawsuit—2,932 unique children were placed in foster homes in the Upstate. *Id*. at 2. Only 261 of them (less than 9%) were placed in foster homes that partner with Miracle Hill. *Id*. at 1. Similarly, in all of the years for which the record contains data, Miracle Hill's families never served more than 10% of the children placed in

---

[1] Citations to "Ex. __" refer to the Exhibits attached to this Brief in Opposition and filed concurrently with it. In contrast, citations to "Dep. of _____," followed by an ECF Docket Number, refer to Exhibits attached to prior filings, which are not duplicated in this Brief's attachments.

the Upstate. *Id*. How Plaintiffs turned that into a "vast majority" is unclear.

In other instances, Plaintiffs offer purportedly "undisputed" facts that rely on cherry picked snippets of testimony that are taken out of context, and which tell less than the full truth. For example, Plaintiffs assert that one witness from SCDSS supposedly testified that she didn't think that Miracle Hill's families would quit serving as foster parents if Miracle Hill were to close its foster care ministry. *See* Pls' MSJ at 13 n.9. But the cited testimony demonstrates this was nothing more than the witness's "hope," which she admitted had "no basis." *See* Ex. B (Barton Tr. 159:10–161:9).[2] In contrast, the witness with actual, personal knowledge of Miracle Hill's foster families testified that 30–50% of them would likely cease fostering if Miracle Hill were shuttered. *See* Lehman Dep., ECF No. 242-6 at 277:10–278:5.

Similarly, Plaintiffs misleadingly state that SCDSS and private CPAs enter into "contracts to recruit and screen prospective foster parents." Pls' MSJ at 1; *see also id*. at 4, 6. But the two pieces of evidence cited by Plaintiffs don't support that assertion—they don't even talk about contracts at all. *See* Pls' MSJ at 4 (citing S.C. Code Regs. § 114-4910(B)–(C); Lowe Dep. Tr. 36:11–37:3). Rather, the record indicates that recruitment of foster families is not required by the contract. *See* Ex. B (Barton Dep. 94:17–21) ("DSS is aware that many of the CPAs do their own recruiting and their own marketing . . . that sit *outside of our contract requirements*") (emphasis added); McDaniel-Oliver Dep., ECF No. 242-3, at 68:24–69:20 (noting "there is no recruitment" requirement in the CPA contract). At most, starting in August 2021, the contract simply instructed CPAs to apprise SCDSS of their recruiting and retention plans. *See* McDaniel-Oliver Dep., ECF No. 243-15, at 63:18–64:6.

---

[2] Plaintiffs cite this deposition excerpt but do not include it in the exhibits to their Motion.

Plaintiffs erroneously assert that foster families partnering with Miracle Hill receive "extra support" or better benefits than the families who partner with other CPAs. *See* Pls' MSJ at 1; *see also id.* at 7, 28. But the evidence—including the evidence cited by Plaintiffs—doesn't bear this out. In fact, Plaintiffs cite evidence that undercuts their assertion by indicating that *other* CPAs (not Miracle Hill) provide their families with house cleaning services. *See id.* at 7. Admittedly, Miracle Hill has more foster care support staff than other CPAs, but Miracle Hill also has more foster families. In fact, the family-to-support-staff ratio at Miracle Hill is *worse* than at some other CPAs.

Most egregiously of all, Plaintiffs seek to pad the record with new "evidence" in the form of a deficient Declaration from a new witness. *See* Pls' MSJ at 18–21, 28, 36. But this Declaration—and the factual assertions and legal arguments supposedly based on it—should be stricken or, at minimum, ignored. *See Holmes v. General Dynamics Mission Systems, Inc.*, 835 Fed. App'x 688 (4th Cir. 2020) (per curiam) (affirming the district court's ruling striking a declaration from an undisclosed witness that the plaintiff had attached to her summary judgment briefing); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329–30 (4th Cir. 2011) (same).

For one, the witness was never disclosed. When a witness is discovered after a party has made its initial (and subsequent) disclosures, including when a witness is discovered after the close of discovery, the party seeking to rely on that testimony must "supplement . . . its disclosure . . . in a timely manner." Fed. R. Civ. P. 26(e)(1). A party's failure to supplement its witness disclosures in a timely manner means that the "the party is not allowed to use that information or witness to supply evidence on a motion.[.]" Fed. R. Civ. P. 37(c)(1); *see also S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 212 F.R.D. 489, 493 (D.S.C. 2001) ("Rule 37(c)(1) was added . . . to create a self-executing sanction for failure to comply with mandatory disclosures."). Plaintiffs never disclosed the declarant, Mr. Wood, as a witness. That failure was neither "substantially

justified" nor "harmless," Fed. R. Civ. P. 37, and it should not be rewarded, *see Holmes*, 835 Fed. App'x at 691; *Hoyle*, 650 F.3d at 330.

In addition, the Declaration should be stricken (or at least ignored) because it is contrary to the requirements of Rule 56, which allows for affidavits or declarations in support of a motion for summary judgment only if the affidavit or declaration is made based on "personal knowledge." Fed. R. Civ. P. 56(c)(3). Here, Mr. Wood's declaration—or at least the point for which it was submitted, namely the contention that the LGBTQ community in the Upstate has access only to ten private CPAs plus SCDSS—is not made on the declarant's personal knowledge. The Declaration pays lip service to the requirement of personal knowledge, *see* Wood Decl. ¶ 1 (ECF No. 243–39), but immediately thereafter concedes that the declarant does not himself know the policies and practices of CPAs in the Upstate and is simply repeating what someone else told him, *see id*. ¶¶ 10, 14. Accordingly, the Declaration both violates Rule 56 and constitutes hearsay for which no exception has been suggested or would apply. *See* Fed. R. Evid. 802, 803; *Maryland Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); *accord Barnes v. Montgomery County*, 798 F.Supp.2d 688, 691 (D. Md. 2011) ( "[H]earsay statements . . . cannot support or defeat a motion for summary judgment."); *Langley v. Dolgencorp, LLC*, No. 4:11-cv-3324-RBH-TER, 2013 WL 4459844, at *4–5 (D.S.C. Aug. 16, 2013) (ruling that hearsay portions of affidavit attached to summary judgment briefing would not be considered by the court).

