IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| EDEN ROGERS and BRANDY WELCH, | ) | Case No.: 6:19-cv-01567-JD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | **ORDER AND OPINION** |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| | ) | |
| ALEX AZAR, in his official capacity as | ) | |
| Secretary of the UNITED STATES | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES; | ) | |
| | ) | |
| ADMINISTRATION FOR CHILDREN | ) | |
| AND FAMILIES; | ) | |
| | ) | |
| LYNN JOHNSON, in her official capacity | ) | |
| as Assistant Secretary of the | ) | |
| ADMINISTRATION FOR CHILDREN | ) | |
| AND FAMILIES; | ) | |
| | ) | |
| SCOTT LEKAN, in his official capacity as | ) | |
| Principal Deputy Assistant Secretary of the | ) | |
| ADMINISTRATION FOR CHILDREN | ) | |
| AND FAMILIES; | ) | |
| | ) | |
| HENRY MCMASTER, in his official | ) | |
| capacity as Governor of the STATE OF | ) | |
| SOUTH CAROLINA; and | ) | |
| | ) | |
| MICHAEL LEACH, in his official capacity | ) | |
| as State Director of the SOUTH | ) | |
| CAROLINA DEPARTMENT OF SOCIAL | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

This is a First Amendment Establishment Clause and Fourteenth Amendment Equal

Protection Clause case. Plaintiffs Eden Rogers and Brandy Welch ("Plaintiffs") challenge the

1

constitutionality of the State of South Carolina's accommodation of a third-party foster care child-placing agency's ("CPA") policy of only working with Christian foster parents who can affirm its doctrinal statement of faith. (DE 1.)  The parties have filed cross-motions for summary judgment for the Court's consideration.[1]  Plaintiffs seek summary judgment asserting Defendants Henry McMaster ("Governor McMaster" or "the Governor"), in his official capacity as Governor of the State of South Carolina, and Michael Leach ("Director Leach"), in his official capacity as the Director of the South Carolina Department of Social Services ("SCDSS" or "DSS") (collectively, the "State Defendants") violated Plaintiffs' Equal Protection rights by authorizing and enabling state-contracted CPAs to use religious criteria to exclude same-sex foster couples and asserting that their actions violate the Establishment Clause.  (DE 243.)

On the other hand, the State Defendants seek summary judgment, arguing that the United States Supreme Court decisions in Fulton (applying the Free Exercise Clause) and Kennedy (applying the Establishment Clause) control the outcome.   (DE 242); see Fulton v. City of Philadelphia, 141 S. Ct. 1868 (2021), Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407 (2022). In addition, the State Defendants assert that there is no Equal Protection violation because the action of a private religious agency cannot be attributed to the State, among other reasons.

Plaintiffs and State Defendants have briefed their motions, and the motions are ripe for review and decision.  After reviewing the motions and memoranda submitted, the Court denies

---

[1]      On December 27, 2022, this Court granted Plaintiffs' Motion for Voluntary Dismissal of Claims against Defendants United States Department of Health and Human Services ("HHS"); Xavier Becerra, in his official capacity as Secretary of HHS; Administration for Children and Families ("ACF"); January Contreras, in her official capacity as the Senior Official Performing the Duties of the Assistant Secretary of ACF; and Jeff Hild, in his official capacity as Principal Deputy Assistant Secretary of ACF (together, the "Federal Defendants"), under Rule 41(a)(2), Fed. R. Civ. P.  (DE 254.)  As a result, the Federal Defendants are no longer parties here.

Plaintiffs' motion for summary judgment (DE 243) and grants the State Defendants' motion for summary judgment (DE 242) for the reasons below.

## BACKGROUND

Ms. Rogers and Ms. Welch live in Simpsonville, South Carolina, which is in the Greenville, South Carolina, area ("Upstate"). (DE 243-11, p. 13:17-14:1.) They were married in South Carolina on November 28, 2015. (DE 243-10, p. 8:9-16; DE 243-11, p. 17:15-18.) They have two children, now ages 10 and 13. (DE 243-31.) Ms. Rogers and Ms. Welch have been interested in fostering children since they started living together in 2013. (DE 243-10, p. 13:12–14:13.) The State of South Carolina is tasked with caring for children the State has removed from their families based on concerns for their safety or well-being. See S.C. Code Ann. §§ 63-1-20(D), 63-7-660 (1976). Its foster care system is overseen by SCDSS, which has legal custody of all foster children in South Carolina, licenses all foster families, and oversees the training and supervision of foster homes and residential foster facilities in the State. SCDSS has final authority over and responsibility for all children in foster care in South Carolina. (DE 242-1, p. 6:2-14.) Only SCDSS can place a child with a foster family, and only SCDSS can license a prospective foster family. See S.C. Code Ann. Regs. 114-4980(A)(2)(d), (A)(3)(b); see also (DE 242-2, p. 7:5-19, 9:5-10); (DE 242-1, p. 3:9-11, 6:2-5, 7:11-13, 9:20-24.)