Further, the Declaration is contrary to the requirements of the controlling statute, which states that an unsworn declaration is permissible only if made under penalty of perjury. *See* 28 U.S.C. § 1746; *see also* Fed. R. Civ. P. 56, advisory committee notes to 2010 amendments ("28

U.S.C. § 1746 allows a written unsworn declaration . . . subscribed in proper form as true under penalty of perjury to substitute for an affidavit."). Mr. Wood's Declaration is not made under penalty of perjury. It may not, therefore, be used to support a motion.

The email chain attached to the Declaration fares no better. Rule 56(c)(1)(A) requires factual assertions in a motion for summary judgment to be supported by "materials in the record." This means that any document attached to a declaration or affidavit must be sworn or certified. *See* Fed. R. Civ. P. 56 advisory committee notes to 2010 amendments (noting that this provision is duplicative of the prior requirement that "a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration"). The document attached to Mr. Wood's Declaration is neither sworn nor certified. Sure, he alleges it is a true and correct copy of the email exchange, *see* Wood Decl. ¶ 15 (ECF No. 243-39), but neither that statement nor *anything* in his Declaration is sworn or made under penalty of perjury.

Mr. Wood's proffered testimony wasn't disclosed; it wasn't given under oath or under penalty of perjury; it hasn't been tested in a deposition; and the allegedly relevant portions consist almost entirely of inadmissible hearsay. Plaintiffs' grasping attempt to manufacture new evidence is impermissible, and the Declaration, its attachment, and the portions of Plaintiffs' Motion that rely on them should be stricken (or, again, at least disregarded).

**ARGUMENT**

## I.    South Carolina is not responsible for the private, unfunded actions of a third party.

Plaintiffs' Motion is premised on two logical leaps. First, it tries to recharacterize Miracle Hill's recruiting and screening practices as government action. Second, it then simply asserts that South Carolina is liable for Miracle Hill's conduct. *E.g.*, Pls' MSJ at 25–27 (Miracle Hill performing "government function"); *id.* at 26 ("[T]he State assumed direct responsibility for

7

[Miracle Hill's] practices"); *id.* at 26, 30–36 (insisting—as if repetition makes it true—that Miracle Hill is exercising a "delegate[d]," "core government function"). Both of those logical leaps are contrary to law.

As to the first, binding precedent confirms that Miracle Hill's recruitment and screening of prospective foster parents is *not* state action, defeating all of Plaintiffs' arguments. Without state action, Miracle Hill's conduct—regardless of how Plaintiffs feel about it—is simply private action. And as to the second, even *assuming* Miracle Hill were engaged in state action, that still doesn't make South Carolina directly liable for Miracle Hill's conduct. Plaintiffs argue that "when the State delegated its obligation to recruit and screen qualified foster families to CPAs, the State assumed direct responsibility for their practices." Pls' MSJ at 26. But Plaintiffs cite no authority for this "transferred liability" argument, which they claim allows them to hold South Carolina liable for the actions of a separate legal entity that the State does not fund and does not direct or control. Plaintiffs point to no comparable examples of a state government being held vicariously liable under the U.S. Constitution for the actions of a third party—even another state actor. Unable to hold South Carolina liable for Miracle Hill's actions, Plaintiffs' motion must be denied.

A.    **Miracle Hill's recruitment and screening of foster parents is not state action.**

Before Plaintiffs can hold South Carolina liable for Miracle Hill's actions, they must first show that Miracle Hill is actually engaged in state action. Otherwise, Miracle Hill's conduct doesn't even *implicate* the Constitution. *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (The Constitution "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (cleaned up)); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ("Our cases try to plot a line between state action subject to Fourteenth

Amendment scrutiny and private conduct (however exceptionable) that is not."); *Tann v. Ludwikoski*, 393 F. App'x 51, 53 (4th Cir. 2010) (same).

The Fourth Circuit and this District have expressly held that a private party's provision of foster care services—even when licensed by and under contract with the State—is not state action that can give rise to a Section 1983 action. *See Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *Pullings v. Jackson*, No. 2:07-0912-MBS, 2007 WL 1726528, at *3 (D.S.C. June 13, 2007); *see also Weller v. Dept. of Soc. Servs. for City of Balt.*, 901 F.2d 387, 392 (4th Cir. 1990). The Fourth Circuit has also expressly held that the State's knowledge of, "acquiescence" to, or even "approval of" the "initiatives of a private party is insufficient" to transform it into state action. *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176 (4th Cir. 2009). That should be the end of the analysis here.

Plaintiffs, however, ignore this clear Fourth Circuit and Supreme Court precedent. Instead, Plaintiffs gesture toward state action, claiming that Miracle Hill's recruitment of and partnership with potential foster parents is an exercise of "governmental power" and a "core government function" delegated to the private agency by the State. Pls' MSJ at 33, 34. But this is a far cry from what the Fourth Circuit and the Supreme Court require. Both consistently hold that a private party is engaged in state action only if the alleged public function "has been traditionally the *exclusive* prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (cleaned up). As the Supreme Court explained, just because "a private entity performs a function which serves the public does not make its acts state action." *Id.* Instead, "the government must have traditionally *and* exclusively performed the function." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022) (en banc), *pet. for cert. pending*, No. 20-1023, (same); *Mentavlos*, 249 F.3d at 317 ("[T]he public function

category is very narrow.") (cleaned up). This analysis is also fact specific, requiring the court to analyze "the specific conduct of which the plaintiff complains." *Mentavlos*, 249 F.3d at 311; *see also Peltier*, 37 F.4th at 119 (rejecting analysis at "high level of generality"). Plaintiffs, however—despite having the burden to show "no genuine dispute as to any material fact," and an "entitle[ment] to judgment as a matter of law"—offer no analysis on this point at all. Fed. R. Civ. P. 56(a).