SCDSS licenses and works directly with foster parents and prospective foster parents of any faith (or of no faith) or sexual orientation, including those in same-sex marriages.[2] (DE 242-2, p. 7:5-19; DE 243-10, p. 23:2-25.) SCDSS, likewise, intentionally and affirmatively recruits from a full cross-section of South Carolinians to ensure the foster care system includes an array of

---

[2]     Recently, SCDSS has largely focused on kinship foster care and directs prospective non-kin foster parents to CPAs to assist them with seeking licensure and to provide support once they are licensed. (DE 242-2, p. 7:13–9:10.) Even so, a foster parent or prospective foster parent who cannot or prefers not to work with a CPA may still work directly with SCDSS. (DE 242-1, p. 10:9-15.)

foster placements as diverse as the children it serves.  (DE 242-1, p. 4:18–5:20; DE 242-2, p. 7:5-11.)  Besides working directly with foster families, SCDSS also licenses CPAs to assist foster families and SCDSS, including identifying licensed foster families into which SCDSS can place children, developing and supervising the implementation of case plans for children placed in foster homes, monitoring foster homes, and providing support and encouragement to those foster families.  See S.C. Code Ann. Regs. 114-4910–4980.  State statutes and regulations govern the licensure and requirements for CPAs.  See, e.g., S.C. Code Ann. Regs. 114-4930(E), (F), (G)(1)(b), (d).

In the last few years, SCDSS began contracting with most CPAs in the State.  (DE 242-3, p. 7:13–25.)  The contract governs services the CPA provides to help SCDSS determine which licensed foster families are available and interested when SCDSS has a foster child needing placement.  (DE 242-4.)  CPAs also provide administrative support and services when a foster child is in the home of a family affiliated with that CPA.  (Id.; see also DE 242-2, p. 3:15–5:16.)  For the services they provide under the contract, CPAs are paid an "administrative payment" of $20 to $30 per child per day (depending on the age of the child) while the child is living with a foster family affiliated with that CPA.[3]  (DE 242-4; see also DE 242-8, p. 3:4-11.)  If foster families change CPAs, the administrative fee follows them to their new CPA.  (DE 242-1, p. 11:5-25.)  If a child is moved to a new foster family's home, the administrative fee follows the child. (Id.)  When SCDSS removes a child from a foster home—e.g., to be returned to her family of origin or to be adopted—the administrative fee to the CPA stops.  (DE 242-2, p. 20:6-15.)

---

[3]     In 2019, the administrative rate was $10 per child per day.  (DE 242-8, p. 7:6-9.)  The amounts were adjusted to their present rates in 2021 pursuant to a Change Order.  (Id. at 3:4-11.)  A separate amount, known as a "board payment" or a "maintenance payment" is paid by SCDSS to the foster family itself to help defray costs associated with housing and caring for the child.  (Id. at 4:11–6:13.)  The board payment amount also varies based on the age of the child.  (Id.)

The contract does not require CPAs to recruit prospective foster parents or to help them seek licensure. (DE 242-4; DE 242-3, p. 5:24–6:20.) The contract provides funding that partially reimburses CPAs for providing the administrative services governed by the agreement. (DE 242-4.) The contract does not require, fund, or reimburse CPAs' efforts to recruit, screen, or assist prospective foster parents seeking licensure from SCDSS. (DE 242-2, p. 17:15–19:16; DE 242-5, p. 6:1-18.) The reimbursement provided under the contract does not reimburse the CPAs' contractual administrative services or any extra-contractual efforts that CPAs undertake. (DE 242-6, p. 6:20–8:23.)

For families who choose not to work with SCDSS directly, twenty-seven CPAs partner with foster families across the State. (DE 242-7.) Eighteen CPAs serve the Upstate. (Id.) Most have been licensed for over a decade. (Id.) All eighteen are licensed to help provide "non-therapeutic" foster care (also known as "regular" foster care), and nine are also licensed to help provide therapeutic foster care for children with heightened needs. (Id.) Of the twenty-seven CPAs across the State, DSS knows only one CPA that limits its partnerships based on the prospective family's faith or same-sex marriage.[4] (DE 242-2, p. 28:3-12; DE 242-5, p. 3:7-11, 4:12–5:8.)

Miracle Hill Ministries ("Miracle Hill") is a CPA located in the Upstate. (DE 243-2, p. 101:9-14.) Miracle Hill is a Christian nonprofit organization that serves the homeless, hungry, and

---

[4]    The record contains evidence of potentially three other CPAs that discriminate on the basis of faith or sexual orientation. See DE 243-38 ¶¶ 6-7 ("Connie Maxwell Children's Ministries serves Christian families who want to foster."); DE 243-35, at 2 ("SC Church of God Home for Children serves Christian individuals and families of any denomination who want to foster and meet the basic requirements to do so in addition to signing a statement of faith and morality statement."); DE 243-13, p. 43:2-6 (Miracle Hill testifying about its understanding that Southeastern Children's Home will not accept prospective foster families based on same-sex relationship status.) That said, this evidence does not rebut the testimony of the SCDSS employees responsible for licensing, monitoring, and reviewing CPAs that all CPAs other than Miracle Hill work with prospective foster parents of any faith (or no faith) and sexual orientation. (DE 242-2, p. 28:3-12; DE 242-5, p. 3:7-11, 4:12–5:8.)

needy in upstate South Carolina and has been licensed as a non-therapeutic CPA since 1992.[5]  (DE 242-7.)  Miracle Hill serves any child in need regardless of race, color, national origin, religion, or sexual orientation.  (DE 242-2, p. 2:5-15; DE 242-9, p. 2.)  Miracle Hill also works with volunteers without regard to such factors.  Even so, because Miracle Hill believes its foster care ministry is an exercise of its religious beliefs, it partners only with prospective foster parents who share its religious mission and affirm its Christian doctrinal statement in belief and practice.  (DE 242-6, p. 3:2–4:11; see also DE 242-10.)  Miracle Hill received $3,326,880 in administrative fees from DSS for foster care services provided between July 1, 2016, and June 30, 2021.[6]  (DE 243-14, p. 1; see also DE 243-7, p. 9:20–10:1, 21:21–22:2.)