There's a reason for Plaintiffs' lack of evidence: Miracle Hill does not engage in anything resembling an exclusive government function. Miracle Hill recruits and partners with foster parents; it doesn't license foster families or make final determinations regarding child placement and removal. Defs' MSJ at 3. This has *never* been a function exclusively and traditionally performed by the State. Quite the opposite. Private foster care providers recruited and screened foster parents long before the government became involved in the foster care system. *See id.* at 26–30. Since the mid-1700s, religious organizations have provided homes for children in need across the United States, *id*. at 26, and in the 1800s spearheaded what we today call the foster care system, *id.* at 27. In South Carolina, the story is the same: The government partnered with (and funded) numerous religious organizations to provide care for orphans and those in need. *Id.* at 28–29. In *Fulton v. City of Philadelphia*, the Supreme Court also chronicled the history of foster care in Philadelphia, noting that over a century ago, "[T]he Church established the Catholic Children's Bureau to place children in foster homes." 141 S. Ct. at 1875. Likewise, the Sixth Circuit has observed that historically, care for children in need was "*predominantly* placed … in the hands of church-supported institutions for which standards of care were limited to those self-imposed by patrons and directors." *Howell v. Father Maloney's Boys' Haven,*, 976 F.3d 750, 753 (6th Cir. 2020) (Sutton, J.) (cleaned up). And even today, governments consistently rely on private foster

care providers to recruit and screen prospective foster parents. *Fulton*, 141 S. Ct. at 1928–29 (Gorsuch, J., concurring) ("foster agencies like CSS screen and enroll adults who wish to serve as foster parents"). Indeed, the private agency in *Fulton* went even further, since it was actually permitted to issue licenses to foster parents (*see id.* at 1875), something South Carolina does not permit private agencies to do. *See* S.C. Code Ann. Regs. 114-4980(A)(2)(d) and (A)(3)(b); *see also* Lowe Dep., ECF No. 242-2 at 188:5–19, 190:5–10; Barton Dep., ECF No. 242-1 at 31:9–11, 67:2–5, 70:11–13, 254:20–24.

This conclusion is reinforced by the overwhelming consensus of courts across the country which have held—often in far more entangling circumstances—that foster care is not a traditional nor exclusive government function and, therefore, is not state action. As the Fourth Circuit held, "The care of foster children is not traditionally the exclusive prerogative of the State." *Milburn*, 871 F.2d at 479. Recently, the Sixth Circuit surveyed and summed up the precedent supporting this position: "Across the country, there's near uniformity that foster homes do not count as state actors." *Howell*, 976 F.3d at 753; *see also Leshko v. Servis*, 423 F.3d 337, 343 (3d Cir. 2005) ("No aspect of providing care to foster children . . . has ever been the exclusive province of the government."); *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (agreeing with the district court's finding that foster care is not traditionally an exclusive state prerogative); *Brown v. Hatch*, 984 F. Supp. 2d 700, 708 (E.D. Mich. 2013) ("[D]ay-to-day provision of foster care is not" an "exclusive governmental function[]."""); *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992) ("The care of foster children is not a power which has been exclusively reserved to the state.") , *aff'd*, 25 F.3d 304 (6th Cir. 1994). That conclusion is even stronger when the only function at issue is the recruitment of foster parents by a private CPA, who must still be separately licensed by the State before any child in state custody is placed in their home. Defs'

MSJ at 3. Plaintiffs cite no case for the proposition that a private CPA recruiting and partnering with foster families is a state actor. They want this Court to be the first.

Ignoring this precedent, Plaintiffs purport to satisfy their burden for summary judgment by citing a single case, breezily claiming that "services to children in the government's custody is a core government function." Pls' MSJ at 34 (citing *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163 (4th Cir. 2010)). But the case they cite says no such thing. Plaintiffs attempt to extend *Doe* to cover the whole of the child welfare system. *Doe* stands for the narrow proposition that "a foster child [may] bring a substantive due process claim where state officials have taken the affirmative action of involuntarily removing the child from his home and placing him in a known, dangerous foster care environment." *Doe*, 597 F.3d at 172. As the Fourth Circuit explained, the unique "custodial relationship" created between the State and a child that the State involuntarily removed from her home meant a state employee could be liable for being "deliberately indifferent" to the child's safety. *Id*. at 171–72. *Doe* says nothing about whether recruiting and partnering with foster parents by a third party constitutes state action. In fact, *Doe* undermines claims brought by putative foster parents, because there the Fourth Circuit ruled against foster parents who also sued the state employee, holding they did not enjoy the same substantive due process rights as the child in state custody. *Id.* at 177. Plaintiffs don't even suggest there is any similar special relationship here—nor could they.

Plaintiffs' other cases also prove fruitless. *Rutan* deals only with the *government*'s indirect burden on a constitutional right. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77–78 (1990) (government may not indirectly burden right of free association by conditioning government hiring on membership in a political party). And in both *Kiryas Joel* and *Larkin*, there was no question that the private religious entities were exercising exclusive and traditional government power. In

*Kiryas*, the State of New York delegated to a religious authority the "political power" over public schools "to take such action as opening schools and closing them, hiring teachers, prescribing textbooks, establishing disciplinary rules, and raising property taxes to fund operations." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 693 (1994). And in *Larkin*, the Court recognized that "[t]he zoning function is traditionally a governmental task," and that it was consequently a delegation of "governmental power" to allow churches to have veto power over zoning decisions. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121, 123 (1982). Unlike raising taxes and making zoning determinations, Plaintiffs can't point to a single case holding that recruiting and partnering with foster parents is a traditional and exclusive government function. And unlike the decisions at issue in *Kiryas Joel* and *Larkin*, CPAs in South Carolina don't have the final say in deciding who can and can't be licensed to serve as a foster parent.

Plaintiffs also suggest, without any case authority for support, that South Carolina "authorized" Miracle Hill's actions, and therefore Miracle Hill is somehow engaged in state action. Pls' MSJ at 33. But there is a reason why Plaintiffs fail to show their work: Mere government permission or authorization does not turn private conduct into state action. As the Fourth Circuit and the Supreme Court have both explained, state action based on government influence is limited to circumstances in which "the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Mentavlos*, 249 F.3d at 311; *Peltier*, 37 F.4th at 115 (same); *see also Rendell-Baker*, 457 U.S. at 840. By contrast, mere acquiescence, permission, or even authorization by the government is not enough. *Blum v. Yaretsky*, 457 U.S. 991, 1010 (1982); *Buchanan v. JumpStart S.C.*, No. 1:21-cv-00385-DCN-SVH, 2022 WL 3754732, at *8 (D.S.C. Aug. 30, 2022) ("[T]he state's mere

acquiescence in a private party's actions is not sufficient." (quoting *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007))).