Like every other State, South Carolina receives foster care reimbursements from HHS as authorized by statute.  That statute prohibits States from using funds in a discriminatory fashion

---

[5]    The record shows that Miracle Hill works with only some of the prospective foster parents and foster child placements handled by SCDSS each year.  In 2019, for example—the year Plaintiffs inquired with Miracle Hill about becoming foster parents—SCDSS licensed 797 new foster parents.  Of that number, only 337 of them (42% of the total) were assisted by a CPA, including 54 (6.7% of the total) who were assisted by Miracle Hill.  (DE 242-11, pp. 1-2.)  Similarly, in 2018—the year the State Defendants took the actions that Plaintiffs challenge in this lawsuit—8,435 unique children were served in foster care, of whom only 2,120 (25% of the total) were placed with help from a CPA, including 261 (3% of the total) who were placed with help from Miracle Hill.  (Id. at 3.)  Thus, more than 93% of newly licensed foster families and 97% of foster children statewide are served by someone other than Miracle Hill, as are more than 90% of foster placements in the Upstate Region.  (Id. at 1-3.)

Still, from 2017 to 2021, Miracle Hill helped more families procure a foster home license than any other nontherapeutic CPA in South Carolina.  During this period, Miracle Hill helped 338 families get licensed—nearly twice as many as the CPA, with the next largest share of nontherapeutic placements (the Bair Foundation with 193).  (DE 243-4, pp. 2-3.)  Between 2017 and 2021, there were 1,278 children placed in nontherapeutic foster care families licensed through Miracle Hill—more than 4 times as many children as the CPA with the next largest share—Epworth Children's Home with 288.  (Id. at 4.)  Most children placed in foster families in the Upstate Region were placed by DSS with Miracle Hill families—almost as many children were placed with Miracle Hill as all the other Upstate nontherapeutic CPAs combined (1,141).  (See id.)

[6]    Miracle Hill received 48% of the $6,905,755 total administrative fees DSS paid to nontherapeutic CPAs from July 1, 2016, to January 31, 2022. (DE 243-14, p. 1.)  Miracle Hill requested to stop receiving these fees starting July 1, 2021 (DE 243-16, p. 2) and has not received them since (DE 243-7, p. 21:21–22:2.)

"on the basis of the race, color, or national origin."  42 U.S.C. § 671(a)(18).  In 2017, HHS amended its regulations to add "religion" and "sexual orientation."  45 C.F.R. § 75.300(c) (2017). This new regulation purported to apply to SCDSS and CPAs as sub-recipients of the funds.  See id. §§ 75.101(b)(1), 1355.30(i).

During the CPA license renewal period in 2018, DSS learned of information indicating that Miracle Hill discriminates against prospective foster parents based on religion.  (DE 243-2, p. 48:6–49:10; DE 243-25, pp. 12-14.)  On January 26, 2018, Jacqueline Lowe, DSS's Licensing Director for Child Placing Agency and Group Home Licensing, sent a letter to Miracle Hill stating that "the Department has received information that Miracle Hill discriminates against potential foster and adoptive parents/families on the basis of the religion of those parents/families." (DE 243-23, p. 2.)  According to DSS, "[u]pon Miracle Hill's application to renew its CPA license for 2018, the Department discovered that Miracle Hill's website refers to its recruitment of specifically Christian foster parents/families and that Miracle Hill's application requests information regarding a foster parent/family's religious beliefs and practice."  (Id.)  DSS also noted that "Miracle Hill's Foster Care Manual also instructs its workers to inquire as to a family's particular religious belief and practice . . . ."  (Id.)

DSS eventually concluded that "Miracle Hill has given the Department reason to believe Miracle Hill intends to refuse to provide its services as a licensed [CPA] to families who are not specifically Christians from a Protestant denomination."  (Id.)  DSS further concluded that "[s]uch discrimination on the basis of religion contravenes" state and federal regulations, including S.C. Code Regs. §§ 114-4980(A)(2)(a) and 114-550, 45 C.F.R. § 75.300(c) and DSS's policy statement § 710.  (Id. at 3.)  In 2018, SCDSS determined it would issue Miracle Hill only a temporary license

renewal in light of Miracle Hill's practice of recruiting and partnering only with foster parents who share its religious beliefs.[7]  (DE 242.)

Afterward, Miracle Hill contacted the Governor's Office about DSS's requirement that it change its policies and practices.  (DE 243-20, p. 13:4-12.)  On February 21, 2018, Governor McMaster sent a letter to Richard Lehman, Miracle Hill's President and CEO, indicating that the Governor's staff had met with representatives from Miracle Hill and was "already working with [HHS] to obtain a waiver of requirements. . . ."  (DE 243-27.)

On February 27, 2018, Governor McMaster sent a letter to then-HHS Administration for Children and Families ("ACF") Principal Deputy Assistant Secretary Steven Wagner requesting a waiver from the nondiscrimination provisions of 45 C.F.R. § 75.300 for "South Carolina and faith-based organizations like Miracle Hill" operating under South Carolina's Title IV-E Foster Care Program.[8]  (DE 243-3.)  His letter contended that the new regulations "effectively require CPAs to abandon their religious beliefs or forgo the available public licensure and funding," which violates the CPAs' constitutional rights, as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4.  (Id. at 2.)  Governor McMaster also directed HHS's attention to Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017), issued after HHS amended its regulations, asserting "[t]he Supreme Court has made clear that faith-based entities may contract with the government without having to abandon their sincere[] religious

---

[7]    On July 26, 2018, DSS issued a second temporary CPA license to Miracle Hill that was valid for six months. (DE 243-26; DE 243-2, p. 59:14-23.)