Here, Plaintiffs do not claim that South Carolina directed, coerced, or even encouraged Miracle Hill's actions. They instead argue only that by accommodating Miracle Hill's religious beliefs, "the Governor *authorized* CPAs to exclude families based on religion." Pls' MSJ at 35 (emphasis in original); *id.* ("State Defendants are aware of Miracle Hill's practices."). "Authorizing"—or declining to punish—private conduct comes nowhere close to the high bar Plaintiffs must meet to show that South Carolina's "engagement [in] or encouragement [of Miracle Hill's recruiting and screening policies] is so significant that the choice must in law be deemed to be that of the State." *Peltier,* 37 F.4th at 115 (cleaned up).

Were this Court to adopt Plaintiffs' theory of state action, all kinds of private actors would suddenly be subject to the Constitution's restrictions on the government. If mere authorization of a private party's conduct were sufficient, every business that operates under a license granted to it by the State would be a state actor; every government contractor (authorized by the State to perform various functions) would be a state actor; every non-profit that received a government grant (authorizing the nonprofit to serve those in need) would be a state actor. And the laws of ten States, which explicitly accommodate CPAs, would be put at risk. *See* Defs' MSJ at 30 n.13. Obviously, mere authorization or permission cannot possibly be the dividing line between constitutional liability and private conduct.

### B.    Even if Miracle Hill were a state actor, South Carolina cannot be held liable for its actions.

Plaintiffs skip another step by claiming that South Carolina can be liable for the actions of a third party, Miracle Hill. Plaintiffs never reached out to SCDSS, never applied to SCDSS to become foster parents, and were never turned away by SCDSS. They sue the State not because it

rejected them, but because a third party did. Plaintiffs elide this distinction, citing various cases where the government itself was alleged to have discriminated—not some third party. *See Heckler v. Matthews*, 465 U.S. 728, 730 (1984) (suing HHS secretary alleging "gender-based classification in the spousal-benefit provisions of the Social Security Act"); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993) (challenging city ordinance regulating how city awarded contracts). Even *Peltier* involved a lawsuit against the charter school itself, not the state of North Carolina for authorizing the school. 37 F.4th at 112.

Plaintiffs' claims turn on the notion that, by giving religious CPAs the freedom permitted to them by law, South Carolina became responsible for the actions of those private providers. If this were true, then every time a government lifted a burden on religious exercise under RFRA, RLUIPA, or the Title VII religious exemption, that state would become responsible for that private religious exercise. State Defendants previously challenged Plaintiffs' standing on this basis, arguing that the actions of a third party were not caused by the State and not redressable by relief against the State. The Court allowed the case to proceed, but the years of discovery since then have confirmed that Plaintiffs' injuries are not traceable to the State and would not be addressed by the relief requested. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"). And Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* Plaintiffs' alleged injuries are not traceable to the State and would not be addressed by the relief requested.

The Fourth Circuit recently clarified the standard for challenging a state order. In *Disability Rights S.C. v. McMaster*, 24 F.4th 893 (4th Cir. 2022), the Fourth Circuit determined plaintiffs lacked standing. There, as here, Plaintiffs "do not even purport to allege that McMaster . . . has

attempted to enforce [the Executive Order] in a manner that directly affects them." *Id.* at 902. Plaintiffs have not shown a sufficient nexus between Governor McMaster's Executive Order, his waiver request letter, SCDSS's licensure of Miracle Hill, and their claimed injuries. Governor McMaster's Executive Order did not direct Miracle Hill to do anything; it merely allowed Miracle Hill to operate as it was permitted to do under state law. As the Fourth Circuit has said, "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Id.* at 901. Governor McMaster issued an Executive Order directing state agencies to follow their responsibilities under the law. Miracle Hill's choice is its own, not attributable to the Governor. The same is true for SCDSS: merely following its general duty to enforce the law does not make it culpable for Miracle Hill's actions.

Nor are the injuries redressable by relief against either Governor McMaster or SCDSS. The Fourth Circuit has held that "redressability is 'problematic when third persons not party to the litigation must act in order for an injury to arise or be cured.'" *McMaster*, 24 F.4th at 903. Discovery has shown that a removal of government funding will not end Miracle Hill's policies— indeed, Miracle Hill has voluntarily given up government funding during the pendency of this case. Nor will Plaintiffs' desired relief redress their injuries. If South Carolina ceases to fund Miracle Hill, that will make no difference to Plaintiffs. If South Carolina ceases to contract with or license Miracle Hill, that will not guarantee Plaintiffs the opportunity to work with Miracle Hill. Instead, Miracle Hill may well stop providing foster care altogether, or focus on some other ministry area, rather than change its policies. *See* Ex. C (Lehman Dep. Tr. 263:10–17). Therefore Plaintiffs "have not established that an order enjoining [Defendants'] enforcement of the [Executive Order] would redress their claimed injuries." *McMaster*, 24 F.4th at 904.

16

## II.     Plaintiffs' Equal Protection Clause claim is meritless, unprecedented, and creates a needless conflict with the Free Exercise Clause.

Even if all these hurdles could be overcome, Plaintiffs' arguments would still fail. Plaintiffs' Equal Protection claim rests on an understanding of Equal Protection doctrine that is not only unprecedented—it is contrary to decades of Equal Protection Clause precedent.