[8]    The "grants rule" (45 C.F.R. § 75.300(c)), passed in 2016, prohibits foster care agencies from, among other things, discriminating on the basis of sex, religion, or sexual orientation. 81 Fed. Reg. 89393 (Dec. 12, 2016) (HHS Grants Regulation).  In 2019, HHS issued a Notification of Nonenforcement of HHS Grants Regulation ("nonenforcement policy"), which made clear that the 2016 grants rule would not be enforced against HHS grants recipients.  See 84 Fed. Reg. 63809 (Nov. 19, 2019).  On January 12, 2021, HHS promulgated a new rule stripping back certain nondiscrimination provisions in the 2016 grants rule. See 86 Fed. Reg. 2257 (Jan. 12, 2021).

beliefs." (Id.) A waiver, Governor McMaster contended, would protect the rights of faith-based CPAs and, more importantly, maximize the number of available foster homes. (Id.)

Shortly after that, Governor McMaster issued Executive Order No. 2018-12 ("Order"), which directed SCDSS to "not deny licensure to faith-based CPAs solely on account of their religious identity or sincerely held religious beliefs" and to "ensure that SCDSS does not directly or indirectly penalize religious identity or activity." (DE 242-14, p. 3.) In support of this directive, the Order stated, among other things, that "the licensing and participation of faith-based organizations in South Carolina's foster-care system is a long-standing and constitutionally permissible practice." (Id. at 2-3.) The Order further stated "faith-based organizations may retain their religious character and participate in government programs," a right "guaranteed by, *inter alia,* the First Amendment to the United States Constitution[,] article I, section 2 of the South Carolina Constitution," and "by the South Carolina Religious Freedom Act of 1999," codified at S.C. Code Ann. §§ 1-32-10–60. (Id.) On January 26, 2019, DSS issued Miracle Hill a new standard CPA license. (DE 243-2, p. 70:6-11.)

On January 23, 2019, HHS responded to Governor McMaster's request for a waiver. (DE 242-15.) The response noted Governor McMaster's concerns about the decrease in available foster homes that would result if HHS enforced the new regulation against faith-based CPAs and his concerns that enforcement would unlawfully force faith-based CPAs to abandon their religious beliefs or forgo licensure. (Id. at 1-2.) HHS determined that requiring subrecipients who use religious criteria in partnering with prospective foster care parents "to comply with the religious non-discrimination provision of 45 C.F.R. § 75.300(c) would cause a burden to religious beliefs that is unacceptable under RFRA." (Id. at 3.) Accordingly, HHS granted the waiver. (Id. at 4.) SCDSS then issued Miracle Hill a regular annual CPA license.

In April 2019, Ms. Rogers and Ms. Welch called Miracle Hill and left a voicemail indicating their interest in fostering.  (DE 243-32.)  A Miracle Hill representative returned their call and spoke with Ms. Welch.  (Id.)  When Ms. Welch mentioned they were a same-sex couple, the representative said they should fill out the online inquiry form and advised the couple to read Miracle Hill's website.  (Id.)  The representative repeatedly mentioned that Miracle Hill is a Christian ministry that follows Christian values.  (Id.)

Ms. Rogers and Ms. Welch completed and submitted Miracle Hill's online form for prospective foster parents on April 28, 2019.  (DE 243-18.)  In their submission, Ms. Rogers and Ms. Welch stated they are interested in foster parenting because they "would like for more children to know what it feels like to be unconditionally loved and to be part of a loving family[,]" offering to "provide a safe and loving environment."  (Id. at 3.)  Plaintiffs also identified themselves as a same-sex couple and members of the local Unitarian Universalist Church.  (Id.)  On May 1, 2019, Sharon Betts, Foster Care Licensing Supervisor at Miracle Hill, sent an email to Ms. Rogers and Ms. Welch rejecting them as potential foster parents because, as members of the Unitarian Universalist Church, their faith "does not align with traditional Christian doctrine[.]"  (DE 243-11, pp. 29:19-31:11; DE 243-33, p. 4.)  Miracle Hill clarified this rejection by stating that "those who hold positions of spiritual responsibility or influence—including foster parents" are required "to share our Christian mission, motivation, and beliefs."  (Id.)

Plaintiffs filed their Complaint on May 30, 2019, alleging, among other things, that the State Defendants "have violated and continue to violate the Establishment Clause of the First Amendment to the United States Constitution," (DE 1, ¶ 112), and have violated the Equal Protection Clause because "State Defendants' actions subject prospective foster parents, like Eden and Brandy, who are same-sex couples, to different and unfavorable treatment based on sex and

sexual orientation," (DE 1, ¶ 132). Both parties have moved for summary judgment. (DE 242,
DE 243.)

## LEGAL STANDARD

"[A] party seeking summary judgment always bears the initial responsibility of informing
the district court of the basis for its motion, and identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'
which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986). "Under Rule 56(c), summary judgment is proper 'if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law.'" Celotex Corp., 477 U.S. at 322. "A fact is
'material' if proof of its existence or non-existence would affect disposition of the case under
applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a
reasonable jury might return a verdict for the non-movant." Wai Man Tom v. Hosp. Ventures
LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). If the burden of persuasion at trial
would be on the nonmoving party "a summary judgment motion may properly be made in reliance
solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Celotex
Corp., 477 U.S. at 324. "[T]he burden on the moving party may be discharged by 'showing' --
that is, pointing out to the district court -- that there is an absence of evidence to support the
nonmoving party's case." Id. at 325. "If the moving party has not fully discharged this initial
burden of production, its motion for summary judgment must be denied . . . ." Id. at 332 (Brennan,
J., dissenting).