### A.     Plaintiffs cannot identify a suspect classification needed to trigger the Equal Protection Clause.

In their zeal to expand Equal Protection law to a new understanding of "sex" discrimination, Pls' MSJ at 22–23—or alternatively, to a new class and level of scrutiny that "[n]o controlling circuit law addresses," *id.* at 24 n.17—Plaintiffs skipped the first step of the Equal Protection analysis. Equal Protection claims don't begin, as Plaintiffs here do, *id.* at 22–25, with a plaintiff claiming he is part of a suspect *class*. Rather, Equal Protection claims "must begin with *the statutory classification itself*." *Califano v. Boles*, 443 U.S. 282, 294–95 (1979) (emphasis added). A "classification" triggers a "level of scrutiny" that is determined by "the basis of the distinction between the classes of persons." *Grimm v. Glouester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert denied*, 141 S. Ct. 2878 (2021). It isn't enough to claim that classifications, "in practice, [] result in some inequality.'" *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961)); *see also id.* ("The Equal Protection Clause does not forbid classifications," as "most laws differentiate in some fashion between classes of persons."). Rather, the Supreme "Court's cases are clear that, unless a classification . . . jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.*

Here, Plaintiffs don't—and can't—identify any government classification on the basis of sex, which would be necessary to trigger heightened review. While they quickly claim that "treat[ing] same-sex and different-sex couples disparately facially classif[ies] on the basis of sex", Pls' MSJ at 23, there's nothing like that here. Rather, the face of Governor McMaster's actions draw no distinction that either "jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic." *Nordlinger*, 505 U.S. at 10. He instead lifted a burden on religious liberty. A religious accommodation alone does not trigger the Equal Protection Clause by creating a sex-based classification. Indeed, concluding otherwise runs headlong into the Free Exercise Clause. *See Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144–45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices . . . .").

Here, Plaintiffs' Equal Protection claim rests on two government actions, and neither one contains a "classification." *See* Pls' MSJ at 25 (identifying actions). The government actions Plaintiffs identify are Governor McMaster's "HHS waiver" request (ECF No. 173-1) and his "Executive Order" (ECF No. 173-2).[3]

The waiver letter contains no classification on its face. Rather, the letter explained that the new HHS regulations "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," which violates the CPAs' constitutional and statutory

---

[3] Plaintiffs also claim that Governor McMaster "direct[ed] DSS to discontinue enforcement of state nondiscrimination regulations and policies and instead issue[] a new permanent license to Miracle Hill." Pls' MSJ at 25. But the claimed "intervention" is nothing more than Governor McMaster's Executive Order and his letter requesting a waiver from HHS, as is confirmed by the deposition testimony that Plaintiffs cite. *See* Ex. B (Barton Dep. Tr. 219:9–21) (contrasting DSS's approach "[b]efore the [HHS] waiver went into effect" and afterward); *see also* Ex. D (Lowe Dep. Tr. 149:23–25) ("[N]ot sure whether or not there were conversations" between DSS and Governor McMaster's office regarding Miracle Hill issues). There is no evidence of any other supposed "intervention."

religious liberty rights. *See* ECF No. 173-1 at 3. In making that point, Governor McMaster relied on the Supreme Court's decision in *Trinity Lutheran*—issued after HHS amended its regulation— "which made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious beliefs." *Id.* (citing *Trinity Lutheran of Columbia v. Comer*, 137 S. Ct. 2012 (2017)).

Not a single sentence in the Governor's waiver request drew a "distinction between [] classes of persons." *Grimm*, 972 F.3d at 607. To the contrary, Governor McMaster's requested waiver sought to uphold "the constitutional rights of faith-based organizations." ECF No. 173-1 at 3. To the extent this distinguishes among persons at all, it is only to recognize the "crucial role" "of South Carolina's faith-based organizations." *Id.* at 2. There can be no Equal Protection liability for lifting a burden on religious exercise—especially when, as here, it is required by federal statute or the Free Exercise Clause—because that alone does not "jeopardize[] [the] exercise of a fundamental right or categorize[] on the basis of an inherently suspect characteristic." *Nordlinger*, 505 U.S. at 10. To the contrary, by holding that "mere repeal of [religion]-related legislation" constitutes a suspect classification, the judiciary "would seriously limit the authority of States to deal with the problems of our heterogenous population." *Crawford v. Bd. of Educ.*, 458 U.S. 527, 539 (1982) (rejecting a claim that lifting a prior burden on race creates a classification that triggers the Equal Protection Clause).

The same is true of Plaintiffs' second claimed government action: Governor McMaster's Executive Order. *See* ECF No. 173-2. This Order acknowledged the "long-standing constitutionally permissible practice" of, and the "crucial need" for, faith-based CPAs' participation in the foster care system. *Id.* at 1. The Executive Order also affirmed the well-founded principle that "faith-based organizations may retain their religious character and participate in

government programs," a right protected by the First Amendment to the U.S. Constitution, by the analogous provision of the South Carolina Constitution, and by the South Carolina Religious Freedom Act of 1999, S.C. Code Ann. §§ 1-32-10 to -60. *See id.* at 1–2. Further, the Order directed DSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "ensure that SCDSS does not directly or indirectly penalize religious identity or activity." *Id.* at 3. As with the waiver request letter, the only government action in Governor McMaster's Order was to lift a burden on religious exercise. That exercise was carried out by private actors, not by the State Defendants. As explained above, an order merely lifting a burden on religious exercise is not a "classification" for Equal Protection purposes.

*    *    *

Plaintiffs repeatedly claim that Governor McMaster's waiver letter and Executive Order "authorized and enabled discrimination by Miracle Hill and other CPAs." Pls' MSJ at 25, 21, & 29. Maximizing the number and diversity of CPAs is not "discrimination," and name-calling doesn't change the lawful actions into unlawful ones. At bottom, Plaintiffs are claiming that the Governor's actions, "in practice, [] result in some inequality." *Nordlinger*, 505 U.S. at 10. That argument does not support Plaintiffs' claim that any action here "facially classif[ies] on the basis of sex," or sexual orientation. Pls' MSJ at 23. Rather, the Supreme "Court's cases are clear that," *Nordlinger*, 505 U.S. at 10, absent a "*statutory classification itself*," there is no facial Equal Protection claim, *Califano*, 443 U.S. at 294–95 (emphasis added). Plaintiffs offer no reason to bypass this well-established principle.