Accordingly, once the movant has made this threshold demonstration, to survive the motion for summary judgment, under Rule 56(e), the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citation omitted). Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is not enough to withstand the summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." Wai Man Tom, 980 F.3d at 1037.

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." Jacobs v. N.C. Admin. Off. of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles A. Wright et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict. Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. See id. at 659-60.

## <u>DISCUSSION</u>

**Equal Protection Claim**

Plaintiffs contend they are entitled to summary judgment on their Equal Protection cause of action because the "State Defendants authorized and enabled state-contracted CPAs to categorically exclude same-sex couples when providing public child welfare services on the State's behalf based on the CPA's religious beliefs." (DE 243, p. 29.) The State Defendants oppose this argument, asserting that Plaintiffs have not identified a government action that they believe violates the Equal Protection Clause, and for that reason (among others), State Defendants believe they are entitled to summary judgment on this claim. (DE 242, p. 46.) The Court agrees with State Defendants. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. In other words, "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

> [T]he action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful. Faithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the *gravamen* of the plaintiff's complaint.

Blum v. Yaretsky, 457 U.S. 991, 1002-03, 102 S. Ct. 2777, 2785 (1982) (emphasis added) (internal quotation marks and citations omitted).

Plaintiffs' Complaint is not premised on South Carolina rejecting their application to be foster parents. Instead, the gravamen of Plaintiffs' claims here hinge on Miracle Hill's May 1, 2019, email to them rejecting them as potential foster parents because, as members of the Unitarian

13

Universalist Church, their faith "does not align with traditional Christian doctrine[.]" (DE 243-11, pp. 29:19–31:11; DE 243-33, p. 4.) Plaintiffs contend that they "were turned away by a state-contracted CPA from pursuing licensure as a foster parent because each is a woman married to another woman[.]" (DE 243, p. 31.) Thus, Plaintiffs contend the Fourteenth Amendment's "state action requirement," see Blum, 457 U.S. at 1002-03, is implicated in two ways. First, Plaintiffs contend that "*Governor McMaster acted to permit* Miracle Hill and other CPAs to discriminate, by seeking the HHS waiver ([DE] 173-1), issuing the Executive Order ([DE] 173-2) and directing DSS to discontinue enforcement of state nondiscrimination regulations and policies and instead issued a new permanent license to Miracle Hill." (DE 243, p. 33 (emphasis added).) Second, Plaintiffs contend "when the State *delegated its obligation* to recruit and screen qualified foster families to CPAs, the State *assumed direct responsibility* for their practices." (Id. at 34.)

Both theories are based on the actions and practices of Miracle Hill and other CPAs. Yet before Plaintiffs can hold State Defendants liable for Miracle Hill's actions, they must first show that Miracle Hill is engaged in state action. Otherwise, Miracle Hill's conduct does not implicate the U.S. Constitution. See Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001) (The Constitution "excludes from its reach merely private conduct, no matter how discriminatory or wrongful."); Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) ("Our cases try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not."). However, a State "will be held responsible for a private actor's decision when the state's engagement or encouragement is so significant that 'the choice must in law be deemed to be that of the State.'" Peltier v. Charter Day Sch., Inc., 37 F.4th 104, 115 (4th Cir. 2022); quoting Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S. Ct.

2764, 73 L. Ed. 2d 418 (1982).  But "a state's exercise of coercive power or compulsion is not a requirement for a finding of state action[.]"  Id.

First, Plaintiffs fail to establish that Governor McMaster's "acts to permit" Miracle Hill and other CPAs' discrimination constituted "engagement or encouragement [] so significant that the choice must in law be deemed to be that of the State." Peltier, 37 F.4th at 115.  Instead, Miracle Hill's actions were that of a private entity serving the public.  Plaintiffs do not claim that South Carolina directed, coerced, or encouraged Miracle Hill's actions. They instead argue only that by accommodating Miracle Hill's religious beliefs, "the Governor authorized CPAs to exclude families based on religion."  (DE 243, p. 43 ("State Defendants are aware of Miracle Hill's practices.").)  Permitting or declining to prevent disparate conduct by Miracle Hill, standing alone, does not satisfy the high bar that Plaintiffs must meet to show that Miracle Hill's conduct is deemed to be that of the State.  See Blum, 457 U.S. at 1010 (emphasis added) ("mere government acquiescence, permission, or *even authorization* is insufficient for state action.); Buchanan v. JumpStart S.C., No. 1:21-cv-00385-DCN-SVH, 2022 WL 3754732, at *8 (D.S.C. Aug. 30, 2022) ("[T]he state's mere acquiescence in a private party's actions is not sufficient." (quoting Wickersham v. City of Columbia, 481 F.3d 591, 597 (8th Cir. 2007))).

Plaintiffs equally fail to establish that the State should be held responsible for Miracle Hill's actions because "the State delegated its obligations to recruit and screen qualified foster families to CPAs." (DE 243, p. 34.)  A State "will be held responsible for a private actor's decision when the state's engagement or encouragement is so significant that 'the choice must in law be deemed to be that of the State.'" Peltier, 37 F.4th at 115 (citation omitted). "Both the Supreme Court and [the Fourth Circuit] have recognized the presence of such engagement or encouragement when a state has outsourced or otherwise delegated certain of its duties to a private entity, thereby

rendering the acts performed under those delegated obligations 'under color of law.'" Id. at 115-16; see also Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1929 n.1 (2019) (emphasis added) ("[A] private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its *constitutional obligations* to [that] private entity."). "When the function at issue has been 'traditionally the exclusive prerogative' of the state, a private entity executing that function has engaged in state action." Peltier, 37 F.4th at 116 (citation omitted).