### B.    Plaintiffs have no evidence of a discriminatory purpose.

Without a classification on the face of either Governor McMaster's waiver letter or Executive Order, Plaintiffs can salvage their Equal Protection claim "only . . . if a discriminatory

purpose can be shown." *Crawford*, 458 U.S. at 537–38; *see also Harris v. McRae,* 448 U.S. 297, 323 n.26 (1980); *Pers. Adm'r v. Feeney*, 442 U.S. 256 (1979); *Washington v. Davis*, 426 U.S. 229 (1976). This requires "more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. Rather, Plaintiffs must point to evidence showing that Governor McMaster "selected or reaffirmed [this] course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (cleaned up) That's especially true when, as here, the "policy" at issue is lifting a religious burden—one "that has in itself always been deemed to be legitimate," *see id.* at 279 n.25—and considering "all of the available evidence" does not lead to or support any adverse inference, *id.*

Here, all Plaintiffs can say is that "Governor McMaster ultimately directed DSS to renew Miracle Hill's standard license despite its failure to comply with DSS's nondiscrimination requirements." Pls' MSJ at 2; *see also, e.g.*, *id.* at 25 ("DSS did so *knowing* that Miracle Hill discriminated against prospective foster parents who are same-sex couples." (emphasis in original)). But that's self-serving speculation. It's not the "because of" showing that's required— at best it's the "in spite of" showing, the showing of "intent as awareness of consequences," and that's not enough. *Feeney*, 442 U.S. at 279. Rather, evidence of "invidious purposes"—not legitimate purposes like accommodating religious exercise—would need to be proven from "[t]he historical background of the decision;" "[t]he specific sequence of events leading up to the challenged decision'" "[d]epatures" from either "normal procedural" or substantive factors; and "legislative or administrative history." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977). But Plaintiffs have none of this. Instead, they want this Court to "infer a discriminatory purpose on the part of the State of [South Carolina]" despite "legitimate reasons for [Governor McMaster] to adopt and maintain" a religious accommodation policy.

*McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987) (declining to do so regarding why "the Georgia Legislature [ ] adopt[ed] and maintain[ed] capital punishment"). This "will not" do. *Id.*

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotation marks and citation omitted). Yet after over two years of discovery, Plaintiffs have no evidence regarding Governor McMaster's discriminatory intent. They therefore have no basis to claim an equal protection violation in the absence of a facial classification.

**C.    Plaintiffs' theory of Equal Protection liability conflicts with the Free Exercise Clause and decades of precedent.**

To succeed, Plaintiffs' Equal Protection claim requires this Court to initiate a sea change in the law. For one, as Plaintiffs concede, they want to import *Bostock*'s reinterpretation of "sex" discrimination from Title VII to the Equal Protection Clause—although they don't cite a court that has done so. Pls' MSJ at 22 n.16 ("In any event, Plaintiffs preserve this argument for appeal."). Plaintiffs' arguments would "exert a gravitational pull" from Title VII liability into the Fourteenth Amendment, "despite the important differences" between them. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1783 (2020) (Alito, J., dissenting). For another, Plaintiffs want this Court to invent a new suspect classification—sexual orientation—without any record evidence on the elements, and with no circuit or Supreme Court precedent on the corresponding standard of review. *See* Pls' MSJ at 24–25. These changes alone would be an innovation. But Plaintiffs still want more.

As explained above, Plaintiffs want the Court to take this step by prohibiting the religious accommodation of CPAs who "deem same-sex marriage to be wrong . . . based on decent and honorable religious or philosophical premises." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). And they want to turn religious accommodation into a trigger for Equal Protection liability based

on what the supposed *effects* of that accommodation would be—despite decades of Equal Protection precedent requiring a specific discriminatory *intent*. *Supra* at 20 (citing *Crawford*, *Feeney*, *Davis*, *Harris*). If State Defendants' actions—lifting a burden on the free exercise of a longstanding religious CPA in the State—alone trigger the Equal Protection Clause, that imposition of liability would *itself* violate what "[t]he First Amendment ensures," namely "that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered." *Obergefell*, 576 U.S. at 679–80. Indeed, if Plaintiffs were right, then the U.S. Supreme Court was wrong to hold—unanimously—that "[t]he refusal of Philadelphia to contract with [Catholic Social Services] for the provision of foster care services unless it agrees to certify same-sex couples as foster parents . . . violates the First Amendment." *Fulton*, 141 S. Ct. at 1882. Plaintiffs have literally no response. Tellingly, *Fulton* appears nowhere in their summary judgment brief.

As the Supreme Court held when expanding Title VII liability to sexual orientation and gender identity discrimination claims, "the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock*, 140 S. Ct. at 1754. That guarantee can accordingly "supersede" antidiscrimination claims. *Id.* But here, Plaintiffs want a *new* suspect class, a *new* standard of review, and a *new* form of Equal Protection liability (disparate impact), all enacted with a *new* trigger: a State that "follows the best of our traditions" and lifts a religious burden. *Zorach*, 343 U.S. at 313–14; *see also Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019) ("The Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously."). There is no reason to embrace or endorse Plaintiffs' purported constitutional conflict. Instead, the Court should apply basic Equal Protection

principles. And because Plaintiffs' Equal Protection claim fails those principles, Plaintiffs' request for summary judgment should be denied.

### D.    Under any level of scrutiny, Plaintiffs' Equal Protection claim fails.

Since Plaintiffs have failed to articulate a suspect classification, South Carolina's actions are constitutional so long as they have a rational basis. "Under this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Plaintiffs have failed to do so. South Carolina has multiple reasons for its actions: complying with state and federal laws guaranteeing religious freedom, avoiding liability from litigation by foster care providers under those laws, maximizing the opportunities available for foster children, and encouraging more private parties to participate in the child welfare system to create more opportunities for foster parents. Plaintiffs bear the burden to negate each of these bases, and they have failed.

These justifications would also pass heightened scrutiny.[4] Accommodation of religious exercise is a significant—indeed, compelling—government interest. Even if the Plaintiffs succeed in establishing that the accommodation was not compelled, it would still be within South Carolina's interest to consider constitutional concerns and federal and state RFRAs when making executive decisions and administrative determinations. The Supreme Court upheld similar reasoning in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, where the Court held that "respondents' argument that the Departments erred by looking to RFRA as a guide when framing the religious exemption is without merit." 140 S. Ct. 2367, 2384 (2020). There, the Court did not decide whether RFRA compelled an exemption, but still upheld the exemption as a proper

---

[4]    Plaintiffs do not argue for strict scrutiny, nor could they since even sex-based classifications receive only intermediate scrutiny. *See* Pls' MSJ at 22.

exercise of regulatory authority. So too, here, South Carolina was correct to consider RFRA and potential liability under federal and state laws—if it "did not look to RFRA's requirements or discuss RFRA at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem." *Id*.