> The common foundation underlying these various and sometimes overlapping circumstances is that (1) there is no bright-line rule separating state action from private action, and that (2) the inquiry is highly fact-specific in nature. In other words, the state action analysis 'lack[s] rigid simplicity' and, thus, a 'range of circumstances' can support a finding of state action. We therefore consider the totality of the circumstances of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state.

Id. (citations omitted).

To begin with, "[t]he care of foster children is not traditionally the exclusive prerogative of the State." Milburn v. Anne Arundel Cty. Dep't of Soc. Servs., 871 F.2d 474, 479 (4th Cir. 1989). Nor have Plaintiffs met their burden to show how Miracle Hill's recruitment and screening process was a delegation by the State of one of its constitutional obligations. Instead, the record reflects a DSS contract does not require CPAs to recruit prospective foster parents. (DE 242-4; DE 242-3, p. 5:24–6:20.) Nor does the contract require, fund, or reimburse CPAs' efforts to recruit, screen, or assist prospective foster parents seeking licensure from DSS. (DE 242-2, p. 17:15–19:16; DE 242-5, p. 6:1-18.) Finally, only DSS can place a child with a foster family, and only DSS can license a prospective foster family. See S.C. Code Ann. Regs. 114-4980(A)(2)(d), (A)(3)(b); see also (DE 242-2, p. 7:5-19, 9:5-10); (DE 242-1, p. 3:9-11, 6:2-5, 7:11-13, 9:20-24.) Accordingly, because Plaintiffs have identified no action that "may fairly be said to be that of the State," their Equal Protection claim must fail, so it is dismissed. Blum, 457 U.S. at 1002-03.

**Establishment Clause claim**

As to Plaintiffs' First Amendment claim, Plaintiffs contend they are entitled to summary judgment because "State Defendants [have] violated the Establishment Clause by authorizing and enabling state-contracted CPAs to use religious criteria to exclude prospective foster parents" in three ways.  (DE 243, p. 40.)  First, Plaintiffs argue that "State Defendants have delegated a government function—recruiting and screening foster parents to care for children in State custody—to religiously affiliated organizations that exclude prospective foster parents based on religious criteria.  (Id.)  Next, Plaintiffs assert that "while State Defendants argue they are simply accommodating Miracle Hill's religious exercise, they are doing so in a way that imposes significant burdens and harms on third parties—non-Christians and same-sex couples seeking to provide loving homes to children in the care of the State."  (Id.)  Lastly, Plaintiffs argue that "State Defendants' actions coerce prospective foster parents into supporting CPAs' religious beliefs in order to become a foster parent."  (Id.)

But State Defendants believe they are entitled to summary judgment on Plaintiffs' Establishment Clause claim because Plaintiffs' claims are moot or, in the alternative, the State Defendants' accommodation for Miracle Hill does not establish religion.  (DE 242.)  This Court disagrees that Plaintiffs' claims are moot[9] but otherwise agrees that State Defendants are entitled

---

[9]    "Article III limits a federal court's jurisdiction to actual 'cases' and 'controversies,' and the parties' dispute must 'be extant at all stages of review, not merely at the time the complaint is filed.'  Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 160 (2016) (citations omitted).  To account for this requirement, the mootness doctrine recognizes that some "intervening circumstance[s] deprive[] the plaintiff of a personal stake in the outcome of the lawsuit, [such that] the action can no longer proceed."  Id. at 160-61 (citation omitted).  "A case becomes moot, however, only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  Id. at 161 (internal quotations and citation omitted).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  Id. (citation omitted). See also Synopsys, Inc. v. Risk Based Sec., Inc., 70 F.4th 759, 764 (4th Cir. 2023).  Further, "[m]ootness has been described as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 68 n.22 (1997) (internal

to summary judgment.  The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  In Kennedy v. Bremerton Sch. District, 142 S. Ct. 2407 (2022), the Supreme Court has instructed that the Establishment Clause must be interpreted by "reference to historical  practices and understandings." Kennedy, 142 S. Ct. at 2428 ("In place of Lemon and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'").  "[T]he line" that courts and governments "must draw between the permissible and the impermissible" has to "accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers." Id. (citations omitted).  "An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception' within the 'Court's Establishment Clause jurisprudence.'"  Id. (citation omitted).  "From now on, historical practice and understanding 'must' play a central role in teasing out what counts as an establishment of religion."  Firewalker-Fields v. Lee, 58 F.4th 104, 122 (4th Cir. 2023).  As a result,

> in Establishment Clause cases, the *plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion*.  That requires proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice.  This is in contrast to those constitutional provisions where the Supreme Court has directed that historical tradition defines an exception, rather than the rule.  There, the burden falls on the defendant to establish the exception.

Id. at 122 n.7 (emphasis added) (internal quotation marks and citations omitted).  Plaintiffs have not met their burden here because they have not set forth facts about the application or delivery of foster care programs nationally or in South Carolina that would have been historically understood

---

quotation marks and citation omitted).  Plaintiffs challenge the State Defendants' conduct permitting a CPA to discriminate against them.  Therefore, Plaintiffs claims are not moot.

as an establishment of religion.[10]  Summary judgment is, therefore, warranted in favor of the State

Defendants based on the arguments and evidence raised by Plaintiffs here.