Plaintiffs' argument to the contrary—that if one person is allegedly denied equal protection as a result of a government action, then the government action cannot be justified by the fact that it accommodated someone else's rights—is circular. Pls' MSJ at 30–31. The government could never accommodate one group of people since doing so would, by definition, mean they were treated differently than some other group or person. This would transform intermediate scrutiny to strict liability—any time a classification is found, the government necessarily loses, since it cannot claim the classification was necessary to serve other citizens. Nor can this argument be squared with *Fulton*, which required that Philadelphia allow a religious foster agency to follow its religious beliefs regarding marriage. Under the theory Plaintiffs assert, *Fulton* imposes a burden on their own Equal Protection rights. The same would be true for *Amos*, which permitted religious organizations to fire employees based on religion.

Plaintiffs cite *Obergefell* and *Romer v. Evans*, but both cases involved laws acting directly on the plaintiffs, not the actions of private parties. In *Romer*, the legal classification at issue "disqualifi[ed] [] a class of persons from the right to seek protection from the law," something "unprecedented in our jurisprudence." 517 U.S. 620, 633 (1996). Here, by contrast, South Carolina itself licenses and recruits same-sex couples to becomes foster parents. And Governor McMaster followed a long, venerable tradition of lifting a burden on religious exercise.

25

Nor are *Palmore* and *Shelley* comparable. In *Obergefell*, the Supreme Court acknowledged that "the First Amendment ensures that religious organizations and persons are given proper protection." *Obergefell*, 576 U.S. at 679. Accordingly, there is no reason to credit Plaintiffs' attempt to "disparage[]" "decent and honorable religious or philosophical premises" about marriage by equating them with invidious racial discrimination. *Id.* at 672; *see* Pls' MSJ at 31 (citing *Palmore* and *Shelley*). The Supreme Court has repeatedly rejected such conflations. *See Fulton*, 141 S. Ct. at 1882 ("[T]his interest cannot justify denying CSS an exception for its religious exercise."); *Bostock*, 140 S. Ct. at 1754 (identifying how some "doctrines protecting religious liberty" "might supersede" sexual orientation and gender identity claims). So should this Court.

Plaintiffs also argue that South Carolina can have no interest in increasing the number of foster families, relying on deposition statements from a SCDSS official who spoke about practices generally, not the specific consequences in South Carolina. *See* Ex. B (Barton Dep. Tr. 116:11) (speaking to "the field of child welfare" generally); *id.* (Barton Dep. Tr. 221:9–15) (testifying as to her personal opinion, not as a 30(b)(6) response for the state). But evidence shows that the number of foster parents in South Carolina increased after the State accommodated Miracle Hill. *See* SCDSS Key Program Data, ECF No. 242-26 at 2. Plaintiffs also ignore contrary evidence that Miracle Hill increased the number of families willing to foster and that some families would cease to foster if they could no longer partner with an agency that shared their faith commitments. *See* Ex. E (Betts Dep. Tr. 253:14–255:8, 262:11–263:16); *see also* Lehman Dep., ECF No. 242-6 at 277:10–278:5. They also ignore testimony that it would be disruptive to relationships between case workers and children in foster care if their CPA were to close. Ex. B (Barton Dep. Tr. 256:18–257:2). Defendants have provided more than enough evidence to show that they were furthering significant state interests by accommodating religious agencies.

### III. South Carolina's accommodation of Miracle Hill does not violate the Establishment Clause.

Plaintiffs lead off their Establishment Clause arguments by again claiming that the State Defendants have "delegated a government function—recruiting and screening foster parents" to "religiously affiliated organizations." Pls' MSJ at 32–35. That argument fails for all the same reasons explained above. *Supra* Part I. Even assuming this Court reaches the merits, Plaintiffs' cursory arguments regarding third-party harms and coerced religious beliefs are easily dismissed. *See* Pls' MSJ at 36–38.

### A. Accommodating Miracle Hill does not impose "significant burdens" on third parties.

Plaintiffs argue that accommodating Miracle Hill causes South Carolina to violate the Establishment Clause because it imposes "significant burdens" on third parties. Pls' MSJ at 36. For support, Plaintiffs cite a single out-of-circuit district court decision which was reversed on appeal. *See id*. That decision is not precedential, and not even persuasive. In *Barber*, the court was concerned that Mississippi's law would "result in LGBT citizens" being "immediately confronted with a denial of service" across the entire economy. *Barber v. Bryant*, 193 F. Supp. 3d 677, 694, 722 (S.D. Miss. 2016), *rev'd*, 860 F.3d 345 (5th Cir. 2017). *Barber* turned on evidence showing that same-sex couples might lose access to whole swaths of the state economy because the law allowed virtually *anyone* to deny LGBTQ individuals *any* service. *Id*. at 721. Here, all foster parents are licensed by SCDSS itself, which not only licenses but actively recruits same-sex couples, so there is no risk that Plaintiffs or others will be excluded.

Meanwhile, the controlling authorities—from the Supreme Court and the Fourth Circuit—have rejected Establishment Clause claims like Plaintiffs' for 30 years. *See* Defs' MSJ at 30–34

(compiling and explaining those cases). Moreover (and once again), Plaintiffs ignore *Fulton*—the case most analogous to this one—in which the Supreme Court rejected Philadelphia's third-party harms argument and the ACLU abandoned as meritless the same Establishment Clause argument it peddles here. *Fulton*, 141 S. Ct. 1868 (upholding accommodation for religious foster care agency that declined to license same-sex couples); Defs' MSJ at 21 (describing the ACLU's abandoned Establishment argument in *Fulton*); *see also Buck v. Gordon,* No. 19-286 (W.D. Mich. Jan. 26, 2022), Stipulated Order, ECF No. 113 (consent judgment confirming that Michigan's refusal to accommodate a religious foster care agency violated the First Amendment). Accommodating Miracle Hill's religious beliefs falls squarely within these precedents and accords with the "historical practices and understandings" of government partnership with religious foster care agencies throughout South Carolina and the Nation. *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).