### 1. Delegation of government function to religious organizations

Plaintiffs contend that "State Defendants have delegated to CPAs, including religiously

affiliated CPAs, the governmental function of screening prospective foster families, and authorized

the CPAs—including Miracle Hill—to carry out such function [] using religious eligibility criteria

to exclude prospective foster families." (DE 243, p. 41.)  Plaintiffs argue that State Defendants

know that Miracle Hill "performs its foster care services in a manner that is not neutral with respect

to religion . . . ."  (DE 243, p. 43.)  Thus, Plaintiffs believe a state may not delegate government

power to religious organizations absent some assurance that the governmental power "will be

exercised neutrally[.]"  (DE 243, p. 41, quoting Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v.

Grumet, 512 U.S. 687, 696 (1994) (hereinafter Grumet).)  First, Plaintiffs' legal premise is based

on the now abandoned framework of the "Lemon Test"[11] by focusing their argument on the third

---

[10]    Plaintiffs believe the Kennedy historical test does not apply here, and therefore, Kennedy's "reference to historical practices and understandings" is unnecessary.  (DE 256, p. 22.)  Alternatively, Plaintiffs suggest that if Kennedy does apply then they object to the State Defendants' arguments and evidence to support their claim of "'a long tradition of partnership between religious ministries and the government,' such that the continued accommodation of religious ministries does not run afoul of the Establishment Clause[,]" (DE 256, p. 31 (quoting DE 242, p. 35)), on the grounds that it is inadmissible hearsay and because "there is no record evidence of historical practices in this case" (DE 256, p. 30). Plaintiffs also argue that the Government-run foster care, as we know it today, simply did not exist during the time Defendants describe.  (Id. at 31.)

Despite these arguments, Plaintiffs overlook their burden here (not the State Defendants), which is "proving a set of facts that would have historically been understood as an establishment of religion.  That requires proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice."  Firewalker-Fields, 58 F.4th at 122 n.7 (4th Cir. 2023).  Plaintiffs concede "there is no record evidence of historical practices in this case." (DE 256, p. 30.)  Therefore, Plaintiffs cannot survive summary judgment.  See Celotex Corp., 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case.").

[11]    According to the "Lemon Test," "t[]o pass muster under the Establishment Clause, a challenged government action must satisfy each of the Lemon test's three criteria" – "[f]irst, whether there was a secular purpose behind the statute; second, whether the statute's principal or primary effect was one that

factor in <u>Lemon</u> regarding an "excessive government entanglement with religion." <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971).[12]   Instead, based on historical practices and understandings which <u>Kennedy</u> requires, Establishment Clause protections are more likely triggered "when the government use[s] the established church to carry out certain civil functions, often by giving 'the established church *a monopoly* over a specific function.'" <u>Shurtleff</u>, 142 S. Ct. at 1609 (Gorsuch, J., joined by Thomas, J., concurring) (citations omitted).[13]   The record does not reflect Miracle Hill was given the exclusive authority over foster care services for the State or that Miracle Hill had any authority to issue licenses.   Also, Miracle Hill was only one of twenty-six other CPAs in the State, and Plaintiffs were not required to go through a CPA to be a foster parent and could foster directly through the State.   Accordingly,  Maddonna has not shown "a historically disfavored establishmentarian practice" based on a claim that the State Defendants delegated governmental power to a religious entity.  <u>Firewalker-Fields</u>, 58 F.4th at 122 n.7.

### 2.  Significant burdens on third parties

Next, Plaintiffs allege that "State Defendants' actions in this case cause significant burdens on third parties."  (DE 243, p. 44.)  Plaintiffs acknowledge that "the Constitution allows the State

---

neither advanced nor inhibited religion; and third, whether the statute fostered an "excessive government entanglement with religion."  <u>Lambeth v. Bd. Of Commissioners Of Davidson Cnty., NC</u>, 407 F.3d 266, 269 (4th Cir. 2005) (citing <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971)).

[12]      Plaintiffs also cite <u>Larkin v. Grendel's Den, Inc.</u>, 459 U.S. 116, 126 (1982) (relying on <u>Lemon</u> in assessing whether a statute "enmeshes churches in the exercise of substantial governmental powers") and <u>Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet</u>, 512 U.S. 687, 696 (1994) (relying on <u>Lemon</u> and <u>Larkin</u> in assessing whether a statute constituted an "impermissible[] entangling [of] government and religion").

[13]      Although the cases Maddonna cites apply <u>Lemon</u>, they still involve complete delegation of civic function to a religious entity.  <u>See Larkin</u>, 459 U.S. 116, 117 (whether a statute that gave churches a "veto" power over issuing a liquor license to any entity within five hundred feet of their church violated the establishment clause; <u>Grumet</u>, 512 U.S. 687 at (whether creating a separate public school district for a specific religious enclave, thus allocating political power on religious criterion, violates the establishment clause.)

to accommodate religious needs by alleviating special burdens . . . accommodation is not a principle without limits." <u>Grumet</u>, 512 U.S. at 705-06. Even so, Plaintiffs argue that an accommodation must not impose significant burdens on third parties to pass constitutional muster (DE 243, p. 44 (citing <u>Est. of Thornton v. Caldor, Inc.</u>, 472 U.S. 703, 710 (1985); <u>Burwell v. Hobby Lobby</u>, 573 U.S. 682, 739 (2014)).) At the start, these arguments do not satisfy the current Establishment Clause standard.[14] "<u>Kennedy</u> makes clear that, under the Establishment Clause, historical analysis is 'the rule rather than some exception.'" <u>Firewalker-Fields</u>, 58 F.4th at 122 n.7 (quoting <u>Kennedy</u>, 142 S. Ct. at 2428)).