Here, Plaintiffs point to no evidence that accommodating Miracle Hill has imposed a significant burden on third parties. Plaintiffs' Complaint alleged that "there are no other agencies in the same area that provide comparable services and support," Compl. ¶ 89, but after over two years of discovery, this claim has been thoroughly debunked. Multiple foster care agencies— serving the same geographic regions as Miracle Hill and providing comparable services—will gladly partner with same-sex couples. *See* Defs' MSJ at 32–33. SCDSS also engages in direct outreach to and recruitment of LGBTQ couples, encouraging them to become foster parents and to contact the State for licensure. *Id*. And—even if the inability to work with Miracle Hill caused a cognizable injury to Plaintiffs—South Carolina is not able to alleviate it. Were South Carolina to require all foster care agencies to work with same-sex couples, Miracle Hill would close its

doors or shift its ministry to provide other services, putting an even greater strain on South Carolina's foster care system.

Plaintiffs fail to show that accommodating Miracle Hill has prevented a single foster family from being able to serve children in need. This is no surprise. There are numerous private foster agencies that gladly serve LGBTQ families, and SCDSS itself actively recruits LGBTQ couples too. Accommodating Miracle Hill increases, rather than decreases, the number of foster homes for children in need. Closing a successful private foster agency will not make it any easier for LGBTQ couples to foster.

**B.     Plaintiffs cannot show that South Carolina has coerced religious beliefs.**

Plaintiffs' final argument also fails. Plaintiffs claim that accommodating a religious foster agency somehow coerces private individuals to "adhere to its faith-based doctrines" Pls' MSJ at 37–38. After over two years of discovery, Plaintiffs cannot point to a shred of evidence showing that South Carolina's mere accommodation of Miracle Hill's ministry has coerced *anyone* to believe *anything* to become a foster parent. That alone should be sufficient to reject this outlandish claim. Facts aside, Plaintiffs also butcher the law. As the Supreme Court recently reemphasized, "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2411 (quoting *Town of Greece*, 572 U.S. at 576). Coercion, therefore, must be understood by looking to the "hallmarks of religious establishments." *Id.* at 2429 (quoting *Lee v. Weisman*, 505 U.S. 577, 589 (1992)); *see also* Michael W. McConnell, *Establishment & Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131–80 (2003) (describing hallmarks). For example, historic coercion included governments "forc[ing] citizens to engage in 'a formal religious exercise.'" *Kennedy*, 142 S. Ct. at 2429.

None of the three "hallmarks" of religious coercion identified in *Kennedy* is present here. Plaintiffs spend a mere two paragraphs outlining vague theories of government coercion, but none of them find support in the record. Pls' MSJ at 37–38. First, contrary to Plaintiffs' assertion, accommodating a religious entity has never been deemed a "punishment for failure to participate in a particular religion." Pls' MSJ at 37. Among other things, there is no government-imposed punishment. Second, there is no established denomination to prefer, nor do religious foster agencies receive funds that secular agencies do not. *Cf. Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., concurring) (contrasting funding "for the established church" to "other churches"). Miracle Hill has never received government funding for its allegedly coercive conduct—namely, its foster care recruitment and screening—and, more generally, SCDSS offers the same financial support to secular and religious CPAs alike. Defs' MSJ at 23–24. Third, Plaintiffs argue that Miracle Hill "carr[ies] out the civil function of recruiting and screening prospective foster parents." Pls' MSJ at 37. But recruiting and partnering with foster families has historically been the prerogative of private actors—not the State. *Supra* at 8–11; Defs' MSJ at 25–29, 38–39.

Plaintiffs' coercion argument was also squarely rejected by *Fulton*. There, the Supreme Court explained that Catholic Social Service's request for an "accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs" does "not . . . impose those beliefs on anyone else," even though that accommodation meant same-sex couples would need to work with one of the other private agencies in the city. *Fulton*, 141 S. Ct. at 1882. As *Fulton* makes clear, an accommodation of religion is a far cry from what courts historically understood to be religious coercion. Plaintiffs point to no facts or law which suggest otherwise. Rather, Plaintiffs' "coercion" theory would "compel the government to purge from the

public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Kennedy*, 142 S. Ct. at 2427 (cleaned up). "The Constitution neither mandates nor tolerates that kind of discrimination." *Id.* at 2433.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ Miles E. Coleman
    Miles E. Coleman
    Federal Bar No. 11594
    E-Mail: miles.coleman@nelsonmullins.com
    2 W. Washington St. / Fourth Floor
    Greenville, SC 29201
    (864) 373-2352

    *Counsel for Governor Henry McMaster and*
    *Director Michael Leach*

OFFICE OF THE GOVERNOR
    Thomas A. Limehouse, Jr.
    Fed. Bar No. 12148
    *Chief Legal Counsel*
    Wm. Grayson Lambert
    Fed. Bar No. 11761
    *Senior Legal Counsel*
    Erica W. Shedd
    Fed. Bar No. 13206
    *Deputy Legal Counsel*
    E-Mail: tlimehouse@governor.sc.gov
    E-Mail: glambert@governor.sc.gov
    E-Mail: eshedd@governor.sc.gov
    South Carolina State House
    1100 Gervais Street
    Columbia, South Carolina 29201
    (803) 734-2100

    *Counsel for Governor Henry McMaster*

OFFICE OF THE ATTORNEY GENERAL

Robert D. Cook, South Carolina Solicitor General
Federal Bar No. 285
E-Mail: bcook@scag.gov
Post Office Box 11549
Columbia, SC 29211
(803) 734-3970

*Counsel for Governor Henry McMaster*

THE BECKET FUND FOR RELIGIOUS LIBERTY

Daniel H. Blomberg*
E-Mail: dblomberg@becketlaw.org
1124 Park West Blvd.
Suite 204
Mount Pleasant, SC 29466
(202) 349-7222

Lori H. Windham*
William J. Haun*
Nicholas R. Reaves*
E-Mail: lwindham@becketlaw.org
E-Mail: whaun@becketlaw.org
E-Mail: nreaves@becketlaw.org
1919 Pennsylvania Ave. NW
Suite 400
Washington, D.C. 20006
(202) 955-0095

**admitted* pro hac vice

*Counsel for Governor Henry McMaster*

DAVIDSON, WREN & DeMASTERS, P.A.

Kenneth P. Woodington, #4741
William H. Davidson, II #425
1611 Devonshire Drive, 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568
wdavidson@dml-law.com
kwoodington@dml-law.com
(803) 806-8222

*Counsel for Director Michael Leach*

January 17, 2023
Greenville, South Carolina