Plaintiffs' argument that "State Defendants' actions violate the Establishment Clause because they impose significant burdens on third parties," naturally invokes the State Defendants' protections under the Free Exercise Clause of the First Amendment. <u>See</u> <u>Fulton v. City of Philadelphia</u>, 141 S. Ct. at 1875 (the Free Exercise Clause is triggered when governments try to sever their partnerships with religious foster agencies because "religious views . . . inform [their] work in this system").

> The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'

<u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 302 (2000) (citation omitted). First, Plaintiffs have failed to establish that State Defendants' actions violate the Establishment Clause on other

---

[14] Plaintiffs' legal premise is again based on the now abandoned framework of the "Lemon Test," namely the second factor regarding "whether the statute's principal or primary effect was one that neither advanced nor inhibited religion." <u>Lemon</u>, 403 U.S. 602, 612-13; <u>see, e.g.</u>, <u>Est. of Thornton v. Caldor, Inc.</u>, 472 U.S. at 710 (applying the "Lemon Test" and found a "statute [had] a primary effect that impermissibly advances a particular religious practice," based in part on the premise that "[t]he First Amendment … gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." (citation omitted)).

grounds.  See discussion supra Section 1, discussion infra Section 3.  Still, Plaintiffs claim that State Defendants' actions led to a reduced set of choices that are unlike Miracle Hill for the 25-30 applicants who failed to meet a CPA's religious test, which imposed a marked burden on the excluded families in violation of the Establishment Clause.  (DE 243, p. 44.)  At any rate, Plaintiffs cite no authority for this proposition.  Instead, Plaintiffs argument is foreclosed by Fulton v. City of Philadelphia, where the Supreme Court mandated a similar religious accommodation for foster care agencies that declined to license same-sex couples in the face of similar concerns. 141 S. Ct. at 1882 (Alito, J., concurring) (As to similar "harms" alleged by State Plaintiffs, "protecting against this form of harm is not an interest that can justify the abridgement of First Amendment rights").   Accordingly, Plaintiffs have not carried their burden.

### 3.  Coercion

Plaintiffs allege that the State Defendants coerce people seeking to be foster parents to engage in and support CPAs' religion by enabling CPAs to condition access to public programs. (DE 243, p. 45.)  Plaintiffs contend coercion is present because "[i]n order to access their services, prospective foster parents must either adhere to its faith-based doctrines or be relegated to a limited pool of CPAs that have fewer resources and less experience."  (Id. at 46.)  A "fundamental limitation imposed by the Establishment Clause, [] guarantees at a minimum that a government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so." Lee v. Weisman, 505 U.S. 577, 587 (1992) (citation omitted). In accordance with Kennedy, coercion as a fundamental limitation of the Establishment Clause must be assessed with "reference to historical practices and understandings." 142 S. Ct. at 2428.   Plaintiffs *identify but misstate* three "hallmarks" of "founding-era religious establishments" that "reflect[] 'forms of coerc[ion]'

regarding 'religion or its exercise.'" <u>Shurtleff v. City of Bos., Massachusetts</u>, 142 S. Ct. 1583, 1609 (2022) (Gorsuch, J., joined by Thomas, J., concurring) (citations omitted). Stated in full, they are: 1) "the government punished dissenting churches and individuals for their religious exercise," 2) "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches," and 3) "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function[.]" <u>Id.</u> (citing Michael W. McConnell, <u>Establishment and Disestablishment at the Founding, Part i: Establishment of Religion</u>, 44 Wm. & Mary L. Rev. 2105 (2003)).

Plaintiffs fail to meet their burden to show that these "hallmarks" exist here. First, the fact Miracle Hill "denied applications from families that do not adhere to their religious beliefs," (DE 243, p. 46) does not amount to "government punishment for religious exercise," considering the record shows Plaintiffs were not denied access to DSS for the same services. Second, the fact that CPAs with religious requirements received administrative fees, (<u>id.</u>), does not constitute preferred financial support over other churches where *all* CPAs received administrative fees on the same schedule. Finally, religious CPAs were not given a monopoly over any civic function, considering Plaintiffs could get the same services at twenty-six other private agencies in the State, including eighteen in the Upstate, or with the State itself (which has the ultimate licensing authority).

Moreover, Plaintiffs' coercion argument does not follow the <u>Fulton</u> Court. <u>See</u> <u>Fulton v. City of Philadelphia</u>, 141 S. Ct. 1868 (2021). There, the Supreme Court explained that Catholic Social Service's request for an "accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs" does "not . . . impose those beliefs on anyone else," even though that accommodation meant same-sex couples would need to work

with one of the other private agencies in the city.  <u>Fulton</u>, 141 S. Ct. at 1882.  Thus, Plaintiffs have

not shown "a historically disfavored establishmentarian practice" based on a claim that the "State

Defendants' actions coerce private citizens into supporting CPAs' religious beliefs."  <u>Firewalker-</u>

<u>Fields</u>, 58 F.4th at 122 n.7; (DE 243, p. 45).

## **<u>CONCLUSION</u>**

Plaintiffs have not shown they are entitled to summary judgment against the State

Defendants.  Accordingly, the Court denies Plaintiffs' motion for summary judgment (DE 243)

and grants the State Defendants' motions for summary judgment (DE 242) for all these reasons.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

September 28, 2023
Florence, South Carolina